UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:  2:16CV14413

```
TAVARES DOCHER, by and through   )
JANICE DOCHER-NEELEY, his mother )
and legal guardian,              )
                                 )
                    Plaintiff,   )
                                 )
vs.                              )
                                 )
CHRISTOPHER NEWMAN,              )
individually, CLAYTON MANGRUM,   )
individually, CALVIN ROBINSON,   )
individually, WADE COURTEMANCHE, )
individually, KEN J. MASCARA, as )
sheriff of St. Lucie County,     )
Florida, JOSE ROSARIO,           )
individually, and the ST. LUCIE  )
COUNTY FIRE DISTRICT, an         )
independent special district,    )
                                 )
                    Defendants.  )
_____  )
```

DEPOSITION OF

TERI STOCKHAM, PH.D.

DATE TAKEN:      September 5, 2017

TIME:            10:06 a.m. - 11:15 a.m.

PLACE:           J & A Reporting
                 2900 N. University Drive
                 Coral Springs, Florida

Examination of the witness before:

Mia Sohn, RPR
Certified Shorthand Reporter
APPEARANCES:

## Page 2

1
2 ON BEHALF OF THE PLAINTIFF:

3    LAW OFFICES OF SEARCY, DENNEY, SCAROLA,
      BARNHART & SHIPLEY, P.A.
     BY:  ADAM S. HECHT, ESQUIRE
4    2139 Palm Beach Lakes Boulevard
     West Palm Beach, Florida  33409
5    (561)686-6300
     ahecht@searcylaw.com
6
7 ON BEHALF OF DEFENDANT MASCARA:
8    LAW OFFICES OF PURDY, JOLLY, GIUFFREDA &
      BARRANCO, P.A.
9    BY:  RICHARD A. GIUFFREDA, ESQUIRE
     Galleria Corporate Centre, Suite 1216
10   2455 East Sunrise Boulevard
     Fort Lauderdale, Florida  33304
11   (954)462-3200
     richard@purdylaw.com
12
13 ON BEHALF OF DEFENDANT PORT ST. LUCIE FIRE RESCUE
     (via telephone):
14
     LAW OFFICES OF WILSON, ELSER, MOSKOWITZ,
15   EDELMAN & DICKER, LLP
     BY:  JULIE TYK, ESQUIRE
16   111 North Orange Avenue, Suite 1200
     Orlando, Florida  32801
17   (407)203-7592
     julie.tyk@wilsonelser.com
18
19
20        - - - - - -
21
22
23
24
25

## Page 3

1
2 I N D E X

3 WITNESS:  TERI STOCKHAM, PH.D.          PAGE

3 Direct Examination by Mr. Hecht          4
4
5
6
7        - - - - - - -
8
9
10        E X H I B I T S
11 FOR PLAINTIFF

12 NO.  DESCRIPTION                    PAGE

13   1  Curriculum vitae, 4 pages          6
14
15   2  Dr. Stockham's fee schedule
        (Not provided to reporter for marking)  18
16   3  CD                               18
17   4  Clinical lab report              34
18
19
20
21
22
23
24
25

## Page 4

1        Thereupon,
2              TERI STOCKHAM, PH.D.,
3 was called as a witness and, after having been
4 first duly sworn, was examined and testified as
5 follows:
6              DIRECT EXAMINATION
7 BY MR. HECHT:
8        Q.   Good morning.  Could you please state
9 your name?
10       A.   Dr. Teri Stockham.
11       Q.   And what is your current employment?
12       A.   I'm a forensic toxicologist consultant.
13       Q.   What is a forensic toxicologist?
14       A.   Forensics combines medical-legal aspects
15 of incidents, and toxicology is the study of toxic
16 effects of drugs and poisons.
17       Q.   So as a forensic toxicologist, you are
18 hired by attorneys to evaluate data and information
19 and then give an opinion as to that data and
20 information; is that correct?
21       A.   Yes.
22       Q.   It looks like according to your C.V. you
23 have two different offices; is that correct?
24       A.   Yes.
25       Q.   You have an office in Parkland, Florida

## Page 5

1 and an office in Manitou Springs, Colorado?
2        A.   Yes.
3        Q.   Why do you have an office in Parkland and
4 in Colorado?
5        A.   They're both home offices.
6        Q.   And what does that mean?
7        A.   I distribute my time between the two
8 locations.  So for local clients in Colorado, I have
9 that address for them.
10       Q.   When you say home offices, is the
11 9218 Meridian Drive West, Parkland, Florida 33076 a
12 home or is it an actual office space?
13       A.   It's a home.
14       Q.   And out of your home, who do you employ
15 out of that Parkland location?
16       A.   No one other than myself.
17       Q.   And in the Colorado location, the
18 36 El Paso Boulevard, Manitou Springs, 80829, is
19 that a residence?
20       A.   Yes, it is.
21       Q.   And do you employ anyone other than
22 yourself at that residence?
23       A.   No.
24       Q.   Currently you are employed as the
25 president of Teri Stockham, Ph.D., Inc., a forensic

Page 6

1  toxicology consulting firm; is that correct?
2      A.  That's correct.
3      Q.  Other than yourself, are there any other
4  employees with that company?
5      A.  No.
6      Q.  In your home offices that you work out
7  of, do you have any sort of machinery or laboratory
8  equipment that you use to evaluate chemicals or
9  substances?
10     A.  No.
11     Q.  Did you bring your C.V. today?
12     A.  I did.
13     Q.  Okay.  If we could go ahead and mark that
14  as Exhibit 1 to the deposition.
15         (The document referred to was
16         subsequently marked Plaintiff's Exhibit
17         No. 1 for identification.)
18         MR. GIUFFREDA:  Is it on the CD?
19         THE WITNESS:  I have my entire case file
20     and everything you asked for in Schedule A that
21     I could provide on a CD presented here today
22     for you.
23  BY MR. HECHT:
24     Q.  All right.  So let me ask you this.
25  Besides what's on the CD -- and I see some documents

Page 7

1  there -- what are those actual physical documents
2  you brought with you?
3      A.  Those I've also scanned into the file and
4  they're on the CD also.
5      Q.  So why don't we do this then.  Tell me
6  everything that is on the CD that you brought with
7  you today.
8      A.  Okay.  I have correspondence.
9         Do you want me to go into detail at this
10  time or --
11     Q.  No.
12     A.  Correspondence, literature, Schedule A.
13  I have the documents that were provided to me which
14  were fire rescue incident report, a copy of my
15  report, a notice of taking of the deposition, second
16  amended complaint, St. Lucie County Medical Center
17  records.  I have my invoices.
18     Q.  And that's everything that's contained on
19  the CD that you brought with you?
20     A.  Correct.
21     Q.  The correspondence is between you and the
22  Purdy, Jolly, Giuffreda & Barranco law firm?
23     A.  It is.
24     Q.  And how many correspondence are there?
25     A.  Two.

Page 8

1      Q.  Can you tell me when it was that you were
2  first retained in this case?
3      A.  I received a letter July 27, 2017.
4      Q.  The literature that you have on that CD,
5  how many articles or literature are there?
6      A.  Two.
7      Q.  And what do those consist of?
8      A.  I want to go back and tell you that I
9  received my retainer on August 6, 2017.  So that's
10  typically when I say I was retained, when I receive
11  that.
12         The correspondence has two articles --
13  I'm sorry.  The literature has two articles,
14  "Adolescent Exposure to Cannabis as a Risk Factor
15  for Psychiatric Disorders" is the title of one, and
16  "Cannabis and Psychosis Neurobiology" is the other.
17     Q.  The documents that you reviewed are all
18  contained on that CD; is that correct?
19     A.  That's correct.
20     Q.  You received the St. Lucie County Fire
21  District run report; is that correct?
22     A.  St. Lucie County Fire District incident
23  report.
24     Q.  It's six pages, correct?
25     A.  Yes.

Page 9

1      Q.  The second amended complaint, correct?
2      A.  Yes.
3      Q.  Did you receive all of the St. Lucie
4  County medical records in this case?
5      A.  No.
6      Q.  Tell me, what specifically did you
7  receive as it relates to the St. Lucie County
8  medical records?
9      A.  I received ten pages of lab reports.
10     Q.  And those ten pages of lab reports are
11  contained on the CD?
12     A.  Yes, they are.
13     Q.  And you have your bills or invoices,
14  correct?
15     A.  Yes, I do.
16     Q.  Was it not necessary for you in this case
17  to review all of the medical records from St. Lucie
18  Hospital?
19     A.  This is all I was provided and asked to
20  look at.
21     Q.  And you have not reviewed any depositions
22  in this case?
23     A.  No.
24     Q.  When you were employed by the office of
25  the medical examiner in both Richmond, New York

Page 10

1  City, and Fort Lauderdale, tell me what it is that
2  you did in those roles.
3      A.  My first position at the Richmond,
4  Virginia medical examiner's office consisted as
5  benchtop toxicologist.  I finished writing my
6  dissertation early prior to my employment in
7  New York City, so I went to the medical examiner's
8  office and asked them if they could use an extra
9  pair of hands and volunteered my time there, and
10  shortly thereafter I was retained as a -- employed
11  as a part-time employee for approximately six months
12  before I moved to New York City.
13      Q.  Tell me what you did during those six
14  months in Richmond.
15      A.  General benchtop analysis, blood alcohol
16  analysis, urine drug screens.
17      Q.  And was that considered working for the
18  government?
19      A.  I don't understand your question.
20      Q.  When you worked at the office of the
21  chief medical examiner in Richmond, was that a
22  government position or was that private practice?
23      A.  It's not private practice.  It was a
24  government agency.
25      Q.  I understand.

Page 11

1      And did you testify on behalf of that
2  government agency while you were employed as a
3  toxicologist in Richmond?
4      A.  No.
5      Q.  You never testified during the one year
6  that you worked at the office of chief medical
7  examiner in Richmond?
8      A.  No.
9      Q.  Okay.  What about when you moved to
10  New York?  I see you worked as a toxicologist at the
11  office of the chief medical examiner.  What did you
12  do there for approximately it looks like five years?
13      A.  That was about three and a half years and
14  it was similar work, benchtop toxicology, so general
15  analysis of specimens to help determine a cause of
16  death for the medical examiner.
17      I also was in charge of method
18  development especially in the HPLC section, and I
19  developed methods for that particular instrument and
20  particular drugs used for analysis on that
21  instrument.  I rotated through all the various
22  sections of analysis.  So general overall toxicology
23  experience.
24      Q.  And did you ever testify at your time as
25  a toxicologist in New York City?

Page 12

1      A.  Yes, I did.
2      Q.  How many times?
3      A.  I'm going to estimate maybe three.  We
4  did not do a blood alcohol analysis program there.
5  That was done by the police, so we just did medical
6  examiner toxicology.
7      Q.  So why is it that you would have gone to
8  court to testify?
9      A.  There were a couple particular DUI cases
10  where they asked us to reanalyze the alcohol and
11  maybe even do a drug test -- I'm not sure -- but
12  they were cases that we were reanalyzing for the
13  police department.
14      Q.  Okay.  And the reason I said that you
15  were employed in New York City as a toxicologist for
16  five years is because on the C.V. that I was
17  provided, it says 1987 to 1991.
18      Do you have a different C.V. that you're
19  looking at, and I'll show you what I have.
20      A.  No.
21      Q.  It says '87 to '91.
22      A.  Right.
23      Q.  But you said it was actually three or
24  three and a half years in New York City.
25      A.  '88, '89, '90, and then half a year.

