EXHIBIT "B"

**In the Matter Of:**

TAVARES DOCHER

vs.

CHRISTOPHER NEWMAN

---

**MELVIN TUCKER**

*July 12, 2017*    **ORIGINAL**

---

LEGAL | MEDIA | EXPERTS

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

```
 1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORDIA
 2
     _____
 3   TAVARES DOCHER, by and through  )
     JANICE DOCHER NEELEY, his mother )
 4   and legal guardian,             )
                         PLAINTIFFS, )
 5                                   )
          vs.                        )
 6                                   )
     CHRISTOPHER NEWMAN, individually,)
 7   CLAYLAN MANGRUM, individually,  )
     CALVIN ROBINSON, individually,  )
 8   KEN J. MASCARA, as SHERIFF of ST.)
     LUCIE COUNTY, FLORIDA, JOSE     )
 9   ROSARIO, individually, and the  )
     ST. LUCIE COUNTY FIRE DISTRICT, )
10   an independent special district,)
                         DEFENDANTS. )
11   _____)

12                  Raleigh, North Carolina

13                     July 12, 2017

14

15                     Deposition of

16                  MELVIN L. TUCKER,

17

18       herein, called for examination by counsel for the

19   Defendants in the above-entitled action, pursuant to

20   agreement, the witness being duly sworn by Mary Lynn

21   Fuller, CVR, Court Reporter and Notary Public in and for

22   the State of North Carolina, taken at Legal Media

23   Experts, 4801 Glenwood Avenue, Suite 200, Raleigh, North

24   Carolina, beginning at 10:04 a.m. on Wednesday, July 12,

25   2017.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

```
                                                        Page 2
  1                 APPEARANCES OF COUNSEL

  2     On behalf of the Plaintiffs:
              Summer M. Barranco
  3           Purdy, Jolly, Giuffreda & Barranco, P.A.
              2455 East Sunrise Boulevard, Suite 1216
  4           Fort Lauderdale, Florida 33304
              (954) 462-3200
  5           summer@purdylaw.com

  6     On behalf of the Defendants:
              Julie Tyk
  7           Gray Robinson
              301 East Pine Street, Suite 1400
  8           Orlando, Florida 32801
              (407) 843-8880
  9           julie.tyk@wilsonelser.com

 10           David Vitale
              Searcy, Denney, Scarola, Barnhart & Shipley, P.A.
 11           2139 Palm Beach Lakes Boulevard
              West Palm Beach, Florida 33409-6601
 12           (561) 686-6300
              dvitale@searcylaw.com

 13

 14              INDEX TO EXAMINATIONS AND EXHIBITS

 15     Examination                                      Page
              Direct by Ms. Barranco                        5
 16           Cross by Ms. Tyk                            112
              Cross by Mr. Vitale                         119
 17           Redirect by Ms. Barranco                    124

 18     Exhibits                                         Page
        Ex A     NOD                                         7
 19     Ex B     Report With Appendices                      7
        Ex C     Front Cover of Book/Chapter 5 of Book      26
 20

 21

 22

 23

 24

 25
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

```
 1                    P R O C E E D I N G S

 2              MELVIN L. TUCKER,

 3         having been duly sworn,

 4          testified as follows:

 5                    DIRECT EXAMINATION

 6      BY MS. BARRANCO:

 7   Q.   Good morning, sir.

 8   A.   Good morning.

 9   Q.   For the record, my name is Summer Barranco.  I'm an

10   attorney and I represent the sheriff of St. Lucie County

11   and several of the St. Lucie County sheriff's deputies

12   that are named in a federal lawsuit that's been brought

13   by Mr. Tavares Docher, by and through his mother, Janice

14   Docher Neeley, and I'm here today to take your

15   deposition.

16              I know some of us are attending by video

17   teleconference, so forgive me if I don't have everything

18   in front of you, but I've done my best to give the

19   exhibits that I expect to be used during your deposition

20   to the court reporter here today.

21              Can you please state your full name and

22   spell your last name for the record.

23   A.   Yes.  My name is Melvin, M-E-L-V-I-N, middle

24   initial, L, last name Tucker, T-U-C-K-E-R.

25   Q.   And what is your present business address, Mr.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 4

1     Tucker?

2     A.    5929 Fordland Drive, Raleigh, North Carolina 27606.

3     Q.    And are you currently seated for a deposition in the

4     state of North Carolina?

5     A.    Am I currently what?

6     Q.    Are you currently in the state of North

7     Carolina, --

8     A.    Oh, --

9     Q.    -- as we're speaking today?

10    A.    Yes.  Yes, I am.

11    Q.    Okay.  Thank you.

12    A.    In Raleigh.

13    Q.    All right.  Now I understand that you've been

14    retained by the plaintiff in this case as a  - an expert

15    witness.  Is that your understanding?

16    A.    Yes.  That's correct.  Police procedures expert.

17    Q.    And that was my next question.  What is the

18    expertise that you hold yourself out as an expert in or

19    what area of subject matter I should say?

20    A.    Well, police procedures is what I generally define

21    it as, which includes personnel matters, use of force,

22    just about anything to do with police agencies.

23    Q.    And in regard to this particular matter, the Docher

24    versus Newman, et al., case, is there a particular aspect

25    of your claimed expertise that you are traveling under?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 5

```
 1   A.    I'm not sure exactly what you're asking me, but I
 2   spell it all out in my report.  Yeah, my expertise on use
 3   of force, having qualified 97 times now as an expert, and
 4   probably 40 or 50 of those were use of force cases,
 5   including matters involving excited delirium, the
 6   physiology of a struggle, what I  - what are typically
 7   called proximity injuries or proximity deaths.  That's
 8   where I hold myself out as an expert in this particular
 9   case.
10   Q.    Okay.  And the other  - you mentioned you've been
11   qualified about 97 times and you said 40 or 50 of those
12   were use of force cases.  What were the other cases?
13   A.    It ranged -- everything from sex discrimination,
14   race discrimination, to high-speed pursuit to religious
15   accommodation.  Just about any activity involving a
16   police agency, but the majority of my cases have been   -
17   and I've had 530 over the last 20 years  - have been what
18   I call high-risk police operations, use of force, and
19   vehicle operations.
20   Q.    And I understand that you also do some security type
21   cases?
22   A.    Yes.  I was certified by the American Society of
23   Industrial Security as a security specialist and was
24   trained in Israel by the Israeli Security Administration
25   on airport security.  So I've had oh, probably 50, I'd
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 6

1    say, or more security cases over the years too.

2              MS. BARRANCO:  Okay.  And just for the record

3    - I know I said this before we went on the record, but

4    just for the record, I'm asking the court reporter to

5    mark the Notice of Deposition for today's deposition,

6    which includes a  - an exhibit that's a decus tecum part

7    of the notice, asking you to bring the items that you  -

8    the items that are listed in your report and all

9    materials not specifically referenced in your report that

10   you used to form the basis of your opinions in this

11   action.  So that's going to be marked as Exhibit A to the

12   deposition here today and then you mentioned your report.

13   I've asked that the court reporter mark what I understand

14   to be your report, Mr. Tucker, in this Docher case  - to

15   mark that as Exhibit B to your deposition here today.

16   (Exhibit A and Exhibit B marked.)

17             BY MS. BARRANCO:

18   Q.   Just so I understand we're talking about the same

19   thing, do you have a copy of your expert report in the

20   Docher case in front of you?

21   A.   I do.

22   Q.   And is the date of that report May 16th, 2017?

23   A.   Yes, it is.

24   Q.   And does it, attached to it, have Appendices A

25   through I believe it is G?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 7

1   A.   Well, actually, H.

2   Q.   Or H.   Okay.

3   A.   Yes.

4   Q.   I think, in my copy, H isn't actually marked, but

5   you reference it as exhibit  - or Appendix H in the

6   report.

7   A.   Okay.

8   Q.   But we're talking about the same thing it sounds

9   like?

10  A.   Yes, we are.

11  Q.   Very good.  Now, in looking at your  - I see

12  Appendix A to your report is what's titled curriculum

13  vitae?

14  A.   Yes.

15  Q.   Can you tell me if that is a current copy of your

16  curriculum vitae or sometimes I'll refer to it as your

17  CV?

18  A.   It is a current copy of my CV and no changes from

19  what you have there since May 16th.

20  Q.   Well, if I understand what you're telling me, that

21  CV was current as of May 16th of 2017?

22  A.   Yes, and nothing has changed since then.

23  Q.   And when was the last time you reviewed this version

24  of your curriculum vitae?

25  A.   About every deposition I have.  So probably the last

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 8

1    deposition, which would've been sometime in May.

2    Q.   And in your last review of that dep  - of that CV,

3    it was accurate?

4    A.   Yes.  As accurate as I can make it.

5    Q.   Sure.  Okay.  Well, in looking at your CV, I see

6    that, in terms of your educational background, you

7    received a B.A. in Business Management from the

8    University of South Florida in 1965.  Is that correct?

9    A.   I was the first graduating class from the University

10   of South Florida.  That's how old I am.

11   Q.   Yeah.  I wasn't going to ask you that question, but

12   that's fine.  And then you received an MPA in Public

13   Administration from Appalachian State University from

14   Boone, North Carolina in 1977, is that right?

15   A.   Yes.  That's correct.

16   Q.   And then you had some military experience in the

17   navy?

18   A.   Yes, active duty for four years and then in the

19   reserves for an additional 12 -- 15 years.

20   Q.   And the active reserves were back in 1965 to 1969?

21   A.   Yes.  No, that  -

22   Q.   And then the  -

23   A.   Yeah.  The active duty was  65 through  69.  That's

24   correct.

25   Q.   Yes.  And then your reserve duty was from 1969 to

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 9

1    1988?

2    A.    Correct.

3    Q.    And then, in terms of your employment background, I

4    see on your CV you've listed litigation consultant and

5    law enforcement/security trainer, 1994 to the present?

6    A.    Correct.

7    Q.    Is that right?

8    A.    Correct.

9    Q.    And is there a company that you were affiliated

10   with?

11   A.    No.  A sole proprietor, just me.

12   Q.    Is there a name for your sole proprietorship?

13   A.    Criminal Justice and Security Consultant/Trainer.

14   Q.    And that's at the top of your CV, correct?

15   A.    Correct.

16   Q.    Other than yourself, does anybody else work with

17   you?

18   A.    No.

19   Q.    Besides your  - well, let me ask you.  Did you

20   prepare the report that's been marked as Exhibit B  -

21   A.    I did.

22   Q.    -- to your deposition?

23   A.    I did.

24   Q.    Did anyone assist you in preparing your report?

25   A.    Nobody assisted me in preparing my report.  My

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 10

1   report is my own report.

2   Q.   So then you would've been the one to type it up as

3   well?

4   A.   Correct.

5   Q.   Did you get input from anybody in terms of what you

6   should put into your report?

7   A.   No.

8   Q.   Did anyone tell you what you should not put in your

9   report?

10  A.   No.

11  Q.   Now I understand that you  - as I mentioned before,

12  you were retained by the plaintiff's side in this case,

13  which is the law firm of Searcy, Denney, et al.  I don't

14  know all the names.  I don't have them memorized.  But

15  have you been retained by this law firm for any other

16  case or proceeding?

17  A.   Yes.

18  Q.   How many times?

19  A.   Let's see.  I did the Dontrell Stephens case, down

20  in West Palm Beach.  I did the Coconut Grove Police

21  Department case  - taser case, which just settled.  The

22  Dontrell Stephens was a plaintiff's judgment at large.

23  Maybe another one.  I don't know.  Like I said, I've had

24  over 500 cases.  But I've done at least two, maybe three

25  cases, with the firm, counting this --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 11

1   Q.   Okay.

2   A.   -- one.

3   Q.   And in that Dontrell Stephens case, which I have

4   personal knowledge of  - my office was involved in that

5   case as well  - do you recall which attorney with Searcy

6   Denney actually retained you?

7   A.   Jack Scarola.

8   Q.   And then the same question in the Coconut Grove case

9   you mentioned.

10  A.   I believe that was Adam Hecht.

11  Q.   And then, in our present Docher case, which lawyer

12  retained you?

13  A.   My original communication on that case was with  -

14  hold on a minute  - with Adam Hecht in December of 2014.

15  Q.   Now you're talking about Docher?

16  A.   Yes.

17  Q.   Okay.  Now you said there might be one other matter,

18  other than these three that you've specified, and I know

19  that you included, as Appendix B to your report, a list

20  of about 57 cases that you've done, it looks like, most

21  recently.  Would looking at that list perhaps refresh

22  your recollection as to what other case you  - or cases

23  you may've been retained in by the Searcy Denney law

24  firm?

25  A.   I'd be happy to look.  The list is what is required

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 12

1    under the rules for experts, a four year period at least,

2    and, typically, what I do is go through that once in a

3    while and, if it's more than four years old, I chop off

4    the number one and keep on going.  So let's see here.

5    Obviously, these are only cases in which I testified in

6    deposition or trial.  So I see the Dontrell Stephens in

7    there because I did testify in trial.  I do not see on

8    the list the Coconut Grove Department, because I was

9    scheduled for deposition May the 26th and it settled

10   before I was deposed.  So it's obviously not on there.

11   But I don't see any other ones right off the bat.  So, to

12   answer your question, the only ones that I know of are

13   what I told you, Stephens, --

14   Q.    Okay.

15   A.    Coconut Grove, and this one.

16   Q.    Okay.  So, in terms of the times that you've been

17   actually retained by the Searcy Denney law firm, other

18   than the present case, your testimony is in three other

19   matters you've been retained by the Searcy Denney law

20   firm?

21   A.    That's the best of my recollection.

22   Q.    And do you remember what court that Coconut Grove

23   case was in?

24   A.    No.

25   Q.    Do you remember if it was federal or state?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 13

1   A.   Obviously, it was federal.

2   Q.   And do you recall if the other one that you didn't

3   have a specific name for, if that was federal or state?

4   A.   I do very little work in state courts since, like I

5   said, it's use of force cases.  They're almost always in

6   federal court.  Anything I've done with this firm has

7   been in federal court.

8   Q.   Okay.  Now I believe, looking at your CV, you've

9   included the fact that you, at one point in time in your

10  career, were a police officer, is that right?

11  A.   A police officer?  Is that what you said?

12  Q.   Yes.

13  A.   I always was a police officer, except for the period

14  of time I was an FBI agent.

15  Q.   Okay.  Well, I understand at some point, for at

16  least 10 years or so, you were the Chief of Police in

17  Tallahassee.  Is that correct?

18  A.   I was Chief of Police in Tallahassee almost 15

19  years.  I was Chief of Police in Asheville a little over

20  two years, because I was a reform chief there.  I was the

21  Chief of Police in Hickory, North Carolina for three and

22  a half years and Chief of Police and Public Safety

23  Director in Morristown, Tennessee for three and a half

24  years.

25  Q.   And so, obviously, during those time periods, even

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 14

1    if you're Chief of Police, you're still considered a

2    police officer?

3    A.    That's correct.  In fact, just, for example, when I

4    was Chief of Police in Morristown, Tennessee, since that

5    was only a 45-officer department, I worked homicide

6    cases, in fact, the murder of a federal judge's sister.

7    I did traffic  - everything that a regular police officer

8    does and I did that, in fact, throughout my career.

9              When I was Chief of Police in Tallahassee,

10   even though it was about 500 officers for employees, I

11   wore a regular police officer's uniform out in the field.

12   At least twice a month, I would schedule to go out so I

13   could keep my policing skills up, number one.  Number

14   two, to audit my police operation by talking to the

15   officers about how my policies were working and I made my

16   last arrest as a police officer in Tallahassee four

17   months before I retired when an armed robbery occurred

18   and I happened to be in the area and spotted the

19   individual and took him into custody.

20   Q.    And what year would that have been?

21   A.    94, when I retired from there.

22   Q.    Okay.  And just to get a sense of what time frame

23   we're talking about here, in looking at your CV, it says

24   you were a Chief of Police and Public Safety Director of

25   Morristown, Tennessee from 1971 to 1974.  Is that

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 15

1    correct?

2    A.    Correct.

3    Q.    And then you were a Chief of Police, Hickory  - of

4    Hickory, North Carolina from 1974 to 1977?

5    A.    Correct.

6    Q.    And how many officers were in the Hickory Police

7    Department?

8    A.    92 at that time.

9    Q.    Sure.  Because we're going back a few years, right?

10   A.    Yes.

11   Q.    Do you know how large of an agency it is now?

12   A.    No, I don't.

13   Q.    You do not?

14   A.    No, I don't.  I'm sorry.

15   Q.    That's okay.  And then it looks like you were the

16   Chief of Police in Asheville, North Carolina from 1977 to

17   1979?

18   A.    Right.

19   Q.    And how many officers were in the Asheville Police

20   Department back when you were a chief?

21   A.    162 as I recall.

22   Q.    And do you know how many are in the force now?

23   A.    No, I don't.

24   Q.    And then I know you've told us that you were Chief

25   of Police in Tallahassee from 1979 to 1994.  You said

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 16

1   there were about 500 officers at the time you retired, is

2   that right?

3   A.    There were 362 when I went there -- officers -- and

4   I think there was close to 500 employees when I left.

5   Somewhere around that mark.  I'm not sure.

6   Q.    And do you know how many officers they currently

7   have working for the Tallahassee Police Department?

8   A.    No, I don't.

9   Q.    All right.  Now I know we discussed some parts of

10  your curriculum vitae, which is Appendix A to your

11  report, and then you told me about the list of cases as

12  Appendix B.  One thing I wanted to ask you was what have

13  you reviewed in this case in formulating your opinions?

14  A.    What have I reviewed?

15  Q.    Yes, sir.

16  A.    That's all listed on Appendix C, which you have.

17  What I did yesterday was updated that list because I have

18  received depositions, which I reviewed, since May the

19  16th.  I reviewed the deposition of Ryan Gonzalez,

20  Hardyal Bhagudas, Mark Brown, Wade Courtemanche -- I

21  don't know if that's pronounced correctly or not  - Clay

22  Mangrum, Christopher Newman, Calvin Robinson, Samantha

23  Gileweski, and I received a video of a medical exam of

24  Mr. Docher by defense expert, Dr. Michael Shahnasarian

25  and I'm told that I'm going to be provided with

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 17

1    additional materials, including the corporate

2    representative from the St. Lucie County Sheriff's

3    Department's deposition.  So, until I have reviewed that,

4    my opinions are going to remain preliminary.

5    Q.    Okay.  Now let me just clarify what you just said.

6    Something about a video of Mr. Docher?

7    A.    It was a  - it's  - it is titled video  - this is

8    what was on the DVD.  Video of CME of Tavares Docher by

9    defense expert, Dr. Michael Shahnasarian, and that's it.

10   Q.    Okay.  I missed the CME part.  So is the  - I guess

11   the compulsory medical examination of Mr. Docher?

12   A.    I think that's what CME stands for, yes.

13   Q.    And do you know when that was conducted?

14   A.    I have it here with me, so I can look and see if

15   it's got a date on it, but  - 5/10/17.  No  - excuse me

16    - 5/16/17.  So the day that I filed my report, it was

17   done.

18   Q.    Did you actually get an opportunity to watch that

19   video before finalizing your report?

20   A.    No.  Very briefly, first of all, I'm not a medical

21   expert and I assume that just goes to damages, that it

22   has nothing to do with my part of the work.

23   Q.    Okay.  The same question for the other depositions

24   that you listed and listed, quite a few.  Did you have

25   the opportunity to actually review all of those

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 18

1    depositions before finalizing your May 16th, 2017 report?

2    A.   Obviously, I couldn't have.  I didn't receive them

3    until  - most of the items that I told you about, I

4    didn't receive until after May the 16th.

5    Q.   Okay.  Thank you for clarifying that.  But you've

6    since been able to review them?  Is that what you told

7    me?

8    A.   That's correct.  All of them.

9    Q.   Now do any of those depositions that you did review

10   since your report was authored change any of your

11   opinions?

12   A.   Well, it reinforced them for sure and, in reading

13   the depositions, I was  - I discovered that Mr. Mangrum,

14   when he was deposed, says he also delivered a  - an elbow

15   strike to Docher's head in his deposition, page 59, line

16   24.  So he didn't consider it to be deadly force  cause

17   he also had done it.  So, certainly, I will be adding in,

18   when I finalize my report, the use of deadly force by

19   Mangrum, who admits that he also delivered an elbow

20   strike to the head, which was deadly force, when it

21   wasn't justified.  I'll be adding that in.

22   Q.   And that's based on that deposition testimony from

23   Deputy Mangrum?

24   A.   Basically, my entire report and opinions are based

25   upon what the officers themselves said in their reports

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 19

1    -- or depositions and reports.

2    Q.   Okay.  Well, in terms of Deputy Mangrum's testimony,

3    did Deputy Mangrum testify specifically what part of Mr.

4    Docher's body he struck with his elbow?

5    A.   No, he didn't say.  He was up at the head area,

6    opposite Newman, and when asked about whether or not he

7    thought it was deadly force, he said an elbow strike to

8    the head, as far as he was concerned, was not deadly

9    force.  He saw the elbow strike of  - that Newman

10   delivered, but he said he couldn't tell if it was to the

11   right side of the temple or not.  But, in any case, he

12   didn't consider it to be deadly force.

13   Q.   And you're referring to Mangrum now, correct?

14   A.   That's correct.

15   Q.   Yes.  And I know that you referred to the elbow

16   strikes as deadly force in your report, in term's of

17   Deputy Newman's action, and I will definitely be covering

18   that with you momentarily.

