Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

            Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF of ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent special district,

            Defendants.
_____/


                DEPOSITION OF

                CLAY MANGRUM


                  VOLUME 1
             Pages 1 through 90


             Wednesday, May 31, 2017
             12:00 p.m. - 1:53 p.m.


                Phipps Reporting
        1680 Southwest Bayshore Boulevard
         Port St. Lucie, Florida  34984

          Stenographically Reported By:
         Patricia A. Lanosa, RPR, FPR, CSR

## Page 2

APPEARANCES:

On behalf of Plaintiff:

SEARCY, DENNEY, SCAROLA
BARNHART & SHIPLEY, PA
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida  33402-3626
(561)686-6300
BY: ADAM S. HECHT, ESQUIRE
ash@searcylaw.com

On behalf of Defendant:

PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
(954)462-3200
BY: SUMMER M. BARRANCO, ESQUIRE
summer@purdylaw.com

On behalf of St. Lucie County Fire District:

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP (Appearing via Phone)
111 North Orange Avenue, Suite 1200
Orlando, Florida  32801
(407)203-7592
BY: JULIE TYK, ESQUIRE
julie.tyk@wilsonelser.com

www.phippsreporting.com
888-811-3408

## Page 3

### I N D E X

Examination                         Page
   VOLUME 1 (Pages 1 - 90)
Direct      By Mr. Hecht         4
Cross       By Ms. Barranco      85

Certificate of Oath                 87
Certificate of Reporter             88
Read and Sign Letter to Witness        89
Errata Sheet (forwarded upon execution)   90

www.phippsreporting.com
888-811-3408

## Page 4

The following proceedings began at 12:00 p.m.:

THE COURT REPORTER:  Would you raise your right hand, please?

Do you solemnly swear that the testimony you shall give today will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, ma'am, I do.

CLAY MANGRUM,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HECHT:

Q.  Please state your name.

A.  Clay Mangrum.

MR. HECHT:  And if we can go off the record for this.

(Discussion off the record.)

BY MR. HECHT:

Q.  Where are you currently employed?

A.  St. Lucie County Sheriff's Office.

Q.  How long have you been employed there?

A.  I'm on my 17th year.

Q.  Currently what is your position?

A.  I'm currently assigned to the criminal investigation division as a detective.

www.phippsreporting.com
888-811-3408

## Page 5

Q.  How long have you been a detective in the criminal investigations unit?

A.  A little over two years.

Q.  In May of 2014, what was your position with the sheriff's office?

A.  I was assigned to uniform patrol.

Q.  Is that road patrol?

A.  Yes.

Q.  During the 17 years that you've been with the St. Lucie County Sheriff's Office, can you tell me what positions you've held with that sheriff's office?

A.  Yes, sir.  I was assigned to detention as a corrections deputy, uniform patrol, school resource, special investigations unit, court security, and as a detective.

Q.  How many years have you actually spent out on the road?

A.  Only a little over three.  As far as uniform patrol.

Q.  Yes, sir.

A.  Maybe eight or nine of those years.

Q.  How many years were you in corrections?

A.  A little over three years.

(Recess 12:07 p.m. until 12:08 p.m.)

www.phippsreporting.com
888-811-3408

Page 6

1    BY MR. HECHT:
2       Q.  Did you work in the jail?
3       A.  Yes.
4       Q.  And school resource, did you work at a
5    school?
6       A.  Yes, I did.  And it was for one school
7    year, roughly.
8       Q.  And court security, how long did you do
9    that for?
10      A.  It was approximately 11 months.
11      Q.  And what about special investigations?
12      A.  It was either -- I would say it was
13   between 16 and 18 months.  So roughly a year and a
14   half.
15      Q.  And prior to working at the St. Lucie
16   County Sheriff's Office, have you worked at any
17   other law enforcement agencies?
18      A.  No, sir.
19      Q.  Where did you go to high school?
20      A.  Lincoln Park Academy.
21      Q.  What did you do after high school?
22      A.  I worked briefly at, what used to be
23   Discount Auto Parts.  I worked on a freight dock
24   with R&L Carriers.  I went through EMT school,
25   firefighter academy.  I got certified as a

Page 7

1    firefighter.  I decided I wanted to go into law
2    enforcement.  Prior to the fire academy, I worked
3    for about a year with Lifeline Medical; it's a
4    private ambulance transport.  And then I got hired
5    on to the sheriff's office from there.
6       Q.  How long did you work at Discount Auto
7    Parts for?
8       A.  It was right around a year.
9       Q.  How old were you when you worked there?
10      A.  Maybe 17 or 18.
11      Q.  And when you worked at the docks, how old
12   were you?
13      A.  Between 18 and 19.
14      Q.  How long did you work on the docks for?
15      A.  It was roughly a year.
16      Q.  And where did you go to EMT firefighter
17   school?
18      A.  Back then it was Indian River Community
19   College.
20      Q.  How long does the EMT firefighter school
21   last for?
22      A.  The EMT portion, I think is in the
23   ballpark of 300 hours.  And the fire academy was
24   around 4-, 500 hours.
25      Q.  Did you actually ever work as an EMT or a

Page 8

1    firefighter?
2       A.  I worked as an EMT with Lifeline Medical.
3       Q.  And that again was a private ambulance
4    company.
5       A.  A private ambulance transport company,
6    yes, sir.
7       Q.  And how long did you work for Lifeline
8    Medical for?
9       A.  Roughly a year.
10      Q.  What years did you work as an EMT?
11      A.  It would have been late 1999 to late 2000.
12      Q.  So did you work as an EMT for
13   approximately 10 years?
14      A.  No, no, no.  1999, late in that year,
15   until late in the year 2000.
16      Q.  I understand.  Approximately one year.
17      A.  Yes.
18      Q.  I thought you said late 2000s.
19      A.  I apologize.
20      Q.  Were you ever a paramedic?
21      A.  No.
22      Q.  And is it after working as an EMT for
23   Lifeline that you joined the St. Lucie County
24   Sheriff's Office?
25      A.  I transferred from Lifeline to St. Lucie

Page 9

1    County Sheriff's Office.
2       Q.  Why did you no longer have an interest in
3    being an EMT?
4       A.  I was more interested in the firefighting
5    aspect of it.  And at that time when I was looking
6    into a job -- the St. Lucie County Fire Department,
7    I believe they had a clause where you sign an
8    agreement to become a paramedic within three years,
9    I believe it was, and I had no interest in becoming
10   a paramedic.
11      Q.  And I take it you had interest in law
12   enforcement?
13      A.  Yes, I did.
14      Q.  And did you go to a police academy?
15      A.  I went to corrections academy with the
16   sheriff's office, and I joined the sheriff's office
17   with the assumption to go into the law enforcement
18   side of it.  And when I was able to afford it, I
19   went to crossover academy, which is the remainder to
20   become law enforcement certified.
21      Q.  Where did you go for the crossover
22   academy?
23      A.  Crossover academy was at Indian River
24   State College.
25      Q.  How long did that crossover program last

Page 10

1   for?
2        A.  I don't remember the hours on that.  It
3   would be on my certification, though.
4        Q.  Did you go through the basic law
5   enforcement training at Indian River State College?
6        A.  All of my law enforcement certification
7   for the full certificate was through Indian River
8   State College.
9        Q.  When you joined the St. Lucie County
10  Sheriff's Office, did you go through additional
11  training?
12       A.  Yes.
13       Q.  Did you go through use-of-force training
14  when you joined this sheriff's office?
15       A.  Yes.
16       Q.  And were you trained on how to identify
17  the signs and symptoms of excited delirium?
18       A.  I had training on that in the past, yes.
19       Q.  How many hours would you say you've
20  undergone as it relates to your training for excited
21  delirium?
22       A.  I couldn't give you a specific number on
23  hours.
24       Q.  During your training and experience as a
25  law enforcement officer, have you come in contact

Page 11

1   with people suffering from excited delirium?
2        A.  I couldn't specifically tell you that I've
3   witnessed an incident.  And yes, that was for sure
4   excited delirium.
5        Q.  What are the signs and symptoms of excited
6   delirium, based on your training and experience?
7        A.  From what I understand to be is irrational
8   behavior; elevated sweating; heart rate; no response
9   to any sort of pain stimulus.  And the best way to
10  describe it, to me would be almost like an
11  accelerated engine, referring to the, like the
12  body's response.
13       Q.  Were you trained on use of force when you
14  joined the St. Lucie County Sheriff's Office?
15       A.  Prior to or when I joined?
16       Q.  When you joined.
17       A.  Yes.
18       Q.  During the 17 years that you spent at the
19  St. Lucie County Sheriff's Office, are there
20  official policies regarding the use of force?
21       A.  We have policies on use of force, yes,
22  sir.
23       Q.  During the 17 years that you worked at St.
24  Lucie County Sheriff's Office, do you undergo
25  continuing education courses or training on the use

Page 12

1   of force?
2        A.  Yes, we do.
3        Q.  When was the last time you underwent a
4   course on use of force?
5        A.  We started in-service this year and
6   covered some use of force, and also last year during
7   in-service was my last full year of in-service
8   training.
9        Q.  And when you say that "you started," what
10  do you mean by that?
11       A.  Our training, our in-service training
12  which is annual, is broken up into blocks.  And
13  being we're just under halfway through the year,
14  I've only been able to attend -- I believe it was
15  two blocks this year so far.
16       Q.  Prior to May of 2014, do you know when the
17  last use-of-force training session you attended?
18       A.  I couldn't give you a specific date or
19  month.
20       Q.  Are you familiar with deadly force
21  techniques?
22       A.  Yes, I am.
23       Q.  Have you ever heard of a thumb strike?
24       A.  A thumb strike?
25       Q.  Yes.  Have you ever heard of that?

Page 13

1        A.  I've heard of it.  I've never heard of it
2   specifically.  I've heard of it through, like,
3   martial arts, or something like that, but not like
4   off the top of my head.
5        Q.  Has the St. Lucie County Sheriff's Office
6   ever trained you to utilize a thumb strike if you
7   were involved in a struggle?
8        A.  We've -- as far as a thumb -- not to my
9   recollection a thumb strike.
10       Q.  What about applying pressure to a nerve
11  mass in the neck using your thumb?
12       A.  I've -- we've been trained with, as far
13  as, like, brachial stun.
14       Q.  What is that?
15       A.  There's a nerve along the side of the neck
16  that it can be utilized in certain situations to
17  gain compliance.
18       Q.  And are you trained to use your thumb to
19  apply pressure to that area of the neck to gain
20  compliance of someone?
21       A.  Through my training I don't recall a
22  specific training on that.  No, I do not.
23       Q.  How is it you know what that is?
24       A.  A thumb strike?
25       Q.  No.  You just said a "brachial" --

Page 14

1    A.  Oh, a brachial stun, we learned and --
2 utilized and learned throughout our defensive tactic
3 training.
4    Q.  Say it to me again.
5    A.  Brachial stun.
6    Q.  Brachial stun.  Just so I'm clear:  The
7 brachial stun technique is when you use your thumb
8 to apply pressure to a nerve in the neck to gain
9 compliance?
10    A.  No, sir.  A brachial stun is normally
11 taught with the inside of your arm, so that it's not
12 a threat strike, like a punch or something like
13 that.
14    Q.  So tell me what a brachial stun is.
15    A.  In certain situations where you're -- you
16 have an actively combative subject, you could
17 basically use the inside of your forearm.  And it's
18 like a contact with the side of the neck, and with
19 the nerve that's on the side of the neck it usually
20 causes -- your desired effect would be almost like a
21 stun effect to gain compliance and control over a
22 person.
23    Q.  So is it correct that the St. Lucie County
24 Sheriff's Office has trained you to utilize a
25 brachial stun to gain compliance of an individual?

www.phippsreporting.com
888-811-3408

Page 15

1    MS. BARRANCO:  Object to the form.  Go
2 ahead.
3    A.  In -- in a situation where you would need
4 one, yes.  You have actively combative, someone
5 fighting you.
6    Q.  And if someone is actively combative, the
7 brachial stun technique is when you use your forearm
8 to strike a nerve on someone's neck, correct?
9    MS. BARRANCO:  Object to form.  Go ahead.
10    A.  On the side.  Not the front of the neck;
11 the side, towards the back.  Where -- basically
12 where you're -- in better terms, your trap would
13 meet your backside of your neck.
14    MS. BARRANCO:  Can I interrupt?  You said,
15 "trap."
16    A.  Trapezius.  The trap muscle.
17    MR. HECHT:  I understood that one.
18    MS. BARRANCO:  Thank you.
19 BY MR. HECHT:
20    Q.  Is it correct that the St. Lucie County
21 Sheriff's Office has not trained you to utilize your
22 thumb to apply neck -- to apply pressure on a nerve
23 mass on the neck?
24    MS. BARRANCO:  Object to the form.  Go
25 ahead.

www.phippsreporting.com
888-811-3408

Page 16

1    A.  We've trained with pressure on nerves.  I
2 recall the -- there's nerve compliance with your
3 arms.  I don't specifically recall the neck.  But I
4 do recall that we have had training on, as far as
5 joint manipulations and compliance, with nerves.
6    BY MR. HECHT:
7    Q.  My specific question is:  During the 17
8 years you've been employed by the St. Lucie County
9 Sheriff's Office -- and you've been trained on joint
10 manipulation -- have you ever been trained to
11 utilize your thumb to apply pressure to a nerve on
12 someone's neck?
13    A.  I don't specifically recall that, no.
14    Q.  And you were not aware of a deadly force
15 technique known as a thumb strike, correct?
16    MS. BARRANCO:  Object to the form.  Go
17 ahead.
18    A.  Not that I could recall.
19 BY MR. HECHT:
20    Q.  Have you ever, during a struggle with an
21 individual, used your thumb to apply pressure to the
22 nerve mass in someone's neck to gain compliance over
23 them?
24    A.  My thumb in the neck?
25    Q.  Yes.

www.phippsreporting.com
888-811-3408

Page 17

1    A.  No.
2    Q.  Why not?
3    A.  Normally it's just never been a thought
4 process to go to some sort of neck pressure to gain
5 compliance.  And it would also have to be -- in my
6 opinion, it would have to be in a position where you
7 could utilize that, any kind of pressure point like
8 that, safely.
9    Q.  Based on your training and experience,
10 would applying pressure to an individual's nerve
11 mass in their neck be considered to be deadly force?
12    MS. BARRANCO:  Object to the form.  Go
13 ahead.
14    A.  Applying pressure, I wouldn't see it as
15 deadly force, no.
16    BY MR. HECHT:
17    Q.  Based on your training and experience
18 applying pressure to the nerve mass in someone's
19 neck, could that lead to great bodily harm?
20    MS. BARRANCO:  Object to the form.  Go
21 ahead.
22    A.  Applying pressure to the side of the neck
23 where the nerve is, no.
24    BY MR. HECHT:
25    Q.  Would you agree with me that based upon

www.phippsreporting.com
888-811-3408

Page 18

1   your training and experience as a law enforcement
2   officer, that an elbow strike to a person's temple
3   is classified as deadly force?
4          MS. BARRANCO: Object to the form. Go
5   ahead.
6       A.  An elbow strike directly, intentionally to
7   the temple?
8   BY MR. HECHT:
9       Q.  Yes, sir.
10      A.  I wouldn't consider that -- I would have
11  to consider the amount of force used if there is
12  any -- but just a basic elbow strike to the temple,
13  it would not constitute deadly force to me, no.
14      Q.  Would you agree with me that -- strike
15  that.
16          Based upon your training and experience as
17  a law enforcement officer, would an elbow strike to
18  a person's temple likely cause great bodily harm?
19          MS. BARRANCO: Objection to form.
20      A.  Once again, it would come down to the
21  amount of force used with the strike, the intent of
22  the strike, and what -- what area the strike was
23  aimed at.
24  BY MR. HECHT:
25      Q.  Were you ever trained either by the

www.phippsreporting.com
888-811-3408

Page 19

1   St. Lucie County Sheriff's Office, or during your
2   time at the police academy, on what techniques are
3   classified as deadly force?
4       A.  Were we ever trained?  Yes.
5       Q.  Would you agree with me that based upon
6   your training and experience as a law enforcement
7   officer, that striking a person on the side of the
8   jaw is likely to cause great bodily harm?
9          MS. BARRANCO: Object to the form.
10      A.  With enough force, it could cause bodily
11  harm, yes.
12  BY MR. HECHT:
13      Q.  Would you agree with me that based upon
14  your training and experience as a law enforcement
15  officer, that striking someone on the side of their
16  jaw is classified as using deadly force?
17          MS. BARRANCO: Object to the form. Go
18  ahead.
19      A.  A general strike to the side of the jaw,
20  no, I don't know it would constitute deadly force on
21  that.
22  BY MR. HECHT:
23      Q.  Based upon your training and experience as
24  a law enforcement officer, is striking a person with
25  your elbow on the bridge of their nose likely to

www.phippsreporting.com
888-811-3408

Page 20

1   cause great bodily harm?
2          MS. BARRANCO: Object to the form. Go
3   ahead.
4       A.  If a forcible strike directly to the
5   bridge of the nose could cause some pretty bad --
6   could cause bodily harm?  To what extent, I'm not
7   sure.
8   BY MR. HECHT:
9       Q.  Based upon your training and experience,
10  would you agree with me that striking a person with
11  your elbow on the bridge of their nose is classified
12  as using deadly force?
13          MS. BARRANCO: Object to the form. Go
14  ahead.
15      A.  It once again would come down to the
16  amount of force used and the intent of the strike.
17  BY MR. HECHT:
18      Q.  Based upon your training and experience as
19  a law enforcement officer, would you agree with me
20  that striking a person with your elbow on their
21  throat is likely to cause great bodily harm?
22          MS. BARRANCO: Object to the form.
23      A.  Directly on the top of the throat in the
24  front of the neck, that could, yes.
25

www.phippsreporting.com
888-811-3408

Page 21

1   BY MR. HECHT:
2       Q.  Would you agree with me that based upon
3   your training and experience, that striking a person
4   with your elbow on their throat is classified as
5   using deadly force?
6          MS. BARRANCO: Object to the form. Go
7   ahead.
8       A.  An intentional direct strike to the throat
9   could be classified as deadly force, yes.
10  BY MR. HECHT:
11      Q.  Would you agree with me that based upon
12  your training and experience as a law enforcement
13  officer, that striking a person with your elbow in
14  the back of their head is likely to cause great
15  bodily harm?
16          MS. BARRANCO: Object to the form.
17      A.  It would come down to the intent, the
18  amount of force used, and the purpose.
19  BY MR. HECHT:
20      Q.  Would you agree with me that based upon
21  your training and experience as a law enforcement
22  officer, that striking a person with your elbow on
23  the side of their head is likely to cause great
24  bodily harm?
25          MS. BARRANCO: Object to the form. Go

www.phippsreporting.com
888-811-3408

Page 22

1    ahead.
2        A.  It would depend on the amount of force,
3    intent, and direction of where they're intending to
4    strike.
5    BY MR. HECHT:
6        Q.  Would you agree with me that based upon
7    your training and experience, that striking someone
8    with your elbow on the side of their head is
9    classified as using deadly force?
10       MS. BARRANCO:  Object to the form.  Go
11   ahead.
12       A.  Circumstantial -- it would be the intent,
13   the amount of force used, and the purpose.
14   BY MR. HECHT:
15       Q.  What are the signs and symptoms of someone
16   experiencing excited delirium?
17       A.  Based on my knowledge, erratic behavior.
18   Not making -- verbally not making sense.  Unaware of
19   their surroundings.  Excessive sweating.  Not
20   responding to their normal stimulus around them,
21   what would be considered a normal response.  If
22   you're close enough, elevated heart rate.
23       Q.  Is someone who is exhibiting the signs and
24   symptoms of excited delirium -- strike that.
25           Is it considered a medical emergency --

www.phippsreporting.com
888-811-3408

Page 23

1    strike that.
2            Is it considered a medical emergency if
3    someone is exhibiting the signs and symptoms of
4    excited delirium?
5        A.  Yes.
6        Q.  And would you agree with me that as a law
7    enforcement officer if you came in contact with
8    someone who you believed to be exhibiting the signs
9    and symptoms of an excited delirium, that you would
10   contact a medical professional?
11       MS. BARRANCO:  Object to the form.
12       A.  Yes, I would.  But also it would come down
13   to scene safety for treatment as well.
14   BY MR. HECHT:
15       Q.  Who would you contact if you were to
16   interact with someone who you believed was having an
17   episode of excited delirium?
18       MS. BARRANCO:  Object to the form.  Go
19   ahead.
20       A.  Well, we communicate by radio.  So it
21   would be -- for me it would be additional units, and
22   for the emergency medical personnel to begin
23   staging -- to be en route and staging for that
24   purpose.
25   BY MR. HECHT:

www.phippsreporting.com
888-811-3408

Page 24

1        Q.  In regards to the interaction that you had
2    with Tavares Docher, at any point on May 11, 2014,
3    did you ever make a determination whether Tavares
4    Docher was experiencing excited delirium?
5        A.  With that incident on that day, I couldn't
6    tell you specifically if the term "excited delirium"
7    crossed my mind.  But as far as concern of medical
8    attention, yes.
9        Q.  And when you first came in contact with
10   Tavares Docher, at any point did you request a
11   medical professional to respond to the scene?
12       A.  During our struggle with Mr. Docher, yes.
13       Q.  What about before the struggle?
14       A.  No.
15       Q.  Why not?
16       A.  He wasn't exhibiting any type of behavior
17   at that point that would lead me to believe excited
18   delirium or anything that required immediate medical
19   attention.
20       Q.  So is it your testimony today that
21   on May 11, 2014 you made a determination that
22   medical assistance was not necessary until after the
23   struggle?
24       MS. BARRANCO:  Object to the form.  Go
25   ahead.

