# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

              Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF of ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent special district,

              Defendants.
_____/


DEPOSITION OF

CALVIN ROBINSON


VOLUME 1
Pages 1 through 77


Thursday, May 25, 2017
11:00 a.m. - 12:40 p.m.


Phipps Reporting
100 Southeast Third Avenue
Fort Lauderdale, Florida  33394

Stenographically Reported By:
Patricia A. Lanosa, RPR, FPR, CSR

Page 2

```
 1    APPEARANCES:

 2
      On behalf of Plaintiff:
 3
             SEARCY, DENNEY, SCAROLA
 4           BARNHART & SHIPLEY, PA
             2139 Palm Beach Lakes Boulevard
 5           P.O. Drawer 3626
             West Palm Beach, Florida 33402-3626
 6           (561)686-6300
             BY:  ADAM S. HECHT, ESQUIRE
 7           ash@searcylaw.com

 8
      On behalf of Defendant:
 9
             PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
10           2455 East Sunrise Boulevard, Suite 1216
             Fort Lauderdale, Florida  33304
11           (954)462-3200
             BY:  RICHARD GIUFFREDA, ESQUIRE
12           richard@purdylaw.com

13
      On behalf of St. Lucie County Fire District:
14
             WILSON, ELSER, MOSKOWITZ,
15           EDELMAN & DICKER, LLP
             111 North Orange Avenue, Suite 1200
16           Orlando, Florida  32801
             (407)203-7592
17           BY:  JULIE TYK, ESQUIRE
             julie.tyk@wilsonelser.com

18

19

20

21

22

23

24

25
```

```
 1
 2                           I N D E X
 3
 4
 5    Examination                                    Page
 6
 7               VOLUME 1 (Pages 1 - 77)
 8    Direct              By Mr. Hecht                  4
      Cross               By Ms. Tyk                   71
 9
      Certificate of Oath                             74
10    Certificate of Reporter                         75
      Read and Sign Letter to Witness                 76
11    Errata Sheet (forwarded upon execution)         77
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    The following proceedings began at 11:00 a.m.:

2              THE COURT REPORTER:  Would you raise your

3         right hand, please?

4              Do you solemnly swear that the testimony

5         you shall give today will be the truth, the

6         whole truth, and nothing but the truth?

7              THE WITNESS:  I swear.

8                   CALVIN ROBINSON,

9    having been first duly sworn or affirmed, was

10   examined and testified as follows:

11                   DIRECT EXAMINATION

12     BY MR. HECHT:

13        **Q.   Good morning, sir.**

14        A.   Good morning.

15        **Q.   My name is Adam Hecht.  I represent**

16   **Tavares Docher.  And today we are going to be taking**

17   **your deposition.  Have you ever given a deposition**

18   **before?**

19        A.   Yes.

20        **Q.   Approximately how many times?**

21        A.   Six.  Seven.

22        **Q.   All right.  Same rules apply as to the**

23   **other depositions.  If I ask you a question you**

24   **don't understand, just tell me you don't understand**

25   **it, and I'll rephrase it.  All right?**

```
 1        A.    Yes.

 2        Q.    If you answer a question of mine, I'm

 3   going to assume you understood the question; fair

 4   enough?

 5        A.    Yes.

 6        Q.    And I don't expect that we'll be here too

 7   long today.  If you have to step out, that's fine.

 8   Just let me know.  Okay?

 9        A.    Okay.

10        Q.    Could you state your full name?

11        A.    Calvin Marcus Robinson, Jr.

12        Q.    What's your date of birth?

13              MR. GIUFFREDA:  If we could put that off

14        the record.

15              MR. HECHT:  His date of birth?

16              MR. GIUFFREDA:  Yeah.  I'd rather have it

17        off the record, in case it gets inadvertently

18        filed.  It would have to be redacted anyway.

19              MR. HECHT:  I never heard of a date of

20        birth -- social security number, home address

21        for an officer, but his date of birth?

22              MR. GIUFFREDA:  Yes.  I'd rather not have

23        it in the transcript, because people file

24        transcripts, summary judgment and things; they

25        forget to redact it.
```

Page 6

1          MR. HECHT:  I don't think there is any

2      sort of confidentiality for date of birth.

3          MR. GIUFFREDA:  No, but you could have

4      identify theft problems with names and dates of

5      births.

6          MR. HECHT:  That's fine.

7      Q.   **Just tell me what your date of birth is.**

8          THE COURT REPORTER:  Are we off?

9          MR. HECHT:  Sure.

10         (Discussion off the record.)

11  BY MR. HECHT:

12     Q.   **Currently, who is your employer?**

13     A.   I'm a student right now.

14     Q.   **Where are you going to school?**

15     A.   Barry University.

16     Q.   **When did you begin going to Barry**

17  **University?**

18     A.   This time around, January.

19     Q.   **Of 2017?**

20     A.   Yes.

21     Q.   **Where is Barry University located?**

22     A.   In Miami Shores.

23     Q.   **What are you studying?**

24     A.   Public administration.

25     Q.   **I heard you say "this time around."  Did**

1   you attend Barry University at some other time prior

2   to beginning in January of 2017?

3         A.    Yes.

4         Q.    When did you begin the first time?

5         A.    January 2014.

6         Q.    And I take it that you did not graduate

7   from Barry University after you began

8   in January 2014?

9         A.    I graduated.

10        Q.    Okay.  What year did you graduate Barry

11  University?

12        A.    2016.

13        Q.    With a degree in what?

14        A.    Bachelor's in emergency management.

15        Q.    While you were a student at Barry

16  University in May of 2014, were you also working in

17  addition to studying?

18        A.    No.  I took that summer off.  It's a

19  private university, so semesters are shorter.  So

20  that kind of fell into summer.  So I wasn't working

21  -- I wasn't going to school at that point.

22        Q.    The reason why I ask, because we're here

23  to talk about an incident involving my client

24  Tavares Docher, that occurred on May 11, 2014.  Do

25  you understand that?

Page 8

1       A.   Yes.

2       Q.   And you're telling me that you began

3  studying at Barry University in January 2014,

4  correct?

5       A.   Yes.

6       Q.   But you were not a student at the time of

7  this incident?

8       A.   No.  I took the summer off.

9       Q.   And why did you take the summer off?

10      A.   Because I was starting a new job.

11      Q.   And what was the new job?

12      A.   It's a deputy sheriff at the St. Lucie

13  Sheriff's Office.

14      Q.   Were you still considered to be a student

15  enrolled at Barry University when you began your

16  employment with the sheriff's office?

17      A.   Yes.

18      Q.   And when did you begin your employment

19  with the St. Lucie County Sheriff's Office?

20      A.   March 17, 2014.

21      Q.   Why is it that you applied for a job at

22  the St. Lucie County Sheriff's Office?

23      A.   Because I wanted a job.

24      Q.   And did you have the intention of going

25  back to Barry University in the fall of 2014?

1      A.   Yes.

2      Q.   So was your understanding when you took a

3  position with the St. Lucie County Sheriff's Office

4  that it would just be for the summertime?

5      A.   I'm not understanding that one.

6      Q.   All right.  You told me that you began

7  your studies at Barry University in January 2014,

8  correct?

9      A.   Yes.

10      Q.   And then summer began, I'm assuming,

11  sometime in May of 2014?

12      A.   Yes.

13      Q.   And you had an opportunity to be employed

14  by the St. Lucie County Sheriff's Office during the

15  summer of 2014, correct?

16      A.   I got hired in the spring, March.

17      Q.   Right.  You got hired and you began

18  in March of 2014, correct?

19      A.   Yes.

20      Q.   And how long was that employment supposed

21  to last for with the St. Lucie County Sheriff's

22  Office?

23      A.   It's permanent.

24      Q.   Did you ever have an intention of going

25  back and being a student at Barry University

1    in August or September of 2014?

2         A.    Yes.

3         Q.    So is it correct to say that

4    in August and September of 2014 you were a student

5    at Barry University while also acting as a deputy

6    sheriff for the St. Lucie County Sheriff's Office?

7         A.    Yes.

8         Q.    I don't want your home address, but in

9     May of 2014 where were you residing?

10        A.    In Port St. Lucie.

11        Q.    How is it that you were a student at Barry

12   University, which was down in Miami and you worked

13   in Port St. Lucie?

14        A.    I went to school online.

15        Q.    I'm sorry.

16        A.    I went to school online.

17        Q.    The two years that you were studying at

18   Barry University from January of 2014 to 2016, were

19   all of your courses online?

20        A.    Yes.

21        Q.    And during that entire two-year period of

22   time you were residing in St. Lucie County?

23        A.    No.

24        Q.    In January of 2014, tell me the city that

25   you lived in.

Page 11

1      A.    Miami Gardens.

2      Q.    And at some point you moved to St. Lucie

3   County.

4      A.    Yes, when I got hired.

5      Q.    So you moved to St. Lucie County

6   in March of 2014.

7      A.    Yes.

8      Q.    And have you resided in St. Lucie County

9   ever since?

10     A.    Yes.

11     Q.    Currently I know you told me you were a

12  student again at Barry University.  Are you getting

13  a master's?

14     A.    Yes.

15     Q.    How long does that program last?

16     A.    Eighteen months.

17     Q.    And currently are you still employed by

18  the St. Lucie County Sheriff's Office?

19     A.    No.

20     Q.    When did you stop your employment with the

21  St. Lucie County Sheriff's Office?

22     A.    February 8, 2017.

23     Q.    Why is it you discontinued your employment

24  with the St. Lucie County Sheriff's Office

25  in February of 2017?

