# EXHIBIT
# C

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

                Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF of ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent special district,

                Defendants.
_____/


DEPOSITION OF

CLAY MANGRUM


VOLUME 1
Pages 1 through 90


Wednesday, May 31, 2017
12:00 p.m. - 1:53 p.m.


Phipps Reporting
1680 Southwest Bayshore Boulevard
Port St. Lucie, Florida  34984

Stenographically Reported By:
Patricia A. Lanosa, RPR, FPR, CSR

```
 1   APPEARANCES:

 2

     On behalf of Plaintiff:
 3
         SEARCY, DENNEY, SCAROLA
 4       BARNHART & SHIPLEY, PA
         2139 Palm Beach Lakes Boulevard
 5       West Palm Beach, Florida  33402-3626

 6       (561)686-6300
         BY:  ADAM S. HECHT, ESQUIRE
 7       ash@searcylaw.com

 8

     On behalf of Defendant:
 9
         PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
10       2455 East Sunrise Boulevard, Suite 1216
         Fort Lauderdale, Florida  33304
11       (954)462-3200
         BY:  SUMMER M. BARRANCO, ESQUIRE
12       summer@purdylaw.com

13

     On behalf of St. Lucie County Fire District:
14
         WILSON, ELSER, MOSKOWITZ,
15       EDELMAN & DICKER, LLP (Appearing via Phone)
         111 North Orange Avenue, Suite 1200
16       Orlando, Florida  32801
         (407)203-7592
17       BY:  JULIE TYK, ESQUIRE
         julie.tyk@wilsonelser.com
18

19

20

21

22

23

24

25
```

Page 3

1

2                              I N D E X

3

4

5    Examination                                      Page

6              VOLUME 1 (Pages 1 - 90)

7    Direct              By Mr. Hecht              4
     Cross               By Ms. Barranco          85
8
     Certificate of Oath                           87
9    Certificate of Reporter                       88
     Read and Sign Letter to Witness              89
10   Errata Sheet (forwarded upon execution)      90

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                   Page 4
 1   The following proceedings began at 12:00 p.m.:
 2            THE COURT REPORTER:  Would you raise your
 3        right hand, please?
 4            Do you solemnly swear that the testimony
 5        you shall give today will be the truth, the
 6        whole truth, and nothing but the truth?
 7            THE WITNESS:  Yes, ma'am, I do.
 8                      CLAY MANGRUM,
 9   having been first duly sworn or affirmed, was
10   examined and testified as follows:
11                  DIRECT EXAMINATION
12     BY MR. HECHT:
13        Q.   Please state your name.
14        A.   Clay Mangrum.
15            MR. HECHT:  And if we can go off the
16        record for this.
17            (Discussion off the record.)
18     BY MR. HECHT:
19        Q.   Where are you currently employed?
20        A.   St. Lucie County Sheriff's Office.
21        Q.   How long have you been employed there?
22        A.   I'm on my 17th year.
23        Q.   Currently what is your position?
24        A.   I'm currently assigned to the criminal
25   investigation division as a detective.
```

1      Q.    How long have you been a detective in the

2  criminal investigations unit?

3      A.    A little over two years.

4      Q.    In May of 2014, what was your position

5  with the sheriff's office?

6      A.    I was assigned to uniform patrol.

7      Q.    Is that road patrol?

8      A.    Yes.

9      Q.    During the 17 years that you've been with

10  the St. Lucie County Sheriff's Office, can you tell

11  me what positions you've held with that sheriff's

12  office?

13      A.    Yes, sir.  I was assigned to detention as

14  a corrections deputy, uniform patrol, school

15  resource, special investigations unit, court

16  security, and as a detective.

17      Q.    How many years have you actually spent out

18  on the road?

19      A.    Only a little over three.  As far as

20  uniform patrol?

21      Q.    Yes, sir.

22      A.    Maybe eight or nine of those years.

23      Q.    How many years were you in corrections?

24      A.    A little over three years.

25          (Recess 12:07 p.m. until 12:08 p.m.)

1    BY MR. HECHT:

2         Q.    Did you work in the jail?

3         A.    Yes.

4         Q.    And school resource, did you work at a

5    school?

6         A.    Yes, I did.  And it was for one school

7    year, roughly.

8         Q.    And court security, how long did you do

9    that for?

10        A.    It was approximately 11 months.

11        Q.    And what about special investigations?

12        A.    It was either -- I would say it was

13   between 16 and 18 months.  So roughly a year and a

14   half.

15        Q.    And prior to working at the St. Lucie

16   County Sheriff's Office, have you worked at any

17   other law enforcement agencies?

18        A.    No, sir.

19        Q.    Where did you go to high school?

20        A.    Lincoln Park Academy.

21        Q.    What did you do after high school?

22        A.    I worked briefly at, what used to be

23   Discount Auto Parts.  I worked on a freight dock

24   with R&L Carriers.  I went through EMT school,

25   firefighter academy.  I got certified as a

1   firefighter.  I decided I wanted to go into law

2   enforcement.  Prior to the fire academy, I worked

3   for about a year with Lifeline Medical; it's a

4   private ambulance transport.  And then I got hired

5   on to the sheriff's office from there.

6        Q.   How long did you work at Discount Auto

7   Parts for?

8        A.   It was right around a year.

9        Q.   How old were you when you worked there?

10       A.   Maybe 17 or 18.

11       Q.   And when you worked at the docks, how old

12   were you?

13       A.   Between 18 and 19.

14       Q.   How long did you work on the docks for?

15       A.   It was roughly a year.

16       Q.   And where did you go to EMT firefighter

17   school?

18       A.   Back then it was Indian River Community

19   College.

20       Q.   How long does the EMT firefighter school

21   last for?

22       A.   The EMT portion, I think is in the

23   ballpark of 300 hours.  And the fire academy was

24   around 4-, 500 hours.

25       Q.   Did you actually ever work as an EMT or a

1    firefighter?

2         A.    I worked as an EMT with Lifeline Medical.

3         Q.    And that again was a private ambulance

4    company.

5         A.    A private ambulance transport company,

6    yes, sir.

7         Q.    And how long did you work for Lifeline

8    Medical for?

9         A.    Roughly a year.

10        Q.    What years did you work as an EMT?

11        A.    It would have been late 1999 to late 2000.

12        Q.    So did you work as an EMT for

13   approximately 10 years?

14        A.    No, no, no.  1999, late in that year,

15   until late in the year 2000.

16        Q.    I understand.  Approximately one year.

17        A.    Yes.

18        Q.    I thought you said late 2000s.

19        A.    I apologize.

20        Q.    Were you ever a paramedic?

21        A.    No.

22        Q.    And is it after working as an EMT for

23   Lifeline that you joined the St. Lucie County

24   Sheriff's Office?

25        A.    I transferred from Lifeline to St. Lucie

Page 9

1   County Sheriff's Office.

2        Q.   Why did you no longer have an interest in

3   being an EMT?

4        A.   I was more interested in the firefighting

5   aspect of it.  And at that time when I was looking

6   into a job -- the St. Lucie County Fire Department,

7   I believe they had a clause where you sign an

8   agreement to become a paramedic within three years,

9   I believe it was, and I had no interest in becoming

10  a paramedic.

11       Q.   And I take it you had interest in law

12  enforcement?

13       A.   Yes, I did.

14       Q.   And did you go to a police academy?

15       A.   I went to corrections academy with the

16  sheriff's office, and I joined the sheriff's office

17  with the assumption to go into the law enforcement

18  side of it.  And when I was able to afford it, I

19  went to crossover academy, which is the remainder to

20  become law enforcement certified.

21       Q.   Where did you go for the crossover

22  academy?

23       A.   Crossover academy was at Indian River

24  State College.

25       Q.   How long did that crossover program last

1    for?

2         A.    I don't remember the hours on that.    It

3    would be on my certification, though.

4         Q.    Did you go through the basic law

5    enforcement training at Indian River State College?

6         A.    All of my law enforcement certification

7    for the full certificate was through Indian River

8    State College.

9         Q.    When you joined the St. Lucie County

10   Sheriff's Office, did you go through additional

11   training?

12        A.    Yes.

13        Q.    Did you go through use-of-force training

14   when you joined this sheriff's office?

15        A.    Yes.

16        Q.    And were you trained on how to identify

17   the signs and symptoms of excited delirium?

18        A.    I had training on that in the past, yes.

19        Q.    How many hours would you say you've

20   undergone as it relates to your training for excited

21   delirium?

22        A.    I couldn't give you a specific number on

23   hours.

24        Q.    During your training and experience as a

25   law enforcement officer, have you come in contact

1    with people suffering from excited delirium?

2         A.    I couldn't specifically tell you that I've

3    witnessed an incident.  And yes, that was for sure

4    excited delirium.

5         Q.    What are the signs and symptoms of excited

6    delirium, based on your training and experience?

7         A.    From what I understand to be is irrational

8    behavior; elevated sweating; heart rate; no response

9    to any sort of pain stimulus.  And the best way to

10   describe it, to me would be almost like an

11   accelerated engine, referring to the, like the

12   body's response.

13        Q.    Were you trained on use of force when you

14   joined the St. Lucie County Sheriff's Office?

15        A.    Prior to or when I joined?

16        Q.    When you joined.

17        A.    Yes.

18        Q.    During the 17 years that you spent at the

19   St. Lucie County Sheriff's Office, are there

20   official policies regarding the use of force?

21        A.    We have policies on use of force, yes,

22   sir.

23        Q.    During the 17 years that you worked at St.

24   Lucie County Sheriff's Office, do you undergo

25   continuing education courses or training on the use

1    of force?

2         A.   Yes, we do.

3         Q.   **When was the last time you underwent a**

4    **course on use of force?**

5         A.   We started in-service this year and

6    covered some use of force, and also last year during

7    in-service was my last full year of in-service

8    training.

9         Q.   **And when you say that "you started," what**

10   **do you mean by that?**

11        A.   Our training, our in-service training

12   which is annual, is broken up into blocks.  And

13   being we're just under halfway through the year,

14   I've only been able to attend -- I believe it was

15   two blocks this year so far.

16        Q.   **Prior to May of 2014, do you know when the**

17   **last use-of-force training session you attended?**

18        A.   I couldn't give you a specific date or

19   month.

20        Q.   **Are you familiar with deadly force**

21   **techniques?**

22        A.   Yes, I am.

23        Q.   **Have you ever heard of a thumb strike?**

24        A.   A thumb strike?

25        Q.   **Yes.  Have you ever heard of that?**

Page 13

1          A.    I've heard of it.  I've never heard of it

2     specifically.  I've heard of it through, like,

3     martial arts, or something like that, but not like

4     off the top of my head.

5          Q.    **Has the St. Lucie County Sheriff's Office**

6     **ever trained you to utilize a thumb strike if you**

7     **were involved in a struggle?**

8          A.    We've -- as far as a thumb -- not to my

9     recollection a thumb strike.

10         Q.    **What about applying pressure to a nerve**

11    **mass in the neck using your thumb?**

12         A.    I've -- we've been trained with, as far

13    as, like, brachial stun.

14         Q.    **What is that?**

15         A.    There's a nerve along the side of the neck

16    that it can be utilized in certain situations to

17    gain compliance.

18         Q.    **And are you trained to use your thumb to**

19    **apply pressure to that area of the neck to gain**

20    **compliance of someone?**

21         A.    Through my training I don't recall a

22    specific training on that.  No, I do not.

23         Q.    **How is it you know what that is?**

24         A.    A thumb strike?

25         Q.    **No.  You just said a "brachial" --**

Page 14

1       A.   Oh, a brachial stun, we learned and --

2  utilized and learned throughout our defensive tactic

3  training.

4       **Q.   Say it to me again.**

5       A.   Brachial stun.

6       **Q.   Brachial stun.  Just so I'm clear:  The**

7  **brachial stun technique is when you use your thumb**

8  **to apply pressure to a nerve in the neck to gain**

9  **compliance?**

10      A.   No, sir.  A brachial stun is normally

11 taught with the inside of your arm, so that it's not

12 a threat strike, like a punch or something like

13 that.

14      **Q.   So tell me what a brachial stun is.**

15      A.   In certain situations where you're -- you

16 have an actively combative subject, you could

17 basically use the inside of your forearm.  And it's

18 like a contact with the side of the neck, and with

19 the nerve that's on the side of the neck it usually

20 causes -- your desired effect would be almost like a

21 stun effect to gain compliance and control over a

22 person.

23      **Q.   So is it correct that the St. Lucie County**

24 **Sheriff's Office has trained you to utilize a**

25 **brachial stun to gain compliance of an individual?**

Page 15

1           MS. BARRANCO:  Object to the form.  Go

2      ahead.

3           A.   In -- in a situation where you would need

4      one, yes.  You have actively combative, someone

5      fighting you.

6           **Q.   And if someone is actively combative, the**

7      **brachial stun technique is when you use your forearm**

8      **to strike a nerve on someone's neck, correct?**

9           MS. BARRANCO:  Object to form.  Go ahead.

10          A.   On the side.  Not the front of the neck;

11     the side, towards the back.  Where -- basically

12     where you're -- in better terms, your trap would

13     meet your backside of your neck.

14          MS. BARRANCO:  Can I interrupt?  You said,

15     "trap."

16          A.   Trapezius.  The trap muscle.

17          MR. HECHT:  I understood that one.

18          MS. BARRANCO:  Thank you.

19     BY MR. HECHT:

20          **Q.   Is it correct that the St. Lucie County**

21     **Sheriff's Office has not trained you to utilize your**

22     **thumb to apply neck -- to apply pressure on a nerve**

23     **mass on the neck?**

24          MS. BARRANCO:  Object to the form.  Go

25      ahead.

1      A.   We've trained with pressure on nerves.   I

2   recall the -- there's nerve compliance with your

3   arms.  I don't specifically recall the neck.  But I

4   do recall that we have had training on, as far as

5   joint manipulations and compliance, with nerves.

6    BY MR. HECHT:

7      Q.   My specific question is:  During the 17

8   years you've been employed by the St. Lucie County

9   Sheriff's Office -- and you've been trained on joint

10   manipulation -- have you ever been trained to

11   utilize your thumb to apply pressure to a nerve on

12   someone's neck?

13      A.   I don't specifically recall that, no.

14      Q.   And you were not aware of a deadly force

15   technique known as a thumb strike, correct?

16         MS. BARRANCO:  Object to the form.  Go

17      ahead.

18      A.   Not that I could recall.

19    BY MR. HECHT:

20      Q.   Have you ever, during a struggle with an

21   individual, used your thumb to apply pressure to the

22   nerve mass in someone's neck to gain compliance over

23   them?

24      A.   My thumb in the neck?

25      Q.   Yes.

1      A.    No.

2      **Q.    Why not?**

3      A.    Normally it's just never been a thought

4  process to go to some sort of neck pressure to gain

5  compliance.  And it would also have to be -- in my

6  opinion, it would have to be in a position where you

7  could utilize that, any kind of pressure point like

8  that, safely.

9      **Q.    Based on your training and experience,**

10  **would applying pressure to an individual's nerve**

11  **mass in their neck be considered to be deadly force?**

12         MS. BARRANCO:  Object to the form.  Go

13      ahead.

14      A.    Applying pressure, I wouldn't see it as

15  deadly force, no.

16  BY MR. HECHT:

17      **Q.    Based on your training and experience**

18  **applying pressure to the nerve mass in someone's**

19  **neck, could that lead to great bodily harm?**

20         MS. BARRANCO:  Object to the form.  Go

21      ahead.

22      A.    Applying pressure to the side of the neck

23  where the nerve is, no.

24  BY MR. HECHT:

25      **Q.    Would you agree with me that based upon**

Page 18

1  **your training and experience as a law enforcement**

2  **officer, that an elbow strike to a person's temple**

3  **is classified as deadly force?**

4          MS. BARRANCO:  Object to the form.  Go

5      ahead.

6      A.   An elbow strike directly, intentionally to

7  the temple?

8  BY MR. HECHT:

9      **Q.   Yes, sir.**

10     A.   I wouldn't consider that -- I would have

11 to consider the amount of force used if there is

12 any -- but just a basic elbow strike to the temple,

13 it would not constitute deadly force to me, no.

14     **Q.   Would you agree with me that -- strike**

15 **that.**

16          **Based upon your training and experience as**

17 **a law enforcement officer, would an elbow strike to**

18 **a person's temple likely cause great bodily harm?**

19          MS. BARRANCO:  Objection to form.

20     A.   Once again, it would come down to the

21 amount of force used with the strike, the intent of

22 the strike, and what -- what area the strike was

23 aimed at.

24 BY MR. HECHT:

25     **Q.   Were you ever trained either by the**

1   **St. Lucie County Sheriff's Office, or during your**

2   **time at the police academy, on what techniques are**

3   **classified as deadly force?**

4        A.   Were we ever trained?  Yes.

5        **Q.   Would you agree with me that based upon**

6   **your training and experience as a law enforcement**

7   **officer, that striking a person on the side of the**

8   **jaw is likely to cause great bodily harm?**

9             MS. BARRANCO:  Object to the form.

10       A.   With enough force, it could cause bodily

11   harm, yes.

12   BY MR. HECHT:

13       **Q.   Would you agree with me that based upon**

14   **your training and experience as a law enforcement**

15   **officer, that striking someone on the side of their**

16   **jaw is classified as using deadly force?**

17            MS. BARRANCO:  Object to the form.  Go

18       ahead.

19       A.   A general strike to the side of the jaw,

20   no, I don't know it would constitute deadly force on

21   that.

22   BY MR. HECHT:

23       **Q.   Based upon your training and experience as**

24   **a law enforcement officer, is striking a person with**

25   **your elbow on the bridge of their nose likely to**

Page 20

1    cause great bodily harm?

2              MS. BARRANCO:  Object to the form.  Go

3         ahead.

4         A.   If a forcible elbow strike directly to the

5    bridge of the nose could cause some pretty bad --

6    could cause bodily harm?  To what extent, I'm not

7    sure.

8    BY MR. HECHT:

9         Q.   Based upon your training and experience,

10   would you agree with me that striking a person with

11   your elbow on the bridge of their nose is classified

12   as using deadly force?

13             MS. BARRANCO:  Object to the form.  Go

14        ahead.

15        A.   It once again would come down to the

16   amount of force used and the intent of the strike.

17   BY MR. HECHT:

18        Q.   Based upon your training and experience as

19   a law enforcement officer, would you agree with me

20   that striking a person with your elbow on their

21   throat is likely to cause great bodily harm?

22             MS. BARRANCO:  Object to the form.

23        A.   Directly on the top of the throat in the

24   front of the neck, that could, yes.

25

Page 21

1    BY MR. HECHT:

2        Q.    Would you agree with me that based upon

3    your training and experience, that striking a person

4    with your elbow on their throat is classified as

5    using deadly force?

6            MS. BARRANCO:  Object to the form.  Go

7        ahead.

8        A.    An intentional direct strike to the throat

9    could be classified as deadly force, yes.

10   BY MR. HECHT:

11       Q.    Would you agree with me that based upon

12   your training and experience as a law enforcement

13   officer, that striking a person with your elbow in

14   the back of their head is likely to cause great

15   bodily harm?

16           MS. BARRANCO:  Object to the form.

17       A.    It would come down to the intent, the

18   amount of force used, and the purpose.

19   BY MR. HECHT:

20       Q.    Would you agree with me that based upon

21   your training and experience as a law enforcement

22   officer, that striking a person with your elbow on

23   the side of their head is likely to cause great

24   bodily harm?

25           MS. BARRANCO:  Object to the form.  Go

Page 22

1    ahead.

2        A.    It would depend on the amount of force,

3    intent, and direction of where they're intending to

4    strike.

5      BY MR. HECHT:

6        **Q.    Would you agree with me that based upon**

7    **your training and experience, that striking someone**

8    **with your elbow on the side of their head is**

9    **classified as using deadly force?**

10            MS. BARRANCO:   Object to the form.   Go

11        ahead.

12       A.    Circumstantial -- it would be the intent,

13   the amount of force used, and the purpose.

14     BY MR. HECHT:

15       **Q.    What are the signs and symptoms of someone**

16   **experiencing excited delirium?**

17       A.    Based on my knowledge, erratic behavior.

18   Not making -- verbally not making sense.   Unaware of

19   their surroundings.   Excessive sweating.   Not

20   responding to their normal stimulus around them,

21   what would be considered a normal response.   If

22   you're close enough, elevated heart rate.

23       **Q.    Is someone who is exhibiting the signs and**

24   **symptoms of excited delirium -- strike that.**

25            **Is it considered a medical emergency --**

Page 23

```
 1    strike that.

