# EXHIBIT G

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF of ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent special district,

Defendants.
_____/

DEPOSITION OF

WADE COURTEMANCHE

VOLUME 1
Pages 1 through 34

Wednesday, May 31, 2017
2:00 p.m. - 2:35 p.m.

Phipps Reporting
1680 Southwest Bayshore Boulevard
Port St. Lucie, Florida  34984

Stenographically Reported By:
Patricia A. Lanosa, RPR, FPR, CSR

```
 1    APPEARANCES:

 2
      On behalf of Plaintiff:
 3
           SEARCY, DENNEY, SCAROLA
 4         BARNHART & SHIPLEY, PA
           2139 Palm Beach Lakes Boulevard
 5         West Palm Beach, Florida  33402-3626

 6         (561)686-6300
           BY:  ADAM S. HECHT, ESQUIRE
 7         ash@searcylaw.com

 8
      On behalf of Defendant:
 9
           PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
10         2455 East Sunrise Boulevard, Suite 1216
           Fort Lauderdale, Florida  33304
11         (954)462-3200
           BY:  SUMMER M. BARRANCO, ESQUIRE
12         summer@purdylaw.com

13
      On behalf of St. Lucie County Fire District:
14
           WILSON, ELSER, MOSKOWITZ,
15         EDELMAN & DICKER, LLP (Appearing via Phone)
           111 North Orange Avenue, Suite 1200
16         Orlando, Florida  32801
           (407)203-7592
17         BY:  JULIE TYK, ESQUIRE
           julie.tyk@wilsonelser.com
18

19

20

21

22

23

24

25
```

1

2                        I N D E X

3

4
    Examination                              Page
5

6              VOLUME 1 (Pages 1 - 34)

7  Direct        By Mr. Hecht                    4

8  Certificate of Oath                         31
   Certificate of Reporter                     32
9  Read and Sign Letter to Witness             33
   Errata Sheet (forwarded upon execution)     34

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

 1    The following proceedings began at 2:00 p.m.:

 2              THE COURT REPORTER:  Would you raise your

 3         right hand, please?

 4              Do you solemnly swear that the testimony

 5         you shall give today will be the truth, the

 6         whole truth, and nothing but the truth?

 7              THE WITNESS:  I do.

 8                   WADE COURTEMANCHE,

 9    having been first duly sworn or affirmed, was

10    examined and testified as follows:

11                   DIRECT EXAMINATION

12      BY MR. HECHT:

13         **Q.   Can you please state your name?**

14         A.   Wade Courtemanche.

15              MR. HECHT:  And we can go off the record

16         for this.

17              (Discussion off the record.)

18      BY MR. HECHT:

19         **Q.   Where are you currently employed?**

20         A.   St. Lucie County Sheriff's Office.

21         **Q.   What is your position there?**

22         A.   I'm a detective -- a canine detective in

23    the special investigations unit.

24         **Q.   How long have you held that position for?**

25         A.   Canine for the last three years.  And for

1    the last six years, the detective.

2         Q.    How long have you been employed by

3    the St. Lucie County Sheriff's Office?

4         A.    Since 2009.

5         Q.    What other law enforcement agencies have

6    you worked for besides the St. Lucie County

7    Sheriff's Office?

8         A.    The City of Pittsfield, New Hampshire, and

9    the New Hampshire Department of Corrections, the

10   state prison.

11        Q.    What were the years that you worked for

12   the Pittsfield, New Hampshire, Police Department?

13        A.    I think it was 2000 to 2007.  And then

14   like '99 to 2000 at the prison.

15        Q.    You worked at the Pittsfield Police

16   Department; is that correct?

17        A.    Yes.

18        Q.    And it was from 2000 to 2007?

19        A.    Yes.

20        Q.    You were a police officer?

21        A.    Yes.

22        Q.    And then for the Department of

23   Corrections, what did you do?

24        A.    Corrections officer at the state prison.

25        Q.    What did you do from 2000 to 2009?

Page 6

1    A.   From 2000 to 2007 I worked for the

2  Pittsfield Police Department.   2007 and 2009 we

3  moved from New Hampshire to here.

4    **Q.   I'm sorry.**

5    A.   It's all right.

6    **Q.   It's kind of a long day.  I apologize.**

7    A.   I knew where you were going.

8    **Q.   Why was it that you relocated from New**

9  **Hampshire to Florida?**

10    A.   Weather.

11    **Q.   Did you grow up in New Hampshire?**

12    A.   Most of it.  I moved to New Hampshire -- I

13  think it was my eighth-grade year.  Before that I

14  was a military brat.  My dad was in the Army.  Born

15  in Texas, moved to Germany, Kansas.

16    **Q.   After high school, what did you do?**

17    A.    I worked for the restaurant business

18  mostly, and then started my college for criminal

19  justice.

20    **Q.   Where did you go to college?**

21    A.   Hesser College.

22    **Q.   Where was that?**

23    A.   Hesser College, that was in Manchester.  I

24  think it's -- I think they were bought out by

25  Southern New Hampshire University now.

1      Q.   Is that a two-year or four-year college?

2      A.   I started it, but I am finishing now

3   through Columbia Southern.  I'm finishing my degree.

4   I'm in my last class as of today.

5      Q.   So you graduated high school.  You worked

6   in the restaurant industry.  And then you went to

7   college but you did not graduate.  Did you join the

8   military at that time?

9      A.   I did not.

10     Q.   What did you do after Hesser College?

11     A.   Restaurant business.  And then I went to

12  work for the New Hampshire State Prison and then

13  Pittsfield.

14     Q.   I apologize, did you tell me that you

15  joined the military?

16     A.   I did not.  My father.  I was a military

17  brat.  I moved around when I was young.

18     Q.   Okay.  Tell me what your involvement was

19  on May 11, 2014 regarding the Tavares Docher case.

20     A.   I was currently assigned, still in special

21  investigations.  I was actually on my way home.  I

22  was south on US 1 when I heard the radio

23  transmission that they needed assistance at the CVS

24  at Prima Vista and Floresta.

25     Q.   And when you got to the CVS, tell me what

1    **you saw.**

2         A.    I observed -- who was it -- Newman,

3    Mangrum and Calvin.  I think Calvin was still FTO.

4    They were actively fighting with an individual that

5    was handcuffed.  The individual was on the ground

6    kicking, flailing his head.

7              I had my window down as I pulled in, and I

8    could hear Mangrum specifically telling him to

9    relax, stop resisting.  As I pulled in, everything

10   kind of stopped.  Everything came to a stop.  He had

11   stopped resisting on the ground.

12             I pulled up and Mangrum asked me to ask

13   the individual that kept creeping up with a cell

14   phone, asked him to get back.  So I did so.  I told

15   him to get back towards the entranceway of the CVS.

16             So I stood in that area, which was

17   probably 20, 25 feet away from them.  At that point

18   after I had told the individual to go back towards

19   the entrance and to back up, I saw Newman trying to

20   render some type of first aid to the individual on

21   the ground, his head.

22             Every once in a little while the

23   individual would flare back up and start kicking a

24   little bit, but he would calm down.  And then

25   shortly after that rescue arrived.

1    Q.   Did you give a statement to anyone in this

2  case?

3    A.   I wrote a report.

4    Q.   The individual that you asked to step

5  back, was his name Sean Mahoney?

