# COMPREHENSIVE REHABILITATION EVALUATION

Containing

**Comprehensive Medical Evaluation**
**Medical Records Review**
**Vocational Position Statement**
**AMA Impairment Rating**
**Functional Assessment**
**Continuation of Care**
**Summary Report**
**Photographs**
**Documentation**

On

# Tavares Docher

Prepared by:
Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
© 2002 by Craig H. Lichtblau, M.D.

EXHIBIT A

# Comprehensive Medical Evaluation

EXHIBIT A

# CRAIG H. LICHTBLAU, M.D., P.A.

PHYSICAL MEDICINE AND REHABILITATION
BOARD CERTIFIED

PEDIATRIC • ADOLESCENT • ADULT • GERIATRIC

550 Northlake Boulevard
North Palm Beach, Florida 33408-5409
Phone: (561) 842-3694
Facsimile: (561) 842-3774

Outpatient Physical Medicine
Inpatient Rehabilitation
Medical Functional Capacity Exams
Nationwide Catastrophic Evaluations

Darryl L. Lewis, Esquire
Searcy, Denney, Scarola, Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Blvd.
West Palm Beach, Florida  33409

## Comprehensive Medical Evaluation

Date:    12/13/14
Patient:   Tavares Docher
Chart #:   34615
DOB:
Date of injury:   05/11/14

History of Present Illness:
The History of Present Illness is being obtained from the patient's mother, Janice
Docher Neeley.

The patient's mother states that her son, Tavares, is a    -year-old, right-hand
dominant  black male who was in his normal state of health until 05/11/14, when he
was arrested by the St. Lucie County Sheriff's Department for public intoxication.
The patient was acting intoxicated, unsteady on his feet, speaking loudly, and
swinging his arms.  The patient was informed he was under arrest for disorderly
intoxication and causing a disturbance.  The patient's mother states her son did not
fight with the deputies; however, eventually, a struggle ensued and her son was hit
in the face on the right side of his head by one of the officer's elbow.  The patient
was held on the ground by the deputies for approximately 15 minutes.  EMS was
called and they administered a shot of Ativan, 4 mg, to her son.

EXHIBIT A

Tavares Docher                                                                Page 2

The patient's mother states shortly after the paramedics gave him the shot of Ativan, they realized he was not breathing. Cardiopulmonary resuscitation was then administered by the emergency technicians all the way to the hospital. The patient's mother states her son never woke up.

Testing was performed and it was found the patient had blood in his urine, and he was having constant seizures in the emergency room. The patient was then transported to Palms West Hospital, where he was evaluated for his continuous seizures. The patient remained in Palms West Hospital for approximately two days.

The patient was then transferred back to St. Lucie Medical Center in Port St. Lucie. The patient had some movement in her arms and legs; however, he did not know what was going on, and he did not communicate. The patient remained in St. Lucie Medical Center until May 27, 2014.

The patient was then transported to Kindred Hospital in Fort Lauderdale, Florida, where he remained for approximately 30 days. On July 3, 2014, the patient was transferred to Unity Health and Rehabilitation Nursing Home in Miami, Florida, where he remains at the present time.

Presently, the patient's mother states her son does not communicate. He does not track with his eyes, and he has no purposeful movement whatsoever. The patient's upper and lower extremities are contracted. The patient is fed by a G-Tube and he has a tracheostomy tube in place. The patient's mother states her son has no interaction with the environment, and he requires 24-hour aide and attendant care and assistance for all activities of daily living, as he can do nothing for himself.

The patient's mother states at this point her son is not receiving any physical, occupational, or speech/cognitive therapy services, and he is not participating in his environment. The patient just lays in bed, and his mother states the most they can hope for is custodial care for someone to keep him clean. The patient's mother states she feels like he is deteriorating quickly while he is in the current facility, and states he is not receiving any services except they clean him once or twice a day. The patient's mother states she does not want her son institutionalized in this current facility, as she feels that he is not getting the care he deserves.

The patient's mother states prior to her son receiving the shot of Ativan, he was independent in ambulation and all activities of daily living. The patient was on disability because he was diagnosed with schizophrenia. The patient's mother states her schizophrenic son lived with her in Fort Lauderdale, and he came home when he felt like it. She states when he did not feel like coming home, he would hang out in Pompano Beach.

EXHIBIT A

Tavares Docher                                                    Page 3

The patient's mother states she would like her son to have as normal a life as possible, whatever that may be at this point, and she does not want her son to experience pain and discomfort. The patient's mother states she is worried her son is going to feel pain and discomfort when he wakes up.

The patient's mother states she would like her son moved to a better facility, or for him to have his own wheelchair accessible home, wheelchair accessible van, appropriate equipment, and 24-hour care at the appropriate level.

Past Medical History:
The patient's mother states her son never had a history of hypertension, diabetes, cancer, or heart attack.

Past Surgical History:
The patient's mother states her son never had any surgical procedures prior to this incident.

Allergies:
No known drug allergies.

Medications:


Family History:
The patient's mother is     years of age, alive and well.  The patient's father is
years of age with no medical problems.

Social History:
The patient is    years of age.  He is schizophrenic.  He did not have a girlfriend. The patient smoked approximately one back of cigarettes a day when he had money.  He enjoyed drinking beer and would drink approximately a 6-pack of beer a day if he had the money.  The patient did not graduate from high school.  He was not gainfully employed prior to the incident; however, he was able to work part-time at McDonald's when he was in high school and in his early 20's he worked installing windows under close supervision.

Review of Systems:
As in HPI.

Physical Examination:
Constitutional:                    **General:**  The patient is lying in bed.  He has
                                   contractures in all joints, (please see photographs).

Tavares Docher                                              Page 4

| | |
|---|---|
| Skin: | The patient has skin breakdown in the plantar aspect of his medial right foot and over his lateral right malleolus. The patient also has skin breakdown over the lateral aspect of his left shoulder. |
| Neck: | There is a tracheostomy tube in place, (please see photographs). |
| Extremities: | The patient has contractures in each joint of his body. |
| Gastrointestinal: | There is a G-tube in place, (please see photographs). |
| Neurological: | The patient has no interaction with his environment and he is unable to participate in his environment at any level. The patient does have his eyes open and demonstrates a sleep/awake cycle.  He does not respond to verbal communication. |
| Gait: | Unable to test, (please see photographs). |
| Babinski: | Untested. |
| Romberg: | Unable to test. |
| Deep Tendon Reflexes: | Untested. |
| Motor: | Unable to test. |
| Sensory: | Untested. |

Records Review:
Medical records were reviewed.  Below is a list of pertinent records.

