UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

                  Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF OF ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent specialized district,

                  Defendants.

_____/

**Expert Report
of
Melvin L. Tucker**

**Retention**

My name is Melvin L. Tucker.  I was retained by counsel for the plaintiff to review the use of force against Tavares Docher by St. Lucie County, Florida Deputies Christopher Newman, Clayton Mangrum, and Calvin Robinson which occurred on May 11, 2014.

I was asked to render my opinions as to whether the deputies violated applicable standards of care for dealing with a person exhibiting the signs that medical attention might be needed; whether the officers use of force was in keeping with established training; and whether the level of force used against Tavares Ocher was greater than other reasonable officers would have used in the same or similar circumstances in 2014.

**General Qualifications**

I am the former Chief of Police for the City of Tallahassee, Florida, having retired in 1994.

During a twenty-five year law enforcement career, I served as a Chief of Police in four cities, in three states and as an Agent with the Federal Bureau of Investigation.

1

**EXHIBIT B**

I served as an FBI Agent from 1969 to 1971 and during the time period from 1971 to 1994, I served as the Chief of Police for Morristown, Tennessee; Hickory, North Carolina; Asheville, North Carolina and Tallahassee, Florida.

I have taught criminal justice courses at colleges and universities across the United States. I served as an adjunct faculty member in criminal justice at Western Carolina University located in Cullowhee, NC; Florida State University, Florida A&M University and Tallahassee Community College located in Tallahassee, FL; Walters State Community College located in Morristown, TN; and the University of Maine located in Augusta, ME.

I held several law enforcement certificates, including the Advanced Certificate from the State of North Carolina and Basic Certificates from Tennessee and Florida.

I received a bachelor's degree from the University of South Florida, Tampa, Florida and a master's degree with honors from Appalachian State University, Boone, North Carolina.

I have authored forty-two articles on policing and criminal justice issues that have been published in legal, public administration, police trade magazines, and criminal justice professional journals.

I served as a member and Chairman of the North Carolina Criminal Justice Education and Training Council for three years and as a member and Vice-Chairman of the Florida Criminal Justice Standards and Training Commission for three years. In both capacities, I was part of a commission that was responsible for establishing uniform minimum standards for the employment and training of all full-time, part-time and auxiliary law enforcement officers and correctional officers in the respective states.

### Specific Qualifications to Provide Opinions on the Facts of this Case

I co-authored a book titled *Prevention and Investigation of Officer Involved Deaths*, which included chapters on policing with respect to emotionally disturbed persons, use of force and the phenomenon known as 'excited delirium."

I am familiar with the training protocols, standards, and model policies published by professional associations on use of force, dealing with emotionally disturbed persons, and dealing with people exhibiting the symptoms of "excited delirium."

I have trained thousands of law enforcement on the legal and professional standards regulating the use of force and was certified until September 2009 on most use of force disciplines.

I have qualified as an expert in law enforcement practices and procedures, including police use of force, ninety-seven times.

My current and complete curriculum vita is attached as Appendix A to this Report.

**EXHIBIT B**

## Objectivity

Over the past twenty years my trial and deposition testimony has been approximately 70% plaintiff and 30% defendants.  A current list of my trial and deposition testimony for the past four years is attached as Appendix B to this Report.

## Fees

My fee for analysis in this case was $6,000.00.  The fee was based upon a $150.00 hourly rate and an estimate that it would require approximately forty hours of work to review the materials provided and to prepare an Expert Report.

## Items Reviewed and Relied Upon in Development of Preliminary Opinions

Before developing my preliminary opinions in this case, I reviewed the materials listed in Appendix C attached to this report. The materials reviewed are of the type typically relied upon by consultants and experts when conducting an analysis of law enforcement issues and provided me with enough relevant data to develop my preliminary opinions to a reasonable degree of professional certainty.

## Methodology Utilized in Developing Preliminary Opinions

The methodology I employed is consistent with my review of the U.S. Supreme Court decisions *Daubert v. Merrill Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and in *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 147 119 S. Ct. 1167 (1999).

I understand that a non-scientific expert must be qualified to offer expert testimony by knowledge, skill, experience, training, or education. I have provided in this report both my general and specific qualifications as a basis for my expert testimony in this case.

I also understand that an expert's testimony must be relevant to the facts of the case and of assistance to the jury in understanding the evidence in the case.

To insure my methodology was reliable, and my conclusions were based upon reliable methodology, I did not assign credibility to any witness; reviewed sufficient data to reach conclusions to a reasonable degree of professional certainty; developed a set of material and relevant facts only after a review of all materials provided; and assumed those facts to be true solely for purposes of analysis.  I then analyzed those facts against a backdrop of the professional standards, practices, principles and protocols recognized, relied upon, and employed in law enforcement on the date of this incident.

The methodology I have used in this case is the same that I have utilized for several years.  The methodology has been accepted over ninety times by presiding judges in previous cases in which I have testified at trial.  The methodology is consistent with the methodology utilized by other experts in the field of law enforcement.

3

**EXHIBIT B**

I possess knowledge regarding the protocols that were recognized in the law enforcement profession prior to 2014 on dealing with emotionally unstable persons and with people exhibiting the symptoms of "excited delirium."

I also am familiar about what officers were taught prior to 2014 in training programs about what force is considered reasonable force in a particular set of circumstances.

These subjects are all matters beyond the knowledge of a typical juror and sufficiently tied to the facts of this case to be relevant and of assistance to the jury in understanding the evidence and resolving factual disputes.

## Summary of Assumed Facts

The facts in this case that are relevant to my opinions are summarized in Appendix D attached to this report.

## Preliminary Opinions

I have classified my opinions as preliminary opinions at this point because I have been advised that I will be provided with additional materials to review in this matter, including deputy depositions and the internal affairs investigation.  I therefore reserve the right to supplement my opinions after my review of the additional materials.

The basis and reasons for my preliminary opinions are premised upon my experience as a law enforcement officer; my education and training in law enforcement; my knowledge of law enforcement standards; my knowledge of law enforcement training and protocols for dealing with emotionally disturbed persons and people exhibiting the symptoms of "excited delirium" my knowledge of a phenomenon known in law enforcement as the "physiology of a struggle"; and my knowledge of law enforcement training and protocols on use of force; through consulting professional literature, and the facts of this case as determined by a comprehensive review of the materials listed in Appendix C.

My preliminary opinions are based upon a synthesis of the above.  I hold the following preliminary opinions to a reasonable degree of professional certainty.

## Preliminary Opinion #1

The force used against Tavares Docher on May 11, 2014 by SLCSO Deputies Christopher Newman, Clayton Mangrum and Calvin Robinson was excessive and unreasonable and was a greater level of force than other officers would have used in 2014 if confronted with the same, or similar, circumstances.

4

EXHIBIT B

**Training on Use of Force**

Since 1989, all law enforcement officers have been instructed in basic law enforcement training programs, in the legal training block, that the United States Supreme Court decided in *Graham v. Connor*, 490 U.S. 386, that the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application and the determination of reasonableness requires careful evaluation of the facts and circumstances of each case including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or another, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

The Court, in *Graham v. Connor*, demonstrated a high level of consideration for law enforcement officers and the difficulty involved in decision making in the field when it declared "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and the calculus of reasonableness must allow for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain and rapidly evolving, about the amount of force that is necessary in a particular situation."

All law enforcement officers in Florida were instructed in Basic Law Enforcement Training (BLET) prior to 2014 that using the elbow to strike a person in the temple, side of jaw, bridge of nose throat or back of head is likely to cause great bodily harm and is classified as deadly force (Page 291, FL BRT Curriculum, Volume 2, titled *Criminal Justice Defensive Tactics* attached as Appendix E).

**Analysis**

Here, before the deputies used force, the only crime Docher had committed was Disorderly Intoxication. In Florida, Disorderly Intoxication (when an intoxicated person causes a public disturbance in a public place) is a second degree misdemeanor. Thus, the severity of the crime Docher committed was minor. In this case, according to Deputy Newman, Docher did not have issues with being placed under arrest for Disorderly Intoxication and he initially complied with Newman's orders, and was handcuffed. However, when the deputies started to put Docher in a patrol car, Docher looked at all three deputies and took off. In response, all three deputies grabbed Docher and took him to the ground. While on the ground Deputy Mangrum delivered palm heel strikes to Docher's large muscle groups and Deputy Newman delivered elbow strikes to the right side of Docher's head (Page 6, SLCSO Case Supplemental Report #14-05401).

In this case, the use of elbow strikes delivered to Docher's head by Deputy Newman was contrary to use of force training all Florida law enforcement officers received prior to 2014 because it was an act of deadly force not justified under the circumstances. In fact, Docher was not criminally charged with Aggravated Assault (necessary to justify the use of deadly force) and instead was charged with simple assault/battery.

**EXHIBIT B**

In my opinion, a reasonable officer, under similar circumstances, would not have perceived Docher as an immediate threat of serious bodily harm or death at any time after the officers handcuffed him.

In my opinion, striking Docher in the head with an elbow strike two times when he was handcuffed and while there were at least three deputies available to control Docher was a greater level of force than other officers would have used under the same, or similar, circumstances.

In addition, citizen witness Merine Kanhai, stated she saw 3-4 deputies restraining an African American male and saw a deputy elbow the male in the face. The male was saying "Don't let them kill me" and the deputies were saying "stop resisting arrest." In her opinion the deputies were using excessive force (Page 21, SLCSO Case Supplemental Report #14-05401).

Ariana Kanhai, another citizen witness, stated she saw deputies holding a man on the ground. He wasn't moving much. The deputies kept hitting the man after he was handcuffed. The deputy by the man's head kept hitting him with his elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Zackery Taylor, the deputies were hitting the man with their elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

Finally, it would have been obvious to any reasonable officer on May 11, 2014, when considering the totality of the circumstances presented to Deputies Newman, Mangrum and Robinson, that Docher was having a medical emergency and needed immediate medical attention. Instead, Newman, Mangrum and Robinson used excessive force on an unarmed and handcuffed man in violation of training and standards.

## Preliminary Opinion # 2

Deputies Newman, Mangrum and Robinson knowingly violated clearly established law enforcement training on how to handle a person exhibiting the symptoms of "excited delirium" when they failed to treat the incident with Tavares Docher as a medical emergency and instead treated the incident as a control and arrest situation.

## Excited Delirium

Excited delirium is a controversial term used to explain sudden deaths, or serious medical ramifications, after restraint of individuals involved in a struggle with the police.

There has been no formal recognition of the phenomenon by the medical community and it is not recognized in the Diagnostic and Statistical Manual of Mental Disorders.

Even though the American Medical Association does not recognize this diagnosis as a medical or psychiatric condition, both the medical and law enforcement communities agree that excited delirium is a medical emergency no matter what the cause.

