Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF of ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent special district,

Defendants.
_____/

DEPOSITION OF

CHRISTOPHER ERIK NEWMAN

VOLUME 1
Pages 1 through 76

Wednesday, May 31, 2017
10:00 a.m. - 11:43 a.m.

Phipps Reporting
1680 Southwest Bayshore Boulevard
Port St. Lucie, Florida  34984

Stenographically Reported By:
Patricia A. Lanosa, RPR, FPR, CSR

```
 1    APPEARANCES:

 2
      On behalf of Plaintiff:
 3
          SEARCY, DENNEY, SCAROLA
 4        BARNHART & SHIPLEY, PA
          2139 Palm Beach Lakes Boulevard
 5        West Palm Beach, Florida  33402-3626

 6        (561)686-6300
          BY:  ADAM S. HECHT, ESQUIRE
 7        ash@searcylaw.com

 8
      On behalf of Defendant:
 9
          PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
10        2455 East Sunrise Boulevard, Suite 1216
          Fort Lauderdale, Florida  33304
11        (954)462-3200
          BY:  SUMMER M. BARRANCO, ESQUIRE
12        summer@purdylaw.com

13
      On behalf of St. Lucie County Fire District:
14
          WILSON, ELSER, MOSKOWITZ,
15        EDELMAN & DICKER, LLP (Appearing via Phone)
          111 North Orange Avenue, Suite 1200
16        Orlando, Florida  32801
          (407)203-7592
17        BY:  JULIE TYK, ESQUIRE
          julie.tyk@wilsonelser.com
18

19

20

21

22

23

24

25
```

Page 3

```
 1

 2                       I N D E X

 3


 4
     Examination                              Page
 5

 6              VOLUME 1 (Pages 1 - 76)

 7   Direct            By Mr. Hecht              4
     Cross             By Ms. Tyk              70
 8
     Certificate of Oath                      73
 9   Certificate of Reporter                  74
     Read and Sign Letter to Witness         75
10   Errata Sheet (forwarded upon execution)  76

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1    The following proceedings began at 10:00 a.m.:

2            THE COURT REPORTER:  Would you raise your

3        right hand, please?

4            Do you solemnly swear that the testimony

5        you shall give today will be the truth, the

6        whole truth, and nothing but the truth?

7            THE WITNESS:  I swear.

8                CHRISTOPHER ERIK NEWMAN,

9    having been first duly sworn or affirmed, was

10   examined and testified as follows:

11                DIRECT EXAMINATION

12     BY MR. HECHT:

13       Q.   Could you please state your full name?

14       A.   Christopher Erik Newman.

15       Q.   What's your date of birth?

16            MS. BARRANCO:  Hold on.  Can we do that

17        off the record for confidentiality purposes?

18            MR. HECHT:  That's fine.

19            (Discussion off the record.)

20     BY MR. HECHT:

21       Q.   Currently where do you reside?  And I

22     don't need your exact address, just the city.

23       A.

24       Q.   Who is your current employer?

25       A.   St. Lucie County Sheriff's Office.

1     Q.   How long have you been employed by the
2  St. Lucie County Sheriff's Office?
3     A.   Coming up on four years.
4     Q.   Currently what is your position at the
5  St. Lucie County Sheriff's Office?
6     A.   I'm currently a detective in the criminal
7  investigations division.
8     Q.   How long have you held that title and
9  position for?
10    A.   I've held that title since November 15th
11 of last year.
12    Q.   Prior to being a detective, what was your
13 position at the St. Lucie County Sheriff's Office?
14    A.   Right before I made detective,
15 from June to November I was on the St. Lucie County
16 Sheriff's Office's -- they call it a Star Team --
17 which basically does the summer details.
18    Q.   The summer details?
19    A.   It's like just an enforcement; we help
20 with traffic, assist with the traffic unit.  Or if
21 they're having a bunch of burglaries, we go and
22 watch the neighborhood for burglaries.
23    Q.   And you said "June to November."  What
24 year was that?
25    A.   That was also 2016.

1        Q.   And prior to that position, what was

2   your --

3        A.   I was a road patrol deputy.

4        Q.   Is it correct to say when you initially

5   began your employment at St. Lucie County Sheriff's

6   Office, you were a road patrol deputy up

7   until June of 2016 when you became part of the Star

8   Team?

9        A.   Yes, sir.

10       Q.   After the Star Team you became a

11   detective.

12       A.   Yes, sir.

13       Q.   Are those the three positions that you've

14   held during the four years at St. Lucie County

15   Sheriff's Office?

16       A.   Yes, sir.

17       Q.   And in May of 2014 were you a road patrol

18   deputy?

19       A.   Yes, sir, I was.

20       Q.   Prior to joining the St. Lucie County

21   Sheriff's Office in approximately 2012 -- where did

22   you work before the St. Lucie County Sheriff's

23   Office?

24       A.   Well, to start with, in 1999 to 2009 I

25   worked for the Fort Pierce Police Department.  And

1    then from 2009 until I started with the St. Lucie

2    County Sheriff's Office, I worked for the Florida

3    Division of Alcoholic Beverages and Tobacco.

4         **Q.    Prior to working at the Fort Pierce Police**

5    **Department, did you have any other experience as**

6    **part of law enforcement?**

7         A.    No, sir.

8         **Q.    What year did you graduate high school?**

9         A.    '91.

10        **Q.    Where did you graduate high school?**

11        A.    Lincoln Park Academy.

12        **Q.    Is that in Fort Pierce?**

13        A.    It's in Fort Pierce.

14        **Q.    What did you do after high school?**

15        A.    For a while I was a mechanic.  And then I

16   worked for -- at the time it was TCI Cable

17   Division -- prior to going into the academy in '98.

18        **Q.    Where did you work as a mechanic?**

19        A.    I worked at my dad's business.

20        **Q.    What was that called?**

21        A.    It was called Newman Sons.

22        **Q.    And then the cable division company, what**

23   **sort of work did you do?**

24        A.    I started off as an installation

25   technician.  And then by the time I left, I was a

1    service technician where I was responsible for the

2    main cable lines.

3         Q.    How long were you -- how long did you work

4    at your dad's mechanic shop for?

5         A.    I want to say two years.

6         Q.    How long did you work at the cable company

7    for?

8         A.    Probably five and a half, six years,

9    before I went to the academy in '98.

10        Q.    Where did you go to the academy?

11        A.    At -- in Indian River County -- sorry --

12   St. Lucie County, Indian River Academy at the time

13   is what it was called.

14        Q.    That's a six-month academy.

15        A.    I believe it was.  I started in October of

16   '98, and I graduated from March of '99.

17        Q.    Did you go to any sort of college

18   university ever?

19        A.    No, sir.

20        Q.    Were you ever in the military?

21        A.    No, sir.

22        Q.    After graduating the academy, you began

23   working for the Fort Pierce Police Department?

24        A.    Yes, sir.

25        Q.    And you worked there for 10, 11 years?

Page 9

1      A.    Yes, sir, about 10 -- a little over

2      10 1/2.

3      **Q.    What was your position at the Fort Pierce**

4      **Police Department?**

5      A.    I started off as a road patrol officer.  I

6      did that for just under two years.  And then I was a

7      detective in special operations, which is basically,

8      like, gangs, drugs, vice crimes.  I did that for

9      just under eight years.  And that position when I

10     left, I was the training officer.

11     **Q.    When you say, "the training officer," tell**

12     **me what that means.**

13     A.    I was responsible for coordinating the

14     training and putting together the trainings for the

15     officers to keep the certification with FDLE.  Was

16     responsible for tracking FDLE certifications

17     involving the officers, and making sure all the

18     requirements were still certified.

19     **Q.    Why did you leave the Fort Pierce Police**

20     **Department?**

21     A.    Pay and hours.

22     **Q.    And when you say, "pay and hours," I'm**

23     **assuming you were being paid too little and working**

24     **too much.**

25     A.    Yes.

Page 10

