UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TAVARES DOCHER, by and through                    CASE NO.: 2:16cv14413
JANICE DOCHER-NEELEY, his mother and
legal guardian,

        Plaintiff(s),

vs.

CHRISTOPHER NEWMAN, individually,
CLAYLAN MANGRUM, individually,
CALVIN ROBINSON, individually, WADE
COURTEMANCHE, individually, KEN J.
MASCARA, as Sheriff of St. Lucie County,
Florida, JOSE ROSARIO, individually, and
the ST. LUCIE COUNTY FIRE DISTRICT,
an independent special district,

        Defendant(s).
_____/

## DEFENDANTS', JOSE ROSARIO AND ST. LUCIE COUNTY FIRE DISTRICT, AMENDED MOTION TO EXCLUDE OPINIONS OF JOHN STERBA, M.D. AND INCORPORATED MEMORANDUM OF LAW

        Defendants, JOSE ROSARIO ("Rosario") and ST. LUCIE COUNTY FIRE DISTRICT

("SLCFD"), by and through their undersigned attorneys, serves this Motion to Exclude Opinions of

John Sterba, M.D., requesting an Order excluding certain opinions of Dr. Sterba pursuant to Rule

702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579

(1992). In support states the following:

**I.    INTRODUCTION**

        1.    On August 11, 2016, Plaintiff filed an Amended Complaint. The twenty count

Amended Complaint asserted claims against Rosario and SLCFD.  Specifically, Count X (First

Amendment Retaliation against Rosario), Count XI (Fourteenth Amendment Due Process),

Count XII (Fourteenth Amendment Deliberate Indifference), Count XIX (Florida State law Negligence against SLCFD) and Count XX (Florida State law Negligence against Rosario). [DE1].

2.      On May 5, 2017, Plaintiff filed her Initial Expert Disclosure disclosing five (5) experts, including Dr. John Sterba. [DE 40]

3.      On May 22, 2017, Plaintiff disclosed Dr. John Sterba's Expert Report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. A copy of Dr. Sterba's May 22, 2017, expert report is attached hereto as **Exhibit A**.

4.      On June 6, 2017, Plaintiff filed a Second Amended Complaint. The twenty-one count Second Amended Complaint asserted claims against Rosario and SLCFD.  Specifically, Count X (First Amendment Retaliation against Rosario), Count XI (Fourteenth Amendment Due Process), Count XII (Fourteenth Amendment Deliberate Indifference), Count XIX (Florida State Law Negligence against SLCFD), Count XX (Florida State Law Negligence against Rosario) and Count XXI (Policy, Custom and Procedure against SLCFD). [DE 60]

5.      On July 25, 2017, Dr. Sterba submitted a supplemental Expert Report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. A copy of Dr. Sterba's July 25, 2017, expert report is attached hereto as **Exhibit B**.

6.      In his report, Dr. Sterba states the following standard of care opinions as to Rosario:

> No EMS emergency treatments had been started such as any administration of high-flow oxygen by non-breather facemask or any other method for this trauma patient with a head injury, bleeding from the head and face, and a most recent loss of consciousness with ongoing altered mental status, responsive only to pain. *See* (Exhibit A page 6).

If Jose Rosario, EMT-P was using only these SO Officer's hard restraints (handcuffs) as his EMS restraining method, he violated strict EMS training and protocols in the approved use of EMS physical restraints. See (Exhibit A page 7).

Jose Rosario, EMT-P failed to meet the EMS Standard-of Care by not using available multiple SO Officers to keep Mr. Docher safely restrained on the EMS long spine board to allow Jose Rosario, EMT-P to then quickly and safely apply his available, EMS approved, four point soft restraints (both ankles then both arms) along with applying his EMS-approved Rayon across-the-chest straps (like seat-bests) onto the long spine board before moving Mr. Docher onto the gurney. *See* (Exhibit A page 8)

According to training and EMS Policies and Procedures, Jose Rosario, EMT-P in this high-risk situation was required to first contact Medical Control before using a strong CNS depressant, sedative-hypnotic, lorazepam (Ativan). See (Exhibit A page 9)

Established EMS protocols list two contra-indications for using lorazepam (Ativan), *both* of which existed for Mr. Docher. He had head trauma and more likely than not, the metabolic disturbance of acidosis from extreme physical exertion being chased, taken down and violently resisting and fighting after being arrested. *See* (Exhibit A page 10).

