# EXHIBIT A

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                Case No.:  2:16CV14413
 3

 4   TAVARES DOCHER, by and through   )
     JANICE DOCHER-NEELEY, his mother )
 5   and legal guardian,              )
                                      )
 6                     Plaintiff,     )        CERTIFIED
                                      )        TRANSCRIPT
 7   vs.                              )
                                      )
 8   CHRISTOPHER NEWMAN,              )
     individually, CLAYTON MANGRUM,   )
 9   individually, CALVIN ROBINSON,   )
     individually, WADE COURTEMANCHE, )
10   individually, KEN J. MASCARA, as )
     sheriff of St. Lucie County,     )
11   Florida, JOSE ROSARIO,           )
     individually, and the ST. LUCIE  )
12   COUNTY FIRE DISTRICT, an         )
     independent special district,    )
13                                    )
                       Defendants.    )
14   _____)

15

16                    DEPOSITION OF

17                TERI STOCKHAM, PH.D.

18

19        DATE TAKEN:      September 5, 2017

20        TIME:            10:06 a.m. - 11:15 a.m.

21        PLACE:           J & A Reporting
                           2900 N. University Drive
22                         Coral Springs, Florida

23
          Examination of the witness before:
24
                      Mia Sohn, RPR
25              Certified Shorthand Reporter
```

                                                                    2

1    <u>APPEARANCES</u>:

2

     ON BEHALF OF THE PLAINTIFF:
3
          LAW OFFICES OF SEARCY, DENNEY, SCAROLA,
4         BARNHART & SHIPLEY, P.A.
          BY:  ADAM S. HECHT, ESQUIRE
5         2139 Palm Beach Lakes Boulevard
          West Palm Beach, Florida  33409
6         (561)686-6300
          ahecht@searcylaw.com
7

8    ON BEHALF OF DEFENDANT MASCARA:

9         LAW OFFICES OF PURDY, JOLLY, GIUFFREDA &
          BARRANCO, P.A.
10        BY:  RICHARD A. GIUFFREDA, ESQUIRE
          Galleria Corporate Centre, Suite 1216
11        2455 East Sunrise Boulevard
          Fort Lauderdale, Florida  33304
12        (954)462-3200
          richard@purdylaw.com
13

14   ON BEHALF OF DEFENDANT PORT ST. LUCIE FIRE RESCUE
     (via telephone):
15
          LAW OFFICES OF WILSON, ELSER, MOSKOWITZ,
16        EDELMAN & DICKER, LLP
          BY:  JULIE TYK, ESQUIRE
17        111 North Orange Avenue, Suite 1200
          Orlando, Florida  32801
18        (407)203-7592
          julie.tyk@wilsonelser.com
19

20

21                    - - - - - -

22

23

24

25

3

1

I N D E X

2

WITNESS:   TERI STOCKHAM, PH.D.                    PAGE

3

Direct Examination by Mr. Hecht                    4

4

5

6

7                     –  –  –  –  –  –  –

8

9

10

E X H I B I T S

11

FOR PLAINTIFF

12

NO.   DESCRIPTION                                  PAGE

13

1     Curriculum vitae, 4 pages                    6

14

2     Dr. Stockham's fee schedule
15          (not provided to reporter for marking)   18

16   3     CD                                         18

17   4     Clinical lab report                        34

18

19

20

21

22

23

24

25

J & A Reporting        (954)344-0555

4

Thereupon,

                    TERI STOCKHAM, PH.D.,

was called as a witness and, after having been

first duly sworn, was examined and testified as

follows:

                    DIRECT EXAMINATION

BY MR. HECHT:

     Q.    Good morning.  Could you please state

your name?

     A.    Dr. Teri Stockham.

     Q.    And what is your current employment?

     A.    I'm a forensic toxicologist consultant.

     Q.    What is a forensic toxicologist?

     A.    Forensics combines medical-legal aspects

of incidents, and toxicology is the study of toxic

effects of drugs and poisons.

     Q.    So as a forensic toxicologist, you are

hired by attorneys to evaluate data and information

and then give an opinion as to that data and

information; is that correct?

     A.    Yes.

     Q.    It looks like according to your C.V. you

have two different offices; is that correct?

     A.    Yes.

     Q.    You have an office in Parkland, Florida

5

1    and an office in Manitou Springs, Colorado?

2         A.    Yes.

3         Q.    Why do you have an office in Parkland and

4    in Colorado?

5         A.    They're both home offices.

6         Q.    And what does that mean?

7         A.    I distribute my time between the two

8    locations.  So for local clients in Colorado, I have

9    that address for them.

10        Q.    When you say home offices, is the

11   9218 Meridian Drive West, Parkland, Florida 33076 a

12   home or is it an actual office space?

13        A.    It's a home.

14        Q.    And out of your home, who do you employ

15   out of that Parkland location?

16        A.    No one other than myself.

17        Q.    And in the Colorado location, the

18   36 El Paso Boulevard, Manitou Springs, 80829, is

19   that a residence?

20        A.    Yes, it is.

21        Q.    And do you employ anyone other than

22   yourself at that residence?

23        A.    No.

24        Q.    Currently you are employed as the

25   president of Teri Stockham, Ph.D., Inc., a forensic

6

1    toxicology consulting firm; is that correct?

2         A.    That's correct.

3         Q.    Other than yourself, are there any other

4    employees with that company?

5         A.    No.

6         Q.    In your home offices that you work out

7    of, do you have any sort of machinery or laboratory

8    equipment that you use to evaluate chemicals or

9    substances?

10        A.    No.

11        Q.    Did you bring your C.V. today?

12        A.    I did.

13        Q.    Okay.  If we could go ahead and mark that

14   as Exhibit 1 to the deposition.

15             (The document referred to was

16             subsequently marked Plaintiff's Exhibit

17             No. 1 for identification.)

18             MR. GIUFFREDA:  Is it on the CD?

19             THE WITNESS:  I have my entire case file

20        and everything you asked for in Schedule A that

21        I could provide on a CD presented here today

22        for you.

23   BY MR. HECHT:

24        Q.    All right.  So let me ask you this.

25   Besides what's on the CD -- and I see some documents

7

