# CRAIG H. LICHTBLAU, M.D., P.A.

PHYSICAL MEDICINE AND REHABILITATION
BOARD CERTIFIED

PEDIATRIC • ADOLESCENT • ADULT • GERIATRIC

550 Northlake Boulevard
North Palm Beach, Florida 33408-5409
Phone: (561) 842-3694
Facsimile: (561) 842-3774

Outpatient Physical Medicine
Inpatient Rehabilitation
Medical Functional Capacity Exams
Nationwide Catastrophic Evaluations

Darryl L. Lewis, Esquire
Searcy, Denney, Scarola, Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33409

## Updated Summary Report

Date: 02/18/17
Patient: Tavares Docher
Chart #: 34615
DOB: 07/04/84
Date of injury: 05/11/14

I initially evaluated this patient on 12/13/14. At that time, the History of Present Illness was obtained from the patient's mother, Janice Docher Neeley.

At that time, the patient's mother stated that her son, Tavares, was a 30-year-old, right-hand dominant black male who was in his normal state of health until 05/11/14, when he was arrested by the St. Lucie County Sheriff's Department for public intoxication. The patient was acting intoxicated, unsteady on his feet, speaking loudly, and swinging his arms. The patient was informed he was under arrest for disorderly intoxication and causing a disturbance. The patient's mother stated her son did not fight with the deputies; however, eventually, a struggle ensued and her son was hit in the face on the right side of his head by one of the officer's elbow. The patient was held on the ground by the deputies for approximately 15 minutes. EMS was called and they administered a shot of Ativan, 4 mg, to her son.

EX. D

The patient's mother stated shortly after the paramedics gave him the shot of Ativan, they realized he was not breathing. Cardiopulmonary resuscitation was then administered by the emergency technicians all the way to the hospital. The patient's mother stated her son never woke up.

Testing was performed and it was found the patient had blood in his urine, and he was having constant seizures in the emergency room. The patient was then transported to Palms West Hospital, where he was evaluated for his continuous seizures. The patient remained in Palms West Hospital for approximately two days.

The patient was then transferred back to St. Lucie Medical Center in Port St. Lucie. The patient had some movement in her arms and legs; however, he did not know what was going on, and he did not communicate. The patient remained in St. Lucie Medical Center until May 27, 2014.

The patient was then transported to Kindred Hospital in Fort Lauderdale, Florida, where he remained for approximately 30 days. On July 3, 2014, the patient was transferred to Unity Health and Rehabilitation Nursing Home in Miami, Florida.

At the time of my evaluation on 12/13/14, his mother stated her son did not communicate. He did not track with his eyes, and he had no purposeful movement whatsoever. The patient's upper and lower extremities were contracted. The patient was being fed by a G-Tube and he had a tracheostomy tube in place. The patient's mother stated her son had no interaction with the environment, and he required 24-hour aide and attendant care and assistance for all activities of daily living, as he could do nothing for himself.

The patient's mother stated at that point her son was not receiving any physical, occupational, or speech/cognitive therapy services, and he was not participating in his environment. The patient just laid in bed, and his mother stated the most they could hope for was custodial care for someone to keep him clean. She stated she felt like he was deteriorating quickly in the facility, and stated he was not receiving any services except being cleaned once or twice a day. The patient's mother stated she did not want her son institutionalized in this facility, as she felt that he was not getting the care he deserves.

The patient's mother stated prior to her son receiving the shot of Ativan, he was independent in ambulation and all activities of daily living. The patient was on disability because he was diagnosed with schizophrenia. The patient's mother stated her schizophrenic son lived with her in Fort Lauderdale, and he came home when he felt like it. She stated when he did not feel like coming home, he would hang out in Pompano Beach.

At that time the patient's mother stated she wanted her son to have as normal a life as possible, whatever that may be at this point, and she did not want her son to experience pain and discomfort. The patient's mother stated she was worried her son was going to feel pain and discomfort when he wakes up.

The patient's mother stated she wanted her son moved to a better facility, or for him to have his own wheelchair accessible home, wheelchair accessible van, appropriate equipment, and 24-hour care at the appropriate level.

I re-evaluated the patient in Unity Health and Rehab Center on February 18, 2017. At that time, the patient's mother stated since the time of my initial evaluation on 12/13/14, her son has remained relatively medically stable except for bouts with pneumonia, infection, and vomiting. The patient was admitted to University of Miami Hospital in July of 2016 for approximately four days, in August of 2016 for approximately four days, in September of 2016 for approximately one week, and in October of 2016. The patient's mother states his last admission in October of 2016 was for approximately five days. The patient was residing in Unity Health and Rehab Center at the time of my re-evaluation, and he had remained relatively stable for the past three to four months.

