JOHN A. STERBA, MD
VOLUME 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
------------------------------------------
TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother and
legal guardian,

Plaintiff,

- vs -   Case No.
2:16cv14413
CHRISTOPHER NEWMAN, individually;
CLAYTON MAGRUM, individually;
CALVIN ROBINSON, individually;
WADE COURTEMANCHE, individually;
KEN J. MASCARA, as Sheriff of
St. Lucie County, Florida;
JOSE ROSARIO, individually; and the
ST. LUCIE COUNTY FIRE DISTRICT,
an independent special district,
Defendants.
------------------------------------------

Continued examination before trial of
JOHN A. STERBA, MD, taken pursuant to Federal Rules
of Civil Procedure at the office of John A. Sterba,
MD, 226 Center Street, East Aurora, New York, on
August 8, 2017, commencing at 1:12 p.m., before
NANCY C. BROICH, Notary Public.
JACK W. HUNT & ASSOCIATES, INC.

---

**201**

1  APPEARANCES:   SEARCY, DENNEY, SCAROLA,
BARNHART & SHIPLEY, PA,
2      By ADAM S. HECHT, ESQ.,
2139 Palm Lakes Boulevard,
3      West Palm Beach, Florida 33409,
(561) 686-6300,
4      ash@searcylaw.com,
Appearing for the Plaintiff,
5      (via telephone).
6      PURDY, JOLLY,
GIUFFREDA & BARRANCO, PA,
7      By SUMMER M. BARRANCO, ESQ.,
2455 East Sunrise Boulevard,
8      Suite 1216,
Fort Lauderdale, Florida,
9      (954) 462-3200,
summer@purdlaw.com,
10     Appearing for the Defendants,
Christopher Newman, Clayton Magrum,
11     Calvin Robinson, Wade Courtemanche,
Ken Mascara,
12     (via telephone).
13     WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP,
14     By JULIE A. TYK, ESQ.,
111 North Orange Avenue, Suite 1200,
15     Orlando, Florida  32801,
(407) 203-7592,
16     julie.tyk@wilsonelser.com,
Appearing for the Defendants,
17     St. Lucie County Fire District,
an independent special district,
18     Jose Rosario,
(via telephone).
19
20  J O H N  A.  S T E R B A, MD, 226 Center Street,
21  East Aurora, New York, after being duly called and
22  sworn, testified as follows:
23

---

**202**

1      EXAMINATION BY MS. BARRANCO:
2
3      Q.  For the record, my name is Summer
4  Barranco and I'm an attorney who represents the
5  Sheriff of St. Lucie County as well as several of
6  his deputies that are being sued in a federal
7  lawsuit being brought my Janice Docher-Neeley on
8  behalf of her son, Tavares Docher.  And, Dr.
9  Sterba, this is the second part of your deposition
10  that began a couple of weeks ago, and can you hear
11  me okay?
12      A.  I can hear you loud and clear with my
13  brand new phone.
14      Q.  Wonderful.  If at any time, Doctor, you
15  are unable to hear me, please let me know and I
16  will do my best to restate my question.
17      A.  Yes, ma'am.
18      Q.  And if you need to take a break for any
19  reason as long as there is not a pending question
20  we can take a break, all right?
21      A.  Yes, ma'am.
22      Q.  I'm going to start by asking you some
23  questions about what was marked as Exhibit 5 to

---

**203**

1  your initial, your original deposition, do you know
2  what I'm referring to?
3      A.  No.
4      Q.  Let me refresh your memory.  It was a
5  series of pages, I believe from Wikipedia, in
6  reference to something called reverse hanging also
7  known as strappado, S-T-R-A-P-P-A-D-O, also known
8  as corda, C-O-R-D-A, that you produced to Attorney
9  Tyk during the first part of your deposition, do
10  you know what I'm referring to now?
11      A.  And I have it.  I didn't realize it was
12  Exhibit Number 5.  I have a picture from 1633
13  strappado and then backwards hanging at Auschwitz
14  and Dachau on page 3.  Page 4 is lifting the arms
15  twisted behind the back, and 5 handcuffed behind
16  the back and suspended in the air by a chain which
17  is a simulated Chinese form of torture.
18      Q.  Okay.  So you were the one who provided
19  these pages to the co-defendants attorney in
20  response to her portion of her notice for the
21  deposition.  And based on your earlier testimony am
22  I correct that these -- that this reverse hanging
23  strappado corda that you talked about previously in

---

1 (Pages 200 to 203)

Sterba, MD - Barranco - 8/8/17

204

1  your deposition is a form of torture?
2       A.  It was a form of torture.  What was the
3  exhibit number again?
4       Q.  5.
5       A.  It is a description of a form of
6  torture.
7       Q.  Now, Doctor, would you agree with me
8  that in all of those documents, the pages that we
9  were just talking about, the form of torture that
10  is referenced there, it involved the person having
11  their hands behind their back and the person is
12  suspended in some fashion either from a tree or
13  from a pole?
14       A.  Or a rope or a chain.
15       Q.  But you would agree that in those
16  circumstances the folks involved were actually
17  suspended from something?
18       A.  Yes.
19       Q.  And I think in a few of those pages are
20  reference to the victims breaking their arms or
21  dislocating their shoulders or even death, do you
22  recall that?
23       A.  Yes.  I spoke about that.  The cause of

205

1  death was not directly related to pain or shoulder
2  dislocation.  It was directly reflected to
3  asphyxiation.
4       Q.  Now, Mr. Docher, his shoulders were not
5  dislocated were they?
6       A.  No.
7       Q.  And Mr. Docher, his arms weren't
8  broken, correct?
9       A.  They were not.
10       Q.  And most importantly Mr. Docher was not
11  suspended from any pole or tree or anything like
12  that; is that correct?
13       A.  Yes.
14       Q.  And I think your testimony previously
15  in your first part of this deposition you said you
16  wanted to be clear that you were not saying that
17  Deputy Magrum tortured Mr. Docher; is that right?
18       A.  That's correct.
19       Q.  So you would agree with me then that
20  the reverse hanging strappado/corda is not what
21  happened to Mr. Docher in this case, correct?
22       A.  Part of it did happen.  Being that the
23  arms pulled up behind the back bound together does

206

1  produce asphyxiation.
2       Q.  But isn't the whole point of the
3  reverse hanging that there is actually a hanging of
4  the body from some object?
5       A.  Yes.
6       Q.  And that didn't happen to Mr. Docher?
7       A.  No.
8       Q.  So what was the purpose of you
9  providing those documents to counsel in regards to
10  this case involving Mr. Docher?
11       A.  It explains the two physiological
12  processes that were in play caused by Deputy
13  Magrum, and that is pulling the arms up, and the
14  second method was stepping on his chest into the
15  pavement so you have two methods that combine to
16  produce rapid asphyxiation.
17       Q.  But would you agree with me that the
18  reverse hanging and those other names for that form
19  of torture doesn't involve anybody being stepped on
20  their back?
21       A.  It does not.
22       Q.  And it doesn't involve anybody laying
23  prone on the ground either, does it?

207

1       A.  No.  It describes half of what Magrum
2  did to Mr. Docher.
3       Q.  Half of what he did?
4       A.  Yes.  The half of pulling the arms up
5  not suspending him above the ground.  He stepped on
6  his chest so he was not hanging.  He was stepped
7  back down into the pavement by Deputy Magrum's left
8  foot between the shoulder blades, so he did not
9  pull him up.  He actually stepped on his chest
10  pushing him down while he pulled up, which is more
11  asphyxiating than strappado or corda.
12       Q.  How would you know that?
13       A.  By directly observing it on the cell
14  phone video by the chest being able to rise and
15  fall adequately, the respiratory distress, the
16  respiratory insufficiency and the respiratory
17  depression that I directly observed.
18       Q.  Well, I guess I'm a little confused,
19  Doctor, what link you have in your own mind between
20  the reverse hanging and what you see on the video?
21       A.  The reverse methods of pulling the arms
22  up combined with rapid suffocation that is a
23  synonym for asphyxiation, restricting the movement

2 (Pages 204 to 207)

Sterba, MD - Barranco - 8/8/17

---

208

1  of the chest to breathe, preventing the adequate
2  exchange of $CO_2$ and oxygen bringing on hypercapnia,
3  an elevated $CO_2$ level in the blood from
4  asphyxiation and hypercapnia, which is reduced
5  oxygen in the blood produced by asphyxiation.
6      Q.  I understand that.  What I'm trying to
7  understand, if you just told me that the reverse
8  hanging is something different than what happened
9  to Mr. Docher, I guess I'm missing what the
10  connection is then between the reverse hanging in
11  the pictures that you shared with counsel and your
12  opinion that you just told us about in terms of
13  what you believe physically happened to Mr. Docher
14  in regards to what Deputy Magrum did?
15      A.  Okay.  I'm waiting on your question.
16      Q.  And I was hoping you would have an
17  answer in the hanging, what does the reverse
18  hanging have to do with anything if --
19      A.  He was not hanging because he was
20  stepped on.  Had Deputy Magrum not stepped on his
21  chest he easily would have been lifted up off the
22  ground.
23      Q.  And how would you know that?

---

209

1      A.  More likely than not --
2      Q.  Did you read that anywhere in Deputy
3  Magrum's deposition or statement that what he was
4  trying to do was lift Mr. Docher up off the ground?
5      A.  No.  And I'm not implying that.
6      Q.  Okay.  Let me -- I know you've done an
7  addendum for us in this case.  What was the date of
8  your addendum?
9      A.  July 25th.
10      Q.  And did you prepare that addendum?
11      A.  Yes.
12      Q.  Did anyone assist you in any way in
13  preparing that addendum?
14      A.  No.
15      Q.  What did you physically review to
16  prepare the timeline that was attached to that
17  addendum?
18      A.  Go to the timeline and I will explain
19  that.
20      Q.  I'm there.
21      A.  It is page 34.  And I'm going there
22  right now.  Just one second.  Okay.  One second.
23  I'm here now.  The actual time at the key is the

---

210

1  CVS Pharmacy surveillance video which recorded
2  actual time in hours, minutes and seconds and that
3  references number 23, and that is the 4th video
4  and the lapsed time, B is the cell phone video
5  lapse time and that is a video duration of one
6  minute and 18 seconds and that comes from reference
7  1.  You don't have the time of day on the cell
8  phone video but everything is linked together by
9  the sounds of the engine starting up which in the
10  actual time A and elapsed time B allows you to
11  calculate C, that's why you see all three
12  categories there.
13      Q.  And who did the calculations for the
14  calculated actual time?
15      A.  I did.
16      Q.  Did anyone assist you in doing that?
17      A.  No.
18      Q.  And my question earlier -- so let me
19  make sure I understand what your answer is.  My
20  question was what did you physically review to
21  prepare the timeline, did you review the CVS
22  Pharmacy surveillance video?
23      A.  Yes, that is called actual time.  And

---

211

1  at the very bottom -- if I can pull this together.
2  At the very bottom you have the white pickup truck
3  drive by T. Docher, and you have that same event
4  happening on the cell phone video and that is what
5  has allowed me to link everything together.
6      Q.  Okay.  So I see where you've got the
7  key at the bottom of your timeline, and it has an A
8  CVS Pharmacy surveillance video number 4, what does
9  the number 4 reference?
10      A.  The DVD I was sent, it was the 4th
11  video that they sent.  That is the one that starts
12  at 6:20:26 and goes to 6:25:20.  Deputy Magrum
13  stands up, bends over and at the very bottom
14  6:28:51 when the white pickup truck drives by.  I
15  have all of that.  And then the part that is in
16  between we have a lapse time.  We have the time
17  before and time after and actual time.  Elapsed
18  time in between allows you to calculate time,
19  actual calculated time C over to the right.  And I
20  double checked it and the math is good.
21      Q.  Now, I just want to understand because
22  I understand there to be numerous CVS surveillance
23  videos, different cameras at the CVS Pharmacy, are

---

3 (Pages 208 to 211)

Sterba, MD - Barranco - 8/8/17

212

1    you familiar with what I'm referring to?
2         A.  No.
3         Q.  So you were provided with -- well, let
4    me ask, how many different camera views were you
5    provided with in regard to the CVS Pharmacy video?
6         A.  I don't know the number.  Number 4 was
7    the one that I was using on this case.
8         Q.  And can you describe for me what
9    perspective or angle that number 4 is from?
10        A.  As I remember it's looking straight out
11   to the parking lot with people walking in and out
12   and cars driving around, and it is to the right
13   that you actually see the front end of the police
14   cruiser, and that's where you see the interaction
15   of Docher talking to the police and leaning up
16   against the car, and him voluntarily putting his
17   hands behind his back and becoming arrested.  And
18   the next thing you see him run out the 15 to 20
19   feet into the parking stall and all of that carries
20   on.
21        Q.  Now, other than the CVS Pharmacy video
22   with the vantage point that you just told us about
23   that you marked as number 4 on your timeline goes

213

1    between 6:20:26 and 6:25:20, did you review any
2    other CVS Pharmacy videos in this case?
3         A.  I did where people are coming and going
4    and coming to the register.  I looked at all of the
5    videos.  This is the only one that I'm using for
6    the timeline.
7         Q.  Are you relying on any other portion of
8    the CVS Pharmacy videos for any of your opinions in
9    this case?
10        A.  No.
11        Q.  Okay.  Were any of the videos that you
12   utilized enhanced in any way in terms of their
13   sound?
14        A.  No.
15        Q.  Were any of the videos that you relied
16   on and looked at enhanced in regard to its quality
17   in terms of what you could see?
18        A.  No.
19        Q.  How do you know that?
20        A.  Nothing was mentioned.  It's just what
21   was initially sent to me.
22        Q.  So, in other words, you were sent a
23   video and you have no reason to believe that it has

214

1    been enhanced in any way; is that correct?
2         A.  I have no reason forensically to
3    believe that it was changed in any way.
4         Q.  Do you have any expertise in dealing
5    with video enhancement?
6         A.  I do not.
7         Q.  And you did not make any enhancements
8    to the video?
9         A.  No.
10        Q.  This timeline, I see you have
11   observations, that is the first column there, are
12   those your observations --
13        A.  Yes.
14        Q.  -- based on your view of that part of
15   the CVS video that you told us about?
16        A.  Yes.  Those are my observations.
17        Q.  And what about the -- well, besides
18   that one part of the CVS video, what else did you
19   personally review to prepare this timeline?
20        A.  That's it.
21        Q.  You also watched the cell phone video?
22        A.  I already mention that it is mentioned
23   in the key.

215

1         Q.  Okay.  I just want to make sure we are
2    on the same page here.  You looked at the cell
3    phone video and that portion of the CVS Pharmacy
4    video and based on what you personally saw is how
5    you prepared the observation portion of your
6    timeline; is that right?
7         A.  Yes.  You can see the eyewitness cell
8    phone video starts when Deputy Magrum stands up and
9    bends over.  And then down at the bottom when the
10   white pickup truck drives by Mr. Docher, that also
11   links up as well, that allows you to calculate true
12   time called calculated actual time of what
13   happened.
14        Q.  Now, I see you have some things in
15   quotations under observations, were you attempting
16   to -- if you had a quotation mark were you
17   attempting to quote verbatim what it was that you
18   heard on the video or videos?
19        A.  Exactly.  For instance, if I quoted and
20   then used italic gasp.  You can't write gasp, so I
21   did it as I typed it up.
22        Q.  So, for instance, where I see you've
23   got an elapsed time of 0:00:11 and you have J.

