UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:   16-14413-Civ-ROSENBERG/MAYNARD

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

        Plaintiff,

vs.

CHRISTOPHER NEWMAN, et. al.

        Defendants.

_____/

**PLAINTIFF'S OMNIBUS RESPONSES TO DEFENDANT SHERIFF,
MANGRUM, NEWMAN, ROBINSON, AND COURTEMANCHE'S
MOTIONS FOR SUMMARY JUDGMENT [DE 83, 84, 85, 87]**

**COMES NOW** the Plaintiff, TAVARES DOCHER, by and through JANICE DOCHER-

NEELEY, his mother and legal guardian (hereinafter "Docher"), by and through his undersigned

attorneys, and pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, hereby submits this Omnibus

Responses to Plaintiff's Omnibus Responses to Defendant Sheriff, Mangrum, Newman, Robinson,

and Courtemanche's Motions for Summary Judgment [DE 83, 84, 85, 87]

    1.     This is a civil action under 42 U.S.C. § 1983 and Florida law against CHRISTOPHER

NEWMAN, individually (hereinafter "Newman"), CLAYLAN MANGRUM, individually

(hereinafter "Mangrum", CALVIN ROBINSON, individually, (hereinafter "Robinson"), WADE

COURTEMANCHE, individually (hereinafter "Courtemanche"), KEN J. MASCARA, as SHERIFF

of ST. LUCIE COUNTY, Florida (hereinafter "St. Lucie County Sheriff's Office"), JOSE

ROSARIO, individually (hereinafter "Rosario"), and the ST. LUCIE COUNTY FIRE DISTRICT,

an independent special district (hereinafter "Fire District").

    2.     Newman, Mangrum, Robinson, Courtemanche, and the St. Lucie County Sheriff's

Office, seek summary judgment as to all claims.  [DE 83, 84, 85, 87].[1]  Defendants Jose Rosario and

---

[1]

    This single thirty-six page memorandum is been filed in lieu of filing four frequently
overlapping and redundant responses to DE 83, 84, 85, 87.   The undersigned has conferred with
Summer M. Barranco, Esq., attorney for Defendants Newman, Mangrum, Robinson, Courtemanche,

the St. Lucie County Fire District have filed separate motions for summary judgment. [DE 98, 99].

**Memorandum of Law**

**1.    Introduction**

Even in claims under 42 U.S.C. § 1983, the historical facts at the summary judgment stage must be viewed in the light most favorable to the non-moving party, and are not simply the facts, views, concerns and fears from the singular perspective of the police officers.  Tolan v. Cotton, 134 S.Ct. 1861, 1866  (2014).  Viewing the evidence in the light most favorable to Docher, this is not a complicated case.   Docher was not engaged in criminal conduct at CVS.   He experienced a medical event.   He was then falsely arrested and subjected to excessive force.   During the use of force, Docher acted in self-defense.   When he did, he was subjected to additional use of force.   The trauma from the force, including Mangrum stepping on Docher's back (with resulting loss of consciousness), placed Docher in a compromised physiologically state.  According to Rosario, the conduct of Mangrum actually caused Docher's cardiac arrest.

For his part, Docher's evidence and testimony shows that he suffered cardiac arrest as a consequence of both the deputies actions, and because Rosario elected to by-pass available physical restraints and instead inject Docher with 4 milligrams of Ativan, notwithstanding his compromised physiological condition.  Within minutes, Docher's heart stopped.  He flat-lined.  More likely than not, Rosario injected some or all of the Ativan in to an artery.  Because Rosario failed to timely monitor Docher following the Ativan injection, he was not immediately aware that Docher flat-lined.  As a result, resuscitation efforts were delayed and Docher now exists in a persistent vegetative state.

These facts are Docher's view of the evidence and inferences.  As the United States Supreme Court made clear in Tolan v. Cotton, 134 S.Ct. 1861 (2014), it is Docher's view of the evidence and inferences that must be credited.   Against that backdrop, Newman, Mangrum, Robinson, Courtemanche, and the St. Lucie County Sheriff's Office are not entitled to summary judgment. Docher's claims must be decided by a jury, not on a summary judgment record.

**2.    The defense of qualified immunity**

Newman, Mangrum, Robinson, Courtemanche, and Rosario have all raised the defense of qualified immunity.  Qualified  immunity protects government officials performing "discretionary

---

and the St. Lucie County Sheriff's Office, and is authorized to represent that there is no objection to the filing of a single thirty-six page response.

functions" from civil liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[2]  Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982).  When evaluating whether pre-existing case law was clearly established, the Eleventh Circuit Court of Appeals generally looks to decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals,[3] as well as the highest court of the state where the case arose.[4]  Jenkins v. Talladega City Board of Education, 115 F.3d 821, 826-27 n.4 (11th Cir. 1997) (en banc);  Courson v. McMillian, 939 F.2d 1479, 14-97-98 n.32.  (11th Cir. 1991).

The qualified immunity inquiry "turns on the 'objective legal reasonableness' of the [official's] action, assessed in light of the legal rules that were 'clearly established' at the time" of the conduct.  Wilson v. Layne, 119 S.Ct. 1692, 1699 (1999) (quoting Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738-39 (1982)).  In 1997, the United States Supreme Court described these principles for the first time as the "fair warning" requirement.  United States v. Lanier, 117 S.Ct. 1219, 1225 (1997).

Under the "fair warning" requirement, liability may be imposed under 42 U.S.C. §1983 "for the deprivation of a constitutional right if, but only if, 'in the light of preexisting law the unlawfulness [under the Constitution is] apparent.'" United States v. Lanier, 117 S.Ct. 1219, 1228 (1997) (quoting Anderson v. Creighton, 107 S.Ct. 3034, 3039 (1987)).  "Where it is, the

---

[2]

Newman, Mangrum, Robinson, Courtemanche, and Rosario are entitled to raise the defense of qualified immunity since they were performing "discretionary functions" at the time of the incident.  Grider v. City of Auburn, Ala., 618 F.3d 1240, 1262 n.33 (11th Cir. 2010) ("[I]n qualified-immunity cases, we examine whether a public official's acts fall within 'his scope of authority' and thus his 'discretionary functions,' not whether he was authorized to commit an illegal act") (citing O'Rourke v. Hayes, 378 F.3d 1201, 1205-06 (11th Cir. 2004)).

[3]

The Eleventh Circuit Court of Appeals has also adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals issued on or before September 30, 1981.  Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[4]

In some cases, the Eleventh Circuit Court of Appeals relies on decisions of state intermediate appellate courts, particularly as to the probable cause prong of the qualified immunity analysis. Davis v. Williams, 451 F.3d 759, 765 (11th Cir. 2006) (surveying intermediate appellate court decisions in Florida); Reese v. Herbert, 527 F.3d 1253, 1273 (11th Cir. 2008) (denying qualified immunity based on the decision of an intermediate appellate court in Georgia).

constitutional requirement of fair warning is satisfied." United States v. Lanier, 117 S.Ct. at 1228.

In United States v. Lanier, Justice Souter analyzed the fair warning requirement in 18 U.S.C. §242, the criminal law counterpart to 42 U.S.C. §1983. Justice Souter explained that United States Supreme Court's decisions "upheld [criminal] convictions under §241 or §242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decision gave *reasonable* warning that the conduct then at issue violated constitutional rights." Id. at 1227 (italics added). Justice Souter also found no difference between the "qualified immunity" standard applicable in civil actions under 42 U.S.C. §1983 and the fair warning requirement applied in criminal cases under 18 U.S.C. §242. "[B]oth [statutes] serve the same objective, and in effect, the qualified immunity test is simply the adaptation of the fair warning standard." Id. at 1227. The Court concluded:

> This is not to say, of course, that the single warning standard points to a single level of specificity in every instance. In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful." As Judge Daughtrey noted in her dissenting opinion in this case, "'[t]he easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.'"

United States v. Lanier, 117 S.Ct. at 1227-1228 (internal citations omitted).

### a).    Qualified immunity post-*Lanier*

In the aftermath of the United States Supreme Court's opinion in Lanier, it was not clear whether Lanier should be limited to the unique facts that case. Any uncertainty ended with the United States Supreme Court's subsequent decision in Hope v. Pelzer, 122 S.Ct. 2508 (2002).

In Hope v. Pelzer, the United States Supreme Court reversed the Eleventh Circuit's determination that qualified immunity protected correctional officers at Alabama's Limestone Prison who "twice handcuffed [Larry Hope] to a hitching post to sanction him for disruptive conduct." Id. at 2512. The Eleventh Circuit granted qualified immunity since there were no "earlier cases with 'materially similar' facts." Id. The United States Supreme Court reversed, concluding:

> Our opinion in *Lanier* thus makes clear that officials can still be on notice that

their conduct violates established law even in novel factual circumstances.   Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar."  Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.   The same is true of cases with "materially similar" facts.  Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

Hope v. Pelzer, 122 S.Ct. at 2516.

Following Hope v. Pelzer, a majority of the Eleventh Circuit's then-active members joined in opinions warning against an "unduly rigid" qualified immunity framework (also referred to as a "rigid gloss").[5]   For example, in Holloman ex. Rel. Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004), Judge Tjoflat observed that

[t]his circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations. . . .The law of this circuit used to be that a government actor could be denied qualified immunity only for acts that are "so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." Lassiter v. Ala. A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).  The Supreme Court, specifically citing *Lassiter* (along with a handful of other Eleventh Circuit cases), held that "[t]his rigid gloss in the qualified immunity standard . . . is not consistent with [the Supreme Court's] cases." Hope v. Pelzer, 536 U.S. 730, 739 & n.9, 122 S.Ct. 2508, 2515 & n.9, 153 L.Ed 2d 666 (2002).

Holloman ex. Rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004).

The decision in Holloman and other post-Hope qualified immunity cases signaled a new era. Lassiter is no longer good law, and "[q]ualified immunity is, as the term implies, qualified.  It is not absolute.  It contemplates instances in which public official's actions are not protected."  Kingsland v. City of Miami, 382 F.3d 1220, 1233 (11th Cir. 2004).   These same principles apply even in the absence of case law with "materially similar" facts.  As the Eleventh Circuit explained in Amnesty International, USA, v. Battle, 559 F.3d 1170 (11th Cir. 2009):

All of the caselaw cited [by Amnesty International, USA] . . . , with the exception of

---

[5]

*See*, Akins v. Fulton County, GA, 420 F.3d 1293, 1307 (11th Cir. 2005); Holloman ex. Rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004); Grayden v. Rhodes, 345 F.3d 1225, 1231-32 (11th Cir. 2003); Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003); Willingham v. Loughnan, 321 F.3d 1299 (11th Cir. 2003).

