UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:  16-14413-Civ-ROSENBERG/MAYNARD

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

        Plaintiff,

vs.

CHRISTOPHER NEWMAN, et. al.

        Defendants.

_____/

**PLAINTIFF'S OMNIBUS RESPONSES TO DEFENDANT ROSARIO AND ST. LUCIE COUNTY FIRE DISTRICT'S MOTIONS FOR SUMMARY JUDGMENT [DE 98, 99]**

**COMES NOW** the Plaintiff, TAVARES DOCHER, by and through JANICE DOCHER-NEELEY, his mother and legal guardian (hereinafter "Docher"), by and through his undersigned attorneys, and pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, hereby submits this Omnibus Responses to Plaintiff's Omnibus Responses to Defendant Rosario and St. Lucie Fire District's Motions for Summary Judgment [DE 98, 99]

1. This is a civil action under 42 U.S.C. § 1983 and Florida law against CHRISTOPHER NEWMAN, individually (hereinafter "Newman"), CLAYLAN MANGRUM, individually (hereinafter "Mangrum", CALVIN ROBINSON, individually, (hereinafter "Robinson"), WADE COURTEMANCHE, individually (hereinafter "Courtemanche"), KEN J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida (hereinafter "St. Lucie County Sheriff's Office"), JOSE ROSARIO, individually (hereinafter "Rosario"), and the ST. LUCIE COUNTY FIRE DISTRICT, an independent special district (hereinafter "Fire District").

2. Defendants Jose Rosario and the St. Lucie County Fire District seek summary judgment on Counts X, XI, XII, and XXI.

### Memorandum of Law

**1.   Introduction**

Even in claims under 42 U.S.C. § 1983, the historical facts at the summary judgment stage must be viewed in the light most favorable to the non-moving party, and are not simply the facts,

views, concerns and fears from the singular perspective of the police officers. Tolan v. Cotton, 134 S.Ct. 1861, 1866 (2014). Viewing the evidence in the light most favorable to Docher, because of the conduct of Rosario and the St. Lucie County Fire District, Tavares Docher lives in a persistent vegetative state. It was completely avoidable.

When Rosario responded, Docher was either unconscious or semi-conscious. There was a pool of blood by his head and numerous deputies on scene. Rosario failed to obtain a complete history from the deputies. He did ask why Docher was unconscious. He knew only that Docher (as he was regaining consciousness) stopped struggling *when he was restrained*.

Beyond any doubt, Docher needed medical care. He needed to be transported to a hospital. Instead of using available physical restraints (since Docher only stopped struggling when he was restrained), Rosario instead injected Docher with a single dosage of 4 milligrams of Ativan, notwithstanding his compromised physiological condition and numerous risks and contraindications. Within minutes, Docher's heart stopped. He flat-lined. More likely than not, Rosario injected some or all of the Ativan in to an artery. Because Rosario failed to timely monitor Docher following the Ativan injection, he was not immediately aware that Docher flat-lined. As a result, resuscitation efforts were delayed and Docher now exists in a persistent vegetative state.

According to Rosario, the Fire District's policies did not *require* that he use physical restraints in lieu of chemical restraints, since the use of physical restraints on combative patients is discretionary. According to Rosario, the Fire District's policies did not *require* that he administer Ativan in incremental dosages (and monitor the patient for the safety), since the policy requiring 1 mg incremental dosages is discretionary. The constitution, however, requires more. It is a violation of clearly established law in the Eleventh Circuit for a health care provider to "to take an easier but less efficacious course of treatment." Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016).

It was simply more expedient and easier for Rosario to bypass physical restraints and instead inject Docher with a chemical restraint– risks and contraindications notwithstanding. And it was easier for Rosario to inject a single 4 mg dosage instead of incremental dosages of 1 mg. For Docher, however, that easier but less efficacious course of care had catastrophic consequences.

Rosario attended one year of school to become a paramedic. Before that, he sold insurance and worked for UPS. He had no business making life and death decisions when four point restraints were available, and the deputies had rope inside their vehicles that was used for restraining subjects

in custody. (Exh. C, 84:3-4).

As the United States Supreme Court made clear in Tolan v. Cotton, 134 S.Ct. 1861 (2014), it is Docher's view of the evidence and inferences that must be credited. Against that backdrop, Rosario and the Fire District are not entitled to summary judgment. Docher's claims must be decided by a jury, not on a summary judgment record.

