UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 16-14413-Civ-ROSENBERG/MAYNARD

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

       Plaintiff,

vs.

CHRISTOPHER NEWMAN, et. al.

       Defendants.
_____/

**PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL FACTS BY
SHERIFF, NEWMAN, MANGRUM, ROBINSON AND COURTEMANCHE [DE 88]**

      **COMES NOW** the Plaintiff, TAVARES DOCHER, by and through JANICE DOCHER-NEELEY, his mother and legal guardian, (hereinafter "Docher") by and through their undersigned attorneys, and submit the following response to the Statement of Material Facts filed by Defendant SHERIFF, NEWMAN, MANGRUM, ROBINSON and COURTEMANCHE [DE 88]:

1-6.    Agreed.

7.    Denied that it was a 911 hangup call. (Exh. A, Incident Reports, p. 27; Exh. B, security videotape of CVS cash register). (See ¶ 7, Plaintiff's Response to Statement of Material Facts by Defendant Rosario).

8-9.    Agreed.

10    Agreed. The deputies admit Docher's possession of the screw driver was not a crime. (Deposition of Clay Mangrum, Exh. C, 35:3-5).

11-12.    Agreed.

13.    Denied. Bhagudas denies that he was concerned for any person's safety while Docher was inside the CVS making his purchase. (Deposition of Hardyal Bhagudas, Exh. D, 25:18-21). Bhagudas testified that it was Docher who "was scared for some reason." (Exh. D, 21:22-25 - 22:1-3). CVS cashier Leah Nicole Boles explained that Docher "purchased a Black and Mild. He made no threats, and there was no cussing. He was just acting confused." (Affidavit of Leah Nicole Boles, Exh. E, p. 1, ¶ 4).

14-18.    Agreed.

19.     Denied.  Robinson described the manner in which Docher exited the vehicle differently.  See *infra*, ¶ 82.

20-21.  Agreed.  See *supra*, ¶ 19.

22.     Denied.  Newman and Mangrum focused their elbow strikes on Docher's head. See, *infra*, ¶¶ 69, 90.  The elbow strikes to Docher's head and face were witnessed by Merine Kanhai and Adriana Kanhai.  See *infra*, ¶¶ 43, 48.  At that time, Shaun Mahonney started recording the incident on his cell phone camera. (Cell phone videotape of Shaun Mahonney - location # 1, Exh. F).

If agrees that if he had seen the elbow strikes to Docher's head he would have told the other deputies to stop because "there is just no need to hit somebody while they're on the ground handcuffed and struggling."  (Deposition of Calvin Robinson, Exh. G, 58:5-10; 58:25-59:1-5).

23.     Agreed that Merine Kanhai described one arm still underneath Docher's body as he was laying on his belly. (Deposition of Merine Kanhai, Exh. H, 9:4-5, 9-12).  Docher was laying on his belly. (Exh. H, 4-5).

At the time, the deputies knew Docher was unarmed, since he had already been subjected to a pat down search for weapons by Robinson.  (Exh. G, 37:4-7).

24.     Denied.  Merine Kanhai was asked if Docher was "pushing up" (when he was on his belly) and testified that "[w]ell, his legs were flying because they were trying to restrain him and his legs were flying." (Exh. H, 10:2-8).  There is no evidence from the videotapes of Docher "pushing up." (Exh. F, cell phone videotape of Shaun Mahonney; Security videotape of CVS parking lot, Exh. I).

25.     Denied.  Merine Kanhai testified that Docher did not attempt to bite any of the deputies. (Exh. H, 11:19-21).

Mangrum admits that Docher never bite his finger, stating: "[H]is lips were actually on my finger."  (Exh. C, 56:5-6).  That is when Mangrum "dropped my forearm down to push his face– to strike his face away from my hand, and then try to regain control – try to regain control over his head." (Exh. C, 52:22-25).  Newman had gloves on and "took over control over the head." (Exh. C, 57:4-5).

