UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:   16-14413-Civ-ROSENBERG/MAYNARD

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

        Plaintiff,

vs.

CHRISTOPHER NEWMAN, et. al.

        Defendants.
_____/

## PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL FACTS BY DEFENDANT ROSARIO [DE 100]

**COMES NOW** the Plaintiff, TAVARES DOCHER, by and through JANICE DOCHER-NEELEY, his mother and legal guardian, (hereinafter "Docher") by and through their undersigned attorneys, and submit the following response to the Statement of Material Facts filed by Defendants ROSARIO [DE 100]:

1. Denied that it was a 911 hangup call (to wit: 911 is dialed and there are no words spoken and the caller hangs up or the call is otherwise dropped). The CVS videotape shows "Docher speak[ing] into the phone for a minute and then hands it to Boles who then gives it to the Brown." ( Exhibit B, security videotape of CVS cash register; Exhibit A, Incident Reports, p. 27).

    Agreed, otherwise.

2-6.    Agreed.

7.    Denied. According to Shannon-Marie Denise Randolph, it did not look like Docher was "resisting at all." (Exhibit P, p. 2, ¶ 5). Docher was handcuffed behind his back and acted in lawful self-defense to the deputies excessive use of force. Dyer v. Lee, 488 F.3d 876, 879, 884 (11th Cir. 2007) (explaining that persons are entitled to act in self-defense since any other result would allow the use of excessive force by a police officer free of fear of civil liability under § 1983); State v. Holley, 480 So.3d 94, 96 (Fla. 1985) (under Florida law a person has the right "to defend himself against unlawful or excessive force, even when being arrested).

    Adriana Kanhai testified that when Docher was on the ground and the deputies were on top of him, he was not moving. (Exhibit O, 13-15). "They were basically, like, beating at him and he

was in handcuffs." (Exhibit O, 13:19-22). Docher was handcuffed and not a threat; the force seemed unnecessary and excessive. (Exhibit O, 14:2-5; 14:12-16; 14:17-21; 14:23-25-15:1-2; 17:2-4). It was police brutality. (Exhibit O, 15:7-10).

     Merine Kanhai arrived with her daughter Adriana Kanhai in the same vehicle. (Exhibit H,, 8:1-3). They arrived early enough to see one of Docher's arms still underneath him. (Exhibit H, 9:9-12). Docher was laying on his belly. (Exhibit H, 4-5). A police officer was by Docher's head elbowing him in the right side of his face. (Exhibit H, 9:4-6, 23-25). Docher never attempted to bite any of the deputies. (Exhibit H, 11:19-21).

     Kanhai was questioned whether Docher was "pushing up" (when he was on his belly) and testified that "[w]ell, his legs were flying because they were trying to restrain him and his legs were flying." (Exhibit H, 10:2-8; Exhibit F, cell phone videotape of Shaun Mahonney - location # 1).

8-9.    Agreed.

10.    Denied. After Docher was rendered unconscious, Mangrum placed Docher in the recovery position (i.e., on his side). The deputies then walked away and waited for Fire Rescue to arrive. (See *infra*, ¶ 93).

11.    Agreed that Trevisol's report states that "Newman suffered injuries to his elbow, knee, and just under his left eye."

     Otherwise denied. There are no corresponding medical records, and according to Rosario the only reported injury was a police officer who "asked for a Band-Aid or something, and I think he had a scuff on his elbow." (Deposition of Jose Rosario, Exhibit J, 128:3-5). Newman went to the hospital, but not to seek medical care. Newman testified: "I did go to the hospital. But Tavares was already in a different room. If I remember right, he was already in a different room; they had already brought him in. And we just went there, the doctor looked at us and kicked us out, and we went to the station." (Deposition of Christopher Newman, Exhibit K, 53:20-25).

12-13.    Agreed.

14.    Denied. Time stamps are included on the CVS videotape, and show the same events recorded on the cell phone videotape. (Exhibit I). For that reason, the time of the events on the cell phone video are ascertainable, at least to the extent the time stamps on the CVS videotape are accurate. (Deposition of John A. Sterba, M.D., N, 210:18-23 - 211:1-20; 214:10-20; 215:1-13).

