UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:   16-14413-Civ-ROSENBERG/MAYNARD

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

      Plaintiff,

vs.

CHRISTOPHER NEWMAN, et. al.

      Defendants.
_____/

**PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL FACTS BY DEFENDANT ST. LUCIE COUNTY FIRE DISTRICT [DE 101]**

**COMES NOW** the Plaintiff, TAVARES DOCHER, by and through JANICE DOCHER-NEELEY, his mother and legal guardian, (hereinafter "Docher") by and through their undersigned attorneys, and submit the following response to the Statement of Material Facts filed by Defendant ST. LUCIE FIRE DISTRICT [DE 101]:

1-47.   Docher adopts and incorporates his responses to Defendant Rosario's Statement of Material Facts.

48-69.   Docher adopts and incorporates his additional statements of fact included at the end of his responses to Defendant Rosario's statement of material facts and Defendants Sheriff, Newman, Mangrum, Robinson, and Courtemanche's statement of material facts.

70.   *Testimony of Thomas Sinclair* . . . . Sinclair and Rosario responded to a patient with a laceration on the forehead.  (*Deposition of Thomas Sinclair* . . . Exh. R, 8:1-2).

71.   When they arrived on scene "the patient was lying on the ground with several deputies on top of him and a large pool of blood around his head." (Exh. R, 8:19-21).  There were four or five deputies with one knee on the ground and one knee of Docher, holding in down. (Exh. R, 29:23-25 - 30:1-4).  The patient had blood in the mouth and nose.  (Exh. R, 43:11-15).  The patient was spitting blood.  (Exh. R, 13:6-8).   Sinclair explained::

>   Q:   Was he spitting blood at someone, or just spitting blood?
>
>   A:   He was just spitting blood.

(Exh. R, 13:6-8).

72. Prior to the administration of the Ativan, Docher "was only calm when pressure was put on him by the deputies." (Exh. R, 31:18-22).

73. Sinclair explained that "it's rare" that he has administered four milligrams of Ativan in a single push dose. (Exh. R, 38:8-11). The protocols for sedation state that Ativan should be given in one milligram increments to a maximum of four milligrams. (Exh. R, 38:20-25). Sinclair does not know why the protocol provides for dosages at one milligram increments to a maximum of four milligrams, stating, "You would have to ask the people that wrote the protocol for that." (Exh. R, 39:15-19) However, paramedics have the "discretion to use up to four milligrams with no specified time between increments." (Exh. R, 39:1-6). That is how they are trained. (Exh. R, 40:19-25 - 41:1-3; 40:19-25 - 41:1-3).

74. Sinclair does not know why four-point soft restrains were not used with Docher. (Exh. R, 41:4-14). Sinclair testified:

> Q: On the date of the incident, did you carry four-point soft restrains on your ambulance?
> 
> A: Yes.
> 
> Q: Have you ever used those before?
> 
> A: Yes.
> 
> Q: Why did you not use those with Tavares Docher?
> 
> A: That's not a question I can answer.
> 
> Q: Why not?
> 
> A: Because I just don't know the answer to it.

(Exh. R, 41:4-14).

75. *Testimony of Fire District under Fed. R. Civ. P. 30(b)6 . . . .* Captain Brian Gonzalez is in charge of training and safety at the Fire District, including paramedics. (Exh. S, 5:10-15).

76. A committee establishes EMS guidelines. (Deposition of St. Lucie County Fire District pursuant to Fed. R. Civ. P. 36, by and through Brian Gonzalez, Exh. S, 6:5-17). The committee's recommendations are reviewed by Gonzalez and Chief Jennifer Chambers. If everybody agrees, the guidelines are sent to the medical director, Dr. Chi Chiou Liu, the medical director, "to make the final decision ion whether it gets implemented." (Exh. S, 8:3-15).

77. With regards to the administration of Ativan, the Fire District has EMS medical guidelines. (Exh. S, 37:19-25 - 38:1). The guidelines do not address the administration of Ativan to patients

with a history of alcohol use or mental illness   (Exh. S, 40:13-22).

