Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

                Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF of ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent special district,

                Defendants.
_____/


DEPOSITION OF

CALVIN ROBINSON


VOLUME 1
Pages 1 through 77


Thursday, May 25, 2017
11:00 a.m. - 12:40 p.m.


Phipps Reporting
100 Southeast Third Avenue
Fort Lauderdale, Florida  33394

Stenographically Reported By:
Patricia A. Lanosa, RPR, FPR, CSR

## Page 2

```
 1   APPEARANCES:
 2
     On behalf of Plaintiff:
 3
        SEARCY, DENNEY, SCAROLA
 4      BARNHART & SHIPLEY, PA
        2139 Palm Beach Lakes Boulevard
 5      P.O. Drawer 3626
        West Palm Beach, Florida 33402-3626
 6      (561)686-6300
        BY: ADAM S. HECHT, ESQUIRE
 7      ash@searcylaw.com
 8
     On behalf of Defendant:
 9
        PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
10      2455 East Sunrise Boulevard, Suite 1216
        Fort Lauderdale, Florida  33304
11      (954)462-3200
        BY:  RICHARD GIUFFREDA, ESQUIRE
12      richard@purdylaw.com
13
     On behalf of St. Lucie County Fire District:
14
        WILSON, ELSER, MOSKOWITZ,
15      EDELMAN & DICKER, LLP
        111 North Orange Avenue, Suite 1200
16      Orlando, Florida  32801
        (407)203-7592
17      BY:  JULIE TYK, ESQUIRE
        julie.tyk@wilsonelser.com
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2                 I N D E X
 3
 4
 5   Examination                       Page
 6
 7        VOLUME 1 (Pages 1 - 77)
 8   Direct      By Mr. Hecht            4
     Cross       By Ms. Tyk             71
 9
     Certificate of Oath                74
10   Certificate of Reporter            75
     Read and Sign Letter to Witness        76
11   Errata Sheet (forwarded upon execution)     77
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   The following proceedings began at 11:00 a.m.:
 2        THE COURT REPORTER:  Would you raise your
 3   right hand, please?
 4        Do you solemnly swear that the testimony
 5   you shall give today will be the truth, the
 6   whole truth, and nothing but the truth?
 7        THE WITNESS:  I swear.
 8             CALVIN ROBINSON,
 9   having been first duly sworn or affirmed, was
10   examined and testified as follows:
11             DIRECT EXAMINATION
12   BY MR. HECHT:
13     Q.  Good morning, sir.
14     A.  Good morning.
15     Q.  My name is Adam Hecht.  I represent
16   Tavares Docher.  And today we are going to be taking
17   your deposition.  Have you ever given a deposition
18   before?
19     A.  Yes.
20     Q.  Approximately how many times?
21     A.  Six.  Seven.
22     Q.  All right.  Same rules apply as to the
23   other depositions.  If I ask you a question you
24   don't understand, just tell me you don't understand
25   it, and I'll rephrase it.  All right?
```

## Page 5

```
 1     A.  Yes.
 2     Q.  If you answer a question of mine, I'm
 3   going to assume you understood the question; fair
 4   enough?
 5     A.  Yes.
 6     Q.  And I don't expect that we'll be here too
 7   long today.  If you have to step out, that's fine.
 8   Just let me know.  Okay?
 9     A.  Okay.
10     Q.  Could you state your full name?
11     A.  Calvin Marcus Robinson, Jr.
12     Q.  What's your date of birth?
13        MR. GIUFFREDA:  If we could put that off
14   the record.
15        MR. HECHT:  His date of birth?
16        MR. GIUFFREDA:  Yeah.  I'd rather have it
17   off the record, in case it gets inadvertently
18   filed.  It would have to be redacted anyway.
19        MR. HECHT:  I never heard of a date of
20   birth -- social security number, home address
21   for an officer, but his date of birth?
22        MR. GIUFFREDA:  Yes.  I'd rather not have
23   it in the transcript, because people file
24   transcripts, summary judgment and things; they
25   forget to redact it.
```

                                    2 (Pages 2 to 5)

Page 6

1      MR. HECHT: I don't think there is any
2  sort of confidentiality for date of birth.
3      MR. GIUFFREDA: No, but you could have
4  identify theft problems with names and dates of
5  births.
6      MR. HECHT: That's fine.
7   Q. Just tell me what your date of birth is.
8      THE COURT REPORTER: Are we off?
9      MR. HECHT: Sure.
10     (Discussion off the record.)
11  BY MR. HECHT:
12  Q. Currently, who is your employer?
13  A. I'm a student right now.
14  Q. Where are you going to school?
15  A. Barry University.
16  Q. When did you begin going to Barry
17  University?
18  A. This time around, January.
19  Q. Of 2017?
20  A. Yes.
21  Q. Where is Barry University located?
22  A. In Miami Shores.
23  Q. What are you studying?
24  A. Public administration.
25  Q. I heard you say "this time around." Did

Page 7

1  you attend Barry University at some other time prior
2  to beginning in January of 2017?
3  A. Yes.
4  Q. When did you begin the first time?
5  A. January 2014.
6  Q. And I take it that you did not graduate
7  from Barry University after you began
8  in January 2014?
9  A. I graduated.
10  Q. Okay. What year did you graduate Barry
11  University?
12  A. 2016.
13  Q. With a degree in what?
14  A. Bachelor's in emergency management.
15  Q. While you were a student at Barry
16  University in May of 2014, were you also working in
17  addition to studying?
18  A. No. I took that summer off. It's a
19  private university, so semesters are shorter. So
20  that kind of fell into summer. So I wasn't working
21  -- I wasn't going to school at that point.
22  Q. The reason why I ask, because we're here
23  to talk about an incident involving my client
24  Tavares Docher, that occurred on May 11, 2014. Do
25  you understand that?

Page 8

1  A. Yes.
2  Q. And you're telling me that you began
3  studying at Barry University in January 2014,
4  correct?
5  A. Yes.
6  Q. But you were not a student at the time of
7  this incident?
8  A. No. I took the summer off.
9  Q. And why did you take the summer off?
10  A. Because I was starting a new job.
11  Q. And what was the new job?
12  A. It's a deputy sheriff at the St. Lucie
13  Sheriff's Office.
14  Q. Were you still considered to be a student
15  enrolled at Barry University when you began your
16  employment with the sheriff's office?
17  A. Yes.
18  Q. And when did you begin your employment
19  with the St. Lucie County Sheriff's Office?
20  A. March 17, 2014.
21  Q. Why is it that you applied for a job at
22  the St. Lucie County Sheriff's Office?
23  A. Because I wanted a job.
24  Q. And did you have the intention of going
25  back to Barry University in the fall of 2014?

Page 9

1  A. Yes.
2  Q. So was your understanding when you took a
3  position with the St. Lucie County Sheriff's Office
4  that it would just be for the summertime?
5  A. I'm not understanding that one.
6  Q. All right. You told me that you began
7  your studies at Barry University in January 2014,
8  correct?
9  A. Yes.
10  Q. And then summer began, I'm assuming,
11  sometime in May of 2014?
12  A. Yes.
13  Q. And you had an opportunity to be employed
14  by the St. Lucie County Sheriff's Office during the
15  summer of 2014, correct?
16  A. I got hired in the spring, March.
17  Q. Right. You got hired and you began
18  in March of 2014, correct?
19  A. Yes.
20  Q. And how long was that employment supposed
21  to last for with the St. Lucie County Sheriff's
22  Office?
23  A. It's permanent.
24  Q. Did you ever have an intention of going
25  back and being a student at Barry University

3 (Pages 6 to 9)

<table>
<tr><td>

**Page 10**

1  in August or September of 2014?
2     A.  Yes.
3     Q.  So is it correct to say that
4  in August and September of 2014 you were a student
5  at Barry University while also acting as a deputy
6  sheriff for the St. Lucie County Sheriff's Office?
7     A.  Yes.
8     Q.  I don't want your home address, but in
9  May of 2014 where were you residing?
10     A.  In Port St. Lucie.
11     Q.  How is it that you were a student at Barry
12  University, which was down in Miami and you worked
13  in Port St. Lucie?
14     A.  I went to school online.
15     Q.  I'm sorry.
16     I went to school online.
17     Q.  The two years that you were studying at
18  Barry University from January of 2014 to 2016, were
19  all of your courses online?
20     A.  Yes.
21     Q.  And during that entire two-year period of
22  time you were residing in St. Lucie County?
23     A.  No.
24     Q.  In January of 2014, tell me the city that
25  you lived in.

</td><td>

**Page 12**

1     A.  I left to seek another job.
2     Q.  And what job was that?
3     A.  As a police officer down here in South
4  Florida.
5     Q.  So in February of 2017, which police
6  department did you start working for?
7     A.  I didn't work for anyone.
8     Q.  Okay.  Currently where are you working?
9     A.  I'm a full-time student.
10     Q.  All right.  So you told me that you no
11  longer work for the St. Lucie County Sheriff's
12  Office as of February 2017, correct?
13     A.  Yes.
14     Q.  And you said that you wanted to work for
15  another police department down south; is that right?
16     A.  Yes.
17     Q.  And did you ever gain employment with any
18  law enforcement agency in South Florida?
19     A.  No, not yet.
20     Q.  You're still looking?
21     A.  Uh-huh.
22     Q.  Is that a yes?
23     MR. GIUFFREDA:  Yes.
24     A.  Yes.
25     MR. GIUFFREDA:  You have to use words.

</td></tr>
<tr><td>

**Page 11**

1     A.  Miami Gardens.
2     Q.  And at some point you moved to St. Lucie
3  County.
4     A.  Yes, when I got hired.
5     Q.  So you moved to St. Lucie County
6  in March of 2014.
7     A.  Yes.
8     Q.  And have you resided in St. Lucie County
9  ever since?
10     A.  Yes.
11     Q.  Currently I know you told me you were a
12  student again at Barry University.  Are you getting
13  a master's?
14     A.  Yes.
15     Q.  How long does that program last?
16     A.  Eighteen months.
17     Q.  And currently are you still employed by
18  the St. Lucie County Sheriff's Office?
19     A.  No.
20     Q.  When did you stop your employment with the
21  St. Lucie County Sheriff's Office?
22     A.  February 8, 2017.
23     Q.  Why is it you discontinued your employment
24  with the St. Lucie County Sheriff's Office
25  in February of 2017?

</td><td>

**Page 13**

1  BY MR. HECHT:
2     Q.  Which agencies have you applied to?
3     A.  Just Miami-Dade.
4     Q.  Did you go through the interview process?
5     A.  Yes.
6     Q.  Put in an application?
7     A.  Yes.
8     Q.  And have they rejected you?
9     A.  No.
10     Q.  So why is it you're not working for them?
11     A.  It takes time.
12     Q.  So are you just waiting to hear back from
13  them?
14     A.  Yes.
15     Q.  Was it your decision to leave the
16  St. Lucie County Sheriff's Office?
17     A.  Yes.
18     Q.  You were not fired?
19     A.  No.
20     Q.  You were not terminated?
21     A.  No.
22     Q.  Prior to your employment at the St. Lucie
23  County Sheriff's Office, have you ever worked at any
24  other law enforcement agency?
25     A.  No.

</td></tr>
</table>

www.phippsreporting.com
888-811-3408

Page 14

1    Q.  As you sit here today, is the only law
2  enforcement agency that you have ever worked for
3  been the St. Lucie County Sheriff's Office?
4    A.  Yes.
5    Q.  Tell me about the training that you went
6  through before you began your employment at the
7  St. Lucie County Sheriff's Office.
8    A.  I went to the Miami-Dade Police Academy,
9  and there I served as a full-time student in the
10  police academy.  It was a six-month academy.
11    Q.  And at the Miami-Dade Police Academy, were
12  you educated and instructed on what is known as
13  basic law enforcement training?
14    A.  Yes.
15    Q.  And what sort of things are you taught in
16  the basic law enforcement training?
17    A.  Conversational techniques, defensive
18  tactics, shooting, defensive driving, driving with
19  lights and sirens, interviewing techniques, and
20  techniques for traffic stops.
21    Q.  How long does the basic law enforcement
22  training last for as part of the police academy
23  training?
24    A.  Six months.
25    Q.  During the basic law enforcement training,

Page 15

1  were you trained in the areas of excessive force?
2    A.  No.
3    Q.  During the six months of your basic law
4  enforcement training, were you trained in the area
5  of what is known as the physiology of a struggle?
6    A.  Not from what I recall.
7    Q.  During the six months that you were at the
8  police academy and you were instructed on basic law
9  enforcement training techniques, were you trained in
10  the area of how to properly handcuff individuals?
11    A.  Yes.
12    Q.  Are you trained -- strike that.
13       Were you trained on how to handcuff
14  individuals after a struggle ensues?
15    A.  Yes.
16    Q.  In your basic law enforcement training
17  that you underwent at the Miami-Dade Police Academy,
18  were you trained on how to identify someone that is
19  experiencing what is known as "excited delirium"?
20    A.  Yes.
21    Q.  During the six months that you underwent
22  your basic law enforcement training, were you
23  educated on how to identify the signs and symptoms
24  of someone that is experiencing excited delirium?
25    A.  Yes.

Page 16

1    Q.  When you began your employment with the
2  St. Lucie County Sheriff's Office, did they provide
3  you additional training?
4    A.  Yes.
5    Q.  And what did that consist of?
6    A.  Defensive tactics, shooting, handcuffing
7  and searching techniques, and scenario-based
8  training.
9    Q.  When you were employed by the St. Lucie
10  County Sheriff's Office, did they provide you
11  training in the area of excessive force?
12    A.  Yes.
13    Q.  During your employment with the St. Lucie
14  County Sheriff's Office, did they train you in the
15  area of what is known as the physiology of a
16  struggle?
17    A.  No, not from what I recall.
18    Q.  During your employment with the St. Lucie
19  County Sheriff's Office, did they train you on how
20  to properly handcuff individuals after a struggle
21  ensues?
22    A.  Yes.
23    Q.  During your employment with the St. Lucie
24  County Sheriff's Office, did they provide you
25  training on how to identify the signs and symptoms

Page 17

1  of someone experiencing excited delirium?
2    A.  Yes, later.
3    Q.  And when you say "later," what are you
4  referring to?
5    A.  I had to go to a training, which is called
6  CIT, crisis intervention training.  I went sometime
7  in 2015.  I want to say January or February.
8    Q.  I want to be a little bit more specific in
9  my questioning.
10    A.  Okay.
11    Q.  Prior to May 11th of 2014, did the
12  St. Lucie County Sheriff's Office provide training
13  to you in the area of excessive force?
14    A.  Yes.
15    Q.  Prior to May 11th of 2014, did the
16  St. Lucie County Sheriff's Office train you in the
17  area of what is known as the physiology of a
18  struggle?
19    A.  No, not from what I recall.
20    Q.  Prior to May 11th of 2014, did the
21  St. Lucie County Sheriff's Office train you on how
22  to properly handcuff an individual after a struggle
23  ensues?
24    A.  Yes.
25    Q.  Prior to May 11, 2014, did the St. Lucie

Page 18

1    County Sheriff's Office train you on how to identify
2    the signs and symptoms of someone experiencing
3    excited delirium?
4         A.   Yes.
5         Q.   So is it correct that the St. Lucie County
6    Sheriff's Office not only trained you on how to
7    identify the signs and symptoms of experienced --
8    strike that.
9         Is it correct that the St. Lucie County
10   Sheriff's Office not only trained you prior
11   to May 11, 2014 on how to identify the signs and
12   symptoms of someone experiencing excited delirium,
13   but also after May 11, 2014, and as you said
14   sometime in 2015, you were provided additional
15   training on how to identify the signs and symptoms
16   of someone experiencing excited delirium?
17        A.   Yes.
18        Q.   Where did you graduate high school?
19        A.   Miami -- Norland.
20        Q.   After high school, did you go on to
21   further -- any sort of education?
22        A.   I went to Miami-Dade Community College.
23        Q.   Did you receive a degree from Miami-Dade
24   College?
25        A.   No.

Page 19

1         Q.   How long did you study at Miami-Dade
2    College for?
3         A.   Maybe a year.
4         Q.   Why did you leave?
5         A.   I didn't like it.
6         Q.   And what did you do once you left?
7         A.   I joined the military.
8         Q.   Which branch?
9         A.   U.S. Air Force.
10        Q.   And how long did you serve in the U.S. Air
11   Force for?
12        A.   Four years.
13        Q.   You were honorably discharged?
14        A.   Yes.
15        Q.   And after you served in the Air Force for
16   four years, what did you do?
17        A.   I got out and joined the police academy.
18        Q.   When you began your employment with the
19   St. Lucie County Sheriff's Office, what was your
20   position?
21        A.   Road deputy.  Deputy sheriff.
22        Q.   And do you know the month and the year
23   that you actually joined the St. Lucie County
24   Sheriff's Office?
25        A.   March 17, 2014.