Page 13

1      Q.  Okay.  I'm not going to quibble, but it
2  says '87 to '91.  That's why I said five years.  I
3  understand.  Okay.
4      Is this your most updated C.V.?
5      A.  Yes.
6      Q.  All right.  And then you left New York
7  City to go to Fort Lauderdale where you became the
8  chief toxicologist, correct?
9      A.  Correct.
10      Q.  And how many years did you work there
11  for?
12      A.  Approximately six and a half, seven.
13      Q.  I agree with you.  According to your
14  C.V., that is correct.  Our math is correct.
15      As the chief toxicologist, what did you
16  do?
17      A.  I was in charge of the entire laboratory
18  operation at the medical examiner's office, so that
19  included doing all autopsy specimen analysis to help
20  determine a cause of death for the medical examiner,
21  and unlike in New York City, in Broward County the
22  medical examiner's office also had the DUI program.
23  So we did all the blood alcohol analysis, all the
24  urine analysis in DUI cases.  So it was my
25  responsibility to oversee -- I probably had five

Page 14

1    toxicologists working underneath me, and to provide
2    the court testimony in particular cases.
3        Q.   During the time that you worked in
4    Fort Lauderdale as the chief toxicologist, would you
5    agree that you testified a lot because you had to go
6    to court and testify in DUI you trials?
7        A.   I had to go and yes, testify about our
8    results in a DUI case for blood alcohol or urine or
9    drug screens.
10       Q.   Was the majority of the testimony that
11   you provided on behalf of the government?
12       A.   Well, I'm in an independent agency.  The
13   medical examiner's office is independent of other
14   agencies such as the Public Defender's Office or the
15   State Attorney's Office.  I would say primarily
16   those cases were -- I was called by the prosecution
17   because we did the analysis.  There were a handful
18   of times that I did testify on behalf of the
19   defense.
20       Q.   Okay.  How many times when you worked in
21   Fort Lauderdale did you go to court and testify?
22       A.   Hundreds and hundreds.
23       Q.   And of those hundreds and hundreds of
24   times, what percentage would you say that you were
25   asked to come to court testifying on behalf of the

Page 15

1    State Attorney's Office?
2        A.   I didn't keep track.  I have no idea.
3        Q.   Was it the majority of the time the State
4    Attorney's Office would ask you to come and testify?
5        A.   I didn't keep track.
6        Q.   So are you telling me that there were
7    times that the Public Defender's Office out of those
8    hundreds and hundreds of times would ask you to come
9    and testify on behalf of someone who was arrested
10   for DUI?
11       A.   Yes.
12       Q.   And you have no information as to how
13   many times that was?
14       A.   I don't keep track.
15       Q.   Okay.  And then you left the Broward
16   County medical examiner's office to become a
17   consultant at PharmChem Laboratories; is that
18   correct?
19       A.   No.  I started my consulting business,
20   Teri Stockham, Ph.D., Incorporated, and underneath
21   that umbrella I did some consulting in addition to
22   my own consulting for PharmChem Laboratories, which
23   was then bought by Kroll Laboratories.  They had the
24   State of Florida contract for violation of probation
25   and parole urine analysis.  So I was consulting with

Page 16

1    them to provide litigation support with their
2    results for Dade, Broward, and West Palm -- and
3    Palm Beach County.
4        Q.   Why is it that you left your job at the
5    Broward County medical examiner's office to start
6    your consulting company?
7        A.   I developed a lung disease from exposure
8    there and I couldn't work in the building
9    environment any longer.  They never corrected the
10   problem.
11       Q.   Have they since corrected that?
12       A.   No --
13       Q.   Okay.
14       A.   -- they haven't.
15       Q.   So you've been working at your consulting
16   firm for 19 years; is that correct?
17       A.   Yes.
18       Q.   How many hours have you put into working
19   on this specific case that we're here to talk about
20   today?
21       A.   Seven.
22       Q.   And your hourly rate is $500 an hour?
23       A.   It is.
24       Q.   So is it correct that you've billed to
25   date $3,500?

Page 17

1        A.   Correct.
2        Q.   And that's what your invoice reflects?
3        A.   Correct.
4        Q.   And in order for the attorneys who
5    represent the sheriff's office to retain you, they
6    first provided you with a $2,500 retainer, correct?
7        A.   Correct.
8        Q.   You worked off that retainer and then
9    apparently you've worked an additional three hours,
10   correct?
11       A.   Correct.
12       Q.   And today for your deposition, my office
13   is paying you $500 an hour for a minimum of two
14   hours, correct?
15       A.   Correct.
16       Q.   And I see on your fee schedule -- which
17   is attached to your C.V., correct?
18            I just don't know if we marked it or not.
19   I don't know if it's on your CD.
20       A.   It wasn't asked for on Schedule A, so
21   it's not here.  If you have a copy of it, then you
22   should put that into --
23            MR. HECHT:  So we'll attach
24   Dr. Stockham's fee schedule as Plaintiff's
25   Exhibit 2, and then we'll attach the CD that

Page 18

1  the doctor brought with her as Plaintiff's
2  Exhibit 3.
3        (The document referred to was to have
4        been marked Plaintiff's Exhibit No. 2 for
5        identification, but was not provided to
6        reporter, and Plaintiff's Exhibit No. 3
7        was marked for identification.)
8  BY MR. HECHT:
9     Q.   It says that for a video deposition,
10 there's an additional charge of $500?
11    A.   Yes.
12    Q.   So obviously we're not videotaping this
13 deposition today, but is it correct that in addition
14 to the $500 per hour, if I wanted to video this
15 deposition, I would have to pay you an additional
16 500?
17    A.   Yes.
18    Q.   Why do you charge an additional $500 for
19 my firm to pay a videographer to come here and to
20 film this deposition?
21    A.   Because typically I find that it's used
22 then in place of me being at trial.  So I think it's
23 fair for me to charge an extra fee.
24    Q.   Okay.  So the reason you would charge a
25 law firm an additional $500 to video your deposition

Page 19

1  is because you're assuming that that would be used
2  in lieu of you having to come to trial when in
3  essence would save someone money, correct, and you
4  would not be getting paid, correct?
5     A.   Correct.
6     Q.   And if this case proceeds to trial, you
7  charge $500 an hour with a minimum of two hours,
8  correct?
9     A.   Correct.
10    Q.   So if you had to drive to Fort Pierce if
11 this case goes to trial and it takes you one hour to
12 get there, you're not just going to charge 500.
13 You're going to charge 1,000, correct?
14    A.   I charge portal to portal.  All my time
15 including travel time is $500 an hour.
16    Q.   So if you drive from your house, which is
17 in Parkland, to Fort Pierce and you're there for ten
18 hours, we would just take ten hours times 500; is
19 that correct?
20    A.   Correct.
21    Q.   And on that CD, did you bring with you a
22 case list for the past five years of cases that you
23 have given depositions in as well as gone to trial
24 on?
25    A.   Yes.

Page 20

1     Q.   And are you able to tell me looking at
2  this case list the percentage of cases that you have
3  been retained for a criminal case versus a civil
4  case?
5     A.   No.
6     Q.   Do you know the breakdown of those cases
7  where you're retained as an expert in a criminal
8  case versus a civil case?
9     A.   No.  I don't keep track.
10    Q.   Are you just able to tell me right now
11 are you typically retained as an expert more on
12 criminal cases or civil cases?
13    A.   I would say more on civil cases.
14    Q.   You just don't know the percentage,
15 correct?
16    A.   Correct.
17    Q.   And in those cases that you are retained
18 on in civil cases, are you able to tell me the
19 percentage breakdown of plaintiff versus defense?
20    A.   No.  I don't keep track.
21    Q.   Have you ever kept track during the 19
22 years that you've been in your consulting practice?
23    A.   No.
24    Q.   Currently, do you know how many cases you
25 have been retained on, whether it be criminal or

Page 21

1  civil cases, that are active?
2     A.   That are active right now?
3     Q.   (Moves head up and down.)
4     A.   No.
5     Q.   So you don't know how many cases you are
6  currently employed as an expert on as you sit here
7  today?
8     A.   No.
9     Q.   Is it more than just this case?
10    A.   Yes.
11    Q.   Is it 500 cases?
12    A.   No.
13    Q.   Is it 100 cases?
14    A.   No.
15    Q.   Less than 100?
16    A.   I would say yes.
17    Q.   You're just not sure how much less than
18 100?
19    A.   Right.  I don't keep track.  Some of them
20 have been around for a long time and sit in my
21 files.
22    Q.   I understand.
23        Have you ever been hired by Summer
24 Barranco or her law firm, Purdy, Jolly, Giuffreda &
25 Barranco, prior to this case?

Page 22

1    A.   I have.
2    Q.   How many times?
3    A.   I wouldn't be able to tell you exact
4  number, but I would say perhaps five or less.
5    Q.   And is that over your 19-year career?
6    A.   I would say yes.
7    Q.   Have you ever been hired by any law firm
8  to act as an expert in a case where the St. Lucie
9  County Sheriff's Office is a defendant?
10   A.   I wouldn't remember that.  I don't know.
11 Perhaps.
12   Q.   When was the first time that you acted as
13 an expert in either a criminal or civil case?
14   A.   When I was in New York City.
15   Q.   And during your entire career providing
16 testimony as a toxicologist, has your testimony ever
17 been limited in any way?
18   A.   No.
19   Q.   Has your testimony ever been struck by a
20 court of law in any way?
21   A.   No.
22   Q.   Do you know how many times you've gone to
23 court and testified at trial?
24   A.   I would say hundreds.
25   Q.   Since you've been working at your

Page 23

1  consulting firm, how many times have you testified
2  in trial?
3    A.   I don't keep track.  I can't answer that.
4    Q.   Do you advertise your services as an
5  expert witness?
6    A.   No.
7    Q.   So it's correct that you are not on any
8  expert witness web sites on the internet?
9    A.   Well, I have my own web site certainly.
10   Q.   Right.  Besides that.
11   A.   I may be affiliated with a couple expert
12 search -- I used to consult with TASA.
13   Q.   What is TASA?
14   A.   They're located in Pennsylvania and
15 they're a firm that helps match I guess attorneys
16 with the expert that they need.  So a referral firm
17 I guess I would call them.
18   Q.   Are you still involved with TASA?
19   A.   No.
20   Q.   When you were involved with TASA, do you
21 pay them for them to advertise on behalf of your
22 practice?
23   A.   No.
24   Q.   So how is it that you get connected with
25 TASA?

Page 24

1    A.   They just have a list of names in their
2  database and what your specialty is.  I don't
3  believe they advertise.
4    Q.   Did you ask to be marketed in their
5  publications?
6    A.   No.
7    Q.   So how is it that you became involved
8  with TASA?
9    A.   I don't remember.  It's been years ago
10 when I first started my own consulting agency.
11   Q.   So if I were to Google you right now, is
12 it your testimony that you wouldn't appear on any
13 sort of expert witness web sites?
14   A.   No, I think I would appear on a couple
15 other expert witness -- I don't even know which ones
16 truthfully, but if you Google me, I'm sure I come up
17 on a couple other sites that I'm associated with as
18 far as -- but I don't think they advertise on my
19 behalf.
20   Q.   Okay.  It sounds like you just don't
21 know; is that correct?
22   A.   Yeah, I just don't know.  My name's in
23 their database as a forensics toxicologist.
24   Q.   Do you ever speak at any attorney
25 conferences whether it be criminal, civil, defense,

Page 25

1  plaintiff?
2    A.   I probably have in the past.  That should
3  be on the -- that might be on the C.V.
4    Q.   What was the last conference that you've
5  gone to where you're speaking to a group of
6  attorneys?
7    A.   I think that's been quite some time.  I'd
8  have to look at my C.V. to answer that.  I haven't
9  done anything like that in a long time.
10   Q.   And you're not currently affiliated with
11 any universities, correct?
12   A.   I'm only a courtesy professor at FIU.
13   Q.   What does that mean, a courtesy
14 professor?
15   A.   You're not paid by the university and
16 you're not on staff, but -- I've been there to
17 lecture before to students.
18   Q.   When was the last time that you lectured
19 at Florida International University as it relates to
20 toxicology?
21   A.   That's been quite some time.  Several
22 years.
23   Q.   Your C.V. says under the heading
24 "Courtesy Professor," department of chemistry,
25 Florida International University, 2000 to the

Page 26

1  present.
2      So is it correct that currently you are
3  not a courtesy professor at FIU?
4      A.   As far as I know I am.
5      Q.   You just haven't lectured there in a few
6  years?
7      A.   Correct.
8      Q.   But you still consider yourself and hold
9  yourself out as a courtesy professor there even
10 though you haven't spoken to students there in a few
11 years?
12     A.   Yes.  I've never been told otherwise.
13     Q.   When was the last time you actually were
14 at Florida International University and lectured on
15 the topic of toxicology?
16     A.   That would be in my C.V.
17     Q.   Can you look at your C.V. and tell me,
18 please?
19     A.   2002.
20     Q.   So the last time that you lectured to
21 students at Florida International University was
22 2002, yet you hold yourself out as a courtesy
23 professor from 2000 to the present time, correct?
24     A.   Correct.
25     Q.   Okay.  I'd like to talk with you about

Page 27

1  your report that's dated August 16, 2017.  If you
2  want to pull that up.
3      A.   Okay.
4      Q.   Is this the only report that you drafted
5  in this case?
6      A.   Yes.
7      Q.   And when is it that you actually drafted
8  this report?  I know it was sent to Summer Barranco
9  on August 16, 2017, but when did you draft it?
10     A.   I worked on the report on 8/14 and 8/15,
11 and finalized it on 8/16.
12     Q.   On the first page, the second sentence,
13 it says or rather you wrote:
14          "I was asked to provide a written
15       report with my opinions and conclusions
16       regarding the toxicological aspects in
17       this case."
18     Does this three-page report contain all
19 the opinions that you're going to offer in this
20 case?
21     A.   As far as I know, yes.
22     Q.   And you feel that you've been able to
23 adequately offer opinions in this case based on the
24 documents that you've been provided in this case?
25     A.   Yes.