19   A.   Yes.

20   Q.   But other than what you just mentioned about Deputy

21   Mangrum and his elbow strike that you referenced from his

22   testimony, was there any other revision or update to your

23   opinions that you believe occurred since the reviewing of

24   all those additional depositions?

25              MR. VITALE:  Object to form.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 20

1   A.   Yeah.  Like I said, the reading of the depositions

2   just reinforced the support for my opinions.  They, in

3   their depositions, talked about him being out of his

4   mind, showing the symptoms of ED, recognizing that ED is

5    - excited delirium is a medical emergency, but then

6   Mangrum says gee, he never  - it never crossed his mind.

7   Excited delirium never crossed his mind once.

8              So, basically, the depositions just

9   reinforced my opinions, as expressed right now, and when

10  I do a final report, of course, I will add in their

11  deposition testimony, where relevant, into the final

12  report after I've seen the deposition testimony of the

13  corporate representative of the St. Lucie County

14  Sheriff's Department.

15  Q.   Okay.  And I didn't want to interrupt you, but you

16  started that answer with using the word they and were you

17  referring to the deputies or someone else?

18  A.   They being the deputies, yes.

19  Q.   Okay.

20  A.   Mangrum  -

21  Q.   And that was based on their --

22  A.   Mangrum, --

23  Q.   Mangrum, --

24  A.   -- Robinson, and Newman.  Correct.

25  Q.   Okay.  And that would  - I'm sorry.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 21

1   A.   That's okay.  Go ahead.

2   Q.   Are you  - okay.  Are you referring to their

3   deposition testimony?

4   A.   Yes.

5   Q.   Now I know Exhibit A  - I mentioned it earlier  -

6   was the notice with the duces tecum, asking you to bring

7   the items that you've relied on or referenced in your

8   report -- or relied on, I think, is the way it's worded.

9   What did you bring to your deposition today, sir?

10  A.   I brought everything, the entire file that I have,

11  and because you asked for  - in the subpoena duces tecum

12  for the items that I relied upon and I footnoted, for

13  example, in my report  - let me find the page, please.

14  I footnoted, in my report, my book.  I footnoted  - that

15  was footnote number 1.  I footnoted the Force Science

16  News #29 bulletin.  So I made a copy of that for you that

17  I brought and I footnoted the International Association

18  of Chiefs of Police National Law Enforcement Policy

19  Center Concepts and Issues paper on excited delirium that

20  was dated April of 2014 and I made a copy of that for you

21  and, as I said, I brought a copy of my book, but I'll

22  keep the book.  You can have the copies that I made of

23  the two other items I footnoted and you can get the book

24  from CRC Publishing.  That would help my royalties.

25  Q.   Okay.  Sure.  Would it be possible to get a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 22

1   photocopy of the cover of your book?

2   A.   Certainly.

3   Q.   Okay.  You want to charge me extra for that?

4   A.   No, no, no.

5   Q.   Okay.  Just so I'll know what it looks like.

6   A.   I'm holding it right there.

7   Q.   Yeah, I see that.  But just so I can have a copy for

8   my file.

9   A.   Okay.

10  Q.   Thank you.

11  A.   Well, she can make a  -

12  Q.   And, for the record, can you just tell me what the

13  name of your book was again?

14  A.   "Investigation and Prevention of Office-Involved

15  Deaths."

16  Q.   And I see, on footnote 1 in your report, on page 9,

17  you reference Chapter 4 of that book?

18  A.   That probably is on excited delirium if I  -

19  Q.   Well, that's what I was going to ask you.  What's

20  the subject matter of Chapter 4?

21  A.   I'm  - Chapter 4  - Chapter 5, excited delirium.  I

22  footnoted Chapter 4?

23  Q.   Yes, sir.  I'm looking at footnote 1 on page 9 of --

24  A.   Yes.

25  Q.   -- your report.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1   A.   Yes, you are and you're - that's a mistake in my

2   report.  It should've been Chapter 5,  cause Chapter 4

3   was on emergency vehicle operations and, clearly, that's

4   not relevant to this case.

5   Q.   It's a good thing I asked the question then.

6   A.   Yes.

7   Q.   Okay.  So it should've been --

8   A.   It should be --

9   Q.   -- 5, which is excited delirium?

10  A.   Right.  Thank you.

11           MS. TYK:  The two papers on excited delirium,

12  do you have copies of those with you today?

13           THE WITNESS:  Yes.

14           MS. TYK:  Do you mind if I take a look at

15  those?

16           THE WITNESS:  Okay.  Hold on a minute here.

17  You're wanting what now?

18           MS. TYK:  The two articles on excited delirium.

19           THE WITNESS:  There's --

20           MS. TYK:  That you said you brought.  They were

21  footnoted.

22           THE WITNESS:  Yes.

23           MS. BARRANCO:  Is that Julie speaking, just so

24  I know?

25           MS. TYK:  Yeah.  I just asked for the copies of

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 24

1   the articles on excited delirium that he footnotes.  I

2   was going to take a look at them.

3              MS. BARRANCO:  Right.  Thank you.

4              MS. TYK:  Um-hmm.

5          BY MS. BARRANCO:

6   Q.   All right.  And, Mr. Tucker, so is Chapter 5,

7   dealing with excited delirium, is that the only chapter

8   you refer to from your book in regard to the Docher case?

9   A.   Yes.  I have --

10  Q.   How many pages   -

11  A.   I  - excuse me.  I have chapters in the book.  For

12  example, Chapter 7 is on positional asphyxia and I -- I

13  most  - I've relied upon my own experience and training

14  over the years and numerous documents, but excited

15  delirium was what I was particularly looking at in this

16  case.  That's it.

17  Q.   How many pages is Chapter 5?

18  A.   How many cases?

19  Q.   No.  How many pages --

20  A.   Oh.

21  Q.   -- is Chapter 5?

22  A.   It ranges  - it goes from page 97 to 111.  So it's

23  not very long.

24  Q.   Okay.  Thank you.

25  A.   12, 13.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 25

1   Q.   I don't suppose you'd be willing to make a copy of

2   that chapter for me and include that in the materials?

3   A.   If they want to take the time to copy it, that's

4   fine.  If she  - I don't have a problem with that.

5   Q.   Thank you.  All right.  And the other materials that

6   you brought to your deposition today, Mr. Tucker, in what

7   format have they been produced?  Are they hard copies or

8   on a disc?

9   A.   No, they're hard copies, which the attorney here for

10  the fire district is looking at right now.  There's

11  another policy from the IACP on excited delirium and a

12  Force Science Newsletter  - Force Science Center

13  Newsletter #29.  That's also on excited delirium.

14  Q.   Okay.  But then you've got plenty of other

15  materials, correct?

16  A.   I've got all the materials that I reviewed, yes.

17  Q.   Okay.  And that's what I was wondering.  Is that  -

18  I wanted to attach to your deposition here today, as

19  Exhibit C, any items you brought in response to the duces

20  tecum portion of the notice and I wasn't sure how we were

21  going to accomplish that.

22  A.   Well, if you're asking me  - what I have is a huge

23  file box here, probably thousands of pages, sitting here

24  on the floor beside me, and DVDs and all that.  I brought

25  the entire file which -- of all the materials that are

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1    listed on Appendix C with me today.  That's it.

2    Q.   Okay.  Do you have those items also electronically

3    maintained somewhere?

4    A.   No.  Some of --

5    Q.   They're all just --

6    A.   Some I do, some I don't.  For example, some of the

7    depositions I received electronically, a couple of them I

8    received hard copy, primarily  cause I was traveling in

9    the last month and they emailed them to me.  And so, some

10   of it's hard copy, some of it's not.

11   Q.   Well, let me just clarify then.  The items that

12   you've brought with you today, are they  - they're all

13   marked  - or I should say listed on Appendix C to your

14   report as well as the items that are footnoted in your

15   report.  Is that correct?

16   A.   That is correct.

17            MR. VITALE:  Objection.

18            THE WITNESS:  That's correct.

19   Q.   Is there anything else you brought that's not either

20   listed on Appendix C or as a footnote in your report?

21   A.   Well, I have my communication file, which is

22   communication between myself and the Searcy law firm,

23   which is privileged under the rules, so I  - and I have a

24   little sheet of paper with  - that I put together with

25   the parties that are involved so I can keep them

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 27

1    straight, for example, Mark Wayne Brown, CVS employee,

2    that sort of thing.

3    Q.   Now the communications file you mentioned, did you

4    rely on any of the communications in coming up with your

5    opinions?

6    A.   Absolutely not.

7    Q.   So your testimony is that communications file had

8    nothing to with ultimately what your opinions were or

9    will be in this case?

10   A.   You asked the question earlier whether I've been

11   provided any direction.  No.  Nothing in that

12   communications file  - it's a file that says enclosed

13   herewith are additional materials for you to review in

14   preparation of the report for this case.  Boom.  That's

15   it.  And then I would have materials.  Or enclosed

16   herewith is your retainer check.  That's basically what

17   the file is.

18   Q.   Okay.  Thank you.  Do you know how many active cases

19   you're currently working on, Mr. Tucker?

20   A.   I know absolutely how many,  cause I'm --

21   Q.   Can you tell me?

22   A.   Because I'm trying to retire, I have stopped

23   accepting cases and it has now dropped down to 41 active

24   cases, of which 12 of those cases are cases that are on

25   appeal.  So you can do the math on that to determine how

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 28

1    many are otherwise active.

2    Q.    And when was it that you stopped taking new case?

3    A.    I started trying to not take new cases about a year

4    ago.  Unfortunately, or fortunately, depending on

5    perspective, I have a couple of attorneys that I've

6    worked for a lot, like Robert Phillips, in South

7    Carolina, who just sends me a file and a check and says

8    looking forward to your report.  And so, you know, I

9    stopped  - I've had a couple of those happen.  But I've

10   been trying to not accept cases for about the last year

11   and have reduced my case load from 60-something down to

12   40.

13   Q    Okay.

14   A.    I found the  -

15   Q.    Now is the  -

16   A.    I found that, to get out of this business, you

17   either have to do one of two things, die or stop

18   accepting cases, and it'll take three or so years or

19   longer.  I have one -- just for the interest part of it

20   -  I go to trial in October, in Toronto, Canada, that I

21   was retained on in 2007.  It's been going on 10 years.

22   Q.    Now litigation does tend to do that sometimes,

23   doesn't it?

24   A.    Apparently so.

25   Q.    Well, hopefully, you'll get to retire and not die

Page 29

1    shortly thereafter.  I know sometimes we've lost some

2    experts because they passed away or they have a stroke or

3    something, which is  -

4    A.    Right.

5    Q.   -- not the way you want to retire, if you can help

6    it anyway.  All right.  Well, I want to turn now to your

7    report in this case and I notice, at page 2, you have a

8    heading of "Specific Qualifications to Provide Opinions

9    on the Facts of this Case."

10   A.    Right.

11   Q.    Are you at that spot there?  And you make mention,

12   about three sentence or paragraphs down, that you were

13   certified  - or was certified until September 2009 on

14   most use of force disciplines.

15   A.    Right.

16   Q.    And my question is what do you mean by that?

17   A.    Very simply, that I  - when I was in  - living in

18   Tennessee, before I moved to North Carolina, I was

19   retained by the Department of Homeland Security to train

20   16 sheriff's departments in east Tennessee on use of

21   force.  And so, to do that, I had to send the  - an

22   outline of the curriculum that I would be teaching and my

23   qualifications, and all that, to the state of Tennessee

24   so they could certify the course so the officers would

25   get paid the incentive money for going to the courses.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 30

1               So I updated all my certifications at that

2    point, which is firearms, which I'm still certified.  I

3    have a retired law enforcement officer's concealed carry

4    permit.  I just qualified again last December.  But, at

5    that time, I updated myself on the baton -- police baton,

6    defensive tactics, oleoresin capsicum, pepper spray or

7    OC, and the X26 and M26 tasers.  Those are the

8    certifications that I'm talking about.

9               And so, when I moved to North Carolina in

10   2008, I did not renew any of that for two reasons.  One,

11   I wasn't going to be doing anymore training like that

12   and, two, I'm too dog-gone old to get shocked and pepper

13   sprayed anymore.  And so, I don't do that.

14   Q.   And in order to maintain your certifications, you

15   would've had to be shocked and peppered sprayed?

16   A.   Well, that -- it was voluntary, but, you know -- you

17   know how it is.  Yeah.  You --

18   Q.   Well, when you're the expert, it's hard to say no, I

19   don't want to do that?

20   A.   Right.

21   Q.   Got it.

22   A.   Back then.  Now I can say no.

23   Q.   Yeah.  No is a good word sometimes.  Now, in this

24   Docher case, Mr. Tucker, there was no usage of tasers,

25   correct?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 31

1    A.    Right.

2    Q.    And there was no usage of firearms?

3    A.    No.

4    Q.    Or OC spray?

5    A.    That's correct.

6    Q.    Or batons?

7    A.    Correct.

8    Q.    The usage of the -- the use of force by the deputies

9    with Mr. Docher was limited to empty-hand tactics.  Is

10   that correct?

11   A.    Yes.  I would agree.  Empty hands would be the

12   general category, but it dealt with, as I said, most

13   significantly, elbow strikes to the head and the

14   compression of a person handcuffed with their hands

15   behind their back in the prone position, which is

16   problematic too.

17   Q.    Okay.  And we'll talk about that, but I just --

18   A.    Sure.

19   Q.    -- wanted to understand, in terms of the type of

20   force that was being utilized by Deputies Newman,

21   Mangrum, and Robinson, it didn't include a lot of the

22   things that you just said you'd had some experience with

23   in the past?

24   A.    They're -- I only am talking about getting certified

25   on the tools of policing in terms of use of force.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 32

1   That's what that is referring to there.

2   Q.   Okay.   Now moving on to page 3 of your report, Mr.

3   Tucker, --

4   A.   Yes.

5   Q.   -- I see at the top you've got a topic that says --

6   or a heading that says "Objectivity."

7   A.   Right.

8   Q.   What did you mean by objectivity?

9   A.   Well, the -- I have come across experts that didn't

10  last very long, that when they were being deposed, they

11  said well, I never will take a case against the police

12  department.  Well, that doesn't show objectivity.  They

13  don't care what the facts are.  They wouldn't take a case

14  against the police or the reverse.

15            So what I'm saying there is that, if

16  you're an expert, you have to be willing to take cases

17  from either plaintiffs or defense and your testimony is

18  based upon what the facts of that particular case are.

19  And, over the time of the past 20 years, I'm saying that

20  my trial and deposition testimony has been 70% plaintiff,

21  30% defense.  That's over the entire time period because,

22  when I first started, it was almost all -- as a recently

23  retired police chief, it was almost all defense work, but

24  then I give you Appendix B, which shows you what my

25  testimony has been for the past four years.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 33

1    Q.    Well -- and let's talk about that.  That Exhibit B,

2    that's your cases that you have told me about for about

3    the last four years or so.  When you look at that list,

4    you've got about 57 cases there and isn't it true that in

5    about 95% of those cases, you were called on behalf of

6    the plaintiff's side?

7    A.    That's exactly correct.  It's been trending

8    plaintiff, but a lot of the cases that I've had for the

9    defense have settled or they've received a summary

10   judgment.  And so, I was never deposed or testified in

11   trial on.  So it's  - but I think you're correct, without

12   a question, that that's what it's been for the last four

13   years.

14   Q.    Okay.  And then, in looking at the cases there, I

15   saw dates ranging from 2007 to 2015.  I'm assuming some

16   of those cases just were older and they took a while to

17   get to trial, which is why they'd still be on your list?

18   A.    Yes.

19   Q.    Okay.  Now if we go to page 4 of your report, I see

20   you've got a heading of "Summary of Assumed Facts"?

21   A.    Right.

22   Q.    And you say there the facts in this case that are

23   relevant to my opinions are summarized in Appendix D to

24   this report and I see --

25   A.    Well, before --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 34

1    Q.    Go ahead.

2    A.    Before you can develop opinions in the case, you'll

3    have -- you have to assume something to be true for

4    purposes of analysis.  So what I do is review the

5    materials that I've received and then I usually make a

6    little bit of a summary of assumed facts and that is what

7    Appendix D is in this particular case.

8    Q.    Okay.  So if I were to assume that Appendix D are

9    all of the facts relevant to your opinions, would that be

10   correct?

11   A.    Probably not.  Like I said, it's a summary.  So it

12   -- my report is what you could consider to be taking into

13   consideration all of the facts, but a summary's a

14   summary, you know.  I tried to list those things which

15   allow me to make sense out of the materials that I

16   reviewed when I look back at it and that's what I've

17   provided in Appendix D.

18   Q.    Okay.  And Appendix D is your -- is it correct that

19   it's about a page -- it's a little short of two pages?

20   It's about a page and three-quarters?

21   A.    That's correct.

22   Q.    Are there any -- I know you said it's a summary of

23   the facts.  Are there any facts that, for whatever

24   reason, isn't contained in the summary --

25   A.    Well, I --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 35

1    Q.    -- or is it just really what's relevant?

2    A.    Right.  I already mentioned the -- one of those,

3    facts, of course, that I didn't learn about until I read

4    Mangrum's deposition, that he also delivered a elbow

5    strike to the head of Docher.  So, obviously, that's not

6    in the facts assumed because I didn't know about it at

7    point in time.

8    Q.    Sure.  Was there any  - is there anything else

9    though that you can think of?

10   A.    No.  I don't think so.  That's -- I think it's -

11             MR. VITALE:  Objection.

12   A.    It is what it is, a summary.

13   Q.    Okay.  And then I'm looking at page 2 of that

14   Appendix D.

15   A.    Yes.

16   Q.    My copy of it ends with a reference to witness

17   Shannon Randolph.  It looks like a quote from her, but

18   there's no end punctuation or end quotes and I'm

19   wondering if your version is the same way or if I'm

20   missing something.

21   A.    No.  I don't think you're missing anything.  I

22   should've had a period quote  - closed quotes there.  I

23   put down, in the summary, what independent witnesses

24   said.  Clearly, that witness's interpretation of what

25   beating the shit out of someone is not relevant to me.  I

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 36

1    - you know, I have to consider the matter in  - against

2    recognized police protocols.

3                     And so, like I said earlier, my

4    preliminary opinions are 90% or more based  - I don't

5    know how to put a percentage on it  - based on the

6    officer's own testimony in re  - I mean their own

7    statements and their incident reports, and that sort of

8    thing, and depositions.

9    Q.    Okay.  So I just wanted to make sure there wasn't

10   anything cut off here from Appendix D.  You're just

11   saying that there should've been a period and an end

12   quote?

13   A.    I  - that was just a mistake on my part for not

14   putting a period and quote, just like on my page 1, I  -

15   under retention, in the second paragraph, I put Ocher

16   instead of Docher, you know.  I  -

17   Q.    Okay.

18   A.    -- made some  -

19   Q.    Where was that?  I didn't see that one.

20   A.    Pointing out a mistake on my report, page 1, under

21   retention, where it says the force used against Tavares

22    - it says O --

23   Q.    O --

24   A.    -- C-H-E-R.  It should be D-O-C-H-E-R.

25   Q.    Thank you.  Yeah.  I didn't see that.  All right.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 37

1    Now page 2 of Appendix D, we were just kind of talking

2    about that.  You were - I notice that you have reference

3    to civilian - some civilian witnesses.  To what extent

4    did the civilian witnesses testimonies play a role in

5    your opinions in this case?

6    A.   Well, they support the officer's own opinions  -

7    their own statements that elbow strikes - for example,

8    Ariana Kanhai, the citizen, said the deputy by the man's

9    head kept hitting him with his elbows and that's

10   consistent with the officer's own statements.  The same

11   thing with Zackary Taylor, the hitting the man with their

12   elbows, consistent.  The  - it just supports the version

13   of the officers in their reports themselves.

14   Q.   I know you mentioned too  - and this might come up

15   later with the excited delirium portion of your opinion,

16   but I see, again, looking at your Appendix D, page 2, you

17   reference, toward the end, according to witness Leah

18   Boles, Docher was "delusional and paranoial" and "very

19   sweaty" and not acting normal.

20   A.   Yeah.  Those are all  -

21   Q.   And then  -

22   A.   Those are all symptoms of excited delirium, just as

23   pacing nervous and delirious, talking murder, ransom, and

24   rewards, from Samantha Gileweski.  Those are symptoms of

25   excited delirium that officers are trained to recognize

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 38

1    and when they recognize it as excited delirium, the

2    protocols are well-established as to what you should do

3    at that point, which they didn't do, but we'll go into

4    that I'm sure.

5    Q.    Okay.  Well, you do understand, Mr. Tucker, that Ms.

6    Boles and Ms. Gileweski, those were both CVS employees

7    who were working inside the store when they saw Mr.

8    Docher behaving as they reported.  Is that correct?

9    A.    That is correct.

10          MR. VITALE:  Objection.

11   Q.    And you -- were the deputies present at that time

12   based on your understanding?

13   A.    Were the deputies present at that time?  No.

14   Q.    Do you know if Ms. Boles or Ms. Gileweski ever

15   witnessed Mr. Docher's conduct outside of the CVS?