www.phippsreporting.com
888-811-3408

Page 25

1        A.  Immediate emergency medical response,
2    there was nothing -- there was no signs or symptoms.
3    He didn't request any medical attention.  And we
4    were still trying to determine the nature of his
5    behavior at that point.
6    BY MR. HECHT:
7        Q.  Did you ever write a report in this case?
8        A.  No, I did not.  Not that I recall.
9        Q.  Did you ever arrest Tavares Docher for any
10   crime on May 11, 2014?
11       A.  Did I arrest him?  No.
12       Q.  Is it your testimony today that you never
13   evaluated Tavares Docher for excited delirium
14   on May 11, 2014?
15       MS. BARRANCO:  Object to the form.  Go
16   ahead.
17       A.  I can express that -- or note that he has
18   possibly -- you know, I could relay what signs and
19   symptoms he has of any kind of condition, but I
20   couldn't make that judgment call, or that
21   professional medical diagnosis that he had excited
22   delirium.  I had concerns during the struggle once
23   his behavior became more erratic and not responding
24   to normal stimulus around him.
25   BY MR. HECHT:

www.phippsreporting.com
888-811-3408

Page 26

1      Q.  Is it correct to say that prior to the
2   struggle you did not believe Tavares Docher to be
3   experiencing excited delirium?
4      A.  No, I did not.
5      Q.  Looking back, do you believe Tavares
6   Docher was experiencing excited delirium prior to
7   the struggle?
8          MS. BARRANCO:  Object to the form.  Go
9   ahead.
10      A.  Looking back, no, I do not.
11   BY MR. HECHT:
12      Q.  Tell me what you recall about your
13   interaction with Tavares Docher on May 11, 2014.
14      A.  The initial contact with him, he was in --
15   I guess his body behavior was more animated than
16   that of a normal person.  He came toward my patrol
17   vehicle when he saw it.  He was carrying a
18   screwdriver in his hand, in the same position that
19   somebody would carry a knife, which is basically the
20   metal end forward and with a fist-grip around the
21   handle.
22      He made -- he responded to me directing
23   him to stand at the front of my patrol vehicle.  He
24   was talking very fast and giving a lot of
25   information without really having any questions

Page 27

1   asked at that point.  And he's -- he was physically
2   shifty.  I don't want to say jumpy, like jumping up
3   and down.  A lot of body movement, pacing in a small
4   area.
5      At that point my biggest concern was the
6   fact that he had a screwdriver.  I didn't want him
7   to -- I didn't know at this point if he wanted to
8   harm himself or others.  He was compliant to
9   direction at that point.  I asked him to drop the
10   screwdriver.  He did.  I asked him to sit on the
11   curb so that we could continue a dialogue.  There
12   was a lot of talk of -- he was giving a lot of
13   information; I do recall it was in reference to
14   somebody being held against their will.  A headless
15   body found in St. Lucie County, I believe it was.
16   And a homicide that occurred in Broward County.
17      We were trying to still just get basic
18   information from him.  He told us as far as why he
19   was there.  He couldn't tell us the location of the
20   house where somebody was being held against his
21   will.  He gave us this information and said he was
22   in St. Lucie County for -- this is a lot of -- there
23   is a lot of dialogue going on during this where --
24   with him in his state of mind, I didn't want to
25   disagree with him or make him believe that what he's

Page 28

1   telling me I believe to be false to further amplify
2   his behavior.  I wanted to bring him down and keep
3   him focused on our interactions.  Because while he
4   was sitting down, he would immediately try to stand
5   up, and then he'd be like, Oh, I'll just remain
6   seated.
7      He was pointing by the bushes by Prima
8   Vista.  Saying people were chasing him, referred to
9   them as Arabs.  I would just to try -- because I'm
10   still trying to validate any of this and get as much
11   information to process it as possible.  To see if we
12   do have somebody legitimately being held against
13   their will, and that we need response there, where
14   it's at.  He couldn't give us a location initially.
15      And during this time he's still -- we're
16   trying to keep -- we're trying to get his -- just to
17   where we could see he's not a flight risk or a
18   danger to himself, because he's acting in a manner
19   along with what he's saying:  He's being watched.
20   He's displaying behavior giving verbal indications
21   that the people are chasing him are there now.
22      And my concern at that point is that if he
23   flees, if he tries to run in the traffic in Prima
24   Vista, he could be struck by a vehicle.  That's a
25   very busy intersection.  I have an open place of

Page 29

1   business that's directly -- almost basically behind
2   us and to the side of us.  There is other citizens
3   there.  So we're trying to maintain the scene safety
4   at that point as well.
5      We could smell some alcohol.  Asked him
6   about that.  He said he had Natty Ice, which I'd
7   known to be Natural Ice-type of beer.  He told us he
8   was a sex offender.
9      While he's giving us this information,
10   we're trying to confirm his identity.  And my
11   trainee was working on that, Deputy Robinson.  And
12   we did confirm he was a registered sex offender.
13   He's giving us a lot of information about being
14   there for a court case, trying to see if he's
15   fleeing from warrants, or if he has any kind of
16   warrants -- any bit of information we could get on
17   him to help us understand what's goin on now.
18      Q.  All right.  Let me ask you some questions
19   up until this point.
20      You pulled up in your vehicle with Deputy
21   Robinson, correct?
22      A.  Yes.
23      Q.  And he was your trainee?
24      A.  Yes.
25      Q.  What was your title in regards to him

Page 30

1  being your trainee?
2      A.  Field training officer.
3      Q.  So you were his field training officer.
4      A.  Yes.
5      Q.  And what does that mean?
6      A.  I'm -- we have phases of what's called
7  field training.  And during that time, during that
8  phase, I was his field training officer for that
9  block of time.
10     Q.  On May 11, 2014, was Deputy Robinson in
11 Phase 2 of his training?
12     A.  I believe it was Phase 2.
13     Q.  And what does Phase 2 entail?
14     A.  Phase 2 initially, as far as that time
15 when I was in the field training program, Phase 2
16 was more aware -- it's basically you want to try to
17 do things, or determine if it could be done half and
18 half.  Allow them, the trainee to take some
19 initiative and see how they react on calls.  So
20 you're kind of half helping, half evaluating.
21     Q.  Does a trainee have arrest powers?
22     A.  Yes.
23     Q.  And they wear the same gun belt that any
24 other deputy would wear.
25     A.  Yes.

Page 31

1      Q.  Are there any powers or authorities that a
2  trainee does not have that a regular deputy sheriff
3  would have had?
4      A.  Well, they -- it's not necessarily as far
5  as powers.  They can't submit reports without it
6  being reviewed by the field training officer prior
7  to.
8      Q.  So the two of you pull up.  And where is
9  it when you drive into the CVS parking lot that you
10 first see Tavares Docher?
11     A.  As we're pulling -- we had already been
12 given a clothing description.  As we're pulling --
13 it's kind of a -- because it's not a straight on,
14 the business; it's kind of turned to face almost
15 like it's pointing into the corner of the
16 intersection.  And we pulled in -- right as we're
17 turning around to come around to the front of the
18 building, I saw him standing under the --
19     Q.  Entrance?
20     A.  Yes.  Basically there is the little cover.
21 He was standing under there within close proximity
22 of the doors.
23     Q.  And when you pulled up in your vehicle,
24 approximately how many feet was your vehicle from
25 where Tavares was standing?

Page 32

1      A.  We stopped -- I couldn't tell you exactly
2  feet -- but we stopped a decent distance away from
3  the door.  First of all, I didn't want to put my
4  patrol car right at the doors of the business.  And
5  second of all, I have to assess -- because he
6  immediately when -- he saw the patrol vehicle, he
7  immediately was -- it wasn't like a slow walk; it
8  was like, Oh, there they are; here I go.
9      Q.  And when you pulled up, prior to you
10 exiting your vehicle, did you see the screwdriver in
11 his hand?
12     A.  I saw something in his hand.  And as he
13 got closer, I realized it was a screwdriver.
14     Q.  How close to your vehicle was it that you
15 realized it was a screwdriver?
16     A.  It was -- it was probably in between --
17 right around the halfway mark, between where I was
18 to my vehicle.  He had a clenched fist.  That's what
19 I was looking at:  Why his fist was clenched, and
20 what he was holding?
21     Q.  And at that point in time did you exit
22 your vehicle and tell him to drop what he was
23 holding?
24     A.  I got out of my vehicle quickly so that --
25 you don't want, in any kind of situation, to be

Page 33

1  sitting in your vehicle when somebody is
2  approaching.  It's not what I consider officer
3  safety.  So I got out quickly so that I could start
4  engaging in verbal interaction with him walking up
5  to us.
6      Q.  Did he continue to approach you, or did
7  you meet him in the middle?
8      A.  He met -- we met towards the right -- near
9  the front of my patrol vehicle.
10     Q.  And he was still holding the screwdriver?
11     A.  Initially, yes.  I told him to drop it and
12 kind of brushed it out of his hand.  He was
13 compliant at that point as far as the verbal
14 instruction.
15     Q.  At any point in time when you saw the
16 screwdriver prior to him dropping it, were you in
17 fear for your life?
18     A.  It was -- I was in fear of being stabbed
19 or struck with it, yes.
20     Q.  At any point did you take out your gun and
21 point it at him?
22     A.  No.
23     Q.  Well, if you felt that you may be in
24 danger because of the screwdriver, aren't you
25 trained to use some sort of offensive maneuver?

Page 34

1      MS. BARRANCO:  Object to the form.  Go
2  ahead.
3      A.  If he held it at a threatening manner or
4  was coming, and it's obvious he's coming to stab me,
5  then I would draw my gun, or I would meet that
6  threat with the proper force.  And a stabbing I
7  would definitely draw my gun, because it could be
8  potentially fatal.
9      At that point it was -- once -- because
10  the first thing I addressed was the threat.  And I
11  said, Go ahead and drop what you got in your hand.
12  I didn't want to draw -- because once he dropped it,
13  I didn't want to draw attention back to that
14  screwdriver.  Why were you carrying a screwdriver?
15  Because he immediately started, basically loudly
16  stating his needs and why.  And it was just a bunch
17  of things at once.  So realizing that we have a
18  potentially emotionally unstable person, I didn't
19  want to draw focus back to the screwdriver for him
20  to pick it up, or realize that he was possibly a
21  threat to law enforcement, because then it presents
22  safety factors for not only us but for him as well.
23  BY MR. HECHT:
24      Q.  Is it illegal to walk with a screwdriver
25  in your hand?

Page 35

1      A.  Generally, to walk with a screwdriver in
2  your hand, no, it's not.
3      Q.  Was Tavares Docher committing a crime as
4  he approached your vehicle holding a screwdriver?
5      A.  I didn't consider it a crime.  It could
6  have been construed as -- it depends on -- but once
7  he made it to my -- it could have been construed as
8  assault.  He's not holding it like he's going to
9  take out a headlight.  He's holding it with a
10  clenched-tight fist, in the same manner you would
11  hold a knife.  But once he became compliant and
12  dropped it, it was no longer a factor.  At that
13  point I had him safely away from the screwdriver.
14  And I was -- my goal was to keep his focus to, that
15  he never -- I didn't want him focusing on the
16  screwdriver in any way.  When Deputy Newman
17  approached, he saw the screwdriver and brushed it
18  further away so it was out of play at that point,
19  basically.
20      Q.  So is it your testimony that he -- as he
21  was approaching your vehicle with the screwdriver
22  while you were inside your vehicle, you considered
23  him a threat?
24      A.  I didn't know at that point what his
25  intent was.  So yes, I did.

Page 36

1      Q.  And when you realized that he was holding
2  a screwdriver and you exited your vehicle prior to
3  you telling him to drop the screwdriver, did you
4  still consider him a threat?
5      A.  I considered it a possibility of a threat,
6  yes.  There is potential for danger.
7      Q.  And is it your testimony that the way in
8  which he was holding the screwdriver was a crime?
9      MS. BARRANCO:  Object to the form.
10      A.  No, I wouldn't call it black-and-white a
11  crime.
12  BY MR. HECHT:
13      Q.  I just recall you moments ago saying, As
14  he approached you with the screwdriver, you could
15  classify that as an assault.
16      MS. BARRANCO:  Object to the form.  Go
17  ahead.
18      A.  If the remaining -- it could have been at
19  that point; I'm still formulating why.  But if he
20  came up and he's still holding it, and I say, Drop
21  the screwdriver, and he says, No, and continues to
22  come up, then the danger has just increased.  And
23  now he's becoming -- but that didn't happen.
24  Because once I said, Drop what's in your hand, he
25  let it go.  And my goal now is to pull his focus

Page 37

1  away from that.  He was no longer a physical threat
2  to me with the screwdriver.
3  BY MR. HECHT:
4      Q.  So at no point in time prior to you
5  telling Tavares to drop the screwdriver was he
6  assaulting you?
7      A.  No.  If I considered it assault at that
8  point, I would have arrested him at that point.
9      Q.  So he was not committing a crime, correct?
10      A.  No.
11      MS. BARRANCO:  Object to the form.
12      A.  At that point he didn't commit a crime
13  that I was going to arrest him for.  I basically
14  dispelled any type of assault threat at that point.
15  When he complied:  Drop the screwdriver.
16      Now, I could have revisited it later if I
17  found -- there's -- it could go several ways at that
18  point.  I don't want to speculate.  Yes, it could
19  have still been a factor through further
20  investigation to be used as a weapon against someone
21  else.
22  BY MR. HECHT:
23      Q.  But that didn't happen?
24      A.  No.  Nor did he ever take a screwdriver
25  again.  So it was no longer a factor at that point.

Page 38

1    Q.  So after he dropped the screwdriver, is it
2  correct that you and Deputy Robinson stood at the
3  front of your vehicle and spoke to him?
4    A.  I don't -- I was at the front of my
5  vehicle.  I remember I was near the push bar of my
6  car.  I don't recall exactly where Deputy Robinson
7  was, because he did step away; because dispatch, if
8  I remember correctly, had additional information to
9  give us.  And he was handling the radio traffic,
10  which is the talk.
11    Q.  When you were speaking with Tavares Docher
12  at the front of your vehicle, would you classify his
13  demeanor as emotionally unstable?
14        MS. BARRANCO:  Object to the form.  Go
15  ahead.
16    A.  Emotionally unstable, you could say it was
17  emotionally unstable at that point.  If it's through
18  the alcohol, any type of emotional behavioral or
19  mental disability, at that point I don't know.  But,
20  yes, I mean you could say it was considered
21  emotionally unstable, yes.
22  BY MR. HECHT:
23    Q.  And how long after you were speaking with
24  Tavares Docher at the front of your vehicle did it
25  take for Deputy Newman to arrive?

Page 39

1    A.  I couldn't tell you time-wise, but to the
2  point where -- from the time he dropped the
3  screwdriver, it wasn't long after that, that Deputy
4  Newman further brushed the screwdriver away so it's
5  no longer in play unless he ran towards it or
6  something like that.
7    Q.  Once Deputy Newman arrived, were you,
8  Deputy Newman, and Deputy Newman, all three
9  surrounding Tavares Docher?
10    A.  Surrounding him, no.  Positioning in --
11  more so, if you have some -- someone that's showing
12  some sort of mental instability or intoxication and
13  not completely calming down like a normal person
14  would when you're trying to understand them, you
15  would want to put yourself in a position so that
16  they're no longer -- if they do flee, you could get
17  them under control so they don't hurt themselves or
18  others.
19    Q.  So explain to me how you, Deputy Robinson,
20  and Deputy Newman were standing or positioning
21  yourselves around Tavares Docher.
22        MS. BARRANCO:  Object to the form.
23    A.  I don't remember exactly who was standing
24  where.  We weren't all three huddled up together,
25  basically.

Page 40

1  BY MR. HECHT:
2    Q.  And at that point in time, was Tavares
3  Docher under arrest for anything?
4    A.  At the initial contact, no.
5    Q.  When you, Deputy Newman, and Deputy
6  Robinson were positioning yourselves around him, was
7  he free to leave at that point in time?
8    A.  No.
9    Q.  Why not?
10    A.  He was -- he's displaying -- his behavior
11  is considered erratic.  We don't know the level of
12  intoxication he has.  We're trying to -- he called
13  us for potentially serious offenses of somebody
14  being detained.  He's talking now about a headless
15  body.  He's -- during this conversation he's not
16  making sense.  We don't know if he's a threat to
17  others.  We can't -- you can't just turn around and
18  walk away from that; we have a liability at that
19  point.
20    Q.  Based on everything you just said, you
21  continued talking to him, correct?
22    A.  Yes.
23    Q.  And based on your investigation, what did
24  you find?
25    A.  Well, during this -- during the time, with

Page 41

1  the continual, you know, just go ahead -- basically
2  I don't remember exactly the words -- but initially
3  I wanted him to sit on the curb so we could -- he's
4  not a flight risk or a danger to himself.  He
5  already displayed shifty body movements, standing up
6  continuously, and pointing at the bushes.  At that
7  point -- during the ongoing course of this, and him
8  not -- we're in a public parking lot; it's already
9  caused some disturbance to the business that we
10  could see where onlookers, people walking around us,
11  were taking up half a parking lot.  At one point we
12  -- during the continuum of this he was placed in
13  hand restraints.  Handcuffs.
14    Q.  Based on the investigation that you,
15  Deputy Newman, and Deputy Robinson engaged in, did
16  you make a determination prior to Tavares being
17  placed in handcuffs if he was a threat to others?
18    A.  At that point we were -- it was more along
19  the lines -- basically it was disorderly
20  intoxication.  We had attempted to bring back some
21  sort of peace and normalcy to CVS.  He's admitted to
22  drinking.  He's displaying signs at the onset that
23  an intoxicated person would display.
24        Once the handcuffs were on him, we
25  continued dialogue with him, and that's when his

Page 42

1   statements became a little bit more erratic and
2   unintelligible to some point and not normal.
3       Q.  Okay.  Prior to Tavares Docher being
4   placed in handcuffs, my question is:  During the
5   investigation when the three of you were positioning
6   yourselves around Tavares, did you determine if
7   Tavares was a threat to others?
8           MS. BARRANCO:  Object to the form.  Go
9       ahead.
10      A.  If he fled on foot, yes.  Or if he -- we
11  -- he -- with his -- with his -- at that point what
12  we believed his level of intoxication or his under
13  the influence of -- because we had never even gotten
14  to ask him as far as drug use, if he takes
15  medications.  Yes, at that point he could have been
16  a threat to others.  Even at the form of just, you
17  know, running into traffic and getting hit by a car.
18  BY MR. HECHT:
19      Q.  So my question is very specific.  I don't
20  want to know if he could have been, or if it was
21  possible that he was a threat to others.  My
22  question specifically is:  During the investigation
23  when you, Deputy Robinson, and Deputy Newman were
24  positioning yourselves around Tavares, prior to him
25  being placed in handcuffs, did you make a

Page 43

1   determination that Tavares Docher was a threat to
2   other people?
3           MS. BARRANCO:  Object to the form.
4       A.  It wasn't considered -- like it wasn't
5   like he is a direct threat to other people.  There
6   is multiple factors that came into play.
7   BY MR. HECHT:
8       Q.  Prior to Tavares Docher being placed in
9   handcuffs, did you make a determination during your
10  investigation as to whether Tavares Docher was a
11  threat to himself?
12      A.  There was the possibility -- the potential
13  for him to be a threat to himself, yes, and to
14  others.
15      Q.  Again, I understand there was the
16  potential.  But certainly he wasn't placed in
17  handcuffs because he was a potential threat to
18  himself and others, correct?
19          MS. BARRANCO:  Object to the form.
20      A.  As far as -- there's -- as far as being,
21  the reason being, Hey, he's a threat to himself and
22  others, those would be more along the line of a
23  Baker Act at that point, based on behavior.  But as
24  far as we're there to investigate the assault where
25  he's the suspect, no.