```
                                              Page 12
```

1        A.   I left to seek another job.

2        **Q.   And what job was that?**

3        A.   As a police officer down here in South

4   Florida.

5        **Q.   So in February of 2017, which police**

6   **department did you start working for?**

7        A.   I didn't work for anyone.

8        **Q.   Okay.  Currently where are you working?**

9        A.   I'm a full-time student.

10       **Q.   All right.  So you told me that you no**

11  **longer work for the St. Lucie County Sheriff's**

12  **Office as of February 2017, correct?**

13       A.   Yes.

14       **Q.   And you said that you wanted to work for**

15  **another police department down south; is that right?**

16       A.   Yes.

17       **Q.   And did you ever gain employment with any**

18  **law enforcement agency in South Florida?**

19       A.   No, not yet.

20       **Q.   You're still looking?**

21       A.   Uh-huh.

22       **Q.   Is that a yes?**

23            MR. GIUFFREDA:  Yes.

24       A.   Yes.

25            MR. GIUFFREDA:  You have to use words.

Page 13

1      BY MR. HECHT:

2          Q.    Which agencies have you applied to?

3          A.    Just Miami-Dade.

4          Q.    Did you go through the interview process?

5          A.    Yes.

6          Q.    Put in an application?

7          A.    Yes.

8          Q.    And have they rejected you?

9          A.    No.

10         Q.    So why is it you're not working for them?

11         A.    It takes time.

12         Q.    So are you just waiting to hear back from

13     them?

14         A.    Yes.

15         Q.    Was it your decision to leave the

16     St. Lucie County Sheriff's Office?

17         A.    Yes.

18         Q.    You were not fired?

19         A.    No.

20         Q.    You were not terminated?

21         A.    No.

22         Q.    Prior to your employment at the St. Lucie

23     County Sheriff's Office, have you ever worked at any

24     other law enforcement agency?

25         A.    No.

Page 14

1    Q.    As you sit here today, is the only law

2    enforcement agency that you have ever worked for

3    been the St. Lucie County Sheriff's Office?

4    A.    Yes.

5    Q.    Tell me about the training that you went

6    through before you began your employment at the

7    St. Lucie County Sheriff's Office.

8    A.    I went to the Miami-Dade Police Academy,

9    and there I served as a full-time student in the

10   police academy.  It was a six-month academy.

11   Q.    And at the Miami-Dade Police Academy, were

12   you educated and instructed on what is known as

13   basic law enforcement training?

14   A.    Yes.

15   Q.    And what sort of things are you taught in

16   the basic law enforcement training?

17   A.    Conversational techniques, defensive

18   tactics, shooting, defensive driving, driving with

19   lights and sirens, interviewing techniques, and

20   techniques for traffic stops.

21   Q.    How long does the basic law enforcement

22   training last for as part of the police academy

23   training?

24   A.    Six months.

25   Q.    During the basic law enforcement training,

1   were you trained in the areas of excessive force?

2        A.   No.

3        Q.   During the six months of your basic law

4   enforcement training, were you trained in the area

5   of what is known as the physiology of a struggle?

6        A.   Not from what I recall.

7        Q.   During the six months that you were at the

8   police academy and you were instructed on basic law

9   enforcement training techniques, were you trained in

10  the area of how to properly handcuff individuals?

11       A.   Yes.

12       Q.   Are you trained -- strike that.

13            Were you trained on how to handcuff

14  individuals after a struggle ensues?

15       A.   Yes.

16       Q.   In your basic law enforcement training

17  that you underwent at the Miami-Dade Police Academy,

18  were you trained on how to identify someone that is

19  experiencing what is known as "excited delirium"?

20       A.   Yes.

21       Q.   During the six months that you underwent

22  your basic law enforcement training, were you

23  educated on how to identify the signs and symptoms

24  of someone that is experiencing excited delirium?

25       A.   Yes.

1          Q.    When you began your employment with the

2     St. Lucie County Sheriff's Office, did they provide

3     you additional training?

4          A.    Yes.

5          Q.    And what did that consist of?

6          A.    Defensive tactics, shooting, handcuffing

7     and searching techniques, and scenario-based

8     training.

9          Q.    When you were employed by the St. Lucie

10    County Sheriff's Office, did they provide you

11    training in the area of excessive force?

12         A.    Yes.

13         Q.    During your employment with the St. Lucie

14    County Sheriff's Office, did they train you in the

15    area of what is known as the physiology of a

16    struggle?

17         A.    No, not from what I recall.

18         Q.    During your employment with the St. Lucie

19    County Sheriff's Office, did they train you on how

20    to properly handcuff individuals after a struggle

21    ensues?

22         A.    Yes.

23         Q.    During your employment with the St. Lucie

24    County Sheriff's Office, did they provide you

25    training on how to identify the signs and symptoms

1  of someone experiencing excited delirium?

2       A.   Yes, later.

3       Q.   And when you say "later," what are you

4  referring to?

5       A.   I had to go to a training, which is called

6  CIT, crisis intervention training.  I went sometime

7  in 2015.  I want to say January or February.

8       Q.   I want to be a little bit more specific in

9  my questioning.

10      A.   Okay.

11      Q.   Prior to May 11th of 2014, did the

12  St. Lucie County Sheriff's Office provide training

13  to you in the area of excessive force?

14      A.   Yes.

15      Q.   Prior to May 11th of 2014, did the

16  St. Lucie County Sheriff's Office train you in the

17  area of what is known as the physiology of a

18  struggle?

19      A.   No, not from what I recall.

20      Q.   Prior to May 11th of 2014, did the

21  St. Lucie County Sheriff's Office train you on how

22  to properly handcuff an individual after a struggle

23  ensues?

24      A.   Yes.

25      Q.   Prior to May 11, 2014, did the St. Lucie

1    County Sheriff's Office train you on how to identify

2    the signs and symptoms of someone experiencing

3    excited delirium?

4         A.    Yes.

5         Q.    So is it correct that the St. Lucie County

6    Sheriff's Office not only trained you on how to

7    identify the signs and symptoms of experienced --

8    strike that.

9              Is it correct that the St. Lucie County

10   Sheriff's Office not only trained you prior

11   to May 11, 2014 on how to identify the signs and

12   symptoms of someone experiencing excited delirium,

13   but also after May 11, 2014, and as you said

14   sometime in 2015, you were provided additional

15   training on how to identify the signs and symptoms

16   of someone experiencing excited delirium?

17        A.    Yes.

18        Q.    Where did you graduate high school?

19        A.    Miami -- Norland.

20        Q.    After high school, did you go on to

21   further -- any sort of education?

22        A.    I went to Miami-Dade Community College.

23        Q.    Did you receive a degree from Miami-Dade

24   College?

25        A.    No.

1     Q.   How long did you study at Miami-Dade

2   College for?

3     A.   Maybe a year.

4     Q.   Why did you leave?

5     A.   I didn't like it.

6     Q.   And what did you do once you left?

7     A.   I joined the military.

8     Q.   Which branch?

9     A.   U.S. Air Force.

10    Q.   And how long did you serve in the U.S. Air

11  Force for?

12    A.   Four years.

13    Q.   You were honorably discharged?

14    A.   Yes.

15    Q.   And after you served in the Air Force for

16  four years, what did you do?

17    A.   I got out and joined the police academy.

18    Q.   When you began your employment with the

19  St. Lucie County Sheriff's Office, what was your

20  position?

21    A.   Road deputy.  Deputy sheriff.

22    Q.   And do you know the month and the year

23  that you actually joined the St. Lucie County

24  Sheriff's Office?

25    A.    March 17, 2014.

1      Q.    Were you ever a trainee?

2      A.    Yes.

3      Q.    When were you a trainee?

4      A.    From that point up until, I think,

5  late July, early August.

6      Q.    Explain to me what it means when you're

7  working at the St. Lucie County Sheriff's Office and

8  you have the title of a trainee.

9      A.    It means that you're being trained in

10  agency standard procedures and that you start first

11  with understanding the policies that the agency has

12  implemented, and you go on to how to use the

13  computer system, and then you go to defensive

14  tactics training, and from there you go on to the

15  road, and you go on to field training.

16      Q.    When you're a trainee, are you assigned to

17  another officer?

18      A.    Yes.

19      Q.    On May 11th, 2014, who was the officer

20  that you were assigned to supervise you?

21      A.    Clay Mangrum.

22      Q.    And how long were you Deputy Sheriff

23  Mangrum's trainee for?

24      A.    I'm not sure.

25      Q.    Is it a few months; or is it a year?

Page 21

 1        A.    No.   I want to say somewhere between three

 2   and five weeks.

 3        Q.    At the time of this incident, which

 4   occurred on May 11, 2014, were you Deputy Sheriff

 5   Mangrum's trainee?

 6        A.    Yes.

 7        Q.    On the date of this incident, May 11,

 8   2014, were you riding in the same patrol car as

 9   Deputy Sheriff Mangrum?

10        A.    Yes.

11        Q.    What were you wearing on this day?

12        A.    A deputy sheriff standard uniform.

13        Q.    Did you have a gun belt?

14        A.    Yes.

15        Q.    Did you have a gun?

16        A.    Yes.

17        Q.    A flashlight?

18        A.    Yes.

19        Q.    The tactical gear we see officers wear

20   around their belt?

21        A.    Yes.

22        Q.    Were you wearing any sort of tactical

23   clothing?

24        A.    No.

25        Q.    On the day of this incident, was Deputy

Page 22

1    Mangrum wearing anything other than the standard

2    sheriff's uniform that are given to you?

3         A.   No.

4         Q.   Were either you or Deputy Mangrum wearing

5    a gun on your leg?

6         A.   No.

7         Q.   Were either of you wearing a bulletproof

8    vest?

9         A.   Yes.

10        Q.   You both were?

11        A.   Yes.

12        Q.   And that's underneath your clothing?

13        A.   Yes.

14        Q.   And as a trainee, do you have all of the

15   same authority that any other deputy sheriff would

16   have?

17        A.   Yeah.

18        Q.   What I'm asking is, As a trainee, do you

19   have the ability to make arrests?

20        A.   Yes, but that depends on what part of the

21   training you're in.

22        Q.   On May 11, 2014, what part of the training

23   were you in?

24        A.   Second phase.

25        Q.   Go through the phases with me, if you

1  **will.**

2      A.   Phase 1, you ride with somebody for a

3  week, and they kind of show you just what's going

4  on.

5          Phase 2, you ride with somebody between

6  three to six weeks, and you go from just being a

7  passenger to actually doing things.

8          Phase 3, you are being evaluated.  The

9  trainer is not really saying or doing much, but they

10  are helping you along the way.

11         And then you have 4, which is the exit

12  phase, and you get a totally different field

13  training officer, and they don't say anything to

14  you; they just evaluate you as you do your job.

15     **Q.   So Phase 1 you're in a ride-along for one**

16  **week?**

17     A.   Yes.

18     **Q.   And Phase 2 you're in a ride-along for**

19  **three to six weeks?**

20     A.   Yes.

21     **Q.   And Phase 3, how long does that last for?**

22     A.   I don't remember specifically.

23     **Q.   And Phase 4, how long does that last?**

24     A.   A couple of weeks.

25     **Q.   On May 11, 2014 you were in Phase 2.**

Page 24

1      A.   Yes.

2      Q.   And what I heard you say to me is that

3   during your Phase 2 you were riding along with

4   Deputy Sheriff Mangrum and you're a passenger and

5   you're able to do things.

6           What specifically are you referring to

7   when you say you're able to do things?

8      A.   Well, at this point you're able to make

9   arrests; you're able to establish your own probable

10  cause.  It goes into a gradual progression.

11     Q.   I think the best way to ask this would be

12  for you to tell me those things that you are not

13  able to do during the Phase 2 program that you would

14  be able to do in Phase 3 or Phase 4.

15     A.   Determine which cause that you take.

16     Q.   What does that mean?

17     A.   Well, when you have a cause -- you have a

18  CAD system -- you prioritize your calls based on the

19  severity of it, or just the priority of it.

20          In Phase 2 you're being instructed, okay,

21  we're going to take this call because this will give

22  you a good experience.  You need this; this is

23  something that's going to be on your checklist, so

24  we're going to take this call.

25     Q.   What else are you not able to do during

Page 25

1    Phase 2 that you would be able to do during Phase 3

2    or Phase 4?

3        A.   I don't know, I think that's pretty much

4    it.

5        Q.   During Phase 2, are there things that you

6    are not allowed to do -- strike that.

7             During Phase 2 are there things that a

8    deputy sheriff is able to do that you're not able to

9    do as a trainee in Phase 2.

10       A.   No, I think I summed it up already.

11       Q.   So all of the arrest powers, and the

12   ability to take someone's liberty away is something

13   that you're able to do in Phase 2?

14       A.   Yes.

15       Q.   You could make those decisions.

16       A.   Yes, but at the discretion of the trainer

17   to guide you through the process.

18       Q.   On May 11, 2014 -- and we're going to talk

19   about the incident in greater detail -- but prior to

20   you making a decision to do anything --

21       A.   Yes.

22       Q.   -- do you have to ask Deputy Sheriff

23   Mangrum for his approval?

24       A.   Yes.

25       Q.   So explain to me just generally, not

1   specifically involving this incident, but just

2   generally what it is during Phase 2 that you would

3   need to get Deputy Sheriff Mangrum's approval for

4   prior to you making an arrest or initiating contact

5   with the civilian.

6       A.   The best way I can describe it is that you

7   come into a situation and you're brand new, and

8   you're getting a lot of things thrown at you; you

9   turn back and you look at your FTO and you say,

10  "What do I do now?"  And then they give you

11  guidance, okay.  This is agency policy; this is

12  standard procedure.  If you have this, this, and

13  this, this is the elements of a crime.  I think that

14  pretty much answers it.

15      Q.   Would you agree with me that in the basic

16  law enforcement training that you underwent, that an

17  elbow strike to a person's temple is classified as

18  deadly force?

19           MR. GIUFFREDA:  Form.  You could answer.

20      A.   Say that again.

21           MR. GIUFFREDA:  You could answer.

22      A.   I don't remember that.

23   BY MR. HECHT:

24      Q.   Would you agree with me that in the basic

25  law enforcement training course that you underwent

Page 27

1    that an elbow strike to a person's temple is likely

2    to cause great bodily harm?

3              MR. GIUFFREDA:  Form.  You could answer.

4        A.   I do not remember that.

5      BY MR. HECHT:

6        Q.   Would you agree with me that in the basic

7    law enforcement training course that you underwent,

8    that striking a person on the side of the jaw is

9    likely to cause great bodily harm?

10             MR. GIUFFREDA:  Form.  You could answer.

11       A.   Yes.

12     BY MR. HECHT:

13       Q.   Would you agree with me that in the basic

14   law enforcement training course that you underwent,

15   that striking someone on the side of the jaw is

16   classified as using deadly force?

17             MR. GIUFFREDA:  Form.  You could answer.

18       A.   No.

19     BY MR. HECHT:

20       Q.   Would you agree with me that the basic law

21   enforcement training that you underwent, that

22   striking a person on the bridge of their nose is

23   likely to cause great bodily harm?

24             MR. GIUFFREDA:  Form.  You could answer.

25       A.   Yes.

1    BY MR. HECHT:

2        Q.    Would you agree with me in the basic law

3    enforcement course that you underwent, that striking

4    a person on the bridge of their nose is classified

5    as using deadly force?

6              MR. GIUFFREDA:  Form.  You could answer.

7        A.    Yes.

8    BY MR. HECHT:

9        Q.    Would you agree with me that in the basic

10   law enforcement course that you underwent, that

11   striking a person on their throat is likely to cause

12   great bodily harm?

13             MR. GIUFFREDA:  Form.  You could answer.

14       A.    Yes.

15   BY MR. HECHT:

16       Q.    Would you agree with me in the basic law

17   enforcement course that you underwent that striking

18   a person on their throat is classified as using

19   deadly force?

20             MR. GIUFFREDA:  Form.  You could answer.

21       A.    I don't remember.

22   BY MR. HECHT:

23       Q.    Would you agree with me that the basic law

24   enforcement training course that you underwent that

25   striking a person in the back of their head is

Page 29

1    likely to cause great bodily harm?

2              MR. GIUFFREDA:  Form.  You could answer.

3        A.    Yes.

4    BY MR. HECHT:

5        Q.    And the basic law enforcement training

6    course that you underwent, would you agree with me

7    that striking someone in the back of their head is

8    classified as using deadly force?

9              MR. GIUFFREDA:  Form.  You could answer.

10       A.    I do not remember.

11   BY MR. HECHT:

12       Q.    Would you agree with me that based on your

13   training and experience that someone exhibiting the

14   signs and symptoms of an excited delirium is

15   classified as a medical emergency?

16             MR. GIUFFREDA:  Form.  You could answer.

17       A.    Yes.

18   BY MR. HECHT:

19       Q.    And would you agree with me that as a law

20   enforcement officer, if you came in contact with

21   someone who you believed to be experiencing the

22   symptoms of excited delirium that you would contact

23   a medical professional?

24             MR. GIUFFREDA:  Form.  You could answer.

25       A.    Yes.

Page 30

1

2    BY MR. HECHT:

3        Q.   As a law enforcement officer, based upon

4    your training and experience, if you came in contact

5    with someone who was exhibiting the symptoms of

6    excited delirium, would you place them in handcuffs

7    prior to contacting a medical health professional if

8    that person did not commit a crime?

9            MR. GIUFFREDA:   Form.   You could answer.

10   A.   Yes.

11   BY MR. HECHT:

12       Q.   And why is that?

13   A.   Because in St. Lucie County if you

14   transported anyone anywhere in the back seat of your

15   car, by policy they had to have handcuffs on, or

16   rescue would not arrive to the scene unless the

17   person was secured, the scene was safe.

18       Q.   What I want to know specifically is:

19   Based upon your training and experience, if you came

20   in contact -- who was exhibiting the signs and

21   symptoms of excited delirium, and that person had

22   not committed a crime, you're telling me that you

23   would place that person in handcuffs solely because

24   they were exhibiting the signs and symptoms of

25   excited delirium?

1        MR. GIUFFREDA:  Form.  You could answer.

2        A.   Yes.  Based off my training and experience

3   working in St. Lucie County, if you were going to

4   Baker Act or Marchman Act them, you had to place

5   them in handcuffs, even though they were not under

6   arrest.  If you were transporting them, by policy

7   they had to be in handcuffs.  Or if rescue was going

8   to transport them, if they calmed down at whatever

9   point and rescue decided they were going to take

10  them, then you would take off the handcuffs.  Before

11  then, rescue would not show up; they would stage

12  until the scene was cleared by law enforcement.

13  BY MR. HECHT:

14       **Q.   For the purposes of my question, I want**

15  **you to assume that there would be no reason to**

16  **transport someone in an ambulance.  Okay?**

17       A.   Okay.

18       **Q.   When you say "rescue," I'm assuming that**

19  **means an ambulance.**

20       A.   Yes.

21       **Q.   So let me ask the question again.**

22       **Based on your training and experience, if**

23  **you came in contact with someone who was exhibiting**

24  **the signs of excited delirium, and that person had**

25  **not committed a crime, and that person did not need**

1    to be placed in an ambulance, would you place

2    handcuffs on that individual?

3            MR. GIUFFREDA:  Form.  You could answer.

4       A.   If they were being Baker Acted, yes.

5    BY MR. HECHT:

6       Q.   And for the purpose of this question, I

7    want you also to assume that the person was not

8    going to be Baker Acted.  Okay?

9       A.   Okay.

10      Q.   So no Baker Act, no transporting in an

11   ambulance.  Okay?

12      A.   Okay.

13      Q.   So let me ask the question again.

14           Based on your training and experience, if

15   you came in contact with an individual who was

16   exhibiting the signs and symptoms of excited

17   delirium, and that person did not commit a crime,

18   and was not being Baker Acted, and was not being

19   transported in an ambulance, would you place that

20   individual in handcuffs?

21           MR. GIUFFREDA:  Form.  You could answer.

22      A.   No.

23   BY MR. HECHT:

24      Q.   Based upon your training and experience,

25   if you came in contact with an individual who was

1    exhibiting the signs and symptoms of excited

2    delirium, and that person committed a misdemeanor

3    and was being placed under arrest for a misdemeanor,

4    and again was experiencing excited delirium, would

5    you place that individual in handcuffs?

6            MR. GIUFFREDA:  Form.  You could answer.

7        A.   Yes.

8     BY MR. HECHT:

9        Q.   Have you been trained -- strike that.

10            You told me that you had been trained on

11   how to identify the signs and symptoms of excited

12   delirium, correct?

13       A.   Yes.

14       Q.   Can you please tell me what you learned

15   based on your training and experience on what to

16   identify in order to determine if someone is

17   experiencing excited delirium?

18       A.   Prior to May 11th or after?

19       Q.   Prior to May 11th.

20       A.   Prior to May 11th we had training on

21   excited delirium, and it was video-based training of

22   officers dealing with people who were suffering from

23   it.  And it was mainly training based off how to

24   identify the erratic behavior and how to restrain

25   them as you fought against them -- you fought with

Page 34

1    them.

2         Q.    Prior to May 11, 2014, tell me what you

3    were taught by the St. Lucie County Sheriff's Office

4    in terms of what signs and symptoms you would notice

5    about someone experiencing excited delirium.

6         A.    Irrational, erratic behavior.  Sometimes

7    violent tendencies.  Extremely high body

8    temperatures.  I was taught that it could be a

9    brain-induced chemical imbalance, or it could be

10   drug or alcohol induced, and that if you do

11   recognize the signs, that you should call rescue

12   after they have been properly restrained.

13        Q.    In this case involving your interaction

14   with Tavares Docher, did you ever identify Tavares

15   Docher to be experiencing excited delirium?

16        A.    After the fight, yes.

17        Q.    Did you come in contact with Tavares

18   Docher prior to him being placed in handcuffs?

19        A.    Yes.

20        Q.    Anytime prior to your -- strike that.

21              Anytime prior to Tavares Docher being

22   placed in handcuffs, did you make a determination

23   whether he was experiencing excited delirium?

24        A.    No.

25        Q.    No you did not notice him experience

Page 35

1    excited delirium; or no you did not make a

2    determination?

3         A.    No, I did not make a determination.

4         Q.    Why not?

5         A.    Because the investigation wasn't complete

6    upon interacting with him.

7         Q.    Were you taught in the basic law

8    enforcement courses that you underwent that when an

9    individual is lying on their stomach and being

10   handcuffed that they may have trouble breathing when

11   pressure is applied to their back?

12        A.    Yes.

13        Q.    And did you also learn that if too much

14   pressure is a applied to an individual's back when

15   they are being handcuffed by officers, that they may

16   suffer from oxygen deficiency?

17        A.    Yes.

18        Q.    Did you also learn all about oxygen

19   deficiency when placing an individual under arrest,

20   once you began your training at the St. Lucie County

21   Sheriff's Office?

22        A.    Yes.

23        Q.    All right, I want to talk about May 11,

24   2014.  Tell me what it is that you recall about your

25   involvement with Tavares Docher?

 1          A.    On May 11, 2014 I was dispatched to a call

 2     at a CVS.  The call was initially classified as a

 3     9-1-1 hang-up.  But prior to my arrival to the call,

 4     it was -- the classification was changed to

 5     disorderly conduct.

 6              Upon arriving at the CVS gas station --

 7     excuse me -- CVS, my trainer, who was driving at the

 8     time, got out of the vehicle and made contact with

 9     Tavares Docher.  I saw Tavares drop something on the

10     ground, and my trainer kicked it away.  As we pulled

11     up, I noticed that Tavares Docher was standing,

12     because he was described in the CAD system as a

13     black male wearing a green shirt, black shorts.  I

14     saw a male matching that description standing out

15     front with another man.

16              I went and I spoke with the other man, who

17     was later identified as the manager of the CVS.  And

18     he said that Mr. Docher came into the CVS and was

19     speaking about a SEAL team out of Broward County,

20     and that they had killed somebody.  And he said that

21     Mr. Docher was scaring the customers.  He also

22     realized that he was holding a screwdriver in his

23     hand, but was attempting to conceal it.

24              And at a certain point they called 9-1-1

25     to get him out of the store.  But the manager was

Page 37

1    able to talk with him.  And he stood outside with

2    him until myself and Deputy Mangrum arrived.  And so

3    I went back to where Deputy Mangrum and Mr. Docher

4    were standing.  I picked up the screwdriver, which

5    was in the parking median side of the dirt, and I

6    secured it inside my patrol car, and I patted

7    Mr. Docher down.

8            And then I got out my pad and started

9    getting his information, standard information:

10   Name, date, social security number.  He rattled off

11   everything.  He informed me that he was a sexual

12   offender of Broward County, and that he was visiting

13   Port St. Lucie to attend a court hearing.

14           We asked him about the -- what happened

15   inside of the CVS.  He went on to tell us that there

16   was a SEAL Team Six out of Broward County Sheriff's

17   Office, and that they had murdered someone and they

18   cut off their head and he knew where the body was,

19   and now they were coming to get him.

20           At that point Deputy Newman pulled up and

21   he started interviewing Mr. Docher.  And it was

22   pretty much from that point a question-and-answer

23   session between Deputy Mangrum and Deputy Newman.

24   And at a certain point Deputy Newman placed him

25   under arrest.  And Mr. Docher asked, "Why am I being

Page 38

1    arrested?"  He said, "disorderly intox."  And he

2    asked Mr. Docher had he been drinking.  He said,

3    "Yes, I had a few Natty Ices -- Natural Ices."  I

4    guess it's a malt liquor or a beer.

5           At that point we took him to Deputy

6    Newman's patrol car.  We opened up the back seat,

7    placed him into the back seat, sat him first,

8    instructed him to sit down.  First placed his feet

9    inside of the car.  He looked at us.  We repeat --

10   Deputy Mangrum repeated, "put his feet inside of the

11   car."  And he continued to look at us, and then I

12   told him "to put his feet inside of the car."

13          After that he started to stand up.  I

14   placed my hand on top of his forehead and tried to

15   force him into the car, but he lunged forward.  I

16   moved out of the way, and Deputy Newman and

17   Deputy Mangrum were being pushed back.  I stepped to

18   the side, gave two strikes to the outer muscle of

19   his leg, and took his feet from underneath him.  We

20   fell to the ground.

21          Deputy Mangrum or Deputy Newman were close

22   to his head.  I was close to his feet.  And at that

23   point we tried to gain control over him.  Deputy

24   Mangrum called for backup and rescue.  And at that

25   point we tried to restrain him the best that we

Page 39