 2            Is it considered a medical emergency if

 3    someone is exhibiting the signs and symptoms of

 4    excited delirium?

 5        A.   Yes.

 6        Q.   And would you agree with me that as a law

 7    enforcement officer if you came in contact with

 8    someone who you believed to be exhibiting the signs

 9    and symptoms of an excited delirium, that you would

10    contact a medical professional?

11            MS. BARRANCO:  Object to the form.

12        A.   Yes, I would.  But also it would come down

13    to scene safety for treatment as well.

14    BY MR. HECHT:

15        Q.   Who would you contact if you were to

16    interact with someone who you believed was having an

17    episode of excited delirium?

18            MS. BARRANCO:  Object to the form.  Go

19        ahead.

20        A.   Well, we communicate by radio.  So it

21    would be -- for me it would be additional units, and

22    for the emergency medical personnel to begin

23    staging -- to be en route and staging for that

24    purpose.

25    BY MR. HECHT:
```

1    Q.    In regards to the interaction that you had

2  with Tavares Docher, at any point on May 11, 2014,

3  did you ever make a determination whether Tavares

4  Docher was experiencing excited delirium?

5    A.    With that incident on that day, I couldn't

6  tell you specifically if the term "excited delirium"

7  crossed my mind.  But as far as concern of medical

8  attention, yes.

9    Q.    And when you first came in contact with

10  Tavares Docher, at any point did you request a

11  medical professional to respond to the scene?

12    A.    During our struggle with Mr. Docher, yes.

13    Q.    What about before the struggle?

14    A.    No.

15    Q.    Why not?

16    A.    He wasn't exhibiting any type of behavior

17  at that point that would lead me to believe excited

18  delirium or anything that required immediate medical

19  attention.

20    Q.    So is it your testimony today that

21  on May 11, 2014 you made a determination that

22  medical assistance was not necessary until after the

23  struggle?

24          MS. BARRANCO:  Object to the form.  Go

25      ahead.

Page 25

1       A.    Immediate emergency medical response,

2  there was nothing -- there was no signs or symptoms.

3  He didn't request any medical attention.  And we

4  were still trying to determine the nature of his

5  behavior at that point.

6  BY MR. HECHT:

7       Q.    **Did you ever write a report in this case?**

8       A.    No, I did not.  Not that I recall.

9       Q.    **Did you ever arrest Tavares Docher for any**

10 **crime on May 11, 2014?**

11      A.    Did I arrest him?  No.

12      Q.    **Is it your testimony today that you never**

13 **evaluated Tavares Docher for excited delirium**

14 **on May 11, 2014?**

15           MS. BARRANCO:  Object to the form.  Go

16      ahead.

17      A.    I can express that -- or note that he has

18 possibly -- you know, I could relay what signs and

19 symptoms he has of any kind of condition, but I

20 couldn't make that judgment call, or that

21 professional medical diagnosis that he had excited

22 delirium.  I had concerns during the struggle once

23 his behavior became more erratic and not responding

24 to normal stimulus around him.

25 BY MR. HECHT:

Page 26

1    Q.   Is it correct to say that prior to the

2    struggle you did not believe Tavares Docher to be

3    experiencing excited delirium?

4    A.   No, I did not.

5    Q.   Looking back, do you believe Tavares

6    Docher was experiencing excited delirium prior to

7    the struggle?

8         MS. BARRANCO:  Object to the form.  Go

9    ahead.

10   A.   Looking back, no, I do not.

11   BY MR. HECHT:

12   Q.   Tell me what you recall about your

13   interaction with Tavares Docher on May 11, 2014.

14   A.   The initial contact with him, he was in --

15   I guess his body behavior was more animated than

16   that of a normal person.  He came toward my patrol

17   vehicle when he saw it.  He was carrying a

18   screwdriver in his hand, in the same position that

19   somebody would carry a knife, which is basically the

20   metal end forward and with a fist-grip around the

21   handle.

22        He made -- he responded to me directing

23   him to stand at the front of my patrol vehicle.  He

24   was talking very fast and giving a lot of

25   information without really having any questions

Page 27

1   asked at that point.  And he's -- he was physically

2   shifty.  I don't want to say jumpy, like jumping up

3   and down.  A lot of body movement, pacing in a small

4   area.

5          At that point my biggest concern was the

6   fact that he had a screwdriver.  I didn't want him

7   to -- I didn't know at this point if he wanted to

8   harm himself or others.  He was compliant to

9   direction at that point.  I asked him to drop the

10  screwdriver.  He did.  I asked him to sit on the

11  curb so that we could continue a dialogue.  There

12  was a lot of talk of -- he was giving a lot of

13  information; I do recall it was in reference to

14  somebody being held against their will.  A headless

15  body found in St. Lucie County, I believe it was.

16  And a homicide that occurred in Broward County.

17         We were trying to still just get basic

18  information from him.  He told us as far as why he

19  was there.  He couldn't tell us the location of the

20  house where somebody was being held against his

21  will.  He gave us this information and said he was

22  in St. Lucie County for -- this is a lot of -- there

23  is a lot of dialogue going on during this where --

24  with him in his state of mind, I didn't want to

25  disagree with him or make him believe that what he's

Page 28

1  telling me I believe to be false to further amplify

2  his behavior.  I wanted to bring him down and keep

3  him focused on our interactions.  Because while he

4  was sitting down, he would immediately try to stand

5  up, and then he'd be like, Oh, I'll just remain

6  seated.

7            He was pointing by the bushes by Prima

8  Vista.  Saying people were chasing him, referred to

9  them as Arabs.  I would just to try -- because I'm

10  still trying to validate any of this and get as much

11  information to process it as possible.  To see if we

12  do have somebody legitimately being held against

13  their will, and that we need response there, where

14  it's at.  He couldn't give us a location initially.

15            And during this time he's still -- we're

16  trying to keep -- we're trying to get his -- just to

17  where we could see he's not a flight risk or a

18  danger to himself, because he's acting in a manner

19  along with what he's saying:  He's being watched.

20  He's displaying behavior giving verbal indications

21  that the people are chasing him are there now.

22            And my concern at that point is that if he

23  flees, if he tries to run in the traffic in Prima

24  Vista, he could be struck by a vehicle.  That's a

25  very busy intersection.  I have an open place of

Page 29

1  business that's directly -- almost basically behind

2  us and to the side of us.  There is other citizens

3  there.  So we're trying to maintain the scene safety

4  at that point as well.

5          We could smell some alcohol.  Asked him

6  about that.  He said he had Natty Ice, which I'd

7  known to be Natural Ice-type of beer.  He told us he

8  was a sex offender.

9          While he's giving us this information,

10  we're trying to confirm his identity.  And my

11  trainee was working on that, Deputy Robinson.  And

12  we did confirm he was a registered sex offender.

13  He's giving us a lot of information about being

14  there for a court case, trying to see if he's

15  fleeing from warrants, or if he has any kind of

16  warrants -- any bit of information we could get on

17  him to help us understand what's going on now.

18      Q.   All right.  Let me ask you some questions

19  up until this point.

20          You pulled up in your vehicle with Deputy

21  Robinson, correct?

22      A.   Yes.

23      Q.   And he was your trainee?

24      A.   Yes.

25      Q.   What was your title in regards to him

1   being your trainee?

2        A.   Field training officer.

3        Q.   So you were his field training officer.

4        A.   Yes.

5        Q.   And what does that mean?

6        A.   I'm -- we have phases of what's called

7   field training.  And during that time, during that

8   phase, I was his field training officer for that

9   block of time.

10       Q.   On May 11, 2014, was Deputy Robinson in

11   Phase 2 of his training?

12       A.   I believe it was Phase 2.

13       Q.   And what does Phase 2 entail?

14       A.   Phase 2 initially, as far as that time

15   when I was in the field training program, Phase 2

16   was more aware -- it's basically you want to try to

17   do things, or determine if it could be done half and

18   half.  Allow them, the trainee to take some

19   initiative and see how they react on calls.  So

20   you're kind of half helping, half evaluating.

21       Q.   Does a trainee have arrest powers?

22       A.   Yes.

23       Q.   And they wear the same gun belt that any

24   other deputy would wear.

25       A.   Yes.

Page 31

1     Q.    Are there any powers or authorities that a

2   trainee does not have that a regular deputy sheriff

3   would have had?

4     A.    Well, they -- it's not necessarily as far

5   as powers.  They can't submit reports without it

6   being reviewed by the field training officer prior

7   to.

8     Q.    So the two of you pull up.  And where is

9   it when you drive into the CVS parking lot that you

10  first see Tavares Docher?

11    A.    As we're pulling -- we had already been

12  given a clothing description.  As we're pulling --

13  it's kind of a -- because it's not a straight on,

14  the business; it's kind of turned to face almost

15  like it's pointing into the corner of the

16  intersection.  And we pulled in -- right as we're

17  turning around to come around to the front of the

18  building, I saw him standing under the --

19    Q.    Entrance?

20    A.    Yes.  Basically there is the little cover.

21  He was standing under there within close proximity

22  of the doors.

23    Q.    And when you pulled up in your vehicle,

24  approximately how many feet was your vehicle from

25  where Tavares was standing?

1      A.   We stopped -- I couldn't tell you exactly

2   feet -- but we stopped a decent distance away from

3   the door.  First of all, I didn't want to put my

4   patrol car right at the doors of the business.  And

5   second of all, I have to assess -- because he

6   immediately when -- he saw the patrol vehicle, he

7   immediately was -- it wasn't like a slow walk; it

8   was like, Oh, there they are; here I go.

9      **Q.   And when you pulled up, prior to you**

10  **exiting your vehicle, did you see the screwdriver in**

11  **his hand?**

12     A.   I saw something in his hand.  And as he

13  got closer, I realized it was a screwdriver.

14     **Q.   How close to your vehicle was it that you**

15  **realized it was a screwdriver?**

16     A.   It was -- it was probably in between --

17  right around the halfway mark, between where he was

18  to my vehicle.  He had a clenched fist.  That's what

19  I was looking at:  Why his fist was clenched, and

20  what he was holding?

21     **Q.   And at that point in time did you exit**

22  **your vehicle and tell him to drop what he was**

23  **holding?**

24     A.   I got out of my vehicle quickly so that --

25  you don't want, in any kind of situation, to be

1   sitting in your vehicle when somebody is

2   approaching.  It's not what I consider officer

3   safety.  So I got out quickly so that I could start

4   engaging in verbal interaction with him walking up

5   to us.

6       Q.   Did he continue to approach you, or did

7   you meet him in the middle?

8       A.   He met -- we met towards the right -- near

9   the front of my patrol vehicle.

10      Q.   And he was still holding the screwdriver?

11      A.   Initially, yes.  I told him to drop it and

12  kind of brushed it out of his hand.  He was

13  compliant at that point as far as the verbal

14  instruction.

15      Q.   At any point in time when you saw the

16  screwdriver prior to him dropping it, were you in

17  fear for your life?

18      A.   It was -- I was in fear of being stabbed

19  or struck with it, yes.

20      Q.   At any point did you take out your gun and

21  point it at him?

22      A.   No.

23      Q.   Well, if you felt that you may be in

24  danger because of the screwdriver, aren't you

25  trained to use some sort of offensive maneuver?

Page 34

1               MS. BARRANCO:   Object to the form.   Go

2        ahead.

3        A.    If he held it at a threatening manner or

4    was coming, and it's obvious he's coming to stab me,

5    then I would draw my gun, or I would meet that

6    threat with the proper force.   And a stabbing I

7    would definitely draw my gun, because it could be

8    potentially fatal.

9               At that point it was -- once -- because

10   the first thing I addressed was the threat.   And I

11   said, Go ahead and drop what you got in your hand.

12   I didn't want to draw -- because once he dropped it,

13   I didn't want to draw attention back to that

14   screwdriver.   Why were you carrying a screwdriver?

15   Because he immediately started, basically loudly

16   stating his needs and why.   And it was just a bunch

17   of things at once.   So realizing that we have a

18   potentially emotionally unstable person, I didn't

19   want to draw focus back to the screwdriver for him

20   to pick it up, or realize that he was possibly a

21   threat to law enforcement, because then it presents

22   safety factors for not only us but for him as well.

23   BY MR. HECHT:

24        Q.   Is it illegal to walk with a screwdriver

25   in your hand?

1      A.   Generally, to walk with a screwdriver in

2  your hand, no, it's not.

3      **Q.   Was Tavares Docher committing a crime as**

4  **he approached your vehicle holding a screwdriver?**

5      A.   I didn't consider it a crime.  It could

6  have been construed as -- it depends on -- but once

7  he made it to my -- it could have been construed as

8  assault.  He's not holding it like he's going to

9  take out a headlight.  He's holding it with a

10  clenched-tight fist, in the same manner you would

11  hold a knife.  But once he became compliant and

12  dropped it, it was no longer a factor.  At that

13  point I had him safely away from the screwdriver.

14  And I was -- my goal was to keep his focus to, that

15  he never -- I didn't want him focusing on the

16  screwdriver in any way.  When Deputy Newman

17  approached, he saw the screwdriver and brushed it

18  further away so it was out of play at that point,

19  basically.

20      **Q.   So is it your testimony that he -- as he**

21  **was approaching your vehicle with the screwdriver**

22  **while you were inside your vehicle, you considered**

23  **him a threat?**

24      A.   I didn't know at that point what his

25  intent was.  So yes, I did.

Page 36

1       Q.    And when you realized that he was holding

2    a screwdriver and you exited your vehicle prior to

3    you telling him to drop the screwdriver, did you

4    still consider him a threat?

5       A.    I considered it a possibility of a threat,

6    yes.  There is potential for danger.

7       Q.    And is it your testimony that the way in

8    which he was holding the screwdriver was a crime?

9             MS. BARRANCO:  Object to the form.

10      A.    No, I wouldn't call it black-and-white a

11   crime.

12   BY MR. HECHT:

13      Q.    I just recall you moments ago saying, As

14   he approached you with the screwdriver, you could

15   classify that as an assault.

16            MS. BARRANCO:  Object to the form.  Go

17        ahead.

18      A.    If the remaining -- it could have been at

19   that point; I'm still formulating why.  But if he

20   came up and he's still holding it, and I say, Drop

21   the screwdriver, and he says, No, and continues to

22   come up, then the danger has just increased.  And

23   now he's becoming -- but that didn't happen.

24   Because once I said, Drop what's in your hand, he

25   let it go.  And my goal now is to pull his focus

Page 37

1  away from that.  He was no longer a physical threat

2  to me with the screwdriver.

3    BY MR. HECHT:

4    **Q.   So at no point in time prior to you**

5  **telling Tavares to drop the screwdriver was he**

6  **assaulting you?**

7    A.   No.  If I considered it assault at that

8  point, I would have arrested him at that point.

9    **Q.   So he was not committing a crime, correct?**

10   A.   No.

11        MS. BARRANCO:  Object to the form.

12   A.   At that point he didn't commit a crime

13 that I was going to arrest him for.  I basically

14 dispelled any type of assault threat at that point.

15 When he complied:  Drop the screwdriver.

16        Now, I could have revisited it later if I

17 found -- there's -- it could go several ways at that

18 point.  I don't want to speculate.  Yes, it could

19 have still been a factor through further

20 investigation to be used as a weapon against someone

21 else.

22   BY MR. HECHT:

23   **Q.   But that didn't happen?**

24   A.   No.  Nor did he ever take a screwdriver

25 again.  So it was no longer a factor at that point.

Page 38

1      Q.   So after he dropped the screwdriver, is it

2   correct that you and Deputy Robinson stood at the

3   front of your vehicle and spoke to him?

4      A.   I don't -- I was at the front of my

5   vehicle.  I remember I was near the push bar of my

6   car.  I don't recall exactly where Deputy Robinson

7   was, because he did step away; because dispatch, if

8   I remember correctly, had additional information to

9   give us.  And he was handling the radio traffic,

10  which is the talk.

11     Q.   When you were speaking with Tavares Docher

12  at the front of your vehicle, would you classify his

13  demeanor as emotionally unstable?

14          MS. BARRANCO:  Object to the form.  Go

15      ahead.

16     A.   Emotionally unstable, you could say it was

17  emotionally unstable at that point.  If it's through

18  the alcohol, any type of emotional behavioral or

19  mental disability, at that point I don't know.  But,

20  yes, I mean you could say it was considered

21  emotionally unstable, yes.

22   BY MR. HECHT:

23     Q.   And how long after you were speaking with

24  Tavares Docher at the front of your vehicle did it

25  take for Deputy Newman to arrive?

 1          A.   I couldn't tell you time-wise, but to the

 2     point where -- from the time he dropped the

 3     screwdriver, it wasn't long after that, that Deputy

 4     Newman further brushed the screwdriver away so it's

 5     no longer in play unless he ran towards it or

 6     something like that.

 7          **Q.   Once Deputy Newman arrived, were you,**

 8     **Deputy Robinson, and Deputy Newman, all three**

 9     **surrounding Tavares Docher?**

10          A.   Surrounding him, no.  Positioning in --

11     more so, if you have some -- someone that's showing

12     some sort of mental instability or intoxication and

13     not completely calming down like a normal person

14     would when you're trying to understand them, you

15     would want to put yourself in a position so that

16     they're no longer -- if they do flee, you could get

17     them under control so they don't hurt themselves or

18     others.

19          **Q.   So explain to me how you, Deputy Robinson,**

20     **and Deputy Newman were standing or positioning**

21     **yourselves around Tavares Docher.**

22               MS. BARRANCO:  Object to the form.

23          A.   I don't remember exactly who was standing

24     where.  We weren't all three huddled up together,

25     basically.

1    BY MR. HECHT:

2        Q.    And at that point in time, was Tavares

3    Docher under arrest for anything?

4        A.    At the initial contact, no.

5        Q.    When you, Deputy Newman, and Deputy

6    Robinson were positioning yourselves around him, was

7    he free to leave at that point in time?

8        A.    No.

9        Q.    Why not?

10        A.    He was -- he's displaying -- his behavior

11    is considered erratic.  We don't know the level of

12    intoxication he has.  We're trying to -- he called

13    us for potentially serious offenses of somebody

14    being detained.  He's talking now about a headless

15    body.  He's -- during this conversation he's not

16    making sense.  We don't know if he's a threat to

17    others.  We can't -- you can't just turn around and

18    walk away from that; we have a liability at that

19    point.

20        Q.    Based on everything you just said, you

21    continued talking to him, correct?

22        A.    Yes.

23        Q.    And based on your investigation, what did

24    you find?

25        A.    Well, during this -- during the time, with

Page 41

1 the continual, you know, just go ahead -- basically

2 I don't remember exactly the words -- but initially

3 I wanted him to sit on the curb so we could -- he's

4 not a flight risk or a danger to himself.  He

5 already displayed shifty body movements, standing up

6 continuously, and pointing at the bushes.  At that

7 point -- during the ongoing course of this, and him

8 not -- we're in a public parking lot; it's already

9 caused some disturbance to the business that we

10 could see where onlookers, people walking around us,

11 were taking up half a parking lot.  At one point we

12 -- during the continuum of this he was placed in

13 hand restraints.  Handcuffs.

14     **Q.   Based on the investigation that you,**

15 **Deputy Newman, and Deputy Robinson engaged in, did**

16 **you make a determination prior to Tavares being**

17 **placed in handcuffs if he was a threat to others?**

18     A.   At that point we were -- it was more along

19 the lines -- basically it was disorderly

20 intoxication.  We had attempted to bring back some

21 sort of peace and normalcy to CVS.  He's admitted to

22 drinking.  He's displaying signs at the onset that

23 an intoxicated person would display.

24        Once the handcuffs were on him, we

25 continued dialogue with him, and that's when his

Page 42

1  statements became a little bit more erratic and

2  unintelligible to some point and not normal.

3      Q.   Okay.  Prior to Tavares Docher being

4  placed in handcuffs, my question is:  During the

5  investigation when the three of you were positioning

6  yourselves around Tavares, did you determine if

7  Tavares was a threat to others?

8          MS. BARRANCO:  Object to the form.  Go

9      ahead.

10     A.   If he fled on foot, yes.  Or if he -- we

11 -- he -- with his -- with his -- at that point what

12 we believed his level of intoxication or his under

13 the influence of -- because we had never even gotten

14 to ask him as far as drug use, if he takes

15 medications.  Yes, at that point he could have been

16 a threat to others.  Even at the form of just, you

17 know, running into traffic and getting hit by a car.

18 BY MR. HECHT:

19     Q.   So my question is very specific.  I don't

20 want to know if he could have been, or if it was

21 possible that he was a threat to others.  My

22 question specifically is:  During the investigation

23 when you, Deputy Robinson, and Deputy Newman were

24 positioning yourselves around Tavares, prior to him

25 being placed in handcuffs, did you make a

1  determination that Tavares Docher was a threat to

2  other people?

3              MS. BARRANCO:  Object to the form.

4      A.   It wasn't considered -- like it wasn't

5  like he is a direct threat to other people.  There

6  is multiple factors that came into play.

7  BY MR. HECHT:

8      Q.   Prior to Tavares Docher being placed in

9  handcuffs, did you make a determination during your

10 investigation as to whether Tavares Docher was a

11 threat to himself?

12     A.   There was the possibility -- the potential

13 for him to be a threat to himself, yes, and to

14 others.

15     Q.   Again, I understand there was the

16 potential.  But certainly he wasn't placed in

17 handcuffs because he was a potential threat to

18 himself and others, correct?

19             MS. BARRANCO:  Object to the form.

20     A.   As far as -- there's -- as far as being,

21 the reason being, Hey, he's a threat to himself and

22 others, those would be more along the line of a

23 Baker Act at that point, based on behavior.  But as

24 far as we're there to investigate the assault where

25 he's the suspect, no.

Page 44

1    BY MR. HECHT:

2        **Q.   So Tavares was not a threat to himself or**

3    **others prior to you placing him in handcuffs,**

4    **correct?**

5            MS. BARRANCO:  Object to the form.  Go

6        ahead.

7        A.   As far as that being the initial, He's a

8    threat to himself and others; let's put handcuffs on

9    him, no.

10   BY MR. HECHT:

11       **Q.   And after you and Deputy Newman continued**

12   **speaking with him, there was a determination made to**

13   **arrest him, correct?**

14           MS. BARRANCO:  Object to the form.  Go

15       ahead.

16       A.   There was a -- he was detained at that

17   point -- further detained at that point with

18   handcuffs.  And we were going with -- at that point

19   it started out -- the initial reason for handcuffs

20   was an arrest, yes.

21   BY MR. HECHT:

22       **Q.   And who was it that placed the handcuffs**

23   **on Tavares Docher?**

24       A.   I believe it was Newman.

25       **Q.   And did you discuss with Deputy Newman**

1   what it was that Tavares Docher would be arrested

2   for?

3        A.   No, I did not.  I don't recall

4   specifically having, like, a sidebar with him or

5   anything on that, no.

6        Q.   What was Tavares Docher at that point

7   being arrested for?

8        A.   Based on my observations from what I saw,

9   disorderly intoxication.

10       Q.   And tell me what are the elements to

11  arrest someone for disorderly intoxication?

12       A.   Under the influence of alcohol, behavior,

13  disrupting normal faculties of society or business,

14  or place of business, or the general public.

15       Q.   Now, you mentioned the CVS parking lot was

16  a public parking lot, correct?

17       A.   Well, it's open to the public.

18       Q.   Is it a public parking lot or a private

19  parking lot?

20       A.   That would be through their -- as far as

21  -- how CVS -- it's private through CVS I would

22  imagine, but it's open to the public.  There is no

23  gated access or anything like that.

24       Q.   Did you witness Tavares Docher, prior to

25  placing him in handcuffs, commit a crime?

Page 46

1        A.   Did I witness him prior to placing him in

2   handcuffs?  As far as, like, on my initial -- I

3   mean, I witnessed your -- I don't -- where are you,

4   as far as prior to the actual handcuffs being placed

5   on him?

6        **Q.   Well, you told me he was arrested for**

7   **disorderly intoxication, correct?**

8        A.   Yes.

9        **Q.   So is that the crime that he was being**

10  **arrested for?**

11       A.   I witnessed him display criteria that

12  meets the probable cause for disorderly

13  intoxication.

14       **Q.   That's what I want to ask you about.**

15           **Tell me what it is that you observed that**

16  **allowed you to arrest Tavares Docher for disorderly**

17  **intoxication.**

18           MS. BARRANCO:  Object to the form.  Go

19       ahead.

20       A.   Is -- he's -- I mean, his behavior, his

21  voice was very loud.  He's drawing out the process

22  with law enforcement being there; it disrupted the

23  facility of CVS.  It disrupted their normal

24  faculties of business.

25  BY MR. HECHT:

Page 47

1        Q.    After placing Tavares Docher in handcuffs,

2    where was Tavares Docher going to be taken to?

3        A.    Initially when he was placed in handcuffs,

4    to jail.  For an arrest, you're going to take him to

5    the county jail.  And that's based on my visual

6    determination.  There was no -- like I said, there

7    were no specific sidebars like, Hey, where are you

8    going to take him or anything like that.

9        Q.    Which vehicle was he placed into?

10       A.    When he sat down, it was Newman's vehicle.

11             MR. HECHT:  If you need to get that.

12       A.    No.  Thank you, though.

13    BY MR. HECHT:

14       Q.    Tavares Docher was handcuffed behind his

15   back, correct?

16       A.    Yes.

17       Q.    And then who escorted him to Deputy

18   Newman's vehicle?

19       A.    Well, we were still -- there was still

20   dialogue over in the general vicinity of my vehicle.

21   I believe -- I know -- I know that Newman was

22   walking with him and so was I.  I do recall Deputy

23   Robinson being at the vehicle when we got to the

24   back of his vehicle, so I believe it was all three

25   of us.

Page 48

1        Q.    And Tavares Docher was then put into the

2   back of Deputy Newman's vehicle?

3        A.    The back door was open on the passenger

4   side.  It was open; I believe it was Newman that

5   opened it.  Asked him to sit down.  Sometimes

6   there's different ways you could ask him to step in

7   the vehicle.  Some people it's easier to have them

8   sit down and put their legs forward.  We were still

9   having a dialogue, so he sat back -- he sat with his

10  butt going into the car.

11            (Discussion off the record.)

12   BY MR. HECHT:

13        Q.    Tell me what happened after Tavares Docher

14   was placed into the back of the vehicle.

15        A.    There was a -- he still appeared to be

16   just normal, the normal dialogue that we had with

17   him.  He was told that -- it was something along the

18   lines, Okay, we're going to head out.  And go ahead

19   and place your feet inside the vehicle.  At that

20   point there wasn't an immediate response.  So I

21   believe it was said again.  And he just looked down;

22   his head was moving, and then he just -- he did --

23   it was like a leap out of the -- like a very

24   forceful frontward motion out of the back of the

25   patrol car.

Page 49

1      Q.    Where did he run towards?

2      A.    It wasn't initially a run.  His body came

3  upward and I saw his knee -- it looked like his knee

4  that came up high with him.  And from where I was --

5  it looked like it struck Newman or Newman brought

6  his hands up to block it.  He tried to go forward

7  away from the car.  But the car is sideways.  He's

8  at the back door.  He's trying to go directly out

9  from the vehicle.  And we were trying to push him

10  back in, telling him to get in the car.  And there

11  was a brief struggle, and then an attempt to push

12  him back in, and he just pushed through.  I was

13  trying to do this over the back door (indicating).