6    A.   I believe so.

7    Q.   And according to your report, you asked

8  him to stop taping, correct?

9    A.   Yes.

10    Q.   Why is it you asked him to stop taping?

11    A.   Just to stop taping and to get back.

12    Q.   But specifically why did he need to stop

13  taping?

14        MS. BARRANCO:  Object to the form.  Go

15        ahead.

16    A.   I'm sorry.

17        MS. BARRANCO:  I'm just objecting to the

18        form of the question.  You can go ahead and

19        answer.

20    A.   For no really specific reason, just to

21  stop taping and get back out of the area so the

22  officers could do what they needed to do and not

23  fear him creeping up on them.

24  BY MR. HECHT:

25    Q.   Was he standing too close to where the

Page 10

1    struggle was going on?

2         A.   He was moving closer and closer.  And then

3    when I got there, Mangrum had said -- asked, said,

4    "Hey, get that guy back."  I guess talking to

5    Mangrum later, he had asked him several times, and

6    he was a lot closer during stages of the struggle.

7         Q.   Is it a crime for an individual to use

8    their cell phone to tape a police encounter with an

9    individual?

10        A.   No.

11             MS. BARRANCO:  Object to the form.  Go

12        ahead.

13        A.   No.

14   BY MR. HECHT:

15        Q.   So it wasn't that he was taping the

16   officers and Tavares Docher.  The reason you asked

17   him to step away was for his safety and the

18   officers' safety?

19        A.   More so, yes, sir.

20        Q.   Did you ever attempt to take his phone

21   away from him?

22        A.   After everything was completed, yes.

23        Q.   When you say, "after everything was

24   completed," what does that mean?

25        A.   Mr. Docher was transported in the

1   ambulance by then and the scene was stale, I guess.

2        **Q.    And why is it that you took his cell**

3   **phone?**

4        A.    At that point other supervisors had shown

5   up, and at that point it was deemed there might

6   actually be some evidentiary value to the video.

7        **Q.    What sort of evidentiary value?**

8        A.    As far as Mr. Docher, I know at some point

9   they stated that he may have passed; he might not

10  have passed.  So at that point I was asked to

11  collect the cell phone.

12       **Q.    And did Sean Mahoney hand over his cell**

13  **phone?**

14       A.    He did.  Actually, I think he handed it to

15  his girlfriend.  His girlfriend handed it over.

16       **Q.    Did you threaten Shaun Mahoney or his**

17  **girlfriend in any way when you attempted to**

18  **confiscate his cell phone?**

19            MS. BARRANCO:  Object to the form.  Go

20       ahead.

21       A.    The very first time I was asked to get the

22  phone, Mr. Mahoney refused but did hand over the

23  phone.  The phone was then returned to Mr. Mahoney,

24  and it was asked of me to retrieve the phone a

25  second time.  So at which time I did, Mr. Mahoney

Page 12

1   refused.  At that time I placed him into handcuffs,

2   and he told me that his girlfriend had the phone.  I

3   asked her for the phone, and then she handed over

4   the phone.

5     BY MR. HECHT:

6       Q.    Okay.  So I want to make sure I understand

7   this correctly.  After the scene was cleared and

8   while Shaun Mahoney was still at the CVS, did you

9   ask him to hand over the cell phone?

10      A.    Yes.

11      Q.    And did he comply?

12      A.    The first time he did comply, from what I

13   remember.  And then I was asked to return the phone

14   back to Mr. Mahoney, so I did.  And then I was asked

15   to retrieve it a third time -- or a second time to

16   retrieve it.

17      Q.    Let's focus on the first time.  You asked

18   Shaun Mahoney for his cell phone, and he handed it

19   over to you, correct?

20      A.    Not initially.  We went round and round

21   about him turning it over.

22      Q.    And tell me about that conversation when

23   you say that you went round and round.

24      A.    Me asking for the phone.  Him telling me

25   he doesn't have to turn it over, that kind of

Page 13

1   conversation back and forth.

2       Q.   I want to know specifically.

3       A.   I don't remember specifically.

4       Q.   So I would imagine you would have said to

5   him, I'm taking your cell phone, or can I have your

6   cell phone?

7       A.   I believe it was more along the line:  The

8   phone is needed for evidence.

9       Q.   And what did he say?

10      A.   I could not tell you.

11      Q.   But he didn't readily hand it over,

12  correct?

13      A.   No, not right away.

14      Q.   And then what would you have said in

15  response?

16      A.   I don't remember.

17      Q.   How did you ultimately get the cell phone?

18  It sounds like he didn't give it to you.

19      A.   He did give it to me the first time.  We

20  went back and forth.  I don't remember exactly what

21  was said.  But I was able to get the phone the first

22  time, and then was asked to give it back, so I gave

23  it back.

24      Q.   I understand.  I still want to talk about

25  this first incident, and then we'll talk about the

Page 14

1   second time you tried to retrieve the phone.

2           You asked him for it, and he didn't hand

3   it over, correct?

4       A.   No, I don't believe so.  Like I said, we

5   argued over the phone.

6       Q.   And did you tell him what would happen to

7   him if he did not hand it over?

8       A.   Possibly.  Like I said, I don't remember

9   the exact conversation.

10      Q.   Did you tell him that he would be arrested

11  if he did not hand over the phone?

12      A.   I could have.

13      Q.   And is that legal?

14           MS. BARRANCO:  Object to the form.

15      A.   I would say, yes.

16   BY MR. HECHT:

17      Q.   You can arrest someone for them not

18  handing over a cell phone when they videotaped

19  footage between officers and an individual during a

20  struggle?

21           MS. BARRANCO:  Object to the form.  Go

22       ahead.

23      A.   At that point there might actually be some

24  evidence on that phone.  So, yes.

25

```
 1    BY MR. HECHT:

 2         Q.    And did you, in fact, tell Mr. Mahoney if

 3    he did not hand over the phone, he would have been

 4    arrested?

 5         A.    I could have.

 6         Q.    After you said that to him, is that when

 7    he handed over the phone?

 8         A.    Probably.  Like I said, I don't remember

 9    the exact conversation.

10         Q.    Okay.  So then you took the cell phone.

11    What did you do with it?

12         A.    I handed it over to I believe one of the

13    detectives that was handling the case.

14         Q.    And do you know what they did it with it?

15         A.    I have no idea.

16         Q.    Did they watch anything on it?

17         A.    I have no idea.

18         Q.    Did they download anything?

19         A.    I have no idea.

20         Q.    And how long after you gave the cell phone

21    to one of the other detectives did they then give it

22    back to you to bring back to Shaun Mahoney?

23         A.    I couldn't tell you.  It wasn't -- I

24    couldn't tell you the exact amount of time.

25         Q.    But you were still at the CVS, correct?
```

1    A.    Yes.  Yes.

2    Q.    So at some point you bring the phone back

3 to Mr. Mahoney, correct?

4    A.    Yes.

5    Q.    How much time went by when you approached

6 him a second time and told him you needed the phone

7 again?

8    A.    I couldn't tell you an amount.  Again, we

9 were still there.

10    Q.    And what happened when you asked

11 Mr. Mahoney for the telephone back?

12    A.    This time he again said no, and that he

13 didn't have the phone anymore.

14    Q.    Did he tell you where the phone was?

15    A.    Not initially.

16    Q.    And at some point did you find out where

17 the phone was?