**2014**

| | |
|---|---|
| 05/11/14 | Reporting Officer Narrative, Officer Joseph Trevisol, St. Lucie County Sheriff's Office |
| 05/11/14 | Emergency Pro, Jose Rosario, EMT., St. Lucie County Fire District |
| 05/11/14 | Emergency Provider Report, Daniel Hohler, D.O. |
| 05/11/14 | Case Supplement Report, Investigator Wade R. Courtemanche |
| 05/11/14 | Case Supplement Report, Investigator Michael Favale |
| 05/11/14 | Case Supplement Report, Investigator Kevin R. Pfeiffer |
| 05/11/14 | Case Supplement Report, Investigator Donna Carmichael |
| 05/12/14 | Case Supplement Report, Investigator Burgess F. Chapman |
| 05/12/14 | Case Supplement Report, Investigator David T. Blatchford |
| 06/06/14 | Case Supplement Report, Investigator David T. Blatchford |

- End of Records Review Index -

EXHIBIT A

Tavares Docher

Diagnostic Impression:

1. History of multiple abrasions to his face, cheeks, shoulders, arms, and bilateral legs, secondary to injuries during an arrest by law enforcement on 05/11/14.
2. History of a laceration to his right temporal region, secondary to injuries during an arrest by law enforcement on 05/11/14.
3. History of contusions to bilateral buttocks, demonstrated on CT scan of his abdomen and pelvis obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
4. History of bilateral depressed nasal bone fractures, demonstrated on CT scan of his face/head obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
5. History of extensive soft tissue swelling over his face, demonstrated on CT scan of his head and brain obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
6. History of small right mastoid effusion, demonstrated on MRI of the brain performed without contrast on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
7. History of non-displaced fracture of his right clavicle, demonstrated on CT scan of his upper extremity obtained on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
8. History of cardiac arrest, status-post injection of 4 mg of Ativan administered by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
9. History of cardiopulmonary resuscitation with electrocardioversion to a normal sinus rhythm, secondary to the administration of Ativan by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
10. History of endotracheal intubation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
11. History of rhabdomyolysis diagnosed on 05/11/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
12. History of metabolic acidosis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
13. History of seizures, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
14. History of acute respiratory failure requiring mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
15. History of central venous line placement on 05/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

Tavares Docher

16. History of anoxic brain injury, diagnosed on 05/14/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

17. History of pneumonia, status-post mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

18. History of severe bilateral cerebral edema, demonstrated on MRI of his brain obtained on 05/16/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

19. History of persistent vegetative state, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

20. History of global hypoxic encephalopathy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

21. History of diffuse abnormal diffusion restriction involving his cortex, subcortical white matter, cerebral hemispheres, and basal ganglia bilaterally, compatible with diffuse anoxia; persistent diffuse sulcal effacement, basilar cistern effacement, and abnormal contour of his mid brain, stable since prior examinations; diffuse leptomeningeal enhancement on post contrast imaging; and bilateral mastoid cell effusions, demonstrated on MRI of the brain with and without contrast performed on 05/17/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

22. History of tracheostomy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

23. History of gastrostomy tube insertion, performed on 05/21/14 by Dr. Scott Altschuler, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

24. Status-post exploration of tracheostomy and ligation of bleeder vessels, performed by Dr. Adam Kurtin on 05/26/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

25. History of chronic respiratory failure, secondary to anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

26. History of dysphasia, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

27. History of transaminitis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

Tavares Docher

28. History of evidence of diffuse global bilateral cerebral dysfunction, consistent
    with a toxic metabolic infection or hypoxic condition, demonstrated on
    electroencephalogram (EEG) performed on 08/12/14, secondary to cardiac
    arrest, secondary to the administration of Ativan during an arrest by law
    enforcement on 05/11/14.
29. Acute functional decline requiring dependence on other people for survival in
    his environment, secondary to severe anoxic brain injury, secondary to
    cardiac arrest, secondary to the administration of Ativan during an arrest by
    law enforcement on 05/11/14.
30. History of schizophrenia.

Assessment:
The patient's mother states that her son, Tavares, is a :  -year-old, right-hand
dominant  black male who was in his normal state of health until 05/11/14, when he
was arrested by the St. Lucie County Sheriff's Department for public intoxication.
The patient was acting intoxicated, unsteady on his feet, speaking loudly, and
swinging his arms.  The patient was informed he was under arrest for disorderly
intoxication and causing a disturbance.  The patient's mother states her son did not
fight with the deputies; however, eventually, a struggle ensued and her son was hit
in the face on the right side of his head by one of the officer's elbow.  The patient
was held on the ground by the deputies for approximately 15 minutes.  EMS was
called and they administered a shot of Ativan, 4 mg, to her son.

The patient's mother states shortly after the paramedics gave him the shot of
Ativan, they realized he was not breathing.  Cardiopulmonary resuscitation was
then administered by the emergency technicians all the way to the hospital.  The
patient's mother states her son never woke up.

Testing was performed and it was found the patient had blood in his urine, and he
was having constant seizures in the emergency room.  The patient was then
transported to Palms West Hospital, where he was evaluated for his continuous
seizures.  The patient remained in Palms West Hospital for approximately two days.

The patient was then transferred back to St. Lucie Medical Center in Port St. Lucie.
The patient had some movement in her arms and legs; however, he did not know
what was going on, and he did not communicate.  The patient remained in St. Lucie
Medical Center until May 27, 2014.

The patient was then transported to Kindred Hospital in Fort Lauderdale, Florida,
where he remained for approximately 30 days.  On July 3, 2014, the patient was
transferred to Unity Health and Rehabilitation Nursing Home in Miami, Florida,
where he remains at the present time.

EXHIBIT A

Tavares Docher                                                                 Page 8

Presently, the patient's mother states her son does not communicate. He does not track with his eyes, and he has no purposeful movement whatsoever. The patient's upper and lower extremities are contracted. The patient is fed by a G-Tube and he has a tracheostomy tube in place. The patient's mother states her son has no interaction with the environment, and he requires 24-hour aide and attendant care and assistance for all activities of daily living, as he can do nothing for himself.

The patient's mother states at this point her son is not receiving any physical, occupational, or speech/cognitive therapy services, and he is not participating in his environment. The patient just lays in bed, and his mother states the most they can hope for is custodial care for someone to keep him clean. The patient's mother states she feels like he is deteriorating quickly while he is in the current facility, and states he is not receiving any services except they clean him once or twice a day. The patient's mother states she does not want her son institutionalized in this current facility, as she feels that he is not getting the care he deserves.

The patient's mother states prior to her son receiving the shot of Ativan, he was independent in ambulation and all activities of daily living. The patient was on disability because he was diagnosed with schizophrenia. The patient's mother states her schizophrenic son lived with her in Fort Lauderdale, and he came home when he felt like it. She states when he did not feel like coming home, he would hang out in Pompano Beach.

The patient's mother states she would like her son to have as normal a life as possible, whatever that may be at this point, and she does not want her son to experience pain and discomfort. The patient's mother states she is worried her son is going to feel pain and discomfort when he wakes up.

The patient's mother states she would like her son moved to a better facility, or for him to have his own wheelchair accessible home, wheelchair accessible van, appropriate equipment, and 24-hour care at the appropriate level.

This patient sustained a hypoxic brain injury on 05/11/14, and I evaluated this patient on 12/13/14. Initially, it was reported that the patient was in a coma, then in a persistent vegetative state, which is a clinical condition of complete unawareness of self in the environment, accompanied by sleep/awake cycles, along with either complete or partial preservation of hypothalamic and brain stem autonomic functions. In addition, patients in a vegetative state show no evidence of sustained, reproducible or voluntary behavioral responses to visual, auditory, tactile or noxious stimuli. They show no evidence of language comprehension or expression, have bowel and bladder incontinence, and have variable preserved cranial nerve and spinal reflexes.