EXHIBIT B

All law enforcement officers in Florida were instructed in Basic Law Enforcement Training (BLET) prior to 2014 about the symptoms of excited delirium (agitation, aggression, hyperactivity, super strength, sweaty) and that when confronting a subject with these symptoms they should immediately seek medical attention because the subject could die suddenly (FRL BRT Curriculum: Volume 2, Criminal Justice Defensive Tactics, Pages 210 and 211 attached as Appendix F).

The International Association of Chiefs of Police (IACP), National Law Enforcement Policy Center, published a Model Policy titled *Excited Delirium* in January 2014 which was designed to provide guidance and direction to officers in the handling of individuals who are exhibiting the signs of excited delirium.

The IACP identified the symptoms as agitation, hyperthermia, profuse sweating, paranoid behavior, constant physical activity, exceptional strength, and unusual calmness after restraint.

According to the IACP officers confronting a subject exhibiting symptoms of excited delirium should have medical personnel on scene before initiating subject control and when subject is restrained they should avoid putting pressure on the subjects chest, neck, or head and should not attempt control by pinning the subject to the ground by using their body weight (IACP Model Policy titled *Excited Delirium* attached as Appendix G).

### Analysis

Just as law enforcement officers had to be trained in years past to distinguish between a combative drunk and a person in a diabetic crises, to make the decision as to which needs to go to jail and which needs to go to the hospital, the law enforcement community has long believed that the key to avoiding deaths, or serious medical ramifications, from excited delirium is to train law enforcement officers on the recognition of the symptoms of excited delirium so that early action can be taken.

Although law enforcement officers are not expected to be medical experts, they have been told in recent years to be alert for the symptoms of excited delirium syndrome such as hallucinations, extreme agitation, screaming, property damage, profuse sweating, cocaine use, glass breakage and bizarre behavior.[1]

The Force Science Research Center (FSRC) published training tips for handling excited delirium incidents in 2005 that identified the same symptoms and concluded that police officers needed to treat excited delirium as a medical emergency.[2]

According to the International Association of Chiefs of Police (IACP), incidents of excited delirium should be treated as a medical emergency rather than a criminal incident notwithstanding any criminal violations that may be involved. [3]

**EXHIBIT B**

According to Deputy Newman, Docher told him he had a few drinks, and Arabs were trying to kill his mother and him because they knew where the Arabs dropped the headless body in St. Lucie County.

In this incident, according to witness Leaha Boles, Docher was "delusional and paranoial" and "very sweaty" and not acting normal (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Samantha Gilewski, Docher "was pacing, nervous and delirious." "He was talking murders, ransom and rewards." (Page 21, SLCSO Case Supplemental Report #14-05401).

All of these are symptoms should have been characterized by Deputies Newman, Robinson and Mangrum as excited delirium and should have alerted them that they were dealing with a medical emergency.

## Preliminary Opinion # 3

Deputies Newman, Mangrum and Robinson knowingly violated clearly established law enforcement training on avoiding the basic physiology of a struggle because of the risk to a subject of death or serious medical ramifications.

### Basic Physiology of a Struggle

The U.S. Department of Justice, National Law Enforcement Technology Center, a National Institute of Justice Program, published a bulletin in June 1995 which described for law enforcement officers what is called the *Basic Physiology of a Struggle.*

Simply stated, a person lying on their stomach has trouble breathing when pressure is applied to the back. As their breathing becomes labored, they try to get up. Officers, not understanding and aware of the physiology of a struggle, interpret the subjects actions as resistance to their control and apply more weight and restraint which results in the subject having increased difficulty in breathing which is a natural reaction to oxygen deficiency – and the subject struggles more violently. The officers then apply more compression and restraint to subdue the subject until death or serious medical ramifications for the subject occurs (U.S. DOJ Bulletin attached as Appendix H).

### Analysis

In this incident, when Docher ran from the deputies he was already handcuffed. According to the SLCSO Reporting Officer Narrative, all three deputies (Newman, Mangrum and Robinson) were on Docher's back and he was taken to the ground. Docher was able to slide the handcuff on his right arm up to his elbow and was attempting to push himself off the ground lifting all three deputies. Robinson then applied a "leg ride" to gain control and Deputy Alonge arrived on the scene and assisted the other three deputies in keeping Docher on the ground (page 6 of SLCSO Reporting Officer Narrative in Case # 14-05401).

EXHIBIT B

According to Paramedic Jose Rosario, when he arrived on the scene he observed several deputies on top of a subject who was still struggling with them (page 13, SLCSO Case Supplemental Report in case # 14-05401).

According to Paramedic Thomas Sinclair, when he arrived on the scene he observed several deputies on top of a subject who was on the ground with a pool of blood around his head (page 14, SLCSO Case Supplemental Report, Case # 14-05401).

**Preliminary Opinion # 4**

Deputies Robinson and Mangrum failed in their responsibility to intervene to stop a fellow deputy from committing a clear violation of training and standards when the saw Deputy Newman deliver two separate elbow strikes to the head of Tavares Docher when they knew, or should have known, that deadly force was not justified under the circumstances they were confronted with.

**Analyses**

All law enforcement officers in Florida were instructed in Basic Law Enforcement Training (BLET) prior to 2014 that using the elbow to strike a person in the temple, side of jaw, bridge of nose throat or back of head is likely to cause great bodily harm and is classified as deadly force (Page 291, FL BRT Curriculum, Volume 2, titled *Criminal Justice Defensive Tactics* attached as Appendix E).

The use of elbow strikes delivered to Docher's head by Deputy Newman was contrary to use of force training all Florida law enforcement officers received prior to 2014 because it was an act of deadly force not justified under the circumstances.  In fact, Docher was not criminally charged with Aggravated Assault (necessary to justify the use of deadly force) and instead was charged with simple assault/battery.

Deputies Robinson and Mangrum should have known that striking Docher in the head with an elbow strike while he was handcuffed and while there were at least three deputies available to control Docher was excessive force and they should have intervened to stop Newman before he was able to deliver a second elbow strike to Docher's head.

Respectfully Submitted,

*Melvin L. Tucker [signature]*

Melvin L. Tucker
May 16, 2017

---

[1] Wecht, Lee, Van Blaricom & Tucker, *Investigation and Prevention of Officer – Involved Deaths*, Chapter 4, CRC Press, 2011
[2] Force Science News #29 titled *Training Tips for Handling Excited Delirium*, 10-7-05
[3] IACP National Law Enforcement Policy Center, Concepts and Issues Paper, *Excited Delirium*, April 2014

**EXHIBIT B**

Appendix A

**MELVIN L. TUCKER**
**Criminal Justice and Security Consultant/Trainer**
**5929 Fordland Drive**
**Raleigh, North Carolina 27606**

mtucker50@nc.rr.com
919 249-6592

# CURRICULUM VITAE

## EMPLOYMENT

- Litigation Consultant and Law Enforcement/Security Trainer 1994 – Present

## ELECTED OFFICE EXPERIENCE

- Councilmember, City of Morristown, Tennessee 2005 - 2008

## CRIMINAL JUSTICE EXPERIENCE

- Project Manager, Maine Community Policing Institute, Augusta, ME, 2000-2004
- Chief of Police, Tallahassee, FL, 1979 - 1994
- Chief of Police, Asheville, NC, 1977 - 1979
- Chief of Police, Hickory, NC, 1974 - 1977
- Chief of Police and Public Safety Director, Morristown, TN, 1971 - 1974
- Special Agent, Federal Bureau of Investigation, 1969 – 1971

## MILITARY EXPERIENCE

- United States Navy Reserve, Active Duty 1965-1969, Ensign to Lieutenant
- United States Navy Reserve, Reserve Duty 1969-1988. Lieutenant to Commander

## EDUCATION

- MPA - Public Administration, Appalachian State University; Boone, NC, 1977
- BA - Business Management, University of South Florida; Tampa, FL, 1965

## ACADEMIC APPOINTMENTS

- The University of Maine at Augusta; Augusta, ME; Adjunct, Criminal Justice, 2000-2004
- Florida A&M University; Tallahassee, FL; Adjunct, Criminal Justice, 1981-1994
- Florida State University; Tallahassee; FL; Adjunct, Criminal Justice, 1984

1

**EXHIBIT B**

- Tallahassee Community College; Tallahassee, FL; Adjunct, Criminal Justice, 1983-1984
- Western Carolina University; Cullowhee, NC; Adjunct, Criminal Justice, 1978-1979
- Walters State Community College; Morristown, TN; Adjunct, Criminal Justice, 1972-1974

## PUBLICATIONS

Books
- Wecht, Cyril; Lee, Henry; Van Blaricom, D.P.; and Tucker, Melvin; *Investigation and Prevention of Officer-Involved Deaths*, CRC Press, 2011

Articles
- Taylor, Roy & Tucker, Melvin, *Action Always Beats Reaction-Or Does It?* The ILEETA Journal, Winter Edition, Volume 5, Edition 3, 2015
- Tucker, Melvin L., *Defense Against Edged Weapons Training and "Unreasonable Fear,"* The ILEETA Journal, Fall Edition, Volume 4, Edition 3, 2014
- Merritt, J., Adams, R., Tucker, M., & McGuinness, J., *Law Enforcement Officer Association Political Candidate Endorsements*, The National Trooper Magazine, October 2012 Issue
- McGuinness, M., & Tucker, M., *Staying out of Trouble and Defending Yourself*, The Blue Review, Issue 5, 2010
- Tucker, M., *The Value of an Expert Witness in Police Litigation*, The Blue Review, Issue 4, 2009
- Tucker, M. & Wisecarver C., *Legal Authority for Preemptive Action*, The Tactical Edge, Spring 2008 Issue
- Overholt, Roger, Tucker, Melvin & Wisecarver, Chris, *Procedural Due Process and the Determination of Just Cause*, The Police Chief, Vol. LXXV, Number 1, January 2008
- Wisecarver, Chris & Tucker, Melvin, *The Force Science Reactionary Gap,* Law and Order, Vol. 55, No.8, September 2007.
- McGuinness, M & Tucker, M., *Police Use of Force: Federal and Colorado Standards*, The Colorado Lawyer, Vol. 36, No. 5, May 2007.
- Tucker, M., *Officer Involved Shootings–Where and When it Happened Matters*, The Tactical Edge, Winter 2007 Issue.
- Tucker, M., *On Liars, Mistletoe and Lack of Respect for Colleagues*, Guest Editorial, The Police Marksman, November/December 2006 Issue.
- Tucker, M., *Poor Training: The Real Story Behind The Headlines*, The Law Enforcement Trainer, Oct/Nov/Dec 2005 Issue.
- Tucker, M., *The Selection Process and the Role of Leadership,* Integrity Talk, International Association of Ethics Instructors, Vol. 5, Issue 2, Summer 2003
- Tucker, M. & Mears, R, *High Risk Police Operations Manual,* Augusta, ME, 10-01
- Tucker, M. & Mears, R, *The Investigation of Police Officers And The Fifth Amendment,* Maine Law Officer's Bulletin No. 21, Augusta, ME, 9-01