```
 1              MS. BARRANCO:  It's always that combo,
 2       huh?
 3    BY MR. HECHT:
 4       Q.   Did you have an interest in working at
 5    Florida Division of Alcohol (sic) and Tobacco?
 6       A.   Yes, sir.
 7       Q.   How long did you work there for?
 8       A.   About four and a half years.
 9       Q.   And what did you do after the Florida
10    Division of Alcohol and Tobacco?
11       A.   I started off as a special agent with the
12    State of Florida, and my job was to investigate tax
13    evasion, alcohol violations.  Any kind of crime that
14    happened at any licensed business to sell alcohol,
15    tobacco, which included drugs, prostitution.
16       Q.   Is the Florida Division of Alcohol and
17    Tobacco different than ATF?
18       A.   ATF is federal.  Florida is statewide.
19       Q.   Florida took out the firearms part?
20       A.   Yes.
21       Q.   All right.  I understand.
22            Why is it you left Florida Division of
23    Alcohol and Tobacco?
24       A.   I was having to travel a lot because you
25    work for the state.  One day you would be in Miami,
```

Page 11

1    and two days later you would have to report to

2    Tallahassee or Pensacola, Jacksonville, Tampa.  I

3    had a young daughter, and I didn't like being away

4    that much.

5         Q.   So did you leave the Fort Pierce Police

6    Department, as well as the Florida Division of

7    Alcohol and Tobacco on your own terms?

8         A.   Yes.

9         Q.   You were not fired?

10        A.   No.

11        Q.   You were not asked to leave?

12        A.   No.

13        Q.   During the training that you received at

14   the police academy, as well as the Fort Pierce

15   Police Department, did you receive training in the

16   use of force?

17        A.   Yes, sir.

18        Q.   Did you receive training on what's known

19   as excited delirium?

20        A.   Not at the academy.  I believe when I went

21   through the academy back then, I don't really think

22   that was really highly talked about.  That was a

23   long time ago.

24        Q.   What about when you went to the Fort

25   Pierce Police Department?  Did they train you on

Page 12

1  excited delirium?

2       A.   I want to say probably near the end of my

3  career at Fort Pierce, that's when that term started

4  coming out.

5       Q.   Did you receive training on excited

6  delirium when you joined the St. Lucie County

7  Sheriff's Office?

8       A.   Yes.

9       Q.   And did you receive training when you

10 joined the St. Lucie County Sheriff's Office on use

11 of force?

12      A.   Yes.

13      Q.   During your entire law enforcement career,

14 have you ever been educated on the term physiology

15 of a struggle?

16      A.   Maybe not under that term.

17      Q.   During your entire law enforcement career,

18 have you been trained on how to restrain an

19 individual that is going to be placed under arrest?

20      A.   Yes.

21      Q.   And during your training as a law

22 enforcement officer, have you been trained in how to

23 properly keep an individual safe once they're

24 handcuffed and struggling with officers?

25           MS. BARRANCO:   Object to the form.   Go

1      ahead.  I'm just objecting to the form of the

2      question.  You could answer it.

3          A.   Well, I would like to say yes, but every

4  instance is different.

5    BY MR. HECHT:

6          **Q.   I understand that.  But I'm just wanting**

7  **to know if during your training, experience at the**

8  **St. Lucie County Sheriff's Office, or your time at**

9  **the Fort Pierce Police Department, if you received**

10 **training on how to handle an individual that is**

11 **placed under arrest in handcuffs, yet continuing to**

12 **struggle with officers.**

13         A.   Yes, we did do some training on that.

14         **Q.   Tell me about that training that you're**

15 **referring to.**

16         A.   When I came to St. Lucie County Sheriff's

17 Office, one of the things that we train on is -- and

18 this is for in the back seat of a vehicle -- is

19 the -- they call it -- I don't know what they call

20 it.  It's just a leg restraint rope that they used.

21 It's a nylon rope that we have that they issue to

22 everybody.  That when somebody is kicking out your

23 back window, or something like that.  We go through

24 a procedure where another deputy is with you, and

25 you basically put the rope -- you fasten the person

1   seat belted in the back seat.  You take the rope and

2   it pulls their feet together, and you basically put

3   it out the door, and then into your door so you

4   could hold their feet while you're driving.

5        Q.   And during your time at the St. Lucie

6   County Sheriff's Office, do officers have this leg

7   restraint in their vehicle at all times?

8        A.   Some do, yes.

9        Q.   In May of 2014 did you have this -- strike

10  that.

11            In May of 2014 did you have this leg

12  restraint device in your vehicle?

13       A.   They issued it, yes, I did.

14       Q.   Do you know if Deputy -- strike that.

15            Anytime during your employment at the Fort

16  Pierce Police Department, are you aware of anyone

17  ever made any accusations against you that you were

18  racially biased in the way in which you interacted

19  with individuals?

20       A.   I believe I had one complaint back when I

21  first started in '99, when I arrested somebody.  I

22  don't believe it ever went to an investigation.  A

23  supervisory inquiry was done, and it was found to be

24  false.

25       Q.   During your time at the Fort Pierce Police

1  Department, did you have any excessive force

2  complaints lobbied against you during the time that

3  you were working at the Fort Pierce Police

4  Department?

5       A.   Not that I'm aware of.

6       Q.   During the time that you've been employed

7  by the St. Lucie County Sheriff's Office, has anyone

8  made any accusations against you that you were

9  racially biased in your interactions with

10 individuals?

11      A.   Not that I'm aware of.

12      Q.   During the time that you've been employed

13 by the St. Lucie County Sheriff's Office, have you

14 had any excessive force complaints lobbied against

15 you during your employment at the St. Lucie County

16 Sheriff's Office?

17      A.   Not that I know of.  I've never been

18 contacted by IA for anything like that.

19      Q.   There was an incident that you were

20 involved in in 2014 where a man was opening or

21 closing his garage and you shot him.  Do you recall

22 that incident?

23      A.   Yeah.  I recall he had a gun, too.

24      Q.   And was there an internal affairs

25 investigation regarding that incident?

Page 16

1        A.    I imagine there would be.  I never gave a

2    statement directly to internal affairs.  I was doing

3    everything through the criminal side.

4        Q.    Do you know what the outcome of that IA

5    investigation was regarding you?

6        A.    I'm going to assume I was cleared because

7    I never received any discipline or anything.

8        Q.    I was just going to ask you that.  Were

9    you sanctioned or disciplined in any way as a result

10   of that incident?

11       A.    No, sir.

12       Q.    And the man that you shot, his name was

13   Mr. Hill; is that correct?

14       A.    Yes, sir.

15       Q.    During your time at the Fort Pierce Police

16   Department, or St. Lucie County Sheriff's Office, or

17   the Florida Division of Alcohol and Tobacco, have

18   you ever been disciplined or sanctioned in any way

19   regarding your use of excessive force?

20       A.    No.

21       Q.    The incident involving Mr. Hill, were you

22   sued in that case?

23       A.    Yes, I was.

24       Q.    Do you know what the outcome of that case

25   was?

1       A.    It's still pending.

2       Q.    **Based on all the training that you've gone**

3  **through during your career as a law enforcement**

4  **officer, would you agree with me that an elbow**

5  **strike to a person's temple is classified as deadly**

6  **force?**

7            MS. BARRANCO:  Object to the form.  Go

8       ahead.

9       A.    No, sir, I would not.

10  BY MR. HECHT:

11      Q.    **Would you agree with me that based on your**

12  **training and experience as a law enforcement**

13  **officer, that an elbow strike to a person's temple**

14  **is likely to cause great bodily harm?**

15            MS. BARRANCO:  Object to the form.  Go

16      ahead.

17      A.    No, sir, I would not agree.

18  BY MR. HECHT:

19      Q.    **Would you agree with me that based on your**

20  **training and experience as a law enforcement officer**

21  **that an elbow strike to a person's head is**

22  **classified as deadly force?**

23      A.    No, sir, I would not.

24            MS. BARRANCO:  Object to the form.

25  BY MR. HECHT:

Page 18

1      Q.   Would you agree with me, based upon all of

2  your training and experience as a law enforcement

3  officer, that an elbow strike to a person's head is

4  likely to cause great bodily harm?

5           MS. BARRANCO:   Object to the form.

6      A.   No, I would not agree.

7   BY MR. HECHT:

8      Q.   Would you agree with me based on all of

9  your training and experience as a law enforcement

10  officer, that striking a person with your elbow on

11  the side of their jaw is likely to cause great

12  bodily harm?

13           MS. BARRANCO:   Object to the form.

14      A.   No, sir, I would not.

15   BY MR. HECHT:

16      Q.   Would you agree with me that based upon

17  your training and experience as a law enforcement

18  officer, that striking an individual with your elbow

19  on the side of their jaw is classified as using

20  deadly force?

21      A.   No, sir.

22           MS. BARRANCO:   Object to the form.

23      A.    I would not agree.

24   BY MR. HECHT:

25      Q.   Would you agree with me that based upon

Page 19

1    all of your training and experience as a law

2    enforcement officer, that striking a person with

3    your elbow on the bridge of their nose is likely to

4    cause great bodily harm?

5              MS. BARRANCO:  Object to the form.

6         A.   I would not agree.

7     BY MR. HECHT:

8         Q.   Would you agree with me that based upon

9    all of your training and experience as a law

10   enforcement officer, that striking a person with

11   your elbow on the bridge of their nose is classified

12   as using deadly force?

13             MS. BARRANCO:  Object to the form.

14        A.   I would not agree.

15    BY MR. HECHT:

16        Q.   Would you agree with me that based upon

17   all your training and experience as a law

18   enforcement officer, that striking a person with

19   your elbow on their throat is likely to cause great

20   bodily harm?

21             MS. BARRANCO:  Object to the form.

22        A.   To the throat, yes.

23    BY MR. HECHT:

24        Q.   Would you agree with me that based upon

25   all of your training and experience as a law

Page 20

1    enforcement officer, that striking a person with

2    your elbow on their throat is classified as using

3    deadly force?

4              MS. BARRANCO:  Object to the form.

5       A.   Yes, any kind of strike to the throat is

6    deadly force.

7     BY MR. HECHT:

8       Q.   Would you agree with me that based upon

9    all of your training and experience as a law

10   enforcement officer, that striking a person with

11   your elbow in the back of their head is likely to

12   cause great bodily harm?

13             MS. BARRANCO:  Object to the form.

14      A.   It depends on where you're talking about

15   to the back of the head.

16    BY MR. HECHT:

17      Q.   Would you mind telling me where on the

18   head, if you were to strike someone with your elbow,

19   that would be classified --

20      A.   Well --

21             MS. BARRANCO:  Hold on.

22    BY MR. HECHT:

23      Q.   Let me ask the question again.

24             Would you mind telling me if you were to

25   strike an individual with your elbow on their head,

Page 21

1    **where on their head would that be likely to cause**

2    **great bodily harm?**

3            MS. BARRANCO:  Object to the form.  Go

4        ahead.

5        A.   To the back of the head where your skull

6    meets your neck definitely would cause harm.

7    BY MR. HECHT:

8        Q.   **Would it cause great bodily harm?**

9        A.   If enough force is applied to the back

10   where the neck and head meet, yes.

11       Q.   **And would you agree with me based upon**

12   **your training and experience that if you struck**

13   **someone with your elbow in the back of their head**

14   **that that would be classified as using deadly force?**

15           MS. BARRANCO:  Object to the form.

16       A.   If struck in the area where the head meets

17   the neck.

18   BY MR. HECHT:

19       Q.   **Then that would be classified as using**

20   **deadly force?**

21       A.   Yes, sir, I would agree to that.

22       Q.   **Do you know what a thumb strike is?**

23       A.   Not by that term, no, sir.

24       Q.   **You've never been trained during your**

25   **career as a law enforcement officer as to what a**

Page 22

1    **thumb strike is?**

2              MS. BARRANCO:  Object to the form.  Go

3         ahead.

4         A.   I have never heard that term before, sir.

5      BY MR. HECHT:

6         **Q.   Have you ever used your thumb in order to**

7    **gain control of an individual during a struggle?**

8         A.   My thumb?

9         **Q.   Yes.**

10        A.   No, I have not.

11        **Q.   According to the St. Lucie County**

12   **Sheriff's Office report during the interaction that**

13   **you had with my client, Tavares Docher, you applied**

14   **your right thumb to the nerve mass in Tavares**

15   **Docher's neck.**

16        A.   That's a pressure point.  I'm sorry,

17   that's just a different term from thumb strike.

18   Using your thumb on a pressure point, yes, we train

19   on that all the time.

20        **Q.   And what do you call that?**

21        A.   Pressure point.

22        **Q.   And where were you trained to give**

23   **pressure points in the neck?**

24        A.   Actually, from the academy all the way up

25   until now.

1      Q.    And my specific question is:  Where

2   physically on the neck are you trained to give a

3   pressure point using your thumb?

4      A.    The area we train, the two areas that are

5   on the neck, this one is called the hollow behind

6   the ear; where your jaw meets the ear, there is a

7   divot -- indentation in your jaw.

8            And the other one is underneath your jaw

9   kind of where -- I don't know if you could tell with

10   this -- where your throat meets your jaw there is

11   another hollow on the bone.  On the inside of your

12   jawbone, that's another pressure point.

13      Q.    Those two pressure point areas that you

14   were trained to use your thumb and apply pressure to

15   the nerve in those areas, would you classify that

16   technique as using deadly force?

17      A.    No, sir.

18      Q.    Would you classify the pressure points

19   that you just described using your thumb to apply

20   pressure to the nerve as likely to cause great

21   bodily harm to an individual?

22      A.    No, sir.

23      Q.    During your career as a law enforcement

24   officer, have you ever been an instructor -- strike

25   that.

1          **During your time as a law enforcement**

2   **officer, have you ever instructed other officers as**

3   **to what excited delirium is?**

4        A.   I have not conducted a class for other

5   officers, no.

6        Q.   **Have you conducted a course for anyone?**

7        A.   No, sir.  I did get a certificate to

8   instruct excited delirium, but I have not

9   instructed.

10       Q.   **When did you -- did you get a certificate**

11  **for that?**

12       A.   Yes, sir.

13       Q.   **When did you receive a certificate to**

14  **teach excited delirium?**

15       A.   I was with the Florida Division of

16  Alcoholic Beverages and Tobacco.  It would have been

17  the October prior to the year I joined the St. Lucie

18  County Sheriff's Office.  So maybe October of 2012.

19  I would have to look at my training file to be sure.

20       Q.   **And how long did that course last for, for**

21  **you to become certified?**

22       A.   That was the instructor symposium.  I

23  think it was an eight-hour class.  Again, I have to

24  look at my files to be sure.

25       Q.   **And during those eight hours where you**

Page 25

1    became certified as an instructor on excited

2    delirium, what was taught to you?

3         A.   Signs, symptoms, physiology of excited

4    delirium.

5         Q.   Why is it you received this certification

6    to teach excited delirium that you never actually

7    have taught it?

8         A.   No one's asked me to.

9         Q.   Are you still certified to teach excited

10   delirium?

11        A.   As far as I know, yes, sir.  I don't know

12   -- like I said, I have to look at my certificate.  I

13   don't believe there is a time limit on the

14   certification.

15        Q.   Based on your training and experience,

16   would you please share with me the signs and

17   symptoms of someone experiencing excited delirium?

18        A.   It would be an accelerated heart rate.

19   Usually somebody that cannot sit still.  Incoherent

20   speech.  Profuse sweating and overheating so much so

21   where they're stripping clothing to actually cool

22   off.  I don't really know how -- I would say

23   abnormally strong and high tolerance for pain.

24        Q.   Would you agree with me that based on your

25   training and experience as a law enforcement

Page 26

1    officer, that someone exhibiting signs and symptoms

2    of excited delirium is classified as a medical

3    emergency?

4              MS. BARRANCO:  Object to the form.  Go

5         ahead.

6         A.   Yeah, there is definitely a reason behind

7    it, yes, sir.

8    BY MR. HECHT:

9         Q.   So you would agree with me excited

10   delirium is classified as a medical emergency?

11             MS. BARRANCO:  Object to the form.  Go

12        ahead.

13        A.   Yes, sir.

14   BY MR. HECHT:

15        Q.   If you came in contact with an individual

16   who you believed to be experiencing -- strike that.

17             If you came in contact with an individual

18   who you believed to be experiencing excited

19   delirium, would you contact a medical professional?

20             MS. BARRANCO:  Object to the form.

21        A.   Absolutely.

22   BY MR. HECHT:

23        Q.   And why is that?

24        A.   Because the person needs medical help.

25        Q.   Based on your training and experience, if

1    **you came in contact with an individual who was**

2    **exhibiting the signs and symptoms of excited**

3    **delirium, and that person was not being Baker Acted,**

4    **and was not going to be transported in an ambulance,**

5    **would you place that individual in handcuffs?**

6            MS. BARRANCO:  Object to the form.  Go

7        ahead.

8        A.   If I was transporting the individual?

9      BY MR. HECHT:

10       **Q.   If you were not.**

11       A.   If I was not transporting an individual.

12   It depends on the actions of the people, if I felt

13   they were a danger to myself, themself, or the

14   public at large, then, yes.

15     BY MR. HECHT:

16       **Q.   If you came in contact with an individual**

17   **who was exhibiting the signs and symptoms of excited**

18   **delirium, that person was not being Baker Acted, and**

19   **was not being transported in the ambulance, and did**

20   **not commit a crime, would you place that individual**

21   **in handcuffs?**

22           MS. BARRANCO:  Object to the form.  Go

23       ahead.

24       A.   Yes, sir, I would stand by the original

25   answer.  If I felt they were a danger to themself,

Page 28

1   myself, or the general safety of the public, then

2   yes.

3     BY MR. HECHT:

4       **Q.   And assuming that you believed that that**

5   **individual was a danger to yourself or others, would**

6   **you call a medical professional prior to placing**

7   **them in handcuffs or after?**

8           MS. BARRANCO:  Object to the form.  Go

9       ahead.

10      A.   It depends on the situation.  If there is

11  time to call, there is time to call.  If not, you

12  call when everything is secure.  Because rescue will

13  not come to the scene anyway until the individual is

14  secured, if it comes to that point.

15    BY MR. HECHT:

16      **Q.   Okay, tell me about May 11, 2014, which is**

17  **the day that you had interaction with my client,**

18  **Tavares Docher.**

19          **What I'd like to know is:  What was your**

20  **shift, to begin, and kind of take me through your**

21  **interaction?**

22      A.   I don't actually remember what shift.  We

23  were on rotating shifts back then, I believe, where