He reckless administered lorazepam (Ativan) incorrectly by going straight to the maximum dose of 4 mg intra-muscularly (IM), not the required 1 mg in step-by-step (incremental) dosing of 1 mg each time, if the patient was indeed determined to be stable with close medical monitoring for any respiratory depression and hypotension. *See* (Exhibit A page 11).

Furthermore, the use EMS use of the maximum dose of 4mg lorazepam (Ativan) either IM of intravenously (IV) is to be done *slowly*, 2 mg per minute, which was not done by Jose Rosario, EMT-P. *See* (Exhibit A page 11).

… Jose Rosario, EMT-P failed to monitor the patient before and during these next three minutes when he thereafter suddenly noticed the Mr. Docher had gone into cardio-pulmonary arrest with no respirations and no pulse. *See* (Exhibit A page 11).

In addition, there was no documentation that Jose Rosario, EMT-P ever aspirated after inserting the needle into the buttocks muscle by first pulling back on the syringe plunger to confirm he had not inadvertently inserted the needle into a vein, or artery. This was not only his training, it was critically medically necessary plus it is the EMS Standard-of-Care. *See* (Exhibit A page 12).

7.      In addition to Dr. Sterba standard of care opinions aimed at SLCFD:

That St. Lucie County Fire District's Emergency Medical Guidelines for Lorazapam (Ativan) use are at fault for not being clearly and properly written, leading to improper training, practices and treatment in the field by EMT-P's. *See* (Exhibit A page 11).

Captain Gonzalez, the St. Lucie County Fire District and Indian River State College fell below the U.S. Standards of Care in their knowledge, teaching and written Policies due to:

1. *Not* understanding or teaching paramedics the Contraindications (except hypersensitivity) for giving Ativan (lorazepam) by injection.

2. Stating and teaching paramedics there are no Contraindications in the emergency setting for the injection of Ativan (lorazepam).

3. Stating and teaching paramedics *can inject up to four milligrams of Ativan (lorazepam) without monitoring* in between 1 milligram incremental doses. *See* (Exhibit B page 20, 30).

These people and agencies listed above and these three failures, individually or collectively, demonstrate a Reckless Disregard for the life and well-being of Tavares Docher because they all either knew or all should have known that these failures and subsequent actions in the field could kill patients. *See* (Exhibit B page 30).

8.     Dr. Sterba also offered the following causation opinions as to Rosario and

SLCFD:

A patient such as Mr. Docher, more likely than not, went into respiratory and cardiac arrest caused by Jose Rosario, EMT-P rapidly administering such a high-does (4 mg) of lorazepam (Ativan), all-at-once, with Mr. Docher having both contraindications of its use, plus being in a critical unstable condition from his existing medical and physiological problems discussed below. *See* (Exhibit A page 12).

More likely than not, had 4 mg, IM of lorazepam (Ativan) ***not*** been given, Mr. Docher would not have gone into cardio-pulmonary arrest. *See* (Exhibit A page 12).

With such a rapid deterioration of Mr. Docher's unstable critical condition into cardio-pulmonary arrest three minutes after injection of the high 4 mg dose of lorazepam (Ativan), more likely than not, this attempted IM injection was actually an IV injection, which would have produced a fast onset of action. *See* (Exhibit A page 12-13).

However, even if Jose Rosario, EMT-P did aspirate finding no venous or arterial blood, his IM injection of such a high-dose (4 mg) under these conditions would still have caused cardio-pulmonary arrest. *See* (Exhibit A page 13).

Jose Rosario, EMT-P caused chemical asphyxiation, cardio-pulmonary arrest and subsequent disability in Mr. Docher. *See* (Exhibit A page 14).

Therefore, more likely than not, Captain Gonzalez, the St. Lucie County Fire District and Indian River State College contributed to causing the cardio-pulmonary arrest and subsequent brain damage of Tavares Docher. *See* (Exhibit B page 21, 30).

## II. UNDERLYING FACTS

On May 11, 2014, at approximately 6:03 p.m., uniform patrol deputies with the St. Lucie County Sheriff's office were dispatched to the CVS pharmacy located at 301 NW Prima Vista Boulevard in reference to a 911 hang-up call inside the store. Deputy Newman, Deputy Mangrum and Deputy Robinson, arrived on scene and they began to interact with Docher. Following their interaction, Docher was handcuffed and placed into the back seat of a marked patrol car. He was seated in the back seat with his feet still outside the car. While attempting to get him completely into the car, he jumped out and attempted to flee. The deputies grabbed Docher and they all fell to the ground.