```
 1   there -- what are those actual physical documents
 2   you brought with you?
 3        A.    Those I've also scanned into the file and
 4   they're on the CD also.
 5        Q.    So why don't we do this then.  Tell me
 6   everything that is on the CD that you brought with
 7   you today.
 8        A.    Okay.  I have correspondence.
 9              Do you want me to go into detail at this
10   time or --
11        Q.    No.
12        A.    Correspondence, literature, Schedule A.
13   I have the documents that were provided to me which
14   were fire rescue incident report, a copy of my
15   report, a notice of taking of the deposition, second
16   amended complaint, St. Lucie County Medical Center
17   records.  I have my invoices.
18        Q.    And that's everything that's contained on
19   the CD that you brought with you?
20        A.    Correct.
21        Q.    The correspondence is between you and the
22   Purdy, Jolly, Giuffreda & Barranco law firm?
23        A.    It is.
24        Q.    And how many correspondence are there?
25        A.    Two.
```

1     Q.    Can you tell me when it was that you were

2 first retained in this case?

3     A.    I received a letter July 27, 2017.

4     Q.    The literature that you have on that CD,

5 how many articles or literature are there?

6     A.    Two.

7     Q.    And what do those consist of?

8     A.    I want to go back and tell you that I

9 received my retainer on August 6, 2017.  So that's

10 typically when I say I was retained, when I receive

11 that.

12           The correspondence has two articles --

13 I'm sorry.  The literature has two articles,

14 "Adolescent Exposure to Cannabis as a Risk Factor

15 for Psychiatric Disorders" is the title of one, and

16 "Cannabis and Psychosis Neurobiology" is the other.

17     Q.    The documents that you reviewed are all

18 contained on that CD; is that correct?

19     A.    That's correct.

20     Q.    You received the St. Lucie County Fire

21 District run report; is that correct?

22     A.    St. Lucie County Fire District incident

23 report.

24     Q.    It's six pages, correct?

25     A.    Yes.

9

1    Q.    The second amended complaint, correct?

2    A.    Yes.

3    Q.    Did you receive all of the St. Lucie

4  County medical records in this case?

5    A.    No.

6    Q.    Tell me, what specifically did you

7  receive as it relates to the St. Lucie County

8  medical records?

9    A.    I received ten pages of lab reports.

10   Q.    And those ten pages of lab reports are

11 contained on the CD?

12   A.    Yes, they are.

13   Q.    And you have your bills or invoices,

14 correct?

15   A.    Yes, I do.

16   Q.    Was it not necessary for you in this case

17 to review all of the medical records from St. Lucie

18 Hospital?

19   A.    This is all I was provided and asked to

20 look at.

21   Q.    And you have not reviewed any depositions

22 in this case?

23   A.    No.

24   Q.    When you were employed by the office of

25 the medical examiner in both Richmond, New York

10

1    City, and Fort Lauderdale, tell me what it is that

2    you did in those roles.

3          A.    My first position at the Richmond,

4    Virginia medical examiner's office consisted as

5    benchtop toxicologist.  I finished writing my

6    dissertation early prior to my employment in

7    New York City, so I went to the medical examiner's

8    office and asked them if they could use an extra

9    pair of hands and volunteered my time there, and

10   shortly thereafter I was retained as a -- employed

11   as a part-time employee for approximately six months

12   before I moved to New York City.

13         Q.    Tell me what you did during those six

14   months in Richmond.

15         A.    General benchtop analysis, blood alcohol

16   analysis, urine drug screens.

17         Q.    And was that considered working for the

18   government?

19         A.    I don't understand your question.

20         Q.    When you worked at the office of the

21   chief medical examiner in Richmond, was that a

22   government position or was that private practice?

23         A.    It's not private practice.  It was a

24   government agency.

25         Q.    I understand.

1          And did you testify on behalf of that

2   government agency while you were employed as a

3   toxicologist in Richmond?

4          A.     No.

5          Q.     You never testified during the one year

6   that you worked at the office of chief medical

7   examiner in Richmond?

8          A.     No.

9          Q.     Okay.  What about when you moved to

10  New York?  I see you worked as a toxicologist at the

11  office of the chief medical examiner.  What did you

12  do there for approximately it looks like five years?

13         A.     That was about three and a half years and

14  it was similar work, benchtop toxicology, so general

15  analysis of specimens to help determine a cause of

16  death for the medical examiner.

17         I also was in charge of method

18  development especially in the HPLC section, and I

19  developed methods for that particular instrument and

20  particular drugs used for analysis on that

21  instrument.  I rotated through all the various

22  sections of analysis.  So general overall toxicology

23  experience.

24         Q.     And did you ever testify at your time as

25  a toxicologist in New York City?

12

1          A.     Yes, I did.

2          Q.     How many times?

3          A.     I'm going to estimate maybe three.  We

4    did not do a blood alcohol analysis program there.

5    That was done by the police, so we just did medical

6    examiner toxicology.

7          Q.     So why is it that you would have gone to

8    court to testify?

9          A.     There were a couple particular DUI cases

10   where they asked us to reanalyze the alcohol and

11   maybe even do a drug test -- I'm not sure -- but

12   they were cases that we were reanalyzing for the

13   police department.

14         Q.     Okay.  And the reason I said that you

15   were employed in New York City as a toxicologist for

16   five years is because on the C.V. that I was

17   provided, it says 1987 to 1991.

18                Do you have a different C.V. that you're

19   looking at, and I'll show you what I have.

20         A.     No.

21         Q.     It says '87 to '91.

22         A.     Right.

23         Q.     But you said it was actually three or

24   three and a half years in New York City.

25         A.     '88, '89, '90, and then half a year.

13

1     Q.    Okay.  I'm not going to quibble, but it

2  says '87 to '91.  That's why I said five years.  I

3  understand.  Okay.

4         Is this your most updated C.V.?

5     A.    Yes.

6     Q.    All right.  And then you left New York

7  City to go to Fort Lauderdale where you became the

8  chief toxicologist, correct?

9     A.    Correct.

10     Q.    And how many years did you work there

11  for?

12     A.    Approximately six and a half, seven.

13     Q.    I agree with you.  According to your

14  C.V., that is correct.  Our math is correct.

15         As the chief toxicologist, what did you

16  do?

17     A.    I was in charge of the entire laboratory

18  operation at the medical examiner's office, so that

19  included doing all autopsy specimen analysis to help

20  determine a cause of death for the medical examiner,

21  and unlike in New York City, in Broward County the

22  medical examiner's office also had the DUI program.

23  So we did all the blood alcohol analysis, all the

24  urine analysis in DUI cases.  So it was my

25  responsibility to oversee -- I probably had five

14

1    toxicologists working underneath me, and to provide

2    the court testimony in particular cases.

3           Q.    During the time that you worked in

4    Fort Lauderdale as the chief toxicologist, would you

5    agree that you testified a lot because you had to go

6    to court and testify in DUI you trials?

7           A.    I had to go and yes, testify about our

8    results in a DUI case for blood alcohol or urine or

9    drug screens.

10          Q.    Was the majority of the testimony that

11   you provided on behalf of the government?

12          A.    Well, I'm in an independent agency.  The

13   medical examiner's office is independent of other

14   agencies such as the Public Defender's Office or the

15   State Attorney's Office.  I would say primarily

16   those cases were -- I was called by the prosecution

17   because we did the analysis.  There were a handful

18   of times that I did testify on behalf of the

19   defense.

20          Q.    Okay.  How many times when you worked in

21   Fort Lauderdale did you go to court and testify?