The patient had a tracheostomy tube with a humidifier and a G-tube and he was in a persistent vegetative state.

The patient's mother stated the patient would have his eyes open at times, but he does not track or perform any purposeful movement.

There has been no clinically significant change in this patient's neurologic status. There is no change in my clinical opinions. I believe the patient remains in a persistent vegetative state. He remains medically stable at this time.

It was my medical opinion at that time the patient was suffering from:

1. History of multiple abrasions to his face, cheeks, shoulders, arms, and bilateral legs, secondary to injuries during an arrest by law enforcement on 05/11/14.
2. History of a laceration to his right temporal region, secondary to injuries during an arrest by law enforcement on 05/11/14.
3. History of contusions to bilateral buttocks, demonstrated on CT scan of his abdomen and pelvis obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
4. History of bilateral depressed nasal bone fractures, demonstrated on CT scan of his face/head obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
5. History of extensive soft tissue swelling over his face, demonstrated on CT scan of his head and brain obtained on 05/11/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
6. History of small right mastoid effusion, demonstrated on MRI of the brain performed without contrast on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.
7. History of non-displaced fracture of his right clavicle, demonstrated on CT scan of his upper extremity obtained on 05/12/14, secondary to injuries during an arrest by law enforcement on 05/11/14.

8. History of cardiac arrest, status-post injection of 4 mg of Ativan administered by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
9. History of cardiopulmonary resuscitation with electrocardioversion to a normal sinus rhythm, secondary to the administration of Ativan by Emergency Medical Services during an arrest by law enforcement on 05/11/14.
10. History of endotracheal intubation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
11. History of rhabdomyolysis diagnosed on 05/11/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
12. History of metabolic acidosis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
13. History of seizures, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
14. History of acute respiratory failure requiring mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
15. History of central venous line placement on 05/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
16. History of anoxic brain injury, diagnosed on 05/14/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
17. History of pneumonia, status-post mechanical ventilation, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
18. History of severe bilateral cerebral edema, demonstrated on MRI of his brain obtained on 05/16/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
19. History of persistent vegetative state, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
20. History of global hypoxic encephalopathy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
21. History of diffuse abnormal diffusion restriction involving his cortex, subcortical white matter, cerebral hemispheres, and basal ganglia bilaterally, compatible with diffuse anoxia; persistent diffuse sulcal effacement, basilar cistern effacement, and abnormal contour of his mid brain, stable since prior examinations; diffuse leptomeningeal enhancement on post contrast imaging; and bilateral mastoid cell effusions, demonstrated on MRI of the brain with and without contrast performed on 05/17/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
22. History of tracheostomy, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
23. History of gastrostomy tube insertion, performed on 05/21/14 by Dr. Scott Altschuler, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.

24. Status-post exploration of tracheostomy and ligation of bleeder vessels, performed by Dr. Adam Kurtin on 05/26/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
25. History of chronic respiratory failure, secondary to anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
26. History of dysphasia, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
27. History of transaminitis, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
28. History of evidence of diffuse global bilateral cerebral dysfunction, consistent with a toxic metabolic infection or hypoxic condition, demonstrated on electroencephalogram (EEG) performed on 08/12/14, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
29. Acute functional decline requiring dependence on other people for survival in his environment, secondary to severe anoxic brain injury, secondary to cardiac arrest, secondary to the administration of Ativan during an arrest by law enforcement on 05/11/14.
30. History of schizophrenia.

After obtaining a history, performing a physical examination, and observing this patient on two occasions, 12/13/14 and 02/18/7, it is my medical opinion as a Board Certified Physiatrist this patient will never participate in gainful employment in the competitive open labor market, or in a sheltered environment with a benevolent employer, secondary to severe physical and cognitive deficits.

It is my medical opinion this patient has reached Maximum Medical Improvement in regards to conservative care and he has a **93%** permanent partial impairment of the whole person, according to the AMA Guides to the Evaluation of Permanent Impairment, Sixth Edition.

After obtaining a history, performing a physical examination, as well as observing this patient in his current facility, it is my medical opinion as a Board Certified Physiatrist as this patient suffers the secondary effects of aging, combined with his current impairment, his disability will actually increase over time.

This patient sustained a hypoxic brain injury on 05/11/14, and I evaluated this patient on 12/13/14 and again on 02/8/17. Initially, it was reported that the patient was in a coma, then in a persistent vegetative state, which is a clinical condition of complete unawareness of self in the environment, accompanied by sleep/awake cycles, along with either complete or partial preservation of hypothalamic and brain stem autonomic functions. In addition, patients in a vegetative state show no evidence of sustained,

reproducible or voluntary behavioral responses to visual, auditory, tactile or noxious stimuli. They show no evidence of language comprehension or expression, have bowel and bladder incontinence, and have variable preserved cranial nerve and spinal reflexes.