4 (Pages 212 to 215)

Sterba, MD - Barranco - 8/8/17

216

1    Docher quote open parens groans in italics end
2    quote, you are saying that you believe Mr. Docher
3    groaned at that point?
4        **A.  Yes.**
5        Q.  How is it, Doctor, that you are able
6    with certainty to know exactly who said what and
7    who groans or made noises at whatever time?
8        **A.  My interpretation is based on my**
9    **training and extensive clinical experience in the**
10   **field for eight years working professionally as an**
11   **EMT but also working in the emergency department,**
12   **and from my medical research on asphyxiation in**
13   **human subjects.  To me professionally it sounded --**
14       Q.  And --
15       MR. HECHT:  Wait, Summer, let him finish.
16       MS. BARRANCO:  I'm sorry, you are not done.
17   Please continue, Doctor.
18       THE WITNESS:  My mistake.  I thought of
19   something else and I actually talked over you.
20   What was I trying to say.  It was my interpretation
21   that it was T. Docher that was groaning and the
22   gasps, that is my interpretation as well.
23       BY MS. BARRANCO:

217

1        Q.  Are you finished with your answer?
2        **A.  Just that all of that that I mentioned**
3    **as far as my experience, human research and being**
4    **in the field extensively for eight years working as**
5    **an EMT working with paramedics, I'm very familiar**
6    **with groaning, especially as it is related to**
7    **respiratory distress, respiratory depression and**
8    **respiratory insufficiency, and I'm done.**
9        Q.  Okay.  Thank you.  Would you agree with
10   me, Doctor, at times in that video there are
11   background voices that you can hear?
12       **A.  Yes.**
13       Q.  And would you agree with me, Doctor, at
14   times you cannot see the deputies' mouths or Mr.
15   Docher's mouth?
16       **A.  Yes.**
17       Q.  And would you agree with me sometimes
18   depending on how the deputies are positioned you
19   are not able to necessarily see what every person
20   is doing at every second?
21       **A.  Yes, I agree.  More likely than not**
22   **with medical certainty what I heard at that time**
23   **that we are talking about at 11 seconds is Docher**

218

1    **groaning and not anything verbalized by a deputy.**
2        Q.  I understand that, Doctor.  I use that
3    as an example where it said groan to understand
4    what your notations were.  I'm referring to the
5    entirety of all of your observations and I
6    appreciate your background and your experience.
7    Your experience in what you've told me doesn't
8    necessarily give you any super human powers, does
9    it?
10       MR. HECHT:  Objection to form.
11       BY MS. BARRANCO:
12       Q.  And you --
13       **A.  I can testify with medical certainty**
14   **that I have never had any super human powers.  So**
15   **I'm not sure if you are asking or if you are making**
16   **a joke apologize.**
17       Q.  That's okay.  I'm not with you.  I know
18   we can't see each others faces to discern whether
19   we are joking or not.  Okay.  Now, I notice a --
20   oh, wait.  First I wanted to ask you was it your
21   intention in the observations, Doctor, to record
22   everything that was said by everyone that was
23   captured in that video --

219

1        **A.  No.**
2        Q.  -- or videos?
3        **A.  No, ma'am.**
4        Q.  Did you leave anything out?
5        **A.  I may have.  I can't answer that.**
6        Q.  Well, do you recall hearing Mr. Docher
7    around the time you hear the car start up say
8    something along the lines of I'm going to get up?
9        **A.  No, I don't.**
10       Q.  If he would have said that would you
11   have recorded that in your observation?
12       **A.  Yes.  If I heard it I would have**
13   **recorded that, but I didn't note that.**
14       Q.  I see at -- I'm looking at your elapsed
15   time of 0:00:37 to 38 seconds.  I see you have T.
16   Docher and you have a quote BR dot end quote,
17   and in parentheses you say breathe?
18       **A.  Yes.**
19       Q.  I want to understand what you mean
20   here.  Are you saying you with your own ears here
21   Mr. Docher say brr (sic.)
22       **A.  I heard that phrase many, many times in**
23   **the emergency department with patients on the verge**

Sterba, MD - Barranco - 8/8/17

220

1  of respiratory arrest.  And when they run out of
2  air and they say I can't brr.  It sounds exactly
3  the way Docher verbalized it.  He ran out of air
4  because someone was stepping on his chest and his
5  arms were being pulled up.  Two reasons to cause
6  rapid asphyxiation.  I do believe with medical
7  certainty he was trying to say I can't breathe but
8  he didn't have enough air to finish saying the word
9  breathe.
10       Q.  Is it also possible, Doctor, that Mr.
11  Docher was going to say something else?
12       A.  No.
13       MR. HECHT:  Form.
14       MS. BARRANCO:  Is it also possible, Doctor,
15  that he was going to say I can't breathe and
16  decided to stop saying the word breathe and not
17  that he didn't have enough air?
18       MR. HECHT:  Form.
19       THE WITNESS:  Not at all.  With medical
20  certainty he ran out of air.  And I can tell that
21  by clinical experience that he had no more air to
22  enunciate the word breathe.
23       MS. BARRANCO:  You would agree with me,

221

1  Doctor, that he did continue to speak thereafter,
2  correct?
3       MR. HECHT:  Form.
4       THE WITNESS:  Barely.  If you count that as
5  three words -- and actually it is only two words at
6  37 seconds, I can't brr.  We hear him at 56 seconds
7  saying help.  That is a one word sentence.  Help me
8  is a two-word sentence.  And then he is down to one
9  word sentences at 1 minute 4 seconds all right and
10  there is a gasp and okay.  That is the last time we
11  hear him speak.  All I hear is shallow gasping
12  breath sounds and no more words heard.
13       Q.  And then the cell phone video of the
14  civilian ends?
15       A.  Yes.  It ends at the white pickup truck
16  driving by.  Thereafter we actually see from
17  6:25:21 and 6:48:49 no more resisting.  He is in
18  recovery position, which is defined as when
19  somebody is unconscious they are placed on their
20  side so that they can breathe as best as possible.
21  And the deputies are moving away and the former EMT
22  Deputy Magrum placed Docher in that position
23  unresponsive, meaning nonverbal.  And I'm with

222

1  medical certainty stating after I hear all right,
2  okay, with gasps in between, and then down to one
3  minute and 7 seconds, thereafter I believe he was
4  unconscious.
5       Q.  Now, you mentioned a moment ago, and I
6  see it in your observations, part of your timeline
7  T. Docher not resisting and appears in recovery
8  position with deputies moving away and walking
9  around, and you have that as a calculated actual
10  time of 6:25:55?
11       A.  Yes.
12       Q.  Are you able to see that on a video
13  anywhere?
14       A.  Yes.
15       Q.  Which video is that?
16       A.  That is actual the time A for CVS
17  Pharmacy video, I can tell that.
18       Q.  And I thought I heard you earlier say
19  that the video of the CVS Pharmacy video portion
20  that you were relying on for your observations
21  ended at 6:25:20, did I misunderstood what you said
22  earlier?
23       A.  That is the actual time until the cell

223

1  phone kicked in, that is why the calculated time is
2  there.  It goes to 6:28:49 seconds.
3       Q.  Okay.  So I'm sorry, if I asked you
4  this a moment ago.  I just want to understand.  You
5  said you were able to see P. Docher not resisting
6  and then put in recovery position with deputies
7  moving around, you saw that from the CVS Pharmacy
8  that you referenced earlier, that portion on number
9  4?
10       A.  That's correct.
11       Q.  Do you recall what part of Mr. Docher's
12  body you were able to see in that part of the
13  video?
14       A.  No.  Just lying on his side.
15       Q.  From the video vantage was that then
16  you were looking at Mr. Docher's back with him
17  laying on his left shoulder?
18       A.  I couldn't really tell.
19       Q.  So how do you know that he -- according
20  to your observations, was not resisting and then
21  appears in recovery position?
22       A.  Having seen it numerous times with
23  eight years in the field as an EMT working with

6 (Pages 220 to 223)

Sterba, MD - Barranco - 8/8/17

---

224

1  paramedics.  When we see Docher in recovery
2  position, placed by other first responders, he
3  looked to be nonverbal, unresponsive in the
4  recovery position.  I can't tell you specifically
5  if he was laying on his left side or his right
6  side.
7      Q.  Just that he was lying on his side?
8      A.  Yes.
9      Q.  And do you recall if you were able to
10 see Mr. Docher's hands or arms in that video?
11     A.  I can't.  I did not see any movement by
12 his body.
13     Q.  Do you recall if EMS had responded by
14 then or not?
15     A.  They cannot if you take a look at when
16 they did get dispatched.  I talked over you and I
17 apologize.  During that time when Docher is in
18 recovery position not moving, unconscious, we do
19 see that no restraining maneuvers were being done
20 by deputies.  In fact, they all backed off and
21 walked around.  By that time EMS had not been
22 dispatched.  In fact, if you go back up to Deputy
23 Magrum, we're trying to get you medical help, and

---

225

1  that would be calculated actual time of 6:25 to
2  6:35.  EMS had not been dispatched yet.  The call
3  for help had not yet been sent out.  So that's not
4  true.
5      Q.  Hold on.  I'm trying to find where you
6  are referring to.  Okay.  I see that you say that's
7  not true, Deputy Magrum, we're trying to get you
8  medical help?
9      A.  Correct, that's not true at all.  And
10 35 seconds no request for EMS had been made.  And
11 if we go to the EMS medical record, the EMS run
12 sheet, and you take a look at the times the call
13 was received at 18:29:56, and at 18:30:12 the
14 ambulance was dispatched.  And they departed
15 46 seconds after 6:30 p.m.  Patient contact is at
16 6:36 p.m. or 18:36 hours.  So backing up, when did
17 the deputies call for EMS, roughly 6:30 p.m. less
18 four seconds, 18:29:56 seconds.  So just one
19 second.  When Deputy Magrum states we're trying to
20 get you some medical help that was at 6:25, and
21 that would be a little over 4 minutes later the
22 call was actually placed.  Four plus minutes went
23 by with no call for help.

---

226

1      Q.  Number one, you are assuming what he
2  meant by that was that they had already dialed for
3  EMS or radioed in; is that right?
4      A.  All I can say is nobody was trying to
5  get medical help.
6      Q.  Well, let me ask you this:  Do you know
7  if the CVS Pharmacy video was cued up to the same
8  time as the EMS run time would have been?
9      A.  No one will ever know.  I have no
10 reason to suspect that these times are not
11 accurate.
12     Q.  Well, right now I'm sitting in my
13 office, Doctor, and I have multiple times.  I have
14 an alarm clock radio that says 1:48 and I have
15 another clock that says 1:47 and the watch on my
16 arm says 1:46, my computer says 1:46 and my cell
17 phone says 1:47.  Have you had an occasion where
18 different time keeping mechanisms aren't synced,
19 are you familiar with that phenomena?
20     MR. HECHT:  Form.
21     THE WITNESS:  Your question was convoluted.
22 Are you asking me if I have ever seen two clocks
23 with different times.

---

227

1      BY MS. BARRANCO:
2      Q.  Yes.
3      A.  Yes.
4      Q.  As you sit here today, Doctor, do you
5  know one way or the other if the time on the CVS
6  Pharmacy video is in sync with the -- say, for
7  instance, the EMS time that you referred to in your
8  answer earlier?
9      MR. HECHT:  Form.
10     THE WITNESS:  No.  However, I did consider
11 that.  And that would be a question to ask the CVS
12 Pharmacy manager and the other employees.  How
13 often do they sync their clocks, in other words, do
14 they calibrate their video surveillance to the
15 actual time.
16     BY MS. BARRANCO:
17     Q.  Okay.  It sounds like you don't know?
18     A.  I don't know.  That would be a question
19 to come up at trial.
20     Q.  Thank you.  I know you told us in the
21 first part of your deposition what your expertise
22 was.  Are you holding yourself out in this case as
23 a law enforcement or police practices expert?

---

7 (Pages 224 to 227)

Sterba, MD - Barranco - 8/8/17

228

1    A.  No.  I was a deputy sheriff, but that
2    does not have any bearing in this case.
3        Q.  Okay.  When you were a deputy sheriff,
4    if I'm not mistaken, it was for three months in
5    1974; is that right?
6        A.  Yes.
7        Q.  Do you have any other law enforcement
8    experience in your career?
9        A.  No, I do not.  I have worked very
10   closely in the ER with all law enforcement officers
11   and military law enforcement.
12       Q.  Now, let me shift gears to Mr. Docher's
13   injuries.  I think you've already testified that
14   you don't have an opinion as to when he received
15   the injuries that you had listed in your initial
16   report, I think there were eight of them; is that
17   correct?
18       A.  That's correct.
19       Q.  And do you know if any of the injuries
20   that you had listed in your initial report -- I
21   want to say it was at page 9 of your initial
22   report, do you know if any of those occurred
23   earlier on the subject date prior to Mr. Docher

229

1    having contact with law enforcement?
2        A.  I'm not sure of your question.  Are you
3    asking me was he injured prior to being arrested?
4        Q.  Yes.
5        A.  I have no knowledge of that.  I can't
6    say.
7        Q.  Okay.  Were you aware of a 911 call
8    that Mr. Docher made earlier on the subject date on
9    his mother's cell phone?
10       A.  No.
11       Q.  Were you aware that he was claiming
12   that he was being struck during that phone call?
13       A.  No.
14       MR. HECHT:  Form.
15       BY MS. BARRANCO:
16       Q.  So you have no knowledge of that?
17       A.  I do not.
18       Q.  Just so the record is clear, I was
19   referring to page 2 of your report where you had a
20   listing of the different injuries for Mr. Docher?
21       A.  Yes, on my page 2.
22       Q.  Okay.  You mention depressed fractures
23   of the facial nasal bone I think was number 5, were

230

1    you aware whether or not Mr. Docher had previously
2    had facial bone fractures in his past history?
3        A.  No.  And I'm looking at number 5 head
4    bilateral, depressed fractures of the facial nasal
5    bone.  There is no mention in the radiologist's
6    dictation whether they were acute or chronic.  Once
7    I review those films at the trial I will be able to
8    tell you.
9        Q.  But my other question though, Doctor --
10   and I appreciate that answer.  My other question
11   was were you aware whether or not Mr. Docher on any
12   prior occasion -- it may have been weeks before or
13   months before or even years before the subject
14   incident, were you aware of whether he had ever
15   previously suffered fractures to his nasal bones?
16       A.  No.
17       Q.  And if he had suffered previous
18   fractures to his nasal bones would that make him
19   more susceptible to nasal fractures?
20       MR. HECHT:  Form.
21       THE WITNESS:  I can't say.
22       BY MS. BARRANCO:
23       Q.  And why is that?