Citizens for Peace in Space, is good authority that predates the November 20, 2003 incident.  Saia, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); Warner Cable Commc'ns, 911 F.2d 634 (11th Cir.1990); Ward, 491 U.S. 781, 109 S.Ct. 2746 (1989).**FN9**   None of these cases, however, are on all fours with the instant case, and do not clearly elucidate the fact-specific rule that police may not create a police cordon that makes a protest rally totally ineffective.  Prior cases clearly establishing the constitutional violation, however, need not be "materially similar" to the present circumstances so long as the right is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).  There need not, however, be a prior case wherein "the very action in question has previously been held unlawful."  Id. at 741, 122 S.Ct. 2508 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034).  Here, Defendants had fair warning that Amnesty had a clearly established right to assemble, to protest, and to be heard while doing so.

**FN9**   Although the discussion of the rights at issue may have been put in general terms in the cited cases, this generality does not deprive these cases of their ability to "clearly establish" the violation of Amnesty's constitutional rights.  Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning ....").

Amnesty International, USA, v. Battle, 559 F.3d at 1185 & n.9 (11th Cir. 2009).

3.  **The requirements of *Tolan v. Cotton***

For purposes of Fed. R. Civ. P. 56, the deputies testimony, concerns and fears are not the historical facts.   The facts and inferences must be viewed in the light most favorable to Docher.  According to independent witnesses and as provided in Docher's statements of additional facts, Docher did not resist arrest and was subjected to excessive force, including elbow strikes to the head.  As a result, Docher was entitled to acted in lawful self-defense.  Wh en the deputies realized they were being filmed, Courtemanche ran off the witnesses and directed Shaun Mahonney to stop recording the incident.

Mangrum subjected Docher to mechanical asphyxiation by pulling up Docher's handcuffed arms behind his back (in a 90 degree angle), forcing Docher's chest down into the asphalt parking lot.   Mangrum then stepped on Docher's back to frustrate Docher's efforts to lift his chest off the ground (so that his chest could make the necessary movements necessary to move air). As a result, Docher could not breathe and lost consciousness.  Deputy Mangrum (a former EMT) placed Docher in the recovery position (on his side) and waited for fire-rescue.  When Rosario arrived, Docher was verbally non-responsive.   He was only calm when being held down by the four-five (if not more) deputies on scene.   Instead of using physical restraints (since Docher remained calm as long as he

was being held down), Rosario went straight to chemical restraints and injected Docher with 4 milligrams of Ativan.   Docher's heart then stopped.

In <u>Tolan v. Cotton</u>, 134 S.Ct. 1861 (2014), Tolan claimed that he had been subjected to excessive force when he was shot in the chest by Cotton, a police sergeant.  <u>Id.</u> at 1864.  At the time of the shooting, Tolan was unarmed and returning to his parents' home when a police officer ran a computer check on Tolan's vehicle.  The officer mistakenly entered the wrong license plate number and the tag came back as stolen.  <u>Id.</u> at 1863-64.   The district court granted summary judgment to Cotton– who  responded to the scene as a back up.   The Fifth Circuit affirmed on the grounds that

> 'an objectively-reasonable officer in Sergeant Cotton's position could have. . . believed' that Tolan "presented an 'immediate threat to the safety of the officers.'" In support of this conclusion, the court relied on the following facts: the front porch had been 'dimly-lit'; Tolan's mother had 'refus[ed] orders to remain quiet and calm'; and Tolan's words had amounted to a 'verba[l] threa[t].'  Most critically, the court also relied on the purported fact that Tolan was 'moving to intervene in' Cotton's handling of his mother, and that Cotton therefore could reasonably have feared for his life.  Accordingly, the court held, Cotton did not violate clearly established law in shooting Tolan.

<u>Tolan v. Cotton</u>, 134 S.Ct. 1865 (internal citations omitted).  The Fifth Circuit denied rehearing en banc.  Judge Dennis dissented on the basis that "the panel opinion 'fail[ed] to address evidence that, when viewed in the light most favorable to the plaintiff, creates genuine issues of material fact as to whether an objective officer in Cotton's position could have reasonably and objectively believed that [Tolan] posed an immediate, significant threat of substantial injury to him.'" [internal citation omitted]  <u>Id.</u> at 1865.

In vacating the Fifth Circuit's decision, the United States Supreme Court explained that even where the defense of qualified immunity is raised, "Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  <u>Id.</u> at 1866.  The Court explained:

> This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."
>
>               \* \* \*
>
> In holding that Cotton's actions did not violate clearly established law, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case.  By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly "weigh[ed] the evidence" and resolved disputed issues in favor of the moving party,

*Anderson*, 477 U.S., at 249, 106 S.Ct. 2505.

Tolan v. Cotton, 134 S. Ct. at 1866.

Tolan testified that he was shot by Cotton after rising to his knees to protest Cotton's treatment of his mother, who was attempting to explain that the car was not stolen.   In affirming summary judgment for Cotten, the Fifth Circuit "concluded that Tolan was 'shouting,' and 'verbally threatening' the officer in the moments before the shooting." Id. at 1867 [internal citations omitted]. Tolan also admitted stating: "Get your fucking hands off my mom," but denied "screaming."  Id.

In vacating the Fifth Circuit's decision, the United States Supreme Court noted that"[a] jury could well have concluded that a reasonable officer would have heard Tolan's words not a threat but a son's plea not to continue any assault of his mother."  Id.  Thus, Tolan v. Cotton makes clear that the historical facts are not the facts as perceived by the officer, even in claims under 42 U.S.C. § 1983.  In other words, there was no disagreement that Tolan stated: "Get your fucking hands off my mom."  However, the question of whether those words amounted to a threat from the standpoint of an objectively reasonable police officer must to be viewed at the summary judgment stage in the light most favorable to Tolan–not from the standpoint of the police officer against whom the supposed threat was directed.  Tolan v. Cotton, 134 S. Ct. at 1868.  Because "a jury could reasonably infer that [Tolan's ] words, in context, did not amount to a statement of intent to inflict harm," summary judgment was not appropriate notwithstanding the officer's contrary perception of the incident.  Id. at 1867.   Thus, Tolan was entitled to have a jury, not Cotton, decide whether his words amounted to a threat when viewed from the standpoint of an objectively reasonable police officer.

These same principles apply to Docher's claims against the deputies an the St. Lucie County Sheriff's Office.

**4.      Docher was subjected to false arrest/false imprisonment under the Fourth Amendment and Florida law**

### a).      Newman lacked probable cause to arrest Docher for disorderly intoxication

First, under Florida law a police officer may make a warrantless arrest for any misdemeanor offense only if all the elements are committed in the presence of a law enforcement officer.  Smith v. State, 778 So.2d 329, 329 (Fla. 2nd DCA 2000) (Florida Statute §901.15 provides that "[a] law enforcement officer may not make a warrantless arrest for a misdemeanor, such as this trespass, unless every element of the crime is committed in his presence"); Johnson v. Barnes & Noble Booksellers, Inc., 437 F.3d 1112, 1116 (11th Cir. 2006).   (Because of the requirements of Florida

Statute §901.15, it is a false arrest for any person to "effectuate a warrantless arrest for a misdemeanor, if the misdemeanor was not committed in his [or her] presence").

The courts have strictly construed the 'presence of the officer' language, requiring that the arresting officer actually see or otherwise detect by his senses that the person has violated the ordinance." Horsley v. State, 734 So.2d 525, 526 (Fla. 2nd DCA 1999).   As the Florida Supreme Court explained in Malone v. Howell,

> [a]n arrest without a warrant for a misdemeanor, to be lawful, can only be made where the offense was committed in the presence of the officer–that is it must have been within the presence or view of the officer in such a manner as to be actually detected by the officer by the use of one of his senses. See *Borwn v. Wallis*, Tex. Civ. App., 101 S. W. 1068, 1070, wherein the court said: 'It is not sufficient that the officer is within seeing or hearing distance of the criminal act and thereby obtains knowledge of the fact, but he must also be able to 'detect it by sight or hearing as the act of the accused.'' See also *People v. Johnson*, 86 Mich. 175, 48 N.W. 870, 13 L.R.A. 163, 24 Am.St.Rep. 116; *Baldwin v. State*, 175 Miss. 316, 167 So. 61; *Kennington-Saenger Inc. v. Wicks*, 168 Miss. 566, 151 So. 549.

Malone v. Howell, 140 Fla. 693, 700 (Fla. 1939).

Newman arrested Docher for the offense of disorderly intoxication, a second degree misdemeanor.  Florida Statute § 856.011(1) provides that

> (1)    No person in the state shall be intoxicated and endanger the safety of another person or property, and no person in the state shall be intoxicated or drink any alcoholic beverage in a public place or in or upon any public conveyance and cause a public disturbance.

Vernold v. State, 376 So.2d 1166, 1167 (Fla. 1979).

Based on the plain language of the statute, § 856.011 applies in two different circumstances. First, intoxicated persons who are not in a public place and endanger the safety or property of another commit the offense of disorderly intoxication.  Secondly, intoxicated persons who are in a public place and cause a public disturbance commit the offense of disorderly intoxication.

Thus, the Florida Standard Jury Instructions in Criminal Cases provides:

> To prove the crime of Disorderly Intoxication, the State must prove the following two elements beyond a reasonable doubt:
>
> *Give a or b as applicable*
>
> a.    [1.    (Defendant) was intoxicated, and
>
>         2.    [He] [She] endangered the safety of another [person] [property].]
>
> b.    [1.    (Defendant) was intoxicated or drank any alcoholic beverage in a [public

place] [in or upon a public conveyance] and

2.      [He] [She] caused a public disturbance.]

*Definition*

"Intoxication" means more than merely being under the influence of an alcoholic beverage.  Intoxication means that the defendant must have been so affected from the drinking of an alcoholic beverage as to have lost or been deprived of the normal control of either [his] [her] body or [his] [her] mental faculties, or both. Intoxication is synonymous with "drunk."

*Optional Definition*

A "public place" is a place where the public has a right to be and to go.