**2.     The defense of qualified immunity**

Docher agrees that Rosario was acting in his discretionary authority and is entitled to raise the defense of qualified immunity. Docher otherwise adopts and incorporates, as if fully set forth herein, the discussion of qualified immunity included in his response to the summary judgment motions filed by Defendants Newman, Mangrum, Robinson, and Courtemanche.

**3.     The requirements of *Tolan v. Cotton***

Again, Docher adopts and incorporates herein the discussion of Tolan v. Cotton, 134 S.Ct. 1861 (2014), included in his response to the summary judgment motions filed by Defendants Newman, Mangrum, Robinson, and Courtemanche.

**4.     Rosario acted deliberate indifference**

The circumstances of that gave rise to Docher's existence in a persistent vegetative state were both unnecessary and avoidable, and highly foreseeable.

Prior to Rosario's arrival on scene, Mangrum (who previously worked as an emergency medical technician) testified that Docher was "breathing lightly." (Exh. N, 243:4-5). Mangrum placed Docher in the recovery position on his side. (Exh. N, 243:4-11; 242:14-16). As Dr. Sterba observed, "[d]uring that time when Docher is in recovery position not moving, unconscious, we do see that no restraining maneuvers were being done by deputies. In fact, they all backed off and walked around." (Exh. N, 224:17-22).

Robinson testified that when the paramedics arrived, he had a "quick conversation" with Rosario. (Exh. G, 66:14). A police officer informed Rosario that Docher had been drinking alcohol. (Exh. J, 61:11-14). The textbook Rosario used at Indian River State College warned that the combination of alcohol and Benzodiazepine can be fatal. (Exhibit N, 172:16-20).

Rosario was also informed that the patient exhibited unusual strength, and therefore, was on notice that the patient may have been using drugs. (Exhibit N, 92:18-20).

Robinson explained to the paramedics that Docher was taken down to the ground by the

deputies and "hit his head, and that's where the blood came from." (Exh. G, 66:17-20).

Rosario observed Docher was handcuffed and on the ground. (Exh. J, 75:14-17; 76:23-24). There was a puddle of blood by the patient's head. (Exh. J, 61:21-25 - 62:1). Docher was "in and out of consciousness" and only responsive to pain stimuli, so Rosario made no effort to verbally communicate with the patient. (Exh. J, 78:11-15; 78:20-25 - 79:1).

According to Rosario, vital signs were not obtained "[b]ecause he was still active with the sheriffs' department," and "the scene was not conducive for me to make any contact with him." (Exh. J, 77:14-20). Prior to the administration of the Ativan, Docher "was only calm when pressure was put on him by the deputies." (Exh. R, 31:18-22).

Sinclair explained that "it's rare" that he has administered four milligrams of Ativan in a single push dose. (Exh. R, 38:8-11). The protocols for sedation state that Ativan should be given in one milligram increments to a maximum of four milligrams. (Exh. R, 38:20-25). Sinclair does not know why the protocol provides for dosages at one milligram increments to a maximum of four milligrams, stating, "You would have to ask the people that wrote the protocol for that." (Exh. R, 39:15-19) However, Sinclair admitted that paramedics have the "discretion to use up to four milligrams with no specified time between increments." (Exh. R, 39:1-6). That is how they are trained. (Exh. R, 40:19-25 - 41:1-3; 40:19-25 - 41:1-3).

Sinclair also testified that he did know why four-point soft restrains were not used with Docher. (Exh. R, 41:4-14):

> Q: On the date of the incident, did you carry four-point soft restrains on your ambulance?
>
> A: Yes.
>
> Q: Have you ever used those before?
>
> A: Yes.
>
> Q: Why did you not use those with Tavares Docher?
>
> A: That's not a question I can answer.
>
> Q: Why not?
>
> A: Because I just don't know the answer to it.

(Exh. R, 41:4-14).

The contraindications for Ativan include substance abuse, as well as "[h]ypotension, respiratory depression, head trauma, metabolic disturbances including hypoxia, which can lead to

lactic acidosis making the heart very unstable, [and] shock." (Exh. N, 37:20-23 - 38:1-2; (Exh. N, 170:5-8). Docher had five contraindications. (Exh. N, 170:5-8). If a patient has "a problem with head trauma or metabolic acidosis you don't give the drug. It's a contraindication." (Exh. N, 38:13-19).