Nor is there any evidence Newman sustained a bite injury.  According to Rosario, the only injury sustained by a police officer concerned a deputy who "asked for a Band-Aid or something, and I think he had a scuff on his elbow." (Deposition of Jose Rosario, Exh. J, 128:3-5).

Newman went to the hospital, but not to seek medical care.  Newman testified: "I did go to the hospital.  But Tavares was already in a different room.  If I remember right, he was already in a

different room; they had already brought him in. And we just went there, the doctor looked at us and kicked us out, and we went to the station." (Deposition of Christopher Newman, Exh. K, 53:20-25).

Regardless, elbow strikes to the head are likely to cause great bodily harm. (Exh. G, 56:14-20; 57:8-14). For that reason, an allegation of a bite or attempted bite would not justify elbow strikes to the head. See *infra*, ¶¶ 101-02, 108.

26-28. Denied that Docher bit Newman or Mangrum, or that an allegation of a bite or attempted bite would justify elbow strikes to the head. See *supra*, ¶ 25.

29. Denied. While on the ground Docher acted in lawful self-defense and did not resist arrest. (See ¶ 7, Plaintiff's Response to Statement of Material Facts by Defendant Rosario). The videotape also shows that Docher (while he is pinned down) moved his legs in response to the unlawful use of force. (Exh. F; see Exh. M, cell phone videotape of Shaun Mahonney - location # 2).

Denied that Docher was resisting arrest when he stated "I'm getting up." Docher stated "I'm getting up" in response to Mangrum pulling upwards on Docher's tee shirt and stating (on videotape), "Get up." (Exh. F).

30. Admitted that Robinson struck Docher with a closed fist.

Otherwise, denied. See *supra*, ¶ 29.

31. Denied. See *supra*, ¶ 29. Mangrum's conduct in raising Docher's arms 90 degrees behind his back contributed to Docher's asphyxiation. Unless deadly force was reasonable (and it was not), the act of asphyxiating Docher was unreasonable. (See ¶ 90, Plaintiff's Response to Statement of Material Facts by Defendant St. Lucie County Fire District).

32. Denied that the deputies exercised "control." Docher was unconscious due to asphyxiation. (See ¶¶ 89-92, Plaintiff's Response to Statement of Material Facts by Defendant St. Lucie County Fire District). Asphyxiation is excessive force, not "control."

Agreed that after Docher was asphyxiated in unconsciousness, the deputies "backed off and walked around." (Deposition of John Sterba, M.D, Exh. N, 224:17-22).

33. Denied. Courtemanche was aware the deputies were using force against Docher, and directed all the witnesses out of the area. Courtemanche ordered Shuan Mahonney to stop video recording the deputies and subsequently handcuffed Mahonney when he failed to turn over his cell phone. (See *infra*, ¶¶ 96-98).

34. Denied. Docher's face was still actively bleeding at the time Rosario arrived, so it could not be cleaned. (Exh. J, 139:23-25). Admitted the deputies called fire-rescue.

35. Denied. At the time the paramedics arrival, Docher was unconscious. He was not kicking, spitting, or trying to sit up. See *supra*, ¶ 32. Rosario testified that he could not "tell whether Docher was conscious or not," but does allege that Docher was "making noises and struggling with the officers." (Exh. J, 70:14-17).

36-39. Agreed that Sinclair and the deputies attempted to place Docher on a backboard without first applying soft restraints, including both ankles. (Exh. N, 128:8-23 - 129:1-8).

The remainder of the allegations in ¶¶ 36-42 do not concern only the conduct of Rosario and St. Lucie Fire District, not the Sheriff or deputies. As to the conduct of Rosario and the St. Lucie Fire District, see Plaintiff's responses to the Statements of Material Facts by Defendants Rosario and St. Lucie Fire District.