     Agreed, however, to the extent that there is no way to know whether the time stamps on the CVS video and the times listed in the records (for both police and Fire Rescue) are synchronized

with the time stamps on the CVS videotape.

15-20.   Agreed.

21.   Denied.  Rosario admits the times listed in his report "are approximate[s]." (Exhibit J, 124:3-23; Exhibit N, 119:2-8).

22.   Denied. See *supra*, ¶ 21.  Dr. Sterba explained: "He really didn't assess any of this at 18:36 on page 1 of 6 for the emergency probe, carotid pulse, radial pulse, brachial pulse, femoral pulse not assessed times four." (Exhibit N, 118:21-23 - 119:1).

23.   Denied that Rosario performed an appropriate assessment of the patient prior to the administration of Ativan.  See *supra*, ¶ 22. Sterba explained: "[W]e teach EMTs and paramedics try to get a radial pulse, if they have a pulse, if something is abnormal there. He did get somehow. But it's required to determine whether or not somebody is stable before you make a determination to give Ativan. He did not have stability at all. He was unstable and in critical condition." (Exhibit N, 119:13-19).   Sterba testified:

> Q:   Are you talking about hemodynamic stability?
>
> A.   Hemodynamic stability looking at blood pressure, looking at the quality of the pulse and the capillary refill, which is prolonged because we do have a capillary refill greater than 2 seconds about four minutes later. So things are all abnormal but incomplete.
>
> Q.   Do you have any opinion as to if his blood pressure was taken at 18:38 what that blood pressure would be?
>
> A.   No. I can't say with medical certainty that it was normal or abnormal. It was just missed. And for Rosario to know that low blood pressure is a contraindication, and that is what he put on his test [during his training], and that is what you see throughout all of these protocols. He needed to measure the blood pressure.

(Sterba, N, 119:20-23 - 24:1-14).

24.   Denied.   The police report of Michael Favale indicates that he arrived on scene at 18:28 hours.  (See Exhibit A, p. 15, Incident Reports).

25.   Denied.  Newman testified that Docher admitted to drinking alcohol and that the paramedics were specifically informed Docher had been drinking alcohol.  (Exhibit K, 60:2-19; 61:8-9). Newman explained: "My job was to let them know that he had been drinking." (Exhibit K, 60:12-13).

Mangrum testified that Docher admitted drinking Natural Ice beer and was arrested for "disorderly intoxication. (Exhibit C, 29:6-7; 45:6-23; 71:11-17).

Finally, Robinson smelled alcohol on Docher's breath. (Exhibit G, 47:8-9).

26. Denied. Rosario admitted that a police officer informed him that Docher had been drinking alcohol. (Exhibit J, 61:11-14).

27. Denied. According to Adriana Kanhai, there was blood "gushing . . . on [Docher's] face." (Exhibit O, 9:18-21). When the paramedics arrived, Sinclair testified that there was "a large pool of blood around [Docher's] head." (Exhibit R, 8:19-21).

24. **[The statement of facts [DE 100] includes paragraphs 24, 25, 26, 27, followed by paragraphs 24, 25, 26, and 27]**. Denied. Sinclair testified that Docher had blood in the mouth and nose and was spitting blood from his mouth. (Exhibit R, 13:6-8; 43:11-15).

25. Agreed.

26. Denied. Docher was only active when the deputies stopped applying pressure. Sinclair testified that Docher "was only calm when pressure was put on him by the deputies." (Exhibit R, 31:18-22). Rosario testified that when Docher "relaxed, they would pull off of him. And as they started trying to move him or do something with him, he would start thrashing again, so they would get back on him. (Exhibit J, 151:17-20).

27. Agreed. Sterba testified that "[h]e did get 110 somehow." (Exhibit N, 119:15) Denied that the patient was stable. (Exhibit N, 119:18-19) To the contrary, Sterba testified the patient was "unstable and critical." (Exhibit N, 119:18-19).