78.     Exhibit 3 to the Fire District's deposition includes the 600 page emergency medical guidelines.  (Exh. S, 42:18-25).  Those guidelines were NOT in effect at the time of the incident on May 11, 2014. (Exh. S, 43:12-25).  The guidelines were a "regional guideline" used by "[m]any participating agencies."  (Exh. S, 43:7-11).   When it was time to update the guidelines, "all [participating] agencies decided to go on their own."  (Exh. S, 43:7-11).

79.     The sedation guidelines used by the Fire District in 2014 were "a guideline.  It is not a policy or procedure." (Exh.  S,  46:21-25 - 47:1-11).  If a paramedics "needed to deviate from these guidelines" they can call the emergency room and speak with a physician, since they do not give out Dr. Chi Chiou Liu's cell phone number to the paramedics.  (Exh. S, 47:13-25 - 48:1-11). "These guidelines are Dr. Liu's offline medical direction;" if a paramedic "needed assistance" they would have to call the physician working it the emergency room.  (Exh. S, 48:15-21 - 49:1-4).

80.     The guidelines do not list any contraindications for Ativan because there are "no contraindications in the emergency setting for Ativan.  (Exh. S, 50:10-21).   There are only "cautions" in the emergency setting, but "no contraindications." (Exh. S, 52:14-24).

81.     Cautions are: 'benzodiazpine may cause respiratory depression or compromise.  When administering, observe for signs of hypotension and respiratory depression." (Exh. S, 81:17-25 - 82:1-4).  Thus, respiratory depression is not contraindicated for Ativan. (Exh. S, 57:4-8).

82.     In 2014, paramedics administering Ativan were trained to administer "one milligram increments to a max of four milligrams." (Exh. S, 58:22-25 - 59:1-3). However, it was the custom, policy, and practice of the Fire District in 2014 that the paramedic has the discretion to administer a single dose of 4 milligrams.  (Exh. S, 59:17-23).  Because the policy does not "state three to five minutes in between" it allows the paramedic to give up to 4 milligrams without monitoring the patient. (Exh. S, 61:1-15).  Intervals between injections are only required under the protocols for patients with chest pains or cocaine overdoes.  (Exh. S, 88:15-21).  So "[i]f Rosario felt . . . the patient was – could cause harm to themselves, to him as a paramedic, or the people around him, he had the right to go straight to four milligrams.  One milligram increments, one after the other."

83.     One single dose of 4 milligrams of Ativan is consistent with the guidelines. (Exh. S, 63:1-6). It was the custom, policy and practice of the Fire District that "they have the option to go to four milligrams." (Exh. S, 63:18-19; 64:4-10).

84.     For combative patients, "[a]ll paramedics were expected to follow the treatment guideline,"

but not the educational section. (Exh. S, 75:24-25 - 76:10-21).  The use of rayon webbing straps is an "educational guideline.  It is not a policy."  (Exh. S, 76:19-24).

85.    In combative patients, the decision whether to use pharmacologic [chemical] restraints instead of physical restraints was left to the discretion of the paramedic.  (Exh. S, 77:20-25 - 78:1-19).

86.    *Testimony of John Sterba, M.D. . . .*  Sterba is a board certified emergency medical physician (Exh. N, 6:14, 7:12-16).  Sterba also has a Ph.D. in cardiovascular physiology."  (Exh. N, 22:15-16).  Sterba is "involved with the EMS . . . every time an ambulance is called."  (Exh. N, 32:8-14).  He previously worked for eight years as an EMT on an ambulance and served as an EMS medical director.  (Exh. N, 133:5-11; 216:8-11).  He has trained EMT's and paramedics.  (Exh. N, 20:11-13).  He is an expert on the effects of Ativan, and as recently as last year while teaching classes on advanced cardiac life support for the American College of Surgeons has instructed paramedics on the hazards of using Ativan.  (Exh. N, 13:2-4; 30:22-23 - 31:1-4; 36:12-15; 37:1-4; 52:13-16; 282:14-15).  As a result of Sterba's work as medical officer for the Navy's experimental diving unit in Panama City, Florida, Sterba is also an "expert on breath holding and asphyxiation."  (Exh. N, 18:7-13; 171:15-16).  Sterba reviewed this case, in part, to determine whether Rosario acted with reckless disregard.  (Exh. N, 165:6-10).