Page 20

1         Q.   Were you ever a trainee?
2         A.   Yes.
3         Q.   When were you a trainee?
4         A.   From that point up until, I think,
5    late July, early August.
6         Q.   Explain to me what it means when you're
7    working at the St. Lucie County Sheriff's Office and
8    you have the title of a trainee.
9         A.   It means that you're being trained in
10   agency standard procedures and that you start first
11   with understanding the policies that the agency has
12   implemented, and you go on to how to use the
13   computer system, and then you go to defensive
14   tactics training, and from there you go on to the
15   road, and you go on to field training.
16        Q.   When you're a trainee, are you assigned to
17   another officer?
18        A.   Yes.
19        Q.   On May 11th, 2014, who was the officer
20   that you were assigned to supervise you?
21        A.   Clay Mangrum.
22        Q.   And how long were you Deputy Sheriff
23   Mangrum's trainee for?
24        A.   I'm not sure.
25        Q.   Is it a few months; or is it a year?

Page 21

1         A.   No.  I want to say somewhere between three
2    and five weeks.
3         Q.   At the time of this incident, which
4    occurred on May 11, 2014, were you Deputy Sheriff
5    Mangrum's trainee?
6         A.   Yes.
7         Q.   On the date of this incident, May 11,
8    2014, were you riding in the same patrol car as
9    Deputy Sheriff Mangrum?
10        A.   Yes.
11        Q.   What were you wearing on this day?
12        A.   A deputy sheriff standard uniform.
13        Q.   Did you have a gun belt?
14        A.   Yes.
15        Q.   Did you have a gun?
16        A.   Yes.
17        Q.   A flashlight?
18        A.   Yes.
19        Q.   The tactical gear we see officers wear
20   around their belt?
21        A.   Yes.
22        Q.   Were you wearing any sort of tactical
23   clothing?
24        A.   No.
25        Q.   On the day of this incident, was Deputy

6 (Pages 18 to 21)

Page 22

1  Mangrum wearing anything other than the standard
2  sheriff's uniform that are given to you?
3      A.  No.
4      Q.  Were either you or Deputy Mangrum wearing
5  a gun on your leg?
6      A.  No.
7      Q.  Were either of you wearing a bulletproof
8  vest?
9      A.  Yes.
10     Q.  You both were?
11     A.  Yes.
12     Q.  And that's underneath your clothing?
13     A.  Yes.
14     Q.  And as a trainee, do you have all of the
15 same authority that any other deputy sheriff would
16 have?
17     A.  Yeah.
18     Q.  What I'm asking is, As a trainee, do you
19 have the ability to make arrests?
20     A.  Yes, but that depends on what part of the
21 training you're in.
22     Q.  On May 11, 2014, what part of the training
23 were you in?
24     A.  Second phase.
25     Q.  Go through the phases with me, if you

Page 23

1  will.
2      A.  Phase 1, you ride with somebody for a
3  week, and they kind of show you just what's going
4  on.
5          Phase 2, you ride with somebody between
6  three to six weeks, and you go from just being a
7  passenger to actually doing things.
8          Phase 3, you are being evaluated.  The
9  trainer is not really saying or doing much, but they
10 are helping you along the way.
11         And then you have 4, which is the exit
12 phase, and you get a totally different field
13 training officer, and they don't say anything to
14 you; they just evaluate you as you do your job.
15     Q.  So Phase 1 you're in a ride-along for one
16 week?
17     A.  Yes.
18     Q.  And Phase 2 you're in a ride-along for
19 three to six weeks?
20     A.  Yes.
21     Q.  And Phase 3, how long does that last for?
22     A.  I don't remember specifically.
23     Q.  And Phase 4, how long does that last?
24     A.  A couple of weeks.
25     Q.  On May 11, 2014 you were in Phase 2.

Page 24

1      A.  Yes.
2      Q.  And what I heard you say to me is that
3  during your Phase 2 you were riding along with
4  Deputy Sheriff Mangrum and you're a passenger and
5  you're able to do things.
6          What specifically are you referring to
7  when you say you're able to do things?
8      A.  Well, at this point you're able to make
9  arrests; you're able to establish your own probable
10 cause.  It goes into a gradual progression.
11     Q.  I think the best way to ask this would be
12 for you to tell me those things that you are not
13 able to do during the Phase 2 program that you would
14 be able to do in Phase 3 or Phase 4.
15     A.  Determine which cause that you take.
16     Q.  What does that mean?
17     A.  Well, when you have a cause -- you have a
18 CAD system -- you prioritize your calls based on the
19 severity of it, or just the priority of it.
20         In Phase 2 you're being instructed, okay,
21 we're going to take this call because this will give
22 you a good experience.  You need this; this is
23 something that's going to be on your checklist, so
24 we're going to take this call.
25     Q.  What else are you not able to do during

Page 25

1  Phase 2 that you would be able to do during Phase 3
2  or Phase 4?
3      A.  I don't know, I think that's pretty much
4  it.
5      Q.  During Phase 2, are there things that you
6  are not allowed to do -- strike that.
7          During Phase 2 are there things that a
8  deputy sheriff is able to do that you're not able to
9  do as a trainee in Phase 2.
10     A.  No, I think I summed it up already.
11     Q.  So all of the arrest powers, and the
12 ability to take someone's liberty away is something
13 that you're able to do in Phase 2?
14     A.  Yes.
15     Q.  You could make those decisions.
16     A.  Yes, but at the discretion of the trainer
17 to guide you through the process.
18     Q.  On May 11, 2014 -- and we're going to talk
19 about the incident in greater detail -- but prior to
20 you making a decision to do anything --
21     A.  Yes.
22     Q.  -- do you have to ask Deputy Sheriff
23 Mangrum for his approval?
24     A.  Yes.
25     Q.  So explain to me just generally, not

Page 26

1   specifically involving this incident, but just
2   generally what it is during Phase 2 that you would
3   need to get Deputy Sheriff Mangrum's approval for
4   prior to you making an arrest or initiating contact
5   with the civilian.
6       A.  The best way I can describe it is that you
7   come into a situation and you're brand new, and
8   you're getting a lot of things thrown at you; you
9   turn back and you look at your FTO and you say,
10  "What do I do now?"  And then they give you
11  guidance, okay.  This is agency policy; this is
12  standard procedure.  If you have this, this, and
13  this, this is the elements of a crime.  I think that
14  pretty much answers it.
15      Q.  Would you agree with me that in the basic
16  law enforcement training that you underwent, that an
17  elbow strike to a person's temple is classified as
18  deadly force?
19          MR. GIUFFREDA:  Form.  You could answer.
20      A.  Say that again.
21          MR. GIUFFREDA:  You could answer.
22      A.  I don't remember that.
23  BY MR. HECHT:
24      Q.  Would you agree with me that in the basic
25  law enforcement training course that you underwent

Page 27

1   that an elbow strike to a person's temple is likely
2   to cause great bodily harm?
3           MR. GIUFFREDA:  Form.  You could answer.
4       A.  I do not remember that.
5   BY MR. HECHT:
6       Q.  Would you agree with me that in the basic
7   law enforcement training course that you underwent,
8   that striking a person on the side of the jaw is
9   likely to cause great bodily harm?
10          MR. GIUFFREDA:  Form.  You could answer.
11      A.  Yes.
12  BY MR. HECHT:
13      Q.  Would you agree with me that in the basic
14  law enforcement training course that you underwent,
15  that striking someone on the side of the jaw is
16  classified as using deadly force?
17          MR. GIUFFREDA:  Form.  You could answer.
18      A.  No.
19  BY MR. HECHT:
20      Q.  Would you agree with me that the basic law
21  enforcement training that you underwent, that
22  striking a person on the bridge of their nose is
23  likely to cause great bodily harm?
24          MR. GIUFFREDA:  Form.  You could answer.
25      A.  Yes.

Page 28

1   BY MR. HECHT:
2       Q.  Would you agree with me in the basic law
3   enforcement course that you underwent, that striking
4   a person on the bridge of their nose is classified
5   as using deadly force?
6           MR. GIUFFREDA:  Form.  You could answer.
7       A.  Yes.
8   BY MR. HECHT:
9       Q.  Would you agree with me that in the basic
10  law enforcement course that you underwent, that
11  striking a person on their throat is likely to cause
12  great bodily harm?
13          MR. GIUFFREDA:  Form.  You could answer.
14      A.  Yes.
15  BY MR. HECHT:
16      Q.  Would you agree with me in the basic law
17  enforcement course that you underwent that striking
18  a person on their throat is classified as using
19  deadly force?
20          MR. GIUFFREDA:  Form.  You could answer.
21      A.  I don't remember.
22  BY MR. HECHT:
23      Q.  Would you agree with me that the basic law
24  enforcement training course that you underwent that
25  striking a person in the back of their head is

Page 29

1   likely to cause great bodily harm?
2           MR. GIUFFREDA:  Form.  You could answer.
3       A.  Yes.
4   BY MR. HECHT:
5       Q.  And the basic law enforcement training
6   course that you underwent, would you agree with me
7   that striking someone in the back of their head is
8   classified as using deadly force?
9           MR. GIUFFREDA:  Form.  You could answer.
10      A.  I do not remember.
11  BY MR. HECHT:
12      Q.  Would you agree with me that based on your
13  training and experience that someone exhibiting the
14  signs and symptoms of an excited delirium is
15  classified as a medical emergency?
16          MR. GIUFFREDA:  Form.  You could answer.
17      A.  Yes.
18  BY MR. HECHT:
19      Q.  And would you agree with me that as a law
20  enforcement officer, if you came in contact with
21  someone who you believed to be experiencing the
22  symptoms of excited delirium that you would contact
23  a medical professional?
24          MR. GIUFFREDA:  Form.  You could answer.
25      A.  Yes.

8 (Pages 26 to 29)

Page 30

1
2      BY MR. HECHT:
3          Q.   As a law enforcement officer, based upon
4      your training and experience, if you came in contact
5      with someone who was exhibiting the symptoms of
6      excited delirium, would you place them in handcuffs
7      prior to contacting a medical health professional if
8      that person did not commit a crime?
9          MR. GIUFFREDA:  Form.  You could answer.
10         A.   Yes.
11     BY MR. HECHT:
12         Q.   And why is that?
13         A.   Because in St. Lucie County if you
14     transported anyone anywhere in the back seat of your
15     car, by policy they had to have handcuffs on, or
16     rescue would not arrive to the scene unless the
17     person was secured, the scene was safe.
18         Q.   What I want to know specifically is:
19     Based upon your training and experience, if you came
20     in contact -- who was exhibiting the signs and
21     symptoms of excited delirium, and that person had
22     not committed a crime, you're telling me that you
23     would place that person in handcuffs solely because
24     they were exhibiting the signs and symptoms of
25     excited delirium?

Page 31

1          MR. GIUFFREDA:  Form.  You could answer.
2          A.   Yes.  Based off my training and experience
3      working in St. Lucie County, if you were going to
4      Baker Act or Marchman Act them, you had to place
5      them in handcuffs, even though they were not under
6      arrest.  If you were transporting them, by policy
7      they had to be in handcuffs.  Or if rescue was going
8      to transport them, if they calmed down at whatever
9      point and rescue decided they were going to take
10     them, then you would take off the handcuffs.  Before
11     then, rescue would not show up; they would stage
12     until the scene was cleared by law enforcement.
13     BY MR. HECHT:
14         Q.   For the purposes of my question, I want
15     you to assume that there would be no reason to
16     transport someone in an ambulance.  Okay?
17         A.   Okay.
18         Q.   When you say "rescue," I'm assuming that
19     means an ambulance.
20         A.   Yes.
21         Q.   So let me ask the question again.
22             Based on your training and experience, if
23     you came in contact with someone who was exhibiting
24     the signs of excited delirium, and that person had
25     not committed a crime, and that person did not need

Page 32

1      to be placed in an ambulance, would you place
2      handcuffs on that individual?
3          MR. GIUFFREDA:  Form.  You could answer.
4          A.   If they were being Baker Acted, yes.
5      BY MR. HECHT:
6          Q.   And for the purpose of this question, I
7      want you also to assume that the person was not
8      going to be Baker Acted.  Okay?
9          A.   Okay.
10         Q.   So no Baker Act, no transporting in an
11     ambulance.  Okay?
12         A.   Okay.
13         Q.   So let me ask the question again.
14             Based on your training and experience, if
15     you came in contact with an individual who was
16     exhibiting the signs and symptoms of excited
17     delirium, and that person did not commit a crime,
18     and was not being Baker Acted, and was not being
19     transported in an ambulance, would you place that
20     individual in handcuffs?
21         MR. GIUFFREDA:  Form.  You could answer.
22         A.   No.
23     BY MR. HECHT:
24         Q.   Based upon your training and experience,
25     if you came in contact with an individual who was

Page 33

1      exhibiting the signs and symptoms of excited
2      delirium, and that person committed a misdemeanor
3      and was being placed under arrest for a misdemeanor,
4      and again was experiencing excited delirium, would
5      you place that individual in handcuffs?
6          MR. GIUFFREDA:  Form.  You could answer.
7          A.   Yes.
8      BY MR. HECHT:
9          Q.   Have you been trained -- strike that.
10             You told me that you had been trained on
11     how to identify the signs and symptoms of excited
12     delirium, correct?
13         A.   Yes.
14         Q.   Can you please tell me what you learned
15     based on your training and experience on what to
16     identify in order to determine if someone is
17     experiencing excited delirium?
18         A.   Prior to May 11th or after?
19         Q.   Prior to May 11th.
20         A.   Prior to May 11th we had training on
21     excited delirium, and it was video-based training of
22     officers dealing with people who were suffering from
23     it.  And it was mainly training based off how to
24     identify the erratic behavior and how to restrain
25     them as you fought against them -- you fought with

Page 34

1   them.
2       Q.   Prior to May 11, 2014, tell me what you
3   were taught by the St. Lucie County Sheriff's Office
4   in terms of what signs and symptoms you would notice
5   about someone experiencing excited delirium.
6       A.   Irrational, erratic behavior.  Sometimes
7   violent tendencies.  Extremely high body
8   temperatures.  I was taught that it could be a
9   brain-induced chemical imbalance, or it could be
10  drug or alcohol induced, and that if you do
11  recognize the signs, that you should call rescue
12  after they have been properly restrained.
13      Q.   In this case involving your interaction
14  with Tavares Docher, did you ever identify Tavares
15  Docher to be experiencing excited delirium?
16      A.   After the fight, yes.
17      Q.   Did you come in contact with Tavares
18  Docher prior to him being placed in handcuffs?
19      A.   Yes.
20      Q.   Anytime prior to your -- strike that.
21           Anytime prior to Tavares Docher being
22  placed in handcuffs, did you make a determination
23  whether he was experiencing excited delirium?
24      A.   No.
25      Q.   No you did not notice him experience

Page 35

1   excited delirium; or no you did not make a
2   determination?
3       A.   No, I did not make a determination.
4       Q.   Why not?
5       A.   Because the investigation wasn't complete
6   upon interacting with him.
7       Q.   Were you taught in the basic law
8   enforcement courses that you underwent that when an
9   individual is lying on their stomach and being
10  handcuffed that they may have trouble breathing when
11  pressure is applied to their back?
12      A.   Yes.
13      Q.   And did you also learn that if too much
14  pressure is a applied to an individual's back when
15  they are being handcuffed by officers, that they may
16  suffer from oxygen deficiency?
17      A.   Yes.
18      Q.   Did you also learn all about oxygen
19  deficiency when placing an individual under arrest,
20  once you began your training at the St. Lucie County
21  Sheriff's Office?
22      A.   Yes.
23      Q.   All right, I want to talk about May 11,
24  2014.  Tell me what it is that you recall about your
25  involvement with Tavares Docher?