Page 28

1      Q.   If we can look at the ending "Incident
2  Summary."
3          The information that's contained in this
4  paragraph under the heading "Incident Summary,"
5  where is it that you received this information from?
6      A.   That was from the actual police incidence
7  report and the medical records and the EMS records.
8      Q.   And when you say the medical records and
9  EMS records, you're referring to the ten pages of
10 laboratory testing data that you received as well as
11 the six-page St. Lucie County Fire District report,
12 correct?
13     A.   Correct.
14     Q.   Now, if there have been depositions in
15 this case from witnesses or defendants that refutes
16 some of the information that you have contained
17 within your incident summary report, would you agree
18 with me then your incident summary report would be
19 inaccurate?
20     MR. GIUFFREDA:  Form.
21     You can answer.
22     THE WITNESS:  If there are some
23 inaccuracies -- I told you where my source of
24 information came from.  I would have to
25 evaluate the additional materials that you say

Page 29

1      are present, and it might change some of those
2      things in there, yes.  It might not.
3  BY MR. HECHT:
4      Q.   I understand.
5          So it's possible if you were provided
6  with additional information in this case of
7  depositions, that your opinions may actually change
8  in this case, correct?
9      A.   Yes, and I reserve the right to do that
10 on my last sentence on my report.
11     Q.   You stated -- it's in the middle of the
12 paragraph under the heading "Incident Summary" --
13 Mr. Docher was arrested for disorderly intoxication.
14     You received that information from the
15 sheriff's incident report, correct?
16     A.   Correct.
17     Q.   Are you aware if there's been testimony
18 in this case that Mr. Docher was in fact never
19 arrested, but was being Baker Acted?
20     MR. GIUFFREDA:  Form.
21     You can answer.
22     THE WITNESS:  No.  I have what I have in
23 my report based on the documents that were
24 given to me.
25

Page 30

```
 1    BY MR. HECHT:
 2       Q.   So it's correct that you have no
 3    information nor have you received any information
 4    that Mr. Docher was in fact not arrested, but was
 5    being Baker Acted, correct?
 6          MR. GIUFFREDA:  Form.
 7          You can answer.
 8          THE WITNESS:  Correct.
 9    BY MR. HECHT:
10       Q.   Is it also correct that you have no
11    information that there's been testimony in this case
12    from one of the officers that Mr. Docher was not
13    arrested for disorderly intoxication, but rather was
14    arrested for disorderly conduct, correct?
15          MR. GIUFFREDA:  Form.
16          You can answer.
17          THE WITNESS:  I don't have that
18    information.
19    BY MR. HECHT:
20       Q.   And the information that you have
21    contained under the heading "Incident Summary,"
22    you've stated that within minutes, Mr. Docher became
23    apneic and pulseless and CPR was initiated.
24          What is your definition of within
25    minutes?
```

Page 31

```
 1       A.   Well, we can go back.  If there's a
 2    number in the report, I would refer back to that.
 3       Q.   Okay.
 4       A.   I mean my memory of it is that almost
 5    immediately, you know, within one or two minutes.
 6    We're not talking 20 minutes or 30 minutes.
 7       Q.   Okay.
 8       A.   Within five minutes.
 9       Q.   Well, it's important to this case, so I
10    want to know where it is that you got information
11    that says within minutes or a certain amount of
12    minutes, Mr. Docher became apneic and pulseless and
13    CPR was initiated.
14       A.   Okay.
15       Q.   Because within minutes can mean different
16    things to different people.
17       A.   Okay.  What does it mean to you?
18       Q.   Well, I didn't write the report, so
19    that's why I'm asking you.
20       A.   I gave you my definition and my
21    understanding.
22       Q.   Okay.  So your testimony in this case is
23    based upon the information that you've received
24    based on the documents that you've been provided is
25    that within minutes equals what?
```

Page 32

```
 1       A.   Less than 30 minutes.
 2       Q.   Are you able to narrow it down any more
 3    than that, and you can take your time.
 4       A.   Thank you.
 5       Q.   Look at all your information.
 6       A.   Well, it says -- according to the EMS
 7    report, at 18:40 he was given the Ativan, and then
 8    it talks about CPR at 18:43.  So that's less than
 9    five minutes.
10       Q.   So would you agree with me that instead
11    of saying within minutes Mr. Docher became apneic
12    and pulseless, we could say less than five minutes
13    Mr. Docher became apneic and pulseless?
14       A.   Well, I would defer to the EMS, the
15    people who were there.  I'm just looking at this
16    report and that's why I wrote within minutes, but I
17    don't have an exact number of minutes that you seem
18    to be wanting, so I would defer that to the EMS who
19    were there.
20       Q.   Okay.  So tell me, where is it that you
21    got the information within minutes?
22       A.   Well, 18:40 to 18:43 is, you know, three
23    minutes, so --
24       Q.   And you're looking at the St. Lucie
25    County Five District six-page incident report to get
```

Page 33

```
 1    that information?
 2       A.   Yes.
 3       Q.   Now, if there was a deposition in this
 4    case by one of the paramedics, Paramedic Rosario,
 5    who stated that the information on his six-page
 6    St. Lucie County Fire District report was
 7    inaccurate, would that affect your estimation of how
 8    you define within minutes?
 9       A.   It could.
10          MR. GIUFFREDA:  Form.
11          You can answer.
12          MS. TYK:  Object to the form.
13    BY MR. HECHT:
14       Q.   That means I asked a good question.
15          All right.  Let's go to your opinions.
16    Your first opinion is that Mr. Docher's blood
17    ethanol concentration after conversion of units from
18    mg/dl --
19          What does that mean?
20       A.   Milligrams per deciliter.
21       Q.   -- to --
22          What does g percentage mean?
23       A.   Gram percent.
24       Q.   -- and serum to whole blood was .03 gram
25    percent at 7:38 p.m.
```

Page 34

1        Did you use retrograde extrapolation in
2   order to determine that?
3        A.  No.  That is the blood reading from the
4   hospital.
5        There was mention in one of the documents
6   that this was a .38 gram percent.  So I was retained
7   to clarify what that blood alcohol truly was.  So it
8   was a 38.  So it was misread or miscalculated by
9   whomever thought it might be .38.  So that's what a
10  38 number -- that's directly from the hospital
11  laboratory, that number.
12       Q.  I'm going to show you a discharge summary
13  report without pathology that looks like to me to
14  contain some toxicology.
15       Is this the 38 that you're referring to?
16       A.  Yes, it is.
17       MR. HECHT:  And we'll go ahead and we'll
18  admit this document -- we'll mark this document
19  as Plaintiff's 4.
20       (The document referred to was
21       thereupon marked Plaintiff's Exhibit
22       No. 4 for identification.)
23  BY MR. HECHT:
24       Q.  So is it your testimony that the 38
25  that's next to, "Alcohol," on Exhibit 4 should

Page 35

1   really be .38 on this medical record or is the 38
2   correct on this medical record?
3        A.  The 38 is correct, but the conversion of
4   that is .03, not .3.
5        Q.  Got it.
6        So you just took the 38, which is the
7   medical blood, and converted it to legal blood; is
8   that correct?
9        A.  Correct.
10       Q.  Your second opinion is that Tavares
11  Docher's blood alcohol content at the time of the
12  altercation an hour and 40 minutes earlier was most
13  likely between .04 to .06.
14       How did you determine that his blood
15  alcohol content an hour and 40 minutes prior to
16  7:38 p.m. was between .04 and .06?
17       A.  That's based on retrograde extrapolation.
18       Q.  And what is retrograde extrapolation?
19       A.  Retrograde extrapolation is determining a
20  blood alcohol concentration at an earlier time point
21  based on a concentration at a later time point.
22       Q.  And is this just a mathematical formula
23  that you performed?
24       A.  Yes.
25       Q.  Do you have that calculation in any of

Page 36

1   the information that you've brought with you today?
2        A.  No.
3        Q.  It's just a standard retrograde equation,
4   correct?
5        A.  Correct.
6        Q.  So if any psychologist did this, they
7   should get between .04 and .06, correct?
8        A.  Correct.
9        Q.  Under opinion no. 2, you said at the time
10  of the altercation.
11       What altercation are you referring to?
12       A.  I'm referring to the events in the
13  parking lot of the CVS.
14       Q.  Are you talking about pre-arrest or
15  post-arrest?
16       A.  I don't have it related in that term.
17  I'm just talking about the altercation between
18  Mr. Docher and the police and the EMS.
19       Q.  Okay.  There was a time that Tavares
20  Docher was outside speaking to the sheriff's
21  deputies in front of their car.  He was not yet
22  arrested.
23       You're not referring to that time,
24  correct?
25       A.  I'm referring to an hour and 40 minutes

Page 37

1   earlier than 6 p.m.
2        Q.  So we're talking about at 6 p.m.,
3   Mr. Docher's blood alcohol content was a .04 to .06,
4   correct?
5        A.  Yeah, because that's -- six to 7:30 is an
6   hour and 40 minutes, so yes, that's the time frame,
7   6 p.m. and 7:38 p.m.
8        Q.  Why is it that you chose 6 p.m. to
9   determine what his blood alcohol content was?
10       A.  Because I believed when I read the
11  records to be the time that they encountered --
12  they, meaning the police, encountered Mr. Docher in
13  the parking lot.
14       Q.  Okay.  And, again, I want to be clear.
15       Would there be a difference between what
16  Tavares Docher's blood alcohol content level would
17  be at 6:00 versus 6:30?
18       A.  Yes.
19       Q.  Would his blood alcohol content have been
20  lower or higher at 6:30 than at 6 p.m.?
21       A.  With this back extrapolation under this
22  circumstance, it would be lower.
23       Q.  Okay.  So what would Tavares Docher's
24  blood alcohol content level have been at, say, 6:30?
25       A.  At 6:30, it would probably a .04 or .05.

Page 38

1    Q.   So still within the range that you would
2  have placed him at at 6 p.m., correct?
3    A.   Correct.
4    Q.   Not really much of a significant
5  difference?
6    A.   No.
7    Q.   But the point between opinion no. 1 and
8  no. 2 is that his blood alcohol content at the time
9  of the altercation was that his blood alcohol
10  content was higher than it would have been when he
11  arrived at the hospital, correct?
12    A.   Correct.
13    Q.   Opinion no. 3, a blood alcohol content of
14  .06 is not consistent with the behavior exhibited by
15  Mr. Docher.
16         What time and what behavior are you
17  referring to?
18    A.   I'm referring to the time period of
19  start, approximately 6 p.m., and I'm referring to
20  him talking about -- and I write that in the
21  incident summary, Arabs trying to kill him and his
22  mother because they knew where Arabs had dropped a
23  headless body.
24         I'm basing that also on the comments by
25  the CVS employees and his combativeness and his

Page 39

1  uncooperativeness, and they describe him as paranoid
2  and delirious, sweating, loud, slurred but rapid
3  speech.
4    Q.   What type of behavior would someone
5  exhibit that is consistent with a .06 BAC?
6    A.   .06 probably would be imperceptible to a
7  layperson, to an average person.  So it could be
8  no -- nothing but perhaps the smell of alcohol or
9  just some decreased inhibitions and maybe someone
10  being more friendly, relaxed.
11    Q.   Do you agree with me that alcohol affects
12  people differently?
13    A.   Yes.
14    Q.   So how is it that you can make a blanket
15  statement that a .06 is not consistent with the
16  behavior exhibited by Mr. Docher when I'm assuming
17  you've never met Mr. Docher?
18    A.   Oh, well, I can base that on the effects
19  of alcohol.
20         Alcohol usually doesn't cause some of
21  these -- some of these behaviors at all, and then
22  you have to have a really high blood alcohol to get
23  things like the combativeness and the
24  non-cooperation kind of thing, and that would be
25  across the board, you know, with most people.