16   A.    Not that I recall.  One of the things that you do as

17   a police officer when you respond to a call is you try --

18   you do a fast preliminary investigation, which typically

19   would be to talk to the complainant, and since there were

20   three deputies on this call -- Newman, Mangrum, and

21   Robinson were riding together and then Newman was

22   separate -- one of those deputies typically would have

23   talked to the employees in the store asked well, what did

24   you see, what's been happening, and would've learned

25   these things -- delusional, paranoial, sweating,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 39

1   etcetera.  Those are all indicators. when you're doing a

2   preliminary investigation. as to what you're getting

3   ready to deal with, which is excited delirium, and if

4   it's -- you've got those symptoms, before you take any

5   law enforcement action, you get medical personnel to the

6   scene as a matter of protocol because any kind of a

7   struggle with that person who's exhibiting the symptoms

8   of excited delirium and restraint has been shown to be

9   very, very dangerous.

10              So that's why we say it's a medical

11   emergency when you do recognize that.  Instead, the

12   officers made a decision to arrest, even though there's

13   confusion on that.  As Newman says, he didn't make an

14   arrest.  The reports say he did.  But, in any case, the

15   fact is these were things that witnesses saw and somebody

16   should've talked to them.

17   Q.   Now, Mr. Tucker, I understand what you're saying,

18   but in terms of those witnesses, if they're busy working

19   inside the CVS, is it your position then that the deputy

20   should've just stood by and waited until they were able

21   to determine any witness that might've had any

22   interaction with Mr. Docher and made Mr. Docher kind of

23   just wait at their car until they could gather all of

24   this information before making any plan?

25   A.   No.  My -- it's real simple, that one deputy would

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 40

1   go to talk to the complainants  - the complainant or

2   complainants and that's not chasing somebody around the

3   store, but just answering  - asking a couple simple

4   questions:  what did you observe about this individual?

5   What do we have here?  Do we have a crime?  Do we have a

6   mentally ill person?  Do we have an intoxicated person?

7   Do we have somebody exhibiting the symptoms of excited

8   delirium?  That's what one deputy should've been doing

9   while the other two communicated, maybe, with Docher,

10  just keep things calm until they got an understanding of

11  what the circumstances were.

12              Were they dealing with a crime?  No.  Were

13  they dealing with an intoxicated person or were they

14  dealing with a mentally ill person or were they dealing

15  with somebody exhibiting the symptoms of excited

16  delirium?  That's  - those are questions that typically

17  officers try to answer before they start taking any kind

18  of action, if possible, and, in this case, it was

19  possible because they didn't have any problems at all

20  until they were placing him in the car after he was

21  handcuffed and then that's when he ran.  They had plenty

22  of time to have made an inquiry of the people in the

23  store as to what they saw.

24  Q.   Well, you mentioned that the deputies should've made

25  contact with the complainant.  Wasn't the complainant Mr.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 41

1    Docher?

2    A.   Well, Mr. Docher asked the -- Mr. Brown to call 911

3    and he needed help and Mr. Brown did that and then handed

4    the phone to Docher and then, after that, the other

5    people got involved, including the store manager,

6    etcetera.  So yeah, Docher was originally the one that

7    said he needed help.

8    Q.   And is it your understanding that there was nobody,

9    other than the deputies and Mr. Docher, that actually

10   witnessed the entire event that transpired between Mr.

11   Docher and these deputies?

12   A.   Well, I'm not sure I understand that question.

13   Q.   I can rephrase.

14   A.   Go ahead.

15   Q.   Do you know of any witnesses, other than the

16   deputies themselves and Mr. Docher, that witnessed the

17   entire interaction between Mr. Docher and the deputies?

18   A.   Gees, I - I'm trying to recall, but it seems like

19   there was somebody there that was videotaping it and one

20   of the deputies seized his video camera, took it from

21   him, and as - so-called as evidence.  So I don't know,

22   but, like I said, what anybody else witnessed, the entire

23   event, what I'm relying on is what the officers - the

24   deputies themselves said happened and what they did and

25   why they did it.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 42

 1   Q.   Okay.  So even though you've read the depositions

 2   and the statements of these witnesses, the CVS employees,

 3   the civilian witnesses outside, you can't tell me whether

 4   any of them saw the entire event or not, is that right?

 5   A.   I can tell you from my remembrance of reading their

 6   depositions.  For example, the store manager, Mr. --

 7   Q.   Bhagudas?

 8   A.   -- Bhagudas, he said that after he left the  -

 9   Docher left the store, he went about his  - he didn't see

10   what happened in the parking lot.  I think that's the

11   same thing for Wayne Brown.  I think that's the same

12   thing for Samantha Gileweski.  So I think it's clear that

13   they went about their business, did not go out into the

14   parking lot and observe all the events.

15   Q.   Now do you recall though that Mr. Bhagudas, who was

16   the store manager, felt compelled to go out to the

17   deputies briefly to let them know that Mr. Docher had a

18   screw driver in his possession?

19   A.   I do recall that and I thought that was, you know,

20   of course, entirely appropriate.  It was a safety matter

21   as far as he saw and he did tell the deputies and the

22   deputies did tell him to put the screwdriver down, which

23   he did comply, and then they kicked it out of the way.

24   All of that's  - no problem with any of that.

25   Q.   Because originally  - or initially, Mr. Docher was

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 43

1    cooperative with the deputies, right?

2    A.    Yes, he was.  And, you know, you mentioned earlier

3    that Docher's the one himself who said call 911.  I think

4    that's a significant fact for the deputies to have

5    understood and it's not clear to me whether they

6    understood -- that was communicated to them or not.  But

7    when somebody calls and says would you  - when somebody

8    says please call 911 for me, I need help, that's an

9    indication that it's not a crime.  It's somebody who's

10   got a mental health problem going on or a medical problem

11   going on,  cause they ve asked for someone to call 911 to

12   help.

13   Q.    Well, would you agree with me though that, just

14   because somebody's asking for 911 to be called, it

15   doesn't always mean that somebody's mentally ill or needs

16   medical assistance, right?

17   A.    Any question that you ask me today that uses terms

18   like always, I'm going to answer the same way, which is

19   anything is possible.  I've heard of people calling 911

20   because McDonald's didn't give them two scoops of ice

21   cream on their cone.  Clearly, anything's possible.  But

22   the fact is that, when a person calls 911 themselves or

23   asks for someone to call 911, that should be of interest

24   to the officers who responded to understand that this is

25   a person seeking help.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 44

1   Q.   Okay.  Well, let me ask you about your Appendix C

2   again, the materials reviewed.

3   A.   Okay.

4   Q.   I see mentioned  - I'll give you a minute to get

5   there.  Appendix C to your report.

6   A.   All right.

7   Q.   And there's mention, at number 13, of five discs

8   containing police reports, articles, event reports,

9   witness statements, CVS video/phone audio, 911 audio,

10  audio/video witness statements, and photos and witness

11  statements.

12  A.   Right.

13  Q.   Do you see what I'm reading from?

14  A.   Yes.  I re  -

15  Q.   Do you know where those five discs came from?

16  A.   Well, I have them here.  I would assume the five

17  discs were all provided to me from the  - they're marked

18  Searcy, Denney, Scarola law firm, photos and witness

19  statements, CVS video/phone video, copied from CD.  All

20  of it's marked, so  -

21  Q.   So  -

22  A.   Marked Searcy, Denney, Scarola.

23  Q.   Okay.

24  A.   So --

25  Q.   But you don't know where they got those five discs

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 45

1   from?

2   A.    Well, they would've had to have gotten them from

3   either the sheriff's department or CVS, because how  -

4   otherwise, they wouldn't have been able to get it.

5   Q.    Or their private investigator?

6               MR. VITALE:   Objection to form.

7   A.    I don't know.

8   Q.    And were you aware, Mr. Tucker, that some of the

9   statements you were provided were taken by the Searcy

10  Denney's private investigator?

11  A.    Yes.  I'm totally aware of that.

12  Q.    Okay.  Now what I really also wanted to know is the

13  reference to the videos, I wanted to understand, Mr.

14  Tucker, what videos  - and I don't mean videos of

15  depositions or videos of interviews, but I want to know

16  what videos from the scene have you ever reviewed.

17  A.    That's  - I'm going by strictly memory now.  I

18  didn't review it in preparation for this deposition.  So

19  the last time I looked at it would've been sometime in

20  April or May.  But I do recall videos.  It was a couple

21  of minutes of the struggle with Docher in the parking

22  lot, if I recall -- a couple minutes.  That's primarily

23  what I remember.

24  Q.    Now my understanding is there is a short cell phone

25  video taken by one of the individuals that was in front

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 46

1    of the CVS.

2    A.    Right.

3    Q.    It was a minute or so long.  I don't remember

4    specifically how long it was, but it wasn't particularly

5    long.  Do you know if you saw that video?

6    A.    Well, certainly, it was referenced in one of the

7    depositions, the deposition of the officer who seized the

8    Iphone from that citizen, and I think he said it was a

9    minute and nine seconds long, but  - and I may have

10   reviewed it, but, you know, again, I can't emphasize

11   enough that my opinions are substantially and almost

12   totally based upon the officers own testimony in

13   deposition or their reports, because video, although some

14   of it is good, you know, a lot of times, it's really

15   difficult to make out what the heck is going on.  But I

16   did review one of those videos that I recall that showed

17   part of the struggle.  I don't remember whether it was

18   the citizen's  - it had to probably have been the

19   citizen's video.

20   Q.    Okay.  I know we were just talking about the cell

21   phone video.  Do you recall  - I know it's been a while

22   since you've seen it apparently, but do you recall what

23   it showed?

24   A.    Some of the struggle, the officers holding Docher

25   down as I  - the deputies holding Docher down as I

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 47

1    recall.

2    Q.   Okay.  Would you agree with me that it was not a

3    videotape of the entire interaction from start to finish

4    between the deputies and Mr. Docher?

5    A.   I would agree with that.

6    Q.   In fact, it was, like you said, only about a minute

7    and nine seconds of the entirety of the event?

8    A.   That's what I recall.  That's correct.

9    Q.   Now have you ever seen any of what I'm going to call

10   surveillance video, for lack of a better word, taken from

11   the CVS store itself?

12   A.   Not that I recall.

13   Q.   Do you recall ever seeing any video showing Mr.

14   Docher and the deputies falling to the ground in the

15   parking lot?

16          MR. VITALE:  Objection to the form.

17   A.   No, I don't.  I don't recall seeing any video of

18   that.  I recall, very distinctly, the officer's

19   deposition testimony and statement testimony of all three

20   of them grabbing at him and all four of them falling to

21   the ground, yeah.

22   Q.   So it sounds like, if I'm understanding what your

23   testimony is, you really are relying more on the

24   deputies' recollection of the events from their

25   depositions and statements more so than any of the video?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 48

1    A.    Typically, I'm going to rely on the most significant

2    information that I can get and that's, in this case, the

3    deputies themselves, as to what they say happened and how

4    it happened, and that's the problem for them because they

5    describe the use of deadly force when it wasn't justified

6    and they describe holding a person down in a prone

7    position with hands cuffed behind their back, which is

8    the so-called physiology of a struggle problem.

9    Q.    And I know that's part of your  - some of your

10   opinions, correct?

11   A.    That is correct.

12   Q.    Okay.  And I'll talk to you about those momentarily.

13   Okay.  Let me turn now to your report again, page 4, your

14   preliminary opinions, and have you already explained to

15   me what you meant by preliminary opinions?

16   A.    Yes.  What I did was titled my opinions as

17   preliminary because I was told, when I filed my report on

18   May the 16th, that I would be receiving additional

19   information to review, including the deposition testimony

20   of the officers.  So that's why I classified them as

21   preliminary and figuring that I would, after reading the

22   depositions, file a supplement report  - supplemental

23   report finalizing my opinions.

24                   What I'm saying today is I still can't do

25   that because, frankly, I just received, yesterday,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 49

1    information that they'll be additional materials provided

2    to me, which is the deposition testimony of whoever the

3    corporate representative is for the St. Lucie County

4    Sheriff's Department, and that will address the issue of

5    whether or not there was an internal affairs

6    investigation done, what the conclusion of the internal

7    affairs investigation was, which I'll have to look at to

8    determine whether there's a custom and practice in the

9    St. Lucie County Sheriff's Department of condoning things

10   like elbow strikes to the head or condoning excessive

11   force.

12   Q.   And so, am I understanding your testimony to be

13   that, to date, you have not yet been asked to opine about

14   any customs or policies of the St. Lucie County Sheriff's

15   Office in relation to this case?

16   A.   Well, typically, I don't get asked anyhow.

17   Typically, because I've been doing this for 20 years, I

18   know what to look for and what to look at, and custom and

19   practice is always something that I look at, and I'm

20   telling you that I can't make a determination on custom

21   and practice right now because I have to wait until I see

22   the testimony  - deposition testimony of the corporate

23   representative from the sheriff's department.

24   Q.   Okay.  Thank you.  Looking at your preliminary

25   opinion number one, on page 4 of your report, Mr.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 50

```
 1    Tucker, --

 2    A.    Yes.

 3    Q.    -- and you mention or you state in there that, I

 4    guess, your preliminary opinion number one is that

 5    Deputies Newman, Mangrum, and Robinson, in the force that

 6    they used with Docher on May 11th, 2014, was excessive

 7    and unreasonable and was a greater level of force than

 8    other officers would've used in 2014 if confronted with

 9    the same or similar circumstances?

10    A.    Yes.

11    Q.    Is that correct?

12    A.    Yes.

13    Q.    Can you tell me what facts or data you rely on to

14    come to that opinion?

15    A.    Well, yes.  That's over  - under the analysis part,

16    on page 5, where I say okay, let's  - what's the standard

17    of care here on use of force and, clearly, it's the

18    Graham v. Connor test, the U.S. Supreme Court decision,

19    1989, and  - as to whether or not it's excessive force or

20    not and, clearly, it says, in the Graham v. Connor case,

21    that you have to take into consideration the totality of

22    the circumstances, to include at least whether or not

23    there was a crime at issue or the severity of the crime

24    at issue.  In this case, we don't have a crime or, if we

25    did, it would've been public intoxication apparently.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 51

1          Whether there was posing an immediate

2    threat, well, I don't think there was an immediate threat

3    posed to the three deputies, to the safety of the

4    officers, and whether he was actively resisting arrest,

5    well, he was resisting when he fled, I guess, and -

6    without question.  So that factor's there.

7          Then, you know, I cite the fact that in

8    Florida  - and I have the  - attached, as Appendix E,

9    right out of the Florida Basic Recruit Training

10   Curriculum:  Volume 2, "Criminal Justice Defensive

11   Tactics," page 291, and it clearly shows that a elbow

12   strike taught in Florida  - and I served three and a half

13   years as vice-chairman of the Criminal Justice Standards

14   and Training Commission in Florida, so I'm familiar with

15   all this.  Elbow strikes to specific areas can cause

16   great bodily harm or death and target areas for deadly

17   force include the following:  temple, the side of the

18   jaw, the bridge of nose, back of the head, the throat.  I

19   don't think it can be any clearer than that.

20          So when you have Newman saying well, it

21   wasn't deadly force, but I  - yeah, I delivered an elbow

22   strike  - in fact, I delivered two and Mangrum saying

23   yeah, well, and I delivered one too and I don't think it

24   was deadly force, where did it come from when they say it

25   wasn't deadly force?  Clearly, the training they received

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 52

1       - or should've received and been aware of says elbow

2     strikes to the head area, the temple, the side of the

3     jaw, the bridge of the nose, the back of the head, the

4     throat, it's deadly force.  That's excessive then, since

5     deadly force was never justified and they admit, in their

6     deposition testimony, that deadly force was never

7     justified, but say well, deadly force was never justified

8     and we didn't use deadly force because we don't consider

9     elbow strikes to be deadly force -- elbow strikes to the

10    head.

11    Q.    Don't let me interrupt you.  Are you finished?

12    A.    Yes.

13    Q.    Okay.  Thank you.  Just so I understand, I know you

14    were talking about the elbow strikes to the head.  Other

15    than elbow strikes to the head by either Newman or

16    Mangrum, do you take issue at any other uses of force by

17    these three deputies?

18    A.    Well, clearly the use of a  - holding a person in

19    the prone position while their hands are cuffed behind

20    their back after them seeing all these issues of symptoms

21    of excited delirium or medical issues is excessive force.

22    There were three deputies there at  - most of the time

23    and four at another point, as I recall, to control Docher

24    without holding him down in the prone position with

25    compression on him, like Mangrum was 205 pounds at the

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 53

1    time.  That's compression.  So that's excessive too and I

2    mentioned that in my report.

3    Q.   Okay.  I just want to understand.  So besides the

4    elbow strikes to the head and the compression issue that

5    you just mentioned, is there any uses of force by these

6    three deputies that you're taking issue with in regard to

7    your opinions in this case?

8    A.   No.  Handcuffing is not use of force.  It's just a

9    restraint.  They didn't use OC, they didn't use night

10   sticks, they didn't use tasers.  So the elbow strikes and

11   the compression in the prone position with hands cuffed

12   behind the back are my issues --

13   Q.   Okay..

14   A.   -- with what they did.

15   Q.   Thank you.  Now you mentioned that no crime had been

16   committed here.  Is that what you said a moment ago?

17   A.   Well, I said that there was no crime, in my opinion,

18   given the fact that it started off with Docher asking to

19   have the 911 called on his own, but if there was any

20   crime at all, it would've been Florida's disorderly

21   intoxication and that's a second-degree misdemeanor,

22   which is a minor crime, and I think that's what he ended

23   up being charged with, if I'm not mistaken, in the case.

24   Q.   Well, --

25   A.   A very insignificant, minor crime, which would

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 54

```
 1    certainly not justify -- you know, it's one of those
 2    factors that Graham v. Connor says you should look at,
 3    severity of the crime at issue, when you're making a
 4    determination as to whether or not the use of force was
 5    excessive or not.
 6    Q.    Sure.  But I see in your analysis, on page 5 of your
 7    report, Mr. Tucker, --
 8    A.    Yes.
 9    Q.    -- that you specifically say here, before the
10    deputies used force, the only crime Docher had committed
11    was disorderly intoxication.
12    A.    Right.
13    Q.    So you admitted that he had committed that crime at
14    least, correct?
15    A.    Well, as I already said, that's what they charged
16    him with.  So, clearly, they thought he was  - in fact,
17    they made the determination, as I recall, that they would
18    take him into custody for that, as opposed to a mental
19    health or medical treatment.
20    Q.    Okay.  Well, once he's in custody, Mr. Tucker,
21    wouldn't you agree that, if he's fleeing from their
22    custody and bolting out of the back seat of the patrol
23    car, that's a violation of the law as well, right?
24    A.    It is.  As I said earlier, that's  - that factor was
25    there.  He was evading arrest by flight.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 55

1  Q.   Escape?

2  A.   Escape?

3  Q.   Yeah.

4  A.   I -

5  Q.   Wouldn't that be,  -

6  A.   I don't  - I --

7  Q.   -- under Florida law, --

8  A.   I wouldn't  -

9  Q.   I think the Florida -- sorry to interrupt you.

10 A.   I'm not a lawyer and I don't render legal

11 conclusions as to whether or not that would meet the

12 definition of escape in Florida or not.  So it certainly

13 was evading the officers.

14 Q.   Okay.  Well, were you aware  - I know you're not a

15 lawyer, but were you aware that a violation of Florida

16 Statute 944.40, which is entitled escape, would be a

17 second-degree felony in the state of Florida?

18          MR. VITALE:  Objection to the form.

19 A.   No.  And, as I said, I did not  - I'm not a lawyer

20 and I didn't look at that.

21 Q.   Okay.  Now let me ask you then  - so you were

22 telling me about the elbow strikes to the head, page 5 of

23 your report, and you just told us a moment ago you

24 referred to, it looks like, Appendix E about elbow

25 strikes to the head being deadly force.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 56

1    A.    Yes.

2    Q.    Is it your opinion, Mr. Tucker, that all elbow

3    strikes to the head are deadly force?

4    A.    No.   I - it is my opinion that the officers in

5    Florida received training, in the basic recruit training

6    curriculum, that deadly force elbow strikes  - that elbow

7    strikes can be deadly force if delivered to the temple,

8    the side of the jaw, the bridge of the nose, the back of

9    the head, or to the throat, and it includes those  - at

10   least includes those.   That's not a -- that -- the way I

11   read that, it's not an inclusive list, but it's examples

12   of that.

13             It is my experience, in law enforcement,

14   that when you're talking about an elbow strike, a bony

15   part of the elbow, that's exactly the reason  - the

16   equivalent of a baton strike, a wooden or a metal baton,

17   and that's exactly the reason why baton strikes to the

18   head area  - and it doesn't say the temple, the back of

19   the head, or the throat or the bridge of the nose, when

20   you're talking about batons.   You just say you don't

21   strike a person in the head with a baton  cause that's

22   deadly force.   So this is the equivalent of that.

23   Q.    Okay.   So I just want to understand what your

24   testimony is and, based on your Appendix E, Defensive

25   Tactics Techniques, and there's a subsection, Deadly

TAVARES DOCHER vs. CHRISTOPHER **NEWMAN**
TUCKER, MELVIN on 07/12/2017

Page 57

1    Force Elbow Strike, isn't it true that not all elbow

2    strikes are deadly force, correct?

3    A.    It depends on where it's delivered and if it's in

4    the head.   Look, I have been involved in law enforcement,

5    with all due respect, since 1969  -  68,  69, almost 50

6    years.   In that entire time, I have been trained, from

7    the FBI to everywhere, that you  - when you use a closed-

8    fist blow or any kind of an elbow strike to the head

9    area, that is deadly force, because it is likely to cause

10   serious bodily harm or death to the person who it's used

11   against, typically subdural hematomas that  - the blood

12   between the brain and the skull result from those kind of

13   blows.