Page 44

1    BY MR. HECHT:
2       Q.  So Tavares was not a threat to himself or
3   others prior to you placing him in handcuffs,
4   correct?
5           MS. BARRANCO:  Object to the form.  Go
6       ahead.
7       A.  As far as that being the initial, He's a
8   threat to himself and others; let's put handcuffs on
9   him, no.
10  BY MR. HECHT:
11      Q.  And after you and Deputy Newman continued
12  speaking with him, there was a determination made to
13  arrest him, correct?
14          MS. BARRANCO:  Object to the form.  Go
15      ahead.
16      A.  There was a -- he was detained at that
17  point -- further detained at that point with
18  handcuffs.  And we were going with -- at that point
19  it started out -- the initial reason for handcuffs
20  was an arrest, yes.
21  BY MR. HECHT:
22      Q.  And who was it that placed the handcuffs
23  on Tavares Docher?
24      A.  I believe it was Newman.
25      Q.  And did you discuss with Deputy Newman

Page 45

1   what it was that Tavares Docher would be arrested
2   for?
3       A.  No, I did not.  I don't recall
4   specifically having, like, a sidebar with him or
5   anything on that, no.
6       Q.  What was Tavares Docher at that point
7   being arrested for?
8       A.  Based on my observations from what I saw,
9   disorderly intoxication.
10      Q.  And tell me what are the elements to
11  arrest someone for disorderly intoxication?
12      A.  Under the influence of alcohol, behavior,
13  disrupting normal faculties of society or business,
14  or place of business, or the general public.
15      Q.  Now, you mentioned the CVS parking lot was
16  a public parking lot, correct?
17      A.  Well, it's open to the public.
18      Q.  Is it a public parking lot or a private
19  parking lot?
20      A.  That would be through their -- as far as
21  -- how CVS -- it's private through CVS I would
22  imagine, but it's open to the public.  There is no
23  gated access or anything like that.
24      Q.  Did you witness Tavares Docher, prior to
25  placing him in handcuffs, commit a crime?

Page 46

1    A.  Did I witness him prior to placing him in
2  handcuffs?  As far as, like, on my initial -- I
3  mean, I witnessed your -- I don't -- where are you,
4  as far as prior to the actual handcuffs being placed
5  on him?
6    Q.  Well, you told me he was arrested for
7  disorderly intoxication, correct?
8    A.  Yes.
9    Q.  So is that the crime that he was being
10 arrested for?
11   A.  I witnessed him display criteria that
12 meets the probable cause for disorderly
13 intoxication.
14   Q.  That's what I want to ask you about.
15   Tell me what it is that you observed that
16 allowed you to arrest Tavares Docher for disorderly
17 intoxication.
18   MS. BARRANCO:  Object to the form.  Go
19 ahead.
20   A.  Is -- he's -- I mean, his behavior, his
21 voice was very loud.  He's drawing out the process
22 with law enforcement being there; it disrupted the
23 facility of CVS.  It disrupted their normal
24 faculties of business.
25   BY MR. HECHT:

www.phippsreporting.com
888-811-3408

Page 47

1    Q.  After placing Tavares Docher in handcuffs,
2  where was Tavares Docher going to be taken to?
3    A.  Initially when he was placed in handcuffs,
4  to jail.  For an arrest, you're going to take him to
5  the county jail.  And that's based on my visual
6  determination.  There was no -- like I said, there
7  were no specific sidebars like, Hey, where are you
8  going to take him or anything like that.
9    Q.  Which vehicle was he placed into?
10   A.  When he sat down, it was Newman's vehicle.
11   MR. HECHT:  If you need to get that.
12   A.  No.  Thank you, though.
13   BY MR. HECHT:
14   Q.  Tavares Docher was handcuffed behind his
15 back, correct?
16   A.  Yes.
17   Q.  And then who escorted him to Deputy
18 Newman's vehicle?
19   A.  Well, we were still -- there was still
20 dialogue over in the general vicinity of my vehicle.
21 I believe -- I know -- I know that Newman was
22 walking with him and so was I.  I do recall Deputy
23 Robinson being at the vehicle when we got to the
24 back of his vehicle, so I believe it was all three
25 of us.

www.phippsreporting.com
888-811-3408

Page 48

1    Q.  And Tavares Docher was then put into the
2  back of Deputy Newman's vehicle?
3    A.  The back door was open on the passenger
4  side.  It was open; I believe it was Newman that
5  opened it.  Asked him to sit down.  Sometimes
6  there's different ways you could ask him to step in
7  the vehicle.  Some people it's easier to have them
8  sit down and put their legs forward.  We were still
9  having a dialogue, so he sat back -- he sat with his
10 butt going into the car.
11   (Discussion off the record.)
12   BY MR. HECHT:
13   Q.  Tell me what happened after Tavares Docher
14 was placed into the back of the vehicle.
15   A.  There was a -- he still appeared to be
16 just normal, the normal dialogue that we had with
17 him.  He was told that -- it was something along the
18 lines, Okay, we're going to head out.  And go ahead
19 and place your feet inside the vehicle.  At that
20 point there wasn't an immediate response.  So I
21 believe it was said again.  And he just looked down;
22 his head was moving, and then he just -- he did --
23 it was like a leap out of the -- like a very
24 forceful frontward motion out of the back of the
25 patrol car.

www.phippsreporting.com
888-811-3408

Page 49

1    Q.  Where did he run towards?
2    A.  It wasn't initially a run.  His body came
3  upward and I saw his knee -- it looked like his knee
4  that came up high with him.  And from where I was --
5  it looked like it struck Newman or Newman brought
6  his hands up to block it.  He tried to go forward
7  away from the car.  But the car is sideways.  He's
8  at the back door.  He's trying to go directly out
9  from the vehicle.  And we were trying to push him
10 back in, telling him to get in the car.  And there
11 was a brief struggle, and then an attempt to push
12 him back in, and he just pushed through.  I was
13 trying to do this over the back door (indicating).
14 Once he pushed through, I was able to catch his arm
15 and try to catch up with him while holding his arm.
16 I don't recall how far we ran.  But I know, from
17 what it felt like to me, when he went forward, I
18 went forward, and like Newman went forward as well.
19 And basically all three of us.  Because I didn't see
20 Robinson went to the ground.
21   Q.  What direction was Tavares headed once he
22 got out of the vehicle?
23   A.  Directly towards Prima Vista is what it
24 looked like to me.
25   Q.  Is that south?

www.phippsreporting.com
888-811-3408

13 (Pages 46 to 49)

Page 50

1    A.  Yes, sorry.  I thought you meant
2  street-wise.
3    Q.  Detective Mangrum, how tall are you?
4    A.  Six-foot-one.
5    Q.  How much do you weigh?
6    A.  330, 335.
7    Q.  Do you recall how tall Tavares Docher was
8  on May 11th?
9    A.  I don't recall his height.  He was -- I
10  don't remember him being taller than me, but he
11  wasn't incredibly short either.
12    Q.  And is it correct to say you, Deputy
13  Robinson, and Deputy Newman had a difficult time
14  controlling Tavares Docher when he left the police
15  car?
16    A.  Yes.
17    Q.  What happens when Tavares Docher is on the
18  ground?
19    A.  Once he's on the ground, it was --
20  initially it was me, from what I remember with me,
21  is getting back -- trying to get back to my knees
22  quickly so he doesn't jump up and run again.
23  We're -- at this point my biggest concern is, he's
24  trying to run; I don't know why.  His -- because
25  again when that -- during that trip to the patrol

Page 51

1  car is -- during that dialogue is when he was more
2  about being chased, and people are actively trying
3  to kill him.  And now he's running out of the patrol
4  car; I don't know why.  And his initial flight
5  direction was towards a busy street.  So I'm trying
6  to get back up, make sure he doesn't try to run
7  again, and just kind of -- what I thought would be
8  just grab his arms, pick him back -- stand him back
9  up and go back to the car and work again on trying
10  to calm him down.
11         Once I was able to get back to my knees
12  and grab more so the left side of his body, and try
13  to, you know, just get control over him, is when I
14  realized that his behavior, physically his
15  movements, his demeanor and everything, had
16  amplified.  So at that point he's become combative.
17  He's -- I was trying -- I was initially toward the
18  top.  He's taking his head in a backward motion like
19  he's trying to strike.  I tried to hold his head
20  still towards the ground.  While I'm trying to hold
21  his head down, I could see that Newman is struggling
22  with his right side, because he's still mostly chest
23  down, but he's trying to bring his right side of his
24  body up; that's when I realized the handcuff had
25  slipped up his forearm, which registered to me

Page 52

1  initially that that would cause a significant amount
2  of discomfort or pain trying to do that, but he had
3  no response that I could see to the handcuff, to him
4  pushing his arm through the handcuff and bringing it
5  up further through his elbow.
6         During that, while I was trying to hold
7  his head down, that's when I noticed now he's very
8  sweaty, and he's -- while my hand is on his head,
9  which would have been -- I don't know, I know you
10  have to -- kind of like palmed over where his ear
11  and top rear portion of his head, I could feel him
12  trying to shake my hand.  And his face is on the
13  asphalt.  And this is having no normal effect.
14  There is no Ow, my face hurt.  And he's grinding his
15  face so I would try to put more pressure to stop his
16  movements.  And that's when I noticed him ducking
17  kind of backwards motion in my hands sliding further
18  towards his face, and that's when he was biting at
19  my finger.  And that's when I noticed he was trying
20  to bite me.  And my hand is -- I can't control my
21  hand slipping, and that's when I would just, at one
22  point I dropped my forearm down to push his face --
23  to strike his face away from my hand, and then try
24  to regain control -- try to regain control over his
25  head.

Page 53

1    Q.  The struggle that you're talking about
2  involving you three deputies and Tavares, how long
3  did that struggle last for prior to Tavares being
4  injected in his buttocks?
5    A.  I couldn't give you a time, because it's
6  -- if I'm just looking at a watch, and it's just --
7  it's easy to say three or four minutes have passed.
8  When it comes to this nature with the amount of
9  thought going through your head and what you're
10  paying attention to, I honestly -- you lose all
11  perception of time.
12    Q.  During the struggle, is it correct that
13  you were applying pressure to Tavares Docher's face?
14    A.  The side of his head, yes.
15    Q.  What were you using to apply pressure to
16  the side of his face?
17    A.  The palm of my hand.  Basically an
18  open-palm hand.  Almost like a basketball.  Just
19  basically like an open hand over the side of his
20  head.
21    Q.  And you were using your hand to make sure
22  that his head stayed level to the ground, correct?
23         MS. BARRANCO:  Object to the form.  Go
24  ahead.
25    A.  Initially what made me make contact with

Page 54

```
 1    his head, he's almost like head striking.  He's
 2    doing head strikes backwards, what my biggest
 3    concern at that point, yes, if one of us fell
 4    forward and hit head-to-head, it would hurt.  The
 5    other, he is hitting his head on the pavement.  I'm
 6    trying to hold -- there is nothing to hold it
 7    against to except for the pavement.  At least if I'm
 8    holding it still, he's not causing injury to
 9    himself, or trying to bite, or anything like that.
10    Once I realized he was biting, that became a great
11    concern to me as well because I didn't have any
12    gloves on.
13         BY MR. HECHT:
14         Q.   When you were applying pressure with your
15    hand to his face, did he continue to strike his head
16    on the ground, or were you able to keep his head
17    level with the ground so he wasn't able to strike
18    his face?
19              MS. BARRANCO:  Object to the form.
20         A.   I was able to hold it -- his head closer
21    to the pavement.  But still, no, he was moving his
22    head in almost like a backwards -- like a
23    semicircle.  And his face is right there on the
24    concrete.  And he's basically -- to me it looks like
25    he was grinding his face in the pavement trying to
```

Page 55

```
 1    get free.  I'm trying to hold it still.  That's when
 2    my hand -- he started to move hard enough to where
 3    my hand was sliding towards his face, and that's
 4    where I saw he was attempting to bite my hand.
 5         BY MR. HECHT:
 6         Q.   And during this struggle you said that you
 7    dropped your forearm to strike his face; is that
 8    correct?
 9         A.   I struck a --
10              MS. BARRANCO:  Objection to form.
11         A.   I apologize.  I basically -- holding him
12    from there, when he would go to bite, the only thing
13    I could do to stop the bite is pull my hand away; it
14    was just basically a drop-down, and then try to
15    regain control over his head.
16         BY MR. HECHT:
17         Q.   Obviously everything you just said is not
18    going to read very well.  There is a lot of, I did
19    this, and then I did that, and then I did this, and
20    then I did a drop-down.
21              What I'd like you to do for the court
22    reporter, because you reenacted that very well for
23    us, tell us specifically what you did once Tavares
24    Docher was attempting to bite you.
25         A.   Okay.  I'll explain this as easy as
```

Page 56

```
 1    possible.  I had my hand directly down on the side
 2    of his head, with applying forward pressure to keep
 3    his head still.  Once he slid his head to where my
 4    hand was in proximity of his mouth, he went to bite,
 5    almost to the point -- his lips actually were on my
 6    finger, and that's when I basically -- the best way
 7    to explain it would be, just a -- from the back side
 8    of the forearm is just straight down in a popping,
 9    striking motion toward his head to push it away from
10    my hand, and then regain control in the same
11    position that I had in my hand to start with.
12         Q.   While you were trying to restrain Tavares
13    Docher, what was he doing?
14         A.   The only -- the biggest -- as far as
15    positioning, all I remember with Deputy Robinson is
16    that he was trying to restrain his legs.  That's
17    when I saw that with Robinson -- when I realized how
18    bad he was kicking and using his legs, and Robinson
19    was just trying to control his legs.  And when he
20    would get kicked, at one point I saw him utilize a
21    strike for compliance.  It looked like it was on his
22    thigh for pain compliance for him to get his leg
23    under control.
24         Q.   And what was Deputy Newman doing during
25    this time as well?
```

Page 57

```
 1         A.   He was on the -- generally the same
 2    position as me, but on the opposite side of the
 3    body.  And once I realized he was biting, I noticed
 4    that Deputy Newman had gloves on, and he took over
 5    control over the head.
 6         Q.   Let me back up a bit.  Prior to Tavares
 7    Docher being placed in handcuffs, was there a
 8    conversation about whether or not Tavares was on any
 9    illegal drugs?
10         A.   There wasn't a specific, but the further
11    we got into talking to him, my concern for more than
12    alcohol was, I did -- because they're -- obviously
13    there is alcohol.  You could smell it.  He admitted
14    to it.  But there is -- with his behavior, once it
15    gets to a certain -- there is also -- because
16    illicit drugs are readily available in St. Lucie
17    County, my concern was during that time, was that if
18    he was using illegal drugs or abusing prescription
19    drugs.
20         Q.   Did you ever ask Tavares, at any point in
21    time, whether he was taking prescription drugs or
22    had taken illegal drugs?
23         A.   The only time I remember asking him, was
24    while we were arguing on ground.  At a certain point
25    when -- because this -- the struggle was trying to
```

Page 58

1     get control over him. There wasn't a whole lot of
2     dialogue, except trying to get him to comply, to
3     stop resisting, stop moving, stop being violent.
4     There was a point where there was some was calm,
5     that I was trying to ask him, because at that point
6     I did have a concern about drugs.
7          Q.   When you asked Tavares Docher during the
8     struggle whether he was on any sort of illegal drugs
9     or prescription drugs, what did he tell you?
10         A.   He wasn't answering any -- he wasn't
11    responding or answering to anything verbally to us
12    at that point.  You heard a lot of yelling, but he
13    wasn't responsive at that point to us like he had
14    been before.
15         Q.   At any point in time during the struggle,
16    did you see Deputy Newman apply his thumb to the
17    nerve mass in the neck of Tavares Docher to gain
18    compliance?
19         A.   Did I see that?  No.
20         Q.   Had you had seen that, would you have told
21    Deputy Newman not to use his thumb and apply
22    pressure to the nerve mass in Tavares Docher's neck?
23         MS. BARRANCO:  Object to the form.
24         A.   No, I would not.
25         BY MR. HECHT:

Page 59

1          Q.   Why not?
2          A.   Because I wouldn't see that -- I would not
3     see anything egregious or unbecoming of a law
4     enforcement officer at that point.
5          Q.   Did you see Deputy Newman use an elbow
6     strike to the right side of Tavares Docher's head
7     during the struggle?
8          MS. BARRANCO:  Object to the form.
9          A.   I saw an elbow strike used.  I don't
10    recall where.  I couldn't tell you it was to the
11    right side of the temple or anything like that.
12         BY MR. HECHT:
13         Q.   How many times did you see Deputy Newman
14    apply an elbow strike to Tavares Docher's head?
15         A.   The one that I saw -- the elbow strike I
16    saw was after -- immediately after I saw him bite
17    Deputy Newman's hand.
18         Q.   Did you ever tell Deputy Newman not to use
19    an elbow strike to Tavares Docher's head?
20         A.   No, I did not.
21         MS. BARRANCO:  Object to the form.
22         BY MR. HECHT:
23         Q.   Why not?
24         A.   Because I had already used one as well,
25    and it was justifiably used, and it was for the

Page 60

1     right purpose.
2          Q.   Is it your testimony today that neither
3     you, Deputy Newman, nor Deputy Robinson utilized
4     excessive force against Tavares Docher?
5          MS. BARRANCO:  Object to the form.  Go
6     ahead.
7          A.   Is that my -- yes.
8          BY MR. HECHT:
9          Q.   And is it your testimony here today that
10    none of the force -- none of the force used by
11    either you, Deputy Newman, or Deputy Robinson was
12    classified as deadly force?
13         MS. BARRANCO:  Object to the form.  Go
14    ahead.
15         A.   I did not classify it as deadly force, nor
16    did I see it as deadly force.
17         BY MR. HECHT:
18         Q.   Was at any point during your entire
19    interaction with Tavares Docher on May 11, 2000 and
20    -- strike that.
21              Was at any point on May 11, 2014 Tavares
22    Docher causing you to believe that he was exhibiting
23    a level of force whereby it would be necessary to
24    justify the use of deadly force against him?
25         MS. BARRANCO:  Object to the form.  Go

Page 61

1     ahead.
2          A.   Did I see as far as him displaying a need
3     for deadly force?  No.
4          BY MR. HECHT:
5          Q.   During the struggle, are you aware if
6     Tavares Docher was having a difficult time
7     breathing?
8          A.   His breathing level during the struggle
9     was getting -- the more -- the more animated he got,
10    and the more he physically struggled against our
11    efforts to subdue him -- because at this point we're
12    trying to physically control him.
13              Because this went from just -- it went
14    from him not making sense, and with the initial
15    detainment, and getting him to the car.  It went
16    from that interaction to -- to now where it's amped
17    up.  He's exhibiting violent behavior.  He's not
18    making any sense.  His breathing increased heavily
19    the more he resisted.
20              And our goal was to get him to stop
21    resisting us and to calm down so that he could bring
22    his heart rate and his breathing down.  He was never
23    having difficulty breathing to where his airway was
24    obstructed because we're on him or anything like
25    that.