```
 1   could.  The St. Lucie sheriff's office does not
 2   offer leg shackles.  They offer a rope to tie your
 3   legs together.  And we held him down the best that
 4   we could.  And after a certain point he got tired.
 5   And once he got tired the rescue -- excuse me -- the
 6   paramedics came.  When the paramedics came they
 7   asked us what was wrong with him.  We told them a
 8   quick version of it.  He attempted to try to run.
 9            Okay.  At that point he was bleeding from
10   his head from the fall which he had took, and rescue
11   asked me to help roll him over to put him on the
12   gurney.  I rolled him over.  He placed him on the
13   gurney.  He kicked one of paramedics.  The
14   paramedics fell backwards and Mr. Docher began to
15   fight again.
16            The paramedic went into the ambulance,
17   came out with a solution and a syringe.  He filled
18   the syringe with that solution and gave Mr. Docher a
19   shot in his buttocks.  Mr. Docher became sedated and
20   let out a large gasp of air.  The paramedic looked
21   at the other paramedic and said, "He just coded."
22   What does that mean?  He said, "He just died."  I
23   helped -- the paramedics placed him into the back of
24   the ambulance.  I jumped into the ambulance with the
25   paramedics.  One of them was driving.  The other one
```

1   was working on him.  The paramedics asked me to

2   unhandcuff him, and place his arms on -- or at least

3   handcuff him to the gurney.  So I used my handcuffs,

4   unlocked him, and placed his -- I unlocked Deputy

5   Newman's handcuffs, laced one arm on one side of the

6   gurney, and I used a set of my handcuffs to place

7   his other arm on the other side of the gurney.

8           As we rode towards Port St. Lucie

9   Hospital, the paramedics asked me to perform chest

10  compressions.  I helped perform chest compressions.

11  Then he performed chest compressions, and he asked

12  me to assist him with a breathing apparatus that you

13  had to squeeze as you held it over the patient's

14  mouth.  So I helped with that.

15          At some point the paramedic cut off

16  Mr. Docher's shirt with a pair of scissors, applied

17  an AED and gave him two electrical shocks.  And the

18  second shock Mr. Docher came responsive, and at that

19  point we arrived at the hospital.  Once we got to

20  the hospital, the paramedics parked, took him out of

21  the back of the ambulance on the gurney and rolled

22  him into the ER, which he was then assisted by the

23  hospital medical staff.

24      **Q.   Were you and Deputy Sheriff Mangrum the**

25  **first law enforcement officers to arrive at the CVS?**

1      A.    Yes.

2      Q.    So when the car that you and Deputy

3  Sheriff Mangrum -- strike that.

4          When you and Deputy Sheriff Mangrum

5  arrived at the CVS, there were no other police

6  officers there, correct?

7      A.    No.

8      Q.    Correct, there were no other police

9  officers there?

10     A.    No, there were no other police officers.

11     Q.    And when you arrived, you saw Tavares

12  Docher outside of the CVS?

13     A.    Yes.

14     Q.    And explain to me his demeanor when you

15  arrived to the CVS.

16     A.    When we pulled up into the parking lot,

17  Mr. Docher began walking briskly towards the patrol

18  car, and Deputy Mangrum was parked adjacent; he was

19  the closest to Mr. Docher, and he made contact

20  first.  And Mr. Docher seemed somewhat relieved we

21  were there, because he wanted to explain his

22  situation and why he believed that his life was in

23  danger.

24     Q.    And when Tavares Docher was speaking with

25  Deputy Sheriff Mangrum, were you still inside the

Page 42

1    police car?

2         A.    No.

3         Q.    So is it correct that you and Deputy

4    Sheriff Mangrum both made contact with Tavares

5    Docher?

6         A.    Yes.

7         Q.    And at that point when you initially spoke

8    with Tavares Docher, did you ever feel that your

9    life was in danger at that point?

10        A.    No.

11        Q.    Did you ever feel if at that point Tavares

12   Docher was exhibiting any signs that would place you

13   or Deputy Sheriff Mangrum in fear for your lives?

14        A.    At that point when we were speaking to

15   him, no.

16        Q.    And during this conversation, did it

17   appear to you if Tavares Docher was experiencing

18   excited delirium?

19        A.    No.  I wasn't sure what he was

20   experiencing.  This was my second week on the road,

21   so I knew he was off, but I didn't know what was

22   wrong with him.

23        Q.    And when you say that you "knew that he

24   was off," what do you mean by that?

25        A.    Well, the Broward County Sheriff's Office

Page 43

1  doesn't have a SEAL Team Six, nor do they decapitate

2  people.

3      **Q.   So you felt that Tavares Docher was acting**

4  **strange.**

5      A.   Yes.

6      **Q.   Did you feel that he may be under the**

7  **influence of alcohol or drugs?**

8      A.   At that point I didn't know.

9      **Q.   Did you think that Tavares Docher may be**

10 **experiencing a psychotic episode?**

11     A.   At that point I didn't know.  It was all

12 through the interpretation.

13     **Q.   And during this conversation that you and**

14 **Deputy Sheriff Mangrum had with Tavares Docher, is**

15 **it correct that Tavares Docher told you and Deputy**

16 **Sheriff Mangrum that he had drank some Natty Ice?**

17     A.   He told that to myself and deputy --

18 excuse me -- myself, Deputy Mangrum, and Deputy

19 Newman.  Because Deputy Newman asked him, "How much

20 have you had to drink"?

21     **Q.   How long did the conversation last between**

22 **you, Deputy Mangrum, and Tavares Docher before**

23 **Deputy Newman arrived?**

24     A.   To be specific, I don't know.  Anywhere

25 between two to five minutes.  Two to five, six

1    minutes.

2        Q.    And is it correct that Deputy Sheriff

3    Newman was the third officer to be on scene?

4        A.    Technically, he was the second because I

5    was still riding with him.  But, yes, you could say

6    that.

7        Q.    So after the conversation that you and

8    Deputy Sheriff Mangrum had, is it fair to say that

9    Deputy Sheriff Newman arrived on scene and then

10   there were three police officers on scene?

11       A.    Yes.

12       Q.    And at that point Deputy Sheriff Newman

13   started to participate in the conversation that you

14   were having with Tavares Docher?

15       A.    Yes.

16       Q.    And during the conversation that you,

17   Deputy Sheriff Mangrum, Deputy Sheriff Newman was

18   having with Tavares Docher, at any point during that

19   conversation did you start to think to yourself:

20   This individual is experiencing excited delirium?

21       A.    No.  Not at that point.

22       Q.    How is Tavares Docher's demeanor once

23   Deputy Sheriff Newman arrived on scene?

24       A.    He was still pretty calm and collected.

25       Q.    How long after Deputy Sheriff Newman

Page 45

1    arrived was Tavares Docher placed under arrest for

2    disorderly conduct?

3         A.   A few minutes.  Say, at least 10.

4         Q.   Okay.  So during that period of time, tell

5    me why it was that Deputy Sheriff Newman placed

6    Tavares Docher under arrest for disorderly conduct.

7              MR. GIUFFREDA:  Form.  You could answer.

8         A.   Why?  I'm not really sure why he did it.

9    Maybe that was his best decision.

10   BY MR. HECHT:

11        Q.   Well, you were there, correct?

12        A.   Yes.

13        Q.   And you were involved in all the

14   conversations that Deputy Sheriff Newman was having

15   with Tavares Docher?

16        A.   Yes.

17        Q.   And so far, I've heard you tell me that

18   Tavares Docher seemed kind of off, correct?

19        A.   Yes.

20        Q.   And I've asked you to describe his

21   demeanor.  And you've told me it was pretty calm.

22   "He was relieved to have us there," correct?

23        A.   Yes.

24        Q.   So what I want to know is, is that if you

25   got a calm person who is relieved that law

Page 46

1   enforcement is there to help them, why is it that

2   Deputy Sheriff Newman placed Tavares Docher under

3   arrest for disorderly conduct?

4           MR. GIUFFREDA:  Form.  You could answer.

5       A.   Sir, I can't really answer that question

6   for Deputy Newman.

7    BY MR. HECHT:

8       Q.   Do you believe that there was probable

9   cause at that point for Deputy Sheriff Newman to

10  place Tavares Docher under arrest for disorderly

11  conduct based on what you observed?

12          MR. GIUFFREDA:  Form.  You could answer.

13      A.   Do I personally believe that?  Yes.

14   BY MR. HECHT:

15      Q.   So my question is:  Based on your training

16  and experience, why is it that there was probable

17  cause to place Tavares Docher under arrest for

18  disorderly conduct?

19          MR. GIUFFREDA:  Form.  You could answer.

20      A.   Well, to be honest, it really could have

21  went either way.  As I said before, he was a little

22  off.  So with the conversations of the Broward

23  sheriff's office SEAL Team Six, the decapitations,

24  between speaking with him and asking him about his

25  personal history and him disclosing the information

Page 47

1    that, you know, he had been arrested in Broward

2    County, that he had -- that he was a registered sex

3    offender, that he knew his birthday, social security

4    number, he knew where he was, he knew why he was in

5    town, it could have went either way.  I know

6    personally from my standpoint while talking with

7    him, as the wind changed -- the wind of the

8    direction changed -- excuse me -- the wind of the

9    direction changed, I smelled alcohol on his breath.

10   So I think that answers your question.  But I can't

11   tell you why he decided to do that.

12     BY MR. HECHT:

13       **Q.   And your testimony is that Deputy Sheriff**

14   **Newman placed Tavares Docher under arrest for**

15   **disorderly conduct?**

16       A.   Yeah.

17            MR. GIUFFREDA:  Form.  You could answer.

18       A.   Yeah.

19     BY MR. HECHT:

20       **Q.   What are the elements to arrest someone**

21   **for disorderly conduct?**

22       A.   Well, you either are drunk in a public

23   place causing a disturbance, or you are -- you're

24   just inebriated and you're going to be a danger to

25   yourself.  You're causing a public nuisance.

Page 48

1   Q.   And disorderly conduct is a second-degree

2   misdemeanor, correct?

3   A.   I'm not sure.

4   Q.   But it is a misdemeanor, correct?

5   A.   Yes.

6   Q.   It's certainly not a felony?

7   A.   No.

8   Q.   In order to place someone under arrest for

9   a second degree misdemeanor, does the officer have

10   to observe the conduct of the person?

11        MR. GIUFFREDA:  Form.  You could answer.

12   A.   Yes.

13   BY MR. HECHT:

14   Q.   Based on what you observed during this

15   interaction that you had with Tavares Docher outside

16   of the CVS, do you believe that Tavares Docher was

17   drunk?

18        MR. GIUFFREDA:  Form.  You could answer.

19        MS. TYK:  Object to form.

20   A.   What did she say?

21        MR. GIUFFREDA:  She just joined in my

22   objection.  You could answer.

23   A.   Could you ask the question one more time?

24   BY MR. HECHT:

25   Q.   Sure.  Based upon your interaction with

Page 49

1    **Tavares Docher outside of the CVS, prior to deputy**

2    **sheriff Newman arresting Tavares Docher, do you**

3    **believe that Tavares Docher was drunk?**

4              MR. GIUFFREDA:  Form.  You could answer.

5         A.   To be --

6              MS. TYK:  Join.

7         A.   To be quite honest, I wasn't sure.

8              MS. TYK:  Go ahead.

9         A.    It was -- like I said, it was my second

10   week on the job.  He had been drinking, but I

11   wouldn't -- to be honest, I wasn't sure -- I didn't

12   know whether he was drunk or not.  I didn't know

13   whether he was mentally delusional.  I didn't know

14   whether it was a combination of both.  I didn't

15   know.

16     BY MR. HECHT:

17        **Q.   During the interaction that you had with**

18   **Tavares Docher prior to Deputy Sheriff Newman**

19   **placing Tavares Docher under arrest, did you witness**

20   **Tavares Docher causing any sort of public**

21   **disturbance?**

22              MR. GIUFFREDA:  Form.  You could answer.

23        A.   He was very loud and boisterous, and he

24   caused a scene at several points.  Basically, the

25   volume of his voice caused a lot of attention.  But

1    he -- other than that, he was very animated.  So as

2    he told the story about the Broward County Sheriff

3    Office SEAL Team Six, he was kind of flailing around

4    and just telling the story for the most part.

5    That's mainly it.

6      BY MR. HECHT:

7         Q.   Okay.  My specific question is, though:

8    **Prior to Tavares Docher being placed under arrest by**