14  Once he pushed through, I was able to catch his arm

15  and try to catch up with him while holding his arm.

16  I don't recall how far we ran.  But I know, from

17  what it felt like to me, when he went forward, I

18  went forward, and like Newman went forward as well.

19  And basically all three of us.  Because I didn't see

20  Robinson went to the ground.

21      Q.    What direction was Tavares headed once he

22  got out of the vehicle?

23      A.    Directly towards Prima Vista is what it

24  looked like to me.

25      Q.    Is that south?

Page 50

1     A.   Yes, sorry.  I thought you meant

2     street-wise.

3     **Q.   Detective Mangrum, how tall are you?**

4     A.   Six-foot-one.

5     **Q.   How much do you weigh?**

6     A.   330, 335.

7     **Q.   Do you recall how tall Tavares Docher was**

8     **on May 11th?**

9     A.   I don't recall his height.  He was -- I

10    don't remember him being taller than me, but he

11    wasn't incredibly short either.

12    **Q.   And is it correct to say you, Deputy**

13    **Robinson, and Deputy Newman had a difficult time**

14    **controlling Tavares Docher when he left the police**

15    **car?**

16    A.   Yes.

17    **Q.   What happens when Tavares Docher is on the**

18    **ground?**

19    A.   Once he's on the ground, it was --

20    initially it was me, from what I remember with me,

21    is getting back -- trying to get back to my knees

22    quickly so he doesn't jump up and run again.

23    We're -- at this point my biggest concern is, he's

24    trying to run; I don't know why.  His -- because

25    again when that -- during that trip to the patrol

1    car is -- during that dialogue is when he was more

2    about being chased, and people are actively trying

3    to kill him.  And now he's running out of the patrol

4    car; I don't know why.  And his initial flight

5    direction was towards a busy street.  So I'm trying

6    to get back up, make sure he doesn't try to run

7    again, and just kind of -- what I thought would be

8    just grab his arms, pick him back -- stand him back

9    up and go back to the car and work again on trying

10   to calm him down.

11           Once I was able to get back to my knees

12   and grab more so the left side of his body, and try

13   to, you know, just get control over him, is when I

14   realized that his behavior, physically his

15   movements, his demeanor and everything, had

16   amplified.  So at that point he's become combative.

17   He's -- I was trying -- I was initially toward the

18   top.  He's taking his head in a backward motion like

19   he's trying to strike.  I tried to hold his head

20   still towards the ground.  While I'm trying to hold

21   his head down, I could see that Newman is struggling

22   with his right side, because he's still mostly chest

23   down, but he's trying to bring his right side of his

24   body up; that's when I realized the handcuff had

25   slipped up his forearm, which registered to me

Page 52

1   initially that that would cause a significant amount

2   of discomfort or pain trying to do that, but he had

3   no response that I could see to the handcuff, to him

4   pushing his arm through the handcuff and bringing it

5   up further through his elbow.

6            During that, while I was trying to hold

7   his head down, that's when I noticed now he's very

8   sweaty, and he's -- while my hand is on his head,

9   which would have been -- I don't know, I know you

10  have to -- kind of like palmed over where his ear

11  and top rear portion of his head, I could feel him

12  trying to shake my hand.  And his face is on the

13  asphalt.  And this is having no normal effect.

14  There is no Ow, my face hurt.  And he's grinding his

15  face so I would try to put more pressure to stop his

16  movements.  And that's when I noticed him ducking

17  kind of backwards motion in my hands sliding further

18  towards his face, and that's when he was biting at

19  my finger.  And that's when I noticed he was trying

20  to bite me.  And my hand is -- I can't control my

21  hand slipping, and that's when I would just, at one

22  point I dropped my forearm down to push his face --

23  to strike his face away from my hand, and then try

24  to regain control -- try to regain control over his

25  head.

Page 53

1     Q.    The struggle that you're talking about

2  involving you three deputies and Tavares, how long

3  did that struggle last for prior to Tavares being

4  injected in his buttocks?

5     A.    I couldn't give you a time, because it's

6  -- if I'm just looking at a watch, and it's just --

7  it's easy to say three or four minutes have passed.

8  When it comes to this nature with the amount of

9  thought going through your head and what you're

10  paying attention to, I honestly -- you lose all

11  perception of time.

12     Q.    During the struggle, is it correct that

13  you were applying pressure to Tavares Docher's face?

14     A.    The side of his head, yes.

15     Q.    What were you using to apply pressure to

16  the side of his face?

17     A.    The palm of my hand.  Basically an

18  open-palm hand.  Almost like a basketball.  Just

19  basically like an open hand over the side of his

20  head.

21     Q.    And you were using your hand to make sure

22  that his head stayed level to the ground, correct?

23         MS. BARRANCO:  Object to the form.  Go

24     ahead.

25     A.    Initially what made me make contact with

Page 54

1   his head, he's almost like head striking.  He's

2   doing head strikes backwards, which my biggest

3   concern at that point, yes, if one of us fell

4   forward and hit head-to-head, it would hurt.  The

5   other, he is hitting his head on the pavement.  I'm

6   trying to hold -- there is nothing to hold it

7   against to except for the pavement.  At least if I'm

8   holding it still, he's not causing injury to

9   himself, or trying to bite, or anything like that.

10  Once I realized he was biting, that became a great

11  concern to me as well because I didn't have any

12  gloves on.

13   BY MR. HECHT:

14      **Q.   When you were applying pressure with your**

15  **hand to his face, did he continue to strike his head**

16  **on the ground, or were you able to keep his head**

17  **level with the ground so he wasn't able to strike**

18  **his face?**

19          MS. BARRANCO:  Object to the form.

20      A.   I was able to hold it -- his head closer

21  to the pavement.  But still, no, he was moving his

22  head in almost like a backwards -- like a

23  semicircle.  And his face is right there on the

24  concrete.  And he's basically -- to me it looks like

25  he was grinding his face in the pavement trying to

1    get free.  I'm trying to hold it still.  That's when

2    my hand -- he started to move hard enough to where

3    my hand was sliding towards his face, and that's

4    where I saw he was attempting to bite my hand.

5        BY MR. HECHT:

6        **Q.   And during this struggle you said that you**

7    **dropped your forearm to strike his face; is that**

8    **correct?**

9        A.   I struck a --

10            MS. BARRANCO:  Objection to form.

11       A.   I apologize.  I basically -- holding him

12   from there, when he would go to bite, the only thing

13   I could do to stop the bite is pull my hand away; it

14   was just basically a drop-down, and then try to

15   regain control over his head.

16       BY MR. HECHT:

17       **Q.   Obviously everything you just said is not**

18   **going to read very well.  There is a lot of, I did**

19   **this, and then I did that, and then I did this, and**

20   **then I did a drop-down.**

21           **What I'd like you to do for the court**

22   **reporter, because you reenacted that very well for**

23   **us, tell us specifically what you did once Tavares**

24   **Docher was attempting to bite you.**

25       A.   Okay.  I'll explain this as easy as

Page 56

1   possible.  I had my hand directly down on the side

2   of his head, with applying forward pressure to keep

3   his head still.  Once he slid his head to where my

4   hand was in proximity of his mouth, he went to bite,

5   almost to the point -- his lips actually were on my

6   finger, and that's when I basically -- the best way

7   to explain it would be, just a -- from the back side

8   of the forearm is just straight down in a popping,

9   striking motion toward his head to push it away from

10   my hand, and then regain control in the same

11   position that I had in my hand to start with.

12       Q.   While you were trying to restrain Tavares

13   Docher, what was he doing?

14       A.   The only -- the biggest -- as far as

15   positioning, all I remember with Deputy Robinson is

16   that he was trying to restrain his legs.  That's

17   when I saw that with Robinson -- when I realized how

18   bad he was kicking and using his legs, and Robinson

19   was just trying to control his legs.  And when he

20   would get kicked, at one point I saw him utilize a

21   strike for compliance.  It looked like it was on his

22   thigh for pain compliance for him to get his leg

23   under control.

24       Q.   And what was Deputy Newman doing during

25   this time as well?

Page 57

1        A.   He was on the -- generally the same

2   position as me, but on the opposite side of the

3   body.  And once I realized he was biting, I noticed

4   that Deputy Newman had gloves on, and he took over

5   control over the head.

6        **Q.   Let me back up a bit.  Prior to Tavares**

7   **Docher being placed in handcuffs, was there a**

8   **conversation about whether or not Tavares was on any**

9   **illegal drugs?**

10       A.   There wasn't a specific, but the further

11  we got into talking to him, my concern for more than

12  alcohol was, I did -- because they're -- obviously

13  there is alcohol.  You could smell it.  He admitted

14  to it.  But there is -- with his behavior, once it

15  gets to a certain -- there is also -- because

16  illicit drugs are readily available in St. Lucie

17  County, my concern was during that time, was that if

18  he was using illegal drugs or abusing prescription

19  drugs.

20       **Q.   Did you ever ask Tavares, at any point in**

21  **time, whether he was taking prescription drugs or**

22  **had taken illegal drugs?**

23       A.   The only time I remember asking him, was

24  while we were arguing on ground.  At a certain point

25  when -- because this -- the struggle was trying to

Page 58

1  get control over him.  There wasn't a whole lot of

2  dialogue, except trying to get him to comply, to

3  stop resisting, stop moving, stop being violent.

4  There was a point where there was some was calm,

5  that I was trying to ask him, because at that point

6  I did have a concern about drugs.

7      **Q.   When you asked Tavares Docher during the**

8  **struggle whether he was on any sort of illegal drugs**

9  **or prescription drugs, what did he tell you?**

10     A.   He wasn't answering any -- he wasn't

11 responding or answering to anything verbally to us

12 at that point.  You heard a lot of yelling, but he

13 wasn't responsive at that point to us like he had

14 been before.

15     **Q.   At any point in time during the struggle,**

16 **did you see Deputy Newman apply his thumb to the**

17 **nerve mass in the neck of Tavares Docher to gain**

18 **compliance?**

19     A.   Did I see that?  No.

20     **Q.   Had you had seen that, would you have told**

21 **Deputy Newman not to use his thumb and apply**

22 **pressure to the nerve mass in Tavares Docher's neck?**

23          MS. BARRANCO:  Object to the form.

24     A.   No, I would not.

25 BY MR. HECHT:

1       Q.    Why not?

2       A.    Because I wouldn't see that -- I would not

3  see anything egregious or unbecoming of a law

4  enforcement officer at that point.

5       Q.    Did you see Deputy Newman use an elbow

6  strike to the right side of Tavares Docher's head

7  during the struggle?

8             MS. BARRANCO:   Object to the form.

9       A.    I saw an elbow strike used.  I don't

10  recall where.  I couldn't tell you it was to the

11  right side of the temple or anything like that.

12  BY MR. HECHT:

13      Q.    How many times did you see Deputy Newman

14  apply an elbow strike to Tavares Docher's head?

15      A.    The one that I saw -- the elbow strike I

16  saw was after -- immediately after I saw him bite

17  Deputy Newman's hand.

18      Q.    Did you ever tell Deputy Newman not to use

19  an elbow strike to Tavares Docher's head?

20      A.    No, I did not.

21             MS. BARRANCO:   Object to the form.

22  BY MR. HECHT:

23      Q.    Why not?

24      A.    Because I had already used one as well,

25  and it was justifiably used, and it was for the

Page 60

1    right purpose.

2         Q.   Is it your testimony today that neither

3    you, Deputy Newman, nor Deputy Robinson utilized

4    excessive force against Tavares Docher?

5              MS. BARRANCO:  Object to the form.  Go

6         ahead.

7         A.   Is that my -- yes.

8    BY MR. HECHT:

9         Q.   And is it your testimony here today that

10   none of the force -- none of the force used by

11   either you, Deputy Newman, or Deputy Robinson was

12   classified as deadly force?

13             MS. BARRANCO:  Object to the form.  Go

14        ahead.

15        A.   I did not classify it as deadly force, nor

16   did I see it as deadly force.

17   BY MR. HECHT:

18        Q.   Was at any point during your entire

19   interaction with Tavares Docher on May 11, 2000 and

20   -- strike that.

21             Was at any point on May 11, 2014 Tavares

22   Docher causing you to believe that he was exhibiting

23   a level of force whereby it would be necessary to

24   justify the use of deadly force against him?

25             MS. BARRANCO:  Object to the form.  Go

Page 61

1        ahead.

2        A.    Did I see as far as him displaying a need

3    for deadly force?  No.

4    BY MR. HECHT:

5        **Q.    During the struggle, are you aware if**

6    **Tavares Docher was having a difficult time**

7    **breathing?**

8        A.    His breathing level during the struggle

9    was getting -- the more -- the more animated he got,

10   and the more he physically struggled against our

11   efforts to subdue him -- because at this point we're

12   trying to physically control him.

13            Because this went from just -- it went

14   from him not making sense, and with the initial

15   detainment, and getting him to the car.  It went

16   from that interaction to -- to now where it's amped

17   up.  He's exhibiting violent behavior.  He's not

18   making any sense.  His breathing increased heavily

19   the more he resisted.

20            And our goal was to get him to stop

21   resisting us and to calm down so that he could bring

22   his heart rate and his breathing down.  He was never

23   having difficulty breathing to where his airway was

24   obstructed because we're on him or anything like

25   that.

Page 62

1      Q.   During the struggle, is it correct that

2   you utilize palm heel strikes to large muscle areas,

3   including the shoulders, chest, and the back of

4   Tavares Docher?

5      A.   I believe I used strikes to the large

6   muscle areas, yes.

7      Q.   And what was the purpose of that?

8      A.   To defeat the physical efforts from that

9   muscle group, and pain, and compliance.

10      Q.   Is it your testimony here today that the

11   force that you utilized during this struggle against

12   Tavares Docher was necessary and appropriate?

13           MS. BARRANCO:   Object to the form.   Go

14       ahead.

15      A.   Yes, I do.

16   BY MR. HECHT:

17      Q.   What involvement did Deputy Courtemanche

18   have in this case?

19      A.   During the struggle on the ground --

20   because once he took off and we got him to the

21   ground, I -- I don't recall who, it could have been

22   me, radioed, We got one running.   Basically we're

23   now turning -- because at that point it's a foot

24   pursuit, and that's all they heard over the radio

25   initially, units respond; there was radio

1  communication for other deputies and rescue.  And

2  the first one I remember seeing outside of the three

3  of us was Deputy Courtemanche.

4      **Q.   At what point did he arrive in relation to**

5  **when the struggle was going on?**

6      A.   More to the end of the struggle.  Like he

7  was still somewhat combative, but it wasn't to the

8  level that it was prior to.  It was more

9  intermittent at that point.

10     **Q.   Did Deputy Courtemanche arrive before the**

11 **paramedics arrived?**

12     A.   I believe so, yes.

13     **Q.   And was Deputy Courtemanche involved in**

14 **trying to restrain Tavares Docher?**

15     A.   No, because at that point I believed it

16 was me that told him to keep -- because at one point

17 just prior to him physically standing where I could

18 see him, I had told some subjects to back away.  And

19 I just told him to make sure that nobody is close,

20 in a dangerous area for them to be at that point.

21     **Q.   So was it Deputy Courtemanche who was**

22 **trying to keep onlookers at bay?**

23     A.   He's the one that kept -- made sure that

24 nobody came up, basically.  Scene control at that

25 point you could say.

Page 64

1      Q.   But he was not involved in the struggle

2   that you, Deputy Newman, and Deputy Robinson were

3   involved in, correct?

4      A.   I never saw him physically to be involved

5   in that at all.

6      Q.   Before coming here to give your deposition

7   today, what have you reviewed?

8      A.   I reviewed my statements.

9      Q.   Were they taped statements?

10      A.   I don't know if it was taped or what.  But

11   I reviewed a --

12      Q.   Transcript?

13      A.   Transcription.

14      Q.   And do you know when was it you gave those

15   statements?

16      A.   It was on that day later at night.

17      Q.   What else have you reviewed?

18      A.   That was all I reviewed for this.

19      Q.   Did you see any video recordings of the

20   struggle?

21      A.   After the investigation I did, yes.  It

22   was on -- there was some on social media and I

23   believe on the news.

24      Q.   Was that back in 2014 now?

25      A.   Yes.  That would have been back in 2014.

Page 65

1      Q.   Prior to coming here today, you haven't

2   seen any sort of surveillance footage, or cell phone

3   video of the events we've been talking about today?

4      A.   No.

5      Q.   Have you reviewed anything else?

6      A.   That's all I reviewed.  I guess this is

7   back in 2014, that was when I initially saw the

8   videos and all of that.

9      Q.   Tavares Docher was never going to be Baker

10   Acted, correct?

11           MS. BARRANCO:  Object to the form.

12      A.   There was a potential for Baker Act.

13   Because like I said, once we got him in handcuffs,

14   his -- the criterion, he started exhibiting more

15   criteria that could meet a Baker Act.  At that point

16   it was:  What's going to get him the best help?  Is

17   leaving him -- because he's not saying that anybody

18   is monitoring his, you know, like, Hey, I normally

19   get care from so and so.  And he's at a CVS in this

20   kind of condition.  So we're -- what's the best

21   route for him to get help and not be a danger to

22   himself?

23    BY MR. HECHT:

24      Q.   But he was not being Baker Acted, correct?

25           MS. BARRANCO:  Object to the form.

Page 66

1        A.   We never got to that point of making a
2   final determination, as far as I recall.
3     BY MR. HECHT:
4        Q.   You had several options.  You could have
5   just let him go free, correct?
6             MS. BARRANCO:  Object to the form.
7        A.   Could that be done?
8     BY MR. HECHT:
9        Q.   Yes.
10       A.   Yes.  I wouldn't recommend it.
11       Q.   I understand.  You could have arrived on
12  scene, talked to him, and then just let him go,
13  correct?
14            MS. BARRANCO:  Object to the form.
15       A.   That would be a huge liability.  It could
16  have been done, yes.
17    BY MR. HECHT:
18       Q.   I understand.  You could have arrested him
19  for disorderly intoxication, correct?
20       A.   Yes, sir.
21            MS. BARRANCO:  Object to the form.
22    BY MR. HECHT:
23       Q.   You could have decided to Baker Act him,
24  correct?
25            MS. BARRANCO:  Object to the form.

Page 67

1      A.   We could have continued to see if he met

2   the criteria.

3    BY MR. HECHT:

4      **Q.   Correct?  The determination that was made,**

5   **by either you or the officers involved, was to**

6   **arrest him for disorderly intoxication, correct?**

7           MS. BARRANCO:  Object to the form.

8      A.   Baker Act and arrest are going to have the

9   same end result, as far as handcuffing and in the

10  back of the patrol car.  As far as I remember, that

11  was not a final -- that was not fully decided at

12  that point.

13   BY MR. HECHT:

14     **Q.   Okay.  You told me before that he was**

15  **placed under arrest for disorderly intoxication,**

16  **correct?**

17     A.   Yes.

18     **Q.   And he was placed in the patrol car.**

19     A.   Yes.

20     **Q.   And he was going to be taken to the jail,**

21  **correct?**

22           MS. BARRANCO:  Object to the form.

23     A.   He was placed in handcuffs originally.  We

24  never got him in the patrol car, locked in the

25  patrol car, doors shut.

Page 68

1          A Baker Act and an arrest are going to

2    have the same procedure, as far as handcuffing,

3    placing him in the back of the car.  Instead of

4    taking him to the jail, you'll take him to the

5    nearest receiving facility.

6          We had not been able to fully get enough

7    information, whether he meets the full criteria for

8    a law enforcement Baker Act, and if that would be

9    the best benefit for his well-being as well.

10   BY MR. HECHT:

11       **Q.   Okay.  Tavares Docher was going to be**

12   **taken to the jail, correct?**

13          MS. BARRANCO:  Object to the form.

14       A.   I don't know that.  As far as -- I can't

15   say that for positive, no.  I wasn't the initial --

16   initially he was being placed in Deputy Newman's

17   car.  He would have the final decision.  We don't --

18   it's not my place to say, Hey, you should do an

19   arrest over Baker Act.

20          We had started to have dialogue about the

21   possibility of a Baker Act and whether he met the

22   criteria during the transition to the patrol

23   vehicle.  Like I said, before his dialogue changed.

24   He went from just being displaying signs of, you

25   know, being intoxicated and just not to the point of

1   almost being -- or you could say belligerent, to now

2   he's -- you know, now he's talking about being

3   chased by people, people are trying to kill him, the

4   Arabs.  During that continued dialogue that he may

5   be a threat to himself or others, based on these

6   delusions that he has that he's being threatened.

7   BY MR. HECHT:

8        **Q.    When you Baker Act someone, do you take**

9   **them to the jail?**

10       A.    To the jail?  No.

11       **Q.    Where do you take them?**

12       A.    The nearest receiving facility.  We have

13  Port St. Lucie Hospital, which is on Walton Road.

14  We have Lawnwood Pavilion, which we take them to

15  Lawnwood emergency room.  We have New Horizons,

16  which is our main hub; it is center county.

17       **Q.    After Tavares Docher was handcuffed behind**

18  **his back and arrested for disorderly intoxication,**

19  **he was not going to any of those facilities,**

20  **correct?**

21            MS. BARRANCO:  Object to the form.

22       A.    I couldn't tell you that.  We never got to

23  fully make that determination.

24  BY MR. HECHT:

25       **Q.    Do you recall earlier in this deposition,**

Page 70

1    you telling me he was going to be taken to the jail?

2              MS. BARRANCO:  Object to form.  Go ahead.

3         A.   Initially, yes.

4    BY MR. HECHT:

5         Q.   What do you mean, "initially"?  And then

6    he was going to go somewhere else?

7         A.   No.

8         Q.   Okay.

9         A.   Once we placed handcuffs on him, there was

10   continued dialogue; that's when he started to

11   display that he may have more faculties involved

12   with impairment beyond drugs or alcohol.  And that's

13   where we started to look into whether he met the

14   criteria for a law-enforcement Baker Act.

15        Q.   Well, he was handcuffed behind his back,

16   correct?

17        A.   Yes.

18        Q.   And at that point he was placed under

19   arrest for disorderly intoxication, correct?

20             MS. BARRANCO:  Object to the form.

21        A.   Initially, yes.

22   BY MR. HECHT:

23        Q.   And he was placed in the back of the

24   patrol vehicle, correct?

25        A.   No, we never fully got him in the patrol

Page 71

1   vehicle.

2        **Q.   He never actually got his butt in the car?**

3        A.   He had his butt in, but feet and the door

4   -- the door was never shut.  Like I said, at that

5   point, the same protocol would have been done for a

6   Baker Act.  And we're talking a misdemeanor arrest.

7   And if it's better for him, and beneficial, and he

8   meets the criteria of a law-enforcement Baker Act,

9   it's as simple as saying, I'm going to drive to the

10  jail; I'm going to drive to New Horizons.

11       **Q.   I understand.  But he was not placed in**

12  **handcuffs because he was being Baker Acted.  He was**

13  **being placed in handcuffs because he was being**

14  **arrested for disorderly intoxication, correct?**

15            MS. BARRANCO:  Object to the form.

16       A.   Initially what I observed, yes, that's

17  what my thought process was.

18  BY MR. HECHT:

19       **Q.   Have you read this report by Joseph**

20  **Trevisol?**

21       A.   I may have read it after the investigation

22  but not recently or anything of that nature.

23       **Q.   According to this report,**

24  **Joseph Trevisol wrote:  "I spoke to Deputies Newman,**

25  **Mangrum, and Robinson separately.  They told me the**

Page 72

1    following:  Docher was acting intoxicated.  Docher

2    told Newman he had a few drinks while watching the

3    games on television.  The drinks went from liquor to

4    Natty Ice, saying how it's really strong beer.

5    Deputy Newman continued telling me Docher was

6    talking about how the Arabs were trying to kill his

7    mother and him because they knew where the Arabs

8    dropped the headless body in St. Lucie County.

9    Deputy Newman also said Docher was able to say who

10   and where he was.  Therefore, they did not see Baker

11   Act as a means to the end."

12          Have you read that statement before?

13       A.   Not that I recall.

14       Q.   Were you involved with telling Joseph

15   Trevisol that the Baker Act was not a means to the

16   end?

17          MS. BARRANCO:  Object to the form.  Go

18       ahead.

19       A.   We did not have -- based on getting to the

20   car at that point of him sitting his -- his actually

21   sitting in the back of the patrol vehicle, I did not

22   see fully the criteria for a Baker Act.  Had he been

23   compliant and sat, and we were able to continue to

24   talk to him, he may have exhibited the more for

25   criteria for that.  But at that point, no.  But was

1  Deputy Newman -- did I know for a fact that Deputy

2  Newman was leaving to drive to the jail?  No, I did

3  not.

4    BY MR. HECHT:

5      **Q.   What I want to know is:  Did you speak**

6  **with Joseph Trevisol, who was the reporting officer?**

7      A.   I don't remember specifically speaking to

8  him.  There was a lot of people there after the

9  fact.

10     **Q.   And according to the narrative written by**

11 **Joseph Trevisol, he wrote:  "Deputy Newman told**

12 **Docher to put his hands behind his back.  He was**

13 **under arrest for disorderly intoxication due to him**

14 **being intoxicated and causing a disturbance."**

15          **Is that your understanding of why Tavares**

16 **Docher was being arrested?**

17          MS. BARRANCO:  Object to the form.

18     A.   I understood that's why he was being

19 placed in handcuffs, yes.

20   BY MR. HECHT:

21     **Q.   He was not placed in handcuffs because he**

22 **was being Baker Acted, correct?**

23          MS. BARRANCO:  Object to the form.

24     A.   When the handcuffs were placed on him,

25 from my observations, no.

Page 74

1    BY MR. HECHT:

2        Q.   Did you ever have any conversations with

3    paramedic Jose Rosario?

4        A.   Specifically, I don't recall.  I don't

5    look at name tags.  I did have some maybe dialogue

6    with paramedics when they showed up.  I do recall

7    when Deputy Alanjay arrived on scene, and I

8    believe -- I'm not 100 percent positive.  I believe

9    it was Deputy Favalet (phonetic) that showed up on

10   scene as well.  I stood up and walked away -- I

11   stood up and walked away at that point to assess

12   myself.

13       Q.   What conversations did you have with any

14   paramedics?

15       A.   I don't recall specifics.  Maybe that --

16   like in a normal circumstance of that nature, I

17   would say he's been combative.  And this is -- but,

18   like, it was relatively fast them getting on scene.

19   And I wanted them -- I didn't have time -- like I

20   didn't do a sidebar and explain it to them.  Because

21   at that point is when he had become unresponsive.

22   And my concern was for his medical well-being.

23       Q.   Did you ever tell any of the paramedics

24   that Tavares Docher had been drinking alcohol?

25       A.   I don't remember ever saying that, no.

Page 75

1       Q.    Did you ever tell any of the paramedics

2    that Tavares Docher was or was not on any prescribed

3    medications or illegal drugs?

4       A.    I don't recall ever saying that.

5       Q.    Do you remember any of the paramedics

6    telling you that they were going to inject Tavares

7    Docher with Ativan?

8       A.    I don't remember any, like, medical

9    terminology.  But I do, yes, he was getting an

10   injection.  Because we at that point were going to

11   help.  If that's their medical procedure, then we're

12   going to assist them if he's combative.

13      Q.    Were you involved in the decision to

14   inject Tavares Docher with any medication?

15      A.    I don't make any of those calls medically,

16   no, sir.

17      Q.    Who made that call on May 11th to inject

18   him with the drug?

19      A.    That would be on the medical side.

20      Q.    And do you know why it is they injected

21   him with a medication?

22      A.    I know initially the -- what halted the

23   initial medical assessment of him and treatment was

24   he was -- because the end of it he had started to --

25   that's when he became completely unresponsive.  His

Page 76