18    A.    Yes.

19    Q.    And how did you find out where the phone

20 was?

21    A.    Mr. Mahoney told me.

22    Q.    And did he tell you, after you told him

23 that if he didn't tell you where it was, he was

24 going to be arrested?

25    A.    Could have.  Like I said, I don't remember

1    the exact conversation.

2         Q.   All right.  And at some point did you

3    approach his girlfriend?

4         A.   Yes.

5         Q.   And did she have his phone?

6         A.   She did.  I believe she had it in her

7    purse, if I remember correctly.

8         Q.   Did you ask her for the phone?

9         A.   Yes.

10        Q.   What did she say?

11        A.   Initially, no.

12        Q.   How did you ultimately get her to hand

13   over the phone?

14        A.   She eventually gave it to me.

15        Q.   Is that after you told had her if she

16   didn't hand it over, she would be arrested?

17        A.   I don't remember what our conversation was

18   either.

19        Q.   But it was clear to you that she did not

20   want to hand it over, correct?

21        A.   Initially, no.

22        Q.   And then what did you do with the phone

23   after she gave it to you?

24        A.   Handed it off to the detective.

25        Q.   Do you know what happened with the phone

1    after that?

2         A.   I do not.

3         Q.   **Did you ever bring them back the phone?**

4         A.   No.

5         Q.   **Did you ever watch anything on the phone?**

6         A.   I did not.

7         Q.   **Were you involved in any of the**

8    **downloading of the phone?**

9         A.   No.  Right after that, I completed my

10   supplement and cleared the scene.

11        Q.   **When you arrived on scene, did you see**

12   **Deputy Newman, Robinson, and Mangrum on top of**

13   **Tavares Docher?**

14             MS. BARRANCO:  Object to the form.  Go

15        ahead.

16        A.   Yes.  They were actively -- he was

17   actively -- Mr. Docher was actively resisting, so

18   they were using strikes, and things like that, to

19   get him to comply.

20    BY MR. HECHT:

21        Q.   **Who did you see striking Tavares Docher?**

22        A.   I don't remember specifically which deputy

23   it was.

24        Q.   **Do you recall more than one deputy**

25   **striking Tavares Docher?**

Page 19

1          A.   No.

2          Q.   **Do you remember where they were striking**

3    **him?**

4          A.   I remember -- I think -- I can't remember

5    exactly which one was towards the legs, maybe -- I

6    believe it was Robinson delivered a strike to his

7    leg.

8          Q.   **Did it appear to you that Shaun Mahoney**

9    **was concerned with the way that -- strike that.**

10              **Did it appear to you that Shaun Mahoney**

11   **was concerned with the way in which Deputy Newman,**

12   **Robinson, and Mangrum were treating Tavares Docher?**

13              MS. BARRANCO:  Object to the form.

14         A.   I have no idea what he was thinking.

15   BY MR. HECHT:

16         Q.   **Did he convey to you in any way that they**

17   **were utilizing force that was excessive,**

18   **unnecessary, and inappropriate?**

19              MS. BARRANCO:  Object to the form.  Go

20         ahead.

21         A.   I don't recall.

22   BY MR. HECHT:

23         Q.   **When you arrived, did you hear Tavares**

24   **Docher screaming, "Help me, help me, they're going**

25   **to kill me"?**

Page 20

1           MS. BARRANCO:  Object to the form.  Go

2      ahead.

3      A.   I don't remember him saying anything.

4   BY MR. HECHT:

5      Q.   **Do you know what a thumb strike is?**

6      A.   A thumb strike?

7      Q.   **Yes, sir.**

8      A.   No.

9      Q.   **Have you ever been trained on how to use a**

10  **thumb strike?**

11     A.   I don't know what it is.  So, no.

12     Q.   **Is it considered deadly force to elbow**

13  **strike an individual in the temple?**

14          MS. BARRANCO:  Object to the form.  Go

15     ahead.

16     A.   I would -- it depends on the situation.

17  BY MR. HECHT:

18     Q.   **Is it considered deadly force to elbow**

19  **strike an individual on the side of the jaw?**

20          MS. BARRANCO:  Object to the form.

21     A.   Again, it depends on the situation.

22  BY MR. HECHT:

23     Q.   **Is it considered deadly force to elbow**

24  **strike an individual on the bridge of their nose?**

25     A.   Same answer.

1             MS. BARRANCO:   Object to form.

2     BY MR. HECHT:

3         Q.   **Is it considered deadly force to strike an**

4     **individual on the back of the head?**

5             MS. BARRANCO:   Object to the form.

6         A.   Same.

7     BY MR. HECHT:

8         Q.   **Is it deadly force to elbow strike an**

9     **individual in their throat?**

10            MS. BARRANCO:   Object to the form.

11        A.   Same.

12    BY MR. HECHT:

13        Q.   **If you were to elbow strike an individual**

14    **on their temple, would that be likely to cause great**

15    **bodily harm to that individual?**

16            MS. BARRANCO:   Object to the form.

17        A.   It could.

18    BY MR. HECHT:

19        Q.   **If you were to utilize an elbow strike to**

20    **the side of the jaw to an individual, would that be**

21    **likely to cause great bodily harm?**

22            MS. BARRANCO:   Object to the form.

23        A.   It could.

24    BY MR. HECHT:

25        Q.   **If you were to utilize an elbow strike to**

1   the bridge of an individual's nose, would that be

2   likely to cause great bodily harm?

3            MS. BARRANCO:  Object to the form.

4       A.   It could.

5     BY MR. HECHT:

6       Q.   If you were to utilize an elbow strike to

7   the back of an individual's head, would that be

8   likely to cause great bodily harm?

9            MS. BARRANCO:  Object to the form.

10      A.   It could.

11    BY MR. HECHT:

12      Q.   If you were to utilize an elbow strike to

13  the throat of an individual, would that be likely to

14  cause great bodily harm?

15           MS. BARRANCO:  Object to the form.

16      A.   It could.

17    BY MR. HECHT:

18      Q.   If you were to utilize an elbow strike to

19  the side of one's head, would that be likely to

20  cause great bodily harm?

21           MS. BARRANCO:  Object to the form.

22      A.   It could.

23    BY MR. HECHT:

24      Q.   Were you acting in any sort of supervisory

25  capacity on May 11, 2014 in regards to this

Page 23

1   incident?

2       A.   Absolutely not.

3       Q.   Did you have any conversations with

4   Tavares Docher?

5       A.   No.

6       Q.   Did you have any conversations with any of

7   the paramedics on scene?

8       A.   No.

9       Q.   Did it appear to you when you arrived that

10  Tavares Docher was having a difficult time

11  breathing?

12      A.   No.

13      Q.   Did it appear he was breathing fine to

14  you?

15           MS. BARRANCO:  Object to the form.  Go

16      ahead.

17      A.   He was moving and actively resisting.

18   BY MR. HECHT:

19      Q.   I understand that.

20           Did it appear to you that he was breathing

21  normally?

22      A.   I was far enough away that I couldn't see

23  him breathing normally or abnormally.