EXHIBIT A

Tavares Docher Page 9

Published in the New England Journal of Medicine, Volume 330, 1572-1579, June 2, 1994, #22 – The life span of adults and children in such a state is substantially reduced. For most such patients life expectancy ranges from 2 to 5 years. Survival beyond 10 years is unusual. A very small number of well described patients in a persistent vegetative state have survived for more than 15 years, including three patients who survived for more than 17, 37 and 41 years. If a patient is in a persistent vegetative state, the probability that the patient will have a prolonged survival (over 15 years) is exceedingly low, probably less than 1 in 15,000 of 75,000.

Nearly all persistent vegetative state patients have some degree of motor activity and eye movement that would be capable of signaling conscious perception of pain or suffering, if such existed. In these cases, it may be difficult to distinguish a persistent vegetative state from a severe locked in state. Under such unusual circumstances a patient may not be able to express behavioral responses to painful stimuli, or their responses may be extremely difficult to detect. The absence of a response cannot be considered as proof of the absence of consciousness. The accepted neurologic position is that no conscious experience of pain and suffering is possible without the integrated function of the brain stem and cerebral cortex. Pain and suffering are attributes of consciousness and patients in a persistent vegetative state do not experience them. The terms of functioning in a minimally conscious state and permanent vegetative state patients are similar, in the regard that neither can function in a meaningful way. But unlike the vegetative state, the minimally conscious state patient can experience some degree of pain and suffering, and may be aware of their immobility, bed sores, incontinence of urine and feces, the inability to feed themselves, total dependence of care on others, and all of the complications that may arise from the prolonged and permanent immobility. Therefore, it should be understood that being nonfunctional and having some awareness to some degree is worse than being nonfunctional and completely unaware.

Based upon my training, clinical experience, review of the medical records, and observing the patient at his bedside, it is my medical opinion to a reasonable degree of medical certainty that he is in a persistent vegetative state at this time.

It is my medical opinion that this patient has no chance of becoming an independent functioning member of society. He demonstrates some level of consciousness, but does not have significant awareness at this time.

The multi-society task force on the persistent vegetative state define the vegetative state as a condition of complete unawareness of self and environment, accompanied by sleep/awake cycles with either complete or partial preservation of hypothalamic and brain stem autonomic functions. The Aspen Consensus Conference Work Group on the Vegetative and Minimally Conscious

State describes the minimally conscious state as a condition of severely altered consciousness in which a person demonstrates minimal, but definite behavioral evidence of self or environmental awareness. There has been a significant amount of literature published regarding survival of patients in the vegetative state; however, relatively little is known about the survival of patients in a minimally conscious state. It must be understood it is possible that this patient may progress to a minimally conscious state; however, I cannot say that this is more probable than not.

It is my medical opinion that this patient suffered a hypoxic brain injury on 05/11/4. He is going to suffer the secondary effects of immobility, which includes but is not limited to deep vein thrombosis, pulmonary embolus, pneumonia, and cardiac disease, secondary to a sedentary lifestyle. New techniques are being developed to provide health care providers with early detection and early treatment of problems associated with the secondary effects of immobility.

It must be understood that the medical opinions that predict a life expectancy for patients in a persistent vegetative state of no more than 2 to 5 years was based on medical research that was authored in 1994, **(Tab Number 1)**, which in my opinion is outdated. It should be understood that there have been advances in medicine that help healthcare providers provide early detection and early intervention for the complications of the secondary effects of immobility and brain injury, which includes but is not limited to deep vein thrombosis, pulmonary embolus, pneumonia, seizures, hydrocephalus and sepsis.

According to updated research, patients in a permanent vegetative state with no purposeful motor or cognitive function that require a feeding tube can live from 7-12 years depending upon their age. This was published in Brain Medicine Principles and Practice 2006, page 253, **(Tab Number 2)**.

As a result, it is my medical opinion as a Board Certified Physiatrist that it is more probable than not that this patient will live between 7 and 12 years from the time of his brain injury, which occurred on 05/11/14. It is my medical opinion that because medical advances are progressing each year, it is not probable but is possible that this patient could live greater than 20 years.

It is my medical opinion as a Board Certified Physiatrist this patient has sustained a significant impairment, disability, and cost for future medical care as a direct result of the injuries sustained on May 11, 2014.

EXHIBIT A

Tavares Docher                                                    Page 11

In order to accurately define this patient's impairment, disability, and cost for future medical care, the following will be performed:

1.   Vocational Position Statement
2.   AMA Impairment Rating
3.   Functional Assessment
4.   Continuation of Care
5.   Summary Report
6.   Photographs
7.   Documentation

Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/dec.14

EXHIBIT A

# Vocational Position Statement

EXHIBIT A

# CRAIG H. LICHTBLAU, M.D., P.A.

## PHYSICAL MEDICINE AND REHABILITATION
### BOARD CERTIFIED

PEDIATRIC • ADOLESCENT • ADULT • GERIATRIC

550 Northlake Boulevard
North Palm Beach, Florida 33408-5409
Phone: (561) 842-3694
Facsimile: (561) 842-3774

Outpatient Physical Medicine
Inpatient Rehabilitation
Medical Functional Capacity Exams
Nationwide Catastrophic Evaluations

Darryl L. Lewis, Esquire
Searcy, Denney, Scarola, Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33409

## Vocational Position Statement

Date:    12/13/14
Patient:   Tavares Docher
Chart #:   34615
DOB:
Date of injury:   05/11/14

Diagnoses:
1. History of multiple abrasions to his face, cheeks, shoulders, arms, and bilateral legs, secondary to injuries during an arrest by law enforcement on 05/11/14.
2. History of a laceration to his right temporal region, secondary to injuries during an arrest by law enforcement on 05/11/14.
3. History of contusions to bilateral buttocks, demonstrated on CT scan of his abdomen and pelvis obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
4. History of bilateral depressed nasal bone fractures, demonstrated on CT scan of his face/head obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
5. History of extensive soft tissue swelling over his face, demonstrated on CT scan of his head and brain obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
6. History of small right mastoid effusion, demonstrated on MRI of the brain performed without contrast on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.