2

**EXHIBIT B**

- Tucker, M., *Warning: Use of Force Standards Have Changed,* The Florida Police Journal, Tallahassee, FL, 1-99
- Tucker, M, *Constitutional Rights of Public Employees in a Para-Military Organization,* Quality Cities, 1-94
- Tucker, M., *Crime Prevention Through Environmental Design (CPTED): The Tallahassee Model,* The Police Chief, Alexandria, VA, 10-93
- Tucker, M., *That Looming Reporter: Coping With a Cantankerous Press,* The Florida Police Chief, Tallahassee, FL, 11-91
- Tucker, M., *Military Joins the Drug Fight,* The Florida Police Chief, Tallahassee, FL, 8-90
- Willingham, Mark & Tucker, M., *Ethics and Values Training: A Multifaceted Approach,* The Police Chief, Alexandria, VA, 11-88
- Tucker, M., *Crack Squad Not Enough,* The Police Chief, Alexandria, VA, 6-88
- Kleman, Daniel A. & Tucker, M., *How to Build an Effective Working Relationship: The Manager/Police Chief Relationship,* Public Management, Tallahassee, FL, 6-88
- Tucker, M., *The Consequences of Liberalizing Gun Laws,* The Police Chief, Alexandria, VA, 3-88
- Tucker, Kimberly J. & Tucker, M., *How to Avoid Becoming a Defendant in a Civil Suit* (Part 2), The Florida Police Chief, Tallahassee, FL, 5-85
- Tucker, Kimberly J. & Tucker, M., *How to Avoid Becoming a Defendant in a Civil Suit* (Part 1), The Florida Police Chief, Tallahassee, FL, 4-85
- Tucker, M., *Law Enforcement Accreditation: It's about Time,* The Florida Police Chief, Tallahassee, FL, 3-85
- Hyder, Alan K. & Tucker, M., *Efficiency in Police Services: Traffic,* Law And Order, Wilmette, IL, 6-79
- Tucker, M & Bumgarner, B.L., *Attaining Public Confidence – The Police Department's Role,* The Administrator, Vol. IV, No. 1, 4-79
- Bumgarner, B.L. & Tucker, M., *Attaining Public Credibility Through Open Access,* The Administrator, North Carolina City and County Management Association, 1-79
- Tucker, M., *The Police Administrator and Affirmative Action,* Southern City, Tallahassee, FL, 1-79
- Tucker, M. & Hyder, Alan K., *Some Practical Considerations in Law Enforcement Education,* North Carolina Police Officer (Reprinted), 5-79
- Tucker, M., *The Problem Solving Task Force: Use of Participatory Management Methodology,* The North Carolina Justice Academy Reporter, 8-79
- Tucker, M. & Hyder, Alan, *Some Practical Considerations in Law Enforcement Education,* The Police Chief, Alexandria, VA, 8-78
- Tucker, M., *Zeroing in on Police Productivity,* North Carolina Police Officer, 7-77
- Tucker, M. & Hyder, Alan, *The Compact Police Car,* Southern City, 10-76
- Tucker, M., *The New Breed Police Chief* (Reprinted), Carolina Law And Order, 9-76
- Tucker, M., *The New Breed Police Chief,* The North Carolina Justice Academy Reporter, 8-76, Alexandria, VA
- Hyder, Alan K. & Tucker, M., *Economic Realities Force Effective Manpower Utilization,* The Police Chief, Alexandria, VA, 4-76

**EXHIBIT B**

- Tucker, M., *Fostering Inefficiency Through LEAA Grants*, <u>Western Piedmont Government News,</u> 12-75
- Tucker, M., *The New Breed of Police Officer,* <u>The North Carolina Justice Academy Reporter,</u> 12-75

## PROFESSIONAL AFFILIATIONS

- International Law Enforcement Educators and Trainers Association (ILEETA)
- National Tactical Officers Association (NTOA)
- American Society of Law Enforcement Trainers (ASLET)
- American Society for Industrial Security (ASIS)
- Police Executive Research Forum (PERF)
- International Association of Chiefs of Police (IACP)
- Maine Chiefs of Police Association (MCPA)
- Florida Department of Business Regulation, Hotels and Restaurants Security Task Force
- Florida Juvenile Justice Center; Commissioner
- Florida Police Chiefs' Association Ethics Committee
- State of Florida Technical Committee for Public Service Education
- Florida District 2, State Emergency Response Commission
- Advisory Board, Florida Criminal Justice Information System (CJIS)
- Advisory Board, Florida Interagency Narcotics Information Network (FININ)
- Florida Criminal Justice Standards and Training Commission; Vice-Chairman
- Florida Governor's Task Force on Law Enforcement
- Florida Police Chiefs Association (FPCA)
- North Carolina Governor's Crime Prevention Commission
- North Carolina Association of Chiefs of Police; Vice-President
- North Carolina Criminal Justice Education and Training Council; Chairman
- North Carolina Association of Chiefs of Police; Secretary-Treasurer
- North Carolina Governor's Law and Order Commission
- Technical Advisory Committee, University of North Carolina, Charlotte

## CERTIFICATIONS

- S&W 9MM Semi-Automatic
- Monadnock PR-24 Baton Basic
- Monadnock Expandable Baton Advanced
- Advanced M-26 and X-26 Taser
- Oleoresin Capsicum (OC)
- Police Defensive Tactics
- Law Enforcement Trainer (CLET), American Society for Law Enforcement Trainers (ASLET)
- Law Enforcement Ethics Instructor, National Institute of Ethics (NIE)

4

**EXHIBIT B**

- Certified Protection Professional (CPP), American Society for Industrial Security 1998-2001
- Law Enforcement Certificate, State of Florida 1979-1994
- Advanced Law Enforcement Certificate, State of North Carolina 1974-1979
- Jail Operations Certificate, State of North Carolina 1974-1977
- Law Enforcement Certificate, State of Tennessee 1971-1974

## AWARDS AND RECOGNITIONS

- *First Place Award*; *Use of Force Academic Test*, 14th Annual Seminar, American Society for Law Enforcement Training (ASLET); Orlando, FL, 2-01
- *Outstanding Public Administrator*, North Florida Chapter of the American Society Of Public Administration (ASPA), 4-93
- *Writing Excellence Award* for article, <u>That Looming Reporter: Coping With a Cantankerous Press</u>, Charles G. Wellborn Foundation, 10-92
- *Service Award*, Glenn Terrell Foundation, Tallahassee, FL, 5-90
- *President's Service Award*, United Way, Tallahassee, FL, 5-83
- *Freedom Award*, NAACP, Tallahassee, FL, 5-81
- *Service Award*, North Carolina Attorney General's Office, 12-79
- *Appreciation Award*, U.S. Secret Service, Tallahassee, FL, 9-79
- *Tennessee Law Enforcement Officer of the Year*, TN 1972

## LAW ENFORCEMENT AND SECURITY TRAINING AND CONSULTING

Since 1994, Chief Tucker has been training law enforcement officers in personnel issues, high-risk operations, conducting security surveys for businesses and government agencies, conducting agency evaluations, providing criminal justice and security consulting services and providing litigation support as an expert in police and security matters for both defense and plaintiffs.

## LITIGATION SUPPORT SERVICES

Chief Tucker has been retained in approximately 530 law enforcement and security cases. He has testified as an expert approximately 97 times in the following areas:

- Negligent hiring, retention, assignment, training, and supervision
- Use of less than lethal and lethal force
- Emergency vehicle operations
- Premises liability/Security Guard negligence
- Reasonable accommodation
- Free speech
- Probable cause/ reasonable suspicion
- Police personnel practices, officer conduct
- Race and sex discrimination
- Proper police procedures, criminal investigations

**EXHIBIT B**

He has provided litigation services in:

| | | | |
|---|---|---|---|
| Alabama | Alaska | Arizona | Arkansas |
| California | Canada | Colorado | Connecticut |
| District of Columbia | Florida | Georgia | Illinois |
| Kentucky | Louisiana | Maine | Maryland |
| Massachusetts | Michigan | Mississippi | Missouri |
| Montana | Nebraska | New Hampshire | New Jersey |
| New Mexico | New York | Nevada | North Carolina |
| Oklahoma | Ohio | Pennsylvania | Puerto Rico |
| South Carolina | Tennessee | Texas | Virginia |
| Washington | West Virginia | | |

## CRIMINAL JUSTICE TRAINING SERVICES

Chief Tucker conducts training seminars for officers, supervisors and managers of federal, state, county and municipal law enforcement agencies in the following areas:

- High-speed pursuit and emergency response
- Use of force
- Personnel practices
- Writing reports to reduce civil liability risk
- Legal and professional standards regulating police high-risk operations
- Auditing operations to reduce civil liability risk
- Civil liability awareness
- Standards for discipline

He has provided criminal justice training for the following organizations:

- The Henry C. Lee Institute of Forensic Science, University of New Haven, *The Crises Between the Police and People of Color*;
- American Bar Association (ABA) Conference in Tampa, FL on *Resolving The Crises*
- Duke Law Center on Law, Race and Politics, *Police Use of Force*
- North Carolina Conference of District Attorneys, *Conducting Investigations and Evaluations of Law Enforcement Officers Use of Deadly Force*, Raleigh, NC
- North Carolina Chapter of the Southern Police Institute Alumni Association, *Career Survival*, Conover, NC
- North Carolina Criminal Defense Lawyers Association, Continuing Legal Education Seminar, Cary, NC, *The Use of Law Enforcement Expert Testimony in Criminal Cases*
- Performance Institute, Arlington, Virginia, National Summit on Use of Force in Law Enforcement, *The Legal Standards of Use of Force*