24  we would work five -- five 8-hour days.  And one

25  week we would work 7 in the morning until 3 in the

Page 29

1   afternoon.  The next week you work 3 in the

2   afternoon until 11 at might.

3       **Q.    So this was -- May 11, 2014 was a Sunday.**

4       A.    And because of that schedule, I would have

5   to look back at a calendar on my old schedule to see

6   exactly what shift I was on.

7       **Q.    Okay, fair enough.  Tell me about what you**

8   **recall regarding when you came to the CVS.**

9       A.    I believe the call went out as a hang-up

10  from inside the CVS.  And I thought something was

11  said about someone thought they were trying to be

12  kidnapped.

13          When I arrived at CVS, Detective -- I'm

14  sorry -- Deputy Mangrum, and Deputy Robinson who was

15  being trained by Deputy Mangrum, were already on

16  scene.  They had already made contact with Tavares.

17  I don't know if they approached him, he approached

18  them.

19          As I drove up, I got out of my car and

20  started walking up to them; also I know Tavares had

21  a screwdriver in his hand.  And Deputy Mangrum and I

22  were asking him to put the screwdriver down, which

23  eventually he did.  He placed it on the ground, and

24  I kind of walked over and kicked it out of arm's

25  reach.  We determined he was the one -- that he was

1    inside -- I guess is it a CVS?

2         **Q.   Yes, sir.**

3         A.   He was inside a CVS and called from inside

4    and hung up and was talking about somebody that was

5    trying to kidnap him or something like that.

6              If I remember correctly, the manager of

7    the store was standing outside when we had our

8    initial contact with Tavares.  So we began talking

9    to him to see what was going on.  He could answer --

10   he gave us his name, date of birth, and where he

11   lived.  He knew that.

12             We asked him why he had the screwdriver.

13   And he said, "To protect himself."  We were trying

14   to find out who he was trying to protect himself

15   from.  And he said, "The Arabs."  And we said, "What

16   Arabs are trying to bother you?"  He said, "Not

17   Arabs; it's Arabs."  I said, "Okay.  Why do the

18   Arabs want to hurt you?"  He said, "Because I saw

19   them hide the body and I know where they dumped it

20   at up here in St. Lucie County."  I said, "Okay."

21   We started talking to him, and he was giving all

22   kinds of statements about being followed by black

23   vans and black helicopters.  And that -- I guess he

24   was staying -- from what I gathered from the

25   conversation, he was staying at his aunt's house in

Page 31

1    Port St. Lucie.  He did tell us he was a registered

2    sex offender out of Fort Lauderdale -- Broward

3    County, I believe.  We asked him why he was up here.

4    He said he had to do something with court.  I don't

5    remember ever verifying that because of what

6    happened.  So I asked him who drove him up here.  He

7    said his mother drove him up here and left.  And I

8    remember asking him where his family was he was

9    staying with, and he said, he didn't know.

10            He would go from having a normal

11   conversation with us to -- at one point there is a

12   small hedge on the south side of the parking lot,

13   and on the other side of that parking lot is a

14   sidewalk and Prima Vista Boulevard.  And I remember

15   at one point he looked behind the hedge; he said,

16   "There they go right there."  And there was nobody

17   there.  He did say he had been drinking.  We asked

18   him if he had taken any medications.  And he said he

19   did not take medications, from what I remember.

20            So I asked him if he had taken any kind of

21   illegal drugs.  I told him he wasn't in trouble if

22   he did, we just need to know.  And he said he didn't

23   take any.  I think he said it was Natural Ice.  He

24   said he had a couple of Natural Ices.

25            You know, at first when we were dealing

Page 32

1  with him it was hard, because he could answer --

2  quite clearly he could answer what day it was, the

3  year.  He knew who was president.  He knew who he

4  was.  He knew his date of birth.  He knew his

5  information.  We carried on a conversation to

6  determine if we were going to Baker Act him, or if

7  he was just on a binge, basically intoxicated.

8          The more we talked to him, the more he had

9  the little episodes where he would see things that

10 weren't there, like with the hedge, and he said a

11 black van was parked across the street -- I believe

12 at one point that was watching him.

13         And right before we went to put the

14 handcuffs on him to secure him, because we were

15 going to give him a Baker Act.  The conversation I

16 was having with him was, I believe he needed help,

17 and he was worried about going to jail.  And right

18 before we put the handcuffs on him, he looked up,

19 and there was a blank sky, and he said the Seal Team

20 Six was in the helicopter up there watching him.

21 Deputy Mangrum and I talked to him, and he actually

22 came to a state where he was carrying on a

23 conversation and he said, "Yeah, you know, I

24 probably need to get help.  I'm not in trouble,

25 right?"  I said, "No, sir, you're not in trouble."

1          I did explain to him, in order to

2     transport him to drive my car we had to put

3     handcuffs on him because that's policy.  And so we

4     placed the handcuffs on him and we walked him to the

5     back of my patrol car.

6          **Q.   All right.  Let me stop you there.  When**

7     **you arrived on scene, is it correct that Deputy**

8     **Mangrum and Deputy Robinson were already speaking**

9     **with Tavares?**

10         A.   Yes.

11         **Q.   And when you arrived, did it appear to you**

12    **that Deputy Robinson or Deputy Mangrum were in fear**

13    **of their life?**

14         MS. BARRANCO:  Object to the form.  Go

15         ahead.

16         A.   I don't know what they were thinking.  But

17    like I said, I walked up, he was holding a

18    screwdriver, being animated.  As he was talking,

19    Tavares Docher was being very animated with his

20    hands as he was talking.

21      BY MR. HECHT:

22         **Q.   Based upon your training and experience as**

23    **a law enforcement officer, aren't you trained to**

24    **identify if an individual is a threat to you or**

25    **other officers?**

Page 34

1            MS. BARRANCO:  Object to the form.  Go

2       ahead.

3       A.   As best as we can, yes.

4   BY MR. HECHT:

5       Q.   And when you arrived on scene, did you

6   quickly exit out of your vehicle to assist Deputy

7   Mangrum and Robinson?

8       A.   I wasn't running up there.  But yes, sir,

9   I parked my car and walked up there.

10      Q.   And when you arrived, did you believe that

11  at that time during the conversation that Deputy

12  Robinson and Deputy Mangrum were having with Tavares

13  Docher, that it appeared to you that Deputy Robinson

14  and Mangrum were in fear of their life?

15           MS. BARRANCO:  Object to the form.

16      A.   I would have to ask them.  But my concern

17  was the screwdriver in his hand and that we were

18  within 6 to 12 feet of Mr. Docher -- of Tavares.

19  BY MR. HECHT:

20      Q.   And I certainly did ask Deputy Robinson

21  about whether he was in fear for his life, and I

22  certainly will ask Deputy Mangrum.

23           But my question for you is:  Did it appear

24  to you that those two officers when you initially

25  arrived were in fear for their lives based upon the

1    interaction that you saw them having with Tavares

2    Docher?

3         A.   I don't know what their fears or concerns

4    were.  Like I said, I saw somebody with a weapon in

5    their hand, and that concerned me to try to get him

6    to drop that screwdriver.

7         Q.   Did it appear to you when you arrived on

8    scene that Tavares Docher was threatening Deputy

9    Mangrum and Deputy Robinson with that screwdriver?

10        A.   It did not appear that he was threatening

11   anybody.  But like I said, with that close distance,

12   and the way he was being animated, and the

13   screwdriver in his hand, it could have easily turned

14   into something that would have very much concerned

15   me, which is why we try to deescalate before it

16   escalates.

17        Q.   And I understand there is many

18   possibilities that were going through your mind.

19   But my specific question is:  When you arrived on

20   scene, did it appear to you that Tavares Docher was

21   threatening Deputy Robinson or Deputy Mangrum with

22   that screwdriver?

23             MS. BARRANCO:  Object to the form.  Go

24        ahead.

25        A.   No, sir, it's not like he had it raised

1  above his head, you know, in a manner to strike

2  them.  It was just a concern because it was his

3  actions, the animation, and the reason why we got

4  the call, the hang-up, somebody accusing of being

5  kidnapped, and close proximity with something that

6  could be used as a deadly weapon.

7      BY MR. HECHT:

8      **Q.   When you approached Deputy Mangrum and**

9  **Deputy Robinson, what was the first thing that you**

10  **did when you approached those two officers?**

11     A.   I think the first thing I did -- I mean, I

12  can't be 100 percent sure -- my main concern was

13  just talking to Tavares.  I had him drop the

14  screwdriver.  I believe Deputy Mangrum was already

15  talking to him about it.

16     **Q.   Did he drop the screwdriver?**

17     A.   After a few moments, yes, he did.

18     **Q.   At that point were you in fear for your**

19  **life?**

20     A.   No, sir.

21     **Q.   During your initial interaction with**

22  **Tavares Docher in the parking lot of CVS, did you**

23  **ever identify to yourself whether Tavares Docher was**

24  **experiencing excited delirium?**

25     A.   I mean, honestly, he gave some symptoms

Page 37

1    that could have been given as that.  But in my

2    experience I've never seen anybody go up and down

3    that way, so it was hard for me to tell on the

4    limited interaction we had.

5         Q.   Did you ever make a determination during

6    this entire interaction that you spent with Tavares

7    Docher whether he was experiencing excited delirium?

8         A.   I never made a determination, no, sir.

9         Q.   Why not?

10        A.   I honestly -- when he started talking

11   about delusionary persons, and items in the area,

12   and the paranoia, I honestly felt like he just

13   needed help.

14        Q.   Prior to Tavares Docher being placed in

15   handcuffs, did you ever fear for your life?

16        A.   No.

17             MS. BARRANCO:   Object.

18        A.   No, I did not fear for my life.  But you

19   always have a concern, especially dealing with

20   somebody that you are having indications they may

21   have -- they may be mentally unstable, or be having

22   an episode of some sort, that you're always on your

23   guard.

24   BY MR. HECHT:

25        Q.   And did you make a determination if

Page 38

1   Tavares Docher was having any sort of mental health

2   concern at that period of time when you initially

3   made contact with him?

4           MS. BARRANCO:  Object to the form.  Go

5       ahead.

6       A.   After the initial contact, I believe he

7   was just drunk.  After speaking to him, I believe he

8   was having some sort of mental issue and that he

9   needed help.

10  BY MR. HECHT:

11      Q.   Did you contact an ambulance or a medical

12  health professional after you determined that he

13  needed help?

14      A.   No, sir.

15      Q.   Why not?

16      A.   Because as of normal dealing with somebody

17  that we're pretty much determined that we're Baker

18  Acting, we transport, perform a law enforcement's

19  Baker Act, transport them to the nearest receiving

20  facility.

21      Q.   So you did make a determination you were

22  going to Baker Act Tavares Docher?

23      A.   That was my recollection of what we did.

24  Because I remember having a conversation with him,

25  as I was putting the handcuffs on him at the back of

Page 39

1    Deputy Mangrum's car, that he was worried about

2    going to jail.  And I told him he was not going to

3    go to jail.  I told him, I think he needed help, so

4    we were going to take him to see a doctor.

5         **Q.   Do you know why -- in the police report it**

6    **states that Deputy Newman also said Docher was able**

7    **to say who and where he was.  Therefore, they did**

8    **not see Baker Act as a means to the end?**

9         A.   I did not write that report, and I did not

10   make that determination to arrest Tavares on that

11   incident.  I never wrote a report.  Those decisions

12   were made after the fact.

13              And Deputy Mangrum and I were very adamant

14   that at that point when we put handcuffs on

15   Mr. Docher, he was going to go to a Baker Act

16   facility.  Like I said at the beginning of the

17   initial contact, we both thought he was just drunk.

18   But after talking with him for a few moments, he --

19   it was honest -- it was plain to see he needed some

20   help.

21        **Q.   So is it your position that the report**

22   **where it states:  "They did not see Baker Act as a**

23   **means to the end," that that is an incorrect**

24   **statement?**

25              MS. BARRANCO:  Object to the form.  Go

Page 40

1       ahead.

2       A.   I don't know why it was written that way.

3   That was a report written by another deputy that was

4   not on scene, and I'm sure he got the facts

5   secondhand.

6            So like I said, the determination to file

7   an arrest report and all that was not --

8   BY MR. HECHT:

9       **Q.   Would you agree with me that the statement**

10  **regarding not to Baker Act Tavares Docher is not a**

11  **true statement?**

12           MS. BARRANCO:   Object to the form.   Go

13      ahead.

14      A.   Like I said before, yes, initially, I

15  would say he was.   But after dealing with him, he

16  was a Baker Act.

17  BY MR. HECHT:

18      **Q.   Prior to you handcuffing Tavares Docher,**

19  **did you believe that Tavares Docher was exhibiting a**

20  **level of force whereby it would be necessary to**

21  **justify the use of deadly force?**

22      A.   Prior to handcuffing?

23      **Q.   Yes, sir.**

24      A.   No, sir, because we didn't use deadly

25  force.

1      Q.   I understand.  So was it you that made the

2   determination that you would Baker Act Tavares

3   Docher?

4      A.   If I recall correctly, like I said, this

5   has been a long time, I believe that Detective

6   Mangrum and I kind of had like a little sidebar to

7   each other, while talking with him, that we were

8   trying to see what we wanted to do.  I think we both

9   came to the determination that after talking with

10  him, and him talking about that hallucinations, and

11  things like that, that we really met Baker Act, and

12  we were going to Baker Act him.

13     Q.   Where were you planning on taking him?

14     A.   At that point it was either going to be

15  New Horizons, or I always mess up the name,

16  St. Lucie Hospital on Walton Road.  I believe I was

17  going to take him to New Horizons.  At that point it

18  would have been closer than driving down Walton

19  Road.

20     Q.   And is it correct that Tavares Docher

21  actually was in agreement with you to be Baker

22  Acted?

23     A.   Yes.

24     Q.   And he specifically said to you, "I need

25  to get help"?

Page 42

1      A.    Well, I told him I need -- I thought, I
2  believed he needed to get help, and he agreed that
3  he would go see a doctor.
4      Q.    And what was his demeanor like at that
5  point in time?
6      A.    He had -- he was not incoherent or, you
7  know, being as animated as he was.
8      Q.    Did you feel that he was a threat to you
9  at that time right before you handcuffed him?
10      A.    Not -- how would I say this?  Because of
11  his actions earlier, I did not want to let my guard
12  down, but at the same time I didn't think that he
13  was going to, you know, fight, or be a problem, or
14  -- but like I said earlier, your guard is still up.
15      Q.    And you placed him in handcuffs, correct?
16      A.    Yes, sir.
17      Q.    Behind his back?
18      A.    Yes, sir.
19      Q.    And why did you place him in handcuffs
20  behind his back?
21      A.    Because it was our policy that we
22  transport anybody in our vehicle to, especially a
23  Baker Act or anything like that, that they are
24  handcuffed in the back before they are placed in the
25  back of your patrol car.

Page 43

1     Q.   Once you placed Tavares Docher in
2   handcuffs behind his back, was he in police custody?
3     A.   Yes, sir.
4     Q.   Was he arrested at that point in time?
5     A.   No, he was not arrested.
6     Q.   Was he free to leave at that point in
7   time.
8     A.   He was the subject of the law enforcement
9   Baker Act.
10    Q.   Does that mean that he's free to leave?
11    A.   No, sir.
12    Q.   So if Tavares Docher, after being
13   handcuffed behind his back said to you, "I'm no
14   longer in agreement with this.  I do not want to be
15   Baker Acted," he would not have been free to leave,
16   correct?
17        MS. BARRANCO:  Object to the form.  Go
18     ahead.
19    A.   No, he would not.
20   BY MR. HECHT:
21    Q.   At that point in time, had you placed
22   Tavares Docher under arrest for disorderly
23   intoxication?
24    A.   I don't believe I ever placed him under
25   arrest for any offense.  The handcuffs went on when

Page 44

1    we decided he was going to be -- at the end when we

2    determined he met criteria for Baker Act.

3         Q.   I just want to be clear.  You keep saying

4    "the end."  I know there was a struggle that ensued.

5    And my questioning is not yet there.  We're still at

6    the point when you're putting the handcuffs on him.

7    Do you understand that?

8         A.   Yes, sir.  I meant at the end of our

9    interview process with him.  I should clarify that.

10   I'm sorry.

11        Q.   Okay.

12        A.   When we were done talking to him, and our

13   interview process was over, we determined that he

14   was not disorderly, that he was actually -- he

15   needed help.

16        Q.   All right.  So it's your testimony here

17   today that when you placed the handcuffs behind his

18   back and were going to put him in the police car,

19   that you had not arrested him for disorderly

20   intoxication or disorderly conduct, correct?

21        A.   No, sir.

22        Q.   In fact, you had not arrested him for

23   anything, correct?

24        A.   No, sir.

25        Q.   If Deputy Robinson had stated that you

Page 45

1  **placed him under arrest at that point for disorderly**

2  **conduct, would that be incorrect?**

3         MS. BARRANCO:  Object to the form.  Go

4      ahead.

5      A.   I honestly don't know because I -- like I

6  said, Deputy Mangrum and I were speaking about what

7  we were going to do with Tavares, whether it was

8  arrest or Baker Act.  We decided on Baker Act.

9  Calvin, Deputy Robinson, was pretty much watching

10  and paying attention to Tavares while we stepped off

11  to the side a little bit to discuss what we were

12  going to do.  He may have thought we were arresting

13  him.

14  BY MR. HECHT:

15      **Q.   According to the sheriff's report, you**

16  **placed Tavares under arrest for disorderly**

17  **intoxication.  Are you saying that again that is an**

18  **incorrect statement?**

19         MS. BARRANCO:  Object to the form.  Go

20      ahead.

21      A.   Yes, sir, I would have to agree that's

22  incorrect.

23  BY MR. HECHT:

24      **Q.   Do you ever review the officer narrative**

25  **reports at the conclusion of an arrest?**

Page 46

1          A.    On my own, yes, I do.

2          Q.    **Did you ever read the St. Lucie County**

3    **Sheriff's Office incident report regarding this**

4    **incident?**

5          A.    Honestly, no, I have not.

6          Q.    **If you saw any misnomers or any incorrect**

7    **information after your involvement with Tavares**

8    **Docher on May 11, 2014, would you have brought that**

9    **to anyone's attention?**

10              MS. BARRANCO:   Object to the form.   Go

11         ahead.

12         A.    If I had read and seen inconsistencies,

13    yes, I would have.

14     BY MR. HECHT:

15         Q.    **And as part of your customs, policy, and**

16    **practices at the St. Lucie County Sheriff's Office,**

17    **after there is an incident report written, do you**

18    **read those?**

19              MS. BARRANCO:   Object to the form.   Go

20         ahead.

21         A.    If I'm not the reporting officer -- I'm

22    not a supervisor.   I don't read everybody else's

23    reports.

24     BY MR. HECHT:

25         Q.    **Did you write a report in this case?**

Page 47