While on the ground, Docher continued to resist by flailing around, kicking his legs and attempting to bite the deputies. At some point during the altercation, Docher received a laceration over his left eye. Fire Rescue was summoned and back-up was also called. The deputies on scene began to render aid to Docher until fire rescue arrived.

At 18:29:56, the St. Lucie County Fire District ("SLCFD") received an emergency trauma call to respond to the CVS Drug Store parking lot at 301 NE Prima Vista Boulevard, Port St. Lucie, FL 34983. Rescue 3 was dispatched at 18:30:12. A-Shift Lead Crew Member Rosario and Thomas Sinclair ("Sinclair") were on board. Rosario was the primary paramedic on the call.

Rosario and Sinclair arrived on scene at 18:34:00. At 18:36:00, Rosario began assessing the situation and Docher.

Docher was initially assessed by Rosario at 18:36:00. Rosario noted that Docher's breathing quality was fast 20 – 30, the venous hemorrhage controlled by PTA (Prior to arrival), extremities normal, central body color normal, mucous membrane normal, and airway, breathing quality, muscle use, chest rise, skin temp, skin turgor and cap refill were all within normal limits. One deputy reported that alcohol had been involved. However, Rosario denied smelling alcohol on Docher at the scene and was not sure if Docher had been drinking. Docher had a laceration on the right side of his head with minimal to no bleeding. Docher's nose and mouth had fresh blood on them. He was lying on his side with his head surrounded by a pool of blood and deputies subduing him. Docher was still active while the deputies were on him.

At 18:38 Rosario noted that Docher had a pulse of 110 regular and rapid, respirations 28, respiratory effort normal and Docher was responsive to painful stimuli.

At 18:39 Rosario and Sinclair attempted to place Docher on a backboard. However, Docher was very combative and would not stay on the backboard. Docher kicked Rosario causing him to fall backwards. At 18:40:00, due to the Docher's combative nature, he was administered 4 mg of Ativan intramuscular in his right buttocks. The SLCFD's policy allows for sedation of combative patients. The policy allows for Ativan 1 mg increments to a max of 4 mg without physician consult. Alcohol is not one of the contraindication listed on the FDA approved Package Insert for Ativan. Rosario testified that that he was not aware of alcohol being a contraindication to Ativan.

At 18:43:00, it was determined that Docher had no pulse, was not breathing and was in cardiac arrest (asystole). CPR was begun. A King Airway was used for immediate airway

control. An IV was placed in Docher's jugular and he was given 1 mg of Epi and 50 mEq of

Sodium Bicarb. Docher was successfully defibrillated and more CPR administered. At 18:47:45,

Docher was transported in Rescue 3 to St. Lucie Medical Center.

Docher had return of spontaneous circulation before being turned over to St Lucie

Medical Center Emergency Room staff at 18:56:10. Laboratory testing at St. Lucie Medical

Center revealed that Docher had a blood alcohol level of .038. A Brain CT without contrast was

negative (no depressed skull fracture).

## III.    MEMORANDUM OF LAW

### A.    Standards for Admissibility

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony and

provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the produce of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

In *Daubert*, the Supreme Court held that district courts must act as gatekeepers, admitting

expert testimony only if it is both reliable and relevant. 111 S. Ct. 2786, 2799 (1993); *Finestone*

*v. Florida Power and Light Co.*, 272 Fed. Appx. 761 (11th Cir. 2008).  *Daubert*'s gatekeeping

function requires "rigorous" analysis and its importance "cannot be overstated."  *United States v.*

*Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).   The court's gatekeeper role "inherently

require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to

ensure they meet the standards for admissibility under Rule 702.  *Id.*  Each step of the expert's

analysis must be demonstrated to be reliable; if any step fails the *Daubert* test, the entire testimony is inadmissible. *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005). *Daubert* requires that trial courts act as "gatekeepers" to ensure that speculative, unreliable expert testimony does not reach the jury. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). This gatekeeping role is significant because an expert's opinion can be both powerful and quite misleading. *Payne v. C.R. Bard, Inc.*, 606 Fed. Appx. 940 (M.D. Fla. 2014) (*quoting United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Court expanded *Daubert* to all expert testimony and found *Daubert* allows the court to exclude evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 157. *See also McDowell v. Brown*, 392 F.3d 1283, 1301-02 (11th Cir.2004) ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions…."). The party offering the expert opinion testimony bears the burden of establishing, by a preponderance of the evidence, the expert's qualifications, reliability and helpfulness. *Payne*, 606 Fed.Appx. at 940.