22          A.    Hundreds and hundreds.

23          Q.    And of those hundreds and hundreds of

24   times, what percentage would you say that you were

25   asked to come to court testifying on behalf of the

15

1    State Attorney's Office?

2         A.    I didn't keep track.  I have no idea.

3         Q.    Was it the majority of the time the State

4    Attorney's Office would ask you to come and testify?

5         A.    I didn't keep track.

6         Q.    So are you telling me that there were

7    times that the Public Defender's Office out of those

8    hundreds and hundreds of times would ask you to come

9    and testify on behalf of someone who was arrested

10   for DUI?

11        A.    Yes.

12        Q.    And you have no information as to how

13   many times that was?

14        A.    I don't keep track.

15        Q.    Okay.  And then you left the Broward

16   County medical examiner's office to become a

17   consultant at PharmChem Laboratories; is that

18   correct?

19        A.    No.  I started my consulting business,

20   Teri Stockham, Ph.D., Incorporated, and underneath

21   that umbrella I did some consulting in addition to

22   my own consulting for PharmChem Laboratories, which

23   was then bought by Kroll Laboratories.  They had the

24   State of Florida contract for violation of probation

25   and parole urine analysis.  So I was consulting with

16

 1    them to provide litigation support with their

 2    results for Dade, Broward, and West Palm -- and

 3    Palm Beach County.

 4         Q.    Why is it that you left your job at the

 5    Broward County medical examiner's office to start

 6    your consulting company?

 7         A.    I developed a lung disease from exposure

 8    there and I couldn't work in the building

 9    environment any longer.  They never corrected the

10    problem.

11         Q.    Have they since corrected that?

12         A.    No --

13         Q.    Okay.

14         A.    -- they haven't.

15         Q.    So you've been working at your consulting

16    firm for 19 years; is that correct?

17         A.    Yes.

18         Q.    How many hours have you put into working

19    on this specific case that we're here to talk about

20    today?

21         A.    Seven.

22         Q.    And your hourly rate is $500 an hour?

23         A.    It is.

24         Q.    So is it correct that you've billed to

25    date $3,500?

1     A.     Correct.

2     Q.     And that's what your invoice reflects?

3     A.     Correct.

4     Q.     And in order for the attorneys who

5  represent the sheriff's office to retain you, they

6  first provided you with a $2,500 retainer, correct?

7     A.     Correct.

8     Q.     You worked off that retainer and then

9  apparently you've worked an additional three hours,

10 correct?

11    A.     Correct.

12    Q.     And today for your deposition, my office

13 is paying you $500 an hour for a minimum of two

14 hours, correct?

15    A.     Correct.

16    Q.     And I see on your fee schedule -- which

17 is attached to your C.V., correct?

18           I just don't know if we marked it or not.

19 I don't know if it's on your CD.

20    A.     It wasn't asked for on Schedule A, so

21 it's not here.  If you have a copy of it, then you

22 should put that into --

23           MR. HECHT:  So we'll attach

24    Dr. Stockham's fee schedule as Plaintiff's

25    Exhibit 2, and then we'll attach the CD that

18

1          the doctor brought with her as Plaintiff's

2          Exhibit 3.

3                    (The document referred to was to have

4                    been marked Plaintiff's Exhibit No. 2 for

5                    identification, but was not provided to

6                    reporter, and Plaintiff's Exhibit No. 3

7                    was marked for identification.)

8     BY MR. HECHT:

9          Q.    It says that for a video deposition,

10    there's an additional charge of $500?

11         A.    Yes.

12         Q.    So obviously we're not videotaping this

13    deposition today, but is it correct that in addition

14    to the $500 per hour, if I wanted to video this

15    deposition, I would have to pay you an additional

16    500?

17         A.    Yes.

18         Q.    Why do you charge an additional $500 for

19    my firm to pay a videographer to come here and to

20    film this deposition?

21         A.    Because typically I find that it's used

22    then in place of me being at trial.  So I think it's

23    fair for me to charge an extra fee.

24         Q.    Okay.  So the reason you would charge a

25    law firm an additional $500 to video your deposition

19

1    is because you're assuming that that would be used

2    in lieu of you having to come to trial when in

3    essence would save someone money, correct, and you

4    would not be getting paid, correct?

5        A.    Correct.

6        Q.    And if this case proceeds to trial, you

7    charge $500 an hour with a minimum of two hours,

8    correct?

9        A.    Correct.

10       Q.    So if you had to drive to Fort Pierce if

11   this case goes to trial and it takes you one hour to

12   get there, you're not just going to charge 500.

13   You're going to charge 1,000, correct?

14       A.    I charge portal to portal.  All my time

15   including travel time is $500 an hour.

16       Q.    So if you drive from your house, which is

17   in Parkland, to Fort Pierce and you're there for ten

18   hours, we would just take ten hours times 500; is

19   that correct?

20       A.    Correct.

21       Q.    And on that CD, did you bring with you a

22   case list for the past five years of cases that you

23   have given depositions in as well as gone to trial

24   on?

25       A.    Yes.

20

1    Q.    And are you able to tell me looking at

2  this case list the percentage of cases that you have

3  been retained for a criminal case versus a civil

4  case?

5    A.    No.

6    Q.    Do you know the breakdown of those cases

7  where you're retained as an expert in a criminal

8  case versus a civil case?

9    A.    No.  I don't keep track.

10    Q.    Are you just able to tell me right now

11  are you typically retained as an expert more on

12  criminal cases or civil cases?

13    A.    I would say more on civil cases.

14    Q.    You just don't know the percentage,

15  correct?

16    A.    Correct.

17    Q.    And in those cases that you are retained

18  on in civil cases, are you able to tell me the

19  percentage breakdown of plaintiff versus defense?

20    A.    No.  I don't keep track.

21    Q.    Have you ever kept track during the 19

22  years that you've been in your consulting practice?

23    A.    No.

24    Q.    Currently, do you know how many cases you

25  have been retained on, whether it be criminal or

21

1    civil cases, that are active?

2         A.    That are active right now?

3         Q.    (Moves head up and down.)

4         A.    No.

5         Q.    So you don't know how many cases you are

6    currently employed as an expert on as you sit here

7    today?

8         A.    No.

9         Q.    Is it more than just this case?

10        A.    Yes.

11        Q.    Is it 500 cases?

12        A.    No.

13        Q.    Is it 100 cases?

14        A.    No.

15        Q.    Less than 100?

16        A.    I would say yes.

17        Q.    You're just not sure how much less than

18   100?

19        A.    Right.  I don't keep track.  Some of them

20   have been around for a long time and sit in my

21   files.

22        Q.    I understand.

23              Have you ever been hired by Summer

24   Barranco or her law firm, Purdy, Jolly, Giuffreda &

25   Barranco, prior to this case?

22

1    A.    I have.

2    Q.    How many times?

3    A.    I wouldn't be able to tell you exact

4  number, but I would say perhaps five or less.

5    Q.    And is that over your 19-year career?

6    A.    I would say yes.

7    Q.    Have you ever been hired by any law firm

8  to act as an expert in a case where the St. Lucie

9  County Sheriff's Office is a defendant?

10    A.    I wouldn't remember that.  I don't know.

11  Perhaps.

12    Q.    When was the first time that you acted as

13  an expert in either a criminal or civil case?

14    A.    When I was in New York City.

15    Q.    And during your entire career providing

16  testimony as a toxicologist, has your testimony ever

17  been limited in any way?

18    A.    No.

19    Q.    Has your testimony ever been struck by a

20  court of law in any way?

21    A.    No.

22    Q.    Do you know how many times you've gone to

23  court and testified at trial?

24    A.    I would say hundreds.

25    Q.    Since you've been working at your

23