Published in the New England Journal of Medicine, Volume 330, 1572-1579, June 2, 1994, #22 – The life span of adults and children in such a state is substantially reduced. For most such patients life expectancy ranges from 2 to 5 years. Survival beyond 10 years is unusual. A very small number of well described patients in a persistent vegetative state have survived for more than 15 years, including three patients who survived for more than 17, 37 and 41 years. If a patient is in a persistent vegetative state, the probability that the patient will have a prolonged survival (over 15 years) is exceedingly low, probably less than 1 in 15,000 of 75,000.

Nearly all persistent vegetative state patients have some degree of motor activity and eye movement that would be capable of signaling conscious perception of pain or suffering, if such existed. In these cases, it may be difficult to distinguish a persistent vegetative state from a severe locked in state. Under such unusual circumstances a patient may not be able to express behavioral responses to painful stimuli, or their responses may be extremely difficult to detect. The absence of a response cannot be considered as proof of the absence of consciousness. The accepted neurologic position is that no conscious experience of pain and suffering is possible without the integrated function of the brain stem and cerebral cortex. Pain and suffering are attributes of consciousness and patients in a persistent vegetative state do not experience them. The terms of functioning in a minimally conscious state and permanent vegetative state patients are similar, in the regard that neither can function in a meaningful way. But unlike the vegetative state, the minimally conscious state patient can experience some degree of pain and suffering, and may be aware of their immobility, bed sores, incontinence of urine and feces, the inability to feed themselves, total dependence of care on others, and all of the complications that may arise from the prolonged and permanent immobility. Therefore, it should be understood that being nonfunctional and having some awareness to some degree is worse than being nonfunctional and completely unaware.

Based upon my training, clinical experience, review of the medical records, and observing the patient at his bedside, it is my medical opinion to a reasonable degree of medical certainty that he is in a persistent vegetative state at this time.

It is my medical opinion that this patient has no chance of becoming an independent functioning member of society. He demonstrates some level of consciousness, but does not have significant awareness at this time.

The multi-society task force on the persistent vegetative state define the vegetative state as a condition of complete unawareness of self and environment, accompanied by sleep/awake cycles with either complete or partial preservation of hypothalamic and brain stem autonomic functions. The Aspen Consensus Conference Work Group on the Vegetative and Minimally Conscious State describes the minimally conscious state as a condition of severely altered consciousness in which a person demonstrates minimal, but definite behavioral evidence of self or environmental awareness. There has been a significant amount of literature published regarding survival of patients in the vegetative state; however, relatively little is known about the survival of patients in a minimally conscious state. It must be understood it is possible that this patient may progress to a minimally conscious state; however, I cannot say that this is more probable than not.

It is my medical opinion that this patient suffered a hypoxic brain injury on 05/11/4. He is going to suffer the secondary effects of immobility, which includes but is not limited to deep vein thrombosis, pulmonary embolus, pneumonia, and cardiac disease, secondary to a sedentary lifestyle. New techniques are being developed to provide health care providers with early detection and early treatment of problems associated with the secondary effects of immobility.

It must be understood that the medical opinions that predict a life expectancy for patients in a persistent vegetative state of no more than 2 to 5 years was based on medical research that was authored in 1994, which in my opinion is outdated. It should be understood that there have been advances in medicine that help healthcare providers provide early detection and early intervention for the complications of the secondary effects of immobility and brain injury, which includes but is not limited to deep vein thrombosis, pulmonary embolus, pneumonia, seizures, hydrocephalus and sepsis.

According to updated research, patients in a permanent vegetative state with no purposeful motor or cognitive function that require a feeding tube can live from 7-12 years depending upon their age. This was published in Brain Medicine Principles and Practice 2006, page 253.

As a result, it is my medical opinion as a Board Certified Physiatrist that it is more probable than not that this patient will live between 7 and 12 years from the time of his brain injury, which occurred on 05/11/14. It is my medical opinion that because medical advances are progressing each year, it is not probable but is possible that this patient could live greater than 20 years.

This patient's future medical care, support services, and durable medical equipment are defined in the Continuation of Care section of this report.

The medical necessity and cost for these items are based on:

1. My history obtained from the patient's mother on 12/13/14 and 02/18/17.
2. My observation of the patient on 12/13/14 and 02/18/17.
3. My review of the medical records.
4. Researched prices that were obtained in the state of Florida, catalogs, and from other current price sources.

_____
Craig H. Lichtblau, M.D.
Board Certified Physical Medicine & Rehabilitation
Fellow, American Academy of Disability Evaluating Physicians
CHL/de/mar.17