231

1        A.  I don't know.
2        MR. HECHT:  Form.
3        THE WITNESS:  My expertise in emergency
4    medicine is to diagnose acute injuries.  Like I
5    said before, upon review of these x-rays at trial I
6    will be able to tell with medical certainty whether
7    they were chronic or acute.
8        BY MS. BARRANCO:
9        Q.  Have you reviewed any of Mr. Docher's
10   x-rays?
11       A.  I have not.
12       Q.  And I don't know frankly if there are
13   -- if he had any MRIs or CAT scans, have you
14   reviewed any of those?
15       A.  I have not look at any of the original
16   imaging studies, just the dictations.
17       Q.  Going back to your list on page 2 of
18   your initial report when you refer to the
19   rhabdomyolysis which you have here listed as
20   destruction of muscle protein into Mr. Docher's
21   circulation?
22       A.  Yes.
23       Q.  I think you told us before trauma or

8 (Pages 228 to 231)

Sterba, MD - Barranco - 8/8/17

232

1   blows to the body can cause that condition?
2       **A.  Yes.**
3       Q.  Can that condition also be caused from
4   overexertion?
5       **A.  Yes, it can.  In this case we have**
6   **significant blunt force trauma documented, and I**
7   **doubt that this happened by falling onto his face**
8   **with 205 pounds on his back, that would be Deputy**
9   **Newman.  These contusions that you were described**
10  **were more on the muscles to the back of the body,**
11  **gluteal region, lower back, right worse than left.**
12      Q.  He fell face forward?
13      **A.  Yes.  He did what is commonly known as**
14  **a face plant, that is the reason he had acute**
15  **fractures to his head, bilateral nasal bone**
16  **fractures.**
17      Q.  To the extent that he did have bruising
18  to his posterior region or his side, do you know if
19  any of that came from an incident that occurred
20  prior to the subject incident, earlier that day?
21      **A.  I don't know.**
22      Q.  If you were to assume hypothetically
23  speaking that Mr. Docher earlier on the subject

233

1   date, several hours before him going to the CVS
2   Pharmacy, was struck multiple times by a stick by
3   his mother, do you have any opinion one way or the
4   other as to whether or not that may have played a
5   role in your ultimate determination that he
6   suffered by rhabdomyolysis?
7       **A.  Yes, I do.  With medical certainty**
8   **knowing that he was not in any physical distress**
9   **other than emotional distress there is absolutely**
10  **nothing in the medical record in terms of the**
11  **statements in the videos to show that he was**
12  **suffering from being beat up by his mother with a**
13  **stick, nothing.  These injuries were as a result of**
14  **excessive force caused directly by the deputies.**
15  **The deputies cause the rhabdomyolysis or skeletal**
16  **muscle breakdown with proteins being released into**
17  **the circulation leading to kidney damage, not by**
18  **his mother, it was caused by the deputies with**
19  **medical certainty.**
20      Q.  You've already told me that you didn't
21  know what I was talking about with the earlier
22  incident, right?
23      MR. HECHT:  Form.

234

1       THE WITNESS:  I don't know what you are
2   talking about as far as his mother beating him up
3   with a stick.  There is no evidence of that or any
4   distress by these physical injuries when he was at
5   CVS, no one noted him limping or complaining that
6   his mother beat him up all over his buttocks with a
7   stick.  He went in to buy cigarettes and he was
8   polite.  These injuries happened by the deputies
9   and no one else.
10      MS. BARRANCO:  You do know now that Mr.
11  Docher called 911 earlier in the day, correct.
12      MR. HECHT:  Form.
13      THE WITNESS:  No, I did not know that.
14      MS. BARRANCO:  Might that play a role in
15  your opinions in this case if you were given that
16  information and listened to that 911 call?
17      MR. HECHT:  Form.
18      THE WITNESS:  No, it does not change my
19  opinion.
20      MS. BARRANCO:  And how would you know that
21  without hearing the earlier 911 call?
22      MR. HECHT:  Form.
23      THE WITNESS:  Any 911 call does not convince

235

1   me that the injuries were not caused by the
2   deputies and were caused by somebody else?
3       BY MS. BARRANCO:
4       Q.  Getting back to the rhabdomyolysis.  I
5   think you did tell me though that in addition to
6   trauma, another thing that can cause that condition
7   is overexertion, correct?
8       **A.  Not this case because of the period of**
9   **exertion.  I have seen rhabdomyolysis with extreme**
10  **exertion, especially under conditions of elevated**
11  **temperature and humidity, and I was in charge of**
12  **hyperthermia, as I mentioned in my first**
13  **deposition, the extreme exertion that you are**
14  **alluding to did not cause rhabdomyolysis in Mr.**
15  **Docher, and that is with medical certainty.**
16      Q.  And the cases that you are talking
17  about were back in the early '90s as I recall your
18  testimony?
19      **A.  In the late '80s to help prevent**
20  **extreme exertional rhabdomyolysis during extended**
21  **exercise and work in the heat far beyond, way**
22  **beyond what would have been experienced in the**
23  **brief period of time by Mr. Docher.  It has no**

9 (Pages 232 to 235)

Sterba, MD - Barranco - 8/8/17

236

1    bearing whatsoever.
2        Q.  And, Doctor, in your experience how
3    many patients have you personally seen that were
4    ultimately diagnosed with having rhabdomyolysis?
5        A.  I can't estimate that.  I have seen a
6    significant number of trauma patients and a much
7    smaller number of heat stroke and heat exhaustion
8    in both civilian and military medicine.  I can't
9    give a number to any of that.
10       Q.  You can't.  Can you tell me if any of
11   those patients that you are referring to were
12   ultimately diagnosed with rhabdomyolysis?
13       A.  They were.
14       Q.  Was it more than ten people?
15       A.  You've asked me for a number and my
16   answer still remains, I don't know.
17       Q.  I'm just trying to figure out if this
18   was something that you come upon every day or
19   something more rare than that?
20       A.  I do not see exertional rhabdomyolysis
21   every day, no.
22       Q.  Now, I think in your report you
23   reference Mr. Docher having a .038 alcohol level?

237

1        A.  Yes.
2        Q.  Are you a toxicologist?
3        A.  I'm trained in toxicology as an
4    emergency medical specialist as a part of my
5    residency.  I do not hold board certification in
6    toxicology.  My board certification with the
7    American Board of Emergency Medicine requires me to
8    be trained and experienced in many areas of
9    toxicology as it relates to the medical practice of
10   emergency medicine.
11       Q.  Well, do you have an opinion as to
12   whether Mr. Docher at the time that he was
13   interacting with the deputies, whether he was in
14   the absorption or metabolic stage with regard to
15   his alcohol consumption?
16       MR. HECHT:  Form.
17       THE WITNESS:  No.
18       BY MS. BARRANCO:
19       Q.  And do you have an opinion as to what
20   Mr. Docher's blood alcohol level was when the
21   deputies had contact with him?
22       A.  No.
23       MR. HECHT:  Form.

238

1        BY MS. BARRANCO:
2        Q.  Do you have an opinion as to what Mr.
3    Docher's blood alcohol level was when he was given
4    the shots of Ativan by Jose Rosario?
5        A.  No.
6        Q.  Now, you may have touched on this
7    already, Dr. Sterba, I want to make sure I
8    understand your testimony here.  I know throughout
9    your report you refer to Mr. Docher being
10   asphyxiated and in parentheses you say suffocated.
11   When you use those two words, and I think you told
12   us already they are synonyms of each other; is that
13   right?
14       A.  Yes.
15       Q.  And by those synonyms do you mean
16   deprivation of oxygen?
17       A.  Asphyxiated restricted elevated CO2 and
18   a drop in the oxygen in the blood and also
19   acidosis.  And the acid would be from carbon
20   dioxide and other acids.  Asphyxiation is the
21   process of preventing adequate ventilation.
22       Q.  Now, is the only defendant in this case
23   that you are claiming asphyxiated or suffocated Mr.

239

1    Docher Deputy Magrum?
2        A.  No.  The only two deputies that were
3    there had a responsibility to protect Docher from
4    being asphyxiated by Magrum and they failed to act.
5    They are held with reckless disregard because that
6    position led to asphyxiation and that is the same
7    thing, that position would lead to rapid
8    cardiopulmonary arrest.  And they did not act to
9    protect the life and well-being of Docher.  They
10   are responsible for this as well.
11       Q.  Well, maybe you misunderstood my
12   question.  My question was specifically -- and I
13   understand that you are pointing the finger at all
14   of my clients that are deputies, except for maybe
15   Courtemanche.  Doctor, I don't think you have an
16   opinion as to Mr. Courtemanche but with regard to
17   Magrum, Robinson and the other deputy, that was Mr.
18   Newman, I know you are putting blame on all three
19   of them, and I understand that.  My specific
20   question was in terms of who you are claiming
21   asphyxiated or suffocated Mr. Docher, are you
22   pointing the finger specifically at Deputy Magrum
23   in terms of his action?

10 (Pages 236 to 239)

Sterba, MD - Barranco - 8/8/17

240

1    MR. HECHT:  Form.
2    THE WITNESS:  Yes.
3    BY MS. BARRANCO:
4    Q.   And you are also claiming that Deputies
5    Newman and Robinson, based on their training, they
6    should have prevented Deputy Magrum from what you
7    refer to as asphyxiating Mr. Docher?
8    A.   They should have stopped him, yes.
9    Q.   And we will talk about that in a
10   minute.  I want to piece it up in little bite size
11   chunks to talk about it.  In regards to Deputy
12   Magrum in terms of the asphyxiation you are
13   referring to, are you basically saying that Deputy
14   Magrum put his foot on Mr. Docher's back and lifted
15   his arms up behind his back, those were the two
16   things that Deputy Magrum did that in your opinion
17   caused the asphyxiation?
18   A.   Yes.
19   Q.   Was there anything else that Deputy
20   Magrum actively did in your opinion that caused
21   asphyxiation?
22   A.   No.
23   Q.   Now, is it your opinion, Doctor, it was

241

1    both the foot on the back and the arms behind the
2    back that caused the asphyxiation or are you saying
3    it was one or the other?
4    A.   Both in combination caused rapid
5    asphyxiation to the point where he was nonverbal,
6    that is unresponsive, and lost conscious for just
7    over ten minutes.
8    Q.   And where do you get that just over ten
9    minutes part?
10   A.   My timeline and the testimony that
11   showed that he was unresponsive when the paramedics
12   came up, and then he came around and kicked
13   Rosario, that elapsed time is just over ten
14   minutes.
15   Q.   So just to clarify or make sure I
16   understand, you are saying according to what you
17   reviewed it is your belief that Mr. Docher was
18   unconscious for ten minutes?
19   A.   Over ten minutes.
20   Q.   How much more over ten minutes?
21   A.   I would say that he came around at the
22   point of contact and that was at 18:36.
23   Q.   Is that when the EMS people were there?

242

1    A.   Yes.  When you take a look at the EMS
2    run report, if you have it there, I'm looking at it
3    right now.
4    Q.   Are you finished with your answer?
5    A.   I'm looking at it right now.  Patient
6    contact came at page 5 of 6 at 18:36.  And at that
7    point when they actually contacted the patient he
8    was unresponsive, not responding, and then came
9    around and he was nonverbal, and then he kicked
10   Rosario.  And according to Magrum he kicked him so
11   hard that Rosario fell down on his butt.  The
12   timeline -- if we go to my timeline where I show at
13   the bottom for -- and it is actually actual and
14   calculated are both the same here.  T. Docher
15   resisting appears in recovery position with
16   deputies moving away and walking around.  Prior to
17   that by a matter of from 6:25:39 to 6:25:51 T.
18   Docher is no longer speaking.  We hear shallow
19   gasping breath sounds, no more words heard at that
20   point.  I believe he lost conscious right around
21   there.  So from 6:25 until 6:36, less maybe a half
22   minute or so, he is unconscious.  He is not
23   responsive.  He is unconscious, nonresponsive and

243

1    nonverbal with abnormal respiratory depression
2    going on.  And that's described on page 76, line 7
3    of Magrum's deposition, which since he was a former
4    Florida EMT, he describes Docher's breathing as
5    breathing lightly.  And that is evidence to me of
6    respiratory insufficiency, respiratory depression,
7    and we know that he is nonverbal, unresponsive at
8    that point, so he's unconscious.  That's why he was
9    placed in recovery position.  And you no longer see
10   the deputies striking, stepping or doing all of
11   those previous maneuvers on him because he's out.
12   They also mention when he came back.  Meaning when
13   he came back, that's when the paramedics showed up,
14   when he came back from being unconscious.  So we
15   have a period of all ten minutes, less than 11
16   minutes from 6:25:39 seconds until 6:36 to as late
17   as 6:35:51 seconds until 6:36 p.m., he's
18   unconscious and barely either breathing, critical
19   unstable condition.
20   Q.   Do you include in your timeline when
21   EMS arrived, is that part of your timeline?
22   A.   Not on the timeline that I sent you on
23   page 34.  This is all documented timeline from the

244

1   videos.  We don't have video of the arrival of EMS.
2   We just have the time, time of day.
3       Q.   So you have never seen any of the CVS
4   Pharmacy video that shows like a stretcher on the
5   scene?
6       A.   No, I didn't see that video.  That will
7   show up at trial.
8       Q.   Now, getting back to Deputy Magrum, you
9   mentioned the asphyxiation, you refer to that word
10  and you told me now that you attribute Deputy
11  Magrum putting his foot on Mr. Docher's back and
12  putting his arms behind his back in tandem, those
13  things causing the asphyxiation.  Did I understand
14  your earlier testimony in the first part of your
15  deposition that you do not know how much pressure
16  was placed on Mr. Docher's back; is that right?
17      A.   What are you referring to as pressure?
18      Q.   Deputy Magrum's foot on Mr. Docher's
19  back.
20      A.   You asked me about pressure, what are
21  you talking about?
22      Q.   Well, how much pressure was exerted by
23  Deputy Magrum with his foot on Mr. Docher's back,

245

1   do you know?
2       A.   You are asking me how many pounds of
3   pressure for 330 to 335 deputy, not including
4   resting on his right leg with his left foot between
5   his shoulders blades, you want to know the number
6   of pounds or pressure?
7       Q.   I don't know if you are being serious
8   with your question or not.  But based on your
9   earlier answers, Doctor, I'm pretty sure you seem
10  to understand most of my questions.
11      A.   You specifically asked me pressure in
12  pounds, are you really asking me pressure in pounds
13  from his left foot, yes or no?
14      Q.   Yes.
15      A.   I don't know, but looking at the video
16  I would say there is a significant -- and this is
17  with medical certainty, there is a significant
18  amount of pressure that even if it is one-third of
19  his weight, that is about 100 pounds.
20      Q.   And do you know how long that amount of
21  pressure was placed on Mr. Docher's back?
22      A.   Long enough to asphyxiate him into
23  unconscious, but I don't have the time for that.