The defendant's admission that [he] [she] drank an alcoholic beverage is not sufficient by itself to prove beyond a reasonable doubt that [he] [she] was under the influence of an alcoholic beverage but this admission may be taken into consideration along with other evidence.

Florida Standard Jury Instructions in Criminal Cases § 29.1.

Newman arrested Docher for disorderly intoxication. (Exh. G, 37:24-25-38:1).  The arrest was unlawful under the first prong of the statute since Mangrum admits Docher was not "a direct threat to other people." (Exh. C, 43:4-5).  Robinson testified that Docher's demeanor was "pretty calm and collected" and he "seemed somewhat relieved we were there." (Exh. G, 41:20-21, 44:22-24).   The CVS videotape of the parking lot corroborates Robinson's testimony.  (Exhibit I).  As Magistrate Judge Torres explained in denying qualified immunity in <u>Ruizdelatorre v. City of Miami Beach</u>, 2008 WL 5381431, at *7–8 (S.D. Fla., 2008),

Frankly, from the officers' testimony it is difficult to find that arguable probable cause existed to charge Fragoso-Diaz with disorderly intoxication.  It is well established in Florida that, under this statute, a person may only be charged with disorderly intoxication if the person is both intoxicated *and* at the same time endangering the public safety. *See, e.g., State v. Holden,* 299 So.2d 8 (Fla.1974); *Jernigan v. State,* 566 So.2d 39 (Fla. 1st DCA 1990); *Blake v. State,* 433 So.2d 611 (Fla. 1st DCA 1983).  Florida law does not make public intoxication unlawful; only disorderly intoxication that endangers the public is unlawful under the statute. *Dazell v. Chertoff,* 2005 WL 2581017, *3 n. 6 (M.D.Fla. Oct.13, 2005).

Thus, for instance, someone who is observed staggering and acting unsteadily on a public road is not committing the offense of disorderly intoxication, even if that person is clearly intoxicated. *See, e.g., Papalas v. State,* 645 So.2d 153, 155 (Fla. 1st DCA 1994). Someone in a public place who smells of alcohol, who is flapping his arms around, talking loudly with profanity, and causing "a little disturbance" is still not engaging in disorderly intoxication. *See Blake,* 433 So.2d at 612.

<u>Ruizdelatorre v. City of Miami Beach</u>, 2008 WL 5381431, at *7–8 (S.D. Fla. 2008)

Nor was there concern for any the safety of any person prior to the officer's arrival, i.e., *outside* the deputies' presence.[6]   CVS employee Hardyal Bhagudas denied he was concerned for any person's safety while Docher was inside the CVS making his purchase.  (Exh. D, 25:18-21).  Bhagudas believed Docher who "was scared for some reason."  (Exh. D, 21:22-25 - 22:1-3).

CVS cashier Leah Nicole Boles explained that while Docher was at the cash register he made "no threats, and there was no cussing.   He was just acting confused."  (Affidavit of Leah Nicole Boles, Exh. E, p. 1, ¶ 4).

According to Mangrum, Docher was arrested for "disorderly intoxication" because the CVS parking lot was "open to the public." (Exh. C, 45:6-23; 71:11-17).  Mangrum explained: "[W]e're in a public parking lot; it's already caused some disturbance to the business that we could see where onlookers, people walking around us, were taking up half a parking lot."  (Exh. C, 41:8-13).  Mangrum is mistaken.

A person does not engage in disorderly intoxication because on-lookers are attracted by the police officers and their vehicles.  As the Eleventh Circuit explained in denying qualified immunity (in the context of an arrest for disorderly conduct):

> [T]he mere fact that neighbors exited their home and observed the scene is not, of itself, sufficient to give rise to arguable probable cause for disorderly conduct unless there is "some evidence that the crowd is actually responding to the defendant's words in some way that threatens to breach the peace." *See Barry,* 934 So.2d at 659 (noting gathering crowds and people stopping to watch are not sufficient to establish a disorderly conduct charge). Here, there are no allegations in the Complaint to support a finding that the Officers could have believed the neighbors were responding to Plaintiff's words in a way that threatened to breach the peace.

---

[6]

Although Florida Statute § 901.15 applies to Docher's state law claims, it has  no application to causes of action under the Fourth Amendment or 42 U.S. C. § 1983.

> Although the existence of probable cause was not established under Florida law, federal law does not restrict the probable cause analysis to conduct witnessed in person by law enforcement officers.  *See Knight v. Jacobson*, 300 F.3d 1272, 1275-76 (11th Cir.2002) (explaining that the Fourth Amendment does not require officers to witness a misdemeanor before conducting a warrantless arrest, even when state law imposes that requirement).

<u>Pierre v. City of Miramar, Florida, Inc.</u>, 537 Fed.Appx. 821, 826 (11th Cir. 2013) (non-published).

Petithomme v. County of Miami-Dade, 511 Fed.Appx. 966, 972, 2013 WL 868610, at *5 (C.A.11 (Fla. 2013).   These same principles apply with obvious clarity to Newman's arrest of Docher.

Finally, even if Docher caused a public disturbance (which he did not), he was never in a "public place" within the meaning of the disorderly intoxication statute.   Under Florida law, the parking lot of a CVS is not a place where the public has a right to be and to go.   CVS is a private business– not a "public place."   Perry Education Association v. Perry Local Educators' Association, 103 S.Ct. 948, 954-56 (1983) (describing different types of public property).   The parking lot of a CVS is considered quasi-public property.   It is a "place where the public has a right to . . . go, but not a "place where the public has a right to be. . . ."   Florida Standard Jury Instructions in Criminal Cases § 29.1.   In other words, a business owner "can limit or revoke the invitation" of a person to remain within.   Smith v. State, 778 So.2d 329, 330 (Fla. 2nd DCA 2000).

Because the parking lot of a CVS is quasi-public property, the for disorderly intoxication fails, regardless of whether Docher caused a disturbance.   As in Ruizdelatorre v. City of Miami Beach, 2008 WL 5381431, at *7–8 (S.D. Fla., 2008), Docher never endangered any person's safety. While Docher was in possession of a screw driver, Mangrum agrees that Docher's possession of the screw driver was not a crime.   (Exh. C, 35:3-5).   When Mangrum asked Docher to drop the screwdriver he was holding, and Docher complied.   (Exh. C, 27:9-10; 37:9-15).   Docher was then subjected to a pat-down search by Robinson.   No weapons were found.   (Exh. G, 37:4-7).

Viewing the evidence and inference in the light most favorable to Docher, a jury could find that Docher was arrested by Newman for disorderly intoxication.   The sworn police reports allege that "Deputy Newman told Docher to put his hands behind his back that he was under arrest for disorderly intoxication."   (Exh. A, Incident Reports, p. 6).

Because Docher's arrest by Newman for the offense of  disorderly intoxication was in the absence of even arguable probable cause, Newman is not entitled to qualified immunity. Ruizdelatorre v. City of Miami Beach, 2008 WL 5381431, at *7–8 (S.D. Fla. 2008) (denying qualified immunity for disorderly intoxication arrest).

**b).**     **Docher's unlawful arrest cannot be justified on the basis that Docher fit the criteria for involuntary civil commitment under the Baker act**

In Devenpeck v. Alford, 125 S.Ct. 588, 594 (2004), the United States Supreme Court held that an arrest is valid under the Fourth Amendment if there is probable cause to support any criminal charge.   Writing or a unanimous Court, Justice Scalia reasoned that regardless of the crime actually

charged by the police officer, "[t]hose are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." Id. at 594.  The Court reasoned that any other result would encourage police officer to "stack[] charges" and lead to "haphazard results." Id. at 595.

However, nothing in Devenpeck v. Alford suggests that these same principles apply when there is no arrest.   An involuntary civil commitment is, by definition, civil.   It is not an arrest for a crime.   Thus, under Florida's Florida Mental Health Act (a/k/a Baker Act), "[p]ersons who have a mental illness but . . . are not charged with a criminal offense shall not be detained or incarcerated in . . . jails." Florida Statute § 394.459(1).  Police officers are required to submit "a written report detailing the circumstances under which the person was taken into custody, which must be made a part of the patient's clinical record".   Florida Statute § 394.463(2)(a)2.   Unless an arrest, confidentiality protections apply.  Florida Statute § 394.415 ("A clinical record is confidential and exempt from the provisions of s. 119.07(1)").  Finally, "persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause" County of Riverside v. McLaughlin, 111 S.Ct. 1661, 1668 (1991).  Under Florida law, "[i]t is the policy of th[e] state that the individual dignity of the patient shall be respected at all times and upon all occasions, including any occasion when the patient is taken into custody, held, or transported." Florida Statute § 394.459.   No such rights apply to pretrial detainees arrested on criminal charges.

Furthermore, the United States Supreme Court concluded in Vitek v. Jones, 100 S.Ct. 1254, 1264 (1980), that a criminal arrest does not provide legal justification for an involuntary civil commitment.   Vitek, as Director of the sate of Nebraska Department of Corrections, argued "that the transfer of a prisoner to a mental hospital is within the range of confinement justified by imposition of a prison sentence, at least after certification by a qualified person that a prisoner suffers from a mental disease or defect."   In rejecting that argument, the Supreme Court stated simply:

> We cannot agree. None of our decisions holds that conviction for a crime entitles a State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime. Our cases recognize as much and reflect an understanding that involuntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual.

Vitek v. Jones, 100 S.Ct. 1254, 1264 (1980).

The United States Supreme Court explained

that for the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty," *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), and in consequence "requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975) (BURGER, C. J., concurring). The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Addington v. Texas, supra*, at 425–426, 99 S.Ct., at 1809. See also *Parham v. J. R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979).

Vitek v. Jones, 100 S.Ct. at 1263.  Viewing the evidence in the light most favorable to Docher, he was subjected to a criminal arrest.  An unlawful criminal arrest remains illegal regardless of whether the person fits the criteria for involuntary civil commitment.

Even if an involuntary civil commitment is a defense to a false arrest, Docher did not fit the criteria for involuntary civil commitment at the time he was placed under arrest by Newman for disorderly intoxication and placed in the back of a police car.   Viewing the evidence in the light most favorable to the non-moving party, a jury could find that Docher was not a physical threat to any person.   He was confused and paranoid, not a physical danger to himself or others.  Hardyal Bhagdus was the manager of the CVS store at the time of the incident.  (Exh. D,7:12-13).  Bhagdus testified that he was never concerned for anyone's safety while Docher was inside the store, and never feared Docher would hurt anybody.  (Exh. D, 23:22-24, 25:18-23).  When Docher exited the CVS to await the police officers, he was "calm as ever."  (Exh. D, 26:4).