> Docher sustained "bilateral nasal bone fractures," likely from the initial use of force when he was taken to the ground while handcuffed behind his back. (Exh. N, 232:13-16). That is the "standard of care" for paramedics. (Exh. N, 38:10-19; 40:2-6). According to Dr. Sterba, Rosario had the responsibility to [ask] what happened to this guy when you were arresting him, was there any problem. Did he lose consciousness? Yeah, he lost consciousness. Well, what were you doing? I had my foot on his chest and I pulled his arms up and he passed out. Oh, my God, how were the respirations after that. Well, they were very shallow. He should have known and he should have asked what happened during all of this arrest. Because the police officers knew, Mangrum knew. And it is the responsibility of EMS always to get as much history as possible especially from law enforcement officers. . . . You always have to work very, very closely with law enforcement officers, not only in the application of EMS approved restraints but whatever happened to the patient, especially if the patient was asphyxiated into unconsciousness. So should he have known, yes. Is it his fault for not asking, yes.

(Exh. N, 144:16-23 - 145:1-13).

Docher "was unresponsive when the paramedics came up, and then he came around and kicked Rosario." (Exh. N, 241:10-13). "It was medically necessary and clinically indicated for Rosario to contact medical control." (Exh. N, 162:7-9). Rosario should have informed medical control that we have "a dangerous situation here, a loss of consciousness. He is not acting normal. We might have alcohol and drugs. They restrained him to the point of a loss of consciousness. Can I go ahead with 4 milligrams of Ativan with no restraints and no oxygen, and I don't know what the blood pressure is, and I don't even know what the pulse ox is. What do you think an emergency physician would say, no. Transport with oxygen and monitor closely." (Exh. N, 163:15-25 - 164:1-3). Sterba added:

> The risks and the contraindications and also violating protocol by skipping over physical restraints, and not using four point restraints, not apply oxygen. Basically not doing anything according to his training . . . . He didn't use oxygen, he didn't check the blood pressure, he didn't check the pulses. He went right ahead to a dangerous level of chemical restraint without using four points. Four points by themselves would have been adequate.

(Exh. N, 162:13-25).

Under the circumstances, four point EMS approved restraints were "medically necessary."

(Exh. N, 139:9-11). "[F]our point restraints . . . would have solved the situation." There would have been no need for "any Ativan." (Exh. N, 139:14-16).

> It was completely avoidable. It was with reckless disregard that approved four point soft restraints were not applied. It was with reckless disregard that Rosario went ahead and gave him with no adequate monitoring before or after the Ativan of 4 milligrams 4 times the dose injection that resulted in an onset of action in one minute as documented in the records right now, that this calmed the patient down a minute later. Approximately two minutes later he went into arrest because of what Rosario did.

(Exh. N, 139:17-25 - 140:1-5). Rosario's conduct was fell "below the standard of care . . . with medical certainty" and he acted with "reckless disregard." (Exh. N, 165:4-5, 288:25 - 289:1). You have a 29 year old patient who was asphyxiated by the deputies and overdosed by the paramedic. (Exh. N, 183:5-6).

Dr. McAlary agrees that Rosario "had a duty to adequately evaluate Mr. Docher as a prerequisite to deciding on treatment, including the administration of any pharmacologic restraint," but failed to conduct "an adequate pre-medication assessment." (Exh. U, 24:6-10, 25:3-6).

> McAlary testified that
>
> prior to the administration of ativan, restraint measures were utilized which included at least three officers with some or most of their body weight applied throughout the area of upper body to legs, including one officer sitting on his lower extremities, and then at some point after that, he, while still in a prone position, had his arms raised in a near vertical position relative to his back and a foot, while the arms were in that position, was placed on his upper back, neck area with weight obviously being applied. The combination of those moves . . . would almost certainly compromise ventilation."

(Exh. X, 79:8-20; 80:1).

Dr. Anderson was hired as an expert witness by Rosario and the St. Lucie County Fire District. (Exh. T, 100:3-14). Anderson testified that respiratory compromise is a contraindication for the administration of Ativan.