40-42. Agreed. When Rosario assessed the patient he did not have a pulse. (Exh. J, 90:12-19).

Rosario testified that the cardiac arrest was caused by Mangrum stepping on Docher's back. (See ¶ 69 of Plaintiff's responses to the Statement of Material Facts by Defendants Rosario).

43. *Testimony of Merine Kanhai* . . . . Merine Kanhai went to the CVS with her 16 year old daughter. (Deposition of Merine Kanhai, Exh. H, 8:2-3). As she pulled into the parking lot, she observed three deputies were "holding down this black guy on the ground" while one of his arms was underneath his body. (Exh. H, 6:17-21, 7:3-5; 9:9-12). From a distance of 20-25 feet, Kanhai observed a white deputy by Docher's head area use "maybe two" elbow strikes to Docher head and face; there was bleeding. (Exh. H, 9:4-5; 9:9-12, 9:22-25 - 10:1, 10:23-25 - 11:1; 11:15-18; 12:4).

44. Docher was saying "don't let them kill me," and the deputy was saying "stop resisting." (Exh. H, 10:7, 11:9-10).

45. Docher did not attempt to bite any of the deputies. (Exh. H, 11:19-21).

46. Kanhai spoke with Shaun Mahoney and his girlfriend. "They were saying that why would the officer beat[] him up like that, that looks like police brutality to me." (Exh. H, 14:24-25-15:1-2).

47. The force seemed unnecessary and excessive. (Exh. H, 25:3-6; 25:14-18).

48. *Testimony of Adriana Kanhai* . . . . Kanhai testified: "I remember there was an officer that was by his head. And, like, I remember the elbows, like, being knocked into him." (Deposition of Adriana Kanhai, Exh. O, 7:6-9). There was blood "gushing . . . on his face." (Exh. O, 9:18-21).

49. When Docher was on the ground and the deputies were on top of him, he was not moving. (Exh. O, 13-15).

50. Docher was saying "please don't let them kill me;" the deputy said "stop resisting." (Exh.

O, 9:16-18).

51.    "They were basically, like, beating at him and he was in handcuffs." (Exh. O, 13:19-22). Docher was handcuffed and not a threat; the force seemed unnecessary and excessive. (Exh. O, 14:2-5; 14:12-16; 14:17-21; 14:23-25-15:1-2; 17:2-4).  It was police brutality. (Exh. O, 15:7-10).

52.    *Testimony of Shannon-Marie Denise Randolph* . . . . Randolph was at CVS with Shaun Mahoney and her 10-year old nephew. (Affidavit of Shannon-Marie Denise Randolph, Exh. P, p. 1, ¶¶ 1-2).

53.    As they were leaving the store she observed Tavares Docher being beaten really badly by the police.  Shaun Mahoney began videotaping.  Tavares Docher looked right into my eyes and said "they are going to kill me, don't let them kill me."  He was begging for his life. (Exh. P, p. 1-2, ¶ 4). 54.    As soon as the police noticed that Mahoney, Randolph, and her nephew were watching they started repeating: "Stop resisting!" "Stop resisting!"  It did not look like Docher was resisting at all.  (Exh. P, p. 2, ¶ 5).

55.    At one point Randolph observed that Tavares Docher's arms were almost at a ninety degree angle going upwards, in an unnatural position.  It forced his body was up off the ground like a snake. He was screaming in pain and there was so much blood.  (Exh. P, p. 2, ¶ 6).

56.    They were then moved away by an officer who told them were not allowed to be there. (Exh. P, p. 2, ¶ 7).  A police officer subsequently approached and demanded Shuan Mahoney's phone and threatened to arrest him if he did not hand it over. (Exh. P, p. 2, ¶ 8).