28. Agreed that Sinclair and the deputies attempted to place Docher on a backboard. Denied that Docher should have been moved to a backboard without first applying soft restraints. (Exhibit N, 128:8-23 - 129:1-8).

Sinclair and the deputies tried to place Docher on the backboard while he was still handcuffed behind his back. (R, 28:20-25). As Sterba explained, Rosario

> never went ahead with any EMS approved physical restraint. He is on his back on the ground with handcuffs behind his back, which may have been somewhat painful. He comes around and he kicks the paramedic. At that point high flow oxygen, getting soft restraints applied to the legs so that nobody else gets kicked. You have three deputies there that could have pressed above his knees, getting the four points started on both ankles, keeping him cuffed, moving the arms over to one side to put soft restraints on one wrist and either leaving him like that or preferably unlocking the handcuffs and bringing the other hand around and reapplying either the handcuffs

> with all four point restraints applied with the police officer present. That is what was needed. And that was completely skipped over. And once those restraints are applied and he is not moving around on the gurney that much, you can try to apply oxygen and maybe even get a pulse ox on the finger. I've done it. And it needed to be done. It's against the US standard of practice to launch straight into the wrong drug and the wrong dose and cause this problem.

(Exhibit N, 128:8-23 - 129:1-8).

29.     Agreed. See *supra*, ¶ 28. As Sinclair testified, the only time Docher "was only calm when pressure was put on him by the deputies." (Exhibit R, 31:18-22).

30.     Agreed. See *supra*, ¶ 28. Sinclair and the deputies attempted to place Docher on a backboard without first applying soft restraints, including both ankles. (Exhibit N, 128:8-23 - 129:1-8).

31.     Agreed that Rosario administered 4 mg Ativan. Otherwise, denied.

Four point EMS approved restraints were "medically necessary." (Exhibit N, 139:9-11). "[F]our point restraints . . . would have solved the situation." There would have been no need for "any Ativan." (Exhibit N, 139:14-16). It was completely avoidable. It was with reckless disregard that approved four point soft restraints were not applied. (Exhibit N, 128:8-23 - 129:1-8). See *infra*, ¶¶ 94-99.

There were five contraindications for the use of Ativan. (Exhibit N, 170:5-8). If a patient has "a problem with head trauma or metabolic acidosis you don't give the drug. It's a contraindication." (Exhibit N, 38:13-19). Docher sustained "bilateral nasal bone fractures," likely from the initial use of force when he was taken to the ground while handcuffed behind his back. (Exhibit N, 232:13-16). That is the "standard of care" for paramedics. (Exhibit N, 38:10-19; 40:2-6). See *infra*, ¶¶ 87- 88.

32.     Denied that the guideline allows for incremental administration of Ativan, i.e., "Ativan 1 mg increments to a max of 4 mg." (See DE 101-7, p. 6). Rosario "went straight to the 4 milligrams and not the 1 milligram with reassessment increments." (Exhibit N, 190:6-10).

In addition, Rosario should not have used chemical restraints where four point physical restraints were "medically necessary." (Exhibit N, 139:9-11). See *infra*, ¶¶ 96-98.

33.     Agreed that the guideline states: "Ativan 1 mg increments to a max of 4 mg." (See DE 1-1-7, p. 6). Rosario "went straight to the 4 milligrams and not the 1 milligram with reassessment increments." (Exhibit N, 190:6-10).

34.     Agreed. The guidelines do not address the administration of Ativan to patients with a history

of alcohol use or mental illness (Exhibit S, 40:13-22).

Additionally, Rosario testified that he does not know whether alcohol is a central nervous system depressant and he did "not have training on the interaction of alcohol and Ativan. (Exhibit J, 23:4-7; 31:4-5). However, the textbook that Rosario used at Indian River State College [warned] that the combination of alcohol and Benzodiazepine can be fatal. (Exhibit N, 172:16-20).