87.    Docher was suffering from "[h]ypotension as a result from asphyxiation by Mangrum." (Exh. N, 185:3-4).  The EMT textbook that Rosario used at Indian River State College [warned] that the combination of alcohol and Benzodiazepine can be fatal.  (Exh. N, 172:16-20).  Rosario scored "a 99 percent on his exam [and] knew that hypotension was a contraindication. He never  measured the blood pressure or attempted to even get close to it with checking the pulses, peripheral or central pulses, before skipping over the required step of physical restraints and going straight to the wrong drug at the wrong dose which caused the brain damage. (Exh. N, 141:16-25 - 142:1).

88.    For Ativan, the contraindications include substance abuse, as well as "[h]ypotension, respiratory depression, head trauma, metabolic disturbances including hypoxia, which can lead to lactic acidosis making the heart very unstable, [and] shock."  (Exh. N, 37:20-23 - 38:1-2; (Exh. N, 170:5-8). Here, you had five contraindications. (Exh. N, 170:5-8).  If a patient has "a problem with head trauma or metabolic acidosis you don't give the drug. It's a contraindication." (Exh. N, 38:13-19).  Docher sustained "bilateral nasal bone fractures," likely from the initial use of force when he was taken to the ground while handcuffed behind his back.  (Exh. N, 232:13-16).  That is the

"standard of care" for paramedics. (Exh. N, 38:10-19; 40:2-6).

89.     In medical terms, Mangrum experienced a "fit of rage" at the point where he was stating, "f'ing stop moving." (Exh. N, 254:4-6; 255:8-13). At 18:25:06 hours (i.e., 33 seconds into the cell phone videotape (Exh. F), Mangrum "steps down" with his left foot onto "Docher's back in between the shoulder blades." (Exh. N: 254:4-10). Sterba explained that Docher "ran out of air" because Mangrum "was stepping on his chest and his arms were being pulled up. Two reasons to cause rapid asphyxiation. I do believe with medical certainty he was trying to say I can't breathe but he didn't have enough air to finish saying the word breathe." (Exh. N, 220:6-9).

90.     Docher's "chest was not allowed to rise and fall for two mechanical reasons of positional asphyxiation, arms being pulled up, chest being stepped on. With shallow rapid irregular breaths, from three word sentences, three to four word sentences, at 6:24:47 seconds to 49 seconds, they are going to kill, gasp, they are going to kill me. And then later all right, all right. And then finally I can't brrr, help, gasp, help me." (Exh. N, 295:7-15). Sterba explained: "When somebody is struggling to breathe they will do everything they can do [to] breathe. It is one of the worse ways to die." (Exh. N, 267:9-11).

91.     "[F]rom 6:25:39 to 6:25:51 . . . Docher is no longer speaking. We hear shallow gasping breath sounds, no more words heard at that point. I believe he lost conscious right around there. So from 6:25 until 6:36, less maybe a half minute or so, he is unconscious. He is not responsive. He is unconscious, nonresponsive and nonverbal with abnormal respiratory depression." (Exh. N, 242:17-25 - 243:1-2; 295:18-22).

92.     Sterba testified that Docher "couldn't breathe. He couldn't inhale, and, therefore, he could not exhale and speak. He was asphyxiated." (Exh. N, 290:8-10). It was the combination of Mangrum weight (330-335 lbs) stepping on Docher's back and driving his chest into the asphalt while lifting his arms up behind his back that caused "rapid asphyxiation to the point where he was nonverbal, that is[,] unresponsive, and lost conscious for just over ten minutes." (Exh. N, 240:11-25 - 241:1-7; 246:8-15).

93.     Mangrum previously worked as an emergency medical technician (EMT) in Florida and testified that Docher was "breathing lightly." (Exh. N, 243:4-5). Mangrum placed Docher in the recovery position on his side. (Exh. N, 243:4-11; 242:14-16). "During that time when Docher is in recovery position not moving, unconscious, we do see that no restraining maneuvers were being done by deputies. In fact, they all backed off and walked around." (Exh. N, 224:17-22).