Page 36

1       A.   On May 11, 2014 I was dispatched to a call
2   at a CVS.  The call was initially classified as a
3   9-1-1 hang-up.  But prior to my arrival to the call,
4   it was -- the classification was changed to
5   disorderly conduct.
6           Upon arriving at the CVS gas station --
7   excuse me -- CVS, my trainer, who was driving at the
8   time, got out of the vehicle and made contact with
9   Tavares Docher.  I saw Tavares drop something on the
10  ground, and my trainer kicked it away.  As we pulled
11  up, I noticed that Tavares Docher was standing,
12  because he was described in the CAD system as a
13  black male wearing a green shirt, black shorts.  I
14  saw a male matching that description standing out
15  front with another man.
16           I went and I spoke with the other man, who
17  was later identified as the manager of the CVS.  And
18  he said that Mr. Docher came into the CVS and was
19  speaking about a SEAL team out of Broward County,
20  and that they had killed somebody.  And he said that
21  Mr. Docher was scaring the customers.  He also
22  realized that he was holding a screwdriver in his
23  hand, but was attempting to conceal it.
24           And at a certain point they called 9-1-1
25  to get him out of the store.  But the manager was

Page 37

1   able to talk with him.  And he stood outside with
2   him until myself and Deputy Mangrum arrived.  And so
3   I went back to where Deputy Mangrum and Mr. Docher
4   were standing.  I picked up the screwdriver, which
5   was in the parking median side of the dirt, and I
6   secured it inside my patrol car, and I patted
7   Mr. Docher down.
8           And then I got out my pad and started
9   getting his information, standard information:
10  Name, date, social security number.  He rattled off
11  everything.  He informed me that he was a sexual
12  offender of Broward County, and that he was visiting
13  Port St. Lucie to attend a court hearing.
14          We asked him about the -- what happened
15  inside of the CVS.  He went on to tell us that there
16  was a SEAL Team Six out of Broward County Sheriff's
17  Office, and that they had murdered someone and they
18  cut off their head and he knew where the body was,
19  and now they were coming to get him.
20          At that point Deputy Newman pulled up and
21  he started interviewing Mr. Docher.  And it was
22  pretty much from that point a question-and-answer
23  session between Deputy Mangrum and Deputy Newman.
24  And at a certain point Deputy Newman placed him
25  under arrest.  And Mr. Docher asked, "Why am I being

10 (Pages 34 to 37)

Page 38

1    arrested?" He said, "disorderly intox." And he
2    asked Mr. Docher had he been drinking. He said,
3    "Yes, I had a few Natty Ices -- Natural Ices." I
4    guess it's a malt liquor or a beer.
5          At that point we took him to Deputy
6    Newman's patrol car. We opened up the back seat,
7    placed him into the back seat, sat him first,
8    instructed him to sit down. First placed his feet
9    inside of the car. He looked at us. We repeat --
10   Deputy Mangrum repeated, "put his feet inside of the
11   car." And he continued to look at us, and then I
12   told him "to put his feet inside of the car."
13         After that he started to stand up. I
14   placed my hand on top of his forehead and tried to
15   force him into the car, but he lunged forward. I
16   moved out of the way, and Deputy Newman and
17   Deputy Mangrum were being pushed back. I stepped to
18   the side, gave two strikes to the outer muscle of
19   his leg, and took his feet from underneath him. We
20   fell to the ground.
21         Deputy Mangrum or Deputy Newman were close
22   to his head. I was close to his feet. And at that
23   point we tried to gain control over him. Deputy
24   Mangrum called for backup and rescue. And at that
25   point we tried to restrain him the best that we

Page 39

1    could. The St. Lucie sheriff's office does not
2    offer leg shackles. They offer a rope to tie your
3    legs together. And we held him down the best that
4    we could. And after a certain point he got tired.
5    And once he got tired the rescue -- excuse me -- the
6    paramedics came. When the paramedics came they
7    asked us what was wrong with him. We told them a
8    quick version of it. He attempted to try to run.
9         Okay. At that point he was bleeding from
10   his head from the fall which he had took, and rescue
11   asked me to help roll him over to put him on the
12   gurney. I rolled him over. He placed him on the
13   gurney. He kicked one of paramedics. The
14   paramedics fell backwards and Mr. Docher began to
15   fight again.
16         The paramedic went into the ambulance,
17   came out with a solution and a syringe. He filled
18   the syringe with that solution and gave Mr. Docher a
19   shot in his buttocks. Mr. Docher became sedated and
20   let out a large gasp of air. The paramedic looked
21   at the other paramedic and said, "He just coded."
22   What does that mean? He said, "He just died." I
23   helped -- the paramedics placed him into the back of
24   the ambulance. I jumped into the ambulance with the
25   paramedics. One of them was driving. The other one

Page 40

1    was working on him. The paramedics asked me to
2    unhandcuff him, and place his arms on -- or at least
3    handcuff him to the gurney. So I used my handcuffs,
4    unlocked him, and placed his -- I unlocked Deputy
5    Newman's handcuffs, laced one arm on one side of the
6    gurney, and I used a set of my handcuffs to place
7    his other arm on the other side of the gurney.
8          As we rode towards Port St. Lucie
9    Hospital, the paramedics asked me to perform chest
10   compressions. I helped perform chest compressions.
11   Then he performed chest compressions, and he asked
12   me to assist him with a breathing apparatus that you
13   had to squeeze as you held it over the patient's
14   mouth. So I helped with that.
15         At some point the paramedic cut off
16   Mr. Docher's shirt with a pair of scissors, applied
17   an AED and gave him two electrical shocks. And the
18   second shock Mr. Docher came responsive, and at that
19   point we arrived at the hospital. Once we got to
20   the hospital, the paramedics parked, took him out of
21   the back of the ambulance on the gurney and rolled
22   him into the ER, which he was then assisted by the
23   hospital medical staff.
24   Q.   Were you and Deputy Sheriff Mangrum the
25   first law enforcement officers to arrive at the CVS?

Page 41

1    A.   Yes.
2    Q.   So when the car that you and Deputy
3    Sheriff Mangrum -- strike that.
4          When you and Deputy Sheriff Mangrum
5    arrived at the CVS, there were no other police
6    officers there, correct?
7    A.   No.
8    Q.   Correct, there were no other police
9    officers there?
10   A.   No, there were no other police officers.
11   Q.   And when you arrived, you saw Tavares
12   Docher outside of the CVS?
13   A.   Yes.
14   Q.   And explain to me his demeanor when you
15   arrived to the CVS.
16   A.   When we pulled up into the parking lot,
17   Mr. Docher began walking briskly towards the patrol
18   car, and Deputy Mangrum was parked adjacent; he was
19   the closest to Mr. Docher, and he made contact
20   first. And Mr. Docher seemed somewhat relieved we
21   were there, because he wanted to explain his
22   situation and why he believed that his life was in
23   danger.
24   Q.   And when Tavares Docher was speaking with
25   Deputy Sheriff Mangrum, were you still inside the

11 (Pages 38 to 41)

Page 42

1  police car?
2  A. No.
3  Q. So is it correct that you and Deputy
4  Sheriff Mangrum both made contact with Tavares
5  Docher?
6  A. Yes.
7  Q. And at that point when you initially spoke
8  with Tavares Docher, did you ever feel that your
9  life was in danger at that point?
10  A. No.
11  Q. Did you ever feel if at that point Tavares
12  Docher was exhibiting any signs that would place you
13  or Deputy Sheriff Mangrum in fear for your lives?
14  A. At that point when we were speaking to
15  him, no.
16  Q. And during this conversation, did it
17  appear to you if Tavares Docher was experiencing
18  excited delirium?
19  A. No. I wasn't sure what he was
20  experiencing. This was my second week on the road,
21  so I knew he was off, but I didn't know what was
22  wrong with him.
23  Q. And when you say that you "knew that he
24  was off," what do you mean by that?
25  A. Well, the Broward County Sheriff's Office

Page 43

1  doesn't have a SEAL Team Six, nor do they decapitate
2  people.
3  Q. So you felt that Tavares Docher was acting
4  strange.
5  A. Yes.
6  Q. Did you feel that he may be under the
7  influence of alcohol or drugs?
8  A. At that point I didn't know.
9  Q. Did you think that Tavares Docher may be
10  experiencing a psychotic episode?
11  A. At that point I didn't know. It was all
12  through the interpretation.
13  Q. And during this conversation that you and
14  Deputy Sheriff Mangrum had with Tavares Docher, is
15  it correct that Tavares Docher told you and Deputy
16  Sheriff Mangrum that he had drank some Natty Ice?
17  A. He told that to myself and deputy --
18  excuse me -- myself, Deputy Mangrum, and Deputy
19  Newman. Because Deputy Newman asked him, "How much
20  have you had to drink"?
21  Q. How long did the conversation last between
22  you, Deputy Mangrum, and Tavares Docher before
23  Deputy Newman arrived?
24  A. To be specific, I don't know. Anywhere
25  between two to five minutes. Two to five, six

Page 44

1  minutes.
2  Q. And is it correct that Deputy Sheriff
3  Newman was the third officer to be on scene?
4  A. Technically, he was the second because I
5  was still riding with him. But, yes, you could say
6  that.
7  Q. So after the conversation that you and
8  Deputy Sheriff Mangrum had, is it fair to say that
9  Deputy Sheriff Newman arrived on scene and then
10  there were three police officers on scene?
11  A. Yes.
12  Q. And at that point Deputy Sheriff Newman
13  started to participate in the conversation that you
14  were having with Tavares Docher?
15  A. Yes.
16  Q. And during the conversation that you,
17  Deputy Sheriff Mangrum, Deputy Sheriff Newman was
18  having with Tavares Docher, at any point during that
19  conversation did you start to think to yourself:
20  This individual is experiencing excited delirium?
21  A. No. Not at that point.
22  Q. How is Tavares Docher's demeanor once
23  Deputy Sheriff Newman arrived on scene?
24  A. He was still pretty calm and collected.
25  Q. How long after Deputy Sheriff Newman

Page 45

1  arrived was Tavares Docher placed under arrest for
2  disorderly conduct?
3  A. A few minutes. Say, at least 10.
4  Q. Okay. So during that period of time, tell
5  me why it was that Deputy Sheriff Newman placed
6  Tavares Docher under arrest for disorderly conduct.
7  MR. GIUFFREDA: Form. You could answer.
8  A. Why? I'm not really sure why he did it.
9  Maybe that was his best decision.
10  BY MR. HECHT:
11  Q. Well, you were there, correct?
12  A. Yes.
13  Q. And you were involved in all the
14  conversations that Deputy Sheriff Newman was having
15  with Tavares Docher?
16  A. Yes.
17  Q. And so far, I've heard you tell me that
18  Tavares Docher seemed kind of off, correct?
19  A. Yes.
20  Q. And I've asked you to describe his
21  demeanor. And you've told me it was pretty calm.
22  "He was relieved to have us there," correct?
23  A. Yes.
24  Q. So what I want to know is, is that if you
25  got a calm person who is relieved that law

12 (Pages 42 to 45)

Page 46

1    enforcement is there to help them, why is it that
2    Deputy Sheriff Newman placed Tavares Docher under
3    arrest for disorderly conduct?
4          MR. GIUFFREDA: Form. You could answer.
5       A. Sir, I can't really answer that question
6    for Deputy Newman.
7       BY MR. HECHT:
8       Q. Do you believe that there was probable
9    cause at that point for Deputy Sheriff Newman to
10   place Tavares Docher under arrest for disorderly
11   conduct based on what you observed?
12         MR. GIUFFREDA: Form. You could answer.
13      A. Do I personally believe that? Yes.
14      BY MR. HECHT:
15      Q. So my question is: Based on your training
16   and experience, why is it that there was probable
17   cause to place Tavares Docher under arrest for
18   disorderly conduct?
19         MR. GIUFFREDA: Form. You could answer.
20      A. Well, to be honest, it really could have
21   went either way. As I said before, he was a little
22   off. So with the conversations of the Broward
23   sheriff's office SEAL Team Six, the decapitations,
24   between speaking with him and asking him about his
25   personal history and him disclosing the information

Page 47

1    that, you know, he had been arrested in Broward
2    County, that he had -- that he was a registered sex
3    offender, that he knew his birthday, social security
4    number, he knew where he was, he knew why he was in
5    town, it could have went either way. I know
6    personally from my standpoint while talking with
7    him, as the wind changed -- the wind of the
8    direction changed -- excuse me -- the wind of the
9    direction changed, I smelled alcohol on his breath.
10   So I think that answers your question. But I can't
11   tell you why he decided to do that.
12      BY MR. HECHT:
13      Q. And your testimony is that Deputy Sheriff
14   Newman placed Tavares Docher under arrest for
15   disorderly conduct?
16      A. Yeah.
17         MR. GIUFFREDA: Form. You could answer.
18      A. Yeah.
19      BY MR. HECHT:
20      Q. What are the elements to arrest someone
21   for disorderly conduct?
22      A. Well, you either are drunk in a public
23   place causing a disturbance, or you are -- you're
24   just inebriated and you're going to be a danger to
25   yourself. You're causing a public nuisance.

Page 48

1       Q. And disorderly conduct is a second-degree
2    misdemeanor, correct?
3       A. I'm not sure.
4       Q. But it is a misdemeanor, correct?
5       A. Yes.
6       Q. It's certainly not a felony?
7       A. No.
8       Q. In order to place someone under arrest for
9    a second degree misdemeanor, does the officer have
10   to observe the conduct of the person?
11         MR. GIUFFREDA: Form. You could answer.
12      A. Yes.
13      BY MR. HECHT:
14      Q. Based on what you observed during this
15   interaction that you had with Tavares Docher outside
16   of the CVS, do you believe that Tavares Docher was
17   drunk?
18         MR. GIUFFREDA: Form. You could answer.
19         MS. TYK: Object to form.
20      A. What did she say?
21         MR. GIUFFREDA: She just joined in my
22   objection. You could answer.
23      A. Could you ask the question one more time?
24      BY MR. HECHT:
25      Q. Sure. Based upon your interaction with

Page 49

1    Tavares Docher outside of the CVS, prior to deputy
2    sheriff Newman arresting Tavares Docher, do you
3    believe that Tavares Docher was drunk?
4          MR. GIUFFREDA: Form. You could answer.
5       A. To be --
6          MS. TYK: Join.
7       A. To be quite honest, I wasn't sure.
8          MS. TYK: Go ahead.
9       A. It was -- like I said, it was my second
10   week on the job. He had been drinking, but I
11   wouldn't -- to be honest, I wasn't sure -- I didn't
12   know whether he was drunk or not. I didn't know
13   whether he was mentally delusional. I didn't know
14   whether it was a combination of both. I didn't
15   know.
16      BY MR. HECHT:
17      Q. During the interaction that you had with
18   Tavares Docher prior to Deputy Sheriff Newman
19   placing Tavares Docher under arrest, did you witness
20   Tavares Docher causing any sort of public
21   disturbance?
22         MR. GIUFFREDA: Form. You could answer.
23      A. He was very loud and boisterous, and he
24   caused a scene at several points. Basically, the
25   volume of his voice caused a lot of attention. But

Page 50

1  he -- other than that, he was very animated.  So as
2  he told the story about the Broward County Sheriff
3  Office SEAL Team Six, he was kind of flailing around
4  and just telling the story for the most part.
5  That's mainly it.
6     BY MR. HECHT:
7     Q.  Okay.  My specific question is, though:
8  Prior to Tavares Docher being placed under arrest by
9  Deputy Sheriff Newman, did you feel that based upon
10 your interaction with Tavares Docher that he was
11 causing a public disturbance?
12        MR. GIUFFREDA:  Form.  You could answer.
13    A.  Yes.
14    BY MR. HECHT:
15    Q.  Didn't you tell me, though, prior he was
16 calm and that he was relieved that you guys were
17 there?
18    A.  Yes, but he kind of wavered, because he
19 had highs and lows during the conversation; like,
20 when we got there, I guess he was calm.  Then as he
21 told the story, he got up there.  And then I asked
22 him about his background; he got calm again.  We
23 asked him some more stuff about Broward, and he kind
24 of got amped up again.  And then he was calm at the
25 time he got placed into handcuffs.

Page 51

1     Q.  Did you ever think during that time that
2  it would have been appropriate to call medical
3  personnel to have Tavares Docher checked out?
4     A.  I didn't think so.  At that point in time,
5  no, I was still brand new.
6     Q.  Yet you had all of the authority and power
7  to make arrests during this time, correct?
8     A.  Yes.  But I wasn't going to exercise the
9  authority not really knowing what I was doing.
10    Q.  During the interaction that you had with
11 Tavares Docher prior to the point in time in which
12 Deputy Sheriff Newman placed Tavares Docher in
13 handcuffs, did you believe that Tavares Docher was a
14 danger to himself or others?
15    A.  Yes.
16    Q.  Why is that?
17    A.  Because of what he was telling us and the
18 screwdriver incident.  I, you know, to be honest, if
19 9-1-1 had not been called and a person of Arabic
20 descent came into the CVS, he may have stabbed him,
21 based off what he was telling us.
22    Q.  So Tavares Docher was placed in handcuffs
23 behind his back by Deputy Sheriff Newman and put
24 into the patrol car, correct?
25    A.  Yes.