Page 40

1         So there's such an extreme between .06,
2  which is hardly any effects, up to what he was
3  experiencing.
4    Q.   When you talk about a combativeness and
5  aggressiveness, would you agree with me that Tavares
6  Docher as you put it was not acting aggressive or
7  combative prior to him being placed in handcuffs?
8    A.   I'm going to defer.  I don't know the
9  answer to that.  I'm going to defer that to the
10  people that were there at the --
11    Q.   Okay, because what you keep saying is
12  aggressiveness, combativeness, and you wouldn't
13  expect to see this with someone with a .06, but you
14  don't know if he was acting combative or aggressive
15  pre- or post-arrest, do you, correct?
16    A.   He was acting strangely in the store, and
17  that's pre, certainly, arrest, pre the --
18         He asked the police to -- I mean he asked
19  CVS to give him a phone to call 911, and he made
20  these odd statements about the headless bodies and
21  the Arabs and people trying to kill him and
22  persecute him, and he was armed -- he had armed
23  himself with a tool.  That might have been his
24  paranoia and wanting to arm himself with a weapon if
25  you will, what he thought he would be able to

Page 41

1  protect himself with, but all the comments while
2  he's in the store that he's paranoid, delusional,
3  nervous, pacing, delirious, loud, slurred rapid
4  speech, those are pretty consistent not acting
5  normal by those witnesses in the store, those people
6  in the store, and that's prior to the police
7  arriving and seeing him, and I've never seen a .06
8  blood alcohol cause that kind of behavior in anyone.
9  It shouldn't do that.
10    Q.   Okay.  When Tavares Docher called the
11  police inside the CVS and prior to the police
12  coming, I know you've mentioned a lot of adjectives
13  to describe him, but you've never used the word
14  aggressive and combative prior to the police
15  arriving, correct?
16    A.   I guess I would say yes to that.
17    Q.   All right.  And what about unexpected
18  strength?  Would you agree with me that Tavares
19  Docher didn't portray any unexpected strength until
20  the police arrived and placed him in handcuffs,
21  correct?
22         MR. GIUFFREDA:  Form.
23         You can answer.
24         THE WITNESS:  Yeah, there was nothing
25  else going on at the time to show that he had

11 (Pages 38 to 41)

Page 42

1    extra strength.
2    BY MR. HECHT:
3         Q.   And you spoke about a screwdriver.
4         Are you aware of any testimony in this
5    case that one of the CVS employees actually told
6    Mr. Docher to put the screwdriver down and he did?
7         A.   I remember that.
8         Q.   And then in fact the manager told him
9    that he'd have to take the screwdriver back because
10   he couldn't leave it on one of the shelves that he
11   placed it on?  Are you aware of that?
12        A.   I know he didn't leave the screwdriver in
13   the store.
14        Q.   Right.
15        A.   So I don't know exactly what transpired
16   there because I wasn't there as far as how exactly
17   that happened, but he ended up back with the
18   screwdriver, yes.
19        Q.   And then after taking the screwdriver,
20   Mr. Docher actually went to wait in line at the CVS
21   behind some other people to purchase some
22   cigarettes.
23        Are you aware of that?
24        A.   What I read was that he bought a cigar
25   and left the store.

Page 43

1         Q.   Okay.  Well, would you agree with me that
2    Mr. Docher who asked to call 911, was told to put
3    the screwdriver down, put it down, was then asked to
4    take it back, took it back, and then waited in line
5    to purchase a cigar is not someone who's acting
6    aggressive and combative and exhibiting unexpected
7    strength?
8         MR. GIUFFREDA:  Form.
9         THE WITNESS:  Not at that time, no.
10   BY MR. HECHT:
11        Q.   Let's go to your fourth opinion.  You
12   state that Mr. Docher's urine was positive for THC:
13        "THC is a psychoactive substance
14        which can cause paranoia such as that
15        experienced by Mr. Docher."
16        Besides causing paranoia, THC also can
17   cause one to exhibit other symptoms, correct?
18        A.   Yes.
19        Q.   And what are the symptoms that one can
20   display that is actively using or on THC?
21        A.   Well, the reasons that it's used for is for
22   its euphoric effect.  It can cause sedation.  It can
23   cause increased appetite, and then if there's any
24   kind of -- especially with anyone with any
25   underlying medical mental health history, it can

Page 44

1    aggravate or exaggerate psychosis.
2         Q.   Would you agree with me that THC can
3    cause someone to be relaxed?
4         A.   Yes.
5         Q.   It can act as a muscle relaxant?
6         A.   I don't know that I would -- I would back
7    up and I agree with your first statement that it can
8    cause someone to be relaxed.  I don't know what the
9    mechanism of that is.  So when you call it a muscle
10   relaxer, I think I can't agree with that.
11        Q.   Okay.  Isn't there scientific studies
12   that Parkinson's patients actually use THC to stop
13   tremors?
14        A.   Yeah, I don't know about that.
15        Q.   You don't know anything about that?
16        A.   No.  They may.
17        Q.   Okay.  You seem to highlight though that
18   the THC can cause paranoia.  You then state that
19   drug-induced psychosis is consistent with the
20   descriptions given by the police officers involved
21   in this interaction, but isn't it important to look
22   at the big picture and see how Tavares Docher was
23   acting prior to, as you call it, the altercation
24   with the police?
25        A.   Yeah.

Page 45

1         Q.   Okay, because you seem to just be
2    focusing on the altercation, but what about the time
3    that Tavares Docher was in the store?
4         You already agreed with me that he wasn't
5    aggressive, that he wasn't combative.
6         You would agree with that, correct?
7         A.   I would, but all the employees also said
8    that he was higher than a kite, high on something,
9    acting not normal.  So they all agree that there was
10   something happening, and their opinions were that
11   he was intoxicated by something.
12        Q.   Okay.  Well, he could have been suffering
13   from a mental illness, correct?
14        A.   Yes.
15        Q.   You have no idea.  You weren't there,
16   correct?
17        A.   I wasn't there, but I'm talking from a
18   toxicology perspective and looking at what is the
19   reason for some of this odd behavior, and from a
20   toxicology standpoint, I have to then describe what
21   was found in the blood and urine, and excited
22   delirium causes that super human -- that unexpected
23   strength, and excited delirium is usually caused
24   by -- it can be drug-induced, and we do know that he
25   is a drug user.

1     Q.   I want to talk about the toxicology
2 report that we've marked as Plaintiff's 4.  It says
3 that URTHC --
4          What does URTHC mean on Exhibit 4?
5     A.   Urine THC, which is cannabinoids.
6     Q.   And then in parentheses next to THC, it
7 says, "AD," and then it says, "Presumptive
8 positive."
9          Do you see that?
10    A.   Yes.
11    Q.   What does presumptive positive mean?
12    A.   Well, the type of testing done was
13 immunoassay testing which is typically a screening
14 test.  So presumptive positive -- they refer to the
15 results of an immunoassay as presumptive positive in
16 a forensic setting.
17    Q.   Is that different than just testing
18 positive?
19    A.   No, no.
20    Q.   Could this report have said positive
21 instead of presumptive positive?
22    A.   No, no.  It's either presumptive positive
23 or none detected on this kind of testing.
24    Q.   What does none detected mean?
25    A.   That none was detected.

1     Q.   Okay.  On the toxicology report that
2 we've marked as Exhibit 4, are you able to explain
3 for me when it was that Tavares Docher either smoked
4 or ingested THC?
5     A.   I can give you a time window.
6     Q.   Okay.  What's the window?
7     A.   It could be anywhere from right before
8 the incident up to, depending on his smoking habits,
9 a few days to a few weeks.
10    Q.   So this presumptive positive could mean
11 that Tavares Docher in fact did not even smoke or
12 ingest THC on the day that this altercation
13 occurred, correct?
14    A.   That's possible.
15    Q.   And in fact it's not just possible, it's
16 within a reasonable degree of toxicology probability
17 that the window that you give is between one day to
18 several weeks, correct?
19    A.   That is the window I give, yeah.
20    Q.   And based on this toxicology report,
21 Tavares Docher was found to have no cocaine in his
22 system, correct?
23    A.   In his urine.
24    Q.   In his urine, correct?
25    A.   The blood wasn't tested, so there could

1 have been cocaine in the blood.
2     Q.   Well, I don't want to know what there
3 could have been or what possibilities there are.
4          Have you seen any documentation in any of
5 the labs that you've reviewed that Tavares Docher
6 tested positive for cocaine?
7     A.   Well, they didn't do a blood drug test,
8 so that information's not available.
9     Q.   But you can't testify that because they
10 failed to perform a blood cocaine test that he in
11 fact would have tested positive for cocaine,
12 correct?
13    A.   No, I can't say that.
14    Q.   You need data as a toxicologist in order
15 to offer an opinion as to whether or not someone is
16 testing positive to a certain substance, correct?
17    A.   Well, we would like a lab report, yes.
18    Q.   So you're not here to tell this jury if
19 this case goes to trial that Tavares Docher had used
20 cocaine on the date of this incident, correct?
21    A.   No, we can't answer that question.  He
22 may have.
23    Q.   Well, he may have also just gotten off a
24 first class flight from Hawaii, correct, on the date
25 of this incident?

1          MR. GIUFFREDA:  Form.
2          THE WITNESS:  But I'm looking at things
3 to explain the behavior and the behavior can be
4 explained by drug use, and we can't answer the
5 question because the hospital didn't do a blood
6 drug screen.  I can't answer some of those
7 questions 100 percent.
8          There were a number of other drugs at the
9 time -- this is 2014 -- drugs such as flakka
10 that was big back then that wouldn't have been
11 picked up by the lab testing either.
12 BY MR. HECHT:
13    Q.   And I know that sitting here you could
14 say they didn't test for this or they didn't test
15 for that and therefore anything is possible.
16          What I want to know is within a
17 reasonable degree of toxicology probability, are you
18 able to testify as to whether or not Tavares Docher
19 was or had utilized cocaine on the date of this
20 incident?
21    A.   No.
22    Q.   Okay.  And what about flakka?  Are you
23 able to testify within a reasonable degree of
24 toxicology probability that on the day of this
25 incident or the weeks leading up to this incident

Page 50

1  whether Tavares Docher had used flakka?
2      A.  I don't know.
3      Q.  Are you able to testify within a
4  reasonable degree of toxicology probability whether
5  Tavares Docher on the day of this incident or the
6  weeks leading up to this incident, whether he had
7  utilized bath salts?
8      A.  I don't know.
9      Q.  Would you agree with me that all we have
10  to go on is the lab reports that were taken at
11  St. Lucie Medical Center as to tell us what drugs he
12  was testing positive for?
13      A.  Well, no, I think that's an incomplete
14  picture, and I would like the jury to know that.
15  It's an incomplete picture.
16      Q.  So tell me what documentation you've seen
17  that tells you from a toxicological standpoint what
18  drugs Tavares Docher was testing positive for on the
19  date of this incident.
20      A.  My opinion is about the drug-induced
21  psychosis or the excited delirium that is caused by
22  some of these drugs, the drug use.  So I'm looking
23  more at the behavior for that.
24      Q.  Okay.
25      A.  And part of that is he did test positive

Page 51

1  for marijuana, so we know that he's a marijuana
2  user.  His aunt said he uses cocaine.  So based on
3  that information, we know that he also uses cocaine,
4  and he drinks alcohol.  We know those at least three
5  things.
6      So I think it's an incomplete picture
7  to -- yes and no.  I can't say that he was under the
8  influence of any one of those drugs because I don't
9  have the right information, but I think the jury
10  should know that the right information isn't there
11  and that's why I have that opinion, not because it's
12  not a possibility.
13      Q.  Okay.  Back to my question.  Have you
14  seen any lab reports or documents or medical records
15  from anywhere as it relates to this case as to what
16  drugs Tavares Docher tested positive for on May 11,
17  2014 other than testing positive for THC?
18      A.  No.
19      Q.  Is it your position that the treating
20  doctors at St. Lucie Medical Center fell below the
21  standard of care and not testing him for other sorts
22  of drugs?
23      A.  No, I don't make a -- I'm not here to
24  make an opinion on standard of care issues.
25      Q.  Now, had the treating doctors at

Page 52

1  St. Lucie Medical Center suspected that Tavares
2  Docher was on drugs other than the ones that they
3  tested for, would you agree with me that there
4  certainly was nothing preventing them from drawing
5  an extra tube and sending it out for testing?
6      MR. GIUFFREDA:  Form.
7      You can answer.
8      THE WITNESS:  I don't think that's part
9  of any hospital's protocol to do that.
10  BY MR. HECHT:
11      Q.  Okay.  You're not offering opinions as to
12  causation in this case, are you, and I'll clarify
13  that if you don't understand the question.
14      A.  Okay.  Please.
15      Q.  You're not going to be offering any
16  opinions as to why it is that Tavares Docher is in
17  the medical condition that he is today, are you?
18      A.  I don't believe so, no.
19      Q.  Have you ever treated someone who had
20  smoked marijuana and was exhibiting aggressiveness
21  and combativeness?
22      A.  No.  I don't treat patients.
23      Q.  Have you seen any of the surveillance
24  footage in this case?
25      A.  No, I have not.