14              So it's not only me looking at Florida,

15   which I pointed out here.  I could go to 10 other states

16   and pull their basic recruit training curriculum that

17   says the same thing Florida says here and, over the

18   entire 45 years or so in law enforcement, it has always

19   been recognized and accepted that closed-fist blows,

20   batons, or elbow strikes to the head is taught in use of

21   force training programs as force likely to cause serious

22   bodily harm or death.  That is deadly force, by

23   definition.

24   Q.   Well, I appreciate your experience, Mr. Tucker, of

25   course.  However, in looking at what you're referring to

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 58

1    here as Appendix, I think it's, E, doesn't the training

2    that you reference in your report specifically say that

3    the elbow strikes that are considered deadly force are

4    only those that utilize the tip of the elbow to only

5    certain spots on the person's head that are stabilized?

6    It's not just any elbow strike to the head is deadly

7    force.   That's not what that says, right?

8    A.    That's right.

9    Q.    Okay.  So maybe it's semantics, but I just want to

10   understand what the training you're referring to is,

11   utilizing the tip of your elbow, the bony prominence of

12   your elbow, to a specific target area, such as the temple

13   or the jaw or the bridge of the nose or the throat, and

14   that area is stabilized when the strike is delivered for

15   it to be considered potentially under those  - under that

16   training as deadly force.

17   A.    Well, that  - it's self-explanatory, right there

18   from the training program, yeah.

19   Q.    So you're not disagreeing with me?

20   A.    I'm not disagreeing with you.  It doesn't say top of

21   the head, for example, although I don't know.

22   Q.    Right.  Okay.  Now do you know specifically where,

23   on Mr. Docher's body, Deputy Newman delivered his elbow

24   strikes?

25   A.    He just said to the side of the head.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 59

```
 1    Q.    Do you know where on the side of the head?

 2    A.    Well, no, I don't.  You know, I'm touching the side

 3    of my head.  That's - the side of my head is the temple

 4    right there.  The side of my head there is the jaw area.

 5    So the side of  -

 6    Q.    But it's also a cheek  -

 7    A.    The side of --

 8    Q.    -- or a jaw, right?

 9    A.    I'm sorry.

10          COURT REPORTER:  I'm sorry.  You got cut off.

11    A.    So if --

12    Q.    I -- go ahead.

13    A.    So if that be the case, that certainly meets the

14    definition of deadly force here, which was to the temple

15    and the side of the jaw, but that's the best I can do

16    from what their testimony is.

17    Q.    Well, do you  - the same question too.  Do you know

18    what part of Deputy Newman's elbow made contact with Mr.

19    Docher's head?

20    A.    Well, he said it was an elbow strike.  Elbow strike

21    is defined as using the tip of the elbow to strike

22    someone.  So, again, I'm using his expression of what

23    happened.  It's startling to me, frankly, when I read

24    that, that this is a guy who says oh, that's not really

25    deadly force.  Well, it is.  I'm sorry.  It is.  It's
```

*Legal Media Experts*
*800-446-1387*

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 60

1    recognized.  You can ask 10,000 law enforcement officers

2    the question, if the elbow - what is an elbow strike?

3    They'll say the tip of the elbow.  A blow to the head

4    with the tip of the elbow, is that likely to cause

5    serious bodily harm or death?  The answer's going to be

6    yes.  So, you know, I'm sorry.  That's just what it is.

7    Q.   Well, let me ask you this, Mr. Tucker.  Have you

8    ever heard of training, in regard to elbow strikes,

9    involving any other portion of the elbow beside the tip,

10   such as the soft area just adjacent to the tip of the

11   elbow?

12   A.   No.  You're talking about like -

13           MR. VITALE:  Objection to form.

14   A.   -- a forearm  -

15           COURT REPORTER:  I'm sorry.  Was that an

16   objection?

17           MR. VITALE:  Yes, ma'am.

18   A.   The answer's no.

19   Q.   Okay.  So when you hear elbow strike, you

20   automatically think tip of elbow?  Is that right?

21   A.   Yes, tip of the elbow.

22   Q.   Were you aware, Mr. Tucker, that when Deputy Newman

23   delivered the elbow strikes that he testified about, it

24   was in reaction to Mr. Docher biting or attempting to

25   bite him?

TAVARES DOCHER vs. CHRISTOPHER **NEWMAN**
TUCKER, MELVIN on 07/12/2017

Page 61

```
1    A.    That's correct.

2    Q.    Does the fact that Mr. Docher was biting or

3    attempting to bite either Deputy Newman or Deputy Mangrum

4    change your opinion at all?

5    A.    Absolutely not.  Attempting to bite somebody is not

6    threatening with -- threatening deadly force.  It's a

7    bite.  That does not justify the use of deadly force in

8    response.  But it justifies --

9    Q.    And, again, I under --

10   A.    It justifies  -

11   Q.    I'm sorry.

12   A.    -- moving your hand away so he can't bite you, but

13   it doesn't justify elbow strikes to the head or the use

14   of deadly force.

15   Q.    But, again, with the understanding that the -- in

16   order -- in your opinion, in order for an elbow strike to

17   the head to be considered deadly force, it has to be

18   delivered to certain targeted areas on the head that are

19   stabilized.  Is that correct?

20   A.    That is correct, and the tip of the elbow.  If

21   you're suggesting to me, however, that because Docher

22   attempted to bite Newman or Mangrum, that that would

23   justify deadly force, then, by gosh, they should've just

24   jumped back and drew their weapons and shot and killed

25   him.  That's for sure the way to deal with deadly force
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 62

1    if deadly force is justified.

2    Q.    I just want to understand it, because, obviously,

3    you're traveling under your definition of what a deadly

4    force elbow strike is, and I just want to understand --

5    A.    Yeah.

6    Q.    -- what your opinion is and whether it changes at

7    all if the person that's being restrained bites or

8    attempts to bite the officer.

9    A.    It doesn't change it --

10   Q.    Go ahead  -

11   A.    It doesn't change it --

12   Q.    -- and clarify.

13   A.    -- at all.

14   Q.    Okay.

15   A.    My testimony is my testimony.

16   Q.    Thank you.  And I see, on the bottom of page 5 of

17   your report, you say, on the last sentence, "In fact,

18   Docher was not criminally charged with aggravated assault

19   (necessary to justify the use of deadly force) and

20   instead was charged with simple assault/battery."  Do you

21   see that?

22   A.    Yes, I do.  What I'm pointing out there simply is,

23   if Docher had somehow had some kind of a weapon, which

24   would be necessary to charge under aggravated assault,

25   which could've caused serious bodily injury to the

Page 63

1    officers, then deadly force would be justified, but that

2    are -- that's not the facts of this case.

3    Q.   Okay.  And I was just going to ask where did you get

4    the information that he was charged with simple

5    assault/battery?

6    A.   I guess the incident report.  Hold on a minute and

7    I'll look at it.  I think that's where I got it.  Yes.

8    On the incident report, page 1, the crime was assault and

9    battery with weapons -- hand, fist, feet.  That's simple

10   assault and battery.

11   Q.   So it was a battery on a law enforcement officer?

12   A.   Yes.

13   Q.   And I know you told us earlier you're not a lawyer.

14   So you wouldn't know what degree of crime battery on a

15   law enforcement officer would be in Florida, I assume?

16            MR. VITALE:  Objection to the form.

17   A.   I did not look it up.  I'm just looking at the

18   incident report and they're saying it was not an

19   aggravated assault because there was no weapons involved

20   and it was -- the crime was assault.

21   Q.   Well, do you know that, in Florida, battery on a law

22   enforcement officer is classified as a felony?

23            MR. VITALE:  Objection to the form.

24   A.   Well, I think that's correct.  Yes.

25   Q.   Now turning to page 6 of your report, Mr. Tucker,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 64

1   and I see  -

2   A.    All right.

3   Q.    I see a couple of in-my-opinions there toward the

4   top of the page.  The first one was, in my opinion, a

5   reasonable officer, under similar circumstances, would

6   not have perceived Docher as an immediate threat of

7   serious bodily harm or death at any time after the

8   officers handcuffed him.  And what facts are you basing

9   that opinion on?

10  A.    I'm basing that on my personal experience, that you

11  have an unarmed person who's handcuffed with his hands

12  behind his back.  No reasonable officer would consider an

13  unarmed person who's handcuffed as an immediate threat of

14  serious bodily harm or death to the officer under the set

15  of circumstances there.

16  Q.    And that was based too on your conclusion that the

17  elbow strikes delivered by Deputy Newman were deadly

18  force, is that right?

19  A.    Correct.

20  Q.    And is that also the case with your next sentence

21  there that says, in my opinion, striking Docher in the

22  head with an elbow strike two times when he was

23  handcuffed and while there were at least three deputies

24  to control Docher was a greater level of force than other

25  officers would've used under the same or similar

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 65

1   circumstances?

2   A.   Correct.  There are absolutely numerous  -

3   innumerable -- I can't even give you the number of them

4   -- of cases that -- on use of force where the

5   consideration of the court as to whether the use of force

6   was reasonable or not is based upon how many officers

7   were present to control an individual and I can give you

8   a couple of those if you want.  But, in any case, since

9   there were at least three deputies here capable and

10  available to deal with Docher, who was handcuffed, then

11  their  - any kind of an elbow strike is not reasonable.

12  Q.   Now I know you've told me you were relying on the

13  deputies' testimony.  Were you aware that the deputies'

14  testimony included the fact that, shortly after they all

15  went to the ground with Mr. Docher, that although he was

16  handcuffed, he apparently was able to slip one of his

17  hands under his body and do a push-up with the deputies

18  on or around him?

19  A.   I'm very aware of that.

20  Q.   Okay.

21  A.   That's part of  -

22  Q.   So  -

23  A.   Oh, by the way, that's part of that physiology of a

24  struggle.  When  - what the officer calls resisting is

25  part of what we call the physiology of a struggle, when a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1    person is down in the prone position on their stomach and

2    can't breath.  When they try to push themselves up so

3    they can breath, the officer says that's resisting.  The

4    person who's down there, most of the time they end up

5    dying from the complications of the restraint and the

6    compression, exacerbated by excited delirium.  In this

7    case, he didn't die, but the same kind of situation.

8    Q.   Now is that related to your opinion concerning

9    positional asphyxia?

10   A.   Yes, ma'am.

11          MR. VITALE:  Objection to the form.

12   Q.   We'll talk about that in a minute also.

13   A.   All right.

14   Q.   Now I see, on page 6 of your report still, you

15   reference, following those two opinions I just mentioned,

16   a citizen witness by the name of Merine -- I think it's

17   M-E-R-I-N-E -- Kanhai, K-A-N-H-A-I, making reference to

18   hearing Mr. Docher say don't let them kill me.  Do you

19   see where I'm referring to that?

20   A.   Yes.

21   Q.   Okay.  Do you know who Mr. Docher was referring to

22   when he was saying don't let them kill me?

23   A.   I don't know if anybody knows who he was referring

24   to since he was delusional.  He was earlier talking about

25   Arabs trying to get him, but he  - nobody knows who  -

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 67

1    what was going on, who he was talking about, but that is

2    what the witness said that he was saying.

3    Q.    At that point in the incident?

4    A.    Correct.

5    Q.    Okay.  Now then, right before you got your

6    preliminary opinion number two, on page 6, you say,

7    "Finally, it would've been obvious to any reasonable

8    officer on May 11th, 2014, when considering the totality

9    of the circumstances presented to Deputies Newman,

10   Mangrum, and Robinson, that Docher was having a medical

11   emergency and needed immediate medical attention.

12   Instead, Newman, Mangrum, and Robinson used excessive

13   force on unarmed and handcuffed man, in violation of

14   training and standards, and my question is what facts do

15   you base that on, that it would've been obvious to any

16   reasonable officer at that time that Mr. Docher was

17   having a medical emergency?

18   A.    Well, let's take Newman first.  He said he'd

19   received training at the St. Lucie County Sheriff's

20   Department on excited delirium and he, in fact, was, at

21   some point along the line, maybe after this incident, but

22   certified to instruct on excited delirium, the signs and

23   symptoms of excited delirium, and then he said, also,

24   that excited delirium is a medical emergency.

25                    Well, let's just say that if they see a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 68

1    person who's delusional, talking about they're trying to

2    kill me, whether he's talking about the deputies or

3    someone, he's sweaty, he's -- all the things that the

4    deputies said they saw him do - Newman says that he kept

5    responding to Arabs, talking about Arabs, and he had to

6     - he saw the Arabs hide the bodies in St. Lucie County

7    and he was seeing things.  If Newman was trained, or any

8    officer, hearing those kind of things that he's

9    describing would've seen this as the symptoms of excited

10   delirium and, therefore, a medical emergency because he

11   knew excited delirium symptoms was a medical emergency,

12   if that makes sense, what I said.

13                  So I'm just saying that any reasonable

14   officer, given the totality of the circumstances here,

15   would've seen this as a person who was exhibiting

16   symptoms of excited delirium and, therefore, he should've

17   been treated as a medical emergency.

18   Q.   In your opinion, Mr. Tucker, do you believe the

19   symptoms of excited delirium are easy to discern for a

20   non-medically trained professional, such as a law

21   enforcement officer?

22   A.   When you read the portion of my book on this

23   chapter, I make it clear that we don't expect officers to

24   be able to diagnose, with any kind of certainty, some

25   kind of a disease or medical experts.  What we do though

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 69

```
 1   is expect them to recognize the symptoms of excited

 2   delirium, just like we did back 20 years ago.  We used to

 3   have numerous examples of officers who would see

 4   somebody, thinking that they were intoxicated.  In fact,

 5   interestingly enough, the case, Graham v. Connor, is

 6   right on point.  It was a black male suffering from a di

 7    - a sugar diabetes insulin problem that the officers

 8   took for him being drunk  - publicly drunk.  So we had to

 9   train officers 20 years ago to recognize the difference

10   between a sugar diabetes issue or public drunkenness and

11   say, if there's a question, treat it as a medical issue,

12   not as a criminal issue.  The same thing is true here.

13              Excited delirium is  - it's not like it's

14   new.  It's been around for quite some time and there's

15   been a lot of training on it  - on recognizing those

16   symptoms and treating it as a medical emergency.

17   Q.   Well, Mr. Tucker, you would agree with me though

18   that every situation is different, right, in terms of

19   facts being confronted by the law enforcement officer on

20   the scene?

21   A.   As I said, --

22   Q.   So they're not all like the Graham v. Connor

23   scenario is what I mean.

24              COURT REPORTER:  I'm sorry.  Can you repeat

25   that last comment?  It cut out.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 70

```
 1              MS. BARRANCO:  Sure.  They're not all the
 2   situation in Graham v. Connor, correct?
 3   A.   I mentioned earlier in the deposition that anything
 4   that says all or always or it's a possibility, I'm going
 5   to always answer it the same way.  Anything's possible.
 6   Yes, it's true that all circum - situations are not
 7   exactly alike.
 8   Q.   Okay.  But -
 9   A.   But I'm dealing with this situation.
10   Q.   Sure.  Well -- and you were talking about excited
11   delirium and training on the signs and symptoms and if we
12   could just look now at one of your appendix to your
13   report, Appendix F, that you refer to with excited
14   delirium mentioned.  Tell me when you're there.
15   A.   I've got it.
16   Q.   All right.  It mentions some symptoms on the second
17   page there.  It says the unusual symptoms or behavior are
18   usually attributed to a condition known as excited
19   delirium.  Excited delirium is a sense of extreme mental
20   and physiological excitement characterized by exceptional
21   agitation and hyperactivity, overheating, excessive
22   tearing of the eyes, hostility, superhuman strength,
23   aggression, acute paranoia, and endurance without
24   apparent fatigue, and there's a citation to Lewinski,
25   2006.  Do you see where I'm reading from?
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 71

1    A.    Do I what?

2    Q.    Do you see where I'm reading from?

3    A.    Oh, I know exactly where you're reading from and

4    Bill Lewinski is from the Force Science Center and this

5    is 2006.  Very, very more symptoms identified, but let's

6    just take agitated.  If Brown would've been talked to,

7    the CVS employee, he said in his deposition, page 9, line

8    8, Docher appeared agitated.  He was not making sense.

9    He was not acting normal.  That's just Brown alone and

10   Bhagudas, if they would've been talking to  - talked to.

11                     In any case, the officers themselves saw

12   him  - he being Docher  - acting the way that they should

13   have, as the final thing said there, when confronting a

14   subject with unusual symptoms, an officer should

15   immediately seek medical attention.  That's the whole

16   point.

17   Q.    Although, even if they seek medical attention, the

18   police are still the ones that are charged with

19   controlling the subject, correct?

20   A.    Well, yes, but I don't know what you mean by that.

21   They need to control, if they can, yes, but they

22   should've sought medical attention immediately.

23   Q.    So do I understand, then, your opinion, Mr. Tucker,

24   is that the deputies in this case, before they ever laid

25   hands on Mr. Docher, should've first summoned EMS?

Page 72

1    A.    Correct.  They should've talked with the persons in

2    CVS and said tell me what's been going on here.  Well,

3    this guy's acting very agitated.  He's not making any

4    sense.  He asked us to call  - he said to call 911 for

5    him, which we did.  He's just not acting normal.  He's

6    sweaty.  These are all things that the CVS employee said,

7    at which point the  - our deputy says wow, those are the

8    symptoms of ED.  So what's the protocol now?  Well, the

9    protocol is let's get EMS to the scene before we even

10   interact with him, if possible.  And so, call for EMS to

11   come to the scene.  Now EMS comes to the scene.  You say

12   to the EMS we're going to overpower him as quickly as we

13   can, get him down, get him cuffed.  It's then your

14   responsibility, as to protocol -- spell it out -- to

15   administer a sedative.  Now I'm not going to tell you

16   what the sedative is --  cause I'm not a medical expert,

17   I'm not an EMS expert  - and the dosage and all that and

18   then transport immediately to the hospital for medical

19   care.  That's the typical protocol spelled out.  It's

20   been understood for several years now.  That's not what

21   happened.

22   Q.    Okay.  Well  - but, even in your scenario, aren't

23   you saying that, even if medical is on standby, the

24   deputies are still charged with having to control the

25   individual, correct?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 73

```
 1   A.    Correct.  You don't expect  -

 2   Q.    The  -

 3   A.    EMTs to do that.

 4   Q.    Well, EMS isn't even going to touch the guy until

 5   he's under control, isn't that right?

 6   A.    Correct.

 7   Q.    And I think I heard you use the words if possible,

 8   is that right?

 9   A.    I don't know.

10         MR. VITALE:  Objection.

11   Q.    Did you use the term if possible or the words if

12   possible?

13   A.    I don't know.  You'd have to read it back, what I

14   said.

15   Q.    Well, you were talking about the protocol and, you

16   know, if possible, call medical first and that sort of

17   scenario.

18   A.    Okay.  That  -

19   Q.    And isn't your protocol kind of a best-case

20   scenario?

21   A.    What I'm saying is, very simply, that if Docher is

22   standing in the parking lot, as opposed to stabbing

23   someone with a screwdriver, then, if he's just standing

24   there doing nothing, then it is possible and reasonable

25   for the officers to call EMS and get them to the scene
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 74

1    once they've recognized and talked to the CVS employees

2    and found that this  - all these symptoms were there, as

3    opposed to a chaotic scene.

4                    For example, again, there's numerous case

5    law, under the Americans With Disabilities Act, and it

6    says, very clearly, that officers are not required to

7    impose protocols for mental health treatment of someone

8    until the scene  - unless the scene is under control or

9    brought under control.  So if there's somebody committing

10   a crime or stabbing, you don't have to run up there and

11   start invoking ED protocol, but ED protocol was

12   reasonable here because he was just standing in the

13   parking lot when they got there.

14   Q.   Of course, you have no idea how long it would've

15   taken a deputy to go inside and actually get to figure

16   out who may have information about how he was behaving

17   inside, --

18   A.   I  -

19   Q.   -- correct?

20   A.   I don't have an idea how long it  - how many minutes

21   or a minute or any of that.  There's not a time line.

22   Q.   Well, do you recall, from the deputy's testimony,

23   that when Mr. Docher was first outside of the CVS with

24   them, he was calm?

25   A.   Smoking a cigar.  That's correct.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 75

1   Q.   Now you mentioned the word agitated as one of the

2   possible symptoms of excited delirium.  Can't agitation

3   be a symptom of other things besides excited delirium?

4   A.   Agitation can be a symptom of a lot of things.  I

5   was very agitated when I backed my boat into the lobster

6   warp and got it all wrapped around my prop.  It had

7   nothing to do with excited delirium.  It cost me a $100

8   to get the diver to go down and cut it off.  I was

9   agitated.

10  Q.   Sure.  And I get that.  What about overheating?

11  That was another word contained in your appendix about a

12  symptom of excited delirium.  I mean, couldn't

13  overheating be somebody that's just sweating  cause it's

14  a hot day or they just were jogging around the block?

15  A.   That's a possibility.

16  Q.   I mean, would you agree with me, Mr. Tucker, that a

17  lot of the symptoms that are attributed to excited

18  delirium can also be attributed to other things unrelated

19  to excited delirium?

20  A.   Yeah.  It could just be attributable to a mental

21  health issue and not excited delirium.