Page 62

1    Q.  During the struggle, is it correct that
2  you utilize palm heel strikes to large muscle areas,
3  including the shoulders, chest, and the back of
4  Tavares Docher?
5    A.  I believe I used strikes to the large
6  muscle areas, yes.
7    Q.  And what was the purpose of that?
8    A.  To defeat the physical efforts from that
9  muscle group, and pain, and compliance.
10    Q.  Is it your testimony here today that the
11  force that you utilized during this struggle against
12  Tavares Docher was necessary and appropriate?
13    MS. BARRANCO:  Object to the form.  Go
14    ahead.
15    A.  Yes, I do.
16  BY MR. HECHT:
17    Q.  What involvement did Deputy Courtemanche
18  have in this case?
19    A.  During the struggle on the ground --
20  because once he took off and we got him to the
21  ground, I -- I don't recall who, it could have been
22  me, radioed, We got one running.  Basically we're
23  now turning -- because at that point it's a foot
24  pursuit, and that's all they heard over the radio
25  initially, units respond; there was radio

www.phippsreporting.com
888-811-3408

Page 63

1  communication for other deputies and rescue.  And
2  the first one I remember seeing outside of the three
3  of us was Deputy Courtemanche.
4    Q.  At what point did he arrive in relation to
5  when the struggle was going on?
6    A.  More to the end of the struggle.  Like he
7  was still somewhat combative, but it wasn't to the
8  level that it was prior to.  It was more
9  intermittent at that point.
10    Q.  Did Deputy Courtemanche arrive before the
11  paramedics arrived?
12    A.  I believe so, yes.
13    Q.  And was Deputy Courtemanche involved in
14  trying to restrain Tavares Docher?
15    A.  No, because at that point I believed it
16  was me that told him to keep -- because at one point
17  just prior to him physically standing where I could
18  see him, I had told some subjects to back away.  And
19  I just told him to make sure that nobody is close,
20  in a dangerous area for them to be at that point.
21    Q.  So was it Deputy Courtemanche who was
22  trying to keep onlookers at bay?
23    A.  He's the one that kept -- made sure that
24  nobody came up, basically.  Scene control at that
25  point you could say.

www.phippsreporting.com
888-811-3408

Page 64

1    Q.  But he was not involved in the struggle
2  that you, Deputy Newman, and Deputy Robinson were
3  involved in, correct?
4    A.  I never saw him physically to be involved
5  in that at all.
6    Q.  Before coming here to give your deposition
7  today, what have you reviewed?
8    A.  I reviewed my statements.
9    Q.  Were they taped statements?
10    A.  I don't know if it was taped or what.  But
11  I reviewed a --
12    Q.  Transcript?
13    A.  Transcription.
14    Q.  And do you know when was it you gave those
15  statements?
16    A.  It was on that day later at night.
17    Q.  What else have you reviewed?
18    A.  That was all I reviewed for this.
19    Q.  Did you see any video recordings of the
20  struggle?
21    A.  After the investigation I did, yes.  It
22  was on -- there was some on social media and I
23  believe on the news.
24    Q.  Was that back in 2014 now?
25    A.  Yes.  That would have been back in 2014.

www.phippsreporting.com
888-811-3408

Page 65

1    Q.  Prior to coming here today, you haven't
2  seen any sort of surveillance footage, or cell phone
3  video of the events we've been talking about today?
4    A.  No.
5    Q.  Have you reviewed anything else?
6    A.  That's all I reviewed.  I guess this is
7  back in 2014, that was when I initially saw the
8  videos and all of that.
9    Q.  Tavares Docher was never going to be Baker
10  Acted, correct?
11    MS. BARRANCO:  Object to the form.
12    A.  There was a potential for Baker Act.
13  Because like I said, once we got him in handcuffs,
14  his -- the criterion, he started exhibiting more
15  criteria that could meet a Baker Act.  At that point
16  it was:  What's going to get him the best help?  Is
17  leaving him -- because he's not saying that anybody
18  is monitoring his, you know, like, Hey, I normally
19  get care from so and so.  And he's at a CVS in this
20  kind of condition.  So we're -- what's the best
21  route for him to get help and not be a danger to
22  himself?
23  BY MR. HECHT:
24    Q.  But he was not being Baker Acted, correct?
25    MS. BARRANCO:  Object to the form.

www.phippsreporting.com
888-811-3408

Page 66

1    A.  We never got to that point of making a
2  final determination, as far as I recall.
3  BY MR. HECHT:
4    Q.  You had several options.  You could have
5  just let him go free, correct?
6      MS. BARRANCO:  Object to the form.
7    A.  Could that be done?
8  BY MR. HECHT:
9    Q.  Yes.
10    A.  Yes.  I wouldn't recommend it.
11    Q.  I understand.  You could have arrived on
12  scene, talked to him, and then just let him go,
13  correct?
14      MS. BARRANCO:  Object to the form.
15    A.  That would have been a huge liability.  It could
16  have been done, yes.
17  BY MR. HECHT:
18    Q.  I understand.  You could have arrested him
19  for disorderly intoxication, correct?
20    A.  Yes, sir.
21      MS. BARRANCO:  Object to the form.
22  BY MR. HECHT:
23    Q.  You could have decided to Baker Act him,
24  correct?
25      MS. BARRANCO:  Object to the form.

www.phippsreporting.com
888-811-3408

Page 67

1    A.  We could have continued to see if he met
2  the criteria.
3  BY MR. HECHT:
4    Q.  Correct?  The determination that was made,
5  by either you or the officers involved, was to
6  arrest him for disorderly intoxication, correct?
7      MS. BARRANCO:  Object to the form.
8    A.  Baker Act and arrest are going to have the
9  same end result, as far as handcuffing and in the
10  back of the patrol car.  As far as I remember, that
11  was not a final -- that was not fully decided at
12  that point.
13  BY MR. HECHT:
14    Q.  Okay.  You told me before that he was
15  placed under arrest for disorderly intoxication,
16  correct?
17    A.  Yes.
18    Q.  And he was placed in the patrol car.
19    A.  Yes.
20    Q.  And he was going to be taken to the jail,
21  correct?
22      MS. BARRANCO:  Object to the form.
23    A.  He was placed in handcuffs originally.  We
24  never got him in the patrol car, locked in the
25  patrol car, doors shut.

www.phippsreporting.com
888-811-3408

Page 68

1    A Baker Act and an arrest are going to
2  have the same procedure, as far as handcuffing,
3  placing him in the back of the car.  Instead of
4  taking him to the jail, you'll take him to the
5  nearest receiving facility.
6      We had not been able to fully get enough
7  information, whether he meets the full criteria for
8  a law enforcement Baker Act, and if that would be
9  the best benefit for his well-being as well.
10  BY MR. HECHT:
11    Q.  Okay.  Tavares Docher was going to be
12  taken to the jail, correct?
13      MS. BARRANCO:  Object to the form.
14    A.  I don't know that.  As far as -- I can't
15  say that for positive, no.  I wasn't the initial --
16  initially he was being placed in Deputy Newman's
17  car.  He would have the final decision.  We don't --
18  it's not my place to say, Hey, you should do an
19  arrest over Baker Act.
20      We had started to have dialogue about the
21  possibility of a Baker Act and whether he met the
22  criteria during the transition to the patrol
23  vehicle.  Like I said, before his dialogue changed.
24  He went from just being displaying signs of, you
25  know, being intoxicated and just not to the point of

www.phippsreporting.com
888-811-3408

Page 69

1  almost being -- or you could say belligerent, to now
2  he's -- you know, now he's talking about being
3  chased by people, people are trying to kill him, the
4  Arabs.  During that continued dialogue that he may
5  be a threat to himself or others, based on these
6  delusions that he has that he's being threatened.
7  BY MR. HECHT:
8    Q.  When you Baker Act someone, do you take
9  them to the jail?
10    A.  To the jail?  No.
11    Q.  Where do you take them?
12    A.  The nearest receiving facility.  We have
13  Port St. Lucie Hospital, which is on Walton Road.
14  We have Lawnwood Pavilion, which we take them to
15  Lawnwood emergency room.  We have New Horizons,
16  which is our main hub; it is center county.
17    Q.  After Tavares Docher was handcuffed behind
18  his back and arrested for disorderly intoxication,
19  he was not going to any of those facilities,
20  correct?
21      MS. BARRANCO:  Object to the form.
22    A.  I couldn't tell you that.  We never got to
23  fully make that determination.
24  BY MR. HECHT:
25    Q.  Do you recall earlier in this deposition,

www.phippsreporting.com
888-811-3408

Page 70

1    you telling me he was going to be taken to the jail?
2        MS. BARRANCO: Object to form. Go ahead.
3        A. Initially, yes.
4    BY MR. HECHT:
5        Q. What do you mean, "initially"? And then
6    he was going to go somewhere else?
7        A. No.
8        Q. Okay.
9        A. Once we placed handcuffs on him, there was
10   continued dialogue; that's when he started to
11   display that he may have more faculties involved
12   with impairment beyond drugs or alcohol. And that's
13   where we started to look into whether he met the
14   criteria for a law-enforcement Baker Act.
15       Q. Well, he was handcuffed behind his back,
16   correct?
17       A. Yes.
18       Q. And at that point he was placed under
19   arrest for disorderly intoxication, correct?
20       MS. BARRANCO: Object to the form.
21       A. Initially, yes.
22   BY MR. HECHT:
23       Q. And he was placed in the back of the
24   patrol vehicle, correct?
25       A. No, we never fully got him in the patrol

www.phippsreporting.com
888-811-3408

Page 71

1    vehicle.
2        Q. He never actually got his butt in the car?
3        A. He had his butt in, but feet and the door
4    -- the door was never shut. Like I said, at that
5    point, the same protocol would have been done for a
6    Baker Act. And we're talking a misdemeanor arrest.
7    And if it's better for him, and beneficial, and he
8    meets the criteria of a law-enforcement Baker Act,
9    it's as simple as saying, I'm going to drive to the
10   jail; I'm going to drive to New Horizons.
11       Q. I understand. But he was not placed in
12   handcuffs because he was being Baker Acted. He was
13   being placed in handcuffs because he was being
14   arrested for disorderly intoxication, correct?
15       MS. BARRANCO: Object to the form.
16       A. Initially what I observed, yes, that's
17   what my thought process was.
18   BY MR. HECHT:
19       Q. Have you read this report by Joseph
20   Trevisol?
21       A. I may have read it after the investigation
22   but not recently or anything of that nature.
23       Q. According to this report,
24   Joseph Trevisol wrote: "I spoke to Deputies Newman,
25   Mangrum, and Robinson separately. They told me the

www.phippsreporting.com
888-811-3408

Page 72

1    following: Docher was acting intoxicated. Docher
2    told Newman he had a few drinks while watching the
3    games on television. The drinks went from liquor to
4    Natty Ice, saying how it's really strong beer.
5    Deputy Newman continued telling me Docher was
6    talking about how the Arabs were trying to kill his
7    mother and him because they knew where the Arabs
8    dropped the headless body in St. Lucie County.
9    Deputy Newman also said Docher was able to say who
10   and where he was. Therefore, they did not see Baker
11   Act as a means to the end."
12       Have you read that statement before?
13       A. Not that I recall.
14       Q. Were you involved with telling Joseph
15   Trevisol that the Baker Act was not a means to the
16   end?
17       MS. BARRANCO: Object to the form. Go
18   ahead.
19       A. We did not have -- based on getting to the
20   car at that point of him sitting his -- his actually
21   sitting in the back of the patrol vehicle, I did not
22   see fully the criteria for a Baker Act. Had he been
23   compliant and sat, and we were able to continue to
24   talk to him, he may have exhibited the more for
25   criteria for that. But at that point, no. But was

www.phippsreporting.com
888-811-3408

Page 73

1    Deputy Newman -- did I know for a fact that Deputy
2    Newman was leaving to drive to the jail? No, I did
3    not.
4    BY MR. HECHT:
5        Q. What I want to know is: Did you speak
6    with Joseph Trevisol, who was the reporting officer?
7        A. I don't remember specifically speaking to
8    him. There was a lot of people there after the
9    fact.
10       Q. And according to the narrative written by
11   Joseph Trevisol, he wrote: "Deputy Newman told
12   Docher to put his hands behind his back. He was
13   under arrest for disorderly intoxication due to him
14   being intoxicated and causing a disturbance."
15       Is that your understanding of why Tavares
16   Docher was being arrested?
17       MS. BARRANCO: Object to the form.
18       A. I understood that's why he was being
19   placed in handcuffs, yes.
20   BY MR. HECHT:
21       Q. He was not placed in handcuffs because he
22   was being Baker Acted, correct?
23       MS. BARRANCO: Object to the form.
24       A. When the handcuffs were placed on him,
25   from my observations, no.

www.phippsreporting.com
888-811-3408

Page 74

1      BY MR. HECHT:
2          Q.  Did you ever have any conversations with
3    paramedic Jose Rosario?
4          A.  Specifically, I don't recall.  I don't
5    look at name tags.  I did have some maybe dialogue
6    with paramedics when they showed up.  I do recall
7    when Deputy Alanjay arrived on scene, and I
8    believe -- I'm not 100 percent positive.  I believe
9    it was Deputy Favalet (phonetic) that showed up on
10   scene as well.  I stood up and walked away -- I
11   stood up and walked away at that point to assess
12   myself.
13         Q.  What conversations did you have with any
14   paramedics?
15         A.  I don't recall specifics.  Maybe that --
16   like in a normal circumstance of that nature, I
17   would say he's been combative.  And this is -- but,
18   like, it was relatively fast them getting on scene.
19   And I wanted them -- I didn't have time -- like I
20   didn't do a sidebar and explain it to them.  Because
21   at that point is when he had become unresponsive.
22   And my concern was for his medical well-being.
23         Q.  Did you ever tell any of the paramedics
24   that Tavares Docher had been drinking alcohol?
25         A.  I don't remember ever saying that, no.

Page 75

1          Q.  Did you ever tell any of the paramedics
2    that Tavares Docher was or was not on any prescribed
3    medications or illegal drugs?
4          A.  I don't recall ever saying that.
5          Q.  Do you remember any of the paramedics
6    telling you that they were going to inject Tavares
7    Docher with Ativan?
8          A.  I don't remember any, like, medical
9    terminology.  But I do, yes, he was getting an
10   injection.  Because we at that point were going to
11   help.  If that's their medical procedure, then we're
12   going to assist them if he's combative.
13         Q.  Were you involved in the decision to
14   inject Tavares Docher with any medication?
15         A.  I don't make any of those calls medically,
16   no, sir.
17         Q.  Who made that call on May 11th to inject
18   him with the drug?
19         A.  That would be on the medical side.
20         Q.  And do you know why it is they injected
21   him with a medication?
22         A.  I know initially the -- what halted the
23   initial medical assessment of him and treatment was
24   he was -- because the end of it he had started to --
25   that's when he became completely unresponsive.  His

Page 76

1    rapidness just went to almost nothing.  And that's
2    when I couldn't tell -- he's not breathing heavily
3    anymore; he's not like exasterbated (sic).  That's
4    when I pulled him on his side, which is considered
5    the recovery position, to check his breathing and
6    his pulse.  I could still feel his pulse, and still
7    hear him breathing lightly and see his stomach
8    moving.  And he was calm at that point.
9          And initially I had stepped away when
10   rescue got there because he was calm and other
11   deputies had taken over.  And I was concerned about
12   blood exposure at that point, because during the end
13   of that I noticed blood on the ground and blood
14   on -- what it looked like was on Deputy Newman.  So
15   I didn't know who was bleeding, where it came from,
16   what exposure level it was.
17         And I stepped back to assess, and that's
18   when I -- the last thing I just noticed is that he
19   almost -- he came back to it seemed like, sat
20   forward, and I saw a kicking motion.  And one of the
21   paramedics go backwards and landed on his butt.  And
22   that's when there was, like, we can't do treatment
23   with him being physically combative toward us.  So
24   there was a struggle to restrain him again.  There
25   was some struggle to hold him down.  And then he

Page 77

1    just went somewhat calm again.  And then they said
2    they needed assistance in giving him an injection.
3    I believe they said, I asked them where, like where
4    do they need to have access to him?  They said the
5    thigh or the butt, I believe.  We tried to hold him
6    in position where they could safely administer that.
7          Q.  Was he struggling during the injection?
8          A.  There was still some struggle to where we
9    had to hold him still.
10         Q.  And was he still handcuffed at the time
11   that he was given the injection in his buttocks?
12         A.  Yes.
13         Q.  He was handcuffed behind his back?
14         A.  Yes.
15         Q.  I'm going to show you a video.  It's a
16   minute long.  If you want to come over here.
17         A.  Yes.
18         (Video played.)
19   BY MR. HECHT:
20         Q.  So I just showed you a minute and nineteen
21   second video.  And I'm going to ask you some
22   questions about that.
23         Based upon what you just saw in this
24   video, is it your testimony that Tavares Docher
25   during this minute and nineteen second video was

Page 78

1    resisting arrest?
2         MS. BARRANCO:  Object to the form.  Go
3    ahead.
4         A.   During that video there is instances of
5    resisting arrest, yes.  Resisting being restrained
6    and controlled.
7    BY MR. HECHT:
8         Q.   Well, you would agree with me at this
9    point he was already under arrest, correct?
10        MS. BARRANCO:  Object to the form.  Go
11   ahead.
12        A.   Yeah, he was under arrest at that point,
13   whether it be for Baker Act, disorderly
14   intoxication.  For this it was disorderly
15   intoxication.
16   BY MR. HECHT:
17        Q.   And a disorderly intoxication arrest is a
18   second-degree misdemeanor, correct?
19        A.   It's a misdemeanor, yes.
20        Q.   Do you take into consideration what one is
21   being arrested for when you exert a certain amount
22   of force on someone?
23        MS. BARRANCO:  Object to the form.  Go
24   ahead.
25        A.   As far as use of force?  No.