9    **Deputy Sheriff Newman, did you feel that based upon**

10   **your interaction with Tavares Docher that he was**

11   **causing a public disturbance?**

12            MR. GIUFFREDA:  Form.  You could answer.

13       A.   Yes.

14     BY MR. HECHT:

15       Q.   **Didn't you tell me, though, prior he was**

16   **calm and that he was relieved that you guys were**

17   **there?**

18       A.   Yes, but he kind of wavered, because he

19   had highs and lows during the conversation; like,

20   when we got there, I guess he was calm.  Then as he

21   told the story, he got up there.  And then I asked

22   him about his background; he got calm again.  We

23   asked him some more stuff about Broward, and he kind

24   of got amped up again.  And then he was calm at the

25   time he got placed into handcuffs.

Page 51

1      Q.   Did you ever think during that time that

2  it would have been appropriate to call medical

3  personnel to have Tavares Docher checked out?

4      A.   I didn't think so.  At that point in time,

5  no, I was still brand new.

6      Q.   Yet you had all of the authority and power

7  to make arrests during this time, correct?

8      A.   Yes.  But I wasn't going to exercise the

9  authority not really knowing what I was doing.

10      Q.   During the interaction that you had with

11  Tavares Docher prior to the point in time in which

12  Deputy Sheriff Newman placed Tavares Docher in

13  handcuffs, did you believe that Tavares Docher was a

14  danger to himself or others?

15      A.   Yes.

16      Q.   Why is that?

17      A.   Because of what he was telling us and the

18  screwdriver incident.  I, you know, to be honest, if

19  9-1-1 had not been called and a person of Arabic

20  descent came into the CVS, he may have stabbed him,

21  based off what he was telling us.

22      Q.   So Tavares Docher was placed in handcuffs

23  behind his back by Deputy Sheriff Newman and put

24  into the patrol car, correct?

25      A.   Yes.

Page 52

1        Q.    And after being placed in the patrol car,

2    he ran out of the patrol car, correct?

3        A.    Yes.

4        Q.    And after Tavares Docher ran out of the

5    patrol car, is it correct that you struck a large

6    muscle mass on or about Tavares Docher's legs and

7    hips?

8        A.    His upper thigh, yes.

9        Q.    Why did you do that?

10       A.    To stifle him from running away full speed

11   with his hands tied behind his back.  It was a

12   technique taught to us inside the basic law academy.

13       Q.    At this point there were three officers on

14   scene, correct?

15       A.    Yes.

16       Q.    At this point in time Tavares Docher still

17   had the handcuffs behind his back.

18       A.    Yes.

19       Q.    And after you struck his legs and hip, he

20   fell to the ground, correct?

21       A.    No, I struck his hips, and then I grabbed

22   his legs, and then we fell to the ground.

23       Q.    And when you fell to the ground, what

24   position did you take on Tavares Docher at that

25   point in time?

Page 53

 1       A.   His legs.

 2       Q.   **And Deputy Sheriff Mangrum was where at**

 3  **that point?**

 4       A.   He was near his upper body.

 5       Q.   **And where was Deputy Newman at that point**

 6  **in time?**

 7       A.   Near his upper body.

 8       Q.   **While all three deputies were trying to**

 9  **control Tavares Docher, was he struggling?**

10       A.   Yes.

11       Q.   **And while Tavares Docher was on the ground**

12  **struggling, did Deputy Mangrum utilize palm heel**

13  **strikes to large muscle areas, including Tavares's**

14  **shoulders, chest, and back?**

15       A.   I don't know.  I didn't see that, but

16  that's what's in the report.

17       Q.   **What is a palm heel strike to a large**

18  **muscle area?**

19       A.   It is when you take your open hand, curl

20  your fingers halfway down, and use a forward

21  striking motion making contact with the palm of your

22  hand to whatever muscle group you're aiming at.

23       Q.   **Based upon your training and experience,**

24  **is a palm heel strike when an officer has a closed**

25  **fist?**

Page 54

1       A.   No.   A palm heel strike is a palm heel

2   strike.

3       Q.   So the fist is not closed.

4       A.   No.

5       Q.   Is a palm heel strike to a large muscle

6   mass, including the shoulders, chest, or back, based

7   on your training and experience, likely to cause

8   great bodily harm?

9            MR. GIUFFREDA:  You could answer.

10      A.   No.   Well, I think any strike is likely to

11  cause bodily harm.  But no, it's not classified that

12  something is restricted.  Only for emergencies.

13  BY MR. HECHT:

14      Q.   So would you agree with me that a palm

15  heel strike to a large muscle mass, including the

16  shoulders, chest, and back, is likely to cause great

17  bodily harm?

18            MR. GIUFFREDA:  Form.  You could answer.

19      A.   No.

20  BY MR. HECHT:

21      Q.   Didn't you just tell me that any strike

22  could cause great bodily harm?

23      A.   Yes.

24      Q.   Let me ask the question again.  Can a palm

25  heel strike to a large muscle area, including the

Page 55

1    shoulders, chest, and back, cause great bodily harm?

2         A.   On a normal, healthy person, no.

3         Q.   Did you know Tavares Docher was a normal,

4    healthy person?

5         A.   He seemed to be.

6         Q.   Did you examine him?

7         A.   No.  Just from speaking with him, looking

8    at his mannerisms.

9         Q.   And he seemed odd to you?

10        A.   He seemed normal.

11        Q.   I thought you said he was off?

12        A.   There is a lot of off people out there.

13        Q.   I want to know about him.  Did he seem

14   normal to you, or was he off?

15        A.   He seemed off mentally but physically he

16   seemed normal.

17        Q.   Did Deputy Newman apply his right thumb to

18   the nerve mass in the neck of Tavares Docher?

19        A.   I didn't see him do that.

20        Q.   If Deputy Newman applied his right thumb

21   to the nerve mass in Tavares Docher's neck, would

22   that be classified based upon basic law enforcement

23   training as likely to cause great bodily harm?

24             MR. GIUFFREDA:  Form.  You could answer.

25        A.   No.

Page 56

1    BY MR. HECHT:

2       Q.   If Deputy Newman applied his right thumb

3    to the nerve mass in Tavares Docher's neck based

4    upon what you've learned in the basic law

5    enforcement training, would that be classified as

6    deadly force?

7            MR. GIUFFREDA:  Form.  You could answer.

8       A.   No.

9    BY MR. HECHT:

10      Q.   Are you aware if Deputy Newman gave an

11   elbow strike to the right side of Tavares Docher's

12   head?

13      A.   No, I didn't see that.

14      Q.   If Deputy Newman gave an elbow strike to

15   the right side of Tavares Docher's head, based upon

16   what you learned in the basic law enforcement

17   training, would that be likely to cause great bodily

18   harm?

19           MR. GIUFFREDA:  Form.  You could answer.

20      A.   Yes.

21   BY MR. HECHT:

22      Q.   If Deputy Newman gave an elbow strike to

23   the right side of Tavares Docher's head based upon

24   what you learned in the basic law enforcement

25   training, would that be classified as deadly force?

Page 57

1              MR. GIUFFREDA:  Form.  You could answer.

2        A.   From basic law enforcement academy or from

3   St. Lucie?

4    BY MR. HECHT:

5        Q.   Based upon your training in the basic law

6   enforcement training --

7        A.   No.

8        Q.   -- if Deputy Newman gave an elbow strike

9   to the right side of Tavares Docher's head based

10  upon any of the training experience that you have

11  ever been through, would that be likely to cause

12  great bodily harm?

13             MR. GIUFFREDA:  Form.  You could answer.

14       A.   Yes.

15   BY MR. HECHT:

16       Q.   If Deputy Newman gave an elbow strike to

17  the right side of Tavares Docher's head, based upon

18  any and all of the training and experience that

19  you've undergone in your law enforcement career,

20  would those actions be classified as deadly force?

21             MR. GIUFFREDA:  Form.  You could answer.

22       A.   No.

23   BY MR. HECHT:

24       Q.   Did you ever witness Deputy Newman give an

25  elbow strike to the right side of Tavares Docher's

1   head?

2            MR. GIUFFREDA:  Form.  You could answer.

3       A.   No.

4    BY MR. HECHT:

5       Q.   If you had seen Deputy Newman strike

6   Tavares Docher with his elbow to the right side of

7   his head, would you have told Deputy Newman to stop

8   doing that?

9            MR. GIUFFREDA:  Form.  You could answer.

10      A.   Yes.

11   BY MR. HECHT:

12      Q.   Why?

13      A.   Because it wouldn't need it.  I don't

14   know.

15      Q.   Why would Tavares Docher not have needed a

16   right elbow -- strike that.

17           Why would Tavares Docher not have needed

18   an elbow strike to the right side of his head?

19           MR. GIUFFREDA:  Form.  You could answer.

20      A.   From my perspective, it didn't seem that

21   way.

22   BY MR. HECHT:

23      Q.   What did not seem that way?

24      A.   That he needed it.

25      Q.   Why did he not need it?

1                 MR. GIUFFREDA:  Form.  You could answer.

2        A.    From my perspective, he was fighting with

3    me with his legs, and there is just no need to hit

4    somebody while they're on the ground handcuffed and

5    struggling.

6    BY MR. HECHT:

7        Q.    **If Deputy Newman gave an elbow strike to**

8    **Tavares Docher's head, based on your training and**

9    **experience would Deputy Newman have utilized**

10   **excessive and unreasonable use of force?**

11                MR. GIUFFREDA:  Form, you could answer.

12       A.    No.

13   BY MR. HECHT:

14       Q.    **But you would agree with me that if Deputy**

15   **Newman gave an elbow strike to the right side of**

16   **Tavares Docher's head, that based upon your training**

17   **and experience that would be likely to cause great**

18   **bodily harm?**

19                MR. GIUFFREDA:  Form.  You could answer.

20       A.    Yes.

21   BY MR. HECHT:

22       Q.    **But it would not be considered excessive**

23   **and unreasonable use of force under these**

24   **circumstances?**

25                MR. GIUFFREDA:  Form.  You could answer.

1      A.   Every officer conceives the situation

2   differently.  I can't say what Deputy Newman felt or

3   saw was needed at the time.  Deputy Newman was a lot

4   more experienced than I was.  At this point, like I

5   said, I had been working the road for two weeks.

6   So, approximately 10 days.  So I can't tell you that

7   yes or no, whether Deputy Newman did the right

8   actions based off his appropriate training.  But for

9   me at that point, no.

10   BY MR. HECHT:

11      **Q.   If you were controlling Tavares Docher's**

12   **legs and Deputy Mangrum and Deputy Newman were**

13   **controlling his upper body, if in that circumstance**

14   **Deputy Sheriff Newman, while Tavares Docher was**

15   **handcuffed behind his back, gave an elbow strike to**

16   **Tavares Docher's head, do you believe that Deputy**

17   **Sheriff Newman in doing that used excessive and**

18   **unreasonable use of force?**

19           MR. GIUFFREDA:  Form.  You could answer.

20      A.   No, I can't speak for Deputy Newman and

21   his own actions.

22   BY MR. HECHT:

23      **Q.   At any point during the struggle with**

24   **Tavares Docher, did you ever say to Deputy Sheriff**

25   **Newman or Deputy Sheriff Mangrum to stop hitting**

Page 61

1    Tavares Docher or striking Tavares Docher in any

2    way?

3              MR. GIUFFREDA:  Form.  You could answer.

4        A.   No, not from what I recall.

5    BY MR. HECHT:

6        Q.   What involvement did Deputy Sheriff Wade

7    Courtemanche have during this interaction with

8    Tavares Docher?

9        A.   To be honest, I don't remember.

10       Q.   Do you remember Deputy Sheriff Wade

11   Courtemanche at CVS?

12       A.   No, I never saw him there.

13       Q.   During your entire interaction with

14   Tavares Docher, was at any point Tavares Docher

15   causing you to believe that he was exhibiting a

16   level of force whereby it would be necessary to

17   justify your use of deadly force?

18       A.   Deadly force?  No.

19       Q.   Based upon your interaction with Tavares

20   Docher at the CVS, was Tavares Docher at any point

21   in time causing you to believe that Tavares Docher

22   was exhibiting a level of force against Deputy

23   Sheriff Newman or Deputy Sheriff Mangrum whereby it

24   would have been necessary for Deputy Sheriff Newman

25   or Deputy Sheriff Mangrum to justify the use of

Page 62

1    deadly force against Tavares Docher?

2        A.   No.

3        Q.   Were you trained in basic law enforcement

4    training to intervene when you see another officer