```
 1    rapidness just went to almost nothing.  And that's

 2    when I couldn't tell -- he's not breathing heavily

 3    anymore; he's not like exasterbated (sic).  That's

 4    when I pulled him on his side, which is considered

 5    the recovery position, to check his breathing and

 6    his pulse.  I could still feel his pulse, and still

 7    hear him breathing lightly and see his stomach

 8    moving.  And he was calm at that point.

 9            And initially I had stepped away when

10    rescue got there because he was calm and other

11    deputies had taken over.  And I was concerned about

12    blood exposure at that point, because during the end

13    of that I noticed blood on the ground and blood

14    on -- what it looked like was on Deputy Newman.  So

15    I didn't know who was bleeding, where it came from,

16    what exposure level it was.

17            And I stepped back to assess, and that's

18    when I -- the last thing I just noticed is that he

19    almost -- he came back to it seemed like, sat

20    forward, and I saw a kicking motion.  And one of the

21    paramedics go backwards and landed on his butt.  And

22    that's when there was, like, we can't do treatment

23    with him being physically combative toward us.  So

24    there was a struggle to restrain him again.  There

25    was some struggle to hold him down.  And then he
```

Page 77

1   just went somewhat calm again.  And then they said

2   they needed assistance in giving him an injection.

3   I believe they said, I asked them where, like where

4   do they need to have access to him?  They said the

5   thigh or the butt, I believe.  We tried to hold him

6   in position where they could safely administer that.

7         Q.    Was he struggling during the injection?

8         A.    There was still some struggle to where we

9   had to hold him still.

10        Q.    And was he still handcuffed at the time

11   that he was given the injection in his buttocks?

12        A.    Yes.

13        Q.    He was handcuffed behind his back?

14        A.    Yes.

15        Q.    I'm going to show you a video.  It's a

16   minute long.  If you want to come over here.

17        A.    Yes.

18              (Video played.)

19   BY MR. HECHT:

20        Q.    So I just showed you a minute and nineteen

21   second video.  And I'm going to ask you some

22   questions about that.

23              Based upon what you just saw in this

24   video, is it your testimony that Tavares Docher

25   during this minute and nineteen second video was

Page 78

1  **resisting arrest?**

2          MS. BARRANCO:  Object to the form.  Go

3      ahead.

4      A.   During that video there is instances of

5  resisting arrest, yes.  Resisting being restrained

6  and controlled.

7    BY MR. HECHT:

8      Q.   **Well, you would agree with me at this**

9  **point he was already under arrest, correct?**

10          MS. BARRANCO:  Object to the form.  Go

11      ahead.

12      A.   Yeah, he was under arrest at that point,

13  whether it be for Baker Act, disorderly

14  intoxication.  For this it was disorderly

15  intoxication.

16    BY MR. HECHT:

17      Q.   **And a disorderly intoxication arrest is a**

18  **second-degree misdemeanor, correct?**

19      A.   It's a misdemeanor, yes.

20      Q.   **Do you take into consideration what one is**

21  **being arrested for when you exert a certain amount**

22  **of force on someone?**

23          MS. BARRANCO:  Object to the form.  Go

24      ahead.

25      A.   As far as use of force?  No.

1    BY MR. HECHT:

2        Q.   So in this situation it doesn't matter if

3    Tavares Docher was arrested for disorderly intox,

4    for murder; he would have been treated the same way

5    as we see him being treated in this video?

6            MS. BARRANCO:  Object to the form.  Go

7        ahead.

8            THE COURT:  At the point of the video

9        you're looking at, he had already committed

10       battery on law enforcement, escape, resisting

11       arrest with violence.  We're not talking about

12       a misdemeanor-level anymore.  Use of force

13       doesn't go based on the nature of the crime, so

14       to say, when you're dealing with a one-on-one

15       with a subject.  It goes to the amount of

16       resistance, and the factors that they're doing,

17       and what it takes to control that reasonably.

18   BY MR. HECHT:

19       Q.   In this video did you see your foot being

20   applied to what appears to be either Tavares

21   Docher's back or neck?

22           MS. BARRANCO:  Object to the form.

23       A.   His back, yes.

24   BY MR. HECHT:

25       Q.   So in this video you saw your foot being

Page 80

```
 1    applied to Tavares Docher's back, correct?