24      Q.   So you have no opinion.

25      A.   Yeah, he appeared fine to me.

Page 24

1    Q.   Based on what you saw, did Deputy Newman,
2    Robinson, and Mangrum comply with the customs,
3    policies and practices of the St. Lucie County
4    Sheriff's Office during their interaction with
5    Tavares Docher?
6           MS. BARRANCO:   Object to the form.   Go
7    ahead.
8    A.   Yes.
9    BY MR. HECHT:
10    Q.   When you arrived on scene, Tavares Docher
11   was handcuffed behind his back, correct?
12    A.   Yeah, I believe he was.
13    Q.   And were his arms at a 90-degree angle in
14   the air?
15    A.   I don't remember seeing that.
16    Q.   But when you arrived, there was an active
17   struggle going on?
18    A.   There was.
19    Q.   And how long after you arrived did that
20   struggle last for?
21    A.   Seconds.
22    Q.   And then Tavares Docher calmed down?
23    A.   Yes.  And that's when, like I said,
24   Detective Newman was rendering first aid to -- I
25   think it was his head.

1      Q.   Did you see the paramedic inject Tavares

2   Docher with any medication?

3      A.   I don't -- I don't believe I did.  I mean,

4   they were working on him.  So I don't know.

5      Q.   When you saw the paramedics working on

6   Tavares Docher, describe Tavares' demeanor.

7      A.   Initially he was calm, and then he kind of

8   started flailing around again.

9      Q.   Were you reprimanded or disciplined or

10  sanctioned in any way as a result of your

11  involvement in this case?

12     A.   No.

13     Q.   Have you ever been trained by any law

14  enforcement agency that you've worked for to apply

15  pressure with your thumb to the nerve mass in

16  someone's neck to gain control over them?

17          MS. BARRANCO:  Object to the form.  Go

18      ahead.

19     A.   Yeah, there's -- I can't actually think of

20  one of the -- there is actually a thumb to the side

21  here (indicating) -- I don't remember the exact

22  nerve -- to get somebody who is resisting to comply.

23   BY MR. HECHT:

24     Q.   And you've been trained on that?

25     A.   Yes.

1      Q.    Have you utilized that technique before?

2      A.    I have not.

3      Q.    Why not?

4      A.    I just haven't had that situation.

5      Q.    Is that technique when you would use your

6    thumb to apply pressure to the nerve mass in one's

7    neck likely to cause great bodily injury?

8           MS. BARRANCO:   Object to the form.   Go

9      ahead.

10      A.    It's more -- the one I'm referring to is

11    up underneath the ear (indicating).   So if that's

12    what you're calling the neck area, then, yes.   Is

13    that likely to cause?   No.

14    BY MR. HECHT:

15      Q.    The entire time that you observed Tavares

16    Docher, was he in handcuffs behind his back?

17      A.    I believe so.   I couldn't tell you

18    exactly.   I don't remember if they got moved to the

19    front or not.

20      Q.    Did you ever see Tavares Docher be placed

21    in the ambulance?

22      A.    I don't remember.   I remember -- I know he

23    got in the ambulance.   I don't remember if I

24    witnessed it or I was talking to somebody else that

25    was there or not.

Page 27

1    Q.   When you arrived on scene and Tavares

2  Docher was handcuffed behind his back, were you in

3  fear for the safety of Deputy Newman, Robinson, and

4  Mangrum?

5         MS. BARRANCO:  Object to the form.  Go

6     ahead.

7    A.   They would have to answer as far as what

8  their fear was.  But he was in active resistance at

9  that point.

10  BY MR. HECHT:

11   Q.   When you arrived on scene, did you ever

12  feel that Deputy Newman, Robinson, and Mangrum's

13  life were in danger?

14         MS. BARRANCO:  Object to the form.

15   A.   Like I said, I was like 20-something feet

16  away.  If I felt at any point that they were in need

17  of any more help or whatnot, I would have helped.

18  BY MR. HECHT:

19   Q.   So is it correct you did not feel like

20  their lives were in danger when you arrived on

21  scene?

22         MS. BARRANCO:  Object to form.  Go ahead.

23   A.   They would have to tell you better what

24  they were feeling.  As far as me, I didn't feel like

25  their lives were in danger at the time.

1    BY MR. HECHT:

2        Q.   **Why is it you did not go to their aid and**

3    **assist in the struggle with Tavares Docher?**

4            MS. BARRANCO:   Object to the form.   Go

5        ahead.

6        A.   At the time, like I said, when I first got

7    there he was kicking around trying to bite and do

8    things.   So he calmed down at that point.   Mangrum

9    had asked me to keep the people back.   There were

10   several other people besides the one individual you

11   mentioned with the phone that were up underneath the

12   CVS front door.   Plus it's an open business with

13   cars coming in and stuff like that.   I stood back

14   there to make sure nobody approached them.

15       Q.   **Were there other people besides Shaun**

16   **Mahoney that were filming this struggle?**

17       A.   I don't recall if there were.   I don't

18   remember seeing any.

19   BY MR. HECHT:

20       Q.   **Is the only person that you told to stop**

21   **filming Shaun Mahoney?**

22            MS. BARRANCO:   Object to the form.

23       A.   I believe so, yes.

24   BY MR. HECHT:

25       Q.   **Why didn't you simply tell Shaun Mahoney**

1  **to step back?  Why is it that you also told him to**

2  **stop filming?**

3           MS. BARRANCO:  Object to the form.

4       A.   I told him to do both.

5   BY MR. HECHT:

6       **Q.   Why is that?**

7       A.   Just to stop filming.  I felt like if he

8   would stop filming, he would just go about his

9   business and leave.  I felt like the only reason he

10  was still there is because he was filming.  Stop

11  filming and move back.

12      **Q.   Did he move back?**

13      A.   He did move back.

14      **Q.   Did he continue to film?**

15      A.   He stopped for a little while.  And then

16  at some point I observed him filming behind a post.

17      **Q.   Did you approach him again?**

18      A.   No.  I think I just told him, "Finish your

19  business.  If you're shopping, shop.  If you're not,

20  go."

21      **Q.   So you did approach him and tell him to**

22  **either continue shopping or leave, correct?**

23      A.   I don't believe I approached him.  I just

24  told him.  We weren't that far away.  It was more

25  just a loud, "Hey, I told you once:  If you're done

Page 30

1   with your business here at CVS, then leave."

2       **Q.   And then when you told this to him, was he**

3   **hiding?**

4       A.   Yeah, at that time he was hiding behind a

5   pillar there.

6       **Q.   He was hiding from you?**

7       A.   I don't know if he was hiding from me or

8   who he was hiding from.

9           MR. HECHT:  All right.  I don't have any

10      other questions.

11          MS. BARRANCO:  Julie, do you have any

12      questions?

13          MS. TYK:  No questions.

14          MS. BARRANCO:  Okay.  I have no questions.

15      He will read the deposition if it's ordered.

16          MR. HECHT:  I'll order it.

17          MS. BARRANCO:  I'll take a copy.

18          MS. TYK:  I'll take a copy.

19          (The proceedings concluded at 2:35 p.m.)

20

21

22

23

24

25

CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF PALM BEACH



        I, the undersigned authority, certify that WADE COURTEMANCHE personally appeared before me and was duly sworn on the 31st day of May, 2017.

        Signed this 1st day of June, 2017.