EXHIBIT A

**Vocational Position Statement**
Tavares Docher
Page Two

7. History of non-displaced fracture of his right clavicle, demonstrated on CT scan of his upper extremity obtained on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
8. History of cardiac arrest, status-post injection of 4 mg of Ativan administered by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
9. History of cardiopulmonary resuscitation with electrocardioversion to a normal sinus rhythm, secondary to the administration of Ativan by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
10. History of endotracheal intubation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
11. History of rhabdomyolysis diagnosed on 05/11/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
12. History of metabolic acidosis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
13. History of seizures, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
14. History of acute respiratory failure requiring mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
15. History of central venous line placement on 05/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
16. History of anoxic brain injury, diagnosed on 05/14/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
17. History of pneumonia, status-post mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
18. History of severe bilateral cerebral edema, demonstrated on MRI of his brain obtained on 05/16/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
19. History of persistent vegetative state, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
20. History of global hypoxic encephalopathy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

**Vocational Position Statement**
Tavares Docher
Page Three

21. History of diffuse abnormal diffusion restriction involving his cortex, subcortical white matter, cerebral hemispheres, and basal ganglia bilaterally, compatible with diffuse anoxia; persistent diffuse sulcal effacement, basilar cistern effacement, and abnormal contour of his mid brain, stable since prior examinations; diffuse leptomeningeal enhancement on post contrast imaging; and bilateral mastoid cell effusions, demonstrated on MRI of the brain with and without contrast performed on 05/17/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

22. History of tracheostomy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

23. History of gastrostomy tube insertion, performed on 05/21/14 by Dr. Scott Altschuler, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

24. Status-post exploration of tracheostomy and ligation of bleeder vessels, performed by Dr. Adam Kurtin on 05/26/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

25. History of chronic respiratory failure, secondary to anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

26. History of dysphasia, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

27. History of transaminitis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

28. History of evidence of diffuse global bilateral cerebral dysfunction, consistent with a toxic metabolic infection or hypoxic condition, demonstrated on electroencephalogram (EEG) performed on 08/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

29. Acute functional decline requiring dependence on other people for survival in his environment, secondary to severe anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

30. History of schizophrenia.

EXHIBIT A

**Vocational Position Statement**
Tavares Docher
Page Four

After obtaining a history, performing a physical examination, and observing this patient in his current facility, it is my medical opinion as a Board Certified Physiatrist this patient will never participate in gainful employment in the competitive open labor market, or in a sheltered environment with a benevolent employer, secondary to severe physical and cognitive deficits.

Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/dec.14

EXHIBIT A

# AMA Impairment Rating

### According to the Sixth Edition AMA Guides to the Evaluation of Permanent Impairment

EXHIBIT A

**AMA Impairment Rating**
Patient:  Tavares Docher
Date:    12/13/14

Diagnoses:
1.  History of multiple abrasions to his face, cheeks, shoulders, arms, and bilateral legs, secondary to injuries during an arrest by law enforcement on 05/11/14.
2.  History of a laceration to his right temporal region, secondary to injuries during an arrest by law enforcement on 05/11/14.
3.  History of contusions to bilateral buttocks, demonstrated on CT scan of his abdomen and pelvis obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
4.  History of bilateral depressed nasal bone fractures, demonstrated on CT scan of his face/head obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
5.  History of extensive soft tissue swelling over his face, demonstrated on CT scan of his head and brain obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
6.  History of small right mastoid effusion, demonstrated on MRI of the brain performed without contrast on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
7.  History of non-displaced fracture of his right clavicle, demonstrated on CT scan of his upper extremity obtained on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
8.  History of cardiac arrest, status-post injection of 4 mg of Ativan administered by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
9.  History of cardiopulmonary resuscitation with electrocardioversion to a normal sinus rhythm, secondary to the administration of Ativan by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
10. History of endotracheal intubation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
11. History of rhabdomyolysis diagnosed on 05/11/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
12. History of metabolic acidosis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
13. History of seizures, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
14. History of acute respiratory failure requiring mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
15. History of central venous line placement on 05/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

**AMA Impairment Rating**
Tavares Docher
Page Two

16. History of anoxic brain injury, diagnosed on 05/14/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
17. History of pneumonia, status-post mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
18. History of severe bilateral cerebral edema, demonstrated on MRI of his brain obtained on 05/16/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
19. History of persistent vegetative state, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
20. History of global hypoxic encephalopathy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
21. History of diffuse abnormal diffusion restriction involving his cortex, subcortical white matter, cerebral hemispheres, and basal ganglia bilaterally, compatible with diffuse anoxia; persistent diffuse sulcal effacement, basilar cistern effacement, and abnormal contour of his mid brain, stable since prior examinations; diffuse leptomeningeal enhancement on post contrast imaging; and bilateral mastoid cell effusions, demonstrated on MRI of the brain with and without contrast performed on 05/17/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
22. History of tracheostomy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
23. History of gastrostomy tube insertion, performed on 05/21/14 by Dr. Scott Altschuler, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
24. Status-post exploration of tracheostomy and ligation of bleeder vessels, performed by Dr. Adam Kurtin on 05/26/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
25. History of chronic respiratory failure, secondary to anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
26. History of dysphasia, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
27. History of transaminitis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

**AMA Impairment Rating**
Tavares Docher
Page Three

28. History of evidence of diffuse global bilateral cerebral dysfunction, consistent with a toxic metabolic infection or hypoxic condition, demonstrated on electroencephalogram (EEG) performed on 08/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
29. Acute functional decline requiring dependence on other people for survival in his environment, secondary to severe anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
30. History of schizophrenia.

Traumatic Brain Injury with Alteration in Mental Status,
Cognition and Highest Integrative Function

Class Diagnosis (CDX): 4
(Pg. 331, Table 13-8)

= 36-50% impairment of the whole person
(Pg. 331, Table 13-8)

Station and Gait Disorder

Class Diagnosis (CDX): 4
(Pg. 336, Table 13-12)

= 36-50% impairment of the whole person
(Pg. 336, Table 13-12)

Upper Extremity CNS Dysfunction - Dominant Upper Extremity 41%
Non-Dominant Upper Extremity 31%

Class Diagnosis (CDX): 4
(Pg. 335, Table 13-11)

= 59% impairment of the whole person
(Pg. 335, Table 13-11).

EXHIBIT A

**AMA Impairment Rating**
Tavares Docher
Page Four


Neurogenic Bowel

Class Diagnosis (CDX):  4
(Pg. 337, Table 13-13)

=        21-50% impairment of the whole person
(Pg. 337, Table 13-13)


Neurogenic Bladder

Class Diagnosis (CDX):  4
(Pg. 337, Table 13-14)

=        21-30% impairment of the whole person
(Pg. 337, Table 13-14)


Neurogenic Sexual Dysfunction

Class Diagnosis (CDX):  3
(Pg. 338, Table 13-15)

=        11-15% impairment of the whole person
(Pg. 338, Table 13-15)

EXHIBIT A

**AMA Impairment Rating**
Tavares Docher
Page Five

Using the Combined Values Chart on Page 604:

| | | |
|---|---|---|
| Alteration Mental Status/Cognitive/HIF | = | 36-50% impairment of the whole person |
| Station and Gait Disorder | = | 36-50% impairment of the whole person |
| Upper Extremity CNS Dysfunction | = | 59% impairment of the whole person |
| Neurogenic Bowel | = | 21-50% impairment of the whole person |
| Neurogenic Bladder | = | 21-30% impairment of the whole person |
| Neurogenic Sexual Dysfunction | = | 11-15% impairment of the whole person |