**EXHIBIT B**

- Jefferson County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Hancock County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Hamblen County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Utah/Nevada FBI National Academy Graduates Association, *Use of Force, Standards & Threat Assessment*
- Morristown, TN Police Department, *Use of Force: Legal and Professional Standards*
- DOJ/COPS, Lewiston, Maine, *Use of Force and Investigation of Citizen Complaints*
- Houlton, Maine Police Department, *Use of Force: Legal, Professional and Ethical Standards*
- Police Executive Leadership Seminar, Lewiston, Maine, *The Police Departments Role in Homeland Security*
- Director's Conference, Regional Community Policing Institutes, Washington, D.C., *Surviving Federal Audits of Grants*
- The 13th Annual NASRO Conference, Orlando, FL, *Avoiding Liability While Serving As A School Resource Officer*
- The 2nd Annual Community Policing Conference, Washington, D.C., *Ethics and Integrity: The Selection Process*
- Augusta Police Department, Augusta, ME, *Emergency Vehicle Operations*
- Mid-Coast Police Chiefs Association, Brunswick, ME, *Ethics in Law Enforcement*
- National Troopers Coalition, Portland, ME, *Free Speech, Due Process, and Use of Force Investigations*
- Maine Department of Corrections, Charleston, ME, *Ethics and Integrity in a Corrections Setting*
- Tallahassee Police Department, Tallahassee, FL, *Writing Reports, Auditing, Training, and Understanding Concepts to Avoid Administrative and Civil Culpability*
- Pat Thomas Law Enforcement Academy, Quincy, FL; *Legal and Professional Standards Regulating Police Use of Force, Pursuit and Emergency Response*
- Bangor Theological Seminary, Bangor, ME; *Counseling Victims in Police Use of Force Cases*
- Maine Criminal Justice Academy, Vassalboro, ME; *Domestic Violence and Crimes Against the Elderly*
- Maine Mid-Coast Chief's Association, Wiscasset, ME; *High Risk Police Operations*
- Maine Mid-Coast Chief's Association, Rockland, ME; *High Risk Police Operations*
- Maine Criminal Justice Academy, Waterville, ME; *Civil Liability Awareness*
- Labor Relations Information System Seminar, Kissimmee, FL; *Standards For Discipline*
- National Expert Witness and Litigation Seminar, Hyannis, MA; *Police Use of Force*
- Labor Relations Information System, Orlando, FL; *Procedural Due Process and Just Cause*
- Maine EMS, Islesboro, ME; *Emergency Vehicle Operations*
- Public Employment Labor Relations Forum, Tampa, FL; *Constitutional Rights of Public Employees*

7

**EXHIBIT B**

- Florida Department of Law Enforcement, Tallahassee, FL; *Investigating Use of Force*
- Center for Advanced Law Enforcement Studies, Tampa, FL; *Excessive and Deadly Force: Law, Policy and Investigation*
- Florida Criminal Justice Executive Institute, Ft. Lauderdale, FL; *Personnel Issues*
- MCPI Leadership 2000 Seminar, Northport, ME; *Auditing Operations to Reduce Civil Liability Risk*
- Gulf Coast Community College, Panama City, FL; *Personnel Issues in Managing a Florida Law Enforcement Agency*
- Florida Police Chiefs and Florida Criminal Justice Executive Institute Annual Seminar, Tallahassee, FL; *Civil Liability, Manpower Allocation and other Personnel Considerations*
- Florida Criminal Justice Executive Institute: Fort Pierce, FL; *Police Personnel Use, Discipline Process, and Public Official Liability*
- New River Criminal Justice Academy, Radford, VA; *Policy Issues Relating to Substance Abuse Within Criminal Justice Agencies*
- Florida Criminal Justice Executive Institute, Tallahassee, FL; *Police Personnel Management*
- Lively Criminal Justice Training Academy, Advanced Instructor Training Series: Quincy, FL; *Police Vehicle Operations, Use of Force,* and *Vicarious Liability Concerns for Instructors*
- Annual Florida Police Chiefs' Seminar: Tallahassee, FL; *Police Patrol, Use of Force, Police Vehicle Operations,* and *Police Tactical Operations*
- Iceland Police Department; Reykjavik, Iceland, *Drug investigations, interdiction, and prevention strategies*
- Florida Criminal Justice Executive Institute, St. Petersburg Junior College, St. Petersburg, FL; Personnel *Issues and High Risk Management*
- Maine Police Chiefs' Association, Houlton, ME; *Police High Risk Operations* and *Vicarious Liability*
- Portland Police Department, Portland, ME; *Police High Risk Operations*
- Florida Marine Patrol, Tallahassee, FL; *Police High Risk Operations*
- Bay County Community College, Panama City, FL; *Police Raids, Stakeouts, Use of Force, Vehicle Operations*
- Escambia County Sheriff's Department, Pensacola, FL; *Police High Risk Operations*
- Broward Community College, Melbourne, FL; *Police Raids, Stakeouts, Use of Force, Vehicle Operations, Hostage Situations*
- O'Connell Corporation, Washington, D.C.; *Criminal Interrogation Techniques*
- Office of the State Attorney, 6th Judicial Circuit, Key West Florida, *Consultant on Police Code of Silence*
- Hillsborough County Sheriff's Department; Tampa, FL; *Police Civil Liability Awareness/High Risk Operations*

## CRIMINAL JUSTICE CONSULTING

Chief Tucker has provided criminal justice consultant services for the following organizations:

8

**EXHIBIT B**

- CNN Kate and John appearance on *Walter Scott Shooting*, North Charleston, SC
- CNN Wolf Blitzer appearance on *Walter Scott Shooting*, North Charleston, SC
- The Associated Press, *Deadly Force Issues since Michael Brown* incident Ferguson, MO
- CBS (Sixty-Minutes) *Police Shootings of unarmed African American males*
- The Associated Press, News Consultant, *Deadly Force Incidents Memphis Police*
- The Sarasota Herald-Tribune, News Consultant, *Off-Duty Officer Involved Shooting*
- The Palm Beach Post, News Consultant, *Policy Guidance, Training, Use of Less Than Lethal Weapons: Tasers*
- The Boston Globe, The Associated Press, The New York Times, The Washington Post, News Consultant, *Death of College Student by Pepper Ball Weapon following Red Sox Game*
- Camden and Rockport, Maine; *Efficiency/Manpower Utilization Studies of Police Departments*
- Louisville Courier-Journal; News Consultant, *Evaluation of Six Officer-Involved Shootings*
- The Florida Department of Lottery; *Review of Firearms Training and Deadly Force Policy*
- Jackson, MS; *Police Chief Selection Consultant*
- CBS program Eye to Eye With Connie Chung; News consultant, *Violence in America*
- CNN program Across America With Larry Woods; News consultant, *Drug Abuse Resistance Education*
- Cape Coral, FL; *Police Chief Selection Consultant*
- Cairo, GA; *Police Chief Selection Consultant*
- Cocoa Beach, FL Police Department; *Management Evaluation*
- Fort Walton Beach, FL; *Police Chief Selection Consultant*
- Orange City Police Department; Orange City, FL; *Management Evaluation*
- Edgewater, FL Police Department; *Management Evaluation*
- Bowling Green, KY; *Police Chief Selection Consultant*
- Hendersonville, NC; *Police Chief Selection Consultant*
- Texas League of Municipalities, Houston, TX; *Police Officer Bill Of Rights Consultant*
- U.S. Department of Justice, Nashua, NH *Race Relations and Racial Profiling*
- The Eighth Annual National Expert Witness and Litigation Seminar, Hyannis, MA *Police Use of Force: Myths and Realities*
- Labor Relations Information Personnel Issues Seminar, Orlando, FL; *Procedural Due Process and the Right to Be Heard*
- Labor Relations Information Systems Personnel Issues Seminar, Orlando, FL; *The Investigation of Police Officers and the Fifth Amendment*
- Labor Relations Information Systems Personnel Issues Seminar, Orlando, FL; *Procedural Due Process and the Determination of Just Cause*
- The American Criminal Justice Association, Pittsburgh, PA; *Police Discipline: An Innovative Process for Intra-Agency Corrective Response*

**EXHIBIT B**

## SECURITY TRAINING AND CONSULTING

During his law enforcement career Chief Tucker supervised crime prevention units in four police departments that provided security surveys of homes, businesses, and government buildings. He routinely reviewed construction plans for new businesses for compliance with the principles of crime prevention through environmental design (see *Crime Prevention Through Environmental: Design (CPTED): The Tallahassee Model,* The Police Chief, 10-93). He trained hotel, motel, and restaurant/lounge managers and apartment complex managers on crime prevention techniques, conducting security surveys, and calculating the risk of crime on their property. He served on the Florida Hotel, Motel, and Restaurants Security Task Force providing crime prevention techniques for the Task Force bulletin. He taught crime prevention strategies, concepts, and techniques at the university level as an adjunct faculty member. He also served on the North Carolina Governor's Crime Prevention Commission. In December 2002 he received training in Tel-Aviv, Israel from the Israeli Security Agency (ISA) on airport/airline security, threat assessment, doctrine development, and training requirements. A member of the American Society for Industrial Security (ASIS) and a former Certified Protection Professional (CPP), he has provided security consulting services and security training for the following organizations:

- Walters State Community College, Morristown, TN, *Campus Security Awareness*
- Consortium of Security Professionals, Chicago O'Hare Airport, *Security in a Mass-Transportation Environment/Role of State and Local Police in Homeland Security*
- Maine Post-Secondary Educational Institutions Security Directors Conference, Augusta, ME, *Campus Security*
- University of Maine Center Directors Conference, Augusta, ME, *Premises Liability Concepts, Risks Identification, Security Protocols*
- State of Maine Campus Security Summit, Colby College, Waterville, ME, *Campus Security Risks Assessments, Programs and Audits*
- Gardiner, ME Boys and Girls Club, *Security Evaluation*
- Seeds of Peace Center, Otisfield, ME, *Security Evaluation in preparation for Israeli/Palestinian youth conference*
- Florida Department of Management Services, Division of Facilities Management, Tallahassee, FL, *Security, Safety & Premises Liability*
- Latitude 44/Longitude 69 Restaurant, Islesboro, Maine, *Security Survey of Facility*
- The Florida Department of Revenue; Tallahassee, FL, *Security Survey of Facilities,* Miami, Tampa, and Clearwater offices
- Academy of Florida Trial Lawyers, Premises Liability Seminar, Tampa, FL; *The Role of Law Enforcement in Crime Prevention on Private Property*
- National Crime Prevention Institute, Reykjavik, Iceland; *Crime Prevention in the Future*
- Brett and DeHaven, Tallahassee, FL; *Security Survey of The Highpoint Center Office Complex*
- Florida Hotel & Motel Association, Tallahassee, FL; *Avoiding Liability in Premises Security*

10

**EXHIBIT B**

Appendix B

Melvin L. Tucker
Deposition/Trial Testimony

1.  <u>Chastity Davidson v. City of Statesville et al</u>
    United States District Court for Western District of North Carolina
    Statesville Division
    C.A. No. 5:10-CV-182
    Deposition/Plaintiff

2.  <u>Dalton Haley v. Washington, Green and Fulton County</u>
    United States District Court
    Northern District of Georgia
    Atlanta Division
    C.A. No. 1:11-CV-1883-TCB
    Deposition/Plaintiff