```
 1          A.   No, sir, I did not.

 2          Q.   Were you the arresting officer in this

 3     case?

 4          A.   I did not make an arrest.

 5          Q.   On May 11, 2014, was Tavares Docher at any

 6     point arrested for anything?

 7               MS. BARRANCO:   Object to the form.   Go

 8          ahead.

 9          A.   Not by me, sir.

10     BY MR. HECHT:

11          Q.   So you never placed him under arrest for

12     resisting, or battery on a law enforcement officer,

13     or aggravated assault, or anything like that?

14          A.   I never filed the charges on Tavares.

15          Q.   All right.   So once Tavares Docher was in

16     handcuffs behind his back, did you escort him to the

17     police car?

18          A.   Yes, sir.

19          Q.   And whose police car were you escorting

20     him to?

21          A.   To my vehicle.

22          Q.   And did you have the assistance of Deputy

23     Mangrum or Deputy Robinson at that point in time?

24          A.   They both walked over with me.

25          Q.   So tell me what happened as you escorted
```

Page 48

1    **Tavares Docher to your car?**

2         A.    They walked him over to my car.  I had to

3    unlock my vehicle, so Deputy Mangrum and Deputy

4    Robinson stood with him at the back door of my car

5    while I unlocked my car.  I walked around, I opened

6    the door on the back passenger's side.  I told

7    Tavares, you know, sit down.  We're going to get

8    going.  And I told him the same thing I tell

9    everybody:  It's easier if you sit down basically

10   with your butt into the car first, and then pick

11   your feet up and slide your feet in.  So since

12   they're handcuffed, they don't fall over or

13   anything.

14         He sat down with his -- facing out of the

15   car like I instructed him to do, and then he just

16   sat there for a minute.  And I said, "Okay, you got

17   to put your feet in the car so we can go."  And he

18   looked at all three of us, glanced around at all

19   three of us.  And I said, "Tavares, you got to put

20   your feet in the car."  And he jumped out of the car

21   and was trying to bite, throwing his elbows around,

22   and tried to -- and basically plowed through all

23   three of us as he tried to run across the parking

24   lot.

25         Q.    **When he ran, how far did he get in the**

1   **parking lot?**

2        A.   My estimation:  15, 20 feet.  Without

3   measuring, I couldn't be exact.  That was my

4   estimation on that night.

5        **Q.   And at this point in time, were the only**

6   **officers on scene you, Deputy Robinson, Deputy**

7   **Mangrum?**

8        A.   At that point yes, sir.

9        **Q.   What happened after Tavares Docher ran**

10  **this approximately 15 to 20 feet?**

11       A.   He jumped out of the back of the car

12  trying to bite at us and wound up elbowing me -- I

13  believe it was in the left eye.  We all three just

14  initially grabbed him, and we were trying to play --

15  I mean, I hate to say it, it was like "Keystone

16  Kops" trying to catch up, trying to grab onto him

17  getting him under control, and he's pulling us all

18  across the parking lot.  And I don't know how, but

19  we all -- after that initial surge, we all three hit

20  the ground.  Actually, all four, including

21  Mr. Docher.  So all four of us hit the ground.

22       **Q.   Okay.  What happened when all three of you**

23  **were on the ground?**

24       A.   As soon as we hit the ground, I -- from

25  what I remember, I was on his right side up by his

Page 50

1    shoulders and head.  And I believe Deputy Mangrum

2    was on the left side, pretty much in the same

3    position.  And I know that when we fell to the

4    ground I -- my chest was on his -- Tavares's back,

5    his right side of his back.  I was not expecting him

6    to go to the ground either.

7            When we hit the ground, everybody just

8    kind of fell.  And immediately he was flexible

9    enough that his hands were behind his back.  And he

10   pulled his arm, I believe it was his right arm over,

11   and the cuff slipped from his wrist almost up to his

12   elbow.  And he just slid the cuff through his arm

13   and put his hand underneath him and began to push

14   himself up.

15       Q.   **And what happened after that?**

16       A.   We tried to pull his arms out from

17   underneath -- his arm out from underneath him to get

18   him back onto the ground so we could secure him to

19   get him back to the vehicle.  And he was trying to

20   push up with his shoulders and kicking his feet.  I

21   was trying to basically hold him down.  His

22   shoulders weren't working.  He was moving too much.

23           So I put his hand on his head, kind of

24   like here by his ear (indicating), to hold him.

25   When I did that, he was moving his head on his left

Page 51

1    side on the ground.  And he -- I had gloves on at

2    the time.  He bit my right hand where my thumb is,

3    on the meat of my hand.  Because my hand was here on

4    his head (indicating) when he bit me, that's when I

5    gave one elbow -- it was just, I picked up my hand

6    and I elbowed like that (indicating).  It was just

7    that little motion there (indicating).

8         Q.    **Where did you elbow him?**

9         A.    Somewhere on the side of the head.

10        Q.    **And how many times during this struggle**

11   **did you elbow him on the side of the head?**

12        A.    Twice.  He -- after I initially elbowed

13   him, he looked towards Deputy Mangrum's side.  He

14   turned his head to the left, and then he came back.

15             I again tried to apply pressure to hold

16   him down.  He was still trying to bite me.  He

17   almost bit me again, so I gave him the exact same

18   technique, just a little short elbow, and told him

19   to stop.  Deputy Mangrum was telling him, "Stop

20   resisting."  And he was -- Tavares was yelling.

21   Eventually we -- I mean, it was -- I don't know how

22   long it was; we were able to kind of hold him down.

23             And as soon as other deputies started

24   arriving, and I felt like the situation was under

25   control, I remember going to my car, because I

Page 52

1    remember seeing Tavares had blood on his face, and I

2    got paper towels out of the car to clean him up,

3    because I didn't want the blood getting into his

4    eyes and stuff.

5              Rescue shortly arrived after that, and I

6    don't know the name of the EMT worker.  But at that

7    point we had gotten Tavares -- and I believe Deputy

8    Mangrum rolled him into like a recovery position,

9    which is on his side, and was holding him there, and

10   that's when I was wiping the blood off of him.  And

11   he was in that position, I believe, when the rescue

12   came, and they were down kind of by his feet because

13   we were up by his head still, and I believe Deputy

14   Mangrum was holding him.  I was wiping his face

15   trying to apply pressure, making sure everything was

16   okay.

17             I believe the rescue worker put his med

18   kit down by Tavares's feet, and he opened it up.

19   And when he was going through it, the next thing I

20   know Tavares kicked the rescue worker in the

21   chest -- I believe it was his chest -- as he was

22   squatted down.  Then they got up.  And then they

23   came back and they had a shot.  And they

24   administered the shot to his right hip -- I think it

25   was -- his right buttock.

1              MS. BARRANCO:  Just to clarify, you said,

2         "they."  Who is "they"?

3         A.    The rescue workers.  EMT.

4              MS. BARRANCO:  Thanks.

5    BY MR. HECHT:

6         **Q.    And what happened after they injected him**

7    **with the drug?**

8         A.    I had walked away at that point.  I saw a

9    lot of commotion.  And I asked one of the rescue

10   workers what was wrong.  And they said that he --

11   that Tavares coded.  Which means that he had

12   basically stopped breathing and gone into arrest,

13   and that they were working on him.  They brought him

14   into the back of the ambulance.  I believe they got

15   him onto a gurney, or a stretcher, or whatever.

16   They put him in the back and they were working on

17   him, and that's when they left.  That was the last

18   time that I had contact with him.

19        **Q.    You never went to the hospital?**

20        A.    I did go to the hospital.  But Tavares was

21   already in a different room.  If I remember right,

22   he was already in a different room; they had already

23   brought him in.  And we just went there, the doctor

24   looked at us and kicked us out, and we went to the

25   station.

Page 54

1              MS. BARRANCO:  Let me clarify again.  The

2        "we," who is the "we"?

3        A.   Deputy Mangrum, Deputy Robinson, and

4   myself.

5              MS. BARRANCO:  Thanks.

6   BY MR. HECHT:

7        Q.   **Is it correct that during the entire**

8   **struggle with Tavares, the only officers involved**

9   **with that struggle were you, Deputy Mangrum, and**

10  **Deputy Robinson?**

11       A.   Yes.  Like -- that's from what I saw, yes.

12       Q.   **Do you remember at some point in time**

13  **during the struggle other officers arriving on**

14  **scene?**

15       A.   Yes, I do, because that's when I went up

16  to get paper towels.  I believe it was Deputy

17  Alanjay (phonetic), arrived.  When the other people

18  started arriving, and Tavares had kind of, I guess,

19  fought himself out, because it's a big thing, I was

20  tired.  That's when I saw an opportunity to go over

21  and get paper towels and try to render aid.

22       Q.   **How tall are you, sir?**

23       A.   I'm 5-11.

24       Q.   **How much do you weigh?**

25       A.   I am 209 pounds.

Page 55

1      Q.    On May 11, 2014 I assume you were the same

2   height.

3      A.    Yes.

4      Q.    And do you recall what your weight was?

5      A.    I think I was actually a little lighter.

6   I think I was, like, 205.

7      Q.    Tavares Docher, do you know how much he

8   weighed in 2014?

9      A.    I do not.

10     Q.    Was he a big guy or a small guy?

11     A.    He was, as far as I remember, just a

12  normal guy.

13     Q.    Approximately how much did he weigh?

14     A.    Honestly I can't even remember.  I

15  couldn't even take a guess.

16     Q.    Is Deputy Sheriff Mangrum a big guy or a

17  small guy?

18     A.    He's a big guy.

19     Q.    And when Tavares Docher ran from the

20  police car, at that point in time were you in fear

21  for your life?

22     A.    Not for my life.  But the direction he was

23  running was right into Prima Vista where traffic

24  was.  And he was screaming stuff about "Don't let

25  them kill me."  To me, I thought maybe he was having

Page 56

1   another episode of seeing Arabs that were trying to

2   kill him, or that he thought we were trying to take

3   him to the Arabs -- I don't know what was going

4   through his head.  All I know is that he was making

5   a straight headway run, full gallop, with hands

6   behind his back towards traffic.

7       Q.   Tell me the direction that he was running

8   when he got out of the police car?

9       A.   South.

10      Q.   And when he was running, the handcuffs

11  were on him?

12      A.   Yes.

13      Q.   And he was cuffed behind his back?

14      A.   Yes, sir.

15      Q.   And is it your testimony that you, along

16  with Deputy Robinson and Deputy Mangrum, had a

17  difficult time controlling him?

18      A.   Very.

19      Q.   At any point in time during this struggle,

20  were Tavares Docher's actions causing you to believe

21  that it would be necessary for you to use deadly

22  force in order to control yourself or him?

23      A.   No, sir, which is why I did not use deadly

24  force.

25      Q.   And it's your testimony:  At no point

Page 57

1    during your interaction with Tavares Docher

2    on May 11, 2014, did you use excessive force.

3         A.   No, sir.

4         Q.   And is it your testimony here today that

5    Deputy Mangrum and Deputy Robinson did not use

6    excessive force against Tavares Docher?

7         A.   With Calvin being at Tavares's feet, I did

8    not even see what Calvin was doing.  I knew there

9    was kicking going on and everything by Tavares.  And

10   honestly, I paid attention to what I was doing.  I

11   couldn't even tell you what was going on in the

12   parking lot at that point.

13        Q.   Did you violate any of St. Lucie County's

14   policies, or procedures, or customs during your

15   interaction with Tavares Docher on May 11, 2014?

16             MS. BARRANCO:  Object to the form.  Go

17        ahead.

18        A.   Not that I'm aware of, no, sir.

19   BY MR. HECHT:

20        Q.   Were you sanctioned or disciplined for

21   anything that you did to Tavares Docher on May 11,

22   2014?

23        A.   No, sir.

24        Q.   Did you ever say to Deputy Mangrum, or

25   Deputy Robinson, to stop doing anything they were

1    doing during the struggle with Tavares Docher?

2         A.   Not that I recall, no, sir.

3         Q.   Did you ever see Deputy Robinson or Deputy

4    Mangrum hitting, punching, striking Tavares Docher

5    and say to him, "Don't do that"?

6              MS. BARRANCO:   Object to the form.   Go

7         ahead.

8         A.   Not that I recall, no, sir.

9    BY MR. HECHT:

10        Q.   Do you recall if Deputy Mangrum or Deputy

11   Robinson said to you during the struggle with

12   Tavares Docher, "Hey Deputy Newman, stop doing

13   that"?

14        A.   I don't remember hearing anything, no,

15   sir.

16        Q.   What did you review, if anything, prior to

17   your deposition today?

18        A.   The only thing I reviewed was my taped

19   statement I gave to the detective that night, which

20   I believe was Blanchford (phonetic).  And I watched

21   a minute of the video and that was it.  I still have

22   not read the arrest report.  I have still not read

23   the report.

24        Q.   Why not?

25        A.   I just haven't.  I still haven't read the

Page 59

1    report on the other case.

2        Q.    I'm sorry, what other case are you

3    referring to?

4        A.    The one you brought up earlier with

5    Mr. Hill.

6        Q.    Did you ever strike Tavares Docher with a

7    closed-fist punch?

8        A.    No, I did not.

9        Q.    Did you ever talk to the paramedic that

10   injected Tavares with the medication?

11       A.    I don't remember any meaningful

12   conversation.  I think I might have asked him, Are

13   you okay, or something like that.  I don't think we

14   really had a conversation.

15       Q.    When the medic -- strike that.

16             When the paramedic who arrived on scene --

17   strike that.

18             The paramedic who arrived on scene, did he

19   approach you and have a conversation with you prior

20   to him administering the medication to Tavares?

21       A.    I don't know who from rescue it was, as

22   they arrive in a group.  But I believe that we told

23   somebody from rescue that, you know, he had been

24   drinking.  We don't know if anything else was in his

25   system.  He was combative at that point.  We told

Page 60

1    them the whole situation and the gist.  Basically,

2    he was okay.  And then he became combative.  He had

3    some alcohol he admitted to earlier, but we didn't

4    know anything about any drugs.

5          Q.   Did you tell the paramedic who injected

6    Tavares with the drug that he had been drinking

7    alcohol?

8          A.   I honestly couldn't tell you who from

9    rescue I told that to that night.  There was three

10   or four of them that arrived on scene at the same

11   time.  I know they tell each other when they

12   disperse the information.  My job was to let them

13   know that he had been drinking.

14         Q.   Just so I'm clear:  You did tell an

15   employee from the St. Lucie County Fire District

16   prior to the administration of the drug that Tavares

17   had been drinking alcohol, correct?

18         A.   I believe we -- yes, I believe we said

19   that to somebody there.

20         Q.   You just said, "We told him."  I want to

21   be specific.

22         A.   Deputy Mangrum, Deputy Robinson, and I.  I

23   remember we were basically telling rescue --

24   basically, if I remember correctly, they were

25   walking up.  We were just shouting to them, Hey,

1    this is what we have, as they're coming up, so they

2    know what they're going to deal with when they get

3    to the patient.

4         Q.   And is it your testimony that you also

5    told paramedics employed by the St. Lucie County

6    Fire District that Tavares Docher told you that he

7    was not on any medications?

8         A.   I don't remember if I brought up

9    medications.  I know we brought up alcohol.  And I

10   remember not saying -- saying we didn't know if he

11   was on anything else.

12        Q.   You told me that you spoke to Tavares

13   Docher prior to putting him in your police car,

14   correct?

15        A.   Yes.

16        Q.   And you told me that you asked him if he

17   was on any illegal drugs, correct?

18        A.   Yes.

19        Q.   And he told you, "no," correct?

20        A.   Yes.

21        Q.   Did you relay that information to a

22   paramedic, that Tavares Docher told you that he was

23   not on any illegal drugs?

24        A.   I would have told them exactly what

25   Tavares told me.  That he said he wasn't doing any

Page 62

```
1    drugs.  That doesn't mean he wasn't, because we
2    weren't -- I just let them know what he told us.
3         Q.   You would have told the paramedics exactly
4    what Tavares Docher told you, correct?
5         A.   Yes, sir.
6         Q.   You would have told the paramedics he was
7    drinking alcohol, correct?
8         A.   Yes.
9         Q.   And you would have told the paramedics
10   that he was not on any medication, correct?
11        A.   I probably would have, yes.
12        Q.   And you would have told the paramedics
13   that he told you that he was not on any illegal
14   drugs, correct?
15        A.   Yes.
16        Q.   You would agree with me that in that
17   minute video that you saw, that there was a
18   significant struggle between you, Deputy Mangrum,
19   Deputy Robinson, and Tavares Docher, correct?
20             MS. BARRANCO:  Object to the form.  Go
21        ahead.
22        A.   That there was a struggle going on?  Yes.
23   BY MR. HECHT:
24        Q.   Were you able to simply lift Tavares off
25   the ground while he was still handcuffed behind his
```

Page 63

1   back at any point in time during the struggle?

2        A.   Not that I recall.  And I wouldn't have

3   lifted him up anyway because that would have been --

4   he could have gotten back and started running again.

5   We're taught that when we want to secure somebody,

6   basically until we could get help, they're on the

7   ground so they can't run, they can't get away, they

8   can't hurt anybody else.

9        Q.   Approximately how much time from the time

10  when Tavares fell to the ground until he was

11  administered the Ativan was he lying face down with

12  his stomach on the pavement?

13       A.   I couldn't tell you.  I don't know how

14  long that video was.  And maybe the struggle was,

15  like, another minute before that.  You even see in

16  the video that, I believe they roll him to his side

17  in the recovery.  I honestly couldn't tell you

18  because I don't even know how long the fight lasted.

19       Q.   Prior to the paramedic injecting Tavares

20  in the buttocks, was Tavares out of breath?

21       A.   I honestly don't recall.

22       Q.   When you watched the video, did it appear

23  to you that Tavares Docher was struggling to

24  breathe?

25       A.   I don't -- it did not appear he was

Page 64

1    struggling to breathe because he was still talking

2    and yelling on the video.

3              MR. HECHT:  All right.  Why don't we take

4         a break?  I'm going to put on my -- turn on my

5         computer and ask you a couple of questions from

6         the video.  Okay.  All right.

7              (Recess 11:23 a.m. until 11:32 a.m.)

8              (Video played.)

9              MR. HECHT:  I'm going to ask you some

10        questions.  You may sit down.

11   BY MR. HECHT:

12        Q.   Deputy Newman, based upon the video that I

13   just showed you, which is a minute and nineteen

14   seconds, that shows you, Deputy Mangrum, and Deputy

15   Robinson on top of Tavares Docher, is there anything

16   in this video that you believe violates any of St.

17   Lucie County Sheriff's Office official policies?

18              MS. BARRANCO:  Object to the form.  Go

19        ahead.

20        A.   Not that I'm aware of.

21   BY MR. HECHT:

22        Q.   Did you hear in this video Deputy Mangrum,

23   yourself, and Deputy Robinson telling Tavares to

24   stop resisting?

25        A.   Yes.

Page 65

1      Q.   And do you see in this video Tavares

2   Docher resisting the three of you?

3      A.   At that point he was just basically moving

4   his legs and kicking his legs still.  I don't know

5   what Deputy Robinson was dealing with.  As you can

6   see in the video, I got up and was trying to assess

7   the situation.  I got on the radio and I believe I

8   heard Deputy Mangrum getting on the radio, too,

9   calling for rescue and giving the injuries that

10   Mr. Docher had sustained.  And that's when you see

11   me going over to the car to get the paper towels.

12      Q.   During this minute and nineteen second

13   video, do you see Tavares Docher resisting you three

14   officers?

15          MS. BARRANCO:  Object to the form.  Go

16      ahead.

17      A.   I know I was there and he was still

18   struggling.  What that video shows is, really at an

19   angle where you can't really see him moving around a

20   lot.  And there was still a lot of pulling and

21   pushing going on between the three of us and him.

22   And like I said, once I felt I was able to, that's

23   when I got up.

24   BY MR. HECHT:

25      Q.   During this minute and nineteen second

1    video, do you see Tavares Docher resisting you three

2    officers?

3              MS. BARRANCO:   Object to the form.   Go

4        ahead.

5        A.    I know he was resisting us.

6    BY MR. HECHT:

7        Q.    During this minute and nineteen second

8    video, does this video show us Tavares Docher

9    resisting arrest?

10       A.    That is not the entire event, no, sir.

11       Q.    Well, during this minute and nineteen

12   second video, was Tavares Docher under arrest?

13       A.    At that point I still had not arrested

14   anybody.   That was just a concern.   Me, myself, I

15   know I didn't want him running into traffic.   He was

16   Baker Acted.   In my opinion he was going to be Baker

17   Acted.   He was obviously seeing things and

18   handcuffed, talking craziness, honestly, and running

19   headlong into traffic.

20       Q.    So during this minute and nineteen second

21   video, Tavares Docher was not under arrest, correct?

22       A.    Under arrest?   No, I had still not

23   arrested.   Would I have charged him myself if things

24   had not gone the way it did for resisting and trying

25   to -- I might have.   But at that point I had not

Page 67

1   made a decision to arrest anybody.  And he was

2   still -- you know, he was still being Baker Acted at

3   that point.

4        Q.   So at this point in time Tavares Docher

5   was in police custody, correct?

6        A.   Yes, absolutely.

7        Q.   And he was not free to leave?

8        A.   No, sir.

9        Q.   Why was it necessary for Deputy Mangrum to

10  have his foot on what appears to be Tavares' neck or

11  back; to have Deputy Robinson punching what appears

12  to be his upper leg or hip.  Why was that necessary?

13            MS. BARRANCO:  Object to the form.  Go

14       ahead.

15       A.   You would have to ask them.  I do not know

16  what they were feeling, was struggling with him.  I

17  do not know what they were experiencing.  At that

18  point I had disengaged and you would have to find

19  out what they were dealing with.  I couldn't tell

20  you.

21   BY MR. HECHT:

22       Q.   And if Tavares Docher was not under

23  arrest, why was it necessary for you to give two

24  elbow strikes to his head at this point in time?

25            MS. BARRANCO:  Object to the form.  Go

Page 68

1      ahead.

2          A.   Well, the first time he had bit me.  The

3    second time he attempted to bite me.  Even though he

4    was not under arrest, he still was in custody.  And

5    even though it was a medical issue -- we don't carry

6    Tasers.  And we still needed to gain compliance to

7    get him treatment.  No receiving facility would take

8    him like that.  Rescue would not treat him or assess

9    him in the manner he was acting before when he was

10   struggling with us.  So he had still had to be

11   controlled.

12     BY MR. HECHT:

13         Q.   **You see that puddle of blood under**

14   **Tavares's face?**

15         A.   Yes, sir.

16         Q.   **How did that puddle of blood get there?**

17         A.   Honestly, I couldn't tell you.

18         Q.   **During this period of time that we see on**

19   **the video, were you in fear for your life and your**

20   **fellow officers' lives?**

21              MS. BARRANCO:  Object to the form.  Go

22         ahead.

23         A.   No, sir.

24     BY MR. HECHT:

25         Q.   **During this period of time that we see on**

Page 69

1    the video, were you in fear for Tavares Docher's

2    life?

3        A.   I did believe he was in a danger to

4    himself still.

5        Q.   And explain to me why Tavares Docher was a

6    danger to himself when he was lying on the ground,

7    handcuffed behind his back, with three officers on

8    top of him?

9            MS. BARRANCO:  Object to the form.  Go

10       ahead.

11       A.   Because the only reason he was on the

12   ground was because he was being restrained there.

13   If left to his own devices, I really believed that

14   he would run out into traffic and gotten hurt, or

15   who knows what would have happened to him.

16     BY MR. HECHT:

17       Q.   Do you recall seeing Deputy Sheriff

18   Courtemanche --

19       A.   Courtemanche.

20       Q.   -- on scene on May 11, 2014?

21       A.   I know he was there, but I don't remember

22   seeing him, no, sir.

23       Q.   How do you know he was there?

24       A.   Obviously he's been named; he said he was

25   there.  I don't remember dealing with Detective

Page 70

1    Courtemanche at any point.

2         Q.   Do you recall seeing him on scene?

3         A.   I might have.  Like I said, I had no

4    interaction with him.

5         Q.   Was he a supervisor on this day?

6         A.   No, sir, not that I know of.

7         Q.   On May 11, 2014, was Deputy Courtemanche a

8    road patrol officer?

9         A.   I believe he was a detective at the time.

10        Q.   Did he have any sort of supervisory roles

11   over you, Deputy Mangrum, or Deputy Robinson?

12        A.   Not that I'm aware of, no, sir.

13             MR. HECHT:  All right.  I don't have any

14        other questions.  Thanks.

15             MS. BARRANCO:  Does Julie have any

16        questions?

17             MS. TYK:  Just a couple.

18                    CROSS-EXAMINATION

19   BY MS. TYK:

20        Q.   I just have a couple of questions.  The

21   one EMT paramedic, Jose Rosario, are you familiar

22   with him personally?

23        A.   No, ma'am.

24        Q.   He's not a personal friend of yours?

25        A.   No, ma'am.

Page 71

1       Q.    Have you ever met Mr. Rosario prior

2  to May 11, 2014, that you know of?

3       A.    That I'm aware of, no.  I mean, I could

4  have been on calls with him and just not recognized

5  him.  It's not anybody that I know.

6       Q.    Okay.  On May 11, 2014 when the paramedic

7  EMTs arrived on the scene, did you have any

8  conversations with them, instructing them or asking

9  them to give Mr. Docher a shot so that he would stop

10  speaking?

11      A.    No, ma'am, I did not.

12      Q.    To your knowledge, did anyone involved in

13  law enforcement have any type of conversation like

14  that with the paramedic EMTs?

15      A.    Not that I'm aware of.

16      Q.    When the paramedic EMTs arrived on scene,

17  was Tavares Docher still screaming and yelling at

18  that point?

19      A.    He was still talking and yelling, yes.

20  But he had -- from what I remember, when EMT

21  arrived, he was on his side at that point.

22      Q.    Do you know what he was saying when they

23  arrived?

24      A.    I don't remember.  No, ma'am.

25            MS. TYK:  That's all the questions I have.