The Eleventh Circuit has set forth a "three part inquiry to determine the admissibility of expert testimony under Fed. R. Evid. 702." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333 (11th Cir. 2003):

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Additionally, the courts have developed a non-exclusive list of inquiries to assess reliability. These include whether the expert's theory can be tested, has been tested, and has been subjected to peer review; the known or potential rate of error; whether the theories are generally accepted; whether an expert has properly accounted for alternative explanations; whether the conclusions grow out of the expert's own research; whether the opinions were prepared with the same care as they would have been outside of litigation; and whether the opinions would assist the trier of fact. *Daubert*, 509 U.S. at 593-94; *Kumho*, 526 U.S. at 154-55.

The burden is on the party offering the proposed expert opinion testimony to prove by a preponderance of the evidence that the testimony satisfies the requirements for admissibility. *See Daubert*, 509 U.S. at 592 n.10; *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). An expert for one purpose is not an expert for all purposes. "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony." 29 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure § 6265 (3rd ed.); *see Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (Stating "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."); *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) (stating "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.")

Accordingly, not all opinions that happen to be held by an expert are "expert opinions." *See U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). Opinions falling outside the expert's area of expertise are inadmissible. *See, eg., Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995)

(holding neurologist's testimony "that the [plaintiffs neck] injury was more consistent with being thrown into a wall than with a stumble into the corner" excluded because doctor had no experience in accident reconstruction or forensic medicine); E*dmonds v. Illinois Central Gulf Railroad*, 910 F.2d 1284, 1287 (5th Cir. 1990) (holding trial court erred in permitting clinical psychologist to testify that stress worsened plaintiffs preexisting heart condition since this was medical, not psychological, issue); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339-40 (7th Cir. 1989) (rejecting economist's opinion that defendant's conduct was contrary to good faith and fair dealing because such "insights are no part of an economist's armamentarium").

### B. Dr. Sterba is Not Qualified to Render Standard of Care Opinions Against SLCFD And/Or Rosario

Dr. Sterba is a medical doctor board certified in emergency medicine, urgent care medicine. *See* (Sterba Depo. 7:12-16, July 19, 2017). A copy of Dr. Sterba's July 19, 2017, deposition transcript is attached hereto as **Exhibit C**. However, he is not board certified in the subspecialty of emergency medical services. *See* (Sterba Dep. II 306:5-10). A copy of Dr. Sterba's August 8, 2017, deposition transcript is attached hereto as **Exhibit D**. He graduated in 1973 with An Emergency Medical Technician (EMT) certificate. *See* Exhibit C  (Sterba Dep. 15:16-18). Dr. Sterba was never trained as a paramedic. *See* Exhibit C (Sterba Dep. 20:2-5). He does not have a current EMT license in any state. *See* Exhibit C (Sterba Dep. 20:16-18). The last time he actually practiced as an EMT was in 1981. *See* Exhibit C (Sterba Dep. 20:19-23). He only performed voluntary work as in EMT in Florida during the summer of 1973. *See* Exhibit C (Sterba 22:17-23:4). While working as an EMT Dr. Sterba never chemically sedated a patient in the field. *See* Exhibit C (Sterba Dep. 23:5-9). Dr. Sterba acknowledged that a paramedic has