```
 1   consulting firm, how many times have you testified

 2   in trial?

 3        A.    I don't keep track.  I can't answer that.

 4        Q.    Do you advertise your services as an

 5   expert witness?

 6        A.    No.

 7        Q.    So it's correct that you are not on any

 8   expert witness web sites on the internet?

 9        A.    Well, I have my own web site certainly.

10        Q.    Right.  Besides that.

11        A.    I may be affiliated with a couple expert

12   search -- I used to consult with TASA.

13        Q.    What is TASA?

14        A.    They're located in Pennsylvania and

15   they're a firm that helps match I guess attorneys

16   with the expert that they need.  So a referral firm

17   I guess I would call them.

18        Q.    Are you still involved with TASA?

19        A.    No.

20        Q.    When you were involved with TASA, do you

21   pay them for them to advertise on behalf of your

22   practice?

23        A.    No.

24        Q.    So how is it that you get connected with

25   TASA?
```

24

1       A.     They just have a list of names in their

2   database and what your specialty is.  I don't

3   believe they advertise.

4       Q.     Did you ask to be marketed in their

5   publications?

6       A.     No.

7       Q.     So how is it that you became involved

8   with TASA?

9       A.     I don't remember.  It's been years ago

10  when I first started my own consulting agency.

11      Q.     So if I were to Google you right now, is

12  it your testimony that you wouldn't appear on any

13  sort of expert witness web sites?

14      A.     No, I think I would appear on a couple

15  other expert witness -- I don't even know which ones

16  truthfully, but if you Google me, I'm sure I come up

17  on a couple other sites that I'm associated with as

18  far as -- but I don't think they advertise on my

19  behalf.

20      Q.     Okay.  It sounds like you just don't

21  know; is that correct?

22      A.     Yeah, I just don't know.  My name's in

23  their database as a forensics toxicologist.

24      Q.     Do you ever speak at any attorney

25  conferences whether it be criminal, civil, defense,

25

1  plaintiff?

2       A.    I probably have in the past.  That should

3  be on the -- that might be on the C.V.

4       Q.    What was the last conference that you've

5  gone to where you're speaking to a group of

6  attorneys?

7       A.    I think that's been quite some time.  I'd

8  have to look at my C.V. to answer that.  I haven't

9  done anything like that in a long time.

10      Q.    And you're not currently affiliated with

11 any universities, correct?

12      A.    I'm only a courtesy professor at FIU.

13      Q.    What does that mean, a courtesy

14 professor?

15      A.    You're not paid by the university and

16 you're not on staff, but -- I've been there to

17 lecture before to students.

18      Q.    When was the last time that you lectured

19 at Florida International University as it relates to

20 toxicology?

21      A.    That's been quite some time.  Several

22 years.

23      Q.    Your C.V. says under the heading

24 "Courtesy Professor," department of chemistry,

25 Florida International University, 2000 to the

26

1   present.

2            So is it correct that currently you are

3   not a courtesy professor at FIU?

4        A.   As far as I know I am.

5        Q.   You just haven't lectured there in a few

6   years?

7        A.   Correct.

8        Q.   But you still consider yourself and hold

9   yourself out as a courtesy professor there even

10  though you haven't spoken to students there in a few

11  years?

12       A.   Yes.  I've never been told otherwise.

13       Q.   When was the last time you actually were

14  at Florida International University and lectured on

15  the topic of toxicology?

16       A.   That would be in my C.V.

17       Q.   Can you look at your C.V. and tell me,

18  please?

19       A.   2002.

20       Q.   So the last time that you lectured to

21  students at Florida International University was

22  2002, yet you hold yourself out as a courtesy

23  professor from 2000 to the present time, correct?

24       A.   Correct.

25       Q.   Okay.  I'd like to talk with you about

1  your report that's dated August 16, 2017.  If you

2  want to pull that up.

3      A.    Okay.

4      Q.    Is this the only report that you drafted

5  in this case?

6      A.    Yes.

7      Q.    And when is it that you actually drafted

8  this report?  I know it was sent to Summer Barranco

9  on August 16, 2017, but when did you draft it?

10     A.    I worked on the report on 8/14 and 8/15,

11 and finalized it on 8/16.

12     Q.    On the first page, the second sentence,

13 it says or rather you wrote:

14             "I was asked to provide a written

15             report with my opinions and conclusions

16             regarding the toxicological aspects in

17             this case."

18             Does this three-page report contain all

19 the opinions that you're going to offer in this

20 case?

21     A.    As far as I know, yes.

22     Q.    And you feel that you've been able to

23 adequately offer opinions in this case based on the

24 documents that you've been provided in this case?

25     A.    Yes.

28

1      Q.    If we can look at the ending "Incident

2   Summary."

3            The information that's contained in this

4   paragraph under the heading "Incident Summary,"

5   where is it that you received this information from?

6      A.    That was from the actual police incidence

7   report and the medical records and the EMS records.

8      Q.    And when you say the medical records and

9   EMS records, you're referring to the ten pages of

10  laboratory testing data that you received as well as

11  the six-page St. Lucie County Fire District report,

12  correct?

13     A.    Correct.

14     Q.    Now, if there have been depositions in

15  this case from witnesses or defendants that refutes

16  some of the information that you have contained

17  within your incident summary report, would you agree

18  with me then your incident summary report would be

19  inaccurate?

20            MR. GIUFFREDA:  Form.

21            You can answer.

22            THE WITNESS:  If there are some

23       inaccuracies -- I told you where my source of

24       information came from.  I would have to

25       evaluate the additional materials that you say

29

1          are present, and it might change some of those

2          things in there, yes.  It might not.

3     BY MR. HECHT:

4          Q.    I understand.

5               So it's possible if you were provided

6     with additional information in this case of

7     depositions, that your opinions may actually change

8     in this case, correct?

9          A.    Yes, and I reserve the right to do that

10    on my last sentence on my report.

11         Q.    You stated -- it's in the middle of the

12    paragraph under the heading "Incident Summary" --

13    Mr. Docher was arrested for disorderly intoxication.

14              You received that information from the

15    sheriff's incident report, correct?

16         A.    Correct.

17         Q.    Are you aware if there's been testimony

18    in this case that Mr. Docher was in fact never

19    arrested, but was being Baker Acted?

20              MR. GIUFFREDA:  Form.

21              You can answer.

22              THE WITNESS:  No.  I have what I have in

23         my report based on the documents that were

24         given to me.

25

30

1   BY MR. HECHT:

2        Q.    So it's correct that you have no

3   information nor have you received any information

4   that Mr. Docher was in fact not arrested, but was

5   being Baker Acted, correct?

6              MR. GIUFFREDA:  Form.

7              You can answer.

8              THE WITNESS:  Correct.

9   BY MR. HECHT:

10       Q.    Is it also correct that you have no

11  information that there's been testimony in this case

12  from one of the officers that Mr. Docher was not

13  arrested for disorderly intoxication, but rather was

14  arrested for disorderly conduct, correct?

15             MR. GIUFFREDA:  Form.

16             You can answer.

17             THE WITNESS:  I don't have that

18      information.

19  BY MR. HECHT:

20       Q.    And the information that you have

21  contained under the heading "Incident Summary,"

22  you've stated that within minutes, Mr. Docher became

23  apneic and pulseless and CPR was initiated.

24             What is your definition of within

25  minutes?

31

1        A.      Well, we can go back.  If there's a

2    number in the report, I would refer back to that.

3        Q.      Okay.

4        A.      I mean my memory of it is that almost

5    immediately, you know, within one or two minutes.

6    We're not talking 20 minutes or 30 minutes.

7        Q.      Okay.

8        A.      Within five minutes.

9        Q.      Well, it's important to this case, so I

10   want to know where it is that you got information

11   that says within minutes or a certain amount of

12   minutes, Mr. Docher became apneic and pulseless and

13   CPR was initiated.

14       A.      Okay.

15       Q.      Because within minutes can mean different

16   things to different people.

17       A.      Okay.  What does it mean to you?

18       Q.      Well, I didn't write the report, so

19   that's why I'm asking you.

20       A.      I gave you my definition and my

21   understanding.

22       Q.      Okay.  So your testimony in this case is

23   based upon the information that you've received

24   based on the documents that you've been provided is

25   that within minutes equals what?

32

1      A.      Less than 30 minutes.

2      Q.      Are you able to narrow it down any more

3  than that, and you can take your time.

4      A.      Thank you.

5      Q.      Look at all your information.

6      A.      Well, it says -- according to the EMS

7  report, at 18:40 he was given the Ativan, and then

8  it talks about CPR at 18:43.  So that's less than

9  five minutes.

10      Q.      So would you agree with me that instead

11  of saying within minutes Mr. Docher became apneic

12  and pulseless, we could say less than five minutes

13  Mr. Docher became apneic and pulseless?

14      A.      Well, I would defer to the EMS, the

15  people who were there.  I'm just looking at this

16  report and that's why I wrote within minutes, but I

17  don't have an exact number of minutes that you seem

18  to be wanting, so I would defer that to the EMS who

19  were there.

20      Q.      Okay.  So tell me, where is it that you

21  got the information within minutes?

22      A.      Well, 18:40 to 18:43 is, you know, three

23  minutes, so --

24      Q.      And you're looking at the St. Lucie

25  County Five District six-page incident report to get

33

1    that information?

2         A.    Yes.

3         Q.    Now, if there was a deposition in this

4    case by one of the paramedics, Paramedic Rosario,

5    who stated that the information on his six-page

6    St. Lucie County Fire District report was

7    inaccurate, would that affect your estimation of how

8    you define within minutes?

9         A.    It could.

10             MR. GIUFFREDA:  Form.

11             You can answer.

12             MS. TYK:  Object to the form.

13   BY MR. HECHT:

14        Q.    That means I asked a good question.

15             All right.  Let's go to your opinions.

16   Your first opinion is that Mr. Docher's blood

17   ethanol concentration after conversion of units from

18   mg/dl --

19             What does that mean?

20        A.    Milligrams per deciliter.

21        Q.    -- to --

22             What does g percentage mean?

23        A.    Gram percent.

24        Q.    -- and serum to whole blood was .03 gram

25   percent at 7:38 p.m.

34

1      Did you use retrograde extrapolation in

2 order to determine that?

3      A.    No.   That is the blood reading from the

4 hospital.

5           There was mention in one of the documents

6 that this was a .38 gram percent.  So I was retained

7 to clarify what that blood alcohol truly was.  So it

8 was a 38.  So it was misread or miscalculated by

9 whomever thought it might be .38.  So that's what a

10 38 number -- that's directly from the hospital

11 laboratory, that number.

12      Q.    I'm going to show you a discharge summary

13 report without pathology that looks like to me to

14 contain some toxicology.

15           Is this the 38 that you're referring to?

16      A.    Yes, it is.

17           MR. HECHT:  And we'll go ahead and we'll

18      admit this document -- we'll mark this document

19      as Plaintiff's 4.

20           (The document referred to was

21           thereupon marked Plaintiff's Exhibit

22           No. 4 for identification.)

23 BY MR. HECHT:

24      Q.    So is it your testimony that the 38

25 that's next to, "Alcohol," on Exhibit 4 should

35