246

1       Q.   So ultimately it sounds like you are
2   reaching your opinion -- backing into it, that you
3   believe Mr. Docher lost consciousness, and because
4   of that you are assuming that it must have been
5   from the pressure exerted on his back; is that
6   right?
7       MR. HECHT:  Form.
8       THE WITNESS:  I already answered that.  It
9   is the combination of reverse hanging without being
10  suspended and having a 330 to 335 pound deputy
11  stepping on the chest driving it into the asphalt.
12  By the number of pounds, that I can't quite
13  estimate, both of those maneuvers combined brought
14  on rapid asphyxiation and rapid unconsciousness
15  both.
16      BY MS. BARRANCO:
17      Q.   You keep referencing this reverse
18  hanging, do you have any personal experience with
19  reverse hanging?
20      A.   Yes, I do.
21      Q.   I know you referenced earlier in your
22  earlier deposition about things that you are not
23  able to share because they're top secret or

247

1   something like that?
2       A.   No.
3       Q.   Then maybe I should ask you, what is
4   your personal experience with reverse hanging?
5       A.   You are not allowed to ask that
6   question.
7       Q.   I think I can ask any question I want.
8   You may not be able to answer the question.
9       A.   I'm not allowed to answer that
10  question.
11      Q.   Okay.  You can't tell me what your
12  experience is, but you are going to tell me you
13  have experience with reverse hanging?
14      A.   Yes.
15      Q.   Okay.  I know you served some time in
16  the Navy, Doctor; is that right?
17      A.   Yes, ma'am.
18      Q.   Were you honorably discharged from the
19  Navy?
20      A.   Check the CV.  Yes, I was.
21      Q.   Thank you.  And in regard to Deputy
22  Magrum's action, do you know how long --
23  specifically how long Mr. Docher's arms were behind

12 (Pages 244 to 247)

Sterba, MD - Barranco - 8/8/17

248

1   his back and lifted away from his body?
2       A.  I haven't calculated that.  And you
3   asked me if I was honorably discharged.  It is on
4   page 1 of my CV, Commander, Medical Corps, United
5   States Navy Reserves.
6       Q.  Thank you.  And so you've told me,
7   Doctor, you don't know exactly how much weight was
8   placed on Mr. Docher's back, and you don't know how
9   long his arms were drawn up behind him, wouldn't
10  that be important in regards to your opinions
11  concerning Deputy Magrum and your ultimate opinion
12  that Deputy Magrum's actions lead to asphyxiating
13  Mr. Docher?
14      MR. HECHT:  Form.
15      THE WITNESS:  Not one bit.
16      BY MS. BARRANCO:
17      Q.  Not one bit is what you said?
18      A.  I'm looking at the physiological
19  responses of Mr. Docher regarding his inability to
20  ventilate, his inability to speak and his
21  subsequent loss of consciousness being nonverbal
22  and nonresponsive with an abnormal respiratory
23  depression and his respiratory insufficiency,

250

1   addendum.  On page 19 and 20 where there were eight
2   depositions -- that was my phone beeping.  I'm
3   sorry.  On page 19 and 20 of the addendum dated
4   July 25 there were eight depositions that I had not
5   yet received.  And basically they had not yet been
6   taken at the writing of my initial report.  So I
7   reserve the right to add to my first report,
8   therefore, I wrote the addendum.
9       Q.  And were you asked to write the
10  addendum?
11      A.  No.  I'm the forensic examiner.  It was
12  my responsibility to do such.
13      Q.  I notice in your initial report you
14  didn't have any opinions specifically in regards to
15  the deputies' actions or inactions, the deputies
16  who are named defendants in this case, why was
17  that?
18      A.  I don't know if that statement is true.
19  I did mention a few things.  What page are you
20  referring to where I concluded the deputies from
21  causing that?
22      Q.  It's hard to point to a page where you
23  conclude it.  My memory of your initial report,

249

1   breathing lightly on scene with former EMT/Deputy
2   Magrum.  It is not necessary for me to have an
3   exact amount of force applied to his chest
4   sufficient to asphyxiate him into unconsciousness
5   into an unstable and critical condition.  As far as
6   the duration, it was long enough to knock him out.
7       Q.  Do you know if Mr. Docher's face plant,
8   as you've described it earlier, if that played a
9   role in any way with regard to his losing
10  consciousness?
11      A.  No.  There was no loss of consciousness
12  from this head trauma.  The CT scan showed no
13  significant intracranial trauma.
14      Q.  And how about his alcohol consumption,
15  do you believe that played a role at all in him
16  losing consciousness?
17      A.  No.
18      Q.  This addendum that you've done, Doctor,
19  why did you do an addendum?
20      A.  I explained that in my first deposition
21  that I was asked to make a report noting that there
22  were a number of other depositions that were
23  forthcoming, and that was explained in the

251

1   Doctor, is that you were reaching opinions about
2   defendant Rosario and what he did or didn't do and
3   whether it was right or wrong in your opinion.  And
4   I don't recall you with specificness referring to
5   the individual deputies.  Now, in your addendum you
6   do.  And I'm just wondering why you didn't have
7   more specific opinions regarding the deputies in
8   your initial report?
9       MR. HECHT:  Form.
10      THE WITNESS:  As I explained I had not yet
11  received the depositions.  Eight of which were
12  reviewed by me, and that allowed me to write the
13  addendum.
14      BY MS. BARRANCO:
15      Q.  And did anyone assist you in writing
16  your addendum?
17      A.  No.
18      Q.  If I can turn to your page 22 of your
19  addendum, and I know you told me earlier you are
20  not holding yourself out in this case as a law
21  enforcement expert or police practices expert, but
22  I see in the last paragraph, despite being trained,
23  Deputy Robinson failed in the line of duty to

13 (Pages 248 to 251)

Sterba, MD - Barranco - 8/8/17

252

1  protect the life of Tavares Docher by not stopping
2  the suffocating of Tavares Docher, what do you base
3  that on, that opinion?
4      A.  The video and the testimony that
5  confirmed that he did not stop the positional
6  asphyxia or asphyxiation caused by Magrum.
7      Q.  Okay.  But my specific question was
8  where you said he failed to protect the life by not
9  stopping, where do you get that opinion, failed in
10  the line of duty is the part that I'm focusing on?
11      A.  In the line of duty meaning that he was
12  on duty.  He failed while on duty or in the line of
13  duty.  He failed while on duty, in the line
14  of duty that is, to stop Magrum from asphyxiating
15  Mr. Docher.
16      Q.  And related to that, Doctor, I see on
17  page 23, the first full paragraph you said in
18  addition to those reasons stated on page 9, I guess
19  you meant of your original report, had Deputy
20  Robinson immediately stopped Deputy Magrum from
21  asphyxiating and suffocating Tavares Docher into
22  his respiratory insufficiency.  And then you go on,
23  more likely than not?

253

1      A.  Well, I --
2      Q.  And my question is at what point is it
3  your opinion that Deputy Robinson should have
4  immediately stopped Deputy Magrum?
5      A.  I think I overspoke myself.  Would you
6  please repeat the second half of your question, at
7  what time should he intervene?
8      Q.  Yes.  Because your report here says had
9  Deputy Robinson immediately stopped Deputy Magrum
10  from asphyxiating Mr. Docher, et cetera, et cetera,
11  and my question was at what point are you saying
12  Deputy Robinson should have immediately stopped
13  Deputy Magrum?
14      A.  Immediately speaks for itself.
15      Q.  I understand you mean right away, I
16  guess, under the normal English language definition
17  of immediately.  I want to understand though in
18  terms of the timeline in this case or the chain of
19  events at what point in time based on what Deputy
20  Magrum was doing do you believe that Deputy
21  Robinson should have stopped him?
22      A.  Immediately, that's why I said it.
23      Q.  Well, what was it that Deputy Magrum

254

1  was specifically doing that in your opinion would
2  have alerted Deputy Robinson to immediately stop
3  him?
4      A.  The fit of rage.  And let's go to the
5  timeline so I can cover that.  The fit of rage
6  where Deputy Magrum, f'ing stop moving.  And he
7  steps back down.  He steps down his left foot upon
8  T. Docher's back in between the shoulder blades,
9  and that is at 33 seconds to 34 seconds into the
10  cell phone video, which the calculated actual time
11  is 6:25 and 6 to 7 seconds.  It is at that point
12  that the two other deputies should have interceded.
13  So I just played it right there at exactly that
14  time, f'ing, stop moving.  And he steps down at
15  that point.  That's when Robinson and Newman should
16  have immediately intervened to prevent the
17  asphyxiation process from starting.
18      Q.  You mentioned something about -- I'm
19  sorry, are you finished with your answer?
20      A.  Yes.
21      MR. HECHT:  Summer, if I can interject real
22  quick.  I need to step out of my office.  Do you
23  mind at some point in the next few minutes if we

255

1  take a five minutes break.
2      MS. BARRANCO:  We can do it now.
3      MR. HECHT:  Fine.  Thank you.
4      (A recess was then taken.)
5  BY MS. BARRANCO:
6      Q.  You make reference, Doctor, to rage,
7  which I think you attribute to Deputy Magrum?
8      A.  I think I used the term uncontrollable
9  rage of using the F bomb as he pulled the arms up
10  and stepped on his chest.  And I'm very familiar
11  with uncontrollable rage medically speaking.  And I
12  have observed it directly in the field working as a
13  paramedic for eight years.
14      Q.  And am I allowed to ask in what context
15  have you observed uncontrollable rage?
16      A.  Police officers.
17      Q.  And how long does uncontrollable rage
18  usually last?
19      A.  It's hard to say.
20      Q.  And how would you know if you are not
21  the person with the rage that it is uncontrollable?
22      A.  I'm not sure what your question is.  I
23  have never experienced uncontrollable rage with a

14 (Pages 252 to 255)

Sterba, MD - Barranco - 8/8/17

256

1  patient either eight years on paramedic ambulance
2  duty or in all the years in emergency medicine.
3       Q.  Well, I guess to me the words
4  uncontrollable is that the rage isn't able to be
5  controlled, and you used the word uncontrollable,
6  and I guess I want to know why is it you are able
7  to tell us in your opinion Deputy Magrum's rage was
8  uncontrollable?
9       A.  Because he yelled F'ing stop moving and
10  he yanked up the arms and stepped on his chest,
11  that is uncontrollable.  He couldn't control
12  himself.  And his two partners, Robinson and
13  Newman, couldn't control him.  So that's why I
14  called it uncontrollable rage with excessive force
15  that resulted in a loss of conscious and an
16  unstable critical condition before the paramedic
17  injected Ativan.  That being said I would like to
18  enter into evidence Exhibits 1, 2, 3 and 4 because
19  I was asked questions about the Ativan package
20  insert.  And I had to explain in my first
21  deposition that I did not review the package insert
22  prior to my depo, but I would do that before the
23  trial, not knowing that there would be a second

257

1  depo.  I have sent, and it was received by Ms.
2  Julie Tyk and also Mr. Ben Newman of that law firm,
3  and it was confirmed by Mr. Darryl Lewis and Mr.
4  Adam Hecht of that law firm.  Four exhibits, and
5  that is the Ativan package insert for Ativan
6  tablets and also Ativan injection from the FDA, and
7  then from the United States Department of Health
8  and Human Services that oversees the agency of the
9  FDA the Lorazepam known as Ativan medical
10  countermeasures database on the contraindications,
11  which goes into great detail, about eight bulleted
12  points listing all the contraindications that I
13  actually mentioned in my deposition.  Those links
14  were sent and received by all four attorneys and
15  I'm entering them in as Exhibits 1 through 4 and
16  handing them to Nancy right now.
17       Q.  Are you finished?
18       A.  Yes.
19       Q.  Okay.  Number one, Doctor, you didn't
20  send that email to me.  Ms. Tyk was kind enough to
21  forward it to me, that is the only reason I know
22  what you are talking about.  Number two, as a
23  witness it is not proper for you to be entering

258

1  anything into evidence for plaintiff's counsel or
2  co-defendant counsel.  And I'm sure you didn't mean
3  anything by it.  They were things I guess you
4  wanted to reference in your deposition.  I'm not
5  sure why you brought that up now.  I wasn't asking
6  you about the medication being injected into Mr.
7  Docher.  In fact, I'm not sure what you were
8  answering, if anything.  With that said if I can
9  ask my next question?
10       A.  No.  The reason is I was told that this
11  second deposition was to be done specifically for
12  the paramedics, that the attorneys for the Sheriff
13  of St. Lucie County was not available.  I was
14  advised that this part two of the deposition was
15  specifically for EMS.  And I was also told by the
16  plaintiff's counsel that I should share this
17  information with all parties.  And that's why you
18  got it back door, I had no idea that you were
19  showing up today.  It doesn't answer any of your
20  questions.  It was necessary and I included it as
21  the forensic examiner.  And I was given to do so by
22  the attorneys and not by you.
23       Q.  And I am the attorney for the Sheriff's

259

1  office and I wasn't available today, but I have
2  made myself available so that we can get your
3  deposition done and concluded.
4       Before you got on the phone, Doctor, the
5  lawyers, myself, Ms. Tyk and Mr. Hecht were advised
6  I was going to have more questions for you because
7  I didn't get to ask you any questions in the first
8  go-round, and I was going to start the questioning.
9  You weren't privi to that part of the conversation.
10  If you didn't realize that, I apologize for that
11  part of it.
12       If I can get back to my question so we can
13  move this along and get this concluded.  You
14  mentioned in your earlier answer something about
15  Deputy Magrum using excessive force, do you
16  remember that answer?
17       A.  Oh, yes.  I didn't hear the question.
18  He did use excessive force to asphyxiate Mr.
19  Docher.
20       Q.  My question is what do you base that
21  opinion on, Doctor, the opinion that the deputy
22  used excessive force since you are not a law
23  enforcement expert?

15 (Pages 256 to 259)

Sterba, MD - Barranco - 8/8/17

260

1    A.  No.  The force that was applied to him
2  to asphyxiate him is a medical term.  Excessive
3  force is not a legal term or law enforcement term.
4  The force was excessive and extreme and contributed
5  significantly, more likely than not, to putting Mr.
6  Docher in an unstable critical condition.  The main
7  reasons I put out the reverse hanging strappado or
8  corda is not to blame torture being done by Deputy
9  Magrum but to show that part of what he did -- and
10  in my analysis, was raising up the arms can bring
11  on asphyxiation over a longer period of time.  So
12  knowing how this is done from previous experience,
13  I brought in these pictures to assist me.  It
14  doesn't change my opinions.  It assists me to
15  explain the physical forces that Magrum was
16  directly applying to Docher, which can asphyxiate
17  someone into death.  However, placing the foot on
18  the chest at the same time in a fit of
19  uncontrollable rage is not only extreme force but
20  excessive force.  I'm not a cop.  I don't have to
21  be a cop.  I'm a familiar with types of forces as a
22  former advanced trauma life support instructor with
23  the American College of Surgeons with a significant

261

1  amount of clinical experience to know what forces
2  and whether or not they are excessive.  In this
3  case there was excessive force applied to
4  asphyxiate the patient into unconsciousness.
5    Q.  Are you finished with your answer,
6  Doctor?
7    A.  Yes, ma'am.
8    Q.  I know you keep referring to the
9  reverse hanging.  Am I incorrect in my
10  understanding that the reverse hanging, what causes
11  the asphyxia in that situation is sometimes the
12  weight of the body from the person hanging from
13  their arms?
14    A.  It is either the weight of the body or
15  if weights with applied to the body to accelerate
16  the asphyxiation.
17    Q.  But the person is hanging?
18    A.  Not always.  They can be suspended with
19  their feet close to touching the ground.  I can't
20  go into detail on that.  The picture shows that the
21  person is hanging, yes.
22    Q.  And the other word you used was
23  suspended?