Newman also knew that Docher did not fit the criteria for involuntary civil commitment. Detective Joseph Trevisol wrote in his sworn police report that "Deputy Newman . . . said Docher was able to say who and where he was; therefore, they did not see Baker Act as a means to the end. Deputy Newman told Docher to put his hands behind his back that he was under arrest for disorderly intoxication, due to him being intoxicated and causing a disturbance."  (Exh. A, Incident Reports, p. 6).  Thus, according to Trevisol, Newman admitted that Docher did not fit the criterial for involuntary civil commitment and was arrested for disorderly intoxication.  Viewing the evidence in the light most favorable to Docher, a jury could agree.

The criteria for involuntary civil commitment are set forth in Florida Statute § 394.463, which provides in pertinent part:

**394.463        Involuntary examination**

(1)    CRITERIA. –A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness:

(a)1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or

2.        The person is unable to determine for himself or herself whether examination is necessary; and

(b)1.    Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or

2.        There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.

Florida Statute § 394.463.

Based on the plain language of the statute, Newman's determination that Docher did not fit the criteria for involuntary civil commitment was well-founded.  Not only was "Docher was able to say who and where he was," Newman admits that Docher "agreed that he would go see a doctor." (Exh. K, 41:24-25 - 42:1-3; 61:16-20).  A person only fits the criteria for involuntary admission if "[t]he person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination."  Florida Statute § 394.463(1)(a)1.  A person is also subject to involuntary civil commitment if they are "unable to determine for himself or herself whether examination is necessary."  Florida Statute § 394.463(2). Based on these criteria, Docher was simply not a candidate for involuntary civil commitment.

As Newman admitted, Docher's agreed "that he would go see a doctor."  Docher therefore never  "refused examination" or was "unable to determine for himself . . . whether examination is necessary."  Because Newman admitted that Docher did not fit the criteria for involuntary civil commitment under the Baker Act, he is not entitled to qualified immunity on the grounds that Docher should have been Baker Acted.  In involuntary civil commitment constitutes"a massive curtailment of liberty. " Vitek v. Jones, 100 S.Ct. 1254, 1263 (1980) (quoting Humphrey v. Cady, 92 S.Ct. 1048, 1052 (1972)).  Fourth Amendment protections obviously apply.

A reasonable jury could agree with Newman's assessment and conclude that while Docher

needed mental health intervention, he did not qualify for involuntary civil commitment under Florida Statute § 394.463. Newman's motion for summary judgment on Count I must be denied (false arrest/false imprisonment claim against Newman, individually, under 42 U.S.C. §1983).

**5.      Docher was entitled to resist the unlawful arrest**

Under Florida law, "the common law rule still remains that a person may lawfully resist an illegal arrest without using any force or violence." Blackshear v. City of Miami Beach, 799 F.Supp.2d 1338, 1346 (S.D. Fla. 2011) (quoting Jay v. State, 731 So.2d 774, 775 (Fla. 4th DCA 1999)); Lozman v. City of Riviera Beach, 39 F.Supp.3d 1392, 1410 (S.D. Fla. 2014) ( "[E]very person has the right to resist, without violence, an unlawful arrest"); State v. Anderson, 639 So.2d 609, 610 (Fla.1994) (On the charge of resisting arrest without violence, if "the defendant maintains that the arrest was unlawful and requests that the jury be instructed on that defense, an instruction should be given to insure that the jury understands that it must decide the issue." State v. Anderson, 639 So.2d 609, 610 (Fla. 1994); State v. Espinosa, 686 So.2d 1345, 1347 (Fla. 1996) ("[T]he law is well settled that the legality of the arrest is an element of the offense of resisting arrest without violence").   Because the arrest of Docher was unlawful, he was privileged to resist arrest without violence.

**6.      Any force used during an unlawful arrest is excessive force**

It is clearly established law in the Eleventh Circuit that "if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest." Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006).  Where the arrest is unlawful in the first instance, any force constitutes excessive force under the Fourth Amendment. Zivojinovich v. Barner, 525 F.3d 1059, 1071 (11th Cir. 2008) ("[E]ven de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect"); Reese v. Herbert, 527 F.3d 1253, 1273 (11th Cir. 2008) (same); Williams v. Sirmons, 307 Fed.Appx. 354, 360, 2009 WL 80264, at *5 (11th Cir. 2009) (non-published) ("If no probable cause authorizes an arrest, *any* use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment").

After Docher was unlawfully arrested and handcuffed, he refused to place his feet inside the police car.  Robinson explained:

> At that point we took him to Deputy Newman's patrol car. We opened up the back seat, placed him into the back seat, sat him first, instructed him to sit down. First placed his feet inside of the car.  He looked at us. We repeat – Deputy Mangrum repeated, "put his feet inside of the car." And he continued to look at us,

and then I told him "to put his feet inside of the car." After that he started to stand up. I placed my hand on top of his forehead and tried to force him into the car, but he lunged forward. I moved out of the way, and Deputy Newman and Deputy Mangrum were being pushed back.  I stepped to the side, gave two strikes to the outer muscle of his leg, and took his feet from underneath him. We fell to the ground.

(Exh. G, 38:5-20).

Viewing the evidence and inferences in the light most favorable to the non-moving party, Newman's arrest of Docher for disorderly intoxication was unlawful.   Yarusso v. State, 942 So.2d 939, 943 (Fla. 2d DCA 2006) ("an individual is guilty of resisting or obstructing an officer by flight only if he flees while knowing of the officer's intent to detain him *and* if the officer is justified in detaining him") (italics in original).   Therefore, Docher's resistance to the arrest was not a crime.

Under controlling circuit precedent, "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect, Zivojinovich v. Barner, 525 F.3d 1059, 1071 (11th Cir. 2008).  As a consequence, Robinson used excessive force when he "placed [his] hand on top of [Docher's] forehead and tried to force him into the car." (Exh. G, 38:14-15).

Following the unlawful use of force by Robinson, Docher "lunged forward. [Robinson] moved out of the way, and Deputy Newman and Deputy Mangrum were being pushed back."  (Exh. G, 38:13-17).   Docher then attempted to flee on foot.   His flight was lawful, because the detention was unlawful.   Yarusso v. State, 942 So.2d 939, 943 (Fla. 2d DCA 2006).

**7.    Docher acted in lawful self-defense**

In the Eleventh Circuit, it is well settled law that a person who is subjected to excessive force retains the right of self-defense.  Otherwise, a victim of excessive force would face a Hobson's choice; either, 1). use force in self-defense (and risk additional criminal charges, bodily injury or death), or; 2). offer no resistance to the excessive force.  Of course, neither outcome is satisfactory nor required.  It is well settled that victims of excessive force retain the right of self-defense.  Dyer v. Lee, 488 F.3d 876, 879, 884 (11th Cir. 2007) (explaining that persons are entitled to act in self-defense since any other result would allow the use of excessive force by a police officer free of fear of consequence under § 1983 ; State v. Holley, 480 So.3d 94, 96 (Fla. 1985) (under Florida law a person has the right "to defend himself against unlawful or excessive force, even when being arrested).

As the Florida Supreme Court explained in State v. Holley, a person may resist the use of

excessive force in making [an] arrest." <u>State v. Holley</u>, 480 So.2d 94, 95 (Fla. 1985):

> In *Ivester,* the district court construed section 776.051(1), Florida Statutes (Supp.1974), which provides that a person is not justified in the use of force to resist a known law enforcement officer, *in pari materia* with section 776.012, Florida Statutes (Supp.1974), which provides in part: "A person is justified in the use of force . . . against another when . . . he reasonably believes that such conduct is necessary to defend himself . . . .against such other's imminent use of unlawful force." The district court concluded:
>
>> The effect of reading these statutes *in pari materia* is to permit an individual to defend himself against unlawful or excessive force, even when being arrested.  This view is consistent with the position taken by other jurisdictions that have been confronted with questions relating to statutes similar to sections 776.012, 776.051 and 848.01, Florida Statutes. Id. 398 So.2d at 930 (citations omitted).

<u>Id</u>.

Viewing the evidence and inferences in the light most favorable to the non-moving party, Docher acted within his rights when he resisted Robinson's excessive force by "lung[ing] forward." (Exh. G, 38:15).  Because Robinson "moved out of the way," Newman and Mangrum "were . . . pushed back." (Exh. G, 38:16-17).  Robinson then "stepped to the side, gave two strikes to the outer muscle of [Docher's] leg, and took [Docher's] feet from underneath him. [T]hey fell to the ground." (Exh. G,  38:17-20).

Because the arrest was unlawful, the two strikes to the outer thigh, leg sweep, and resulting fall to the ground (while Docher was handcuffed behind his back) were excessive and unreasonable under the Fourth Amendment.  Docher should never have been arrested for disorderly intoxication in the first instance.  He needed mental health intervention, and acknowledged that fact. By handcuffing Docher behind his back and subjecting him to force, the deputies violated clearly established law." <u>Zivojinovich v. Barner</u>, 525 F.3d 1059, 1071 (11th Cir. 2008); <u>Reese v. Herbert</u>, 527 F.3d 1253, 1273 (11th Cir. 2008).

Docher's injuries included a forehead laceration, bilateral depressed nasal fractures, and a collar bone fracture.  (Exh. U, 76:10-13).  According to Dr. McAlary, "the most likely cause of the collar bone fracture was his being thrown to the ground while his hands were held behind him with handcuffs, making it impossible for him to break his fall by extending his arms.  The laceration to the forehead is also probably . . . related to the fall." (Exh. U, 76:76:14-22).   In Dr. McAlary's opinion, the depressed bilateral nasal fractures are "more likely related . . . . to the use of elbows to

his head area." (Exh. U, 76:22 - 77:1-3).  Dr. Sterba, however, was less certain.  He explained:  "I can't tell you when it happened.  But it happened, I believe, as a result of falling, having somebody on him. And he did have strikes to the head, but there is nothing in the chart to show that he had strikes to his nose.  More likely than not with medical certainty it was the result of a face plant with his hands handcuffed behind his back being tackled to the asphalt with a deputy on his back."  (Exh. N, Vol. 1, 86:7-15).