> Q: And so we know there's a struggle before he was put in a recovery position, and let's assume his respiratory function was compromised and at that point his pulmonary reserves are low. Do you believe injecting 4 milligrams of ativan was appropriate at that point considering those contraindications?
>
> A: Well, again, you know, if the patient had evidence of respiratory compromise, then absolutely, yeah, I would say no, you shouldn't give a benzodiazepine in that setting.

(Exh. T, 83:1-13). Anderson explained: "[S]ome four minutes prior to the injection, [Docher] is seen with respiratory rates of 20 to 30. So he's obviously in some degree of respiratory distress at that point, even though being described as in the recovery position of left lateral decubitus. So he obviously was in a compromised status at the time of the injection. (Exh. U, 33:9-15). In fact, the FDA warning for Ativan indicates: "**Drug Interactions** ATIVAN Injection, like other injectable benzodiazepines, produces additive depression of the central nervous system when administered with other CNS depressants such as ethyl alcohol, phenothiazines, barbiturates, MAO inhibitors, and other antidepressants." (Exhibit N, p. 437).

5. **It was the official policy of the Fire District that there were no policies, and instead, all decisions were left to the discretion of the paramedics**

Captain Brian Gonzalez testified as the official representative of the Fire District pursuant to Fed. R. Civ. P. 30(b)6. Put simply, the Fire District has no official policies. Gonzalez explained: "We don't have policies, we have guidelines." (Exh. S, 37:5-7). As such, all decisions were left to the discretion of the paramedics. For combative patients, the use of rayon webbing straps (i.e,. four point restraints) is an "educational guideline. It is not a policy." (Exh. S, 76:19-24).

For combative patients, the decision whether to use pharmacologic [chemical] restraints instead of physical restraints was left to the discretion of the paramedic. (Exh. S, 77:20-25 - 78:1-19). One single dose of 4 milligrams of Ativan is consistent with the guidelines, since paramedics in their discretion "have the option to go to four milligrams." (Exh. S, 63:1-6; 63:18-19; 64:4-10).

The guidelines do not list any contraindications for Ativan because there are "no contraindications in the emergency setting for Ativan. (Exh. S, 50:10-21). There are only "cautions." (Exh. S, 52:14-24). Paramedics are cautioned that 'benzodiazpine may cause respiratory depression or compromise. When administering, they are directed to look for signs of hypotension and respiratory depression." (Exh. S, 81:17-25 - 82:1-4). However, because the are no "contraindications," it is the official policy of the Fire District that respiratory depression is not contraindicated for Ativan. (Exh. S, 57:4-8).

As the Fire District's expert explained, respiratory depression is absolutely contraindicated for Ativan. Dr. Anderson testified:

> Q: And so we know there's a struggle before he was put in a recovery position, and let's assume his respiratory function was compromised and at that point his pulmonary reserves are low. Do you believe injecting 4 milligrams of ativan was appropriate at that point considering those contraindications?

>    A:   Well, again, you know, if the patient had evidence of respiratory compromise, then absolutely, yeah, I would say no, you shouldn't give a benzodiazepine in that setting.

(Exh. T, 83:1-13). Anderson explained: "[S]ome four minutes prior to the injection, [Docher] is seen with respiratory rates of 20 to 30. So he's obviously in some degree of respiratory distress at that point, even though being described as in the recovery position of left lateral decubitus. So he obviously was in a compromised status at the time of the injection. (Exh. U, 33:9-15).

In 2014, paramedics administering Ativan were trained pursuant to the Fire District's medical guidelines that to administer Ativan in "one milligram increments to a max of four milligrams." (Exh. S, 58:22-25 - 59:1-3). Nevertheless, Fire District paramedics had the discretion to administer a single dose of 4 milligrams. (Exh. S, 59:17-23).

The Fire District's sedation guidelines for Ativan provide: "0.1 mg/kg increments, max of 4 mg." According to the Fire District, that guideline allows the paramedic to give up to 4 milligrams in a single dosage without monitoring the patient. (Exh. S, 61:1-15; 88:15-21). As Captain Gonzalez testified (on behalf of the Fire District), the sedation guidelines are just that– "a guideline. It is not a policy or procedure." (Exh. S, 46:21-25 - 47:1-11).

Gonzalez admitted, however, that if a paramedics "needed to deviate from these guidelines" they can call the emergency room and speak with a physician. (Exh. S, 47:13-25 - 48:1-11).