57.    *Testimony of Leah Nicole Boles* . . . . Boles had just started her shift at CVS when Docher came to the cash register and purchased a Black and Mild. (Exh. E, p. 1, ¶¶ 1-4).  Docher did not engage in any criminal conduct. (Exh. E, p. 2, ¶ 5).  He made no threats, and was not cussing. (Exh. E, pp. 1-2, ¶ 4).  He was just acting confused. (Exh. E, p. 1, ¶ 4).

58.    The police arrived. (Exh. E, pp. 1-2, ¶ 4).  When Boles looked outside she "did see that [Docher's] face was getting beat by the police. [Boles] felt that it was wrong." (Exh. E, p. 2, ¶ 6).

58.    *Testimony of Clay Mangrum* . . . . Upon initial contact Docher was more animated than a normal person and talking very fast. (Exh. C, 26:12-14). Mangrum asked Docher to drop the screwdriver he was holding, and Docher complied.  (Exh. C, 27:9-10; 37:9-15).

59.    The possession of the screw driver was not a crime. (Exh. C, 35:3-5).  When Newman arrived he moved the screwdriver further away from Docher. (Exh. C, 35:16-19).

60.    Docher admitted drinking Natural Ice beer. (Exh. C, 29:6-7).

61. Docher never exhibited signs of excited delirium. (Exh. C, 24:1-19). "[Y]ou could say [he] was emotionally unstable at that point. If it's through the alcohol, any type of emotional behavioral or mental disability, at that point I don't know." (Exh. C, 38:16-19).

62. Docher was not "a direct threat to other people." (Exh. C, 43:4-5). He was arrested for "disorderly intoxication" because the CVS parking lot is "open to the public;" there is no "gated access" to the parking lot "or anything like that." (Exh. C, 45:6-23; 71:11-17).

63. Mangrum explained: "[W]e're in a public parking lot; it's already caused some disturbance to the business that we could see where onlookers, people walking around us, were taking up half a parking lot." (Exh. C, 41:8-13).

64. Docher was handcuffed by Newman and placed inside Newman's vehicle. (Exh. C, 44:22-24, 47:9-10). He then alighted from the vehicle and "there was a brief struggle, and then an attempt to push him back in." (Exh. C, 49:9-12).

65. Mangrum's "biggest concern is, he's trying to run," since Docher claimed he was "being chased, and people are actively trying to kill him." (Exh. C, 50:23-25-51:1-3).

66. Mangrum "tied to hold his head still towards the ground." (Exh. C, 51:19-20). Mangrum explained: "I could feel him trying to shake my hand. And his face is on the asphalt. And this is having no normal effect. There is no [ouch], my face hurt[s]. And he's grinding his face, so I would try to put more pressure to stop his movements." (Exh. C, 52:18-20).

67. Docher then tried to bite Mangrum's finger. (Exh. C, 52:18-20). Mangrum explained: "[H]is lips were actually on my finger." (Exh. C, 56:5-6). That is when Mangrum "dropped my forearm down to push his face– to strike his face away from my hand, and then try to regain control – try to regain control over his head." (Exh. C, 52:22-25).

68. Newman had gloves on and "took over control over the head." (Exh. C, 57:4-5).

69. Mangrum used an elbow strike against Docher. (Exh. C, 59:18-25- 60:1). He also used hand strikes to the large muscle areas. (Exh. C, 62:5-6). Mangrum also observed another deputy use an elbow strike, but doesn't recall where. (Exh. C, 59:9-10). Robinson was also striking Docher in his leg for pain compliance. (Exh. C, 19-23).

70. Mangrum never told Newman not to use elbow strikes on Docher's head. (Exh. C, 59:18-19)

71. When Courtemanche arrived Mangrum told him to "make sure nobody is close." (Exh. C, 63:19).

72. Mangrum placed Docher on his side in "the recovery position" after he became "completely unresponsive. His rapidness just went to almost nothing." (Exh. C, 75:25-76:1). Mangrum "could still feel his pulse, and still hear him breathing lightly, and see his stomach moving. And he was calm at that point." (Exh. C, 76:1-8).