35. Agreed. The contraindications for Ativan include substance abuse, as well as "[h]ypotension, respiratory depression, head trauma, metabolic disturbances including hypoxia, which can lead to lactic acidosis making the heart very unstable, [and] shock." (Exhibit N, 37:20-23 - 38:1-2; (Exhibit N, 170:5-8). Rosario was informed by a police officer that "the patient is on something because he was so strong." (Exhibit N, 92:18-20). Thus, substance abuse ("on something") was indicated. (Exhibit N, 92:18-20).

While Ativan is not contraindicated for patients with a history of alcohol use, it is a listed "drug interaction." (Exhibit N, p. 437). The United States Department of Heath & Human Services has oversight authority for the United States Food & Drug Administration. (Exhibit N, 344:20-23) In its regulations for Ativan, the FDA lists "alcohol" (or "ethal alcohol") as a "drug interaction." (Exhibit N, p. 437). The FDA warning provides: "**Drug Interactions** ATIVAN Injection, like other injectable benzodiazepines, produces additive depression of the central nervous system when administered with other CNS depressants such as ethyl alcohol, phenothiazines, barbiturates, MAO inhibitors, and other antidepressants." (Exhibit N, p. 437).

The textbook that Rosario used at Indian River State College [warned] that the combination of alcohol and Benzodiazepine can be fatal. (Exhibit N, 172:16-20).

36. Agreed. However, the textbook that Rosario used at Indian River State College [warned] that the combination of alcohol and Benzodiazepine can be fatal. (Exhibit N, 172:16-20).

37. Agreed. However, Rosario admits the times listed in his report "are approximate[s]." (Exhibit J, 124:3-23; Exhibit N, 119:2-8).

38-43. Agreed.

44. Agreed. However, Rosario noted a "[l]aceration . . . to the right side of the head with minimal bleeding." (Exhibit N, 67:23-25). Docher sustained "bilateral nasal bone fractures." (Exhibit N, 232:13-16). If a patient has "a problem with head trauma or metabolic acidosis you don't give [Ativan]. It's a contraindication." (Exhibit N, 38:13-19). That is the "standard of care" for paramedics. (Exhibit N, 38:10-19; 40:2-6).

45.     Agreed.  Rosario described the patient as "nonverbal." (Exhibit J, 70:9-11).  Docher was "making noises and struggling with the officers." (Exhibit J, 70:17).  Docher was also spitting blood from his mouth. (Exhibit R, 13:6-8; 43:11-15).

46.     Agreed.  However, Docher sustained "bilateral nasal bone fractures." (Exhibit N, 232:13-16).  Rosario was aware that Docher was "making noises and struggling with the officers." (Exhibit J, 70:17).  He was also spitting blood from his mouth. (Exhibit R, 13:6-8; 43:11-15).

*[Docher adopts and incorporates his additional statements of fact included at the end of his responses to Defendant St. Lucie County Fire District's statement of material facts and Defendants Sheriff, Newman, Mangrum, Robinson, and Courtemanche's statement of material facts].*

47.     *Testimony of Calvin Robinson* . . . . When the paramedics arrived, Robinson had a "quick conversation" with Rosario.  (Deposition of Calvin Robinson, Exhibit G, 66:14).  Robinson explained that Docher was taken down to the ground by the deputies and "hit his head, and that's where the blood came from."  (Exhibit G, 66:17-20).

48.     Robinson observed Rosario speak with Docher, and ask: "Hey man, what's up?  How can we help you?"  Rosario did not ask Docher any other questions.  (Exhibit G, 67:7-10, 67:19-21).  Docher "didn't respond" to Rosario. (Exhibit G, 68:3-4)

49.     *Testimony of Christopher Newman* . . . . Upon their arrival, Newman informed a paramedic that Docher had been drinking, but had denied taking any medications or illegal drugs.  (Deposition of Christopher Newman, Exhibit K, 59:22-24; 62:6-15).