94. Rosario "had the responsibility to [ask] what happened to this guy when you were arresting him, was there any problem. Did he lose consciousness? Yeah, he lost consciousness. Well, what were you doing? I had my foot on his chest and I pulled his arms up and he passed out. Oh, my God, how were the respirations after that. Well, they were very shallow. He should have known and he should have asked what happened during all of this arrest.  Because the police officers knew, Mangrum knew. And it is the responsibility of EMS always to get as much history as possible especially from law enforcement officers. . . . You always have to work very, very closely with law enforcement officers, not only in the application of EMS approved restraints but whatever happened to the patient, especially if the patient was asphyxiated into unconsciousness. So should he have known, yes. Is it his fault for not asking, yes. (Exh. N, 144:16-23 - 145:1-13).

95. "It was with reckless disregard that his care was not only incomplete, it was dangerous, reckless. [Rosario] caused the cardiopulmonary arrest that was compounded by what the law enforcement officers did and it led to brain damage. Both are at fault and both caused the brain damage." (Exh. N, 146:5-17).  As a result, Rosario's conduct was fell "below the standard of care . . .with medical certainty." (Exh. N, 288:25 - 289:1).

96. Docher "was unresponsive when the paramedics came up, and then he came around and kicked Rosario." (Exh. N, 241:10-13).  "It was medically necessary and clinically indicated for Rosario to contact medical control." (Exh. N, 162:7-9).  Rosario should have informed medical control that we have "a dangerous situation here, a loss of consciousness. He is not acting normal. We might have alcohol and drugs. They restrained him to the point of a loss of consciousness. Can I go ahead with 4 milligrams of Ativan with no restraints and no oxygen, and I don't know what the blood pressure is, and I don't even know what the pulse ox is. What do you think an emergency physician would say, no. Transport with oxygen and monitor closely. (Exh. N, 163:15-25 - 164:1-3).

97. The risks and the contraindications and also violating protocol by skipping over physical restraints, and not using four point restraints, not apply oxygen. Basically not doing anything according to his training . . . . He didn't use oxygen, he didn't check the blood pressure, he didn't check the pulses. He went right ahead to a dangerous level of chemical restraint without using four points.  Four points by themselves would have been adequate.  (Exh. N, 162:13-25).

98. Four point EMS approved restraints were "medically necessary."  (Exh. N, 139:9-11). "[F]our point restraints . . . would have solved the situation."  There would have been no need for "any Ativan." (Exh. N, 139:14-16).  It was completely avoidable.  It was with reckless disregard

that approved four point soft restraints were not applied. It was with reckless disregard that Rosario went ahead and gave him with no adequate monitoring before or after the Ativan of 4 milligrams 4 times the dose injection that resulted in an onset of action in one minute as documented in the records right now, that this calmed the patient down a minute later. Approximately two minutes later he went into arrest because of what Rosario did. (Exh. N, 139:17-25 - 140:1-5).

99. Rosario "acted with reckless disregard and caused the problem along with Mangrum." (Exh. N, 165:4-5); "[B]oth of them together caused the cardiac arrest, caused the brain damage and disability with medical certainty." (Exh. N, 310:7-12). You have a 29 year old patient who was asphyxiated by the deputies and overdosed by the paramedic. (Exh. N, 183:5-6).

100. *Testimony of Joe R. Anderson, PharmD* . . . . Dr. Anderson was hired as an expert witness by Rosario and the St. Lucie County Fire District. (Deposition of Joe R. Anderson, PharmD., Exh. T, 100:3-14).

101. Dr. Anderson testified that respiratory compromise is a contraindication for the administration of Ativan. Dr. Anderson explained:

> Q: And so we know there's a struggle before he was put in a recovery position, and let's assume his respiratory function was compromised and at that point his pulmonary reserves are low. Do you believe injecting 4 milligrams of ativan was appropriate at that point considering those contraindications?
>
> A: Well, again, you know, if the patient had evidence of respiratory compromise, then absolutely, yeah, I would say no, you shouldn't give a benzodiazepine in that setting.

(Exh. T, 83:1-13).