Page 52

1     Q.  And after being placed in the patrol car,
2  he ran out of the patrol car, correct?
3     A.  Yes.
4     Q.  And after Tavares Docher ran out of the
5  patrol car, is it correct that you struck a large
6  muscle mass on or about Tavares Docher's legs and
7  hips?
8     A.  His upper thigh, yes.
9     Q.  Why did you do that?
10    A.  To stifle him from running away full speed
11 with his hands tied behind his back.  It was a
12 technique taught to us inside the basic law academy.
13    Q.  At this point there were three officers on
14 scene, correct?
15    A.  Yes.
16    Q.  At this point in time Tavares Docher still
17 had the handcuffs behind his back.
18    A.  Yes.
19    Q.  And after you struck his legs and hip, he
20 fell to the ground, correct?
21    A.  No, I struck his hips, and then I grabbed
22 his legs, and then we fell to the ground.
23    Q.  And when you fell to the ground, what
24 position did you take on Tavares Docher at that
25 point in time?

Page 53

1     A.  His legs.
2     Q.  And Deputy Sheriff Mangrum was where at
3  that point?
4     A.  He was near his upper body.
5     Q.  And where was Deputy Newman at that point
6  in time?
7     A.  Near his upper body.
8     Q.  While all three deputies were trying to
9  control Tavares Docher, was he struggling?
10    A.  Yes.
11    Q.  And while Tavares Docher was on the ground
12 struggling, did Deputy Mangrum utilize palm heel
13 strikes to large muscle areas, including Tavares's
14 shoulders, chest, and back?
15    A.  I don't know.  I didn't see that, but
16 that's what's in the report.
17    Q.  What is a palm heel strike to a large
18 muscle area?
19    A.  It is when you take your open hand, curl
20 your fingers halfway down, and use a forward
21 striking motion making contact with the palm of your
22 hand to whatever muscle group you're aiming at.
23    Q.  Based upon your training and experience,
24 is a palm heel strike when an officer has a closed
25 fist?

14 (Pages 50 to 53)

Page 54

1    A. No. A palm heel strike is a palm heel
2  strike.
3    Q. So the fist is not closed.
4    A. No.
5    Q. Is a palm heel strike to a large muscle
6  mass, including the shoulders, chest, or back, based
7  on your training and experience, likely to cause
8  great bodily harm?
9      MR. GIUFFREDA: You could answer.
10    A. No. Well, I think any strike is likely to
11  cause bodily harm. But no, it's not classified that
12  something is restricted. Only for emergencies.
13  BY MR. HECHT:
14    Q. So would you agree with me that a palm
15  heel strike to a large muscle mass, including the
16  shoulders, chest, and back, is likely to cause great
17  bodily harm?
18      MR. GIUFFREDA: Form. You could answer.
19    A. No.
20  BY MR. HECHT:
21    Q. Didn't you just tell me that any strike
22  could cause great bodily harm?
23    A. Yes.
24    Q. Let me ask the question again. Can a palm
25  heel strike to a large muscle area, including the

Page 55

1  shoulders, chest, and back, cause great bodily harm?
2    A. On a normal, healthy person, no.
3    Q. Did you know Tavares Docher was a normal,
4  healthy person?
5    A. He seemed to be.
6    Q. Did you examine him?
7    A. No. Just from speaking with him, looking
8  at his mannerisms.
9    Q. And he seemed odd to you?
10    A. He seemed normal.
11    Q. I thought you said he was off?
12    A. There is a lot of off people out there.
13    Q. I want to know about him. Did he seem
14  normal to you, or was he off?
15    A. He seemed off mentally but physically he
16  seemed normal.
17    Q. Did Deputy Newman apply his right thumb to
18  the nerve mass in the neck of Tavares Docher?
19    A. I didn't see him do that.
20    Q. If Deputy Newman applied his right thumb
21  to the nerve mass in Tavares Docher's neck, would
22  that be classified based upon basic law enforcement
23  training as likely to cause great bodily harm?
24      MR. GIUFFREDA: Form. You could answer.
25    A. No.

Page 56

1  BY MR. HECHT:
2    Q. If Deputy Newman applied his right thumb
3  to the nerve mass in Tavares Docher's neck based
4  upon what you've learned in the basic law
5  enforcement training, would that be classified as
6  deadly force?
7      MR. GIUFFREDA: Form. You could answer.
8    A. No.
9  BY MR. HECHT:
10    Q. Are you aware if Deputy Newman gave an
11  elbow strike to the right side of Tavares Docher's
12  head?
13    A. No, I didn't see that.
14    Q. If Deputy Newman gave an elbow strike to
15  the right side of Tavares Docher's head, based upon
16  what you learned in the basic law enforcement
17  training, would that be likely to cause great bodily
18  harm?
19      MR. GIUFFREDA: Form. You could answer.
20    A. Yes.
21  BY MR. HECHT:
22    Q. If Deputy Newman gave an elbow strike to
23  the right side of Tavares Docher's head based upon
24  what you learned in the basic law enforcement
25  training, would that be classified as deadly force?

Page 57

1      MR. GIUFFREDA: Form. You could answer.
2    A. From basic law enforcement academy or from
3  St. Lucie?
4  BY MR. HECHT:
5    Q. Based upon your training in the basic law
6  enforcement training --
7    A. No.
8    Q. -- if Deputy Newman gave an elbow strike
9  to the right side of Tavares Docher's head based
10  upon any of the training experience that you have
11  ever been through, would that be likely to cause
12  great bodily harm?
13      MR. GIUFFREDA: Form. You could answer.
14    A. Yes.
15  BY MR. HECHT:
16    Q. If Deputy Newman gave an elbow strike to
17  the right side of Tavares Docher's head, based upon
18  any and all of the training and experience that
19  you've undergone in your law enforcement career,
20  would those actions be classified as deadly force?
21      MR. GIUFFREDA: Form. You could answer.
22    A. No.
23  BY MR. HECHT:
24    Q. Did you ever witness Deputy Newman give an
25  elbow strike to the right side of Tavares Docher's

15 (Pages 54 to 57)

## Page 58

1   head?
2        MR. GIUFFREDA: Form. You could answer.
3        A. No.
4   BY MR. HECHT:
5        Q. If you had seen Deputy Newman strike
6   Tavares Docher with his elbow to the right side of
7   his head, would you have told Deputy Newman to stop
8   doing that?
9        MR. GIUFFREDA: Form. You could answer.
10       A. Yes.
11  BY MR. HECHT:
12       Q. Why?
13       A. Because it wouldn't need it. I don't
14  know.
15       Q. Why would Tavares Docher not have needed a
16  right elbow -- strike that.
17       Why would Tavares Docher not have needed
18  an elbow strike to the right side of his head?
19       MR. GIUFFREDA: Form. You could answer.
20       A. From my perspective, it didn't seem that
21  way.
22  BY MR. HECHT:
23       Q. What did not seem that way?
24       A. That he needed it.
25       Q. Why did he not need it?

## Page 59

1        MR. GIUFFREDA: Form. You could answer.
2        A. From my perspective, he was fighting with
3   me with his legs, and there is just no need to hit
4   somebody while they're on the ground handcuffed and
5   struggling.
6   BY MR. HECHT:
7        Q. If Deputy Newman gave an elbow strike to
8   Tavares Docher's head, based on your training and
9   experience would Deputy Newman have utilized
10  excessive and unreasonable use of force?
11       MR. GIUFFREDA: Form, you could answer.
12       A. No.
13  BY MR. HECHT:
14       Q. But you would agree with me that if Deputy
15  Newman gave an elbow strike to the right side of
16  Tavares Docher's head, that based upon your training
17  and experience that would be likely to cause great
18  bodily harm?
19       MR. GIUFFREDA: Form. You could answer.
20       A. Yes.
21  BY MR. HECHT:
22       Q. But it would not be considered excessive
23  and unreasonable use of force under these
24  circumstances?
25       MR. GIUFFREDA: Form. You could answer.

## Page 60

1        A. Every officer conceives the situation
2   differently. I can't say what Deputy Newman felt or
3   saw was needed at the time. Deputy Newman was a lot
4   more experienced than I was. At this point, like I
5   said, I had been working the road for two weeks.
6   So, approximately 10 days. So I can't tell you that
7   yes or no, whether Deputy Newman did the right
8   actions based off his appropriate training. But for
9   me at that point, no.
10  BY MR. HECHT:
11       Q. If you were controlling Tavares Docher's
12  legs and Deputy Mangrum and Deputy Newman were
13  controlling his upper body, if in that circumstance
14  Deputy Sheriff Newman, while Tavares Docher was
15  handcuffed behind his back, gave an elbow strike to
16  Tavares Docher's head, do you believe that Deputy
17  Sheriff Newman in doing that used excessive and
18  unreasonable use of force?
19       MR. GIUFFREDA: Form. You could answer.
20       A. No, I can't speak for Deputy Newman and
21  his own actions.
22  BY MR. HECHT:
23       Q. At any point during the struggle with
24  Tavares Docher, did you ever say to Deputy Sheriff
25  Newman or Deputy Sheriff Mangrum to stop hitting

## Page 61

1   Tavares Docher or striking Tavares Docher in any
2   way?
3        MR. GIUFFREDA: Form. You could answer.
4        A. No, not from what I recall.
5   BY MR. HECHT:
6        Q. What involvement did Deputy Sheriff Wade
7   Courtemanche have during this interaction with
8   Tavares Docher?
9        A. To be honest, I don't remember.
10       Q. Do you remember Deputy Sheriff Wade
11  Courtemanche at CVS?
12       A. No, I never saw him there.
13       Q. During your entire interaction with
14  Tavares Docher, was at any point Tavares Docher
15  causing you to believe that he was exhibiting a
16  level of force whereby it would be necessary to
17  justify your use of deadly force?
18       A. Deadly force? No.
19       Q. Based upon your interaction with Tavares
20  Docher at the CVS, was Tavares Docher at any point
21  in time causing you to believe that Tavares Docher
22  was exhibiting a level of force against Deputy
23  Sheriff Newman or Deputy Sheriff Mangrum whereby it
24  would have been necessary for Deputy Sheriff Newman
25  or Deputy Sheriff Mangrum to justify the use of

16 (Pages 58 to 61)

Page 62

1 deadly force against Tavares Docher?
2      A.  No.
3      Q.  Were you trained in basic law enforcement
4 training to intervene when you see another officer
5 committing a constitutional violation of deadly
6 force?
7      A.  Yes.
8      Q.  Were you also taught this in your training
9 at the St. Lucie County Sheriff's Office?
10      A.  Yes.
11      Q.  Was it solely Deputy Sheriff Newman's
12 decision to make an arrest in this case; or did he
13 discuss whether to make an arrest with either you
14 and Deputy Sheriff Mangrum?
15      A.  It was his decision because it was his
16 arrest.
17      Q.  Did you ever have a conversation with
18 Tavares Docher after he was handcuffed and on the
19 ground?
20      A.  No.
21      Q.  Did you ever tell Tavares Docher to stop
22 resisting once he was on the ground with handcuffs
23 behind his back?
24      A.  Yes.
25      Q.  So it's your testimony that Tavares Docher

Page 63

1 was resisting arrest?
2      A.  He was, yes.
3      Q.  How was he resisting arrest?
4      A.  For one, he tried to flee.  And two, we
5 had to tackle him to the ground.  And three, he was
6 bucking and flailing around his legs, so I was on
7 top of his legs and I had to tell him to stop
8 resisting.
9      Q.  Is one of the reasons that Tavares Docher
10 was flailing his legs, as you say, because he
11 couldn't breathe?
12           MR. GIUFFREDA:  Form.  You could answer.
13      A.  No.
14 BY MR. HECHT:
15      Q.  This was a significant struggle, wasn't
16 it?
17      A.  Yes.
18      Q.  Do you remember how Tavares Docher was
19 breathing?
20      A.  He was -- no, not specifically, not at
21 this point.
22      Q.  Was he having a difficult time breathing?
23      A.  I don't think so.
24      Q.  Have you seen any video footage of the
25 arrest of Tavares Docher or anything thereafter?

Page 64

1      A.  Yes.
2      Q.  You saw the struggle on video?
3      A.  Yes.
4      Q.  It was taken by a bystander.
5      A.  Yes.
6      Q.  When was the last time you saw that video?
7      A.  Today.
8      Q.  Right before this deposition?
9      A.  Uh-huh.
10      Q.  How long did the struggle last once you
11 and Tavares Docher fell to the ground?
12      A.  I'd say it lasted less than a minute.  And
13 he calmed down and then he -- for a minute or two.
14 And he started struggling again for, like, another
15 minute or two, and then he calmed down.  And by the
16 time fire rescue came, he was calm until we
17 attempted to put him on the gurney, and then he
18 began to become hostile again.
19      Q.  Prior to fire rescue arriving and your
20 attempt to put him on a gurney, how long did the
21 struggle last for?
22           MR. GIUFFREDA:  In total, or which --
23           MR. HECHT:  In total.
24 BY MR. HECHT:
25      Q.  Prior to fire rescue arriving, how long

Page 65

1 did the total struggle last for?
2      A.  I don't know specifically.
3      Q.  How long was Tavares Docher face first on
4 the ground with his stomach on the ground?
5      A.  I don't know specifically.  But at one
6 point I remember rolling him over to the side so he
7 can breathe.
8      Q.  Prior to rolling him over to the side, how
9 long had the struggle lasted for?
10      A.  Less than a minute.
11      Q.  When you were -- when you fell down with
12 Tavares Docher, why was there a need for three
13 officers to gain control of him?
14      A.  Well, when he lunged out of the car, he
15 lunged at the two other deputies.  I stood to the
16 side.  And as he pushed him across the parking lot,
17 that's when I performed the take-down.  It just
18 happened just like that.
19      Q.  Why didn't you just lift Tavares Docher
20 off the ground since he was handcuffed behind his
21 back?
22           MR. GIUFFREDA:  Form.
23      A.  Because that's dangerous.
24 BY MR. HECHT:
25      Q.  Why is that dangerous?

17 (Pages 62 to 65)

Page 66

1    A.  If I lift him several feet off the air and
2  he falls on his head while he's handcuffed, he could
3  get hurt.
4    Q.  So based upon your training and
5  experience, are you trained to keep an individual
6  laying on the ground with handcuffs behind them?
7    A.  Yes, until you can gain compliance.
8    Q.  No matter how much time goes by and how
9  long a struggle ensues.
10    A.  Yes.  And then once they're compliant, you
11  lift them you up.  You can either sit them up or
12  roll them on their side, whatever.  But you don't
13  pick them up.
14    Q.  Did you have any conversations with
15  paramedic Jose Rosario prior to that paramedic
16  administering the injection?
17    A.  Yes, a quick conversation.  He asked what
18  happened, and we told him that we had to take him
19  down to the floor, he hit his head, and that's where
20  the blood came from, and that was pretty much it.
21    Q.  Did paramedic Jose Rosario ever discuss
22  with you whether or not he should inject Tavares
23  Docher with any sort of medication?
24    A.  No.
25    Q.  Did you hear any conversations -- let me

Page 67

1  rephrase.
2    Did you ever hear any conversations
3  between any of the deputies on scene discuss whether
4  or not Jose Rosario should inject Tavares Docher
5  with a medication?
6    A.  No.
7    Q.  Did you ever see Jose Rosario, who was the
8  paramedic that injected my client with a sedative --
9  did you ever see him try and talk to Tavares Docher
10  prior to administering the injection?
11    A.  Yes.
12    MS. TYK:  Form.
13  BY MR. HECHT:
14    Q.  What do you remember about that
15  conversation?
16    A.  She said something.
17    Q.  It's okay.
18    MR. GIUFFREDA:  You could answer.
19    A.  I remember him saying, "Hey man, what's
20  up?  How can we help you?"  I think that's pretty
21  much it.
22  BY MR. HECHT:
23    Q.  He literally said, "Hey man, what's up?
24  How can we help you?"
25    A.  Yes, from what I remember.