Page 53

1      Q.  So you wouldn't know if prior to the
2  police placing Tavares Docher in handcuffs, if he
3  was calm or not, correct?
4      A.  Correct.
5      Q.  Are those all the opinions that you have
6  in this case that we've gone over today?
7      A.  Yes, sir.
8      MR. HECHT:  Okay.  I don't have any other
9  questions.
10      Julie, do you have any questions?
11      MS. TYK:  No questions.
12      MR. GIUFFREDA:  No questions.
13      MR. HECHT:  I'm assuming you'd like to
14  read?
15      THE WITNESS:  Read, please.
16      MR. GIUFFREDA:  Are you going to order?
17      MR. HECHT:  Yes, I'm ordering.
18      MR. GIUFFREDA:  I'll take a mini and a
19  regular.
20      (Thereupon, the taking of the deposition
21  was concluded at 11:15 a.m.)
22      (Reading and signing not waived.)

Page 54

```
 1              CERTIFICATE OF OATH
 2
 3    STATE OF FLORIDA :
 4    COUNTY  OF  PALM BEACH:
 5
 6
 7
 8         I, the undersigned authority, certify
 9    that TERI STOCKHAM, PH.D. personally appeared
10    before me and was duly sworn.
11
12
13         WITNESS my hand and official seal this
14    18th day of September, 2017.
15
16
17              /s/ Mia Sohn, RPR
                MIA SOHN, RPR
18              Notary Public - State of
                Florida
19              My Commission No.: GG102175
                Expires:  Aug. 30, 2021
20
21
22
23
24
25
```

Page 56

```
 1              ERRATA SHEET
 2    F.R.C.P. Rule 1.310 provides in part:
         (E)"...Any changes in form or substance that
 3    the witness wants to make shall be entered upon a
      separate correction page by the officer with a
 4    statement of the reasons given by the witness for
      making them..."
 5
 6    Page/Line    Change/Correction     Reason
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18
19    Under penalties of perjury, I declare that I have
      read my deposition transcript, and it is true and
20    correct subject to any changes in form or substance
      entered here.
21
22    _____    _____
      Date        Signature
23
24
25
```

Page 55

```
 1         REPORTER'S DEPOSITION CERTIFICATE
 2
 3         I, MIA SOHN, Shorthand Reporter, certify
 4    that I was authorized to and did
 5    stenographically report the deposition of TERI
 6    STOCKHAM, PH.D.; that a review of the
 7    transcript was requested; and that the
 8    transcript is a true and complete record of my
 9    stenographic notes.
10         I further certify that I am not a
11    relative, employee, attorney or counsel of any
12    of the parties, nor am I a relative or employee
13    of any of the parties' attorney or counsel
14    connected with the action, nor am I financially
15    interested in the action.
16
17         DATED this 18th day of September, 2017.
18
19
20              /s/ Mia Sohn, RPR
                MIA SOHN, RPR
21              Notary Public - State of
                Florida
22              My Commission No.: GG102175
                Expires:  Aug. 30, 2021
23
24
25
```

Page 57

```
 1    9/18/17
 2    Teri Stockham, Ph.D.
      c/o Richard A. Giuffreda, Esquire
 3    Purdy, Jolly, Giuffreda & Barranco, P.A.
      2455 E. Sunrise Boulevard, Suite 1216
 4    Fort Lauderdale, Florida  33304
 5
      RE    :  Docher v. Newman, et al.
 6    DEPO OF :  Teri Stockham, Ph.D.
      TAKEN  :  September 5, 2017
 7
 8    Dear Dr. Stockham:
 9    This letter is to advise you that the transcript of
      your deposition is completed and is available for
10    reading and signing.
11    Please contact our office at (954)344-0555 to make
      arrangements to read and sign, or sign below to
12    waive review of this transcript.  If the reading and
      signing has not been completed within 30 days or
13    before the start of the trial of this matter, we
      shall conclude that you have waived the reading and
14    signing of the deposition transcript.
15    Your prompt attention to this matter is appreciated.
16    Sincerely,
17    Mia Sohn, RPR, Shorthand Reporter
      J & A Reporting
18
      cc: Adam S. Hecht, Esquire
19        Julie Tyk, Esquire
20    Waiver:
21    I, _____, hereby waive the reading and
      signing of my deposition transcript.
22
23    _____    _____
      Deponent Signature     Date
24
25
```

Page 58

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

**a.m** 1:20,20
  53:21
**able** 20:1,10,18
  22:3 27:22
  32:2 40:25
  47:2 49:18,23
  50:3
**act** 22:8 44:5
**acted** 22:12
  29:19 30:5
**acting** 40:6,14
  40:16 41:4
  43:5 44:23
  45:9
**action** 55:14,15
**active** 21:1,2
**actively** 43:20
**actual** 5:12 7:1
  28:6
**AD** 46:7
**Adam** 2:3 57:18
**addition** 15:21
  18:13
**additional** 17:9
  18:10,15,18,25
  28:25 29:6
**address** 5:9
**adequately**
  27:23
**adjectives** 41:12
**admit** 34:18
**Adolescent** 8:14
**advertise** 23:4
  23:21 24:3,18
**advise** 57:8
**affect** 33:7
**affiliated** 23:11
  25:10
**agencies** 14:14
**agency** 10:24
  11:2 14:12
  24:10
**aggravate** 44:1
**aggressive** 40:6
  40:14 41:14
  43:6 45:5
**aggressiveness**
  40:5,12 52:20

**ago** 24:9
**agree** 13:13 14:5
  28:17 32:10
  39:11 40:5
  41:18 43:1
  44:2,7,10 45:6
  45:9 50:9 52:3
**agreed** 45:4
**ahead** 6:13
  34:17
**ahecht@searc...**
  2:5
**al** 57:5
**alcohol** 10:15
  12:4,10 13:23
  14:8 34:7,25
  35:11,15,20
  37:3,9,16,19
  37:24 38:8,9
  38:13 39:8,11
  39:19,20,22
  41:8 51:4
**altercation**
  35:12 36:10,11
  36:17 38:9
  44:23 45:2
  47:12
**amended** 7:16
  9:1
**amount** 31:11
**analysis** 10:15
  10:16 11:15,20
  11:22 12:4
  13:19,23,24
  14:17 15:25
**answer** 23:3
  25:8 28:21
  29:21 30:7,16
  33:11 40:9
  41:23 48:21
  49:4,6 52:7
**apneic** 30:23
  31:12 32:11,13
**apparently** 17:9
**appear** 24:12,14
**APPEARAN...**
  1:25
**appeared** 54:9
**appetite** 43:23

**appreciated**
  57:14
**approximately**
  10:11 11:12
  13:12 38:19
**Arabs** 38:21,22
  40:21
**arm** 40:24
**armed** 40:22,22
**arrangements**
  57:11
**arrest** 40:17
**arrested** 15:9
  29:13,19 30:4
  30:13,14 36:22
**arrived** 38:11
  41:20
**arriving** 41:7,15
**articles** 8:5,12
  8:13
**asked** 6:20 9:19
  10:8 12:10
  14:25 17:20
  27:14 33:14
**asking** 31:19
**aspects** 4:14
  27:16
**associated** 24:17
**assuming** 19:1
  39:16 53:13
**Ativan** 32:7
**attach** 17:23,25
**attached** 17:17
**attention** 57:14
**attorney** 24:24
  55:11,13
**Attorney's**
  14:15 15:1,4
**attorneys** 4:18
  17:4 23:15
  25:6
**Aug** 54:19 55:22
**August** 8:9 27:1
  27:9
**aunt** 51:2
**authority** 54:8
**authorized** 55:4

**autopsy** 13:19
**available** 48:8
  57:9
**Avenue** 2:16
**average** 39:7
**aware** 29:17
  42:4,11,23

**B**

**B** 3:10
**BAC** 39:5
**back** 8:8 31:1,2
  37:21 42:9,17
  43:4,4 44:6
  49:10 51:13
**Baker** 29:19
  30:5
**BARNHART**
  2:3
**Barranco** 2:8
  7:22 21:24,25
  27:8 57:3
**base** 39:18
**based** 27:23
  29:23 31:23,24
  35:17,21 47:20
  51:2
**basing** 38:24
**bath** 50:7
**Beach** 2:4,4 16:3
  54:4
**behalf** 2:1,7,13
  11:1 14:11,18
  14:25 15:9
  23:21 24:19
**behavior** 38:14
  38:16 39:4,16
  41:8 45:19
  49:3,3 50:23
**behaviors** 39:21
**believe** 24:3
  52:18
**believed** 37:10
**benchtop** 10:5
  10:15 11:14
**big** 44:22 49:10
**billed** 16:24
**bills** 9:13
**blanket** 39:14

**blood** 10:15 12:4
  13:23 14:8
  33:16,24 34:3
  34:7 35:7,7,11
  35:14,20 37:3
  37:9,16,19,24
  38:8,9,13
  39:22 41:8
  45:21 47:25
  48:1,7,10 49:5
**board** 39:25
**bodies** 40:20
**body** 38:23
**bought** 15:23
  42:24
**Boulevard** 2:4
  2:10 5:18 57:3
**breakdown** 20:6
  20:19
**bring** 6:11 19:21
**brought** 7:2,6,19
  18:1 36:1
**Broward** 13:21
  15:15 16:2,5
**building** 16:8
**business** 15:19

**C**

**C.V** 4:22 6:11
  12:16,18 13:4
  13:14 17:17
  25:3,8,23
  26:16,17
**c/o** 57:2
**calculation**
  35:25
**call** 23:17 40:19
  43:2 44:9,23
**called** 4:3 14:16
  41:10
**calm** 53:3
**CALVIN** 1:9
**cannabinoids**
  46:5
**Cannabis** 8:14
  8:16
**car** 36:21
**care** 51:21,24
**career** 22:5,15

**case** 1:2 6:19 8:2
9:4,16,22 14:8
16:19 19:6,11
19:22 20:2,3,4
20:8,8 21:9,25
22:8,13 27:5
27:17,20,23,24
28:15 29:6,8
29:18 30:11
31:9,22 33:4
42:5 48:19
51:15 52:12,24
53:6
**cases** 12:9,12
13:24 14:2,16
19:22 20:2,6
20:12,12,13,17
20:18,24 21:1
21:5,11,13
**causation** 52:12
**cause** 11:15
13:20 39:20
41:8 43:14,17
43:22,23 44:3
44:8,18
**caused** 45:23
50:21
**causes** 45:22
**causing** 43:16
**cc** 57:18
**CD** 3:16 6:18,21
6:25 7:4,6,19
8:4,18 9:11
17:19,25 19:21
**Center** 7:16
50:11 51:20
52:1
**Centre** 2:9
**certain** 31:11
48:16
**certainly** 23:9
40:17 52:4
**CERTIFICA...**
54:1 55:1
**Certified** 1:25
**certify** 54:8 55:3
55:10
**change** 29:1,7
**Change/Corre...**

56:6
**changes** 56:2,20
**charge** 11:17
13:17 18:10,18
18:23,24 19:7
19:12,13,14
**chemicals** 6:8
**chemistry** 25:24
**chief** 10:21 11:6
11:11 13:8,15
14:4
**chose** 37:8
**CHRISTOPH...**
1:8
**cigar** 42:24 43:5
**cigarettes** 42:22
**circumstance**
37:22
**City** 10:1,7,12
11:25 12:15,24
13:7,21 22:14
**civil** 20:3,8,12
20:13,18 21:1
22:13 24:25
**clarify** 34:7
52:12
**class** 48:24
**CLAYTON** 1:8
**clear** 37:14
**clients** 5:8
**Clinical** 3:17
**cocaine** 47:21
48:1,6,10,11
48:20 49:19
51:2,3
**Colorado** 5:1,4
5:8,17
**combative** 40:7
40:14 41:14
43:6 45:5
**combativeness**
38:25 39:23
40:4,12 52:21
**combines** 4:14
**come** 14:25 15:4
15:8 18:19
19:2 24:16
**coming** 41:12
**comments** 38:24

41:1
**Commission**
54:19 55:22
**company** 6:4
16:6
**complaint** 7:16
9:1
**complete** 55:8
**completed** 57:9
57:12
**concentration**
33:17 35:20,21
**conclude** 57:13
**concluded** 53:21
**conclusions**
27:15
**condition** 52:17
**conduct** 30:14
**conference** 25:4
**conferences**
24:25
**connected** 23:24
55:14
**consider** 26:8
**considered**
10:17
**consist** 8:7
**consisted** 10:4
**consistent** 38:14
39:5,15 41:4
44:19
**consult** 23:12
**consultant** 4:12
15:17
**consulting** 6:1
15:19,21,22,25
16:6,15 20:22
23:1 24:10
**contact** 57:10
**contain** 27:18
34:14
**contained** 7:18
8:18 9:11 28:3
28:16 30:21
**content** 35:11,15
37:3,9,16,19
37:24 38:8,10
38:13
**contract** 15:24