22  Q.   Or a combination thereof?

23  A.   A combination thereof.

24  Q.   Now do you know if these deputies had any knowledge

25  about Mr. Docher's medical history when they encountered

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 76

1    him?

2    A.    Medical history?  No.

3    Q.    Other than maybe what Mr. Docher decided to share

4    with them.

5              MR. VITALE:  Objection to the form.

6    A.    I don't remember anything about anybody asking him

7    about medical issues he might be having.  They asked if

8    he'd had anything to drink and he said yes.  I think an

9    Ice something or other he said.  Some kind of a beer.

10   But I don't remember anything about medical issues being

11   asked.

12   Q.    Do you remember anything about drug use being

13   brought up in the conversation between the deputies and

14   Mr. Docher?

15   A.    Yeah.  I think that was when he responded that he

16   had drank some ice  - I forget the name of the beer.

17   Some kind of a beer.

18   Q.    Natural Ice?

19   A.    I think that's right.

20   Q.    Okay.  But you don't remember anything about drugs

21   specifically being discussed?

22   A.    No, I don't.

23   Q.    Now, just so I understand, so based on your opinion

24   a moment ago, saying that you thought the deputies should

25   have immediately seen Mr. Docher's situation as being a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 77

1    medical emergency and summed the medical people to come

2    to the scene, does the fact that Mr. Docher was initially

3    compliant, in terms of being handcuffed and placed in the

4    back of the patrol car, at least his posterior region in

5    the back seat of the patrol car - does the fact that he

6    was initially compliant, does that change your opinion at

7    all or do you believe the deputies still, regardless of

8    Mr. Docher's initial compliance, they still should've

9    first summoned EMS?

10              MR. VITALE:  Objection to the form.

11              MS. TYK:  Summer?

12              MS. BARRANCO:  Yes?

13              MS. TYK:  This is Julie.  Just, when you have a

14   natural breaking point, if we could just take a comfort

15   break for a couple minutes?

16              MS. BARRANCO:  Sure.  Well, now is fine.  I

17   need to get some water anyway.

18              MS. TYK:  Are you sure?  Do you want him to

19   answer that question first.

20              MS. BARRANCO:  Yeah.  Let him answer the

21   question first, --

22              MS. TYK:  Okay.

23              MS. BARRANCO:  -- please.

24   A.   Somewhere in the documents  -- that's what I was

25   looking for  - on excited delirium, they talk about the

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 78

1    fact that, very often, the person who is suffering from

2    excited delirium will be extremely calm at first and then

3    become violent immediately thereafter and I can find that

4    in the cited delirium concepts and issues paper, if

5    necessary, but  - so the answer to the question, I guess,

6    is that the fact that he was calm doesn't mean that he

7    wasn't suffering excited delirium syndrome.

8    Q.   Okay.  Just to clarify, what document were you just

9    referring to, talking about being calm first?

10   A.   Either the January or the April 2014 Concepts and

11   Issues paper of the National Law Enforcement Policy

12   Center on excited delirium.

13   Q.   And that's your Appendix G, is that right, to your

14   report?

15   A.   It's Appendix G and, also, the copy that I made of

16   my reference in my report at the bottom  - at the end of

17   the report, footnote three.

18         MS. BARRANCO:  Okay.  So if you want to take a

19   little break now.

20         THE WITNESS:  That's fine.

21   (Off the record at 11:56 a.m.)

22   (On the record at 12:05 p.m.)

23      BY MS. BARRANCO:

24   Q.   Mr. Tucker, I'm looking at page 6 of your report,

25   your preliminary opinion number two, and it says Deputies

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 79

1    Newman, Mangrum, and Robinson knowingly violated clearly

2    established law enforcement training on how to handle a

3    person exhibiting the symptoms of "excited delirium" when

4    they failed to treat the incident with Tavares Docher as

5    a medical emergency and instead treated the incident as

6    control-and-arrest situation.  My first question about

7    that is how do you know that the deputies knowingly

8    violated the training?

9    A.    Well, because training is  - they either were

10   ignorant of the training or knowingly violated the

11   training and, according to Newman, he was very familiar

12   with the  - in his deposition testimony, with the

13   symptoms of excited delirium and even qualified to teach

14   it, so that would meaningly from his standpoint for sure,

15   but I think that's clear enough.

16   Q.    How about Deputy Robinson?

17   A.    Robinson was new on the job, only a couple weeks,

18   but had been the one who was most recently through the

19   basic recruit training program and I don't recall  -

20   let's see.  I'll have to look and see what he said about

21    - he received training that ED is a medical emergency.

22   He said that in his deposition, page 29, line 17.  So

23   knowingly violated with him and Mangrum, I don't recall

24   what he had to say about it, but it speaks for itself.

25   If I could go --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 80

1    Q.    Well, --

2    A.    Go ahead.

3    Q.    I was just going to ask, because you're lumping all

4    three of the deputies together, saying that they

5    knowingly did something, and I really would like to break

6    it down a little bit in terms of your opinion, saying

7    that  - I guess that they knowingly violated their

8    training and treating it as something other than a

9    medical emergency based on the symptoms that apparently,

10   according to you, that Mr. Docher was exhibiting of

11   exited delirium.  So I wanted to ask you what symptoms,

12   in regard to Deputy Robinson anyway, what symptoms of

13   excited delirium did you believe Deputy Robinson would've

14   known about that he apparently, according to you anyway,

15   knowingly didn't attribute that to being excited

16   delirium, as opposed to something else, I guess.

17                    MR. VITALE:  Objection to the form.

18                    MS. BARRANCO:  Did you understand the

19   question?

20   A.    Yes.  And I'm reading right now where it says St.

21   Lucie County provided me with training on the signs and

22   symptoms of excited delirium prior to 5/11/14.  Robinson

23   said that himself on page 18 of his deposition, line 17.

24   So that's where I would get that.  If he was provided

25   with that training, then he knowingly violated or just

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 81

1    ignored it.

2    Q.   Well, let me ask you though more specifically,

3    because I know there are multiple symptoms apparently of

4    excited delirium, and my question for you, Mr. Ticker, is

5    what symptoms would Deputy Robinson should have known

6    that Mr. Docher had that he should've attributed to being

7    excited delirium?

8    A.   Well, I don't recall what he said that he noticed.

9    I do know that, for example, Mangrum said it never ever

10   even entered my mind to think about excited delirium.

11   But, for example, what I was getting ready to go to

12   earlier, if you look at my report, page 7, on the third

13   paragraph down, that is what I'm talking about there,

14    cause you raised the issue about well, he was very calm

15   when he was handcuffed, do you see where I say there that

16   the International Association of Chiefs of Police have  -

17   Q.   Yes.

18   A.   -- identified the symptoms of agitation,

19   hyperthermia, profuse sweating, paranoid behavior?

20   Clearly, Robinson was there when he was talking about

21   Arabs and looking for heads and all that.  That's

22   paranoid, crazy kind of behavior.  Constant physical

23   activity, exceptional strength, and unusual calmness

24   after restraint.  It is specifically pointed out that

25   that by itself is another symptom of excited delirium and

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 82

1    they all noticed that Docher was  - submitted with no

2    problem to being handcuffed and didn't attempt to flee or

3    anything until after that.

4    Q.   Well, it wasn't until after  - and according to what

5    you were telling me a moment ago, the  - you believe the

6    deputies, before they even restrained Mr. Docher,

7    should've been calling EMS, right?

8    A.   Certainly.

9    Q.   So, to the extent that you're hanging your hat on

10   this unusual calmness after restraint, they wouldn't of

11   known whether he was going to be calm after he was

12   restrained before he was restrained obviously, right?

13                    MR. VITALE:  Objection to the form.

14   A.   You're right.

15   Q.   And I think you've already told me that this

16   particular  - I mean, we've got now  - we're looking at

17   page 7 of your report.  So now we're referring to a

18   different source of the symptomology of the excited

19   delirium, but I think you've already agreed with me that

20   these kinds of symptoms, such as agitation or

21   hyperthermia, profuse sweating, paranoid behavior,

22   constant physical activity, exceptional strength could be

23   attributed to something other than excited delirium,

24   correct, --

25   A.   They  -

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 83

1    Q.   -- like drug use or alcohol problems or mental

2    health problems or anger or activity, like jogging?

3    A.   Could -

4              MR. VITALE:   Objection to the form.

5    A.   Could anything be possible?  Yes.  Has - had the

6    symptoms  - more symptoms been identified as time went

7    by, yes.  You cited the Force Science Center that I

8    talked about.  In 2006, there were certain symptoms

9    identified there.  Since then, more and more of these

10   symptoms have been identified as excited delirium has

11   been more identified in terms of deaths and, in this

12   case, a vegetative state for people who have had excited

13   delirium and been involved in a struggle with the police.

14              Another one that hasn't been mentioned but

15   is now out there all over the place is some kind of a

16   fixation with glass.  For some reason, these people who

17   are  - they'll break glass and just get fixated on glass.

18   So there's  - the point is that there were a sufficient

19   number of symptoms that the deputies could have, should

20   have observed themselves to have classified this as

21   excited delirium, called and invoked the protocol for ED,

22   which is call for medical assistance first, before they

23   attempt to control.  Work it out with medical to take

24   control, administer a sedative, and then transport to a

25   hospital.  They didn't.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 84

```
 1   Q.   Well, you mentioned something about fixation on

 2   glass as being one of the symptoms most re  - more

 3   recently discovered as perhaps being attributable to ED?

 4   A.   Right.

 5   Q.   Do you know if Mr. Docher was exhibiting any signs

 6   of a fixation on glass?

 7   A.   I don't recall that he was.

 8   Q.   Okay.  And is one of the possible symptoms of ED

 9   also that the person gets very heated and sometimes even

10   strips naked --

11   A.   Right.

12   Q.   -- according to that?

13   A.   Yes.

14   Q.   Mr. Docher was never taking his clothes off or

15   striping naked, right?

16   A.   Right.  You're right.

17   Q.   And that's the scenario in some circumstances,

18   right?

19   A.   Yes.  Of course.

20   Q.   But I know, based on your earlier testimony, not all

21   the circumstances  - but not all circumstances involve

22   all of those symptoms?

23   A.   If I could liken this to the issue of probable

24   cause.  When you are looking at whether there's

25   sufficient evidence to believe a crime is being
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 85

1   committed, you look at incriminating information, you

2   look at exculpatory information.  If the incriminating

3   information outweighs the exculpatory information, then

4   you make a decision that you have probable cause to make

5   an arrest.  This is no different.  If you have a person

6   who's sweaty, who's delusional, who's talking about Arabs

7   and heads and people hunting him and all of those

8   symptoms that he had identified  - that were identified

9   by the people in the store right off the bat, you have a

10  whole bunch of incriminating  - yeah, he didn't break any

11  glass, so I guess that would be exculpatory, but the

12  weight of this is clearly over to the side, symptoms of

13  ED.  If you have symptoms of ED, treat it as a medical

14  emergency, not an arrest situation.  It's that simple.

15  Q.   And your opinion is that the deputies -- one of them

16  should've gone in the store to interview the civilians

17  inside, right?

18  A.   Correct.

19            MR. VITALE:  Objection to the form.

20  Q.   And they didn't do that.  So you would agree with me

21  then they didn't know what the civilians knew inside the

22  store, at least in terms of how Mr. Docher was acting

23  earlier, right?

24  A.   Correct.

25  Q.   And getting back to your preliminary opinion number

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 86

1  two, Mr. Tucker, --

2  A.   Yes.

3  Q.   -- you mentioned something about the deputies

4  knowingly violating their training, but I assume you

5  understand though that in a federal civil rights case,

6  such as this, the standard that you're talking about,

7  Graham versus Connor, isn't a subjective standard, right?

8  A.   Isn't -

9           MR. VITALE:  Objection to the form.

10 Q.   It's objective, correct?

11 A.   The Graham v. Connor is a so-called objective

12 standard.  And what is - what does that mean?  Well, it

13 means that - let's just take, for example, if any

14 officer says well, he attacked me with a toothpick raised

15 in his right hand and I was fearful of death, so I shot

16 him.  Well, now we're going to do an analysis and that is

17 that officer's subjective threat assessment, the

18 toothpick in a raised hand.  Now how do we make it

19 objective?  The objective analysis is when you ask the

20 question would other officers have perceived the threat

21 the same way and responded in a like manner.  If you do

22 that in this case, you're saying that the objective

23 standard is that there were symptoms of excited delirium

24 present and other reasonable officers, not Mangrum,

25 Newman, and Robinson,  cause they did not do it  - they

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 87

1    made their subjective determination that this was an

2    arrest-and-control situation, but other reasonable

3    officers would've perceived this and recognized this as

4    an ED situation and a medical emergency.  That's what I'm

5    saying.  That's the objective analysis.

6    Q.    Okay.  So the part about the knowingly violating

7    their training, that's not what you're referring to?

8    A.    I am referring  - did I say something that takes

9    that off the table?  I told you earlier that these

10   officers had received training on excited delirium.

11   Robinson said he even got it from the St. Lucie County

12   Sheriff's Department now and on symptoms and everything,

13   so he had been most recently through it.  He either

14   forgot or ignored it or  - we don't know, but clearly he

15   was provided with it, so he violated that training.

16   Q.    Okay.

17   A.    Didn't follow it.

18   Q.    Let me just ask about your Appendix G, which is the

19   IACP National Law Enforcement Policy Center, Excited

20   Delirium.  It says model policy, January 2014?

21   A.    Yes.

22   Q.    Am I correct that that is a model policy, sort of a

23   best-case-scenario policy, but not necessarily a policy

24   that would have  - that these particular deputies

25   involved with Mr. Docher would've been bound by?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 88

1    A.    No, you're not  -

2              MR. VITALE:  Objection to the form.

3    A.    No, you are not correct.  The National Law

4    Enforcement Policy Center is a joint enterprise between

5    the U.S. Department of Justice and the International

6    Association of Chiefs of Police.  What they do is they

7    identify problems that the police have out there, one of

8    which would be excited delirium, and then what do they

9    do?  Well, they say okay, we're having a lot of deaths in

10   arrest situations turning out to be excited delirium.

11   They get together subject matter experts, medical people,

12   medical examiners, for example.  They get defensive

13   tactics instructors from law enforcement and lawyers.

14   They get these specialized  - these experts together and

15   they say what are the concepts and issues involved here?

16   Well, one of the concepts involved is excited delirium

17   and the symp  - recognizing the symptoms of excited

18   delirium.  After that, the subject matter experts work on

19   it.  They put it into a model policy to guide law

20   enforcement agencies on what to do when you are

21   confronted with excited delirium.

22              In this case, they say rapid control of

23   the subject and transfer to the care of emergency medial

24   provider should be the primary objective, unless other

25   actions are necessary to protect the officers.  They  -

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER. MELVIN on 07/12/2017

Page 89

1    persons exhibiting symptomatic behavior should be

2    suspected of being the subject of a medical emergency

3    that could result in sudden death.  That's the policy.

4                    Now does that mean that St. Lucie County

5    is required to follow this?  No.  This is a protocol that

6    is recognized in the law enforcement profession for how

7    to deal  - best practice for dealing with people

8    exhibiting the signs of excited delirium.   There's no

9    legal requirement that St. Lucie County follow it, but it

10   is the protocol recognized in the law enforcement

11   profession and was in 2014 when this happened.

12   Q.   Okay.  And I also noticed, at the end of that

13   protocol, there's a footnote that includes the following

14   language:  each law enforcement agency operates in a

15   unique environment of federal court rulings, state laws,

16   local ordinances, regulations, judicial and

17   administrative decisions, and collective bargaining

18   agreements that must be considered.  In addition, the

19   formulation of specific agency policies must take into

20   account local political and community perspectives and

21   customs, prerogatives and demands, often divergent law

22   enforcement strategies and philosophies, and the impact

23   of varied agency resource capabilities, among other

24   factors.  So is that what you were just telling me about?

25   A.   What you just said was that if there was a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 90

1    collective bargaining agreement that would prohibit the

2    St. Lucie County Sheriff's Department from classifying

3    the symptoms of excited delirium as a medical emergency

4    or a law in Florida that prohibited that, this wouldn't

5    apply, but that's not the case.  There's not a law in

6    Florida that says you can't classify excited delirium as

7    a medical emergency.  There's not a collective bargaining

8    agreement that I've ever heard of.  So that's not

9    applicable.  What I'm saying is simply that this is not a

10   law.  It is a recognized best practice in the law

11   enforcement profession that has been put out there prior

12   to this incident and now, going on several years, as the

13   proper the action to follow when you have an excited

14   delirium situation.

15   Q.   Okay.  Thank you for that clarification, Mr. Tucker.

16   Now if we could move to your preliminary opinion number

17   three that's on page 8 of your report.

18   A.   Okay.

19   Q.   And, just for the record, it says Deputies Newman,

20   Mangrum, and Robinson knowingly violated clearly

21   established law enforcement training on avoiding the

22   basic physiology of a struggle because of the risk to a

23   subject of death or serious medical ramifications.  Did I

24   read that correctly?

25   A.   Yes.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 91

1    Q.    Can you explain to me  - and I guess it's in your

2    report here, but what are you referring to when you say

3    the basic physiology of a struggle?

4    A.    Well, it's right there, spelled out, in Appendix H

5    and I've been training officers on this for at least 20

6    years.  Very simply, officers are taught, in use of force

7    training programs that I have been through and certainly

8    are taught by me when I teach use of force, that officers

9    need to be aware of what is called the basic physiology

10   of a struggle and that basic physiology of a struggle is,

11   very simply, that when you restrain a person in a face-

12   down position, their breathing can become labored.  I

13   know that because when I play around with my

14   grandchildren and I'm laying down on the floor on my

15   stomach and they're on my back, it's difficult to breath.

16   I recognize that right off.  And then, if you apply

17   weight to the person's back, the more weight you apply,

18   the more severe the compression, the more difficulty

19   there is in breathing.  I know that.  As the

20   grandchildren have gotten older and weigh more, it's more

21    - it causes more difficulty for me to breath when

22   they're on my back and the natural reaction to that lack

23   of being able to breath is to try to get up to  - so you

24   can breath and law enforcement officers are taught you

25   have to recognize that that's not resistance.  That's a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 92

1    struggle on the part of the person to be able to breath.

2    So don't be saying things like stop resisting, stop

3    resisting and don't then apply more weight and more

4    pressure, which exacerbates the situation, and that's

5    what happens.  That's why they call it the physiology of

6    a struggle.  Officers tend to, as the person's

7    struggling, apply more weight and more restraint until

8    the person dies and it's always -

9    Q.    Is that all?

10   A.    It's been spelled out for --

11   Q.    I'm sorry.

12   A.    -- 20  - when I say knowingly violated, I don't know

13   that I've ever bumped into an officer, you know, that has

14   not heard of this and been taught this over the last 20

15    - it's just as common as  - it's just training that

16   almost everybody receives on the use of force.

17   Q.    Well, is that the same thing as the theory about

18   positional asphyxia?

19   A.    Well, yes, it is.  That -- positional asphyxia is

20   also the same thing, that you put in certain positions,

21   recognized for the last 40 years or 30 years,

22   particularly in transporting prisoners with their hands

23   cuffed behind their back and lay them down prone in the

24   back seat of police car and you get to the jail and

25   they're already dead and that's been a topic of

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 93

1    instruction in use of force training programs for at

2    least 30 years.

3    Q.    Well, are you aware, Mr. Tucker, of any more recent

4    studies in regards to putting pressure on people that are

5    handcuffed and in the prone position, with the studies

6    revealing that the whole concept of positional asphyxia

7    is really not accurate?

8    A.    I'm aware  - there's probably 50 studies that I've

9    read over a period of time, going back to Dr. Rhey, who

10   was the original one that  - R-H-E-Y - that identified

11   positional asphyxia and then his claim that he had

12   retracted that later, etcetera, etcetera, etcetera.  But

13   the bottom line is the profession  - the law enforcement

14   profession.  This is the National Law Enforcement

15   Technology Center, a part of the U.S. Department of

16   Justice, that is warning against the possibility of

17   sudden death from positional asphyxia and the basic

18   physiology of a struggle since 1995.  They have not come

19   out and said we retract all this.  It's okay to hold

20   somebody down in a prone position and put weight on their

21   back and hold them there for 15 minutes.  They have never

22   retracted this.  So there are  - it's like the cigarette

23   industry.  There were all kinds of research projects that

24   said cigarette didn't cause cancer and there were

25   research projects that said cigarettes do cause cancer.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 94

1    The same thing here.  It's a matter of controversy, but

2    the protocol is well established and clear to avoid these

3    things  cause sudden death can occur.

4    Q.   Well, what specific facts are you relying on, Mr.

5    Tucker, in regard to how these three deputies, according

6    to you, knowingly violated their training on avoiding the

7    basic physiology of a struggle?  Like what was it that

8    they did or didn't do that you're critical of in this

9    regard?

10   A.   Hold on just a minute.  Let me see if I can find it.

11   And all four hit the ground, Newman's saying.  So there's

12   Newman and Mangrum up at the upper part of his body  – I

13   say Docher's body  - and Robinson on his feet.  That's

14   where the struggle started.  Then let's see.  I'm trying

15   to  - that these officers were taught that if a person is

16   on their stomach handcuffed, they may have trouble

17   breathing.  Robinson says that in his deposition.  He was

18   taught that, page 35, at line 12 of his deposition.

19   After everybody hit the ground, Newman was on the upper

20   body, Mangrum was on the upper body, and Robinson was on

21   the legs.  That's Robinson definition  - deposition, page

22   53, at lines 1 through 7.  I'd have to go through and

23   look other places, but the witness statements of the

24   deputies on him  - on Docher all fit the definition of a

25   the physiology of a struggle.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 95

1    Q.    Now just so I understand though, in terms of what

2    you took issue with in regards to what was done, was that

3    related to weight being placed on Mr. Docher's back or

4    something else?

5    A.    My analysis is pretty clear in my report.  Docher

6    runs.  He's already handcuffed.  All three deputies were

7    on Docher's back when he was taken to the  - and he was

8    taken to the ground.  He slid the handcuffs on his right

9    arm up to his elbow and was trying to push himself up,

10   lifting all three deputies.  That's an example, again, of

11   excited delirium, super strength, and it's also a

12   struggle to breath.  You get a lot of strength when

13   you're trying to say live and Robinson applied what he

14   called a leg ride -- that is, he's hold him down on  -

15   his legs down to gain control  - and Alonge  - Deputy

16   Alonge, A-L-O-N-G-E, arrived on the scene and he

17   assisted.

18              So for a period of, according to their own

19   report -- their own narrative, page 6 of the  - their

20   reporting officer narrative, there were four officers

21   holding him down at one point and then you have the

22   paramedic.  Jose Rosario says, when he arrived on the

23   scene, he observed several deputies on top of a subject

24   who was still struggling with them and then you got

25   Paramedic Thomas Sinclair.  When he arrived, he observed

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 96

1    several deputies on top of a subject who was on the

2    ground with a pool of blood around his head.

3                    So there you have independent witnesses,

4    paramedics, testifying in their  - or making statements

5    in their supplemental reports of holding Docher down with

6    the deputies on top of him and a struggle ensuing.

7    Q.    So are you taking issue with the fact that they were

8    holding him down or that they were on top of him or both

9    of those things?

10   A.    Both of those things.  There were three --

11   Q.    So you're saying --

12   A.    -- deputies present.  This was a man handcuffed with

13   his hands behind his back, not armed with anything.  If

14   three deputies, one of which was 209 pounds, Mangrum, and

15   a 14 or 15 year veteran at that point -- if three

16   deputies  - Mangrum, Newman, and Robinson  - couldn't

17   pick that guy up off the ground and stand there and hold

18   him steady, you know, one on each side of his  - holding

19   each arm, I  - it's incomprehensible to me that they

20   couldn't control him like that.

21   Q.    Well, that was my next questions.  So -- and for

22   your opinion, Mr. -- in your opinion, Mr. Tucker, you

23   believe that, rather than trying to keep him down on the

24   ground, what the deputies should've done was lifted him

25   up and stood him on his own two legs --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 97

1    A.    Or --

2    Q.    -- until EMS controlled him with a shot or

3    something?

4    A.    Put him in the recovery position, which is put him

5    on his side and hold him, or sit him up, set up in a

6    position so he could breath.  Not necessarily having to

7    stand him up, but certainly the opposite is  - you don't

8    do  - you don't hold him down in the pone position; that

9    is, on his stomach with his hands cuffed behind his back

10   and the compression weight of three deputies at one point

11   and four at another point because that is the recipe for

12   positional asphyxia, death or, in this case, a vegetative

13   state.

14   Q.    Well, what about a situation where the individual

15   has indicated he doesn't want to stay in a seated

16   position or standing still?  He might be bolting from

17   you.  What do you  - what would you recommend in that

18   situation?

19   A.    Did you say bolt from you?

20   Q.    Yes, like bolt out of the back of the patrol car.

21   A.    Well, you know, what the person wants  - he says

22   well, I don't want to say seated.  Okay.  The officers or

23   deputies, there's three of them to control him.  So you

24   say sit right there.  That's the way it is, buddy.  Sit

25   there.  We want to make sure you can breath, but you

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 98

1    don't hold them down in the prone position on  - with

2    hands cuffed behind the back and weight compression on

3    him.  That's the bottom line.

4    Q.   Well, referring to the weight and compression on Mr.

5    Docher, do you know how much pressure was applied to Mr.

6    Docher's body?

7    A.   None of us know.  There's no pressure gauges or

8    anything involved here, but we do know that there were

9    three deputies on top of him based upon the paramedics'

10   own statements to  - in  - that are put in the police

11   case supplemental reports and I do know that Mangrum was

12   asked how much he weighed and he said 209 pounds now, but

13   I was 205 then.  Well, put 200 pounds on my back or

14   anybody's back while you're  - they're on their stomach

15   in a prone position and their hands are cuffed behind

16   their back, not counting the other two, the legs of  -

17   being held by Robinson and Newman up on the head  - at

18   the head area.  We don't know for sure, but you're just

19   taught not to do it because of the obvious reason, people

20   die when you do that to them.

21   Q.   Well, Mr. Tucker, don't sometimes people refer to

22   things such as I saw the deputies on top of somebody and

23   it's really more of a manner of speaking, not that all

24   three deputies were literally laying with their full

25   weight on top of Mr. Docher?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 99

1    A.    You'll have to ask Rosario and Sinclair when you   -

2    if you depose them as to how   - what   - how they describe

3    it more.   I'm going on basically just what they said in

4    the police report, that Rosario   -

5    Q.    And   -

6    A.    -- and Sinclair said.

7    Q.    And assuming that, in fact, the deputies had all of

8    their entire weights on top of Mr. Docher, do you have

9    any idea how long of a period of time that would've been?

10   A.    No.

11   Q.    Doesn't that kind of matter in terms of determining

12   whether or not it's going to substantially impact

13   somebody's ability to breath?

14   A.    I've had probably 25 cases like this with physiology

15   of a struggle.   One of them that I did, up in

16   Massachusetts, there was a reporter with a camera

17   snapping pictures and they were time-sequenced and that

18   guy lived for 15 minutes.   Others have died within a

19   matter of a minute and a half or a minute.   It depends on

20   things like the guy that took 15 minutes who just smoked

21   some marijuana.   That's all.   Otherwise, he was a healthy

22   individual, but it took 15 minutes for him to die.

23   Others have died in a matter of a minute because they had

24   ingested cocaine and were suffering from excited

25   delirium, which was a complication.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 100

1           So how long it takes to die or suffer

2    permanent injuries is dependent upon a whole of

3    conditions.   The point is officers have been trained for

4    20 years, 25 years not to put a person in the prone

5    position with their hands cuffed behind their back and

6    compression on them because people will die if you do

7    that or they run the risk of dying.

8    Q.   And then, in regards to the information you have,

9    Mr. Tucker, concerning that training, do you know if

10   deputies have been trained in terms of how much weight is

11   too much?

12   A.   No, I don't.

13   Q.   So, I mean, would you agree with me that, very

14   often, deputies, in taking people into custody, have to

15   use some pressure in terms of holding the person down

16   long enough to handcuff them.

17   A.   Sure.

18   Q    Correct?

19   A.   Sure.

20   Q.   Okay, sir.  All right.  Let me move on to your last

21   preliminary opinion in your report, page number 9,

22   preliminary opinion number four and, for the record, I'll

23   read it.  Deputies Robinson and Mangrum failed in their

24   responsibility to intervene to stop a fellow deputy from

25   committing a clear violation of training and standards

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 101

1   when it says "the saw" -- I'm assuming you meant they saw

2   Deputy Newman deliver two separate elbow strikes to the

3   head of Tavares Docher when they knew or should've known

4   that deadly force was not justified under the

5   circumstances they were confronted with.  Did I read that

6   correctly, Mr. Tucker?

7   A.   Yes, you did.

8   Q.   Okay.  First, just to clarify, I assume that this

9   opinion is based, in part, on your earlier opinion that

10   it is your opinion that the elbow strikes by Deputy

11   Newman to Mr. Docher's head were, in fact, deadly force?

12   A.   Correct.  That's correct.  And officers are

13   taught --

14   Q.   So -

15   A.   Offices are taught, in use of force training

16   programs, that if they're present at the scene when a

17   constitutional violation is occurring, they have a duty

18   to intervene to stop that constitutional violation.  In

19   this case, the use of excessive force, deadly force, when

20   deadly force wasn't justified.

21          Now Robinson is - should've known and he

22   observed  - Robinson says he observed Newman deliver the

23   strike to Docher's head and he knew that blows to the

24   head could result  - it'd be deadly force, and that's on

25   page 28 of his deposition, line 7.  Now I have  - and I

Page 102

1    was including Mangrum because, at that point, when I

2    wrote the report, I didn't know that Mangrum himself had

3    delivered an elbow strike to the head of Docher.  So

4    Mangrum either failed to stop Newman or he participated,

5    just like Newman did.  I don't know where that's going to

6    all shake out when I'm all done with this, but either

7    way, Mangrum was wrong to not have intervened or he was

8    wrong by delivering an elbow strike himself to the head

9    of Docher.

10   Q.   Okay.  Now, Mr. Tucker, I just want to clarify

11   something.  You've told me, I believe, that you do not

12   know specifically where on Mr. Docher's head either

13   Deputy Newman or Deputy Mangrum struck him with their

14   elbows, correct?

15   A.   The side of the head is what was said by  - in their

16   deposition testimony.  Now I just know myself there's the

17   side of my head.  That's the temple.  Here's the side of

18   my head, the jaw, both of which are clearly identified

19   specifically as deadly force in Florida training, but

20   nobody - yeah, that's - it's true I don't know exactly.

21   It might've been in between the jaw and the temple.  I

22   don't know.  But it was a blow to the head and that is

23   recognized -- closed-fists, batons, elbow strikes are

24   deadly force when delivered to the head of a person.  No

25   question about it, accepted for the last -- I've been at

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 103

 1    this for 40-some years, so I know that.

 2    Q.    Now does it matter how strong the blow is?  If it's

 3    a tap versus a pile driver elbow strike, does that matter

 4    to you in your analysis, Mr. Tucker?

 5    A.    With all due respect, when I do a -- I'll just give

 6    you an analogy.  When I do taser cases and the -- often,

 7    the attorneys will say things like well, do you know what

 8    the actual charge of the taser was and the temperature of

 9    the battery when that shock was delivered?

10    A.    No, we don't know, but what you do know is it was

11    delivered because there's a data report that prints out

12    and says there was a shock delivered.  We don't have some

13    kind of a gauge that we can say well, this was an elbow

14    strike with two pounds of pressure or 14 pounds.  We

15    don't know, but that's why elbow strikes and closed-fist

16    strikes and baton strikes, whether light impact or heavy

17    impact, are not to be delivered because they can result

18    in serious -- and are likely to cause serious body injury

19    or death.  But we don't know about how much pressure, how

20    strong Newman was or Mangrum when they delivered those

21    strikes.  That's true.

22    Q.    Okay.  So, ultimately, it sounds like it doesn't

23    matter to you whether it's a tap with an elbow or a slam

24    of an elbow.  To you, if you're using the elbow and

25    hitting the head, it's deadly use of force?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 104