www.phippsreporting.com
888-811-3408

Page 79

1    BY MR. HECHT:
2         Q.   So in this situation it doesn't matter if
3    Tavares Docher was arrested for disorderly intox,
4    for murder; he would have been treated the same way
5    as we see him being treated in this video?
6         MS. BARRANCO:  Object to the form.  Go
7    ahead.
8         THE COURT:  At the point of the video
9    you're looking at, he had already committed
10   battery on law enforcement, escape, resisting
11   arrest with violence.  We're not talking about
12   a misdemeanor-level anymore.  Use of force
13   doesn't go based on the nature of the crime, so
14   to say, when you're dealing with a one-on-one
15   with a subject.  It goes to the amount of
16   resistance, and the factors that they're doing,
17   and what it takes to control that reasonably.
18   BY MR. HECHT:
19        Q.   In this video did you see your foot being
20   applied to what appears to be either Tavares
21   Docher's back or neck?
22        MS. BARRANCO:  Object to the form.
23        A.   His back, yes.
24   BY MR. HECHT:
25        Q.   So in this video you saw your foot being

www.phippsreporting.com
888-811-3408

Page 80

1    applied to Tavares Docher's back, correct?
2         A.   Yes.
3         Q.   And what is that technique known as?
4         A.   It doesn't have a name.
5         Q.   Why were you placing your foot on Tavares
6    Docher's back in this video?
7         A.   When I initially stood up he had -- this
8    is toward the end of the overall.  When I stood up,
9    that's when he had gone somewhat -- he was -- we
10   noticed some sort of verbal agreeance, okay, okay.
11   And he had started to slow and stop his efforts to
12   struggle against us, and my arm was a slur strike.  And as I'm
13   standing up, he started again with his legs and his
14   upper body.  That's when I initially grabbed the arm
15   and then transitioned to the handcuffs, because at
16   this point he's already injured as I can see.
17        To keep him from causing further injury to
18   himself, the only thing I could think of to
19   improvise at that time was to hold his arms out
20   straight.  Now, if I hold his arms out straight
21   without applying any counterforce to keep his body
22   still, he's going to be able to flail about still
23   and cause injury and damage to his shoulders just
24   being held with his arms out.  So I applied some
25   pressure -- counterpressure with my foot to keep his

www.phippsreporting.com
888-811-3408

Page 81

1    arms out straight and his body still, so he couldn't
2    injure himself any further.
3    BY MR. HECHT:
4         Q.   When you placed pressure on Tavares
5    Docher's back using your foot, as we see in this
6    video, is that an approved law enforcement maneuver?
7         MS. BARRANCO:  Object to the form.  Go
8    ahead.
9         A.   It's approved to manipulate and control
10   physical resistance.
11   BY MR. HECHT:
12        Q.   Did you learn that in the police academy
13   or during your training at the St. Lucie County
14   Sheriff's Office?
15        MS. BARRANCO:  Object to the form.  Go
16   ahead.
17        A.   That -- in that video with the foot on the
18   back and the hands out straight, that was improvised
19   to gain control over him and prevent him from
20   harming himself any further.
21   BY MR. HECHT:
22        Q.   That was an improvised maneuver, correct?
23        A.   Yes.
24        Q.   That's not something you learned in your
25   training, correct?

www.phippsreporting.com
888-811-3408

Page 82

1      MS. BARRANCO: Object to the form. Go
2  ahead.
3      A. Not that I specifically recall learning.
4  We can't train for every possible form of
5  resistance. You just got to go with what's safe and
6  reasonable at that point.
7  BY MR. HECHT:
8      Q. Did you have other reasonable options at
9  that time, instead of using your foot to apply
10  pressure to his back?
11      MS. BARRANCO: Object to the form. Go
12  ahead.
13      A. At that point to see that we were being
14  just as effective, no, I did not.
15  BY MR. HECHT:
16      Q. At this point in time where we're watching
17  this minute and nineteen second video, if you wanted
18  to, would you have just been able to pick Tavares
19  Docher off of the ground safely?
20      MS. BARRANCO: Object to the form. Go
21  ahead.
22      A. No.
23  BY MR. HECHT:
24      Q. I'm sorry?
25      A. No.

Page 83

1      Q. Why not?
2      A. Well, first of all, we have a concern of a
3  medical nature to him. So if we pick him up off the
4  ground, where is he going to go? So, I mean, we
5  can't put him in the back of the patrol car and put
6  him in further confinement. If we had him contained
7  on the ground, at that point we had him contained.
8  At that point we are trying to keep him from getting
9  excessively violent again, or animated. And now my
10  biggest concern is to keep him from causing any
11  bodily harm to himself, because he's already struck
12  his face on the pavement and showed no response to
13  pain stimulus that would have been through us or
14  himself. So that was my concern.
15      With pulling his arms out straight and
16  backwards, I have maneuverability with the handcuffs
17  to at least do joint manipulation, if it comes to
18  that, which it didn't, and have the advantage of
19  having his upper body somewhat immobilized so he
20  can't flail out and cause further injury to himself.
21      Q. On May 11, 2014, did you have any sort of
22  leg restraints in your police vehicle?
23      A. I don't recall having -- I don't have any
24  issued with leg restrains or anything like that. We
25  have issued rope; that's considered a hobble

Page 84

1  restraint, but we didn't have it readily accessible
2  at that time where I could have ran and got it.
3      Q. On May 11, 2014 would you have had that
4  rope in your vehicle?
5      A. It would have been in my trunk, yes.
6      Q. Do you know if Deputy Newman had that in
7  his trunk on May 11, 2014?
8      A. That would be speculation on my part.
9      Q. You just don't know.
10      A. I don't know.
11      Q. But you had it in your vehicle.
12      A. I had one issued, yes, and I kept mine in
13  my trunk.
14      Q. Why didn't you use it?
15      A. I didn't have an option to go get it at
16  that point. Now, if it was -- you're not going to
17  -- if there is a person available free to grab one,
18  you would utilize it that way. If three people are
19  involved in the active detaining and controlling
20  somebody, once the scene is safe, then you would go
21  get that. At that point it didn't just go to scene
22  safe and him being calm. It went into immediate
23  medical attention from that point. And we assumed
24  and thought with his calmness that it was just a
25  medical condition at that point and he would be --

Page 85

1  no further physical resistance from him, which it
2  was intermittent at that. So our biggest concern
3  was medical attention and the hobble, like me
4  leaving far enough to get my hobble is never an
5  option to me at that point.
6      MR. HECHT: Thank you. I don't have any
7  other questions. Julie, do you have questions?
8      MS. TYK: Yes. No questions.
9      MS. BARRANCO: I actually have one
10  clarifying question.
11      CROSS-EXAMINATION
12  BY MS. BARRANCO:
13      Q. Earlier you were asked about whether you
14  had given, or what you had reviewed in preparation
15  for your deposition. And you referred to reviewing
16  "statements" in the plural. Do you know if you gave
17  a single statement or more than one statement?
18      A. I apologize, by statements I meant that it
19  was multiple pages.
20      Q. Of one statement?
21      A. One statement that was given to
22  detectives.
23      Q. So there should there -- there was only
24  one?
25      A. When I said plural, I was referring to the