5    committing a constitutional violation of deadly

6    force?

7        A.   Yes.

8        Q.   Were you also taught this in your training

9    at the St. Lucie County Sheriff's Office?

10       A.   Yes.

11       Q.   Was it solely Deputy Sheriff Newman's

12   decision to make an arrest in this case; or did he

13   discuss whether to make an arrest with either you

14   and Deputy Sheriff Mangrum?

15       A.   It was his decision because it was his

16   arrest.

17       Q.   Did you ever have a conversation with

18   Tavares Docher after he was handcuffed and on the

19   ground?

20       A.   No.

21       Q.   Did you ever tell Tavares Docher to stop

22   resisting once he was on the ground with handcuffs

23   behind his back?

24       A.   Yes.

25       Q.   So it's your testimony that Tavares Docher

Page 63

1    was resisting arrest?

2         A.    He was, yes.

3         Q.    How was he resisting arrest?

4         A.    For one, he tried to flee.  And two, we

5    had to tackle him to the ground.  And three, he was

6    bucking and flailing around his legs, so I was on

7    top of his legs and I had to tell him to stop

8    resisting.

9         Q.    Is one of the reasons that Tavares Docher

10   was flailing his legs, as you say, because he

11   couldn't breathe?

12             MR. GIUFFREDA:  Form.  You could answer.

13        A.    No.

14    BY MR. HECHT:

15        Q.    This was a significant struggle, wasn't

16   it?

17        A.    Yes.

18        Q.    Do you remember how Tavares Docher was

19   breathing?

20        A.    He was -- no, not specifically, not at

21   this point.

22        Q.    Was he having a difficult time breathing?

23        A.    I don't think so.

24        Q.    Have you seen any video footage of the

25   arrest of Tavares Docher or anything thereafter?

Page 64

1        A.    Yes.

2        Q.    **You saw the struggle on video?**

3        A.    Yes.

4        Q.    **It was taken by a bystander.**

5        A.    Yes.

6        Q.    **When was the last time you saw that video?**

7        A.    Today.

8        Q.    **Right before this deposition?**

9        A.    Uh-huh.

10        Q.    **How long did the struggle last once you**

11  **and Tavares Docher fell to the ground?**

12        A.    I'd say it lasted less than a minute.  And

13  he calmed down and then he -- for a minute or two.

14  And he started struggling again for, like, another

15  minute or two, and then he calmed down.  And by the

16  time fire rescue came, he was calm until we

17  attempted to put him on the gurney, and then he

18  began to become hostile again.

19        Q.    **Prior to fire rescue arriving and your**

20  **attempt to put him on a gurney, how long did the**

21  **struggle last for?**

22            MR. GIUFFREDA:  In total, or which --

23            MR. HECHT:  In total.

24    BY MR. HECHT:

25        Q.    **Prior to fire rescue arriving, how long**

1   did the total struggle last for?

2        A.   I don't know specifically.

3        Q.   **How long was Tavares Docher face first on**

4   **the ground with his stomach on the ground?**

5        A.   I don't know specifically.  But at one

6   point I remember rolling him over to the side so he

7   can breathe.

8        Q.   **Prior to rolling him over to the side, how**

9   **long had the struggle lasted for?**

10       A.   Less than a minute.

11       Q.   **When you were -- when you fell down with**

12  **Tavares Docher, why was there a need for three**

13  **officers to gain control of him?**

14       A.   Well, when he lunged out of the car, he

15  lunged at the two other deputies.  I stood to the

16  side.  And as he pushed him across the parking lot,

17  that's when I performed the take-down.  It just

18  happened just like that.

19       Q.   **Why didn't you just lift Tavares Docher**

20  **off the ground since he was handcuffed behind his**

21  **back?**

22            MR. GIUFFREDA:  Form.

23       A.   Because that's dangerous.

24    BY MR. HECHT:

25       Q.   **Why is that dangerous?**

Page 66

1       A.    If I lift him several feet off the air and

2   he falls on his head while he's handcuffed, he could

3   get hurt.

4       **Q.    So based upon your training and**

5   **experience, are you trained to keep an individual**

6   **laying on the ground with handcuffs behind them?**

7       A.    Yes, until you can gain compliance.

8       **Q.    No matter how much time goes by and how**

9   **long a struggle ensues.**

10      A.    Yes.  And then once they're compliant, you

11  lift them you up.  You can either sit them up or

12  roll them on their side, whatever.  But you don't

13  pick them up.

14      **Q.    Did you have any conversations with**

15  **paramedic Jose Rosario prior to that paramedic**

16  **administering the injection?**

17      A.    Yes, a quick conversation.  He asked what

18  happened, and we told him that we had to take him

19  down to the floor, he hit his head, and that's where

20  the blood came from, and that was pretty much it.

21      **Q.    Did paramedic Jose Rosario ever discuss**

22  **with you whether or not he should inject Tavares**

23  **Docher with any sort of medication?**

24      A.    No.

25      **Q.    Did you hear any conversations -- let me**

Page 67

1   rephrase.

2           Did you ever hear any conversations

3   between any of the deputies on scene discuss whether

4   or not Jose Rosario should inject Tavares Docher

5   with a medication?

6       A.   No.

7       Q.   Did you ever see Jose Rosario, who was the

8   paramedic that injected my client with a sedative --

9   did you ever see him try and talk to Tavares Docher

10  prior to administering the injection?

11      A.   Yes.

12           MS. TYK:   Form.

13    BY MR. HECHT:

14      Q.   What do you remember about that

15  conversation?

16      A.   She said something.

17      Q.   It's okay.

18           MR. GIUFFREDA:   You could answer.

19      A.   I remember him saying, "Hey man, what's

20  up?  How can we help you?"  I think that's pretty

21  much it.

22    BY MR. HECHT:

23      Q.   He literally said, "Hey man, what's up?

24  How can we help you?"

25      A.   Yes, from what I remember.

Page 68

1   Q. And do you recall what Tavares Docher's

2 response was?

3   A. He didn't respond.  He just kind of just

4 sat there.  When we turned him over, he kicked him.

5   Q. Did you ever -- strike that.

6   Were you ever investigated by internal

7 affairs as a result of this incident?

8   A. Yes.

9   Q. And what was the outcome of that?

10   A. I was cleared negative findings, I guess

11 is the proper termination.

12   Q. You were not disciplined and sanctioned in

13 any way as a result of your involvement with this

14 incident?

15   A. No.

16   Q. Do you know if any of the officers

17 involved with this incident on May 11, 2014 were

18 ever disciplined or sanctioned in any way?

19   A. No, I don't think so.

20   Q. Do you believe that you followed all of

21 the customs, policies, and procedures of the

22 St. Lucie County Sheriff's Office in your

23 involvement with this incident involving my client?

24   MR. GIUFFREDA:  Form.  You could answer.

25   A. Yes.

Page 69

1

2    BY MR. HECHT:

3         Q.   Do you believe that the actions of Deputy

4    Sheriff Newman and Deputy Sheriff Mangrum complied

5    with the customs, policies, and practices of the

6    St. Lucie County Sheriff's Office and their

7    involvement in this case?

8              MR. GIUFFREDA:   Form.   You could answer.

9         A.   Yes.

10             MR. HECHT:   All right.   Why don't we take

11       a break?   We can go off the record.

12             (Recess 12:25 p.m. until 12:32 p.m.)

13    BY MR. HECHT:

14        Q.   All right, sir.   I'm going to show you a

15    video that's approximately 1 minute and 11 seconds,

16    and it was taken by a bystander.   I'm going to have

17    you watch the video, and then I will ask you some

18    questions.   Okay?

19        A.   Okay.

20             (Video played.)

21    BY MR. HECHT:

22        Q.   Based on the video that you just watched,

23    I see that there are two white officers and a black

24    officer, correct?

25        A.   Yes.

Page 70

1       Q.   Who is the officer who is a white male

2  with a bald head?

3       A.   That is Deputy Clay Mangrum.

4       Q.   And who is the other white officer?

5       A.   Deputy Christopher Newman.

6       Q.   In this video did you see Deputy Sheriff

7  Mangrum with his foot on Tavares Docher's neck?

8       A.   No.  I saw it his on back.

9       Q.   And what offensive or defensive technique

10  is that known as?

11       A.   I don't know.  I've never learned that

12  one.

13       Q.   Is the "foot on the back technique"

14  trained in the basic law enforcement training

15  program?

16       A.   No.

17       Q.   Did you ever learn the "foot on the back

18  technique" during your training with the St. Lucie

19  County Sheriff's Office?

20       A.   No.

21       Q.   Is that an approved technique?

22       A.   I don't know.  I never heard them speak

23  about saying not to do it.

24       Q.   And the third officer, is that you?

25       A.   Yes.

Page 71

1        Q.    In this video, at any point did you see

2    yourself punch Tavares Docher on his side?

3        A.    There is a closed-fist strike to his upper

4    thigh.

5        Q.    And what was the purpose of you striking

6    Tavares Docher with a closed fist strike to his

7    upper thigh?

8        A.    To gain compliance from him to stop him

9    from kicking.

10        Q.    Did you have any other options besides

11    punching him?

12        A.    At that part of his body, no.

13             MR. HECHT:  Okay.  You could go back and

14        sit down.  That's all the questions I have on

15        the video.  Let me go back and look at my notes

16        very quickly, sir.

17             Okay.  Thank you, sir, I don't have any

18        other questions.

19             MR. GIUFFREDA:  Julie?

20             MS. TYK:  Yep, just a couple.

21                       CROSS-EXAMINATION

22    BY MS. TYK:

23        Q.    Good afternoon.  My name is Julie Tyk.  I

24    represent the St. Lucie Fire District and Jose

25    Rosario.  I just have a few questions for you.

Page 72

1          Do you personally know Mr. Rosario?

2     A.   No.

3     Q.   Do you recall anytime during the struggle

4  in which Mr. Docher was yelling, "Don't let them

5  kill me" on May 11, 2014?

6     A.   You said, "Do I recall that"?

7     Q.   Right.

8     A.   Yes, ma'am.

9     Q.   Okay.  When the fire rescue EMS personnel,

10  including Mr. Rosario, arrived on scene, was

11  Mr. Docher yelling that phrase at that time?

12     A.   No.

13     Q.   Was there any discussions with the fire

14  rescue personnel, including Mr. Rosario, to give

15  Tavares Docher an injection to prevent him from

16  speaking?

17     A.   No, ma'am.

18          MS. TYK:  That's all the questions I have.

19          MR. GIUFFREDA:  I have none.  Do you have

20     any more?  If it's ordered, he'll read.

21          MR. HECHT:  I will be ordering.

22          MR. GIUFFREDA:  I'll take a regular and a

23     mini.

24          THE COURT REPORTER:  Ms. Tyk, do you need

25     a copy?

Page 73

1              MS. TYK:  Yes.  E-tran, please.

2              MR. GIUFFREDA:  As far as reading goes,

3       can you send it to me and I'll make sure he

4       gets it?

5              (The proceedings concluded at 12:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

        I, the undersigned authority, certify that CALVIN ROBINSON personally appeared before me and was duly sworn on the 25th day of May, 2017.

        Signed this 30th day of May, 2017.

_____
PATRICIA A. LANOSA, RPR, FPR, CSR
Notary Public, State of Florida
My Commission No. FF 169350
Expires: 10/19/2018

CERTIFICATE OF REPORTER


STATE OF FLORIDA

COUNTY OF PALM BEACH


       I, PATRICIA A. LANOSA, Registered

Professional Reporter, do hereby certify that I

was authorized to and did stenographically report

the foregoing deposition of CALVIN ROBINSON;

Pages 1 through 77; that a review of the

transcript was requested; and that the transcript

is a true record of my stenographic notes.

       I FURTHER CERTIFY that I am not a

relative, employee, attorney, or counsel of any

of the parties, nor am I a relative or employee

of any of the parties' attorneys or counsel

connected with the action, nor am I financially

interested in the action.

       Dated this 30th day of May, 2017.


PATRICIA A. LANOSA, RPR, FPR, CSR

May 30, 2017

PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
c/o Calvin Robinson
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
(954)462-3200
ATTN:  RICHARD GIUFFREDA, ESQUIRE

Re:  Docher v. Newman et al.
Case No.:  2:16cv14413

Please take notice that on the 25th day of May,
2017, you gave your deposition in the above cause.
At that time, you did not waive your signature.

The above-addressed attorney has ordered a copy of
this transcript and will make arrangements with you