 2         A.   Yes.

 3         Q.   And what is that technique known as?

 4         A.   It doesn't have a name.

 5         Q.   Why were you placing your foot on Tavares

 6    Docher's back in this video?

 7         A.   When I initially stood up he had -- this

 8    is toward the end of the overall.  When I stood up,

 9    that's when he had gone somewhat -- he was -- we

10    noticed some sort of verbal agreeance, okay, okay.

11    And he had started to slow and stop his efforts to

12    struggle against us, and via strike.  And as I'm

13    standing up, he started again with his legs and his

14    upper body.  That's when I initially grabbed the arm

15    and then transitioned to the handcuffs, because at

16    this point he's already injured as I can see.

17              To keep him from causing further injury to

18    himself, the only thing I could think of to

19    improvise at that time was to hold his arms out

20    straight.  Now, if I hold his arms out straight

21    without applying any counterforce to keep his body

22    still, he's going to be able to flail about still

23    and cause injury and damage to his shoulders just

24    being held with his arms out.  So I applied some

25    pressure -- counterpressure with my foot to keep his
```

Page 81

1    arms out straight and his body still, so he couldn't

2    injure himself any further.

3      BY MR. HECHT:

4          Q.    When you placed pressure on Tavares

5    Docher's back using your foot, as we see in this

6    video, is that an approved law enforcement maneuver?

7              MS. BARRANCO:  Object to the form.  Go

8          ahead.

9          A.    It's approved to manipulate and control

10   physical resistance.

11     BY MR. HECHT:

12         Q.    Did you learn that in the police academy

13   or during your training at the St. Lucie County

14   Sheriff's Office?

15             MS. BARRANCO:  Object to the form.  Go

16         ahead.

17         A.    That -- in that video with the foot on the

18   back and the hands out straight, that was improvised

19   to gain control over him and prevent him from

20   harming himself any further.

21     BY MR. HECHT:

22         Q.    That was an improvised maneuver, correct?

23         A.    Yes.

24         Q.    That's not something you learned in your

25   training, correct?

Page 82

1              MS. BARRANCO:  Object to the form.  Go

2       ahead.

3       A.   Not that I specifically recall learning.

4  We can't train for every possible form of

5  resistance.  You just got to go with what's safe and

6  reasonable at that point.

7  BY MR. HECHT:

8       Q.   **Did you have other reasonable options at**

9  **that time, instead of using your foot to apply**

10 **pressure to his back?**

11             MS. BARRANCO:  Object to the form.  Go

12      ahead.

13      A.   At that point to see that we were being

14 just as effective, no, I did not.

15 BY MR. HECHT:

16      Q.   **At this point in time where we're watching**

17 **this minute and nineteen second video, if you wanted**

18 **to, would you have just been able to pick Tavares**

19 **Docher off of the ground safely?**

20             MS. BARRANCO:  Object to the form.  Go

21      ahead.

22      A.   No.

23 BY MR. HECHT:

24      Q.   **I'm sorry?**

25      A.   No.

1      **Q.   Why not?**

2      A.   Well, first of all, we have a concern of a

3   medical nature to him.  So if we pick him up off the

4   ground, where is he going to go?  So, I mean, we

5   can't put him in the back of the patrol car and put

6   him in further confinement.  If we had him contained

7   on the ground, at that point we had him contained.

8   At that point we are trying to keep him from getting

9   excessively violent again, or animated.  And now my

10  biggest concern is to keep him from causing any

11  bodily harm to himself, because he's already struck

12  his face on the pavement and showed no response to

13  pain stimulus that would have been through us or

14  himself.  So that was my concern.

15          With pulling his arms out straight and

16  backwards, I have maneuverability with the handcuffs

17  to at least do joint manipulation, if it comes to

18  that, which it didn't, and have the advantage of

19  having his upper body somewhat immobilized so he

20  can't flail out and cause further injury to himself.

21      **Q.   On May 11, 2014, did you have any sort of**

22  **leg restraints in your police vehicle?**

23      A.   I don't recall having -- I don't have any

24  issued with leg restrains or anything like that.  We

25  have issued rope; that's considered a hobble

Page 84

1   restraint, but we didn't have it readily accessible

2   at that time where I could have ran and got it.

3        Q.   On May 11, 2014 would you have had that

4   rope in your vehicle?

5        A.   It would have been in my trunk, yes.

6        Q.   Do you know if Deputy Newman had that in

7   his trunk on May 11, 2014?

8        A.   That would be speculation on my part.

9        Q.   You just don't know.

10       A.   I don't know.

11       Q.   But you had it in your vehicle.

12       A.   I had one issued, yes, and I kept mine in

13  my trunk.

14       Q.   Why didn't you use it?

15       A.    I didn't have an option to go get it at

16  that point.  Now, if it was -- you're not going to

17  -- if there is a person available free to grab one,

18  you would utilize it that way.  If three people are

19  involved in the active detaining and controlling

20  somebody, once the scene is safe, then you would go

21  get that.  At that point it didn't just go to scene

22  safe and him being calm.  It went into immediate

23  medical attention from that point. And we assumed

24  and thought with his calmness that it was just a

25  medical condition at that point and he would be --

Page 85

1   no further physical resistance from him, which it

2   was intermittent at that.  So our biggest concern

3   was medical attention and the hobble, like me

4   leaving far enough to go get my hobble is never an

5   option to me at that point.

6          MR. HECHT:  Thank you.  I don't have any

7       other questions.  Julie, do you have questions?

8          MS. TYK:  Yes.  No questions.

9          MS. BARRANCO:  I actually have one

10      clarifying question.

11                    CROSS-EXAMINATION

12    BY MS. BARRANCO:

13       **Q.   Earlier you were asked about whether you**

14   **had given, or what you had reviewed in preparation**

15   **for your deposition.  And you referred to reviewing**

16   **"statements" in the plural.  Do you know if you gave**

17   **a single statement or more than one statement?**

18       A.   I apologize, by statements I meant that it

19   was multiple pages.

20       **Q.   Of one statement?**

21       A.   One statement that was given to

22   detectives.

23       **Q.   So there should there -- there was only**

24   **one?**

25       A.   When I said plural, I was referring to the

Page 86

1    pages.  I apologize.

2              MS. BARRANCO:  That was the only question

3        I had just to clarify.

4              MR. HECHT:  Thanks.

5              MS. BARRANCO:  He'll read the deposition

6        if it's ordered.

7              MR. HECHT:  I'm going to order.

8              MS. BARRANCO:  And I'll take a copy.

9

10             (The proceedings concluded at 1:53 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

       I, the undersigned authority, certify that CLAY MANGRUM personally appeared before me and was duly sworn on the 31st day of May, 2017.

       Signed this 1st day of June, 2017.

PATRICIA A. LANOSA, RPR, FPR, CSR
Notary Public, State of Florida
My Commission No. FF 169350
Expires: 10/19/2018

Page 88

### CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH


   I, PATRICIA A. LANOSA, Registered

Professional Reporter, do hereby certify that I

was authorized to and did stenographically report

the foregoing deposition of CLAY MANGRUM; Pages 1

through 90; that a review of the transcript was

requested; and that the transcript is a true

record of my stenographic notes.

   I FURTHER CERTIFY that I am not a

relative, employee, attorney, or counsel of any

of the parties, nor am I a relative or employee

of any of the parties' attorneys or counsel

connected with the action, nor am I financially

interested in the action.

   Dated this 1st day of June, 2017.


_____

PATRICIA A. LANOSA, RPR, FPR, CSR

Page 89

June 1, 2017

PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
c/o Clay Mangrum
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
(954)462-3200
ATTN:  SUMMER BARRANCO, ESQUIRE

Re:  Docher v. Newman et al.
Case No.:  2:16cv14413

Please take notice that on the 31st day of May,
2017, you gave your deposition in the above cause.
At that time, you did not waive your signature.

The above-addressed attorney has ordered a copy of
this transcript and will make arrangements with you
to read their copy.  Please execute the Errata
Sheet, which can be found at the back of the
transcript, and have it returned to us for
distribution to all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.

Very truly yours,

PATRICIA A. LAROSA, RPR, FPR, CSR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.

_____

CLAY MANGRUM

Page 90

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re:  DOCHER V. NEWMAN ET AL.
Case No.:  2:16cv14413
CLAY MANGRUM
May 31, 2017


PAGE    LINE         CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.


_____            _____

Date                        CLAY MANGRUM

**A**

**able** 9:18 12:14
49:14 51:11
54:16,17,20
68:6 72:9,23
80:22 82:18
**above-address...**
89:9
**abusing** 57:18
**academy** 6:20
6:25 7:2,23
9:14,15,19,22
9:23 19:2
81:12
**accelerated**
11:11
**access** 45:23
77:4
**accessible** 84:1
**Act** 43:23 65:12
65:15 66:23
67:8 68:1,8,19
68:21 69:8
70:14 71:6,8
72:11,15,22
78:13
**Acted** 65:10,24
71:12 73:22
**acting** 28:18
72:1
**action** 88:17,18
**active** 84:19
**actively** 14:16
15:4,6 51:2
**actual** 46:4
**ADAM** 2:6
**additional** 10:10
23:21 38:8
**address** 89:16
**addressed** 34:10
**administer** 77:6
**admitted** 41:21
57:13
**advantage** 83:18
**affirmed** 4:9
**afford** 9:18

**agencies** 6:17
**ago** 36:13
**agree** 17:25
18:14 19:5,13
20:10,19 21:2
21:11,20 22:6
23:6 78:8
**agreeance** 80:10
**agreement** 9:8
**ahead** 15:2,9,25
16:17 17:13,21
18:5 19:18
20:3,14 21:7
22:1,11 23:19
24:25 25:16
26:9 34:2,11
36:17 38:15
41:1 42:9 44:6
44:15 46:19
48:18 53:24
60:6,14 61:1
62:14 70:2
72:18 78:3,11
78:24 79:7
81:8,16 82:2
82:12,21
**aimed** 18:23
**airway** 61:23
**al** 89:5 90:3
**Alanjay** 74:7
**alcohol** 29:5
38:18 45:12
57:12,13 70:12
74:24
**Allow** 30:18
**allowed** 46:16
**ambulance** 7:4
8:3,5
**amount** 18:11
18:21 20:16
21:18 22:2,13
52:1 53:8
78:21 79:15
**amped** 61:16
**amplified** 51:16
**amplify** 28:1
**animated** 26:15

**agencies** 61:9 83:9
**annual** 12:12
**answering** 58:10
58:11
**anybody** 65:17
**anymore** 76:3
79:12
**apologize** 8:19
55:11 85:18
86:1
**APPEARAN...**
2:1
**appeared** 48:15
87:9
**Appearing** 2:15
**appears** 79:20
**applied** 79:20
80:1,24
**apply** 13:19 14:8
15:22,22 16:11
16:21 53:15
58:16,21 59:14
82:9
**applying** 13:10
17:10,14,18,22
53:13 54:14
56:2 80:21
**approach** 33:6
**approached**
35:4,17 36:14
**approaching**
33:2 35:21
**appropriate**
62:12
**approved** 81:6,9
**approximately**
6:10 8:13,16
31:24
**Arabs** 28:9 69:4
72:6,7
**area** 13:19 18:22
27:4 63:20
**areas** 62:2,6
**arguing** 57:24
**arm** 14:11 49:14
49:15 52:4
80:14

**arms** 16:3 51:8
80:19,20,24
81:1 83:15
**arrangements**
89:9
**arrest** 25:9,11
30:21 37:13
40:3 44:13,20
45:11 46:16
47:4 67:6,8,15
68:1,19 70:19
71:6 73:13
78:1,5,9,12,17
79:11
**arrested** 37:8
45:1,7 46:6,10
66:18 69:18
71:14 73:16
78:21 79:3
**arrive** 38:25
63:4,10
**arrived** 39:7
63:11 66:11
74:7
**arts** 13:3
**ash@searcyla...**
2:7
**asked** 27:1,9,10
29:5 48:5 58:7
77:3 85:13
**asking** 57:23
**aspect** 9:5
**asphalt** 52:13
**assault** 35:8
36:15 37:7,14
43:24
**assaulting** 37:6
**assess** 32:5
74:11 76:17
**assessment**
75:23
**assigned** 4:24
5:6,13
**assist** 75:12
**assistance** 24:22
77:2
**assumed** 84:23

**assumption** 9:17
**Ativan** 75:7
**attempt** 49:11
**attempted** 41:20
**attempting** 55:4
55:24
**attend** 12:14
**attended** 12:17
**attention** 24:8
24:19 25:3
34:13 53:10
84:23 85:3
**ATTN** 89:4
**attorney** 88:14
89:9,13
**attorneys** 88:16
**authorities** 31:1
**authority** 87:8
**authorized** 88:8
**Auto** 6:23 7:6
**available** 57:16
84:17
**Avenue** 2:15
**aware** 16:14
30:16 61:5

**B**

**back** 7:18 15:11
21:14 26:5,10
34:13,19 41:20
47:15,24 48:2
48:3,9,14,24
49:8,10,12,13
50:21,21 51:6
51:8,8,9,11
56:7 57:6 62:3
63:18 64:24,25
65:7 67:10
68:3 69:18
70:15,23 72:21
73:12 76:17,19
77:13 79:21,23
80:1,6 81:5,18
82:10 83:5
89:10
**backside** 15:13
**backward** 51:18

**backwards**
52:17 54:2,22
76:21 83:16
**bad** 20:5 56:18
**Baker** 43:23
65:9,12,15,24
66:23 67:8
68:1,8,19,21
69:8 70:14
71:6,8,12
72:10,15,22
73:22 78:13
**ballpark** 7:23
**bar** 38:5
**BARNHART**
2:4
**Barranco** 2:9,11
3:7 15:1,9,14
15:18,24 16:16
17:12,20 18:4
18:19 19:9,17
20:2,13,22
21:6,16,25
22:10 23:11,18
24:24 25:15
26:8 34:1 36:9
36:16 37:11
38:14 39:22
42:8 43:3,19
44:5,14 46:18
53:23 54:19
55:10 58:23
59:8,21 60:5
60:13,25 62:13
65:11,25 66:6
66:14,21,25
67:7,22 68:13
69:21 70:2,20
71:15 72:17
73:17,23 78:2
78:10,23 79:6
79:22 81:7,15
82:1,11,20
85:9,12 86:2,5
86:8 89:2,4
**based** 11:6 17:9
17:17,25 18:16

19:5,13,23
20:9,18 21:2
21:11,20 22:6
22:17 40:20,23
41:14 43:23
45:8 47:5 69:5
72:19 77:23
79:13
**basic** 10:4 18:12
27:17
**basically** 14:17
15:11 26:19
29:1 30:16
31:20 34:15
35:19 37:13
39:25 41:1,19
49:19 53:17,19
54:24 55:11,14
56:6 62:22
63:24
**basketball** 53:18
**battery** 79:10
**bay** 63:22
**Bayshore** 1:23
**Beach** 2:4,5 87:5
88:4 89:20
**becoming** 9:9
36:23
**beer** 29:7 72:4
**began** 4:1
**behalf** 2:2,8,13
**behavior** 11:8
22:17 24:16
25:5,23 26:15