_____
PATRICIA A. LANOSA, RPR, FPR, CSR
Notary Public, State of Florida
My Commission No. FF 169350
Expires: 10/19/2018

CERTIFICATE OF REPORTER


STATE OF FLORIDA

COUNTY OF PALM BEACH


        I, PATRICIA A. LANOSA, Registered

Professional Reporter, do hereby certify that I

was authorized to and did stenographically report

the foregoing deposition of WADE COURTEMANCHE;

Pages 1 through 34; that a review of the

transcript was requested; and that the transcript

is a true record of my stenographic notes.

        I FURTHER CERTIFY that I am not a

relative, employee, attorney, or counsel of any

of the parties, nor am I a relative or employee

of any of the parties' attorneys or counsel

connected with the action, nor am I financially

interested in the action.

        Dated this 1st day of June, 2017.


_____
PATRICIA A. LANOSA, RPR, FPR, CSR

June 1, 2017

PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
c/o Wade Courtemanche
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
(954)462-3200
ATTN:  SUMMER BARRANCO, ESQUIRE

Re:  Docher v. Newman et al.
Case No.:  2:16cv14413

Please take notice that on the 31st day of May,
2017, you gave your deposition in the above cause.
At that time, you did not waive your signature.

The above-addressed attorney has ordered a copy of
this transcript and will make arrangements with you
to read their copy.  Please execute the Errata
Sheet, which can be found at the back of the
transcript, and have it returned to us for
distribution to all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.

Very truly yours,

PATRICIA A. LANOSA, RPR, FPR, CSR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.

_____

WADE COURTEMANCHE

Page  34

ERRATA  SHEET

DO  NOT  WRITE  ON  TRANSCRIPT  -  ENTER  CHANGES  HERE

In  Re:   DOCHER  V.  NEWMAN  ET  AL.
Case  No.:   2:16cv14413
WADE  COURTEMANCHE
May  31,  2017

PAGE     LINE          CHANGE               REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under  penalties  of  perjury,  I  declare  that  I  have
read  the  foregoing  document  and  that  the  facts
stated  in  it  are  true.

_____          _____

Date                     WADE  COURTEMANCHE

**A**

able 13:21
abnormally
  23:23
above-address...
  33:9
**Absolutely** 23:2
acting 22:24
action 32:17,18
active 24:16
  27:8
actively 8:4
  18:16,17,17
  23:17
**ADAM** 2:6
address 33:16
affirmed 4:9
agencies 5:5
agency 25:14
ahead 9:15,18
  10:12 11:20
  14:22 18:15
  19:20 20:2,15
  23:16 24:7
  25:18 26:9
  27:6,22 28:5
aid 8:20 24:24
  28:2
air 24:14
al 33:5 34:3
ambulance 11:1
  26:21,23
amount 15:24
  16:8
angle 24:13
answer 9:19
  20:25 27:7
anymore 16:13
apologize 6:6
  7:14
appear 19:8,10
  23:9,13,20
**APPEARAN...**
  2:1
appeared 23:25
  31:9

**Appearing** 2:15
apply 25:14 26:6
approach 17:3
  29:17,21
approached
  16:5 28:14
  29:23
area 8:16 9:21
  26:12
argued 14:5
arms 24:13
**Army** 6:14
arrangements
  33:9
arrest 14:17
arrested 14:10
  15:4 16:24
  17:16
arrived 8:25
  18:11 19:23
  23:9 24:10,16
  24:19 27:1,11
  27:20
ash@searcyla...
  2:7
asked 8:12,14
  9:4,7,10 10:3,5
  10:16 11:10,21
  11:24 12:3,13
  12:14,17 13:22
  14:2 16:10
  28:9
asking 12:24
behalf 2:2,8,13
assigned 7:20
assist 28:3
assistance 7:23
attempt 10:20
attempted 11:17
**ATTN** 33:4
attorney 32:14
  33:9,13
attorneys 32:16
authority 31:8
authorized 32:8
**Avenue** 2:15

**B**

**back** 8:14,15,18
  8:19,23 9:5,11
  9:21 10:4
  12:14 13:1,20
  13:22,23 15:22
  15:22 16:2,11
  18:3 21:4 22:7
  24:11 26:16
  27:2 28:9,13
  29:1,11,12,13
  33:10
**BARNHART**
  2:4
**BARRANCO**
  2:9,11 9:14,17
  10:11 11:19
  14:14,21 18:14
  19:13,19 20:1
  20:14,20 21:1
  21:5,10,16,22
  22:3,9,15,21
  23:15 24:6
  25:17 26:8
  27:5,14,22
  28:4,22 29:3
  30:11,14,17
  33:2,4
**Based** 24:1
**Bayshore** 1:23
**Beach** 2:4,5 31:5
  32:4 33:20
began 4:1
behalf 2:2,8,13
believe 9:6 13:7
  14:4 15:12
  17:6 19:6
  24:12 25:3
  26:17 28:23
  29:23
better 27:23
bit 8:24
bite 28:7
blank 33:15
bodily 21:15,21
  22:2,8,14,20
  26:7
**Born** 6:14

**bottom** 33:15
**bought** 6:24
**Boulevard** 1:23
  2:4,10 33:3
**brat** 6:14 7:17
breathing 23:11
  23:13,20,23
bridge 20:24
  22:1
bring 15:22 16:2
  18:3
business 6:17
  7:11 28:12
  29:9,19 30:1

**C**

c/o 33:2
calling 26:12
calm 8:24 25:7
calmed 24:22
  28:8
**Calvin** 1:9 8:3,3
canine 4:22,25
capacity 22:25
cars 28:13
case 1:2 7:19 9:2
  15:13 25:11
  33:6 34:3
cause 21:14,21
  22:2,8,14,20
  26:7,13 33:7
cell 8:13 10:8
  11:2,11,12,18
  12:9,18 13:5,6
  13:17 14:18
  15:10,20
**Certificate** 3:8,8
  31:1 32:1
certify 31:8 32:7
  32:13
**CHANGE** 34:6
**CHANGES** 34:2
**CHRISTOPH...**
  1:8
**City** 5:8
class 7:4
**CLAYTON** 1:8

**clear** 17:19
**cleared** 12:7
  18:10
**Clerk** 33:14
close 9:25
closer 10:2,2,6
collect 11:11
college 6:18,20
  6:21,23 7:1,7
  7:10
**Columbia** 7:3
coming 28:13
**Commission**
  31:16
completed 10:22
  10:24 18:9
comply 12:11,12
  18:19 24:2
  25:22
concerned 19:9
  19:11
concluded 30:19
confiscate 11:18
connected 32:17
considered
  20:12,18,23
  21:3
continue 29:14
  29:22
control 25:16
conversation
  12:22 13:1
  14:9 15:9 17:1
  17:17
conversations
  23:3,6
convey 19:16
copy 30:17,18
  33:9,10
correct 5:16 9:8
  12:19 13:12
  14:3 15:25
  16:3 17:20
  24:11 27:19
  29:22
**Corrections** 5:9
  5:23,24

**correctly** 12:7
17:7
**counsel** 32:14,16
**County** 1:10,12
2:13 4:20 5:3,6
24:3 31:5 32:4
**Court** 1:1 4:2
33:14
**Courtemanche**
1:9,17 4:8,14
31:9 32:9 33:2
33:22 34:4,24
**creeping** 8:13
9:23
**crime** 10:7
**criminal** 6:18
**CSR** 1:25 31:15
32:21 33:18
**currently** 4:19
7:20
**customs** 24:2
**CVS** 7:23,25
8:15 12:8
15:25 28:12
30:1