=        **93% permanent partial impairment of the whole person**

Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/dec.14

EXHIBIT A

# Functional Assessment

EXHIBIT A

**Functional Assessment**
Patient:  Tavares Docher
Date:  12/13/14

Diagnoses:
1. History of multiple abrasions to his face, cheeks, shoulders, arms, and bilateral legs, secondary to injuries during an arrest by law enforcement on 05/11/14.
2. History of a laceration to his right temporal region, secondary to injuries during an arrest by law enforcement on 05/11/14.
3. History of contusions to bilateral buttocks, demonstrated on CT scan of his abdomen and pelvis obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
4. History of bilateral depressed nasal bone fractures, demonstrated on CT scan of his face/head obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
5. History of extensive soft tissue swelling over his face, demonstrated on CT scan of his head and brain obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
6. History of small right mastoid effusion, demonstrated on MRI of the brain performed without contrast on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
7. History of non-displaced fracture of his right clavicle, demonstrated on CT scan of his upper extremity obtained on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
8. History of cardiac arrest, status-post injection of 4 mg of Ativan administered by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
9. History of cardiopulmonary resuscitation with electrocardioversion to a normal sinus rhythm, secondary to the administration of Ativan by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
10. History of endotracheal intubation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
11. History of rhabdomyolysis diagnosed on 05/11/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
12. History of metabolic acidosis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
13. History of seizures, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
14. History of acute respiratory failure requiring mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
15. History of central venous line placement on 05/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

**Functional Assessment**
Tavares Docher
Page Two

16. History of anoxic brain injury, diagnosed on 05/14/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
17. History of pneumonia, status-post mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
18. History of severe bilateral cerebral edema, demonstrated on MRI of his brain obtained on 05/16/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
19. History of persistent vegetative state, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
20. History of global hypoxic encephalopathy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
21. History of diffuse abnormal diffusion restriction involving his cortex, subcortical white matter, cerebral hemispheres, and basal ganglia bilaterally, compatible with diffuse anoxia; persistent diffuse sulcal effacement, basilar cistern effacement, and abnormal contour of his mid brain, stable since prior examinations; diffuse leptomeningeal enhancement on post contrast imaging; and bilateral mastoid cell effusions, demonstrated on MRI of the brain with and without contrast performed on 05/17/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
22. History of tracheostomy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
23. History of gastrostomy tube insertion, performed on 05/21/14 by Dr. Scott Altschuler, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
24. Status-post exploration of tracheostomy and ligation of bleeder vessels, performed by Dr. Adam Kurtin on 05/26/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
25. History of chronic respiratory failure, secondary to anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
26. History of dysphasia, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
27. History of transaminitis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

**Functional Assessment**
Tavares Docher
Page Three

28. History of evidence of diffuse global bilateral cerebral dysfunction, consistent with a toxic metabolic infection or hypoxic condition, demonstrated on electroencephalogram (EEG) performed on 08/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
29. Acute functional decline requiring dependence on other people for survival in his environment, secondary to severe anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
30. History of schizophrenia.

After obtaining a history, performing a physical examination, as well as observing this patient in his current facility, it is my medical opinion as a Board Certified Physiatrist as this patient suffers the secondary effects of aging, combined with his current impairment, his disability will actually increase over time.

Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/dec.14

EXHIBIT A

# Continuation of Care

# Model I

EXHIBIT A

## Continuation of Care - Model I

Date:    12/13/14
Patient:    Tavares Docher

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Medical Care*: | | | |
| Neurologist | Life | 1x Ev 3 Mos & Prn | 85.-325.00/OV |
| Primary Care Physician | Life | 1x Ev 3-4 Mos And Prn | 100.-200.00/OV |
| Cardiologist | Life | Prn | 90.-125.00/OV |
| Ophthalmologist | Life | Prn | 85.-240.00/OV |
| Orthopedic Surgeon | Life | Prn | 200.-400.00/OV |
| Gastroenterologist | Life | 2x Yr and Prn | 250.-350.00/IE 130.00/FU |
| ENT | Life | 1x Yr and Prn | 150.-450.00/OV |

EXHIBIT A

**Continuation of Care - Model I**
Page Two

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Medical Care*:  (Continued) | | | |
| Urological | Life | Prn | 75.-150.00/OV |
| Physiatrist | Life | 2-4x Yr and Prn | 200.-350.00/OV |
| Neuropsychologist | Life | 1x Yr / Prn | 100.00/OV |
| Dentist | Life | Ev 6 Mos | 234.00 (Cleaning, Check-Up and X-Rays) |

EXHIBIT A

**Continuation of Care - Model I**
Page Three

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Diagnostic Tests*: | | | |
| Electroencephalogram (EEG) | Life | Prn | 450.-850.00 |
| EKG | Life | Prn | 75.00 |
| Echocardiogram | Life | Prn | 700.00 |
| Renal Ultrasound | Life | Prn | 120.00 |
| MRI (Brain) | Life | Prn | 300.-400.00 |
| MRI (Lumbosacral) (Hips) | Life | Prn | 300.-400.00 ea |
| X-ray Thoracolumbar | Life | 1x Yr/Prn | 40.-42.00 ea |
| X-ray Lumbosacral | Life | 1 x Yr/Prn | 40.-42.00 ea |
| Chest x-ray | Life | 1x Ev 3-4 Months | 40.-42.00 ea |

EXHIBIT A

**Continuation of Care - Model I**
Page Four

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Diagnostic Tests*: (Continued) | | | |
| Intravenous Pyelogram | Life | Prn | 200.-225.00 |
| Barium Swallow | Life | 1x Yr/Prn | 122.-150.00 |
| Scoliosis Survey | Life | Prn | 58.00 |
| Routine Urinalysis | Life | 1x Yr | 31.00 |
| *CBC with Differential | Life | 1x Ev 3-4 Months | 37.00 |
| *Hepatic Panel | Life | 1x Ev 3-4 Months | 41.00 |
| *SMA-20 | Life | 1x Ev 3-4 Months | 104.00 |
| *Serum Level of Anti-Seizure Medication | Life | 1x Ev 3-6 Months | 91.00-103.00 |

* If patient is on anti-seizure medications.

EXHIBIT A

Continuation of Care - Model I
Page Five

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|

*Possible Surgical Procedures and Potential Complications*:

| | | |
|---|---|---|
| Pulmonary | Life | **UNABLE** |
| Urological | Life | |
| Thrombophlebitis | Life | **TO** |
| Renal Complications | Life | |
| Decubitus Care | Life | **OBTAIN** |
| Seizure Activity | Life | |
| Hydrocephalus Requiring VP Shunt Placement | Life | **COSTS** |
| | | **WITH** |
| V-P Shunt Replacement | Life | **MEDICAL** |
| Infection of Shunt | Life | |
| Strabismus | Life | **CERTAINTY.** |

EXHIBIT A

Continuation of Care - Model I
Page Six

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|

*Possible Surgical Procedures and Potential Complications*: (Continued)

| | | | |
|---|---|---|---|
| Contractive Deformities | Life | | **UNABLE** |
| Spine Stabilization | Life | | **TO** |
| Dorsal Rhizotomy | Life | | **OBTAIN** |
| Intra. Baclofen Pump | Life | | **COSTS** |
| Aspiration Pneumonia | Life | | |
| Urosepsis | Life | | **WITH** |
| G-Tube Replacement | Life | | **MEDICAL** |
| Endoscopy | Life | | |
| Botox Injections | Life | | **CERTAINTY.** |