3.  <u>Jack Sayegh v. William Paterson University, et al</u>
    Superior Court of New Jersey
    Law Division – Passaic County
    Docket No. PAS-L-1304-10
    Deposition/Plaintiff

4.  <u>Joseph McAdam v. Officer Warmuskerken, Deputy Wilson, Deputy Davila, City</u>
    <u>of Ludington and County of Mason</u>
    United States District Court
    Western District of Michigan
    Southern Division
    Case No. 1:11 – cv – 00170
    Deposition/Plaintiff

5.  <u>Joanne Lose vs. Renters Paradise Realty, Inc, NJZ Enterprises, Inc</u>
    In the Circuit Court of the 11th Judicial Circuit
    Miami-Dade County, Florida
    Case No: 10-21450 CA 06
    Deposition/Plaintiff

6.  <u>Martin Robinson v. Lt. Jerome Barrow, et al</u>
    United States District Court
    Northern District of Ohio
    Eastern Division
    Case No: 1:11-CV-1609
    Deposition/Plaintiff

**EXHIBIT B**

7.   Dwayne Allen Dail v. City of Goldsboro, et al.
     United States District Court
     Eastern District of North Carolina
     Western Division
     Case No.; 5:10 CV 451-BHO
     Deposition/Plaintiff

8.   Estate of Jeffrey Scot Heinze v. City of Mesa, et al.
     United States District Court
     District of Arizona
     Case No. CVV 10-02385-PHX-SRB
     Deposition/Plaintiff

9.   Christopher Zamora v. City of Houston
     United States District Court
     Southern District of Texas
     Houston Division
     Civil Action No. 4:07-4510
     Trial/Plaintiff

10.  Matthew Olson v. Kenneth Dier, Elizabeth Morgan, Scott Goss, Robert Atkins,
     Scott Barnes and Craig Buth
     Middle District of Florida
     Orlando Division
     Case No.; 6:10-CV-01771-JA-DAB
     Deposition/Plaintiff

11.  Gerald Allmond v. North Carolina State Highway Patrol
     North Carolina Industrial Commission
     Raleigh, NC
     I.C. Docket No. TA-22537
     Deposition/Plaintiff

12.  Robert Putnam, Debra Putnam v. Sam's Club Puerto Rico
     USDC
     District of Puerto Rico
     C.A. No: 11-1325 (SEC)
     Deposition/Defense

13.  Winston Gaillard v. City of Mobile, et al
     USDC
     Southern District of Alabama
     Civil Action No. CV-112-228-WS-N
     Deposition/Plaintiff

**EXHIBIT B**

14.  <u>Anelle Wharton (Ellis) v. Officer Brett Lampris-Tremba, et al.</u>
     Second Judicial District Court
     County of Bernalillo
     State of New Mexico
     Civil Action No: CV-2010-06590
     Deposition/Trial/Plaintiff

15.  <u>Jesus Ornelas vs. C. R. Lovewell</u>
     USDC
     District of Kansas
     Civil Action No. 11-2261-JAR-KMH
     Deposition/Plaintiff

16.  <u>Donald Spadaro  vs. City of Miramar and Broward County Sheriff's Office</u>
     United States District Court
     Southern District of Florida
     CA 11-61607-CIV-COHN/Seltzer
     Deposition/Plaintiff

17.  <u>Veronica Lewis, Lance Lewis v. Bradenton Beach Police Department et al</u>
     United States District Court
     Middle District of Florida
     Tampa Division
     CA No. 8:11-CV-18-T-39AEP
     Trial/Defense

18.  <u>Breedlove vs Demings Orange County So et al</u>
     United States District Court
     Middle District of Florida
     Orlando Division
     CA No. 6:11 CV 2027 – ORL – 31 KRS
     Deposition/Plaintiff

19.  <u>Streater v. City of Charlotte, et al</u>
     United States District Court
     Western District of North Carolina
     Charlotte Division
     C.A. No. 3:11 CV 548
     Trial Plaintiff

20.  <u>Rolen v. City of Cleveland, et al</u>
     United States District Court
     Northern District of Ohio
     Eastern Division
     CA No. 1:12 CV 1914
     Deposition/Plaintiff

**EXHIBIT B**

21.   <u>Anthony Caravella v. City of Miramar, et al</u>
      United States District Court
      Southern District of Florida
      Case No. 11-61607-CIV-COHN/Seltzer
      Trial/Plaintiff

22.   <u>Leonora Macharia v City of Revere, et al.</u>
      United States District Court
      District of Massachusetts
      Case No. 1:09-CV-10391
      Trial/Plaintiff

23.   <u>Alan Loehle v. Georgia DPS and City of Atlanta</u>
      State Court of Fulton County
      State of Georgia
      Civil Action No. 10EV011568E
      Deposition/Plaintiff

24.   <u>Hollis v. City of Key West, FL</u>
      United States District Court
      Southern District Of Florida
      Key West Division
      Civil Action 12-10013-CIV
      Trial/Plaintiff

25.   <u>Beatriz Torres v. City of Greenville, et al</u>
      United States District Court
      District of South Carolina
      CA No. 6:12-1767-JMC
      Deposition/Plaintiff

26.   <u>Peter Paske v. Joel Fitzgerald, et al</u>
      United States District Court
      Southern District of Texas
      Houston Division
      CA No: H-12-2915
      Deposition/Plaintiff

27.   <u>Adam Wade Carter v. Wake County Sheriff, et al</u>
      United States District Court
      Eastern District of North Carolina
      Western Division
      CA 5:12-cv-00701-H
      Deposition/ Plaintiff

**EXHIBIT B**

28. <u>Tenisha Felio v. Christopher Hyatt, Karl Hydrick and City of Lawrenceville, GA</u>
United States District Court
Northern District of Georgia
Atlanta Division
CA 1:12-cv-04186-ODE
Deposition/Plaintiff

29. <u>Suzanne Wick v. Phillip Redmond and Ben Jenkins</u>
United States District Court
Western District of North Carolina
Statesville Division
CA No: 5:12-cv-00052-RLV-DSC
Deposition/Plaintiff

30. <u>Darwin Johnson v City of Fayetteville</u>
United States District Court
Eastern District of North Carolina
Western Division
CA No: 5:12-cv-00456-F
Deposition/Plaintiff

31. <u>Gladys Freeman v John Turner and Scotland Neck PD</u>
United States District Court
Eastern District of North Carolina
Western Division
CA No: 4:13-cv-129-F
Deposition/Plaintiff

32. <u>Charles Shelley v. Oddie Tribble</u>
United States District Court
District of South Carolina
Columbia Division
CA No. 3:11-3477-CMC
Trial/Plaintiff

33. <u>Ronald Armstrong v. Village of Pinehurst, et al.</u>
United States District Court
Middle District of North Carolina
CA No: 13 CVS 00455
Deposition/Plaintiff

**EXHIBIT B**

34. <u>Anthony Boschele v. David Rainwater and Chesterfield County SO</u>
    United Sates District Court
    District of South Carolina
    Florence Division
    CA No: 2013-CP-13-000185
    Deposition/Plaintiff

35. <u>Heather Minick, et al v. Metro Government of Nashville Davidson County ,et al</u>
    United States District Court
    Middle District of Tennessee
    Nashville Division
    CA No: 3:12-cv-00524
    Deposition/Plaintiff

36. <u>Abel Martinez vs. City of Pembroke Pines, et al</u>
    United States District Court
    Southern District of Florida
    CA No: 0:14 cv-61303
    Deposition/ Defense

37. <u>Rodney Mitchell v Sarasota County Sheriff's Office et al</u>
    United States District Court
    Middle District of Florida
    Tampa Division
    CA No: 8:14-cv-01376
    Deposition/Plaintiff

38. <u>Tanner Gates vs Officers Leonbruno and Gerardi, Willoughby Hills PD</u>
    Court of Common Pleas
    Cuyahoga County, Ohio
    CV 14 824344
    Deposition/Plaintiff

39. <u>Madel Rivero v Sheriff Steve Loftis, Greenville County SO</u>
    Court of Common Pleas
    County of Greenville
    State of South Carolina
    Case # 2013-CP-23-06522
    Deposition/Plaintiff/Trial

**EXHIBIT B**

40.   <u>Monte Stanford v Union County Sheriff's Department</u>
      Court of Common Pleas
      County of Union
      State of South Carolina
      Case No.:2013-CP-44-00227
      Deposition/Plaintiff

41.   <u>Shauna Smith v. Pt. Roger Jones</u>
      United Sates District Court
      Northern District of Ohio
      Case No. 1:13-CV-744
      Trial/Plaintiff

42.   <u>Vicki McKenney v. Nicholas Mangino, Cumberland County SO</u>
      United States District Court
      District of Maine
      CA No.: 2:15-cv-00073-JDL
      Deposition/Plaintiff

43.   <u>Arlean Brown vs. Brian Elliott, Jim Matthews, & Kershaw County SO</u>
      United States District Court
      District of South Carolina
      Columbia Division
      CA.: 3:14-cv-01188-JFA-PJG
      Deposition/Plaintiff

44.   <u>Williston Drayton vs. County of Charleston, et al.</u>
      United States District Court
      District of South Carolina
      Charleston Division
      CA No.: 2:14-CV-3488-RMG-BM
      Deposition/Plaintiff

45.   <u>June Morris v. City of East Orange, et al</u>
      Superior Court of New Jersey
      Essex County
      Docket # ESX-L-3896-13
      Deposition/Plaintiff

46.   <u>Dontrell Stephens v. Ric Bradshaw and PBCSO</u>
      United States District Court
      Southern District of Florida
      CA No.: 9:14-cv-80425
      Trial/Plaintiff

**EXHIBIT B**

47.   William Sadulsky v. Town of Winslow, et al
       United States District Court
       District of Maine
       CA No: 1:14-CV-01-GZS
       Trial/Plaintiff

48.   Corey Khansari v. City of Houston, et al
       United States District Court
       Southern District of Texas
       Houston Division
       CA N0: 4:13-CV-02722
       Trial/Plaintiff

49.   Kenneth Hunter, Rick Donathan, Jerry Medlin v. Town of Mocksville
       United States District Court
       Middle District of North Carolina
       CA NO: 1:12-cv-333
       Deposition/Trial/Plaintiff

50.   Willie Grimes vs. City of Hickory, et al
       United States District Court
       Western District of North Carolina
       Statesville Division
       CA No 5:14-CV-160
       Deposition/Plaintiff

51.   Spencer Mims Jr. vs City of Charlotte et al.
       General Court of Justice
       Superior Court Division State of North Carolina
       County of Mecklenburg
       2014 –CVS-23815
       Deposition/Plaintiff

52.   Veronica Dorato vs. Officer Martin Smith, et al.
       United States District Court
       District of New Mexico
       No: 1:14-CV-00365 JB-GBW
       Deposition/Plaintiff