```
                                                    Page 72
```

1           MS. BARRANCO:  And I have no questions.

2       He'll read if it gets ordered.

3           MR. HECHT:  I will order.  I'll take a

4       copy.

5           THE COURT REPORTER:  Ms. Tyk, do you want

6       a copy of the deposition?

7           MS. TYK:  Yes, please.

8           (The proceedings concluded at 11:43 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

       I, the undersigned authority, certify that CHRISTOPHER ERIK NEWMAN personally appeared before me and was duly sworn on the 31st day of May, 2017.

       Signed this 1st day of June, 2017.



_____
PATRICIA A. LANOSA, RPR, FPR, CSR
Notary Public, State of Florida
My Commission No. FF 169350
Expires: 10/19/2018

Page 74

CERTIFICATE OF REPORTER


STATE OF FLORIDA

COUNTY OF PALM BEACH


       I, PATRICIA A. LANOSA, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of CHRISTOPHER ERIK NEWMAN; Pages 1 through 76; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

       I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

       Dated this 1st day of June, 2017.

       PATRICIA A. LANOSA, RPR, FPR, CSR

Page 75

June 1, 2017

PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
c/o Christopher Erik Newman
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
(954)462-3200
ATTN: SUMMER BARRANCO, ESQUIRE

Re: Docher v. Newman et al.
Case No.: 2:16cv14413

Please take notice that on the 31st day of May,
2017, you gave your deposition in the above cause.
At that time, you did not waive your signature.

The above-addressed attorney has ordered a copy of
this transcript and will make arrangements with you
to read their copy. Please execute the Errata
Sheet, which can be found at the back of the
transcript, and have it returned to us for
distribution to all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.

Very truly yours,

PATRICIA A. LANOSA, RPR, FPR, CSR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.

_____
CHRISTOPHER ERIK NEWMAN

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re:  DOCHER V. NEWMAN ET AL.
Case No.:  2:16cv14413
CHRISTOPHER ERIK NEWMAN
May 31, 2017


PAGE    LINE          CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.


_____          _____

Date                      CHRISTOPHER ERIK NEWMAN

**A**

**a.m** 1:21,21 4:1
  64:7,7 72:8
**able** 39:6 51:22
  62:24 65:22
**abnormally**
  25:23
**above-address...**
  75:9
**absolutely** 26:21
  67:6
**academy** 7:11
  7:17 8:9,10,12
  8:14,22 11:14
  11:20,21 22:24
**accelerated**
  25:18
**accusations**
  14:17 15:8
**accusing** 36:4
**Act** 32:6,15
  38:19,22 39:8
  39:15,22 40:10
  40:16 41:2,11
  41:12 42:23
  43:9 44:2 45:8
  45:8
**Acted** 27:3,18
  41:22 43:15
  66:16,17 67:2
**acting** 38:18
  68:9
**action** 74:17,18
**actions** 27:12
  36:3 42:11
  56:20
**ADAM** 2:6
**adamant** 39:13
**address** 4:22
  75:16
**administered**
  52:24 63:11
**administering**
  59:20
**administration**
  60:16

**admitted** 60:3
**affairs** 15:24
  16:2
**affirmed** 4:9
**afternoon** 29:1,2
**agent** 10:11
**aggravated**
  47:13
**ago** 11:23
**agree** 17:4,11,17
  17:19 18:1,6,8
  18:16,23,25
  19:6,8,14,16
  19:24 20:8
  21:11,21 25:24
  26:9 40:9
  45:21 62:16
**agreed** 42:2
**agreement** 41:21
  43:14
**ahead** 13:1 17:8
  17:16 21:4
  22:3 26:5,12
  27:7,23 28:9
  33:15 34:2
  35:24 38:5
  40:1,13 43:18
  45:4,20 46:11
  46:20 47:8
  57:17 58:7
  62:21 64:19
  65:16 66:4
  67:14 68:1,22
  69:10
**aid** 54:21
**al** 75:5 76:3
**Alanjay** 54:17
**alcohol** 10:5,10
  10:13,14,16,23
  11:7 16:17
  60:3,7,17 61:9
  62:7
**Alcoholic** 7:3
  24:16
**ambulance** 27:4
  27:19 38:11
  53:14

**angle** 65:19
**animated** 33:18
  33:19 35:12
  42:7
**animation** 36:3
**answer** 13:2
  27:25 30:9
  32:1,2
**anybody** 35:11
  37:2 42:22
  63:8 66:14
  67:1 71:5
**anyone's** 46:9
**Anytime** 14:15
**anyway** 28:13
  63:3
**appear** 33:11
  34:23 35:7,10
  35:20 63:22,25
**APPEARAN...**
  2:1
**appeared** 34:13
  73:8
**Appearing** 2:15
**appears** 67:10
  67:11
**applied** 21:9
  22:13
**apply** 23:14,19
  51:15 52:15
**approach** 59:19
**approached**
  29:17,17 36:8
  36:10
**approximately**
  6:21 49:10
  55:13 63:9
**Arabs** 30:15,16
  30:17,17,18
  56:1,3
**area** 21:16 23:4
  37:11
**areas** 23:4,13,15
**arm** 50:10,10,12
  50:17
**arm's** 29:24
**arms** 50:16

**arrangements**
  75:9
**arrest** 12:19
  13:11 39:10
  40:7 43:22,25
  45:1,8,16,25
  47:4,11 53:12
  58:22 66:9,12
  66:21,22 67:1
  67:23 68:4
**arrested** 14:21
  43:4,5 44:19
  44:22 47:6
  66:13,23
**arresting** 45:12
  47:2
**arrive** 59:22
**arrived** 29:13
  33:7,11 34:5
  34:10,25 35:7
  35:19 52:5
  54:17 59:16,18
  60:10 71:7,16
  71:21,23
**arriving** 51:24
  54:13,18
**ash@searcyla...**
  2:7
**asked** 11:11 25:8
  30:12 31:3,6
  31:17,20 53:9
  59:12 61:16
**asking** 29:22
  31:8 71:8
**assault** 47:13
**assess** 65:6 68:8
**assist** 5:20 34:6
**assistance** 47:22
**assume** 16:6
  55:1
**assuming** 9:23
  28:4
**ATF** 10:17,18
**Ativan** 63:11
**attempted** 68:3
**attention** 45:10
  46:9 57:10

**ATTN** 75:4
**attorney** 74:14
  75:9,13
**attorneys** 74:16
**aunt's** 30:25
**authority** 73:7
**authorized** 74:8
**Avenue** 2:15
**aware** 14:16
  15:5,11 57:18
  64:20 70:12
  71:3,15

**B**

**back** 11:21
  13:18,23 14:1
  14:20 20:11,15
  21:5,9,13
  28:23 29:5
  33:5 38:25
  42:17,20,24,25
  43:2,13 44:18
  47:16 48:4,6
  49:11 50:4,5,9
  50:18,19 51:14
  52:23 53:14,16
  56:6,13 63:1,4
  67:11 69:7
  75:10
**Baker** 27:3,18
  32:6,15 38:17
  38:19,22 39:8
  39:15,22 40:10
  40:16 41:2,11
  41:12,21 42:23
  43:9,15 44:2
  45:8,8 66:16
  66:16 67:2
**BARNHART**
  2:4
**BARRANCO**
  2:9,11 4:16
  10:1 12:25
  17:7,15,24
  18:5,13,22
  19:5,13,21
  20:4,13,21

21:3,15 22:2
26:4,11,20
27:6,22 28:8
33:14 34:1,15
35:23 37:17
38:4 39:25
40:12 43:17
45:3,19 46:10
46:19 47:7
53:1,4 54:1,5
57:16 58:6
62:20 64:18
65:15 66:3
67:13,25 68:21
69:9 70:15
72:1 75:2,4
**based** 17:2,11,19
18:1,8,16,25
19:8,16,24
20:8 21:11
25:15,24 26:25
33:22 34:25
64:12
**basically** 5:17
9:7 13:25 14:2
32:7 48:9,22
50:21 53:12
60:1,23,24
63:6 65:3
**battery** 47:12
**Bayshore** 1:23
**Beach** 2:4,5 73:4
74:4 75:20
**began** 4:1 6:5
8:22 30:8
50:13
**beginning** 39:16
**behalf** 2:2,8,13
**believe** 8:15
11:20 14:20,22
25:13 28:23
29:9 31:3
32:11,16 34:10
36:14 38:6,7
40:19 41:5,16
43:24 49:13
50:1,10 52:7

52:11,13,17,21
53:14 54:16
56:20 58:20
59:22 60:18,18
63:16 64:16
65:7 69:3 70:9
**believed** 26:16
26:18 28:4
42:2 69:13
**belted** 14:1
**best** 34:3
**Beverages** 7:3
24:16
**biased** 14:18
15:9
**big** 54:19 55:10
55:16,18
**binge** 32:7
**birth** 4:15 30:10
32:4
**bit** 45:11 51:2,4
51:17 68:2
**bite** 48:21 49:12
51:16 68:3
**black** 30:22,23
32:11
**Blanchford**
58:20
**blank** 32:19
75:15
**blood** 52:1,3,10
68:13,16
**bodily** 17:14
18:4,12 19:4
19:20 20:12
21:2,8 23:21
**body** 30:19
**bone** 23:11
**bother** 30:16
**bottom** 75:15
**Boulevard** 1:23
2:4,10 31:14
75:3
**break** 64:4
**breath** 63:20
**breathe** 63:24
64:1

**breathing** 53:12
**bridge** 19:3,11
**brought** 46:8
53:13,23 59:4
61:8,9
**Broward** 31:2
**bunch** 5:21
**burglaries** 5:21
5:22
**business** 7:19
10:14
**butt** 48:10
**buttock** 52:25
**buttocks** 63:20
_____
## C
**c/o** 75:2
**cable** 7:16,22
8:2,6
**calendar** 29:5
**call** 5:16 13:19
13:19 22:20
28:6,11,11,12
29:9 36:4
**called** 7:20,21
8:13 23:5 30:3
**calling** 65:9
**calls** 71:4
**Calvin** 1:9 45:9
57:7,8
**car** 29:19 33:2,5
34:9 39:1
42:25 44:18
47:17,19 48:1
48:2,4,5,10,15
48:17,20,20
49:11 51:25
52:2 55:20
56:8 61:13
65:11
**career** 12:3,13
12:17 17:3
21:25 23:23
**carried** 32:5
**carry** 68:5
**carrying** 32:22
**case** 1:2 16:22

16:24 46:25
47:3 59:1,2
75:6 76:3
**catch** 49:16
**cause** 17:14 18:4
18:11 19:4,19
20:12 21:1,6,8
23:20 75:7
**causing** 56:20
**certainly** 34:20
34:22
**certificate** 3:8,9
24:7,10,13
25:12 73:1
74:1
**certification**
9:15 25:5,14
**certifications**
9:16
**certified** 9:18
24:21 25:1,9
**certify** 73:7 74:7
74:13
**CHANGE** 76:6
**CHANGES** 76:2
**charged** 66:23
**charges** 47:14
**chest** 50:4 52:21
52:21
**Christopher** 1:8
1:17 4:8,14
73:8 74:9 75:2
75:22 76:4,24
**city** 4:22
**clarify** 44:9 53:1
54:1
**class** 24:4,23
**classified** 17:5
17:22 18:19
19:11 20:2,19
21:14,19 26:2
26:10
**classify** 23:15,18
**CLAYTON** 1:8
**clean** 52:2
**clear** 44:3 60:14
**cleared** 16:6

**clearly** 32:2
**Clerk** 75:14
**client** 22:13
28:17
**close** 35:11 36:5
**closed-fist** 59:7
**closer** 41:18
**closing** 15:21
**clothing** 25:21
**coded** 53:11
**college** 8:17
**combative** 59:25
60:2
**combo** 10:1
**come** 28:13
**comes** 28:14
**coming** 5:3 12:4
61:1
**Commission**
73:15
**commit** 27:20
**commotion** 53:9
**company** 7:22
8:6
**complaint** 14:20
**complaints** 15:2
15:14
**compliance** 68:6
**computer** 64:5
**concern** 34:16
36:2,12 37:19
38:2 66:14
**concerned** 35:5
35:14
**concerns** 35:3
**concluded** 72:8
**conclusion**
45:25
**conduct** 44:20
45:2
**conducted** 24:4
24:6
**confidentiality**
4:17
**connected** 74:17
**contact** 26:15,17
26:19 27:1,16

29:16 30:8
38:3,6,11
39:17 53:18
**contacted** 15:18
**continuing**
13:11
**control** 22:7
49:17 51:25
56:22
**controlled** 68:11
**controlling**
56:17
**conversation**
30:25 31:11
32:5,15,23
34:11 38:24
59:12,14,19
71:13
**conversations**
71:8
**cool** 25:21
**coordinating**
9:13
**copy** 72:4,6 75:9
75:10
**correct** 6:4
16:13 33:7
41:20 42:15
43:16 44:20,23
54:7 60:17
61:14,17,19
62:4,7,10,14
62:19 66:21
67:5
**correctly** 30:6
41:4 60:24
**counsel** 74:14,16
**County** 1:10,12
2:13 4:25 5:2,5
5:13,15 6:5,14
6:20,22 7:2
8:11,12 12:6
12:10 13:8,16
14:6 15:7,13
15:15 16:16
22:11 24:18
30:20 31:3

**46:2,16 60:15**
61:5 64:17
73:4 74:4
**County's** 57:13
**couple** 31:24
64:5 70:17,20
**course** 24:6,20
**court** 1:1 4:2
31:4 72:5
75:14
**Courtemanche**
1:9 69:18,19
70:1,7
**craziness** 66:18
**crime** 10:13
27:20
**crimes** 9:8
**criminal** 5:6
16:3
**criteria** 44:2
**Cross** 3:7
**CROSS-EXA...**
70:18
**CSR** 1:25 73:14
74:21 75:18
**cuff** 50:11,12
**cuffed** 56:13
**current** 4:24
**currently** 4:21
5:4,6
**custody** 43:2
67:5 68:4
**customs** 46:15
57:14
**CVS** 29:8,10,13
30:1,3 36:22

— **D** —
**D** 3:2
**dad's** 7:19 8:4
**danger** 27:13,25
28:5 69:3,6
**date** 4:15 30:10
32:4 76:24