more training and clinical experience than an EMT. *See* Exhibit C (Sterba Dep. 24:5-8). He also acknowledged that paramedics are also able to perform high level of care than an EMT such as ACLS skills, intubation  and medication administration. *See* Exhibit C (Sterba Dep. 24:9-20). He also acknowledged that the level of care an emergency physician is able to provide is much different that the level of care a paramedic can provide. *See* Exhibit C (Sterba Dep. 24:21-25:6). Dr. Sterba is not a member of the National Association of Emergency Medical Technicians. *See* Exhibit C (Sterba Dep. 26:2-4). He is not a member of the National Association of State EMS Officials. *See* Exhibit C (Sterba Dep. 26:5-17). He is not a member of the National Association of EMS Physicians. *See* Exhibit C (Sterba Dep. 26:8-10). He has not authored any articles, peer reviewed journal articles, books or textbooks in the field of emergency medical services related to any of the issues in this case. *See* Exhibit C (Sterba Dep. 26:11-27:6). That the last time he taught EMTs was back in 1990 to 1993. *See* Exhibit C (Sterba Dep. 30:11-19). Now he only occasionally has a paramedic attend one of his ACLS classes. *See* Exhibit C(Sterba Dep. 30:22-31). He does not teach any specific paramedic or EMT programs. *See* Exhibit D (Sterba Dep. II 306:31-307:3). The last time he may have been involved with developing policies and procedures for an emergency medical provider was in 1990 to 1993. *See* Exhibit C (Sterba Dep. 32:23-33:13). He does not recall writing any policy or procedure for an emergency medical service provider entity regarding sedation. *See* Exhibit C (Sterba 33:17-19). Dr. Sterba has not developed any policies or procedures for any governmental or private emergency medical service provider. *See* Exhibit D (Sterba Dep. II 306:11-20).

It clear that while Dr. Sterba holds himself out as an expert witness, his actual training, education, and experience as to paramedic and/or emergency medical service providers is extremely limited, and demonstrates his lack of qualifications to address standard of care

opinions as to SLCFD and Rosario a set forth in his Expert Reports.

Not only does Rule 702 as interpreted by *Daubert* seek to insure the reliability of the expert's testimony, it also seeks to verify the qualifications of the expert. *In Re: Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d. 1348, 1352 (N.D. Ga. 2000). Many Courts have excluded the opinions and expert testimony of experts under *Daubert* and is progeny and Rule 702 based on the expert's lack of qualifications. *In Re: Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d. 1348 (N.D. Ga. 2000); *City of Tuscaloosa v. Harcros Chemc., Inc.*, 158 F. 3d 548 (11th Cir. 1998); *Joiner v. GE*, 78 F. 3d 524 (11th Cir. 1996); *Everett v. Georgia-Pacific Corp.*, 949 F. Supp. 856 (S.D. Ga. 1996); *McLendon v. Georgia Kaolin Co.*, 841 F. Supp. 415 (M.D. Ga. 1994); *Wheat v. Sofamaf, S.N.C.*, 46 F. Supp. 2d. 1351 (N.D. Ga. 1999). It is clear therefore from a careful review of Dr. Sterba's training, education, and experience that he is not qualified to render the opinions set forth in his Rule 26 Report regarding standard of care as to SLCFD. Nor is he qualified to render the opinions set forth in his Rule 26 Report regarding standard of care as to Rosario.

### C. Dr. Sterba's Is Not Qualified To Testify As To The Pharmacokinetic Properties Of Ativan

Dr. Sterba admitted at his deposition that he is not an expert in the area of Pharmacokinetics. *See* Exhibit D (Sterba Depo II, 282:21-283:2). Pharmacokinetics is the study of the movements of drugs within biologic systems, as affected by uptake, distribution, binding, elimination, and biotransformation; particularly the rates of such movements. By his own admission he is not qualified to testify as to the pharmacokinetic properties of Ativan, including onset of action. *See* Exhibit C (Sterba Dep. 170:19-21) (defining Pharmacokinetics as how

quickly [a medication] kicks in and how long it lasts). As such, all opinions as to the pharmacokinetic properties of Ativan, including onset of action and related opinions, should be excluded. *See* Exhibit C (Sterba Dep. 171:17-20). *See, e.g., In re Trasylol Prods. Liab. Litig.*, No. 1:08-md-1928, 2010 WL 4053756, at *4-7 (S.D. Fla. May 17, 2010) (excluding testimony by proffered plaintiffs' expert who admitted she was not an expert); *Parmentier v. Novartis Pharm. Corp.*, No. 1:12-cv-45 SNLJ, 2012 WL 2326047, at *4 (E.D. Mo. June 19, 2012) ("Defendant argues that [expert's] admission that he is not an expert at diagnosing the causes of ONJ precludes him from testifying as an expert on specific causation. This Court agrees."); *Luttrell v. Novartis Pharm. Corp.*, No. 07-CV-3015-TOR, 2012 WL 4513109, at *7 (E.D. Wash. Oct. 1, 2012) (same); *Bouchard*, 2002 WL 32597992, at *4-5 (excluding expert without experience in FDA regulations from criticizing defendant for not complying with FDA regulations); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 611 (7th Cir. 2002) (affirming exclusion of expert testimony when purported expert admitted at his deposition that he was not an expert in the areas of modeling he relied on to form his conclusion); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("In view of [the expert's] admitted lack of pertinent expertise, the testimony is excluded.").