```
 1    really be .38 on this medical record or is the 38

 2    correct on this medical record?

 3         A.    The 38 is correct, but the conversion of

 4    that is .03, not .3.

 5         Q.    Got it.

 6               So you just took the 38, which is the

 7    medical blood, and converted it to legal blood; is

 8    that correct?

 9         A.    Correct.

10         Q.    Your second opinion is that Tavares

11    Docher's blood alcohol content at the time of the

12    altercation an hour and 40 minutes earlier was most

13    likely between .04 to .06.

14               How did you determine that his blood

15    alcohol content an hour and 40 minutes prior to

16    7:38 p.m. was between .04 and .06?

17         A.    That's based on retrograde extrapolation.

18         Q.    And what is retrograde extrapolation?

19         A.    Retrograde extrapolation is determining a

20    blood alcohol concentration at an earlier time point

21    based on a concentration at a later time point.

22         Q.    And is this just a mathematical formula

23    that you performed?

24         A.    Yes.

25         Q.    Do you have that calculation in any of
```

36

```
 1    the information that you've brought with you today?
 2         A.    No.
 3         Q.    It's just a standard retrograde equation,
 4    correct?
 5         A.    Correct.
 6         Q.    So if any psychologist did this, they
 7    should get between .04 and .06, correct?
 8         A.    Correct.
 9         Q.    Under opinion no. 2, you said at the time
10    of the altercation.
11              What altercation are you referring to?
12         A.    I'm referring to the events in the
13    parking lot of the CVS.
14         Q.    Are you talking about pre-arrest or
15    post-arrest?
16         A.    I don't have it related in that term.
17    I'm just talking about the altercation between
18    Mr. Docher and the police and the EMS.
19         Q.    Okay.  There was a time that Tavares
20    Docher was outside speaking to the sheriff's
21    deputies in front of their car.  He was not yet
22    arrested.
23              You're not referring to that time,
24    correct?
25         A.    I'm referring to an hour and 40 minutes
```

37

1    earlier than 6 p.m.

2         Q.    So we're talking about at 6 p.m.,

3    Mr. Docher's blood alcohol content was a .04 to .06,

4    correct?

5         A.    Yeah, because that's -- six to 7:30 is an

6    hour and 40 minutes, so yes, that's the time frame,

7    6 p.m. and 7:38 p.m.

8         Q.    Why is it that you chose 6 p.m. to

9    determine what his blood alcohol content was?

10        A.    Because I believed when I read the

11   records that to be the time that they encountered --

12   they, meaning the police, encountered Mr. Docher in

13   the parking lot.

14        Q.    Okay.  And, again, I want to be clear.

15            Would there be a difference between what

16   Tavares Docher's blood alcohol content level would

17   be at 6:00 versus 6:30?

18        A.    Yes.

19        Q.    Would his blood alcohol content have been

20   lower or higher at 6:30 than at 6 p.m.?

21        A.    With this back extrapolation under this

22   circumstance, it would be lower.

23        Q.    Okay.  So what would Tavares Docher's

24   blood alcohol content level have been at, say, 6:30?

25        A.    At 6:30, it would probably a .04 or .05.

38

1       Q.    So still within the range that you would

2   have placed him at at 6 p.m., correct?

3       A.    Correct.

4       Q.    Not really much of a significant

5   difference?

6       A.    No.

7       Q.    But the point between opinion no. 1 and

8   no. 2 is that his blood alcohol content at the time

9   of the altercation was that his blood alcohol

10  content was higher than it would have been when he

11  arrived at the hospital, correct?

12      A.    Correct.

13      Q.    Opinion no. 3, a blood alcohol content of

14  .06 is not consistent with the behavior exhibited by

15  Mr. Docher.

16           What time and what behavior are you

17  referring to?

18      A.    I'm referring to the time period of

19  start, approximately 6 p.m., and I'm referring to

20  him talking about -- and I write that in the

21  incident summary, Arabs trying to kill him and his

22  mother because they knew where Arabs had dropped a

23  headless body.

24           I'm basing that also on the comments by

25  the CVS employees and his combativeness and his

39

1    uncooperativeness, and they describe him as paranoid

2    and delirious, sweating, loud, slurred but rapid

3    speech.

4         Q.    What type of behavior would someone

5    exhibit that is consistent with a .06 BAC?

6         A.    .06 probably would be imperceptible to a

7    layperson, to an average person.  So it could be

8    no -- nothing but perhaps the smell of alcohol or

9    just some decreased inhibitions and maybe someone

10   being more friendly, relaxed.

11        Q.    Do you agree with me that alcohol affects

12   people differently?

13        A.    Yes.

14        Q.    So how is it that you can make a blanket

15   statement that a .06 is not consistent with the

16   behavior exhibited by Mr. Docher when I'm assuming

17   you've never met Mr. Docher?

18        A.    Oh, well, I can base that on the effects

19   of alcohol.

20             Alcohol usually doesn't cause some of

21   these -- some of these behaviors at all, and then

22   you have to have a really high blood alcohol to get

23   things like the combativeness and the

24   non-cooperation kind of thing, and that would be

25   across the board, you know, with most people.

40

1          So there's such an extreme between .06,

2    which is hardly any effects, up to what he was

3    experiencing.

4          Q.    When you talk about a combativeness and

5    aggressiveness, would you agree with me that Tavares

6    Docher as you put it was not acting aggressive or

7    combative prior to him being placed in handcuffs?

8          A.    I'm going to defer.  I don't know the

9    answer to that.  I'm going to defer that to the

10   people that were there at the --

11         Q.    Okay, because what you keep saying is

12   aggressiveness, combativeness, and you wouldn't

13   expect to see this with someone with a .06, but you

14   don't know if he was acting combative or aggressive

15   pre- or post-arrest, do you, correct?

16         A.    He was acting strangely in the store, and

17   that's pre, certainly, arrest, pre the --

18              He asked the police to -- I mean he asked

19   CVS to give him a phone to call 911, and he made

20   these odd statements about the headless bodies and

21   the Arabs and people trying to kill him and

22   persecute him, and he was armed -- he had armed

23   himself with a tool.  That might have been his

24   paranoia and wanting to arm himself with a weapon if

25   you will, what he thought he would be able to

41

1    protect himself with, but all the comments while

2    he's in the store that he's paranoid, delusional,

3    nervous, pacing, delirious, loud, slurred rapid

4    speech, those are pretty consistent not acting

5    normal by those witnesses in the store, those people

6    in the store, and that's prior to the police

7    arriving and seeing him, and I've never seen a .06

8    blood alcohol cause that kind of behavior in anyone.

9    It shouldn't do that.

10        Q.    Okay.  When Tavares Docher called the

11   police inside the CVS and prior to the police

12   coming, I know you've mentioned a lot of adjectives

13   to describe him, but you've never used the word

14   aggressive and combative prior to the police

15   arriving, correct?

16        A.    I guess I would say yes to that.

17        Q.    All right.  And what about unexpected

18   strength?  Would you agree with me that Tavares

19   Docher didn't portray any unexpected strength until

20   the police arrived and placed him in handcuffs,

21   correct?