262

1    A.  In those pictures this assisted me in
2  explaining the forces that are involved to
3  asphyxiate Docher.  Those pictures are necessarily
4  for me to explain medically and physiologically the
5  forces being applied to this person that caused
6  asphyxiation, which were worsened by the additional
7  maneuver of stepping on his chest preventing
8  ventilation causing respiratory insufficiency and
9  respiratory depression, elevation in $CO_2$, a drop in
10  oxygen, elevated acids in the body, all of that was
11  occurring as a direct result of what Magrum was
12  doing.  Even though Magrum did not do reverse
13  hanging, he just pulled up the arms, the pictures
14  are essential for me to explain the mechanism of
15  injury and the forces that are applied.
16    Q.  Okay.  If I could switch gears here for
17  a moment, Doctor, I see on the top of page 29 of
18  your addendum, and it is not the only place, it is
19  one place that I reference that Mr. Docher is
20  scared?
21    A.  Yes.
22    Q.  And how is it that you know -- I know
23  in your prior deposition you said you don't know

263

1  what was going on in Mr. Docher's mind; is that
2  right?
3    A.  No, but looking at the testimony he was
4  very, very frightened.
5    Q.  Based on the things that he was saying?
6    A.  The testimony of the CVS Pharmacy
7  employees it appeared he was very frightened and
8  even paranoid.
9    Q.  So you are basing that finding on what
10  the witnesses were saying inside the CVS Pharmacy?
11    A.  Yes.  Paranoid and delusional.
12    Q.  Okay.  On the bottom of page 29 you
13  mention that Mr. Docher did not have any
14  preexisting chronic pulmonary medical conditions?
15    A.  Right.
16    Q.  How do you know that?
17    A.  I took a look at the EMS run sheets
18  from -- I believe it is Pompano Beach around Miami,
19  there is no mention of that.  Those are the only
20  previous medical records that I have.  In addition
21  the followup care at the acute care facilities
22  after the date in question, there is nothing
23  mentioned that he had emphysema or asthma.

Sterba, MD - Barranco - 8/8/17

264

1    Q.  Going to page 30 of your addendum,
2  Doctor, you reference at the top that you conducted
3  human medical research?
4    A.  You are on page 30.
5    Q.  Yes.  At the top of page 30 is one
6  place you mentioned based on your clinical
7  experience in human medical research, et cetera?
8    A.  Yes.
9    Q.  And my question is can you describe the
10  human medical research that you have conducted?
11    A.  Internal RIB approved medical research
12  simulated cold water drowning experience with
13  civilian college scuba divers able to break their
14  breath hold at any time.  We measured the
15  physiological long duration breath hold with warm
16  water or cold water applied to the eye area of the
17  face.  None of this was dangerous at all.  It is
18  sitting in a dental chair hold your breath or
19  sitting in a tank of warm water holding your
20  breath.  Clinical research was in the United States
21  Navy as their research medical officer and diving
22  physiology where I had to evaluate respiratory
23  insufficiency and respiratory depression using

265

1  diving helmets at extreme depths monitoring divers
2  that were partially asphyxiated.  And I measured
3  breath by breath their exhaled $CO_2$ and we were also
4  able to measure cardiac output.  I established the
5  safe exposure limit SEL for $CO_2$ in hypercapnia,
6  elevated blood $CO_2$.  So I'm very familiar with when
7  somebody is quite short of breath.  Not just from
8  human medical research but seeing approximately
9  15,000 patients by paramedic ambulance, and however
10  many thousands of patients in the emergency
11  department that were short of breath on the verge
12  of respiratory collapse.
13    Q.  Any other human medical research that
14  you have been directly involved in?
15    A.  Yes, but not related to this case.  You
16  are asking me specifically about breathlessness,
17  apnea or dyspnea that is the feeling that I can't
18  breath that is the sensation of air hunger ore I
19  can't breathe that I have seen clinically as well
20  as in research.
21    Q.  Have you been directly involved in
22  human medical research involving people handcuffed
23  behind their back lying on the ground?

266

1    A.  No.  Water boarding yes, that wasn't
2  human medical research, that was just part of my
3  training.
4    Q.  Part of your training where?
5    A.  U.S. diving medical officer training.
6  I experienced water boarding.
7    Q.  The bottom of page 30 of your addendum,
8  Doctor, you mention in the bottom paragraph, I want
9  to clarify you said these people and agencies
10  listed above, and these three failures individually
11  or collectively, and then you continue on.  I just
12  want to understand are you referring to in that
13  paragraph to Captain Gonzalez, the St. Lucie Fire
14  Department and the Indian River State College?
15    A.  Yes.
16    Q.  Are you referring to anyone else in
17  that paragraph?
18    A.  No.
19    Q.  Now, looking at page 31, Doctor, of
20  your addendum, you start that page saying Deputy
21  Robinson and Deputy Newman individually and
22  collectively acted with reckless disregard to not
23  protect the life of Tavares Docher by not stopping

267

1  asphyxiating and suffocating into unconsciousness
2  and hypoxia (low blood oxygen), what do you base
3  your opinion that Deputy Robinson and Deputy Newman
4  acted with reckless disregard on?
5    A.  I didn't observe them making any
6  efforts on the cell phone video and they never
7  testified that they tried to stop Magrum from this
8  unapproved untaught torturous method of raising the
9  arms.  And notice I said it is torturous.  When
10  somebody is struggling to breathe they will do
11  everything they can do breathe.  It is one of the
12  worse ways to die, but it was not torture.
13    Q.  And circulating back to what you told
14  me earlier, you cannot tell me what experiences or
15  knowledge you have in regards to torture; is that
16  right?
17    A.  That's correct.
18    Q.  Now, the first part of your deposition,
19  Doctor, and I don't know if you have seen -- I
20  should ask you, have you seen a transcript of the
21  first part of your deposition?
22    A.  I have my depo printed, is that what
23  you mean?

17 (Pages 264 to 267)

268

1    Q.  Yes.  Have you looked at it, have you
2  read it at all?
3    A.  Yes.  And there are six pages of
4  errata.
5    Q.  Have you shared that errata sheet with
6  any of the lawyers in this case yet?
7    A.  Immediately.  And I sent on the
8  original as well.
9    Q.  What did you say about originals?
10    A.  It had to be notarized, all six pages.
11  So I faxed the six errata sheets of the JW Hunt
12  errata sheets along with a cover letter.  And then
13  I was told to mail the original because it is
14  notarized, that went off to Mr. Hecht.
15    Q.  What date was that because I haven't
16  seen that errata sheet or errata sheets I should
17  say?
18    A.  I will find it.
19    Q.  While you are looking, do you know if
20  it's part of your official transcript to your
21  deposition or of your deposition?
22    A.  It is to be included with my official
23  transcript.  But if it had been done yet, I don't

269

1  know.
2    Q.  Okay.  I know I have a hard copy of
3  your deposition, the first part of it with the
4  Exhibits, et cetera.  I don't see the errata sheet
5  in it.  Any way, I don't have it.  But what I
6  started to say I wanted to refer to page 16 of your
7  deposition, you mentioned something about a mistake
8  on a video, I think you referred to as their
9  mistake on a video, something about that you had
10  worked in the summer of 1993 for the Indian River
11  Volunteer Ambulance Squad for eight years?
12    A.  Yes.  That was just part of the EMT
13  training.  And for some reason they had me working
14  for the ambulance squad down in Vero Beach.  In
15  eight years that never happened, that was part of
16  my EMT training.
17    Q.  My question was they were mistaken, who
18  is the they you refer to?
19    A.  Whoever made the video.
20    Q.  Which video?
21    A.  There was some video presentation that
22  was shared with me that summarizes the case.
23    Q.  So whoever put that video together you

270

1  are saying there was a mistake, that you only
2  worked at the Indian River Volunteer Ambulance
3  Squad for the summer, not for eight years as is in
4  that video?
5    A.  Yes.  My CV is correct.
6    Q.  Give me a moment, Doctor, if I May.
7    A.  Okay.
8    Q.  While I'm doing that, Julia, I think
9  I'm finished with my questions, if you want to do
10  yours.  I don't know how much you have.  In the
11  interest of trying to save everybody's time.  I
12  don't know if Adam had any questions.
13    MS. TYK:  Adam, do you have any questions?
14    MR. HECHT:  Yes.  I will wait until the end.
15  You guys finish.  It's your deposition.
16    MS. TYK:  Adam, do you have those errata
17  sheets?
18    MR. HECHT:  I just -- as Summer was asking,
19  my assistant said we just got them in interoffice
20  mail and she will email a copy to you guys.
21    MS. BARRANCO:  Is she emailing that soon or
22  do you know?
23    MR. HECHT:  Hold on.  Off the record.

271

1    (Discussion off the record.)
2
3    EXAMINATION BY MS. TYK:
4
5    Q.  Good afternoon Dr. Sterba.  I just have
6  some followup questions from our last deposition.
7  I know that you provided us with a supplemental
8  report.  Are there any other materials that you
9  haven't referenced in your reports that you relied
10  on in forming any of your opinions in this case?
11    A.  No.  There is nothing else.  The report
12  stands.
13    Q.  Okay.  And that's what I want to make
14  sure that everything you relied on has been laid
15  out and referenced in your report?
16    A.  Yes, ma'am.
17    Q.  The articles that you and textbooks
18  that you referenced as far as emergency care for
19  emergency medical services, eight, nine, it looks
20  like ten, even the stuff referenced in Dr.
21  Lindsey's report, are those reasonably reliable on
22  the issue of emergency medical services?
23    MR. HECHT:  Form.

Sterba, MD - Tyk - 8/8/17

272

1    THE WITNESS:  Reasonably reliable, what does
2  that mean?  I mean, is it truthful?
3    BY MS. TYK:
4    Q.  Are they materials that are reasonably
5  reliable on the issues or on the subject of
6  emergency medical services such that you're
7  referencing them?
8    **A.  Are they reasonably reliable meaning --**
9  **could you define what you mean by reasonably**
10  **reliable.  It sounds like a legal term.  Nothing**
11  **that I would use in medicine or physiology.**
12    Q.  The fact that the information that they
13  provide in the various textbooks that you
14  referenced as being supportive of your opinion, are
15  they reliable in the area of emergency medical
16  services?
17    MR. HECHT:  Form.
18    THE WITNESS:  I can't answer that.  Again,
19  I've asked you to define what you're talking about
20  and you're using the word reliable to define
21  reliable.  Are you saying are they truthful,
22  complete, accurate, not missing anything?
23    Q.  Are they consistent of good quality?

273

1    MR. HECHT:  Form.
2    THE WITNESS:  No, they are not.
3    BY MS. TYK:
4    Q.  They are not?
5    **A.  No.**
6    Q.  Why reference them then?
7    **A.  To show that they were not only poorly**
8  **written, they did not list the contraindications**
9  **that came up so many times in my first deposition.**
10    Q.  Doctor, I'm talking about the textbooks
11  that you relied upon to say what should have been
12  included?
13    MR. HECHT:  Form.
14    MS. TYK:  Your reference, Exhibits 8, 9, 10
15  that you referenced in attachments to Dr. Lindsey
16  that you have used throughout your deposition and
17  report to support what should have been done in
18  this case?
19    MR. HECHT:  Form.
20    THE WITNESS:  Are you talking about page 15
21  of the deposition and references used to summarize
22  and support them?
23    BY MS. TYK:

274

1    Q.  Yes.
2    **A.  You are talking about 8, Emergency Care**
3  **and Transportation of the Sick & Injured, 8th and**
4  **9th edition, and 9, Emergency Medical Guidelines,**
5  **4th edition.  And what else?**
6    Q.  10?
7    **A.  Patient Restraint in Emergency Medical**
8  **Services.  Are they reliable?**
9    Q.  No.  Do they --
10    **A.  I'm not done.  Do they illustrate a**
11  **lack of information as to be reckless to leave off**
12  **major contraindications to misinformed or not to**
13  **inform paramedics as to the life threatening**
14  **contraindications in properly using Ativan,**
15  **absolutely.  As I mentioned over and over, the only**
16  **contraindications listed on one of those forms was**
17  **hypersensitive metabolic disturbance, hypercapnia,**
18  **coma, lost of consciousness, co-ingestion of other**
19  **CNS, like alcohol or possibly another drug.  Those**
20  **things are left off.  And they are clearly**
21  **identified as contraindications by the United**
22  **States Department of Health & Human Services, which**
23  **oversees the Federal Drug Administration.  So are**

275

1  **they reliable, no, they are not reliable.  They**
2  **point out faults and omissions that were critical**
3  **in this case.**
4    Q.  So the references that you use 8, 9,
5  and 10, you are saying they are not reliable even
6  though you relied on them in forming your opinion?
7    MR. HECHT:  Form.
8    THE WITNESS:  Again, you are getting me a
9  bit confused with the term reliable.
10    MS. TYK:  Again, I gave you the definition,
11  which is something that would be of trustworthy
12  quality, something that would be consistently good
13  quality.
14    MR. HECHT:  Form.
15    MS. TYK:  Not that it is perfecting, not
16  that it contains everything, not that it is
17  100 percent, that is not the definition.
18    THE WITNESS:  I misunderstood.  Let me back
19  up.  The references are reliable and I used them to
20  form my opinion.  And they may not be complete, as
21  I previously mentioned.  They left off major
22  contraindications and warnings to using Ativan,
23  that is why you have Exhibits 1 through 4 that you

19 (Pages 272 to 275)

Sterba, MD - Tyk - 8/8/17

276

1  questioned me about.  You asked me have you read
2  the FDA package insert for Ativan a long time ago
3  but not prior to this case.  I explained that I am
4  going to review it before the trial and I did.  As
5  well as the supervising agency of the US Department
6  of Health & Human Services, and it goes into great
7  detail about Ativan, that's why it is included now
8  in the second deposition for you.
9      Q.  I appreciate you sending me the
10 information, Doctor.  I have not attached them as
11 Exhibits to your deposition.  The FDA insert that
12 you are discussing, where do you find the
13 contraindications, on what page are they located?
14     A.  The four websites that I sent you just
15 today that you opened, and I have confirmation of,
16 that list for Ativan tablets as --
17     Q.  Doctor, I ask for the contraindications
18 for the injection, where do you see the
19 contraindications for Ativan injection?
20     A.  I didn't hear that part.  Ativan
21 injection, which is the second website.  The pages
22 are not numbered, but it would be the bottom of
23 page 7.