**8.      The continued use of force on the ground against a handcuffed subject was excessive and unreasonable**

To fully understand excessive force claims under the Fourth Amendment,  it is necessary to start at the beginning.  In Tennessee v. Garner, 105 S.Ct. 1694 (1985), the United States Supreme Court analyzed the common-law rule that "allowed the use of whatever force was necessary to effect the arrest of a fleeing felon.  Id. at 1701.  The common law rule was supported by the fact that, at the time, "virtually all felonies were punishable by death."  Id. at 1702.   In addition, because the common-law rule developed when weapons were rudimentary," the use of deadly force was typically the result of hand-to-hand combat.  Id. at 1703.

In rejecting the use of the common-law rule under the Fourth Amendment, the Court concluded:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape.  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.
>
> * * *
>
> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Id. at 1701.

The trial court in Tennessee v. Garner concluded that the fatal shooting of a 15 year-old eighth-grader, Edward Garner, was lawful.  The court found that "Garner appeared to be unarmed, though [Officer] Hymon could not be certain this was the case." Id. at 1706.   In rejecting the

findings of the trial court, the United States Supreme Court reasoned that "[i]n Fourth Amendment terms," the trial court's findings "mean[] Hymon had *no* articulable basis to think Garner was armed." Id. (italics added).

The United States Supreme Court agreed with the conclusion of the Court of Appeals, and in doing so, rejected the notion that their holding would require police officers to "make impossible, split-second evaluations of unknowable facts." Id. at 1705. To the contrary, the Court reasoned, police officers are often required to make "difficult judgments . . . in equally uncertain circumstances." Id. at 1706.

Soon after Tennessee v. Garner, the Eleventh Circuit reviewed claims filed on behalf of the estate of Thomas Patillo, who was shot and killed in 1980 by a police officer in Atlanta. Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir. 1985). After drinking heavy on New Years Day, Patillo celebrated by almost colliding with another motorist and threatening the other driver with a gun.

The drunken and unruly Patillo was subsequently pulled out of his home by Atlanta police and subjected to excessive force. Patillo was then shot and killed by Officer Sampson after Patillo "was apparently free and moving toward" Sampson. Id. at 1501.

In finding the use of force excessive and unconstitutional, the Eleventh Circuit rejected Officer Sampson's claim that his life was in danger, finding that "any fear on the officer's part was fear of retaliation against his own unjustified physical abuse. We conclude that a moment of legitimate fear should not preclude liability for a harm which largely resulted from . . . improper use of . . . official power." Id. The Court noted that at the time of the shooting, Patillo was in a police-dominated environment, "a sufficient distance by bystanders to establish that the surroundings posed no particular threat to the safety of the officers." Id. at 1502. Thus, the Court concluded: "Patillo did little to provoke the police officers to beat him. That unwarranted intrusion, as well as the unwarranted shooting which directly resulted from his efforts to escape the officers' further physical abuse, give grounds for relief under the fourth amendment." Id.

The United States Supreme Court followed their decision in Tennessee v .Garner with Graham v. Connor, 109 S.Ct. 1865 (1989). From a legal standpoint, the primary significance of Graham was the Court's determination that all claims of "excessive force in the course of making an arrest . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." Id. at 1867-68. From a more practical standpoint, however, the *language* in Graham provided much more. A single page from

the Supreme Court's decision includes many of the most frequently quoted passages in Fourth

Amendment use-of-force case law.  Justice Rehnquist wrote:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," [internal citations omitted] . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See* <u>Tennessee v. Garner</u>, 471 U.S., at 8-9, 105 S.Ct., at 1699-1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").
>
> * * *
>
> As in other Fourth Amendment contexts . . . the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation . . . .An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

<u>Graham v. Connor</u>, 109 S.Ct. 1865, 1872 (1989).

It was against this backdrop that the Eleventh Circuit decided <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919 (11th Cir. 2000).  In <u>Priester</u>, Judge Edmondson held that K-9 officer James Wheeler and Sergeant William Cushing were not entitled to qualified immunity for the apprehension of Willie Priester, who was awarded a total of $25,000 in compensatory and punitive damages after being bitten by Wheeler's K-9.

Wheeler and Cushing were investigating the burglary of a golf shop in Riviera Beach, Florida.  Near midnight, Wheeler's K-9 tracked Priester to a canal near the store.  Because Priester was on parole, he "hid from the police" in a canal embankment.  <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 923 (11th Cir. 2000).  Wheeler's K-9 initially walked past the concealed Priester, but Cushing spotted Priester with his flashlight from his position atop the embankment.

Priester stood up and put his hands in the air, but initially resisted Wheeler's command to "lie down on the ground."  <u>Id</u>. at 923.   Wheeler responded by threatening to release the K-9 if Priester continued to refuse to comply.   Priester complied, but Wheeler nevertheless released the K-9.  When Priester "kicked" the K-9, Wheeler threatened to shoot Priester.  <u>Id</u>.

Both Wheeler and Cushing stood and watched the K-9 apprehension, which could have lasted as long as two (2) minutes.  <u>Id</u>. at 923-24.  Priester sustained "a total of fourteen puncture wounds

on both of his legs." Id. at 924.

Against this backdrop, Judge Edmondson denied the K-9 officer's motion for judgment as a matter of law on basis of qualified immunity, finding that the "'unlawfulness of the conduct was readily apparent. . . notwithstanding the lack of caselaw.'" Id. at 926 (quoting Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997)).

Judge Edmondson similarly denied Cushing's claim of qualified immunity on the basis that Cushing failed to intervene in Wheeler's use of excessive force, concluding:   "Nor do we think particularized case law is necessary to overcome Defendant Cushing's claim of qualified immunity. That a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994." Id. at 927.  The Court noted that "Cushing observed the entire attack and had the time and ability to intervene, but he did nothing." Id. at 927.  Judge Edmondson further observed that "Cushing himself testified that an attack like Plaintiff described 'would definitely be a violation and I would immediately try to stop it and report it to a higher authority.'" Id. at 927 n.5.

In 2003, the United States Supreme Court decided Hope v. Pelzer, 122 S.Ct. 2508 (2003). Hope v. Pelzer rejected what the United States Supreme Court described as the Eleventh Circuit's "rigid[] overreliance on factual similarity" in it's qualified immunity analysis. Id. at 2517.  Citing Ort v. White, 813 F.2d 318 (11th Cir. 1987), the United States Supreme Court concluded that "[t]he reasoning, though not the holding," of Ort v. White provided fair warning to reasonable officers in the Eleventh Circuit.  Hope v. Pelzer, 122 S.Ct. 2508 (2003). "Although the facts of the case are not identical, *Ort's* premise is that 'physical abuse directed at [a] prisoner *after* he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation.'" Hope v. Pelzer, 122 S.Ct. at 2517 (quoting Ort v. White, 813 F.2d 318, 324 (11th Cir. 1987) (italics in original)).

Following Hope v. Pelzer, the Eleventh Circuit issued its decision in Mercado v. City of Orlando, 407 F.3d 1152 (2005).   In 2002, a suicidal Mercado was confronted inside his residence by City of Orlando Police Officers Pfficers Ramfis and Christina Rouse.  Mercado was found sitting on the floor of his kitchen with a knife placed up to his chest.  Id. at 1154, 1161.   Mercado was despondent because his wife wanted to end their marriage and return to Puerto Rico.  "Rouse testified that the incident did not require deadly force; however, Padilla stated that the situation might have required such force." Id. at 1155.  "Fifteen to thirty seconds after" Mercado failed to comply with orders to drop the knife, Padilla shot Mercado with his Sage SL6 Launcher from a

distance of six feet, fracturing Mercado's skull and causing brain injuries.  Id. at 1155.

In rejecting Padilla's claim of qualified immunity, the Court noted that Mercado was not "posing an immediate threat to the officers at the time he was shot in the head, [and] if Padilla aimed for Mercado's head, he used excessive force when apprehending Mercado." Id. at 1157-58.   The Court agreed with Mercado that "deadly force cannot be employed in a situation that requires less-than-lethal force," and "[u]nder Florida law, 'deadly force' means any 'force that is likely to cause death or great bodily harm." Id. at 1160.   Padilla was also charged with knowledge "that alternative actions, such as utilizing a crisis negotiating team, were available means of resolving the situation." Id. at 1158.

In Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1316 (11th Cir. 2010), the Eleventh Circuit reviewed the excessive force claims of Marcella Pourmoghani-Esfahani, who was arrested and taken to the Hillsborough County Jail in Tampa.   Pourmoghani-Esfanhani was arrested on outstanding warrants following a domestic disturbance call.   She was taken to an area of the jail booking facility that had a security camera, but no sound.   Id. at 1315.   The court observed that the video failed to convey not just the words spoken, but the tone of those words.   Id.   The camera also "sometimes fail[ed] to provide an unobstructed view of the events.   Id.

Deputy Shanna Marsh tried to pull Pourmoghani-Esfanhani from a chair in the jail waiting room, when both women went to the floor.   Id. at 1316.

> In those first few seconds on the floor, [Pourmoghani-Esfahani] reflexively clutched [Marsh]'s legs and grabbed at the area near [Marsh]'s utility belt.   Then, while [Pourmoghani-Esfahani ]was on her knees, [Marsh] hit her three times on the back of the head with [Marsh]'s hand.   Within seconds, additional officers came to assist in subduing [Pourmoghani-Esfahani]: a small group of officers leaned over [Pourmoghani-Esfahani], who by that time had been restrained face downward on the floor.
>
> Then, while [Pourmoghani-Esfahani] remained restrained on the floor, [Pourmoghani-Esfahani] says that Marsh grabbed [Pourmoghani-Esfahani] head and slammed it to the floor seven to eight times, causing cuts and bruises on her face and leaving a pool of blood on the floor.[FN2]
>
> > [FN][Marsh] denies that the face slammings occurred.   The video does not establish whether the slammings occurred and does not establish whether a pool of blood was on the floor.

Pourmoghani-Esfahani v. Gee, 625 F.3d at 1319 & n.2.

The facts in Gee are remarkably similar Docher's arrest, with a few notable differences.

Docher was secured in handcuffs behind his back, while Pourmoghani-Esfahani was not handcuffed.  Under the objective reasonableness standard, a person who is handcuffed behind their back is obviously less of a threat.  In addition, three deputies simultaneously used force against Docher.  Just one deputy used force against Pourmoghani-Esfahani, although a group of officers came to assist Marsh in subduing Pourmoghani-Esfahani.