It is ultimately a jury question whether the guideline directing a paramedic to call the emergency room is an actual policy that must be followed, or simply discretionary. Captain Gonzalez testified:

>    Q:   . . . So the document that was in existence and active and that would have been used by a paramedic for reference in May of 2014, is what you brought with you today, Plaintiff's Exhibit, 2 heading sedation, correct?
>
>    A.   Correct.
>
>    Q.   This is a medical guideline; is that correct?
>
>    A.   Correct.
>
>    Q.   Is it a policy and procedure that paramedics are supposed to follow when administering Ativan?
>
>    A.   It is a guideline. It is not a policy or procedure.
>
>    Q.   And when you say guideline, that leads me to believe that they can essentially stray from the guideline; is that true?

        A.    They can come call for orders if they needed to deviate from these guidelines.

        Q.    Who would they call?

        A.    The ER.

        Q.    Would they speak to a physician?

        A.    Yes.

(Exh. S, 46:21-25; 47:1-24).

On other hand, notwithstanding Rosario's failure to call the emergency department prior to injecting Docher with 4 mg of Ativan, Gonzalez testified that Rosario was in compliance with the St. Lucie County Fire District guidelines: (Exh. 83:3-8). Gonzalez testified:

        Q.    Was it the custom, policy and practice of paramedics employed by the St. Lucie County Fire District in May of 2014, to administer intramuscularly one single four-milligram dose to patients in the field?

        A.    They have that discretion.

(Exh. S, 59:1-6).

At the time Rosario arrived, there were at least five police officers on scene. (Exh. I). Rosario testified that the only time Docher was calm was when he was being physically restrained by the deputies. Nevertheless, with five deputies available to assist with four-point restraints and rope available, paramedics have the discretion to by-pass physical restraints and go right to chemical restraints. (Exh. S, 79:9-21; Exh. C, 84:3-4).

**6.**     <u>**The conduct of Rosario and the Fire District was unconstitutional and constitutes deliberate indifference**</u>

    **a).**     **The Fire District's lack of policies is unconstitutional**

The United States Supreme Court explained in <u>City of Canton, Ohio v. Harris</u> that

> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

<u>City of Canton, Ohio v. Harris</u>, 109 S.Ct. 1197, 1205 n. 10 1989). However, this is not a failure to train case. The Fire District's paramedics *were* trained. The problem is that they were trained that everything is discretionary. "[F]inal decisions" concerning the guidelines are made by Dr. Chi Chiou

Liu. (Exh. S, 20:14-19). Nevertheless, even the treatment sections of the guidelines are considered discretionary. So when the Fire District takes the position that "[w]e are held to the standard of our treatment section," it really is not true. (Exh. S, Exhibit # 2, p. 6). The Fire District takes the position that the treatment guidelines regarding the administration of Ativan are, in fact, *discretionary*. The sedation guidelines provide: "Ativan, 1 mg, may be repeated to a max of 4 mg." Id. But it is the official practice of the Fire District to read the guideline as nothing more than advisory. (Exh. S, 59:17-23). That would be tantamount to the City of Canton issuing its police officers firearms and training them on the use of deadly force– but at the same time informing the officers that the city's policies concerning deadly force are discretionary, irrespective of the requirements of the Fourth Amendment.

That lack of policies is itself, unconstitutional. Under Monell, to establish an unlawful

> policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality. Normally random acts or isolated incidents are insufficient to establish a custom or policy. *Bennett v. City of Slidell,* 728 F.2d 762, on rehearing, 735 F.2d 861 (5th Cir.1984) (*en banc*). However, the custom need not receive formal approval. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036.

Depew v. City of St. Marys, Georgia, 787 F.2d 1496, 1499 (11th Cir. 1986).

With regards to the Fire District, the practice of all guidelines being discretionary wasn't just random or isolated– it is the unofficial policy of the Fire District. For that reason, the sedation guidelines provide: "Ativan, 1 mg, may be repeated to a max of 4 mg." Id. However, the guidelines are deemed discretionary. (Exh. S, 59:17-23).

Rosario himself admits to injecting patients with a single dose of 4 milligrams of Ativan as many as 100 times. (Exh. J., 34:2-13). So the widespread and customary practice of making all decisions discretionary is not a failure to train. It is an absence of necessary policies. Under Monell, "liability may be imposed due to the existence of an improper policy or from the *absence* of a policy." Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (italics added). Put simply, the Fire District had no polices. All decisions were discretionary. Under Monell, that is unconstitutional. Id.