73. Towards the end, Mangrum admits placing his foot on Docher's back. (Exh. C, 79:19-23; 80:7-8). That technique "doesn't have a name." (Exh. C, 3-4). It "was improvised." (Exh. C, 81:17-18).

74. Mangrum pulled Docher's arms and handcuffs upward "because at that point he's already injured," and "[t]o keep him from causing further injury to himself." (Exh. C, 80;15-18). Mangrum explained: "Now, if I hold his arms out straight without applying any counterforce to keep his body still, he's going to be able to flail about still and cause injury and damage to his shoulders just being held with his arms out. So I applied some pressure–counterpressure with my foot to keep his arms out straight and his body still, so he couldn't injure himself any further." (Exh. C, 80:20-25-81:1-2).

75. Mangrum had been issued rope that could be used as a hobble, but testified that he didn't have time to get it from the trunk of his vehicle. (Exh. C, 83:21-25-84:1-16).

76. When Deputy Alonge and Deputy Favale arrived on scene, Mangrum stood up and walked away and let the other deputies take over. (Exh. C, 74:6-12; 74:9-12). Mangrum was concerned about Docher's blood pressure when he "noticed the blood on the ground." (Exh. C, 11-13). 77. Docher than "came back" and "sat forward," and Mangrum observed "a kicking motion." (Exh. C, 19-20). "[O]ne of the paramedics go backwards and landed on his butt." (Exh. C, 20-21). There was "some struggle to hold him down," and then he "just went calm again." (Exh. C, 76:23-25-77:1). Docher was then held in position so the paramedics could safely administer the injection in his buttocks. (Exh. C, 77:1-12).

78. *Testimony of Calvin Robinson* . . . . Robinson was a trainee at the time of the incident working under Mangrum's supervision. (Deposition of Calvin Robinson, Exh. G, 20:1-2, 20:19-21).

79. Initially, Docher's demeanor was "pretty calm and collected" and he "seemed somewhat relieved we were there." (Exh. G, 41:20-21, 44:22-24).

80. Robinson picked up the screwdriver and conducted a pat-down search on Docher. (Exh. G, 37:4-7).

81. Newman arrested Docher for disorderly intoxication. (Exh. G, 37:24-25-38:1). Robinson didn't know if Docher was drunk, delusional, or a combination of both. (Exh. G, 49:11-15).

82. After Docher was seated in the police car, he "started to stand up." Robinson placed his hand on Docher's forehead but Docher lunged forward out of the car, and Robinson moved out of the way. Newman and Mangrum "were being pushed back," at which time Robinson stepped to the side and gave Docher "two strikes to the outer muscle of his leg, and took his feet from underneath him." At that point, ""[w]e fell to the ground. (Exh. G, 38:5-20).

83. Robinson knew from his training and experience that elbow strikes to the head are likely to cause great bodily harm. (Exh. G, 56:14-20; 57:8-14).

84. If Robinson had seen elbow strikes to Docher's head he would have told Newman to stop because "there is just no need to hit somebody while they're on the ground handcuffed and struggling." (Exh. G, 58:5-10; 58:25-59:1-5).

85. Robinson never told Newman or Mangrum to stop striking Docher. (Exh. G, 60-23-25-61:1-4).

86. *Testimony of Christopher Newman* . . . .Docher denied using drugs but "agreed that he would go see a doctor." (Deposition of Christopher Newman, Exh. K, 41:24-25 - 42:1-3; 61:16-20).

87. Newman obtained an instructor's certificate on excited delirium. (Exh. K, 24:1-8). It was never Newman's opinion that Docher was experiencing excited delirium. (Exh. K, 37:5-8). Docher was paranoid, and Newman believed "he just needed help." (Exh. K, 37:9-13).

88. When the fell to the ground, Newman placed his hand on Docher's head to hold him down. (Exh. K, 50:20-24).

89. The situation on the ground started "another minute" prior to the start of the cell phone videotape. (Exh. K, 63:14-15).