50.     *Testimony of Jose Rosario* . . . . Rosario has been a paramedic since 2007.  (Deposition of Jose Rosario, Exhibit J, 7-12).  During that time, he has administered Ativan fifty to 200 times or more.  Rosario administered the maximum dosage of 4 milligrams in one single dosage "[p]ossibly half that time." (Exhibit J, 34:2-13).

51.     The "protocol" states that a paramedic can administer 1 milligram to 4 milligrams of Ativan with the approval of a physician. (Exhibit J, 32:13-18).

52.     Rosario does not know whether alcohol is a central nervous system depressant and he did "not have training on the interaction of alcohol and Ativan. (Deposition of Jose Rosario, Exhibit J, 23:4-7; 31:4-5).

53.     Rosario himself decides whether to administer 1 milligram or 4 milligrams. (Exhibit J, 38:10-12).  He does not need a physician's approval since paramedics "work under a physician's license" and the "[p]rotocols give us parameters."  (Exhibit J, 38:13-18).

54. The only contraindication to Ativan is hypersensitivity. (Exhibit J, 38:19-21).

55. According to Rosario, the protocol stating *Aivan 1 mg increments to a max of 4 mg* actually means that paramedics may administer 4 milligrams to a patient in one single dosage without consulting with a physician. (Exhibit J, 53:6-20).

56. Rosario arrived on scene at 18:34 hours in response to a traumatic injury. (Exhibit J, 57:21-22; 59:20-22). A police officer "asked for a Band-Aid or someting, and I think he had a scuff on his elbow." (Exhibit J, 128:3-5).

57. Rosario performed his assessment at 18:36 hours. (Exhibit J, 69:20-21). A police officer informed Rosario that Docher had been drinking alcohol. (Exhibit J, 61:11-14). The patient was handcuffed and on the ground. (Exhibit J, 75:14-17; 76:23-24). There was a puddle of blood by the patient's head. (Exhibit J, 61:21-25 - 62:1). The patient was nonverbal, so no patient history could be obtained. (Exhibit J, 66:5-20; 67:10-11; 70:9-13).

58. Rosario does not know whether Docher was conscious or unconscious, but he was "making noises and struggling with the officers." (Exhibit J, 70:14-17). Vital signs were not obtained "[b]ecause he was still active with the sheriffs' department," and as such, "the scene was not conducive for me to make any contact with him." (Exhibit J, 77:14-20). Rosario claims that breathing quality was abnormal, i.e., "higher than normal." (Exhibit J, 70:14-17; 73:21-23). There was active bleeding from the nose and chin. (Exhibit J, 139:23-25). Rosario could not tell "if the blood came directly from the mouth. If it came out of the nose, it might have spilled onto the mouth and . . . looked like it came out of the mouth." (Exhibit J, 139:20-23).

59. Rosario's primary impression was "behavioral and/or psychiatric disorder." (Exhibit J, 138:6-11).

60. At 18:38 Docher was "in and out of consciousness" and only responsive to pain stimuli, so Rosario made no effort to verbally communicate with the patient. (Exhibit J, 78:11-15; 78:20-25 - 79:1; ). During the call, Docher would "go to like a period of calm." but "as soon as [there was] any movement of him– or from the officers, he started to move again and start squirming and, you know, move around." (Exhibit J, 79:5-14).

61. Rosario's assessment "was to figure out his injuries and remove him from the situation that would further injure – cause injury to himself or any officers." (Exhibit J, 96:1-4).

62. Docher was too much of a danger to himself and others to use physical restraints like Rayon webbing. (Exhibit J, 101:15-20).

63.     Rosario never attempted to use physical restrains such as Rayon webbing straps across Docher's chest and legs, or hard extremity restraints.  (Exhibit J, 100:1-4; 102:3-5).  Rosario explained that Docher was "still in the care of the [Sheriff's Office] and struggling.  They had not gotten complete control of him for me to be safe enough to put him on a stretcher." (Exhibit J, 100:14-20).  So for that reason, Rosario injected Docher with Ativan. (Exhibit J, 100:21-25; 101:1-2).