100. *Testimony of Brian G. McAlary, M.D.* . . . Rosario "had a duty to adequately evaluate Mr. Docher as a prerequisite to deciding on treatment, including the administration of any pharmacologic restraint," but failed to conduct "an adequate pre-medication assessment." (Deposition of Brian G. McAlary, M.D., Exh. U, 24:6-10, 25:3-6).

101. McAlary testified that

> prior to the administration of ativan, restraint measures were utilized which included at least three officers with some or most of their body weight applied throughout the area of upper body to legs, including one officer sitting on his lower extremities, and then at some point after that, he, while still in a prone position, had his arms raised in a near vertical position relative to his back and a foot, while the arms were in that position, was placed on his upper back, neck area with weight obviously being applied. The combination of those moves . . . would almost certainly compromise ventilation."

(Exh. X, 79:8-20; 80:1).

102.   "[S]ome four minutes prior to the injection, [Docher] is seen with respiratory rates of 20 to 30.  So he's obviously in some degree of respiratory distress at that point, even though being described as in the recovery position of left lateral decubitus.  So he obviously was in a compromised status at the time of the injection.  (Exh. U, 33:9-15).

103:   Docher became "hypercapnic, hypoxic, and acidotic with associated medical derangement, making him very vulnerable, along with his antecedent alcohol ingestion, to the respiratory depressant effects of the ativan, making it all the more necessary that the guidelines for administering ativan should have been followed.  (Exh. U, 28:18-22).

104.   More likely than not, "some, most, [or] all of the ativan was intravascularly injected.  (Exh. U, 33:19-20).

105.   Rosario administration of "an entire 4 milligram dose" of Ativan was an "excessive dose," and administered intravascularly as a result of the lack of aspiration prior to injection.  (Exh. U, 25:7-16).

106.   "[F]ollowing the administration of the drug, there was no monitoring the patient because none of the monitoring devices were at the patient's bedside, they were all within the rescue vehicle, and that the injected drug with its needle was returned to the sharps bin of the rescue vehicle and then there was the return to the patient's side in the parking lot where it was observed that the patient was in complete cardiopulmonary arrest as manifest by no pulse, no breathing, and upon return to the vehicle which was done in an accelerated manner, hooked to an ECG which showed a straight line."  (Exh. U, 25:13-22 - 26:1-9).

107.   This delay resulted in a "resulted in complete [cardiac] arrest prior to intervention."  (Exh. U, 26:15-16).

**DATED** this   26th    day of October, 2017.

/s/ DARRYL L. LEWIS
DARRYL L. LEWIS
Florida Bar No.: 818021
Attorney E-Mail(s): dll@searcylaw.com and
axs@searcylaw.com
Primary E-Mail:  lewisteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 383-9485
Attorney for Plaintiff(s)

By:  *s/. Hugh L. Koerner*
Hugh L. Koerner
Florida Bar No.: 716952
Email: hlklaw@hughkoerner.com
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone:  (954) 522-1235
Facsimile:   (954) 522-1176
*Attorneys for Plaintiff(s)*

## CERTIFICATE OF SERVICE
### Case No.: 16-14413-Civ-ROSENBERG/MAYNARD

I HEREBY CERTIFY that this   26th    day of October, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  *s/. Hugh L. Koerner*
Hugh L. Koerner

**Service List**

Summer M. Barranco, Esquire
summer@purdylaw.com; melissa@purdylaw.com
Purdy Jolly Giuffreda & Barranco, P.A.
2455 E Sunrise Boulevard, Suite 1216
Fort Lauderdale, FL 33304
Phone: (954)-462-3200
Fax: (954)-462-3861
*Attorneys for Christopher Newman, individually, Claylan Mangrum, individually, Calvin Robinson, individually, Wade Courtemanche, individually, Ken J. Mascara, as Sheriff of St. Lucie County, Florida*

Benjamin W. Newman, Esquire
Ben.Newman@wilsonelser.com; Leah.Rover@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 N Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 203-7592
Fax: (407) 648-1376
*Attorneys for Jose Rosario, individually, and the St. Lucie County Fire District, an independent special district*