Page 68

1    Q.  And do you recall what Tavares Docher's
2  response was?
3    A.  He didn't respond.  He just kind of just
4  sat there.  When we turned him over, he kicked him.
5    Q.  Did you ever -- strike that.
6    Were you ever investigated by internal
7  affairs as a result of this incident?
8    A.  Yes.
9    Q.  And what was the outcome of that?
10    A.  I was cleared negative findings, I guess
11  is the proper termination.
12    Q.  You were not disciplined and sanctioned in
13  any way as a result of your involvement with this
14  incident?
15    A.  No.
16    Q.  Do you know if any of the officers
17  involved with this incident on May 11, 2014 were
18  ever disciplined or sanctioned in any way?
19    A.  No, I don't think so.
20    Q.  Do you believe that you followed all of
21  the customs, policies, and procedures of the
22  St. Lucie County Sheriff's Office in your
23  involvement with this incident involving my client?
24    MR. GIUFFREDA:  Form.  You could answer.
25    A.  Yes.

Page 69

1
2  BY MR. HECHT:
3    Q.  Do you believe that the actions of Deputy
4  Sheriff Newman and Deputy Sheriff Mangrum complied
5  with the customs, policies, and practices of the
6  St. Lucie County Sheriff's Office and their
7  involvement in this case?
8    MR. GIUFFREDA:  Form.  You could answer.
9    A.  Yes.
10    MR. HECHT:  All right.  Why don't we take
11  a break?  We can go off the record.
12    (Recess 12:25 p.m. until 12:32 p.m.)
13  BY MR. HECHT:
14    Q.  All right, sir.  I'm going to show you a
15  video that's approximately 1 minute and 11 seconds,
16  and it was taken by a bystander.  I'm going to have
17  you watch the video, and then I will ask you some
18  questions.  Okay?
19    A.  Okay.
20    (Video played.)
21  BY MR. HECHT:
22    Q.  Based on the video that you just watched,
23  I see that there are two white officers and a black
24  officer, correct?
25    A.  Yes.

## Page 70

1    Q.   Who is the officer who is a white male
2  with a bald head?
3    A.   That is Deputy Clay Mangrum.
4    Q.   And who is the other white officer?
5    A.   Deputy Christopher Newman.
6    Q.   In this video did you see Deputy Sheriff
7  Mangrum with his foot on Tavares Docher's neck?
8    A.   No.  I saw it his on back.
9    Q.   And what offensive or defensive technique
10  is that known as?
11    A.   I don't know.  I've never learned that
12  one.
13    Q.   Is the "foot on the back technique"
14  trained in the basic law enforcement training
15  program?
16    A.   No.
17    Q.   Did you ever learn the "foot on the back
18  technique" during your training with the St. Lucie
19  County Sheriff's Office?
20    A.   No.
21    Q.   Is that an approved technique?
22    A.   I don't know.  I never heard them speak
23  about saying not to do it.
24    Q.   And the third officer, is that you?
25    A.   Yes.

## Page 71

1    Q.   In this video, at any point did you see
2  yourself punch Tavares Docher on his side?
3    A.   There is a closed-fist strike to his upper
4  thigh.
5    Q.   And what was the purpose of you striking
6  Tavares Docher with a closed fist strike to his
7  upper thigh?
8    A.   To gain compliance from him to stop him
9  from kicking.
10    Q.   Did you have any other options besides
11  punching him?
12    A.   At that part of his body, no.
13    MR. HECHT:  Okay.  You could go back and
14  sit down.  That's all the questions I have on
15  the video.  Let me go back and look at my notes
16  very quickly, sir.
17    Okay.  Thank you, sir, I don't have any
18  other questions.
19    MR. GIUFFREDA:  Julie?
20    MS. TYK:  Yep, just a couple.
21    CROSS-EXAMINATION
22  BY MS. TYK:
23    Q.   Good afternoon.  My name is Julie Tyk.  I
24  represent the St. Lucie Fire District and Jose
25  Rosario.  I just have a few questions for you.

## Page 72

1    Do you personally know Mr. Rosario?
2    A.   No.
3    Q.   Do you recall anytime during the struggle
4  in which Mr. Docher was yelling, "Don't let them
5  kill me" on May 11, 2014?
6    A.   You said, "Do I recall that"?
7    Q.   Right.
8    A.   Yes, ma'am.
9    Q.   Okay.  When the fire rescue EMS personnel,
10  including Mr. Rosario, arrived on scene, was
11  Mr. Docher yelling that phrase at that time?
12    A.   No.
13    Q.   Was there any discussions with the fire
14  rescue personnel, including Mr. Rosario, to give
15  Tavares Docher an injection to prevent him from
16  speaking?
17    A.   No, ma'am.
18    MS. TYK:  That's all the questions I have.
19    MR. GIUFFREDA:  I have none.  Do you have
20  any more?  If it's ordered, he'll read.
21    MR. HECHT:  I will be ordering.
22    MR. GIUFFREDA:  I'll take a regular and a
23  mini.
24    THE COURT REPORTER:  Ms. Tyk, do you need
25  a copy?

## Page 73

1    MS. TYK:  Yes.  E-tran, please.
2    MR. GIUFFREDA:  As far as reading goes,
3  can you send it to me and I'll make sure he
4  gets it?
5    (The proceedings concluded at 12:40 p.m.)

www.phippsreporting.com
888-811-3408

Page 74

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF PALM BEACH

      I, the undersigned authority, certify that CALVIN ROBINSON personally appeared before me and was duly sworn on the 25th day of May, 2017.

      Signed this 30th day of May, 2017.

PATRICIA A. LANOSA, RPR, FPR, CSR
Notary Public, State of Florida
My Commission No. FF 169350
Expires: 10/19/2018

---

Page 75

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF PALM BEACH

      I, PATRICIA A. LANOSA, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of CALVIN ROBINSON; Pages 1 through 77; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

      I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

      Dated this 30th day of May, 2017.

PATRICIA A. LANOSA, RPR, FPR, CSR

---

Page 76

May 30, 2017
PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
c/o Calvin Robinson
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
(954)462-3200
ATTN:  RICHARD GIUFFREDA, ESQUIRE

Re:  Docher v. Newman et al.
Case No.:  2:16cv14413
Please take notice that on the 25th day of May, 2017, you gave your deposition in the above cause. At that time, you did not waive your signature. The above-addressed attorney has ordered a copy of this transcript and will make arrangements with you to read their copy.  Please execute the Errata Sheet, which can be found at the back of the transcript, and have it returned to us for distribution to all parties.

If you do not read and sign the deposition within thirty (30) days, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.
If you wish to waive your signature now, please sign your name in the blank at the bottom of this letter and return to the address listed below.
Very truly yours,

PATRICIA A. LANOSA, RPR, FPR, CSR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401
I do hereby waive my signature.
_____
CALVIN ROBINSON

---

Page 77

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
In Re:  DOCHER V. NEWMAN ET AL.
Case No.:  2:16cv14413
CALVIN ROBINSON
May 25, 2017

PAGE  LINE    CHANGE        REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____    _____
Date          CALVIN ROBINSON

**A**

**a.m** 1:21 4:1
**ability** 22:19
  25:12
**able** 24:5,7,8,9
  24:13,14,25
  25:1,8,8,13
  37:1
**above-address...**
  76:9
**academy** 14:8
  14:10,10,11,22
  15:8,17 19:17
  52:12 57:2
**Act** 31:4,4 32:10
**Acted** 32:4,8,18
**acting** 10:5 43:3
**action** 75:17,18
  60:8,21 69:3
**actions** 57:20
**Adam** 2:6 4:15
**addition** 7:17
**additional** 16:3
  18:14
**address** 5:20
  10:8 76:16
**adjacent** 41:18
**administering**
  66:16 67:10
**administration**
  6:24
**AED** 40:17
**affairs** 68:7
**affirmed** 4:9
**afternoon** 71:23
**agencies** 13:2
**agency** 12:18
  13:24 14:2
  20:10,11 26:11
**agree** 26:15,24
  27:6,13,20
  28:2,9,16,23
  29:6,12,19
  54:14 59:14
**ahead** 49:8
**aiming** 53:22

**air** 19:9,10,15
  39:20 66:1
**al** 76:5 77:3
**alcohol** 34:10
  43:7 47:9
**allowed** 25:6
**ambulance**
  31:16,19 32:1
  32:11,19 39:16
  39:24,24 40:21
**amped** 50:24
**animated** 50:1
**answer** 5:2
  26:19,21 27:3
  27:10,17,24
  28:6,13,20
  29:2,9,16,24
  30:9 31:1 32:3
  32:21 33:6
  45:7 46:4,5,12
  46:19 47:17
  48:11,18,22
  49:4,22 50:12
  54:9,18 55:24
  56:7,19 57:1
  57:13,21 58:2
  58:9,19 59:1
  59:11,19,25
  60:19 61:3
  63:12 67:18
  68:24 69:8
**answers** 26:14
  47:10
**anytime** 34:20
  34:21 72:3
**anyway** 5:18
**apparatus** 40:12
**appear** 42:17
**APPEARAN...**
  2:1
**appeared** 74:9
**application** 13:6
**applied** 8:21
  13:2 35:11,14
  40:16 55:20
  56:2
**apply** 4:22 55:17

**appropriate**
  51:2 60:8
**approval** 25:23
  26:3
**approved** 70:21
**approximately**
  4:20 60:6
  69:15
**Arabic** 51:19
**area** 15:4,10
  16:11,15 17:13
  17:17 53:18
  54:25
**areas** 15:1 53:13
**arm** 40:5,7
**arms** 40:2
**arrangements**
  76:9
**arrest** 25:11
  26:4 31:6 33:3
  35:19 37:25
  45:1,6 46:3,10
  46:17 47:14,20
  48:8 49:19
  50:8 62:12,13
  62:16 63:1,3
  63:25
**arrested** 38:1
  47:1
**arresting** 49:2
**arrests** 22:19
  24:9 51:7
**arrival** 36:3
**arrive** 30:16
  40:25
**arrived** 37:2
  40:19 41:5,11
  41:15 43:23
  44:9,23 45:1
  72:10
**arriving** 36:6
  64:19,25
**ash@searcyla...**
  2:7
**asked** 37:14,25
  38:2 39:7,11
  40:1,9,11

  43:19 45:20
  50:21,23 66:17
**asking** 22:18
  46:24
**assigned** 20:16
  20:20
**assist** 40:12
**assisted** 40:22
**assume** 5:3
  31:15 32:7
**assuming** 9:10
  31:18
**attempt** 64:20
**attempted** 39:8
  64:17
**attempting**
  36:23
**attend** 7:1 37:13
**attention** 49:25
**ATTN** 76:4
**attorney** 75:14
  76:9,13
**attorneys** 75:16
**August** 10:1,4
  20:5
**authority** 22:15
  51:6,9 74:8
**authorized** 75:8
**Avenue** 1:23
  2:15
**aware** 56:10

**B**

**Bachelor's** 7:14
**back** 8:25 9:25
  13:12 26:9
  28:25 29:7
  30:14 35:11,14
  37:3 38:6,7,17
  39:23 40:21
  51:23 52:11,17
  53:14 54:6,16
  55:1 60:15
  62:23 65:21
  70:8,13,17
  71:13,15 76:10
**background**

  50:22
**backup** 38:24
**backwards**
  39:14
**Baker** 31:4 32:4
  32:8,10,18
**bald** 70:2
**BARNHART**
  2:4
**BARRANCO**
  2:9 76:2
**Barry** 6:15,16
  6:21 7:1,7,10
  7:15 8:3,15,25
  9:7,25 10:5,11
  10:18 11:12
**based** 24:18
  29:12 30:3,19
  31:2,22 32:14
  32:24 33:15,23
  46:11,15 48:14
  48:25 50:9
  51:21 53:23
  54:6 55:22
  56:3,15,23
  57:5,9,17 59:8
  59:16 60:8
  61:19 66:4
  69:22
**basic** 14:13,16
  14:21,25 15:3
  15:8,16,22
  26:15,24 27:6
  27:13,20 28:2
  28:9,16,23
  29:5 35:7
  52:12 55:22
  56:4,16,24
  57:2,5 62:3
  70:14
**Basically** 49:24
**Beach** 2:4,5 74:5
  75:4 76:20
**beer** 38:4
**began** 4:1 7:7
  8:2,15 9:6,10
  9:17 14:6 16:1

19:18 35:20 39:14 41:17 64:18
**beginning** 7:2
**behalf** 2:2,8,13
**behavior** 33:24 34:6
**believe** 46:8,13 48:16 49:3 51:13 60:16 61:15,21 68:20 69:3
**believed** 29:21 41:22
**belt** 21:13,20
**best** 24:11 26:6 38:25 39:3 45:9
**birth** 5:12,15,20 5:21 6:2,7
**birthday** 47:3
**births** 6:5
**bit** 17:8
**black** 36:13,13 69:23
**blank** 76:15
**bleeding** 39:9
**blood** 66:20
**bodily** 27:2,9,23 28:12 29:1 54:8,11,17,22 55:1,23 56:17 57:12 59:18
**body** 34:7 37:18 53:4,7 60:13 71:12
**boisterous** 49:23
**bottom** 76:15
**Boulevard** 2:4 2:10 76:3
**brain-induced** 34:9
**branch** 19:8
**brand** 26:7 51:5
**break** 69:11
**breath** 47:9
**breathe** 63:11

65:7
**breathing** 35:10 40:12 63:19,22
**bridge** 27:22 28:4
**briskly** 41:17
**Broward** 36:19 37:12,16 42:25 46:22 47:1 50:2,23
**bucking** 63:6
**bulletproof** 22:7
**buttocks** 39:19
**bystander** 64:4 69:16

---

**C**
**c/o** 76:2
**CAD** 24:18 36:12
**call** 24:21,24 34:11 36:1,2,3 51:2
**called** 17:5 36:24 38:24 51:19
**calls** 24:18
**calm** 44:24 45:21,25 50:16 50:20,22,24 64:16
**calmed** 31:8 64:13,15
**Calvin** 1:9,17 4:8 5:11 74:9 75:9 76:2,22 77:4,24
**car** 21:8 30:15 37:6 38:6,9,11 38:12,15 41:2 41:18 42:1 51:24 52:1,2,5 65:14
**career** 57:19
**case** 1:2 5:17 34:13 62:12 69:7 76:6 77:3

**cause** 24:10,15 24:17 27:2,9 27:23 28:11 29:1 46:9,17 54:7,11,16,22 55:1,23 56:17 57:11 59:17 76:7
**caused** 49:24,25
**causing** 47:23 47:25 49:20 50:11 61:15,21
**certain** 36:24 37:24 39:4
**certainly** 48:6
**Certificate** 3:9 3:10 74:1 75:1
**certify** 74:8 75:7 75:13
**CHANGE** 77:6
**changed** 36:4 47:7,8,9
**CHANGES** 77:2
**checked** 51:3
**checklist** 24:23
**chemical** 34:9
**chest** 40:9,10,11 53:14 54:6,16 55:1
**Christopher** 1:8 70:5
**circumstance** 60:13
**circumstances** 59:24
**CIT** 17:6
**city** 10:24
**civilian** 26:5
**classification** 36:4
**classified** 26:17 27:16 28:4,18 29:8,15 36:2 54:11 55:22 56:5,25 57:20
**Clay** 20:21 70:3
**CLAYTON** 1:8

**cleared** 31:12 68:10
**Clerk** 76:14
**client** 7:23 67:8 68:23
**close** 38:21,22
**closed** 53:24 54:3 71:6
**closed-fist** 71:3
**closest** 41:19
**clothing** 21:23 22:12
**coded** 39:21
**collected** 44:24
**College** 18:22,24 19:2
**combination** 49:14
**come** 26:7 34:17
**coming** 37:19
**Commission** 74:16
**commit** 30:8 32:17
**committed** 30:22 31:25 33:2
**committing** 62:5
**Community** 18:22
**complete** 35:5
**compliance** 66:7 71:8
**compliant** 66:10
**complied** 69:4
**compressions** 40:10,10,11
**computer** 20:13
**conceal** 36:23
**conceives** 60:1
**concluded** 73:5
**conduct** 36:5 45:2,6 46:3,11 46:18 47:15,21 48:1,10
**confidentiality** 6:2

**connected** 75:17
**considered** 8:14 59:22
**consist** 16:5
**constitutional** 62:5
**contact** 26:4 29:20,22 30:4 30:20 31:23 32:15,25 34:17 36:8 41:19 42:4 53:21
**contacting** 30:7
**continued** 38:11
**control** 38:23 53:9 65:13
**controlling** 60:11,13
**conversation** 42:16 43:13,21 44:7,13,16,19 50:19 62:17 66:17 67:15
**Conversational** 14:17
**conversations** 45:14 46:22 66:14,25 67:2
**copy** 72:25 76:9 76:10
**correct** 8:4 9:8 9:15,18 10:3 12:12 18:5,9 33:12 41:6,8 42:3 43:15 44:2 45:11,18 45:22 48:2,4 51:7,24 52:2,5 52:14,20 69:24
**counsel** 75:14,16
**County** 1:10,12 2:13 8:19,22 9:3,14,21 10:6 10:22 11:3,5,8 11:18,21,24 12:11 13:16,23 14:3,7 16:2,10