**conversion**
33:17 35:3
**converted** 35:7
**copy** 7:14 17:21
**Coral** 1:22
**Corporate** 2:9
**correct** 4:20,23
6:1,2 7:20 8:18
8:19,21,24 9:1
9:14 13:8,9,14
13:14 15:18
16:16,24 17:1
17:3,6,7,10,11
17:14,15,17
18:13 19:3,4,5
19:8,9,13,19
19:20 20:15,16
23:7 24:21
25:11 26:2,7
26:23,24 28:12
28:13 29:8,15
29:16 30:2,5,8
30:10,14 35:2
35:3,8,9 36:4,5
36:7,8,24 37:4
38:2,3,11,12
40:15 41:15,21
43:17 45:6,13
45:16 47:13,18
47:22,24 48:12
48:16,20,24
53:3,4 56:20
**corrected** 16:9
16:11
**correction** 56:3
**correspondence**
7:8,12,21,24
8:12
**counsel** 55:11,13
**County** 1:10,12
7:16 8:20,22
9:4,7 13:21
15:16 16:3,5
22:9 28:11
32:25 33:6
54:4
**couple** 12:9
23:11 24:14,17
**court** 1:1 12:8

14:2,6,21,25
22:20,23
**COURTEMA...**
1:9
**courtesy** 25:12
25:13,24 26:3
26:9,22
**CPR** 30:23
31:13 32:8
**criminal** 20:3,7
20:12,25 22:13
24:25
**current** 4:11
**currently** 5:24
20:24 21:6
25:10 26:2
**Curriculum**
3:13
**CVS** 36:13
38:25 40:19
41:11 42:5,20

— — —
**D**
**D** 3:1
**Dade** 16:2
**data** 4:18,19
28:10 48:14
**database** 24:2
24:23
**date** 1:19 16:25
48:20,24 49:19
50:19 56:22
57:23
**dated** 27:1 55:17
**day** 47:12,17
49:24 50:5
54:14 55:17
**days** 47:9 57:12
**Dear** 57:7
**death** 11:16
13:20
**deciliter** 33:20
**declare** 56:19
**decreased** 39:9
**defendant** 2:7
2:13 22:9
**defendants** 1:13
28:15
**Defender's**

14:14 15:7
**defense** 14:19
20:19 24:25
**defer** 32:14,18
40:8,9
**define** 33:8
**definition** 30:24
31:20
**degree** 47:16
49:17,23 50:4
**delirious** 39:2
41:3
**delirium** 45:22
45:23 50:21
**delusional** 41:2
**DENNEY** 2:2
**department**
12:13 25:24
**depending** 47:8
**DEPO** 57:6
**Deponent** 57:23
**deposition** 1:16
6:14 7:15
17:12 18:9,13
18:15,20,25
33:3 53:20
55:1,5 56:19
57:9,13,21
**depositions** 9:21
19:23 28:14
29:7
**deputies** 36:21
**describe** 39:1
41:13 45:20
**DESCRIPTI...**
3:12
**descriptions**
44:20
**detail** 7:9
**detected** 46:23
46:24,25
**determine** 11:15
13:20 34:2
35:14 37:9
**determining**
35:19
**developed** 11:19
16:7
**development**

11:18
**DICKER** 2:15
**difference** 37:15
38:5
**different** 4:23
12:18 31:15,16
46:17
**differently**
39:12
**Direct** 3:3 4:6
**directly** 34:10
**discharge** 34:12
**disease** 16:7
**disorderly** 29:13
30:13,14
**Disorders** 8:15
**display** 43:20
**dissertation**
10:6
**distribute** 5:7
**district** 1:1,1,12
1:12 8:21,22
28:11 32:25
33:6
**Docher** 1:4
29:13,18 30:4
30:12,22 31:12
32:11,13 36:18
36:20 37:12
38:15 39:16,17
40:6 41:10,19
42:6,20 43:2
43:15 44:22
45:3 47:3,11
47:21 48:5,19
49:18 50:1,5
50:18 51:16
52:2,16 53:2
57:5
**Docher's** 33:16
35:11 37:3,16
37:23 43:12
**DOCHER-NE...**
1:4
**doctor** 18:1
**doctors** 51:20,25
**document** 6:15
18:3 34:18,18
34:20

**documentation**
48:4 50:16
**documents** 6:25
7:1,13 8:17
27:24 29:23
31:24 34:5
51:14
**doing** 13:19
**Dr** 3:14 4:10
17:24 57:7
**draft** 27:9
**drafted** 27:4,7
**drawing** 52:4
**drinks** 51:4
**drive** 1:21 5:11
19:10,16
**dropped** 38:22
**drug** 10:16
12:11 14:9
45:25 48:7
49:4,6 50:22
**drug-induced**
44:19 45:24
50:20
**drugs** 4:16
11:20 49:8,9
50:11,18,22
51:8,16,22
52:2
**DUI** 12:9 13:22
13:24 14:6,8
15:10
**duly** 4:4 54:10

**E**

**E** 3:1,10 56:2
57:3
**earlier** 35:12,20
37:1
**early** 10:6
**East** 2:10
**EDELMAN**
2:15
**effect** 43:22
**effects** 4:16
39:18 40:2
**either** 22:13
46:22 47:3
49:11

**El** 5:18
**ELSER** 2:14
**employ** 5:14,21
**employed** 5:24
9:24 10:10
11:2 12:15
21:6
**employee** 10:11
55:11,12
**employees** 6:4
38:25 42:5
45:7
**employment**
4:11 10:6
**EMS** 28:7,9 32:6
32:14,18 36:18
**encountered**
37:11,12
**ended** 42:17
**entered** 56:3,20
**entire** 6:19
13:17 22:15
**environment**
16:9
**equals** 31:25
**equation** 36:3
**equipment** 6:8
**ERRATA** 56:1
**especially** 11:18
43:24
**Esquire** 2:3,9,15
57:2,18,19
**essence** 19:3
**estimate** 12:3
**estimation** 33:7
**et** 57:5
**ethanol** 33:17
**euphoric** 43:22
**evaluate** 4:18
6:8 28:25
**events** 36:12
**exact** 22:3 32:17
**exactly** 42:15,16
**exaggerate** 44:1
**Examination**
1:23 3:3 4:6
**examined** 4:4
**examiner** 9:25
10:21 11:7,11

11:16 12:6
13:20
**examiner's** 10:4
10:7 13:18,22
14:13 15:16
16:5
**excited** 45:21,23
50:21
**exhibit** 6:14,16
17:25 18:2,4,6
34:21,25 39:5
43:17 46:4
47:2
**exhibited** 38:14
39:16
**exhibiting** 43:6
52:20
**expect** 40:13
**experience**
11:23
**experienced**
43:15
**experiencing**
40:3
**expert** 20:7,11
21:6 22:8,13
23:5,8,11,16
24:13,15
**Expires** 54:19
55:22
**explain** 47:2
49:3
**explained** 49:4
**exposure** 8:14
16:7
**extra** 10:8 18:23
42:1 52:5
**extrapolation**
34:1 35:17,18
35:19 37:21
**extreme** 40:1

**F**

**F.R.C.P** 56:2
**fact** 29:18 30:4
42:8 47:11,15
48:11
**Factor** 8:14
**failed** 48:10

**fair** 18:23
**far** 24:18 26:4
  27:21 42:16
**fee** 3:14 17:16
  17:24 18:23
**feel** 27:22
**fell** 51:20
**file** 6:19 7:3
**files** 21:21
**film** 18:20
**finalized** 27:11
**financially**
  55:14
**find** 18:21
**finished** 10:5
**fire** 1:12 2:13
  7:14 8:20,22
  28:11 33:6
**firm** 6:1 7:22
  16:16 18:19,25
  21:24 22:7
  23:1,15,16
**first** 4:4 8:2 10:3
  17:6 22:12
  24:10 27:12
  33:16 44:7
  48:24
**FIU** 25:12 26:3
**five** 11:12 12:16
  13:2,25 19:22
  22:4 31:8 32:9
  32:12,25
**flakka** 49:9,22
  50:1
**flight** 48:24
**Florida** 1:1,11
  1:22 2:4,10,16
  4:25 5:11
  15:24 25:19,25
  26:14,21 54:3
  54:18 55:21
  57:4
**focusing** 45:2
**follows** 4:5
**footage** 52:24
**forensic** 4:12,13
  4:17 5:25
  46:16
**forensics** 4:14

  24:23
**form** 28:20
  29:20 30:6,15
  33:10,12 41:22
  43:8 49:1 52:6
  56:2,20
**formula** 35:22
**Fort** 2:10 10:1
  13:7 14:4,21
  19:10,17 57:4
**found** 45:21
  47:21
**fourth** 43:11
**frame** 37:6
**friendly** 39:10
**front** 36:21
**further** 55:10

**———— G ————**

**g** 33:22
**Galleria** 2:9
**general** 10:15
  11:14,22
**getting** 19:4
**GG102175**
  54:19 55:22
**Giuffreda** 2:8,9
  6:18 7:22
  21:24 28:20
  29:20 30:6,15
  33:10 41:22
  43:8 49:1 52:6
  53:12,16,18
  57:2,3
**give** 4:19 40:19
  47:5,17,19
**given** 19:23
  29:24 32:7
  44:20 56:4
**go** 6:13 7:9 8:8
  13:7 14:5,7,21
  31:1 33:15
  34:17 43:11
  50:10
**goes** 19:11 48:19
**going** 12:3 13:1
  19:12,13 27:19
  34:12 40:8,9
  41:25 52:15

  53:16
**good** 4:8 33:14
**Google** 24:11,16
**gotten** 48:23
**government**
  10:18,22,24
  11:2 14:11
**gram** 33:23,24
  34:6
**group** 25:5
**guardian** 1:5
**guess** 23:15,17
  41:16

**———— H ————**

**H** 3:10
**habits** 47:8
**half** 11:13 12:24
  12:25 13:12
**hand** 54:13
**handcuffs** 40:7
  41:20 53:2
**handful** 14:17
**hands** 10:9
**happened** 42:17
**happening**
  45:10
**Hawaii** 48:24
**head** 21:3
**heading** 25:23
  28:4 29:12
  30:21
**headless** 38:23
  40:20
**health** 43:25
**Hecht** 2:3 3:3
  4:7 6:23 17:23
  18:8 29:3 30:1
  30:9,19 33:13
  34:17,23 42:2
  43:10 49:12
  52:10 53:8,13
  53:17 57:18
**help** 11:15 13:19
**helps** 23:15
**high** 39:22 45:8
**higher** 37:20
  38:10 45:8
**highlight** 44:17

**hired** 4:18 21:23
  22:7
**history** 43:25
**hold** 26:8,22
**home** 5:5,10,12
  5:13,14 6:6
**hospital** 9:18
  34:4,10 38:11
  49:5
**hospital's** 52:9
**hour** 16:22
  17:13 18:14
  19:7,11,15
  35:12,15 36:25
  37:6
**hourly** 16:22
**hours** 16:18
  17:9,14 19:7
  19:18,18
**house** 19:16
**HPLC** 11:18
**human** 45:22
**hundreds** 14:22
  14:22,23,23
  15:8,8 22:24

**———— I ————**

**idea** 15:2 45:15
**identification**
  6:17 18:5,7
  34:22
**illness** 45:13
**immediately**
  31:5
**immunoassay**
  46:13,15
**imperceptible**
  39:6
**important** 31:9
  44:21
**inaccuracies**
  28:23
**inaccurate**
  28:19 33:7
**incidence** 28:6
**incident** 7:14
  8:22 28:1,4,17
  28:18 29:12,15
  30:21 32:25

  38:21 47:8
  48:20,25 49:20
  49:25,25 50:5
  50:6,19
**incidents** 4:15
**included** 13:19
**including** 19:15
**incomplete**
  50:13,15 51:6
**Incorporated**
  15:20
**increased** 43:23
**independent**
  1:12 14:12,13
**individually** 1:8
  1:9,9,10,11
**influence** 51:8
**information**
  4:18,20 15:12
  28:3,5,16,24
  29:6,14 30:3,3
  30:11,18,20
  31:10,23 32:5
  32:21 33:1,5
  36:1 51:3,9,10
**information's**
  48:8
**ingest** 47:12
**ingested** 47:4
**inhibitions** 39:9
**initiated** 30:23
  31:13
**inside** 41:11
**instrument**
  11:19,21
**interaction**
  44:21
**interested** 55:15
**International**
  25:19,25 26:14
  26:21
**internet** 23:8
**intoxicated**
  45:11
**intoxication**
  29:13 30:13
**invoice** 17:2
**invoices** 7:17
  9:13

involved 23:18
  23:20 24:7
  44:20
issues 51:24

**J**

J 1:10,21 57:17
JANICE 1:4
job 16:4
Jolly 2:8 7:22
  21:24 57:3
JOSE 1:11
Julie 2:15 53:10
  57:19
julie.tyk@wils...
  2:17
July 8:3
jury 48:18 50:14
  51:9