```
 1   A.    That's what the officers --

 2            MR. VITALE:  Objection to the form.

 3   A.   -- are taught.  That's correct.

 4   Q.   And we were talking about Robinson and Mangrum

 5   failing to intervene.  I assume you're aware that they

 6   would need to be in a position to intervene I assume,

 7   correct?

 8   A.   Well, they  - yes.  Of course.  They were there.

 9   They were present.  So  - and Robinson was holding the

10   legs down.  I think clearly he could of  - yeah.  They

11   had to be in the position and they were.

12   Q.   Do you know if they actually were able to see the

13   elbow strikes being delivered to Mr. Docher's head?

14   A.    Yes, I do.  In fact, Mangrum himself says I saw

15   Newman deliver the elbow strike to Docher.  Let me see if

16   I can find out where he said it, but I have it in here

17   somewhere.

18   Q.   And while you're looking that up, can you also tell

19   me if Deputy Mangrum ever was asked where did he see

20   Deputy Newman strike Mr. Docher on the head?

21   A.    Well, I do remember.  He said he doesn't know

22   exactly where the hit  - the strike was, but he saw him

23   strike him in the head with an elbow strike.

24   Q.   But regardless of where on the head, again, you're

25   saying that's deadly force?
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 105

1    A.   Yes.  It's - it is recognized as deadly force,

2    elbow strikes to the head, although Mangrum says a strike

3    to the temple is not deadly force.  Well, it is.  That

4    specifically says that in the Florida Basic Recruit

5    Training Program, but Mangrum says no, it's not.  He's

6    completely in disagreement with the training in Florida,

7    page 18 of his deposition, line 13.

8    Q.   And who is that?  I'm sorry.

9    A.   Mangrum.  He says a strike -

10   Q.   Okay.

11   A.   -- to the temple is not deadly force.

12   Q.   But you don't - you've already told me you don't -

13   Deputy New  - I'm sorry - Deputy Mangrum said he didn't

14   know specifically where Deputy Newman's elbow strike -

15   what part of Mr. Docher's head it struck?

16   A.   Yeah.  Right.  He didn't know what part was struck.

17   Q.   Okay.  Now, Mr. Tucker, let ask you.  What are your

18   charges in this case to date?

19   A.   A $6,000 flat-fee retainer that I receive whenever I

20   take on a case.

21   Q.   And are expecting any additional charges in the

22   future?

23   A.   Well, I assume I'm going to be paid for my

24   deposition for today, which should be a $1,500 fee, and

25   that should be it until it goes to trial.  If it goes to

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 106

1    trial, I will charge my regular trial fee of $3,000 plus

2    travel expenses to the trial site.

3    Q.   Okay.  And the $1,500 for deposition, is that a flat

4    fee?

5    A.   It is, if it's a deposition done in my home

6    location, which Raleigh is, today.

7    Q.   Okay.  And can you tell me how many hours you've

8    spent on the subject case to date?

9    A.   I cannot.  In fact, that's the reason why I do a

10   flat-fee system, because there's only me.  I don't keep

11   tabs of how many minutes I worked on this case today and

12   how many hours I worked on it the next day.  I have, over

13   the years, developed an idea that it takes about 40 hours

14   of work for me to look at a typical case and write a

15   report.  And so, at $150 an hour, that's where the $6,000

16   comes from.

17   Q.   And then, after that, if that amount is surpassed,

18   in terms of your time spent, do you then ask for an

19   additional retainer?

20   A.   That has happened twice in the 20 years I've done

21   litigation consulting.  One of them was a case down in

22   Florida where I had a  - seven file boxes full of

23   material and I had to go back to the attorney and ask for

24   an additional retainer and once up in Massachusetts over

25   the last 20 years.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 107

1  Q.   And, in those circumstances, did you request another

2  retainer or did you just start billing by the hour or do

3  you know?

4  A.   Started going by the hour.

5  Q.   Okay.  And I know you told me earlier  - well, let

6  me ask you.  How many times, to your knowledge, have you

7  been qualified as an expert in the law enforcement police

8  practices field?

9  A.   Upwards of 90 times.

10  Q.   And have any of the courts ever excluded any of your

11  opinions for any reason?

12  A.   Yes.  Of course.  Motions in limine as to whether or

13  not the issue involved was a legal conclusion, like

14  whether or not there was probable cause, for example.  If

15  I would've said, for example, when I express my opinions

16  here and I say that it was a level of force that was a

17  greater level of force than other officers would've used

18  in 2014, that, in essence, is a lay person or a police

19  person's way of expressing excessive force.  But if I

20  would've said my first opinion was that the deputies used

21  excessive force and it was objectively unreasonable, you

22  would've filed a motion to  - in limine to have that

23  opinion stricken because that's a legal conclusion.  So

24  that has happened to me in the past, but that's why I say

25  things they way I say them today so I don't have to worry

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 108

1    about that.

2    Q.   And can you tell me how times your opinions have

3    been excluded for any reason?

4    A.   No, I can't.  Probably, I'd just say a few times.

5    And early on  - most early on in my career because, as I

6    said, I learned after  - in fact, I talked to a judge and

7    said how do I explain excessive force without it being a

8    legal conclusion if, theoretically, any expert that takes

9    on a use of force case and says it was objectively

10   reasonable force, if you're on the defense side, that

11   could be excluded as a legal opinion.  You know, on the

12   other side, the plaintiff says it was excessive force.

13   That could be excluded  cause it's a legal conclusion.

14   That's why I say things the way I do now because I had to

15   literally ask the judge how to say it and he said put it

16   in police terms and explain it that way, which is what I

17   do.

18   Q.   Have your  - any of your opinions been excluded

19   because you were basically commenting on the credibility

20   of a witness?

21   A.   No.  I don't assign credibility in any witnesses.

22   That's up to the jury, the trier of fact, to assign

23   credibility.

24   Q.   And I know you've told me that, at least a few

25   times, your opinions have been excluded over the years,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 109

 1   but do you typically follow up with the attorneys that

 2   you dealt with to find out what the outcome of motions in

 3   limine were or --

 4   A.   Oh, I --

 5   Q.   -- things that happened during the trial?

 6   A.   Sure, sure.  Yeah, I typically do.  It's a learning

 7   process.

 8   Q.   And what's the percentage of your income that you

 9   obtain from this consulting work?

10   A.   Well, up till this point, it was probably 90%, but

11   now that I've been working toward retirement, I'd say

12   probably 40 or 50%.  I have a retirement from the City of

13   Tallahassee.  I draw social security.  I'm under contract

14   with the City of Tallahassee to advise them on all their

15   cases where they're sued.  So I'd say probably 40 or 50%

16   at this point.

17   Q.   All right.  Mr. Tucker, is there any topic that you

18   believe is relevant to your opinions that I have not

19   discussed with you here today?

20           MR. VITALE:  Objection to the form.

21   A.   You didn't ask me anything at all about whether --

22   you know, custom and practice and I told you that I'm

23   classifying my opinions as still preliminary until after

24   I've seen the deposition testimony of the corporate

25   representative of the St. Lucie County Sheriff's Office

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 110

1    so I can make a determination on that and finalize

2    everything.

3    Q.   Sure.  Well, just so we're clear, Mr. Tucker, as of

4    right now, the plaintiff does not have a custom policy

5    claim against the sheriff's office of St. Lucie

6    County, --

7    A.   Yeah.

8    Q    -- so, as far as I'm concerned, I'm not going to ask

9    you a bunch of questions that, as of right now, arguably,

10   isn't even relevant to the proceeding, at least in terms

11   of the claims that are currently pending.  It may be down

12   the road that they'll amend and I will be talking to you

13   again.

14   A.   Okay.

15   Q.   I don't know.

16   A.   All right.

17   Q.   I guess we'll figure that out.

18   A.   Sure.  I understand.

19          MR. BARRANCO:  I appreciate your time.  I have

20   no more questions for you.  I don't know if anyone else

21   does.

22          THE WITNESS:  Thank you for your questions.  I

23   appreciate it.

24          MS. BARRANCO:  Thank you.

25          MS. TYK:  Mr. Tucker, --

Page 111

1            MR. VITALE:  This is David Vitale.  I have a

2    few questions.

3            MS. TYK:  I have questions too.  Do you want to

4    wait until I go or do you want to go first/

5            MR. VITALE:  Yeah.  You can go first.

6            MS. TYK:  Okay.  Hi, Mr. Tucker.  My name is

7    Julie Tyk.  I represent the St. Lucie County Fire

8    District and Jose Rosario.  I just have a few questions

9    about your report that you've written in this matter.

10           THE WITNESS:  Right.

11           CROSS-EXAMINATION

12       BY MS. TYK:

13   Q.    Specifically, as to your preliminary opinion number

14   two, dealing with excited delirium, --

15   A.    All right.

16   Q.    -- now I know in your report you discuss the fact

17   that you are not a medical doctor.  Is that correct?

18   A.    Correct.

19   Q.    Okay.  And you have no formal medical training.  Is

20   that correct?

21   A.    Correct.

22   Q.    And, in your report, you are not diagnosing Mr.

23   Tavares Docher with excited delirium.  Is that accurate?

24   A.    That's correct.  He's exhibiting the symptoms of

25   excited delirium.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 112

1   Q.   Okay.  And so, is it an assumption on your part for

2   your opinions that he had excited delirium at the time of

3   the incident?

4   A.   As I testified to earlier, one has to  - an expert

5   has to assume something to be true or there's no way he

6   can render an opinion.  So, yes, I assumed  - and, in

7   fact, I think it was  - well, in any case, I assumed he

8   was excited delirium because he was exhibiting the

9   symptoms of excited delirium.

10  Q.   Have you seen any reports -- medical records in

11  which a medical physician has diagnosed Tavares Docher as

12  suffering from exciting delirium on May 11th, 2014?

13  A.   No.

14  Q.   Have you seen any other expert report in this case?

15           MR. VITALE:  Objection to form.

16  A.   Just the CME of the  - Docher by the defense expert.

17  Q.   Okay.  No other formal written  -

18  A.   No.

19  Q.   -- reports?

20  A.   No.

21  Q.   All right.  And I think, in reviewing your report,

22  the symptoms of excited delirium that you believe he was

23  exhibiting were hallucinations, sweating, agitation.

24  Anything else?

25  A.   Delusional, breaking glass  - we  -

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 113

1   Q.   Well, I meant that he was exhibiting, not -

2   A.   Oh.

3   Q.   -- all of the symptoms.

4   A.   Sweaty, delusional, seeing things that aren't there,

5   according to the deputies, heads  - Arabs trying to get

6   him because he knew where the bodies were  - the heads

7   were buried in St. Lucie County, not acting normal,

8   agitation.  Those were the primary signs.