Page 86

```
 1      pages.  I apologize.
 2          MS. BARRANCO:  That was the only question
 3      I had just to clarify.
 4          MR. HECHT:  Thanks.
 5          MS. BARRANCO:  He'll read the deposition
 6      if it's ordered.
 7          MR. HECHT:  I'm going to order.
 8          MS. BARRANCO:  And I'll take a copy.
 9
10          (The proceedings concluded at 1:53 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

www.phippsreporting.com
888-811-3408

Page 87

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF PALM BEACH

I, the undersigned authority, certify
that CLAY MANGRUM personally appeared before me
and was duly sworn on the 31st day of May, 2017.
Signed this 1st day of June, 2017.

PATRICIA A. LANOSA, RPR, FPR, CSR
Notary Public, State of Florida
My Commission No. FF 169350
Expires: 10/19/2018

www.phippsreporting.com
888-811-3408

Page 88

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF PALM BEACH

I, PATRICIA A. LANOSA, Registered
Professional Reporter, do hereby certify that I
was authorized to and did stenographically report
the foregoing deposition of CLAY MANGRUM; Pages 1
through 90; that a review of the transcript was
requested; and that the transcript is a true
record of my stenographic notes.
I FURTHER CERTIFY that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorneys or counsel
connected with the action, nor am I financially
interested in the action.
Dated this 1st day of June, 2017.

PATRICIA A. LANOSA, RPR, FPR, CSR

www.phippsreporting.com
888-811-3408

Page 89

June 1, 2017
PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
c/o Clay Mangrum
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
(954)462-3200
ATTN: SUMMER BARRANCO, ESQUIRE

Re:  Docher v. Newman et al.
Case No.:  2:16cv14413
Please take notice that on the 31st day of May,
2017, you gave your deposition in the above cause.
At that time, you did not waive your signature.
The above-addressed attorney has ordered a copy of
this transcript and will make arrangements with you
to read their copy.  Please execute the Errata
Sheet, which can be found at the back of the
transcript, and have it returned to us for
distribution to all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.
If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.
Very truly yours,
PATRICIA A. LANOSA, RPR, FPR, CSR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401
I do hereby waive my signature.

_____
CLAY MANGRUM

www.phippsreporting.com
888-811-3408

Page 90

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re:  DOCHER V. NEWMAN ET AL.

Case No.:  2:16cv14413

CLAY MANGRUM

May 31, 2017

PAGE  LINE    CHANGE          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have

read the foregoing document and that the facts

stated in it are true.

_____        _____

Date              CLAY MANGRUM

# www.phippsreporting.com
## 888-811-3408

**A**

**able** 9:18 12:14
  49:14 51:11
  54:16,17,20
  68:6 72:9,23
  80:22 82:18
**above-address...**
  89:9
**abusing** 57:18
**academy** 6:20
  6:25 7:2,23
  9:14,15,19,22
  9:23 19:2
  81:12
**accelerated**
  11:11
**access** 45:23
  77:4
**accessible** 84:1
**Act** 43:23 65:12
  65:15 66:23
  67:8 68:1,8,19
  68:21 69:8
  70:14 71:6,8
  72:11,15,22
  78:13
**Acted** 65:10,24
  71:12 73:22
**acting** 28:18
  72:1
**action** 88:17,18
**active** 84:19
**actively** 14:16
  15:4,6 51:2
**actual** 46:4
**ADAM** 2:6
**additional** 10:10
  23:21 38:8
**address** 89:16
**addressed** 34:10
**administer** 77:6
**admitted** 41:21
  57:13
**advantage** 83:18
**affirmed** 4:9
**afford** 9:18

**agencies** 6:17
**ago** 36:13
**agree** 17:25
  18:14 19:5,13
  20:10,19 21:2
  21:11,20 22:6
  23:6 78:8
**agreeance** 80:10
**agreement** 9:8
**ahead** 15:2,9,25
  16:17 17:13,21
  18:5 19:18
  20:3,14 21:7
  22:1,11 23:19
  24:25 25:16
  26:9 34:2,11
  36:17 38:15
  41:1 42:9 44:6
  44:15 46:19
  48:18 53:24
  60:6,14 61:1
  62:14 70:2
  72:18 78:3,11
  78:24 79:7
  81:8,16 82:2
  82:12,21
**aimed** 18:23
**airway** 61:23
**al** 89:5 90:3
**Alanjay** 74:7
**alcohol** 29:5
  38:18 45:12
  57:12,13 70:12
  74:24
**Allow** 30:18
**allowed** 46:16
**ambulance** 7:4
  8:3,5
**amount** 18:11
  18:21 20:16
  21:18 22:2,13
  52:1 53:8
  78:21 79:15
**amped** 61:16
**amplified** 51:16
**amplify** 28:1
**animated** 26:15

61:9 83:9
**annual** 12:12
**answering** 58:10
  58:11
**anybody** 65:17
**anymore** 76:3
  79:12
**apologize** 8:19
  55:11 85:18
  86:1
**APPEARAN...**
  2:1
**appeared** 48:15
  87:9
**Appearing** 2:15
**appears** 79:20
**applied** 79:20
  80:1,24
**apply** 13:19 14:8
  15:22,22 16:11
  16:21 53:15
  58:16,21 59:14
  82:9
**applying** 13:10
  17:10,14,18,22
  53:13 54:14
  56:2 80:21
**approach** 33:6
**approached**
  35:4,17 36:14
**approaching**
  33:2 35:21
**appropriate**
  62:12
**approved** 81:6,9
**approximately**
  6:10 8:13,16
  31:24
**Arabs** 28:9 69:4
  72:6,7
**area** 13:19 18:22
  27:4 63:20
**areas** 62:2,6
**arguing** 57:24
**arm** 14:11 49:14
  49:15 52:4
  80:14

**arms** 16:3 51:8
  80:19,20,24
  81:1 83:15
**arrangements**
  89:9
**arrest** 25:9,11
  30:21 37:13
  40:3 44:13,20
  45:11 46:16
  47:4 67:6,8,15
  68:1,19 70:19
  71:6 73:13
  78:1,5,9,12,17
  79:11
**arrested** 37:8
  45:1,7 46:6,10
  66:18 69:18
  71:14 73:16
  78:21 79:3
**arrive** 38:25
  63:4,10
**arrived** 39:7
  63:11 66:11
  74:7
**arts** 13:3
**ash@searcyla...**
  2:7
**asked** 27:1,9,10
  29:5 48:5 58:7
  77:3 85:13
**asking** 57:23
**aspect** 9:5
**asphalt** 52:13
**assault** 35:8
  36:15 37:7,14
  43:24
**assaulting** 37:6
**assess** 32:5
  74:11 76:17
**assessment**
  75:23
**assigned** 4:24
  5:6,13
**assist** 75:12
**assistance** 24:22
  77:2
**assumed** 84:23

**assumption** 9:17
**Ativan** 75:7
**attempt** 49:11
**attempted** 41:20
**attempting** 55:4
  55:24
**attend** 12:14
**attended** 12:17
**attention** 24:8
  24:19 25:3
  34:13 53:10
  84:23 85:3
**ATTN** 89:4
**attorney** 88:14
  89:9,13
**attorneys** 88:16
**authorities** 31:1
**authority** 87:8
**authorized** 88:8
**Auto** 6:23 7:6
**available** 57:16
  84:17
**Avenue** 2:15
**aware** 16:14
  30:16 61:5

**B**

**back** 7:18 15:11
  21:14 26:5,10
  34:13,19 41:20
  47:15,24 48:2
  48:3,9,14,24
  49:8,10,12,13
  50:21,21 51:6
  51:8,8,9,11
  56:7 57:6 62:3
  63:18 64:24,25
  65:7 67:10
  68:3 69:18
  70:15,23 72:21
  73:12 76:17,19
  77:13 79:21,23
  80:1,6 81:5,18
  82:10 83:5
  89:10
**backside** 15:13
**backward** 51:18

**backwards**
52:17 54:2,22
76:21 83:16
**bad** 20:5 56:18
**Baker** 43:23
65:9,12,15,24
66:23 67:8
68:1,8,19,21
69:8 70:14
71:6,8,12
72:10,15,22
73:22 78:13
**ballpark** 7:23
**bar** 38:5
**BARNHART**
2:4
**Barranco** 2:9,11
3:7 15:1,9,14
15:18,24 16:16
17:12,20 18:4
18:19 19:9,17
20:2,13,22
21:6,16,25
22:10 23:11,18
24:24 25:15
26:8 34:1 36:9
36:16 37:11
38:14 39:22
42:8 43:3,19
44:5,14 46:18
53:23 54:19
55:10 58:23
59:8,21 60:5
60:13,25 62:13
65:11,25 66:6
66:14,21,25
67:7,22 68:13
69:21 70:2,20
71:15 72:17
73:17,23 78:2
78:10,23 79:6
79:22 81:7,15
82:1,11,20
85:9,12 86:2,5
86:8 89:2,4
**based** 11:6 17:9
17:17,25 18:16

19:5,13,23
20:9,18 21:2
21:11,20 22:6
22:17 40:20,23
41:14 43:23
45:8 47:5 69:5
72:19 77:23
79:13
**basic** 10:4 18:12
27:17
**basically** 14:17
15:11 26:19
29:1 30:16
31:20 34:15
35:19 37:13
39:25 41:1,19
49:19 53:17,19
54:24 55:11,14
56:6 62:22
63:24
**basketball** 53:18
**battery** 79:10
**bay** 63:22
**Bayshore** 1:23
**Beach** 2:4,5 87:5
88:4 89:20
**becoming** 9:9
36:23
**beer** 29:7 72:4
**began** 4:1
**behalf** 2:2,8,13
**behavior** 11:8
22:17 24:16
25:5,23 26:15
28:2,20 40:10
43:23 45:12
46:20 51:14
57:14 61:17
**behavioral**
38:18
**believe** 9:7,9
12:14 24:17
26:2,5 27:15
27:25 28:1
30:12 44:24
47:21,24 48:4
48:21 60:22

62:5 63:12
64:23 74:8,8
77:3,5
**believed** 23:8,16
42:12 63:15
**belligerent** 69:1
**belt** 30:23
**beneficial** 71:7
**benefit** 68:9
**best** 11:9 56:6
65:16,20 68:9
**better** 15:12
71:7
**beyond** 70:12
**biggest** 27:5
50:23 54:2
56:14 83:10
85:2
**bit** 29:16 42:1
57:6
**bite** 52:20 54:9
55:4,12,13,24
56:4 59:16
**biting** 52:18
54:10 57:3
**black-and-wh...**
36:10
**blank** 89:15
**bleeding** 76:15
**block** 30:9 49:6
**blocks** 12:12,15
**blood** 76:12,13
76:13
**bodily** 17:19
18:18 19:8,10
20:1,6,21
21:15,24 83:11
**body** 26:15 27:3
27:15 40:15
41:5 49:2
51:12,24 57:3
72:8 80:14,21
81:1 83:19
**body's** 11:12
**bottom** 89:15
**Boulevard** 1:23
2:4,10 89:3

**brachial** 13:13
13:25 14:1,5,6
14:7,10,14,25
15:7
**breathing** 61:7,8
61:18,22,23
76:2,5,7
**bridge** 19:25
20:5,11
**brief** 49:11
**briefly** 6:22
**bring** 28:2 41:20
51:23 61:21
**bringing** 52:4
**broken** 12:12
**brought** 49:5
**Broward** 27:16
**brushed** 33:12
35:17 39:4
**building** 31:18
**bunch** 34:16
**bushes** 28:7 41:6
**business** 29:1
31:14 32:4
41:9 45:13,14
46:24
**busy** 28:25 51:5
**butt** 48:10 71:2
71:3 76:21
77:5
**buttocks** 53:4
77:11

_____

**C**

**c/o** 89:2
**call** 25:20 36:10
75:17
**called** 30:6
40:12
**calls** 30:19 75:15
**calm** 51:10 58:4
61:21 76:8,10
77:1 84:22
**calming** 39:13
**calmness** 84:24
**CALVIN** 1:9
**car** 32:4 38:6

42:17 48:10,25
49:7,7,10
50:15 51:1,4,9
61:15 67:10,18
67:24,25 68:3
68:17 71:2
72:20 83:5
**care** 65:19
**Carriers** 6:24
**carry** 26:19
**carrying** 26:17
34:14
**case** 1:2 25:7
29:14 62:18
89:6 90:3
**catch** 49:14,15
**cause** 18:18 19:8
19:10 20:1,5,6
20:21 21:14,23
46:12 52:1
80:23 83:20
89:7
**caused** 41:9
**causes** 14:20
**causing** 54:8
60:22 73:14
80:17 83:10
**cell** 65:2
**center** 69:16
**certain** 13:16
14:15 57:15,24
78:21
**certainly** 43:16
**certificate** 3:8,9
10:7 87:1 88:1
**certification**
10:3,6
**certified** 6:25
9:20
**certify** 87:8 88:7
88:13
**CHANGE** 90:6
**changed** 68:23
**CHANGES** 90:2
**chased** 51:2 69:3
**chasing** 28:8,21
**check** 76:5

chest 51:22 62:3
CHRISTOPH...
 1:8
circumstance
 74:16
Circumstantial
 22:12
citizens 29:2
clarify 86:3
clarifying 85:10
classified 18:3
 19:3,16 20:11
 21:4,9 22:9
 60:12
classify 36:15
 38:12 60:15
clause 9:7
Clay 1:17 4:8,14
 87:9 88:9 89:2
 89:22 90:4,24
CLAYTON 1:8
clear 14:6
clenched 32:18
 32:19
clenched-tight
 35:10
Clerk 89:14
close 22:22
 31:21 32:14
 63:19
closer 32:13
 54:20
clothing 31:12
College 7:19
 9:24 10:5,8
combative 14:16
 15:4,6 51:16
 63:7 74:17
 75:12 76:23
come 10:25
 18:20 20:15
 21:17 23:12
 31:17 36:22
 77:16
comes 53:8
 83:17
coming 34:4,4

64:6 65:1
Commission
 87:15
commit 37:12
 45:25
committed 79:9
committing 35:3
 37:9
communicate
 23:20
communication
 63:1
Community
 7:18
company 8:4,5
completely
 39:13 75:25
compliance
 13:17,20 14:9
 14:21,25 16:2
 16:5,22 17:5
 56:21,22 58:18
 62:9
compliant 27:8
 33:13 35:11
 72:23
complied 37:15
comply 58:2
concern 24:7
 27:5 28:22
 50:23 54:3,11
 57:11,17 58:6
 74:22 83:2,10
 83:14 85:2
concerned 76:11
concerns 25:22
concluded 86:10
concrete 54:24
condition 25:19
 65:20 84:25
confinement
 83:6
confirm 29:10
 29:12
connected 88:17
consider 18:10
 18:11 33:2

35:5 36:4
consideration
 78:20
considered
 17:11 22:21,25
 23:2 35:22
 36:5 37:7
 38:20 40:11
 43:4 76:4
 83:25
constitute 18:13
 19:20
construed 35:6,7
contact 10:25
 14:18 23:7,10
 23:15 24:9
 26:14 40:4
 53:25
contained 83:6,7
continual 41:1
continue 27:11
 33:6 54:15
 72:23
continued 40:21
 41:25 44:11
 67:1 69:4
 70:10 72:5
continues 36:21
continuing
 11:25
continuously
 41:6
continuum
 41:12
control 14:21
 39:17 51:13
 52:20,24,24
 55:15 56:10,19
 56:23 57:5
 58:1 61:12
 63:24 79:17
 81:9,19
controlled 78:6
controlling
 50:14 84:19
conversation
 40:15 57:8

conversations
 74:2,13
copy 86:8 89:9
 89:10
corner 31:15
correct 14:23
 15:8,20 16:15
 26:1 29:21
 37:9 38:2
 40:21 43:18
 44:4,13 45:16
 46:7 47:15
 50:12 53:12,22
 55:8 62:1 64:3
 65:10,24 66:5
 66:13,19,24
 67:4,6,16,21
 68:12 69:20
 70:16,19,24
 71:14 73:22
 78:9,18 80:1
 81:22,25
corrections 5:14
 5:23 9:15
correctly 38:8
counsel 88:14,16
counterforce
 80:21
counterpressure
 80:25
county 1:10,12
 2:13 4:20 5:10
 6:16 8:23 9:1,6
 10:9 11:14,19
 11:24 13:5
 14:23 15:20
 16:8 19:1
 27:15,16,22
 47:5 57:17
 69:16 72:8
 81:13 87:5
 88:4
course 12:4 41:7
courses 11:25
court 1:1 4:2
 5:15 6:8 29:14
 55:21 79:8

89:14
Courtemanche
 1:9 62:17 63:3
 63:10,13,21
cover 31:20
covered 12:6
crime 25:10 35:3
 35:5 36:8,11
 37:9,12 45:25
 46:9 79:13
criminal 4:24
 5:2
criteria 46:11
 65:15 67:2
 68:7,22 70:14
 71:8 72:22,25
criterion 65:14
Cross 3:7
CROSS-EXA...
 85:11
crossed 24:7
crossover 9:19
 9:21,23,25
CSR 1:25 87:14
 88:21 89:18
curb 27:11 41:3
currently 4:19
 4:23,24
CVS 31:9 41:21
 45:15,21,21
 46:23 65:19

———— D ————
D 3:2
damage 80:23
danger 28:18
 33:24 36:6,22
 41:4 65:21
dangerous 63:20
date 12:18 90:24
Dated 88:19
day 24:5 64:16
 87:10,11 88:19
 89:7
days 89:13
deadly 12:20
 16:14 17:11,15

18:3,13 19:3
19:16,20 20:12
21:5,9 22:9
60:12,15,16,24
61:3
**dealing** 79:14
**decent** 32:2
**decided** 7:1
66:23 67:11
**decision** 68:17
75:13
**declare** 90:21
**defeat** 62:8
**Defendant** 2:8
**Defendants** 1:13
**defensive** 14:2
**definitely** 34:7
**delirium** 10:17
10:21 11:1,4,6
22:16,24 23:4
23:9,17 24:4,6
24:18 25:13,22
26:3,6
**delusions** 69:6
**demeanor** 38:13
51:15
**DENNEY** 2:3
**Department** 9:6
**depend** 22:2
**depends** 35:6
**deposition** 1:16
64:6 69:25
85:15 86:5
88:9 89:7,12
**deputies** 53:2
63:1 71:24
76:11
**deputy** 5:14
29:11,20 30:10
30:24 31:2
35:16 38:2,6
38:25 39:3,7,8
39:8,19,20
40:5,5 41:15
41:15 42:23,23
44:11,25 47:17
47:22 48:2

50:12,13 56:15
56:24 57:4
58:16,21 59:5
59:13,17,18
60:3,3,11,11
62:17 63:3,10
63:13,21 64:2
64:2 68:16
72:5,9 73:1,1
73:11 74:7,9
76:14 84:6
**describe** 11:10
**description**
31:12
**desired** 14:20
**detained** 40:14
44:16,17
**detaining** 84:19
**detainment**
61:15
**detective** 4:25
5:1,16 50:3
**detectives** 85:22
**detention** 5:13
**determination**
24:3,21 41:16
43:1,9 44:12
47:6 66:2 67:4
69:23
**determine** 25:4
30:17 42:6
**diagnosis** 25:21
**dialogue** 27:11
27:23 41:25
47:20 48:9,16
51:1 58:2
68:20,23 69:4
70:10 74:5
**DICKER** 2:15
**different** 48:6
**difficult** 50:13
61:6
**difficulty** 61:23
**direct** 3:7 4:11
21:8 43:5
**directing** 26:22
**direction** 22:3

27:9 49:21
51:5
**directly** 18:6
20:4,23 29:1
49:8,23 56:1
**disability** 38:19
**disagree** 27:25
**discomfort** 52:2
**Discount** 6:23
7:6
**discuss** 44:25
**Discussion** 4:17
48:11
**disorderly** 41:19
45:9,11 46:7
46:12,16 66:19
67:6,15 69:18
70:19 71:14
73:13 78:13,14
78:17 79:3
**dispatch** 38:7
**dispelled** 37:14
**display** 41:23
46:11 70:11
**displayed** 41:5
**displaying** 28:20
40:10 41:22
61:2 68:24
**disrupted** 46:22
46:23
**disrupting** 45:13
**distance** 32:2
**distribution**
89:11
**district** 1:1,1,12
1:12 2:13
**disturbance**
41:9 73:14
**division** 4:25
**Docher** 1:4 24:2
24:4,10,12
25:9,13 26:2,6
26:13 31:10
35:3 38:11,24
39:9,21 40:3
42:3 43:1,8,10
44:23 45:1,6

45:24 46:16
47:1,2,14 48:1
48:13 50:7,14
50:17 55:24
56:13 57:7
58:7,17 60:4
60:19,22 61:6
62:4,12 63:14
65:9 68:11
69:17 72:1,1,5
72:9 73:12,16
74:24 75:2,7
75:14 77:24
79:3 82:19
89:5 90:3
**Docher's** 53:13
58:22 59:6,14
59:19 79:21
80:1,6 81:5
**DOCHER-NE...**
1:4
**dock** 6:23
**docks** 7:11,14
**document** 90:21
**doing** 54:2 56:13
56:24 79:16
**door** 32:3 48:3
49:8,13 71:3,4
**doors** 31:22 32:4
67:25
**draw** 34:5,7,12
34:13,19
**Drawer** 2:5
**drawing** 46:21
**drinking** 41:22
74:24
**drinks** 72:2,3
**drive** 31:9 71:9
71:10 73:2
**drop** 27:9 32:22
33:11 34:11
36:3,20,24
37:5,15
**drop-down**
55:14,20
**dropped** 34:12
35:12 38:1

39:2 52:22
55:7 72:8
**dropping** 33:16
**drug** 42:14
75:18
**drugs** 57:9,16,18
57:19,21,22
58:6,8,9 70:12
75:3
**ducking** 52:16
**due** 73:13
**duly** 4:9 87:10

### E

**E** 3:2
**ear** 52:10
**earlier** 69:25
85:13
**easier** 48:7
**East** 2:10 89:3
**easy** 53:7 55:25
**EDELMAN**
2:15
**education** 11:25
**effect** 14:20,21
52:13
**effective** 82:14
**efforts** 61:11
62:8 80:11
**egregious** 59:3
**eight** 5:22
**either** 6:12
18:25 50:11
60:11 67:5
79:20
**elbow** 18:2,6,12
18:17 19:25
20:4,11,20
21:4,13,22
22:8 52:5 59:5
59:9,14,15,19
**elements** 45:10
**elevated** 11:8
22:22
**ELSER** 2:14
**emergency**
22:25 23:2,22

25:1 69:15
**emotional** 38:18
**emotionally**
34:18 38:13,16
38:17,21
**employed** 4:19
4:21 16:8
**employee** 88:14
88:15
**EMT** 6:24 7:16
7:20,22,25 8:2
8:10,12,22 9:3
**en** 23:23
**enforcement**
6:17 7:2 9:12
9:17,20 10:5,6
10:25 18:1,17
19:6,14,24
20:19 21:12,21
23:7 34:21
46:22 59:4
68:8 79:10
81:6