to read their copy.  Please execute the Errata
Sheet, which can be found at the back of the
transcript, and have it returned to us for
distribution to all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.

Very truly yours,

PATRICIA A. LAROSA, RPR, FPR, CSR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.

_____
CALVIN ROBINSON

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re:  DOCHER V. NEWMAN ET AL.
Case No.:  2:16cv14413
CALVIN ROBINSON
May 25, 2017


PAGE    LINE         CHANGE                  REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.


_____              _____

Date                         CALVIN ROBINSON

**A**

**a.m** 1:21 4:1
**ability** 22:19
  25:12
**able** 24:5,7,8,9
  24:13,14,25
  25:1,8,8,13
  37:1
**above-address...**
  76:9
**academy** 14:8
  14:10,10,11,22
  15:8,17 19:17
  52:12 57:2
**Act** 31:4,4 32:10
**Acted** 32:4,8,18
**acting** 10:5 43:3
**action** 75:17,18
  60:8,21 69:3
**actions** 57:20
**Adam** 2:6 4:15
**addition** 7:17
**additional** 16:3
  18:14
**address** 5:20
  10:8 76:16
**adjacent** 41:18
**administering**
  66:16 67:10
**administration**
  6:24
**AED** 40:17
**affairs** 68:7
**affirmed** 4:9
**afternoon** 71:23
**agencies** 13:2
**agency** 12:18
  13:24 14:2
  20:10,11 26:11
**agree** 26:15,24
  27:6,13,20
  28:2,9,16,23
  29:6,12,19
  54:14 59:14
**ahead** 49:8
**aiming** 53:22

**air** 19:9,10,15
  39:20 66:1
**al** 76:5 77:3
**alcohol** 34:10
  43:7 47:9
**allowed** 25:6
**ambulance**
  31:16,19 32:1
  32:11,19 39:16
  39:24,24 40:21
**amped** 50:24
**animated** 50:1
**answer** 5:2
  26:19,21 27:3
  27:10,17,24
  28:6,13,20
  29:2,9,16,24
  30:9 31:1 32:3
  32:21 33:6
  45:7 46:4,5,12
  46:19 47:17
  48:11,18,22
  49:4,22 50:12
  54:9,18 55:24
  56:7,19 57:1
  57:13,21 58:2
  58:9,19 59:1
  59:11,19,25
  60:19 61:3
  63:12 67:18
  68:24 69:8
**answers** 26:14
  47:10
**anytime** 34:20
  34:21 72:3
**anyway** 5:18
**apparatus** 40:12
**appear** 42:17
**APPEARAN...**
  2:1
**appeared** 74:9
**application** 13:6
**applied** 8:21
  13:2 35:11,14
  40:16 55:20
  56:2
**apply** 4:22 55:17

**appropriate**
  51:2 60:8
**approval** 25:23
  26:3
**approved** 70:21
**approximately**
  4:20 60:6
  69:15
**Arabic** 51:19
**area** 15:4,10
  16:11,15 17:13
  17:17 53:18
  54:25
**areas** 15:1 53:13
**arm** 40:5,7
**arms** 40:2
**arrangements**
  76:9
**arrest** 25:11
  26:4 31:6 33:3
  35:19 37:25
  45:1,6 46:3,10
  46:17 47:14,20
  48:8 49:19
  50:8 62:12,13
  62:16 63:1,3
  63:25
**arrested** 38:1
  47:1
**arresting** 49:2
**arrests** 22:19
  24:9 51:7
**arrival** 36:3
**arrive** 30:16
  40:25
**arrived** 37:2
  40:19 41:5,11
  41:15 43:23
  44:9,23 45:1
  72:10
**arriving** 36:6
  64:19,25
**ash@searcyla...**
  2:7
**asked** 37:14,25
  38:2 39:7,11
  40:1,9,11

  43:19 45:20
  50:21,23 66:17
**asking** 22:18
  46:24
**assigned** 20:16
  20:20
**assist** 40:12
**assisted** 40:22
**assume** 5:3
  31:15 32:7
**assuming** 9:10
  31:18
**attempt** 64:20
**attempted** 39:8
  64:17
**attempting**
  36:23
**attend** 7:1 37:13
**attention** 49:25
**ATTN** 76:4
**attorney** 75:14
  76:9,13
**attorneys** 75:16
**August** 10:1,4
  20:5
**authority** 22:15
  51:6,9 74:8
**authorized** 75:8
**Avenue** 1:23
  2:15
**aware** 56:10

**B**

**Bachelor's** 7:14
**back** 8:25 9:25
  13:12 26:9
  28:25 29:7
  30:14 35:11,14
  37:3 38:6,7,17
  39:23 40:21
  51:23 52:11,17
  53:14 54:6,16
  55:1 60:15
  62:23 65:21
  70:8,13,17
  71:13,15 76:10
**background**

  50:22
**backup** 38:24
**backwards**
  39:14
**Baker** 31:4 32:4
  32:8,10,18
**bald** 70:2
**BARNHART**
  2:4
**BARRANCO**
  2:9 76:2
**Barry** 6:15,16
  6:21 7:1,7,10
  7:15 8:3,15,25
  9:7,25 10:5,11
  10:18 11:12
**based** 24:18
  29:12 30:3,19
  31:2,22 32:14
  32:24 33:15,23
  46:11,15 48:14
  48:25 50:9
  51:21 53:23
  54:6 55:22
  56:3,15,23
  57:5,9,17 59:8
  59:16 60:8
  61:19 66:4
  69:22
**basic** 14:13,16
  14:21,25 15:3
  15:8,16,22
  26:15,24 27:6
  27:13,20 28:2
  28:9,16,23
  29:5 35:7
  52:12 55:22
  56:4,16,24
  57:2,5 62:3
  70:14
**Basically** 49:24
**Beach** 2:4,5 74:5
  75:4 76:20
**beer** 38:4
**began** 4:1 7:7
  8:2,15 9:6,10
  9:17 14:6 16:1

19:18 35:20 39:14 41:17 64:18
**beginning** 7:2
**behalf** 2:2,8,13
**behavior** 33:24 34:6
**believe** 46:8,13 48:16 49:3 51:13 60:16 61:15,21 68:20 69:3
**believed** 29:21 41:22
**belt** 21:13,20
**best** 24:11 26:6 38:25 39:3 45:9
**birth** 5:12,15,20 5:21 6:2,7
**birthday** 47:3
**births** 6:5
**bit** 17:8
**black** 36:13,13 69:23
**blank** 76:15
**bleeding** 39:9
**blood** 66:20
**bodily** 27:2,9,23 28:12 29:1 54:8,11,17,22 55:1,23 56:17 57:12 59:18
**body** 34:7 37:18 53:4,7 60:13 71:12
**boisterous** 49:23
**bottom** 76:15
**Boulevard** 2:4 2:10 76:3
**brain-induced** 34:9
**branch** 19:8
**brand** 26:7 51:5
**break** 69:11
**breath** 47:9
**breathe** 63:11

65:7
**breathing** 35:10 40:12 63:19,22
**bridge** 27:22 28:4
**briskly** 41:17
**Broward** 36:19 37:12,16 42:25 46:22 47:1 50:2,23
**bucking** 63:6
**bulletproof** 22:7
**buttocks** 39:19
**bystander** 64:4 69:16

---
**C**
**c/o** 76:2
**CAD** 24:18 36:12
**call** 24:21,24 34:11 36:1,2,3 51:2
**called** 17:5 36:24 38:24 51:19
**calls** 24:18
**calm** 44:24 45:21,25 50:16 50:20,22,24 64:16
**calmed** 31:8 64:13,15
**Calvin** 1:9,17 4:8 5:11 74:9 75:9 76:2,22 77:4,24
**car** 21:8 30:15 37:6 38:6,9,11 38:12,15 41:2 41:18 42:1 51:24 52:1,2,5 65:14
**career** 57:19
**case** 1:2 5:17 34:13 62:12 69:7 76:6 77:3

**cause** 24:10,15 24:17 27:2,9 27:23 28:11 29:1 46:9,17 54:7,11,16,22 55:1,23 56:17 57:11 59:17 76:7
**caused** 49:24,25
**causing** 47:23 47:25 49:20 50:11 61:15,21
**certain** 36:24 37:24 39:4
**certainly** 48:6
**Certificate** 3:9 3:10 74:1 75:1
**certify** 74:8 75:7 75:13
**CHANGE** 77:6
**changed** 36:4 47:7,8,9
**CHANGES** 77:2
**checked** 51:3
**checklist** 24:23
**chemical** 34:9
**chest** 40:9,10,11 53:14 54:6,16 55:1
**Christopher** 1:8 70:5
**circumstance** 60:13
**circumstances** 59:24
**CIT** 17:6
**city** 10:24
**civilian** 26:5
**classification** 36:4
**classified** 26:17 27:16 28:4,18 29:8,15 36:2 54:11 55:22 56:5,25 57:20
**Clay** 20:21 70:3
**CLAYTON** 1:8

**cleared** 31:12 68:10
**Clerk** 76:14
**client** 7:23 67:8 68:23
**close** 38:21,22
**closed** 53:24 54:3 71:6
**closed-fist** 71:3
**closest** 41:19
**clothing** 21:23 22:12
**coded** 39:21
**collected** 44:24
**College** 18:22,24 19:2
**combination** 49:14
**come** 26:7 34:17
**coming** 37:19
**Commission** 74:16
**commit** 30:8 32:17
**committed** 30:22 31:25 33:2
**committing** 62:5
**Community** 18:22
**complete** 35:5
**compliance** 66:7 71:8
**compliant** 66:10
**complied** 69:4
**compressions** 40:10,10,11
**computer** 20:13
**conceal** 36:23
**conceives** 60:1
**concluded** 73:5
**conduct** 36:5 45:2,6 46:3,11 46:18 47:15,21 48:1,10
**confidentiality** 6:2

**connected** 75:17
**considered** 8:14 59:22
**consist** 16:5
**constitutional** 62:5
**contact** 26:4 29:20,22 30:4 30:20 31:23 32:15,25 34:17 36:8 41:19 42:4 53:21
**contacting** 30:7
**continued** 38:11
**control** 38:23 53:9 65:13
**controlling** 60:11,13
**conversation** 42:16 43:13,21 44:7,13,16,19 50:19 62:17 66:17 67:15
**Conversational** 14:17
**conversations** 45:14 46:22 66:14,25 67:2
**copy** 72:25 76:9 76:10
**correct** 8:4 9:8 9:15,18 10:3 12:12 18:5,9 33:12 41:6,8 42:3 43:15 44:2 45:11,18 45:22 48:2,4 51:7,24 52:2,5 52:14,20 69:24
**counsel** 75:14,16
**County** 1:10,12 2:13 8:19,22 9:3,14,21 10:6 10:22 11:3,5,8 11:18,21,24 12:11 13:16,23 14:3,7 16:2,10

16:14,19,24
17:12,16,21
18:1,5,9 19:19
19:23 20:7
30:13 31:3
34:3 35:20
36:19 37:12,16
42:25 47:2
50:2 62:9
68:22 69:6
70:19 74:5
75:4
**couple** 23:24
71:20
**course** 26:25
27:7,14 28:3
28:10,17,24
29:6
**courses** 10:19
35:8
**court** 1:1 4:2 6:8
37:13 72:24
76:14
**Courtemanche**
1:9 61:7,11
**crime** 26:13 30:8
30:22 31:25
32:17
**crisis** 17:6
**Cross** 3:8
**CROSS-EXA...**
71:21
**CSR** 1:25 74:15
75:21 76:18
**curl** 53:19
**currently** 6:12
11:11,17 12:8
**customers** 36:21
**customs** 68:21
69:5
**cut** 37:18 40:15
**CVS** 36:2,6,7,17
36:18 37:15
40:25 41:5,12
41:15 48:16
49:1 51:20
61:11,20

**D**

**D** 3:2
**danger** 41:23
42:9 47:24
51:14
**dangerous** 65:23
65:25
**date** 5:12,15,19
5:21 6:2,7 21:7
37:10 77:24
**Dated** 75:19
**dates** 6:4
**day** 21:11,25
74:10,12 75:19
76:7
**days** 60:6 76:13
**deadly** 26:18
27:16 28:5,19
29:8 56:6,25
57:20 61:17,18
62:1,5
**dealing** 33:22
**decapitate** 43:1
**decapitations**
46:23
**decided** 31:9
47:11
**decision** 13:15
25:20 45:9
62:12,15
**decisions** 25:15
**declare** 77:21
**Defendant** 2:8
**Defendants** 1:13
**defensive** 14:17
14:18 16:6
20:13 70:9
**deficiency** 35:16
35:19
**degree** 7:13
18:23 48:9
**delirium** 15:19
15:24 17:1
18:3,12,16
29:14,22 30:6
30:21,25 31:24

32:17 33:2,4
33:12,17,21
34:5,15,23
35:1 42:18
44:20
**delusional** 49:13
**demeanor** 41:14
44:22 45:21
**DENNEY** 2:3
**department**
12:6,15
**depends** 22:20
**deposition** 1:16
4:17,17 64:8
75:9 76:7,12
**depositions** 4:23
**deputies** 53:8
65:15 67:3
**deputy** 8:12
10:5 19:21,21
20:22 21:4,9
21:12,25 22:4
22:15 24:4
25:8,22 26:3
37:2,3,20,23
37:23,24 38:5
38:10,16,17,21
38:21,23 40:4
40:24 41:2,4
41:18,25 42:3
42:13 43:14,15
43:17,18,18,19
43:22,23 44:2
44:8,9,12,17
44:17,23,25
45:5,14 46:2,6
46:9 47:13
49:1,18 50:9
51:12,23 53:2
53:5,12 55:17
55:20 56:2,10
56:14,22 57:8
57:16,24 58:5
58:7 59:7,9,14
60:2,3,7,12,12
60:14,16,20,24
60:25 61:6,10

61:22,23,24,25
62:11,14 69:3
69:4 70:3,5,6
**descent** 51:20
**describe** 26:6
45:20
**described** 36:12
**description**
36:14
**detail** 25:19
**determination**
34:22 35:2,3
**determine** 24:15
33:16
**DICKER** 2:15
**died** 39:22
**different** 23:12
**differently** 60:2
**difficult** 63:22
**Direct** 3:8 4:11
**direction** 47:8,9
**dirt** 37:5
**discharged**
19:13
**disciplined**
68:12,18
**disclosing** 46:25
**discontinued**
11:23
**discretion** 25:16
**discuss** 62:13
66:21 67:3
**Discussion** 6:10
**discussions**
72:13
**disorderly** 36:5
38:1 45:2,6
46:3,10,18
47:15,21 48:1
**dispatched** 36:1
**distribution**
76:11
**district** 1:1,1,12
1:12 2:13
71:24
**disturbance**
47:23 49:21

50:11
**Docher** 1:4 4:16
7:24 34:14,15
34:18,21 35:25
36:9,11,18,21
37:3,7,21,25
38:2 39:14,18
39:19 40:18
41:12,17,19,20
41:24 42:5,8
42:12,17 43:3
43:9,14,15,22
44:14,18 45:1
45:6,15,18
46:2,10,17
47:14 48:15,16
49:1,2,3,18,19
49:20 50:8,10
51:3,11,12,13
51:22 52:4,16
52:24 53:9,11
55:3,18 58:6
58:15,17 60:14
60:24 61:1,1,8
61:14,14,20,20
61:21 62:1,18
62:21,25 63:9
63:18,25 64:11
65:1,2,19
66:23 67:4,9
71:2,6 72:4,11
72:15 76:5
77:3
**Docher's** 40:16
44:22 52:6
55:21 56:3,11
56:15,23 57:9
57:17,25 59:8
59:16 60:11,16
68:1 70:7
**DOCHER-NE...**
1:4
**document** 77:21
**doing** 23:7,9
51:9 58:8
60:17
**drank** 43:16

**Drawer** 2:5
**drink** 43:20
**drinking** 38:2
  49:10
**driving** 14:18,18
  36:7 39:25
**drop** 36:9
**drug** 34:10
**drugs** 43:7
**drunk** 47:22
  48:17 49:3,12
**duly** 4:9 74:10

**E**

**E** 3:2
**E-tran** 73:1
**early** 20:5
**East** 2:10 76:3
**EDELMAN**
  2:15
**educated** 14:12
  15:23
**education** 18:21
**Eighteen** 11:16
**either** 22:4,7
  46:21 47:5,22
  62:13 66:11
**elbow** 26:17
  27:1 56:11,14
  56:22 57:8,16
  57:25 58:6,16
  58:18 59:7,15
  60:15
**electrical** 40:17
**elements** 26:13
  47:20
**ELSER** 2:14
**emergencies**
  54:12
**emergency** 7:14
  29:15
**employed** 9:13
  11:17 16:9
**employee** 75:14
  75:15
**employer** 6:12
**employment**

8:16,18 9:20
11:20,23 12:17
13:22 14:6
16:1,13,18,23
19:18
**EMS** 72:9
**enforcement**
  12:18 13:24
  14:2,13,16,21
  14:25 15:4,9
  15:16,22 26:16
  26:25 27:7,14
  27:21 28:3,10
  28:17,24 29:5
  29:20 30:3
  31:12 35:8
  40:25 46:1
  55:22 56:5,16
  56:24 57:2,6
  57:19 62:3
  70:14
**enrolled** 8:15
**ensues** 15:14
  16:21 17:23
  66:9
**ENTER** 77:2
**entire** 10:21
  61:13
**episode** 43:10
**ER** 40:22
**Errata** 3:11
  76:10 77:1
**erratic** 33:24
  34:6
**ESQUIRE** 2:6
  2:11,17 76:4
**establish** 24:9
**et** 76:5 77:3
**evaluate** 23:14
**evaluated** 23:8
**Examination**
  3:5 4:11
**examine** 55:6
**examined** 4:10
**excessive** 15:1
  16:11 17:13
  59:10,22 60:17

**excited** 15:19,24
  17:1 18:3,12
  18:16 29:14,22
  30:6,21,25
  31:24 32:16
  33:1,4,11,17
  33:21 34:5,15
  34:23 35:1
  42:18 44:20
**excuse** 36:7 39:5
  43:18 47:8
**execute** 76:10
**execution** 3:11
**exercise** 51:8
**exhibiting** 29:13
  30:5,20,24
  31:23 32:16
  33:1 42:12
  61:15,22
**exit** 23:11
**expect** 5:6
**experience**
  24:22 29:13
  30:4,19 31:2
  31:22 32:14,24
  33:15 34:25
  46:16 53:23
  54:7 57:10,18
  59:9,17 66:5
**experienced**
  18:7 60:4
**experiencing**
  15:19,24 17:1
  18:2,12,16
  29:21 33:4,17
  34:5,15,23
  42:17,20 43:10
  44:20
**Expires** 74:17
**explain** 20:6
  25:25 41:14,21
**Extremely** 34:7

**F**

**face** 65:3
**facts** 77:21
**fair** 5:3 44:8

**fall** 8:25 39:10
**falls** 66:2
**far** 45:17 73:2
**fear** 42:13
**February** 11:22
  11:25 12:5,12
  17:7
**feel** 42:8,11 43:6
  50:9
**feet** 38:8,10,12
  38:19,22 66:1
**fell** 7:20 38:20
  39:14 52:20,22
  52:23 64:11
  65:11
**felony** 48:6
**felt** 43:3 60:2
**FF** 74:16
**field** 20:15 23:12
**fight** 34:16
  39:15
**fighting** 59:2
**file** 5:23
**filed** 5:18 76:14
**filled** 39:17
**financially** 75:17
**findings** 68:10
**fine** 5:7 6:6
**fingers** 53:20
**fire** 1:12 2:13
  64:16,19,25
  71:24 72:9,13
**fired** 13:18
**first** 4:9 7:4
  20:10 38:7,8