28:2,20 40:10
43:23 45:12
46:20 51:14
57:14 61:17
**behavioral**
38:18
**believe** 9:7,9
12:14 24:17
26:2,5 27:15
27:25 28:1
30:12 44:24
47:21,24 48:4
48:21 60:22

62:5 63:12
64:23 74:8,8
77:3,5
**believed** 23:8,16
42:12 63:15
**belligerent** 69:1
**belt** 30:23
**beneficial** 71:7
**benefit** 68:9
**best** 11:9 56:6
65:16,20 68:9
**better** 15:12
71:7
**beyond** 70:12
**biggest** 27:5
50:23 54:2
56:14 83:10
85:2
**bit** 29:16 42:1
57:6
**bite** 52:20 54:9
55:4,12,13,24
56:4 59:16
**biting** 52:18
54:10 57:3
**black-and-wh...**
36:10
**blank** 89:15
**bleeding** 76:15
**block** 30:9 49:6
**blocks** 12:12,15
**blood** 76:12,13
76:13
**bodily** 17:19
18:18 19:8,10
20:1,6,21
21:15,24 83:11
**body** 26:15 27:3
27:15 40:15
41:5 49:2
51:12,24 57:3
72:8 80:14,21
81:1 83:19
**body's** 11:12
**bottom** 89:15
**Boulevard** 1:23
2:4,10 89:3

**brachial** 13:13
13:25 14:1,5,6
14:7,10,14,25
15:7
**breathing** 61:7,8
61:18,22,23
76:2,5,7
**bridge** 19:25
20:5,11
**brief** 49:11
**briefly** 6:22
**bring** 28:2 41:20
51:23 61:21
**bringing** 52:4
**broken** 12:12
**brought** 49:5
**Broward** 27:16
**brushed** 33:12
35:17 39:4
**building** 31:18
**bunch** 34:16
**bushes** 28:7 41:6
**business** 29:1
31:14 32:4
41:9 45:13,14
46:24
**busy** 28:25 51:5
**butt** 48:10 71:2
71:3 76:21
77:5
**buttocks** 53:4
77:11

_____

**C**

**c/o** 89:2
**call** 25:20 36:10
75:17
**called** 30:6
40:12
**calls** 30:19 75:15
**calm** 51:10 58:4
61:21 76:8,10
77:1 84:22
**calming** 39:13
**calmness** 84:24
**CALVIN** 1:9
**car** 32:4 38:6

42:17 48:10,25
49:7,7,10
50:15 51:1,4,9
61:15 67:10,18
67:24,25 68:3
68:17 71:2
72:20 83:5
**care** 65:19
**Carriers** 6:24
**carry** 26:19
**carrying** 26:17
34:14
**case** 1:2 25:7
29:14 62:18
89:6 90:3
**catch** 49:14,15
**cause** 18:18 19:8
19:10 20:1,5,6
20:21 21:14,23
46:12 52:1
80:23 83:20
89:7
**caused** 41:9
**causes** 14:20
**causing** 54:8
60:22 73:14
80:17 83:10
**cell** 65:2
**center** 69:16
**certain** 13:16
14:15 57:15,24
78:21
**certainly** 43:16
**certificate** 3:8,9
10:7 87:1 88:1
**certification**
10:3,6
**certified** 6:25
9:20
**certify** 87:8 88:7
88:13
**CHANGE** 90:6
**changed** 68:23
**CHANGES** 90:2
**chased** 51:2 69:3
**chasing** 28:8,21
**check** 76:5

**chest** 51:22 62:3
**CHRISTOPH...**
  1:8
**circumstance**
  74:16
**Circumstantial**
  22:12
**citizens** 29:2
**clarify** 86:3
**clarifying** 85:10
**classified** 18:3
  19:3,16 20:11
  21:4,9 22:9
  60:12
**classify** 36:15
  38:12 60:15
**clause** 9:7
**Clay** 1:17 4:8,14
  87:9 88:9 89:2
  89:22 90:4,24
**CLAYTON** 1:8
**clear** 14:6
**clenched** 32:18
  32:19
**clenched-tight**
  35:10
**Clerk** 89:14
**close** 22:22
  31:21 32:14
  63:19
**closer** 32:13
  54:20
**clothing** 31:12
**College** 7:19
  9:24 10:5,8
**combative** 14:16
  15:4,6 51:16
  63:7 74:17
  75:12 76:23
**come** 10:25
  18:20 20:15
  21:17 23:12
  31:17 36:22
  77:16
**comes** 53:8
  83:17
**coming** 34:4,4

64:6 65:1
**Commission**
  87:15
**commit** 37:12
  45:25
**committed** 79:9
**committing** 35:3
  37:9
**communicate**
  23:20
**communication**
  63:1
**Community**
  7:18
**company** 8:4,5
**completely**
  39:13 75:25
**compliance**
  13:17,20 14:9
  14:21,25 16:2
  16:5,22 17:5
  56:21,22 58:18
  62:9
**compliant** 27:8
  33:13 35:11
  72:23
**complied** 37:15
**comply** 58:2
**concern** 24:7
  27:5 28:22
  50:23 54:3,11
  57:11,17 58:6
  74:22 83:2,10
  83:14 85:2
**concerned** 76:11
**concerns** 25:22
**concluded** 88:10
**concrete** 54:24
**condition** 25:19
  65:20 84:25
**confinement**
  83:6
**confirm** 29:10
  29:12
**connected** 88:17
**consider** 18:10
  18:11 33:2

35:5 36:4
**consideration**
  78:20
**considered**
  17:11 22:21,25
  23:2 35:22
  36:5 37:7
  38:20 40:11
  43:4 76:4
  83:25
**constitute** 18:13
  19:20
**construed** 35:6,7
**contact** 10:25
  14:18 23:7,10
  23:15 24:9
  26:14 40:4
  53:25
**contained** 83:6,7
**continual** 41:1
**continue** 27:11
  33:6 54:15
  72:23
**continued** 40:21
  41:25 44:11
  67:1 69:4
  70:10 72:5
**continues** 36:21
**continuing**
  11:25
**continuously**
  41:6
**continuum**
  41:12
**control** 14:21
  39:17 51:13
  52:20,24,24
  55:15 56:10,19
  56:23 57:5
  58:1 61:12
  63:24 79:17
  81:9,19
**controlled** 78:6
**controlling**
  50:14 84:19
**conversation**
  40:15 57:8

**conversations**
  74:2,13
**copy** 86:8 89:9
  89:10
**corner** 31:15
**correct** 14:23
  15:8,20 16:15
  26:1 29:21
  37:9 38:2
  40:21 43:18
  44:4,13 45:16
  46:7 47:15
  50:12 53:12,22
  55:8 62:1 64:3
  65:10,24 66:5
  66:13,19,24
  67:4,6,16,21
  68:12 69:20
  70:16,19,24
  71:14 73:22
  78:9,18 80:1
  81:22,25
**corrections** 5:14
  5:23 9:15
**correctly** 38:8
**counsel** 88:14,16
**counterforce**
  80:21
**counterpressure**
  80:25
**county** 1:10,12
  2:13 4:20 5:10
  6:16 8:23 9:1,6
  10:9 11:14,19
  11:24 13:5
  14:23 15:20
  16:8 19:1
  27:15,16,22
  47:5 57:17
  69:16 72:8
  81:13 87:5
  88:4
**course** 12:4 41:7
**courses** 11:25
**court** 1:1 4:2
  5:15 6:8 29:14
  55:21 79:8

89:14
**Courtemanche**
  1:9 62:17 63:3
  63:10,13,21
**cover** 31:20
**covered** 12:6
**crime** 25:10 35:3
  35:5 36:8,11
  37:9,12 45:25
  46:9 79:13
**criminal** 4:24
  5:2
**criteria** 46:11
  65:15 67:2
  68:7,22 70:14
  71:8 72:22,25
**criterion** 65:14
**Cross** 3:7
**CROSS-EXA...**
  85:11
**crossed** 24:7
**crossover** 9:19
  9:21,23,25
**CSR** 1:25 87:14
  88:21 89:18
**curb** 27:11 41:3
**currently** 4:19
  4:23,24
**CVS** 31:9 41:21
  45:15,21,21
  46:23 65:19

────────────
        **D**
────────────
**D** 3:2
**damage** 80:23
**danger** 28:18
  33:24 36:6,22
  41:4 65:21
**dangerous** 63:20
**date** 12:18 90:24
**Dated** 88:19
**day** 24:5 64:16
  87:10,11 88:19
  89:7
**days** 89:13
**deadly** 12:20
  16:14 17:11,15

18:3,13 19:3
19:16,20 20:12
21:5,9 22:9
60:12,15,16,24
61:3
**dealing** 79:14
**decent** 32:2
**decided** 7:1
66:23 67:11
**decision** 68:17
75:13
**declare** 90:21
**defeat** 62:8
**Defendant** 2:8
**Defendants** 1:13
**defensive** 14:2
**definitely** 34:7
**delirium** 10:17
10:21 11:1,4,6
22:16,24 23:4
23:9,17 24:4,6
24:18 25:13,22
26:3,6
**delusions** 69:6
**demeanor** 38:13
51:15
**DENNEY** 2:3
**Department** 9:6
**depend** 22:2
**depends** 35:6
**deposition** 1:16
64:6 69:25
85:15 86:5
88:9 89:7,12
**deputies** 53:2
63:1 71:24
76:11
**deputy** 5:14
29:11,20 30:10
30:24 31:2
35:16 38:2,6
38:25 39:3,7,8
39:8,19,20
40:5,5 41:15
41:15 42:23,23
44:11,25 47:17
47:22 48:2

50:12,13 56:15
56:24 57:4
58:16,21 59:5
59:13,17,18
60:3,3,11,11
62:17 63:3,10
63:13,21 64:2
64:2 68:16
72:5,9 73:1,1
73:11 74:7,9
76:14 84:6
**describe** 11:10
**description**
31:12
**desired** 14:20
**detained** 40:14
44:16,17
**detaining** 84:19
**detainment**
61:15
**detective** 4:25
5:1,16 50:3
**detectives** 85:22
**detention** 5:13
**determination**
24:3,21 41:16
43:1,9 44:12
47:6 66:2 67:4
69:23
**determine** 25:4
30:17 42:6
**diagnosis** 25:21
**dialogue** 27:11
27:23 41:25
47:20 48:9,16
51:1 58:2
68:20,23 69:4
70:10 74:5
**DICKER** 2:15
**different** 48:6
**difficult** 50:13
61:6
**difficulty** 61:23
**direct** 3:7 4:11
21:8 43:5
**directing** 26:22
**direction** 22:3

27:9 49:21
51:5
**directly** 18:6
20:4,23 29:1
49:8,23 56:1
**disability** 38:19
**disagree** 27:25
**discomfort** 52:2
**Discount** 6:23
7:6
**discuss** 44:25
**Discussion** 4:17
48:11
**disorderly** 41:19
45:9,11 46:7
46:12,16 66:19
67:6,15 69:18
70:19 71:14
73:13 78:13,14
78:17 79:3
**dispatch** 38:7
**dispelled** 37:14
**display** 41:23
46:11 70:11
**displayed** 41:5
**displaying** 28:20
40:10 41:22
61:2 68:24
**disrupted** 46:22
46:23
**disrupting** 45:13
**distance** 32:2
**distribution**
89:11
**district** 1:1,1,12
1:12 2:13
**disturbance**
41:9 73:14
**division** 4:25
**Docher** 1:4 24:2
24:4,10,12
25:9,13 26:2,6
26:13 31:10
35:3 38:11,24
39:9,21 40:3
42:3 43:1,8,10
44:23 45:1,6

45:24 46:16
47:1,2,14 48:1
48:13 50:7,14
50:17 55:24
56:13 57:7
58:7,17 60:4
60:19,22 61:6
62:4,12 63:14
65:9 68:11
69:17 72:1,1,5
72:9 73:12,16
74:24 75:2,7
75:14 77:24
79:3 82:19
89:5 90:3
**Docher's** 53:13
58:22 59:6,14
59:19 79:21
80:1,6 81:5
**DOCHER-NE...**
1:4
**dock** 6:23
**docks** 7:11,14
**document** 90:21
**doing** 54:2 56:13
56:24 79:16
**door** 32:3 48:3
49:8,13 71:3,4
**doors** 31:22 32:4
67:25
**draw** 34:5,7,12
34:13,19
**Drawer** 2:5
**drawing** 46:21
**drinking** 41:22
74:24
**drinks** 72:2,3
**drive** 31:9 71:9
71:10 73:2
**drop** 27:9 32:22
33:11 34:11
36:3,20,24
37:5,15
**drop-down**
55:14,20
**dropped** 34:12
35:12 38:1

39:2 52:22
55:7 72:8
**dropping** 33:16
**drug** 42:14
75:18
**drugs** 57:9,16,18
57:19,21,22
58:6,8,9 70:12
75:3
**ducking** 52:16
**due** 73:13
**duly** 4:9 87:10

**E**

**E** 3:2
**ear** 52:10
**earlier** 69:25
85:13
**easier** 48:7
**East** 2:10 89:3
**easy** 53:7 55:25
**EDELMAN**
2:15
**education** 11:25
**effect** 14:20,21
52:13
**effective** 82:14
**efforts** 61:11
62:8 80:11
**egregious** 59:3
**eight** 5:22
**either** 6:12
18:25 50:11
60:11 67:5
79:20
**elbow** 18:2,6,12
18:17 19:25
20:4,11,20
21:4,13,22
22:8 52:5 59:5
59:9,14,15,19
**elements** 45:10
**elevated** 11:8
22:22
**ELSER** 2:14
**emergency**
22:25 23:2,22

25:1 69:15
**emotional** 38:18
**emotionally**
34:18 38:13,16
38:17,21
**employed** 4:19
4:21 16:8
**employee** 88:14
88:15
**EMT** 6:24 7:16
7:20,22,25 8:2
8:10,12,22 9:3
**en** 23:23
**enforcement**
6:17 7:2 9:12
9:17,20 10:5,6
10:25 18:1,17
19:6,14,24
20:19 21:12,21
23:7 34:21
46:22 59:4
68:8 79:10
81:6
**engaged** 41:15
**engaging** 33:4
**engine** 11:11
**entail** 30:13
**ENTER** 90:2
**entire** 60:18
**Entrance** 31:19
**episode** 23:17
**Errata** 3:10
89:10 90:1
**erratic** 22:17
25:23 40:11
42:1
**escape** 79:10
**escorted** 47:17
**ESQUIRE** 2:6
2:11,17 89:4
**et** 89:5 90:3
**evaluated** 25:13
**evaluating** 30:20
**events** 65:3
**exactly** 32:1
38:6 39:23
41:2

**Examination**
3:5 4:11
**examined** 4:10
**exasterbated**
76:3
**excessive** 22:19
60:4
**excessively** 83:9
**excited** 10:17,20
11:1,4,5 22:16
22:24 23:4,9
23:17 24:4,6
24:17 25:13,21
26:3,6
**execute** 89:10
**execution** 3:10
**exert** 78:21
**exhibited** 72:24
**exhibiting** 22:23
23:3,8 24:16
60:22 61:17
65:14
**exit** 32:21
**exited** 36:2
**exiting** 32:10
**experience**
10:24 11:6
17:9,17 18:1
18:16 19:6,14
19:23 20:9,18
21:3,12,21
22:7
**experiencing**
22:16 24:4
26:3,6
**Expires** 87:16
**explain** 39:19
55:25 56:7
74:20
**exposure** 76:12
76:16
**express** 25:17
**extent** 20:6

_____
**F**
**face** 31:14 52:12
52:14,15,18,22

52:23 53:13,16
54:15,18,23,25
55:3,7 83:12
**facilities** 69:19
**facility** 46:23
68:5 69:12
**fact** 27:6 73:1,9
**factor** 35:12
37:19,25
**factors** 34:22
43:6 79:16
**facts** 90:21
**faculties** 45:13
46:24 70:11
**false** 28:1
**familiar** 12:20
**far** 5:19 12:15
13:8,12 16:4
24:7 27:18
30:14 31:4
33:13 42:14
43:20,20,24
44:7 45:20
46:2,4 49:16
56:14 61:2
66:2 67:9,10
68:2,14 78:25
85:4
**fast** 26:24 74:18
**fatal** 34:8
**Favalet** 74:9
**fear** 33:17,18
**feel** 52:11 76:6
**feet** 31:24 32:2
48:19 71:3
**fell** 54:3
**felt** 33:23 49:17
**FF** 87:15
**field** 30:2,3,7,8
30:15 31:6
**fighting** 15:5
**filed** 89:14
**final** 66:2 67:11
68:17
**financially** 88:17
**find** 40:24
**finger** 52:19

56:6
**fire** 1:12 2:13
7:2,23 9:6
**firefighter** 6:25
7:1,16,20 8:1
**firefighting** 9:4
**first** 4:9 24:9
31:10 32:3
34:10 63:2
83:2
**fist** 32:18,19
35:10
**fist-grip** 26:20
**flail** 80:22 83:20
**fled** 42:10
**flee** 39:16
**fleeing** 29:15
**flees** 28:23
**flight** 28:17 41:4
51:4
**Florida** 1:1,11
1:23 2:5,10,16
87:4,15 88:3
89:3,20
**focus** 34:19
35:14 36:25
**focused** 28:3
**focusing** 35:15
**following** 4:1
72:1
**follows** 4:10
**foot** 42:10 62:23
79:19,25 80:5
80:25 81:5,17
82:9
**footage** 65:2
**force** 11:13,20
11:21 12:1,4,6
12:20 16:14
17:11,15 18:3
18:11,13,21
19:3,10,16,20
20:12,16 21:5
21:9,18 22:2,9
22:13 34:6
60:4,10,10,12
60:15,16,23,24

61:3 62:11
78:22,25 79:12
**forceful** 48:24
**forcible** 20:4
**forearm** 14:17
15:7 51:25
52:22 55:7
56:8
**foregoing** 88:9
90:21
**form** 15:1,9,24
16:16 17:12,20
18:4,19 19:9
19:17 20:2,13
20:22 21:6,16
21:25 22:10
23:11,18 24:24
25:15 26:8
34:1 36:9,16
37:11 38:14
39:22 42:8,16
43:3,19 44:5
44:14 46:18
53:23 54:19
55:10 58:23
59:8,21 60:5
60:13,25 62:13
65:11,25 66:6
66:14,21,25
67:7,22 68:13
69:21 70:2,20
71:15 72:17
73:17,23 78:2
78:10,23 79:6
79:22 81:7,15
82:1,4,11,20
**formulating**
36:19
**Fort** 2:10 89:3
**Forum** 89:19
**forward** 26:20
48:8 49:6,17
49:18,18 54:4
56:2 76:20
**forwarded** 3:10
89:13
**found** 27:15

37:17 89:10
**four** 53:7
**FPR** 1:25 87:14
    88:21 89:18
**free** 40:7 55:1
    66:5 84:17
**freight** 6:23
**front** 15:10
    20:24 26:23
    31:17 33:9
    38:3,4,12,24
**frontward** 48:24
**full** 10:7 12:7
    68:7
**fully** 67:11 68:6
    69:23 70:25
    72:22
**further** 28:1
    35:18 37:19
    39:4 44:17
    52:5,17 57:10
    80:17 81:2,20
    83:6,20 85:1
    88:13

**G**
**gain** 13:17,19
    14:8,21,25
    16:22 17:4
    58:17 81:19
**games** 72:3
**gated** 45:23
**general** 19:19
    45:14 47:20
**generally** 35:1
    57:1
**getting** 42:17
    50:21 61:9,15
    72:19 74:18
    75:9 83:8
**GIUFFREDA**
    2:9 89:2
**give** 4:5 10:22
    12:18 28:14
    38:9 53:5 64:6
**given** 31:12
    77:11 85:14,21

**giving** 26:24
    27:12 28:20
    29:9,13 77:2
**gloves** 54:12
    57:4
**go** 4:15 6:19 7:1
    7:16 9:14,17
    9:21 10:4,10
    10:13 15:1,9
    15:24 16:16
    17:4,12,20
    18:4 19:17
    20:2,13 21:6
    21:25 22:10
    23:18 24:24
    25:15 26:8
    32:8 34:1,11
    36:16,25 37:17
    38:14 41:1
    42:8 44:5,14
    46:18 48:18
    49:6,8 51:9
    53:23 55:12
    60:5,13,25
    62:13 66:5,12
    70:2,6 72:17
    76:21 78:2,10
    78:23 79:6,13
    81:7,15 82:1,5
    82:11,20 83:4
    84:15,20,21
    85:4
**goal** 35:14 36:25
    61:20
**goes** 79:15
**going** 27:23
    29:17 35:8
    37:13 44:18
    47:2,4,8 48:10
    48:18 53:9
    55:18 63:5
    65:9,16 67:8
    67:20 68:1,11
    69:19 70:1,6
    71:9,10 75:6
    75:10,12 77:15
    77:21 80:22

83:4 84:16
    86:7
**gotten** 42:13
**grab** 51:8,12
    84:17
**grabbed** 80:14
**great** 17:19
    18:18 19:8
    20:1,21 21:14
    21:23 54:10
**grinding** 52:14
    54:25
**ground** 49:20
    50:18,19 51:20