**D**

**D** 3:2
**dad** 6:14
**danger** 27:13,20
27:25
**Date** 34:24
**Dated** 32:19
**day** 6:6 31:10,12
32:19 33:7
**days** 33:13
**deadly** 20:12,18
20:23 21:3,8
**declare** 34:21
**deemed** 11:5
**Defendant** 2:8
**Defendants** 1:13
**degree** 7:3
**delivered** 19:6
**demeanor** 25:6
**DENNEY** 2:3
**Department** 5:9

5:12,16,22 6:2
**depends** 20:16
20:21
**deposition** 1:16
30:15 32:9
33:7,12
**deputy** 18:12,22
18:24 19:11
24:1 27:3,12
**describe** 25:6
**detective** 4:22
4:22 5:1 17:24
24:24
**detectives** 15:13
15:21
**DICKER** 2:15
**difficult** 23:10
**Direct** 3:7 4:11
**disciplined** 25:9
**Discussion** 4:17
**distribution**
33:11
**district** 1:1,1,12
1:12 2:13
**Docher** 1:4 7:19
10:16,25 11:8
18:13,17,21,25
19:12,24 23:4
23:10 24:5,10
24:22 25:2,6
26:16,20 27:2
28:3 33:5 34:3
**DOCHER-NE...**
1:4
**document** 34:21
**door** 28:12
**download** 15:18
**downloading**
18:8
**Drawer** 2:5
**duly** 4:9 31:10

**E**

**E** 3:2
**ear** 26:11
**East** 2:10 33:3
**EDELMAN**

2:15
**eighth-grade**
6:13
**either** 17:18
29:22
**elbow** 20:12,18
20:23 21:8,13
21:19,25 22:6
22:12,18
**ELSER** 2:14
**employed** 4:19
5:2
**employee** 32:14
32:15
**encounter** 10:8
**enforcement** 5:5
25:14
**ENTER** 34:2
**entire** 26:15
**entrance** 8:19
**entranceway**
8:15
**Errata** 3:9 33:10
34:1
**ESQUIRE** 2:6
2:11,17 33:4
**et** 33:5 34:3
**eventually** 17:14
**evidence** 13:8
14:24
**evidentiary** 11:6
11:7
**exact** 14:9 15:9
15:24 17:1
25:21
**exactly** 13:20
19:5 26:18
**Examination**
3:4 4:11
**examined** 4:10
**excessive** 19:17
**execute** 33:10
**execution** 3:9
**Expires** 31:17

**F**

**fact** 15:2

**facts** 34:21
**far** 11:8 23:22
27:7,24 29:24
**father** 7:16
**fear** 9:23 27:3,8
**feel** 27:12,19,24
**feeling** 27:24
**feet** 8:17 27:15
**felt** 27:16 29:7,9
**FF** 31:16
**fighting** 8:4
**filed** 33:14
**film** 29:14
**filming** 28:16,21
29:2,7,8,10,11
29:16
**financially** 32:17
**find** 16:16,19
**fine** 23:13,25
**Finish** 29:18
**finishing** 7:2,3
**Fire** 1:12 2:13
**first** 4:9 8:20
11:21 12:12,17
13:19,21,25
24:24 28:6
**flailing** 8:6 25:8
**flare** 8:23
**Floresta** 7:24
**Florida** 1:1,11
1:23 2:5,10,16
6:9 31:4,16
32:3 33:3,20
**focus** 12:17
**following** 4:1
**follows** 4:10
**footage** 14:19
**force** 19:17
20:12,18,23
21:3,8
**foregoing** 32:9
34:21
**form** 9:14,18
10:11 11:19
14:14,21 18:14
19:13,19 20:1
20:14,20 21:1

21:5,10,16,22
22:3,9,15,21
23:15 24:6
25:17 26:8
27:5,14,22
28:4,22 29:3
**Fort** 2:10 33:3
**forth** 13:1,20
**Forum** 33:19
**forwarded** 3:9
33:13
**found** 33:10
**four-year** 7:1
**FPR** 1:25 31:15
32:21 33:18
**front** 26:19
28:12
**FTO** 8:3
**FURTHER**
32:13

**G**

**gain** 25:16
**Germany** 6:15
**girlfriend** 11:15
11:15,17 12:2
17:3
**GIUFFREDA**
2:9 33:2
**give** 4:5 9:1
13:18,19,22
15:21
**go** 4:15 6:20
8:18 9:14,18
10:11 11:19
14:21 18:14
19:19 20:1,14
23:15 24:6
25:17 26:8
27:5,22 28:2,4
29:8,20
**going** 6:7 10:1
16:24 19:24
24:17
**graduate** 7:7
**graduated** 7:5
**great** 21:14,21

22:2,8,14,20
26:7
**ground** 8:5,11
8:21
**grow** 6:11
**guardian** 1:5
**guess** 10:4 11:1
**guy** 10:4

**H**
**Hampshire** 5:8
5:9,12 6:3,9,11
6:12,25 7:12
**hand** 4:3 11:12
11:22 12:9
13:11 14:2,7
14:11 15:3
17:12,16,20
**handcuffed** 8:5
24:11 27:2
**handcuffs** 12:1
26:16
**handed** 11:14,15
12:3,18 15:7
15:12 17:24
**handing** 14:18
**handling** 15:13
**happen** 14:6
**happened** 16:10
17:25
**harm** 21:15,21
22:2,8,14,20
**head** 8:6,21 21:4
22:7,19 24:25
**hear** 8:8 19:23
**heard** 7:22
**Hecht** 2:6 3:7
4:12,15,18
9:24 10:14
12:5 14:16
15:1 18:20
19:15,22 20:4
20:17,22 21:2
21:7,12,18,24
22:5,11,17,23
23:18 24:9
25:23 26:14

27:10,18 28:1
28:19,24 29:5
30:9,16
**held** 4:24
**help** 19:24,24
27:17
**helped** 27:17
**Hesser** 6:21,23
7:10
**Hey** 10:4 29:25
**hiding** 30:3,4,6
30:7,8
**high** 6:16 7:5
**home** 7:21

**I**
**idea** 15:15,17,19
19:14
**imagine** 13:4
**inappropriate**
19:18
**incident** 13:25
23:1
**independent**
1:12
**indicating** 25:21
26:11
**individual** 8:4,5
8:13,18,20,23
9:4 10:7,9
14:19 20:13,19
20:24 21:4,9
21:13,15,20
22:13 28:10
**individual's**
22:1,7
**individually** 1:8
1:9,9,10,11
**industry** 7:6
**initially** 12:20
16:15 17:11,21
25:7
**inject** 25:1
**injury** 26:7
**interaction** 24:4
**interested** 32:18
**investigations**

4:23 7:21
**involved** 18:7
**involvement**
7:18 25:11

**J**
**J** 1:10
**JANICE** 1:4
**jaw** 20:19 21:20
**join** 7:7
**joined** 7:15
**JOLLY** 2:9 33:2
**JOSE** 1:11
**Julie** 2:17 30:11
**julie.tyk@wils...**
2:17
**June** 31:12
32:19 33:1
**justice** 6:19