EXHIBIT A

**Continuation of Care – Model I**
Page Seven

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Therapeutic Evaluations*: | | | |
| Physical Therapy | Life | 1x Yr & Prn | 385.00 |
| Occupational Therapy | Life | 1x Yr & Prn | 250.00 |
| Speech/Cognitive | Life | 1x Yr & Prn | 250.00 |
| Neuropsychological | Life | 1 x Yr / Prn | 1,500.00- 2,000.00 (Includes Evaluation and Testing) |
| *Outpatient Therapy*: | | | |
| Physical | Life | 3 x Wk | 80.00/Visit |
| Occupational/ADL | Life | 3 x Wk | 65.00/Visit |
| Speech Therapy | Life | 3 x Wk | 65.00/Visit |

EXHIBIT A

**Continuation of Care – Model I**
Page Eight

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|

*Medications*:

(Pending/Records)

Nutrition:

(Pending/Records)

EXHIBIT A

**Continuation of Care - Model I**
Page Nine

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Support Care*: | | | |
| *RN | Life | 24 hrs/Day 7 days/Wk 52 wks/Yr | 35.-40.00 / Hr |
| **LPN | Life | 24 hrs/Day 7 days/Wk 52 wks/Yr | 27.-30.00 / Hr |
| Housekeeper | Now - Death | 4 Hrs/Dy 3 Dys/Wk | 16.00/Hr (Approximate) |
| Case Manager | Life | 2-3x Mo | 150.00/Visit |

*During periods of medical fragility an R.N. must provide the patient's care, (5% of the time).

**During periods of medical stability an L.P.N. can provide the services, (95% of the time).

EXHIBIT A

**Continuation of Care - Model I**
Page Ten

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Orthosis*: | | | |
| Bilateral Hand Splints | Life | 2 Ev 3-5 Yrs | 61.30 - 100.57 ea |
| Bilateral Ankle AFOs | Life | 2 Ev 3-5 Yrs | 119.57 ea |
| | | | |
| *Medical/Personal Supplies* | | | |
| Depends | Life | 6 per day | 69.95 (64) |
| Wipes | Life | 4 Pkgs/Month | 5.25/Pkg. |
| Disposable Underpads (Chux) | Life | 30-60/Month | 35.95 (100) |
| Nonsterile Gloves | Life | 2-4 Boxes/Month | 7.25/Box |

EXHIBIT A

**Continuation of Care - Model I**
Page Eleven

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Bathing/Toileting*: | | | |
| Bathtub Transfer Chair | Life | 1 Ev 7 Yrs | 349.99 |
| Orthopedic Adaptive Commode/Shower Chair | Life | 1 Every 15 Yrs | 539.99 |
| *Mobility Equipment*: | | | |
| Manual Wheelchair | Life | 1 Ev 5-7 Yrs | 3,745.00 - 4,495.00 |
| *Transferring*: | | | |
| Hoyer Lift | Life | 1 Ev 10 Yrs | 1,229.95-2,798.95 |
| *Housing*: | | | |
| Wheelchair Accessible Home | | 1 X | 150,000.00-300,000.00 Estimate |

EXHIBIT A

**Continuation of Care – Model I**
Page Twelve

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Transportation:* | | | |
| Van W/Conversions & Modifications | Life | 1x Ev 5-7 Years | 48,000.00-69,000.00 - |
| Automobile Association (Yearly + Plan) | Life | Yearly | 59.50-79.00 |
| Cellular Phone (Portable) | Life | 1 Ev 5-7 Yrs | 39.99 and up |

Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/dec.14

EXHIBIT A

# Continuation of Care

# Model II

EXHIBIT A

## Continuation of Care - Model II

Date:     12/13/14
Patient:  Tavares Docher

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Medical Care*: | | | |
| Neurologist | Life | 1x Ev 3 Mos & Prn | 85.-325.00/OV |
| Primary Care Physician | Life | 1x Ev 3-4 Mos And Prn | 100.-200.00/OV |
| Cardiologist | Life | Prn | 90.-125.00/OV |
| Ophthalmologist | Life | Prn | 85.-240.00/OV |
| Orthopedic Surgeon | Life | Prn | 200.-400.00/OV |
| Gastroenterologist | Life | 2x Yr and Prn | 250.-350.00/IE 130.00/FU |
| ENT | Life | 1x Yr and Prn | 150.-450.00/OV |

EXHIBIT A

Continuation of Care – Model II
Page Two

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Medical Care*: (Continued) | | | |
| Urological | Life | Prn | 75.-150.00/OV |
| Physiatrist | Life | 2-4x Yr and Prn | 200.-350.00/OV |
| Neuropsychologist | Life | 1x Yr / Prn | 100.00/OV |
| Dentist | Life | Ev 6 Mos | 234.00 (Cleaning, Check-Up and X-Rays) |

EXHIBIT A

**Continuation of Care - Model II**
Page Three

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Diagnostic Tests*: | | | |
| Electroencephalogram (EEG) | Life | Prn | 450.-850.00 |
| EKG | Life | Prn | 75.00 |
| Echocardiogram | Life | Prn | 700.00 |
| Renal Ultrasound | Life | Prn | 120.00 |
| MRI (Brain) | Life | Prn | 300.-400.00 |
| MRI (Lumbosacral) (Hips) | Life | Prn | 300.-400.00 ea |
| X-ray Thoracolumbar | Life | 1x Yr/Prn | 40.-42.00 ea |
| X-ray Lumbosacral | Life | 1 x Yr/Prn | 40.-42.00 ea |
| Chest x-ray | Life | 1x Ev 3-4 Months | 40.-42.00 ea |

EXHIBIT A

**Continuation of Care – Model II**
Page Four

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| *Diagnostic Tests*: (Continued) | | | |
| Intravenous Pyelogram | Life | Prn | 200.-225.00 |
| Barium Swallow | Life | 1x Yr/Prn | 122.-150.00 |
| Scoliosis Survey | Life | Prn | 58.00 |
| Routine Urinalysis | Life | 1x Yr | 31.00 |
| *CBC with Differential | Life | 1x Ev 3-4 Months | 37.00 |
| *Hepatic Panel | Life | 1x Ev 3-4 Months | 41.00 |
| *SMA-20 | Life | 1x Ev 3-4 Months | 104.00 |
| *Serum Level of Anti-Seizure Medication | Life | 1x Ev 3-6 Months | 91.00-103.00 |

\* If patient is on anti-seizure medications.