53.   Jordan Jefferson v Thaddeus Reddish, City of New Haven et al
       United States District Court
       District of Connecticut
       CA 3:12-cv-01543-VLB
       Deposition/Plaintiff

**EXHIBIT B**

54.   <u>Reginald Newberne v. NC Department of Public Safety</u>
      General Court of Justice
      Superior Court Division
      Wake County, NC
      Trial/Plaintiff

55.   <u>Lissette Hernandez v. Bob Hansell et al</u>
      USDC
      Middle District of Florida
      Orlando Division
      CA NO: 6:14-cv-1351-ACC-DAB
      Trial/Plaintiff

56.   <u>Jeffrey Martin, et al v. Mississippi Dept of Public Safety</u>
      Circuit Court of Lee County, Mississippi
      CA No: CV 2013-021
      Trial/Plaintiff

57.   <u>Sara Knowlton vs. Richland County, Ohio, et al</u>
      USDC
      Northern District of Ohio
      Eastern Division
      CA N0: 1:15-CV-00210
      Deposition/Plaintiff

**EXHIBIT B**

Appendix C

Materials Reviewed

1.      Amended Complaint;
2.      Answer and Affirmative Defenses of St. Lucie County Fire District;
3.      Answer and Affirmative Defenses – Sheriff Mascara;
4.      Answer and Affirmative Defenses – Deputy Courtemanche;
5.      Answer and Affirmative Defenses – Deputy Robinson;
6.      Answer and Affirmative Defenses – Deputy Newman;
7.      Answer and Affirmative Defenses – Deputy Mangrum;
8.      Scheduling Order and Order Referring Case to Mediation;
9.      Emergency Medical Guidelines (Plaintiff's Exhibit #1 Rosario Deposition);
10.     St. Lucie County Fire District's Emergency Medical Guidelines for Ativan use (Plaintiff's Exhibit #2 Rosario Deposition);
11.     Deposition of Janice Docher-Neeley taken 2-2-16;
12.     Deposition of Jose Rosario taken 4-13-17 (volume 1);
13.     Five (5) discs containing police reports, articles, event reports, witness statements, CVS video/phone audio, 911 audio, audio/video witness statements and photos and witness statements;
14.     News article from WPBF 8-13-14;
15.     Statement of Mark Brown dated January 26, 2015;
16.     Statement of Leah Boles dated January 27, 2015;
17.     St. Lucie County Sheriff's Office Statement Form statement of Leah Boles dated 5-11-14;
18.     Statement of Samantha Gileweski dated January 14, 2015;
19.     Statement of Hardyal Bhagudas dated January 16, 2015;
20.     Statement of Shawn P. Mahoney dated 12-18-14;
21.     St. Lucie County Sheriff's Office Statement Form statement of Shaun Mahoney dated 5-11-14;
22.     St. Lucie County Sheriff's Office, Ft. Pierce, Florida Miranda Warning for Shaun Mahoney dated 5-11-14;
23.     Statement of Shannon Randolph dated 12-18-14;
24.     Numerous photographs of scene, Docher and deputies involved;
25.     St Lucie County Fire District Incident Report;
26.     Incident Report SLCSO dated 1-14-16;
27.     IA Files Responding Deputy Carmichael;
28.     IA Files Responding Deputy Mangrum;
29.     IA Files Responding Deputy Alonge;
30.     IA Files Responding Deputy Robinson;
31.     IA Files Responding Deputy Newman;
32.     Personnel Actions-Deputy Claylan Mangrum;
33.     Personnel Actions-Deputy Christopher Newman;
34.     Personnel File of Responding Deputy Alonge;
35.     Personnel File of Responding Deputy Mangrum;
36.     Personnel File of Responding Deputy Newman;

**EXHIBIT B**

37.   Personnel File of Responding Deputy Courtemanche; and

38.   Personnel File of Responding Deputy Robinson;

**EXHIBIT B**

Appendix D

Facts Assumed

At approximately 6:00 pm on Sunday, May 11, 2014, Mark Wayne Brown, an employee of the CVS Drug Store located at 301 NE Prima Vista Boulevard, Port St. Lucie, Florida, noticed a black male, later identified as Tavares Docher, in the CVS store.

According to Brown, Docher was talking loudly, not making any sense, saying that somebody was at his house threatening him, and he had change missing from his laundry room. Because of his concern about Docher's behavior, Brown called 911 and was advised deputies from the St. Lucie County Sheriff's Office (SLCSO) would be sent to him. Docher then walked out of the store. According to Brown, Docher was "higher than a kite" (Page 13, SLCSO Case Supplemental Report #14-05401).

At approximately 6:03 pm, SLCSO Deputies Christopher Newman, Clayton Mangrum and Calvin Robinson were dispatched to the CVS Store and made contact with Docher.

According to the deputies, Docher was acting intoxicated, was unsteady on his feet, speaking loudly and swinging his hands and arms. Docher was holding a screwdriver in his right hand which he dropped when commanded to do so by Deputy Mangrum (Page 6, SLCSO Case Supplemental Report #14-05401).

According to Deputy Newman, Docher told him he had a few drinks, and Arabs were trying to kill his mother and him because they knew where the Arabs dropped the headless body in St. Lucie County.

According to Deputy Newman, because Docher was able to tell them who and where he was, they decided to arrest Docher for disorderly intoxication instead of taking him into protective custody under the Baker Act (Page 6, SLCSO Case Supplemental Report #14-05401).

According to Newman, he told Docher to put his hands behind his back because he was arresting him for Disorderly Intoxication. According to Newman, Docher did not have issues with that, complied with Newman's orders, and was handcuffed. However, when the deputies started to put Docher in a patrol car, Docher looked at all three deputies and took off. In response, all three deputies grabbed Docher and took him to the ground. While on the ground Deputy Mangrum delivered palm heel strike to Docher's large muscle groups and Deputy Newman delivered an elbow strike to the right side of Docher's head (Page 6, SLCSO Case Supplemental Report #14-05401).

According to Deputy Newman, Docher tried to bite him so he delivered a second elbow strike to Docher's head (Page 25, SLCSO Case Supplemental Report #14-05401). Deputy Mangrum then called for Rescue to respond to treat Docher's injuries. Deputy Alonge then arrived on the scene and assisted in keeping Docher on the ground.

1
**EXHIBIT B**

According to Deputy Mangrum, before medical personnel arrived on the scene, he noticed Docher go limp so he checked for a heartbeat and breathing and placed Docher in the recovery position (Page 25, SLCSO Case Supplemental Report #14-05401).

After Medical arrived on the scene  and started treating Docher, Docher came to and started fighting again and Rescue gave him a shot and one minute later Docher was calm enough to be placed on a gurney and put in an ambulance (Pages 25 and 26, SLCSO Case Supplemental Report #14-05401).

According to citizen witness Merine Kanhai, she saw 3-4 deputies restraining an African American male and saw a deputy elbow the male in the face. The male was saying "Don't let them kill me" and the deputies were saying "stop resisting arrest."  In her opinion the deputies were using excessive force (Page 21, SLCSO Case Supplemental Report #14-05401).

Ariana Kanhai, another citizen witness, stated she saw deputies holding a man on the ground.  He wasn't moving much.  The deputies kept hitting the man after he was handcuffed. The deputy by the man's head kept hitting him with his elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Zackery Taylor, the deputies were hitting the man with their elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Leaha Boles, Doucher was "delusional and paranoial" and "very sweaty" and not acting normal (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Samantha Gilewski, Doucher "was pacing, nervous and delirious." "He was talking murders, ransom and rewards." (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Shannon Randolf, when she saw the incident Docher was on the ground with his hands behind his back and the cops "were beating the shit out of him

**EXHIBIT B**

# Defensive Tactics Techniques: Deadly Force Techniques

Appendix E

Deadly force is usually associated with the use of a firearm. However, certain empty-hand techniques and unconventional weapons can be used effectively in a deadly force encounter. Empty-hand techniques become deadly force when they have the capability of causing great bodily harm or even death. A good example is a ground fight that turns into a deadly threat when a subject attempts to choke or bite you, gouge your eyes, or grab your gun. If you cannot access a weapon, then an empty-hand technique may help stop or disable your attacker, giving you the chance to recover to a different position.

Some empty-hand techniques can become deadly force if applied to a specific target area of the body that is likely to result in great bodily harm or death. Some examples of deadly force techniques include the thumb strike, elbow strike, and eye gouge. *(DT501.3.T.)*

**OBJECTIVES**
DT501.3.T. Demonstrate the simulation of deadly force techniques

## Deadly Force Thumb Strike

Form a fist with your strong hand.

Extend your thumb past the middle knuckle of your index finger.

Squeeze your hand tightly so that the pad of the thumb pushes firmly against the index finger.

Allow it to curl upward to form a slight bend that will lock the middle knuckle of the thumb.

Using good control, deliver a strike to various areas of the subject. Some examples of striking areas include the throat and eyes. (See Figure 4-106)

The throat and eyes are two examples of effective target areas for a deadly force thumb strike.

## Deadly Force Elbow Strike

The deadly force elbow strike uses the tip of the elbow to target a specific area where great bodily harm may result. To be a deadly force strike, certain target areas must be stabilized.

Some target areas for a deadly force elbow strike include the following:

- temple
- side of jaw
- bridge of nose
- back of the head
- throat (See Figure 4-107)



Deadly force thumb strike    *Figure 4-106*

EXHIBIT B

# Defensive Tactics Techniques:
# Threat Assessment—Assessment and Response

**OBJECTIVES**

**DT501.3.A.1.** Identify the necessity of conducting a threat assessment.

**DT501.1.C.** Identify verbal and nonverbal cues in assessing threats.

**DT501.3.A.** Demonstrate officer presence.

**DT501.3.A.4.** Demonstrate the interview stance.

**DT501.3.A.5.** Demonstrate the offensive ready stance.

**DT501.3.A.b.** Identify relative positioning.

**DT501.3.A.3.** Demonstrate the slide step approach.

**DT501.3.A.2.** Demonstrate how to maintain a minimum reactionary gap.

**DT501.3.A.3.a.** Identify the danger zone.

**DT501.3.B.1.** Demonstrate hand clearing techniques.

**DT501.3.A.1.a.** Define *reaction time principle.*

**DT501.3.I.1.** Demonstrate evasion techniques.

**DT501.3.I.2.** Demonstrate redirection techniques.

Though it may be difficult to determine factors that constitute a specific threat, there are certain facts, circumstances, and conditions that, when taken together, may be perceived by an officer as threatening.