**Dated** 74:19
**daughter** 11:3
**day** 10:25 28:17

**32:2 70:5 73:9**
73:11 74:19
75:7
**days** 11:1 28:24
75:13
**deadly** 17:5,22
18:20 19:12
20:3,6 21:14
21:20 23:16
36:6 40:21,24
56:21,23
**deal** 61:2
**dealing** 31:25
37:19 38:16
40:15 65:5
67:19 69:25
**decided** 44:1
45:8
**decision** 67:1
**decisions** 39:11
**declare** 76:21
**deescalate** 35:15
**Defendant** 2:8
**Defendants** 1:13
**definitely** 21:6
26:6
**delirium** 11:19
12:1,6 24:3,8
24:14 25:2,4,6
25:10,17 26:2
26:10,19 27:3
27:18 36:24
37:7
**delusionary**
37:11
**demeanor** 42:4
**DENNEY** 2:3
**Department**
6:25 7:5 8:23
9:4,20 11:6,15
11:25 13:9
14:16 15:1,4
16:16
**depends** 20:14
27:12 28:10
**deposition** 1:16
58:17 72:6

**74:9 75:7,12**
**deputies** 51:23
**deputy** 6:3,6,18
13:24 14:14
29:14,14,15,21
32:21 33:7,8
33:12,12 34:6
34:11,12,13,20
34:22 35:8,9
35:21,21 36:8
36:9,14 39:1,6
39:13 40:3
44:25 45:6,9
47:22,23 48:3
48:3 49:6,6
50:1 51:13,19
52:7,13 54:3,3
54:9,10,16
55:16 56:16,16
57:5,5,24,25
58:3,3,10,10
58:12 60:22,22
62:18,19 64:12
64:14,14,22,23
65:5,8 67:9,11
69:17 70:7,11
70:11
**described** 23:19
**details** 5:17,18
**detective** 5:6,12
5:14 6:11 9:7
29:13 41:5
58:19 69:25
70:9
**determination**
37:5,8,25
38:21 39:10
40:6 41:2,9
**determine** 32:6
**determined**
29:25 38:12,17
44:2,13
**device** 14:12
**devices** 69:13
**DICKER** 2:15
**different** 10:17
13:4 22:17

**53:21,22**
**difficult** 56:17
**Direct** 3:7 4:11
**direction** 55:22
56:7
**directly** 16:2
**discipline** 16:7
**disciplined** 16:9
16:18 57:20
**discuss** 45:11
**Discussion** 4:19
**disengaged**
67:18
**disorderly** 43:22
44:14,19,20
45:1,16
**disperse** 60:12
**distance** 35:11
**distribution**
75:11
**district** 1:1,1,12
1:12 2:13
60:15 61:6
**division** 5:7 7:3
7:17,22 10:5
10:10,16,22
11:6 16:17
24:15
**divot** 23:7
**Docher** 1:4
22:13 28:18
33:19 34:13,18
35:2,8,20
36:22,23 37:7
37:14 38:1,22
39:6,15 40:10
40:18,19 41:3
41:20 43:1,12
43:22 46:8
47:5,15 48:1
49:9,21 55:7
55:19 57:1,6
57:15,21 58:1
58:4,12 59:6
61:6,13,22
62:4,19 63:23
64:15 65:2,10

65:13 66:1,8
66:12,21 67:4
67:22 69:5
71:9,17 75:5
76:3
**Docher's** 22:15
56:20 69:1
**DOCHER-NE...**
1:4
**doctor** 39:4 42:3
53:23
**document** 76:21
**doing** 16:2 57:8
57:10,25 58:1
58:12 61:25
**door** 14:3,3 48:4
48:6
**Drawer** 2:5
**drinking** 31:17
59:24 60:6,13
60:17 62:7
**drive** 33:2
**driving** 14:4
41:18
**drop** 35:6 36:13
36:16
**drove** 29:19 31:6
31:7
**drug** 53:7 60:6
60:16
**drugs** 9:8 10:15
31:21 60:4
61:17,23 62:1
62:14
**drunk** 38:7
39:17
**duly** 4:9 73:9
**dumped** 30:19

**E**
**E** 3:2
**ear** 23:6,6 50:24
**earlier** 42:11,14
59:4 60:3
**easier** 48:9
**easily** 35:13
**East** 2:10 75:3

**EDELMAN**
2:15
**educated** 12:14
**eight** 9:9 24:25
**eight-hour**
24:23
**either** 41:14
50:6
**elbow** 17:4,13
17:21 18:3,10
18:18 19:3,11
19:19 20:2,11
20:18,25 21:13
50:12 51:5,8
51:11,18 67:24
**elbowed** 51:6,12
**elbowing** 49:12
**elbows** 48:21
**else's** 46:22
**ELSER** 2:14
**emergency** 26:3
26:10
**employed** 5:1
15:6,12 61:5
**employee** 60:15
74:14,15
**employer** 4:24
**employment** 6:5
14:15 15:15
**EMT** 52:6 53:3
70:21 71:20
**EMTs** 71:7,14
71:16
**enforcement**
5:19 7:6 12:13
12:17,22 17:3
17:12,20 18:2
18:9,17 19:2
19:10,18 20:1
20:10 21:25
23:23 24:1
25:25 33:23
43:8 47:12
71:13
**enforcement's**
38:18
**ensued** 44:4

**ENTER** 76:2
**entire** 12:13,17
37:6 54:7
66:10
**episode** 37:22
56:1
**episodes** 32:9
**Erik** 1:17 4:8,14
73:8 74:9 75:2
75:22 76:4,24
**Errata** 3:10
75:10 76:1
**escalates** 35:16
**escort** 47:16
**escorted** 47:25
**escorting** 47:19
**especially** 37:19
42:22
**ESQUIRE** 2:6
2:11,17 75:4
**estimation** 49:2
49:4
**et** 75:5 76:3
**evasion** 10:13
**event** 66:10
**eventually** 29:23
51:21
**everybody** 13:22
46:22 48:9
50:7
**exact** 4:22 49:3
51:17
**exactly** 29:6
61:24 62:3
**Examination**
3:4 4:11
**examined** 4:10
**excessive** 15:1
15:14 16:19
57:2,6
**excited** 11:19
12:1,5 24:3,8
24:14 25:1,3,6
25:9,17 26:2,9
26:18 27:2,17
36:24 37:7
**execute** 75:10

**execution** 3:10
**exhibiting** 26:1
27:2,17 40:19
**exit** 34:6
**expecting** 50:5
**experience** 7:5
13:7 17:12,20
18:2,9,17 19:1
19:9,17,25
20:9 21:12
25:15,25 26:25
33:22 37:2
**experiencing**
25:17 26:16,18
36:24 37:7
67:17
**Expires** 73:16
**explain** 33:1
69:5
**eye** 49:13
**eyes** 52:4

**F**
**face** 52:1,14
63:11 68:14
**facility** 38:20
39:16 68:7
**facing** 48:14
**fact** 39:12 44:22
**facts** 40:4 76:21
**fair** 29:7
**fall** 48:12
**false** 14:24
**familiar** 70:21
**family** 31:8
**far** 25:11 48:25
55:11
**fasten** 13:25
**FDLE** 9:15,16
**fear** 33:12 34:14
34:21,25 36:18
37:15,18 55:20
68:19 69:1
**fears** 35:3
**federal** 10:18
**feel** 42:8
**feeling** 67:16

**feet** 14:2,4 34:18
48:11,11,17,20
49:2,10 50:20
52:12,18 57:7
**fell** 50:3,8 63:10
**fellow** 68:20
**felt** 27:12,25
37:12 51:24
65:22
**FF** 73:15
**fight** 42:13
63:18
**file** 24:19 40:6
**filed** 47:14 75:14
**files** 24:24
**financially** 74:17
**find** 30:14 67:18
**fine** 4:18
**Fire** 1:12 2:13
60:15 61:6
**firearms** 10:19
**fired** 11:9
**first** 4:9 14:21
31:25 36:9,11
48:10 68:2
**five** 8:8 28:24,24
**flexible** 50:8
**Florida** 1:1,11
1:23 2:5,10,16
4:23 7:2 10:5,9
10:12,16,18,19
10:22 11:6
16:17 24:15
73:3,15 74:3
75:3,20
**followed** 30:22
**following** 4:1
**follows** 4:10
**foot** 67:10
**force** 11:16
12:11 15:1,14
16:19 17:6,22
18:20 19:12
20:3,6 21:9,14
21:20 23:16
40:20,21,25
56:22,24 57:2

57:6
**foregoing** 74:9
76:21
**form** 12:25 13:1
17:7,15,24
18:5,13,22
19:5,13,21
20:4,13 21:3
21:15 22:2
26:4,11,20
27:6,22 28:8
33:14 34:1,15
35:23 38:4
39:25 40:12
43:17 45:3,19
46:10,19 47:7
57:16 58:6
62:20 64:18
65:15 66:3
67:13,25 68:21
69:9
**Fort** 2:10 4:23
6:25 7:4,12,13
8:23 9:3,19
11:5,14,24
12:3 13:9
14:15,25 15:3
16:15 31:2
75:3
**Forum** 75:19
**forwarded** 3:10
75:13
**fought** 54:19
**found** 14:23
75:10
**four** 5:3 6:14
10:8 49:20,21
60:10
**FPR** 1:25 73:14
74:21 75:18
**free** 43:6,10,15
67:7
**friend** 70:24
**full** 4:13 56:5
**FURTHER**
74:13

**G**

**gain** 22:7 68:6
**gallop** 56:5
**gangs** 9:8
**garage** 15:21
**gathered** 30:24
**general** 28:1
**getting** 49:17
52:3 65:8
**gist** 60:1
**GIUFFREDA**
2:9 75:2
**give** 4:5 22:22
23:2 32:15
67:23 71:9
**given** 37:1
**giving** 30:21
65:9
**glanced** 48:18
**gloves** 51:1
**go** 5:21 8:10,17
12:25 13:23
17:7,15 21:3
22:2 26:4,11
27:6,22 28:8
31:10,16 33:14
34:1 35:23
37:2 38:4 39:3
39:15,25 40:12
42:3 43:17
45:3,19 46:10
46:19 47:7
48:17 50:6
53:20 54:20
57:16 58:6
62:20 64:18
65:15 66:3
67:13,25 68:21
69:9
**going** 7:17 12:19
16:6,8 27:4
30:9 32:6,15
32:17 35:18
38:22 39:2,2,4
39:15 41:12,14
41:17 42:13

44:1,18 45:7
45:12 48:7,8
51:25 52:19
56:3 57:9,11
61:2 62:22
64:4,9 65:11
65:21 66:16
**gotten** 52:7 63:4
69:14
**grab** 49:16
**grabbed** 49:14
**graduate** 7:8,10
**graduated** 8:16
**graduating** 8:22
**great** 17:14 18:4
18:11 19:4,19
20:12 21:2,8
23:20
**ground** 29:23
49:20,21,23,24
50:4,6,7,18
51:1 62:25
63:7,10 69:6
69:12
**group** 59:22
**guard** 37:23
42:11,14
**guardian** 1:5
**guess** 30:1,23
54:18 55:15
**gun** 15:23
**gurney** 53:15
**guy** 55:10,19,12
55:16,17,18

**H**

**half** 8:8 10:8
**hallucinations**
41:10
**hand** 4:3 29:21
34:17 35:5,13
50:13,23 51:2
51:3,3,5
**handcuffed**
12:24 42:9,24
43:13 48:12
62:25 66:18

69:7
**handcuffing**
40:18,22
**handcuffs** 13:11
27:5,21 28:7
32:14,18 33:3
33:4 37:15
38:25 39:14
42:15,19 43:2
43:25 44:6,17
47:16 56:10
**handle** 13:10
**hands** 33:20
50:9 56:5
**hang-up** 29:9
36:4
**happened** 10:14
31:6 47:25
49:9,22 50:15
53:6 69:15
**hard** 32:1 37:3
**harm** 17:14 18:4
18:12 19:4,20
20:12 21:2,6,8
23:21
**hate** 49:15
**He'll** 72:2
**head** 17:21 18:3
20:11,15,18,25
21:1,5,10,13
21:16 36:1
50:1,23,25
51:4,9,11,14
52:13 56:4
67:24
**headlong** 66:19
**headway** 56:5
**health** 38:1,12
**hear** 64:22
**heard** 22:4 65:8
**hearing** 58:14
**heart** 25:18
**Hecht** 2:6 3:7
4:12,18,20
10:3 13:5
17:10,18,25
18:7,15,24

19:7,15,23
20:7,16,22
21:7,18 22:5
26:8,14,22
27:9,15 28:3
28:15 33:21
34:4,19 36:7
37:24 38:10
40:8,17 43:20
45:14,23 46:14
46:24 47:10
53:5 54:6
57:19 58:9
62:23 64:3,9
64:11,21 65:24
66:6 67:21
68:12,24 69:16
70:13 72:3
**hedge** 31:12,15
32:10
**height** 55:2
**held** 5:8,10 6:14
**helicopter** 32:20
**helicopters**
30:23
**help** 5:19 26:24
32:16,24 37:13
38:9,13 39:3
39:20 41:25
42:2 44:15
63:6
**Hey** 58:12 60:25
**hide** 30:19
**high** 7:8,10,14
25:23
**highly** 11:22
**Hill** 16:13,21
59:5
**hip** 52:24 67:12
**hit** 49:19,21,24
50:7
**hitting** 58:4
**hold** 4:16 14:4
20:21 50:21,24
51:15,22
**holding** 33:17
52:9,14

hollow 23:5,11
honest 39:19
honestly 36:25
 37:10,12 45:5
 46:5 55:14
 57:10 60:8
 63:17,21 66:18
 68:17
Horizons 41:15
 41:17
hospital 41:16
 53:19,20
hours 9:21,22
 24:25
house 30:25
huh 10:2
hung 30:4
hurt 30:18 63:8
 69:14

 I
IA 15:18 16:4
Ice 31:23
Ices 31:24
identify 33:24
 36:23
illegal 31:21
 61:17,23 62:13
imagine 16:1
immediately
 50:8
incident 15:19
 15:22,25 16:10
 16:21 39:11
 46:3,4,17
included 10:15
including 49:20
incoherent
 25:19 42:6
inconsistencies
 46:12
incorrect 39:23
 45:2,18,22
 46:6
indentation 23:7
independent
 1:12

Indian 8:11,12
indicating 50:24
 51:4,6,7
indications
 37:20
individual 12:19
 12:23 13:10
 18:18 20:25
 22:7 23:21
 26:15,17 27:1
 27:5,8,11,16
 27:20 28:5,13
 33:24
individually 1:8
 1:9,9,10,11
individuals
 14:19 15:10
information
 32:5 46:7
 60:12 61:21
initial 30:8
 36:21 38:6
 39:17 49:19
initially 6:4
 34:24 38:2
 40:14 49:14
 51:12
injected 53:6
 59:10 60:5
injecting 63:19
injuries 65:9
inquiry 14:23
inside 23:11
 29:10 30:1,3,3
installation 7:24
instance 13:4
instruct 24:8
instructed 24:2
 24:9 48:15
instructing 71:8
instructor 23:24
 24:22 25:1
interacted 14:18
interaction
 22:12 28:17,21
 35:1 36:21
 37:4,6 57:1,15

70:4
interactions
 15:9
interest 10:4
interested 74:18
internal 15:24
 16:2
interview 44:9
 44:13
intoxicated 32:7
intoxication
 43:23 44:20
 45:17
investigate
 10:12
investigation
 14:22 15:25
 16:5
investigations
 5:7
involved 15:20
 54:8 71:12
involvement
 46:7
involving 9:17
 16:21
issue 13:21 38:8
 68:5
issued 14:13
items 37:11

 J
J 1:10
Jacksonville
 11:2
jail 32:17 39:2,3
JANICE 1:4
jaw 18:11,19
 23:6,7,8,10
jawbone 23:12
job 10:12 60:12
joined 12:6,10
 24:17
joining 6:20
JOLLY 2:9 75:2
Jose 1:11 70:21
Julie 2:17 70:15

julie.tyk@wils...
 2:17