### D.    Dr. Sterba's Opinion Regarding An IV Injection Should Be Excluded.

It is Dr. Sterba's opinion that "[w]ith such a rapid deterioration of Mr. Docher's unstable critical condition into cardio-pulmonary arrest three minutes after injection of the high 4 mg dose of lorazepam (Ativan), more likely than not, this attempted IM injection was actually an IV injection, which would have produced a fast onset of action." *See* (Exhibit A page 12-13). However, he admits that he cannot say within a reasonable degree of medical probability (as required by Florida law) that the Ativan was given intravenously. *See* Exhibit C (Sterba Dep.

177:8-12). *See Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So. 2d 1015, 1018 (Fla. 1984) ("Florida Courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury.")). Dr. Sterba's opinion regarding an IV injection of Ativan does not satisfy the requirements of Federal Rule of Evidence 702 or *Daubert. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 LED 2d 469 (1993).

### E. The Court Should Exclude Dr. Sterba's Timeline As It Is Based On Assumptions Which Are Contradicted By Record Evidence

In evaluating an expert opinion's relevance, *Daubert's* gatekeeping function requires that there be an analytical "fit" between an expert's offered opinions and the facts of the case. *Daubert*, 509 US at 591. An expert witness may not ignore inconvenient facts or base opinions on assumptions contradicted by record evidence when it held:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Electric Co. v. Joiner*, 522 U.S. 136, 147 (1997). *See also Chikovsky v. Ortho Pharm. Co.*, 832 F.Supp. 341, 345-46 (S.D.Fla. 1993) (excluding expert testimony for failure to base opinion on sufficient facts or data); *Elock v. Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000) (excluding expert testimony based on assumption without factual predicate as a "castle made of sand"); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record").

In reaching his opinions, Dr. Sterba created a timeline of the events by solely using on CVS surveillance video with the vantage point of looking out to the parking lot, and the cell phone video available. *See* Exhibit D (Sterba Dep. II 213:4-6; 214:21-23). However, he admitted that the timeline he created is strictly based on his observations and interpretations, and while he suspects the times reflected on both videos match up, he does not know if the time on the CVS pharmacy was calibrated to the actual time. *See* Exhibit D (Sterba Dep. II 227:4-19). Thus, the timeline he created to support his opinion is not reliable.

Dr. Sterba's timeline also contains entries such as Docher "groans", "gasps", "shallow gasping breath sounds", however he admits that this is solely his interpretation that Docher was groaning and gasping. *See* Exhibit D (Sterba Dep. II 216:20-22). Dr. Sterba admits that at times in the video there are background voices that can be heard, that at times one cannot see the deputies' mouths or Mr. Docher, depending on how the deputies are positioned one is not able to see what everyone is doing every second. *See* Exhibit D (Sterba Dep. II 217:9-20). He attributes the statement "F***ing stop moving!" to being said by Deputy Mangrum, however, he admits that he does not have expertise in voice/video enhancement. *See* Exhibit D (Sterba Dep. II 214:4-6). Dr. Sterba's testimony that it was deputy Mangrum that made that statement, and that he exhibited uncontrollable rage as he said that, is simply speculation and allowing him to testify as such would only confuse and influence the jury. The video evidence speaks for itself, and the jury will be able to view the videos, and listen to the audio and make its own finding as to who said what.

In his timeline, Dr. Sterba also notes that Docher said "I can't brr…". *See* (Exhibit B page 34). Dr. Sterba's opinion is that Mr. Docher tried to say "I can't breathe" but ran out of air and all he got out is "I can't brr..". *See* Exhibit D (Sterba Dep. II 220:3-9).  However, he did

admit and noted in his timeline that after saying "I can't brr…", he said other one word sentences such as "Help", "Alright", "Ok". *See* Exhibit D (Sterba Dep. II 221:1-12). Just like his opinion as to the statement allegedly made by Mangrum, his opinion as to what Docher wanted to say is pure speculation and should not be permitted, especially when the jurors will be able to make their own determination as to what  was said and what it meant. Dr. Sterba does not have any expertise in video and/or voice enhancement, and so his view and interpretation of what it is seen and heard is in no way more superior to the ability of the juror to do just that, and his interpretation will in no way assist the jury in understanding that they are looking at and hear in the video.