22             MR. GIUFFREDA:  Form.

23             You can answer.

24             THE WITNESS:  Yeah, there was nothing

25        else going on at the time to show that he had

42

1          extra strength.

2     BY MR. HECHT:

3          Q.    And you spoke about a screwdriver.

4                Are you aware of any testimony in this

5     case that one of the CVS employees actually told

6     Mr. Docher to put the screwdriver down and he did?

7          A.    I remember that.

8          Q.    And then in fact the manager told him

9     that he'd have to take the screwdriver back because

10    he couldn't leave it on one of the shelves that he

11    placed it on?  Are you aware of that?

12         A.    I know he didn't leave the screwdriver in

13    the store.

14         Q.    Right.

15         A.    So I don't know exactly what transpired

16    there because I wasn't there as far as how exactly

17    that happened, but he ended up back with the

18    screwdriver, yes.

19         Q.    And then after taking the screwdriver,

20    Mr. Docher actually went to wait in line at the CVS

21    behind some other people to purchase some

22    cigarettes.

23                Are you aware of that?

24         A.    What I read was that he bought a cigar

25    and left the store.

43

1      Q.    Okay.  Well, would you agree with me that

2  Mr. Docher who asked to call 911, was told to put

3  the screwdriver down, put it down, was then asked to

4  take it back, took it back, and then waited in line

5  to purchase a cigar is not someone who's acting

6  aggressive and combative and exhibiting unexpected

7  strength?

8              MR. GIUFFREDA:  Form.

9              THE WITNESS:  Not at that time, no.

10  BY MR. HECHT:

11      Q.    Let's go to your fourth opinion.  You

12  state that Mr. Docher's urine was positive for THC:

13              "THC is a psychoactive substance

14              which can cause paranoia such as that

15              experienced by Mr. Docher."

16              Besides causing paranoia, THC also can

17  cause one to exhibit other symptoms, correct?

18      A.    Yes.

19      Q.    And what are the symptoms that one can

20  display that is actively using or on THC?

21      A.    Well, the reasons that it's used is for

22  its euphoric effect.  It can cause sedation.  It can

23  cause increased appetite, and then if there's any

24  kind of -- especially with anyone with any

25  underlying medical mental health history, it can

44

1   aggravate or exaggerate psychosis.

2       Q.    Would you agree with me that THC can

3   cause someone to be relaxed?

4       A.    Yes.

5       Q.    It can act as a muscle relaxant?

6       A.    I don't know that I would -- I would back

7   up and I agree with your first statement that it can

8   cause someone to be relaxed.  I don't know what the

9   mechanism of that is.  So when you call it a muscle

10  relaxer, I think I can't agree with that.

11      Q.    Okay.  Isn't there scientific studies

12  that Parkinson's patients actually use THC to stop

13  tremors?

14      A.    Yeah, I don't know about that.

15      Q.    You don't know anything about that?

16      A.    No.  They may.

17      Q.    Okay.  You seem to highlight though that

18  the THC can cause paranoia.  You then state that

19  drug-induced psychosis is consistent with the

20  descriptions given by the police officers involved

21  in this interaction, but isn't it important to look

22  at the big picture and see how Tavares Docher was

23  acting prior to, as you call it, the altercation

24  with the police?

25      A.    Yeah.

45

1      Q.    Okay, because you seem to just be

2  focusing on the altercation, but what about the time

3  that Tavares Docher was in the store?

4         You already agreed with me that he wasn't

5  aggressive, that he wasn't combative.

6         You would agree with that, correct?

7      A.    I would, but all the employees also said

8  that he was higher than a kite, high on something,

9  acting not normal.  So they all agree that there was

10  something happening, and their opinions were is that

11  he was intoxicated by something.

12      Q.    Okay.  Well, he could have been suffering

13  from a mental illness, correct?

14      A.    Yes.

15      Q.    You have no idea.  You weren't there,

16  correct?

17      A.    I wasn't there, but I'm talking from a

18  toxicology perspective and looking at what is the

19  reason for some of this odd behavior, and from a

20  toxicology standpoint, I have to then describe what

21  was found in the blood and urine, and excited

22  delirium causes that super human -- that unexpected

23  strength, and excited delirium is usually caused

24  by -- it can be drug-induced, and we do know that he

25  is a drug user.

46

1      Q.    I want to talk about the toxicology

2  report that we've marked as Plaintiff's 4.  It says

3  that URTHC --

4            What does URTHC mean on Exhibit 4?

5      A.    Urine THC, which is cannabinoids.

6      Q.    And then in parentheses next to THC, it

7  says, "AD," and then it says, "Presumptive

8  positive."

9            Do you see that?

10     A.    Yes.

11     Q.    What does presumptive positive mean?

12     A.    Well, the type of testing done was

13  immunoassay testing which is typically a screening

14  test.  So presumptive positive -- they refer to the

15  results of an immunoassay as presumptive positive in

16  a forensic setting.

17     Q.    Is that different than just testing

18  positive?

19     A.    No, no.

20     Q.    Could this report have said positive

21  instead of presumptive positive?

22     A.    No, no.  It's either presumptive positive

23  or none detected on this kind of testing.

24     Q.    What does none detected mean?

25     A.    That none was detected.

47

1      Q.    Okay.  On the toxicology report that

2  we've marked as Exhibit 4, are you able to explain

3  for me when it was that Tavares Docher either smoked

4  or ingested THC?

5      A.    I can give you a time window.

6      Q.    Okay.  What's the window?

7      A.    It could be anywhere from right before

8  the incident up to, depending on his smoking habits,

9  a few days to a few weeks.

10     Q.    So this presumptive positive could mean

11 that Tavares Docher in fact did not even smoke or

12 ingest THC on the day that this altercation

13 occurred, correct?

14     A.    That's possible.

15     Q.    And in fact it's not just possible, it's

16 within a reasonable degree of toxicology probability

17 that the window that you give is between one day to

18 several weeks, correct?

19     A.    That is the window I give, yeah.

20     Q.    And based on this toxicology report,

21 Tavares Docher was found to have no cocaine in his

22 system, correct?

23     A.    In his urine.

24     Q.    In his urine, correct?

25     A.    The blood wasn't tested, so there could

1    have been cocaine in the blood.

2         Q.    Well, I don't want to know what there

3    could have been or what possibilities there are.

4              Have you seen any documentation in any of

5    the labs that you've reviewed that Tavares Docher

6    tested positive for cocaine?

7         A.    Well, they didn't do a blood drug test,

8    so that information's not available.

9         Q.    But you can't testify that because they

10   failed to perform a blood cocaine test that he in

11   fact would have tested positive for cocaine,

12   correct?

13        A.    No, I can't say that.

14        Q.    You need data as a toxicologist in order

15   to offer an opinion as to whether or not someone is

16   testing positive to a certain substance, correct?

17        A.    Well, we would like a lab report, yes.

18        Q.    So you're not here to tell this jury if

19   this case goes to trial that Tavares Docher had used

20   cocaine on the date of this incident, correct?

21        A.    No, we can't answer that question.  He

22   may have.