277

1      Q.  Under precautions?
2      A.  No.  Under contraindications, it
3  specifically states and I quote it is also
4  contraindicated with patients with severe
5  respiratory insufficiency, and it goes on.  He is
6  lying on the ground, he has respiratory
7  insufficiency.  It goes beyond the FDA panel
8  insert.  If you take a look at the third one, which
9  is by the U.S. Department of Health & Human
10 Services, Lorazepam number 10, contraindications,
11 and that second page lists the contraindications.
12 It not only lists the things we talked about
13 before.  The 4th one, patient with severe
14 respiratory insufficiency.  Right after it says --
15     Q.  Doctor, I'm trying to follow you --
16     A.  I'm sorry, Mrs. Tyk, you are not
17 allowed to interrupt me when I'm explaining the
18 contraindications.  The next three bulleted points
19 pertain to this case and comport exactly with what
20 I said on my first deposition.  The drugs that act
21 the CNS and alcohol in such combination, excessive
22 sedation and partial airway obstruction.  And these
23 Benzodiazepines should not be administered to

278

1  patients with hypotension that may be in shock or
2  coma.  Patients with a depressed respiratory and
3  other drugs which may have included alcohol as
4  well.  Benzodiazepines should not be included in
5  acute alcohol intoxication.  And again, he was
6  arrested for disorderly intoxication.  And
7  depressed vital signs.  The direct video by cell
8  phone, he was hypercapnic, he wasn't breathing
9  adequately, he had altered mental status to the
10 point of paranoia and unconscious without being
11 placed in the recovery position.  So everything we
12 talked about is listed as contraindications as
13 documented in the Department of Health & Human
14 Services.  The 4th website talks about Ativan
15 injections and this goes into greater detail about
16 the things that I just discussed.
17     Q.  I appreciate your response, Doctor.  I
18 will move to strike everything that was not
19 responsive to my question about the FDA label?
20     A.  That does respond to your question and
21 it goes into greater detail in the 4th website,
22 17 pages.  And I actually highlighted them.  Ativan
23 should not be given.  It has extreme caution must

279

1  be used for patients who have limited pulmonary
2  reserve because of the possibility that
3  hypoventilation and/or hypoxic cardiac arrest may
4  occur.  It goes on in greater detail and all of
5  this will come out.  And yes, they are included as
6  Exhibits.
7      Q.  I understand they may be included to
8  your report.  I have not attached them as Exhibits
9  to this deposition.
10     A.  They are not included with my report.
11 They are a part of my deposition.  They are used to
12 assist me just as the pictures are used to assist
13 me to explain specifically what happened.  They do
14 not change my opinion.
15     Q.  Doctor, I have not attached them.  And
16 as far as witnesses are not allowed to go ahead and
17 enter their own Exhibits.
18     A.  I'm not admitting them into evidence.
19 I was instructed by the plaintiff's attorney that
20 they would be entered into evidence by them.  I
21 understand that I can't do that.  I was instructed
22 to present them to you and to them and they would
23 be including them on this deposition as Exhibits.

20  (Pages 276 to 279)

Sterba, MD - Tyk - 8/8/17

280

1    Q.  Okay.  Has that occurred yet?
2    A.  You are asking me what?
3    Q.  Have you been questioned by the
4    plaintiff's counsel in this case yet?
5    A.  Yes.
6    Q.  During this deposition?
7    A.  Not part two, no.
8    Q.  Okay.  Doctor, can you define for me
9    what a contraindication is?
10   A.  A contraindication -- a medical
11   definition or my personal definition?
12   Q.  A medical definition of what a
13   contraindication is.
14   A.  I would say it is any special symptom
15   or circumstance that would render the use of a
16   remedy or a drug that if it was carried out the
17   procedure would be very inadvisable.  And in this
18   case, as I explained in my first deposition, that
19   there are far more than one reason.  There could be
20   as many as eight reasons now that you do not give
21   this drug.  In this situation, in this exact
22   situation, not in general.  Not for someone who
23   just has alcohol onboard or in an operating room

281

1    with an anesthesiologist, that is altogether
2    different.  With Mr. Docher Ativan is clearly
3    contraindicated for many, many reasons that are
4    defined and published by the United States
5    Department of Health & Human Services, and it's
6    underlying agency, the Food & Drug Administration.
7    I agree with their contraindications.
8    Q.  I will move to strike everything after
9    your definition of contraindication as not
10   responsive.  Doctor, can you define for me the term
11   negligent?
12   A.  No.
13   Q.  Can you define for me the term
14   reckless?
15   A.  You were cutoff.  Do you mean reckless
16   disregard?
17   Q.  Yes.
18   A.  I did.  It is the same definition I
19   used in the first deposition.  They knew or should
20   have known that their actions could lead to
21   disability or death.
22   Q.  How is that different than somebody
23   being negligent?

282

1    A.  That is a legal term.  I can't answer
2    that.
3    Q.  Are you saying that reckless
4    indifference is not a legal term?
5    A.  Reckless indifference, is that what you
6    just said?
7    Q.  Reckless disregard is what I was
8    talking about.  Is reckless disregard a legal term?
9    A.  Possibly.  Medically speaking reckless
10   disregard is when somebody did something and they
11   knew or should have known that their actions --
12   like administering Ativan, could hurt or kill
13   somebody.
14   Q.  Do you hold yourself out as an expert
15   on the physiological effects of Ativan?
16   A.  Yes.
17   Q.  And what is the basis of that?
18   A.  M.D., Ph.D., Board Certified in
19   Emergency Medicine and clinical experience using
20   Ativan in numerous clinical settings.
21   Q.  Are you an expert on the
22   pharmacokinetics of intramuscular Ativan?
23   A.  You meant to say pharmacokinetics.  And

283

1    no, I'm not.  I did read the onset of action.  And
2    I explained all of that in my first deposition.
3    Q.  What is the difference between onset of
4    action and peak --
5    A.  Peak effect?
6    Q.  Yes.
7    A.  Peak effect is when the drug effect
8    reaches its maximum physical effect, onset of
9    action when it first starts to effect the patient.
10   And that depends on a number of factors.  If the
11   patient is unable or has any contraindications or
12   physiological reasons to be highly sensitized to
13   the Benzodiazepine such as respiratory
14   insufficiency, respiratory depression, alcohol,
15   possibly other drugs onboard, head trauma and
16   metabolic disturbance, acidosis and hypercapnia,
17   and I did mention lactic acid.  It is the $CO_2$ that
18   builds up and then anaerobic lactic acidosis.  All
19   of those things were in play with Docher.
20   Q.  How do you define severe respiratory
21   insufficiency?
22   A.  Inability to adequately ventilate.
23   Q.  What makes it severe though, like what

21 (Pages 280 to 283)

Sterba, MD - Tyk - 8/8/17

284

1    is THE difference between regular respiratory
2    insufficiency and the severe?
3        A.  The severity.
4        Q.  And how is that determined?
5        A.  Clinically by a physician.
6        Q.  Again, as a physician how do you
7    determine if somebody is suffering from severe, I
8    guess, respiratory insufficiency?
9        A.  By directing observing the patient.
10        Q.  Anything else?
11        A.  Measuring respiratory rate, the
12    adequacy of ventilation and any other parameters.
13    End tidal CO2, which was not done in this case.
14        Q.  Can you tell me if end tidal CO2 had
15    been done on Mr. Docher just prior to the Ativan
16    injection, can you tell me with medical certainty
17    what that would have shown?
18        A.  No.
19        Q.  Can you define for me, Doctor, what the
20    term standard of care means?
21        A.  Standard of care refers to -- and it is
22    very similar to my layman's understanding of
23    negligent, negligence, I think you are asking me

285

1    for what my legal definition of negligence was.
2    And I told you I'm not too sure what it is in legal
3    terms.  The standard of care or when someone is
4    negligent not to provide the standard of care is a
5    failure to exercise the care or render care that a
6    reasonably prudent person or a physician would do
7    or exercise in similar situations.  And the
8    standard of care in this case for EMS is different
9    than what would be done in the controlled
10    environment of a hospital.  I am very familiar with
11    agitated, combative patient care having worked
12    exclusively nights and weekends for eight years,
13    and also most of my time in the ER was nights and
14    weekends as well.
15        Q.  Dr. Sterba, when was the last time that
16    you had to chemically sedate a patient?
17        A.  I recommended it to paramedics back in
18    the fall of last year, 2016, and I didn't have
19    Ativan with me at that time.  We did have it but I
20    didn't have it with me.  I didn't anticipate
21    needing it.  It has to be kept cold either in a
22    refrigerator or in a cooler.  And so I recommended
23    it for the patient to paramedics that were

286

1    transporting a patient of mine from home.
2        Q.  And what were the circumstances that
3    led you to recommend chemical sedation in the fall
4    of 2016?
5        A.  I said you may have to use Ativan.  I
6    determined the patient was physiological stable and
7    four point restraints were applied in a case of
8    multiple sclerosis with extreme confusion and
9    respiratory distress.  And the patient tore out her
10    IV and was attempting to tear off surgical
11    bandages.  We applied four point restraints.  And I
12    reassessed if physically stable to have 1 milligram
13    of Ativan IV and repeat.  The transport time was
14    probably over a half hour.
15        Q.  What was it that necessitated the
16    Ativan if she was in four point restraints?
17        A.  If things go out of control on the way
18    to the hospital.
19        Q.  Even though she was under control with
20    the four point restraints you felt it necessary to
21    have her chemically sedated at the same time?
22        A.  No, not at the same time.  The EMS
23    literature, my experience states that you try to

287

1    calm the patient down, and then you use physical
2    restraints.  And when necessary, you can add on
3    chemical restraints provided that you establish the
4    patient is stable and not suffering from the
5    contraindications that we have gone over ad nausea.
6    And in this case she was.  And I said to the
7    paramedics I'm ordering 1 milligram of Ativan IV,
8    monitor her vital signs and her breathing, her air
9    exchange and airway, and be ready to intubate if
10    necessary.  I did not administer the Ativan.
11        Q.  And I understand that.  I guess my
12    question is more if she was controlled with the
13    four point restraints why the added use of Ativan?
14        A.  I already explained that.  I said if
15    things get out of control on a 30 minute transport
16    time from a rural area to a major medical center in
17    Downtown Buffalo they may have to go ahead and use
18    chemical restraint of 1 milligram of Ativan if they
19    determined she continued to be physiologically
20    stable.
21        Q.  Besides that incident in 2016 have you
22    had to give chemical sedation to any other patient
23    in the last ten years?

22 (Pages 284 to 287)

Sterba, MD - Tyk - 8/8/17

288

1    A.  Absolutely.  I don't use Ativan that
2  much.  That was one case.  After intubating
3  patients I would frequently use Ativan.
4    Q.  Doctor, can you describe for me how it
5  is that you would attempt to take a blood pressure
6  from a patient who is physically combative with
7  you?
8    A.  Yes.  You apply the standards of basic
9  trauma life support that paramedics and EMT have
10  gone through.  If you can't get a cuff on a patient
11  you try to grab the further peripheral pulse to see
12  if their blood pressure would be above 70 to 80 of
13  Mercury, if you can feel that pulse, get a
14  capillary refill.  This is hemodynamic assessment.
15  You may not be able to get a blood pressure cuff,
16  and pump it up and release the pressure until you
17  feel a pulse at the radial that is called BP
18  systolic by palpation.  There are times where you
19  might not be able to feel the radial pulse and then
20  you go more centrally with the femoral pulse and
21  the carotid pulse and central pulses.  None of that
22  was done prior to administering Ativan in this
23  case, which falls below the standard of care, and

289

1  that is with medical certainty.
2    Q.  Going to the videos that you've
3  reviewed in this case of Mr. Docher, and the one
4  that you discussed with us at length about, and
5  that you've used in your timeline where you say it
6  shows that he is asphyxiated, did you consider any
7  other explanation for why he might not have
8  finished sentences or statements other than
9  suffocation or asphyxiation?
10    A.  There were no other contributing
11  factors that restricted his ventilation other than
12  positional asphyxia caused by Deputy Magrum.
13    Q.  Did you consider the possibility of
14  exhaustion from having been through a physical
15  altercation with law enforcement?
16    A.  It was of such brief duration that I do
17  not believe the so-called term excited delirium has
18  any play on this.  There was no physiological or
19  medical reason to suspect the theory that he was on
20  sympathomimetic drugs or methamphetamine or
21  cocaine.  The onset of action of those drugs is
22  extremely fast.  And we saw no action of that at
23  CVS Pharmacy.  So no, this was not drug induced and

290

1  excited delirium is not a cause for the arrest.
2    Q.  And I appreciate your response, maybe
3  you didn't understand my question.  My question was
4  more specifically as to why he might not have
5  finished statements that you believe he was in the
6  process of saying, could that be due to just
7  physical exhaustion rather than asphyxiation?
8    A.  No.  He couldn't breathe.  He couldn't
9  inhale, and, therefore, he could not exhale and
10  speak.  He was asphyxiated.
11    Q.  And what is that based upon?
12    A.  Direct observations with clinical and
13  research experience.
14    Q.  And, Doctor, as a medical physician do
15  you in your work -- clinical work in doing house
16  calls, do you diagnose somebody as having
17  asphyxiated or suffocated based on just pure
18  observations?
19    A.  Yes.  And then I directly intervene
20  with either bag valve mask, oral airway intubation
21  and also working closely with paramedics that got
22  dispatched as well, yes.
23    Q.  Is there anything else that you do as a

291

1  medical physician before determining whether
2  someone is asphyxiated or suffocated?
3    A.  That is a very ambiguous question.  The
4  ABCs of emergency medicine are always in play and
5  they are always reassessed frequently.
6    Q.  And are those --
7    A.  Airway, breathing, circulation.
8    Q.  And how could you go about assessing
9  those?
10    A.  Establish whether or not the airway is
11  open, the quality of breathing, not just
12  respiratory rate, but the depth of each breath,
13  which is known as tidal volume, how much air you
14  exchange with one breath, and if it is adequate or
15  not.  Circulation, not necessarily by just the
16  blood pressure cuff getting systolic and diastolic
17  pressure, but capillary refill, pulses, maybe sis
18  blood pressure by palpation, as I mentioned, and
19  frequent blood pressure checks as well as cardiac
20  output.
21    Q.  Now, during to the video timeline that
22  you have done, are you able to tell me with medical
23  certainty whether Mr. Docher's airway was open at

292

1  the time of the video?
2      A.  Yes, it was open.
3      Q.  And with medical certainty are you able
4  to tell me what his tidal volume would have been if
5  taken at the time of the video?
6      A.  Yes.
7      Q.  And what would his tidal volume be?
8      A.  Not in milliliters.  It was grossly
9  inadequate to support life.  He was being
10 asphyxiated.  He was speaking in multiple word
11 sentences like please don't let them kill me.  Let
12 me go to my exact timeline here so I don't get
13 misquoted.
14     Q.  Doctor, do you measure tidal volume by
15 observation?
16     A.  I measure it with computerized
17 calibrated spirometry using a $4,000 CP 200 unit by
18 Welch Allyn interpreted by me with the pulmonary
19 functioning testing done at the bedside at home.
20 So, yes, I can determine tidal volume that way.  I
21 can also grossly determine whether or not a
22 person's breath is adequate by assessing air
23 exchange.