In Pourmoghani-Esfahani, the videotape lacked sound and viewing angles were obstructed. In the case *sub judice*, the videotape is incomplete.  It begins after the use of force starts, and Shaun Mahonney and the other civilian witnesses were run off by Courtemanche before the incident ended. As in Pourmoghani-Esfahani, some of the viewing angles are blocked.  Finally, in Gee, the video did not establish "whether a pool of blood was on the floor."  Id. In the case *sub judice*, the pool of blood is clearly seen on the video and described by the witnesses. (Exh. F).  Adriana Kanhai recalls seen blood "gushing . . . on his face."  (Exh. O, 9:18-21).  Shannon-Marie Denise Randolph testified Docher was screaming in pain and there was so much blood.   (Exh. P, p. 2, ¶ 6).

On the other hand, the cases are more similar than dissimilar.  In Gee, the Eleventh Circuit affirmed the district court's denial of summary judgment on the excessive force claim on the basis of qualified immunity, concluding:

> We stress that we do not decide today that [Marsh], in reality, used unjustified or even unnecessary force. On this record (even with the video), we cannot know.  But, for the sake of this appeal, we have taken the "facts" as [Pourmoghani-Esfanhani] asserts them.  If we take her "facts" as true, we then accept that the force that [Marsh] used was obviously—in the light of the preexisting law—beyond what the Constitution would allow under the circumstances.

Pourmoghani-Esfahani v. Gee, 625 F.3d at 1317 (11th Cir. 2010).

Because the case *sub judice* is not meaningfully distinguishable from Gee, Newman, Mangrum, and Robinson are not entitled to qualified immunity. Pourmoghani-Esfahani v. Gee, 625 F.3d at 1317 (11th Cir. 2010); Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir. 1985).

As in Gee, there is videotape of the incident, albeit, incomplete.   Unlike Gee, there are independent witnesses to the use of force against Docher.

Merine Kanhai went to the CVS with her 16 year old daughter.  (Exh. H, 8:2-3).  As she pulled into the parking lot, she observed three deputies were "holding down this black guy on the ground" while one of his arms was underneath his body.  (Exh. H, 6:17-21, 7:3-5; 9:9-12).   From a distance of 20-25 feet, Kanhai observed a white deputy by Docher's head area use "maybe two"

elbow strikes to Docher head and face; there was bleeding.  (Exh. H, 9:4-5; 9:9-12, 9:22-25 - 10:1, 10:23-25 - 11:1; 11:15-18; 12:4).  Docher was saying "don't let them kill me," and the deputy was saying "stop resisting."  (Exh. H, 10:7, 11:9-10).

Docher did not attempt to bite any of the deputies.  (Exh. H, 11:19-21). Kanhai spoke with Shaun Mahoney and his girlfriend.  "They were saying that why would the officer beat[] him up like that, that looks like police brutality to me."  (Exh. H, 14:24-25-15:1-2).  Kanhai agreed, and described the force as unnecessary and excessive.  (Exh. H, 25:3-6; 25:14-18).

Adriana Kanhai "remember[s] there was an officer that was by [Docher's] head. And, like, I remember the elbows, like, being knocked into him."  (Exh. O, 7:6-9).  There was blood "gushing . . . on his face."  (Exh. O, 9:18-21).

When Docher was on the ground and the deputies were on top of him, he was not moving. (Exh. O, 13-15).  Docher was saying "please don't let them kill me;"the deputy said "stop resisting." (Exh. O, 9:16-18).  Adriana Kanhai explained:  "They were basically, like, beating at him and he was in handcuffs."  (Exh. O, 13:19-22).  The force seemed unnecessary and excessive. (Exh. O, 14:2-5; 14:12-16; 14:17-21; 14:23-25-15:1-2; 17:2-4).  In her mind, it was police brutality.  (Exh. O, 15:7-10).

Shannon-Marie Denise Randolph was at CVS with Shaun Mahoney and her10-year old nephew.  (Exh. P, p. 1, ¶¶ 1-2).  As they were leaving the store she observed Docher being beaten really badly by the police.  (Exh. P, p. 1-2, ¶ 4). It did not look like Docher was "resisting at all." (Exhibit P, p. 2, ¶ 5).  Shaun Mahoney began videotaping.   Docher looked right into her eyes and said "they are going to kill me, don't let them kill me."   He was begging for his life. (Exh. P, p. 1-2, ¶ 4).

As soon as the police noticed that Mahoney, Randolph, and her nephew were watching, they started repeating:   "Stop resisting!" "Stop resisting!"  It did not look like Docher was resisting at all.  (Exh. P, p. 2, ¶ 5).  At one point Randolph observed that Docher's arms were almost at a ninety degree angle going upwards, in an unnatural position.   It forced his body was up off the ground like a snake.   He was screaming in pain and there was so much blood.  (Exh. P, p. 2, ¶ 6).

Mahoney, Randolph, and her nephew were then moved away by an officer who told them were not allowed to be there. (Exh. P, p. 2, ¶ 7).   A police officer subsequently approached and demanded Shaun Mahoney's phone and threatened to arrest him if he did not hand it over.  (Exh. P, p. 2, ¶ 8).

57.

Leah Nicole Boles just started her shift at CVS when Docher came to the cash register. (Exh. E, p. 1, ¶¶ 1-4). Docher did not engage in any criminal conduct. (Exh. E, p. 2, ¶ 5). He made no threats, and was not cussing. (Exh. E, pp. 1-2, ¶ 4). He was just acting confused. (Exh. E, p. 1, ¶ 4). The police subsequently arrived. (Exh. E, pp. 1-2, ¶ 4). When Boles looked outside she observed "[Docher's] face was getting beat by the police. [Boles] felt that it was wrong." (Exh. E, p. 2, ¶ 6).

For his part, Mangrum admits only to "dropp[ing] my forearm down to push his face– to strike his face away from my hand, and then try to regain control – try to regain control over his head." (Exh. C, 52:22-25). He also admits using fist strikes to the large muscle areas. (Exh. C, 62:5-6). He also observed another deputy use an elbow strike, but doesn't recall where. (Exh. C, 59:9-10). Mangrum also observed Robinson striking Docher in his leg for pain compliance. (Exh. C, 19-23).

Newman admits striking Docher with his elbow in the head– but just one time (Exh. K, 51:4-5). He does not have any explanation for the pool of blood by Docher's head. (Exh. K, 63:16-17).

According to Rosario, the only injury sustained by a police officer concerned a deputy who "asked for a Band-Aid or something, and I think he had a scuff on his elbow." (Exh. J, 128:3-5). Newman is the deputy seen on the video moving to a standing position. Blood is seen on his right elbow. (Exh. F).

Robinson testified that he knew from his training and experience that elbow strikes to the head are likely to cause great bodily harm. (Exh. G, 56:14-20; 57:8-14). He explained that the elbow strikes to Docher's head are not justifiable because "there is just no need to hit somebody while they're on the ground handcuffed and struggling." (Exh. G, 58:5-10; 58:25-59:1-5). However, Robinson himself is clearly seen on the Shaun Mahonney videotape striking Docher with a closed fist (apparently in the kidney area) while Docher was on the ground handcuffed. So by his own analysis, Robinson used excessive force, as well.

Mel  Tucker's testified that, in his opinion, "no crime" occurred. (Exh. L, 15-17). Any reasonable officer should have seen this was a medical emergency, "not an arrest situation." (Exh. L, 68:13-17; 85:13-14). Tucker explained that "[n]o reasonable officer would consider an unarmed person who's handcuffed as an immediate threat of serious bodily harm or death to the officer under the set of circumstances there." (Exh. L, 64:12-15).

Tucker "served three and a half years as vice-chairman of the Criminal Justice Standards and Training Commission in Florida." (Exh. L, 51:12-19). Everywhere Tucker trained, including the FBI, elbow strikes to the head area are considered deadly force because they are "likely to cause serious bodily injury or death to the person who it's used against, typical subdural hematomas . . . the blood between the brain and the skull result from those kind of blows." (Exh. L, 57:4-13).

The elbow strikes delivered by Newman and Mangrum are the equivalent of a baton strike and constitute excessive force. (Exh. L, p. 51:4, 50:20-23, 56:13-22). Tucker explained that because "there were at least three deputies here capable and available to deal with Docher, who was handcuffed . . . , an elbow strike is not reasonable." (Exh. L, 65:9-11). Finally, any allegation of a bite or attempted bite would "absolutely not" justify deadly force. (Exh. L, 61:1-5). Otherwise, "they should've just jumped back and drew their weapons and shot and killed him. For sure, that's the way to deal with deadly force." (Exh. L, 61:23-25).

Tucker also testified that Mangrum's stepping on Docher's back constitutes excessive force. (Exh. L, 52:22-25 - 53:1-2). Tucker is correct. "Officer [are] taught that if a person is on their stomach handcuffed, they may have trouble breathing. Robinson says that in his deposition. (Exh. L, 94:15-25). A person who is in a prone position and unable to breathe will try and push themselves up. That is not resisting; it is simply "the physiology of a struggle." (Exh. L, 65:24-25 - 66:1-3).

"[O]fficers have been trained for 20 years, 25 years, not to place a person in the prone position with their hands cuffed behind their back with compression on them, because people will die if you do that." (Exh. L, 100:3-7). With three deputies on scene, Docher should have been placed "in the recovery position, which is put him on his side and hold him . . . so he could breath." (Exh. L, 96:7-12; 97:4-6). Mangrum weighed 300 pounds and Newman weighed 205 pounds. (Exh. L, 121:23-25 - 122:1-4). The compression weight of the deputies "is the recipe" for asphyxia. (Exh. L, 97:10-12).

Unfortunately, the recipe worked. Dr. John Sterba explained that at 18:25:06 hours (i.e., 33 seconds into the cell phone videotape (Exh. F), Mangrum "steps down" with his left foot onto "Docher's back in between the shoulder blades." (Exh. N: 254:4-10). Docher "ran out of air" because Mangrum "was stepping on his chest and his arms were being pulled up. Two reasons to cause rapid asphyxiation. I do believe with medical certainty [Docher] was trying to say I can't breathe but he didn't have enough air to finish saying the word breathe." (Exh. N, 220:6-9).