As Dr. Sterba pointed out, the lack of policies caused Docher's damages, since no emergency room physician would have agreed that 4 milligrams of Ativan with no restraints and no oxygen was

medically appropriate. (Exh. N, 163:15-25 - 164:1-3).

Four points by themselves would have been adequate. (Exh. N, 162:13-25). Again, the Fire District has no policy on when four-point restraints were required. The lack of necessary policies was unconstitutional, and proximately caused Docher's injuries. Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991). Docher was calm only when he was being restrained. There was a significant police presence on scene. Under those circumstances, Rosario defaulted to chemical restraints because there was no policy that said he could not.

For the foregoing reasons, the Fire District's motion for summary judgment on Count XXI must be denied (custom, policy and practice claim against the Fire District, under 42 U.S.C. §1983).

### b). Rosario's conduct towards Docher was unconstitutional notwithstanding the Fire District's lack of policies

In the Eleventh Circuit, "[a] plaintiff claiming deliberate indifference to a serious medical need must prove: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (disapproving a "more than gross negligence" standard and adopting "more than mere negligence"). The Court in Melton v. Abston explained that "conduct deliberately indifferent to serious medical needs . . . include[s]: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Id. at 1223; Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) ("decision to take an easier and less efficacious course of treatment" constitutes deliberate indifference).

Rosario acted with, at best, wilful blindness to the fact that Ativan was dangerous and contraindicated in the first instance. As the Eleventh Circuit reasoned in Goebert v. Lee County, 510 F.3d 1312, 1328 (11th Cir. 2007),

> "[a] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact." *United States v. Baxter Int'l, Inc.,* 345 F.3d 866, 902 (11th Cir.2003). Choosing to deliberately disregard, without any investigation or inquiry, everything any [pretrial detainee or prisoner] says amounts to willful blindness.

Goebert v. Lee County, 510 F.3d 1312, 1328 (11th Cir. 2007). In the case *sub judice*, Docher had five contraindications to Ativan. (Exh. N, 170:5-8). If a patient has "a problem with head trauma or metabolic acidosis you don't give the drug. It's a contraindication." (Exh. N, 38:13-19). Even Dr. Anderson testified that "some four minutes prior to the injection, [Docher] is seen with respiratory rates of 20 to 30. So he's obviously in some degree of respiratory distress at that point,

even though being described as in the recovery position of left lateral decubitus. So he obviously was in a compromised status at the time of the injection. (Exh. U, 33:9-15).

Notwithstanding these (unfortunately for Docher) very real and not imaginary risks, Rosario administered the maximum 4 milligrams of Ativan in a single injection. As Dr. Sterba explained, "Rosario knew -- he tested on it and got a 99 percent on his exam, he knew that hypotension was a contraindication. He never measured the blood pressure or attempted to even get close to it with checking the pulses, peripheral or central pulses, before skipping over the required step of physical restraints and going straight to the wrong drug at the wrong dose which caused the brain damage." (Exh. N, 141:17-23; 142:1).

Sterba is correct. Rosario's test results are attached to the Fire District's deposition pursuant to Fed. R. Civ. P. 30(b)6. On page 679, Rosario wrote for Lorazepam (i.e., Ativan): Contraindications: *HYPOTENSION*.

Viewing the evidence and inferences in the light most favorable to Docher, Rosario either knew physical restraints (i.e., four point restraints) were the more efficacious course of care for Docher, or he acted with wilful blindness to that fact. Even Sinclair testified that he did know why four-point soft restrains were not used with Docher. (Exh. R, 41:4-14).

As Sterba explained, Rosario "didn't use oxygen, he didn't check the blood pressure, he didn't check the pulses. He went right ahead to a dangerous level of chemical restraint without using four points. Four points by themselves would have been adequate." (Exh. N, 162:13-25). Because "[f]our point restraints . . . would have solved the situation" there was no need for "any Ativan" (Exh. N, 139:14-16).