90. Newman admits striking Docher in the head one time with his elbow. (Exh. K, 51:4-5). Newman denies that an elbow strike to the head, nose, or jaw is likely to cause great bodily harm. (Exh. K, 17:11-17; 18:1-15; 18:25-19:1-6).

91. Newman did not witness any other deputy strike Docher. (Exh. K, 58:3-8).

92. Because of the angle of the videotape, "you can't really see [Docher] moving around a lot." (Exh. K, 65:18-21).

93. Newman has no explanation for Mangrum placing his foot on Docher's back, stating: "You would have to ask him." (Exh. K, 67:9-15).

94. Newman does not have any explanation for the pool of blood. (Exh. K, 63:16-17).

95. *Police Report of Detective Joseph Trevisol* . . . . Detective Joseph Trevisol wrote in his sworn

police report that "Deputy Newman . . . said Docher was able to say who and where he was; therefore, they did not see Baker Act as a means to the end. Deputy Newman told Docher to put his hands behind his back that he was under arrest for disorderly intoxication, due to him being intoxicated and causing a disturbance. (Exh. A, Incident Reports, p. 6).

96.     *Testimony of Wade Courtemanche* . . . . When Courtemanche arrived on scene the deputies "were using strikes, and thinks like that, to get [Docher] to comply." (Deposition of Wade Courtemanche, Exh. Q, 18:11-19). Courtemanche recalls that "Robinson delivered a strike to [Docher's] leg." (Exh. Q, 5:6-7).

97.     Courtemanche was told by Mangrum to tell Shaun Mahoney to step back. (Deposition of Wade Courtemanche, Exh. Q, 8:12-15; 9:4-6). Courtemanche directed Mahoney "to stop taping and to get back." (Exh. Q, 9:7-11). There was no specific reason why Courtemanche told Mahoney to stop taping. (Exh. Q, 9:12-23). It is not a crime for a person to use their cell phone to record police officers. (Exh. Q, 10:7-10).

97.     Courtemanche subsequently observed Mahoney hiding behind a pillar, filming. (Exh. Q, 29:15-16; 30:4-5). Courtemanche told Mahoney: "Hey, I told you once: If you're done with your business here at CVS, then leave." (Exh. Q, 29:23-25 - 30:1). Courtemanche added: "If you're shopping, shop. If you're not, go." (Exh. Q, 29:18-20).

98.     After Docher was transported from the scene, Courtemanche tried to take Mahoney's cell phone. (Exh. Q, 10:20-25 -11:1). When Mahoney refused to turn over the phone, he placed him in handcuffs. (Exh. Q, 11:16-25 - 12:1). Afer Mahoney was handcuffed he stated that his girlfriend had the phone in her purse. (Exh. Q, 11:16-25 - 12:1). Courtemanche asked the girlfriend for the phone, and she complied. (Exh. Q, 12:2-3).

99.     *Testimony of Mel Tucker* . . . . It is Tucker's opinion that "no crime" occurred. (Deposition of Mel Tucker, Exh. L, 15-17). Any reasonable officer should have seen this was a medical emergency, "not an arrest situation." (Exh. L, 68:13-17; 85:13-14).

100.    If Docher did commit any crime, it was disorderly intoxication; "a minor crime," a second degree misdemeanor. (Exh. L, 53:17-23).

101.    Tucker testified: "No reasonable officer would consider an unarmed person who's handcuffed as an immediate threat of serious bodily harm or death to the officer under the set of circumstances there." (Exh. L, 64:12-15).

102.    Tucker "served three and a half years as vice-chairman of the Criminal Justice Standards and

Training Commission in Florida." (Exh. L, 51:12-19).  Everywhere Tucker trained, including the FBI, elbow strikes to the head area are considered deadly force because they are "likely to cause serious bodily injury or death to the person who it's used against, typical subdural hematomas . . . the blood between the brain and the skull result from those kind of blows."  (Exh. L, 57:4-13).