64.     The use of physical restraints on combative patients instead of chemical restrains like Ativan are included in the "educational guidelines" and "not the protocol." (Exhibit J, 103:17-18; 104:14-22).   The protocols are approved by the medical director and are not included in the educational guidelines.  (Exhibit J, 105:13-17).

65.     The Fire District's "protocols are guidelines also."   (Exhibit J, 106:18-19).

66.     Rosario  "felt 4 milligrams of Ativan was the appropriate dosage to help remedy the situation." (Exhibit J, 37:17-19).

67.     Rosario administered the Ativan. (Exhibit J, 99:6-8).  The times listed in Rosario's report are not exact.  (Exhibit J, 87:7).

68.     Rosario informed a female deputy that the Ativan would take effect in "two to three minutes." (Exhibit J, 126:18-25 - 127:1-7).

69.     When Rosario assessed the patient he did not have a pulse. (Exhibit J, 90:12-19).  Rosario testified that the cardiac arrest was caused by Mangrum stepping on Docher's back.  Rosario explained

> that the patient experienced an external pericardial tamponade, which means . . . the sac around the heart due to trauma fills with blood, and then now the heart beating inside of this sac does not have the proper amount of movement to actually make a complete beat, and eventually it stops because you're hindering from actually beating.
>
> * * *
>
> [W]hen the patient was being subdued -- meaning, somebody was on his thoracic region from his back -- that after some time in struggle, your oxygen demand increases because you're struggling . . . Your oxygen demand increases, so your heart rate increases also. So you have to breathe fast to compensate for your heart rate. Otherwise, you're going to be circulating unoxygenated blood in your body.
>
> So for his case, since he has obviously been in a struggle with the officers prior to our arrival . . . the act of somebody placing their weight upon his thoracic region could have caused his heart to not have enough room to work, and compress.
>
> Also, he's a young guy. A lot of medical ailments don't really come early on

in life, so arteriosclerosis and blood clots, all that stuff does not happen to a seemingly healthy young guy. You know, he was -- you know, he was a smaller guy, but it doesn't seem like he had any, like, cardiac issues or anything like that.

So to have somebody -- their initial rhythm go from obviously moving around to actually asystole only concluded me in my opinion to say his heart was physically stopped.

(Exhibit J, 149:3-25 - 150:1-16).

**DATED** this ___26th___ day of October, 2017.

/s/ DARRYL L. LEWIS
DARRYL L. LEWIS
Florida Bar No.: 818021
Attorney E-Mail(s): dll@searcylaw.com and
axs@searcylaw.com
Primary E-Mail:  lewisteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 383-9485
Attorney for Plaintiff(s)

By: *s/. Hugh L. Koerner*
Hugh L. Koerner
Florida Bar No.: 716952
Email: hlklaw@hughkoerner.com
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone:  (954) 522-1235
Facsimile:   (954) 522-1176
*Attorneys for Plaintiff(s)*

## CERTIFICATE OF SERVICE
### Case No.: 16-14413-Civ-ROSENBERG/MAYNARD

I HEREBY CERTIFY that this ___26th___ day of October, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _s/. Hugh L. Koerner_
Hugh L. Koerner

### Service List

Summer M. Barranco, Esquire
summer@purdylaw.com; melissa@purdylaw.com
Purdy Jolly Giuffreda & Barranco, P.A.
2455 E Sunrise Boulevard, Suite 1216
Fort Lauderdale, FL 33304
Phone: (954)-462-3200
Fax: (954)-462-3861
*Attorneys for Christopher Newman, individually, Claylan Mangrum, individually, Calvin Robinson, individually, Wade Courtemanche, individually, Ken J. Mascara, as Sheriff of St. Lucie County, Florida*

Benjamin W. Newman, Esquire
Ben.Newman@wilsonelser.com; Leah.Rover@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 N Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 203-7592
Fax: (407) 648-1376
*Attorneys for Jose Rosario, individually, and the St. Lucie County Fire District, an independent special district*