16:14,19,24
17:12,16,21
18:1,5,9 19:19
19:23 20:7
30:13 31:3
34:3 35:20
36:19 37:12,16
42:25 47:2
50:2 62:9
68:22 69:6
70:19 74:5
75:4
**couple** 23:24
71:20
**course** 26:25
27:7,14 28:3
28:10,17,24
29:6
**courses** 10:19
35:8
**court** 1:1 4:2 6:8
37:13 72:24
76:14
**Courtemanche**
1:9 61:7,11
**crime** 26:13 30:8
30:22 31:25
32:17
**crisis** 17:6
**Cross** 3:8
**CROSS-EXA...**
71:21
**CSR** 1:25 74:15
75:21 76:18
**curl** 53:19
**currently** 6:12
11:11,17 12:8
**customers** 36:21
**customs** 68:21
69:5
**cut** 37:18 40:15
**CVS** 36:2,6,7,17
36:18 37:15
40:25 41:5,12
41:15 48:16
49:1 51:20
61:11,20

**D**

**D** 3:2
**danger** 41:23
42:9 47:24
51:14
**dangerous** 65:23
65:25
**date** 5:12,15,19
5:21 6:2,7 21:7
37:10 77:24
**Dated** 75:19
**dates** 6:4
**day** 21:11,25
74:10,12 75:19
76:7
**days** 60:6 76:13
**deadly** 26:18
27:16 28:5,19
29:8 56:6,25
57:20 61:17,18
62:1,5
**dealing** 33:22
**decapitate** 43:1
**decapitations**
46:23
**decided** 31:9
47:11
**decision** 13:15
25:20 45:9
62:12,15
**decisions** 25:15
**declare** 77:21
**Defendant** 2:8
**Defendants** 1:13
**defensive** 14:17
14:18 16:6
20:13 70:9
**deficiency** 35:16
35:19
**degree** 7:13
18:23 48:9
**delirium** 15:19
15:24 17:1
18:3,12,16
29:14,22 30:6
30:21,25 31:24

32:17 33:2,4
33:12,17,21
34:5,15,23
35:1 42:18
44:20
**delusional** 49:13
**demeanor** 41:14
44:22 45:21
**DENNEY** 2:3
**department**
12:6,15
**depends** 22:20
**deposition** 1:16
4:17,17 64:8
75:9 76:7,12
**depositions** 4:23
**deputies** 53:8
65:15 67:3
**deputy** 8:12
10:5 19:21,21
20:22 21:4,9
21:12,25 22:4
22:15 24:4
25:8,22 26:3
37:2,3,20,23
37:23,24 38:5
38:10,16,17,21
38:21,23 40:4
40:24 41:2,4
41:18,25 42:3
42:13 43:14,15
43:17,18,18,19
43:22,23 44:2
44:8,9,12,17
44:17,23,25
45:5,14 46:2,6
46:9 47:13
49:1,18 50:9
51:12,23 53:2
53:5,12 55:17
55:20 56:12,10
56:14,22 57:8
57:16,24 58:5
58:7 59:7,9,14
60:2,3,7,12,12
60:14,16,20,24
60:25 61:6,10

61:22,23,24,25
62:11,14 69:3
69:4 70:3,5,6
**descent** 51:20
**describe** 26:6
45:20
**described** 36:12
**description**
36:14
**detail** 25:19
**determination**
34:22 35:2,3
**determine** 24:15
33:16
**DICKER** 2:15
**died** 39:22
**different** 23:12
**differently** 60:2
**difficult** 63:22
**Direct** 3:8 4:11
**direction** 47:8,9
**dirt** 37:5
**discharged**
19:13
**disciplined**
68:12,18
**disclosing** 46:25
**discontinued**
11:23
**discretion** 25:16
**discuss** 62:13
66:21 67:3
**Discussion** 6:10
**discussions**
72:13
**disorderly** 36:5
38:1 45:2,6
46:3,10,18
47:15,21 48:1
**dispatched** 36:1
**distribution**
76:11
**district** 1:1,1,12
1:12 2:13
71:24
**disturbance**
47:23 49:21

50:11
**Docher** 1:4 4:16
7:24 34:14,15
34:18,21 35:25
36:9,11,18,21
37:3,7,21,25
38:2 39:14,18
39:19 40:18
41:12,17,19,20
41:24 42:5,8
42:12,17 43:3
43:9,14,15,22
44:14,18 45:1
45:6,15,18
46:2,10,17
47:14 48:15,16
49:1,2,3,18,19
49:20 50:8,10
51:3,11,12,13
51:22 52:4,16
52:24 53:9,11
55:3,18 58:6
58:15,17 60:14
60:24 61:1,1,8
61:14,14,20,20
61:21 62:1,18
62:21,25 63:9
63:18,25 64:11
63:12,19
66:23 67:4,9
71:2,6 72:4,11
72:15 76:5
77:3
**Docher's** 40:16
44:22 52:6
55:21 56:3,11
56:15,23 57:9
57:17,25 59:8
59:16 60:11,16
68:1 70:7
**DOCHER-NE...**
1:4
**document** 77:21
**doing** 23:7,9
51:9 58:8
60:17
**drank** 43:16

**Drawer** 2:5
**drink** 43:20
**drinking** 38:2
   49:10
**driving** 14:18,18
   36:7 39:25
**drop** 36:9
**drug** 34:10
**drugs** 43:7
**drunk** 47:22
   48:17 49:3,12
**duly** 4:9 74:10

**E**

**E** 3:2
**E-tran** 73:1
**early** 20:5
**East** 2:10 76:3
**EDELMAN**
   2:15
**educated** 14:12
   15:23
**education** 18:21
**Eighteen** 11:16
**either** 22:4,7
   46:21 47:5,22
   62:13 66:11
**elbow** 26:17
   27:1 56:11,14
   56:22 57:8,16
   57:25 58:6,16
   58:18 59:7,15
   60:15
**electrical** 40:17
**elements** 26:13
   47:20
**ELSER** 2:14
**emergencies**
   54:12
**emergency** 7:14
   29:15
**employed** 9:13
   11:17 16:9
**employee** 75:14
   75:15
**employer** 6:12
**employment**

8:16,18 9:20
11:20,23 12:17
13:22 14:6
16:1,13,18,23
19:18
**EMS** 72:9
**enforcement**
12:18 13:24
14:2,13,16,21
14:25 15:4,9
15:16,22 26:16
26:25 27:7,14
27:21 28:3,10
28:17,24 29:5
29:20 30:3
31:12 35:8
40:25 46:1
55:22 56:5,16
56:24 57:2,6
57:19 62:3
70:14
**enrolled** 8:15
**ensues** 15:14
16:21 17:23
66:9
**ENTER** 77:2
**entire** 10:21
61:13
**episode** 43:10
**ER** 40:22
**Errata** 3:11
76:10 77:1
**erratic** 33:24
34:6
**ESQUIRE** 2:6
2:11,17 76:4
**establish** 24:9
**et** 76:5 77:3
**evaluate** 23:14
**evaluated** 23:8
**Examination**
3:5 4:11
**examine** 55:6
**examined** 4:10
**excessive** 15:1
16:11 17:13
59:10,22 60:17

**excited** 15:19,24
17:1 18:3,12
18:16 29:14,22
30:6,21,25
31:24 32:16
33:1,4,11,17
33:21 34:5,15
34:23 35:1
42:18 44:20
**excuse** 36:7 39:5
43:18 47:8
**execute** 76:10
**execution** 3:11
**exercise** 51:8
**exhibiting** 29:13
30:5,20,24
31:23 32:16
33:1 42:12
61:15,22
**exit** 23:11
**expect** 5:6
**experience**
24:22 29:13
30:4,19 31:2
31:22 32:14,24
33:15 34:25
46:16 53:23
54:7 57:10,18
59:9,17 66:5
**experienced**
18:7 60:4
**experiencing**
15:19,24 17:1
18:2,12,16
29:21 33:4,17
34:5,15,23
42:17,20 43:10
44:20
**Expires** 74:17
**explain** 20:6
25:25 41:14,21
**Extremely** 34:7

**F**

**face** 65:3
**facts** 77:21
**fair** 5:3 44:8

**fall** 8:25 39:10
**falls** 66:2
**far** 45:17 73:2
**fear** 42:13
**February** 11:22
11:25 12:5,12
17:7
**feel** 42:8,11 43:6
50:9
**feet** 38:8,10,12
38:19,22 66:1
**fell** 7:20 38:20
39:14 52:20,22
52:23 64:11
65:11
**felony** 48:6
**felt** 43:3 60:2
**FF** 74:16
**field** 20:15 23:12
**fight** 34:16
39:15
**fighting** 59:2
**file** 5:23
**filed** 5:18 76:14
**filled** 39:17
**financially** 75:17
**findings** 68:10
**fine** 5:7 6:6
**fingers** 53:20
**fire** 1:12 2:13
64:16,19,25
71:24 72:9,13
**fired** 13:18
**first** 4:9 7:4
20:10 38:7,8
40:25 41:20
65:3
**fist** 53:25 54:3
71:6
**five** 21:2 43:25
43:25
**flailing** 50:3
63:6,10
**flashlight** 21:17
**flee** 63:4
**floor** 66:19
**Florida** 1:1,11

1:23 2:5,10,16
12:4,18 74:4
74:16 75:3
76:3,20
**followed** 68:20
**following** 4:1
**follows** 4:10
**foot** 70:7,13,17
**footage** 63:24
**force** 15:1 16:11
17:13 19:9,11
19:15 26:18
27:16 28:5,19
29:8 38:15
56:6,25 57:20
59:10,23 60:18
61:16,17,18,22
62:1,6
**foregoing** 75:9
77:21
**forehead** 38:14
**forget** 5:25
**form** 26:19 27:3
27:10,17,24
28:6,13,20
29:2,9,16,24
30:9 31:1 32:3
32:21 33:6
45:7 46:4,12
46:19 47:17
48:11,18,19
49:4,22 50:12
54:18 55:24
56:7,19 57:1
57:13,21 58:2
58:9,19 59:1
59:11,19,25
60:19 61:3
63:12 65:22
67:12 68:24
69:8
**Fort** 1:23 2:10
76:3
**Forum** 76:19
**forward** 38:15
53:20
**forwarded** 3:11

76:13
**fought** 33:25,25
**found** 76:10
**four** 19:12,16
**FPR** 1:25 74:15
75:21 76:18
**front** 36:15
**FTO** 26:9
**full** 5:10 52:10
**full-time** 12:9
14:9
**further** 18:21
75:13

———————
**G**
**gain** 12:17 38:23
65:13 66:7
71:8
**Gardens** 11:1
**gas** 36:6
**gasp** 39:20
**gear** 21:19
**generally** 25:25
26:2
**getting** 11:12
26:8 37:9
**GIUFFREDA**
2:9,11 5:13,16
5:22 6:3 12:23
12:25 26:19,21
27:3,10,17,24
28:6,13,20
29:2,9,16,24
30:9 31:1 32:3
32:21 33:6
45:7 46:4,12
46:19 47:17
48:11,18,21
49:4,22 50:12
54:9,18 55:24
56:7,19 57:1
57:13,21 58:2
58:9,19 59:1
59:11,19,25
60:19 61:3
63:12 64:22
65:22 67:18

68:24 69:8
71:19 72:19,22
73:2 76:2,4
**give** 4:5 24:21
26:10 57:24
72:14
**given** 4:17 22:2
**go** 13:4 17:5
18:20 20:12,13
20:14,15 22:25
23:6 49:8
69:11 71:13,15
**goes** 24:10 66:8
73:2
**going** 4:16 5:3
6:14,16 7:21
8:24 9:24 23:3
24:21,23,24
25:18 31:3,7,9
32:8 47:24
51:8 69:14,16
**good** 4:13,14
24:22 71:23
**grabbed** 52:21
**gradual** 24:10
**graduate** 7:6,10
18:18
**graduated** 7:9
**great** 27:2,9,23
28:12 29:1
54:8,16,22
55:1,23 56:17
57:12 59:17
**greater** 25:19
**green** 36:13
**ground** 36:10
38:20 52:20,22
52:23 53:11
59:4 62:19,22
63:5 64:11
65:4,4,20 66:6
**group** 53:22
**guardian** 1:5
**guess** 38:4 50:20
68:10
**guidance** 26:11
**guide** 25:17

**gun** 21:13,15
22:5
**gurney** 39:12,13
40:3,6,7,21
64:17,20
**guys** 50:16

———————
**H**
**halfway** 53:20
**hand** 4:3 36:23
38:14 53:19,22
**handcuff** 15:10
15:13 16:20
17:22 40:3
**handcuffed**
35:10,15 59:4
60:15 62:18
65:20 66:2
**handcuffing**
16:6
**handcuffs** 30:6
30:15,23 31:5
31:7,10 32:2
32:20 33:5
34:18,22 40:3
40:5,6 50:25
51:13,22 52:17
62:22 66:6
**hands** 52:11
**hang-up** 36:3
**happened** 37:14
65:18 66:18
**harm** 27:2,9,23
28:12 29:1
54:8,11,17,22
55:1,23 56:18
57:12 59:18
**he'll** 72:20
**head** 28:25 29:7
37:18 38:22
39:10 56:12,15
56:23 57:9,17
58:1,7,18 59:8
59:16 60:16
66:2,19 70:2
**health** 30:7
**healthy** 55:2,4

**hear** 13:12 66:25
67:2
**heard** 5:19 6:25
24:2 45:17
70:22
**hearing** 37:13
**Hecht** 2:6 3:8
4:12,15 5:15
5:19 6:1,6,9,11
13:1 26:23
27:5,12,19
28:1,8,15,22
29:4,11,18
30:2,11 31:13
32:5,23 33:8
45:10 46:7,14
47:12,19 48:13
48:24 49:16
50:6,14 54:13
54:20 56:1,9
56:21 57:4,15
57:23 58:4,11
58:22 59:6,13
59:21 60:10,22
61:5 63:14
64:23,24 65:24
67:13,22 69:2
69:10,13,21
71:13 72:21
**heel** 53:12,17,24
54:1,1,5,15,25
**held** 39:3 40:13
**help** 39:11 46:1
67:20,24
**helped** 39:23
40:10,14
**helping** 23:10
**Hey** 67:19,23
**high** 18:18,20
34:7
**highs** 50:19
**hip** 52:19
**hips** 52:7,21
**hired** 9:16,17
11:4
**history** 46:25
**hit** 59:3 66:19

**hitting** 60:25
**holding** 36:22
**home** 5:20 10:8
**honest** 46:20
49:7,11 51:18
61:9
**honorably** 19:13
**hospital** 40:9,19
40:20,23
**hostile** 64:18
**hurt** 66:3

———————
**I**
**Ice** 43:16
**Ices** 38:3,3
**identified** 36:17
**identify** 6:4
15:18,23 16:25
18:1,7,11,15
33:11,16,24
34:14
**imbalance** 34:9
**implemented**
20:12
**inadvertently**
5:17
**incident** 7:23
8:7 21:3,7,25
25:19 26:1
51:18 68:7,14
68:17,23
**including** 53:13
54:6,15,25
72:10,14
**independent**
1:12
**individual** 17:22
32:2,15,20,25
33:5 35:9,19
44:20 66:5
**individual's**
35:14
**individually** 1:8
1:9,9,10,11
**individuals**
15:10,14 16:20
**induced** 34:10

**inebriated** 47:24
**influence** 43:7
**information**
  37:9,9 46:25
**informed** 37:11
**initially** 36:2
  42:7
**initiating** 26:4
**inject** 66:22 67:4
**injected** 67:8
**injection** 66:16
  67:10 72:15
**inside** 37:6,15
  38:9,10,12
  41:25 52:12
**instructed** 14:12
  15:8 24:20
  38:8
**intention** 8:24
  9:24
**interacting** 35:6
**interaction**
  34:13 48:15,25
  49:17 50:10
  51:10 61:7,13
  61:19
**interested** 75:18
**internal** 68:6
**interpretation**
  43:12
**intervene** 62:4
**intervention**
  17:6
**interview** 13:4
**interviewing**
  14:19 37:21
**intox** 38:1
**investigated**
  68:6
**investigation**
  35:5
**involved** 45:13
  68:17
**involvement**
  35:25 61:6
  68:13,23 69:7
**involving** 7:23