**K**

keep 15:2,5,14
  20:9,20 21:19
  23:3 40:11
KEN 1:10
kept 20:21
kill 38:21 40:21
kind 39:24 41:8
  43:24 46:23
kite 45:8
knew 38:22
know 17:18,19
  20:6,14,24
  21:5 22:10,22
  24:15,21,22
  26:4 27:8,21
  31:5,10 32:22
  39:25 40:8,14
  41:12 42:12,15
  44:6,8,14,15
  45:24 48:2
  49:13,16 50:2
  50:8,14 51:1,3
  51:4,10 53:1
Kroll 15:23

**L**

lab 3:17 9:9,10
  48:17 49:11
  50:10 51:14

Laboratories
  15:17,22,23
laboratory 6:7
  13:17 28:10
  34:11
labs 48:5
Lakes 2:4
Lauderdale 2:10
  10:1 13:7 14:4
  14:21 57:4
law 2:2,8,14
  7:22 18:25
  21:24 22:7,20
layperson 39:7
leading 49:25
  50:6
leave 42:10,12
lecture 25:17
lectured 25:18
  26:5,14,20
left 13:6 15:15
  16:4 42:25
legal 1:5 35:7
Let's 33:15
  43:11
letter 8:3 57:8
level 37:16,24
lieu 19:2
limited 22:17
line 42:20 43:4
list 19:22 20:2
  24:1
literature 7:12
  8:4,5,13
litigation 16:1
LLP 2:15
local 5:8
located 23:14
location 5:15,17
locations 5:8
long 21:20 25:9
longer 16:9
look 9:20 25:8
  26:17 28:1
  32:5 44:21
looking 12:19
  20:1 32:15,24
  45:18 49:2
  50:22

looks 4:22 11:12
  34:13
lot 14:5 36:13
  37:13 41:12
loud 39:2 41:3
lower 37:20,22
Lucie 1:10,11
  2:13 7:16 8:20
  8:22 9:3,7,17
  22:8 28:11
  32:24 33:6
  50:11 51:20
  52:1
lung 16:7

**M**

machinery 6:7
majority 14:10
  15:3
making 56:4
manager 42:8
MANGRUM
  1:8
Manitou 5:1,18
marijuana 51:1
  51:1 52:20
mark 6:13 34:18
marked 6:16
  17:18 18:4,7
  34:21 46:2
  47:2
marketed 24:4
marking 3:15
MASCARA
  1:10 2:7
match 23:15
materials 28:25
math 13:14
mathematical
  35:22
matter 57:12,14
mean 5:6 25:13
  31:4,15,17
  33:19,22 40:18
  46:4,11,24
  47:10
meaning 37:12
means 33:14
mechanism 44:9

medical 7:16 9:4
  9:8,17,25 10:4
  10:7,21 11:6
  11:11,16 12:5
  13:18,20,22
  14:13 15:16
  16:5 28:7,8
  35:1,2,7 43:25
  50:11 51:14,20
  52:1,17
medical-legal
  4:14
memory 31:4
mental 43:25
  45:13
mention 34:5
mentioned
  41:12
Meridian 5:11
met 39:17
method 11:17
methods 11:19
mg/dl 33:18
Mia 1:24 54:17
  54:17 55:3,20
  55:20 57:17
middle 29:11
Milligrams
  33:20
mini 53:18
minimum 17:13
  19:7
minutes 30:22
  30:25 31:5,6,6
  31:8,11,12,15
  31:25 32:1,9
  32:11,12,16,17
  32:21,23 33:8
  35:12,15 36:25
  37:6
miscalculated
  34:8
misread 34:8
money 19:3
months 10:11,14
morning 4:8
MOSKOWITZ
  2:14
mother 1:4

38:22
moved 10:12
  11:9
Moves 21:3
muscle 44:5,9

**N**

N 1:21 3:1
name 4:9
name's 24:22
names 24:1
narrow 32:2
necessary 9:16
need 23:16
  48:14
nervous 41:3
Neurobiology
  8:16
never 11:5 16:9
  26:12 29:18
  39:17 41:7,13
New 9:25 10:7
  10:12 11:10,25
  12:15,24 13:6
  13:21 22:14
Newman 1:8
  57:5
non-cooperati...
  39:24
normal 41:5
  45:9
North 2:16
Notary 54:18
  55:21
notes 55:9
notice 7:15
number 22:4
  31:2 32:17
  34:10,11 49:8

**O**

OATH 54:1
Object 33:12
obviously 18:12
occurred 47:13
odd 40:20 45:19
offer 27:19,23
  48:15
offering 52:11
  52:15

**office** 4:25 5:1,3
5:12 9:24 10:4
10:8,20 11:6
11:11 13:18,22
14:13,14,15
15:1,4,7,16
16:5 17:5,12
22:9 57:10
**officer** 56:3
**officers** 30:12
44:20
**offices** 2:2,8,14
4:23 5:5,10 6:6
**official** 54:13
**Oh** 39:18
**Okay** 6:13 7:8
11:9 12:14
13:1,3 14:20
15:15 16:13
18:24 24:20
26:25 27:3
31:3,7,14,17
31:22 32:20
36:19 37:14,23
40:11 41:10
43:1 44:11,17
45:1,12 47:1,6
49:22 50:24
51:13 52:11,14
53:8
**ones** 24:15 52:2
**operation** 13:18
**opinion** 4:19
33:16 35:10
36:9 38:7,13
43:11 48:15
50:20 51:11,24
**opinions** 27:15
27:19,23 29:7
33:15 45:10
52:11,16 53:5
**Orange** 2:16
**order** 17:4 34:2
48:14 53:16
**ordering** 53:17
**Orlando** 2:16
**outside** 36:20
**overall** 11:22
**oversee** 13:25

**P**

**P.A** 2:3,8 57:3
**p.m** 33:25 35:16
37:1,2,7,7,8,20
38:2,19
**pacing** 41:3
**page** 3:2,12
27:12 56:3
**Page/Line** 56:6
**pages** 3:13 8:24
9:9,10 28:9
**paid** 19:4 25:15
**pair** 10:9
**Palm** 2:4,4 16:2
16:3 54:4
**paragraph** 28:4
29:12
**Paramedic** 33:4
**paramedics** 33:4
**paranoia** 40:24
43:14,16 44:18
**paranoid** 39:1
41:2
**parentheses**
46:6
**parking** 36:13
37:13
**Parkinson's**
44:12
**Parkland** 4:25
5:3,11,15
19:17
**parole** 15:25
**part** 50:25 52:8
56:2
**part-time** 10:11
**particular** 11:19
11:20 12:9
14:2
**parties** 55:12
**parties'** 55:13
**Paso** 5:18
**pathology** 34:13
**patients** 44:12
52:22
**pay** 18:15,19
23:21
**paying** 17:13
**penalties** 56:19

**Pennsylvania**
23:14
**people** 31:16
32:15 39:12,25
40:10,21 41:5
42:21
**percent** 33:23
33:25 34:6
49:7
**percentage**
14:24 20:2,14
20:19 33:22
**perform** 48:10
**performed**
35:23
**period** 38:18
**perjury** 56:19
**persecute** 40:22
**person** 39:7
**personally** 54:9
**perspective**
45:18
**Ph.D** 1:17 3:2
4:2 5:25 15:20
54:9 55:6 57:2
57:6
**PharmChem**
15:17,22
**phone** 40:19
**physical** 7:1
**picked** 49:11
**picture** 44:22
50:14,15 51:6
**Pierce** 19:10,17
**place** 1:21 18:22
**placed** 38:2 40:7
41:20 42:11
**placing** 53:2
**plaintiff** 1:6 2:1
3:11 20:19
25:1
**Plaintiff's** 6:16
17:24 18:1,4,6
34:19,21 46:2
**please** 4:8 26:18
52:14 53:15
57:10
**point** 35:20,21
38:7

**poisons** 4:16
**police** 12:5,13
28:6 36:18
37:12 40:18
41:6,11,11,14
41:20 44:20,24
53:2
**PORT** 2:13
**portal** 19:14,14
**portray** 41:19
**position** 10:3,22
51:19
**positive** 43:12
46:8,11,14,15
46:18,20,21,22
47:10 48:6,11
48:16 50:12,18
50:25 51:16,17
**possibilities**
48:3
**possibility** 51:12
**possible** 29:5
47:14,15 49:15
**post-arrest**
36:15 40:15
**practice** 10:22
10:23 20:22
23:22
**pre** 40:17,17
**pre-** 40:15
**pre-arrest** 36:14
**present** 26:1,23
29:1
**presented** 6:21
**president** 5:25
**presumptive**
46:7,11,14,15
46:21,22 47:10
**pretty** 41:4
**preventing** 52:4
**primarily** 14:15
**prior** 10:6 21:25
35:15 40:7
41:6,11,14
44:23 53:1
**private** 10:22,23
**probability**
47:16 49:17,24
50:4

**probably** 13:25
25:2 37:25
39:6
**probation** 15:24
**problem** 16:10
**proceeds** 19:6
**professor** 25:12
25:14,24 26:3
26:9,23
**program** 12:4
13:22
**prompt** 57:14
**prosecution**
14:16
**protect** 41:1
**protocol** 52:9
**provide** 6:21
14:1 16:1
27:14
**provided** 3:15
7:13 9:19
12:17 14:11
17:6 18:5
27:24 29:5
31:24
**provides** 56:2
**providing** 22:15
**Psychiatric** 8:15
**psychoactive**
43:13
**psychologist**
36:6
**psychosis** 8:16
44:1,19 50:21
**Public** 14:14
15:7 54:18
55:21
**publications**
24:5
**pull** 27:2
**pulseless** 30:23
31:12 32:12,13
**purchase** 42:21
43:5
**Purdy** 2:8 7:22
21:24 57:3
**put** 16:18 17:22
40:6 42:6 43:2
43:3

**Q**

question 10:19
33:14 48:21
49:5 51:13
52:13
questions 49:7
53:9,10,11,12
quibble 13:1
quite 25:7,21

**R**

range 38:1
rapid 39:2 41:3
rate 16:22
read 37:10
42:24 53:14,15
56:19 57:11
reading 34:3
53:22 57:9,11
57:13,21
really 35:1 38:4
39:22
reanalyze 12:10
reanalyzing
12:12
reason 12:14
18:24 45:19
56:6
reasonable
47:16 49:17,23
50:4
reasons 43:21
56:4
receive 8:10 9:3
9:7
received 8:3,9
8:20 9:9 28:5
28:10 29:14
30:3 31:23
record 35:1,2
55:8
records 7:17 9:4
9:8,17 28:7,7,8
28:9 37:11
51:14
refer 31:2 46:14
referral 23:16
referred 6:15
18:3 34:20

referring 28:9
34:15 36:11,12
36:23,25 38:17
38:18,19
reflects 17:2
refutes 28:15
regarding 27:16
regular 53:19
related 36:16
relates 9:7 25:19
51:15
relative 55:11
55:12
relaxant 44:5
relaxed 39:10
44:3,8
relaxer 44:10
remember 22:10
24:9 42:7
report 3:17 7:14
7:15 8:21,23
27:1,4,8,10,15
27:18 28:7,11
28:17,18 29:10
29:15,23 31:2
31:18 32:7,16
32:25 33:6
34:13 46:2,20
47:1,20 48:17
55:5
reporter 1:25
3:15 18:6 55:3
57:17
REPORTER'S
55:1
Reporting 1:21
57:17
reports 9:9,10
50:10 51:14
represent 17:5
requested 55:7
rescue 2:13 7:14
reserve 29:9
residence 5:19
5:22
responsibility
13:25
results 14:8 16:2
46:15

retain 17:5
retained 8:2,10
10:10 20:3,7
20:11,17,25
34:6
retainer 8:9
17:6,8
retrograde 34:1
35:17,18,19
36:3
review 9:17 55:6
57:11
reviewed 8:17
9:21 48:5
Richard 2:9
57:2
richard@pur...
2:11
Richmond 9:25
10:3,14,21
11:3,7
right 6:24 12:22
13:6 20:10
21:2,19 23:10
24:11 29:9
33:15 41:17
42:14 47:7
51:9,10
Risk 8:14
ROBINSON 1:9
roles 10:2
Rosario 1:11
33:4
rotated 11:21
RPR 1:24 54:17
54:17 55:20,20
57:17
Rule 56:2
run 8:21