9   Q.   Did you review the deposition of his mother and of

10  his aunt and cousin in this matter?

11  A.   No.

12  Q.   Were you aware that Mr. Docher actually did have a

13  friend who was beheaded?

14  A.   No.

15  Q.   Under the symptoms of excited delirium, one of them

16  is extreme agitation.  What is your definition of extreme

17  agitation?

18  A.   I think it's what was said by Mr. Brown.  He seemed

19  agitated.  He didn't say extreme [sic] agitated.

20  Irritable or, you know, just upset.  You know, I don't

21  know how to put  - extreme would be very upset.  That's

22  basically it.

23  Q.   Okay.  So, with excited delirium, is it more that

24  the person has extreme agitation versus somebody who's

25  just regularly agitated?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 114

1    A.    They just used the term agitation and Brown

2    described him as being agitated.

3    Q.    Okay.  So you don't know the level of agitation that

4    he --

5    A.    No.

6    Q.    -- exhibited?

7    A.    I don't think there is some kind of a bright line

8    that says okay, he's agitated, but that's not excited

9    delirium.  Oh, he's very agitated, so now it is excited

10   delirium.  I don't think there's any kind of a bright

11   line there.  You look at all these facts combined, that's

12   what you conclude, excited delirium.

13   Q.    Do you know how common it is for a person to be

14   suffering from excited delirium?

15   A.    How common?

16   Q.    Um-hmm.  The incident --

17   A.    Well, --

18   Q.    -- rate.  The incident rate of an individual.

19   A.    It accounts for a great percentage and I'm saying I

20   think probably the latest I'd seen was some studies

21   saying 20 or 30% of all in-custody deaths.

22   Q.    And do you know what studies showed that?

23   A.    I don't have one off the top of my head.  I may have

24   cited some of those studies in that chapter in the book.

25   I don't know.  They may be cited in the documents that I

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 115

1   provided on excited delirium.  They probably are.  I

2   can't keep track of all the studies.

3   Q.   And outside of in-custody deaths, do you know the

4   overall incident rate for the overall population in the

5   United States for somebody suffering from excited

6   delirium?

7   A.   No.

8   Q.   Do you have  - did you receive any medical records

9   for Tavares Docher in this matter?

10  A.   Well, let me look and see what's listed there on  -

11  it doesn't look like it.

12  Q.   So you're unaware of his medical history in this

13  matter?

14  A.   No, I am not.

15  Q.   Have you seen the lab reports that were done at St.

16  Lucie Medical Center from this incident?

17  A.   No.

18  Q.   Do you know what his blood alcohol level was?

19  A.   I do not.

20  Q.   Do you know what the results of any of the drug

21  testing were?

22          MR. VITALE:  Objection to form.

23  A.   It seems like somewhere I saw that and there wasn't

24  the presence of drugs in his system.  I  - it seems like

25  I saw that somewhere.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 116

1  Q.   Okay.  I noted that on your CV, you  -

2  A.   On my what?

3  Q.   Curriculum vitae.

4  A.   CV?  Yeah.

5  Q.   Yeah.  That you, under your training services,

6  indicate a couple of training services for emergency

7  vehicle operations.

8  A.   Right.

9  Q.   What exactly is that?

10  A.   EVOT, Emergency Vehicle Operations Training.

11  Emergency response and high-speed pursuit --

12  Q.   Okay.

13  A.   -- basically.

14  Q.   But nothing to do with any type of medical --

15  A.   I did some training for one of the agencies in

16  Maine, an EMS organization in Maine, on emergency vehicle

17  operations, the requirement that -- whether it's a

18  medical emergency or not, that you operate audio and

19  visual signals, that you exercise due regard to the

20  motoring public that's out there, that sort of thing,

21  just to help them out from potential liability

22  situations.  But, typically, it's all that I do in

23  policing.

24  Q.   Okay.  And you're not a paramedic or an EMT?

25  A.   No, I"m not.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 117

1    Q.   You attached to your report the IACP policy on

2    excited delirium.

3    A.   Yes.

4    Q.   Is that accurate?  Okay.  Do you find that to be a

5    reliable authority on  -

6    A.   Well, yes, I do.

7    Q.   -- excited delirium?

8    A.   It's published by the U.S. Professional Police

9    Association  - International Police Association.

10   Q.   Okay.  And  -

11        COURT REPORTER:  Did you say  - I'm sorry.  You

12   said authority on what?  I didn't -

13        MS. TYK:  A reliable authority on excited

14   delirium.

15        COURT REPORTER:  Thank you.

16        MS. TYK:  Um-hmm.

17   BY MS. TYK:

18   Q.   And you also brought with you, and cited in your

19   report, the IACP National Law Enforcement Policy Center

20   paper on excited delirium.  Do you also find that to be a

21   reliable authority?

22   A.   Yes.

23   Q.   And, again, it looks like it was Force Science News

24   #29, 10 Training Tips for Handling "Excited Delirium."

25   Do you find that to be a reliable authority?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 118

```
 1    A.    At the time it was published, it was, but it's a

 2    2006 and there's been a lot of developments since then.

 3    Q.    Okay.  And what has changed?

 4    A.    The identification of more symptoms.

 5    Q.    Anything else?

 6    A.    No.

 7    Q.    Okay.  If you would  - is it correct to state that

 8    all of the papers that we just discussed recognize the

 9    use of chemical sedation when dealing with somebody who

10    is exhibiting the symptoms of excited delirium?

11    A.    Yes.

12              MS. TYK:  That's all the questions I have.

13              THE WITNESS:  Thank you.

14              MS. TYK:  Thank you.

15              MR. VITALE:  Okay.  I have a few questions, Mr.

16    Tucker.

17              THE WITNESS:  Yes, sir.

18         BY MR. VITALE:

19    Q.    On direct examination, you referenced the Coconut

20    Grove case.  Do you recall that?

21    A.    Yes, sir.

22    Q.    Were you referring to the Coconut Creek case?

23    A.    Okay.  Yes.

24    Q.    And if we could turn to Appendix B of your report,

25    which has been marked as Exhibit B to this deposition.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 119

```
 1    Let me know when you're there.

 2    A.   D?

 3    Q.   Exhibit B, as in boy.

 4    A.   B.  Okay.  Yes.  I'm there.

 5    Q.   Okay.  And the deadly force elbow strike, which is

 6    the bottom of Appendix E, do you see that?

 7    A.   Wait a minute.  I'm sorry.  What appendix?

 8    Q.   I'm at Appendix E of your report.

 9    A.   E.  Okay.  I was looking at B.  All right.  I'm

10    looking at E.

11    Q.   Okay.  And at the bottom is where I believe you were

12    having a discussion during direct examination on deadly

13    force elbow strikes.

14    A.   Yes.

15    Q.   Do you see that?

16    A.   Yes.

17    Q.   And it says, "Some target areas for a deadly force

18    elbow strike include the following."  Do you see that?

19    A.   Yes.

20    Q.   Did I read that correctly?

21    A.   Yes.

22    Q.   And it includes five bullet points, which are

23    examples of target areas for a deadly force elbow strike,

24    correct?

25    A.   Right.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 120

1   Q.    That is not an exclusive list of all the target

2   areas for a deadly force elbow strike, correct?

3   A.    It is not an inclusive.  I - as I testified to

4   earlier, it's examples of places that would be,

5   obviously, deadly force.

6   Q.    Okay.  But, for example, it doesn't list the eye

7   socket  -

8   A.    Correct.

9   Q.    -- of a person's face, correct?

10  A.    Correct.

11  Q.    That would be an example.  An elbow strike to an

12  individual's eye socket would be an example of deadly

13  force, correct?

14  A.    Correct.

15  Q.    And do you recall being asked some questions

16  regarding the amount of force for each elbow strike

17  delivered by either Deputy Newman or Deputy Mangrum?

18  A.    Yes, I do.

19  Q.    And do you recall  - and I believe you said that you

20  had viewed the cell phone video that one of the witnesses

21  took.  Is that correct?

22  A.    Correct.

23  Q.    Do you recall whether there was blood depicted in

24  that video?

25  A.    A lot.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 121

1   Q.   And  -

2   A.   And described by the paramedic when he arrived on

3   the scene.  He said that he saw the deputies on top of

4   the guy and that he was laying with his head in a pool of

5   blood.  So, yes, --

6   Q.   Do --

7   A.   -- he was.

8   Q.   Do you recall seeing any blood on Deputy Newman's

9   elbow?

10  A.   Yes.

11  Q.   Would you agree with me that Deputy Newman must've

12  used considerable force in delivering those two elbow

13  strikes?

14          MS. BARRANCO:  Object to the form.

15  A.   I would because  - enough to cause that kind of

16  bleeding, yes.

17  Q.   You also, I believe, discussed the weight of Deputy

18  Mangrum and you indicated that was about 205 pounds.  Is

19  that correct?

20  A.   In his deposition, he said he weighed 209 pounds at

21  the date of deposition, but at the time of the incident,

22  he was 205.

23  Q.   Do you recall Deputy Mangrum indicating that he was

24  actually 330 pounds at his deposition and that Deputy

25  Newman had been 209 pounds, but I believe -- on the May

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 122

1    11th, 2014, he believed he was roughly 205 pounds?

2    A.   Well, let me see.  I may have the names reversed,

3    but -- from memory, but I do  - one of them weighed 205

4    and I think the other one did weigh 300 pounds.

5    Q.   And the weight of those deputy would be a factor

6    regarding your opinion on the physiology of a struggle?

7    A    Correct.

8    Q.   And if you could flip to page 6 of your report,

9    please.

10   A.   Page 6?  Yes, sir.

11   Q.   Yes.  And the first paragraph, which begins with in

12   my opinion, do you see that?

13   A.   Yes.

14   Q.   Do you recall counsel asking you some questions

15   about this opinion on direct examination?

16   A.   Yes.

17   Q.   It says, "In my opinion, a reasonable officer, under

18   similar circumstances, would not have perceived Docher as

19   an immediate threat of serious bodily harm or death at

20   any time after the officers handcuffed him."  Did I read

21   that correctly?

22   A.   Correct.

23   Q.   Do you recall in the officer's testimony  -

24   deposition testimony, which I understand that you read

25   after finalizing the report that's been marked as Exhibit

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 123

1   B, --

2   A.   Right.

3   Q.   Do you recall whether the officers themselves

4   admitted that they did not feel that Mr. Docher posed an

5   immediate threat of serious bodily harm or death at any

6   point during the altercation?

7   A.   And I think I already testified to that fact.  Yes,

8   I do recall it and I cited their testimony to that fact.

9              MR. VITALE:  No further questions.  Thank you,

10  sir.

11             THE WITNESS:  Thank you.

12             MS. BARRANCO:  And just one follow-up question,

13  if I could, Mr. Tucker.

14             THE WITNESS:  Yes, ma'am.

15             REDIRECT EXAMINATION

16       BY MS. BARRANCO:

17  Q.   You mentioned reference to the pool of blood under

18  Mr. Docher's head.

19  A.   Yes.

20  Q.   Do you have any idea where that blood came from in

21  terms of whether it was a product of Mr. Docher falling

22  to the ground or elbow strikes or something else?

23  A.   No, I don't.  I think just  -

24  Q.   And you don't have an opinion in that regard either?

25  A.   The only thing I can say is that there was a pool of

Page 124

1    blood.  There was blood on Newman's elbow  - blood stains

2     - and Paramedic Sinclair said that the subject was on

3    the ground with a pool of blood around his head.

4              MS. BARRANCO:  Okay.  Thank you.  I have no

5    further questions.

6              MS. TYK:  No other questions.

7              MS. BARRANCO:  And I guess he's going to read

8    and I would like to get a copy and, --

9              COURT REPORTER:  Um-hmm.

10             MS. BARRANCO:  -- in terms of Exhibit C, I

11   know, Mr. Tucker, you had those two articles and I didn't

12   know if the court reporter would be able to photocopy

13   that one chapter 5 for me and include it as part of

14   Exhibit C.

15             COURT REPORTER:  Okay.  I can get the people at

16   the desk to make a copy.  So you want  - for Exhibit C,

17   you want chapter 5 copied and then you wanted a copy of

18   the front of the book as well  - the front cover of the

19   book?

20             MS. BARRANCO:  Yes.

21             THE WITNESS:  How about if I leave the book and

22   those -- Exhibit C with -- that's updated and the two

23   other articles that I brought with the court reporter and

24   she sends it all back to me.

25             MS. BARRANCO:  That'll be great.  Thank you,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1    Mr. Tucker.

2              THE WITNESS:  Thank you.

3              MR. VITALE:  Thank you.

4              COURT REPORTER:  Okay.  Mr. Vitale, before you

5    get off the phone, I know that Summer wants a copy.  Do

6    you want to order the transcript?

7              MR. VITALE:  Yes.  We'll take a copy, please.

8              COURT REPORTER:  Do you want condensed,

9    electronic, full?  What's your pleasure?

10             MR. VITALE:  Condensed is fine.

11             COURT REPORTER:  Okay.  Do either of you need

12   the transcript expedited for any reason?

13             MS. BARRANCO:  Not me.

14             MR. VITALE:  No, ma'am.

15             COURT REPORTER:  Okay.  Great.  Thank you.

16   (The deposition concluded at 1:12 p.m.)

17

18

19

20

21

22

23

24

25

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 126

1                        CERTIFICATE

2

3      State of North Carolina

4      County of Harnett

5

6           I, Mary Lynn Fuller, a Notary Public in and for the

7      State of North Carolina, do hereby state that there came

8      before me on the 12th day of July, 2017, the person

9      hereinbefore named, who was by me sworn to testify to the

10     truth and nothing but the truth of his knowledge

11     concerning the matters of controversy in this cause; that

12     the witness was thereupon examined under oath, the

13     examination reduced to typewriting; and the deposition is

14     a true and accurate transcription of the testimony given

15     by the witness.

16          I further certify that I am not counsel for, nor in

17     the employment of any of the parties to this action; that

18     I am not related by blood or marriage to any of the

19     parties, nor am I interested, either directly or

20     indirectly, in the results of this action.

21          In witness whereof, I have hereto set my hand, this

22     the 25th day of July, 2017.

23

24     *Mary Lynn Fuller /EG*

25     Mary Lynn Fuller, Notary

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: #29..561 686-6300

| # |
|---|

**#29**  21:16 25:13 117:24

| $ |
|---|

**$1,500**  105:24 106:3

**$100**  75:7

**$150**  106:15

**$3,000**  106:1

**$6,000**  105:19 106:15

| 1 |
|---|

**1**  21:15 22:16,23 36:14,20 63:8
94:22

**10**  13:16 28:21 57:15 117:24

**10,000**  60:1

**10:04**  1:24

**111**  24:22

**112**  2:16

**119**  2:16

**11:56**  78:21

**11th**  50:6 67:8 112:12 122:1

**12**  1:13,24 8:19 24:25 27:24 94:18

**1216**  2:3

**124**  2:17

**12:05**  78:22

**13**  24:25 44:7 105:7

**14**  96:15 103:14

**1400**  2:7

**15**  8:19 13:18 93:21 96:15 99:18,
20,22

**16**  29:20

**162**  15:21

**16th**  6:22 7:19,21 16:19 18:1,4
48:18

**17**  79:22 80:23

**18**  80:23 105:7

**1965**  8:8,20

**1969**  8:20,25 57:5

**1971**  14:25

**1974**  14:25 15:4

**1977**  8:14 15:4,16

**1979**  15:17,25

**1988**  9:1

**1989**  50:19

**1994**  9:5 15:25

**1995**  93:18

**1:12**  125:16

| 2 |
|---|

**2**  29:7 35:13 37:1,16 51:10

**20**  5:17 32:19 49:17 69:2,9 91:5
92:12,14 100:4 106:20,25 114:21

**200**  1:23 98:13

**2006**  70:25 71:5 83:8 118:2

**2007**  28:21 33:15

**2008**  30:10

**2009**  29:13

**2014**  11:14 21:20 50:6,8 67:8
78:10 87:20 89:11 107:18 112:12
122:1

**2015**  33:15

**2017**  1:13,25 6:22 7:21 18:1

**205**  52:25 98:13 121:18,22 122:1,
3

**209**  96:14 98:12 121:20,25

**2139**  2:11

**24**  18:16

**25**  99:14 100:4

**26**  2:19

**26th**  12:9

**27606**  4:2

**28**  101:25

**29**  79:22

**291**  51:11

| 3 |
|---|

**3**  32:2

**30**  92:21 93:2

**30%**  32:21 114:21

**300**  122:4

**32801**  2:8

**330**  121:24

**33304**  2:4

**33409-6601**  2:11

**35**  94:18

**362**  16:3

| 4 |
|---|

**4**  22:17,20,21,22 23:2 33:19 48:13
49:25

**40**  5:4,11 28:12 92:21 106:13
109:12,15

**40-some**  103:1

**407 843-8880**  2:8

**41**  27:23

**45**  57:18

**45-officer**  14:5

**4801**  1:23

| 5 |
|---|

**5**  2:15,19 22:21 23:2,9 24:6,17,21
50:16 54:6 55:22 62:16 124:13,17

**5/10/17**  17:15

**5/11/14**  80:22

**5/16/17**  17:16

**50**  5:4,11,25 57:5 93:8

**50%**  109:12,15

**500**  10:24 14:10 16:1,4

**53**  94:22

**530**  5:17

**561 686-6300**  2:12

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: 57..apparently

**57** 11:20 33:4

**59** 18:15

**5929** 4:2

---

**6**

**6** 63:25 66:14 67:6 78:24 95:19 122:8,10

**60-something** 28:11

**65** 8:23

**68** 57:5

**69** 8:23 57:5

---

**7**

**7** 2:18,19 24:12 81:12 82:17 94:22 101:25

**70%** 32:20

---

**8**

**8** 71:8 90:17

---

**9**

**9** 22:16,23 71:7 100:21

**90** 107:9

**90%** 36:4 109:10

**911** 41:2 43:3,8,11,14,19,22,23 44:9 53:19 72:4

**92** 15:8

**94** 14:21

**944.40** 55:16

**95%** 33:5

**954 462-3200** 2:4

**97** 5:3,11 24:22

---

**A**

**A-l-o-n-g-e** 95:16

**a.m.** 1:24 78:21

**ability** 99:13

**above-entitled** 1:19

**absolutely** 27:6,20 61:5 65:2

**accept** 28:10

**accepted** 57:19 102:25

**accepting** 27:23 28:18

**accommodation** 5:15

**accomplish** 25:21

**account** 89:20

**accounts** 114:19

**accurate** 8:3,4 93:7 111:23 117:4

**Act** 74:5

**acting** 37:19 71:9,12 72:3,5 85:22 113:7

**action** 1:19 6:11 19:17 39:5 40:18 90:13

**actions** 88:25

**active** 8:18,20,23 27:18,23 28:1

**actively** 51:4

**activity** 5:15 81:23 82:22 83:2

**actual** 103:8

**acute** 70:23

**Adam** 11:10,14

**add** 20:10

**adding** 18:17,21

**addition** 89:18

**additional** 8:19 17:1 19:24 27:13 48:18 49:1 105:21 106:19,24

**address** 3:25 49:4

**adjacent** 60:10

**administer** 72:15 83:24

**Administration** 5:24 8:13

**administrative** 89:17

**admit** 52:5

**admits** 18:19

**admitted** 54:13 123:4

**advise** 109:14

**affairs** 49:5,7

**affiliated** 9:9

**agencies** 4:22 88:20 116:15

**agency** 5:16 15:11 89:14,19,23

**agent** 13:14

**aggravated** 62:18,24 63:19

**aggression** 70:23

**agitated** 71:6,8 72:3 75:1,5,9 113:19,25 114:2,8,9

**agitation** 70:21 75:2,4 81:18 82:20 112:23 113:8,16,17,24 114:1,3

**agree** 31:11 43:13 47:2,5 54:21 69:17 75:16 85:20 100:13 121:11

**agreed** 82:19

**agreement** 1:20 90:1,8

**agreements** 89:18

**ahead** 21:1 34:1 41:14 59:12 62:10 80:2

**airport** 5:25

**alcohol** 83:1 115:18

**alike** 70:7

**Alonge** 95:15,16

**altercation** 123:6

**amend** 110:12

**American** 5:22

**Americans** 74:5

**amount** 106:17 120:16

**analogy** 103:6

**analysis** 34:4 50:15 54:6 86:16,19 87:5 95:5 103:4

**anger** 83:2

**answer's** 60:5,18

**answering** 40:3

**anybody's** 98:14

**anymore** 30:11,13

**anything's** 43:21 70:5

**Appalachian** 8:13

**apparent** 70:24

**apparently** 28:24 46:22 50:25 65:16 80:9,14 81:3

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                    Index: appeal..behavior

**appeal** 27:25

**APPEARANCES** 2:1

**appeared** 71:8

**Appendices** 2:19 6:24

**appendix** 7:5,12 11:19 16:10,12, 16 26:1,13,20 32:24 33:23 34:7,8, 17,18 35:14 36:10 37:1,16 44:1,5 51:8 55:24 56:24 58:1 70:12,13 75:11 78:13,15 87:18 91:4 118:24 119:6,7,8