**engaged** 41:15
**engaging** 33:4
**engine** 11:11
**entail** 30:13
**ENTER** 90:2
**entire** 60:18
**Entrance** 31:19
**episode** 23:17
**Errata** 3:10
89:10 90:1
**erratic** 22:17
25:23 40:11
42:1
**escape** 79:10
**escorted** 47:17
**ESQUIRE** 2:6
2:11,17 89:4
**et** 89:5 90:3
**evaluated** 25:13
**evaluating** 30:20
**events** 65:3
**exactly** 32:1
38:6 39:23
41:2

**Examination**
3:5 4:11
**examined** 4:10
**exasterbated**
76:3
**excessive** 22:19
60:4
**excessively** 83:9
**excited** 10:17,20
11:1,4,5 22:16
22:24 23:4,9
23:17 24:4,6
24:17 25:13,21
26:3,6
**execute** 89:10
**execution** 3:10
**exert** 78:21
**exhibited** 72:24
**exhibiting** 22:23
23:3,8 24:16
60:22 61:17
65:14
**exit** 32:21
**exited** 36:2
**exiting** 32:10
**experience**
10:24 11:6
17:9,17 18:1
18:16 19:6,14
19:23 20:9,18
21:3,12,21
22:7
**experiencing**
22:16 24:4
26:3,6
**Expires** 87:16
**explain** 39:19
55:25 56:7
74:20
**exposure** 76:12
76:16
**express** 25:17
**extent** 20:6

───────
**F**
**face** 31:14 52:12
52:14,15,18,22

52:23 53:13,16
54:15,18,23,25
55:3,7 83:12
**facilities** 69:19
**facility** 46:23
68:5 69:12
**fact** 27:6 73:1,9
**factor** 35:12
37:19,25
**factors** 34:22
43:6 79:16
**facts** 90:21
**faculties** 45:13
46:24 70:11
**false** 28:1
**familiar** 12:20
**far** 5:19 12:15
13:8,12 16:4
24:7 27:18
30:14 31:4
33:13 42:14
43:20,20,24
44:7 45:20
46:2,4 49:16
56:14 61:2
66:2 67:9,10
68:2,14 78:25
85:4
**fast** 26:24 74:18
**fatal** 34:8
**Favalet** 74:9
**fear** 33:17,18
**feel** 52:11 76:6
**feet** 31:24 32:2
48:19 71:3
**fell** 54:3
**felt** 33:23 49:17
**FF** 87:15
**field** 30:2,3,7,8
30:15 31:6
**fighting** 15:5
**filed** 89:14
**final** 66:2 67:11
68:17
**financially** 88:17
**find** 40:24
**finger** 52:19

56:6
**fire** 1:12 2:13
7:2,23 9:6
**firefighter** 6:25
7:1,16,20 8:1
**firefighting** 9:4
**first** 4:9 24:9
31:10 32:3
34:10 63:2
83:2
**fist** 32:18,19
35:10
**fist-grip** 26:20
**flail** 80:22 83:20
**fled** 42:10
**flee** 39:16
**fleeing** 29:15
**flees** 28:23
**flight** 28:17 41:4
51:4
**Florida** 1:1,11
1:23 2:5,10,16
87:4,15 88:3
89:3,20
**focus** 34:19
35:14 36:25
**focused** 28:3
**focusing** 35:15
**following** 4:1
72:1
**follows** 4:10
**foot** 42:10 62:23
79:19,25 80:5
80:25 81:5,17
82:9
**footage** 65:2
**force** 11:13,20
11:21 12:1,4,6
12:20 16:14
17:11,15 18:3
18:11,13,21
19:3,10,16,20
20:12,16 21:5
21:9,18 22:2,9
22:13 34:6
60:4,10,10,12
60:15,16,23,24

61:3 62:11
78:22,25 79:12
**forceful** 48:24
**forcible** 20:4
**forearm** 14:17
15:7 51:25
52:22 55:7
56:8
**foregoing** 88:9
90:21
**form** 15:1,9,24
16:16 17:12,20
18:4,19 19:9
19:17 20:2,13
20:22 21:6,16
21:25 22:10
23:11,18 24:24
25:15 26:8
34:1 36:9,16
37:11 38:14
39:22 42:8,16
43:3,19 44:5
44:14 46:18
53:23 54:19
55:10 58:23
59:8,21 60:5
60:13,25 62:13
65:11,25 66:6
66:14,21,25
67:7,22 68:13
69:21 70:2,20
71:15 72:17
73:17,23 78:2
78:10,23 79:6
79:22 81:7,15
82:1,4,11,20
**formulating**
36:19
**Fort** 2:10 89:3
**Forum** 89:19
**forward** 26:20
48:8 49:6,17
49:18,18 54:4
56:2 76:20
**forwarded** 3:10
89:13
**found** 27:15

37:17 89:10
**four** 53:7
**FPR** 1:25 87:14
  88:21 89:18
**free** 40:7 55:1
  66:5 84:17
**freight** 6:23
**front** 15:10
  20:24 26:23
  31:17 33:9
  38:3,4,12,24
**frontward** 48:24
**full** 10:7 12:7
  68:7
**fully** 67:11 68:6
  69:23 70:25
  72:22
**further** 28:1
  35:18 37:19
  39:4 44:17
  52:5,17 57:10
  80:17 81:2,20
  83:6,20 85:1
  88:13

**G**

**gain** 13:17,19
  14:8,21,25
  16:22 17:4
  58:17 81:19
**games** 72:3
**gated** 45:23
**general** 19:19
  45:14 47:20
**generally** 35:1
  57:1
**getting** 42:17
  50:21 61:9,15
  72:19 74:18
  75:9 83:8
**GIUFFREDA**
  2:9 89:2
**give** 4:5 10:22
  12:18 28:14
  38:9 53:5 64:6
**given** 31:12
  77:11 85:14,21

**giving** 26:24
  27:12 28:20
  29:9,13 77:2
**gloves** 54:12
  57:4
**go** 4:15 6:19 7:1
  7:16 9:14,17
  9:21 10:4,10
  10:13 15:1,9
  15:24 16:16
  17:4,12,20
  18:4 19:17
  20:2,13 21:6
  21:25 22:10
  23:18 24:24
  25:15 26:8
  32:8 34:1,11
  36:16,25 37:17
  38:14 41:1
  42:8 44:5,14
  46:18 48:18
  49:6,8 51:9
  53:23 55:12
  60:5,13,25
  62:13 66:5,12
  70:2,6 72:17
  76:21 78:2,10
  78:23 79:6,13
  81:7,15 82:1,5
  82:11,20 83:4
  84:15,20,21
  85:4
**goal** 35:14 36:25
  61:20
**goes** 79:15
**going** 27:23
  29:17 35:8
  37:13 44:18
  47:2,4,8 48:10
  48:18 53:9
  55:18 63:5
  65:9,16 67:8
  67:20 68:1,11
  69:19 70:1,6
  71:9,10 75:6
  75:10,12 77:15
  77:21 80:22

83:4 84:16
  86:7
**gotten** 42:13
**grab** 51:8,12
  84:17
**grabbed** 80:14
**great** 17:19
  18:18 19:8
  20:1,21 21:14
  21:23 54:10
**grinding** 52:14
  54:25
**ground** 49:20
  50:18,19 51:20
  53:22 54:16,17
  57:24 62:19,21
  76:13 82:19
  83:4,7
**group** 62:9
**guardian** 1:5
**guess** 26:15 65:6
**gun** 30:23 33:20
  34:5,7

**H**

**half** 6:14 30:17
  30:18,20,20
  41:11
**halfway** 12:13
  32:17
**halted** 75:22
**hand** 4:3 26:18
  32:11,12 33:12
  34:11,25 35:2
  36:24 41:13
  52:8,12,20,21
  52:23 53:17,18
  53:19,21 54:15
  55:2,3,4,13
  56:1,4,10,11
  59:17
**handcuff** 51:24
  52:3,4
**handcuffed**
  47:14 69:17
  70:15 77:10,13
**handcuffing**

67:9 68:2
**handcuffs** 41:13
  41:17,24 42:4
  42:25 43:9,17
  44:3,8,18,19
  44:22 45:25
  46:2,4 47:1,3
  57:7 65:13
  67:23 70:9
  71:12,13 73:19
  73:21,24 80:15
  83:16
**handle** 26:21
**handling** 38:9
**hands** 49:6
  52:17 73:12
  81:18
**happen** 36:23
  37:23
**happened** 48:13
**happens** 50:17
**hard** 55:2
**harm** 17:19
  18:18 19:8,11
  20:1,6,21
  21:15,24 27:8
  83:11
**harming** 81:20
**He'll** 86:5
**head** 13:4 21:14
  21:23 22:8
  48:18,22 51:18
  51:19,21 52:7
  52:8,11,25
  53:9,14,20,22
  54:1,1,2,5,15
  54:16,20,22
  55:15 56:2,3,3
  56:9 57:5 59:6
  59:14,19
**head-to-head**
  54:4
**headed** 49:21
**headless** 27:14
  40:14 72:8
**headlight** 35:9
**hear** 76:7

**heard** 12:23,25
  13:1,1,2 58:12
  62:24
**heart** 11:8 22:22
  61:22
**heavily** 61:18
  76:2
**Hecht** 2:6 3:7
  4:12,15,18 6:1
  15:17,19 16:6
  16:19 17:16,24
  18:8,24 19:12
  19:22 20:8,17
  21:1,10,19
  22:5,14 23:14
  23:25 25:6,25
  26:11 34:23
  36:12 37:3,22
  38:22 40:1
  42:18 43:7
  44:1,10,21
  46:25 47:11,13
  48:12 54:13
  55:5,16 58:25
  59:12,22 60:8
  60:17 61:4
  62:16 65:23
  66:3,8,17,22
  67:3,13 68:10
  69:7,24 70:4
  70:22 71:18
  73:4,20 74:1
  77:19 78:7,16
  79:1,18,24
  81:3,11,21
  82:7,15,23
  85:6 86:4,7
**heel** 62:2
**height** 50:9
**held** 5:11 27:14
  27:20 28:12
  34:3 80:24
**help** 29:17 65:16
  65:21 75:11
**helping** 30:20
**Hey** 43:21 47:7
  65:18 68:18

high 6:19,21
    49:4
hired 7:4
hit 42:17 54:4
hitting 54:5
hobble 83:25
    85:3,4
hold 35:11 51:19
    51:20 52:6
    54:6,6,20 55:1
    76:25 77:5,9
    80:19,20
holding 32:20
    32:23 33:10
    35:4,8,9 36:1,8
    36:20 49:15
    54:8 55:11
homicide 27:16
honestly 53:10
Horizons 69:15
    71:10
Hospital 69:13
hours 7:23,24
    10:2,19,23
house 27:20
hub 69:16
huddled 39:24
huge 66:15
hurt 39:17 52:14
    54:4

I
Ice 29:6 72:4
Ice-type 29:7
identify 10:16
identity 29:10
illegal 34:24
    57:9,18,22
    58:8 75:3
illicit 57:16
imagine 45:22
immediate
    24:18 25:1
    48:20 84:22
immediately
    28:4 32:6,7
    34:15 59:16

immobilized
    83:19
impairment
    70:12
improvise 80:19
improvised
    81:18,22
in-service 12:5,7
    12:7,11
incident 11:3
    24:5
including 62:3
increased 36:22
    61:18
incredibly 50:11
independent
    1:12
Indian 7:18 9:23
    10:5,7
indicating 49:13
indications
    28:20
individual 14:25
    16:21
individual's
    17:10
individually 1:8
    1:9,9,10,11
influence 42:13
    45:12
information
    26:25 27:13,18
    27:21 28:11
    29:9,13,16
    38:8 68:7
initial 26:14
    40:4 44:7,19
    46:2 51:4
    61:14 68:15
    75:23
initially 28:14
    30:14 33:11
    41:2 47:3 49:2
    50:20 51:17
    52:1 53:25
    62:25 65:7
    68:16 70:3,5

70:21 71:16
    75:22 76:9
    80:7,14
initiative 30:19
inject 75:6,14,17
injected 53:4
    75:20
injection 75:10
    77:2,7,11
injure 81:2
injured 80:16
injury 54:8
    80:17,23 83:20
inside 14:11,17
    35:22 48:19
instability 39:12
instances 78:4
instruction
    33:14
intending 22:3
intent 18:21
    20:16 21:17
    22:3,12 35:25
intentional 21:8
intentionally
    18:6
interact 23:16
interaction 24:1
    26:13 33:4
    60:19 61:16
interactions
    28:3
interest 9:2,9,11
interested 9:4
    88:18
intermittent
    63:9 85:2
interrupt 15:14
intersection
    28:25 31:16
intox 79:3
intoxicated
    41:23 68:25
    72:1 73:14
intoxication
    39:12 40:12
    41:20 42:12

45:9,11 46:7
    46:13,17 66:19
    67:6,15 69:18
    70:19 71:14
    73:13 78:14,15
    78:17
investigate
    43:24
investigation
    4:25 37:20
    40:23 41:14
    42:5,22 43:10
    64:21 71:21
investigations
    5:2,15 6:11
involved 13:7
    63:13 64:1,3,4
    67:5 70:11
    72:14 75:13
    84:19
involvement
    62:17
involving 53:2
irrational 11:7
issued 83:24,25
    84:12

J
J 1:10
jail 6:2 47:4,5
    67:20 68:4,12
    69:9,10 70:1
    71:10 73:2
JANICE 1:4
jaw 19:8,16,19
job 9:6
joined 8:23 9:16
    10:9,14 11:14
    11:15,16
joint 16:5,9
    83:17
JOLLY 2:9 89:2
Jose 1:11 74:3
Joseph 71:19,24
    72:14 73:6,11
judgment 25:20
Julie 2:17 85:7

julie.tyk@wils...
    2:17
jump 50:22
jumping 27:2
jumpy 27:2
June 87:11
    88:19 89:1
justifiably 59:25
justify 60:24

K
keep 28:2,16
    35:14 54:16
    56:2 63:16,22
    80:17,21,25
    83:8,10
KEN 1:10
kept 63:23 84:12
kicked 56:20
kicking 56:18
    76:20
kill 51:3 69:3
    72:6
kind 17:7 25:19
    29:15 30:20
    31:13,14 32:25
    33:12 51:7
    52:10,17 65:20
knee 49:3,3
knees 50:21
    51:11
knew 72:7
knife 26:19
    35:11
know 12:16
    13:23 19:20
    25:18 27:7
    35:24 38:19
    40:11,16 41:1
    42:17,20 47:21
    47:21 49:16
    50:24 51:4,13
    52:9,9 64:10
    64:14 65:18
    68:14,25 69:2
    73:1,5 75:20
    75:22 76:15

84:6,9,10
85:16
**knowledge**
22:17
**known** 16:15
29:7 80:3

**L**

**Lakes** 2:4
**landed** 76:21
**Lanosa** 1:25
87:14 88:6,21
89:18
**large** 62:2,5
**late** 8:11,11,14
8:15,18
**Lauderdale** 2:10
89:3
**law** 6:17 7:1
9:11,17,20
10:4,6,25 18:1
18:17 19:6,14
19:24 20:19
21:12,21 23:6
34:21 46:22
59:3 68:8
79:10 81:6
**law-enforcem...**
70:14 71:8
**Lawnwood**
69:14,15
**lead** 17:19 24:17
**leap** 48:23
**learn** 81:12
**learned** 14:1,2
81:24
**learning** 82:3
**leave** 40:7
**leaving** 65:17
73:2 85:4
**left** 50:14 51:12
**leg** 56:22 83:22
83:24
**legal** 1:5
**legitimately**
28:12
**legs** 48:8 56:16

**let's** 44:8
**letter** 3:9 89:15
**level** 40:11 42:12
53:22 54:17
60:23 61:8
63:8 76:16
**liability** 40:18
66:15
**life** 33:17
**Lifeline** 7:3 8:2
8:7,23,25
**lightly** 76:7
**Lincoln** 6:20
**line** 43:22 90:6
**lines** 41:19 48:18
**lips** 56:5
**liquor** 72:3
**listed** 89:16
**little** 5:3,19,24
31:20 42:1
**LLP** 2:15
**location** 27:19
28:14
**locked** 67:24
**long** 4:21 5:1 6:8
7:6,14,20 8:7
9:25 38:23
39:3 53:2
77:16
**longer** 9:2 35:12
37:1,25 39:5
39:16
**look** 70:13 74:5
**looked** 48:21
49:3,5,24
56:21 76:14
**looking** 9:5 26:5
26:10 32:19
53:6 79:9
**looks** 54:24
**lose** 53:10
**lot** 26:24 27:3,12
27:12,22,23
29:13 31:9
41:8,11 45:15
45:16,18,19

56:18,19 80:13

55:18 58:1,12
73:8
**loud** 46:21
**loudly** 34:15
**Lucie** 1:10,11,23
2:13 4:20 5:10
6:15 8:23,25
9:6 10:9 11:14
11:19,24 13:5
14:23 15:20
16:8 19:1
27:15,22 57:16
69:13 72:8
81:13

**M**

**M** 2:11
**ma'am** 4:7
**main** 69:16
**maintain** 29:3
**making** 22:18,18
40:16 61:14,18
66:1
**maneuver** 33:25
81:6,22
**maneuverabili...**
83:16
**Mangrum** 1:8
1:17 4:8,14
50:3 71:25
87:9 88:9 89:2
89:22 90:4,24
**manipulate** 81:9
**manipulation**
16:10 83:17
**manipulations**
16:5
**manner** 28:18
34:3 35:10
**mark** 32:17
**martial** 13:3
**MASCARA**
1:10
**mass** 13:11
15:23 16:22
17:11,18 58:17
58:22

**matter** 79:2
**mean** 12:10 30:5
38:20 46:3,20
70:5 83:4
**means** 72:11,15
**meant** 50:1
85:18
**media** 64:22
**medical** 7:3 8:2
8:8 22:25 23:2
23:10,22 24:7
24:11,18,22
25:1,3,21
74:22 75:8,11
75:19,23 83:3
84:23,25 85:3
**medically** 75:15
**medication**
75:14,21
**medications**
42:15 75:3
**meet** 15:13 33:7
34:5 65:15
**meets** 46:12 68:7
71:8
**mental** 38:19
39:12
**mentioned**
45:15
**met** 33:8,8 67:1
68:21 70:13
**metal** 26:20
**middle** 33:7
**mind** 24:7 27:24
**mine** 84:12
**minute** 77:16,20
77:25 82:17
**minutes** 53:7
**misdemeanor**
71:6 78:18,19
**misdemeanor-...**
79:12
**moments** 36:13
**monitoring**
65:18
**month** 12:19
**months** 6:10,13

**MOSKOWITZ**
2:14
**mother** 1:4 72:7
**motion** 48:24
51:18 52:17
56:9 76:20
**mouth** 56:4
**move** 55:2
**movement** 27:3
**movements** 41:5
51:15 52:16
**moving** 48:22
54:21 58:3
76:8
**multiple** 43:6
85:19
**murder** 79:4
**muscle** 15:16
62:2,6,9

**N**

**N** 3:2
**name** 4:13 74:5
80:4 89:15
**narrative** 73:10
**Natty** 29:6 72:4
**Natural** 29:7
**nature** 25:4 53:8
71:22 74:16
79:13 83:3
**near** 33:8 38:5
**nearest** 68:5
69:12
**necessarily** 31:4
**necessary** 24:22
60:23 62:12
**neck** 13:11,15
13:19 14:8,18
14:19 15:8,10
15:13,22,23
16:3,12,22,24
17:4,11,19,22
20:24 58:17,22
79:21
**need** 15:3 28:13
47:11 61:2
77:4

**needed** 77:2
**needs** 34:16
**neither** 60:2
**nerve** 13:10,15
    14:8,19 15:8
    15:22 16:2,11
    16:22 17:10,18
    17:23 58:17,22
**nerves** 16:1,5
**never** 13:1 17:3
    25:12 35:15
    42:13 61:22
    64:4 65:9 66:1
    67:24 69:22
    70:25 71:2,4
    85:4
**New** 69:15 71:10
**Newman** 1:8
    35:16 38:25
    39:4,7,8,20
    40:5 41:15
    42:23 44:11,24
    44:25 47:21
    48:4 49:5,5,18
    50:13 51:21
    56:24 57:4
    58:16,21 59:5
    59:13,18 60:3
    60:11 64:2
    71:24 72:2,5,9
    73:1,2,11
    76:14 84:6
    89:5 90:3
**Newman's** 47:10
    47:18 48:2
    59:17 68:16
**news** 64:23
**night** 64:16
**nine** 5:22
**nineteen** 77:20
    77:25 82:17
**normal** 22:20,21
    25:24 26:16
    39:13 42:2
    45:13 46:23
    48:16,16 52:13
    74:16

**normalcy** 41:21
**normally** 14:10
    17:3 65:18
**North** 2:15
**nose** 19:25 20:5
    20:11
**Notary** 87:15
**note** 25:17
**notes** 88:12
**notice** 89:7
**noticed** 52:7,16
    52:19 57:3
    76:13,18 80:10
**number** 10:22

_____

**O**

**Oath** 3:8 87:1
**Object** 15:1,9,24
    16:16 17:12,20
    18:4 19:9,17
    20:2,13,22
    21:6,16,25
    22:10 23:11,18
    24:24 25:15
    26:8 34:1 36:9
    36:16 37:11
    38:14 39:22
    42:8 43:3,19
    44:5,14 46:18
    53:23 54:19
    58:23 59:8,21
    60:5,13,25
    62:13 65:11,25
    66:6,14,21,25
    67:7,22 68:13
    69:21 70:2,20
    71:15 72:17
    73:17,23 78:2
    78:10,23 79:6
    79:22 81:7,15
    82:1,11,20
**Objection** 18:19
    55:10
**observations**
    45:8 73:25
**observed** 46:15
    71:16

**obstructed**
    61:24
**obvious** 34:4
**obviously** 55:17
    57:12
**occurred** 27:16
**offender** 29:8,12
**offenses** 40:13
**offensive** 33:25
**office** 4:20 5:5
    5:10,12 6:16
    7:5 8:24 9:1,16
    9:16 10:10,14
    11:14,19,24
    13:5 14:24
    15:21 16:9
    19:1 81:14
**officer** 10:25
    18:2,17 19:7
    19:15,24 20:19
    21:13,22 23:7
    30:2,3,8 31:6
    33:2 59:4 73:6
**officers** 67:5
**official** 11:20
**Oh** 14:1 28:5
    32:8
**okay** 42:3 48:18
    55:25 67:14
    68:11 70:8
    80:10,10
**old** 7:9,11
**once** 18:20
    20:15 25:22
    34:9,12,17
    35:6,11 36:24
    39:7 41:24
    49:14,21 50:19
    51:11 54:10
    55:23 56:3
    57:3,14 62:20
    65:13 70:9
    84:20
**one-on-one**
    79:14
**ongoing** 41:7
**onlookers** 41:10

    63:22
**onset** 41:22
**open** 28:25
    45:17,22 48:3
    48:4 53:19
**open-palm**
    53:18
**opened** 48:5
**opinion** 17:6
**opposite** 57:2
**option** 84:15
    85:5
**options** 66:4
    82:8
**Orange** 2:15
**order** 86:7
**ordered** 86:6
    89:9
**ordering** 89:13
**original** 89:13
**originally** 67:23
**Orlando** 2:16
**outside** 63:2
**overall** 80:8
**Ow** 52:14

_____

**P**

**p.m** 1:21,21 4:1
    5:25,25 86:10
**P.O** 2:5
**PA** 2:4,9 89:2
**pacing** 27:3
**Page** 3:5 90:6
**pages** 1:19 3:6
    85:19 86:1
    88:9
**pain** 11:9 52:2
    56:22 62:9
    83:13
**palm** 2:4,5 53:17
    62:2 87:5 88:4
    89:20
**palmed** 52:10
**paramedic** 8:20
    9:8,10 74:3
**paramedics**
    63:11 74:6,14

    74:23 75:1,5
    76:21
**Park** 6:20
**parking** 31:9
    41:8,11 45:15
    45:16,18,19
**part** 84:8
**parties** 88:15
    89:11
**parties'** 88:16
**Parts** 6:23 7:7
**passed** 53:7
**passenger** 48:3
**Patricia** 1:25
    87:14 88:6,21
    89:18
**patrol** 5:6,7,14
    5:20 26:16,23
    32:4,6 33:9
    48:25 50:25
    51:3 67:10,18