  40:25 41:20
  65:3
**fist** 53:25 54:3
  71:6
**five** 21:2 43:25
  43:25
**flailing** 50:3
  63:6,10
**flashlight** 21:17
**flee** 63:4
**floor** 66:19
**Florida** 1:1,11

1:23 2:5,10,16
12:4,18 74:4
74:16 75:3
76:3,20
**followed** 68:20
**following** 4:1
**follows** 4:10
**foot** 70:7,13,17
**footage** 63:24
**force** 15:1 16:11
  17:13 19:9,11
  19:15 26:18
  27:16 28:5,19
  29:8 38:15
  56:6,25 57:20
  59:10,23 60:18
  61:16,17,18,22
  62:1,6
**foregoing** 75:9
  77:21
**forehead** 38:14
**forget** 5:25
**form** 26:19 27:3
  27:10,17,24
  28:6,13,20
  29:2,9,16,24
  30:9 31:1 32:3
  32:21 33:6
  45:7 46:4,12
  46:19 47:17
  48:11,18,19
  49:4,22 50:12
  54:18 55:24
  56:7,19 57:1
  57:13,21 58:2
  58:9,19 59:1
  59:11,19,25
  60:19 61:3
  63:12 65:22
  67:12 68:24
  69:8
**Fort** 1:23 2:10
  76:3
**Forum** 76:19
**forward** 38:15
  53:20
**forwarded** 3:11

76:13
**fought** 33:25,25
**found** 76:10
**four** 19:12,16
**FPR** 1:25 74:15
  75:21 76:18
**front** 36:15
**FTO** 26:9
**full** 5:10 52:10
**full-time** 12:9
  14:9
**further** 18:21
  75:13

**G**

**gain** 12:17 38:23
  65:13 66:7
  71:8
**Gardens** 11:1
**gas** 36:6
**gasp** 39:20
**gear** 21:19
**generally** 25:25
  26:2
**getting** 11:12
  26:8 37:9
**GIUFFREDA**
  2:9,11 5:13,16
  5:22 6:3 12:23
  12:25 26:19,21
  27:3,10,17,24
  28:6,13,20
  29:2,9,16,24
  30:9 31:1 32:3
  32:21 33:6
  45:7 46:4,12
  46:19 47:17
  48:11,18,21
  49:4,22 50:12
  54:9,18 55:24
  56:7,19 57:1
  57:13,21 58:2
  58:9,19 59:1
  59:11,19,25
  60:19 61:3
  63:12 64:22
  65:22 67:18

**gun** 21:13,15
  22:5
**gurney** 39:12,13
  40:3,6,7,21
  64:17,20
**guys** 50:16

**H**

**halfway** 53:20
**hand** 4:3 36:23
  38:14 53:19,22
**handcuff** 15:10
  15:13 16:20
  17:22 40:3
**handcuffed**
  35:10,15 59:4
  60:15 62:18
  65:20 66:2
**handcuffing**
  16:6
**handcuffs** 30:6
  30:15,23 31:5
  31:7,10 32:2
  32:20 33:5
  34:18,22 40:3
  40:5,6 50:25
  51:13,22 52:17
  62:22 66:6
**hands** 52:11
**hang-up** 36:3
**happened** 37:14
  65:18 66:18
**harm** 27:2,9,23
  28:12 29:1
  54:8,11,17,22
  55:1,23 56:18
  57:12 59:18
**he'll** 72:20
**head** 28:25 29:7
  37:18 38:22
  39:10 56:12,15
  56:23 57:9,17
  58:1,7,18 59:8
  59:16 60:16
  66:2,19 70:2
**health** 30:7
**healthy** 55:2,4

**hear** 13:12 66:25
  67:2
**heard** 5:19 6:25
  24:2 45:17
  70:22
**hearing** 37:13
**Hecht** 2:6 3:8
  4:12,15 5:15
  5:19 6:1,6,9,11
  13:1 26:23
  27:5,12,19
  28:1,8,15,22
  29:4,11,18
  30:2,11 31:13
  32:5,23 33:8
  45:10 46:7,14
  47:12,19 48:13
  48:24 49:16
  50:6,14 54:13
  54:20 56:1,9
  56:21 57:4,15
  57:23 58:4,11
  58:22 59:6,13
  59:21 60:10,22
  61:5 63:14
  64:23,24 65:24
  67:13,22 69:2
  69:10,13,21
  71:13 72:21
**heel** 53:12,17,24
  54:1,1,5,15,25
**held** 39:3 40:13
**help** 39:11 46:1
  67:20,24
**helped** 39:23
  40:10,14
**helping** 23:10
**Hey** 67:19,23
**high** 18:18,20
  34:7
**highs** 50:19
**hip** 52:19
**hips** 52:7,21
**hired** 9:16,17
  11:4
**history** 46:25
**hit** 59:3 66:19

**hitting** 60:25
**holding** 36:22
**home** 5:20 10:8
**honest** 46:20
  49:7,11 51:18
  61:9
**honorably** 19:13
**hospital** 40:9,19
  40:20,23
**hostile** 64:18
**hurt** 66:3

**I**

**Ice** 43:16
**Ices** 38:3,3
**identified** 36:17
**identify** 6:4
  15:18,23 16:25
  18:1,7,11,15
  33:11,16,24
  34:14
**imbalance** 34:9
**implemented**
  20:12
**inadvertently**
  5:17
**incident** 7:23
  8:7 21:3,7,25
  25:19 26:1
  51:18 68:7,14
  68:17,23
**including** 53:13
  54:6,15,25
  72:10,14
**independent**
  1:12
**individual** 17:22
  32:2,15,20,25
  33:5 35:9,19
  44:20 66:5
**individual's**
  35:14
**individually** 1:8
  1:9,9,10,11
**individuals**
  15:10,14 16:20
**induced** 34:10

68:24 69:8
  71:19 72:19,22
  73:2 76:2,4
**give** 4:5 24:21
  26:10 57:24
  72:14
**given** 4:17 22:2
**go** 13:4 17:5
  18:20 20:12,13
  20:14,15 22:25
  23:6 49:8
  69:11 71:13,15
**goes** 24:10 66:8
  73:2
**going** 4:16 5:3
  6:14,16 7:21
  8:24 9:24 23:3
  24:21,23,24
  25:18 31:3,7,9
  32:8 47:24
  51:8 69:14,16
**good** 4:13,14
  24:22 71:23
**grabbed** 52:21
**gradual** 24:10
**graduate** 7:6,10
  18:18
**graduated** 7:9
**great** 27:2,9,23
  28:12 29:1
  54:8,16,22
  55:1,23 56:17
  57:12 59:17
**greater** 25:19
**green** 36:13
**ground** 36:10
  38:20 52:20,22
  52:23 53:11
  59:4 62:19,22
  63:5 64:11
  65:4,4,20 66:6
**group** 53:22
**guardian** 1:5
**guess** 38:4 50:20
  68:10
**guidance** 26:11
**guide** 25:17

**inebriated** 47:24
**influence** 43:7
**information**
　37:9,9 46:25
**informed** 37:11
**initially** 36:2
　42:7
**initiating** 26:4
**inject** 66:22 67:4
**injected** 67:8
**injection** 66:16
　67:10 72:15
**inside** 37:6,15
　38:9,10,12
　41:25 52:12
**instructed** 14:12
　15:8 24:20
　38:8
**intention** 8:24
　9:24
**interacting** 35:6
**interaction**
　34:13 48:15,25
　49:17 50:10
　51:10 61:7,13
　61:19
**interested** 75:18
**internal** 68:6
**interpretation**
　43:12
**intervene** 62:4
**intervention**
　17:6
**interview** 13:4
**interviewing**
　14:19 37:21
**intox** 38:1
**investigated**
　68:6
**investigation**
　35:5
**involved** 45:13
　68:17
**involvement**
　35:25 61:6
　68:13,23 69:7
**involving** 7:23

26:1 34:13
68:23
**Irrational** 34:6

_____

**J**

**J** 1:10
**JANICE** 1:4
**January** 6:18
　7:2,5,8 8:3 9:7
　10:18,24 17:7
**jaw** 27:8,15
**job** 8:10,11,21
　8:23 12:1,2
　23:14 49:10
**Join** 49:6
**joined** 19:7,17
　19:23 48:21
**JOLLY** 2:9 76:2
**Jose** 1:11 66:15
　66:21 67:4,7
　71:24
**Jr** 5:11
**judgment** 5:24
**Julie** 2:17 71:19
　71:23
**julie.tyk@wils...**
　2:17
**July** 50:7
**jumped** 39:24
**justify** 61:17,25

_____

**K**

**keep** 66:5
**KEN** 1:10
**kicked** 36:10
　39:13 68:4
**kicking** 71:9
**kill** 72:5
**killed** 36:20
**kind** 7:20 23:3
　45:18 50:3,18
　50:23 68:3
**knew** 37:18
　42:21,23 47:3
　47:4,4
**know** 5:8 11:11
　19:22 25:3

30:18 42:21
43:8,11,24
45:24 47:1,5
49:12,12,13,15
51:18 53:15
55:3,13 58:14
65:2,5 68:16
70:11,22 72:1
**knowing** 51:9
**known** 14:12
　15:5,19 16:15
　17:17 70:10

_____

**L**

**laced** 40:5
**Lakes** 2:4
**Lanosa** 1:25
　74:15 75:6,21
　76:18
**large** 39:20 52:5
　53:13,17 54:5
　54:15,25
**lasted** 64:12
　65:9
**late** 20:5
**Lauderdale** 1:23
　2:10 76:3
**law** 12:18 13:24
　14:1,13,16,21
　14:25 15:3,8
　15:16,22 26:16
　26:25 27:7,14
　27:20 28:2,10
　28:16,23 29:5
　29:19 30:3
　31:12 35:7
　40:25 45:25
　52:12 55:22
　56:4,16,24
　57:2,5,19 62:3
　70:14
**laying** 66:6
**learn** 35:13,18
　70:17
**learned** 33:14
　56:4,16,24
　70:11

**leave** 13:15 19:4
**left** 12:1 19:6
**leg** 22:5 38:19
　39:2
**legal** 1:5
**legs** 39:3 52:6,19
　52:22 53:1
　59:3 60:12
　63:6,7,10
**letter** 3:10 76:15
**level** 61:16,22
**liberty** 25:12
**life** 41:22 42:9
**lift** 65:19 66:1
　66:11
**lights** 14:19
**LINE** 77:6
**liquor** 38:4
**listed** 76:16
**literally** 67:23
**little** 17:8 46:21
**lived** 10:25
**lives** 42:13
**LLP** 2:15
**located** 6:21
**long** 5:7 9:20
　11:15 14:21
　19:1,10 20:22
　23:21,23 43:21
　44:25 64:10,20
　64:25 65:3,9
　66:9
**longer** 12:11
**look** 26:9 38:11
　71:15
**looked** 38:9
　39:20
**looking** 12:20
　55:7
**lot** 26:8 41:16
　49:25 55:12
　60:3 65:16
**loud** 49:23
**lows** 50:19
**Lucie** 1:10,11
　2:13 8:12,19
　8:22 9:3,14,21

10:6,10,13,22
11:2,5,8,18,21
11:24 12:11
13:16,22 14:3
14:7 16:2,9,13
16:18,23 17:12
17:16,21,25
18:5,9 19:19
19:23 20:7
30:13 31:3
34:3 35:20
37:13 39:11
40:8 57:3 62:9
68:22 69:6
70:18 71:24
**lunged** 38:15
　65:14,15
**lying** 35:9

_____

**M**

**ma'am** 72:8,17
**making** 25:20
　26:4 53:21
**male** 36:13,14
　70:1
**malt** 38:4
**man** 36:15,16
　67:19,23
**management**
　7:14
**manager** 36:17
　36:25
**Mangrum** 1:8
　20:21 21:9
　22:1,4 24:4
　25:23 37:2,3
　37:23 38:10,17
　38:21,24 40:24
　41:3,4,18,25
　42:4,13 43:14
　43:16,18,22
　44:8,17 53:2
　53:12 60:12,25
　61:23,25 62:14
　69:4 70:3,7
**Mangrum's**
　20:23 21:5

26:3
**mannerisms**
55:8
**March** 8:20 9:16
9:18 11:6
19:25
**Marchman** 31:4
**Marcus** 5:11
**MASCARA**
1:10
**mass** 52:6 54:6
54:15 55:18,21
56:3
**master's** 11:13
**matching** 36:14
**matter** 66:8
**mean** 24:16
39:22 42:24
**means** 20:6,9
31:19
**median** 37:5
**medical** 29:15
29:23 30:7
40:23 51:2
**medication**
66:23 67:5
**mentally** 49:13
55:15
**Miami** 6:22
10:12 11:1
18:19
**Miami-Dade**
13:3 14:8,11
15:17 18:22,23
19:1
**military** 19:7
**mine** 5:2
**mini** 72:23
**minute** 64:12,13
64:15 65:10
69:15
**minutes** 43:25
44:1 45:3
**misdemeanor**
33:2,3 48:2,4,9
**month** 19:22
**months** 11:16

14:24 15:3,7
15:21 20:25
**morning** 4:13,14
**MOSKOWITZ**
2:14
**mother** 1:4
**motion** 53:21
**mouth** 40:14
**moved** 11:2,5
38:16
**murdered** 37:17
**muscle** 38:18
52:6 53:13,18
53:22 54:5,15
54:25

_____

**N**

**N** 3:2
**name** 4:15 5:10
37:10 71:23
76:15
**names** 6:4
**Natty** 38:3 43:16
**Natural** 38:3
**near** 53:4,7
**necessary** 61:16
61:24
**neck** 55:18,21
56:3 70:7
**need** 24:22 26:3
31:25 58:13,25
59:3 65:12
72:24
**needed** 58:15,17
58:24 60:3
**negative** 68:10
**nerve** 55:18,21
56:3
**never** 5:19 61:12
70:11,22
**new** 8:10,11
26:7 51:5
**Newman** 1:8
37:20,23,24
38:16,21 43:19
43:19,23 44:3
44:9,12,17,23

44:25 45:5,14
46:2,6,9 47:14
49:2,18 50:9
51:12,23 53:5
55:17,20 56:2
56:10,14,22
57:8,16,24
58:5,7 59:7,9
59:15 60:2,3,7
60:12,14,17,20
60:25 61:23,24
69:4 70:5 76:5
77:3
**Newman's** 38:6
40:5 62:11
**Norland** 18:19
**normal** 55:2,3
55:10,14,16
**North** 2:15
**nose** 27:22 28:4
**Notary** 74:16
**notes** 71:15
75:12
**notice** 34:4,25
76:7
**noticed** 36:11
**nuisance** 47:25
**number** 5:20
37:10 47:4

_____

**O**

**Oath** 3:9 74:1
**Object** 48:19
**objection** 48:22
**observe** 48:10
**observed** 46:11
48:14
**occurred** 7:24
21:4
**odd** 55:9
**offender** 37:12
47:3
**offensive** 70:9
**offer** 39:2,2
**office** 8:13,16,19
8:22 9:3,14,22
10:6 11:18,21

11:24 12:12
13:16,23 14:3
14:7 16:2,10
16:14,19,24
17:12,16,21
18:1,6,10
19:19,24 20:7
34:3 35:21
37:17 39:1
42:25 46:23
50:3 62:9
68:22 69:6
70:19
**officer** 5:21 12:3
20:17,19 23:13
29:20 30:3
44:3 48:9
53:24 60:1
62:4 69:24
70:1,4,24
**officers** 21:19
33:22 35:15
40:25 41:6,9
41:10 44:10
52:13 65:13
68:16 69:23
**okay** 5:8,9 7:10
12:8 17:10
24:20 26:11
31:16,17 32:8
32:9,11,12
39:9 45:4 50:7
67:17 69:18,19
71:13,17 72:9
**once** 19:6 35:20
39:5 40:19
44:22 62:22
64:10 66:10
**online** 10:14,16
10:19
**open** 53:19
**opened** 38:6
**opportunity**
9:13
**options** 71:10
**Orange** 2:15
**order** 33:16 48:8

**ordered** 72:20
76:9
**ordering** 72:21
76:13
**original** 76:13
**Orlando** 2:16
**outcome** 68:9
**outer** 38:18
**outside** 37:1
41:12 48:15
49:1
**oxygen** 35:16,18

_____

**P**

**p.m** 1:21 69:12
69:12 73:5
**P.O** 2:5
**PA** 2:4,9 76:2
**pad** 37:8
**Page** 3:5 77:6
**Pages** 1:19 3:7
75:10
**pair** 40:16
**palm** 2:4,5 53:12
53:17,21,24
54:1,1,5,14,24
74:5 75:4
76:20
**paramedic**
39:16,20,21
40:15 66:15,15
66:21 67:8
**paramedics** 39:6
39:6,13,14,23
39:25 40:1,9
40:20
**parked** 40:20
41:18
**parking** 37:5
41:16 65:16
**part** 14:22 22:20
22:22 50:4
71:12
**participate**
44:13
**parties** 75:15
76:11

parties' 75:16
passenger 23:7
  24:4
patient's 40:13
Patricia 1:25
  74:15 75:6,21
  76:18
patrol 21:8 37:6
  38:6 41:17
  51:24 52:1,2,5
patted 37:6
penalties 77:21
people 5:23
  33:22 43:2
  55:12
perform 40:9,10
performed
  40:11 65:17
period 10:21
  45:4
perjury 77:21
permanent 9:23
person 27:8,22
  28:4,11,18,25
  30:8,17,21,23
  31:24,25 32:7
  32:17 33:2
  45:25 48:10
  51:19 55:2,4
person's 26:17
  27:1
personal 46:25
personally 46:13
  47:6 72:1 74:9
personnel 51:3
  72:9,14
perspective
  58:20 59:2
phase 22:24
  23:2,5,8,12,15
  23:18,21,23,25
  24:3,13,14,14
  24:20 25:1,1,2
  25:5,7,9,13
  26:2
phases 22:25
Phipps 1:22

76:19
phrase 72:11
physically 55:15
physiology 15:5
  16:15 17:17
pick 66:13
picked 37:4
place 30:6,23
  31:4 32:1,19
  33:5 40:2,6
  42:12 46:10,17
  47:23 48:8
  76:19
placed 32:1 33:3
  34:18,22 37:24
  38:7,8,14
  39:12,23 40:4
  45:1,5 46:2
  47:14 50:8,25
  51:12,22 52:1
placing 35:19
  49:19
Plaintiff 1:6 2:2
played 69:20
please 4:3 33:14
  73:1 76:7,10
  76:15
point 7:21 11:2
  20:4 24:8 31:9
  36:24 37:20,22
  37:24 38:5,23
  38:25 39:4,9
  40:15,19 42:7
  42:9,11,14
  43:8,11 44:12
  44:18,21 46:9
  51:4,11 52:13
  52:16,25 53:3
  53:5 60:4,9,23
  61:14,20 63:21
  65:6 71:1
points 49:24
police 12:3,5,15
  14:8,10,11,22
  15:8,17 19:17
  41:5,8,10 42:1
  44:10

policies 20:11
  68:21 69:5
policy 26:11
  30:15 31:6
Port 10:10,13
  37:13 40:8
position 9:3
  19:20 52:24
power 51:6
powers 25:11
practices 69:5
pressure 35:11
  35:14
pretty 25:3
  26:14 37:22
  44:24 45:21
  66:20 67:20
prevent 72:15
prior 7:1 13:22
  17:11,15,20,25
  18:10 25:19
  26:4 30:7
  33:18,19,20
  34:2,18,20,21
  36:3 49:1,18
  50:8,15 51:11
  64:19,25 65:8
  66:15 67:10
prioritize 24:18
priority 24:19
private 7:19
probable 24:9
  46:8,16
problems 6:4
procedure 26:12
procedures
  20:10 68:21
proceedings 4:1
  73:5
process 13:4
  25:17
professional
  29:23 30:7
  75:7
program 11:15
  24:13 70:15
progression

24:10
proper 68:11
properly 15:10
  16:20 17:22
  34:12
provide 16:2,10
  16:24 17:12
provided 18:14
psychotic 43:10
public 6:24
  47:22,25 49:20
  50:11 74:16
pulled 36:10
  37:20 41:16
punch 71:2
punching 71:11
PURDY 2:9
  76:2
purpose 32:6
  71:5
purposes 31:14
pushed 38:17
  65:16
put 5:13 13:6
  38:10,12 39:11
  51:23 64:17,20

―――――――――
        Q
question 4:23
  5:2,3 31:14,21
  32:6,13 46:5
  46:15 47:10
  48:23 50:7
  54:24
question-and-...