    53:22 54:16,17
    57:24 62:19,21
    76:13 82:19
    83:4,7
**group** 62:9
**guardian** 1:5
**guess** 26:15 65:6
**gun** 30:23 33:20
    34:5,7

**H**
**half** 6:14 30:17
    30:18,20,20
    41:11
**halfway** 12:13
    32:17
**halted** 75:22
**hand** 4:3 26:18
    32:11,12 33:12
    34:11,25 35:2
    36:24 41:13
    52:8,12,20,21
    52:23 53:17,18
    53:19,21 54:15
    55:2,3,4,13
    56:1,4,10,11
    59:17
**handcuff** 51:24
    52:3,4
**handcuffed**
    47:14 69:17
    70:15 77:10,13
**handcuffing**

67:9 68:2
**handcuffs** 41:13
    41:17,24 42:4
    42:25 43:9,17
    44:3,8,18,19
    44:22 45:25
    46:2,4 47:1,3
    57:7 65:13
    67:23 70:9
    71:12,13 73:19
    73:21,24 80:15
    83:16
**handle** 26:21
**handling** 38:9
**hands** 49:6
    52:17 73:12
    81:18
**happen** 36:23
    37:23
**happened** 48:13
**happens** 50:17
**hard** 55:2
**harm** 17:19
    18:18 19:8,11
    20:1,6,21
    21:15,24 27:8
    83:11
**harming** 81:20
**He'll** 86:5
**head** 13:4 21:14
    21:23 22:8
    48:18,22 51:18
    51:19,21 52:7
    52:8,11,25
    53:9,14,20,22
    54:1,1,2,5,15
    54:16,20,22
    55:15 56:2,3,3
    56:9 57:5 59:6
    59:14,19
**head-to-head**
    54:4
**headed** 49:21
**headless** 27:14
    40:14 72:8
**headlight** 35:9
**hear** 76:7

**heard** 12:23,25
    13:1,1,2 58:12
    62:24
**heart** 11:8 22:22
    61:22
**heavily** 61:18
    76:2
**Hecht** 2:6 3:7
    4:12,15,18 6:1
    15:17,19 16:6
    16:19 17:16,24
    18:8,24 19:12
    19:22 20:8,17
    21:1,10,19
    22:5,14 23:14
    23:25 25:6,25
    26:11 34:23
    36:12 37:3,22
    38:22 40:1
    42:18 43:7
    44:1,10,21
    46:25 47:11,13
    48:12 54:13
    55:5,16 58:25
    59:12,22 60:8
    60:17 61:4
    62:16 65:23
    66:3,8,17,22
    67:3,13 68:10
    69:7,24 70:4
    70:22 71:18
    73:4,20 74:1
    77:19 78:7,16
    79:1,18,24
    81:3,11,21
    82:7,15,23
    85:6 86:4,7
**heel** 62:2
**height** 50:9
**held** 5:11 27:14
    27:20 28:12
    34:3 80:24
**help** 29:17 65:16
    65:21 75:11
**helping** 30:20
**Hey** 43:21 47:7
    65:18 68:18

high 6:19,21
   49:4
hired 7:4
hit 42:17 54:4
hitting 54:5
hobble 83:25
   85:3,4
hold 35:11 51:19
   51:20 52:6
   54:6,6,20 55:1
   76:25 77:5,9
   80:19,20
holding 32:20
   32:23 33:10
   35:4,8,9 36:1,8
   36:20 49:15
   54:8 55:11
homicide 27:16
honestly 53:10
Horizons 69:15
   71:10
Hospital 69:13
hours 7:23,24
   10:2,19,23
house 27:20
hub 69:16
huddled 39:24
huge 66:15
hurt 39:17 52:14
   54:4

I

Ice 29:6 72:4
Ice-type 29:7
identify 10:16
identity 29:10
illegal 34:24
   57:9,18,22
   58:8 75:3
illicit 57:16
imagine 45:22
immediate
   24:18 25:1
   48:20 84:22
immediately
   28:4 32:6,7
   34:15 59:16

immobilized
   83:19
impairment
   70:12
improvise 80:19
improvised
   81:18,22
in-service 12:5,7
   12:7,11
incident 11:3
   24:5
including 62:3
increased 36:22
   61:18
incredibly 50:11
independent
   1:12
Indian 7:18 9:23
   10:5,7
indicating 49:13
indications
   28:20
individual 14:25
   16:21
individual's
   17:10
individually 1:8
   1:9,9,10,11
influence 42:13
   45:12
information
   26:25 27:13,18
   27:21 28:11
   29:9,13,16
   38:8 68:7
initial 26:14
   40:4 44:7,19
   46:2 51:4
   61:14 68:15
   75:23
initially 28:14
   30:14 33:11
   41:2 47:3 49:2
   50:20 51:17
   52:1 53:25
   62:25 65:7
   68:16 70:3,5

70:21 71:16
   75:22 76:9
   80:7,14
initiative 30:19
inject 75:6,14,17
injected 53:4
   75:20
injection 75:10
   77:2,7,11
injure 81:2
injured 80:16
injury 54:8
   80:17,23 83:20
inside 14:11,17
   35:22 48:19
instability 39:12
instances 78:4
instruction
   33:14
intending 22:3
intent 18:21
   20:16 21:17
   22:3,12 35:25
intentional 21:8
intentionally
   18:6
interact 23:16
interaction 24:1
   26:13 33:4
   60:19 61:16
interactions
   28:3
interest 9:2,9,11
interested 9:4
   88:18
intermittent
   63:9 85:2
interrupt 15:14
intersection
   28:25 31:16
intox 79:3
intoxicated
   41:23 68:25
   72:1 73:14
intoxication
   39:12 40:12
   41:20 42:12

45:9,11 46:7
   46:13,17 66:19
   67:6,15 69:18
   70:19 71:14
   73:13 78:14,15
   78:17
investigate
   43:24
investigation
   4:25 37:20
   40:23 41:14
   42:5,22 43:10
   64:21 71:21
investigations
   5:2,15 6:11
involved 13:7
   63:13 64:1,3,4
   67:5 70:11
   72:14 75:13
   84:19
involvement
   62:17
involving 53:2
irrational 11:7
issued 83:24,25
   84:12

J

J 1:10
jail 6:2 47:4,5
   67:20 68:4,12
   69:9,10 70:1
   71:10 73:2
JANICE 1:4
jaw 19:8,16,19
job 9:6
joined 8:23 9:16
   10:9,14 11:14
   11:15,16
joint 16:5,9
   83:17
JOLLY 2:9 89:2
Jose 1:11 74:3
Joseph 71:19,24
   72:14 73:6,11
judgment 25:20
Julie 2:17 85:7

julie.tyk@wils...
   2:17
jump 50:22
jumping 27:2
jumpy 27:2
June 87:11
   88:19 89:1
justifiably 59:25
justify 60:24

K

keep 28:2,16
   35:14 54:16
   56:2 63:16,22
   80:17,21,25
   83:8,10
KEN 1:10
kept 63:23 84:12
kicked 56:20
kicking 56:18
   76:20
kill 51:3 69:3
   72:6
kind 17:7 25:19
   29:15 30:20
   31:13,14 32:25
   33:12 51:7
   52:10,17 65:20
knee 49:3,3
knees 50:21
   51:11
knew 72:7
knife 26:19
   35:11
know 12:16
   13:23 19:20
   25:18 27:7
   35:24 38:19
   40:11,16 41:1
   42:17,20 47:21
   47:21 49:16
   50:24 51:4,13
   52:9,9 64:10
   64:14 65:18
   68:14,25 69:2
   73:1,5 75:20
   75:22 76:15

84:6,9,10
85:16
**knowledge**
22:17
**known** 16:15
29:7 80:3

**L**

**Lakes** 2:4
**landed** 76:21
**Lanosa** 1:25
87:14 88:6,21
89:18
**large** 62:2,5
**late** 8:11,11,14
8:15,18
**Lauderdale** 2:10
89:3
**law** 6:17 7:1
9:11,17,20
10:4,6,25 18:1
18:17 19:6,14
19:24 20:19
21:12,21 23:6
34:21 46:22
59:3 68:8
79:10 81:6
**law-enforcem...**
70:14 71:8
**Lawnwood**
69:14,15
**lead** 17:19 24:17
**leap** 48:23
**learn** 81:12
**learned** 14:1,2
81:24
**learning** 82:3
**leave** 40:7
**leaving** 65:17
73:2 85:4
**left** 50:14 51:12
**leg** 56:22 83:22
83:24
**legal** 1:5
**legitimately**
28:12
**legs** 48:8 56:16

**let's** 44:8
**letter** 3:9 89:15
**level** 40:11 42:12
53:22 54:17
60:23 61:8
63:8 76:16
**liability** 40:18
66:15
**life** 33:17
**Lifeline** 7:3 8:2
8:7,23,25
**lightly** 76:7
**Lincoln** 6:20
**line** 43:22 90:6
**lines** 41:19 48:18
**lips** 56:5
**liquor** 72:3
**listed** 89:16
**little** 5:3,19,24
31:20 42:1
**LLP** 2:15
**location** 27:19
28:14
**locked** 67:24
**long** 4:21 5:1 6:8
7:6,14,20 8:7
9:25 38:23
39:3 53:2
77:16
**longer** 9:2 35:12
37:1,25 39:5
39:16
**look** 70:13 74:5
**looked** 48:21
49:3,5,24
56:21 76:14
**looking** 9:5 26:5
26:10 32:19
53:6 79:9
**looks** 54:24
**lose** 53:10
**lot** 26:24 27:3,12
27:12,22,23
29:13 31:9
41:8,11 45:15
45:16,18,19

56:18,19 80:13

55:18 58:1,12
73:8
**loud** 46:21
**loudly** 34:15
**Lucie** 1:10,11,23
2:13 4:20 5:10
6:15 8:23,25
9:6 10:9 11:14
11:19,24 13:5
14:23 15:20
16:8 19:1
27:15,22 57:16
69:13 72:8
81:13

**M**

**M** 2:11
**ma'am** 4:7
**main** 69:16
**maintain** 29:3
**making** 22:18,18
40:16 61:14,18
66:1
**maneuver** 33:25
81:6,22
**maneuverabili...**
83:16
**Mangrum** 1:8
1:17 4:8,14
50:3 71:25
87:9 88:9 89:2
89:22 90:4,24
**manipulate** 81:9
**manipulation**
16:10 83:17
**manipulations**
16:5
**manner** 28:18
34:3 35:10
**mark** 32:17
**martial** 13:3
**MASCARA**
1:10
**mass** 13:11
15:23 16:22
17:11,18 58:17
58:22

**matter** 79:2
**mean** 12:10 30:5
38:20 46:3,20
70:5 83:4
**means** 72:11,15
**meant** 50:1
85:18
**media** 64:22
**medical** 7:3 8:2
8:8 22:25 23:2
23:10,22 24:7
24:11,18,22
25:1,3,21
74:22 75:8,11
75:19,23 83:3
84:23,25 85:3
**medically** 75:15
**medication**
75:14,21
**medications**
42:15 75:3
**meet** 15:13 33:7
34:5 65:15
**meets** 46:12 68:7
71:8
**mental** 38:19
39:12
**mentioned**
45:15
**met** 33:8,8 67:1
68:21 70:13
**metal** 26:20
**middle** 33:7
**mind** 24:7 27:24
**mine** 84:12
**minute** 77:16,20
77:25 82:17
**minutes** 53:7
**misdemeanor**
71:6 78:18,19
**misdemeanor-...**
79:12
**moments** 36:13
**monitoring**
65:18
**month** 12:19
**months** 6:10,13

**MOSKOWITZ**
2:14
**mother** 1:4 72:7
**motion** 48:24
51:18 52:17
56:9 76:20
**mouth** 56:4
**move** 55:2
**movement** 27:3
**movements** 41:5
51:15 52:16
**moving** 48:22
54:21 58:3
76:8
**multiple** 43:6
85:19
**murder** 79:4
**muscle** 15:16
62:2,6,9

**N**

**N** 3:2
**name** 4:13 74:5
80:4 89:15
**narrative** 73:10
**Natty** 29:6 72:4
**Natural** 29:7
**nature** 25:4 53:8
71:22 74:16
79:13 83:3
**near** 33:8 38:5
**nearest** 68:5
69:12
**necessarily** 31:4
**necessary** 24:22
60:23 62:12
**neck** 13:11,15
13:19 14:8,18
14:19 15:8,10
15:13,22,23
16:3,12,22,24
17:4,11,19,22
20:24 58:17,22
79:21
**need** 15:3 28:13
47:11 61:2
77:4

**needed** 77:2
**needs** 34:16
**neither** 60:2
**nerve** 13:10,15
  14:8,19 15:8
  15:22 16:2,11
  16:22 17:10,18
  17:23 58:17,22
**nerves** 16:1,5
**never** 13:1 17:3
  25:12 35:15
  42:13 61:22
  64:4 65:9 66:1
  67:24 69:22
  70:25 71:2,4
  85:4
**New** 69:15 71:10
**Newman** 1:8
  35:16 38:25
  39:4,7,8,20
  40:5 41:15
  42:23 44:11,24
  44:25 47:21
  48:4 49:5,5,18
  50:13 51:21
  56:24 57:4
  58:16,21 59:5
  59:13,18 60:3
  60:11 64:2
  71:24 72:2,5,9
  73:1,2,11
  76:14 84:6
  89:5 90:3
**Newman's** 47:10
  47:18 48:2
  59:17 68:16
**news** 64:23
**night** 64:16
**nine** 5:22
**nineteen** 77:20
  77:25 82:17
**normal** 22:20,21
  25:24 26:16
  39:13 42:2
  45:13 46:23
  48:16,16 52:13
  74:16

**normalcy** 41:21
**normally** 14:10
  17:3 65:18
**North** 2:15
**nose** 19:25 20:5
  20:11
**Notary** 87:15
**note** 25:17
**notes** 88:12
**notice** 89:7
**noticed** 52:7,16
  52:19 57:3
  76:13,18 80:10
**number** 10:22

─────────
**O**
**Oath** 3:8 87:1
**Object** 15:1,9,24
  16:16 17:12,20
  18:4 19:9,17
  20:2,13,22
  21:6,16,25
  22:10 23:11,18
  24:24 25:15
  26:8 34:1 36:9
  36:16 37:11
  38:14 39:22
  42:8 43:3,19
  44:5,14 46:18
  53:23 54:19
  58:23 59:8,21
  60:5,13,25
  62:13 65:11,25
  66:6,14,21,25
  67:7,22 68:13
  69:21 70:2,20
  71:15 72:17
  73:17,23 78:2
  78:10,23 79:6
  79:22 81:7,15
  82:1,11,20
**Objection** 18:19
  55:10
**observations**
  45:8 73:25
**observed** 46:15
  71:16

**obstructed**
  61:24
**obvious** 34:4
**obviously** 55:17
  57:12
**occurred** 27:16
**offender** 29:8,12
**offenses** 40:13
**offensive** 33:25
**office** 4:20 5:5
  5:10,12 6:16
  7:5 8:24 9:1,16
  9:16 10:10,14
  11:14,19,24
  13:5 14:24
  15:21 16:9
  19:1 81:14
**officer** 10:25
  18:2,17 19:7
  19:15,24 20:19
  21:13,22 23:7
  30:2,3,8 31:6
  33:2 59:4 73:6
**officers** 67:5
**official** 11:20
**Oh** 14:1 28:5
  32:8
**okay** 42:3 48:18
  55:25 67:14
  68:11 70:8
  80:10,10
**old** 7:9,11
**once** 18:20
  20:15 25:22
  34:9,12,17
  35:6,11 36:24
  39:7 41:24
  49:14,21 50:19
  51:11 54:10
  55:23 56:3
  57:3,14 62:20
  65:13 70:9
  84:20
**one-on-one**
  79:14
**ongoing** 41:7
**onlookers** 41:10

  63:22
**onset** 41:22
**open** 28:25
  45:17,22 48:3
  48:4 53:19
**open-palm**
  53:18
**opened** 48:5
**opinion** 17:6
**opposite** 57:2
**option** 84:15
  85:5
**options** 66:4
  82:8
**Orange** 2:15
**order** 86:7
**ordered** 86:6
  89:9
**ordering** 89:13
**original** 89:13
**originally** 67:23
**Orlando** 2:16
**outside** 63:2
**overall** 80:8
**Ow** 52:14

─────────
**P**
**p.m** 1:21,21 4:1
  5:25,25 86:10
**P.O** 2:5
**PA** 2:4,9 89:2
**pacing** 27:3
**Page** 3:5 90:6
**pages** 1:19 3:6
  85:19 86:1
  88:9
**pain** 11:9 52:2
  56:22 62:9
  83:13
**palm** 2:4,5 53:17
  62:2 87:5 88:4
  89:20
**palmed** 52:10
**paramedic** 8:20
  9:8,10 74:3
**paramedics**
  63:11 74:6,14

  74:23 75:1,5
  76:21
**Park** 6:20
**parking** 31:9
  41:8,11 45:15
  45:16,18,19
**part** 84:8
**parties** 88:15
  89:11
**parties'** 88:16
**Parts** 6:23 7:7
**passed** 53:7
**passenger** 48:3
**Patricia** 1:25
  87:14 88:6,21
  89:18
**patrol** 5:6,7,14
  5:20 26:16,23
  32:4,6 33:9
  48:25 50:25
  51:3 67:10,18
  67:24,25 68:22
  70:24,25 72:21
  83:5
**pavement** 54:5,7
  54:21,25 83:12
**Pavilion** 69:14
**paying** 53:10
**peace** 41:21
**penalties** 90:21
**people** 11:1 28:8
  28:21 41:10
  43:2,5 48:7
  51:2 69:3,3
  73:8 84:18
**percent** 74:8
**perception**
  53:11
**perjury** 90:21
**person** 14:22
  19:7,24 20:10
  20:20 21:3,13
  21:22 26:16
  34:18 39:13
  41:23 84:17
**person's** 18:2,18
**personally** 87:9

personnel 23:22
phase 30:8,11,12
  30:13,14,15
phases 30:6
Phipps 1:22
  89:19
phone 2:15 65:2
phonetic 74:9
physical 37:1
  62:8 81:10
  85:1
physically 27:1
  51:14 61:10,12
  63:17 64:4
  76:23
pick 34:20 51:8
  82:18 83:3
place 28:25
  45:14 48:19
  68:18 89:19
placed 41:12,17
  42:4,25 43:8
  43:16 44:22
  46:4 47:3,9
  48:14 57:7
  67:15,18,23
  68:16 70:9,18
  70:23 71:11,13
  73:19,21,24
  81:4
placing 44:3
  45:25 46:1
  47:1 68:3 80:5
Plaintiff 1:6 2:2
play 35:18 39:5
  43:6
played 77:18
please 4:3,13
  89:7,10,15
plural 85:16,25
point 17:7 24:2
  24:10,17 25:5
  27:1,5,7,9
  28:22 29:4,19
  32:21 33:13,15
  33:20,21 34:9
  35:13,18,24

36:19 37:4,8,8
37:12,14,18,25
38:17,19 39:2
40:2,7,19 41:7
41:11,18 42:2
42:11,15 43:23
44:17,17,18
45:6 48:20
50:23 51:16
52:22 54:3
56:5,20 57:20
57:24 58:4,5
58:12,13,15
59:4 60:18,21
61:11 62:23
63:4,9,15,16
63:20,25 65:15
66:1 67:12
68:25 70:18
71:5 72:20,25
74:11,21 75:10
76:8,12 78:9
78:12 79:8
80:16 82:6,13
82:16 83:7,8
84:16,21,23,25
85:5
pointing 28:7
  31:15 41:6
police 9:14 19:2
  50:14 81:12
  83:22
policies 11:20,21
popping 56:8
Port 1:23 69:13
portion 7:22
  52:11
position 4:23 5:4
  17:6 26:18
  39:15 56:11
  57:2 76:5 77:6
positioning
  39:10,20 40:6
  42:5,24 56:15
positions 5:11
positive 68:15
  74:8

possibility 36:5
  43:12 68:21
possible 28:11
  42:21 56:1
  82:4
possibly 25:18
  34:20
potential 36:6
  43:12,16,17
  65:12
potentially 34:8
  34:18 40:13
powers 30:21
  31:1,5
preparation
  85:14
prescribed 75:2
prescription
  57:18,21 58:9
presents 34:21
pressure 13:10
  13:19 14:8
  15:22 16:1,11
  16:21 17:4,7
  17:10,14,18,22
  52:15 53:13,15
  54:14 56:2
  58:22 80:25
  81:4 82:10
pretty 20:5
prevent 81:19
Prima 28:7,23
  49:23
prior 6:15 7:2
  11:15 12:16
  26:1,6 31:6
  32:9 33:16
  36:2 37:4
  41:16 42:3,24
  43:8 44:3
  45:24 46:1,4
  53:3 57:6 63:8
  63:17 65:1
private 7:4 8:3,5
  45:18,21
probable 46:12
probably 32:16

procedure 68:2
  75:11
proceedings 4:1
  86:10
process 17:4
  28:11 46:21
  71:17
professional
  23:10 24:11
  25:21 88:7
program 9:25
  30:15
proper 34:6
protocol 71:5