**K**
**Kansas** 6:15
**keep** 28:9
**KEN** 1:10
**kept** 8:13
**kicking** 8:6,23
28:7
**kill** 19:25
**kind** 6:6 8:10
12:25 25:7
**knew** 6:7
**know** 11:8 13:2
15:14 17:25
20:5,11 25:4
26:22 30:7

**L**
**Lakes** 2:4
**Lanosa** 1:25
31:15 32:6,21
33:18
**Lauderdale** 2:10
33:3
**law** 5:5 25:13
**leave** 29:9,22
30:1
**leg** 19:7

**legal** 1:5 14:13
**legs** 19:5
**Let's** 12:17
**letter** 3:9 33:15
**life** 27:13
**line** 13:7 34:6
**listed** 33:16
**little** 8:22,24
29:15
**lives** 27:20,25
**LLP** 2:15
**long** 4:24 5:2 6:6
15:20 24:19
**lot** 10:6
**loud** 29:25
**Lucie** 1:10,11,23
2:13 4:20 5:3,6
24:3

**M**
**M** 2:11
**Mahoney** 9:5
11:12,16,22,23
11:25 12:8,14
12:18 15:2,22
16:3,11,21
19:8,10 28:16
28:21,25
**Manchester**
6:23
**Mangrum** 1:8
8:3,8,12 10:3,5
18:12 19:12
24:2 27:4 28:8
**Mangrum's**
27:12
**MASCARA**
1:10
**mass** 25:15 26:6
**mean** 10:24 25:3
**medication** 25:2
**mentioned**
28:11
**military** 6:14 7:8
7:15,16
**MOSKOWITZ**
2:14

**mother** 1:4
**move** 29:11,12
29:13
**moved** 6:3,12,15
7:17 26:18
**moving** 10:2
23:17

**N**
**N** 3:2
**name** 4:13 9:5
33:15
**neck** 25:16 26:7
26:12
**need** 9:12 27:16
**needed** 7:23
9:22 13:8 16:6
**nerve** 25:15,22
26:6
**New** 5:8,9,12 6:3
6:8,11,12,25
7:12
**Newman** 1:8 8:2
8:19 18:12
19:11 24:1,24
27:3,12 33:5
34:3
**normally** 23:21
23:23
**North** 2:15
**nose** 20:24 22:1
**Notary** 31:16
**notes** 32:12
**notice** 33:7

**O**
**Oath** 3:8 31:1
**Object** 9:14
10:11 11:19
14:14,21 18:14
19:13,19 20:1
20:14,20 21:1
21:5,10,16,22
22:3,9,15,21
23:15 24:6
25:17 26:8
27:5,14,22

28:4,22 29:3
**objecting** 9:17
**observed** 8:2
  26:15 29:16
**Office** 4:20 5:3,7
  24:4
**officer** 5:20,24
**officers** 9:22
  10:16 14:19
**officers'** 10:18
**Okay** 7:18 12:6
  15:10 30:14
**once** 8:22 29:25
**one's** 22:19 26:6
**open** 28:12
**opinion** 23:24
**Orange** 2:15
**order** 30:16
**ordered** 30:15
  33:9
**ordering** 33:13
**original** 33:13
**Orlando** 2:16

**P**
**p.m** 1:21,21 4:1
  30:19
**P.O** 2:5
**PA** 2:4,9 33:2
**Page** 3:4 34:6
**Pages** 1:19 3:6
  32:10
**Palm** 2:4,5 31:5
  32:4 33:20
**paramedic** 25:1
**paramedics** 23:7
  25:5
**parties** 32:15
  33:11
**parties'** 32:16
**passed** 11:9,10
**Patricia** 1:25
  31:15 32:6,21
  33:18
**penalties** 34:21
**people** 28:9,10
  28:15

**perjury** 34:21
**person** 28:20
**personally** 31:9
**Phipps** 1:22
  33:19
**phone** 2:15 8:14
  10:8,20 11:3
  11:11,13,18,22
  11:23,23,24
  12:2,3,4,9,13
  12:18,24 13:5
  13:6,8,17,21
  14:1,5,11,18
  14:24 15:3,7
  15:10,20 16:2
  16:6,13,14,17
  16:19 17:5,8
  17:13,22,25
  18:3,5,8 28:11
**pillar** 30:5
**Pittsfield** 5:8,12
  5:15 6:2 7:13
**Place** 33:19
**placed** 12:1
  26:20
**Plaintiff** 1:6 2:2
**please** 4:3,13
  33:7,10,15
**Plus** 28:12
**point** 8:17 11:4
  11:5,8,10
  14:23 16:2,16
  17:2 27:9,16
  28:8 29:16
**police** 5:12,15
  5:20 6:2 10:8
**policies** 24:3
**Port** 1:23
**position** 4:21,24
**Possibly** 14:8
**post** 29:16
**practices** 24:3
**pressure** 25:15
  26:6
**Prima** 7:24
**prison** 5:10,14
  5:24 7:12

**probably** 8:17
  15:8
**proceedings** 4:1
  30:19
**Professional**
  32:7
**Public** 31:16
**pulled** 8:7,9,12
**PURDY** 2:9
  33:2
**purse** 17:7

**Q**
**question** 9:18
**questions** 30:10
  30:12,13,14

**R**
**radio** 7:22
**raise** 4:2
**read** 3:9 30:15
  33:10,12 34:21
**readily** 13:11
**really** 9:20
**reason** 9:20
  10:16 29:9
  34:6
**recall** 18:24
  19:21 28:17
**record** 4:15,17
  32:12
**referring** 26:10
**refused** 11:22
  12:1
**regarding** 7:19
**regards** 22:25
**Registered** 32:6
**relative** 32:14,15
**relax** 8:9
**relocated** 6:8
**remember** 12:13
  13:3,16,20
  14:8 15:8
  16:25 17:7,17
  18:22 19:2,4,4
  20:3 24:15
  25:21 26:18,22

26:22,23 28:18
**render** 8:20
**rendering** 24:24
**report** 9:3,7
  32:8
**Reported** 1:24
**Reporter** 3:8 4:2
  32:1,7
**Reporting** 1:22
  33:19
**reprimanded**
  25:9
**requested** 32:11
**rescue** 8:25
**resistance** 27:8
**resisting** 8:9,11
  18:17 23:17
  25:22
**response** 13:15
**restaurant** 6:17
  7:6,11
**result** 25:10
**retrieve** 11:24
  12:15,16 14:1
**return** 12:13
  33:16
**returned** 11:23
  33:11
**review** 32:10
**right** 4:3 6:5
  13:13 17:2
  18:9 30:9
**Robinson** 1:9
  18:12 19:6,12
  24:2 27:3,12
**ROSARIO** 1:11
**round** 12:20,20
  12:23,23
**RPR** 1:25 31:15
  32:21 33:18