EXHIBIT A

Continuation of Care - Model II
Page Five

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|

_Possible Surgical Procedures and Potential Complications_:

Pulmonary                              Life

Urological                             Life

Thrombophlebitis    Life

Renal Complications  Life

Decubitus Care             Life

Seizure Activity            Life

Hydrocephalus             Life
Requiring VP
Shunt Placement

V-P Shunt                        Life
Replacement

Infection of Shunt           Life

Strabismus                         Life

**UNABLE**

**TO**

**OBTAIN**

**COSTS**

**WITH**

**MEDICAL**

**CERTAINTY.**

EXHIBIT A

**Continuation of Care – Model II**
Page Six

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|

*Possible Surgical Procedures and Potential Complications*:  (Continued)

| | | |
|---|---|---|
| Contractive Deformities | Life | |
| Spine Stabilization | Life | |
| Dorsal Rhizotomy | Life | |
| Intra. Baclofen Pump | Life | |
| Aspiration Pneumonia | Life | |
| Urosepsis | Life | |
| G-Tube Replacement | Life | |
| Endoscopy | Life | |
| Botox Injections | Life | |

**UNABLE TO OBTAIN COSTS WITH MEDICAL CERTAINTY.**

**Medications:**

Pending/Records

EXHIBIT A

**Continuation of Care - Model II**
Page Seven

| Medical Care | Period Over Which Services Provided | Frequency | Cost Per Visit/Item |
|---|---|---|---|

## Florida Institute for Neurologic Rehabilitation

Florida Institute for
Neurologic Rehabilitation
Life
$ 1,550.00/ Day

Includes:

Physical Therapy
Occupational Therapy
Speech/Language Therapy
Recreational Therapy
Respiratory Therapy
Psychological
Case Management
Behavioral Management

The cost would be $ 1,550.00 per day.  This would include the room and board, physical therapy, occupational therapy, speech therapy, recreational therapy, respiratory therapy, psychological services, case management and behavioral management.

Any extra ancillary charges, such as laboratory tests, medications, consultations, etc. are billed separately.

*Pricing per James Bailey, Admissions Department, Florida Institute for Neurologic Rehabilitation.  Please see Documentation Section.

Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/jan.15

EXHIBIT A

# Summary Report

EXHIBIT A

# CRAIG H. LICHTBLAU, M.D., P.A.

PHYSICAL MEDICINE AND REHABILITATION
BOARD CERTIFIED

PEDIATRIC • ADOLESCENT • ADULT • GERIATRIC

550 Northlake Boulevard
North Palm Beach, Florida 33408-5409
Phone: (561) 842-3694
Facsimile: (561) 842-3774

Outpatient Physical Medicine
Inpatient Rehabilitation
Medical Functional Capacity Exams
Nationwide Catastrophic Evaluations

Darryl L. Lewis, Esquire
Searcy, Denney, Scarola, Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Blvd.
West Palm Beach, Florida  33409

## Summary Report

Date:    12/13/14
Patient:   Tavares Docher
Chart #:   34615
DOB:
Date of injury:   05/11/14

The History of Present Illness was obtained from the patient's mother, Janice Docher Neeley.

The patient's mother stated that her son, Tavares, is a     -year-old, right-hand dominant black male who was in his normal state of health until 05/11/14, when he was arrested by the St. Lucie County Sheriff's Department for public intoxication.  The patient was acting intoxicated, unsteady on his feet, speaking loudly, and swinging his arms.  The patient was informed he was under arrest for disorderly intoxication and causing a disturbance.  The patient's mother stated her son did not fight with the deputies; however, eventually, a struggle ensued and her son was hit in the face on the right side of his head by one of the officer's elbow.  The patient was held on the ground by the deputies for approximately 15 minutes. EMS was called and they administered a shot of Ativan, 4 mg, to her son.

EXHIBIT A

The patient's mother stated shortly after the paramedics gave him the shot of Ativan, they realized he was not breathing. Cardiopulmonary resuscitation was then administered by the emergency technicians all the way to the hospital. The patient's mother stated her son never woke up.

Testing was performed and it was found the patient had blood in his urine, and he was having constant seizures in the emergency room. The patient was then transported to Palms West Hospital, where he was evaluated for his continuous seizures. The patient remained in Palms West Hospital for approximately two days.

The patient was then transferred back to St. Lucie Medical Center in Port St. Lucie. The patient had some movement in her arms and legs; however, he did not know what was going on, and he did not communicate. The patient remained in St. Lucie Medical Center until May 27, 2014.

The patient was then transported to Kindred Hospital in Fort Lauderdale, Florida, where he remained for approximately 30 days. On July 3, 2014, the patient was transferred to Unity Health and Rehabilitation Nursing Home in Miami, Florida, where he remains at the present time.

Initially when I evaluated the patient on 12/13/14, his mother stated her son does not communicate. He does not track with his eyes, and he has no purposeful movement whatsoever. The patient's upper and lower extremities are contracted. The patient is fed by a G-Tube and he has a tracheostomy tube in place. The patient's mother stated her son has no interaction with the environment, and he requires 24-hour aide and attendant care and assistance for all activities of daily living, as he can do nothing for himself.

The patient's mother stated at this point her son is not receiving any physical, occupational, or speech/cognitive therapy services, and he is not participating in his environment. The patient just lays in bed, and his mother stated the most they can hope for is custodial care for someone to keep him clean. She stated she feels like he is deteriorating quickly while he is in the current facility, and stated he is not receiving any services except they clean him once or twice a day. The patient's mother stated she does not want her son institutionalized in this current facility, as she feels that he is not getting the care he deserves.

The patient's mother stated prior to her son receiving the shot of Ativan, he was independent in ambulation and all activities of daily living. The patient was on disability because he was diagnosed with schizophrenia. The patient's mother stated her schizophrenic son lived with her in Fort Lauderdale, and he came home when he felt like it. She stated when he did not feel like coming home, he would hang out in Pompano Beach.

The patient's mother stated she would like her son to have as normal a life as possible, whatever that may be at this point, and she does not want her son to experience pain and discomfort. The patient's mother stated she is worried her son is going to feel pain and discomfort when he wakes up.

EXHIBIT A

Tavares Docher                                                                                    Page 3

The patient's mother stated she would like her son moved to a better facility, or for him to have his own wheelchair accessible home, wheelchair accessible van, appropriate equipment, and 24-hour care at the appropriate level.

It was my medical opinion at that time the patient was suffering from:

1. History of multiple abrasions to his face, cheeks, shoulders, arms, and bilateral legs, secondary to injuries during an arrest by law enforcement on 05/11/14.
2. History of a laceration to his right temporal region, secondary to injuries during an arrest by law enforcement on 05/11/14.
3. History of contusions to bilateral buttocks, demonstrated on CT scan of his abdomen and pelvis obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
4. History of bilateral depressed nasal bone fractures, demonstrated on CT scan of his face/head obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
5. History of extensive soft tissue swelling over his face, demonstrated on CT scan of his head and brain obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
6. History of small right mastoid effusion, demonstrated on MRI of the brain performed without contrast on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
7. History of non-displaced fracture of his right clavicle, demonstrated on CT scan of his upper extremity obtained on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
8. History of cardiac arrest, status-post injection of 4 mg of Ativan administered by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
9. History of cardiopulmonary resuscitation with electrocardioversion to a normal sinus rhythm, secondary to the administration of Ativan by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
10. History of endotracheal intubation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
11. History of rhabdomyolysis diagnosed on 05/11/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
12. History of metabolic acidosis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
13. History of seizures, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
14. History of acute respiratory failure requiring mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
15. History of central venous line placement on 05/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