An officer's assessment of a perceived threat is critical for safety and influences his or her actions when dealing with a situation. The more information an officer has, the better prepared he or she will be to assess the situation. All factors, whether obvious or not, should be considered when assessing threats. *(DT501.3.A.1.)*

Officers must recognize that threats may be fluid and constantly changing. Circumstances must be continually analyzed for their threat potential.

## Subject Behavior

There are certain verbal and nonverbal cues that indicate the possibility of subject aggression or posturing. *(DT501.1.C.)*

Verbal cues may include abnormal stuttering, serious and specific swearing, and specific verbal threats.

Nonverbal cues may include the following:

- increased breathing and pulse rates
- cessation of all movement
- clenched fists and quivering hands
- refusal to show palms of hands
- reddened or flushed face
- expanding veins showing prominently on face and forearms
- shifting of shoulders or change of stance
- target glance
- ignoring the officer
- rapid, angry movements

## *Excited Delirium*

Officers should be aware of unusual symptoms exhibited by a subject upon initial contact or that may develop or intensify during the course of the confrontation. These symptoms may be indicators of serious issues, such as physical illness, mental illness, drug reaction or overdose, or post-traumatic stress disorder.

he unusual symptoms or behavior is usually attributed to a condition known as excited delirium. "*Excited delirium* is a state of extreme mental and physiological excitement characterized by exceptional agitation and hyperactivity, overheating, excessive tearing of the eyes, hostility, superhuman strength, aggression, acute paranoia, and endurance without apparent fatigue" (Lewinski, 2006).

A subject in a state of excited delirium could die suddenly and without explanation, a death sometimes referred to as Sudden Death Syndrome. Unfortunately, the death may be wrongly attributed to the actions of an officer or his or her use of certain levels of force.

When confronting a subject with unusual symptoms, an officer should immediately seek medical attention. Be careful of the position in which the subject is restrained. Take care to maintain an open airway, and ensure continuous breathing and proper circulation until medical help arrives.

## Environmental Factors

Some potential environmental factors that should also be considered in threat assessment may include weather, traffic conditions, terrain, presence of animals, presence of bystanders, and potential weapons.

## Presence

*Officer presence* is your ability to convey to subjects and onlookers that you are able and ready to take control. Subjects' and onlookers' reaction toward you depends on their perceptions of how you present yourself.

You should be aware of and interpret nonverbal communication. Some movements and gestures are clues to escalating aggression, for example, clenched fists, shifting feet, or hidden hands. Subjects also observe your actions to determine your attitudes and intentions. Officer presence is your first response to any situation. By simply arriving on the scene, an officer affects a subject or situation. *(DT501.3.A.)*

*Command presence* is the way you carry yourself. Your presence can determine whether a subject's resistance escalates or de-escalates. A good command presence projects an image of confidence in your skills and abilities to perform the task at hand. Important aspects of command presence include personal appearance (uniform and personal grooming), erect posture, and alertness and attention to surroundings.

## Stances
### Interview Stance *(DT501.3.A.4.)*

Stand with head, hips, and feet aligned.

Place your feet shoulder-width apart with the knees slightly bent.

Angle your body to the subject with the strong side away.

Place your hands above waist level. (See Figure 4-4)



Interview stance                    *Figure 4-4*

Appendix G

# IACP National Law Enforcement Policy Center
# EXCITED DELIRIUM
## Model Policy
## January 2014

## I.  PURPOSE

The purpose of this policy is to provide guidance and direction in the handling of individuals who may appear to law enforcement officers and others to be in a state of excited delirium (ExDS). This policy is part of a cooperative response protocol shared by this department, the emergency call center, Emergency Medical Services (EMS), and hospital emergency department staff. The coordinated activities and responsibilities identified herein are designed to enhance the response to incidents involving excited delirium.

## II.  POLICY

Rapid control of the subject and transfer to the care of emergency medical providers should be the primary objectives of law enforcement officers unless other action is necessary in order to protect officers or others.  The underlying causes of ExDS are not fully understood, although its common symptoms have been documented and witnessed by police officers. Persons exhibiting symptomatic behavior should be suspected of being the subject of a medical emergency that could result in sudden death.

## III. DEFINITIONS

*Excited Delirium Syndrome (ExDS):* A medical disorder generally characterized by observable behaviors including extreme mental and physiological excitement, intense agitation, hyperthermia often resulting in nudity, hostility, exceptional strength, endurance without apparent fatigue, and unusual calmness after restraint accompanied by a risk of sudden death.[1]

*Medical Syndrome:* A collection of behavioral and physiological signs and symptoms of a medical disorder known to frequently appear together but without a full understanding of their underlying cause or causes.

## IV. PROCEDURES

   A.  Initial Call
      1.  Calls associated with ExDS often include descriptions by complainants of wild, uncontrollable physical action, and hostility that comes on rapidly.
      2.  Where there is suspicion from the complainant that ExDS might be involved, call takers shall request the following types of information:
         a.  Specific behaviors of the subject

1

      b. Whether the subject has been or is using PCP, methamphetamine, cocaine, alcohol, or other mind-altering substances separately or in combination.

      c. Whether the subject has a history of mental or physical illness or substance use.

3. When information suggests ExDS, a sufficient number of officers to physically control the subject should be dispatched together with Advanced Life Support EMS personnel, all of whom shall be alerted to the possibility that the call may involve ExDS.

4. A supervisory officer should be dispatched to all such calls for service, when reasonably possible.

5. The caller should be kept on the line, unless it is unsafe or impractical so he or she can provide updated information about the subject that can be relayed to responding officers and emergency medical providers.

B. Assessment

While officers cannot diagnose ExDS, they should be cognizant of specific signs and characteristic symptoms. These may include one or more of the following.

1. Constant or near constant physical activity
2. Irresponsiveness to police presence
3. Nakedness/inadequate clothing that may indicate "self-cooling" attempts
4. Elevated body temperature/Hot to touch
5. Rapid breathing
6. Profuse sweating
7. Extreme aggression or violence
8. Making unintelligible, animal-like noises
9. Insensitivity to/extreme tolerance of pain
10. Excessive strength (out of proportion)
11. Lack of fatigue despite heavy exertion
12. Screaming and incoherent talk
13. Paranoid or panicked demeanor
14. Attraction to bright lights/loud sounds/glass or shiny objects

C. Control

Physical control must be affected quickly to minimize the intensity and duration of resistance and struggle, which often are direct contributors to sudden death.

1. When responding to a call involving possible ExDS, officers shall do the following:

      a. Eliminate unnecessary emergency lights and sirens.

      b. Ensure that an adequate number of backup officers have been dispatched to affect rapid control of the suspect.

      c. Ensure that EMS is on the scene or en route. Where possible, EMS should be on site when subject control is initiated.

2. When the individual is responsive to verbal commands, one officer should approach the subject and employ verbal techniques to help reduce his or her agitation before resorting to the use of force. The officer should

2

**EXHIBIT B**

    a. not rush toward, become confrontational, verbally challenge, or attempt to intimidate the subject, as he or she may not comprehend or respond positively to these actions and may become even more agitated or combative; and

    b. ask the subject to sit down, which may have a calming effect, and be prepared to repeat instructions or questions.[2]

3. Pepper spray, impact weapons, and electronic control weapons (ECWs) used in drive stun contact mode are normally ineffective due to the subject's elevated threshold of pain.

4. If an ECW is used in probe mode, the officer shall energize the suspect no longer than necessary to overcome resistance. The subject should be restrained as soon as practical while affected by ECW power.

5. Alternately, a physical takedown using a swarming technique is an effective means of obtaining compliance as long as an adequate number of officers are available. Lateral vascular neck restraint, if authorized, is another effective means of obtaining control. A coordinated restraint plan should be devised quickly before implementing these approaches.

6. Officers should use only those restraints that appear necessary to control the situation and only for the period of time required.

7. When restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck, or head.

8. Reasonable steps should be taken to avoid injury, such as moving the subject from asphalt to a grassy area to reduce abrasions and contusions.

9. Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.

10. Officers should check the subject's pulse and respiration on a continuous basis until transferred to EMS personnel. Officers shall ensure the airway is unrestricted and be prepared to administer CPR or an automated external defibrillator (AED) if the subject becomes unconscious.

11. If the subject becomes calm and breathing is not labored shortly during or after the application of restraints while officers are still gasping for air, it may be an indication that the subject is in jeopardy and requires immediate medical attention to avoid cardiac arrest.

12. Individual officers who encounter persons exhibiting symptoms of ExDS should adhere to the following guidelines.

    a. When there is no apparent threat of immediate injury to the subject or others, the officer should not attempt to take physical control of the subject. This would likely precipitate a struggle and exacerbate the subject's physical and emotional distress. The officer should wait for backup and EMS assistance before attempting to control the subject.

    b. If the subject poses a threat of death or serious bodily injury to the officer, others, or to him or herself, apart from the dangers inherent

**EXHIBIT B**

in ExDS alone, intervention should be taken using that level of force reasonably necessary to control the individual.

   c. If it can be determined that the subject has been under duress for an extended period of time, the symptoms of ExDS appear acute, and EMS is not readily available, the officer should consider affecting control and transporting the subject to the nearest emergency medical facility. This decision should be based largely on whether police backup and/or EMS assistance is forthcoming, and the officer's judgment as to his or her ability to gain control through the use of ECWs or similar means without undue personal risk of bodily harm.

D. Emergency Medical Response

   1. As soon as control is obtained, pre-staged EMS personnel should examine the subject and provide emergency medical aid as necessary, to include sedation and cooling as indicated.

   2. If sedation is authorized, officers shall work with EMS to control the subject for purposes of drug administration.

   3. Whenever possible, an officer should accompany the subject to the hospital for security purposes and to provide assistance as necessary.

E. Documentation

   1. Documentation of ExDS incidents is critical for purposes of post-incident personnel review and debriefing, training, creation of a historical record to respond effectively to any civil litigation that may arise, and to respond effectively to inquiries concerning the incident from the community and the media. Documentation should include, at a minimum,

      a. Conditions at the incident scene

      b. Description of the subject's behavior and its duration

      c. Description of what the subject said during the event

      d. Type of and duration of resistance

      e. Identity of officers at the scene

      f. Actions taken to control the subject

      g. Restraints used on the subject and the length of time applied

      h. Location of the restraints on the subject

      i. Response time and actions taken by EMS, including a list of drugs given to the patient

      j. Means of transport and total elapsed time of transport

      k. Behavior of the subject during transport

      l. Means of resuscitation, if appropriate

      m. Vital signs; especially body temperature

      n. Ambient temperature at the time of the incident (warm temperatures are associated with increased frequency of ExDS)

      o. Results of tests and medical assessments taken by EMS personnel and emergency medical staff

      p. Results of autopsy, if appropriate

      q. Information from relatives and friends of the subject that can provide insight to the potential causation of the incident

4

**EXHIBIT B**

     r.  Measures taken by EOC during initial receipt of the call for service, dispatch, and follow up

     s.  Analysis of incident and arrest reports and any other information from involved police personnel concerning the department's response to ExDS

     t.  Where in-car video cameras and related video recordings are available, they should be used to document the actions of the subject and officers during the incident

F.  Training

   1.  This department's training authority shall ensure that officers are properly prepared for such incidents, including early detection of ExDS, instruction in defensive tactics recommended for use when dealing with ExDS subjects, tactics and techniques that should be avoided, and protocols for interfacing with emergency medical responders.