jumped 48:20
 49:11
June 5:15,23 6:7
 73:11 74:19
 75:1
justify 40:21

 K
keep 9:15 12:23
 44:3
KEN 1:10
Keystone 49:15
kicked 29:24
 52:20 53:24
kicking 13:22
 50:20 57:9
 65:4
kidnap 30:5
kidnapped
 29:12 36:5
kill 55:25 56:2
kind 10:13 20:5
 23:9 28:20
 29:24 31:20
 41:6 50:8,23
 51:22 52:12
 54:18
kinds 30:22
kit 52:18
knew 30:11 32:3
 32:3,4,4 57:8
know 13:7,19
 14:14 15:17
 16:4,24 21:22
 23:9 25:11,11
 25:22 28:19
 29:17,20 30:19
 31:9,22,25
 32:23 33:16
 35:3 36:1 39:5
 40:2 42:7,13
 44:4 45:5 48:7
 49:18 50:3
 51:21 52:6,20
 55:7 56:3,4

59:21,23,24
60:4,11,13
61:2,9,10 62:2
63:13,18 65:4
65:17 66:5,15
67:2,15,17
69:21,23 70:6
71:2,5,22
knowledge
 71:12
known 11:18
knows 69:15
Kops 49:16

 L
Lakes 2:4
Lanosa 1:25
 73:14 74:6,21
 75:18
large 27:14
lasted 63:18
Lauderdale 2:10
 31:2 75:3
law 7:6 12:13,17
 12:21 17:3,12
 17:20 18:2,9
 18:17 19:1,9
 19:17,25 20:9
 21:25 23:23
 24:1 25:25
 33:23 38:18
 43:8 47:12
 71:13
leave 9:19 11:5
 11:11 43:6,10
 43:15 67:7
left 7:25 9:10
 10:22 31:7
 49:13 50:2,25
 51:14 53:17
 69:13
leg 13:20 14:6
 14:11 67:12
legal 1:5
legs 65:4,4
letter 3:9 75:15
level 40:20

licensed 10:14
life 33:13 34:14
  34:21 36:19
  37:15,18 55:21
  55:22 68:19
  69:2
lift 62:24
lifted 63:3
lighter 55:5
limit 25:13
limited 37:4
Lincoln 7:11
LINE 76:6
lines 8:2
listed 75:16
little 9:1,23 32:9
  41:6 45:11
  51:7,18 55:5
lived 30:11
lives 34:25 68:20
LLP 2:15
lobbied 15:2,14
long 5:1,8 8:3,3
  8:6 10:7 11:23
  24:20 41:5
  51:22 63:14,18
longer 43:14
look 24:19,24
  25:12 29:5
looked 31:15
  32:18 48:18
  51:13 53:24
lot 10:24 31:12
  31:13 36:22
  48:24 49:1,18
  53:9 57:12
  65:20,20
Lucie 1:10,11,23
  2:13 4:25 5:2,5
  5:13,15 6:5,14
  6:20,22 7:1
  8:12 12:6,10
  13:8,16 14:5
  15:7,13,15
  16:16 22:11
  24:17 30:20
  31:1 41:16

46:2,16 57:13
60:15 61:5
64:17
lying 63:11 69:6

———— M ————
M 2:11
ma'am 70:23,25
  71:11,24
main 8:2 36:12
making 9:17
  52:15 56:4
man 15:20 16:12
manager 30:6
Mangrum 1:8
  29:14,15,21
  32:21 33:8,12
  34:7,12,14,22
  35:9,21 36:8
  36:14 39:13
  41:6 45:6
  47:23 48:3
  49:7 50:1
  51:19 52:8,14
  54:3,9 55:16
  56:16 57:5,24
  58:4,10 60:22
  62:18 64:14,22
  65:8 67:9
  70:11
Mangrum's
  39:1 51:13
manner 36:1
  68:9
March 8:16
MASCARA
  1:10
mass 22:14
mean 36:11,25
  43:10 49:15
  51:21 62:1
  71:3
meaningful
  59:11
means 9:12 39:8
  39:23 53:11
meant 44:8

measuring 49:3
meat 51:3
mechanic 7:15
  7:18 8:4
med 52:17
medic 59:15
medical 26:2,10
  26:19,24 28:6
  38:11 68:5
medication
  59:10,20 62:10
medications
  31:18,19 61:7
  61:9
meet 21:10
meets 21:6,16
  23:6,10
mental 38:1,8
mentally 37:21
mess 41:15
met 41:11 44:2
  71:1
Miami 10:25
military 8:20
mind 20:17,24
  35:18
minute 48:16
  58:21 62:17
  63:15 64:13
  65:12,25 66:7
  66:11,20
misnomers 46:6
moments 36:17
  39:18
morning 28:25
MOSKOWITZ
  2:14
mother 1:4 31:7
motion 51:7
moving 50:22,25
  65:3,19

———— N ————
N 3:2
name 4:13 16:12
  30:10 41:15
  52:6 75:15

named 69:24
narrative 45:24
Natural 31:23
  31:24
near 12:2
nearest 38:19
necessary 40:20
  56:21 67:9,12
  67:23
neck 21:6,10,17
  22:15,23 23:2
  23:5 67:10
need 4:22 31:22
  32:24 41:24
  42:1
needed 32:16
  37:13 38:9,13
  39:3,19 42:2
  44:15 68:6
needs 26:24
neighborhood
  5:22
nerve 22:14
  23:15,20
never 15:17 16:1
  16:7 21:24
  22:4 25:6 37:2
  37:8 39:11
  47:11,14 53:19
New 41:15,17
Newman 1:8,17
  4:8,14 7:21
  39:6 58:12
  64:12 73:8
  74:10 75:2,5
  75:22 76:3,4
  76:24
night 49:4 58:19
  60:9
nineteen 64:13
  65:12,25 66:7
  66:11,20
normal 31:10
  38:16 55:12
North 2:15
nose 19:3,11
Notary 73:15

notes 74:12
notice 75:7
November 5:10
  5:15,23
nylon 13:21

———— O ————
Oath 3:8 73:1
Object 12:25
  17:7,15,24
  18:5,13,22
  19:5,13,21
  20:4,13 21:3
  21:15 22:2
  26:4,11,20
  27:6,22 28:8
  33:14 34:1,15
  35:23 37:17
  38:4 39:25
  40:12 43:17
  45:3,19 46:10
  46:19 47:7
  57:16 58:6
  62:20 64:18
  65:15 66:3
  67:13,25 68:21
  69:9
objecting 13:1
obviously 66:17
  69:24
October 8:15
  24:17,18
offender 31:2
offense 43:25
Office 4:25 5:2,5
  5:13 6:6,15,21
  6:23 7:2 12:7
  12:10 13:8,17
  14:6 15:7,13
  15:16 16:16
  22:12 24:18
  46:3,16 64:17
Office's 5:16
officer 9:5,10,11
  12:22 17:4,13
  17:20 18:3,10
  18:18 19:2,10

19:18 20:1,10
21:25 23:24
24:2 26:1
33:23 45:24
46:21 47:2,12
70:8
**officers** 9:15,17
12:24 13:12
14:6 24:2,5
33:25 34:24
36:10 49:6
54:8,13 65:14
66:2 69:7
**officers'** 68:20
**official** 64:17
**okay** 28:16 29:7
30:17,20 44:11
48:16 49:22
52:16 59:13
60:2 64:6 71:6
**old** 29:5
**once** 12:23 43:1
47:15 65:22
**one's** 25:8
**opened** 48:5
52:18
**opening** 15:20
**operations** 9:7
**opinion** 66:16
**opportunity**
54:20
**Orange** 2:15
**order** 22:6 33:1
56:22 72:3
**ordered** 72:2
75:9
**ordering** 75:13
**original** 27:24
75:13
**Orlando** 2:16
**outcome** 16:4,24
**outside** 30:7
**overheating**
25:20

**P**

**P.O** 2:5

**PA** 2:4,9 75:2
**Page** 3:4 76:6
**Pages** 1:19 3:6
74:10
**paid** 9:23 57:10
**pain** 25:23
**Palm** 2:4,5 73:4
74:4 75:20
**paper** 52:2
54:16,21 65:11
**paramedic** 59:9
59:16,18 60:5
61:22 63:19
70:21 71:6,14
71:16
**paramedics** 61:5
62:3,6,9,12
**paranoia** 37:12
**Park** 7:11
**parked** 32:11
34:9
**parking** 31:12
31:13 36:22
48:23 49:1,18
57:12
**part** 6:7 7:6
10:19 46:15
**parties** 74:15
75:11
**parties'** 74:16
**passenger's** 48:6
**patient** 61:3
**Patricia** 1:25
73:14 74:6,21
75:18
**patrol** 6:3,6,17
9:5 33:5 42:25
70:8
**pavement** 63:12
**pay** 9:21,22
**paying** 45:10
**penalties** 76:21
**pending** 17:1
**Pensacola** 11:2
**people** 27:12
54:17
**percent** 36:12

**perform** 38:18
**period** 38:2
68:18,25
**perjury** 76:21
**person** 13:25
18:10 19:2,10
19:18 20:1,10
26:24 27:3,18
**person's** 17:5,13
17:21 18:3
**personal** 70:24
**personally** 70:22
73:8
**persons** 37:11
**Phipps** 1:22
75:19
**Phone** 2:15
**phonetic** 54:17
58:20
**physically** 23:2
**physiology**
12:14 25:3
**pick** 48:10
**picked** 51:5
**Pierce** 4:23 6:25
7:4,12,13 8:23
9:3,19 11:5,14
11:25 12:3
13:9 14:16,25
15:3 16:15
**place** 27:5,20
42:19 75:19
**placed** 12:19
13:11 29:23
33:4 37:14
42:15,24 43:1
43:21,24 44:17
45:1,16 47:11
**placing** 28:6
**plain** 39:19
**Plaintiff** 1:6 2:2
**planning** 41:13
**play** 49:14
**played** 64:8
**please** 4:3,13
25:16 72:7
75:7,10,15

**plowed** 48:22
**point** 22:16,18
22:21 23:3,12
23:13 28:14
31:11,15 32:12
36:18 39:14
41:14,17 42:5
43:4,6,21 44:6
45:1 47:6,23
49:5,8 52:7
53:8 54:12
55:20 56:19,25
57:12 59:25
63:1 65:3
66:13,25 67:3
67:4,18,24
70:1 71:18,21
**points** 22:23
23:18
**police** 6:25 7:4
8:23 9:4,19
11:5,14,15,25
13:9 14:16,25
15:3 16:15
39:5 43:2
44:18 47:17,19
55:20 56:8
61:13 67:5
**policies** 57:14
64:17
**policy** 33:3
42:21 46:15
**Port** 1:23 31:1
**position** 5:4,9,13
6:1 9:3,9 39:21
50:3 52:8,11
**positions** 6:13
**possibilities**
35:18
**pounds** 54:25
**practices** 46:16
**president** 32:3
**pressure** 22:16
22:18,21,23
23:3,12,13,14
23:18,20 51:15
52:15

**pretty** 38:17
45:9 50:2
**Prima** 31:14
55:23
**prior** 5:12 6:1
6:20 7:4,17
24:17 28:6
37:14 40:18,22
58:16 59:19
60:16 61:13
63:19 71:1
**probably** 8:8
12:2 32:24
62:11
**problem** 42:13
**procedure** 13:24
**procedures**
57:14
**proceedings** 4:1
72:8
**process** 44:9,13
**professional**
26:19 28:6
38:12 74:7
**Profuse** 25:20
**properly** 12:23
**prostitution**
10:15
**protect** 30:13,14
**proximity** 36:5
**public** 27:14
28:1 73:15
**puddle** 68:13,16
**pull** 50:16
**pulled** 50:10
**pulling** 49:17
65:20
**pulls** 14:2
**punch** 59:7
**punching** 58:4
67:11
**PURDY** 2:9
75:2
**purposes** 4:17
**push** 50:13,20
**pushing** 65:21
**put** 13:25 14:2

29:22 32:13,18
33:2 39:14
44:18 48:17,19
50:13,23 52:17
53:16 64:4
**putting** 9:14
38:25 44:6
61:13

**Q**

**question** 13:2
20:23 23:1
34:23 35:19
**questioning** 44:5
**questions** 64:5
64:10 70:14,16
70:20 71:25
72:1
**quickly** 34:6
**quite** 32:2

**R**

**racially** 14:18
15:9
**radio** 65:7,8
**raise** 4:2
**raised** 35:25
**ran** 48:25 49:9
55:19
**rate** 25:18
**reach** 29:25
**read** 3:9 46:2,12
46:18,22 58:22
58:22,25 72:2
75:10,12 76:21
**really** 11:21,22
25:22 41:11
59:14 65:18,19
69:13
**reason** 26:6 36:3
69:11 76:6
**recall** 15:21,23
29:8 41:4 55:4
58:2,8,10 63:2
63:21 69:17
70:2
**receive** 11:15,18

12:5,9 24:13
**received** 11:13
13:9 16:7 25:5
**receiving** 38:19
68:7
**Recess** 64:7
**recognized** 71:4
**recollection**
38:23
**record** 4:17,19
74:12
**recovery** 52:8
63:17
**referring** 13:15
59:3
**regarding** 15:25
16:5,19 29:8
40:10 46:3
**registered** 31:1
74:6
**relative** 74:14,15
**relay** 61:21
**remember** 28:22
30:6 31:5,8,14
31:19 38:24
49:25 51:25
52:1 53:21
54:12 55:11,14
58:14 59:11
60:23,24 61:8
61:10 69:21,25
71:20,24
**render** 54:21
**report** 11:1
22:12 39:5,9
39:11,21 40:3
40:7 45:15
46:3,17,25
58:22,23 59:1
74:8
**Reported** 1:24
**Reporter** 3:9 4:2
72:5 74:1,7
**reporting** 1:22
46:21 75:19
**reports** 45:25
46:23

**requested** 74:11
**requirements**
9:18
**rescue** 28:12
52:5,11,17,20
53:3,9 59:21
59:23 60:9,23
65:9 68:8
**reside** 4:21
**resisting** 47:12
51:20 64:24
65:2,13 66:1,5
66:9,24
**responsible** 8:1
9:13,16
**restrain** 12:18
**restrained** 69:12
**restraint** 13:20
14:7,12
**result** 16:9
**return** 75:16
**returned** 75:11
**review** 45:24
58:16 74:10
**reviewed** 58:18
**right** 4:3 5:14
10:21 22:14
31:16 32:13,17
32:25 33:6
42:9 44:16
47:15 49:25
50:5,10 51:2
52:24,25 53:21
55:23 64:3,6
70:13
**River** 8:11,12
**road** 6:3,6,17
9:5 41:16,19
70:8
**Robinson** 1:9
29:14 33:8,12
34:7,12,13,20
35:9,21 36:9
44:25 45:9
47:23 48:4
49:6 54:3,10
56:16 57:5,25

58:3,11 60:22
62:19 64:15,23
65:5 67:11
70:11
**roles** 70:10
**roll** 63:16
**rolled** 52:8
**room** 53:21,22
**rope** 13:20,21,25
14:1
**Rosario** 1:11
70:21 71:1
**rotating** 28:23
**RPR** 1:25 73:14
74:21 75:18
**run** 48:23 56:5
63:7 69:14
**running** 34:8
55:23 56:7,10
63:4 66:15,18

**S**

**S** 2:6
**safe** 12:23
**safety** 28:1
**sanctioned** 16:9
16:18 57:20
**sat** 48:14,16
**saw** 30:18 35:1,4
46:6 53:8
54:11,20 62:17
**saying** 44:3
45:17 61:10,10
71:22
**SCAROLA** 2:3
**scene** 28:13
29:16 33:7
34:5 35:8,20
40:4 49:6
54:14 59:16,18
60:10 69:20
70:2 71:7,16
**schedule** 29:4,5
**school** 7:8,10,14
**screaming** 55:24
71:17
**screwdriver**

29:21,22 30:12
33:18 34:17
35:6,9,13,22
36:14,16
**Seal** 32:19
**SEARCY** 2:3
**seat** 13:18 14:1,1
**second** 65:12,25
66:7,12,20
68:3