### F.     Dr. Sterba's Testimony Should be Limited to Only the Opinions Included in His Expert Report

The trial of this matter is set on the Court's trial docket beginning January 22, 2018. On May 5, 2017, Plaintiff filed her Initial Expert Disclosure disclosing five (5) experts, including Dr. John Sterba. [DE 40]  On May 22, 2017, Plaintiff disclosed Dr. Sterba's Expert Report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Dr. Sterba supplemented his May 22, 2017, Expert Report on July 25, 2017.

On July 19, 2017, and August 8, 2017, Dr. Sterba was deposed in this matter. *See* Exhibit C and Exhibit D. During the deposition, he testified for the first time as to several opinions not contained within his May 22, 2017, or July 25, 2017 Expert Reports. Dr. Sterba testified that in addition to the standard of care opinions contained in his Expert Report, he believes Rosario fell below the standard of Care in failing to talk Docher down prior to using chemical sedation. *See* Exhibit C (Sterba Dep. 130:8-20; 136:19-22). Dr. Sterba also testified that there were actually five (5) contraindications to the use of Ativan in Mr. Docher's situation: 1) substance abuse, 2)

coma, 3) shock, 4) severe hypotension and 5) CNS depression. *See* Exhibit C (Sterba Dep. 142:16-144:1). He testified for the first time that Rosario should have asked if Docher loss consciousness prior to his arrival. *See* Exhibit C (Sterba Dep. 144:8-146:17). Dr. Sterba also added to his standard of care opinion as to SLCFD that risks for use of Ativan should have been included in any policies and procedures. *See* Exhibit C (Sterba Dep. 191:19-192:6). Dr. Sterba testified as to his opinion of what Docher's end tidal $CO_2$ and blood pressure would have been at the time of the video. *See* Exhibit D (Sterba Dep. II 292:3-13; 296:4-22). Finally, he also testified as to what he believed Docher's pH level would have been prior to the Ativan injection. *See* Exhibit D(Sterba Dep. II 299:16-22).

The law is well settled that an expert witness cannot testify at trial regarding opinions which were not previously disclosed as part of the expert's written report. Federal Rule of Civil Procedure 26(a)(2)(B)(i) provides that an expert witness's written report *"must contain ... a complete* statement of *all* opinions the witness will express and the basis and reasons for them."* Similarly, S.D. Fla. L.R. 16.1.K requires that an expert witness's written report contain, among other things, *"the substance of the facts and all opinions to which the expert is expected to testify...."* As the Seventh Circuit observed in *Salgado by Salgado v. General Motors Corporation,* 150 F.3d 735 (7th Cir. 1998):

> Rule 26(a) expert reports must be "detailed and complete." A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor. The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources. Expert reports must not be sketchy, vague or preliminary in nature .... Expert reports must include "how" and "why" the expert reached a particular result, not merely the expert's conclusory opinions .... The "incentive for total

> disclosure" is the threat that expert testimony not disclosed in
> accordance with the rule can be excluded pursuant to Rule
> 37(c)(1). The availability of this sanction "put[s] teeth into the
> rule."

*Id.* at 746 n. 6 (citations omitted).