23        Q.    Well, he may have also just gotten off a

24   first class flight from Hawaii, correct, on the date

25   of this incident?

49

1           MR. GIUFFREDA:  Form.

2           THE WITNESS:  But I'm looking at things

3       to explain the behavior and the behavior can be

4       explained by drug use, and we can't answer the

5       question because the hospital didn't do a blood

6       drug screen.  I can't answer some of those

7       questions 100 percent.

8           There were a number of other drugs at the

9       time -- this is 2014 -- drugs such as flakka

10      that was big back then that wouldn't have been

11      picked up by the lab testing either.

12  BY MR. HECHT:

13      Q.    And I know that sitting here you could

14  say they didn't test for this or they didn't test

15  for that and therefore anything is possible.

16          What I want to know is within a

17  reasonable degree of toxicology probability, are you

18  able to testify as to whether or not Tavares Docher

19  was or had utilized cocaine on the date of this

20  incident?

21      A.    No.

22      Q.    Okay.  And what about flakka?  Are you

23  able to testify within a reasonable degree of

24  toxicology probability that on the day of this

25  incident or the weeks leading up to this incident

1    whether Tavares Docher had used flakka?

2         A.    I don't know.

3         Q.    Are you able to testify within a

4    reasonable degree of toxicology probability whether

5    Tavares Docher on the day of this incident or the

6    weeks leading up to this incident, whether he had

7    utilized bath salts?

8         A.    I don't know.

9         Q.    Would you agree with me that all we have

10   to go on is the lab reports that were taken at

11   St. Lucie Medical Center as to tell us what drugs he

12   was testing positive for?

13        A.    Well, no, I think that's an incomplete

14   picture, and I would like the jury to know that.

15   It's an incomplete picture.

16        Q.    So tell me what documentation you've seen

17   that tells you from a toxicological standpoint what

18   drugs Tavares Docher was testing positive for on the

19   date of this incident.

20        A.    My opinion is about the drug-induced

21   psychosis or the excited delirium that is caused by

22   some of these drugs, the drug use.  So I'm looking

23   more at the behavior for that.

24        Q.    Okay.

25        A.    And part of that is he did test positive

51

1    for marijuana, so we know that he's a marijuana

2    user.  His aunt said he uses cocaine.  So based on

3    that information, we know that he also uses cocaine,

4    and he drinks alcohol.  We know those at least three

5    things.

6            So I think it's an incomplete picture

7    to -- yes and no.  I can't say that he was under the

8    influence of any one of those drugs because I don't

9    have the right information, but I think the jury

10   should know that the right information isn't there

11   and that's why I have that opinion, not because it's

12   not a possibility.

13       Q.    Okay.  Back to my question.  Have you

14   seen any lab reports or documents or medical records

15   from anywhere as it relates to this case as to what

16   drugs Tavares Docher tested positive for on May 11,

17   2014 other than testing positive for THC?

18       A.    No.

19       Q.    Is it your position that the treating

20   doctors at St. Lucie Medical Center fell below the

21   standard of care and not testing him for other sorts

22   of drugs?

23       A.    No, I don't make a -- I'm not here to

24   make an opinion on standard of care issues.

25       Q.    Now, had the treating doctors at

52

1    St. Lucie Medical Center suspected that Tavares

2    Docher was on drugs other than the ones that they

3    tested for, would you agree with me that there

4    certainly was nothing preventing them from drawing

5    an extra tube and sending it out for testing?

6              MR. GIUFFREDA:  Form.

7              You can answer.

8              THE WITNESS:  I don't think that's part

9        of any hospital's protocol to do that.

10   BY MR. HECHT:

11       Q.    Okay.  You're not offering opinions as to

12   causation in this case, are you, and I'll clarify

13   that if you don't understand the question.

14       A.    Okay.  Please.

15       Q.    You're not going to be offering any

16   opinions as to why it is that Tavares Docher is in

17   the medical condition that he is today, are you?

18       A.    I don't believe so, no.

19       Q.    Have you ever treated someone who had

20   smoked marijuana and was exhibiting aggressiveness

21   and combativeness?

22       A.    No.  I don't treat patients.

23       Q.    Have you seen any of the surveillance

24   footage in this case?

25       A.    No, I have not.

53

1      Q.    So you wouldn't know if prior to the

2  police placing Tavares Docher in handcuffs, if he

3  was calm or not, correct?

4      A.    Correct.

5      Q.    Are those all the opinions that you have

6  in this case that we've gone over today?

7      A.    Yes, sir.

8            MR. HECHT:  Okay.  I don't have any other

9       questions.

10           Julie, do you have any questions?

11           MS. TYK:  No questions.

12           MR. GIUFFREDA:  No questions.

13           MR. HECHT:  I'm assuming you'd like to

14      read?

15           THE WITNESS:  Read, please.

16           MR. GIUFFREDA:  Are you going to order?

17           MR. HECHT:  Yes, I'm ordering.

18           MR. GIUFFREDA:  I'll take a mini and a

19      regular.

20           (Thereupon, the taking of the deposition

21       was concluded at 11:15 a.m.)

22           (Reading and signing not waived.)

23

24

25

54

1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA :

4   COUNTY  OF  PALM BEACH:

5

6

7

8         I, the undersigned authority, certify

9      that TERI STOCKHAM, PH.D. personally appeared

10      before me and was duly sworn.

11

12

13         WITNESS my hand and official seal this

14      18th day of September, 2017.

15

16

17                     /s/ Mia Sohn, RPR
                       MIA SOHN, RPR
18                     Notary Public - State of
                       Florida
19                     My Commission No.: GG102175
                       Expires: Aug. 30, 2021
20

21

22

23

24

25

55

REPORTER'S DEPOSITION CERTIFICATE

3     I, MIA SOHN, Shorthand Reporter, certify

4     that I was authorized to and did

5     stenographically report the deposition of TERI

6     STOCKHAM, PH.D.; that a review of the

7     transcript was requested; and that the

8     transcript is a true and complete record of my

9     stenographic notes.

10     I further certify that I am not a

11     relative, employee, attorney or counsel of any

12     of the parties, nor am I a relative or employee

13     of any of the parties' attorney or counsel

14     connected with the action, nor am I financially

15     interested in the action.

17     DATED this 18th day of September, 2017.

20          /s/ Mia Sohn, RPR
          MIA SOHN, RPR
21          Notary Public – State of
          Florida
22          My Commission No.: GG102175
          Expires:  Aug. 30, 2021

                                                                56

 1                          ERRATA SHEET

 2   F.R.C.P. Rule 1.310 provides in part:
         (e)"...Any changes in form or substance that
 3   the witness wants to make shall be entered upon a
     separate correction page by the officer with a
 4   statement of the reasons given by the witness for
     making them..."

 5

 6   Page/Line          Change/Correction         Reason

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

19   Under penalties of perjury, I declare that I have
     read my deposition transcript, and it is true and
20   correct subject to any changes in form or substance
     entered here.

21

22   _____     _____

23   Date                    Signature

24

25

57