293

1      Q.  And my question was specifically about
2  tidal volume.  And you said you could determine
3  what that would be at the time that that video was
4  shot on your timeline.  And my question is what is
5  the basis of that, is it simply on observation?
6      A.  It is based on observation and it would
7  not be a quantitative measurement.  I said I can't
8  tell you with certainty the number of milliliters
9  in his small gasping breath quantitatively.  His
10 tidal volume is grossly diminished and with rapid
11 breathing and air exchange is grossly diminished
12 because he has respiratory insufficiency.  His
13 respirations are depressed from positional
14 asphyxiation.
15     Q.  Doctor, as a physician do you use
16 simple observation to determine whether your
17 patient's tidal volume is low, high in your medical
18 practice?
19     A.  That, and hands-on assessment.  The
20 rise and fall of the chest you can determine that.
21 You can feel that by osculation by using a
22 stethoscope.
23     Q.  Do you find it acceptable in the

294

1  medical practice to determine tidal volumes by
2  simple observation?
3      A.  Your questions are confusing.
4      Q.  Doctor, it is pretty simple.  Is there
5  any medical literature, teachings for your
6  education and training, have you been taught that
7  you are to determine a patient's tidal volume based
8  solely on observation alone?
9      A.  Your question is still confusing.  Tied
10 can be assessed qualitatively and quantitatively.
11 I think you are missing my point.
12     Q.  Doctor --
13     A.  Can you pause for a second.  Tidal
14 volume can be determined qualitatively.  It has to
15 be adequate or inadequate or if the patient is
16 breathing far too much, in other words,
17 hyperventilating.  Tidal volume can also be
18 determined quantitatively measuring milliliter or
19 actual volume.  You cannot determine tidal volume
20 by looking at somebody.  You can determine whether
21 or not they are adequately exchanging air.  What is
22 the air exchange, is it adequate or insufficient.
23 Do they have insufficient respiration, insufficient

295

1  ventilation.  Like in Docher's case I cannot
2  determine somebody's tidal volume objectively by
3  looking at a video.  Go ahead.
4      Q.  And what was it about his breathing
5  that qualitatively you believe his tidal volume
6  would have been low?
7      A.  His chest was not allowed to rise and
8  fall for two mechanical reasons of positional
9  asphyxiation, arms being pulled up, chest being
10 stepped on.  With shallow rapid irregular breaths,
11 from three word sentences, three to four word
12 sentences, at 6:24:47 seconds to 49 seconds, they
13 are going to kill, gasp, they are going to kill me.
14 And then later all right, all right.  And then
15 finally I can't brrr, help, gasp, help me.  We're
16 trying to get you medical help, which we know
17 didn't happen for four more minutes.  Plus, all
18 right, all right, gasp.  All I see is irregular
19 gasping, inadequate shallow breaths.  Quality
20 actively grossly inadequate tidal volumes, and
21 grossly inadequate respiratory rate as he goes into
22 unconscious nonverbal and unresponsive on that
23 point on my timeline.

24  (Pages 292 to 295)

Sterba, MD - Tyk - 8/8/17

296

1    Q.  Did you attempt to count or determine
2  his actual respirations on the video?
3    A.  No.
4    Q.  Can you tell me with medical certainty
5  if you were to take his respirations during the
6  time of the video what they would be?
7    A.  No.
8    Q.  Can you tell me with medical certainty
9  what his blood pressure would be if you took it at
10  the time of the video?
11    A.  Yes.
12    Q.  And what would his blood pressure be?
13    A.  He would be approaching shock.  His
14  blood pressure probably initially would have been
15  elevated as he lost consciousness.  With medical
16  certainty he would have been hypotensive.  When
17  someone is asphyxiated they respond by rapid
18  respiratory rate to try to compensate.  They are
19  not allowed to breathe and CO2 is very, very high.
20  That does not cause lost of consciousness.  A drop
21  in oxygen causes a lost of consciousness along with
22  a drop in the blood pressure.
23    Q.  And at the time of the video are you

297

1  able to tell me with medical certainty what his
2  pulse rate would have been?
3    A.  No.  As I mentioned the sequence of
4  events with asphyxiation is tachycardia or rapid
5  heart rate.  And if somebody has their breathing
6  restricted like this as in drowning or asphyxiated
7  or trying to dive with a helmet and that, the
8  respiratory rate, it doesn't matter whether you are
9  breathing fast.  You may not be able to ventilate.
10  His respiration is fast, irregular and then it
11  becomes less and less adequate.  The tidal volume
12  is much less, the respiration drops to the point of
13  him losing consciousness, that is the sequence of
14  events with medical certainty.  I can tell you when
15  he was unconscious, nonresponsive and nonverbal his
16  blood pressure would be low.  And we have an EMT on
17  scene that describes breathing as respiratory
18  insufficiency.  And in his words former EMT Deputy
19  Magrum, page 76, line 7 said after he put him into
20  recovery position he checked his pulse, but he was
21  never even asked what is the pulse.  He said
22  breathing was very abnormal and in his words
23  breathing lightly.  He was on the verge of dying,

298

1  unstable in critical condition.
2    Q.  Dr. Sterba, do you consider yourself an
3  expert on torture?
4    A.  No.
5    Q.  I looked up strappado that you were
6  gracious enough to provide information, that was
7  part of your first deposition.  Were you aware that
8  is --
9    A.  I didn't hear what you said.
10    Q.  That strappado is also positioned for
11  bonding and BDSM?
12    A.  I didn't catch the initials, what is
13  that?
14    Q.  BDSM or bondage?
15    A.  BDSM, are you talking about bondage
16  sadomasochism?
17    Q.  Correct.
18    A.  I didn't know what you were referring
19  to.  No.
20    Q.  How long does somebody's arms have to
21  be in that position before they would asphyxiate?
22    A.  Are you talking about elevating
23  somebody off the ground with reverse hanging like

299

1  the pictures that I showed?
2    Q.  We can start with that, yes.
3    A.  I don't know.  It is mentioned though
4  that if they did not relieve -- I think it was the
5  picture from France, if they did not bring the
6  person down after an hour that they would
7  frequently die of asphyxiation.
8    Q.  Do you know how long it would take for
9  somebody to asphyxiate if they were placed with
10  their stomach on the ground with pressure on their
11  back and their arms being elevated --
12    A.  No.
13    Q.  -- how long that would take before they
14  would asphyxiate?
15    A.  No.
16    Q.  Do you know what Mr. Docher's pH level
17  would have been with medical certainty if taken
18  prior to the Ativan injection?
19    A.  Yes.
20    Q.  And what would that quantitative level
21  be?
22    A.  Less than 7.4.
23    Q.  And how did you determine that?

25 (Pages 296 to 299)

Sterba, MD - Tyk - 8/8/17

300

1      A.  He was acidotic from respiratory
2  acidosis, as we went into detail about before.  If
3  you cannot breathe, if somebody is stepping on your
4  chest and yanking your arms up, you can't get rid
5  of CO2 because of asphyxiation.  When CO2 climbs
6  that produces a lot of acid right away, that
7  metabolic disturbance is called respiratory
8  acidosis.  Over time it can lead to respiratory
9  acidosis being that your oxygen level drops so
10  severely you're anaerobically dropping off a lot of
11  lactic acid that is itself a metabolic component.
12  His pH is 7.35 to 7.45.  His pH would have been low
13  as a result of a 10 plus minute of lost of
14  consciousness after an undefined period of
15  asphyxiation by Deputy Magrum.  So his pH would
16  have been abnormally low with medical certainty
17  below 7.35.  That is not talking about the extreme
18  metabolic acidosis that happened after the 16
19  minute period of time with no pulse until he had a
20  blood pressure in normal sinus rhythm and a blood
21  gas was done in the ER, that is something
22  different.  We are talking about immediate acidosis
23  from not being able to breathe due to respiratory

301

1  insufficiency or respiratory depression from
2  asphyxiation or suffocation that drops the pH.
3      Q.  Doctor --
4      A.  Go ahead.
5      Q.  What is normal end tidal CO2?
6      A.  Right around 30 to maybe 40 or 45, that
7  also reflects the amount of CO2 that is in aerial
8  blood gas providing the heart and lungs are working
9  normally together.
10      Q.  And that would be the normal range of
11  end tidal CO2?
12      A.  Yes, if it is measured correctly.
13      Q.  And with somebody who would have
14  respiratory insufficiency what would their 02
15  saturation be?
16      MR. HECHT:  Form.
17      THE WITNESS:  Below normal.  I can't tell
18  you what it would be for him, but it would be
19  probably very abnormally low.  His CO2 would be
20  abnormally high.  I can't tell you with medical
21  certainty quantitatively give you a number of what
22  those numbers would have been.
23      BY MS. TYK:

302

1      Q.  What is abnormally low 02 saturation?
2      A.  Saturation less than 70 percent.
3      Q.  And what is --
4      A.  I'm sorry.  I was just looking through
5  the papers here.  I said 70 percent.  I was looking
6  at some papers right here.  It would be less than
7  90 percent.  I didn't mean to say 70.  I was
8  looking at some papers.  Anything less than 90
9  percent.
10      Q.  And as far as having a high CO2 level,
11  if you took end tidal CO2 what would that look
12  like, we talked about 40 being normal?
13      A.  Probably over 70 milliliters of
14  Mercury.  The safe exposure level of 70 was
15  determined by me with human experimentation with US
16  Navy divers using various diver helmets by breath
17  analysis of their exhaled carbon dioxide, a mask
18  spectrometer.
19      Q.  Is there a difference between somebody
20  who is drowning versus somebody who is on land and
21  is asphyxiated and suffocating?
22      A.  Yes, many differences.
23      Q.  What are those differences?

303

1      A.  The initial phase of drowning with a
2  small amount of water touching the vocal cords
3  slams the vocal cords called laryngospasm.  There
4  is an initial breath holding phase where -- meaning
5  that they can't really move air in or out.  As they
6  relax and lose consciousness the so-called dry lung
7  crowning can turn into a wet lung.  This can occur
8  very quickly if somebody steps on the chest, sits
9  on the chest or other methods of positional
10  asphyxiation, like hog tying somebody and putting
11  them into the back of a squad car and ending up in
12  the ER with a dead patient, that can happen very
13  quickly.
14      Q.  Has any of your research -- I know that
15  it has dealt with drowning, has any of your
16  research dealt with asphyxiation or suffocation
17  outside of the water context?
18      A.  Yes.  The breath holding experiments
19  were done in dry land conditions with just cold
20  water applied to the face.  The breath holding
21  subjects were immersed underwater with cold and
22  warm water.  Most of our experience was sitting in
23  a dental chair actually.  We studied -- and I was

26 (Pages 300 to 303)

Sterba, MD - Tyk - 8/8/17

304

1  the principal investigator and lead author of what
2  happens to your heart and lungs in peripheral
3  circulation and central circulation, in other
4  words, cardiac output.  All of these things were
5  measured during simulated drowning, including at
6  the end of the breath holding.  The experiment
7  subject, the scuba diver would exhale his breath
8  into a bag and we would measure what was in the
9  lung and re-inhale that directly extensively
10  measuring end tidal CO2 as well as the oxygen level
11  while currently measuring pulse ox metrically.  And
12  at no time did anybody lose consciousness during
13  these supervised human experiments.  The only loss
14  of consciousness was one experimental subject, that
15  was me, I held my breath until I lost
16  consciousness, but this was not a part of our
17  research.
18      Q.   When a person loses consciousness, do
19  they cease breathing?
20      A.  It's hard to say.  They might have --
21      Q.   Are you able to say in Mr. Docher's
22  case?
23      A.  Yes.  They can breathe.  Very shallow

305

1  breaths can be observed, such as breathing lightly.
2  And I feel that is what former EMT Deputy Magrum
3  was observing, that Docher's respirations were
4  grossly inadequate with his respiratory
5  insufficiency being that he was breathing lightly
6  or they can just not breathe at all.
7      Q.   We talked about at your first
8  deposition the increments that you believe the 1
9  milligram increments of Ativan that should have
10  been used, in the policies and procedures more
11  clearly defined, what is the time period that one
12  should wait between those increments before giving
13  the next 1 milligram of Ativan when using the
14  chemical sedation?
15      A.  I looked that up.  It is making sure
16  the vital signs are stable and no ongoing
17  respiratory depression or respiratory
18  insufficiency.  And if I mention one of those terms
19  without the other, I mean both.  There is no time
20  frame as to what period of time must elapse before
21  you give the next milligram.  The important point
22  is the dose that is delivered by injection must not
23  exceed 2 milligrams per minute.  And can we take a

306

1  brief break, please.
2      MS. TYK:  Sure.
3      (A recess was then taken.)
4  BY MS. TYK:
5      Q.   And, Doctor, I believe we talked about
6  this in your last deposition.  You are Board
7  Certified in Emergency Medicine, do you hold the
8  subspecialty board certification in emergency
9  medical services?
10      A.  No.
11      Q.   And we also talked about in your last
12  deposition development of policies and procedures
13  for emergency medical services.  My understanding
14  is that you believe that you were part of
15  developing some policies and procedures back in the
16  1990s for the military.  Outside of the military
17  context have you developed policies and procedures
18  for either governmental or private emergency
19  medical services?
20      A.  No.
21      Q.   Have you -- and we also talked about
22  your teaching, and I know that you do do some
23  teaching in which some paramedics or EMTs might be

307

1  students, do you teach any specific paramedic or
2  EMT programs?
3      A.  No, I do not.  I just remembered.  Back
4  in 1993 Dr. Richard Cummins who is the -- one
5  second, the chairperson on the committee of
6  cardiovascular care for ECC.  He in 93.  Invited me
7  to go on the committee for ECC specifically on
8  matters of resuscitation.  And I declined due to
9  other family and research commitments, so I never
10  did develop those policies.
11      MS. TYK:  That's all the questions that I
12  have.  I'm going through your errata.  So far they
13  are a lot of transcription errors.  Does that sound
14  accurate?  A lot of medical lingo that I was
15  speaking rather quickly, so I apologize for that.
16      MR. HECHT:  This is very embarrassing, but I
17  need to put something on the record.  This has
18  never happened to me before.  During Ms. Tyk's
19  deposition I had my phone on mute.  And we just got
20  a new phone system and I must have pressed
21  something and didn't realize it.  And this was
22  brought to my attention when I was asking Julie and
23  the Doctor -- Ms. Tyk and the doctor to not speak

27 (Pages 304 to 307)

Sterba, MD - Tyk - 8/8/17

---

308

1    over each other and I was not getting a response.
2    I probably made 40 to 50 form objections during the
3    course of your hour or so of questioning.  So I
4    just want to state on the record I was trying to
5    take some notes to recall what my form objections
6    were.  There were numerous objections regarding the
7    definition of negligence, reckless disregard and
8    standard of care, reasonable, appropriateness,
9    questions that called for, in my opinion, a legal
10   conclusion.  And just numerous others that I simply
11   cannot recall.  So what I would like to put on the
12   record is that I want to preserve any form
13   objections for the time of trial or in the
14   alternative at this time I'm going to simply make a
15   blanket form objection to questions that Ms. Tyk
16   asked because I obviously can't go back in time.
17   And I don't know how this happened.  I apologize,
18   but I did want to put that on the record before I
19   ask the doctor some questions.
20        MS. TYK:  Adam with those form objection to
21   every one of my questions, do I have to ask every
22   single one of them again?
23        MR. HECHT:  And that is the thing, obviously

---

309

1    no.  I'm just putting this on the record, and we
2    will have to deal with this at trial.  You know,
3    quite frankly, to be -- not to be disingenuous, I
4    don't know if that is proper.  There is nothing
5    else that I can think of at this time.  I had my
6    phone on mute for over an hour.
7         MS. TYK:  I did hear you making phone
8    objections to certain questions.  I don't know if
9    it is accurate that it was on mute the entire time.
10        MR. HECHT:  I can tell you at about 2:45 is
11   when I realized it was on mute.  I think it started
12   at maybe 2:00, 1:50.  I honestly don't know.  I
13   just want to put that on the record.
14        MS. TYK:  You've said what you want to on
15   the record.
16
17        EXAMINATION BY MR. HECHT:
18
19        Q.   Dr. Sterba, can you hear me?
20        A.   Yes, I can.
21        Q.   I just have several questions for you.
22   It is not going to be long, sir.  In your medical
23   opinion, and within a reasonable degree of medical