Docher's "chest was not allowed to rise and fall for two mechanical reasons of positional

asphyxiation, arms being pulled up, chest being stepped on. With shallow rapid irregular breaths, from . . . three to four word sentences, at 6:24:47 seconds to 49 seconds, they are going to kill, gasp, they are going to kill me. And then later all right, all right. And then finally I can't brrr, help, gasp, help me." (Exh. N, 295:7-15). Sterba added that "[w]hen somebody is struggling to breathe they will do everything they can do [to] breathe. It is one of the worse ways to die." (Exh. N, 267:9-11). "[F]rom 6:25:39 to 6:25:51 . . . Docher is no longer speaking. We hear shallow gasping breath sounds, no more words heard at that point. I believe he lost conscious right around there. So from 6:25 until 6:36, less maybe a half minute or so, he is unconscious. He is not responsive. He is unconscious, nonresponsive and nonverbal with abnormal respiratory depression." (Exh. N, 242:17-25 - 243:1-2; 295:18-22).

According to Sterba, Docher was asphyxiated by Mangrum. (Exh. N, 290:8-10). It was the combination of Mangrum weight (330-335 lbs) stepping on Docher's back and driving his chest into the asphalt while lifting his arms up behind his back that caused "rapid asphyxiation to the point where he was nonverbal, that is[,] unresponsive, and lost conscious for just over ten minutes." (Exh. N, 240:11-25 - 241:1-7; 246:8-15).

Mangrum's conduct violated clearly established law. Prior to Docher's arrest, Mangrum had fair warning that asphyxiating a person in police custody into unconsciousness after they have surrendered constitutes excessive force. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005), *abrogated on other grounds*, Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015) (rejecting a subjective intent element in excessive force claims by pretrial detainees).

In the final analysis, Sterba's testified that both Mangrum and Rosario contributed to Docher's cardiac arrest, brain damage, and disability. (Exh. N, 310:7-12). You have a 29 year old patient who was asphyxiated by the deputies and overdosed by the paramedic. (Exh. N, 183:5-6).

For his part, Rosario denies any wrongdoing and attributes the cardiac arrest to Mangrum stepping on Docher's back. Rosario explained

> that the patient experienced an external pericardial tamponade, which means . . . the sac around the heart due to trauma fills with blood, and then now the heart beating inside of this sac does not have the proper amount of movement to actually make a complete beat, and eventually it stops because you're hindering from actually beating.
>
> * * *
>
> [W]hen the patient was being subdued -- meaning, somebody was on his

thoracic region from his back -- that after some time in struggle, your oxygen demand increases because you're struggling . . . Your oxygen demand increases, so your heart rate increases also. So you have to breathe fast to compensate for your heart rate. Otherwise, you're going to be circulating unoxygenated blood in your body.

So for his case, since he has obviously been in a struggle with the officers prior to our arrival . . . the act of somebody placing their weight upon his thoracic region could have caused his heart to not have enough room to work, and compress.

Also, he's a young guy. A lot of medical ailments don't really come early on in life, so arteriosclerosis and blood clots, all that stuff does not happen to a seemingly healthy young guy. You know, he was -- you know, he was a smaller guy, but it doesn't seem like he had any, like, cardiac issues or anything like that.

So to have somebody -- their initial rhythm go from obviously moving around to actually asystole only concluded me in my opinion to say his heart was physically stopped.

(Exhibit J, 149:3-25 - 150:1-16).

Mangrum asserts that he is entitled to qualified immunity based on Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556 (11th Cir. 1993), *opinion modified*, 14 F.3d 583 (11th Cir. 1994).  In Post, City of Fort Lauderdale police officer Sellers-Sampson arrested Lirio, whom he new had a past history of resisting arrest.  Post v. City of Fort Lauderdale, 7 F.3d 1552, 1569 (11th Cir. 1993). Sellers-Sampson placed Lirio "in a choke hold for about 'five seconds.'"  Id. at 1559.  Lirio "sought no medical treatment until almost three years after the arrest."  Id.  From that starting point, the Court in Post deemed the force used by Seller-Sampson de minimus, and not plainly unlawful, reasoning that "[w]hen Lirio raised his hands, a reasonable officer in Sellers–Sampson's place could have concluded that the technique Sellers–Sampson used was needed to stop Lirio from becoming violent."  Id.

That the amount of force Sellers–Sampson used, even if unnecessary, was enough to violate the law was not plain; reasonable doubt existed, and still exists, on whether this amount of unnecessary force was unlawful. *See, e.g., Ingraham v. Wright,* 430 U.S. 651, 675, 97 S.Ct. 1401, 1415, 51 L.Ed.2d 711 (1977) (*de minimis* rule applies to excessive force claims asserted under Eighth Amendment); *Norris v. District of Columbia,* 737 F.2d 1148, 1152 (D.C.Cir.1984) (*de minimis* rule applies to excessive force claims asserted under due process clause); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.1973) ("Not every push or shove ... violates a prisoner's constitutional rights."); *Hudson v. McMillian,* 503 U.S. 1, ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force"). Sellers–Sampson is entitled to qualified immunity because it was not clearly established that the amount of force he used outside the restaurant was unlawful.

Post v. City of Fort Lauderdale, 7 F.3d at 1560.

Post is clearly distinguishable.    To facilitate the arrest, Sellers-Sampson placed Post in a choke hold for about five seconds.  In the Eleventh Circuit, it is clearly established that

> "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872 (citation omitted). Indeed, "the *typical* arrest involves some force and injury," *Rodriguez,* 280 F.3d at 1351 (citing *Nolin,* 207 F.3d at 1257–58) (emphasis added), and the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes.

Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002).  The right to use "some degree of physical coercion" is a far cry from asphyxiating a handcuffed person into unconsciousness, which is ultra dangerous and requires more than de minimus force.  Post is therefore distinguishable, and Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) provided Mangrum with fair warning that his conduct towards Docher was unlawful.

For the foregoing reasons, Newman, Mangrum, and Robinson's motions for summary judgment on Counts II, III, and IV must be denied (excessive force claims against Newman, Mangrum, and Robinson, individually, under 42 U.S.C. §1983).

**9.**    **Failure to intervene**

Newman, Mangrum, and Robinson seek summary judgment Docher's failure to intervene claims on the basis that they were not in a position to intervene.  Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("[L]iability . . . only arises when the officer is in a position to intervene and fails to do so").  In concluding that officer Cushing was not entitled to summary judgment on the basis of qualified immunity, Eleventh Circuit explained that

> that the district court mistakenly relied upon *Defendants'* version of the facts, rather than Plaintiff's version of the facts, as it was required to do.  The district court said "[the dog] bit Priester once or twice" and "both Cushing and Wheeler immediately commanded Priester to put his hands up and stop resisting the police dog so that the dog could release his hold." But, it was Defendants' testimony—not Plaintiff's—that the dog only bit Plaintiff once or twice.  And, it was Defendants' testimony—not Plaintiff's—that, when the dog bit Plaintiff, they immediately commanded Plaintiff to put his hands up and stop resisting.
>
> The district court also said that "the events happened very quickly."  But, Plaintiff testified that the dog attacked him for "more than an eternity."   And,

although Wheeler testified that the incident may have lasted for only 5 or 10 seconds, Sergeant Cushing admitted on cross-examination that the dog's attack on Plaintiff may have lasted as long as *two minutes*.  Two minutes was long enough for a reasonable jury to conclude that Sergeant Cushing had time to intervene and to order Wheeler to restrain the dog.   And, because Cushing stood on top of the canal with his flashlight on the scene and watched the entire event and was in voice contact with Wheeler, this case is distinguishable from those cases where an officer who failed to intervene was found not liable because he did not observe the violation or have the opportunity to intervene.

Priester v. City of Riviera Beach, Fla., 208 F.3d at 925.

These same principle apply with obvious clarity to the conduct of Newman, Mangrum, and Robinson.  Newman admitted that he has no explanation for Mangrum placing his foot on Docher's back, stating:  "You would have to ask him." (Exh. K, 67:9-15).

Robinson and Mangrum also observed the elbow strikes by Newman , but did nothing.  (Exh. L, 101:21-25 - 102:1-9).

Mangrum  observed another deputy use an elbow strike, but doesn't recall where.  (Exh. C, 59:9-10).   Mangrum also was aware that Robinson was striking Docher in his leg for pain compliance.  (Exh. C, 19-23).

According to Newman, the situation on the ground began "another minute" prior to the start of the cell phone videotape.  (Exh. K, 63:14-15).  The videotape itself lasts longer than one minute.  (Exh. F).  Thus, although the entire incident (until Docher was placed in the recovery position by Mangrum) lasted far longer than two minutes, Newman, Mangrum, and Robinson did nothing to intervene.  Based on Priester v. City of Riviera Beach, Newman, Mangrum, and Robinson violated clearly established law.

For the foregoing reasons, Newman, Mangrum, and Robinson's motions for summary judgment on Counts VI, VII, and VIII must be denied (failure to intervene claims against Newman, Mangrum, and Robinson, individually, under 42 U.S.C. §1983).

**10.** **Mangrum had an obligation to supervise Robinson**

Mangrum was Robinson's supervisor during Phase 2 of his field training.  (Exh. G, 22:22-24).   In Phase 2, "you ride with somebody between three to six weeks, and you go from just being a passenger to actually doing things."  (Exh. G, 23:5-7).   There is a "checklist" of tasks the trainee must perform.  (Exh. G, 24:16-24).

In the Eleventh Circuit, "[s]upervisory liability occurs either when the supervisor personally

participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

Because Mangrum (as well as Newman and Robinson) directly participated throughout the entirety of the incident, Mangrum has supervisory liability for the constitutional wrongs of his subordinate. If Docher was subjected to false arrest (and he was), it was Mangrum's constitutional duty to protect Docher from any use for force by Robinson, and he failed to do so. If Docher was lawfully arrested (and he was not), it was Mangrum's constitutional duty to protect Docher from excessive use for force by Robinson, and he failed to do so. Id.

For the foregoing reasons, Mangrum's motion for summary judgment on Counts V must be denied (supervisory liability against Mangrum, individually, under 42 U.S.C. §1983).

**11.    Courtemanche violated Docher's rights under the First Amendment**

The First Amendment includes protections for freedom of speech, assembly, and association. The United States Supreme Court has specifically "recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." Roberts v. U.S. Jaycees, 104 S.Ct. 3244, 3249 (1984); Amnesty International, USA, v. Battle, 559 F.3d 1170 (11th Cir. 2009).

As the United States Supreme Court explained in Terminiello v. City of Chicago, 69 S.Ct. 894, 896 (1949),

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

Terminiello v. City of Chicago, 69 S.Ct. at 896 (internal citation omitted).