Rosario acted with deliberate indifference by going straight to chemical restraints. At a minimum, Rosario has the ability to call the emergency room and confer with an doctor. (Exh. S, 47:13-25 - 48:1-11). Obviously, he did not. But even if the Fire District's guidelines made all decisions discretionary, at best, Rosario chose to "deliberately disregard, without any investigation or inquiry," all the risks associated with a single dosage of Ativan. Goebert v. Lee County, 510 F.3d 1312, 1328 (11th Cir. 2007). Because Rosario's conduct constitutes (at best) "willful blindness," he is not entitled to qualified immunity for his decision to by-pass physical restraints and take an "easier but less efficacious course of treatment" by injecting Docher with 4 milligrams of Ativan in a single dosage. Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016); Waldrop v. Evans, 871 F.2d 1030,

1033 (11th Cir. 1989) ("decision to take an easier and less efficacious course of treatment" constitutes deliberate indifference).

Nor is Rosario's denial of wrongdoing sufficient to avoid responsibility for his conduct. As the Eleventh Circuit reiterated in Melton v. Abston, "[s]ince a finding of deliberate indifference requires a finding of the defendant's subjective knowledge of the relevant risk, a genuine issue of material fact exists 'only if the record contains evidence, albeit circumstantial, of such subjective awareness.'" Melton v. Abston, 841 F.3d 1207, 1224 (11th Cir. 2016) (quoting McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). Because the record contains circumstantial evidence that Rosario knew that four point EMS approved restraints were "medically necessary" and "would have solved the situation," (Exh. N, 139:9-11, 14-16), and a single dosage of 4 milligrams of Ativan was either a risk to the patient or contraindicated, a jury could find that Rosario decided on an "easier but less efficacious course of treatment," in deliberate indifference to Rosarios's constitutional rights under the Fourteenth Amendment. Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016).

Finally, Rosario's reliance on Taylor v. Adams is misplaced. As the Eleventh Circuit noted, the patient (Mason) "simply declined treatment. And there is no indication from the summary-judgment facts that the firemedics perceived [Mason] to do so incoherently or otherwise without the ability to speak for himself." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000). The facts in the case *sub judice* are exactly the opposite.

Rosario described the Docher as "nonverbal" and spitting blood from his mouth. (Exh. J, 70:9-11; Exh. R, 13:6-8; 43:11-15). He was "in and out of consciousness" and only responsive to pain stimuli, so Rosario made no effort to verbally communicate with the patient. (Exh. J, 78:11-15; 78:20-25 - 79:1). So this was not a situation where Docher simply declined treatment and suffered the consequences.

For the foregoing reasons, Rosario's motion for summary judgment on Count XII must be denied (Fourteenth Amendment deliberate indifference claim against Rosario, individually, under 42 U.S.C. §1983).

    **c).** **Docher had a clearly established right to be free from the administration of psychotropic medications**

It is clearly established law that "[u]nder the Due Process Clause of the Fourteenth Amendment, pretrial detainees have 'a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs.'" Spaulding v. Poitier, 548 Fed.Appx. 587, 590 (11th Cir.

2013) (quoting Washington v. Harper, 110 S.Ct. 1028, 1036 (1990) (using the terms antipsychotic and psychotropic drugs interchangably).

Docher sustained "bilateral nasal bone fractures."(Exh. N, 232:13-16). He was "in and out of consciousness," nonverbal, and spitting blood from his mouth. (Exh. J, 70:9-11; 78:11-15; 78:20-25 - 79:1; Exh. R, 13:6-8; 43:11-15). According to Robinson, Docher kicked Rosario, causing him to fall backwards. Robinson testified: "The paramedic went into the ambulance, came out with a solution and a syringe. He filled the syringe with that solution and gave Mr. Docher a shot in his buttocks. Mr. Docher became sedated and let out a large gasp of air. The paramedic looked at the other paramedic and said, "He just coded." What does that mean? He said, "He just died." (Exh. G, 16-22).

As Sterba explained, four point EMS approved restraints were "medically necessary." (Exh. N, 139:9-11). "[F]our point restraints . . . would have solved the situation." There would have been no need for "any Ativan." (Exh. N, 139:14-16). It was completely avoidable. It was with reckless disregard that approved four point soft restraints were not applied. It was with reckless disregard that Rosario went ahead and gave him with no adequate monitoring before or after the Ativan . . . . Approximately two minutes later [Docher] went into arrest because of what Rosario did. (Exh. N, 139:17-25 - 140:1-5).