103.    Newman admitted two elbow strikes and Mangrum admitted one. (Exh. L, 51:20-23).  The elbow strikes were the equivalent of a baton strike and constitute excessive force.  (Exh. L, p. 51:4, 56:13-22).  Tucker explained that because "there were at least three deputies here capable and available to deal with Docher, who was handcuffed . . . , an elbow strike is not reasonable."  (Exh. L, 65:9-11).

104.    Robinson and Mangrum both observed the elbow strikes by Newman and did not intervene. (Exh. L, 101:21-25 - 102:1-9).

105.    Mangrum's stepping on Docher's back was also excessive force.  (Exh. L, 52:22-25 - 53:1-2).  "Officer [are] taught that if a person is on their stomach handcuffed, they may have trouble breathing.  Robinson says that in his deposition. (Exh. L, 94:15-25).  A person who is in a prone position and unable to breathe will try and push themselves up.  That is not resisting; it is simply "the physiology of a struggle."  (Exh. L, 65:24-25 - 66:1-3).

106.    "[O]fficers have been trained for 20 years, 25 years, not to place a person in the prone position with their hands cuffed behind their back with compression on them, because people will die if you do that."  (Exh. L, 100:3-7).  With three deputies on scene, Docher should have been placed "in the recovery position, which is put him on his side and hold him . . . so he could breath." (Exh. L, 96:7-12; 97:4-6).  Mangrum weighed 300 pounds and Newman weighed 205 pounds. (Exh. L, 121:23-25 - 122:1-4).  The compression weight of the deputies "is the recipe" for asphyxia. (Exh. L, 97:10-12).

107.    Tucker explained: "So the elbow strikes and the compression in the prone position with hands cuffed behind the back are my issues . . . with what they did."  (Exh. L, 53:3-14).

108.    An allegation of a bite or attempted bite would "absolutely not" justify deadly force. (Exh. L, 61:1-5).  Otherwise, "they should've just jumped back and drew their weapons and shot and killed him.  For sure, that's the way to deal with deadly force."  (Exh. L, 61:23-25).

**DATED** this __26th__ day of October, 2017.

/s/ DARRYL L. LEWIS
DARRYL L. LEWIS
Florida Bar No.: 818021
Attorney E-Mail(s): dll@searcylaw.com and
axs@searcylaw.com
Primary E-Mail:  lewisteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 383-9485
Attorney for Plaintiff(s)

By: *s/. Hugh L. Koerner*
Hugh L. Koerner
Florida Bar No.: 716952
Email: hlklaw@hughkoerner.com
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone:  (954) 522-1235
Facsimile:   (954) 522-1176
*Attorneys for Plaintiff(s)*

## CERTIFICATE OF SERVICE
### Case No.: 16-14413-Civ-ROSENBERG/MAYNARD

I HEREBY CERTIFY that this __26th__ day of October, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *s/. Hugh L. Koerner*
Hugh L. Koerner

**Service List**

Summer M. Barranco, Esquire
summer@purdylaw.com; melissa@purdylaw.com
Purdy Jolly Giuffreda & Barranco, P.A.

2455 E Sunrise Boulevard, Suite 1216
Fort Lauderdale, FL 33304
Phone: (954)-462-3200
Fax: (954)-462-3861
*Attorneys for Christopher Newman, individually, Claylan Mangrum, individually, Calvin Robinson, individually, Wade Courtemanche, individually, Ken J. Mascara, as Sheriff of St. Lucie County, Florida*

Benjamin W. Newman, Esquire
Ben.Newman@wilsonelser.com; Leah.Rover@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 N Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 203-7592
Fax: (407) 648-1376
*Attorneys for Jose Rosario, individually, and the St. Lucie County Fire District, an independent special district*