26:1 34:13
68:23
**Irrational** 34:6

**J**

**J** 1:10
**JANICE** 1:4
**January** 6:18
  7:2,5,8 8:3 9:7
  10:18,24 17:7
**jaw** 27:8,15
**job** 8:10,11,21
  8:23 12:1,2
  23:14 49:10
**Join** 49:6
**joined** 19:7,17
  19:23 48:21
**JOLLY** 2:9 76:2
**Jose** 1:11 66:15
  66:21 67:4,7
  71:24
**Jr** 5:11
**judgment** 5:24
**Julie** 2:17 71:19
  71:23
**julie.tyk@wils...**
  2:17
**July** 20:5
**jumped** 39:24
**justify** 61:17,25

**K**

**keep** 66:5
**KEN** 1:10
**kicked** 36:10
  39:13 68:4
**kicking** 71:9
**kill** 72:5
**killed** 36:20
**kind** 7:20 23:3
  45:18 50:3,18
  50:23 68:3
**knew** 37:18
  42:21,23 47:3
  47:4,4
**know** 5:8 11:11
  19:22 25:3

30:18 42:21
43:8,11,24
45:24 47:1,5
49:12,12,13,15
51:18 53:15
55:3,13 58:14
65:2,5 68:16
70:11,22 72:1
**knowing** 51:9
**known** 14:12
  15:5,19 16:15
  17:17 70:10

**L**

**laced** 40:5
**Lakes** 2:4
**Lanosa** 1:25
  74:15 75:6,21
  76:18
**large** 39:20 52:5
  53:13,17 54:5
  54:15,25
**lasted** 64:12
  65:9
**late** 20:5
**Lauderdale** 1:23
  2:10 76:3
**law** 12:18 13:24
  14:1,13,16,21
  14:25 15:3,8
  15:16,22 26:16
  26:25 27:7,14
  27:20 28:2,10
  28:16,23 29:5
  29:19 30:3
  31:12 35:7
  40:25 45:25
  52:12 55:22
  56:4,16,24
  57:2,5,19 62:3
  70:14
**laying** 66:6
**learn** 35:13,18
  70:17
**learned** 33:14
  56:4,16,24
  70:11

**leave** 13:15 19:4
**left** 12:1 19:6
**leg** 22:5 38:19
  39:2
**legal** 1:5
**legs** 39:3 52:6,19
  52:22 53:1
  59:3 60:12
  63:6,7,10
**letter** 3:10 76:15
**level** 61:16,22
**liberty** 25:12
**life** 41:22 42:9
**lift** 65:19 66:1
  66:11
**lights** 14:19
**LINE** 77:6
**liquor** 38:4
**listed** 76:16
**literally** 67:23
**little** 17:8 46:21
**lived** 10:25
**lives** 42:13
**LLP** 2:15
**located** 6:21
**long** 5:7 9:20
  11:15 14:21
  19:1,10 20:22
  23:21,23 43:21
  44:25 64:10,20
  64:25 65:3,9
  66:9
**longer** 12:11
**look** 26:9 38:11
  71:15
**looked** 38:9
  39:20
**looking** 12:20
  55:7
**lot** 26:8 41:16
  49:25 55:12
  60:3 65:16
**loud** 49:23
**lows** 50:19
**Lucie** 1:10,11
  2:13 8:12,19
  8:22 9:3,14,21

10:6,10,13,22
11:2,5,8,18,21
11:24 12:11
13:16,22 14:3
14:7 16:2,9,13
16:18,23 17:12
17:16,21,25
18:5,9 19:19
19:23 20:7
30:13 31:3
34:3 35:20
37:13 39:11
40:8 57:3 62:9
68:22 69:6
70:18 71:24
**lunged** 38:15
  65:14,15
**lying** 35:9

**M**

**ma'am** 72:8,17
**making** 25:20
  26:4 53:21
**male** 36:13,14
  70:1
**malt** 38:4
**man** 36:15,16
  67:19,23
**management**
  7:14
**manager** 36:17
  36:25
**Mangrum** 1:8
  20:21 21:9
  22:1,4 24:4
  25:23 37:2,3
  37:23 38:10,17
  38:21,24 40:24
  41:3,4,18,25
  42:4,13 43:14
  43:16,18,22
  44:8,17 53:2
  53:12 60:12,25
  61:23,25 62:14
  69:4 70:3,7
**Mangrum's**
  20:23 21:5

26:3
**mannerisms**
55:8
**March** 8:20 9:16
9:18 11:6
19:25
**Marchman** 31:4
**Marcus** 5:11
**MASCARA**
1:10
**mass** 52:6 54:6
54:15 55:18,21
56:3
**master's** 11:13
**matching** 36:14
**matter** 66:8
**mean** 24:16
39:22 42:24
**means** 20:6,9
31:19
**median** 37:5
**medical** 29:15
29:23 30:7
40:23 51:2
**medication**
66:23 67:5
**mentally** 49:13
55:15
**Miami** 6:22
10:12 11:1
18:19
**Miami-Dade**
13:3 14:8,11
15:17 18:22,23
19:1
**military** 19:7
**mine** 5:2
**mini** 72:23
**minute** 64:12,13
64:15 65:10
69:15
**minutes** 43:25
44:1 45:3
**misdemeanor**
33:2,3 48:2,4,9
**month** 19:22
**months** 11:16

14:24 15:3,7
15:21 20:25
**morning** 4:13,14
**MOSKOWITZ**
2:14
**mother** 1:4
**motion** 53:21
**mouth** 40:14
**moved** 11:2,5
38:16
**murdered** 37:17
**muscle** 38:18
52:6 53:13,18
53:22 54:5,15
54:25

___

**N**

**N** 3:2
**name** 4:15 5:10
37:10 71:23
76:15
**names** 6:4
**Natty** 38:3 43:16
**Natural** 38:3
**near** 53:4,7
**necessary** 61:16
61:24
**neck** 55:18,21
56:3 70:7
**need** 24:22 26:3
31:25 58:13,25
59:3 65:12
72:24
**needed** 58:15,17
58:24 60:3
**negative** 68:10
**nerve** 55:18,21
56:3
**never** 5:19 61:12
70:11,22
**new** 8:10,11
26:7 51:5
**Newman** 1:8
37:20,23,24
38:16,21 43:19
43:19,23 44:3
44:9,12,17,23

44:25 45:5,14
46:2,6,9 47:14
49:2,18 50:9
51:12,23 53:5
55:17,20 56:2
56:10,14,22
57:8,16,24
58:5,7 59:7,9
59:15 60:2,3,7
60:12,14,17,20
60:25 61:23,24
69:4 70:5 76:5
77:3
**Newman's** 38:6
40:5 62:11
**Norland** 18:19
**normal** 55:2,3
55:10,14,16
**North** 2:15
**nose** 27:22 28:4
**Notary** 74:16
**notes** 71:15
75:12
**notice** 34:4,25
76:7
**noticed** 36:11
**nuisance** 47:25
**number** 5:20
37:10 47:4

___

**O**

**Oath** 3:9 74:1
**Object** 48:19
**objection** 48:22
**observe** 48:10
**observed** 46:11
48:14
**occurred** 7:24
21:4
**odd** 55:9
**offender** 37:12
47:3
**offensive** 70:9
**offer** 39:2,2
**office** 8:13,16,19
8:22 9:3,14,22
10:6 11:18,21

11:24 12:12
13:16,23 14:3
14:7 16:2,10
16:14,19,24
17:12,16,21
18:1,6,10
19:19,24 20:7
34:3 35:21
37:17 39:1
42:25 46:23
50:3 62:9
68:22 69:6
70:19
**officer** 5:21 12:3
20:17,19 23:13
29:20 30:3
44:3 48:9
53:24 60:1
62:4 69:24
70:1,4,24
**officers** 21:19
33:22 35:15
40:25 41:6,9
41:10 44:10
52:13 65:13
68:16 69:23
**okay** 5:8,9 7:10
12:8 17:10
24:20 26:11
31:16,17 32:8
32:9,11,12
39:9 45:4 50:7
67:17 69:18,19
71:13,17 72:9
**once** 19:6 35:20
39:5 40:19
44:22 62:22
64:10 66:10
**online** 10:14,16
10:19
**open** 53:19
**opened** 38:6
**opportunity**
9:13
**options** 71:10
**Orange** 2:15
**order** 33:16 48:8

**ordered** 72:20
76:9
**ordering** 72:21
76:13
**original** 76:13
**Orlando** 2:16
**outcome** 68:9
**outer** 38:18
**outside** 37:1
41:12 48:15
49:1
**oxygen** 35:16,18

___

**P**

**p.m** 1:21 69:12
69:12 73:5
**P.O** 2:5
**PA** 2:4,9 76:2
**pad** 37:8
**Page** 3:5 77:6
**Pages** 1:19 3:7
75:10
**pair** 40:16
**palm** 2:4,5 53:12
53:17,21,24
54:1,1,5,14,24
74:5 75:4
76:20
**paramedic**
39:16,20,21
40:15 66:15,15
66:21 67:8
**paramedics** 39:6
39:6,13,14,23
39:25 40:1,9
40:20
**parked** 40:20
41:18
**parking** 37:5
41:16 65:16
**part** 14:22 22:20
22:22 50:4
71:12
**participate**
44:13
**parties** 75:15
76:11

**parties'** 75:16
**passenger** 23:7
   24:4
**patient's** 40:13
**Patricia** 1:25
   74:15 75:6,21
   76:18
**patrol** 21:8 37:6
   38:6 41:17
   51:24 52:1,2,5
**patted** 37:6
**penalties** 77:21
**people** 5:23
   33:22 43:2
   55:12
**perform** 40:9,10
**performed**
   40:11 65:17
**period** 10:21
   45:4
**perjury** 77:21
**permanent** 9:23
**person** 27:8,22
   28:4,11,18,25
   30:8,17,21,23
   31:24,25 32:7
   32:17 33:2
   45:25 48:10
   51:19 55:2,4
**person's** 26:17
   27:1
**personal** 46:25
**personally** 46:13
   47:6 72:1 74:9
**personnel** 51:3
   72:9,14
**perspective**
   58:20 59:2
**phase** 22:24
   23:2,5,8,12,15
   23:18,21,23,25
   24:3,13,14,14
   24:20 25:1,1,2
   25:5,7,9,13
   26:2
**phases** 22:25
**Phipps** 1:22

76:19
**phrase** 72:11
**physically** 55:15
**physiology** 15:5
   16:15 17:17
**pick** 66:13
**picked** 37:4
**place** 30:6,23
   31:4 32:1,19
   33:5 40:2,6
   42:12 46:10,17
   47:23 48:8
   76:19
**placed** 32:1 33:3
   34:18,22 37:24
   38:7,8,14
   39:12,23 40:4
   45:1,5 46:2
   47:14 50:8,25
   51:12,22 52:1
**placing** 35:19
   49:19
**Plaintiff** 1:6 2:2
**played** 69:20
**please** 4:3 33:14
   73:1 76:7,10
   76:15
**point** 7:21 11:2
   20:4 24:8 31:9
   36:24 37:20,22
   37:24 38:5,23
   38:25 39:4,9
   40:15,19 42:7
   42:9,11,14
   43:8,11 44:12
   44:18,21 46:9
   51:4,11 52:13
   52:16,25 53:3
   53:5 60:4,9,23
   61:14,20 63:21
   65:6 71:1
**points** 49:24
**police** 12:3,5,15
   14:8,10,11,22
   15:8,17 19:17
   41:5,8,10 42:1
   44:10

**policies** 20:11
   68:21 69:5
**policy** 26:11
   30:15 31:6
**Port** 10:10,13
   37:13 40:8
**position** 9:3
   19:20 52:24
**power** 51:6
**powers** 25:11
**practices** 69:5
**pressure** 35:11
   35:14
**pretty** 25:3
   26:14 37:22
   44:24 45:21
   66:20 67:20
**prevent** 72:15
**prior** 7:1 13:22
   17:11,15,20,25
   18:10 25:19
   26:4 30:7
   33:18,19,20
   34:2,18,20,21
   36:3 49:1,18
   50:8,15 51:11
   64:19,25 65:8
   66:15 67:10
**prioritize** 24:18
**priority** 24:19
**private** 7:19
**probable** 24:9
   46:8,16
**problems** 6:4
**procedure** 26:12
**procedures**
   20:10 68:21
**proceedings** 4:1
   73:5
**process** 13:4
   25:17
**professional**
   29:23 30:7
   75:7
**program** 11:15
   24:13 70:15
**progression**

24:10
**proper** 68:11
**properly** 15:10
   16:20 17:22
   34:12
**provide** 16:2,10
   16:24 17:12
**provided** 18:14
**psychotic** 43:10
**public** 6:24
   47:22,25 49:20
   50:11 74:16
**pulled** 36:10
   37:20 41:16
**punch** 71:2
**punching** 71:11
**PURDY** 2:9
   76:2
**purpose** 32:6
   71:5
**purposes** 31:14
**pushed** 38:17
   65:16
**put** 5:13 13:6
   38:10,12 39:11
   51:23 64:17,20

——————
      **Q**
——————
**question** 4:23
   5:2,3 31:14,21
   32:6,13 46:5
   46:15 47:10
   48:23 50:7
   54:24
**question-and-...**
   37:22
**questioning** 17:9
**questions** 69:18
   71:14,18,25
   72:18
**quick** 39:8 66:17
**quickly** 71:16
**quite** 49:7

——————
      **R**
——————
**raise** 4:2
**ran** 52:2,4

**rattled** 37:10
**read** 3:10 72:20
   76:10,12 77:21
**reading** 73:2
**realized** 36:22
**really** 23:9 45:8
   46:5,20 51:9
**reason** 7:22
   31:15 77:6
**reasons** 63:9
**recall** 15:6 16:17
   17:19 35:24
   61:4 68:1 72:3
   72:6
**receive** 18:23
**Recess** 69:12
**recognize** 34:11
**record** 5:14,17
   6:10 69:11
   75:12
**redact** 5:25
**redacted** 5:18
**referring** 17:4
   24:6
**registered** 47:2
   75:6
**regular** 72:22
**rejected** 13:8
**relative** 75:14,15
**relieved** 41:20
   45:22,25 50:16
**remember** 23:22
   26:22 27:4
   28:21 29:10
   61:9,10 63:18
   65:6 67:14,19
   67:25
**repeat** 38:9
**repeated** 38:10
**rephrase** 4:25
   67:1
**report** 53:16
   75:8
**Reported** 1:24
**Reporter** 3:10
   4:2 6:8 72:24
   75:1,7

**Reporting** 1:22
  76:19
**represent** 4:15
  71:24
**requested** 75:11
**rescue** 30:16
  31:7,9,11,18
  34:11 38:24
  39:5,10 64:16
  64:19,25 72:9
  72:14
**resided** 11:8
**residing** 10:9,22
**resisting** 62:22
  63:1,3,8
**respond** 68:3
**response** 68:2
**responsive** 40:18
**restrain** 33:24
  38:25
**restrained** 34:12
**restricted** 54:12
**result** 68:7,13
**return** 76:16
**returned** 76:11
**review** 75:10
**RICHARD** 2:11
  76:4
**richard@pur...**
  2:12
**ride** 23:2,5
**ride-along** 23:15
  23:18
**riding** 21:8 24:3
  44:5
**right** 4:3,22,25
  6:13 9:6,17
  12:10,15 35:23
  55:17,20 56:2
  56:11,15,23
  57:9,17,25
  58:6,16,18
  59:15 60:7
  64:8 69:10,14
  72:7
**road** 19:21
  20:15 42:20

60:5
**Robinson** 1:9,17
  4:8 5:11 74:9
  75:9 76:2,22
  77:4,24
**rode** 40:8
**roll** 39:11 66:12
**rolled** 39:12
  40:21
**rolling** 65:6,8
**rope** 39:2
**Rosario** 1:11
  66:15,21 67:4
  67:7 71:25
  72:1,10,14
**RPR** 1:25 74:15
  75:21 76:18
**rules** 4:22
**run** 39:8
**running** 52:10

**S**

**S** 2:6
**safe** 30:17
**sanctioned**
  68:12,18
**sat** 38:7 68:4
**saw** 36:9,14
  41:11 60:3
  61:12 64:2,6
  70:8
**saying** 23:9
  67:19 70:23
**scaring** 36:21
**SCAROLA** 2:3
**scenario-based**
  16:7
**scene** 30:16,17
  31:12 44:3,9
  44:10,23 49:24
  52:14 67:3
  72:10
**school** 6:14 7:21
  10:14,16 18:18
  18:20
**scissors** 40:16
**screwdriver**