**S**

S 2:3 3:10 57:18
s/ 54:17 55:20
salts 50:7
save 19:3
saying 32:11
40:11
says 12:17,21
13:2 18:9

25:23 27:13
31:11 32:6
46:2,7,7
scanned 7:3
SCAROLA 2:2
schedule 3:14
6:20 7:12
17:16,20,24
scientific 44:11
screen 49:6
screening 46:13
screens 10:16
14:9
screwdriver
42:3,6,9,12,18
42:19 43:3
seal 54:13
search 23:12
SEARCY 2:2
second 7:15 9:1
27:12 35:10
section 11:18
sections 11:22
sedation 43:22
see 6:25 11:10
17:16 40:13
44:22 46:9
seeing 41:7
seen 41:7 48:4
50:16 51:14
52:23
sending 52:5
sent 27:8
sentence 27:12
29:10
separate 56:3
September 1:19
54:14 55:17
57:6
serum 33:24
services 23:4
setting 46:16
seven 13:12
16:21
SHEET 56:1
shelves 42:10
sheriff 1:10
sheriff's 17:5
22:9 29:15

36:20
SHIPLEY 2:3
Shorthand 1:25
55:3 57:17
shortly 10:10
show 12:19
34:12 41:25
sign 57:11,11
Signature 56:22
57:23
significant 38:4
signing 53:22
57:9,12,13,21
similar 11:14
Sincerely 57:16
sir 53:7
sit 21:6,20
site 23:9
sites 23:8 24:13
24:17
sitting 49:13
six 8:24 10:11,13
13:12 37:5
six-page 28:11
32:25 33:5
slurred 39:2
41:3
smell 39:8
smoke 47:11
smoked 47:3
52:20
smoking 47:8
Sohn 1:24 54:17
54:17 55:3,20
55:20 57:17
sorry 8:13
sort 6:7 24:13
sorts 51:21
sounds 24:20
source 28:23
SOUTHERN
1:1
space 5:12
speak 24:24
speaking 25:5
36:20
special 1:12
specialty 24:2
specific 16:19

specifically 9:6
specimen 13:19
specimens 11:15
speech 39:3 41:4
spoke 42:3
spoken 26:10
Springs 1:22 5:1
5:18
St 1:10,11 2:13
7:16 8:20,22
9:3,7,17 22:8
28:11 32:24
33:6 50:11
51:20 52:1
staff 25:16
standard 36:3
51:21,24
standpoint
45:20 50:17
start 16:5 38:19
57:12
started 15:19
24:10
state 4:8 14:15
15:1,3,24
43:12 44:18
54:3,18 55:21
stated 29:11
30:22 33:5
statement 39:15
44:7 56:4
statements
40:20
STATES 1:1
stenographic
55:9
stenographica...
55:5
Stockham 1:17
3:2 4:2,10 5:25
15:20 54:9
55:6 57:2,6,7
Stockham's 3:14
17:24
stop 44:12
store 40:16 41:2
41:5,6 42:13
42:25 45:3
strangely 40:16

strength 41:18
41:19 42:1
43:7 45:23
struck 22:19
students 25:17
26:10,21
studies 44:11
study 4:15
subject 56:20
subsequently
6:16
substance 43:13
48:16 56:2,20
substances 6:9
suffering 45:12
Suite 2:9,16 57:3
summary 28:2,4
28:17,18 29:12
30:21 34:12
38:21
Summer 21:23
27:8
Sunrise 2:10
57:3
super 45:22
support 16:1
sure 12:11 21:17
24:16
surveillance
52:23
suspected 52:1
sweating 39:2
sworn 4:4 54:10
symptoms 43:17
43:19
system 47:22

T

T 3:10
take 19:18 32:3
42:9 43:4
53:18
taken 1:19 50:10
57:6
takes 19:11
talk 16:19 26:25
40:4 46:1
talking 31:6
36:14,17 37:2

38:20 45:17
talks 32:8
TASA 23:12,13
23:18,20,25
24:8
Tavares 1:4
35:10 36:19
37:16,23 40:5
41:10,18 44:22
45:3 47:3,11
47:21 48:5,19
49:18 50:1,5
50:18 51:16
52:1,16 53:2
telephone 2:13
tell 7:5 8:1,8 9:6
10:1,13 20:1
20:10,18 22:3
26:17 32:20
48:18 50:11,16
telling 15:6
tells 50:17
ten 9:9,10 19:17
19:18 28:9
Teri 1:17 3:2 4:2
4:10 5:25
15:20 54:9
55:5 57:2,6
term 36:16
test 12:11 46:14
48:7,10 49:14
49:14 50:25
tested 47:25
48:6,11 51:16
52:3
testified 4:4 11:5
14:5 22:23
23:1
testify 11:1,24
12:8 14:6,7,18
14:21 15:4,9
48:9 49:18,23
50:3
testifying 14:25
testimony 14:2
14:10 22:16,16
22:19 24:12
29:17 30:11
31:22 34:24

42:4
testing 28:10
46:12,13,17,23
48:16 49:11
50:12,18 51:17
51:21 52:5
Thank 32:4
THC 43:12,13
43:16,20 44:2
44:12,18 46:5
46:6 47:4,12
51:17
thing 39:24
things 29:2
31:16 39:23
49:2 51:5
think 18:22
24:14,18 25:7
44:10 50:13
51:6,9 52:8
thought 34:9
40:25
three 11:13 12:3
12:23,24 17:9
32:22 51:4
three-page
27:18
time 1:20 5:7
7:10 10:9
11:24 14:3
15:3 19:14,15
21:20 22:12
25:7,9,18,21
26:13,20,23
32:3 35:11,20
35:21 36:9,19
36:23 37:6,11
38:8,16,18
41:25 43:9
45:2 47:5 49:9
times 12:2 14:18
14:20,24 15:7
15:8,13 19:18
22:2,22 23:1
title 3:15
today 6:11,21
7:7 16:20
17:12 18:13
21:7 36:1

52:17 53:6
told 26:12 28:23
42:5,8 43:2
tool 40:23
topic 26:15
toxic 4:15
toxicological
27:16 50:17
toxicologist 4:12
4:13,17 10:5
11:3,10,25
12:15 13:8,15
14:4 22:16
24:23 48:14
toxicologists
14:1
toxicology 4:15
6:1 11:14,22
12:6 25:20
26:15 34:14
45:18,20 46:1
47:1,16,20
49:17,24 50:4
track 15:2,5,14
20:9,20,21
21:19 23:3
transcript 55:7
55:8 56:19
57:8,11,13,21
transpired
42:15
travel 19:15
treat 52:22
treated 52:19
treating 51:19
51:25
tremors 44:13
trial 18:22 19:2
19:6,11,23
22:23 23:2
48:19 57:12
trials 14:6
true 55:8 56:19
truly 34:7
truthfully 24:16
trying 38:21
40:21
tube 52:5
two 4:23 5:7

7:25 8:6,12,13
17:13 19:7
31:5
**Tyk** 2:15 33:12
53:11 57:19
**type** 39:4 46:12
**typically** 8:10
18:21 20:11
46:13

**U**

**umbrella** 15:21
**uncooperative...**
39:1
**underlying**
43:25
**underneath** 14:1
15:20
**undersigned**
54:8
**understand**
10:19,25 13:3
21:22 29:4
52:13
**understanding**
31:21
**unexpected**
41:17,19 43:6
45:22
**UNITED** 1:1
**units** 33:17
**universities**
25:11
**university** 1:21
25:15,19,25
26:14,21
**updated** 13:4
**urine** 10:16
13:24 14:8
15:25 43:12
45:21 46:5
47:23,24
**URTHC** 46:3,4
**use** 6:8 10:8 34:1
44:12 49:4
50:22
**user** 45:25 51:2
**uses** 51:2,3
**usually** 39:20

45:23
**utilized** 49:19
50:7

**V**

**v** 57:5
**various** 11:21
**versus** 20:3,8,19
37:17
**video** 18:9,14,25
**videographer**
18:19
**videotaping**
18:12
**violation** 15:24
**Virginia** 10:4
**vitae** 3:13
**volunteered**
10:9
**vs** 1:7

**W**

**WADE** 1:9
**wait** 42:20
**waited** 43:4
**waive** 57:11,21
**waived** 53:22
57:13
**Waiver** 57:20
**want** 7:9 8:8
27:2 31:10
37:14 46:1
48:2 49:16
**wanted** 18:14
**wanting** 32:18
40:24
**wants** 56:3
**wasn't** 17:20
42:16 45:4,5
45:17 47:25
**way** 22:17,20
**we'll** 17:23,25
34:17,17,18
**we're** 16:19
18:12 31:6
37:2
**we've** 46:2 47:2
53:6
**weapon** 40:24
**web** 23:8,9

24:13
**weeks** 47:9,18
49:25 50:6
**went** 10:7 42:20
**weren't** 45:15
**West** 2:4 5:11
16:2
**WILSON** 2:14
**window** 47:5,6
47:17,19
**witness** 1:23 3:2
4:3 6:19 23:5,8
24:13,15 28:22
29:22 30:8,17
41:24 43:9
49:2 52:8
53:15 54:13
56:3,4
**witnesses** 28:15
41:5
**word** 41:13
**work** 6:6 11:14
13:10 16:8
**worked** 10:20
11:6,10 14:3
14:20 17:8,9
27:10
**working** 10:17
14:1 16:15,18
22:25
**wouldn't** 22:3
22:10 24:12
40:12 49:10
53:1
**write** 31:18
38:20
**writing** 10:5
**written** 27:14
**wrote** 27:13
32:16

**X**

**X** 3:1,10

**Y**

**yeah** 24:22 37:5
41:24 44:14,25
47:19
**year** 11:5 12:25
**years** 11:12,13

12:16,24 13:2
13:10 16:16
19:22 20:22
24:9 25:22
26:6,11
**York** 9:25 10:7
10:12 11:10,25
12:15,24 13:6
13:21 22:14

**Z**

**0**

**03** 33:24 35:4
**04** 35:13,16 36:7
37:3,25
**05** 37:25
**06** 35:13,16 36:7
37:3 38:14
39:5,6,15 40:1
40:13 41:7

**1**

**1** 3:13 6:14,17
38:7
**1,000** 19:13
**1.310** 56:2
**10:06** 1:20
**100** 21:13,15,18
49:7
**11** 51:16
**11:15** 1:20 53:21
**111** 2:16
**1200** 2:16
**1216** 2:9 57:3
**16** 27:1,9
**18** 3:15,16
**18:40** 32:7,22
**18:43** 32:8,22
**18th** 54:14 55:17
**19** 16:16 20:21
**19-year** 22:5
**1987** 12:17
**1991** 12:17

**2**

**2** 3:14 17:25
18:4 36:9 38:8
**2,500** 17:6
**2:16CV14413**

1:2
**20** 31:6
**2000** 25:25
26:23
**2002** 26:19,22
**2014** 49:9 51:17
27:1,9 54:14
55:17 57:6
**2021** 54:19
55:22
**2139** 2:4
**2455** 2:10 57:3
**27** 8:3
**2900** 1:21

**3**

**3** 3:16 18:2,6
35:4 38:13
**3,500** 16:25
**30** 31:6 32:1
54:19 55:22
57:12
**32801** 2:16
**33076** 5:11
**33304** 2:10 57:4
**33409** 2:4
**34** 3:17
**36** 5:18
**38** 34:6,8,9,10
34:15,24 35:1
35:1,3,6

**4**

**4** 3:3,13,17
34:19,22,25
46:2,4 47:2
**40** 35:12,15
36:25 37:6
**407)203-7592**
2:17

**5**

**5** 1:19 57:6
**500** 16:22 17:13
18:10,14,16,18
18:25 19:7,12
19:15,18 21:11
**561)686-6300**
2:5

**6**

**6** 3:13 8:9 37:1,2
 37:7,8,20 38:2
 38:19
**6:00** 37:17
**6:30** 37:17,20,24
 37:25

**7**

**7:30** 37:5
**7:38** 33:25 35:16
 37:7

**8**

**8/14** 27:10
**8/15** 27:10
**8/16** 27:11
**80829** 5:18
**87** 12:21 13:2
**88** 12:25
**89** 12:25

**9**

**9/18/17** 57:1
**90** 12:25
**91** 12:21 13:2
**911** 40:19 43:2
**9218** 5:11
**954)344-0555**
 57:10
**954)462-3200**
 2:11