**applicable** 90:9

**applied** 95:13 98:5

**apply** 90:5 91:16,17 92:3,7

**April** 21:20 45:20 78:10

**Arabs** 66:25 68:5,6 81:21 85:6 113:5

**area** 4:19 14:18 19:5 52:2 56:18 57:9 58:12,14 59:4 60:10 98:18

**areas** 51:15,16 61:18 119:17,23 120:2

**arguably** 110:9

**Ariana** 37:8

**arm** 95:9 96:19

**armed** 14:17 96:13

**arrest** 14:16 39:12,14 51:4 54:25 85:5,14 88:10

**arrest-and-control** 87:2

**arrived** 95:16,22,25 121:2

**articles** 23:18 24:1 44:8 124:11, 23

**Asheville** 13:19 15:16,19

**asks** 43:23

**aspect** 4:24

**asphyxia** 24:12 66:9 92:18,19 93:6,11,17 97:12

**assault** 62:18,24 63:8,10,19,20

**assault/battery** 62:20 63:5

**assessment** 86:17

**assign** 108:21,22

**assist** 9:24

**assistance** 43:16 83:22

**assisted** 9:25 95:17

**Association** 21:17 81:16 88:6 117:9

**assume** 17:21 34:3,8 44:16 63:15 86:4 101:8 104:5,6 105:23 112:5

**assumed** 33:20 34:6 35:6 112:6, 7

**assuming** 33:15 99:7 101:1

**assumption** 112:1

**attach** 25:18

**attached** 6:24 51:8 117:1

**attacked** 86:14

**attempt** 82:2 83:23

**attempted** 61:22

**attempting** 60:24 61:3,5

**attempts** 62:8

**attending** 3:16

**attention** 67:11 71:15,17,22

**attorney** 3:10 11:5 25:9 106:23

**attorneys** 28:5 103:7 109:1

**attributable** 75:20 84:3

**attribute** 80:15

**attributed** 70:18 75:17,18 81:6 82:23

**audio** 44:9 116:18

**audio/video** 44:10

**audit** 14:14

**aunt** 113:10

**authored** 18:10

**authority** 117:5,12,13,21,25

**automatically** 60:20

**Avenue** 1:23

**avoid** 94:2

**avoiding** 90:21 94:6

**aware** 45:8,11 52:1 55:14,15 60:22 65:13,19 91:9 93:3,8 104:5 113:12

**B**

**B.A.** 8:7

**back** 8:20 15:9,20 30:22 31:15 34:16 48:7 51:18 52:3,20 53:12 54:22 56:8,18 61:24 64:12 69:2 73:13 77:4,5 85:25 91:15,17,22 92:23,24 93:9,21 95:3,7 96:13 97:9,20 98:2,13,14,16 100:5 106:23 124:24

**backed** 75:5

**background** 8:6 9:3

**bargaining** 89:17 90:1,7

**Barnhart** 2:10

**Barranco** 2:2,3,15,17 3:6,9 6:2, 17 23:23 24:3,5 70:1 77:12,16,20, 23 78:18,23 80:18 110:19,24 121:14 123:12,16 124:4,7,10,20, 25 125:13

**base** 67:15

**based** 18:22,24 20:21 32:18 36:4,5 38:12 46:12 56:24 64:16 65:6 76:23 80:9 84:20 98:9 101:9

**basic** 51:9 56:5 57:16 79:19 90:22 91:3,9,10 93:17 94:7 105:4

**basically** 18:24 20:8 27:16 99:3 108:19 113:22 116:13

**basing** 64:8,10

**basis** 6:10

**bat** 12:11 85:9

**baton** 30:5 56:16,17,21 103:16

**batons** 31:6 56:20 57:20 102:23

**battery** 63:9,10,11,14,21 103:9

**Beach** 2:11 10:20

**beating** 35:25

**beer** 76:9,16,17

**beginning** 1:24

**begins** 122:11

**behalf** 2:2,6 33:5

**behaving** 38:8 74:16

**behavior** 70:17 81:19,22 82:21 89:1

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                              Index: beheaded..changed

**beheaded** 113:13

**believed** 122:1

**best-case** 73:19

**best-case-scenario** 87:23

**Bhagudas** 16:20 42:7,8,15 71:10

**Bill** 71:4

**billing** 107:2

**bit** 34:6 80:6

**bite** 60:25 61:3,5,7,12,22 62:8

**bites** 62:7

**biting** 60:24 61:2

**black** 69:6

**bleeding** 121:16

**block** 75:14

**blood** 57:11 96:2 115:18 120:23
    121:5,8 123:17,20 124:1,3

**blow** 57:8 60:3 102:22 103:2

**blows** 57:13,19 101:23

**boat** 75:5

**bodies** 68:6 113:6

**bodily** 51:16 57:10,22 60:5 62:25
    64:7,14 122:19 123:5

**body** 19:4 58:23 65:17 94:12,13,
    20 98:6 103:18

**Boles** 37:18 38:6,14

**bolt** 97:19,20

**bolting** 54:22 97:16

**bony** 56:14 58:11

**book** 2:19 21:14,21,22,23 22:1,
    13,17 24:8,11 68:22 114:24
    124:18,19,21

**Book/chapter** 2:19

**Boom** 27:14

**Boone** 8:14

**bottom** 62:16 78:16 93:13 98:3
    119:6,11

**Boulevard** 2:3,11

**bound** 87:25

**box** 25:23

**boxes** 106:22

**boy** 119:3

**brain** 57:12

**break** 77:15 78:19 80:5 83:17
    85:10

**breaking** 77:14 112:25

**breath** 66:2,3 91:15,21,23,24
    92:1 95:12 97:6,25 99:13

**breathing** 91:12,19 94:17

**bridge** 51:18 52:3 56:8,19 58:13

**briefly** 17:20 42:17

**bright** 114:7,10

**bring** 6:7 21:6,9

**brought** 3:12 21:10,17,21 23:20
    25:6,19,24 26:12,19 74:9 76:13
    117:18 124:23

**Brown** 16:20 27:1 41:2,3 42:11
    71:6,9 113:18 **114**:1

**buddy** 97:24

**bullet** 119:22

**bulletin** 21:16

**bumped** 92:13

**bunch** 85:10 110:9

**buried** 113:7

**business** 3:25 8:7 28:16 42:13

**busy** 39:18

————————————————————
                  **C**
————————————————————

**C-h-e-r** 36:24

**call** 5:18 38:17,20 41:2 43:3,8,11,
    23 47:9 65:25 72:4,10 73:16,25
    83:22 92:5

**called** 1:18 5:7 33:5 43:14 53:19
    83:21 91:9 95:14

**calling** 43:19 82:7

**calls** 43:7,22 65:24

**calm** 40:10 74:24 78:2,6,9 81:14
    82:11

**calmness** 81:23 82:10

**Calvin** 1:7 16:22

**camera** 41:20 99:16

**Canada** 28:20

**cancer** 93:24,25

**capabilities** 89:23

**capable** 65:9

**capsicum** 30:6

**car** 39:23 40:20 54:23 77:4,5
    92:24 97:20

**care** 32:13 50:17 72:19 88:23

**career** 13:10 14:8 108:5

**Carolina** 1:12,22,24 4:2,4,7 8:14
    13:21 15:4,16 28:7 29:18 30:9

**carry** 30:3

**case** 4:14,24 5:9 6:14,20 10:12,
    16,19,21 11:3,5,8,11,13,22 12:18,
    23 16:13 19:11 23:4 24:8,16 27:9,
    14 28:2,11 29:7,9 30:24 32:11,13,
    18 33:22 34:2,7 37:5 39:14 40:18
    48:2 49:15 50:20,24 53:7,23
    59:13 63:2 64:20 65:8 66:7 69:5
    71:11,24 74:4 83:12 86:5,22
    88:22 90:5 97:12 98:11 101:19
    105:18,20 106:8,11,14,21 108:9
    112:7,14 118:20,22

**cases** 5:4,12,16,21 6:1 10:24,25
    11:20,22 12:5 13:5 14:6 16:11
    24:18 27:18,23,24 28:3,10,18
    32:16 33:2,4,5,8,14,16 65:4 99:14
    103:6 109:15

**category** 31:12

**caused** 62:25

**CD** 44:19

**cell** 45:24 46:20 120:20

**Center** 21:19 25:12 71:4 78:12
    83:7 87:19 88:4 93:15 115:16
    117:19

**certainty** 68:24

**certifications** 30:1,8,14

**certified** 5:22 29:13 30:2 31:24
    67:22

**certify** 29:24

**change** 18:10 61:4 62:9,11 77:6

**changed** 7:22 118:3

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                    Index: chaotic..considered

**chaotic** 74:3

**chapter** 22:17,20,21,22 23:2 24:6,7,12,17,21 25:2 68:23 114:24 124:13,17

**chapters** 24:11

**characterized** 70:20

**charge** 22:3 62:24 103:8 106:1

**charged** 53:23 54:15 62:18,20 63:4 71:18 72:24

**charges** 105:18,21

**chasing** 40:2

**check** 27:16 28:7

**cheek** 59:6

**chemical** 118:9

**chief** 13:16,18,19,20,21,22 14:1, 4,9,24 15:3,16,20,24 32:23

**Chiefs** 21:18 81:16 88:6

**chop** 12:3

**Christopher** 1:6 16:22

**cigar** 74:25

**cigarette** 93:22,24

**cigarettes** 93:25

**circum** 70:6

**circumstances** 40:11 50:9,22 64:5,15 65:1 67:9 68:14 84:17,21 101:5 107:1 122:18

**citation** 70:24

**cite** 51:7

**cited** 78:4 83:7 114:24,25 117:18 123:8

**citizen** 37:8 46:8 66:16

**citizen's** 46:18,19

**City** 109:12,14

**civil** 86:5

**civilian** 37:3,4 42:3

**civilians** 85:16,21

**claim** 93:11 110:5

**claimed** 4:25

**claims** 110:11

**clarification** 90:15

**clarify** 17:5 26:11 62:12 78:8 101:8 102:10

**clarifying** 18:5

**class** 8:9

**classified** 48:20 63:22 83:20

**classify** 90:6

**classifying** 90:2 109:23

**Clay** 16:21

**CLAYLAN** 1:7

**clear** 42:12 43:5 68:23 79:15 94:2 95:5 100:25 110:3

**clearer** 51:19

**close** 16:4

**closed** 35:22

**closed-** 57:7

**closed-fist** 57:19 103:15

**closed-fists** 102:23

**clothes** 84:14

**CME** 17:8,10,12 112:16

**cocaine** 99:24

**Coconut** 10:20 11:8 12:8,15,22 118:19,22

**collective** 89:17 90:1,7

**combination** 75:22,23

**combined** 114:11

**comfort** 77:14

**comment** 69:25

**commenting** 108:19

**Commission** 51:14

**committed** 53:16 54:10,13 85:1

**committing** 74:9 100:25

**common** 92:15 114:13,15

**communicated** 40:9 43:6

**communication** 11:13 26:21,22

**communications** 27:3,4,7,12

**community** 89:20

**company** 9:9

**compelled** 42:16

**complainant** 38:19 40:1,25

**complainants** 40:1,2

**completely** 105:6

**compliance** 77:8

**compliant** 77:3,6

**complication** 99:25

**complications** 66:5

**comply** 42:23

**compression** 31:14 52:25 53:1, 4,11 66:6 91:18 97:10 98:2,4 100:6

**compulsory** 17:11

**concealed** 30:3

**concept** 93:6

**concepts** 21:19 78:4,10 88:15, 16

**concerned** 19:8 110:8

**conclude** 114:12

**concluded** 125:16

**conclusion** 49:6 64:16 107:13, 23 108:8,13

**conclusions** 55:11

**condensed** 125:8,10

**condition** 70:18

**conditions** 100:3

**condoning** 49:9,10

**conduct** 38:15

**conducted** 17:13

**cone** 43:21

**confronted** 50:8 69:19 88:21 101:5

**confronting** 71:13

**confusion** 39:13

**Connor** 50:18,20 54:2 69:5,22 70:2 86:7,11

**considerable** 121:12

**consideration** 34:13 50:21 65:5

**considered** 14:1 58:3,15 61:17

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: consistent..decisions

89:18

**consistent**  37:10,12

**constant**  81:22 82:22

**constitutional**  101:17,18

**consultant**  9:4

**Consultant/trainer**  9:13

**consulting**  106:21 109:9

**contact**  40:25 59:18

**contained**  34:24 75:11

**contract**  109:13

**control**  52:23 64:24 65:7 71:21
72:24 73:5 74:8,9 83:23,24 88:22
95:15 96:20 97:23

**control-and-arrest**  79:6

**controlled**  97:2

**controlling**  71:19

**controversy**  94:1

**conversation**  76:13

**cooperative**  43:1

**copied**  44:19 124:17

**copies**  21:22 23:12,25 25:7,9

**copy**  6:19 7:4,15,18 21:16,20,21
22:7 25:1,3 26:8,10 35:16 78:15
124:8,16,17 125:5,7

**corporate**  17:1 20:13 49:3,22
109:24

**correct**  4:16 8:8,15,24 9:2,6,8,
14,15 10:4 13:17 14:3 15:1,2,5
18:8 19:13,14 20:24 25:15 26:15,
16,18 30:25 31:5,7,10 33:7,11
34:10,18,21 38:8,9 47:8 48:10,11
50:11 54:14 57:2 61:1,19,20
63:24 64:19 65:2 67:4 70:2 71:19
72:1,25 73:1,6 74:19,25 82:24
85:18,24 86:10 87:22 88:3 100:18
101:12 102:14 104:3,7 111:17,18,
20,21,24 118:7 119:24 120:2,8,9,
10,13,14,21,22 121:19 122:7,22

**correctly**  16:21 90:24 101:6
119:20 122:21

**cost**  75:7

**could've**  62:25

**counsel**  1:18 2:1 122:14

**counting**  10:25 98:16

**County**  1:8,9 3:10,11 17:2 20:13
49:3,9,14 67:19 68:6 80:21 87:11
89:4,9 90:2 109:25 110:6 111:7
113:7

**couple**  26:7 28:5,9 40:3 45:20,22
64:3 65:8 77:15 79:17 116:6

**courses**  29:25

**court**  1:1,21 3:20 6:4,13 12:22
13:6,7 50:18 59:10 60:15 65:5
69:24 89:15 117:11,15 124:9,12,
15,23 125:4,8,11,15

**Courtemanche**  16:20

**courts**  13:4 107:10

**cousin**  113:10

**cover**  2:19 22:1 124:18

**covering**  19:17

**crazy**  81:22

**CRC**  21:24

**cream**  43:21

**credibility**  108:19,21,23

**Creek**  118:22

**crime**  40:5,12 43:9 50:23,24
53:15,17,20,22,25 54:3,10,13
63:8,14,20 74:10 84:25

**criminal**  9:13 51:10,13 69:12

**criminally**  62:18

**critical**  94:8

**Cross**  2:16

**CROSS-EXAMINATION**
111:11

**crossed**  20:6,7

**cuffed**  48:7 52:19 53:11 72:13
92:23 97:9 98:2,15 100:5

**current**  7:15,18,21

**curriculum**  7:12,16,24 16:10
29:22 51:10 56:6 57:16 116:3

**custody**  14:19 54:18,20,22
100:14

**custom**  49:8,18,20 109:22 110:4

**customs**  49:14 89:21

**cut**  36:10 59:10 69:25 75:8

**CV**  7:17,18,21 8:2,5 9:4,14 13:8
14:23 116:1,4

**CVR**  1:21

**CVS**  27:1 38:6,15 39:19 42:2
44:9,19 45:3 46:1 47:11 71:7
72:2,6 74:1,23

---

**D**

**D-o-c-h-e-r**  36:24

**damages**  17:21

**dangerous**  39:9

**data**  50:13 103:11

**date**  6:22 17:15 49:13 105:18
106:8 121:21

**dated**  21:20

**dates**  33:15

**David**  2:10 111:1

**day**  17:16 75:14 106:12

**dead**  92:25

**deadly**  18:16,18,20 19:7,8,12,16
48:5 51:16,21,24,25 52:4,5,6,7,8,
9 55:25 56:3,6,7,22,25 57:2,9,22
58:3,6,16 59:14,25 61:6,7,14,17,
23,25 62:1,3,19 63:1 64:17 101:4,
11,19,20,24 102:19,24 103:25
104:25 105:1,3,11 119:5,12,17,23
120:2,5,12

**deal**  39:3 61:25 65:10 89:7

**dealing**  24:7 40:12,13,14 70:9
89:7 111:14 118:9

**dealt**  31:12 109:2

**death**  51:16 57:10,22 60:5 64:7,
14 86:15 89:3 90:23 93:17 94:3
97:12 103:19 122:19 123:5

**deaths**  5:7 22:15 83:11 88:9
114:21 115:3

**December**  11:14 30:4

**decided**  76:3

**decision**  39:12 50:18 85:4

**decisions**  89:17

decus 6:6

**Defendants** 1:10,19 2:6

**defense** 16:24 17:9 32:17,21,23 33:9 108:10 112:16

**defensive** 30:6 51:10 56:24 88:12

**define** 4:20

**defined** 59:21

**definition** 55:12 57:23 59:14 62:3 94:21,24 113:16

**degree** 63:14

**delirious** 37:23

**delirium** 5:5 20:5,7 21:19 22:18, 21 23:9,11,18 24:1,7,15 25:11,13 37:15,22,25 38:1 39:3,8 40:8,16 52:21 66:6 67:20,22,23,24 68:10, 11,16,19 69:2,13 70:11,14,19 75:2,3,7,12,18,19,21 77:25 78:2, 4,7,12 79:3,13 80:11,13,16,22 81:4,7,10,25 82:19,23 83:10,13, 21 86:23 87:10,20 88:8,10,16,18, 21 89:8 90:3,6,14 95:11 99:25 111:14,23,25 112:2,8,9,12,22 113:15,23 114:9,10,12,14 115:1,6 117:2,7,14,20,24 118:10

**deliver** 101:2,22 104:15

**delivered** 18:14,19 19:10 35:4 51:21,22,23 56:7 57:3 58:14,23 60:23 61:18 64:17 102:3,24 103:9,11,12,17,20 104:13 120:17

**delivering** 102:8 121:12

**delusional** 37:18 38:25 66:24 68:1 85:6 112:25 113:4

**demands** 89:21

**Denney** 2:10 10:13 11:6,23 12:17,19 44:18,22

**Denney's** 45:10

**dep** 8:2

**department** 10:21 12:8 14:5 15:7,20 16:7 20:14 29:19 32:12 45:3 49:4,9,23 67:20 87:12 88:5 90:2 93:15

**Department's** 17:3

**departments** 29:20

**dependent** 100:2

**depending** 28:4

**depends** 57:3 99:19

**depicted** 120:23

**depose** 99:2

**deposed** 12:10 18:14 32:10 33:10

**deposition** 1:15 3:15,19 4:3 6:5, 12,15 7:25 8:1 9:22 12:6,9 16:19 17:3 18:15,22 20:11,12 21:3,9 25:6,18 32:20 35:4 45:18 46:7,13 47:19 48:19 49:2,22 52:6 70:3 71:7 79:12,22 80:23 94:17,18,21 101:25 102:16 105:7,24 106:3,5 109:24 113:9 118:25 121:20,21, 24 122:24 125:16

**depositions** 16:18 17:23 18:1,9, 13 19:1,24 20:1,3,8 26:7 36:8 42:1,6 45:15 46:7 47:25 48:22

**deputies** 3:11 20:17,18 31:8,20 38:11,13,20,22 40:24 41:9,11,16, 17,20,24 42:17,21,22 43:1,4 46:25 47:4,14 48:3 50:5 51:3 52:17,22 53:6 54:10 64:23 65:9, 17 67:9 68:2,4 71:24 72:24 75:24 76:13,24 77:7 78:25 79:7 80:4 82:6 83:19 85:15 86:3 87:24 90:19 94:5,24 95:6,10,23 96:1,6, 12,14,16,24 97:10,23 98:9,22,24 99:7 100:10,14,23 107:20 113:5 121:3

**deputies'** 47:24 65:13

**deputy** 18:23 19:2,3,17,20 37:8 39:19,25 40:8 58:23 59:18 60:22 61:3 64:17 72:7 74:15 79:16 80:12,13 81:5 95:15 100:24 101:2,10 102:13 104:19,20 105:13,14 120:17 121:8,11,17,23, 24 122:5

**deputy's** 74:22

**describe** 48:5,6 99:2

**describing** 68:9

**desk** 124:16

**determination** 49:20 54:4,17 87:1 110:1

**determine** 27:25 39:21 49:8

**determining** 99:11

**develop** 34:2

**developed** 106:13

**developments** 118:2

**di** 69:6

**diabetes** 69:7,10

**diagnose** 68:24

**diagnosed** 112:11

**diagnosing** 111:22

**die** 28:17,25 66:7 98:20 99:22 100:1,6

**died** 99:18,23

**dies** 92:8

**difference** 69:9

**difficult** 46:15 91:15

**difficulty** 91:18,21

**direct** 2:15 3:5 118:19 119:12 122:15

**direction** 27:11

**Director** 13:23 14:24

**Disabilities** 74:5

**disagreeing** 58:19,20

**disagreement** 105:6

**disc** 25:8

**discern** 68:19

**disciplines** 29:14

**discovered** 18:13 84:3

**discrimination** 5:13,14

**discs** 44:7,15,17,25

**discuss** 111:16

**discussed** 16:9 76:21 109:19 118:8 121:17

**discussion** 119:12

**disease** 68:25

**disorderly** 53:20 54:11

**distinctly** 47:18

**district** 1:1,9,10 25:10 111:8

**diver** 75:8

**divergent** 89:21

**Docher** 1:3 3:13,14 4:23 6:14,20