    67:24,25 68:22
    70:24,25 72:21
    83:5
**pavement** 54:5,7
    54:21,25 83:12
**Pavilion** 69:14
**paying** 53:10
**peace** 41:21
**penalties** 90:21
**people** 11:1 28:8
    28:21 41:10
    43:2,5 48:7
    51:2 69:3,3
    73:8 84:18
**percent** 74:8
**perception**
    53:11
**perjury** 90:21
**person** 14:22
    19:7,24 20:10
    20:20 21:3,13
    21:22 26:16
    34:18 39:13
    41:23 84:17
**person's** 18:2,18
**personally** 87:9

personnel 23:22
phase 30:8,11,12
  30:13,14,15
phases 30:6
Phipps 1:22
  89:19
phone 2:15 65:2
phonetic 74:9
physical 37:1
  62:8 81:10
  85:1
physically 27:1
  51:14 61:10,12
  63:17 64:4
  76:23
pick 34:20 51:8
  82:18 83:3
place 28:25
  45:14 48:19
  68:18 89:19
placed 41:12,17
  42:4,25 43:8
  43:16 44:22
  46:4 47:3,9
  48:14 57:7
  67:15,18,23
  68:16 70:9,18
  70:23 71:11,13
  73:19,21,24
  81:4
placing 44:3
  45:25 46:1
  47:1 68:3 80:5
Plaintiff 1:6 2:2
play 35:18 39:5
  43:6
played 77:18
please 4:3,13
  89:7,10,15
plural 85:16,25
point 17:7 24:2
  24:10,17 25:5
  27:1,5,7,9
  28:22 29:4,19
  32:21 33:13,15
  33:20,21 34:9
  35:13,18,24

36:19 37:4,8,8
37:12,14,18,25
38:17,19 39:2
40:2,7,19 41:7
41:11,18 42:2
42:11,15 43:23
44:17,17,18
45:6 48:20
50:23 51:16
52:22 54:3
56:5,20 57:20
57:24 58:4,5
58:12,13,15
59:4 60:18,21
61:11 62:23
63:4,9,15,16
63:20,25 65:15
66:1 67:12
68:25 70:18
71:5 72:20,25
74:11,21 75:10
76:8,12 78:9
78:12 79:8
80:16 82:6,13
82:16 83:7,8
84:16,21,23,25
85:5
pointing 28:7
  31:15 41:6
police 9:14 19:2
  50:14 81:12
  83:22
policies 11:20,21
popping 56:8
Port 1:23 69:13
portion 7:22
  52:11
position 4:23 5:4
  17:6 26:18
  39:15 56:11
  57:2 76:5 77:6
positioning
  39:10,20 40:6
  42:5,24 56:15
positions 5:11
positive 68:15
  74:8

possibility 36:5
  43:12 68:21
possible 28:11
  42:21 56:1
  82:4
possibly 25:18
  34:20
potential 36:6
  43:12,16,17
  65:12
potentially 34:8
  34:18 40:13
powers 30:21
  31:1,5
preparation
  85:14
prescribed 75:2
prescription
  57:18,21 58:9
presents 34:21
pressure 13:10
  13:19 14:8
  15:22 16:1,11
  16:21 17:4,7
  17:10,14,18,22
  52:15 53:13,15
  54:14 56:2
  58:22 80:25
  81:4 82:10
pretty 20:5
prevent 81:19
Prima 28:7,23
  49:23
prior 6:15 7:2
  11:15 12:16
  26:1,6 31:6
  32:9 33:16
  36:2 37:4
  41:16 42:3,24
  43:8 44:3
  45:24 46:1,4
  53:3 57:6 63:8
  63:17 65:1
private 7:4 8:3,5
  45:18,21
probable 46:12
probably 32:16

procedure 68:2
  75:11
proceedings 4:1
  86:10
process 17:4
  28:11 46:21
  71:17
professional
  23:10 24:11
  25:21 88:7
program 9:25
  30:15
proper 34:6
protocol 71:5
proximity 31:21
  56:4
public 41:8
  45:14,16,17,18
  45:22 87:15
pull 31:8 36:25
  55:13
pulled 29:20
  31:16,23 32:9
  76:4
pulling 31:11,12
  83:15
pulse 76:6,6
punch 14:12
PURDY 2:9
  89:2
purpose 21:18
  22:13 23:24
  60:1 62:7
pursuit 62:24
push 38:5 49:9
  49:11 52:22
  56:9
pushed 49:12,14
pushing 52:4
put 32:3 39:15
  44:8 48:1,8
  52:15 73:12
  83:5,5

────────────
Q
────────────
question 16:7
  42:4,19,22

85:10 86:2
questions 26:25
  29:18 77:22
  85:7,7,8
quickly 32:24
  33:3 50:22

────────────
R
────────────
R&L 6:24
radio 23:20 38:9
  62:24,25
radioed 62:22
raise 4:2
ran 39:5 49:16
  84:2
rapidness 76:1
rate 11:8 22:22
  61:22
react 30:19
read 3:9 55:18
  71:19,21 72:12
  86:5 89:10,12
  90:21
readily 57:16
  84:1
realize 34:20
realized 32:13
  32:15 36:1
  51:14,24 54:10
  56:17 57:3
realizing 34:17
really 26:25 72:4
rear 52:11
reason 43:21
  44:19 90:6
reasonable 82:6
  82:8
reasonably
  79:17
recall 13:21 16:2
  16:3,4,13,18
  25:8 26:12
  27:13 36:13
  38:6 45:3
  47:22 49:16
  50:7,9 59:10
  62:21 66:2

69:25 72:13
74:4,6,15 75:4
82:3 83:23
**receiving** 68:5
69:12
**Recess** 5:25
**recollection** 13:9
**recommend**
66:10
**record** 4:16,17
48:11 88:12
**recordings**
64:19
**recovery** 76:5
**reenacted** 55:22
**reference** 27:13
**referred** 28:8
85:15
**referring** 11:11
85:25
**regain** 52:24,24
55:15 56:10
**regarding** 11:20
**regards** 24:1
29:25
**registered** 29:12
51:25 88:6
**regular** 31:2
**relates** 10:20
**relation** 63:4
**relative** 88:14,15
**relatively** 74:18
**relay** 25:18
**remain** 28:5
**remainder** 9:19
**remaining** 36:18
**remember** 10:2
38:5,8 39:23
41:2 50:10,20
56:15 57:23
63:2 67:10
73:7 74:25
75:5,8
**report** 25:7
71:19,23 88:8
**Reported** 1:24
**reporter** 3:9 4:2

55:22 88:1,7
**reporting** 1:22
73:6 89:19
**reports** 31:5
**request** 24:10
25:3
**requested** 88:11
**required** 24:18
**rescue** 63:1
76:10
**resistance** 79:16
81:10 82:5
85:1
**resisted** 61:19
**resisting** 58:3
61:21 78:1,5,5
79:10
**resource** 5:15
6:4
**respond** 24:11
62:25
**responded** 26:22
**responding**
22:20 25:23
58:11
**response** 11:8,12
22:21 25:1
28:13 48:20
52:3 83:12
**responsive** 58:13
**restrain** 56:12
56:16 63:14
76:24
**restrained** 78:5
**restrains** 83:24
**restraint** 84:1
**restraints** 41:13
83:22
**result** 67:9
**return** 89:16
**returned** 89:11
**review** 88:10
**reviewed** 31:6
64:7,8,11,17
64:18 65:5,6
85:14
**reviewing** 85:15

**revisited** 37:16
**right** 4:3 7:8
29:18 31:16
32:4,17 33:8
51:22,23 54:23
59:6,11 60:1
**risk** 28:17 41:4
**River** 7:18 9:23
10:5,7
**road** 5:7,18
69:13
**Robinson** 1:9
29:11,21 30:10
38:2,6 39:8,19
40:6 41:15
42:23 47:23
49:20 50:13
56:15,17,18
60:3,11 64:2
71:25
**room** 69:15
**rope** 83:25 84:4
**Rosario** 1:11
74:3
**roughly** 6:7,13
7:15 8:9
**route** 23:23
65:21
**RPR** 1:25 87:14
88:21 89:18
**run** 28:23 49:1,2
50:22,24 51:6
**running** 42:17
51:3 62:22

_____
**S**
**S** 2:6
**safe** 82:5 84:20
84:22
**safely** 17:8 35:13
77:6 82:19
**safety** 23:13
29:3 33:3
34:22
**sat** 47:10 48:9,9
72:23 76:19
**saw** 26:17 31:18

32:6,12 33:15
35:17 45:8
49:3 55:4
56:17,20 59:9
59:15,16,16
64:4 65:7
76:20 77:23
79:25
**saying** 28:8,19
36:13 65:17
71:9 72:4
74:25 75:4
**says** 36:21
**SCAROLA** 2:3
**scene** 23:13
24:11 29:3
63:24 66:12
74:7,10,18
84:20,21
**school** 5:14 6:4,5
6:6,19,21,24
7:17,20
**screwdriver**
26:18 27:6,10
32:10,13,15
33:10,16,24
34:14,14,19,24
35:1,4,13,16
35:17,21 36:2
36:3,8,14,21
37:2,5,15,24
38:1 39:3,4
**SEARCY** 2:3
**seated** 28:6
**second** 32:5
77:21,25 82:17
**second-degree**
78:18
**security** 5:16 6:8
**see** 17:14 28:11
28:17 29:14
30:19 31:10
32:10 41:10
49:19 51:21
52:3 58:16,19
59:2,3,5,13
60:16 61:2

63:18 64:19
67:1 72:10,22
76:7 79:5,19
80:16 81:5
82:13
**seeing** 63:2
**seen** 58:20 65:2
**semicircle** 54:23
**sense** 22:18
40:16 61:14,18
**separately** 71:25
**serious** 40:13
**session** 12:17
**sex** 29:8,12
**shake** 52:12
**Sheet** 3:10 89:10
90:1
**sheriff** 1:10 31:2
**sheriff's** 4:20 5:5
5:10,11 6:16
7:5 8:24 9:1,16
9:16 10:10,14
11:14,19,24
13:5 14:24
15:21 16:9
19:1 81:14
**shifty** 27:2 41:5
**SHIPLEY** 2:4
**short** 50:11
**shoulders** 62:3
80:23
**show** 77:15
**showed** 74:6,9
77:20 83:12
**showing** 39:11
**shut** 67:25 71:4
**sic** 76:3
**side** 9:18 13:15
14:18,19 15:10
15:11 17:22
19:7,5,19
21:23 22:8
29:2 48:4
51:12,22,23
53:14,16,19
56:1,7 57:2
59:6,11 75:19

76:4
sidebar 45:4
74:20
sidebars 47:7
sideways 49:7
sign 3:9 9:7
89:12,15
signature 89:8
89:15,21
Signed 87:11
significant 52:1
signs 10:17 11:5
22:15,23 23:3
23:8 25:2,18
41:22 68:24
simple 71:9
single 85:17
sir 5:13,21 6:18
8:6 11:22
14:10 18:9
66:20 75:16
sit 27:10 41:3
48:5,8
sitting 28:4 33:1
72:20,21
situation 15:3
32:25 79:2
situations 13:16
14:15
Six-foot-one
50:4
slid 56:3
sliding 52:17
55:3
slipped 51:25
slipping 52:21
slow 32:7 80:11
small 27:3
smell 29:5 57:13
social 64:22
society 45:13
solemnly 4:4
somebody 26:19
27:14,20 28:12
33:1 40:13
84:20
someone's 15:8

16:12,22 17:18
somewhat 63:7
77:1 80:9
83:19
sorry 50:1 82:24
sort 11:9 17:4
33:25 39:12
41:21 58:8
65:2 80:10
83:21
south 49:25
SOUTHERN
1:1
Southwest 1:23
speak 73:5
speaking 38:11
38:23 44:12
73:7
special 1:12 5:15
6:11
specific 10:22
12:18 13:22
16:7 42:19
47:7 57:10
specifically 11:2
13:2 16:3,13
24:6 42:22
45:4 55:23
73:7 74:4 82:3
specifics 74:15
speculate 37:18
speculation 84:8
spent 5:17 11:18
spoke 38:3 71:24
St 1:10,11,23
2:13 4:20 5:10
6:15 8:23,25
9:6 10:9 11:14
11:19,23 13:5
14:23 15:20
16:8 19:1
27:15,22 57:16
69:13 72:8
81:13
stab 34:4
stabbed 33:18
stabbing 34:6

staging 23:23,23
stand 26:23 28:4
51:8
standing 31:18
31:21,25 39:20
39:23 41:5
63:17 80:13
start 33:3 56:11
started 12:5,9
34:15 44:19
55:2 65:14
68:20 70:10,13
75:24 80:11,13
state 4:13 9:24
10:5,8 27:24
87:4,15 88:3
stated 90:22
statement 72:12
85:17,17,20,21
statements 42:1
64:8,9,15
85:16,18
STATES 1:1
stating 34:16
stayed 53:22
stenographic
88:12
stenographica...
1:24 88:8
step 38:7 48:6
stepped 76:9,17
stimulus 11:9
22:20 25:24
83:13
stomach 76:7
stood 38:2 74:10
74:11 80:7,8
stop 52:15 55:13
58:3,3,3 61:20
80:11
stopped 32:1,2
straight 31:13
56:8 80:20,20
81:1,18 83:15
street 51:5
street-wise 50:2
strike 12:23,24

13:6,9,24
14:12 15:8
16:15 18:2,6
18:12,14,17,21
18:22,22 19:19
20:4,16 21:8
22:4,24 23:1
51:19 52:23
54:15,17 55:7
56:21 59:6,9
59:14,15,19
60:20 80:12
strikes 54:2 62:2
62:5
striking 19:7,15
19:24 20:10,20
21:3,13,22
22:7 54:1 56:9
strong 72:4
struck 28:24
33:19 49:5
55:9 83:11
struggle 13:7
16:20 24:12,13
24:23 25:22
26:2,7 49:11
53:1,3,12 55:6
57:25 58:8,15
59:7 61:5,8
62:1,11,19
63:5,6 64:1,20
76:24,25 77:8
80:12
struggled 61:10
struggling 51:21
77:7
stun 13:13 14:1
14:5,6,7,10,14
14:21,25 15:7
subdue 61:11
subject 14:16
79:15
subjects 63:18
submit 31:5
suffering 11:1
Suite 2:10,15
89:3,19

SUMMER 2:11
89:4
summer@pur...
2:12
Sunrise 2:10
89:3
sure 11:3 20:7
51:6 53:21
63:19,23
surrounding
39:9,10
surroundings
22:19
surveillance
65:2
suspect 43:25
swear 4:4
sweating 11:8
22:19
sweaty 52:8
sworn 4:9 87:10
symptoms 10:17
11:5 22:15,24
23:3,9 25:2,19

_____

T
tactic 14:2
tags 74:5
take 9:11 30:18
33:20 35:9
37:24 38:25
47:4,8 68:4
69:8,11,14
78:20 86:8
89:7
taken 47:2 57:22
67:20 68:12
70:1 76:11
takes 42:14
79:17
talk 27:12 38:10
72:24
talked 66:12
talking 26:24
40:14,21 53:1
57:11 65:3
69:2 71:6 72:6

79:11
**tall** 50:3,7
**taller** 50:10
**taped** 64:9,10
**taught** 14:11
**Tavares** 1:4 24:2
  24:3,10 25:9
  25:13 26:2,5
  26:13 31:10,25
  35:3 37:5
  38:11,24 39:9
  39:21 40:2
  41:16 42:3,6,7
  42:24 43:1,8
  43:10 44:2,23
  45:1,6,24
  46:16 47:1,2
  47:14 48:1,13
  49:21 50:7,14
  50:17 53:2,3
  53:13 55:23
  56:12 57:6,8
  57:20 58:7,17
  58:22 59:6,14
  59:19 60:4,19
  60:21 61:6
  62:4,12 63:14
  65:9 68:11
  69:17 73:15
  74:24 75:2,6
  75:14 77:24
  79:3,20 80:1,5
  81:4 82:18
**technique** 14:7
  15:7 16:15
  80:3
**techniques**
  12:21 19:2
**television** 72:3
**tell** 5:10 11:2
  14:14 24:6
  26:12 27:19
  32:1,22 39:1
  45:10 46:15
  48:13 55:23
  58:9 59:10,18
  69:22 74:23

75:1 76:2
**telling** 28:1 36:3
  37:5 49:10
  70:1 72:5,14
  75:6
**temple** 18:2,7,12
  18:18 59:11
**term** 24:16
**terminology**
  75:9
**terms** 15:12
**testified** 4:10
**testimony** 4:4
  24:20 25:12
  35:20 36:7
  60:2,9 62:10
  77:24
**Thank** 15:18
  47:12 85:6
**Thanks** 86:4
**thigh** 56:22 77:5
**thing** 34:10
  55:12 76:18
  80:18
**things** 30:17
  34:17
**think** 7:22 80:18
**thirty** 89:13
**thought** 8:18
  17:3 50:1 51:7
  53:9 71:17
  84:24
**threat** 14:12
  34:6,10,21
  35:23 36:4,5
  37:1,14 40:16
  41:17 42:7,16
  42:21 43:1,5
  43:11,13,17,21
  44:2,8 69:5
**threatened** 69:6
**threatening** 34:3
**three** 5:19,24
  9:8 39:8,24
  42:5 47:24
  49:19 53:2,7
  63:2 84:18

**throat** 20:21,23
  21:4,8
**thumb** 12:23,24
  13:6,8,9,11,18
  13:24 14:7
  15:22 16:11,15
  16:21,24 58:16
  58:21
**time** 9:5 12:3
  19:2 28:15
  30:7,9,14
  32:21 33:15
  37:4 39:2 40:2
  40:7,25 50:13
  53:5,11 56:25
  57:17,21,23
  58:15 61:6
  74:19 77:10
  80:19 82:9,16
  84:2 89:8
**time-wise** 39:1
**times** 59:13
**title** 29:25
**today** 4:5 24:20
  25:12 60:2,9
  62:10 64:7
  65:1,3
**told** 27:18 29:7
  33:11 46:6
  48:17 58:20
  63:16,18,19
  67:14 71:25
  72:2 73:11
**top** 13:4 20:23
  51:18 52:11
**traffic** 28:23
  38:9 42:17
**train** 82:4
**trained** 10:16
  11:13 13:6,12
  13:18 14:24
  15:21 16:1,9
  16:10 18:25
  19:4 33:25
**trainee** 29:11,23
  30:1,18,21
  31:2

**training** 10:5,11
  10:13,18,20,24
  11:6,25 12:8
  12:11,11,17
  13:21,22 14:3
  16:4 17:9,17
  18:1,16 19:6
  19:14,23 20:9
  20:18 21:3,12
  21:21 22:7
  30:2,3,7,8,11
  30:15 31:6
  81:13,25
**transcript** 64:12
  88:10,11 89:9
  89:11 90:2
**Transcription**
  64:13
**transferred** 8:25
**transition** 68:22
**transitioned**
  80:15
**transport** 7:4
  8:5
**trap** 15:12,15,16
**Trapezius** 15:16
**treated** 79:4,5
**treatment** 23:13
  75:23 76:22
**Trevisol** 71:20
  71:24 72:15
  73:6,11
**tried** 49:6 51:19
  77:5
**tries** 28:23
**trip** 50:25
**true** 88:11 90:22
**truly** 89:17
**trunk** 84:5,7,13
**truth** 4:5,6,6
**try** 28:4,9 30:16
  49:15 51:6,12
  52:15,23,24
  55:14
**trying** 25:4
  27:17 28:10,16
  28:16 29:3,10

29:14 39:14
  40:12 49:8,9
  49:13 50:21,24
  51:2,5,9,17,19
  51:20,23 52:2
  52:6,12,19
  54:6,9,25 55:1
  56:12,16,19
  57:25 58:2,5
  61:12 63:14,22
  69:3 72:6 83:8
**turn** 40:17
**turned** 31:14
**turning** 31:17
  62:23
**two** 5:3 12:15
  31:8
**TYK** 2:17 85:8
**type** 24:16 37:14
  38:18

———— U ————
**Unaware** 22:18
**unbecoming**
  59:3
**undergo** 11:24
**undergone**
  10:20
**undersigned**
  87:8
**understand** 8:16
  11:7 29:17
  39:14 43:15
  66:11,18 71:11
**understanding**
  73:15
**understood**
  15:17 73:18
**underwent** 12:3
**uniform** 5:6,14
  5:20
**unintelligible**
  42:2
**unit** 5:2,15
**UNITED** 1:1
**units** 23:21
  62:25

unresponsive
74:21 75:25
unstable 34:18
38:13,16,17,21
upper 80:14
83:19
upward 49:3
use 11:13,20,21
11:25 12:4,6
13:18 14:7,17
15:7 33:25
42:14 58:21
59:5,18 60:24
78:25 79:12
84:14
use-of-force
10:13 12:17
usually 14:19
utilize 13:6
14:24 15:21
16:11 17:7
56:20 62:2
84:18
utilized 13:16
14:2 60:3
62:11

**V**
v 89:5 90:3
validate 28:10
vehicle 26:17,23
28:24 29:20
31:23,24 32:6
32:10,14,18,22
32:24 33:1,9
35:4,21,22
36:2 38:3,5,12
38:24 47:9,10
47:18,20,23,24
48:2,7,14,19
49:9,22 68:23
70:24 71:1
72:21 83:22
84:4,11
verbal 28:20
33:4,13 80:10
verbally 22:18

58:11
vicinity 47:20
video 64:19 65:3
77:15,18,21,24
77:25 78:4
79:5,8,19,25
80:6 81:6,17
82:17
videos 65:8
violence 79:11
violent 58:3
61:17 83:9
Vista 28:8,24
49:23
visual 47:5
voice 46:21
VOLUME 1:18
3:6
vs 1:7

**W**
WADE 1:9
waive 89:8,15,21
walk 32:7 34:24
35:1 40:18
walked 74:10,11
walking 33:4
41:10 47:22
Walton 69:13
want 27:2,6,24
30:16 32:3,25
34:12,13,19
35:15 37:18
39:15 42:20
46:14 73:5
77:16
wanted 7:1 27:7
28:2 41:3
74:19 82:17
warrants 29:15
29:16
wasn't 24:16
32:7 39:3 43:4
43:4,16 48:20
49:2 50:11
54:17 57:10
58:1,10,10,13

63:7 68:15
watch 53:6
watched 28:19
watching 72:2
82:16
way 11:9 35:16
36:7 56:6 79:4
84:18
ways 37:17 48:6
we're 12:13
28:15,16 29:3
29:10 31:11,12
31:16 40:12
41:8 43:24
48:18 50:23
61:11,24 62:22
65:20 71:6
75:11 79:11
82:16
we've 13:8,12
16:1 65:3
weapon 37:20
wear 30:23,24
Wednesday 1:20
weigh 50:5
well-being 68:9
74:22
went 6:24 9:15
9:19 49:17,18
49:18,20 56:4
61:13,13,15
68:24 72:3
76:1 77:1
84:22
weren't 39:24
West 2:5 89:20
WILSON 2:14
wish 89:15
witness 3:9 4:7
45:24 46:1
witnessed 11:3
46:3,11
words 41:2
work 6:2,4 7:6
7:14,25 8:7,10
8:12 51:9
worked 6:16,22

6:23 7:2,9,11
8:2 11:23
working 6:15
8:22 29:11
wouldn't 17:14
18:10 36:10
59:2 66:10
write 25:7 90:2
written 73:10
wrote 71:24
73:11

**X**
X 3:2

**Y**
Yeah 78:12
year 4:22 6:7,13
7:3,8,15 8:9,14
8:15,16 12:5,6
12:7,13,15
years 5:3,9,17
5:22,23,24
8:10,13 9:8
11:18,23 16:8
yelling 58:12

**Z**

**0**

**1**
1 1:18,19 3:6,6
88:9 89:1
1:53 1:21 86:10
10 8:13
10/19/2018
87:16
100 74:8
11 6:10 24:2,21
25:10,14 26:13
30:10 60:19,21
83:21 84:3,7
111 2:15
11th 50:8 75:17
12:00 1:21 4:1
12:07 5:25
12:08 5:25

1200 2:15
1216 2:10 89:3
1551 89:19
16 6:13
1680 1:23
169350 87:15
17 5:9 7:10
11:18,23 16:7
17th 4:22
18 6:13 7:10,13
19 7:13
1999 8:11,14
1st 87:11 88:19

**2**
2 30:11,12,13,14
30:15
2:16cv14413 1:2
89:6 90:3
200-E 89:19
2000 8:11,15
60:19
2000s 8:18
2014 5:4 12:16
24:2,21 25:10
25:14 26:13
30:10 60:21
64:24,25 65:7
83:21 84:3,7
2017 1:20 87:10
87:11 88:19
89:1,7 90:4
2139 2:4
2455 2:10 89:3

**3**
30 89:13
300 7:23
31 1:20 90:4
31st 87:10 89:7
32801 2:16
330 50:6
33304 2:10 89:3
33401 89:20
33402-3626 2:5
335 50:6
34984 1:23

| | | | | |
|---|---|---|---|---|
| **3626** 2:5 | | | | |

**4**

**4** 3:7
**4-** 7:24
**407)203-7592**
  2:16

**5**

**500** 7:24
**561)686-6300**
  2:6

**6**

**7**

**8**

**85** 3:7
**87** 3:8
**88** 3:9
**89** 3:9

**9**

**90** 1:19 3:6,10
  88:10
**954)462-3200**
  2:11 89:4