  37:22
questioning 17:9
questions 69:18
  71:14,18,25
  72:18
quick 39:8 66:17
quickly 71:16
quite 49:7

―――――――――
        R
raise 4:2
ran 52:2,4

rattled 37:10
read 3:10 72:20
  76:10,12 77:21
reading 73:2
realized 36:22
really 23:9 45:8
  46:5,20 51:9
reason 7:22
  31:15 77:6
reasons 63:9
recall 15:6 16:17
  17:19 35:24
  61:4 68:1 72:3
  72:6
receive 18:23
Recess 69:12
recognize 34:11
record 5:14,17
  6:10 69:11
  75:12
redact 5:25
redacted 5:18
referring 17:4
  24:6
registered 47:2
  75:6
regular 72:22
rejected 13:8
relative 75:14,15
relieved 41:20
  45:22,25 50:16
remember 23:22
  26:22 27:4
  28:21 29:10
  61:9,10 63:18
  65:6 67:14,19
  67:25
repeat 38:9
repeated 38:10
rephrase 4:25
  67:1
report 53:16
  75:8
Reported 1:24
Reporter 3:10
  4:2 6:8 72:24
  75:1,7

**Reporting** 1:22
    76:19
**represent** 4:15
    71:24
**requested** 75:11
**rescue** 30:16
    31:7,9,11,18
    34:11 38:24
    39:5,10 64:16
    64:19,25 72:9
    72:14
**resided** 11:8
**residing** 10:9,22
**resisting** 62:22
    63:1,3,8
**respond** 68:3
**response** 68:2
**responsive** 40:18
**restrain** 33:24
    38:25
**restrained** 34:12
**restricted** 54:12
**result** 68:7,13
**return** 76:16
**returned** 76:11
**review** 75:10
**RICHARD** 2:11
    76:4
**richard@pur...**
    2:12
**ride** 23:2,5
**ride-along** 23:15
    23:18
**riding** 21:8 24:3
    44:5
**right** 4:3,22,25
    6:13 9:6,17
    12:10,15 35:23
    55:17,20 56:2
    56:11,15,23
    57:9,17,25
    58:6,16,18
    59:15 60:7
    64:8 69:10,14
    72:7
**road** 19:21
    20:15 42:20

60:5
**Robinson** 1:9,17
    4:8 5:11 74:9
    75:9 76:2,22
    77:4,24
**rode** 40:8
**roll** 39:11 66:12
**rolled** 39:12
    40:21
**rolling** 65:6,8
**rope** 39:2
**Rosario** 1:11
    66:15,21 67:4
    67:7 71:25
    72:1,10,14
**RPR** 1:25 74:15
    75:21 76:18
**rules** 4:22
**run** 39:8
**running** 52:10

                    **S**
**S** 2:6
**safe** 30:17
**sanctioned**
    68:12,18
**sat** 38:7 68:4
**saw** 36:9,14
    41:11 60:3
    61:12 64:2,6
    70:8
**saying** 23:9
    67:19 70:23
**scaring** 36:21
**SCAROLA** 2:3
**scenario-based**
    16:7
**scene** 30:16,17
    31:12 44:3,9
    44:10,23 49:24
    52:14 67:3
    72:10
**school** 6:14 7:21
    10:14,16 18:18
    18:20
**scissors** 40:16
**screwdriver**

36:22 37:4
    51:18
**SEAL** 36:19
    37:16 43:1
    46:23 50:3
**searching** 16:7
**SEARCY** 2:3
**seat** 30:14 38:6,7
**second** 22:24
    40:18 42:20
    44:4 48:9 49:9
**second-degree**
    48:1
**seconds** 69:15
**secured** 30:17
    37:6
**security** 5:20
    37:10 47:3
**sedated** 39:19
**sedative** 67:8
**see** 21:19 53:15
    55:19 56:13
    62:4 67:7,9
    69:23 70:6
    71:1
**seek** 12:1
**seen** 58:5 63:24
**semesters** 7:19
**send** 73:3
**September** 10:1
    10:4
**serve** 19:10
**served** 14:9
    19:15
**session** 37:23
**set** 40:6
**Seven** 4:21
**severity** 24:19
**sex** 47:2
**sexual** 37:11
**shackles** 39:2
**Sheet** 3:11 76:10
    77:1
**sheriff** 1:10 8:12
    10:6 19:21
    20:22 21:4,9
    21:12 22:15

24:4 25:8,22
    26:3 40:24
    41:3,4,25 42:4
    42:13 43:14,16
    44:2,8,9,12,17
    44:17,23,25
    45:5,14 46:2,9
    47:13 49:2,18
    50:2,9 51:12
    51:23 53:2
    60:14,17,24,25
    61:6,10,23,23
    61:24,25 62:11
    62:14 69:4,4
    70:6
**sheriff's** 8:13,16
    8:19,22 9:3,14
    9:21 10:6
    11:18,21,24
    12:11 13:16,23
    14:3,7 16:2,10
    16:14,19,24
    17:12,16,21
    18:1,6,10
    19:19,24 20:7
    22:2 34:3
    35:21 37:16
    39:1 42:25
    46:23 62:9
    68:22 69:6
    70:19
**SHIPLEY** 2:4
**shirt** 36:13
    40:16
**shock** 40:18
**shocks** 40:17
**shooting** 14:18
    16:6
**Shores** 6:22
**shorter** 7:19
**shorts** 36:13
**shot** 39:19
**shoulders** 53:14
    54:6,16 55:1
**show** 23:3 31:11
    69:14
**side** 27:8,15 37:5

38:18 40:5,7
    56:11,15,23
    57:9,17,25
    58:6,18 59:15
    65:6,8,16
    66:12 71:2
**sign** 3:10 76:12
    76:15
**signature** 76:8
    76:15,21
**Signed** 74:12
**significant** 63:15
**signs** 15:23
    16:25 18:2,7
    18:11,15 29:14
    30:20,24 31:24
    32:16 33:1,11
    34:4,11 42:12
**sir** 4:13 46:5
    69:14 71:16,17
**sirens** 14:19
**sit** 14:1 38:8
    66:11 71:14
**situation** 26:7
    41:22 60:1
**six** 4:21 14:24
    15:3,7,21 23:6
    23:19 37:16
    43:1,25 46:23
    50:3
**six-month** 14:10
**smelled** 47:9
**social** 5:20 37:10
    47:3
**solely** 30:23
    62:11
**solemnly** 4:4
**solution** 39:17
    39:18
**somebody** 23:2
    23:5 36:20
    59:4
**someone's** 25:12
**somewhat** 41:20
**sorry** 10:15
**sort** 6:2 14:15
    18:21 21:22

49:20 66:23
**south** 12:3,15,18
**Southeast** 1:23
**SOUTHERN**
  1:1
**speak** 60:20
  70:22
**speaking** 36:19
  41:24 42:14
  46:24 55:7
  72:16
**special** 1:12
**specific** 17:8
  43:24 50:7
**specifically**
  23:22 24:6
  26:1 30:18
  63:20 65:2,5
**speed** 52:10
**spoke** 36:16 42:7
**spring** 9:16
**squeeze** 40:13
**St** 1:10,11 2:13
  8:12,19,22 9:3
  9:14,21 10:6
  10:10,13,22
  11:2,5,8,18,21
  11:24 12:11
  13:16,22 14:3
  14:7 16:2,9,13
  16:18,23 17:12
  17:16,21,25
  18:5,9 19:19
  19:23 20:7
  30:13 31:3
  34:3 35:20
  37:13 39:1
  40:8 57:3 62:9
  68:22 69:6
  70:18 71:24
**stabbed** 51:20
**staff** 40:23
**stage** 31:11
**stand** 38:13
**standard** 20:10
  21:12 22:1
  26:12 37:9

**standing** 36:11
  36:14 37:4
**standpoint** 47:6
**start** 12:6 20:10
  44:19
**started** 37:8,21
  38:13 44:13
  64:14
**starting** 8:10
**state** 5:10 74:4
  74:16 75:3
**stated** 77:22
**STATES** 1:1
**station** 36:6
**stenographic**
  75:12
**stenographica...**
  1:24 75:8
**step** 5:7
**stepped** 38:17
**stifle** 52:10
**stomach** 35:9
  65:4
**stood** 37:1 65:15
**stop** 11:20 58:7
  60:25 62:21
  63:7 71:8
**stops** 14:20
**store** 36:25
**story** 50:2,4,21
**strange** 43:4
**strike** 15:12 18:8
  25:6 26:17
  27:1 33:9
  34:20 41:3
  53:17,24 54:1
  54:2,5,10,15
  54:21,25 56:11
  56:14,22 57:8
  57:16,25 58:5
  58:16,18 59:7
  59:15 60:15
  68:5 71:3,6
**strikes** 38:18
  53:13
**striking** 27:8,15
  27:22 28:3,11

28:17,25 29:7
  53:21 61:1
  71:5
**struck** 52:5,19
  52:21
**struggle** 15:5,14
  16:16,20 17:18
  17:22 60:23
  63:15 64:2,10
  64:21 65:1,9
  66:9 72:3
**struggling** 53:9
  53:12 59:5
  64:14
**student** 6:13
  7:15 8:6,14
  9:25 10:4,11
  11:12 12:9
  14:9
**studies** 9:7
**study** 19:1
**studying** 6:23
  7:17 8:3 10:17
**stuff** 50:23
**suffer** 35:16
**suffering** 33:22
**Suite** 2:10,15
  76:3,19
**summary** 5:24
**summed** 25:10
**summer** 7:18,20
  8:8,9 9:10,15
**summertime** 9:4
**Sunrise** 2:10
  76:3
**supervise** 20:20
**supposed** 9:20
**sure** 6:9 20:24
  42:19 45:8
  48:3,25 49:7
  49:11 73:3
**swear** 4:4,7
**sworn** 4:9 74:10
**symptoms** 15:23
  16:25 18:2,7
  18:12,15 29:14
  29:22 30:5,21

30:24 32:16
  33:1,11 34:4
**syringe** 39:17,18
**system** 20:13
  24:18 36:12

——————————
**T**
——————————
**tackle** 63:5
**tactical** 21:19,22
**tactics** 14:18
  16:6 20:14
**take** 7:6 8:9
  24:15,21,24
  25:12 31:9,10
  52:24 53:19
  66:18 69:10
  72:22 76:7
**take-down**
  65:17
**taken** 64:4 69:16
**takes** 13:11
**talk** 7:23 25:18
  35:23 37:1
  67:9
**talking** 47:6
**taught** 14:15
  34:3,8 35:7
  52:12 62:8
**Tavares** 1:4 4:16
  7:24 34:14,14
  34:17,21 35:25
  36:9,9,11
  41:11,24 42:4
  42:8,11,17
  43:3,9,14,15
  43:22 44:14,18
  44:22 45:1,6
  45:15,18 46:2
  46:10,17 47:14
  48:15,16 49:1
  49:2,3,18,19
  49:20 50:8,10
  51:3,11,12,13
  51:22 52:4,6
  52:16,24 53:9
  53:11 55:3,18
  55:21 56:3,11

56:15,23 57:9
  57:17,25 58:6
  58:15,17 59:8
  59:16 60:11,14
  60:16,24 61:1
  61:1,8,14,14
  61:19,20,21
  62:1,18,21,25
  63:9,18,25
  64:11 65:3,12
  65:19 66:22
  67:4,9 68:1
  70:7 71:2,6
  72:15
**Tavares's** 53:13
**team** 36:19
  37:16 43:1
  46:23 50:3
**Technically** 44:4
**technique** 52:12
  70:9,13,18,21
**techniques**
  14:17,19,20
  15:9 16:7
**tell** 4:24 6:7
  10:24 14:5
  24:12 33:14
  34:2 35:24
  37:15 45:4,17
  47:11 50:15
  54:21 60:6
  62:21 63:7
**telling** 8:2 30:22
  50:4 51:17,21
**temperatures**
  34:8
**temple** 26:17
  27:1
**tendencies** 34:7
**terminated**
  13:20
**termination**
  68:11
**terms** 34:4
**testified** 4:10
**testimony** 4:4
  47:13 62:25

**Thank** 71:17
**theft** 6:4
**thigh** 52:8 71:4
  71:7
**things** 5:24
  14:15 23:7
  24:5,7,12 25:5
  25:7 26:8
**think** 6:1 20:4
  24:11 25:3,10
  26:13 43:9
  44:19 47:10
  51:1,4 54:10
  63:23 67:20
  68:19
**third** 1:23 44:3
  70:24
**thirty** 76:13
**thought** 55:11
**three** 21:1 23:6
  23:19 44:10
  52:13 53:8
  63:5 65:12
**throat** 28:11,18
**thrown** 26:8
**thumb** 55:17,20
  56:2
**Thursday** 1:20
**tie** 39:2
**tied** 52:11
**time** 6:18,25 7:1
  7:4 8:6 10:22
  13:11 21:3
  36:8 45:4
  48:23 50:25
  51:1,4,7,11
  52:16,25 53:6
  60:3 61:21
  63:22 64:6,16
  66:8 72:11
  76:8
**times** 4:20
**tired** 39:4,5
**title** 20:8
**today** 4:5,16 5:7
  14:1 64:7
**told** 9:6 11:11

12:10 33:10
38:12 39:7
43:15,17 45:21
50:2,21 58:7
66:18
**top** 38:14 63:7
**total** 64:22,23
  65:1
**totally** 23:12
**town** 47:5
**traffic** 14:20
**train** 16:14,19
  17:16,21 18:1
**trained** 15:1,4,9
  15:12,13,18
  18:6,10 20:9
  33:9,10 62:3
  66:5 70:14
**trainee** 20:1,3,8
  20:16,23 21:5
  22:14,18 25:9
**trainer** 23:9
  25:16 36:7,10
**training** 14:5,13
  14:16,22,23,25
  15:4,9,16,22
  16:3,8,11,25
  17:5,6,12
  18:15 20:14,15
  22:21,22 23:13
  26:16,25 27:7
  27:14,21 28:24
  29:5,13 30:4
  30:19 31:2,22
  32:14,24 33:15
  33:20,21,23
  35:20 46:15
  53:23 54:7
  55:23 56:5,17
  56:25 57:5,6
  57:10,18 59:8
  59:16 60:8
  62:4,8 66:4
  70:14,18
**transcript** 5:23
  75:11,11 76:9
  76:11 77:2

**transcripts** 5:24
**transport** 31:8
  31:16
**transported**
  30:14 32:19
**transporting**
  31:6 32:10
**tried** 38:14,23
  38:25 63:4
**trouble** 35:10
**true** 75:12 77:22
**truly** 76:17
**truth** 4:5,6,6
**try** 39:8 67:9
**trying** 53:8
**turn** 26:9
**turned** 68:4
**two** 10:17 38:18
  40:17 43:25,25
  60:5 63:4
  64:13,15 65:15
  69:23
**two-year** 10:21
**Tyk** 2:17 3:8
  48:19 49:6,8
  67:12 71:20,22
  71:23 72:18,24
  73:1

**U**

**U.S** 19:9,10
**Uh-huh** 12:21
  64:9
**undergone**
  57:19
**underneath**
  22:12 38:19
**undersigned**
  74:8
**understand** 4:24
  4:24 7:25
**understanding**
  9:2,5 20:11
**understood** 5:3
**underwent**
  15:17,21 26:16
  26:25 27:7,14

27:21 28:3,10
28:17,24 29:6
35:8
**unhandcuff** 40:2
**uniform** 21:12
  22:2
**UNITED** 1:1
**university** 6:15
  6:17,21 7:1,7
  7:11,16,19 8:3
  8:15,25 9:7,25
  10:5,12,18
  11:12
**unlocked** 40:4,4
**unreasonable**
  59:10,23 60:18
**upper** 52:8 53:4
  53:7 60:13
  71:3,7
**use** 12:25 20:12
  53:20 59:10,23
  60:18 61:17,25
**utilize** 53:12
**utilized** 59:9

**V**

**v** 76:5 77:3
**vehicle** 36:8
**version** 39:8
**vest** 22:8
**video** 63:24 64:2
  64:6 69:15,17
  69:20,22 70:6
  71:1,15
**video-based**
  33:21
**violation** 62:5
**violent** 34:7
**visiting** 37:12
**voice** 49:25
**volume** 1:18 3:7
  49:25
**vs** 1:7

**W**

**Wade** 1:9 61:6
  61:10

**waiting** 13:12
**waive** 76:8,15,21
**walking** 41:17
**want** 10:8 17:7,8
  21:1 30:18
  31:14 32:7
  35:23 45:24
  55:13
**wanted** 8:23
  12:14 41:21
**wasn't** 7:20,21
  35:5 42:19
  49:7,11 51:8
  63:15
**watch** 69:17
**watched** 69:22
**wavered** 50:18
**way** 23:10 24:11
  26:6 38:16
  46:21 47:5
  58:21,23 61:2
  68:13,18
**we'll** 5:6
**we're** 7:22 24:21
  24:24 25:18
**wear** 21:19
**wearing** 21:11
  21:22 22:1,4,7
  36:13
**week** 23:3,16
  42:20 49:10
**weeks** 21:2 23:6
  23:19,24 60:5
**went** 10:14,16
  14:5,8 17:6
  18:22 36:16
  37:3,15 39:16
  46:21 47:5
**West** 2:5 76:20
**white** 69:23 70:1
  70:4
**WILSON** 2:14
**wind** 47:7,7,8
**wish** 76:15
**witness** 3:10 4:7
  49:19 57:24
**words** 12:25

**work** 12:7,11,14
**worked** 10:12
  13:23 14:2
**working** 7:16,20
  12:6,8 13:10
  20:7 31:3 40:1
  60:5
**wouldn't** 49:11
  58:13
**WRITE** 77:2
**wrong** 39:7
  42:22

**X**

**X** 3:2

**Y**

**Yeah** 5:16 22:17
  47:16,18
**year** 7:10 19:3
  19:22 20:25
**years** 10:17
  19:12,16
**yelling** 72:4,11
**Yep** 71:20

**Z**

**0**

**1**

**1** 1:18,19 3:7,7
  23:2,15 69:15
  75:10
**10** 45:3 60:6
**10/19/2018**
  74:17
**100** 1:23
**11** 7:24 17:25
  18:11,13 21:4
  21:7 22:22
  23:25 25:18
  34:2 35:23
  36:1 68:17
  69:15 72:5
**11:00** 1:21 4:1
**111** 2:15
**11th** 17:11,15,20

  20:19 33:18,19
  33:20
**12:25** 69:12
**12:32** 69:12
**12:40** 1:21 73:5
**1200** 2:15
**1216** 2:10 76:3
**1551** 76:19
**169350** 74:16
**17** 8:20 19:25

**2**

**2** 23:5,18,25
  24:3,13,20
  25:1,5,7,9,13
  26:2
**2:16cv14413** 1:2
  76:6 77:3
**200-E** 76:19
**2014** 7:5,8,16,24
  8:3,20,25 9:7
  9:11,15,18
  10:1,4,9,18,24
  11:6 17:11,15
  17:20,25 18:11
  18:13 19:25
  20:19 21:4,8
  22:22 23:25
  25:18 34:2
  35:24 36:1
  68:17 72:5
**2015** 17:7 18:14
**2016** 7:12 10:18
**2017** 1:20 6:19
  7:2 11:22,25
  12:5,12 74:11
  74:12 75:19
  76:1,7 77:4
**2139** 2:4
**2455** 2:10 76:3
**25** 1:20 77:4
**25th** 74:10 76:7

**3**

**3** 23:8,21 24:14
  25:1
**30** 76:1,13

**30th** 74:12 75:19
**32801** 2:16
**33304** 2:10 76:3
**33394** 1:23
**33401** 76:20
**33402-3626** 2:5
**3626** 2:5

**4**

**4** 3:8 23:11,23
  24:14 25:2
**407)203-7592**
  2:16

**5**

**561)686-6300**
  2:6

**6**

**7**

**71** 3:8
**74** 3:9
**75** 3:10
**76** 3:10
**77** 1:19 3:7,11
  75:10

**8**

**8** 11:22

**9**

**9-1-1** 36:3,24
  51:19
**954)462-3200**
  2:11 76:4