proximity 31:21
  56:4
public 41:8
  45:14,16,17,18
  45:22 87:15
pull 31:8 36:25
  55:13
pulled 29:20
  31:16,23 32:9
  76:4
pulling 31:11,12
  83:15
pulse 76:6,6
punch 14:12
PURDY 2:9
  89:2
purpose 21:18
  22:13 23:24
  60:1 62:7
pursuit 62:24
push 38:5 49:9
  49:11 52:22
  56:9
pushed 49:12,14
pushing 52:4
put 32:3 39:15
  44:8 48:1,8
  52:15 73:12
  83:5,5

---
**Q**
---
question 16:7
  42:4,19,22

85:10 86:2
questions 26:25
  29:18 77:22
  85:7,7,8
quickly 32:24
  33:3 50:22

---
**R**
---
R&L 6:24
radio 23:20 38:9
  62:24,25
radioed 62:22
raise 4:2
ran 39:5 49:16
  84:2
rapidness 76:1
rate 11:8 22:22
  61:22
react 30:19
read 3:9 55:18
  71:19,21 72:12
  86:5 89:10,12
  90:21
readily 57:16
  84:1
realize 34:20
realized 32:13
  32:15 36:1
  51:14,24 54:10
  56:17 57:3
realizing 34:17
really 26:25 72:4
rear 52:11
reason 43:21
  44:19 90:6
reasonable 82:6
  82:8
reasonably
  79:17
recall 13:21 16:2
  16:3,4,13,18
  25:8 26:12
  27:13 36:13
  38:6 45:3
  47:22 49:16
  50:7,9 59:10
  62:21 66:2

69:25 72:13 74:4,6,15 75:4 82:3 83:23
**receiving** 68:5 69:12
**Recess** 5:25
**recollection** 13:9
**recommend** 66:10
**record** 4:16,17 48:11 88:12
**recordings** 64:19
**recovery** 76:5
**reenacted** 55:22
**reference** 27:13
**referred** 28:8 85:15
**referring** 11:11 85:25
**regain** 52:24,24 55:15 56:10
**regarding** 11:20
**regards** 24:1 29:25
**registered** 29:12 51:25 88:6
**regular** 31:2
**relates** 10:20
**relation** 63:4
**relative** 88:14,15
**relatively** 74:18
**relay** 25:18
**remain** 28:5
**remainder** 9:19
**remaining** 36:18
**remember** 10:2 38:5,8 39:23 41:2 50:10,20 56:15 57:23 63:2 67:10 73:7 74:25 75:5,8
**report** 25:7 71:19,23 88:8
**Reported** 1:24
**reporter** 3:9 4:2

55:22 88:1,7
**reporting** 1:22 73:6 89:19
**reports** 31:5
**request** 24:10 25:3
**requested** 88:11
**required** 24:18
**rescue** 63:1 76:10
**resistance** 79:16 81:10 82:5 85:1
**resisted** 61:19
**resisting** 58:3 61:21 78:1,5,5 79:10
**resource** 5:15 6:4
**respond** 24:11 62:25
**responded** 26:22
**responding** 22:20 25:23 58:11
**response** 11:8,12 22:21 25:1 28:13 48:20 52:3 83:12
**responsive** 58:13
**restrain** 56:12 56:16 63:14 76:24
**restrained** 78:5
**restrains** 83:24
**restraint** 84:1
**restraints** 41:13 83:22
**result** 67:9
**return** 89:16
**returned** 89:11
**review** 88:10
**reviewed** 31:6 64:7,8,11,17 64:18 65:5,6 85:14
**reviewing** 85:15

**revisited** 37:16
**right** 4:3 7:8 29:18 31:16 32:4,17 33:8 51:22,23 54:23 59:6,11 60:1
**risk** 28:17 41:4
**River** 7:18 9:23 10:5,7
**road** 5:7,18 69:13
**Robinson** 1:9 29:11,21 30:10 38:2,6 39:8,19 40:6 41:15 42:23 47:23 49:20 50:13 56:15,17,18 60:3,11 64:2 71:25
**room** 69:15
**rope** 83:25 84:4
**Rosario** 1:11 74:3
**roughly** 6:7,13 7:15 8:9
**route** 23:23 65:21
**RPR** 1:25 87:14 88:21 89:18
**run** 28:23 49:1,2 50:22,24 51:6
**running** 42:17 51:3 62:22

_____
**S**
**S** 2:6
**safe** 82:5 84:20 84:22
**safely** 17:8 35:13 77:6 82:19
**safety** 23:13 29:3 33:3 34:22
**sat** 47:10 48:9,9 72:23 76:19
**saw** 26:17 31:18

32:6,12 33:15 35:17 45:8 49:3 55:4 56:17,20 59:9 59:15,16,16 64:4 65:7 76:20 77:23 79:25
**saying** 28:8,19 36:13 65:17 71:9 72:4 74:25 75:4
**says** 36:21
**SCAROLA** 2:3
**scene** 23:13 24:11 29:3 63:24 66:12 74:7,10,18 84:20,21
**school** 5:14 6:4,5 6:6,19,21,24 7:17,20
**screwdriver** 26:18 27:6,10 32:10,13,15 33:10,16,24 34:14,14,19,24 35:1,4,13,16 35:17,21 36:2 36:3,8,14,21 37:2,5,15,24 38:1 39:3,4
**SEARCY** 2:3
**seated** 28:6
**second** 32:5 77:21,25 82:17
**second-degree** 78:18
**security** 5:16 6:8
**see** 17:14 28:11 28:17 29:14 30:19 31:10 32:10 41:10 49:19 51:21 52:3 58:16,19 59:2,3,5,13 60:16 61:2

63:18 64:19 67:1 72:10,22 76:7 79:5,19 80:16 81:5 82:13
**seeing** 63:2
**seen** 58:20 65:2
**semicircle** 54:23
**sense** 22:18 40:16 61:14,18
**separately** 71:25
**serious** 40:13
**session** 12:17
**sex** 29:8,12
**shake** 52:12
**Sheet** 3:10 89:10 90:1
**sheriff** 1:10 31:2
**sheriff's** 4:20 5:5 5:10,11 6:16 7:5 8:24 9:1,16 9:16 10:10,14 11:14,19,24 13:5 14:24 15:21 16:9 19:1 81:14
**shifty** 27:2 41:5
**SHIPLEY** 2:4
**short** 50:11
**shoulders** 62:3 80:23
**show** 77:15
**showed** 74:6,9 77:20 83:12
**showing** 39:11
**shut** 67:25 71:4
**sic** 76:3
**side** 9:18 13:15 14:18,19 15:10 15:11 17:22 19:7,15,19 21:23 22:8 29:2 48:4 51:12,22,23 53:14,16,19 56:1,7 57:2 59:6,11 75:19

76:4
sidebar 45:4
74:20
sidebars 47:7
sideways 49:7
sign 3:9 9:7
89:12,15
signature 89:8
89:15,21
Signed 87:11
significant 52:1
signs 10:17 11:5
22:15,23 23:3
23:8 25:2,18
41:22 68:24
simple 71:9
single 85:17
sir 5:13,21 6:18
8:6 11:22
14:10 18:9
66:20 75:16
sit 27:10 41:3
48:5,8
sitting 28:4 33:1
72:20,21
situation 15:3
32:25 79:2
situations 13:16
14:15
Six-foot-one
50:4
slid 56:3
sliding 52:17
55:3
slipped 51:25
slipping 52:21
slow 32:7 80:11
small 27:3
smell 29:5 57:13
social 64:22
society 45:13
solemnly 4:4
somebody 26:19
27:14,20 28:12
33:1 40:13
84:20
someone's 15:8

16:12,22 17:18
somewhat 63:7
77:1 80:9
83:19
sorry 50:1 82:24
sort 11:9 17:4
33:25 39:12
41:21 58:8
65:2 80:10
83:21
south 49:25
SOUTHERN
1:1
Southwest 1:23
speak 73:5
speaking 38:11
38:23 44:12
73:7
special 1:12 5:15
6:11
specific 10:22
12:18 13:22
16:7 42:19
47:7 57:10
specifically 11:2
13:2 16:3,13
24:6 42:22
45:4 55:23
73:7 74:4 82:3
specifics 74:15
speculate 37:18
speculation 84:8
spent 5:17 11:18
spoke 38:3 71:24
St 1:10,11,23
2:13 4:20 5:10
6:15 8:23,25
9:6 10:9 11:14
11:19,23 13:5
14:23 15:20
16:8 19:1
27:15,22 57:16
69:13 72:8
81:13
stab 34:4
stabbed 33:18
stabbing 34:6

staging 23:23,23
stand 26:23 28:4
51:8
standing 31:18
31:21,25 39:20
39:23 41:5
63:17 80:13
start 33:3 56:11
started 12:5,9
34:15 44:19
55:2 65:14
68:20 70:10,13
75:24 80:11,13
state 4:13 9:24
10:5,8 27:24
87:4,15 88:3
stated 90:22
statement 72:12
85:17,17,20,21
statements 42:1
64:8,9,15
85:16,18
STATES 1:1
stating 34:16
stayed 53:22
stenographic
88:12
stenographica...
1:24 88:8
step 38:7 48:6
stepped 76:9,17
stimulus 11:9
22:20 25:24
83:13
stomach 76:7
stood 38:2 74:10
74:11 80:7,8
stop 52:15 55:13
58:3,3,3 61:20
80:11
stopped 32:1,2
straight 31:13
56:8 80:20,20
81:1,18 83:15
street 51:5
street-wise 50:2
strike 12:23,24

13:6,9,24
14:12 15:8
16:15 18:2,6
18:12,14,17,21
18:22,22 19:19
20:4,16 21:8
22:4,24 23:1
51:19 52:23
54:15,17 55:7
56:21 59:6,9
59:14,15,19
60:20 80:12
strikes 54:2 62:2
62:5
striking 19:7,15
19:24 20:10,20
21:3,13,22
22:7 54:1 56:9
strong 72:4
struck 28:24
33:19 49:5
55:9 83:11
struggle 13:7
16:20 24:12,13
24:23 25:22
26:2,7 49:11
53:1,3,12 55:6
57:25 58:8,15
59:7 61:5,8
62:1,11,19
63:5,6 64:1,20
76:24,25 77:8
80:12
struggled 61:10
struggling 51:21
77:7
stun 13:13 14:1
14:5,6,7,10,14
14:21,25 15:7
subdue 61:11
subject 14:16
79:15
subjects 63:18
submit 31:5
suffering 11:1
Suite 2:10,15
89:3,19

SUMMER 2:11
89:4
summer@pur...
2:12
Sunrise 2:10
89:3
sure 11:3 20:7
51:6 53:21
63:19,23
surrounding
39:9,10
surroundings
22:19
surveillance
65:2
suspect 43:25
swear 4:4
sweating 11:8
22:19
sweaty 52:8
sworn 4:9 87:10
symptoms 10:17
11:5 22:15,24
23:3,9 25:2,19

T
tactic 14:2
tags 74:5
take 9:11 30:18
33:20 35:9
37:24 38:25
47:4,8 68:4
69:8,11,14
78:20 86:8
89:7
taken 47:2 57:22
67:20 68:12
70:1 76:11
takes 42:14
79:17
talk 27:12 38:10
72:24
talked 66:12
talking 26:24
40:14,21 53:1
57:11 65:3
69:2 71:6 72:6

79:11
**tall** 50:3,7
**taller** 50:10
**taped** 64:9,10
**taught** 14:11
**Tavares** 1:4 24:2
24:3,10 25:9
25:13 26:2,5
26:13 31:10,25
35:3 37:5
38:11,24 39:9
39:21 40:2
41:16 42:3,6,7
42:24 43:1,8
43:10 44:2,23
45:1,6,24
46:16 47:1,2
47:14 48:1,13
49:21 50:7,14
50:17 53:2,3
53:13 55:23
56:12 57:6,8
57:20 58:7,17
58:22 59:6,14
59:19 60:4,19
60:21 61:6
62:4,12 63:14
65:9 68:11
69:17 73:15
74:24 75:2,6
75:14 77:24
79:3,20 80:1,5
81:4 82:18
**technique** 14:7
15:7 16:15
80:3
**techniques**
12:21 19:2
**television** 72:3
**tell** 5:10 11:2
14:14 24:6
26:12 27:19
32:1,22 39:1
45:10 46:15
48:13 55:23
58:9 59:10,18
69:22 74:23

75:1 76:2
**telling** 28:1 36:3
37:5 49:10
70:1 72:5,14
75:6
**temple** 18:2,7,12
18:18 59:11
**term** 24:6
**terminology**
75:9
**terms** 15:12
**testified** 4:10
**testimony** 4:4
24:20 25:12
35:20 36:7
60:2,9 62:10
77:24
**Thank** 15:18
47:12 85:6
**Thanks** 86:4
**thigh** 56:22 77:5
**thing** 34:10
55:12 76:18
80:18
**things** 30:17
34:17
**think** 7:22 80:18
**thirty** 89:13
**thought** 8:18
17:3 50:1 51:7
53:9 71:17
84:24
**threat** 14:12
34:6,10,21
35:23 36:4,5
37:1,14 40:16
41:17 42:7,16
42:21 43:1,5
43:11,13,17,21
44:2,8 69:5
**threatened** 69:6
**threatening** 34:3
**three** 5:19,24
9:8 39:8,24
42:5 47:24
49:19 53:2,7
63:2 84:18

**throat** 20:21,23
21:4,8
**thumb** 12:23,24
13:6,8,9,11,18
13:24 14:7
15:22 16:11,15
16:21,24 58:16
58:21
**time** 9:5 12:3
19:2 28:15
30:7,9,14
32:21 33:15
37:4 39:2 40:2
40:7,25 50:13
53:5,11 56:25
57:17,21,23
58:15 61:6
74:19 77:10
80:19 82:9,16
84:2 89:8
**time-wise** 39:1
**times** 59:13
**title** 29:25
**today** 4:5 24:20
25:12 60:2,9
62:10 64:7
65:1,3
**told** 27:18 29:7
33:11 46:6
48:17 58:20
63:16,18,19
67:14 71:25
72:2 73:11
**top** 13:4 20:23
51:18 52:11
**traffic** 28:23
38:9 42:17
**train** 82:4
**trained** 10:16
11:13 13:6,12
13:18 14:24
15:21 16:1,9
16:10 18:25
19:4 33:25
**trainee** 29:11,23
30:1,18,21
31:2

**training** 10:5,11
10:13,18,20,24
11:6,25 12:8
12:11,11,17
13:21,22 14:3
16:4 17:9,17
18:1,16 19:6
19:14,23 20:9
20:18 21:3,12
21:21 22:7
30:2,3,7,8,11
30:15 31:6
81:13,25
**transcript** 64:12
88:10,11 89:9
89:11 90:2
**Transcription**
64:13
**transferred** 8:25
**transition** 68:22
**transitioned**
80:15
**transport** 7:4
8:5
**trap** 15:12,15,16
**Trapezius** 15:16
**treated** 79:4,5
**treatment** 23:13
75:23 76:22
**Trevisol** 71:20
71:24 72:15
73:6,11
**tried** 49:6 51:19
77:5
**tries** 28:23
**trip** 50:25
**true** 88:11 90:22
**truly** 89:17
**trunk** 84:5,7,13
**truth** 4:5,6,6
**try** 28:4,9 30:16
49:15 51:6,12
52:15,23,24
55:14
**trying** 25:4
27:17 28:10,16
28:16 29:3,10

29:14 39:14
40:12 49:8,9
49:13 50:21,24
51:2,5,9,17,19
51:20,23 52:2
52:6,12,19
54:6,9,25 55:1
56:12,16,19
57:25 58:2,5
61:12 63:14,22
69:3 72:6 83:8
**turn** 40:17
**turned** 31:14
**turning** 31:17
62:23
**two** 5:3 12:15
31:8
**TYK** 2:17 85:8
**type** 24:16 37:14
38:18

**U**

**Unaware** 22:18
**unbecoming**
59:3
**undergo** 11:24
**undergone**
10:20
**undersigned**
87:8
**understand** 8:16
11:7 29:17
39:14 43:15
66:11,18 71:11
**understanding**
73:15
**understood**
15:17 73:18
**underwent** 12:3
**uniform** 5:6,14
5:20
**unintelligible**
42:2
**unit** 5:2,15
**UNITED** 1:1
**units** 23:21
62:25

**unresponsive** 74:21 75:25
**unstable** 34:18 38:13,16,17,21
**upper** 80:14 83:19
**upward** 49:3
**use** 11:13,20,21 11:25 12:4,6 13:18 14:7,17 15:7 33:25 42:14 58:21 59:5,18 60:24 78:25 79:12 84:14
**use-of-force** 10:13 12:17
**usually** 14:19
**utilize** 13:6 14:24 15:21 16:11 17:7 56:20 62:2 84:18
**utilized** 13:16 14:2 60:3 62:11

**V**
**v** 89:5 90:3
**validate** 28:10
**vehicle** 26:17,23 28:24 29:20 31:23,24 32:6 32:10,14,18,22 32:24 33:1,9 35:4,21,22 36:2 38:3,5,12 38:24 47:9,10 47:18,20,23,24 48:2,7,14,19 49:9,22 68:23 70:24 71:1 72:21 83:22 84:4,11
**verbal** 28:20 33:4,13 80:10
**verbally** 22:18

**vicinity** 47:20 58:11
**video** 64:19 65:3 77:15,18,21,24 77:25 78:4 79:5,8,19,25 80:6 81:6,17 82:17
**videos** 65:8
**violence** 79:11
**violent** 58:3 61:17 83:9
**Vista** 28:8,24 49:23
**visual** 47:5
**voice** 46:21
**VOLUME** 1:18 3:6
**vs** 1:7

**W**
**WADE** 1:9
**waive** 89:8,15,21
**walk** 32:7 34:24 35:1 40:18
**walked** 74:10,11
**walking** 33:4 41:10 47:22
**Walton** 69:13
**want** 27:2,6,24 30:16 32:3,25 34:12,13,19 35:15 37:18 39:15 42:20 46:14 73:5 77:16
**wanted** 7:1 27:7 28:2 41:3 74:19 82:17
**warrants** 29:15 29:16
**wasn't** 24:16 32:7 39:3 43:4 43:4,16 48:20 49:2 50:11 54:17 57:10 58:1,10,10,13

**watch** 53:6 63:7 68:15
**watched** 28:19
**watching** 72:2 82:16
**way** 11:9 35:16 36:7 56:6 79:4 84:18
**ways** 37:17 48:6
**we're** 12:13 28:15,16 29:3 29:10 31:11,12 31:16 40:12 41:8 43:24 48:18 50:23 61:11,24 62:22 65:20 71:6 75:11 79:11 82:16
**we've** 13:8,12 16:1 65:3
**weapon** 37:20
**wear** 30:23,24
**Wednesday** 1:20
**weigh** 50:5
**well-being** 68:9 74:22
**went** 6:24 9:15 9:19 49:17,18 49:18,20 56:4 61:13,13,15 68:24 72:3 76:1 77:1 84:22
**weren't** 39:24
**West** 2:5 89:20
**WILSON** 2:14
**wish** 89:15
**witness** 3:9 4:7 45:24 46:1
**witnessed** 11:3 46:3,11
**words** 41:2
**work** 6:2,4 7:6 7:14,25 8:7,10 8:12 51:9
**worked** 6:16,22

**working** 6:15 6:23 7:2,9,11 8:2 11:23 8:22 29:11
**wouldn't** 17:14 18:10 36:10 59:2 66:10
**write** 25:7 90:2
**written** 73:10
**wrote** 71:24 73:11

**X**
**X** 3:2

**Y**
**Yeah** 78:12
**year** 4:22 6:7,13 7:3,8,15 8:9,14 8:15,16 12:5,6 12:7,13,15
**years** 5:3,9,17 5:22,23,24 8:10,13 9:8 11:18,23 16:8
**yelling** 58:12

**Z**

**0**

**1**
**1** 1:18,19 3:6,6 88:9 89:1
**1:53** 1:21 86:10
**10** 8:13
**10/19/2018** 87:16
**100** 74:8
**11** 6:10 24:2,21 25:10,14 26:13 30:10 60:19,21 83:21 84:3,7
**111** 2:15
**11th** 50:8 75:17
**12:00** 1:21 4:1
**12:07** 5:25
**12:08** 5:25

**1200** 2:15
**1216** 2:10 89:3
**1551** 89:19
**16** 6:13
**1680** 1:23
**169350** 87:15
**17** 5:9 7:10 11:18,23 16:7
**17th** 4:22
**18** 6:13 7:10,13
**19** 7:13
**1999** 8:11,14
**1st** 87:11 88:19

**2**
**2** 30:11,12,13,14 30:15
**2:16cv14413** 1:2 89:6 90:3
**200-E** 89:19
**2000** 8:11,15 60:19
**2000s** 8:18
**2014** 5:4 12:16 24:2,21 25:10 25:14 26:13 30:10 60:21 64:24,25 65:7 83:21 84:3,7
**2017** 1:20 87:10 87:11 88:19 89:1,7 90:4
**2139** 2:4
**2455** 2:10 89:3

**3**
**30** 89:13
**300** 7:23
**31** 1:20 90:4
**31st** 87:10 89:7
**32801** 2:16
**330** 50:6
**33304** 2:10 89:3
**33401** 89:20
**33402-3626** 2:5
**335** 50:6
**34984** 1:23

| | | | | |
|---|---|---|---|---|
| **3626** 2:5 | | | | |
| **4** | | | | |
| **4** 3:7 | | | | |
| **4-** 7:24 | | | | |
| **407)203-7592** 2:16 | | | | |
| **5** | | | | |
| **500** 7:24 | | | | |
| **561)686-6300** 2:6 | | | | |
| **6** | | | | |
| **7** | | | | |
| **8** | | | | |
| **85** 3:7 | | | | |
| **87** 3:8 | | | | |
| **88** 3:9 | | | | |
| **89** 3:9 | | | | |
| **9** | | | | |
| **90** 1:19 3:6,10 88:10 | | | | |
| **954)462-3200** 2:11 89:4 | | | | |