**S**
**S** 2:6
**safety** 10:17,18
  27:3
**sanctioned**
  25:10

**saw** 8:1,19 24:1
  25:5
**saying** 20:3
**SCAROLA** 2:3
**scene** 11:1 12:7
  18:10,11 23:7
  24:10 27:1,11
  27:21
**school** 6:16 7:5
**screaming** 19:24
**Sean** 9:5 11:12
**SEARCY** 2:3
**second** 11:25
  12:15 14:1
  16:6
**Seconds** 24:21
**see** 18:11,21
  23:22 25:1
  26:20
**seeing** 24:15
  28:18
**Shaun** 11:16
  12:8,18 15:22
  19:8,10 28:15
  28:21,25
**Sheet** 3:9 33:10
  34:1
**SHERIFF** 1:10
**Sheriff's** 4:20
  5:3,7 24:4
**SHIPLEY** 2:4
**shop** 29:19
**shopping** 29:19
  29:22
**shortly** 8:25
**shown** 11:4
**side** 20:19 21:20
  22:19 25:20
**sign** 3:9 33:12
  33:15
**signature** 33:8
  33:15,21
**Signed** 31:12
**simply** 28:25
**sir** 10:19 20:7
**situation** 20:16
  20:21 26:4

**six** 5:1
**solemnly** 4:4
**somebody** 25:22 26:24
**someone's** 25:16
**sorry** 6:4 9:16
**sort** 11:7 22:24
**sounds** 13:18
**south** 7:22
**Southern** 1:1 6:25 7:3
**Southwest** 1:23
**special** 1:12 4:23 7:20
**specific** 9:20
**specifically** 8:8 9:12 13:2,3 18:22
**St** 1:10,11,23 2:13 4:20 5:3,6 24:3
**stages** 10:6
**stale** 11:1
**standing** 9:25
**start** 8:23
**started** 6:18 7:2 25:8
**state** 4:13 5:10 5:24 7:12 31:4 31:16 32:3
**stated** 11:9 34:22
**statement** 9:1
**STATES** 1:1
**stenographic** 32:12
**stenographica...** 1:24 32:8
**step** 9:4 10:17 29:1
**stood** 8:16 28:13
**stop** 8:9,10 9:8 9:10,11,12,21 28:20 29:2,7,8 29:10
**stopped** 8:10,11 29:15

**strike** 19:6,9 20:5,6,10,13 20:19,24 21:3 21:8,13,19,25 22:6,12,18
**strikes** 18:18
**striking** 18:21 18:25 19:2
**struggle** 10:1,6 14:20 24:17,20 28:3,16
**stuff** 28:13
**Suite** 2:10,15 33:3,19
**SUMMER** 2:11 33:4
**summer@pur...** 2:12
**Sunrise** 2:10 33:3
**supervisors** 11:4
**supervisory** 22:24
**supplement** 18:10
**sure** 12:6 28:14
**swear** 4:4
**sworn** 4:9 31:10

---

**T**
**take** 10:20 30:17 30:18 33:7
**talk** 13:24,25
**talking** 10:4 26:24
**tape** 10:8
**taping** 9:8,10,11 9:13,21 10:15
**Tavares** 1:4 7:19 10:16 18:13,21 18:25 19:12,23 23:4,10 24:5 24:10,22 25:1 25:6 26:15,20 27:1 28:3
**Tavares'** 25:6
**technique** 26:1,5

**telephone** 16:11
**tell** 7:14,18,25 12:22 13:10 14:6,10 15:2 15:23,24 16:8 16:14,22,23 26:17 27:23 28:25 29:21
**telling** 8:8 12:24
**temple** 20:13 21:14
**testified** 4:10
**testimony** 4:4
**Texas** 6:15
**things** 18:18 28:8
**think** 5:13 6:13 6:24,24 8:3 11:14 19:4 24:25 25:19 29:18
**thinking** 19:14
**third** 12:15
**thirty** 33:13
**threaten** 11:16
**three** 4:25
**throat** 21:9 22:13
**thumb** 20:5,6,10 25:15,20 26:6
**time** 7:8 11:21 11:25,25 12:1 12:12,15,15,17 13:19,22 14:1 15:24 16:5,6 16:12 23:10 26:15 27:25 28:6 30:4 33:8
**times** 10:5
**today** 4:5 7:4
**told** 8:14,18 12:2 16:6,21,22 17:15 28:20 29:1,4,18,24 29:25 30:2
**top** 18:12
**trained** 20:9

25:13,24
**transcript** 32:11 32:11 33:9,11 34:2
**transmission** 7:23
**transported** 10:25
**treating** 19:12
**tried** 14:1
**true** 32:12 34:22
**truly** 33:17
**truth** 4:5,6,6
**trying** 8:19 28:7
**turn** 12:25
**turning** 12:21
**two-year** 7:1
**TYK** 2:17 30:13 30:18
**type** 8:20

---

**U**
**ultimately** 13:17 17:12
**underneath** 26:11 28:11
**undersigned** 31:8
**understand** 12:6 13:24 23:19
**unit** 4:23
**UNITED** 1:1
**University** 6:25
**unnecessary** 19:18
**use** 10:7 20:9 26:5
**utilize** 21:19,25 22:6,12,18
**utilized** 26:1
**utilizing** 19:17

---

**V**
**v** 33:5 34:3
**value** 11:6,7
**video** 11:6
**videotaped**

14:18
**Vista** 7:24
**VOLUME** 1:18 3:6
**vs** 1:7

---

**W**
**Wade** 1:9,17 4:8 4:14 31:9 32:9 33:2,22 34:4 34:24
**waive** 33:8,15,21
**want** 12:6 13:2 13:24 17:20
**wasn't** 10:15 15:23
**watch** 15:16 18:5
**way** 7:21 11:17 19:9,11,16 25:10
**we'll** 13:25
**Weather** 6:10
**Wednesday** 1:20
**went** 7:6,11 12:20,23 13:20 16:5
**weren't** 29:24
**West** 2:5 33:20
**whatnot** 27:17
**WILSON** 2:14
**window** 8:7
**wish** 33:15
**Witness** 3:9 4:7
**witnessed** 26:24
**work** 7:12
**worked** 5:6,11 5:15 6:1,17 7:5 25:14
**working** 25:4,5
**WRITE** 34:2
**wrote** 9:3

---

**X**
**X** 3:2

---

**Y**

**Yeah** 23:25 24:12 25:19 30:4
**year** 6:13
**years** 4:25 5:1 5:11
**young** 7:17

**Z**

**0**

**1**
**1** 1:18,19 3:6,6 7:22 32:10 33:1
**10/19/2018** 31:17
**11** 7:19 22:25
**111** 2:15
**1200** 2:15
**1216** 2:10 33:3
**1551** 33:19
**1680** 1:23
**169350** 31:16
**1st** 31:12 32:19

**2**
**2:00** 1:21 4:1
**2:16cv14413** 1:2 33:6 34:3
**2:35** 1:21 30:19
**20** 8:17
**20-something** 27:15
**200-E** 33:19
**2000** 5:13,14,18 5:25 6:1
**2007** 5:13,18 6:1 6:2
**2009** 5:4,25 6:2
**2014** 7:19 22:25
**2017** 1:20 31:11 31:12 32:19 33:1,7 34:4
**2139** 2:4
**2455** 2:10 33:3

**25** 8:17

**3**
**30** 33:13
**31** 1:20 3:8 34:4
**31st** 31:10 33:7
**32** 3:8
**32801** 2:16
**33** 3:9
**33304** 2:10 33:3
**33401** 33:20
**33402-3626** 2:5
**34** 1:19 3:6,9 32:10
**34984** 1:23
**3626** 2:5

**4**
**4** 3:7
**407)203-7592** 2:16

**5**
**561)686-6300** 2:6

**6**

**7**

**8**

**9**
**90-degree** 24:13
**954)462-3200** 2:11 33:4
**99** 5:14