EXHIBIT A

16. History of anoxic brain injury, diagnosed on 05/14/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

17. History of pneumonia, status-post mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

18. History of severe bilateral cerebral edema, demonstrated on MRI of his brain obtained on 05/16/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

19. History of persistent vegetative state, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

20. History of global hypoxic encephalopathy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

21. History of diffuse abnormal diffusion restriction involving his cortex, subcortical white matter, cerebral hemispheres, and basal ganglia bilaterally, compatible with diffuse anoxia; persistent diffuse sulcal effacement, basilar cistern effacement, and abnormal contour of his mid brain, stable since prior examinations; diffuse leptomeningeal enhancement on post contrast imaging; and bilateral mastoid cell effusions, demonstrated on MRI of the brain with and without contrast performed on 05/17/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

22. History of tracheostomy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

23. History of gastrostomy tube insertion, performed on 05/21/14 by Dr. Scott Altschuler, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

24. Status-post exploration of tracheostomy and ligation of bleeder vessels, performed by Dr. Adam Kurtin on 05/26/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

25. History of chronic respiratory failure, secondary to anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

26. History of dysphasia, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

27. History of transaminitis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

28. History of evidence of diffuse global bilateral cerebral dysfunction, consistent with a toxic metabolic infection or hypoxic condition, demonstrated on electroencephalogram (EEG) performed on 08/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

29. Acute functional decline requiring dependence on other people for survival in his environment, secondary to severe anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

30. History of schizophrenia.

367a90025d8ede1f

After obtaining a history, performing a physical examination, and observing this patient in his current facility, it is my medical opinion as a Board Certified Physiatrist this patient will never participate in gainful employment in the competitive open labor market, or in a sheltered environment with a benevolent employer, secondary to severe physical and cognitive deficits.

It is my medical opinion this patient has reached Maximum Medical Improvement in regards to conservative care and he has a **93%** permanent partial impairment of the whole person, according to the AMA Guides to the Evaluation of Permanent Impairment, Sixth Edition.

After obtaining a history, performing a physical examination, as well as observing this patient in his current facility, it is my medical opinion as a Board Certified Physiatrist as this patient suffers the secondary effects of aging, combined with his current impairment, his disability will actually increase over time.

This patient sustained a hypoxic brain injury on 05/11/14, and I evaluated this patient on 12/13/14. Initially, it was reported that the patient was in a coma, then in a persistent vegetative state, which is a clinical condition of complete unawareness of self in the environment, accompanied by sleep/awake cycles, along with either complete or partial preservation of hypothalamic and brain stem autonomic functions. In addition, patients in a vegetative state show no evidence of sustained, reproducible or voluntary behavioral responses to visual, auditory, tactile or noxious stimuli. They show no evidence of language comprehension or expression, have bowel and bladder incontinence, and have variable preserved cranial nerve and spinal reflexes.

Published in the New England Journal of Medicine, Volume 330, 1572-1579, June 2, 1994, #22 – The life span of adults and children in such a state is substantially reduced. For most such patients life expectancy ranges from 2 to 5 years. Survival beyond 10 years is unusual. A very small number of well described patients in a persistent vegetative state have survived for more than 15 years, including three patients who survived for more than 17, 37 and 41 years. If a patient is in a persistent vegetative state, the probability that the patient will have a prolonged survival (over 15 years) is exceedingly low, probably less than 1 in 15,000 of 75,000.

Nearly all persistent vegetative state patients have some degree of motor activity and eye movement that would be capable of signaling conscious perception of pain or suffering, if such existed. In these cases, it may be difficult to distinguish a persistent vegetative state from a severe locked in state. Under such unusual circumstances a patient may not be able to express behavioral responses to painful stimuli, or their responses may be extremely difficult to detect. The absence of a response cannot be considered as proof of the absence of consciousness. The accepted neurologic position is that no conscious experience of pain and suffering is possible without the integrated function of the brain stem and cerebral cortex. Pain and suffering are attributes of consciousness and patients in a persistent vegetative state do not experience them. The terms of functioning in a minimally conscious state and

EXHIBIT A

permanent vegetative state patients are similar, in the regard that neither can function in a meaningful way. But unlike the vegetative state, the minimally conscious state patient can experience some degree of pain and suffering, and may be aware of their immobility, bed sores, incontinence of urine and feces, the inability to feed themselves, total dependence of care on others, and all of the complications that may arise from the prolonged and permanent immobility. Therefore, it should be understood that being nonfunctional and having some awareness to some degree is worse than being nonfunctional and completely unaware.

Based upon my training, clinical experience, review of the medical records, and observing the patient at his bedside, it is my medical opinion to a reasonable degree of medical certainty that he is in a persistent vegetative state at this time.

It is my medical opinion that this patient has no chance of becoming an independent functioning member of society. He demonstrates some level of consciousness, but does not have significant awareness at this time.

The multi-society task force on the persistent vegetative state define the vegetative state as a condition of complete unawareness of self and environment, accompanied by sleep/awake cycles with either complete or partial preservation of hypothalamic and brain stem autonomic functions. The Aspen Consensus Conference Work Group on the Vegetative and Minimally Conscious State describes the minimally conscious state as a condition of severely altered consciousness in which a person demonstrates minimal, but definite behavioral evidence of self or environmental awareness. There has been a significant amount of literature published regarding survival of patients in the vegetative state; however, relatively little is known about the survival of patients in a minimally conscious state. It must be understood it is possible that this patient may progress to a minimally conscious state; however, I cannot say that this is more probable than not.

It is my medical opinion that this patient suffered a hypoxic brain injury on 05/11/4. He is going to suffer the secondary effects of immobility, which includes but is not limited to deep vein thrombosis, pulmonary embolus, pneumonia, and cardiac disease, secondary to a sedentary lifestyle. New techniques are being developed to provide health care providers with early detection and early treatment of problems associated with the secondary effects of immobility.

It must be understood that the medical opinions that predict a life expectancy for patients in a persistent vegetative state of no more than 2 to 5 years was based on medical research that was authored in 1994, **(Tab Number 1)**, which in my opinion is outdated. It should be understood that there have been advances in medicine that help healthcare providers provide early detection and early intervention for the complications of the secondary effects of immobility and brain injury, which includes but is not limited to deep vein thrombosis, pulmonary embolus, pneumonia, seizures, hydrocephalus and sepsis.

EXHIBIT A

According to updated research, patients in a permanent vegetative state with no purposeful motor or cognitive function that require a feeding tube can live from 7-12 years depending upon their age. This was published in Brain Medicine Principles and Practice 2006, page 253, **(Tab Number 2)**.

As a result, it is my medical opinion as a Board Certified Physiatrist that it is more probable than not that this patient will live between 7 and 12 years from the time of his brain injury, which occurred on 05/11/14. It is my medical opinion that because medical advances are progressing each year, it is not probable but is possible that this patient could live greater than 20 years.

This patient's future medical care, support services, and durable medical equipment are defined in the Continuation of Care section of this report. The medical necessity and cost for these items are based on:

1. My history obtained from the patient's mother.
2. My observation of the patient.
3. My review of the medical records.
4. Researched prices that were obtained in the state of Florida, catalogs, and from other current price sources.

Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/dec/14

EXHIBIT A