   2.  Emergency call center staff shall be trained to recognize symptoms that may indicate that an incident involves someone experiencing ExDS.

**Acknowledgment**

This document was prepared by the IACP National Law Enforcement Policy Center, in conjunction with the IACP Police Physicians Section and the IACP Police Psychological Services Section.

**Endnotes**

[1] A broad based panel of experts, commissioned by the National Institute of Justice, US Department of Justice, concluded that "the consensus view of the panel's medical experts is that this syndrome is indeed real." Special Panel Review of Excited Delirium, Weapons and Protective Systems Technology Center, December 2011. This is not necessarily the view of the NIJ or USDOJ. However, the report illustrates the continuing debate on underlying causation rather than whether the syndrome, by any other name, exists.

The term "excited delirium" has been accepted by the National Association of Medical Examiners (NAME), the American College of Emergency Physicians (ACEP), and other medical experts but not by the American Medical Association or the American Psychiatric Association.

[2] While verbal de-escalation techniques should be employed before the use of force, due to the extreme fear, confusion, agitation, and panic characteristic of ExDS, these actions will not normally be adequate in efforts to gain compliance sufficient to apply restraints.

© Copyright 2014. Departments are encouraged to use this policy to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

Every effort has been made by the IACP National Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors.

This project was supported by Grant No. 2010-DJ-BX-K002 awarded by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the SMART Office, and the Office for Victims of Crime. Points

**EXHIBIT B**

of view or opinions in this document are those of the author and do not represent the official position or policies of the United States Department of Justice or the IACP.

IACP National Law Enforcement Policy Center Staff: Philip Lynn, Manager; Sara Dziejma, Project Specialist; Gregory Joy, Policy Advisor - Law Enforcement, Bureau of Justice Assistance, U.S. Department of Justice; and Bart R. Johnson, Executive Director, International Association of Chiefs of Police.

.

6

**EXHIBIT B**



U.S. Department of Justice

Office of Justice Programs

*National Institute of Justice*



# National Law Enforcement Technology Center

June 1995                                                                 A National Institute of Justice Program

# Positional Asphyxia—Sudden Death

*Major portions of this bulletin are drawn from a report prepared by the International Association of Chiefs of Police for the National Institute of Justice (NIJ), based on research conducted by Dr. Charles S. Petty, Professor of Forensic Pathology, University of Texas, and Dr. Edward T. McDonough, Deputy Chief Medical Examiner, State of Connecticut, and reviewed by the Less-Than-Lethal Liability Task Group.*

Police, sheriffs, and correctional officers have a limited and largely inadequate set of tools to use to safely subdue violent and aggressive subjects. Through NIJ's National Law Enforcement Technology Center (NLETC), the Federal Government is working to identify and support the development of a range of less-than-lethal technologies—from those suitable for one-on-one encounters to those that might be used for stopping fleeing vehicles. In a recent analysis of in-custody deaths, we discovered evidence that unexplained in-custody deaths are caused more often than is generally known by a little-known phenomenon called positional asphyxia.

This NLETC bulletin presents information relevant to positional asphyxia—i.e., death as a result of body position that interferes with one's ability to breathe—as it occurs within a confrontational situation involving law enforcement officers. We offer this information to help officers recognize factors contributing to this phenomenon and, therefore, enable them to respond in a way that will ensure the subject's safety and minimize risk of death.

The bulletin identifies factors found to precipitate positional asphyxia, and provides recommendations for ensuring a subject's safety and advisory guidelines for care of subjects. Information regarding the collection of potential evidence in cases involving positional asphyxia is also included. Through officer awareness and resultant action, it is anticipated that deaths attributable to this cause will be reduced.

Sudden in-custody death is not a new phenomenon—it can occur at any time, for a variety of reasons. Any law enforcement agency may experience a sudden in-custody death, and while rare, such deaths appear to be associated most often with the following variables:

- **Cocaine-induced bizarre or frenzied behavior.** When occurring while confined by restraints, cocaine-induced excited delirium (an acute mental disorder characterized by impaired thinking, disorientation, visual hallucinations, and illusions) may increase a subject's susceptibility to sudden death by effecting an increase of the heart rate to a critical level.

- **Drugs and/or alcohol intoxication.** Drug and acute alcohol intoxication is a major risk factor because respiratory drive is reduced, and *subjects may not realize they are suffocating.*

- **Violent struggle extreme enough to require the officers to employ some type of restraint technique.** Subjects who have engaged in extreme violent activities may be more vulnerable to subsequent respiratory muscle failure.

- **Unresponsiveness of subject during or immediately after a struggle.** Such unresponsiveness may indicate cardiopulmonary arrest and the need for immediate medical attention.

It is important to understand how preexisting risk factors, combined with the subject's body position when subdued or in transit, can compound the risk of sudden death. Information contained in this bulletin may help to alert officers to those factors found frequently in deaths involving positional asphyxia.

## Basic Physiology of a Struggle

A person lying on his stomach has trouble breathing when pressure is applied to his back. The remedy seems relatively simple: get the pressure off his back. However, during a violent struggle between an officer or officers and a suspect, the solution is not as simple as it may sound. Often, the situation is compounded by a vicious cycle of suspect resistance and officer restraint:

- A suspect is restrained in a face-down position, and breathing may become labored.

- Weight is applied to the person's back—the more weight, the more severe the degree of compression.

EXHIBIT B

- The individual experiences increased difficulty breathing.

- The natural reaction to oxygen deficiency occurs—the person struggles more violently.

- The officer applies more compression to subdue the individual.

## Predisposing Factors to Positional Asphyxia

Certain factors may render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position:

- Obesity.

- Alcohol and high drug use.

- An enlarged heart (renders an individual more susceptible to a cardiac arrhythmia under conditions of low blood oxygen and stress).

The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position.

## Advisory Guidelines for Care of Subdued Subjects

To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors contributing to positional asphyxia. Where possible, avoid the use of maximally prone restraint techniques (e.g., hogtying). To help minimize the potential for in-custody injury or death, officers should:

- Follow existing training and policy guidelines for situations involving physical restraint of subjects.

**Officer Subduing a Violent Suspect and How It Can Interfere With Breathing**



Subject's chest fully extended.

Breathing becomes labored due to pressure being exerted on subject's back.

Officer subdues violent suspect.

- As soon as the suspect is handcuffed, get him off his stomach.

- Ask the subject if he has used drugs recently or suffers from any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema.

- Monitor subject carefully and obtain medical treatment if needed.

- Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the individual to the emergency room, or call for an emergency medical team (EMT) unit if such signs are observed.

- Obtain medical care upon subject's request.

- If the subject is turned over to a detention facility, inform the facility's custodians of any preexisting medical conditions (cardiac, respiratory) or that the subject requested or needed medical treatment because of respiratory difficulty or because he became unconscious.

## Collection of Potential Evidence

Officers involved in confrontational situations should collect information that may later be of value in a civil or perhaps criminal action.

A use-of-force report should include details of how the individual was

2

EXHIBIT B

restrained. The following information should be included:

- What was the nature of the postarrest restraint procedure? Identify whatever type of restraint (including chemical incapacitants) was used.

- How long was the subject face down and/or restrained?

- How was the subject transported, and in what position was the subject during transport?

- How long did the transport phase last, and what observations were made of the subject's condition?

To reasonably establish the cause of death or serious injury, a broad range of factors must be examined:

- Nature of the confrontation.

- Weapon(s), if any, employed by officers.*

- Duration of the physical combat.

- System or type of postarrest restraint employed.

- Transportation of the subject: destination, duration, mode of transport, and position of subject during transport.

- Emergency room observations and actions, names of attending medical personnel.

- Postmortem examination (autopsy) of subject: nature of injuries, diseases present, drugs present, and other physical factors.

_____
*If any incapacitant was used (e.g., pepper spray), the delivery system should immediately be secured for possible analysis.

## Conclusion

To help minimize the risk of positional asphyxia, diligent observation and monitoring of subjects displaying any one or a combination of the described indicators are procedurally warranted. Furthermore, the use of maximal, prone restraint techniques should be avoided. If prone positioning is required, subjects should be closely and continuously monitored. By implementing such procedural protocols, the potential for in-custody deaths may be lessened.

### NLETC Bulletin

The *NLETC Bulletin* is designed as a forum for disseminating to the law enforcement and criminal justice communities the most current information on technologies relevant to your needs. We welcome your comments or recommendations for future *Bulletins.*

_____

The National Law Enforcement Technology Center is designing data bases to help respond to agencies that want to know who manufactures a specific product and what other agencies may be using that product. Your contributions to the Center's information network are important. What technologies or techniques are you using that you would like to share with colleagues? Please call or write to the National Law Enforcement Technology Center, P.O. Box 1160, Rockville, MD 20849, 800–248–2742.

NYPD's Guidelines to Preventing Deaths in Custody

- As soon as the subject is handcuffed, *get him off his stomach.* Turn him on his side or place him in a seated position.

- If he continues to struggle, *do not sit on his back.* Hold his legs down or wrap his legs with a strap.

- Never tie the handcuffs to a leg or ankle restraint.

- If required, get the suspect immediate medical attention.

- Do not lay the person on his stomach during transport to a station house or hospital. Instead, place him in a seated position.

- An officer should sit in the rear seat beside the suspect for observation and control.

The New York City Police Department (NYPD) has developed a training tape on positional asphyxia. The Department has agreed to make the tape available to interested law enforcement agencies. To request a complimentary copy, please send your written request on departmental letterhead, and a blank VHS tape, to the Deputy Commissioner of Training, NYPD, 235 East 20th Street, New York, New York 10003.

The National Law Enforcement Technology Center is supported by Cooperative Agreement #95–IJ–CX–K002 awarded by the U.S. Department of Justice, National Institute of Justice.

The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, Bureau of Justice Statistics, Office of Juvenile Justice and Delinquency Prevention, and Office for Victims of Crime.

EXHIBIT B

   
**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*

*Washington, DC 20531*

Official Business
Penalty for Private Use $300

BULK RATE
POSTAGE & FEES PAID
DOJ/NIJ
Permit No. G–91

EXHIBIT B