**secondhand**
40:5
**seconds** 64:14
**secure** 28:12
32:14 50:18
63:5
**secured** 28:14
**see** 29:5 30:9
32:9 39:4,8,19
39:22 41:8
42:3 57:8 58:3
63:15 65:1,6
65:10,13,19
66:1 68:13,18
68:25
**seeing** 52:1 56:1
66:17 69:17,22
70:2
**seen** 37:2 46:12
**sell** 10:14
**service** 8:1
**sex** 31:2
**share** 25:16
**Sheet** 3:10 75:10
76:1
**Sheriff** 1:10
55:16 69:17
**sheriff's** 4:25 5:2
5:5,13,16 6:5
6:15,21,22 7:2
12:7,10 13:8
13:16 14:6
15:7,13,16
16:16 22:12
24:18 45:15
46:3,16 64:17
**shift** 28:20,22

29:6
**shifts** 28:23
**SHIPLEY** 2:4
**shop** 8:4
**short** 51:18
**shortly** 52:5
**shot** 15:21 16:12
52:23,24 71:9
**shoulders** 50:1
50:20,22
**shouting** 60:25
**show** 66:8
**showed** 64:13
**shows** 64:14
65:18
**sic** 10:5
**side** 16:3 18:11
18:19 31:12,13
45:11 48:6
49:25 50:2,5
51:1,9,11,13
52:9 63:16
71:21
**sidebar** 41:6
**sidewalk** 31:14
**sign** 3:9 75:12
75:15
**signature** 75:8
75:15,21
**Signed** 73:11
**significant** 62:18
**signs** 25:3,16
26:1 27:2,17
**simply** 62:24
**sir** 6:9,12,16,19
7:7 8:19,21,24
9:1 10:6 11:17
16:11,14 17:9
17:17,23 18:14
18:21 21:21,23
22:4 23:17,22
24:7,12 25:11
26:7,13 27:24
30:2 32:25
34:8 35:25
36:20 37:8
38:14 40:23,24

42:16,18 43:3
43:11 44:8,21
44:24 45:21
47:1,9,18 49:8
54:22 56:14,23
57:3,18,23
58:2,8,15 62:5
66:10 67:8
68:15,23 69:22
70:6,12
**sit** 25:19 48:7,9
56:12
**situation** 28:10
51:24 60:1
65:7
**six** 8:8 32:20
**six-month** 8:14
**skull** 21:5
**sky** 32:19
**slid** 50:12
**slide** 48:11
**slipped** 50:11
**small** 31:12
55:10,17
**solemnly** 4:4
**somebody** 13:22
14:21 25:19
30:4 35:4 36:4
37:20 38:16
59:23 60:19
63:5
**Sons** 7:21
**soon** 49:24
51:23
**sorry** 8:11 22:16
29:14 44:10
59:2
**sort** 7:23 8:17
37:22 38:1,8
70:10
**south** 31:12 56:9
**SOUTHERN**
1:1
**Southwest** 1:23
**speaking** 33:8
38:7 45:6
71:10

**special** 1:12 9:7
10:11
**specific** 23:1
35:19 60:21
**specifically**
41:24
**speech** 25:20
**spent** 37:6
**spoke** 61:12
**squatted** 52:22
**St** 1:10,11,23
2:13 4:25 5:2,5
5:13,15 6:5,14
6:20,22 7:1
8:12 12:6,10
13:8,14 14:5
15:7,13,15
16:16 22:11
24:17 30:20
31:1 41:16
46:2,16 57:13
60:15 61:5
64:16
**stand** 27:24
**standing** 30:7
**Star** 5:16 6:7,10
**start** 6:24
**started** 7:1,24
8:15 9:5 10:11
12:3 14:21
29:20 30:21
37:10 51:23
54:18 63:4
**state** 4:13 10:12
10:25 32:22
73:3,15 74:3
**stated** 44:25
76:22
**statement** 16:2
39:24 40:9,11
45:18 58:19
**statements**
30:22
**states** 1:1 39:6
39:22
**statewide** 10:18
**station** 53:25

**staying** 30:24,25
31:9
**stenographic**
74:12
**stenographica...**
1:24 74:8
**stepped** 45:10
**stomach** 63:12
**stood** 48:4
**stop** 33:6 51:19
51:19 57:25
58:12 64:24
71:9
**stopped** 53:12
**store** 30:7
**straight** 56:5
**street** 32:11
**stretcher** 53:15
**strike** 14:9,14
17:5,13,21
18:3 20:5,18
20:25 21:22
22:1,17 23:24
26:16 36:1
59:6,15,17
**strikes** 67:24
**striking** 18:10
18:18 19:2,10
19:18 20:1,10
58:4
**stripping** 25:21
**strong** 25:23
**struck** 21:12,16
**struggle** 12:15
13:12 22:7
44:4 51:10
54:8,9,13
56:19 58:1,11
62:18,22 63:1
63:14
**struggling** 12:24
63:23 64:1
65:18 67:16
68:10
**stuff** 52:4 55:24
**subject** 43:8
**sued** 16:22

**Suite** 2:10,15
75:3,19
**summer** 2:11
5:17,18 75:4
**summer@pur...**
2:12
**Sunday** 29:3
**Sunrise** 2:10
75:3
**supervisor** 46:22
70:5
**supervisory**
14:23 70:10
**sure** 9:17 24:19
24:24 36:12
40:4 52:15
**surge** 49:19
**sustained** 65:10
**swear** 4:4,7
**sweating** 25:20
**sworn** 4:9 73:9
**symposium**
24:22
**symptoms** 25:3
25:17 26:1
27:2,17 36:25
**system** 59:25

**T**
**take** 14:1 28:20
31:19,23 39:4
41:17 55:15
56:2 64:3 68:7
72:3 75:7
**taken** 31:18,20
**talk** 59:9
**talked** 11:22
32:8,21
**talking** 20:14
30:4,8,21
33:18,20 36:13
36:15 37:10
39:18 41:7,9
41:10 44:12
64:1 66:18
71:19
**tall** 54:22

**Tallahassee** 11:2
**Tampa** 11:2
**taped** 58:18
**Tasers** 68:6
**taught** 25:2,7
  63:5
**Tavares** 1:4
  22:13,14 28:18
  29:16,20 30:8
  33:9,19 34:12
  34:18 35:1,8
  35:20 36:13,22
  36:23 37:6,14
  38:1,22 39:10
  40:10,18,19
  41:2,20 43:1
  43:12,22 45:7
  45:10,16 46:7
  47:5,14,15
  48:1,7,19 49:9
  51:20 52:1,7
  52:20 53:11,20
  54:8,18 55:7
  55:19 56:20
  57:1,6,9,15,21
  58:1,4,12 59:6
  59:10,20 60:6
  60:16 61:6,12
  61:22,25 62:4
  62:19,24 63:10
  63:19,20,23
  64:15,23 65:1
  65:13 66:1,8
  66:12,21 67:4
  67:22 69:1,5
  71:17
**Tavares'** 67:10
**Tavares's** 50:4
  52:18 57:7
  68:14
**tax** 10:12
**TCI** 7:16
**teach** 24:14 25:6
  25:9
**Team** 5:16 6:8
  6:10 32:19
**technician** 7:25

8:1
**technique** 23:16
  51:18
**tell** 9:11 13:14
  23:9 28:16
  29:7 31:1 37:3
  47:25 48:8
  56:7 57:11
  60:5,8,11,14
  63:13,17 67:19
  68:17
**telling** 20:17,24
  51:19 60:23
  64:23
**temple** 17:5,13
**term** 12:3,14,16
  21:23 22:4,17
**terms** 11:7
**testified** 4:10
**testimony** 4:4
  44:16 56:15,25
  57:4 61:4
**Thanks** 53:4
  54:5 70:14
**themself** 27:13
  27:25
**thing** 36:9,11
  48:8 52:19
  54:19 58:18
**things** 13:17
  32:9 41:11
  66:17,23
**think** 11:21
  24:23 31:23
  36:11 39:3
  41:8 42:12
  52:24 55:5,6
  59:12,13
**thinking** 33:16
**thirty** 75:13
**thought** 29:10
  29:11 39:17
  42:1 45:12
  55:25 56:2
**threat** 33:24
  42:8
**threatening** 35:8

35:10,21
**three** 6:13 48:18
  48:19,23 49:13
  49:19,22 60:9
  65:2,13,21
  66:1 69:7
**throat** 19:19,22
  20:2,5 23:10
**throwing** 48:21
**thumb** 21:22
  22:1,6,8,14,17
  22:18 23:3,14
  23:19 51:2
**time** 7:16,25
  8:12 11:23
  13:8 14:5,25
  15:2,6,12
  16:15 22:19
  24:1 25:13
  28:11,11 34:11
  38:2 41:5 42:5
  42:9,12 43:4,7
  43:21 47:23
  49:5 51:2
  53:18 54:12
  55:20 56:17,19
  60:11 63:1,9,9
  67:4,24 68:2,3
  68:18,25 70:9
  75:8
**times** 14:7 51:10
**tired** 54:20
**title** 5:8,10
**tobacco** 7:3 10:5
  10:10,15,17,23
  11:7 16:17
  24:16
**today** 4:5 44:17
  57:4 58:17
**told** 31:21 39:2,3
  42:1 48:6,8
  51:18 59:22,25
  60:9,20 61:5,6
  61:12,16,19,22
  61:24,25 62:2
  62:3,4,6,9,12
  62:13

**tolerance** 25:23
**top** 64:15 69:8
**towels** 52:2
  54:16,21 65:11
**tracking** 9:16
**traffic** 5:20,20
  55:23 56:6
  66:15,19 69:14
**train** 11:25
  13:17 22:18
  23:4
**trained** 12:18,22
  21:24 22:22
  23:2,14 29:15
  33:23
**training** 9:10,11
  9:14 11:13,15
  11:18 12:5,9
  12:21 13:7,10
  13:13,14 17:2
  17:12,20 18:2
  18:9,17 19:1,9
  19:17,25 20:9
  21:12 24:19
  25:15,25 26:25
  33:22
**trainings** 9:14
**transcript** 74:11
  74:11 75:9,11
  76:2
**transport** 33:2
  38:18,19 42:22
**transported**
  27:4,19
**transporting**
  27:8,11
**travel** 10:24
**treat** 68:8
**treatment** 68:7
**tried** 48:22,23
  50:16 51:15
**trouble** 31:21
  32:24,25
**true** 40:11 74:12
  76:22
**truly** 75:17
**truth** 4:5,6,6

**try** 35:5,15
  54:21
**trying** 29:11
  30:5,13,14,16
  41:8 48:21
  49:12,14,16,16
  50:19,21 51:16
  52:15 56:1,2
  65:6 66:24
**turn** 64:4
**turned** 35:13
  51:14
**Twice** 51:12
**two** 8:5 9:6 11:1
  23:4,13 34:24
  36:10 67:23
**Tyk** 2:17 3:7
  70:17,19 71:25
  72:5,7
**type** 71:13

**U**
**underneath** 23:8
  50:13,17,17
**undersigned**
  73:7
**understand**
  10:21 13:6
  35:17 41:1
  44:7
**unit** 5:20
**UNITED** 1:1
**university** 8:18
**unlock** 48:3
**unlocked** 48:5
**unstable** 37:21
**upper** 67:12
**use** 11:16 12:10
  16:19 23:14
  40:21,24 56:21
  56:23 57:2,5
**Usually** 25:19

**V**
**v** 75:5 76:3
**van** 32:11
**vans** 30:23

**vehicle** 13:18
  14:7,12 34:6
  42:22 47:21
  48:3 50:19
**verifying** 31:5
**vice** 9:8
**video** 58:21
  62:17 63:14,16
  63:22 64:2,6,8
  64:12,16,22
  65:1,6,13,18
  66:1,8,8,12,21
  68:19 69:1
**violate** 57:13
**violates** 64:16
**violations** 10:13
**Vista** 31:14
  55:23
**VOLUME** 1:18
  3:6
**vs** 1:7

---

**W**

**WADE** 1:9
**waive** 75:8,15,21
**walked** 29:24
  33:4,17 34:9
  47:24 48:2,5
  53:8
**walking** 29:20
  60:25
**Walton** 41:16,18
**want** 8:5 12:2
  30:18 42:11
  43:14 44:3
  52:3 60:20
  63:5 66:15
  72:5
**wanted** 41:8
**wanting** 13:6
**wasn't** 31:21
  34:8 61:25
  62:1
**watch** 5:22
**watched** 58:20
  63:22
**watching** 32:12

32:20 45:9
**way** 14:18 16:9
  16:18 22:24
  35:12 37:3
  40:2 66:24
**we're** 38:17,17
  44:5 48:7 63:5
**weapon** 35:4
  36:6
**Wednesday** 1:20
**week** 28:25 29:1
**weigh** 54:24
  55:13
**weighed** 55:8
**weight** 55:4
**went** 8:9 11:20
  11:24 14:22
  29:9 32:13
  43:25 53:19,23
  53:24 54:15
**weren't** 32:10
  50:22 62:2
**West** 2:5 75:20
**WILSON** 2:14
**window** 13:23
**wiping** 52:10,14
**wish** 75:15
**Witness** 3:9 4:7
**work** 6:22 7:18
  7:23 8:3,6 10:7
  10:25 28:24,25
  29:1
**worked** 6:25 7:2
  7:16,19 8:25
**worker** 52:6,17
  52:20
**workers** 53:3,10
**working** 7:4
  8:23 9:23 10:4
  15:3 50:22
  53:13,16
**worried** 32:17
  39:1
**wouldn't** 63:2
**wound** 49:12
**wrist** 50:11
**write** 39:9 46:25

76:2
**written** 40:2,3
  46:17
**wrong** 53:10
**wrote** 39:11

---

**X**

**X** 3:2

---

**Y**

**Yeah** 15:23 26:6
  32:23
**year** 5:11,24 7:8
  24:17 32:3
**years** 5:3 6:14
  8:5,8,25 9:6,9
  10:8
**yelling** 51:20
  64:2 71:17,19
**young** 11:3

---

**Z**

---

**0**

---

**1**

**1** 1:18,19 3:6,6
  74:10 75:1
**1/2** 9:2
**10** 8:25 9:1,2
**10/19/2018**
  73:16
**10:00** 1:21 4:1
**100** 36:12
**11** 8:25 28:16
  29:2,3 46:8
  47:5 55:1 57:2
  57:15,21 69:20
  70:7 71:2,6
**11:23** 64:7
**11:32** 64:7
**11:43** 1:21 72:8
**111** 2:15
**12** 34:18
**1200** 2:15
**1216** 2:10 75:3
**15** 49:2,10
**1551** 75:19

**15th** 5:10
**1680** 1:23
**169350** 73:15
**1999** 6:24
**1st** 73:11 74:19

---

**2**

**2:16cv14413** 1:2
  75:6 76:3
**20** 49:2,10
**200-E** 75:19
**2009** 6:24 7:1
**2012** 6:21 24:18
**2014** 6:17 14:9
  14:11 15:20
  28:16 29:3
  46:8 47:5 55:1
  55:8 57:2,15
  57:22 69:20
  70:7 71:2,6
**2016** 5:25 6:7
**2017** 1:20 73:10
  73:11 74:19
  75:1,7 76:4
**205** 55:6
**209** 54:25
**2139** 2:4
**2455** 2:10 75:3

---

**3**

**3** 28:25 29:1
**30** 75:13
**31** 1:20 76:4
**31st** 73:9 75:7
**32801** 2:16
**33304** 2:10 75:3
**33401** 75:20
**33402-3626** 2:5
**34984** 1:23
**3626** 2:5

---

**4**

**4** 3:7
**407)203-7592**
  2:16

---

**5**

**5-11** 54:23
**561)686-6300**
  2:6

---

**6**

**6** 34:18

---

**7**

**7** 28:25
**70** 3:7
**73** 3:8
**74** 3:9
**75** 3:9
**76** 1:19 3:6,10
  74:10

---

**8**

**8-hour** 28:24

---

**9**

**91** 7:9
**954)462-3200**
  2:11 75:4
**98** 7:17 8:9,16
**99** 8:16 14:21