Based on these Rules and principles, it is well settled that an expert witness may not testify at trial regarding opinions which were not included or disclosed in the expert's written report. *See, e.g., Osterhouse v. Grover,* 2006 WL 2051301, at *2 (S.D. Ill. July 20, 2006) (because "[a]ll opinions to be expressed must be contained in an expert report .... any opinion that any of the plaintiffs' experts would express at trial is limited to only those opinions found in their respective expert report"); *Dairy Farmers of America, Inc. v. Travelers Ins. Co., 391* F.3d 936, 943-44 (8th Cir. 2004) (district court properly excluded opinion of expert that was not disclosed in expert's report); *Nurtrasweet Company v. X-L Engineering Co.,* 227 F.3d 776, 786 (7th Cir. 2000) (approving district court ruling that limited an expert's testimony to the opinions outlined in the original expert report as no supplemental report was filed prior to the expert report deadline); *Bailey v. U.S. Dept. of Transp.,* 2008 WL 918717, at *1 (C.D. Cal. Jan. 10, 2008) (granting motion in limine to prevent expert witness from "offer[ing] opinions at trial that were not contained in his expert report"); *Beller ex rel. Beller v. U.S.,* 221 F.R.D. 689, 695 (D.N.M. 2003) (limiting expert witness's testimony at trial to opinions timely disclosed in original expert report); *see also Cooper v. Southern Co.,* 390 F.3d 695, 728 (11th Cir. 2004) (approving district court's exclusion of plaintiffs' expert's declaration in opposition to summary judgment motion where plaintiffs failed to provide a report containing the expert's opinions). As succinctly stated by the court in *Coles v. Perry,* 217 F.R.D. 1 (D.D.C. 2003):

> The interest served by requiring the disclosure of expert opinions is
> self evident. It is to prevent unfair surprise at trial and to permit the

> opposing party to prepare for the expert's cross examination. By "locking" the expert witness into what Fed. R. Civ. P. 26(a)(2)(B) calls "a complete statement of all opinions to be expressed and the basis and reasons therefor," the opposing party knows exactly what she is facing and can decide whether to take the deposition of the expert and how to prepare for cross examination and rebuttal. When the expert supplements her report by addressing a new matter after discovery has ended, the very purpose of the rule is nullified. [The court], therefore, [is] obliged by these rules to strike [any supplemental opinions].

*Id.* at 4.

## IV.   CONCLUSION

Defendants Rosario and SLCFD respectfully request the Court to exclude the standard of care opinions as to Rosario of Plaintiff's proffered expert, Dr. John Sterba. Dr. Sterba does not meet the minimum requirements under Rule 702 and *Daubert,* and further, he is simply not qualified to render opinions regarding standard of care, as set forth in his Expert Report in this case. However, if the Court permits Dr. Sterba to testify, the Court should nevertheless limit his testimony to opinions contained within his Expert Report.

WHEREFORE, Defendants, JOSE ROSARIO and ST. LUCIE COUNTY FIRE DISTRICT, respectfully request this Court grant their motion and prevent Dr. Sterba from offering his standard of care opinions as to Rosario and/or SLCFD at trial as it does not meet the admissibility standards if section Rule 702 and *Daubert*; to exclude Dr. Sterba's opinion regarding an IV injection; to exclude any pharmacokinetics opinions as he admits he is not an expert in that field; to limit his testimony to opinions contained within his Expert Report and any other relief the Court deems proper and just.

## 7.1(a)(3) STATEMENT

Counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and Plaintiff thereby objects.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the Clerk of Court using the CM/ECF on this 6th day of October 2017, and furnished a copy to: **Adam Hecht, Esq.,** *(Counsel for Plaintiff)* ash@searcylaw.com, axs@searcylaw.com, mal@searcylaw.com, jcx@searcylaw.com, lewisteam@searcylaw.com, Searcy Denney Scarola Barnhart & Shipley, P.A., 2139 Palm Beach Lakes Boulevard, West Palm Beach, FL 33409; **Summer M. Barranco, Esq.,** (*Counsel for Christopher Newman, Claylan Mangrum, Calvin Robinson, Wade Courtemanche, and Ken J. Mascara, as Sheriff of St. Lucie County, Florida*) summer@purdylaw.com; Melissa@purdylaw.com; Law Offices of Purdy, Jolly, Giuffreda & Barranco, P.A., 2455 East Sunrise Boulevard, Suite 1216, Fort Lauderdale, FL 33304.

> */s/BENJAMIN W. NEWMAN*
> BENJAMIN W. NEWMAN, ESQUIRE
> Florida Bar No.: 0011223
> JULIE A. TYK, ESQUIRE
> Florida Bar No.: 84493
> Wilson Elser Moskowitz Edelman & Dicker, LLP
> 111 N. Orange Ave., Suite 1200
> Orlando, FL 32801
> Phone: (407) 203-7599
> Fax:    (407) 648-1376
> Ben.Newman@wilsonelser.com
> Julie.Tyk@wilsonelser.com
> Counsel for Defendants, JOSE ROSARIO and
> ST. LUCIE COUNTY FIRE DISTRICT