```
 1   9/18/17

 2   Teri Stockham, Ph.D.
     c/o Richard A. Giuffreda, Esquire
 3   Purdy, Jolly, Giuffreda & Barranco, P.A.
     2455 E. Sunrise Boulevard, Suite 1216
 4   Fort Lauderdale, Florida  33304

 5
     RE      :  Docher v. Newman, et al.
 6   DEPO OF :  Teri Stockham, Ph.D.
     TAKEN   :  September 5, 2017
 7
     Dear Dr. Stockham:
 8
     This letter is to advise you that the transcript of
 9   your deposition is completed and is available for
     reading and signing.
10
     Please contact our office at (954)344-0555 to make
11   arrangements to read and sign, or sign below to
     waive review of this transcript.  If the reading and
12   signing has not been completed within 30 days or
     before the start of the trial of this matter, we
13   shall conclude that you have waived the reading and
     signing of the deposition transcript.
14
     Your prompt attention to this matter is appreciated.
15

16   Sincerely,

17   Mia Sohn, RPR, Shorthand Reporter
     J & A Reporting
18
     cc:  Adam S. Hecht, Esquire
19        Julie Tyk, Esquire

20   Waiver:

21   I, _____, hereby waive the reading and
     signing of my deposition transcript.
22

23   _____         _____
     Deponent Signature            Date
24

25
```