---

310

1    probability, did the actions by the deputy sheriffs
2    in this case combined with the actions of the
3    paramedics subsequently contribute to Mr. Docher's
4    injury?
5         MS. TYK:  Object to the form.
6         MS. BARRANCO:  Object to the form.
7         THE WITNESS:  Yes.  Individually and
8    collectively, meaning the deputies by themselves,
9    the paramedics by themselves, and both of them
10   together caused the cardiac arrest, caused the
11   brain damage and disability with medical certainty,
12   and that's it.
13   BY MR. HECHT:
14        Q.   And in your medical opinion and within
15   a reasonable degree of medical probability did the
16   actions of the sheriff's deputies in this case
17   combined with the actions of the paramedics cause
18   Tavares Docher's injuries?
19        A.   Yes.
20        MS. TYK:  Object to the form.
21        MS. BARRANCO:  Object to the form.
22   BY MR. HECHT:
23        Q.   And, Dr. Sterba, since your last

---

311

1    deposition you conducted some research by the Food
2    & Drug Administration as well as the United States
3    Department of Health & Human Services; is that
4    correct?
5         A.   Yes.
6         Q.   And what is it that you reviewed, sir?
7         A.   I was asked to comment on the FDA
8    package insert, which I did not review prior to my
9    first deposition.  So I pulled that up.  And that's
10   what revealed all the contraindications that I was
11   speaking about.  It assisted me and I think it is
12   very important to bring that out.  It didn't change
13   my opinions.  It certainly assisted me and
14   supported my opinions.
15        Q.   And you brought all of that literature
16   that you conducted by the Food & Drug
17   administration and the United States Department of
18   Health & Human Services to the deposition today; is
19   that correct?
20        A.   Yes, I did.  I made two copies, one for
21   me and one for all of the attorneys.
22        Q.   Thank you very much, sir.  What I would
23   like to do at this point is have you hand a copy to

---

28 (Pages 308 to 311)

Sterba, MD - Hecht - 8/8/17

312

1   the court reporter and we can mark that as
2   Plaintiff's Exhibit 1.
3   **A.  Yes.  All four have been handed to**
4   **Nancy, the court reporter, or did you want them**
5   **marked 1, 2, 3 or 4?**
6   Q.   We will mark them as a Composite
7   Plaintiff's Exhibit to put them in?
8   **A.  Fine.**
9   **The following was marked for Identification:**
10  **PLF EXH. 1    Four Printouts from the Food**
11  **& Drug Administration and the**
12  **US Department of Health &**
13  **Human Services**
14  BY MR. HECHT:
15  Q.   Sir, it is Plaintiff's Composite
16  Exhibit 1 has not changed any of your opinions in
17  this case?
18  **A.  It has not changed any opinions.  It**
19  **only confirms them.**
20  MR. HECHT:  Dr. Sterba, I don't have any
21  other questions, but some of the other attorneys,
22  Ms. Barranco or Ms. Tyk may.  Thank you, sir.
23  MS. BARRANCO:  I don't have any more

313

1   questions.
2   MS. TYK:  I don't have any more questions.
3   MR. HECHT:  We will read and sign.
4   (Deposition concluded at 4:11 p.m.)
5   * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

314

1   I hereby CERTIFY that I have read the
2   foregoing 114 pages, and that they are a true and
3   accurate transcript of the testimony given by me in
4   the above entitled action on August 8, 2017.
5
6
7   -----------------------
    JOHN A. STERBA, MD
8
9   Sworn to before me this
10
11  -------- day of  ---------, 2017.
12
13  --------------------------
14  NOTARY PUBLIC.
15
16
17
18
19
20
21
22
23

315

1   STATE OF NEW YORK )
2                      ss:
3   COUNTY OF ERIE   )
4
5   I DO HEREBY CERTIFY as a Notary Public in and
6   for the State of New York, that I did attend and
7   report the foregoing deposition, which was taken
8   down by me in a verbatim manner by means of machine
9   shorthand.  Further, that the deposition was then
10  reduced to writing in my presence and under my
11  direction.  That the deposition was taken to be
12  used in the foregoing entitled action.  That the
13  said deponent, before examination, was duly sworn
14  to testify to the truth, the whole truth and
15  nothing but the truth, relative to said action.
16
17
18          NANCY C. BROICH,
            Notary Public.
19
20
21
22
23

29 (Pages 312 to 315)

316

1          INDEX TO EXHIBITS

2     Exhibit          Description          Page

3     PLF EXH. 1    Four Printouts from the      312
                    Food & Drug Administration
4                   and the US Department of
                    Health & Human Services

5

6

7

8     *Original exhibits attached to Mr. Hecht's
      transcript.
9     Copies of exhibits attached to all other
      transcripts.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

317

1          INDEX TO WITNESSES

2     Witness          Examination          Page

3     JOHN A. STERBA, MD   BY MS. BARRANCO:    202

4                    BY MS. TYK:     271

5                    BY MR. HECHT:   309

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

30 (Pages 316 to 317)

315

```
 1  STATE OF NEW YORK )

 2                      ss:

 3  COUNTY OF ERIE     )

 4

 5      I DO HEREBY CERTIFY as a Notary Public in and

 6  for the State of New York, that I did attend and

 7  report the foregoing deposition, which was taken

 8  down by me in a verbatim manner by means of machine

 9  shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18              NANCY C. BROICH,
                Notary Public.

19

20

21

22

23
```

314

1       I hereby CERTIFY that I have read the

2  foregoing 114 pages, and that they are a true and

3  accurate transcript of the testimony given by me in

4  the above entitled action on August 8, 2017, *along*

5  *with five (5) pages of Errata Sheets completed by me.*

6

7                          _John A. Sterba_ MD, PhD, FACEP, FACPEx

8                          JOHN A. STERBA, MD
                           *John A. Sterba, M.D., Ph.D., FACEP, FACPEx*

9  Sworn to before me this

10

11  ------- *8* day of *Sept*---, 2017.

12

13  _____

14  NOTARY PUBLIC.

15

16      DONNA J. SCHOFIELD
     NOTARY PUBLIC STATE OF NEW YORK
17        QUALIFIED IN WYOMING
          LIC. #01SC6024747
18        COMM. EXP. *5-17-2019*

19

20

21

22

23

## ERRATA SHEET

Pg. 1 8 5

F.R.C.P. RULE 1.310 PROVIDES, IN PART:

(e)"... Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

| PAGE/LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| 205/2 | " It was directly related to ... | Transcription error. |
| 207/14 | " ... by the chest NOT being able to rise ..." | Transcription error. |
| 208/4 | " ... asphyxiation and hypoxemia, which is ..." | Transcription error. |
| 211/16 | " ... between we have elapsed time." | Transcription error. |
| 218/16 | " ... a joke to apologize." | Transcription error. |
| 218/17 | " ... That's okay. I'm Now with you." | Transcription error. |
| 231/23 | " ... And, I'm saying with medical ..." | Transcription error. |
| 224/15 | " They did NOT if you take a look ..." | Transcription error. |
| 228/10 | " ... closely in the ER/EMS with all ..." | Transcription error. |
| 231/15 | " ... I have not looked at any ..." | Transcription error. |
| 233/12 | " ...from being beaten up by his ..." | Transcription error. |
| 235/2 | " ... and were caused by somebody else." | Transcription error. |
| 235/12 | " ... in charge & hyperthermia treatment ..." | Transcription error. |
| 237/14 | " ... Emergency Medicine specialist ..." | Transcription error. |
| 238/17 | " Asphyxiation resulted in elevated $CO_2$ | Transcription error. |
| 239/7 | " ... that position could lead to ..." | Transcription error. |
| 241/22 | " point & EMS contact and ..." | Transcription error. |
| 242/14-15 | " T. Docher NOT resisting, appears in ..." | Transcription error. |
| 243/18 | " ... barely either breathing, in critical ..." | Transcription error. |
| 244/6 | " ... "yes, I did see that video + that ..." | Transcription error. |
| 225/1-2;9-10 | " ... & 6:25 and 35 seconds, EMS ... "And & 6:25 and 35 seconds, NOT request." | Both Transcription errors, pg. 225. |

I, JOHN STERBA, M.D., do hereby certify that I have read the foregoing transcript of my deposition, given on August 8, 2017, and that together with any additions or corrections made herein, it is true and correct.

John A. Sterba, MD, PhD, FACEP, FACFEI

JOHN STERBA, M.D. - Deponent
John A. Sterba, M.D., Ph.D, FACEP, FACFEI

## ERRATA SHEET

pg. 2 8 5

F.R.C.P. RULE 1.310 PROVIDES, IN PART:

(e)"... Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

| PAGE/LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| 245/3 | "... pressure for this 330 to 355 pound deputy..." | Transcription error. |
| 249/11 | "No, it did not. There was no loss of..." | Clarification. |
| 254/6 | "... where Deputy Mangrum says, "F'ing stop moving!" | Transcription error. |
| 254/13 | "... it right there. (On the DVD on my computer at..." | Clarification. |
| 254/14 | "... time, "F'ing stop moving!" And he..." | Transcription error. |
| 255/12-13 | "... in the field working with paramedics for..." | Transcription error. |
| 256/9 | "... he yelled, "F'ing stop moving!" and..." | Transcription error. |
| 258/13 | "... & St. Lucie County were not available." | Transcription error. |
| 258/21 | "And I was given permission to do so..." | Transcription error. |
| 261/15 | "... if weights are applied to the body..." | Transcription error. |
| 264/10 | "Institutional Review Board (IRB)-approved..." | Transcription error. |
| 264/12 | "... simulating the cold-water drowning..." | Transcription error. |
| 264/15 | "physiological long-duration breath-holds..." | Transcription error. |
| 264/22 | "... and diving physiologist where I..." | Transcription error. |
| 265/9 | "... by paramedic ambulance services..." | Transcription error. |
| 265/18 | "... & air hunger, or I can't breathe" | Transcription error. |
| 269/12 | "Yes. In 1973, that was just part of..." | Clarification. |
| 274/17 | "... was only hypersensitivity, not metabolic..." | Transcription error. |
| 273/21 | "... page 15 & the Report and references used..." | Clarification |
| 274/12 | "... contraindications to MISINFORM, or not to..." | Transcription error |

I, JOHN STERBA, M.D., do hereby certify that I have read the foregoing transcript of my deposition, given on August 8, 2017, and that together with any additions or corrections made herein, it is true and correct.

_John A. Sterba, MD, PhD, FACEP, FACFEI_

JOHN STERBA, M.D. - Deponent
John A. Sterba, M.D., Ph.D., FACEP, FACFEI

## ERRATA SHEET

Pg. 3 & 5

F.R.C.P. RULE 1.310 PROVIDES, IN PART:

(e)"... Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

| PAGE/LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| 274/23 | "... oversees the Federal FOOD and Drug Administration." | Transcription error. |
| 277/20 | "... The drugs that act upon the CNS and Alcohol..." | Transcription error. |
| 278/23 | "... It says extreme caution must ..." | Transcription error. |
| 283/11 | "... If the patient is UNSTABLE or has ..." | Transcription Error. |
| 284/9 | " By directly observing the patient" | Transcription Error |
| 285/11 | "...combative patient care having worked EMS ..." | Transcription Error |
| 286/8 | "...with extreme confusion, and NO respiratory distress." | Transcription Error |
| 286/12 | "... And I reassessed, and if physiologically stable, to give 1..." | Transcription Error |
| 287/5 | "... have gone ever, and NAUSEAM." | Transcription Error. |
| 288/11-18 | "... grab the furthest peripheral pulse to see if their blood pressure would be above 70 to 80 MM (millimeters) of Mercury, if you can feel the pulse, and then get a capillary refill. This is hemodynamic assessment. You may not be able to get a blood pressure cuff on, and pump it up and release the pressure until you feel a pulse at the radial artery, that is called BP systolic pressure by palpation." | Transcription error. |
| 288/20-21 | "... the femoral pulse and then the carotid pulse a more central pulse. | Transcription error. |

I, JOHN STERBA, M.D., do hereby certify that I have read the foregoing transcript of my deposition, given on August 8, 2017, and that together with any additions or corrections made herein, it is true and correct.

_John A. Sterba, MD, PhD, FACEP, FACFEI_

JOHN STERBA, M.D. - Deponent
JOHN A. STERBA, M.D., Ph.D., FACEP, FACFEI

## ERRATA SHEET

Pg. 4 & 5

F.R.C.P. RULE 1.310 PROVIDES, IN PART:

(e)"... Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

| PAGE/LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| 289/22 | "And we saw no evidence of that at CVS." | Transcription Error. |
| 291/17 | "... pulses, maybe systolic blood pressure ..." | Transcription error. |
| 291/20 | "... as well as cardiac assessment." | Transcription error. |
| 292/22 | "... person's breathing is adequate by ..." | Transcription error. |
| 294/9 | "Tidal volume can be assessed ..." | Transcription error. |
| 294/18 | "... measuring milliliters or actual volume." | Transcription error. |
| 294/21 | "That is the air exchange, ..." | Transcription error. |
| 296/15-16 | "... have been elevated, and he lost consciousness. With medical contents, he would have then been hypotensive. | Transcription error. |
| 297/6-7 | "like this or as in drowning, or asphyxiation or trying to dive deep with a helmet and with a high respiratory rate." | Transcription error. |
| 297/10 | "his respirations are fast, irregular and then they ..." | Transcription Error. |
| 297/21 | "never asked what was the pulse." | Transcription Error. |
| 300/12 | "normal pH is 7.35 to 7.45." | Transcription error. |
| 301/6 | "Right around 40 to maybe 40 to 45." | Transcription error. |
| 302/7-8 | "It would be less than 95 percent." "Anything less than 95 percent." | Transcription error. |
| 302/16-17 | "by breath-by-breath analysis ... using a MASS spectrometer. | Transcription error. |

I, JOHN STERBA, M.D., do hereby certify that I have read the foregoing transcript of my deposition, given on August 8, 2017, and that together with any additions or corrections made herein, it is true and correct.

_John A. Sterba, MD, PhD, FACEP, FACFEI_

JOHN STERBA, M.D. - Deponent
JOHN A. STERBA, M.D., Ph.D., FACEP, FACFEI

## ERRATA SHEET

*Pg. 5 8 5*

F.R.C.P. RULE 1.310 PROVIDES, IN PART:

(e)"... Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

| PAGE/LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| 303/3 | "... slams the vocal cords shut called ..." | Transcription Error. |
| 303/7 | " dry lung drowning can turn into a wet lung drowning. | Transcription Error. |
| 304/6 | " The Experimental subject ... " | Transcription Error. |
| 304/11 | "... measuring pulse oximetry." | Transcription error. |
| 307/6 | " He, back in '93 invited me to go ..." | Transcription error. |

I, JOHN STERBA, M.D., do hereby certify that I have read the foregoing transcript of my deposition, given on August 8, 2017, and that together with any additions or corrections made herein, it is true and correct.

*John A. Sterba, MD, PhD, FACEP, FACFEI*

JOHN STERBA, M.D. - Deponent
*JOHN A. STERBA, M.D., Ph.D., FACEP, FACFEI*