Shannon-Marie Denise Randolph testified that as she, Shaun Mahonney, and her niece were leaving the CVS, she observed Tavares Docher being beaten really badly by the police. Shaun

Mahoney began videotaping.  Tavares Docher looked right into her eyes and said "they are going to kill me, don't let them kill me."  He was begging for his life.  (Exh. P, p. 1-2, ¶ 4).  54.

As soon as the police noticed that Mahoney, Randolph, and her nephew were watching they started repeating:  "Stop resisting!" "Stop resisting!"  It did not look like Docher was resisting at all.  (Exh. P, p. 2, ¶ 5).

When Courtemanche arrived on scene the deputies "were using strikes, and thinks like that, to get [Docher] to comply."  (Exh. Q, 18:11-19).  Courtemanche recalls that "Robinson delivered a strike to [Docher's] leg."  (Exh. Q, 5:6-7).

Courtemanche was told by Mangrum to direct Shaun Mahoney to step back.  (Exh. Q, 8:12-15; 9:4-6).  Courtemanche ordered Mahoney "to stop taping and to get back."  (Exh. Q, 9:7-11).  Courtemanche agrees that it is not a crime for a person to use their cell phone to record police officers, and there was no specific reason why Courtemanche ordered Mahoney to stop taping.  (Exh. Q, 9:12-23; 10:7-10).

Courtemanche subsequently observed Mahoney hiding behind a pillar, filming.  (Exh. Q, 29:15-16; 30:4-5).  Courtemanche told Mahoney: "Hey, I told you once: If you're done with your business here at CVS, then leave." (Exh. Q, 29:23-25 - 30:1).  Courtemanche added:  "If you're shopping, shop. If you're not, go."  (Exh. Q, 29:18-20).

Courtemanche subsequently tried to take Mahoney's cell phone.  (Exh. Q, 10:20-25 -11:1).  When Mahoney refused to turn over the phone, he placed him in handcuffs.  (Exh. Q, 11:16-25 - 12:1).

Courtemanche's conduct was unconstitutional. Police officers do not have a right to use excessive force.  As such, they do not have the right to block citizens from viewing– or protesting– their unlawful conduct.

Courtemanche violated clearly established law.  <u>Amnesty International, USA, v. Battle</u>, 559 F.3d 1170 (11th Cir. 2009).  At the time of the incident, Courtemanche had fair warning of Docher "clearly established right to assemble, to protest, and to be heard while doing so."  <u>Id.</u> at 1185 & n.9 (11th Cir. 2009).  As the United States Supreme Court explained in <u>City of Houston v. Hill</u>,  107 S.Ct. 2502 (1987), "[t]he freedom of individuals verbally to oppose or challenge police action . . . is one of the principal characteristics by which we distinguish a free nation from a police state." <u>Id</u>. at 2510.

In retaliation for Docher's protected speech and assembly, Courtemanche ran off the

independent witnesses (mostly successfully, in the final analysis) and  stopped Shaun Mahonney from filming the actions and recording the sounds, as Docher was beaten and asphyxiated.  (Exh. Q, 9:7-11).  Courtemanche understood that it was lawful for persons to use their cell phones to record police officers, but has no explanation for why he told Mahoney to stop taping.  (Exh. Q, 9:12-23; 10:7-10).

Courtemanche then directed Mahoney to leave a private business (notwithstanding his status as a business invitee)  (Exh. Q, 29:18-20, 23-25 - 30:1), and subsequently placed Mahonney in handcuffs.  Viewing the evidence and inferences in the light most favorable to Docher, a jury could conclude that Courtemanche retaliated against Docher's exercise of protected rights under the First Amendment.  Because Courtemanche's actions "would likely deter . . . person[s] of ordinary firmness from exercising [their] First Amendment rights," Courtemanche violated clearly established law.  Bennett v. Hendrix, 423 F.3d 1247, 1252 (11th Cir. 2005).

Courtemanche's reliance on Lloyd Corp., Limited v. Tanner, 92 S.Ct. 2219, 2221 (1972), is misplaced.  Lloyd Corp. concerned the rights of Vietnam War protestors to "distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against all handbilling." Id. at 2228.  Because "Lloyd's privately owned and operated shopping center" had not been dedicated to "public use," Lloyd could lawfully exclude the protestors without violating their first amendment rights. Id. at 2229.

In the case *sub judice*, Docher is not seeking relief against CVS.   Nor did CVS stop any person for the exercise of their first amendment rights.   It was the government.   The government, unlike a private party on private property, is restricted in its right to limit First Amendment activities– subject to the usual time, place and manner restrictions not at issue here.  Thus, Lloyd Corp. is unhelpful to Courtemanche– unless he was the owner of the CVS (which he was not).

For the foregoing reasons, Courtemanche's  motion for summary judgment on Counts IX must be denied (first amendment retaliation claim against Courtemanche, individually, under 42 U.S.C. §1983).

## 12.    The Sheriff is not entitled to summary judgment on the state law claims for false arrest and battery

As to the state law claims, the Sheriff has adopted the arguments set forth in the motions of summary judgment filed by Newman, Mangrum, Robinson, and Courtemanche.

As to Counts XIII (state law claim for false arrest) and Count XV  battery/unnecessary use

of force), Docher similarly adopts and incorporates the arguments and analysis set forth above.

With regards to the state law claims against the individual deputies, it is a question of fact whether the deputies acted "in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property."  Florida Statute § 768.28.

The scope of Florida's limited waiver of sovereign immunity was examined in detail by the Florida Supreme Court in McGhee v. Volusia County, 679 So.2d 729, 732 (Fla. 1996).  The Court explained that the statutory framework provided by Florida Statute §768.28 distinguishes between police conduct that is an abuse of power lawfully vested in a police officer and conduct that is "an unlawful usurpation of power the officer did not rightfully possess."  McGhee v. Volusia County, 679 So.2d 729, 732 (Fla. 1996).  From this starting point,"[t]he employing agency is immune as a matter of law only if the acts are so extreme as to constitute a clearly unlawful usurpation of authority the deputy does not rightfully possess . . . , or if there is not even a pretense of lawful right in the performance of the acts."  Id. at 733.

In McGhee, the Florida Supreme Court reviewed the claims of Morris McGhee, who alleged he was subjected to battery by Volusia County Deputy Hernlen.   The Court explained:

> During booking procedures, McGhee was in handcuffs.  McGhee testified that, at some point, he told Hernlen that "you all" were no longer welcome in his father's saw shop, where deputies apparently had come on occasion.  According to McGhee, Hernlen asked if McGhee was threatening him, and Hernlen then lunged at McGhee, grabbed him by the throat, and began kicking McGhee with force.

Id. at 730.  McGhee sued Hernlen and the county.  In reversing the order of dismissal of Volusia County on the basis of sovereign immunity, the Supreme Court of Florida explained:

> Under *Swenson*, a jury question as to the sheriff or employing agency's liability exists for acts of officers that can be described as abuses of lawful power.  The employing agency is immune as a matter of law only if the acts are so extreme as to constitute a clearly unlawful usurpation of authority the deputy does not rightfully possess, *Swenson*, or if there is not even a pretense of lawful right in the performance of the acts.  *Craft v. John Sirounis & Sons, Inc.*, 575 So.2d 795 (Fla. 4th DCA 1991).  Here, Deputy Hernlen clearly had the lawful authority to restrain arrestees, detain them, or even respond with force in appropriate situations.  His office gave him that authority, and he therefore cannot be described as a usurper.  The fact that Hernlen may have intentionally abused his office does not in itself shield the sheriff from liability.

Id. at 733.

Since Hernlen was not a usurper, the Florida Supreme Court turned to the language of

§768.28 and concluded that the question of whether Hernlen or the government was responsible turns on whether "Hernlen acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property." Id.   The Court explained: "In sum, the question must be put to the fact-finder" whether the officer's conduct falls outside the protections of Florida's limited wavier of sovereign immunity. Id.

These same principles apply to Docher's state law false arrest/false imprisonment claim against Newman, individually (Count XIV), as well as the state law battery/unnecessary use of force claims against Newman, individually (Count XVI), Mangrum, individually (Count XVII), and Robinson, individually (Count XVIII).   The question must be put to the jury whether Newman, Mangrum, and Robinson acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property." Id.

For the foregoing reasons, the motion for summary judgment on the state law claims for false arrest/false imprisonment (Counts XIII and XIV) and battery/unnecessary use of force (Counts XV, XVI, XVII, and XVIII) must be denied.

**WHEREFORE**, Docher requests that the Court enter an Order denying Defendants Newman, Mangrum, Robinson, Courtemanche, and St. Lucie County Sheriff's Office's motions for summary judgment [DE 83, 84, 85, 87].

**DATED** this ___26th___ day of October, 2017.

/s/ DARRYL L. LEWIS_____
DARRYL L. LEWIS
Florida Bar No.: 818021
Attorney E-Mail(s): dll@searcylaw.com and
axs@searcylaw.com
Primary E-Mail: lewisteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 383-9485
Attorney for Plaintiff(s)

By:   *s/. Hugh L. Koerner*

Hugh L. Koerner
Florida Bar No.: 716952
Email: hlklaw@hughkoerner.com
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone:  (954) 522-1235
Facsimile:   (954) 522-1176
*Attorneys for Plaintiff(s)*

## CERTIFICATE OF SERVICE
### Case No.: 16-14413-Civ-ROSENBERG/MAYNARD

I HEREBY CERTIFY that this __26th__ day of October, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   *s/. Hugh L. Koerner*

Hugh L. Koerner

### Service List

Summer M. Barranco, Esquire
summer@purdylaw.com; melissa@purdylaw.com
Purdy Jolly Giuffreda & Barranco, P.A.
2455 E Sunrise Boulevard, Suite 1216
Fort Lauderdale, FL 33304
Phone: (954)-462-3200
Fax: (954)-462-3861
*Attorneys for Christopher Newman, individually, Claylan Mangrum, individually, Calvin Robinson, individually, Wade Courtemanche, individually, Ken J. Mascara, as Sheriff of St. Lucie County, Florida*

Benjamin W. Newman, Esquire
Ben.Newman@wilsonelser.com; Leah.Rover@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 N Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 203-7592
Fax: (407) 648-1376
*Attorneys for Jose Rosario, individually, and the St. Lucie County Fire District, an independent special district*