A jury could find that while in a semi-conscious state, Docher kicked Rosario. Numerous deputies were on scene, and physical restraints were "medically necessary." Instead, Rosario went into the ambulance, came out with a solution and a syringe. Within minutes, Docher was dead. (Exh. G, 16-22).

Viewing the evidence and inferences in the light most favorable to Docher, Rosario subjected Docher to the maximum 4 milligrams in retaliation and as punishment for Docher's conduct towards Rosario, and not because it was medically necessary. "[F]our point restraints . . . would have solved the situation." There would have been no need for "any Ativan." (Exh. N, 139:14-16).

For the foregoing reasons, Rosario's motion for summary judgment on Count XI must be denied (Fourteenth Amendment due process claim against Rosario, individually, under 42 U.S.C. §1983).

> **d).** **Rosario violated Docher's rights under the First Amendment to be free from retaliation**

Rosario does not know whether Docher was conscious or unconscious, but he was "making

noises and struggling with the officers." (Exh. J, 70:14-17). He sustained "bilateral nasal bone fractures," was "nonverbal" and spitting blood. (Exh. N, 232:13-16; Exh. R, 13:6-8).

Viewing the evidence and inferences in the light most favorable to the non-moving party, Docher could not breathe through his nose and had blood in his mouth. He was handcuffed behind his back, and "in and out of consciousness." (Exh. J, 78:11-15; 78:20-25 - 79:1).

Expressive conduct, such as wearing an arm-band to protest the war in Vietnam, is protected under the First Amendment. Tinker v. Des Moines Independent Community School Dist., 89 S.Ct. 733, 735 (1969). Viewing the evidence in the light most favorable to Docher, his act of spitting blood was intended to convey a message– most likely that he had blood in his mouth and (because he had blood in his mouth) was unable to breathe without clearing his airway– or simply that he was trying to speak ("making noises") but was unable to do so because his mouth was filled with blood.

As set forth above, Rosario responded by-passing four-point restraints, and instead, went into the ambulance, came out with a solution and a syringe. (Exh. G, 16-22). A jury could find that Rosario injected Docher with 4 milligrams of Ativan in one singe dosage, non-incrementally, in retaliation for the exercise of his clearly established First Amendment rights. Bennett v. Hendrix, 423 F.3d 1247, 1252 (11th Cir. 2005).

For the foregoing reasons, Rosario's motion for summary judgment on Count X must be denied (First Amendment free speech retaliation claim against Rosario, individually, under 42 U.S.C. §1983).

**WHEREFORE**, Docher requests that the Court enter an Order denying Defendants Rosario and Fire District's motions for summary judgment [DE 98, 99].

**DATED** this   26th   day of October, 2017.

/s/ DARRYL L. LEWIS
DARRYL L. LEWIS
Florida Bar No.: 818021
Attorney E-Mail(s): dll@searcylaw.com and
axs@searcylaw.com
Primary E-Mail:  lewisteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 383-9485
Attorney for Plaintiff(s)

By: *s/. Hugh L. Koerner*
Hugh L. Koerner
Florida Bar No.: 716952
Email: hlklaw@hughkoerner.com
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone:  (954) 522-1235
Facsimile:    (954) 522-1176
*Attorneys for Plaintiff(s)*

## CERTIFICATE OF SERVICE
### Case No.: 16-14413-Civ-ROSENBERG/MAYNARD

I HEREBY CERTIFY that this   26th    day of October, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *s/. Hugh L. Koerner*
Hugh L. Koerner

### Service List

Summer M. Barranco, Esquire
summer@purdylaw.com; melissa@purdylaw.com
Purdy Jolly Giuffreda & Barranco, P.A.
2455 E Sunrise Boulevard, Suite 1216
Fort Lauderdale, FL 33304
Phone: (954)-462-3200
Fax: (954)-462-3861
*Attorneys for Christopher Newman, individually, Claylan Mangrum, individually, Calvin Robinson, individually, Wade Courtemanche, individually, Ken J. Mascara, as Sheriff of St. Lucie County, Florida*

Benjamin W. Newman, Esquire
Ben.Newman@wilsonelser.com; Leah.Rover@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 N Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 203-7592
Fax: (407) 648-1376
*Attorneys for Jose Rosario, individually, and the St. Lucie County Fire District, an independent special district*