36:22 37:4
  51:18
**SEAL** 36:19
  37:16 43:1
  46:23 50:3
**searching** 16:7
**SEARCY** 2:3
**seat** 30:14 38:6,7
**second** 22:24
  40:18 42:20
  44:4 48:9 49:9
**second-degree**
  48:1
**seconds** 69:15
**secured** 30:17
  37:6
**security** 5:20
  37:10 47:3
**sedated** 39:19
**sedative** 67:8
**see** 21:19 53:15
  55:19 56:13
  62:4 67:7,9
  69:23 70:6
  71:1
**seek** 12:1
**seen** 58:5 63:24
**semesters** 7:19
**send** 73:3
**September** 10:1
  10:4
**serve** 19:10
**served** 14:9
  19:15
**session** 37:23
**set** 40:6
**Seven** 4:21
**severity** 24:19
**sex** 47:2
**sexual** 37:11
**shackles** 39:2
**Sheet** 3:11 76:10
  77:1
**sheriff** 1:10 8:12
  10:6 19:21
  20:22 21:4,9
  21:12 22:15

24:4 25:8,22
  26:3 40:24
  41:3,4,25 42:4
  42:13 43:14,16
  44:2,8,9,12,17
  44:17,23,25
  45:5,14 46:2,9
  47:13 49:2,18
  50:2,9 51:12
  51:23 53:2
  60:14,17,24,25
  61:6,10,23,23
  61:24,25 62:11
  62:14 69:4,4
  70:6
**sheriff's** 8:13,16
  8:19,22 9:3,14
  9:21 10:6
  11:18,21,24
  12:11 13:16,23
  14:3,7 16:2,10
  16:14,19,24
  17:12,16,21
  18:1,6,10
  19:19,24 20:7
  22:2 34:3
  35:21 37:16
  39:1 42:25
  46:23 62:9
  68:22 69:6
  70:19
**SHIPLEY** 2:4
**shirt** 36:13
  40:16
**shock** 40:18
**shocks** 40:17
**shooting** 14:18
  16:6
**Shores** 6:22
**shorter** 7:19
**shorts** 36:13
**shot** 39:19
**shoulders** 53:14
  54:6,16 55:1
**show** 23:3 31:11
  69:14
**side** 27:8,15 37:5

38:18 40:5,7
  56:11,15,23
  57:9,17,25
  58:6,18 59:15
  65:6,8,16
  66:12 71:2
**sign** 3:10 76:12
  76:15
**signature** 76:8
  76:15,21
**Signed** 74:12
**significant** 63:15
**signs** 15:23
  16:25 18:2,7
  18:11,15 29:14
  30:20,24 31:24
  32:16 33:1,11
  34:4,11 42:12
**sir** 4:13 46:5
  69:14 71:16,17
**sirens** 14:19
**sit** 14:1 38:8
  66:11 71:14
**situation** 26:7
  41:22 60:1
**six** 4:21 14:24
  15:3,7,21 23:6
  23:19 37:16
  43:1,25 46:23
  50:3
**six-month** 14:10
**smelled** 47:9
**social** 5:20 37:10
  47:3
**solely** 30:23
  62:11
**solemnly** 4:4
**solution** 39:17
  39:18
**somebody** 23:2
  23:5 36:20
  59:4
**someone's** 25:12
**somewhat** 41:20
**sorry** 10:15
**sort** 6:2 14:15
  18:21 21:22

49:20 66:23
**south** 12:3,15,18
**Southeast** 1:23
**SOUTHERN**
1:1
**speak** 60:20
70:22
**speaking** 36:19
41:24 42:14
46:24 55:7
72:16
**special** 1:12
**specific** 17:8
43:24 50:7
**specifically**
23:22 24:6
26:1 30:18
63:20 65:2,5
**speed** 52:10
**spoke** 36:16 42:7
**spring** 9:16
**squeeze** 40:13
**St** 1:10,11 2:13
8:12,19,22 9:3
9:14,21 10:6
10:10,13,22
11:2,5,8,18,21
11:24 12:11
13:16,22 14:3
14:7 16:2,9,13
16:18,23 17:12
17:16,21,25
18:5,9 19:19
19:23 20:7
30:13 31:3
34:3 35:20
37:13 39:1
40:8 57:3 62:9
68:22 69:6
70:18 71:24
**stabbed** 51:20
**staff** 40:23
**stage** 31:11
**stand** 38:13
**standard** 20:10
21:12 22:1
26:12 37:9

**standing** 36:11
36:14 37:4
**standpoint** 47:6
**start** 12:6 20:10
44:19
**started** 37:8,21
38:13 44:13
64:14
**starting** 8:10
**state** 5:10 74:4
74:16 75:3
**stated** 77:22
**STATES** 1:1
**station** 36:6
**stenographic**
75:12
**stenographica...**
1:24 75:8
**step** 5:7
**stepped** 38:17
**stifle** 52:10
**stomach** 35:9
65:4
**stood** 37:1 65:15
**stop** 11:20 58:7
60:25 62:21
63:7 71:8
**stops** 14:20
**store** 36:25
**story** 50:2,4,21
**strange** 43:4
**strike** 15:12 18:8
25:6 26:17
27:1 33:9
34:20 41:3
53:17,24 54:1
54:2,5,10,15
54:21,25 56:11
56:14,22 57:8
57:16,25 58:5
58:16,18 59:7
59:15 60:15
68:5 71:3,6
**strikes** 38:18
53:13
**striking** 27:8,15
27:22 28:3,11

28:17,25 29:7
53:21 61:1
71:5
**struck** 52:5,19
52:21
**struggle** 15:5,14
16:16,20 17:18
17:22 60:23
63:15 64:2,10
64:21 65:1,9
66:9 72:3
**struggling** 53:9
53:12 59:5
64:14
**student** 6:13
7:15 8:6,14
9:25 10:4,11
11:12 12:9
14:9
**studies** 9:7
**study** 19:1
**studying** 6:23
7:17 8:3 10:17
**stuff** 50:23
**suffer** 35:16
**suffering** 33:22
**Suite** 2:10,15
76:3,19
**summary** 5:24
**summed** 25:10
**summer** 7:18,20
8:8,9 9:10,15
**summertime** 9:4
**Sunrise** 2:10
76:3
**supervise** 20:20
**supposed** 9:20
**sure** 6:9 20:24
42:19 45:8
48:3,25 49:7
49:11 73:3
**swear** 4:4,7
**sworn** 4:9 74:10
**symptoms** 15:23
16:25 18:2,7
18:12,15 29:14
29:22 30:5,21

30:24 32:16
33:1,11 34:4
**syringe** 39:17,18
**system** 20:13
24:18 36:12

——————
**T**
——————
**tackle** 63:5
**tactical** 21:19,22
**tactics** 14:18
16:6 20:14
**take** 7:6 8:9
24:15,21,24
25:12 31:9,10
52:24 53:19
66:18 69:10
72:22 76:7
**take-down**
65:17
**taken** 64:4 69:16
**takes** 13:11
**talk** 7:23 25:18
35:23 37:1
67:9
**talking** 47:6
**taught** 14:15
34:3,8 35:7
52:12 62:8
**Tavares** 1:4 4:16
7:24 34:14,14
34:17,21 35:25
36:9,9,11
41:11,24 42:4
42:8,11,17
43:3,9,14,15
43:22 44:14,18
44:22 45:1,6
45:15,18 46:2
46:10,17 47:14
48:15,16 49:1
49:2,3,18,19
49:20 50:8,10
51:3,11,12,13
51:22 52:4,6
52:16,24 53:9
53:11 55:3,18
55:21 56:3,11

56:15,23 57:9
57:17,25 58:6
58:15,17 59:8
59:16 60:11,14
60:16,24 61:1
61:1,8,14,14
61:19,20,21
62:1,18,21,25
63:9,18,25
64:11 65:3,12
65:19 66:22
67:4,9 68:1
70:7 71:2,6
72:15
**Tavares's** 53:13
**team** 36:19
37:16 43:1
46:23 50:3
**Technically** 44:4
**technique** 52:12
70:9,13,18,21
**techniques**
14:17,19,20
15:9 16:7
**tell** 4:24 6:7
10:24 14:5
24:12 33:14
34:2 35:24
37:15 45:4,17
47:11 50:15
54:21 60:6
62:21 63:7
**telling** 8:2 30:22
50:4 51:17,21
**temperatures**
34:8
**temple** 26:17
27:1
**tendencies** 34:7
**terminated**
13:20
**termination**
68:11
**terms** 34:4
**testified** 4:10
**testimony** 4:4
47:13 62:25

**Thank** 71:17
**theft** 6:4
**thigh** 52:8 71:4
 71:7
**things** 5:24
 14:15 23:7
 24:5,7,12 25:5
 25:7 26:8
**think** 6:1 20:4
 24:11 25:3,10
 26:13 43:9
 44:19 47:10
 51:1,4 54:10
 63:23 67:20
 68:19
**third** 1:23 44:3
 70:24
**thirty** 76:13
**thought** 55:11
**three** 21:1 23:6
 23:19 44:10
 52:13 53:8
 63:5 65:12
**throat** 28:11,18
**thrown** 26:8
**thumb** 55:17,20
 56:2
**Thursday** 1:20
**tie** 39:2
**tied** 52:11
**time** 6:18,25 7:1
 7:4 8:6 10:22
 13:11 21:3
 36:8 45:4
 48:23 50:25
 51:1,4,7,11
 52:16,25 53:6
 60:3 61:21
 63:22 64:6,16
 66:8 72:11
 76:8
**times** 4:20
**tired** 39:4,5
**title** 20:8
**today** 4:5,16 5:7
 14:1 64:7
**told** 9:6 11:11

12:10 33:10
 38:12 39:7
 43:15,17 45:21
 50:2,21 58:7
 66:18
**top** 38:14 63:7
**total** 64:22,23
 65:1
**totally** 23:12
**town** 47:5
**traffic** 14:20
**train** 16:14,19
 17:16,21 18:1
**trained** 15:1,4,9
 15:12,13,18
 18:6,10 20:9
 33:9,10 62:3
 66:5 70:14
**trainee** 20:1,3,8
 20:16,23 21:5
 22:14,18 25:9
**trainer** 23:9
 25:16 36:7,10
**training** 14:5,13
 14:16,22,23,25
 15:4,9,16,22
 16:3,8,11,25
 17:5,6,12
 18:15 20:14,15
 22:21,22 23:13
 26:16,25 27:7
 27:14,21 28:24
 29:5,13 30:4
 30:19 31:2,22
 32:14,24 33:15
 33:20,21,23
 35:20 46:15
 53:23 54:7
 55:23 56:5,17
 56:25 57:5,6
 57:10,18 59:8
 59:16 60:8
 62:4,8 66:4
 70:14,18
**transcript** 5:23
 75:11,11 76:9
 76:11 77:2

**transcripts** 5:24
**transport** 31:8
 31:16
**transported**
 30:14 32:19
**transporting**
 31:6 32:10
**tried** 38:14,23
 38:25 63:4
**trouble** 35:10
**true** 75:12 77:22
**truly** 76:17
**truth** 4:5,6,6
**try** 39:8 67:9
**trying** 53:8
**turn** 26:9
**turned** 68:4
**two** 10:17 38:18
 40:17 43:25,25
 60:5 63:4
 64:13,15 65:15
 69:23
**two-year** 10:21
**Tyk** 2:17 3:8
 48:19 49:6,8
 67:12 71:20,22
 71:23 72:18,24
 73:1

U

**U.S** 19:9,10
**Uh-huh** 12:21
 64:9
**undergone**
 57:19
**underneath**
 22:12 38:19
**undersigned**
 74:8
**understand** 4:24
 4:24 7:25
**understanding**
 9:2,5 20:11
**understood** 5:3
**underwent**
 15:17,21 26:16
 26:25 27:7,14

27:21 28:3,10
 28:17,24 29:6
 35:8
**unhandcuff** 40:2
**uniform** 21:12
 22:2
**UNITED** 1:1
**university** 6:15
 6:17,21 7:1,7
 7:11,16,19 8:3
 8:15,25 9:7,25
 10:5,12,18
 11:12
**unlocked** 40:4,4
**unreasonable**
 59:10,23 60:18
**upper** 52:8 53:4
 53:7 60:13
 71:3,7
**use** 12:25 20:12
 53:20 59:10,23
 60:18 61:17,25
**utilize** 53:12
**utilized** 59:9

V

**v** 76:5 77:3
**vehicle** 36:8
**version** 39:8
**vest** 22:8
**video** 63:24 64:2
 64:6 69:15,17
 69:20,22 70:6
 71:1,15
**video-based**
 33:21
**violation** 62:5
**violent** 34:7
**visiting** 37:12
**voice** 49:25
**volume** 1:18 3:7
 49:25
**vs** 1:7

W

**Wade** 1:9 61:6
 61:10

**waiting** 13:12
**waive** 76:8,15,21
**walking** 41:17
**want** 10:8 17:7,8
 21:1 30:18
 31:14 32:7
 35:23 45:24
 55:13
**wanted** 8:23
 12:14 41:21
**wasn't** 7:20,21
 35:5 42:19
 49:7,11 51:8
 63:15
**watch** 69:17
**watched** 69:22
**wavered** 50:18
**way** 23:10 24:11
 26:6 38:16
 46:21 47:5
 58:21,23 61:2
 68:13,18
**we'll** 5:6
**we're** 7:22 24:21
 24:24 25:18
**wear** 21:19
**wearing** 21:11
 21:22 22:1,4,7
 36:13
**week** 23:3,16
 42:20 49:10
**weeks** 21:2 23:6
 23:19,24 60:5
**went** 10:14,16
 14:5,8 17:6
 18:22 36:16
 37:3,15 39:16
 46:21 47:5
**West** 2:5 76:20
**white** 69:23 70:1
 70:4
**WILSON** 2:14
**wind** 47:7,7,8
**wish** 76:15
**witness** 3:10 4:7
 49:19 57:24
**words** 12:25

**work** 12:7,11,14
**worked** 10:12
  13:23 14:2
**working** 7:16,20
  12:6,8 13:10
  20:7 31:3 40:1
  60:5
**wouldn't** 49:11
  58:13
**WRITE** 77:2
**wrong** 39:7
  42:22

**X**

**X** 3:2

**Y**

**Yeah** 5:16 22:17
  47:16,18
**year** 7:10 19:3
  19:22 20:25
**years** 10:17
  19:12,16
**yelling** 72:4,11
**Yep** 71:20

**Z**

**0**

**1**

**1** 1:18,19 3:7,7
  23:2,15 69:15
  75:10
**10** 45:3 60:6
**10/19/2018**
  74:17
**100** 1:23
**11** 7:24 17:25
  18:11,13 21:4
  21:7 22:22
  23:25 25:18
  34:2 35:23
  36:1 68:17
  69:15 72:5
**11:00** 1:21 4:1
**111** 2:15
**11th** 17:11,15,20

20:19 33:18,19
  33:20
**12:25** 69:12
**12:32** 69:12
**12:40** 1:21 73:5
**1200** 2:15
**1216** 2:10 76:3
**1551** 76:19
**169350** 74:16
**17** 8:20 19:25

**2**

**2** 23:5,18,25
  24:3,13,20
  25:1,5,7,9,13
  26:2
**2:16cv14413** 1:2
  76:6 77:3
**200-E** 76:19
**2014** 7:5,8,16,24
  8:3,20,25 9:7
  9:11,15,18
  10:1,4,9,18,24
  11:6 17:11,15
  17:20,25 18:11
  18:13 19:25
  20:19 21:4,8
  22:22 23:25
  25:18 34:2
  35:24 36:1
  68:17 72:5
**2015** 17:7 18:14
**2016** 7:12 10:18
**2017** 1:20 6:19
  7:2 11:22,25
  12:5,12 74:11
  74:12 75:19
  76:1,7 77:4
**2139** 2:4
**2455** 2:10 76:3
**25** 1:20 77:4
**25th** 74:10 76:7

**3**

**3** 23:8,21 24:14
  25:1
**30** 76:1,13

**30th** 74:12 75:19
**32801** 2:16
**33304** 2:10 76:3
**33394** 1:23
**33401** 76:20
**33402-3626** 2:5
**3626** 2:5

**4**

**4** 3:8 23:11,23
  24:14 25:2
**407)203-7592**
  2:16

**5**

**561)686-6300**
  2:6

**6**

**7**

**71** 3:8
**74** 3:9
**75** 3:10
**76** 3:10
**77** 1:19 3:7,11
  75:10

**8**

**8** 11:22

**9**

**9-1-1** 36:3,24
  51:19
**954)462-3200**
  2:11 76:4