**In the Matter Of:**

TAVARES DOCHER

vs.

CHRISTOPHER NEWMAN

---

**MELVIN TUCKER**

*July 12, 2017*

---

LEGAL | MEDIA | EXPERTS

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORDIA
 2
   _____
 3  TAVARES DOCHER, by and through   )
    JANICE DOCHER NEELEY, his mother  )
 4  and legal guardian,              )
                        PLAINTIFFS,  )
 5                                   )
        vs.                          )
 6                                   )
    CHRISTOPHER NEWMAN, individually, )
 7  CLAYLAN MANGRUM, individually,    )
    CALVIN ROBINSON, individually,    )
 8  KEN J. MASCARA, as SHERIFF of ST. )
    LUCIE COUNTY, FLORIDA, JOSE       )
 9  ROSARIO, individually, and the    )
    ST. LUCIE COUNTY FIRE DISTRICT,   )
10  an independent special district,  )
                        DEFENDANTS.  )
11  _____)

12                    Raleigh, North Carolina

13                    July 12, 2017

14

15                    Deposition of

16                 MELVIN L. TUCKER,

17

18       herein, called for examination by counsel for the

19  Defendants in the above-entitled action, pursuant to

20  agreement, the witness being duly sworn by Mary Lynn

21  Fuller, CVR, Court Reporter and Notary Public in and for

22  the State of North Carolina, taken at Legal Media

23  Experts, 4801 Glenwood Avenue, Suite 200, Raleigh, North

24  Carolina, beginning at 10:04 a.m. on Wednesday, July 12,

25  2017.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 2

1              APPEARANCES OF COUNSEL

2   On behalf of the Plaintiffs:
         Summer M. Barranco
3        Purdy, Jolly, Giuffreda & Barranco, P.A.
         2455 East Sunrise Boulevard, Suite 1216
4        Fort Lauderdale, Florida 33304
         (954) 462-3200
5        summer@purdylaw.com

6   On behalf of the Defendants:
         Julie Tyk
7        Gray Robinson
         301 East Pine Street, Suite 1400
8        Orlando, Florida 32801
         (407) 843-8880
9        julie.tyk@wilsonelser.com

10       David Vitale
         Searcy, Denney, Scarola, Barnhart & Shipley, P.A.
11       2139 Palm Beach Lakes Boulevard
         West Palm Beach, Florida 33409-6601
12       (561) 686-6300
         dvitale@searcylaw.com

13

14              INDEX TO EXAMINATIONS AND EXHIBITS

15   Examination                                    Page
         Direct by Ms. Barranco                     5
16       Cross by Ms. Tyk                           112
         Cross by Mr. Vitale                        119
17       Redirect by Ms. Barranco                   124

18   Exhibits                                       Page
     Ex A      NOD                                  7
19   Ex B      Report With Appendices               7
     Ex C      Front Cover of Book/Chapter 5 of Book    26
20

21

22

23

24

25

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 3

```
1                    P R O C E E D I N G S

2              MELVIN L. TUCKER,

3          having been duly sworn,

4           testified as follows:

5                    DIRECT EXAMINATION

6      BY MS. BARRANCO:

7  Q.    Good morning, sir.

8  A.    Good morning.

9  Q.    For the record, my name is Summer Barranco.  I'm an

10  attorney and I represent the sheriff of St. Lucie County

11  and several of the St. Lucie County sheriff's deputies

12  that are named in a federal lawsuit that's been brought

13  by Mr. Tavares Docher, by and through his mother, Janice

14  Docher Neeley, and I'm here today to take your

15  deposition.

16              I know some of us are attending by video

17  teleconference, so forgive me if I don't have everything

18  in front of you, but I've done my best to give the

19  exhibits that I expect to be used during your deposition

20  to the court reporter here today.

21              Can you please state your full name and

22  spell your last name for the record.

23  A.    Yes.  My name is Melvin, M-E-L-V-I-N, middle

24  initial, L, last name Tucker, T-U-C-K-E-R.

25  Q.    And what is your present business address, Mr.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 4

 1  Tucker?

 2  A.   5929 Fordland Drive, Raleigh, North Carolina 27606.

 3  Q.   And are you currently seated for a deposition in the

 4  state of North Carolina?

 5  A.   Am I currently what?

 6  Q.   Are you currently in the state of North

 7  Carolina, --

 8  A.   Oh, --

 9  Q.   -- as we're speaking today?

10  A.   Yes.  Yes, I am.

11  Q.   Okay.  Thank you.

12  A.   In Raleigh.

13  Q.   All right.  Now I understand that you've been

14  retained by the plaintiff in this case as a  - an expert

15  witness.  Is that your understanding?

16  A.   Yes.  That's correct.  Police procedures expert.

17  Q.   And that was my next question.  What is the

18  expertise that you hold yourself out as an expert in or

19  what area of subject matter I should say?

20  A.   Well, police procedures is what I generally define

21  it as, which includes personnel matters, use of force,

22  just about anything to do with police agencies.

23  Q.   And in regard to this particular matter, the Docher

24  versus Newman, et al., case, is there a particular aspect

25  of your claimed expertise that you are traveling under?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 5

```
 1   A.    I'm not sure exactly what you're asking me, but I

 2   spell it all out in my report.  Yeah, my expertise on use

 3   of force, having qualified 97 times now as an expert, and

 4   probably 40 or 50 of those were use of force cases,

 5   including matters involving excited delirium, the

 6   physiology of a struggle, what I  - what are typically

 7   called proximity injuries or proximity deaths.  That's

 8   where I hold myself out as an expert in this particular

 9   case.

10   Q.    Okay.  And the other  - you mentioned you've been

11   qualified about 97 times and you said 40 or 50 of those

12   were use of force cases.  What were the other cases?

13   A.    It ranged -- everything from sex discrimination,

14   race discrimination, to high-speed pursuit to religious

15   accommodation.  Just about any activity involving a

16   police agency, but the majority of my cases have been  -

17   and I've had 530 over the last 20 years  - have been what

18   I call high-risk police operations, use of force, and

19   vehicle operations.

20   Q.    And I understand that you also do some security type

21   cases?

22   A.    Yes.  I was certified by the American Society of

23   Industrial Security as a security specialist and was

24   trained in Israel by the Israeli Security Administration

25   on airport security.  So I've had oh, probably 50, I'd
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 6

1    say, or more security cases over the years too.

2              MS. BARRANCO:  Okay.  And just for the record

3    - I know I said this before we went on the record, but

4    just for the record, I'm asking the court reporter to

5    mark the Notice of Deposition for today's deposition,

6    which includes a  - an exhibit that's a decus tecum part

7    of the notice, asking you to bring the items that you  -

8    the items that are listed in your report and all

9    materials not specifically referenced in your report that

10   you used to form the basis of your opinions in this

11   action.  So that's going to be marked as Exhibit A to the

12   deposition here today and then you mentioned your report.

13   I've asked that the court reporter mark what I understand

14   to be your report, Mr. Tucker, in this Docher case  - to

15   mark that as Exhibit B to your deposition here today.

16   (Exhibit A and Exhibit B marked.)

17        BY MS. BARRANCO:

18   Q.   Just so I understand we're talking about the same

19   thing, do you have a copy of your expert report in the

20   Docher case in front of you?

21   A.   I do.

22   Q.   And is the date of that report May 16th, 2017?

23   A.   Yes, it is.

24   Q.   And does it, attached to it, have Appendices A

25   through I believe it is G?

Page 7

1   A.   Well, actually, H.

2   Q.   Or H.  Okay.

3   A.   Yes.

4   Q.   I think, in my copy, H isn't actually marked, but

5   you reference it as exhibit  - or Appendix H in the

6   report.

7   A.   Okay.

8   Q.   But we're talking about the same thing it sounds

9   like?

10   A.   Yes, we are.

11   Q.   Very good.  Now, in looking at your  - I see

12   Appendix A to your report is what's titled curriculum

13   vitae?

14   A.   Yes.

15   Q.   Can you tell me if that is a current copy of your

16   curriculum vitae or sometimes I'll refer to it as your

17   CV?

18   A.   It is a current copy of my CV and no changes from

19   what you have there since May 16th.

20   Q.   Well, if I understand what you're telling me, that

21   CV was current as of May 16th of 2017?

22   A.   Yes, and nothing has changed since then.

23   Q.   And when was the last time you reviewed this version

24   of your curriculum vitae?

25   A.   About every deposition I have.  So probably the last

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 8

1    deposition, which would've been sometime in May.

2    Q.   And in your last review of that dep - of that CV,

3    it was accurate?

4    A.   Yes.  As accurate as I can make it.

5    Q.   Sure.  Okay.  Well, in looking at your CV, I see

6    that, in terms of your educational background, you

7    received a B.A. in Business Management from the

8    University of South Florida in 1965.  Is that correct?

9    A.   I was the first graduating class from the University

10   of South Florida.  That's how old I am.

11   Q.   Yeah.  I wasn't going to ask you that question, but

12   that's fine.  And then you received an MPA in Public

13   Administration from Appalachian State University from

14   Boone, North Carolina in 1977, is that right?

15   A.   Yes.  That's correct.

16   Q.   And then you had some military experience in the

17   navy?

18   A.   Yes, active duty for four years and then in the

19   reserves for an additional 12 -- 15 years.

20   Q.   And the active reserves were back in 1965 to 1969?

21   A.   Yes.  No, that -

22   Q.   And then the -

23   A.   Yeah.  The active duty was  65 through  69.  That's

24   correct.

25   Q.   Yes.  And then your reserve duty was from 1969 to

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 9

1    1988?

2    A.   Correct.

3    Q.   And then, in terms of your employment background, I

4    see on your CV you've listed litigation consultant and

5    law enforcement/security trainer, 1994 to the present?

6    A.   Correct.

7    Q.   Is that right?

8    A.   Correct.

9    Q.   And is there a company that you were affiliated

10   with?

11   A.   No.  A sole proprietor, just me.

12   Q.   Is there a name for your sole proprietorship?

13   A.   Criminal Justice and Security Consultant/Trainer.

14   Q.   And that's at the top of your CV, correct?

15   A.   Correct.

16   Q.   Other than yourself, does anybody else work with

17   you?

18   A.   No.

19   Q.   Besides your  - well, let me ask you.  Did you

20   prepare the report that's been marked as Exhibit B  -

21   A.   I did.

22   Q.   -- to your deposition?

23   A.   I did.

24   Q.   Did anyone assist you in preparing your report?

25   A.   Nobody assisted me in preparing my report.  My

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 10

 1   report is my own report.

 2   Q.   So then you would've been the one to type it up as

 3   well?

 4   A.   Correct.

 5   Q.   Did you get input from anybody in terms of what you

 6   should put into your report?

 7   A.   No.

 8   Q.   Did anyone tell you what you should not put in your

 9   report?

10   A.   No.

11   Q.   Now I understand that you  - as I mentioned before,

12   you were retained by the plaintiff's side in this case,

13   which is the law firm of Searcy, Denney, et al.  I don't

14   know all the names.  I don't have them memorized.  But

15   have you been retained by this law firm for any other

16   case or proceeding?

17   A.   Yes.

18   Q.   How many times?

19   A.   Let's see.  I did the Dontrell Stephens case, down

20   in West Palm Beach.  I did the Coconut Grove Police

21   Department case  - taser case, which just settled.  The

22   Dontrell Stephens was a plaintiff's judgment at large.

23   Maybe another one.  I don't know.  Like I said, I've had

24   over 500 cases.  But I've done at least two, maybe three

25   cases, with the firm, counting this --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 11

1   Q.   Okay.

2   A.   -- one.

3   Q.   And in that Dontrell Stephens case, which I have

4   personal knowledge of  - my office was involved in that

5   case as well  - do you recall which attorney with Searcy

6   Denney actually retained you?

7   A.   Jack Scarola.

8   Q.   And then the same question in the Coconut Grove case

9   you mentioned.

10  A.   I believe that was Adam Hecht.

11  Q.   And then, in our present Docher case, which lawyer

12  retained you?

13  A.   My original communication on that case was with  -

14  hold on a minute  - with Adam Hecht in December of 2014.

15  Q.   Now you're talking about Docher?

16  A.   Yes.

17  Q.   Okay.  Now you said there might be one other matter,

18  other than these three that you've specified, and I know

19  that you included, as Appendix B to your report, a list

20  of about 57 cases that you've done, it looks like, most

21  recently.  Would looking at that list perhaps refresh

22  your recollection as to what other case you  - or cases

23  you may've been retained in by the Searcy Denney law

24  firm?

25  A.   I'd be happy to look.  The list is what is required

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1    under the rules for experts, a four year period at least,

2    and, typically, what I do is go through that once in a

3    while and, if it's more than four years old, I chop off

4    the number one and keep on going.  So let's see here.

5    Obviously, these are only cases in which I testified in

6    deposition or trial.  So I see the Dontrell Stephens in

7    there because I did testify in trial.  I do not see on

8    the list the Coconut Grove Department, because I was

9    scheduled for deposition May the 26th and it settled

10   before I was deposed.  So it's obviously not on there.

11   But I don't see any other ones right off the bat.  So, to

12   answer your question, the only ones that I know of are

13   what I told you, Stephens, --

14   Q.   Okay.

15   A.   Coconut Grove, and this one.

16   Q.   Okay.  So, in terms of the times that you've been

17   actually retained by the Searcy Denney law firm, other

18   than the present case, your testimony is in three other

19   matters you've been retained by the Searcy Denney law

20   firm?

21   A.   That's the best of my recollection.

22   Q.   And do you remember what court that Coconut Grove

23   case was in?

24   A.   No.

25   Q.   Do you remember if it was federal or state?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 13

```
 1   A.   Obviously, it was federal.

 2   Q.   And do you recall if the other one that you didn't

 3   have a specific name for, if that was federal or state?

 4   A.   I do very little work in state courts since, like I

 5   said, it's use of force cases.  They're almost always in

 6   federal court.  Anything I've done with this firm has

 7   been in federal court.

 8   Q.   Okay.  Now I believe, looking at your CV, you've

 9   included the fact that you, at one point in time in your

10   career, were a police officer, is that right?

11   A.   A police officer?  Is that what you said?

12   Q.   Yes.

13   A.   I always was a police officer, except for the period

14   of time I was an FBI agent.

15   Q.   Okay.  Well, I understand at some point, for at

16   least 10 years or so, you were the Chief of Police in

17   Tallahassee.  Is that correct?

18   A.   I was Chief of Police in Tallahassee almost 15

19   years.  I was Chief of Police in Asheville a little over

20   two years, because I was a reform chief there.  I was the

21   Chief of Police in Hickory, North Carolina for three and

22   a half years and Chief of Police and Public Safety

23   Director in Morristown, Tennessee for three and a half

24   years.

25   Q.   And so, obviously, during those time periods, even
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 14

```
 1   if you're Chief of Police, you're still considered a

 2   police officer?

 3   A.    That's correct.  In fact, just, for example, when I

 4   was Chief of Police in Morristown, Tennessee, since that

 5   was only a 45-officer department, I worked homicide

 6   cases, in fact, the murder of a federal judge's sister.

 7   I did traffic  - everything that a regular police officer

 8   does and I did that, in fact, throughout my career.

 9                     When I was Chief of Police in Tallahassee,

10   even though it was about 500 officers for employees, I

11   wore a regular police officer's uniform out in the field.

12   At least twice a month, I would schedule to go out so I

13   could keep my policing skills up, number one.  Number

14   two, to audit my police operation by talking to the

15   officers about how my policies were working and I made my

16   last arrest as a police officer in Tallahassee four

17   months before I retired when an armed robbery occurred

18   and I happened to be in the area and spotted the

19   individual and took him into custody.

20   Q.    And what year would that have been?

21   A.    94, when I retired from there.

22   Q.    Okay.  And just to get a sense of what time frame

23   we're talking about here, in looking at your CV, it says

24   you were a Chief of Police and Public Safety Director of

25   Morristown, Tennessee from 1971 to 1974.  Is that
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 15

1    correct?

2    A.    Correct.

3    Q.    And then you were a Chief of Police, Hickory  - of

4    Hickory, North Carolina from 1974 to 1977?

5    A.    Correct.

6    Q.    And how many officers were in the Hickory Police

7    Department?

8    A.    92 at that time.

9    Q.    Sure.  Because we're going back a few years, right?

10   A.    Yes.

11   Q.    Do you know how large of an agency it is now?

12   A.    No, I don't.

13   Q.    You do not?

14   A.    No, I don't.  I'm sorry.

15   Q.    That's okay.  And then it looks like you were the

16   Chief of Police in Asheville, North Carolina from 1977 to

17   1979?

18   A.    Right.

19   Q.    And how many officers were in the Asheville Police

20   Department back when you were a chief?

21   A.    162 as I recall.

22   Q.    And do you know how many are in the force now?

23   A.    No, I don't.

24   Q.    And then I know you've told us that you were Chief

25   of Police in Tallahassee from 1979 to 1994.  You said

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 16

```
 1   there were about 500 officers at the time you retired, is

 2   that right?

 3   A.   There were 362 when I went there -- officers -- and

 4   I think there was close to 500 employees when I left.

 5   Somewhere around that mark.  I'm not sure.

 6   Q.   And do you know how many officers they currently

 7   have working for the Tallahassee Police Department?

 8   A.   No, I don't.

 9   Q.   All right.  Now I know we discussed some parts of

10   your curriculum vitae, which is Appendix A to your

11   report, and then you told me about the list of cases as

12   Appendix B.  One thing I wanted to ask you was what have

13   you reviewed in this case in formulating your opinions?

14   A.   What have I reviewed?

15   Q.   Yes, sir.

16   A.   That's all listed on Appendix C, which you have.

17   What I did yesterday was updated that list because I have

18   received depositions, which I reviewed, since May the

19   16th.  I reviewed the deposition of Ryan Gonzalez,

20   Hardyal Bhagudas, Mark Brown, Wade Courtemanche -- I

21   don't know if that's pronounced correctly or not  - Clay

22   Mangrum, Christopher Newman, Calvin Robinson, Samantha

23   Gileweski, and I received a video of a medical exam of

24   Mr. Docher by defense expert, Dr. Michael Shahnasarian

25   and I'm told that I'm going to be provided with
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 17

```
 1    additional materials, including the corporate

 2    representative from the St. Lucie County Sheriff's

 3    Department's deposition.  So, until I have reviewed that,

 4    my opinions are going to remain preliminary.

 5    Q.   Okay.  Now let me just clarify what you just said.

 6    Something about a video of Mr. Docher?

 7    A.   It was a - it's - it is titled video - this is

 8    what was on the DVD.  Video of CME of Tavares Docher by

 9    defense expert, Dr. Michael Shahnasarian, and that's it.

10    Q.   Okay.  I missed the CME part.  So is the - I guess

11    the compulsory medical examination of Mr. Docher?

12    A.   I think that's what CME stands for, yes.

13    Q.   And do you know when that was conducted?

14    A.   I have it here with me, so I can look and see if

15    it's got a date on it, but - 5/10/17.  No - excuse me

16    - 5/16/17.  So the day that I filed my report, it was

17    done.

18    Q.   Did you actually get an opportunity to watch that

19    video before finalizing your report?

20    A.   No.  Very briefly, first of all, I'm not a medical

21    expert and I assume that just goes to damages, that it

22    has nothing to do with my part of the work.

23    Q.   Okay.  The same question for the other depositions

24    that you listed and listed, quite a few.  Did you have

25    the opportunity to actually review all of those
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 18

1   depositions before finalizing your May 16th, 2017 report?

2   A.   Obviously, I couldn't have.  I didn't receive them

3   until - most of the items that I told you about, I

4   didn't receive until after May the 16th.

5   Q.   Okay.  Thank you for clarifying that.  But you've

6   since been able to review them?  Is that what you told

7   me?

8   A.   That's correct.  All of them.

9   Q.   Now do any of those depositions that you did review

10  since your report was authored change any of your

11  opinions?

12  A.   Well, it reinforced them for sure and, in reading

13  the depositions, I was - I discovered that Mr. Mangrum,

14  when he was deposed, says he also delivered a  - an elbow

15  strike to Docher's head in his deposition, page 59, line

16  24.  So he didn't consider it to be deadly force  cause

17  he also had done it.  So, certainly, I will be adding in,

18  when I finalize my report, the use of deadly force by

19  Mangrum, who admits that he also delivered an elbow

20  strike to the head, which was deadly force, when it

21  wasn't justified.  I'll be adding that in.

22  Q.   And that's based on that deposition testimony from

23  Deputy Mangrum?

24  A.   Basically, my entire report and opinions are based

25  upon what the officers themselves said in their reports

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1    -- or depositions and reports.

2    Q.   Okay.  Well, in terms of Deputy Mangrum's testimony,

3    did Deputy Mangrum testify specifically what part of Mr.

4    Docher's body he struck with his elbow?

5    A.   No, he didn't say.  He was up at the head area,

6    opposite Newman, and when asked about whether or not he

7    thought it was deadly force, he said an elbow strike to

8    the head, as far as he was concerned, was not deadly

9    force.  He saw the elbow strike of  - that Newman

10   delivered, but he said he couldn't tell if it was to the

11   right side of the temple or not.  But, in any case, he

12   didn't consider it to be deadly force.

13   Q.   And you're referring to Mangrum now, correct?

14   A.   That's correct.

15   Q.   Yes.  And I know that you referred to the elbow

16   strikes as deadly force in your report, in term's of

17   Deputy Newman's action, and I will definitely be covering

18   that with you momentarily.

19   A.   Yes.

20   Q.   But other than what you just mentioned about Deputy

21   Mangrum and his elbow strike that you referenced from his

22   testimony, was there any other revision or update to your

23   opinions that you believe occurred since the reviewing of

24   all those additional depositions?

25            MR. VITALE:  Object to form.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 20

```
 1   A.    Yeah.  Like I said, the reading of the depositions

 2   just reinforced the support for my opinions.  They, in

 3   their depositions, talked about him being out of his

 4   mind, showing the symptoms of ED, recognizing that ED is

 5    - excited delirium is a medical emergency, but then

 6   Mangrum says gee, he never  - it never crossed his mind.

 7   Excited delirium never crossed his mind once.

 8              So, basically, the depositions just

 9   reinforced my opinions, as expressed right now, and when

10   I do a final report, of course, I will add in their

11   deposition testimony, where relevant, into the final

12   report after I've seen the deposition testimony of the

13   corporate representative of the St. Lucie County

14   Sheriff's Department.

15   Q.    Okay.  And I didn't want to interrupt you, but you

16   started that answer with using the word they and were you

17   referring to the deputies or someone else?

18   A.    They being the deputies, yes.

19   Q.    Okay.

20   A.    Mangrum  -

21   Q.    And that was based on their --

22   A.    Mangrum, --

23   Q.    Mangrum, --

24   A.    -- Robinson, and Newman.  Correct.

25   Q.    Okay.  And that would  - I'm sorry.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 21

```
 1   A.   That's okay.  Go ahead.

 2   Q.   Are you  - okay.  Are you referring to their

 3   deposition testimony?

 4   A.   Yes.

 5   Q.   Now I know Exhibit A  - I mentioned it earlier  -

 6   was the notice with the duces tecum, asking you to bring

 7   the items that you've relied on or referenced in your

 8   report -- or relied on, I think, is the way it's worded.

 9   What did you bring to your deposition today, sir?

10   A.   I brought everything, the entire file that I have,

11   and because you asked for  - in the subpoena duces tecum

12   for the items that I relied upon and I footnoted, for

13   example, in my report  - let me find the page, please.

14   I footnoted, in my report, my book.  I footnoted  - that

15   was footnote number 1.  I footnoted the Force Science

16   News #29 bulletin.  So I made a copy of that for you that

17   I brought and I footnoted the International Association

18   of Chiefs of Police National Law Enforcement Policy

19   Center Concepts and Issues paper on excited delirium that

20   was dated April of 2014 and I made a copy of that for you

21   and, as I said, I brought a copy of my book, but I'll

22   keep the book.  You can have the copies that I made of

23   the two other items I footnoted and you can get the book

24   from CRC Publishing.  That would help my royalties.

25   Q.   Okay.  Sure.  Would it be possible to get a
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

```
 1   photocopy of the cover of your book?

 2   A.    Certainly.

 3   Q.    Okay.  You want to charge me extra for that?

 4   A.    No, no, no.

 5   Q.    Okay.  Just so I'll know what it looks like.

 6   A.    I'm holding it right there.

 7   Q.    Yeah, I see that.  But just so I can have a copy for

 8   my file.

 9   A.    Okay.

10   Q.    Thank you.

11   A.    Well, she can make a  -

12   Q.    And, for the record, can you just tell me what the

13   name of your book was again?

14   A.    "Investigation and Prevention of Office-Involved

15   Deaths."

16   Q.    And I see, on footnote 1 in your report, on page 9,

17   you reference Chapter 4 of that book?

18   A.    That probably is on excited delirium if I  -

19   Q.    Well, that's what I was going to ask you.  What's

20   the subject matter of Chapter 4?

21   A.    I'm  - Chapter 4  - Chapter 5, excited delirium.  I

22   footnoted Chapter 4?

23   Q.    Yes, sir.  I'm looking at footnote 1 on page 9 of --

24   A.    Yes.

25   Q.    -- your report.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 23

1    A.   Yes, you are and you're - that's a mistake in my

2    report.  It should've been Chapter 5,  cause Chapter 4

3    was on emergency vehicle operations and, clearly, that's

4    not relevant to this case.

5    Q.   It's a good thing I asked the question then.

6    A.   Yes.

7    Q.   Okay.  So it should've been --

8    A.   It should be --

9    Q.   -- 5, which is excited delirium?

10   A.   Right.  Thank you.

11            MS. TYK:  The two papers on excited delirium,

12   do you have copies of those with you today?

13            THE WITNESS:  Yes.

14            MS. TYK:  Do you mind if I take a look at

15   those?

16            THE WITNESS:  Okay.  Hold on a minute here.

17   You're wanting what now?

18            MS. TYK:  The two articles on excited delirium.

19            THE WITNESS:  There's --

20            MS. TYK:  That you said you brought.  They were

21   footnoted.

22            THE WITNESS:  Yes.

23            MS. BARRANCO:  Is that Julie speaking, just so

24   I know?

25            MS. TYK:  Yeah.  I just asked for the copies of

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 24

1    the articles on excited delirium that he footnotes.  I

2    was going to take a look at them.

3              MS. BARRANCO:  Right.  Thank you.

4              MS. TYK:  Um-hmm.

5         BY MS. BARRANCO:

6    Q.   All right.  And, Mr. Tucker, so is Chapter 5,

7    dealing with excited delirium, is that the only chapter

8    you refer to from your book in regard to the Docher case?

9    A.   Yes.  I have --

10   Q.   How many pages  -

11   A.   I  - excuse me.  I have chapters in the book.  For

12   example, Chapter 7 is on positional asphyxia and I -- I

13   most  - I've relied upon my own experience and training

14   over the years and numerous documents, but excited

15   delirium was what I was particularly looking at in this

16   case.  That's it.

17   Q.   How many pages is Chapter 5?

18   A.   How many cases?

19   Q.   No.  How many pages --

20   A.   Oh.

21   Q.   -- is Chapter 5?

22   A.   It ranges  - it goes from page 97 to 111.  So it's

23   not very long.

24   Q.   Okay.  Thank you.

25   A.   12, 13.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 25

1   Q.   I don't suppose you'd be willing to make a copy of

2   that chapter for me and include that in the materials?

3   A.   If they want to take the time to copy it, that's

4   fine.  If she  - I don't have a problem with that.

5   Q.   Thank you.  All right.  And the other materials that

6   you brought to your deposition today, Mr. Tucker, in what

7   format have they been produced?  Are they hard copies or

8   on a disc?

9   A.   No, they're hard copies, which the attorney here for

10  the fire district is looking at right now.  There's

11  another policy from the IACP on excited delirium and a

12  Force Science Newsletter  - Force Science Center

13  Newsletter #29.  That's also on excited delirium.

14  Q.   Okay.  But then you've got plenty of other

15  materials, correct?

16  A.   I've got all the materials that I reviewed, yes.

17  Q.   Okay.  And that's what I was wondering.  Is that  -

18  I wanted to attach to your deposition here today, as

19  Exhibit C, any items you brought in response to the duces

20  tecum portion of the notice and I wasn't sure how we were

21  going to accomplish that.

22  A.   Well, if you're asking me  - what I have is a huge

23  file box here, probably thousands of pages, sitting here

24  on the floor beside me, and DVDs and all that.  I brought

25  the entire file which -- of all the materials that are

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 26

 1   listed on Appendix C with me today.  That's it.

 2   Q.   Okay.  Do you have those items also electronically

 3   maintained somewhere?

 4   A.   No.  Some of --

 5   Q.   They're all just --

 6   A.   Some I do, some I don't.  For example, some of the

 7   depositions I received electronically, a couple of them I

 8   received hard copy, primarily  cause I was traveling in

 9   the last month and they emailed them to me.  And so, some

10   of it's hard copy, some of it's not.

11   Q.   Well, let me just clarify then.  The items that

12   you've brought with you today, are they  - they're all

13   marked  - or I should say listed on Appendix C to your

14   report as well as the items that are footnoted in your

15   report.  Is that correct?

16   A.   That is correct.

17           MR. VITALE:  Objection.

18           THE WITNESS:  That's correct.

19   Q.   Is there anything else you brought that's not either

20   listed on Appendix C or as a footnote in your report?

21   A.   Well, I have my communication file, which is

22   communication between myself and the Searcy law firm,

23   which is privileged under the rules, so I  - and I have a

24   little sheet of paper with  - that I put together with

25   the parties that are involved so I can keep them

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 27

```
 1  straight, for example, Mark Wayne Brown, CVS employee,
 2  that sort of thing.
 3  Q.   Now the communications file you mentioned, did you
 4  rely on any of the communications in coming up with your
 5  opinions?
 6  A.   Absolutely not.
 7  Q.   So your testimony is that communications file had
 8  nothing to with ultimately what your opinions were or
 9  will be in this case?
10  A.   You asked the question earlier whether I've been
11  provided any direction.  No.  Nothing in that
12  communications file  - it's a file that says enclosed
13  herewith are additional materials for you to review in
14  preparation of the report for this case.  Boom.  That's
15  it.  And then I would have materials.  Or enclosed
16  herewith is your retainer check.  That's basically what
17  the file is.
18  Q.   Okay.  Thank you.  Do you know how many active cases
19  you're currently working on, Mr. Tucker?
20  A.   I know absolutely how many,  cause I'm --
21  Q.   Can you tell me?
22  A.   Because I'm trying to retire, I have stopped
23  accepting cases and it has now dropped down to 41 active
24  cases, of which 12 of those cases are cases that are on
25  appeal.  So you can do the math on that to determine how
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 28

1   many are otherwise active.

2   Q.   And when was it that you stopped taking new case?

3   A.   I started trying to not take new cases about a year

4   ago.  Unfortunately, or fortunately, depending on

5   perspective, I have a couple of attorneys that I've

6   worked for a lot, like Robert Phillips, in South

7   Carolina, who just sends me a file and a check and says

8   looking forward to your report.  And so, you know, I

9   stopped  - I've had a couple of those happen.  But I've

10  been trying to not accept cases for about the last year

11  and have reduced my case load from 60-something down to

12  40.

13  Q    Okay.

14  A.   I found the  -

15  Q.   Now is the  -

16  A.   I found that, to get out of this business, you

17  either have to do one of two things, die or stop

18  accepting cases, and it'll take three or so years or

19  longer.  I have one -- just for the interest part of it

20  - I go to trial in October, in Toronto, Canada, that I

21  was retained on in 2007.  It's been going on 10 years.

22  Q.   Now litigation does tend to do that sometimes,

23  doesn't it?

24  A.   Apparently so.

25  Q.   Well, hopefully, you'll get to retire and not die

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 29

```
 1    shortly thereafter.  I know sometimes we've lost some

 2    experts because they passed away or they have a stroke or

 3    something, which is  -

 4    A.    Right.

 5    Q.    -- not the way you want to retire, if you can help

 6    it anyway.  All right.  Well, I want to turn now to your

 7    report in this case and I notice, at page 2, you have a

 8    heading of "Specific Qualifications to Provide Opinions

 9    on the Facts of this Case."

10    A.    Right.

11    Q.    Are you at that spot there?  And you make mention,

12    about three sentence or paragraphs down, that you were

13    certified  - or was certified until September 2009 on

14    most use of force disciplines.

15    A.    Right.

16    Q.    And my question is what do you mean by that?

17    A.    Very simply, that I  - when I was in  - living in

18    Tennessee, before I moved to North Carolina, I was

19    retained by the Department of Homeland Security to train

20    16 sheriff's departments in east Tennessee on use of

21    force.  And so, to do that, I had to send the  - an

22    outline of the curriculum that I would be teaching and my

23    qualifications, and all that, to the state of Tennessee

24    so they could certify the course so the officers would

25    get paid the incentive money for going to the courses.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 30

1              So I updated all my certifications at that

2   point, which is firearms, which I'm still certified.  I

3   have a retired law enforcement officer's concealed carry

4   permit.  I just qualified again last December.  But, at

5   that time, I updated myself on the baton -- police baton,

6   defensive tactics, oleoresin capsicum, pepper spray or

7   OC, and the X26 and M26 tasers.  Those are the

8   certifications that I'm talking about.

9              And so, when I moved to North Carolina in

10  2008, I did not renew any of that for two reasons.  One,

11  I wasn't going to be doing anymore training like that

12  and, two, I'm too dog-gone old to get shocked and pepper

13  sprayed anymore.  And so, I don't do that.

14  Q.   And in order to maintain your certifications, you

15  would've had to be shocked and peppered sprayed?

16  A.   Well, that -- it was voluntary, but, you know -- you

17  know how it is.  Yeah.  You --

18  Q.   Well, when you're the expert, it's hard to say no, I

19  don't want to do that?

20  A.   Right.

21  Q.   Got it.

22  A.   Back then.  Now I can say no.

23  Q.   Yeah.  No is a good word sometimes.  Now, in this

24  Docher case, Mr. Tucker, there was no usage of tasers,

25  correct?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 31

```
 1   A.   Right.

 2   Q.   And there was no usage of firearms?

 3   A.   No.

 4   Q.   Or OC spray?

 5   A.   That's correct.

 6   Q.   Or batons?

 7   A.   Correct.

 8   Q.   The usage of the -- the use of force by the deputies

 9   with Mr. Docher was limited to empty-hand tactics.  Is

10   that correct?

11   A.   Yes.  I would agree.  Empty hands would be the

12   general category, but it dealt with, as I said, most

13   significantly, elbow strikes to the head and the

14   compression of a person handcuffed with their hands

15   behind their back in the prone position, which is

16   problematic too.

17   Q.   Okay.  And we'll talk about that, but I just --

18   A.   Sure.

19   Q.   -- wanted to understand, in terms of the type of

20   force that was being utilized by Deputies Newman,

21   Mangrum, and Robinson, it didn't include a lot of the

22   things that you just said you'd had some experience with

23   in the past?

24   A.   They're -- I only am talking about getting certified

25   on the tools of policing in terms of use of force.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 32

1   That's what that is referring to there.

2   Q.   Okay.   Now moving on to page 3 of your report, Mr.

3   Tucker, --

4   A.   Yes.

5   Q.   -- I see at the top you've got a topic that says --

6   or a heading that says "Objectivity."

7   A.   Right.

8   Q.   What did you mean by objectivity?

9   A.   Well, the -- I have come across experts that didn't

10  last very long, that when they were being deposed, they

11  said well, I never will take a case against the police

12  department.   Well, that doesn't show objectivity.   They

13  don't care what the facts are.   They wouldn't take a case

14  against the police or the reverse.

15              So what I'm saying there is that, if

16  you're an expert, you have to be willing to take cases

17  from either plaintiffs or defense and your testimony is

18  based upon what the facts of that particular case are.

19  And, over the time of the past 20 years, I'm saying that

20  my trial and deposition testimony has been 70% plaintiff,

21  30% defense.   That's over the entire time period because,

22  when I first started, it was almost all -- as a recently

23  retired police chief, it was almost all defense work, but

24  then I give you Appendix B, which shows you what my

25  testimony has been for the past four years.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 33

1    Q.   Well -- and let's talk about that.  That Exhibit B,

2    that's your cases that you have told me about for about

3    the last four years or so.  When you look at that list,

4    you've got about 57 cases there and isn't it true that in

5    about 95% of those cases, you were called on behalf of

6    the plaintiff's side?

7    A.   That's exactly correct.  It's been trending

8    plaintiff, but a lot of the cases that I've had for the

9    defense have settled or they've received a summary

10   judgment.  And so, I was never deposed or testified in

11   trial on.  So it's  - but I think you're correct, without

12   a question, that that's what it's been for the last four

13   years.

14   Q.   Okay.  And then, in looking at the cases there, I

15   saw dates ranging from 2007 to 2015.  I'm assuming some

16   of those cases just were older and they took a while to

17   get to trial, which is why they'd still be on your list?

18   A.   Yes.

19   Q.   Okay.  Now if we go to page 4 of your report, I see

20   you've got a heading of "Summary of Assumed Facts"?

21   A.   Right.

22   Q.   And you say there the facts in this case that are

23   relevant to my opinions are summarized in Appendix D to

24   this report and I see --

25   A.   Well, before --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 34

1  Q.   Go ahead.

2  A.   Before you can develop opinions in the case, you'll

3  have -- you have to assume something to be true for

4  purposes of analysis.  So what I do is review the

5  materials that I've received and then I usually make a

6  little bit of a summary of assumed facts and that is what

7  Appendix D is in this particular case.

8  Q.   Okay.  So if I were to assume that Appendix D are

9  all of the facts relevant to your opinions, would that be

10  correct?

11  A.   Probably not.  Like I said, it's a summary.  So it

12  -- my report is what you could consider to be taking into

13  consideration all of the facts, but a summary's a

14  summary, you know.  I tried to list those things which

15  allow me to make sense out of the materials that I

16  reviewed when I look back at it and that's what I've

17  provided in Appendix D.

18  Q.   Okay.  And Appendix D is your -- is it correct that

19  it's about a page -- it's a little short of two pages?

20  It's about a page and three-quarters?

21  A.   That's correct.

22  Q.   Are there any -- I know you said it's a summary of

23  the facts.  Are there any facts that, for whatever

24  reason, isn't contained in the summary --

25  A.   Well, I --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 35

1   Q.   -- or is it just really what's relevant?

2   A.   Right.  I already mentioned the -- one of those,

3   facts, of course, that I didn't learn about until I read

4   Mangrum's deposition, that he also delivered a elbow

5   strike to the head of Docher.  So, obviously, that's not

6   in the facts assumed because I didn't know about it at

7   point in time.

8   Q.   Sure.  Was there any  - is there anything else

9   though that you can think of?

10  A.   No.  I don't think so.  That's -- I think it's -

11          MR. VITALE:  Objection.

12  A.   It is what it is, a summary.

13  Q.   Okay.  And then I'm looking at page 2 of that

14  Appendix D.

15  A.   Yes.

16  Q.   My copy of it ends with a reference to witness

17  Shannon Randolph.  It looks like a quote from her, but

18  there's no end punctuation or end quotes and I'm

19  wondering if your version is the same way or if I'm

20  missing something.

21  A.   No.  I don't think you're missing anything.  I

22  should've had a period quote  - closed quotes there.  I

23  put down, in the summary, what independent witnesses

24  said.  Clearly, that witness's interpretation of what

25  beating the shit out of someone is not relevant to me.  I

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 36

```
 1     - you know, I have to consider the matter in  - against

 2    recognized police protocols.

 3                    And so, like I said earlier, my

 4    preliminary opinions are 90% or more based  - I don't

 5    know how to put a percentage on it  - based on the

 6    officer's own testimony in re  - I mean their own

 7    statements and their incident reports, and that sort of

 8    thing, and depositions.

 9    Q.   Okay.  So I just wanted to make sure there wasn't

10    anything cut off here from Appendix D.  You're just

11    saying that there should've been a period and an end

12    quote?

13    A.   I  - that was just a mistake on my part for not

14    putting a period and quote, just like on my page 1, I  -

15    under retention, in the second paragraph, I put Ocher

16    instead of Docher, you know.  I  -

17    Q.   Okay.

18    A.   -- made some  -

19    Q.   Where was that?  I didn't see that one.

20    A.   Pointing out a mistake on my report, page 1, under

21    retention, where it says the force used against Tavares

22     - it says O --

23    Q.   O --

24    A.   -- C-H-E-R.  It should be D-O-C-H-E-R.

25    Q.   Thank you.  Yeah.  I didn't see that.  All right.
```

Page 37

```
 1    Now page 2 of Appendix D, we were just kind of talking

 2    about that.  You were  - I notice that you have reference

 3    to civilian  - some civilian witnesses.  To what extent

 4    did the civilian witnesses testimonies play a role in

 5    your opinions in this case?

 6    A.    Well, they support the officer's own opinions  -

 7    their own statements that elbow strikes  - for example,

 8    Ariana Kanhai, the citizen, said the deputy by the man's

 9    head kept hitting him with his elbows and that's

10    consistent with the officer's own statements.  The same

11    thing with Zackary Taylor, the hitting the man with their

12    elbows, consistent.  The  - it just supports the version

13    of the officers in their reports themselves.

14    Q.    I know you mentioned too  - and this might come up

15    later with the excited delirium portion of your opinion,

16    but I see, again, looking at your Appendix D, page 2, you

17    reference, toward the end, according to witness Leah

18    Boles, Docher was "delusional and paranoial" and "very

19    sweaty" and not acting normal.

20    A.    Yeah.  Those are all  -

21    Q.    And then  -

22    A.    Those are all symptoms of excited delirium, just as

23    pacing nervous and delirious, talking murder, ransom, and

24    rewards, from Samantha Gileweski.  Those are symptoms of

25    excited delirium that officers are trained to recognize
```

Page 38

```
 1   and when they recognize it as excited delirium, the

 2   protocols are well-established as to what you should do

 3   at that point, which they didn't do, but we'll go into

 4   that I'm sure.

 5   Q.   Okay.  Well, you do understand, Mr. Tucker, that Ms.

 6   Boles and Ms. Gileweski, those were both CVS employees

 7   who were working inside the store when they saw Mr.

 8   Docher behaving as they reported.  Is that correct?

 9   A.   That is correct.

10          MR. VITALE:  Objection.

11   Q.   And you -- were the deputies present at that time

12   based on your understanding?

13   A.   Were the deputies present at that time?  No.

14   Q.   Do you know if Ms. Boles or Ms. Gileweski ever

15   witnessed Mr. Docher's conduct outside of the CVS?

16   A.   Not that I recall.  One of the things that you do as

17   a police officer when you respond to a call is you try --

18   you do a fast preliminary investigation, which typically

19   would be to talk to the complainant, and since there were

20   three deputies on this call -- Newman, Mangrum, and

21   Robinson were riding together and then Newman was

22   separate -- one of those deputies typically would have

23   talked to the employees in the store asked well, what did

24   you see, what's been happening, and would've learned

25   these things -- delusional, paranoial, sweating,
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 39

1    etcetera.  Those are all indicators. when you're doing a

2    preliminary investigation. as to what you're getting

3    ready to deal with, which is excited delirium, and if

4    it's -- you've got those symptoms, before you take any

5    law enforcement action, you get medical personnel to the

6    scene as a matter of protocol because any kind of a

7    struggle with that person who's exhibiting the symptoms

8    of excited delirium and restraint has been shown to be

9    very, very dangerous.

10                  So that's why we say it's a medical

11   emergency when you do recognize that.  Instead, the

12   officers made a decision to arrest, even though there's

13   confusion on that.  As Newman says, he didn't make an

14   arrest.  The reports say he did.  But, in any case, the

15   fact is these were things that witnesses saw and somebody

16   should've talked to them.

17   Q.   Now, Mr. Tucker, I understand what you're saying,

18   but in terms of those witnesses, if they're busy working

19   inside the CVS, is it your position then that the deputy

20   should've just stood by and waited until they were able

21   to determine any witness that might've had any

22   interaction with Mr. Docher and made Mr. Docher kind of

23   just wait at their car until they could gather all of

24   this information before making any plan?

25   A.   No.  My -- it's real simple, that one deputy would

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

```
 1   go to talk to the complainants  - the complainant or

 2   complainants and that's not chasing somebody around the

 3   store, but just answering  - asking a couple simple

 4   questions:  what did you observe about this individual?

 5   What do we have here?  Do we have a crime?  Do we have a

 6   mentally ill person?  Do we have an intoxicated person?

 7   Do we have somebody exhibiting the symptoms of excited

 8   delirium?  That's what one deputy should've been doing

 9   while the other two communicated, maybe, with Docher,

10   just keep things calm until they got an understanding of

11   what the circumstances were.

12               Were they dealing with a crime?  No.  Were

13   they dealing with an intoxicated person or were they

14   dealing with a mentally ill person or were they dealing

15   with somebody exhibiting the symptoms of excited

16   delirium?  That's  - those are questions that typically

17   officers try to answer before they start taking any kind

18   of action, if possible, and, in this case, it was

19   possible because they didn't have any problems at all

20   until they were placing him in the car after he was

21   handcuffed and then that's when he ran.  They had plenty

22   of time to have made an inquiry of the people in the

23   store as to what they saw.

24   Q.   Well, you mentioned that the deputies should've made

25   contact with the complainant.  Wasn't the complainant Mr.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 41

1   Docher?

2   A.   Well, Mr. Docher asked the -- Mr. Brown to call 911

3   and he needed help and Mr. Brown did that and then handed

4   the phone to Docher and then, after that, the other

5   people got involved, including the store manager,

6   etcetera.  So yeah, Docher was originally the one that

7   said he needed help.

8   Q.   And is it your understanding that there was nobody,

9   other than the deputies and Mr. Docher, that actually

10  witnessed the entire event that transpired between Mr.

11  Docher and these deputies?

12  A.   Well, I'm not sure I understand that question.

13  Q.   I can rephrase.

14  A.   Go ahead.

15  Q.   Do you know of any witnesses, other than the

16  deputies themselves and Mr. Docher, that witnessed the

17  entire interaction between Mr. Docher and the deputies?

18  A.   Gees, I - I'm trying to recall, but it seems like

19  there was somebody there that was videotaping it and one

20  of the deputies seized his video camera, took it from

21  him, and as - so-called as evidence.  So I don't know,

22  but, like I said, what anybody else witnessed, the entire

23  event, what I'm relying on is what the officers - the

24  deputies themselves said happened and what they did and

25  why they did it.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 42

1   Q.   Okay.  So even though you've read the depositions

2   and the statements of these witnesses, the CVS employees,

3   the civilian witnesses outside, you can't tell me whether

4   any of them saw the entire event or not, is that right?

5   A.   I can tell you from my remembrance of reading their

6   depositions.  For example, the store manager, Mr. --

7   Q.   Bhagudas?

8   A.   -- Bhagudas, he said that after he left the  -

9   Docher left the store, he went about his  - he didn't see

10  what happened in the parking lot.  I think that's the

11  same thing for Wayne Brown.  I think that's the same

12  thing for Samantha Gileweski.  So I think it's clear that

13  they went about their business, did not go out into the

14  parking lot and observe all the events.

15  Q.   Now do you recall though that Mr. Bhagudas, who was

16  the store manager, felt compelled to go out to the

17  deputies briefly to let them know that Mr. Docher had a

18  screw driver in his possession?

19  A.   I do recall that and I thought that was, you know,

20  of course, entirely appropriate.  It was a safety matter

21  as far as he saw and he did tell the deputies and the

22  deputies did tell him to put the screwdriver down, which

23  he did comply, and then they kicked it out of the way.

24  All of that's  - no problem with any of that.

25  Q.   Because originally  - or initially, Mr. Docher was

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1    cooperative with the deputies, right?

2    A.   Yes, he was.  And, you know, you mentioned earlier

3    that Docher's the one himself who said call 911.  I think

4    that's a significant fact for the deputies to have

5    understood and it's not clear to me whether they

6    understood -- that was communicated to them or not.  But

7    when somebody calls and says would you  - when somebody

8    says please call 911 for me, I need help, that's an

9    indication that it's not a crime.  It's somebody who's

10   got a mental health problem going on or a medical problem

11   going on,  cause they ve asked for someone to call 911 to

12   help.

13   Q.   Well, would you agree with me though that, just

14   because somebody's asking for 911 to be called, it

15   doesn't always mean that somebody's mentally ill or needs

16   medical assistance, right?

17   A.   Any question that you ask me today that uses terms

18   like always, I'm going to answer the same way, which is

19   anything is possible.  I've heard of people calling 911

20   because McDonald's didn't give them two scoops of ice

21   cream on their cone.  Clearly, anything's possible.  But

22   the fact is that, when a person calls 911 themselves or

23   asks for someone to call 911, that should be of interest

24   to the officers who responded to understand that this is

25   a person seeking help.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 44

```
 1   Q.   Okay.  Well, let me ask you about your Appendix C

 2   again, the materials reviewed.

 3   A.   Okay.

 4   Q.   I see mentioned  - I'll give you a minute to get

 5   there.  Appendix C to your report.

 6   A.   All right.

 7   Q.   And there's mention, at number 13, of five discs

 8   containing police reports, articles, event reports,

 9   witness statements, CVS video/phone audio, 911 audio,

10   audio/video witness statements, and photos and witness

11   statements.

12   A.   Right.

13   Q.   Do you see what I'm reading from?

14   A.   Yes.  I re  -

15   Q.   Do you know where those five discs came from?

16   A.   Well, I have them here.   I would assume the five

17   discs were all provided to me from the  - they're marked

18   Searcy, Denney, Scarola law firm, photos and witness

19   statements, CVS video/phone video, copied from CD.  All

20   of it's marked, so  -

21   Q.   So  -

22   A.   Marked Searcy, Denney, Scarola.

23   Q.   Okay.

24   A.   So --

25   Q.   But you don't know where they got those five discs
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 45

1    from?

2    A.   Well, they would've had to have gotten them from

3    either the sheriff's department or CVS, because how -

4    otherwise, they wouldn't have been able to get it.

5    Q.   Or their private investigator?

6             MR. VITALE:   Objection to form.

7    A.   I don't know.

8    Q.   And were you aware, Mr. Tucker, that some of the

9    statements you were provided were taken by the Searcy

10   Denney's private investigator?

11   A.   Yes.  I'm totally aware of that.

12   Q.   Okay.  Now what I really also wanted to know is the

13   reference to the videos, I wanted to understand, Mr.

14   Tucker, what videos  - and I don't mean videos of

15   depositions or videos of interviews, but I want to know

16   what videos from the scene have you ever reviewed.

17   A.   That's  - I'm going by strictly memory now.  I

18   didn't review it in preparation for this deposition.  So

19   the last time I looked at it would've been sometime in

20   April or May.  But I do recall videos.  It was a couple

21   of minutes of the struggle with Docher in the parking

22   lot, if I recall -- a couple minutes.  That's primarily

23   what I remember.

24   Q.   Now my understanding is there is a short cell phone

25   video taken by one of the individuals that was in front

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 46

1    of the CVS.

2    A.    Right.

3    Q.    It was a minute or so long.  I don't remember

4    specifically how long it was, but it wasn't particularly

5    long.  Do you know if you saw that video?

6    A.    Well, certainly, it was referenced in one of the

7    depositions, the deposition of the officer who seized the

8    Iphone from that citizen, and I think he said it was a

9    minute and nine seconds long, but  - and I may have

10   reviewed it, but, you know, again, I can't emphasize

11   enough that my opinions are substantially and almost

12   totally based upon the officers own testimony in

13   deposition or their reports, because video, although some

14   of it is good, you know, a lot of times, it's really

15   difficult to make out what the heck is going on.  But I

16   did review one of those videos that I recall that showed

17   part of the struggle.  I don't remember whether it was

18   the citizen's  - it had to probably have been the

19   citizen's video.

20   Q.    Okay.  I know we were just talking about the cell

21   phone video.  Do you recall  - I know it's been a while

22   since you've seen it apparently, but do you recall what

23   it showed?

24   A.    Some of the struggle, the officers holding Docher

25   down as I  - the deputies holding Docher down as I

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 47

1    recall.

2    Q.   Okay.  Would you agree with me that it was not a

3    videotape of the entire interaction from start to finish

4    between the deputies and Mr. Docher?

5    A.   I would agree with that.

6    Q.   In fact, it was, like you said, only about a minute

7    and nine seconds of the entirety of the event?

8    A.   That's what I recall.  That's correct.

9    Q.   Now have you ever seen any of what I'm going to call

10   surveillance video, for lack of a better word, taken from

11   the CVS store itself?

12   A.   Not that I recall.

13   Q.   Do you recall ever seeing any video showing Mr.

14   Docher and the deputies falling to the ground in the

15   parking lot?

16          MR. VITALE:  Objection to the form.

17   A.   No, I don't.  I don't recall seeing any video of

18   that.  I recall, very distinctly, the officer's

19   deposition testimony and statement testimony of all three

20   of them grabbing at him and all four of them falling to

21   the ground, yeah.

22   Q.   So it sounds like, if I'm understanding what your

23   testimony is, you really are relying more on the

24   deputies' recollection of the events from their

25   depositions and statements more so than any of the video?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 48

1   A.   Typically, I'm going to rely on the most significant

2   information that I can get and that's, in this case, the

3   deputies themselves, as to what they say happened and how

4   it happened, and that's the problem for them because they

5   describe the use of deadly force when it wasn't justified

6   and they describe holding a person down in a prone

7   position with hands cuffed behind their back, which is

8   the so-called physiology of a struggle problem.

9   Q.   And I know that's part of your  - some of your

10  opinions, correct?

11  A.   That is correct.

12  Q.   Okay.  And I'll talk to you about those momentarily.

13  Okay.  Let me turn now to your report again, page 4, your

14  preliminary opinions, and have you already explained to

15  me what you meant by preliminary opinions?

16  A.   Yes.  What I did was titled my opinions as

17  preliminary because I was told, when I filed my report on

18  May the 16th, that I would be receiving additional

19  information to review, including the deposition testimony

20  of the officers.  So that's why I classified them as

21  preliminary and figuring that I would, after reading the

22  depositions, file a supplement report  - supplemental

23  report finalizing my opinions.

24             What I'm saying today is I still can't do

25  that because, frankly, I just received, yesterday,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 49

1    information that they'll be additional materials provided

2    to me, which is the deposition testimony of whoever the

3    corporate representative is for the St. Lucie County

4    Sheriff's Department, and that will address the issue of

5    whether or not there was an internal affairs

6    investigation done, what the conclusion of the internal

7    affairs investigation was, which I'll have to look at to

8    determine whether there's a custom and practice in the

9    St. Lucie County Sheriff's Department of condoning things

10   like elbow strikes to the head or condoning excessive

11   force.

12   Q.   And so, am I understanding your testimony to be

13   that, to date, you have not yet been asked to opine about

14   any customs or policies of the St. Lucie County Sheriff's

15   Office in relation to this case?

16   A.   Well, typically, I don't get asked anyhow.

17   Typically, because I've been doing this for 20 years, I

18   know what to look for and what to look at, and custom and

19   practice is always something that I look at, and I'm

20   telling you that I can't make a determination on custom

21   and practice right now because I have to wait until I see

22   the testimony  - deposition testimony of the corporate

23   representative from the sheriff's department.

24   Q.   Okay.  Thank you.  Looking at your preliminary

25   opinion number one, on page 4 of your report, Mr.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 50

```
 1   Tucker, --

 2   A.   Yes.

 3   Q.   -- and you mention or you state in there that, I

 4   guess, your preliminary opinion number one is that

 5   Deputies Newman, Mangrum, and Robinson, in the force that

 6   they used with Docher on May 11th, 2014, was excessive

 7   and unreasonable and was a greater level of force than

 8   other officers would've used in 2014 if confronted with

 9   the same or similar circumstances?

10   A.   Yes.

11   Q.   Is that correct?

12   A.   Yes.

13   Q.   Can you tell me what facts or data you rely on to

14   come to that opinion?

15   A.   Well, yes.  That's over  - under the analysis part,

16   on page 5, where I say okay, let's  - what's the standard

17   of care here on use of force and, clearly, it's the

18   Graham v. Connor test, the U.S. Supreme Court decision,

19   1989, and  - as to whether or not it's excessive force or

20   not and, clearly, it says, in the Graham v. Connor case,

21   that you have to take into consideration the totality of

22   the circumstances, to include at least whether or not

23   there was a crime at issue or the severity of the crime

24   at issue.  In this case, we don't have a crime or, if we

25   did, it would've been public intoxication apparently.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 51

1            Whether there was posing an immediate

2     threat, well, I don't think there was an immediate threat

3     posed to the three deputies, to the safety of the

4     officers, and whether he was actively resisting arrest,

5     well, he was resisting when he fled, I guess, and -

6     without question.  So that factor's there.

7            Then, you know, I cite the fact that in

8     Florida - and I have the - attached, as Appendix E,

9     right out of the Florida Basic Recruit Training

10    Curriculum:  Volume 2, "Criminal Justice Defensive

11    Tactics," page 291, and it clearly shows that a elbow

12    strike taught in Florida - and I served three and a half

13    years as vice-chairman of the Criminal Justice Standards

14    and Training Commission in Florida, so I'm familiar with

15    all this.  Elbow strikes to specific areas can cause

16    great bodily harm or death and target areas for deadly

17    force include the following:  temple, the side of the

18    jaw, the bridge of nose, back of the head, the throat.  I

19    don't think it can be any clearer than that.

20            So when you have Newman saying well, it

21    wasn't deadly force, but I - yeah, I delivered an elbow

22    strike - in fact, I delivered two and Mangrum saying

23    yeah, well, and I delivered one too and I don't think it

24    was deadly force, where did it come from when they say it

25    wasn't deadly force?  Clearly, the training they received

Page 52

1    - or should've received and been aware of says elbow

2    strikes to the head area, the temple, the side of the

3    jaw, the bridge of the nose, the back of the head, the

4    throat, it's deadly force.  That's excessive then, since

5    deadly force was never justified and they admit, in their

6    deposition testimony, that deadly force was never

7    justified, but say well, deadly force was never justified

8    and we didn't use deadly force because we don't consider

9    elbow strikes to be deadly force -- elbow strikes to the

10   head.

11   Q.    Don't let me interrupt you.  Are you finished?

12   A.    Yes.

13   Q.    Okay.  Thank you.  Just so I understand, I know you

14   were talking about the elbow strikes to the head.  Other

15   than elbow strikes to the head by either Newman or

16   Mangrum, do you take issue at any other uses of force by

17   these three deputies?

18   A.    Well, clearly the use of a  - holding a person in

19   the prone position while their hands are cuffed behind

20   their back after them seeing all these issues of symptoms

21   of excited delirium or medical issues is excessive force.

22   There were three deputies there at  - most of the time

23   and four at another point, as I recall, to control Docher

24   without holding him down in the prone position with

25   compression on him, like Mangrum was 205 pounds at the

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 53

1   time.  That's compression.  So that's excessive too and I

2   mentioned that in my report.

3   Q.   Okay.  I just want to understand.  So besides the

4   elbow strikes to the head and the compression issue that

5   you just mentioned, is there any uses of force by these

6   three deputies that you're taking issue with in regard to

7   your opinions in this case?

8   A.   No.  Handcuffing is not use of force.  It's just a

9   restraint.  They didn't use OC, they didn't use night

10  sticks, they didn't use tasers.  So the elbow strikes and

11  the compression in the prone position with hands cuffed

12  behind the back are my issues --

13  Q.   Okay..

14  A.   -- with what they did.

15  Q.   Thank you.  Now you mentioned that no crime had been

16  committed here.  Is that what you said a moment ago?

17  A.   Well, I said that there was no crime, in my opinion,

18  given the fact that it started off with Docher asking to

19  have the 911 called on his own, but if there was any

20  crime at all, it would've been Florida's disorderly

21  intoxication and that's a second-degree misdemeanor,

22  which is a minor crime, and I think that's what he ended

23  up being charged with, if I'm not mistaken, in the case.

24  Q.   Well, --

25  A.   A very insignificant, minor crime, which would

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 54

1    certainly not justify -- you know, it's one of those

2    factors that Graham v. Connor says you should look at,

3    severity of the crime at issue, when you're making a

4    determination as to whether or not the use of force was

5    excessive or not.

6    Q.   Sure.  But I see in your analysis, on page 5 of your

7    report, Mr. Tucker, --

8    A.   Yes.

9    Q.   -- that you specifically say here, before the

10   deputies used force, the only crime Docher had committed

11   was disorderly intoxication.

12   A.   Right.

13   Q.   So you admitted that he had committed that crime at

14   least, correct?

15   A.   Well, as I already said, that's what they charged

16   him with.  So, clearly, they thought he was  - in fact,

17   they made the determination, as I recall, that they would

18   take him into custody for that, as opposed to a mental

19   health or medical treatment.

20   Q.   Okay.  Well, once he's in custody, Mr. Tucker,

21   wouldn't you agree that, if he's fleeing from their

22   custody and bolting out of the back seat of the patrol

23   car, that's a violation of the law as well, right?

24   A.   It is.  As I said earlier, that's  - that factor was

25   there.  He was evading arrest by flight.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 55

```
 1   Q.   Escape?

 2   A.   Escape?

 3   Q.   Yeah.

 4   A.   I -

 5   Q.   Wouldn't that be,  -

 6   A.   I don't  - I --

 7   Q.   -- under Florida law, --

 8   A.   I wouldn't  -

 9   Q.   I think the Florida -- sorry to interrupt you.

10   A.   I'm not a lawyer and I don't render legal

11   conclusions as to whether or not that would meet the

12   definition of escape in Florida or not.  So it certainly

13   was evading the officers.

14   Q.   Okay.  Well, were you aware  - I know you're not a

15   lawyer, but were you aware that a violation of Florida

16   Statute 944.40, which is entitled escape, would be a

17   second-degree felony in the state of Florida?

18            MR. VITALE:  Objection to the form.

19   A.   No.  And, as I said, I did not  - I'm not a lawyer

20   and I didn't look at that.

21   Q.   Okay.  Now let me ask you then  - so you were

22   telling me about the elbow strikes to the head, page 5 of

23   your report, and you just told us a moment ago you

24   referred to, it looks like, Appendix E about elbow

25   strikes to the head being deadly force.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 56

1   A.   Yes.

2   Q.   Is it your opinion, Mr. Tucker, that all elbow

3   strikes to the head are deadly force?

4   A.   No.  I - it is my opinion that the officers in

5   Florida received training, in the basic recruit training

6   curriculum, that deadly force elbow strikes  - that elbow

7   strikes can be deadly force if delivered to the temple,

8   the side of the jaw, the bridge of the nose, the back of

9   the head, or to the throat, and it includes those  - at

10  least includes those.  That's not a -- that -- the way I

11  read that, it's not an inclusive list, but it's examples

12  of that.

13          It is my experience, in law enforcement,

14  that when you're talking about an elbow strike, a bony

15  part of the elbow, that's exactly the reason  - the

16  equivalent of a baton strike, a wooden or a metal baton,

17  and that's exactly the reason why baton strikes to the

18  head area  - and it doesn't say the temple, the back of

19  the head, or the throat or the bridge of the nose, when

20  you're talking about batons.  You just say you don't

21  strike a person in the head with a baton  cause that's

22  deadly force.  So this is the equivalent of that.

23  Q.   Okay.  So I just want to understand what your

24  testimony is and, based on your Appendix E, Defensive

25  Tactics Techniques, and there's a subsection, Deadly

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 57

```
 1   Force Elbow Strike, isn't it true that not all elbow

 2   strikes are deadly force, correct?

 3   A.   It depends on where it's delivered and if it's in

 4   the head.  Look, I have been involved in law enforcement,

 5   with all due respect, since 1969  -  68,  69, almost 50

 6   years.  In that entire time, I have been trained, from

 7   the FBI to everywhere, that you  - when you use a closed-

 8   fist blow or any kind of an elbow strike to the head

 9   area, that is deadly force, because it is likely to cause

10   serious bodily harm or death to the person who it's used

11   against, typically subdural hematomas that  - the blood

12   between the brain and the skull result from those kind of

13   blows.

14                  So it's not only me looking at Florida,

15   which I pointed out here.  I could go to 10 other states

16   and pull their basic recruit training curriculum that

17   says the same thing Florida says here and, over the

18   entire 45 years or so in law enforcement, it has always

19   been recognized and accepted that closed-fist blows,

20   batons, or elbow strikes to the head is taught in use of

21   force training programs as force likely to cause serious

22   bodily harm or death.  That is deadly force, by

23   definition.

24   Q.   Well, I appreciate your experience, Mr. Tucker, of

25   course.  However, in looking at what you're referring to
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 58

1    here as Appendix, I think it's, E, doesn't the training

2    that you reference in your report specifically say that

3    the elbow strikes that are considered deadly force are

4    only those that utilize the tip of the elbow to only

5    certain spots on the person's head that are stabilized?

6    It's not just any elbow strike to the head is deadly

7    force.   That's not what that says, right?

8    A.   That's right.

9    Q.   Okay.  So maybe it's semantics, but I just want to

10   understand what the training you're referring to is,

11   utilizing the tip of your elbow, the bony prominence of

12   your elbow, to a specific target area, such as the temple

13   or the jaw or the bridge of the nose or the throat, and

14   that area is stabilized when the strike is delivered for

15   it to be considered potentially under those  - under that

16   training as deadly force.

17   A.   Well, that  - it's self-explanatory, right there

18   from the training program, yeah.

19   Q.   So you're not disagreeing with me?

20   A.   I'm not disagreeing with you.  It doesn't say top of

21   the head, for example, although I don't know.

22   Q.   Right.  Okay.  Now do you know specifically where,

23   on Mr. Docher's body, Deputy Newman delivered his elbow

24   strikes?

25   A.   He just said to the side of the head.

Page 59

```
 1   Q.   Do you know where on the side of the head?

 2   A.   Well, no, I don't.  You know, I'm touching the side

 3   of my head.  That's - the side of my head is the temple

 4   right there.  The side of my head there is the jaw area.

 5   So the side of  -

 6   Q.   But it's also a cheek  -

 7   A.   The side of --

 8   Q.   -- or a jaw, right?

 9   A.   I'm sorry.

10        COURT REPORTER:  I'm sorry.  You got cut off.

11   A.   So if --

12   Q.   I -- go ahead.

13   A.   So if that be the case, that certainly meets the

14   definition of deadly force here, which was to the temple

15   and the side of the jaw, but that's the best I can do

16   from what their testimony is.

17   Q.   Well, do you  - the same question too.  Do you know

18   what part of Deputy Newman's elbow made contact with Mr.

19   Docher's head?

20   A.   Well, he said it was an elbow strike.  Elbow strike

21   is defined as using the tip of the elbow to strike

22   someone.  So, again, I'm using his expression of what

23   happened.  It's startling to me, frankly, when I read

24   that, that this is a guy who says oh, that's not really

25   deadly force.  Well, it is.  I'm sorry.  It is.  It's
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 60

1    recognized.  You can ask 10,000 law enforcement officers

2    the question, if the elbow - what is an elbow strike?

3    They'll say the tip of the elbow.  A blow to the head

4    with the tip of the elbow, is that likely to cause

5    serious bodily harm or death?  The answer's going to be

6    yes.  So, you know, I'm sorry.  That's just what it is.

7    Q.   Well, let me ask you this, Mr. Tucker.  Have you

8    ever heard of training, in regard to elbow strikes,

9    involving any other portion of the elbow beside the tip,

10   such as the soft area just adjacent to the tip of the

11   elbow?

12   A.   No.  You're talking about like -

13          MR. VITALE:  Objection to form.

14   A.   -- a forearm  -

15          COURT REPORTER:  I'm sorry.  Was that an

16   objection?

17          MR. VITALE:  Yes, ma'am.

18   A.   The answer's no.

19   Q.   Okay.  So when you hear elbow strike, you

20   automatically think tip of elbow?  Is that right?

21   A.   Yes, tip of the elbow.

22   Q.   Were you aware, Mr. Tucker, that when Deputy Newman

23   delivered the elbow strikes that he testified about, it

24   was in reaction to Mr. Docher biting or attempting to

25   bite him?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 61

```
 1   A.    That's correct.

 2   Q.    Does the fact that Mr. Docher was biting or

 3   attempting to bite either Deputy Newman or Deputy Mangrum

 4   change your opinion at all?

 5   A.    Absolutely not.  Attempting to bite somebody is not

 6   threatening with -- threatening deadly force.  It's a

 7   bite.  That does not justify the use of deadly force in

 8   response.  But it justifies --

 9   Q.    And, again, I under --

10   A.    It justifies  -

11   Q.    I'm sorry.

12   A.    -- moving your hand away so he can't bite you, but

13   it doesn't justify elbow strikes to the head or the use

14   of deadly force.

15   Q.    But, again, with the understanding that the -- in

16   order -- in your opinion, in order for an elbow strike to

17   the head to be considered deadly force, it has to be

18   delivered to certain targeted areas on the head that are

19   stabilized.  Is that correct?

20   A.    That is correct, and the tip of the elbow.  If

21   you're suggesting to me, however, that because Docher

22   attempted to bite Newman or Mangrum, that that would

23   justify deadly force, then, by gosh, they should've just

24   jumped back and drew their weapons and shot and killed

25   him.  That's for sure the way to deal with deadly force
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 62

```
 1    if deadly force is justified.

 2    Q.    I just want to understand it, because, obviously,

 3    you're traveling under your definition of what a deadly

 4    force elbow strike is, and I just want to understand --

 5    A.    Yeah.

 6    Q.    -- what your opinion is and whether it changes at

 7    all if the person that's being restrained bites or

 8    attempts to bite the officer.

 9    A.    It doesn't change it --

10    Q.    Go ahead  -

11    A.    It doesn't change it --

12    Q.    -- and clarify.

13    A.    -- at all.

14    Q.    Okay.

15    A.    My testimony is my testimony.

16    Q.    Thank you.  And I see, on the bottom of page 5 of

17    your report, you say, on the last sentence, "In fact,

18    Docher was not criminally charged with aggravated assault

19    (necessary to justify the use of deadly force) and

20    instead was charged with simple assault/battery."  Do you

21    see that?

22    A.    Yes, I do.  What I'm pointing out there simply is,

23    if Docher had somehow had some kind of a weapon, which

24    would be necessary to charge under aggravated assault,

25    which could've caused serious bodily injury to the
```

Page 63

1    officers, then deadly force would be justified, but that

2    are -- that's not the facts of this case.

3    Q.   Okay.  And I was just going to ask where did you get

4    the information that he was charged with simple

5    assault/battery?

6    A.   I guess the incident report.  Hold on a minute and

7    I'll look at it.  I think that's where I got it.  Yes.

8    On the incident report, page 1, the crime was assault and

9    battery with weapons -- hand, fist, feet.  That's simple

10   assault and battery.

11   Q.   So it was a battery on a law enforcement officer?

12   A.   Yes.

13   Q.   And I know you told us earlier you're not a lawyer.

14   So you wouldn't know what degree of crime battery on a

15   law enforcement officer would be in Florida, I assume?

16          MR. VITALE:  Objection to the form.

17   A.   I did not look it up.  I'm just looking at the

18   incident report and they're saying it was not an

19   aggravated assault because there was no weapons involved

20   and it was -- the crime was assault.

21   Q.   Well, do you know that, in Florida, battery on a law

22   enforcement officer is classified as a felony?

23          MR. VITALE:  Objection to the form.

24   A.   Well, I think that's correct.  Yes.

25   Q.   Now turning to page 6 of your report, Mr. Tucker,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 64

1  and I see -

2  A.   All right.

3  Q.   I see a couple of in-my-opinions there toward the

4  top of the page.  The first one was, in my opinion, a

5  reasonable officer, under similar circumstances, would

6  not have perceived Docher as an immediate threat of

7  serious bodily harm or death at any time after the

8  officers handcuffed him.  And what facts are you basing

9  that opinion on?

10  A.   I'm basing that on my personal experience, that you

11  have an unarmed person who's handcuffed with his hands

12  behind his back.  No reasonable officer would consider an

13  unarmed person who's handcuffed as an immediate threat of

14  serious bodily harm or death to the officer under the set

15  of circumstances there.

16  Q.   And that was based too on your conclusion that the

17  elbow strikes delivered by Deputy Newman were deadly

18  force, is that right?

19  A.   Correct.

20  Q.   And is that also the case with your next sentence

21  there that says, in my opinion, striking Docher in the

22  head with an elbow strike two times when he was

23  handcuffed and while there were at least three deputies

24  to control Docher was a greater level of force than other

25  officers would've used under the same or similar

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 65

 1   circumstances?

 2   A.    Correct.  There are absolutely numerous -

 3   innumerable -- I can't even give you the number of them

 4   -- of cases that -- on use of force where the

 5   consideration of the court as to whether the use of force

 6   was reasonable or not is based upon how many officers

 7   were present to control an individual and I can give you

 8   a couple of those if you want.  But, in any case, since

 9   there were at least three deputies here capable and

10   available to deal with Docher, who was handcuffed, then

11   their  - any kind of an elbow strike is not reasonable.

12   Q.    Now I know you've told me you were relying on the

13   deputies' testimony.  Were you aware that the deputies'

14   testimony included the fact that, shortly after they all

15   went to the ground with Mr. Docher, that although he was

16   handcuffed, he apparently was able to slip one of his

17   hands under his body and do a push-up with the deputies

18   on or around him?

19   A.    I'm very aware of that.

20   Q.    Okay.

21   A.    That's part of  -

22   Q.    So  -

23   A.    Oh, by the way, that's part of that physiology of a

24   struggle.  When  - what the officer calls resisting is

25   part of what we call the physiology of a struggle, when a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 66

1   person is down in the prone position on their stomach and

2   can't breath.  When they try to push themselves up so

3   they can breath, the officer says that's resisting.  The

4   person who's down there, most of the time they end up

5   dying from the complications of the restraint and the

6   compression, exacerbated by excited delirium.  In this

7   case, he didn't die, but the same kind of situation.

8   Q.   Now is that related to your opinion concerning

9   positional asphyxia?

10  A.   Yes, ma'am.

11            MR. VITALE:  Objection to the form.

12  Q.   We'll talk about that in a minute also.

13  A.   All right.

14  Q.   Now I see, on page 6 of your report still, you

15  reference, following those two opinions I just mentioned,

16  a citizen witness by the name of Merine -- I think it's

17  M-E-R-I-N-E -- Kanhai, K-A-N-H-A-I, making reference to

18  hearing Mr. Docher say don't let them kill me.  Do you

19  see where I'm referring to that?

20  A.   Yes.

21  Q.   Okay.  Do you know who Mr. Docher was referring to

22  when he was saying don't let them kill me?

23  A.   I don't know if anybody knows who he was referring

24  to since he was delusional.  He was earlier talking about

25  Arabs trying to get him, but he  - nobody knows who  -

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 67

1   what was going on, who he was talking about, but that is

2   what the witness said that he was saying.

3   Q.   At that point in the incident?

4   A.   Correct.

5   Q.   Okay.  Now then, right before you got your

6   preliminary opinion number two, on page 6, you say,

7   "Finally, it would've been obvious to any reasonable

8   officer on May 11th, 2014, when considering the totality

9   of the circumstances presented to Deputies Newman,

10  Mangrum, and Robinson, that Docher was having a medical

11  emergency and needed immediate medical attention.

12  Instead, Newman, Mangrum, and Robinson used excessive

13  force on unarmed and handcuffed man, in violation of

14  training and standards, and my question is what facts do

15  you base that on, that it would've been obvious to any

16  reasonable officer at that time that Mr. Docher was

17  having a medical emergency?

18  A.   Well, let's take Newman first.  He said he'd

19  received training at the St. Lucie County Sheriff's

20  Department on excited delirium and he, in fact, was, at

21  some point along the line, maybe after this incident, but

22  certified to instruct on excited delirium, the signs and

23  symptoms of excited delirium, and then he said, also,

24  that excited delirium is a medical emergency.

25              Well, let's just say that if they see a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 68

```
 1   person who's delusional, talking about they're trying to

 2   kill me, whether he's talking about the deputies or

 3   someone, he's sweaty, he's -- all the things that the

 4   deputies said they saw him do  - Newman says that he kept

 5   responding to Arabs, talking about Arabs, and he had to

 6    - he saw the Arabs hide the bodies in St. Lucie County

 7   and he was seeing things.  If Newman was trained, or any

 8   officer, hearing those kind of things that he's

 9   describing would've seen this as the symptoms of excited

10   delirium and, therefore, a medical emergency because he

11   knew excited delirium symptoms was a medical emergency,

12   if that makes sense, what I said.

13               So I'm just saying that any reasonable

14   officer, given the totality of the circumstances here,

15   would've seen this as a person who was exhibiting

16   symptoms of excited delirium and, therefore, he should've

17   been treated as a medical emergency.

18   Q.   In your opinion, Mr. Tucker, do you believe the

19   symptoms of excited delirium are easy to discern for a

20   non-medically trained professional, such as a law

21   enforcement officer?

22   A.   When you read the portion of my book on this

23   chapter, I make it clear that we don't expect officers to

24   be able to diagnose, with any kind of certainty, some

25   kind of a disease or medical experts.  What we do though
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 69

```
 1    is expect them to recognize the symptoms of excited

 2    delirium, just like we did back 20 years ago.  We used to

 3    have numerous examples of officers who would see

 4    somebody, thinking that they were intoxicated.  In fact,

 5    interestingly enough, the case, Graham v. Connor, is

 6    right on point.  It was a black male suffering from a di

 7     - a sugar diabetes insulin problem that the officers

 8    took for him being drunk - publicly drunk.  So we had to

 9    train officers 20 years ago to recognize the difference

10    between a sugar diabetes issue or public drunkenness and

11    say, if there's a question, treat it as a medical issue,

12    not as a criminal issue.  The same thing is true here.

13              Excited delirium is - it's not like it's

14    new.  It's been around for quite some time and there's

15    been a lot of training on it  - on recognizing those

16    symptoms and treating it as a medical emergency.

17    Q.   Well, Mr. Tucker, you would agree with me though

18    that every situation is different, right, in terms of

19    facts being confronted by the law enforcement officer on

20    the scene?

21    A.   As I said, --

22    Q.   So they're not all like the Graham v. Connor

23    scenario is what I mean.

24              COURT REPORTER:  I'm sorry.  Can you repeat

25    that last comment?  It cut out.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 70

```
 1            MS. BARRANCO:  Sure.  They're not all the

 2    situation in Graham v. Connor, correct?

 3    A.   I mentioned earlier in the deposition that anything

 4    that says all or always or it's a possibility, I'm going

 5    to always answer it the same way.  Anything's possible.

 6    Yes, it's true that all circum  - situations are not

 7    exactly alike.

 8    Q.   Okay.  But  -

 9    A.   But I'm dealing with this situation.

10    Q.   Sure.  Well -- and you were talking about excited

11    delirium and training on the signs and symptoms and if we

12    could just look now at one of your appendix to your

13    report, Appendix F, that you refer to with excited

14    delirium mentioned.  Tell me when you're there.

15    A.   I've got it.

16    Q.   All right.  It mentions some symptoms on the second

17    page there.  It says the unusual symptoms or behavior are

18    usually attributed to a condition known as excited

19    delirium.  Excited delirium is a sense of extreme mental

20    and physiological excitement characterized by exceptional

21    agitation and hyperactivity, overheating, excessive

22    tearing of the eyes, hostility, superhuman strength,

23    aggression, acute paranoia, and endurance without

24    apparent fatigue, and there's a citation to Lewinski,

25    2006.  Do you see where I'm reading from?
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 71

1   A.   Do I what?

2   Q.   Do you see where I'm reading from?

3   A.   Oh, I know exactly where you're reading from and

4   Bill Lewinski is from the Force Science Center and this

5   is 2006.  Very, very more symptoms identified, but let's

6   just take agitated.  If Brown would've been talked to,

7   the CVS employee, he said in his deposition, page 9, line

8   8, Docher appeared agitated.  He was not making sense.

9   He was not acting normal.  That's just Brown alone and

10  Bhagudas, if they would've been talking to  - talked to.

11              In any case, the officers themselves saw

12  him  - he being Docher  - acting the way that they should

13  have, as the final thing said there, when confronting a

14  subject with unusual symptoms, an officer should

15  immediately seek medical attention.  That's the whole

16  point.

17  Q.   Although, even if they seek medical attention, the

18  police are still the ones that are charged with

19  controlling the subject, correct?

20  A.   Well, yes, but I don't know what you mean by that.

21  They need to control, if they can, yes, but they

22  should've sought medical attention immediately.

23  Q.   So do I understand, then, your opinion, Mr. Tucker,

24  is that the deputies in this case, before they ever laid

25  hands on Mr. Docher, should've first summoned EMS?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 72

 1   A.    Correct.  They should've talked with the persons in

 2   CVS and said tell me what's been going on here.  Well,

 3   this guy's acting very agitated.  He's not making any

 4   sense.  He asked us to call  - he said to call 911 for

 5   him, which we did.  He's just not acting normal.  He's

 6   sweaty.  These are all things that the CVS employee said,

 7   at which point the  - our deputy says wow, those are the

 8   symptoms of ED.  So what's the protocol now?  Well, the

 9   protocol is let's get EMS to the scene before we even

10   interact with him, if possible.  And so, call for EMS to

11   come to the scene.  Now EMS comes to the scene.  You say

12   to the EMS we're going to overpower him as quickly as we

13   can, get him down, get him cuffed.  It's then your

14   responsibility, as to protocol -- spell it out -- to

15   administer a sedative.  Now I'm not going to tell you

16   what the sedative is --  cause I'm not a medical expert,

17   I'm not an EMS expert  - and the dosage and all that and

18   then transport immediately to the hospital for medical

19   care.  That's the typical protocol spelled out.  It's

20   been understood for several years now.  That's not what

21   happened.

22   Q.    Okay.  Well  - but, even in your scenario, aren't

23   you saying that, even if medical is on standby, the

24   deputies are still charged with having to control the

25   individual, correct?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 73

```
 1   A.    Correct.  You don't expect  -

 2   Q.    The  -

 3   A.    EMTs to do that.

 4   Q.    Well, EMS isn't even going to touch the guy until

 5   he's under control, isn't that right?

 6   A.    Correct.

 7   Q.    And I think I heard you use the words if possible,

 8   is that right?

 9   A.    I don't know.

10         MR. VITALE:  Objection.

11   Q.    Did you use the term if possible or the words if

12   possible?

13   A.    I don't know.  You'd have to read it back, what I

14   said.

15   Q.    Well, you were talking about the protocol and, you

16   know, if possible, call medical first and that sort of

17   scenario.

18   A.    Okay.  That  -

19   Q.    And isn't your protocol kind of a best-case

20   scenario?

21   A.    What I'm saying is, very simply, that if Docher is

22   standing in the parking lot, as opposed to stabbing

23   someone with a screwdriver, then, if he's just standing

24   there doing nothing, then it is possible and reasonable

25   for the officers to call EMS and get them to the scene
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

1    once they've recognized and talked to the CVS employees

2    and found that this - all these symptoms were there, as

3    opposed to a chaotic scene.

4                   For example, again, there's numerous case

5    law, under the Americans With Disabilities Act, and it

6    says, very clearly, that officers are not required to

7    impose protocols for mental health treatment of someone

8    until the scene - unless the scene is under control or

9    brought under control.  So if there's somebody committing

10   a crime or stabbing, you don't have to run up there and

11   start invoking ED protocol, but ED protocol was

12   reasonable here because he was just standing in the

13   parking lot when they got there.

14   Q.   Of course, you have no idea how long it would've

15   taken a deputy to go inside and actually get to figure

16   out who may have information about how he was behaving

17   inside, --

18   A.   I -

19   Q.   -- correct?

20   A.   I don't have an idea how long it  - how many minutes

21   or a minute or any of that.  There's not a time line.

22   Q.   Well, do you recall, from the deputy's testimony,

23   that when Mr. Docher was first outside of the CVS with

24   them, he was calm?

25   A.   Smoking a cigar.  That's correct.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 75

1  Q.   Now you mentioned the word agitated as one of the

2  possible symptoms of excited delirium.  Can't agitation

3  be a symptom of other things besides excited delirium?

4  A.   Agitation can be a symptom of a lot of things.  I

5  was very agitated when I backed my boat into the lobster

6  warp and got it all wrapped around my prop.  It had

7  nothing to do with excited delirium.  It cost me a $100

8  to get the diver to go down and cut it off.  I was

9  agitated.

10 Q.   Sure.  And I get that.  What about overheating?

11 That was another word contained in your appendix about a

12 symptom of excited delirium.  I mean, couldn't

13 overheating be somebody that's just sweating  cause it's

14 a hot day or they just were jogging around the block?

15 A.   That's a possibility.

16 Q.   I mean, would you agree with me, Mr. Tucker, that a

17 lot of the symptoms that are attributed to excited

18 delirium can also be attributed to other things unrelated

19 to excited delirium?

20 A.   Yeah.  It could just be attributable to a mental

21 health issue and not excited delirium.

22 Q.   Or a combination thereof?

23 A.   A combination thereof.

24 Q.   Now do you know if these deputies had any knowledge

25 about Mr. Docher's medical history when they encountered

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 76

1    him?

2    A.   Medical history?  No.

3    Q.   Other than maybe what Mr. Docher decided to share

4    with them.

5            MR. VITALE:  Objection to the form.

6    A.   I don't remember anything about anybody asking him

7    about medical issues he might be having.  They asked if

8    he'd had anything to drink and he said yes.  I think an

9    Ice something or other he said.  Some kind of a beer.

10   But I don't remember anything about medical issues being

11   asked.

12   Q.   Do you remember anything about drug use being

13   brought up in the conversation between the deputies and

14   Mr. Docher?

15   A.   Yeah.  I think that was when he responded that he

16   had drank some ice  - I forget the name of the beer.

17   Some kind of a beer.

18   Q.   Natural Ice?

19   A.   I think that's right.

20   Q.   Okay.  But you don't remember anything about drugs

21   specifically being discussed?

22   A.   No, I don't.

23   Q.   Now, just so I understand, so based on your opinion

24   a moment ago, saying that you thought the deputies should

25   have immediately seen Mr. Docher's situation as being a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 77

```
 1   medical emergency and summed the medical people to come

 2   to the scene, does the fact that Mr. Docher was initially

 3   compliant, in terms of being handcuffed and placed in the

 4   back of the patrol car, at least his posterior region in

 5   the back seat of the patrol car - does the fact that he

 6   was initially compliant, does that change your opinion at

 7   all or do you believe the deputies still, regardless of

 8   Mr. Docher's initial compliance, they still should've

 9   first summoned EMS?

10               MR. VITALE:  Objection to the form.

11               MS. TYK:  Summer?

12               MS. BARRANCO:  Yes?

13               MS. TYK:  This is Julie.  Just, when you have a

14   natural breaking point, if we could just take a comfort

15   break for a couple minutes?

16               MS. BARRANCO:  Sure.  Well, now is fine.  I

17   need to get some water anyway.

18               MS. TYK:  Are you sure?  Do you want him to

19   answer that question first.

20               MS. BARRANCO:  Yeah.  Let him answer the

21   question first, --

22               MS. TYK:  Okay.

23               MS. BARRANCO:  -- please.

24   A.   Somewhere in the documents  - that's what I was

25   looking for  - on excited delirium, they talk about the
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 78

1    fact that, very often, the person who is suffering from

2    excited delirium will be extremely calm at first and then

3    become violent immediately thereafter and I can find that

4    in the cited delirium concepts and issues paper, if

5    necessary, but  - so the answer to the question, I guess,

6    is that the fact that he was calm doesn't mean that he

7    wasn't suffering excited delirium syndrome.

8    Q.   Okay.  Just to clarify, what document were you just

9    referring to, talking about being calm first?

10   A.   Either the January or the April 2014 Concepts and

11   Issues paper of the National Law Enforcement Policy

12   Center on excited delirium.

13   Q.   And that's your Appendix G, is that right, to your

14   report?

15   A.   It's Appendix G and, also, the copy that I made of

16   my reference in my report at the bottom  - at the end of

17   the report, footnote three.

18           MS. BARRANCO:  Okay.  So if you want to take a

19   little break now.

20           THE WITNESS:  That's fine.

21   (Off the record at 11:56 a.m.)

22   (On the record at 12:05 p.m.)

23       BY MS. BARRANCO:

24   Q.   Mr. Tucker, I'm looking at page 6 of your report,

25   your preliminary opinion number two, and it says Deputies

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 79

1    Newman, Mangrum, and Robinson knowingly violated clearly

2    established law enforcement training on how to handle a

3    person exhibiting the symptoms of "excited delirium" when

4    they failed to treat the incident with Tavares Docher as

5    a medical emergency and instead treated the incident as

6    control-and-arrest situation.  My first question about

7    that is how do you know that the deputies knowingly

8    violated the training?

9    A.   Well, because training is  - they either were

10   ignorant of the training or knowingly violated the

11   training and, according to Newman, he was very familiar

12   with the  - in his deposition testimony, with the

13   symptoms of excited delirium and even qualified to teach

14   it, so that would meaningly from his standpoint for sure,

15   but I think that's clear enough.

16   Q.   How about Deputy Robinson?

17   A.   Robinson was new on the job, only a couple weeks,

18   but had been the one who was most recently through the

19   basic recruit training program and I don't recall  -

20   let's see.  I'll have to look and see what he said about

21    - he received training that ED is a medical emergency.

22   He said that in his deposition, page 29, line 17.  So

23   knowingly violated with him and Mangrum, I don't recall

24   what he had to say about it, but it speaks for itself.

25   If I could go --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 80

1  Q.   Well, --

2  A.   Go ahead.

3  Q.   I was just going to ask, because you're lumping all

4  three of the deputies together, saying that they

5  knowingly did something, and I really would like to break

6  it down a little bit in terms of your opinion, saying

7  that  - I guess that they knowingly violated their

8  training and treating it as something other than a

9  medical emergency based on the symptoms that apparently,

10  according to you, that Mr. Docher was exhibiting of

11  exited delirium.  So I wanted to ask you what symptoms,

12  in regard to Deputy Robinson anyway, what symptoms of

13  excited delirium did you believe Deputy Robinson would've

14  known about that he apparently, according to you anyway,

15  knowingly didn't attribute that to being excited

16  delirium, as opposed to something else, I guess.

17                  MR. VITALE:  Objection to the form.

18                  MS. BARRANCO:  Did you understand the

19  question?

20  A.   Yes.  And I'm reading right now where it says St.

21  Lucie County provided me with training on the signs and

22  symptoms of excited delirium prior to 5/11/14.  Robinson

23  said that himself on page 18 of his deposition, line 17.

24  So that's where I would get that.  If he was provided

25  with that training, then he knowingly violated or just

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 81

1    ignored it.

2    Q.    Well, let me ask you though more specifically,

3    because I know there are multiple symptoms apparently of

4    excited delirium, and my question for you, Mr. Ticker, is

5    what symptoms would Deputy Robinson should have known

6    that Mr. Docher had that he should've attributed to being

7    excited delirium?

8    A.    Well, I don't recall what he said that he noticed.

9    I do know that, for example, Mangrum said it never ever

10   even entered my mind to think about excited delirium.

11   But, for example, what I was getting ready to go to

12   earlier, if you look at my report, page 7, on the third

13   paragraph down, that is what I'm talking about there,

14    cause you raised the issue about well, he was very calm

15   when he was handcuffed, do you see where I say there that

16   the International Association of Chiefs of Police have  -

17   Q.    Yes.

18   A.    -- identified the symptoms of agitation,

19   hyperthermia, profuse sweating, paranoid behavior?

20   Clearly, Robinson was there when he was talking about

21   Arabs and looking for heads and all that.  That's

22   paranoid, crazy kind of behavior.  Constant physical

23   activity, exceptional strength, and unusual calmness

24   after restraint.  It is specifically pointed out that

25   that by itself is another symptom of excited delirium and

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 82

1    they all noticed that Docher was  - submitted with no

2    problem to being handcuffed and didn't attempt to flee or

3    anything until after that.

4    Q.   Well, it wasn't until after  - and according to what

5    you were telling me a moment ago, the  - you believe the

6    deputies, before they even restrained Mr. Docher,

7    should've been calling EMS, right?

8    A.   Certainly.

9    Q.   So, to the extent that you're hanging your hat on

10   this unusual calmness after restraint, they wouldn't of

11   known whether he was going to be calm after he was

12   restrained before he was restrained obviously, right?

13                MR. VITALE:  Objection to the form.

14   A.   You're right.

15   Q.   And I think you've already told me that this

16   particular  - I mean, we've got now  - we're looking at

17   page 7 of your report.  So now we're referring to a

18   different source of the symptomology of the excited

19   delirium, but I think you've already agreed with me that

20   these kinds of symptoms, such as agitation or

21   hyperthermia, profuse sweating, paranoid behavior,

22   constant physical activity, exceptional strength could be

23   attributed to something other than excited delirium,

24   correct, --

25   A.   They  -

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 83

1    Q.   -- like drug use or alcohol problems or mental

2    health problems or anger or activity, like jogging?

3    A.   Could -

4                 MR. VITALE:  Objection to the form.

5    A.   Could anything be possible?  Yes.  Has - had the

6    symptoms  - more symptoms been identified as time went

7    by, yes.  You cited the Force Science Center that I

8    talked about.  In 2006, there were certain symptoms

9    identified there.  Since then, more and more of these

10   symptoms have been identified as excited delirium has

11   been more identified in terms of deaths and, in this

12   case, a vegetative state for people who have had excited

13   delirium and been involved in a struggle with the police.

14                 Another one that hasn't been mentioned but

15   is now out there all over the place is some kind of a

16   fixation with glass.  For some reason, these people who

17   are  - they'll break glass and just get fixated on glass.

18   So there's  - the point is that there were a sufficient

19   number of symptoms that the deputies could have, should

20   have observed themselves to have classified this as

21   excited delirium, called and invoked the protocol for ED,

22   which is call for medical assistance first, before they

23   attempt to control.  Work it out with medical to take

24   control, administer a sedative, and then transport to a

25   hospital.  They didn't.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 84

1   Q.   Well, you mentioned something about fixation on

2   glass as being one of the symptoms most re - more

3   recently discovered as perhaps being attributable to ED?

4   A.   Right.

5   Q.   Do you know if Mr. Docher was exhibiting any signs

6   of a fixation on glass?

7   A.   I don't recall that he was.

8   Q.   Okay.  And is one of the possible symptoms of ED

9   also that the person gets very heated and sometimes even

10   strips naked --

11   A.   Right.

12   Q.   -- according to that?

13   A.   Yes.

14   Q.   Mr. Docher was never taking his clothes off or

15   striping naked, right?

16   A.   Right.  You're right.

17   Q.   And that's the scenario in some circumstances,

18   right?

19   A.   Yes.  Of course.

20   Q.   But I know, based on your earlier testimony, not all

21   the circumstances  - but not all circumstances involve

22   all of those symptoms?

23   A.   If I could liken this to the issue of probable

24   cause.  When you are looking at whether there's

25   sufficient evidence to believe a crime is being

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 85

1    committed, you look at incriminating information, you

2    look at exculpatory information.  If the incriminating

3    information outweighs the exculpatory information, then

4    you make a decision that you have probable cause to make

5    an arrest.  This is no different.  If you have a person

6    who's sweaty, who's delusional, who's talking about Arabs

7    and heads and people hunting him and all of those

8    symptoms that he had identified  - that were identified

9    by the people in the store right off the bat, you have a

10   whole bunch of incriminating  - yeah, he didn't break any

11   glass, so I guess that would be exculpatory, but the

12   weight of this is clearly over to the side, symptoms of

13   ED.  If you have symptoms of ED, treat it as a medical

14   emergency, not an arrest situation.  It's that simple.

15   Q.   And your opinion is that the deputies -- one of them

16   should've gone in the store to interview the civilians

17   inside, right?

18   A.   Correct.

19             MR. VITALE:  Objection to the form.

20   Q.   And they didn't do that.  So you would agree with me

21   then they didn't know what the civilians knew inside the

22   store, at least in terms of how Mr. Docher was acting

23   earlier, right?

24   A.   Correct.

25   Q.   And getting back to your preliminary opinion number

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 86

```
 1   two, Mr. Tucker, --

 2   A.   Yes.

 3   Q.   -- you mentioned something about the deputies

 4   knowingly violating their training, but I assume you

 5   understand though that in a federal civil rights case,

 6   such as this, the standard that you're talking about,

 7   Graham versus Connor, isn't a subjective standard, right?

 8   A.   Isn't -

 9        MR. VITALE:  Objection to the form.

10   Q.   It's objective, correct?

11   A.   The Graham v. Connor is a so-called objective

12   standard.  And what is - what does that mean?  Well, it

13   means that - let's just take, for example, if any

14   officer says well, he attacked me with a toothpick raised

15   in his right hand and I was fearful of death, so I shot

16   him.  Well, now we're going to do an analysis and that is

17   that officer's subjective threat assessment, the

18   toothpick in a raised hand.  Now how do we make it

19   objective?  The objective analysis is when you ask the

20   question would other officers have perceived the threat

21   the same way and responded in a like manner.  If you do

22   that in this case, you're saying that the objective

23   standard is that there were symptoms of excited delirium

24   present and other reasonable officers, not Mangrum,

25   Newman, and Robinson,  cause they did not do it  - they
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 87

1    made their subjective determination that this was an

2    arrest-and-control situation, but other reasonable

3    officers would've perceived this and recognized this as

4    an ED situation and a medical emergency.  That's what I'm

5    saying.  That's the objective analysis.

6    Q.    Okay.  So the part about the knowingly violating

7    their training, that's not what you're referring to?

8    A.    I am referring - did I say something that takes

9    that off the table?  I told you earlier that these

10   officers had received training on excited delirium.

11   Robinson said he even got it from the St. Lucie County

12   Sheriff's Department now and on symptoms and everything,

13   so he had been most recently through it.  He either

14   forgot or ignored it or  - we don't know, but clearly he

15   was provided with it, so he violated that training.

16   Q.    Okay.

17   A.    Didn't follow it.

18   Q.    Let me just ask about your Appendix G, which is the

19   IACP National Law Enforcement Policy Center, Excited

20   Delirium.  It says model policy, January 2014?

21   A.    Yes.

22   Q.    Am I correct that that is a model policy, sort of a

23   best-case-scenario policy, but not necessarily a policy

24   that would have  - that these particular deputies

25   involved with Mr. Docher would've been bound by?

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 88

```
 1   A.   No, you're not  -

 2             MR. VITALE:  Objection to the form.

 3   A.   No, you are not correct.  The National Law

 4   Enforcement Policy Center is a joint enterprise between

 5   the U.S. Department of Justice and the International

 6   Association of Chiefs of Police.  What they do is they

 7   identify problems that the police have out there, one of

 8   which would be excited delirium, and then what do they

 9   do?  Well, they say okay, we're having a lot of deaths in

10   arrest situations turning out to be excited delirium.

11   They get together subject matter experts, medical people,

12   medical examiners, for example.  They get defensive

13   tactics instructors from law enforcement and lawyers.

14   They get these specialized  - these experts together and

15   they say what are the concepts and issues involved here?

16   Well, one of the concepts involved is excited delirium

17   and the symp  - recognizing the symptoms of excited

18   delirium.  After that, the subject matter experts work on

19   it.  They put it into a model policy to guide law

20   enforcement agencies on what to do when you are

21   confronted with excited delirium.

22             In this case, they say rapid control of

23   the subject and transfer to the care of emergency medial

24   provider should be the primary objective, unless other

25   actions are necessary to protect the officers.  They  -
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 89

```
1    persons exhibiting symptomatic behavior should be

2    suspected of being the subject of a medical emergency

3    that could result in sudden death.  That's the policy.

4                 Now does that mean that St. Lucie County

5    is required to follow this?  No.  This is a protocol that

6    is recognized in the law enforcement profession for how

7    to deal  - best practice for dealing with people

8    exhibiting the signs of excited delirium.   There's no

9    legal requirement that St. Lucie County follow it, but it

10   is the protocol recognized in the law enforcement

11   profession and was in 2014 when this happened.

12   Q.   Okay.  And I also noticed, at the end of that

13   protocol, there's a footnote that includes the following

14   language:  each law enforcement agency operates in a

15   unique environment of federal court rulings, state laws,

16   local ordinances, regulations, judicial and

17   administrative decisions, and collective bargaining

18   agreements that must be considered.  In addition, the

19   formulation of specific agency policies must take into

20   account local political and community perspectives and

21   customs, prerogatives and demands, often divergent law

22   enforcement strategies and philosophies, and the impact

23   of varied agency resource capabilities, among other

24   factors.  So is that what you were just telling me about?

25   A.   What you just said was that if there was a
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 90

```
 1   collective bargaining agreement that would prohibit the

 2   St. Lucie County Sheriff's Department from classifying

 3   the symptoms of excited delirium as a medical emergency

 4   or a law in Florida that prohibited that, this wouldn't

 5   apply, but that's not the case.  There's not a law in

 6   Florida that says you can't classify excited delirium as

 7   a medical emergency.  There's not a collective bargaining

 8   agreement that I've ever heard of.  So that's not

 9   applicable.  What I'm saying is simply that this is not a

10   law.  It is a recognized best practice in the law

11   enforcement profession that has been put out there prior

12   to this incident and now, going on several years, as the

13   proper the action to follow when you have an excited

14   delirium situation.

15   Q.   Okay.  Thank you for that clarification, Mr. Tucker.

16   Now if we could move to your preliminary opinion number

17   three that's on page 8 of your report.

18   A.   Okay.

19   Q.   And, just for the record, it says Deputies Newman,

20   Mangrum, and Robinson knowingly violated clearly

21   established law enforcement training on avoiding the

22   basic physiology of a struggle because of the risk to a

23   subject of death or serious medical ramifications.  Did I

24   read that correctly?

25   A.   Yes.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 91

1    Q.   Can you explain to me  - and I guess it's in your

2    report here, but what are you referring to when you say

3    the basic physiology of a struggle?

4    A.   Well, it's right there, spelled out, in Appendix H

5    and I've been training officers on this for at least 20

6    years.  Very simply, officers are taught, in use of force

7    training programs that I have been through and certainly

8    are taught by me when I teach use of force, that officers

9    need to be aware of what is called the basic physiology

10   of a struggle and that basic physiology of a struggle is,

11   very simply, that when you restrain a person in a face-

12   down position, their breathing can become labored.  I

13   know that because when I play around with my

14   grandchildren and I'm laying down on the floor on my

15   stomach and they're on my back, it's difficult to breath.

16   I recognize that right off.  And then, if you apply

17   weight to the person's back, the more weight you apply,

18   the more severe the compression, the more difficulty

19   there is in breathing.  I know that.  As the

20   grandchildren have gotten older and weigh more, it's more

21    - it causes more difficulty for me to breath when

22   they're on my back and the natural reaction to that lack

23   of being able to breath is to try to get up to  - so you

24   can breath and law enforcement officers are taught you

25   have to recognize that that's not resistance.  That's a

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 92

1    struggle on the part of the person to be able to breath.

2    So don't be saying things like stop resisting, stop

3    resisting and don't then apply more weight and more

4    pressure, which exacerbates the situation, and that's

5    what happens.  That's why they call it the physiology of

6    a struggle.  Officers tend to, as the person's

7    struggling, apply more weight and more restraint until

8    the person dies and it's always -

9    Q.   Is that all?

10   A.   It's been spelled out for --

11   Q.   I'm sorry.

12   A.   -- 20  - when I say knowingly violated, I don't know

13   that I've ever bumped into an officer, you know, that has

14   not heard of this and been taught this over the last 20

15    - it's just as common as  - it's just training that

16   almost everybody receives on the use of force.

17   Q.   Well, is that the same thing as the theory about

18   positional asphyxia?

19   A.   Well, yes, it is.  That -- positional asphyxia is

20   also the same thing, that you put in certain positions,

21   recognized for the last 40 years or 30 years,

22   particularly in transporting prisoners with their hands

23   cuffed behind their back and lay them down prone in the

24   back seat of police car and you get to the jail and

25   they're already dead and that's been a topic of

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 93

```
 1  instruction in use of force training programs for at

 2  least 30 years.

 3  Q.   Well, are you aware, Mr. Tucker, of any more recent

 4  studies in regards to putting pressure on people that are

 5  handcuffed and in the prone position, with the studies

 6  revealing that the whole concept of positional asphyxia

 7  is really not accurate?

 8  A.   I'm aware - there's probably 50 studies that I've

 9  read over a period of time, going back to Dr. Rhey, who

10  was the original one that  - R-H-E-Y - that identified

11  positional asphyxia and then his claim that he had

12  retracted that later, etcetera, etcetera, etcetera.  But

13  the bottom line is the profession  - the law enforcement

14  profession.  This is the National Law Enforcement

15  Technology Center, a part of the U.S. Department of

16  Justice, that is warning against the possibility of

17  sudden death from positional asphyxia and the basic

18  physiology of a struggle since 1995.  They have not come

19  out and said we retract all this.  It's okay to hold

20  somebody down in a prone position and put weight on their

21  back and hold them there for 15 minutes.  They have never

22  retracted this.  So there are  - it's like the cigarette

23  industry.  There were all kinds of research projects that

24  said cigarette didn't cause cancer and there were

25  research projects that said cigarettes do cause cancer.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 94

1    The same thing here.  It's a matter of controversy, but

2    the protocol is well established and clear to avoid these

3    things  cause sudden death can occur.

4    Q.   Well, what specific facts are you relying on, Mr.

5    Tucker, in regard to how these three deputies, according

6    to you, knowingly violated their training on avoiding the

7    basic physiology of a struggle?  Like what was it that

8    they did or didn't do that you're critical of in this

9    regard?

10   A.   Hold on just a minute.  Let me see if I can find it.

11   And all four hit the ground, Newman's saying.  So there's

12   Newman and Mangrum up at the upper part of his body  - I

13   say Docher's body  - and Robinson on his feet.  That's

14   where the struggle started.  Then let's see.  I'm trying

15   to  - that these officers were taught that if a person is

16   on their stomach handcuffed, they may have trouble

17   breathing.  Robinson says that in his deposition.  He was

18   taught that, page 35, at line 12 of his deposition.

19   After everybody hit the ground, Newman was on the upper

20   body, Mangrum was on the upper body, and Robinson was on

21   the legs.  That's Robinson definition  - deposition, page

22   53, at lines 1 through 7.  I'd have to go through and

23   look other places, but the witness statements of the

24   deputies on him  - on Docher all fit the definition of a

25   the physiology of a struggle.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 95

1    Q.   Now just so I understand though, in terms of what

2    you took issue with in regards to what was done, was that

3    related to weight being placed on Mr. Docher's back or

4    something else?

5    A.   My analysis is pretty clear in my report.  Docher

6    runs.  He's already handcuffed.  All three deputies were

7    on Docher's back when he was taken to the  - and he was

8    taken to the ground.  He slid the handcuffs on his right

9    arm up to his elbow and was trying to push himself up,

10   lifting all three deputies.  That's an example, again, of

11   excited delirium, super strength, and it's also a

12   struggle to breath.  You get a lot of strength when

13   you're trying to say live and Robinson applied what he

14   called a leg ride -- that is, he's hold him down on  -

15   his legs down to gain control  - and Alonge  - Deputy

16   Alonge, A-L-O-N-G-E, arrived on the scene and he

17   assisted.

18                 So for a period of, according to their own

19   report -- their own narrative, page 6 of the  - their

20   reporting officer narrative, there were four officers

21   holding him down at one point and then you have the

22   paramedic.  Jose Rosario says, when he arrived on the

23   scene, he observed several deputies on top of a subject

24   who was still struggling with them and then you got

25   Paramedic Thomas Sinclair.  When he arrived, he observed

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 96

1   several deputies on top of a subject who was on the

2   ground with a pool of blood around his head.

3                  So there you have independent witnesses,

4   paramedics, testifying in their  - or making statements

5   in their supplemental reports of holding Docher down with

6   the deputies on top of him and a struggle ensuing.

7   Q.   So are you taking issue with the fact that they were

8   holding him down or that they were on top of him or both

9   of those things?

10  A.   Both of those things.  There were three --

11  Q.   So you're saying --

12  A.   -- deputies present.  This was a man handcuffed with

13  his hands behind his back, not armed with anything.  If

14  three deputies, one of which was 209 pounds, Mangrum, and

15  a 14 or 15 year veteran at that point -- if three

16  deputies  - Mangrum, Newman, and Robinson  - couldn't

17  pick that guy up off the ground and stand there and hold

18  him steady, you know, one on each side of his  - holding

19  each arm, I  - it's incomprehensible to me that they

20  couldn't control him like that.

21  Q.   Well, that was my next questions.  So -- and for

22  your opinion, Mr. -- in your opinion, Mr. Tucker, you

23  believe that, rather than trying to keep him down on the

24  ground, what the deputies should've done was lifted him

25  up and stood him on his own two legs --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 97

```
 1   A.   Or --

 2   Q.   -- until EMS controlled him with a shot or

 3   something?

 4   A.    Put him in the recovery position, which is put him

 5   on his side and hold him, or sit him up, set up in a

 6   position so he could breath.  Not necessarily having to

 7   stand him up, but certainly the opposite is  - you don't

 8   do  - you don't hold him down in the pone position; that

 9   is, on his stomach with his hands cuffed behind his back

10   and the compression weight of three deputies at one point

11   and four at another point because that is the recipe for

12   positional asphyxia, death or, in this case, a vegetative

13   state.

14   Q.   Well, what about a situation where the individual

15   has indicated he doesn't want to stay in a seated

16   position or standing still?  He might be bolting from

17   you.  What do you  - what would you recommend in that

18   situation?

19   A.   Did you say bolt from you?

20   Q.   Yes, like bolt out of the back of the patrol car.

21   A.   Well, you know, what the person wants  - he says

22   well, I don't want to say seated.  Okay.  The officers or

23   deputies, there's three of them to control him.  So you

24   say sit right there.  That's the way it is, buddy.  Sit

25   there.  We want to make sure you can breath, but you
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 98

```
 1    don't hold them down in the prone position on  - with

 2    hands cuffed behind the back and weight compression on

 3    him.  That's the bottom line.

 4    Q.   Well, referring to the weight and compression on Mr.

 5    Docher, do you know how much pressure was applied to Mr.

 6    Docher's body?

 7    A.   None of us know.  There's no pressure gauges or

 8    anything involved here, but we do know that there were

 9    three deputies on top of him based upon the paramedics'

10    own statements to  - in  - that are put in the police

11    case supplemental reports and I do know that Mangrum was

12    asked how much he weighed and he said 209 pounds now, but

13    I was 205 then.  Well, put 200 pounds on my back or

14    anybody's back while you're  - they're on their stomach

15    in a prone position and their hands are cuffed behind

16    their back, not counting the other two, the legs of  -

17    being held by Robinson and Newman up on the head  - at

18    the head area.  We don't know for sure, but you're just

19    taught not to do it because of the obvious reason, people

20    die when you do that to them.

21    Q.   Well, Mr. Tucker, don't sometimes people refer to

22    things such as I saw the deputies on top of somebody and

23    it's really more of a manner of speaking, not that all

24    three deputies were literally laying with their full

25    weight on top of Mr. Docher?
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 99

 1   A.    You'll have to ask Rosario and Sinclair when you  -

 2   if you depose them as to how  - what  - how they describe

 3   it more.  I'm going on basically just what they said in

 4   the police report, that Rosario  -

 5   Q.    And  -

 6   A.    -- and Sinclair said.

 7   Q.    And assuming that, in fact, the deputies had all of

 8   their entire weights on top of Mr. Docher, do you have

 9   any idea how long of a period of time that would've been?

10   A.    No.

11   Q.    Doesn't that kind of matter in terms of determining

12   whether or not it's going to substantially impact

13   somebody's ability to breath?

14   A.    I've had probably 25 cases like this with physiology

15   of a struggle.  One of them that I did, up in

16   Massachusetts, there was a reporter with a camera

17   snapping pictures and they were time-sequenced and that

18   guy lived for 15 minutes.  Others have died within a

19   matter of a minute and a half or a minute.  It depends on

20   things like the guy that took 15 minutes who just smoked

21   some marijuana.  That's all.  Otherwise, he was a healthy

22   individual, but it took 15 minutes for him to die.

23   Others have died in a matter of a minute because they had

24   ingested cocaine and were suffering from excited

25   delirium, which was a complication.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 100

```
 1                    So how long it takes to die or suffer
 2    permanent injuries is dependent upon a whole of
 3    conditions.  The point is officers have been trained for
 4    20 years, 25 years not to put a person in the prone
 5    position with their hands cuffed behind their back and
 6    compression on them because people will die if you do
 7    that or they run the risk of dying.
 8    Q.   And then, in regards to the information you have,
 9    Mr. Tucker, concerning that training, do you know if
10    deputies have been trained in terms of how much weight is
11    too much?
12    A.   No, I don't.
13    Q.   So, I mean, would you agree with me that, very
14    often, deputies, in taking people into custody, have to
15    use some pressure in terms of holding the person down
16    long enough to handcuff them.
17    A.   Sure.
18    Q    Correct?
19    A.   Sure.
20    Q.   Okay, sir.  All right.  Let me move on to your last
21    preliminary opinion in your report, page number 9,
22    preliminary opinion number four and, for the record, I'll
23    read it.  Deputies Robinson and Mangrum failed in their
24    responsibility to intervene to stop a fellow deputy from
25    committing a clear violation of training and standards
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 101

1   when it says "the saw" -- I'm assuming you meant they saw

2   Deputy Newman deliver two separate elbow strikes to the

3   head of Tavares Docher when they knew or should've known

4   that deadly force was not justified under the

5   circumstances they were confronted with.  Did I read that

6   correctly, Mr. Tucker?

7   A.   Yes, you did.

8   Q.   Okay.  First, just to clarify, I assume that this

9   opinion is based, in part, on your earlier opinion that

10  it is your opinion that the elbow strikes by Deputy

11  Newman to Mr. Docher's head were, in fact, deadly force?

12  A.   Correct.  That's correct.  And officers are

13  taught --

14  Q.   So -

15  A.   Offices are taught, in use of force training

16  programs, that if they're present at the scene when a

17  constitutional violation is occurring, they have a duty

18  to intervene to stop that constitutional violation.  In

19  this case, the use of excessive force, deadly force, when

20  deadly force wasn't justified.

21          Now Robinson is  - should've known and he

22  observed  - Robinson says he observed Newman deliver the

23  strike to Docher's head and he knew that blows to the

24  head could result  - it'd be deadly force, and that's on

25  page 28 of his deposition, line 7.  Now I have  - and I

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 102

```
 1   was including Mangrum because, at that point, when I
 2   wrote the report, I didn't know that Mangrum himself had
 3   delivered an elbow strike to the head of Docher.  So
 4   Mangrum either failed to stop Newman or he participated,
 5   just like Newman did.  I don't know where that's going to
 6   all shake out when I'm all done with this, but either
 7   way, Mangrum was wrong to not have intervened or he was
 8   wrong by delivering an elbow strike himself to the head
 9   of Docher.
10   Q.   Okay.  Now, Mr. Tucker, I just want to clarify
11   something.  You've told me, I believe, that you do not
12   know specifically where on Mr. Docher's head either
13   Deputy Newman or Deputy Mangrum struck him with their
14   elbows, correct?
15   A.   The side of the head is what was said by  - in their
16   deposition testimony.  Now I just know myself there's the
17   side of my head.  That's the temple.  Here's the side of
18   my head, the jaw, both of which are clearly identified
19   specifically as deadly force in Florida training, but
20   nobody  - yeah, that's  - it's true I don't know exactly.
21   It might've been in between the jaw and the temple.  I
22   don't know.  But it was a blow to the head and that is
23   recognized -- closed-fists, batons, elbow strikes are
24   deadly force when delivered to the head of a person.  No
25   question about it, accepted for the last -- I've been at
```

Page 103

 1   this for 40-some years, so I know that.

 2   Q.   Now does it matter how strong the blow is?  If it's

 3   a tap versus a pile driver elbow strike, does that matter

 4   to you in your analysis, Mr. Tucker?

 5   A.   With all due respect, when I do a -- I'll just give

 6   you an analogy.  When I do taser cases and the -- often,

 7   the attorneys will say things like well, do you know what

 8   the actual charge of the taser was and the temperature of

 9   the battery when that shock was delivered?

10   A.   No, we don't know, but what you do know is it was

11   delivered because there's a data report that prints out

12   and says there was a shock delivered.  We don't have some

13   kind of a gauge that we can say well, this was an elbow

14   strike with two pounds of pressure or 14 pounds.  We

15   don't know, but that's why elbow strikes and closed-fist

16   strikes and baton strikes, whether light impact or heavy

17   impact, are not to be delivered because they can result

18   in serious -- and are likely to cause serious body injury

19   or death.  But we don't know about how much pressure, how

20   strong Newman was or Mangrum when they delivered those

21   strikes.  That's true.

22   Q.   Okay.  So, ultimately, it sounds like it doesn't

23   matter to you whether it's a tap with an elbow or a slam

24   of an elbow.  To you, if you're using the elbow and

25   hitting the head, it's deadly use of force?

Page 104

```
 1   A.   That's what the officers --

 2              MR. VITALE:  Objection to the form.

 3   A.   -- are taught.  That's correct.

 4   Q.   And we were talking about Robinson and Mangrum

 5   failing to intervene.  I assume you're aware that they

 6   would need to be in a position to intervene I assume,

 7   correct?

 8   A.   Well, they  - yes.  Of course.  They were there.

 9   They were present.  So  - and Robinson was holding the

10   legs down.  I think clearly he could of  - yeah.  They

11   had to be in the position and they were.

12   Q.   Do you know if they actually were able to see the

13   elbow strikes being delivered to Mr. Docher's head?

14   A.   Yes, I do.  In fact, Mangrum himself says I saw

15   Newman deliver the elbow strike to Docher.  Let me see if

16   I can find out where he said it, but I have it in here

17   somewhere.

18   Q.   And while you're looking that up, can you also tell

19   me if Deputy Mangrum ever was asked where did he see

20   Deputy Newman strike Mr. Docher on the head?

21   A.   Well, I do remember.  He said he doesn't know

22   exactly where the hit  - the strike was, but he saw him

23   strike him in the head with an elbow strike.

24   Q.   But regardless of where on the head, again, you're

25   saying that's deadly force?
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 105

 1   A.   Yes.  It's - it is recognized as deadly force,

 2   elbow strikes to the head, although Mangrum says a strike

 3   to the temple is not deadly force.  Well, it is.  That

 4   specifically says that in the Florida Basic Recruit

 5   Training Program, but Mangrum says no, it's not.  He's

 6   completely in disagreement with the training in Florida,

 7   page 18 of his deposition, line 13.

 8   Q.   And who is that?  I'm sorry.

 9   A.   Mangrum.  He says a strike -

10   Q.   Okay.

11   A.   -- to the temple is not deadly force.

12   Q.   But you don't - you've already told me you don't  -

13   Deputy New  - I'm sorry  - Deputy Mangrum said he didn't

14   know specifically where Deputy Newman's elbow strike  -

15   what part of Mr. Docher's head it struck?

16   A.   Yeah.  Right.  He didn't know what part was struck.

17   Q.   Okay.  Now, Mr. Tucker, let ask you.  What are your

18   charges in this case to date?

19   A.   A $6,000 flat-fee retainer that I receive whenever I

20   take on a case.

21   Q.   And are expecting any additional charges in the

22   future?

23   A.   Well, I assume I'm going to be paid for my

24   deposition for today, which should be a $1,500 fee, and

25   that should be it until it goes to trial.  If it goes to

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 106

1   trial, I will charge my regular trial fee of $3,000 plus

2   travel expenses to the trial site.

3   Q.   Okay.  And the $1,500 for deposition, is that a flat

4   fee?

5   A.   It is, if it's a deposition done in my home

6   location, which Raleigh is, today.

7   Q.   Okay.  And can you tell me how many hours you've

8   spent on the subject case to date?

9   A.   I cannot.  In fact, that's the reason why I do a

10  flat-fee system, because there's only me.  I don't keep

11  tabs of how many minutes I worked on this case today and

12  how many hours I worked on it the next day.  I have, over

13  the years, developed an idea that it takes about 40 hours

14  of work for me to look at a typical case and write a

15  report.  And so, at $150 an hour, that's where the $6,000

16  comes from.

17  Q.   And then, after that, if that amount is surpassed,

18  in terms of your time spent, do you then ask for an

19  additional retainer?

20  A.   That has happened twice in the 20 years I've done

21  litigation consulting.  One of them was a case down in

22  Florida where I had a  - seven file boxes full of

23  material and I had to go back to the attorney and ask for

24  an additional retainer and once up in Massachusetts over

25  the last 20 years.

Page 107

1   Q.   And, in those circumstances, did you request another

2   retainer or did you just start billing by the hour or do

3   you know?

4   A.   Started going by the hour.

5   Q.   Okay.  And I know you told me earlier  - well, let

6   me ask you.  How many times, to your knowledge, have you

7   been qualified as an expert in the law enforcement police

8   practices field?

9   A.   Upwards of 90 times.

10  Q.   And have any of the courts ever excluded any of your

11  opinions for any reason?

12  A.   Yes.  Of course.  Motions in limine as to whether or

13  not the issue involved was a legal conclusion, like

14  whether or not there was probable cause, for example.  If

15  I would've said, for example, when I express my opinions

16  here and I say that it was a level of force that was a

17  greater level of force than other officers would've used

18  in 2014, that, in essence, is a lay person or a police

19  person's way of expressing excessive force.  But if I

20  would've said my first opinion was that the deputies used

21  excessive force and it was objectively unreasonable, you

22  would've filed a motion to  - in limine to have that

23  opinion stricken because that's a legal conclusion.  So

24  that has happened to me in the past, but that's why I say

25  things they way I say them today so I don't have to worry

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 108

1   about that.

2   Q.   And can you tell me how times your opinions have

3   been excluded for any reason?

4   A.   No, I can't.  Probably, I'd just say a few times.

5   And early on  - most early on in my career because, as I

6   said, I learned after  - in fact, I talked to a judge and

7   said how do I explain excessive force without it being a

8   legal conclusion if, theoretically, any expert that takes

9   on a use of force case and says it was objectively

10  reasonable force, if you're on the defense side, that

11  could be excluded as a legal opinion.  You know, on the

12  other side, the plaintiff says it was excessive force.

13  That could be excluded  cause it's a legal conclusion.

14  That's why I say things the way I do now because I had to

15  literally ask the judge how to say it and he said put it

16  in police terms and explain it that way, which is what I

17  do.

18  Q.   Have your  - any of your opinions been excluded

19  because you were basically commenting on the credibility

20  of a witness?

21  A.   No.  I don't assign credibility in any witnesses.

22  That's up to the jury, the trier of fact, to assign

23  credibility.

24  Q.   And I know you've told me that, at least a few

25  times, your opinions have been excluded over the years,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 109

 1    but do you typically follow up with the attorneys that

 2    you dealt with to find out what the outcome of motions in

 3    limine were or --

 4    A.   Oh, I --

 5    Q.   -- things that happened during the trial?

 6    A.   Sure, sure.  Yeah, I typically do.  It's a learning

 7    process.

 8    Q.   And what's the percentage of your income that you

 9    obtain from this consulting work?

10    A.   Well, up till this point, it was probably 90%, but

11    now that I've been working toward retirement, I'd say

12    probably 40 or 50%.  I have a retirement from the City of

13    Tallahassee.  I draw social security.  I'm under contract

14    with the City of Tallahassee to advise them on all their

15    cases where they're sued.  So I'd say probably 40 or 50%

16    at this point.

17    Q.   All right.  Mr. Tucker, is there any topic that you

18    believe is relevant to your opinions that I have not

19    discussed with you here today?

20              MR. VITALE:  Objection to the form.

21    A.   You didn't ask me anything at all about whether --

22    you know, custom and practice and I told you that I'm

23    classifying my opinions as still preliminary until after

24    I've seen the deposition testimony of the corporate

25    representative of the St. Lucie County Sheriff's Office

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 110

1    so I can make a determination on that and finalize

2    everything.

3    Q.   Sure.  Well, just so we're clear, Mr. Tucker, as of

4    right now, the plaintiff does not have a custom policy

5    claim against the sheriff's office of St. Lucie

6    County, --

7    A.   Yeah.

8    Q    -- so, as far as I'm concerned, I'm not going to ask

9    you a bunch of questions that, as of right now, arguably,

10   isn't even relevant to the proceeding, at least in terms

11   of the claims that are currently pending.  It may be down

12   the road that they'll amend and I will be talking to you

13   again.

14   A.   Okay.

15   Q.   I don't know.

16   A.   All right.

17   Q.   I guess we'll figure that out.

18   A.   Sure.  I understand.

19          MR. BARRANCO:  I appreciate your time.  I have

20   no more questions for you.  I don't know if anyone else

21   does.

22          THE WITNESS:  Thank you for your questions.  I

23   appreciate it.

24          MS. BARRANCO:  Thank you.

25          MS. TYK:  Mr. Tucker, --

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 111

```
 1              MR. VITALE:  This is David Vitale.  I have a
 2   few questions.
 3              MS. TYK:  I have questions too.  Do you want to
 4   wait until I go or do you want to go first/
 5              MR. VITALE:  Yeah.  You can go first.
 6              MS. TYK:  Okay.  Hi, Mr. Tucker.  My name is
 7   Julie Tyk.  I represent the St. Lucie County Fire
 8   District and Jose Rosario.  I just have a few questions
 9   about your report that you've written in this matter.
10              THE WITNESS:  Right.
11              CROSS-EXAMINATION
12         BY MS. TYK:
13    Q.    Specifically, as to your preliminary opinion number
14   two, dealing with excited delirium, --
15    A.    All right.
16    Q.    -- now I know in your report you discuss the fact
17   that you are not a medical doctor.  Is that correct?
18    A.    Correct.
19    Q.    Okay.  And you have no formal medical training.  Is
20   that correct?
21    A.    Correct.
22    Q.    And, in your report, you are not diagnosing Mr.
23   Tavares Docher with excited delirium.  Is that accurate?
24    A.    That's correct.  He's exhibiting the symptoms of
25   excited delirium.
```

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 112

1   Q.   Okay.  And so, is it an assumption on your part for

2   your opinions that he had excited delirium at the time of

3   the incident?

4   A.   As I testified to earlier, one has to  - an expert

5   has to assume something to be true or there's no way he

6   can render an opinion.  So, yes, I assumed  - and, in

7   fact, I think it was  - well, in any case, I assumed he

8   was excited delirium because he was exhibiting the

9   symptoms of excited delirium.

10  Q.   Have you seen any reports -- medical records in

11  which a medical physician has diagnosed Tavares Docher as

12  suffering from exciting delirium on May 11th, 2014?

13  A.   No.

14  Q.   Have you seen any other expert report in this case?

15                MR. VITALE:  Objection to form.

16  A.   Just the CME of the  - Docher by the defense expert.

17  Q.   Okay.  No other formal written  -

18  A.   No.

19  Q.   -- reports?

20  A.   No.

21  Q.   All right.  And I think, in reviewing your report,

22  the symptoms of excited delirium that you believe he was

23  exhibiting were hallucinations, sweating, agitation.

24  Anything else?

25  A.   Delusional, breaking glass  - we  -

Page 113

1  Q.   Well, I meant that he was exhibiting, not -

2  A.   Oh.

3  Q.   -- all of the symptoms.

4  A.   Sweaty, delusional, seeing things that aren't there,

5  according to the deputies, heads  - Arabs trying to get

6  him because he knew where the bodies were  - the heads

7  were buried in St. Lucie County, not acting normal,

8  agitation.  Those were the primary signs.

9  Q.   Did you review the deposition of his mother and of

10  his aunt and cousin in this matter?

11  A.   No.

12  Q.   Were you aware that Mr. Docher actually did have a

13  friend who was beheaded?

14  A.   No.

15  Q.   Under the symptoms of excited delirium, one of them

16  is extreme agitation.  What is your definition of extreme

17  agitation?

18  A.   I think it's what was said by Mr. Brown.  He seemed

19  agitated.  He didn't say extreme [sic] agitated.

20  Irritable or, you know, just upset.  You know, I don't

21  know how to put  - extreme would be very upset.  That's

22  basically it.

23  Q.   Okay.  So, with excited delirium, is it more that

24  the person has extreme agitation versus somebody who's

25  just regularly agitated?

Page 114

```
 1   A.   They just used the term agitation and Brown

 2   described him as being agitated.

 3   Q.   Okay.  So you don't know the level of agitation that

 4   he --

 5   A.   No.

 6   Q.   -- exhibited?

 7   A.   I don't think there is some kind of a bright line

 8   that says okay, he's agitated, but that's not excited

 9   delirium.  Oh, he's very agitated, so now it is excited

10   delirium.  I don't think there's any kind of a bright

11   line there.  You look at all these facts combined, that's

12   what you conclude, excited delirium.

13   Q.   Do you know how common it is for a person to be

14   suffering from excited delirium?

15   A.   How common?

16   Q.   Um-hmm.  The incident --

17   A.   Well, --

18   Q.   -- rate.  The incident rate of an individual.

19   A.   It accounts for a great percentage and I'm saying I

20   think probably the latest I'd seen was some studies

21   saying 20 or 30% of all in-custody deaths.

22   Q.   And do you know what studies showed that?

23   A.   I don't have one off the top of my head.  I may have

24   cited some of those studies in that chapter in the book.

25   I don't know.  They may be cited in the documents that I
```

Page 115

 1   provided on excited delirium.  They probably are.  I

 2   can't keep track of all the studies.

 3   Q.   And outside of in-custody deaths, do you know the

 4   overall incident rate for the overall population in the

 5   United States for somebody suffering from excited

 6   delirium?

 7   A.   No.

 8   Q.   Do you have  - did you receive any medical records

 9   for Tavares Docher in this matter?

10   A.   Well, let me look and see what's listed there on  -

11   it doesn't look like it.

12   Q.   So you're unaware of his medical history in this

13   matter?

14   A.   No, I am not.

15   Q.   Have you seen the lab reports that were done at St.

16   Lucie Medical Center from this incident?

17   A.   No.

18   Q.   Do you know what his blood alcohol level was?

19   A.   I do not.

20   Q.   Do you know what the results of any of the drug

21   testing were?

22        MR. VITALE:  Objection to form.

23   A.   It seems like somewhere I saw that and there wasn't

24   the presence of drugs in his system.  I  - it seems like

25   I saw that somewhere.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 116

1    Q.    Okay.  I noted that on your CV, you  -

2    A.    On my what?

3    Q.    Curriculum vitae.

4    A.    CV?  Yeah.

5    Q.    Yeah.  That you, under your training services,

6    indicate a couple of training services for emergency

7    vehicle operations.

8    A.    Right.

9    Q.    What exactly is that?

10   A.    EVOT, Emergency Vehicle Operations Training.

11   Emergency response and high-speed pursuit --

12   Q.    Okay.

13   A.    -- basically.

14   Q.    But nothing to do with any type of medical --

15   A.    I did some training for one of the agencies in

16   Maine, an EMS organization in Maine, on emergency vehicle

17   operations, the requirement that -- whether it's a

18   medical emergency or not, that you operate audio and

19   visual signals, that you exercise due regard to the

20   motoring public that's out there, that sort of thing,

21   just to help them out from potential liability

22   situations.  But, typically, it's all that I do in

23   policing.

24   Q.    Okay.  And you're not a paramedic or an EMT?

25   A.    No, I"m not.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 117

1    Q.   You attached to your report the IACP policy on

2    excited delirium.

3    A.   Yes.

4    Q.   Is that accurate?  Okay.  Do you find that to be a

5    reliable authority on  -

6    A.   Well, yes, I do.

7    Q.   -- excited delirium?

8    A.   It's published by the U.S. Professional Police

9    Association  - International Police Association.

10   Q.   Okay.  And  -

11          COURT REPORTER:  Did you say  - I'm sorry.  You

12   said authority on what?  I didn't -

13          MS. TYK:  A reliable authority on excited

14   delirium.

15          COURT REPORTER:  Thank you.

16          MS. TYK:  Um-hmm.

17      BY MS. TYK:

18   Q.   And you also brought with you, and cited in your

19   report, the IACP National Law Enforcement Policy Center

20   paper on excited delirium.  Do you also find that to be a

21   reliable authority?

22   A.   Yes.

23   Q.   And, again, it looks like it was Force Science News

24   #29, 10 Training Tips for Handling "Excited Delirium."

25   Do you find that to be a reliable authority?

Page 118

1   A.   At the time it was published, it was, but it's a

2   2006 and there's been a lot of developments since then.

3   Q.   Okay.  And what has changed?

4   A.   The identification of more symptoms.

5   Q.   Anything else?

6   A.   No.

7   Q.   Okay.  If you would - is it correct to state that

8   all of the papers that we just discussed recognize the

9   use of chemical sedation when dealing with somebody who

10  is exhibiting the symptoms of excited delirium?

11  A.   Yes.

12        MS. TYK:  That's all the questions I have.

13        THE WITNESS:  Thank you.

14        MS. TYK:  Thank you.

15        MR. VITALE:  Okay.  I have a few questions, Mr.

16  Tucker.

17        THE WITNESS:  Yes, sir.

18        BY MR. VITALE:

19  Q.   On direct examination, you referenced the Coconut

20  Grove case.  Do you recall that?

21  A.   Yes, sir.

22  Q.   Were you referring to the Coconut Creek case?

23  A.   Okay.  Yes.

24  Q.   And if we could turn to Appendix B of your report,

25  which has been marked as Exhibit B to this deposition.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 119

 1    Let me know when you're there.

 2    A.   D?

 3    Q.   Exhibit B, as in boy.

 4    A.   B.  Okay.  Yes.  I'm there.

 5    Q.   Okay.  And the deadly force elbow strike, which is

 6    the bottom of Appendix E, do you see that?

 7    A.   Wait a minute.  I'm sorry.  What appendix?

 8    Q.   I'm at Appendix E of your report.

 9    A.   E.  Okay.  I was looking at B.  All right.  I'm

10    looking at E.

11    Q.   Okay.  And at the bottom is where I believe you were

12    having a discussion during direct examination on deadly

13    force elbow strikes.

14    A.   Yes.

15    Q.   Do you see that?

16    A.   Yes.

17    Q.   And it says, "Some target areas for a deadly force

18    elbow strike include the following."  Do you see that?

19    A.   Yes.

20    Q.   Did I read that correctly?

21    A.   Yes.

22    Q.   And it includes five bullet points, which are

23    examples of target areas for a deadly force elbow strike,

24    correct?

25    A.   Right.

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 120

 1   Q.   That is not an exclusive list of all the target

 2   areas for a deadly force elbow strike, correct?

 3   A.   It is not an inclusive.  I - as I testified to

 4   earlier, it's examples of places that would be,

 5   obviously, deadly force.

 6   Q.   Okay.  But, for example, it doesn't list the eye

 7   socket -

 8   A.   Correct.

 9   Q.   -- of a person's face, correct?

10   A.   Correct.

11   Q.   That would be an example.  An elbow strike to an

12   individual's eye socket would be an example of deadly

13   force, correct?

14   A.   Correct.

15   Q.   And do you recall being asked some questions

16   regarding the amount of force for each elbow strike

17   delivered by either Deputy Newman or Deputy Mangrum?

18   A.   Yes, I do.

19   Q.   And do you recall  - and I believe you said that you

20   had viewed the cell phone video that one of the witnesses

21   took.  Is that correct?

22   A.   Correct.

23   Q.   Do you recall whether there was blood depicted in

24   that video?

25   A.   A lot.

Page 121

1    Q.   And  -

2    A.   And described by the paramedic when he arrived on

3    the scene.  He said that he saw the deputies on top of

4    the guy and that he was laying with his head in a pool of

5    blood.  So, yes, --

6    Q.   Do --

7    A.   -- he was.

8    Q.   Do you recall seeing any blood on Deputy Newman's

9    elbow?

10   A.   Yes.

11   Q.   Would you agree with me that Deputy Newman must've

12   used considerable force in delivering those two elbow

13   strikes?

14            MS. BARRANCO:  Object to the form.

15   A.   I would because  - enough to cause that kind of

16   bleeding, yes.

17   Q.   You also, I believe, discussed the weight of Deputy

18   Mangrum and you indicated that was about 205 pounds.  Is

19   that correct?

20   A.   In his deposition, he said he weighed 209 pounds at

21   the date of deposition, but at the time of the incident,

22   he was 205.

23   Q.   Do you recall Deputy Mangrum indicating that he was

24   actually 330 pounds at his deposition and that Deputy

25   Newman had been 209 pounds, but I believe -- on the May

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 122

1    11th, 2014, he believed he was roughly 205 pounds?

2    A.   Well, let me see.  I may have the names reversed,

3    but -- from memory, but I do  - one of them weighed 205

4    and I think the other one did weigh 300 pounds.

5    Q.   And the weight of those deputy would be a factor

6    regarding your opinion on the physiology of a struggle?

7    A    Correct.

8    Q.   And if you could flip to page 6 of your report,

9    please.

10   A.   Page 6?  Yes, sir.

11   Q.   Yes.  And the first paragraph, which begins with in

12   my opinion, do you see that?

13   A.   Yes.

14   Q.   Do you recall counsel asking you some questions

15   about this opinion on direct examination?

16   A.   Yes.

17   Q.   It says, "In my opinion, a reasonable officer, under

18   similar circumstances, would not have perceived Docher as

19   an immediate threat of serious bodily harm or death at

20   any time after the officers handcuffed him."  Did I read

21   that correctly?

22   A.   Correct.

23   Q.   Do you recall in the officer's testimony  -

24   deposition testimony, which I understand that you read

25   after finalizing the report that's been marked as Exhibit

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 123

1    B, --

2    A.    Right.

3    Q.    Do you recall whether the officers themselves

4    admitted that they did not feel that Mr. Docher posed an

5    immediate threat of serious bodily harm or death at any

6    point during the altercation?

7    A.    And I think I already testified to that fact.  Yes,

8    I do recall it and I cited their testimony to that fact.

9              MR. VITALE:  No further questions.  Thank you,

10   sir.

11             THE WITNESS:  Thank you.

12             MS. BARRANCO:  And just one follow-up question,

13   if I could, Mr. Tucker.

14             THE WITNESS:  Yes, ma'am.

15             REDIRECT EXAMINATION

16      BY MS. BARRANCO:

17   Q.    You mentioned reference to the pool of blood under

18   Mr. Docher's head.

19   A.    Yes.

20   Q.    Do you have any idea where that blood came from in

21   terms of whether it was a product of Mr. Docher falling

22   to the ground or elbow strikes or something else?

23   A.    No, I don't.  I think just  -

24   Q.    And you don't have an opinion in that regard either?

25   A.    The only thing I can say is that there was a pool of

Page 124

1    blood.  There was blood on Newman's elbow  - blood stains

2     - and Paramedic Sinclair said that the subject was on

3    the ground with a pool of blood around his head.

4             MS. BARRANCO:  Okay.  Thank you.  I have no

5    further questions.

6             MS. TYK:  No other questions.

7             MS. BARRANCO:  And I guess he's going to read

8    and I would like to get a copy and, --

9             COURT REPORTER:  Um-hmm.

10             MS. BARRANCO:  -- in terms of Exhibit C, I

11    know, Mr. Tucker, you had those two articles and I didn't

12    know if the court reporter would be able to photocopy

13    that one chapter 5 for me and include it as part of

14    Exhibit C.

15             COURT REPORTER:  Okay.  I can get the people at

16    the desk to make a copy.  So you want  - for Exhibit C,

17    you want chapter 5 copied and then you wanted a copy of

18    the front of the book as well  - the front cover of the

19    book?

20             MS. BARRANCO:  Yes.

21             THE WITNESS:  How about if I leave the book and

22    those -- Exhibit C with -- that's updated and the two

23    other articles that I brought with the court reporter and

24    she sends it all back to me.

25             MS. BARRANCO:  That'll be great.  Thank you,

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 125

 1    Mr. Tucker.

 2              THE WITNESS:  Thank you.

 3              MR. VITALE:  Thank you.

 4              COURT REPORTER:  Okay.  Mr. Vitale, before you

 5    get off the phone, I know that Summer wants a copy.  Do

 6    you want to order the transcript?

 7              MR. VITALE:  Yes.  We'll take a copy, please.

 8              COURT REPORTER:  Do you want condensed,

 9    electronic, full?  What's your pleasure?

10              MR. VITALE:  Condensed is fine.

11              COURT REPORTER:  Okay.  Do either of you need

12    the transcript expedited for any reason?

13              MS. BARRANCO:  Not me.

14              MR. VITALE:  No, ma'am.

15              COURT REPORTER:  Okay.  Great.  Thank you.

16    (The deposition concluded at 1:12 p.m.)

17

18

19

20

21

22

23

24

25

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Page 126

1                    CERTIFICATE

2

3    State of North Carolina

4    County of Harnett

5

6         I, Mary Lynn Fuller, a Notary Public in and for the

7    State of North Carolina, do hereby state that there came

8    before me on the 12th day of July, 2017, the person

9    hereinbefore named, who was by me sworn to testify to the

10   truth and nothing but the truth of his knowledge

11   concerning the matters of controversy in this cause; that

12   the witness was thereupon examined under oath, the

13   examination reduced to typewriting; and the deposition is

14   a true and accurate transcription of the testimony given

15   by the witness.

16        I further certify that I am not counsel for, nor in

17   the employment of any of the parties to this action; that

18   I am not related by blood or marriage to any of the

19   parties, nor am I interested, either directly or

20   indirectly, in the results of this action.

21        In witness whereof, I have hereto set my hand, this

22   the 25th day of July, 2017.

23

24

25   Mary Lynn Fuller, Notary

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                        Index: #29..561 686-6300

---

**#**

**#29**  21:16 25:13 117:24

---

**$**

**$1,500**  105:24 106:3
**$100**  75:7
**$150**  106:15
**$3,000**  106:1
**$6,000**  105:19 106:15

---

**1**

**1**  21:15 22:16,23 36:14,20 63:8 94:22
**10**  13:16 28:21 57:15 117:24
**10,000**  60:1
**10:04**  1:24
**111**  24:22
**112**  2:16
**119**  2:16
**11:56**  78:21
**11th**  50:6 67:8 112:12 122:1
**12**  1:13,24 8:19 24:25 27:24 94:18
**1216**  2:3
**124**  2:17
**12:05**  78:22
**13**  24:25 44:7 105:7
**14**  96:15 103:14
**1400**  2:7
**15**  8:19 13:18 93:21 96:15 99:18, 20,22
**16**  29:20
**162**  15:21
**16th**  6:22 7:19,21 16:19 18:1,4 48:18
**17**  79:22 80:23
**18**  80:23 105:7

---

**1965**  8:8,20
**1969**  8:20,25 57:5
**1971**  14:25
**1974**  14:25 15:4
**1977**  8:14 15:4,16
**1979**  15:17,25
**1988**  9:1
**1989**  50:19
**1994**  9:5 15:25
**1995**  93:18
**1:12**  125:16

---

**2**

**2**  29:7 35:13 37:1,16 51:10
**20**  5:17 32:19 49:17 69:2,9 91:5 92:12,14 100:4 106:20,25 114:21
**200**  1:23 98:13
**2006**  70:25 71:5 83:8 118:2
**2007**  28:21 33:15
**2008**  30:10
**2009**  29:13
**2014**  11:14 21:20 50:6,8 67:8 78:10 87:20 89:11 107:18 112:12 122:1
**2015**  33:15
**2017**  1:13,25 6:22 7:21 18:1
**205**  52:25 98:13 121:18,22 122:1, 3
**209**  96:14 98:12 121:20,25
**2139**  2:11
**24**  18:16
**25**  99:14 100:4
**26**  2:19
**26th**  12:9
**27606**  4:2
**28**  101:25
**29**  79:22
**291**  51:11

---

**3**

**3**  32:2
**30**  92:21 93:2
**30%**  32:21 114:21
**300**  122:4
**32801**  2:8
**330**  121:24
**33304**  2:4
**33409-6601**  2:11
**35**  94:18
**362**  16:3

---

**4**

**4**  22:17,20,21,22 23:2 33:19 48:13 49:25
**40**  5:4,11 28:12 92:21 106:13 109:12,15
**40-some**  103:1
**407 843-8880**  2:8
**41**  27:23
**45**  57:18
**45-officer**  14:5
**4801**  1:23

---

**5**

**5**  2:15,19 22:21 23:2,9 24:6,17,21 50:16 54:6 55:22 62:16 124:13,17
**5/10/17**  17:15
**5/11/14**  80:22
**5/16/17**  17:16
**50**  5:4,11,25 57:5 93:8
**50%**  109:12,15
**500**  10:24 14:10 16:1,4
**53**  94:22
**530**  5:17
**561 686-6300**  2:12

---

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                   Index: 57..apparently

**57** 11:20 33:4

**59** 18:15

**5929** 4:2

---

**6**

**6** 63:25 66:14 67:6 78:24 95:19 122:8,10

**60-something** 28:11

**65** 8:23

**68** 57:5

**69** 8:23 57:5

---

**7**

**7** 2:18,19 24:12 81:12 82:17 94:22 101:25

**70%** 32:20

---

**8**

**8** 71:8 90:17

---

**9**

**9** 22:16,23 71:7 100:21

**90** 107:9

**90%** 36:4 109:10

**911** 41:2 43:3,8,11,14,19,22,23 44:9 53:19 72:4

**92** 15:8

**94** 14:21

**944.40** 55:16

**95%** 33:5

**954 462-3200** 2:4

**97** 5:3,11 24:22

---

**A**

**A-l-o-n-g-e** 95:16

**a.m.** 1:24 78:21

**ability** 99:13

**above-entitled** 1:19

**absolutely** 27:6,20 61:5 65:2

**accept** 28:10

**accepted** 57:19 102:25

**accepting** 27:23 28:18

**accommodation** 5:15

**accomplish** 25:21

**account** 89:20

**accounts** 114:19

**accurate** 8:3,4 93:7 111:23 117:4

**Act** 74:5

**acting** 37:19 71:9,12 72:3,5 85:22 113:7

**action** 1:19 6:11 19:17 39:5 40:18 90:13

**actions** 88:25

**active** 8:18,20,23 27:18,23 28:1

**actively** 51:4

**activity** 5:15 81:23 82:22 83:2

**actual** 103:8

**acute** 70:23

**Adam** 11:10,14

**add** 20:10

**adding** 18:17,21

**addition** 89:18

**additional** 8:19 17:1 19:24 27:13 48:18 49:1 105:21 106:19,24

**address** 3:25 49:4

**adjacent** 60:10

**administer** 72:15 83:24

**Administration** 5:24 8:13

**administrative** 89:17

**admit** 52:5

**admits** 18:19

**admitted** 54:13 123:4

**advise** 109:14

**affairs** 49:5,7

**affiliated** 9:9

**agencies** 4:22 88:20 116:15

**agency** 5:16 15:11 89:14,19,23

**agent** 13:14

**aggravated** 62:18,24 63:19

**aggression** 70:23

**agitated** 71:6,8 72:3 75:1,5,9 113:19,25 114:2,8,9

**agitation** 70:21 75:2,4 81:18 82:20 112:23 113:8,16,17,24 114:1,3

**agree** 31:11 43:13 47:2,5 54:21 69:17 75:16 85:20 100:13 121:11

**agreed** 82:19

**agreement** 1:20 90:1,8

**agreements** 89:18

**ahead** 21:1 34:1 41:14 59:12 62:10 80:2

**airport** 5:25

**alcohol** 83:1 115:18

**alike** 70:7

**Alonge** 95:15,16

**altercation** 123:6

**amend** 110:12

**American** 5:22

**Americans** 74:5

**amount** 106:17 120:16

**analogy** 103:6

**analysis** 34:4 50:15 54:6 86:16, 19 87:5 95:5 103:4

**anger** 83:2

**answer's** 60:5,18

**answering** 40:3

**anybody's** 98:14

**anymore** 30:11,13

**anything's** 43:21 70:5

**Appalachian** 8:13

**apparent** 70:24

**apparently** 28:24 46:22 50:25 65:16 80:9,14 81:3

---

**appeal** 27:25

**APPEARANCES** 2:1

**appeared** 71:8

**Appendices** 2:19 6:24

**appendix** 7:5,12 11:19 16:10,12, 16 26:1,13,20 32:24 33:23 34:7,8, 17,18 35:14 36:10 37:1,16 44:1,5 51:8 55:24 56:24 58:1 70:12,13 75:11 78:13,15 87:18 91:4 118:24 119:6,7,8

**applicable** 90:9

**applied** 95:13 98:5

**apply** 90:5 91:16,17 92:3,7

**April** 21:20 45:20 78:10

**Arabs** 66:25 68:5,6 81:21 85:6 113:5

**area** 4:19 14:18 19:5 52:2 56:18 57:9 58:12,14 59:4 60:10 98:18

**areas** 51:15,16 61:18 119:17,23 120:2

**arguably** 110:9

**Ariana** 37:8

**arm** 95:9 96:19

**armed** 14:17 96:13

**arrest** 14:16 39:12,14 51:4 54:25 85:5,14 88:10

**arrest-and-control** 87:2

**arrived** 95:16,22,25 121:2

**articles** 23:18 24:1 44:8 124:11, 23

**Asheville** 13:19 15:16,19

**asks** 43:23

**aspect** 4:24

**asphyxia** 24:12 66:9 92:18,19 93:6,11,17 97:12

**assault** 62:18,24 63:8,10,19,20

**assault/battery** 62:20 63:5

**assessment** 86:17

**assign** 108:21,22

**assist** 9:24

**assistance** 43:16 83:22

**assisted** 9:25 95:17

**Association** 21:17 81:16 88:6 117:9

**assume** 17:21 34:3,8 44:16 63:15 86:4 101:8 104:5,6 105:23 112:5

**assumed** 33:20 34:6 35:6 112:6, 7

**assuming** 33:15 99:7 101:1

**assumption** 112:1

**attach** 25:18

**attached** 6:24 51:8 117:1

**attacked** 86:14

**attempt** 82:2 83:23

**attempted** 61:22

**attempting** 60:24 61:3,5

**attempts** 62:8

**attending** 3:16

**attention** 67:11 71:15,17,22

**attorney** 3:10 11:5 25:9 106:23

**attorneys** 28:5 103:7 109:1

**attributable** 75:20 84:3

**attribute** 80:15

**attributed** 70:18 75:17,18 81:6 82:23

**audio** 44:9 116:18

**audio/video** 44:10

**audit** 14:14

**aunt** 113:10

**authored** 18:10

**authority** 117:5,12,13,21,25

**automatically** 60:20

**Avenue** 1:23

**avoid** 94:2

**avoiding** 90:21 94:6

**aware** 45:8,11 52:1 55:14,15 60:22 65:13,19 91:9 93:3,8 104:5 113:12

---

**B**

**B.A.** 8:7

**back** 8:20 15:9,20 30:22 31:15 34:16 48:7 51:18 52:3,20 53:12 54:22 56:8,18 61:24 64:12 69:2 73:13 77:4,5 85:25 91:15,17,22 92:23,24 93:9,21 95:3,7 96:13 97:9,20 98:2,13,14,16 100:5 106:23 124:24

**backed** 75:5

**background** 8:6 9:3

**bargaining** 89:17 90:1,7

**Barnhart** 2:10

**Barranco** 2:2,3,15,17 3:6,9 6:2, 17 23:23 24:3,5 70:1 77:12,16,20, 23 78:18,23 80:18 110:19,24 121:14 123:12,16 124:4,7,10,20, 25 125:13

**base** 67:15

**based** 18:22,24 20:21 32:18 36:4,5 38:12 46:12 56:24 64:16 65:6 76:23 80:9 84:20 98:9 101:9

**basic** 51:9 56:5 57:16 79:19 90:22 91:3,9,10 93:17 94:7 105:4

**basically** 18:24 20:8 27:16 99:3 108:19 113:22 116:13

**basing** 64:8,10

**basis** 6:10

**bat** 12:11 85:9

**baton** 30:5 56:16,17,21 103:16

**batons** 31:6 56:20 57:20 102:23

**battery** 63:9,10,11,14,21 103:9

**Beach** 2:11 10:20

**beating** 35:25

**beer** 76:9,16,17

**beginning** 1:24

**begins** 122:11

**behalf** 2:2,6 33:5

**behaving** 38:8 74:16

**behavior** 70:17 81:19,22 82:21 89:1

Case 2:16-cv-14413-RLR Document 136-1 Entered on FLSD Docket 10/27/2017 Page 131 of 210

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                    Index: beheaded..changed

beheaded 113:13

believed 122:1

best-case 73:19

best-case-scenario 87:23

Bhagudas 16:20 42:7,8,15 71:10

Bill 71:4

billing 107:2

bit 34:6 80:6

bite 60:25 61:3,5,7,12,22 62:8

bites 62:7

biting 60:24 61:2

black 69:6

bleeding 121:16

block 75:14

blood 57:11 96:2 115:18 120:23 121:5,8 123:17,20 124:1,3

blow 57:8 60:3 102:22 103:2

blows 57:13,19 101:23

boat 75:5

bodies 68:6 113:6

bodily 51:16 57:10,22 60:5 62:25 64:7,14 122:19 123:5

body 19:4 58:23 65:17 94:12,13, 20 98:6 103:18

Boles 37:18 38:6,14

bolt 97:19,20

bolting 54:22 97:16

bony 56:14 58:11

book 2:19 21:14,21,22,23 22:1, 13,17 24:8,11 68:22 114:24 124:18,19,21

Book/chapter 2:19

Boom 27:14

Boone 8:14

bottom 62:16 78:16 93:13 98:3 119:6,11

Boulevard 2:3,11

bound 87:25

box 25:23

boxes 106:22

boy 119:3

brain 57:12

break 77:15 78:19 80:5 83:17 85:10

breaking 77:14 112:25

breath 66:2,3 91:15,21,23,24 92:1 95:12 97:6,25 99:13

breathing 91:12,19 94:17

bridge 51:18 52:3 56:8,19 58:13

briefly 17:20 42:17

bright 114:7,10

bring 6:7 21:6,9

brought 3:12 21:10,17,21 23:20 25:6,19,24 26:12,19 74:9 76:13 117:18 124:23

Brown 16:20 27:1 41:2,3 42:11 71:6,9 113:18 114:1

buddy 97:24

bullet 119:22

bulletin 21:16

bumped 92:13

bunch 85:10 110:9

buried 113:7

business 3:25 8:7 28:16 42:13

busy 39:18

_____

C

C-h-e-r 36:24

call 5:18 38:17,20 41:2 43:3,8,11, 23 47:9 65:25 72:4,10 73:16,25 83:22 92:5

called 1:18 5:7 33:5 43:14 53:19 83:21 91:9 95:14

calling 43:19 82:7

calls 43:7,22 65:24

calm 40:10 74:24 78:2,6,9 81:14 82:11

calmness 81:23 82:10

Calvin 1:7 16:22

camera 41:20 99:16

Canada 28:20

cancer 93:24,25

capabilities 89:23

capable 65:9

capsicum 30:6

car 39:23 40:20 54:23 77:4,5 92:24 97:20

care 32:13 50:17 72:19 88:23

career 13:10 14:8 108:5

Carolina 1:12,22,24 4:2,4,7 8:14 13:21 15:4,16 28:7 29:18 30:9

carry 30:3

case 4:14,24 5:9 6:14,20 10:12, 16,19,21 11:3,5,8,11,13,22 12:18, 23 16:13 19:11 23:4 24:8,16 27:9, 14 28:2,11 29:7,9 30:24 32:11,13, 18 33:22 34:2,7 37:5 39:14 40:18 48:2 49:15 50:20,24 53:7,23 59:13 63:2 64:20 65:8 66:7 69:5 71:11,24 74:4 83:12 86:5,22 88:22 90:5 97:12 98:11 101:19 105:18,20 106:8,11,14,21 108:9 112:7,14 118:20,22

cases 5:4,12,16,21 6:1 10:24,25 11:20,22 12:5 13:5 14:6 16:11 24:18 27:18,23,24 28:3,10,18 32:16 33:2,4,5,8,14,16 65:4 99:14 103:6 109:15

category 31:12

caused 62:25

CD 44:19

cell 45:24 46:20 120:20

Center 21:19 25:12 71:4 78:12 83:7 87:19 88:4 93:15 115:16 117:19

certainty 68:24

certifications 30:1,8,14

certified 5:22 29:13 30:2 31:24 67:22

certify 29:24

change 18:10 61:4 62:9,11 77:6

changed 7:22 118:3

**chaotic** 74:3

**chapter** 22:17,20,21,22 23:2 24:6,7,12,17,21 25:2 68:23 114:24 124:13,17

**chapters** 24:11

**characterized** 70:20

**charge** 22:3 62:24 103:8 106:1

**charged** 53:23 54:15 62:18,20 63:4 71:18 72:24

**charges** 105:18,21

**chasing** 40:2

**check** 27:16 28:7

**cheek** 59:6

**chemical** 118:9

**chief** 13:16,18,19,20,21,22 14:1, 4,9,24 15:3,16,20,24 32:23

**Chiefs** 21:18 81:16 88:6

**chop** 12:3

**Christopher** 1:6 16:22

**cigar** 74:25

**cigarette** 93:22,24

**cigarettes** 93:25

**circum** 70:6

**circumstances** 40:11 50:9,22 64:5,15 65:1 67:9 68:14 84:17,21 101:5 107:1 122:18

**citation** 70:24

**cite** 51:7

**cited** 78:4 83:7 114:24,25 117:18 123:8

**citizen** 37:8 46:8 66:16

**citizen's** 46:18,19

**City** 109:12,14

**civil** 86:5

**civilian** 37:3,4 42:3

**civilians** 85:16,21

**claim** 93:11 110:5

**claimed** 4:25

**claims** 110:11

**clarification** 90:15

**clarify** 17:5 26:11 62:12 78:8 101:8 102:10

**clarifying** 18:5

**class** 8:9

**classified** 48:20 63:22 83:20

**classify** 90:6

**classifying** 90:2 109:23

**Clay** 16:21

**CLAYLAN** 1:7

**clear** 42:12 43:5 68:23 79:15 94:2 95:5 100:25 110:3

**clearer** 51:19

**close** 16:4

**closed** 35:22

**closed-** 57:7

**closed-fist** 57:19 103:15

**closed-fists** 102:23

**clothes** 84:14

**CME** 17:8,10,12 112:16

**cocaine** 99:24

**Coconut** 10:20 11:8 12:8,15,22 118:19,22

**collective** 89:17 90:1,7

**combination** 75:22,23

**combined** 114:11

**comfort** 77:14

**comment** 69:25

**commenting** 108:19

**Commission** 51:14

**committed** 53:16 54:10,13 85:1

**committing** 74:9 100:25

**common** 92:15 114:13,15

**communicated** 40:9 43:6

**communication** 11:13 26:21,22

**communications** 27:3,4,7,12

**community** 89:20

**company** 9:9

**compelled** 42:16

**complainant** 38:19 40:1,25

**complainants** 40:1,2

**completely** 105:6

**compliance** 77:8

**compliant** 77:3,6

**complication** 99:25

**complications** 66:5

**comply** 42:23

**compression** 31:14 52:25 53:1, 4,11 66:6 91:18 97:10 98:2,4 100:6

**compulsory** 17:11

**concealed** 30:3

**concept** 93:6

**concepts** 21:19 78:4,10 88:15, 16

**concerned** 19:8 110:8

**conclude** 114:12

**concluded** 125:16

**conclusion** 49:6 64:16 107:13, 23 108:8,13

**conclusions** 55:11

**condensed** 125:8,10

**condition** 70:18

**conditions** 100:3

**condoning** 49:9,10

**conduct** 38:15

**conducted** 17:13

**cone** 43:21

**confronted** 50:8 69:19 88:21 101:5

**confronting** 71:13

**confusion** 39:13

**Connor** 50:18,20 54:2 69:5,22 70:2 86:7,11

**considerable** 121:12

**consideration** 34:13 50:21 65:5

**considered** 14:1 58:3,15 61:17

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: consistent..decisions

89:18

**consistent** 37:10,12

**constant** 81:22 82:22

**constitutional** 101:17,18

**consultant** 9:4

**Consultant/trainer** 9:13

**consulting** 106:21 109:9

**contact** 40:25 59:18

**contained** 34:24 75:11

**contract** 109:13

**control** 52:23 64:24 65:7 71:21 72:24 73:5 74:8,9 83:23,24 88:22 95:15 96:20 97:23

**control-and-arrest** 79:6

**controlled** 97:2

**controlling** 71:19

**controversy** 94:1

**conversation** 76:13

**cooperative** 43:1

**copied** 44:19 124:17

**copies** 21:22 23:12,25 25:7,9

**copy** 6:19 7:4,15,18 21:16,20,21 22:7 25:1,3 26:8,10 35:16 78:15 124:8,16,17 125:5,7

**corporate** 17:1 20:13 49:3,22 109:24

**correct** 4:16 8:8,15,24 9:2,6,8, 14,15 10:4 13:17 14:3 15:1,2,5 18:8 19:13,14 20:24 25:15 26:15, 16,18 30:25 31:5,7,10 33:7,11 34:10,18,21 38:8,9 47:8 48:10,11 50:11 54:14 57:2 61:1,19,20 63:24 64:19 65:2 67:4 70:2 71:19 72:1,25 73:1,6 74:19,25 82:24 85:18,24 86:10 87:22 88:3 100:18 101:12 102:14 104:3,7 111:17,18, 20,21,24 118:7 119:24 120:2,8,9, 10,13,14,21,22 121:19 122:7,22

**correctly** 16:21 90:24 101:6 119:20 122:21

**cost** 75:7

**could've** 62:25

**counsel** 1:18 2:1 122:14

**counting** 10:25 98:16

**County** 1:8,9 3:10,11 17:2 20:13 49:3,9,14 67:19 68:6 80:21 87:11 89:4,9 90:2 109:25 110:6 111:7 113:7

**couple** 26:7 28:5,9 40:3 45:20,22 64:3 65:8 77:15 79:17 116:6

**courses** 29:25

**court** 1:1,21 3:20 6:4,13 12:22 13:6,7 50:18 59:10 60:15 65:5 69:24 89:15 117:11,15 124:9,12, 15,23 125:4,8,11,15

**Courtemanche** 16:20

**courts** 13:4 107:10

**cousin** 113:10

**cover** 2:19 22:1 124:18

**covering** 19:17

**crazy** 81:22

**CRC** 21:24

**cream** 43:21

**credibility** 108:19,21,23

**Creek** 118:22

**crime** 40:5,12 43:9 50:23,24 53:15,17,20,22,25 54:3,10,13 63:8,14,20 74:10 84:25

**criminal** 9:13 51:10,13 69:12

**criminally** 62:18

**critical** 94:8

**Cross** 2:16

**CROSS-EXAMINATION** 111:11

**crossed** 20:6,7

**cuffed** 48:7 52:19 53:11 72:13 92:23 97:9 98:2,15 100:5

**current** 7:15,18,21

**curriculum** 7:12,16,24 16:10 29:22 51:10 56:6 57:16 116:3

**custody** 14:19 54:18,20,22 100:14

**custom** 49:8,18,20 109:22 110:4

**customs** 49:14 89:21

**cut** 36:10 59:10 69:25 75:8

**CV** 7:17,18,21 8:2,5 9:4,14 13:8 14:23 116:1,4

**CVR** 1:21

**CVS** 27:1 38:6,15 39:19 42:2 44:9,19 45:3 46:1 47:11 71:7 72:2,6 74:1,23

---

**D**

**D-o-c-h-e-r** 36:24

**damages** 17:21

**dangerous** 39:9

**data** 50:13 103:11

**date** 6:22 17:15 49:13 105:18 106:8 121:21

**dated** 21:20

**dates** 33:15

**David** 2:10 111:1

**day** 17:16 75:14 106:12

**dead** 92:25

**deadly** 18:16,18,20 19:7,8,12,16 48:5 51:16,21,24,25 52:4,5,6,7,8, 9 55:25 56:3,6,7,22,25 57:2,9,22 58:3,6,16 59:14,25 61:6,7,14,17, 23,25 62:1,3,19 63:1 64:17 101:4, 11,19,20,24 102:19,24 103:25 104:25 105:1,3,11 119:5,12,17,23 120:2,5,12

**deal** 39:3 61:25 65:10 89:7

**dealing** 24:7 40:12,13,14 70:9 89:7 111:14 118:9

**dealt** 31:12 109:2

**death** 51:16 57:10,22 60:5 64:7, 14 86:15 89:3 90:23 93:17 94:3 97:12 103:19 122:19 123:5

**deaths** 5:7 22:15 83:11 88:9 114:21 115:3

**December** 11:14 30:4

**decided** 76:3

**decision** 39:12 50:18 85:4

**decisions** 89:17

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                    Index: decus..Docher

**decus** 6:6

**Defendants** 1:10,19 2:6

**defense** 16:24 17:9 32:17,21,23 33:9 108:10 112:16

**defensive** 30:6 51:10 56:24 88:12

**define** 4:20

**defined** 59:21

**definition** 55:12 57:23 59:14 62:3 94:21,24 113:16

**degree** 63:14

**delirious** 37:23

**delirium** 5:5 20:5,7 21:19 22:18, 21 23:9,11,18 24:1,7,15 25:11,13 37:15,22,25 38:1 39:3,8 40:8,16 52:21 66:6 67:20,22,23,24 68:10, 11,16,19 69:2,13 70:11,14,19 75:2,3,7,12,18,19,21 77:25 78:2, 4,7,12 79:3,13 80:11,13,16,22 81:4,7,10,25 82:19,23 83:10,13, 21 86:23 87:10,20 88:8,10,16,18, 21 89:8 90:3,6,14 95:11 99:25 111:14,23,25 112:2,8,9,12,22 113:15,23 114:9,10,12,14 115:1,6 117:2,7,14,20,24 118:10

**deliver** 101:2,22 104:15

**delivered** 18:14,19 19:10 35:4 51:21,22,23 56:7 57:3 58:14,23 60:23 61:18 64:17 102:3,24 103:9,11,12,17,20 104:13 120:17

**delivering** 102:8 121:12

**delusional** 37:18 38:25 66:24 68:1 85:6 112:25 113:4

**demands** 89:21

**Denney** 2:10 10:13 11:6,23 12:17,19 44:18,22

**Denney's** 45:10

**dep** 8:2

**department** 10:21 12:8 14:5 15:7,20 16:7 20:14 29:19 32:12 45:3 49:4,9,23 67:20 87:12 88:5 90:2 93:15

**Department's** 17:3

**departments** 29:20

**dependent** 100:2

**depending** 28:4

**depends** 57:3 99:19

**depicted** 120:23

**depose** 99:2

**deposed** 12:10 18:14 32:10 33:10

**deposition** 1:15 3:15,19 4:3 6:5, 12,15 7:25 8:1 9:22 12:6,9 16:19 17:3 18:15,22 20:11,12 21:3,9 25:6,18 32:20 35:4 45:18 46:7,13 47:19 48:19 49:2,22 52:6 70:3 71:7 79:12,22 80:23 94:17,18,21 101:25 102:16 105:7,24 106:3,5 109:24 113:9 118:25 121:20,21, 24 122:24 125:16

**depositions** 16:18 17:23 18:1,9, 13 19:1,24 20:1,3,8 26:7 36:8 42:1,6 45:15 46:7 47:25 48:22

**deputies** 3:11 20:17,18 31:8,20 38:11,13,20,22 40:24 41:9,11,16, 17,20,24 42:17,21,22 43:1,4 46:25 47:4,14 48:3 50:5 51:3 52:17,22 53:6 54:10 64:23 65:9, 17 67:9 68:2,4 71:24 72:24 75:24 76:13,24 77:7 78:25 79:7 80:4 82:6 83:19 85:15 86:3 87:24 90:19 94:5,24 95:6,10,23 96:1,6, 12,14,16,24 97:10,23 98:9,22,24 99:7 100:10,14,23 107:20 113:5 121:3

**deputies'** 47:24 65:13

**deputy** 18:23 19:2,3,17,20 37:8 39:19,25 40:8 58:23 59:18 60:22 61:3 64:17 72:7 74:15 79:16 80:12,13 81:5 95:15 100:24 101:2,10 102:13 104:19,20 105:13,14 120:17 121:8,11,17,23, 24 122:5

**deputy's** 74:22

**describe** 48:5,6 99:2

**describing** 68:9

**desk** 124:16

**determination** 49:20 54:4,17 87:1 110:1

**determine** 27:25 39:21 49:8

**determining** 99:11

**develop** 34:2

**developed** 106:13

**developments** 118:2

**di** 69:6

**diabetes** 69:7,10

**diagnose** 68:24

**diagnosed** 112:11

**diagnosing** 111:22

**die** 28:17,25 66:7 98:20 99:22 100:1,6

**died** 99:18,23

**dies** 92:8

**difference** 69:9

**difficult** 46:15 91:15

**difficulty** 91:18,21

**direct** 2:15 3:5 118:19 119:12 122:15

**direction** 27:11

**Director** 13:23 14:24

**Disabilities** 74:5

**disagreeing** 58:19,20

**disagreement** 105:6

**disc** 25:8

**discern** 68:19

**disciplines** 29:14

**discovered** 18:13 84:3

**discrimination** 5:13,14

**discs** 44:7,15,17,25

**discuss** 111:16

**discussed** 16:9 76:21 109:19 118:8 121:17

**discussion** 119:12

**disease** 68:25

**disorderly** 53:20 54:11

**distinctly** 47:18

**district** 1:1,9,10 25:10 111:8

**diver** 75:8

**divergent** 89:21

**Docher** 1:3 3:13,14 4:23 6:14,20

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: Docher's..EXAMINATIONS

11:11,15 16:24 17:6,8,11 24:8
30:24 31:9 35:5 36:16 37:18 38:8
39:22 40:9 41:1,2,4,6,9,11,16,17
42:9,17,25 45:21 46:24,25 47:4,
14 50:6 52:23 53:18 54:10 60:24
61:2,21 62:18,23 64:6,21,24
65:10,15 66:18,21 67:10,16 71:8,
12,25 73:21 74:23 76:3,14 77:2
79:4 80:10 81:6 82:1,6 84:5,14
85:22 87:25 94:24 95:5 96:5 98:5,
25 99:8 101:3 102:3,9 104:15,20
111:23 112:11,16 113:12 115:9
122:18 123:4,21

**Docher's**  18:15 19:4 38:15 43:3
58:23 59:19 75:25 76:25 77:8
94:13 95:3,7 98:6 101:11,23
102:12 104:13 105:15 123:18

**doctor**  111:17

**document**  78:8

**documents**  24:14 77:24 114:25

**dog-gone**  30:12

**Dontrell**  10:19,22 11:3 12:6

**dosage**  72:17

**drank**  76:16

**draw**  109:13

**drew**  61:24

**drink**  76:8

**Drive**  4:2

**driver**  42:18 103:3

**dropped**  27:23

**drug**  76:12 83:1 115:20

**drugs**  76:20 115:24

**drunk**  69:8

**drunkenness**  69:10

**duces**  21:6,11 25:19

**due**  57:5 103:5 116:19

**duly**  1:20 3:3

**duty**  8:18,23,25 101:17

**DVD**  17:8

**DVDS**  25:24

**dvitale@searcylaw.com**  2:12

**dying**  66:5 100:7

**E**

**earlier**  21:5 27:10 36:3 43:2
54:24 63:13 66:24 70:3 81:12
84:20 85:23 87:9 101:9 107:5
112:4 120:4

**early**  108:5

**east**  2:3,7 29:20

**easy**  68:19

**ED**  20:4 72:8 74:11 79:21 83:21
84:3,8 85:13 87:4

**educational**  8:6

**elbow**  18:14,19 19:4,7,9,15,21
31:13 35:4 37:7 49:10 51:11,15,
21 52:1,9,14,15 53:4,10 55:22,24
56:2,6,14,15 57:1,8,20 58:3,4,6,
11,12,23 59:18,20,21 60:2,3,4,8,
9,11,19,20,21,23 61:13,16,20
62:4 64:17,22 65:11 95:9 101:2,
10 102:3,8,23 103:3,13,15,23,24
104:13,15,23 105:2,14 119:5,13,
18,23 120:2,11,16 121:9,12
123:22 124:1

**elbows**  37:9,12 102:14

**electronic**  125:9

**electronically**  26:2,7

**emailed**  26:9

**emergency**  20:5 23:3 39:11
67:11,17,24 68:10,11,17 69:16
77:1 79:5,21 80:9 85:14 87:4
88:23 89:2 90:3,7 116:6,10,11,16,
18

**emphasize**  46:10

**employee**  27:1 71:7 72:6

**employees**  14:10 16:4 38:6,23
42:2 74:1

**employment**  9:3

**Empty**  31:11

**empty-hand**  31:9

**EMS**  71:25 72:9,10,11,12,17
73:4,25 77:9 82:7 97:2 116:16

**EMT**  116:24

**EMTS**  73:3

**enclosed**  27:12,15

**encountered**  75:25

**end**  35:18 36:11 37:17 66:4 78:16
89:12

**ended**  53:22

**ends**  35:16

**endurance**  70:23

**enforcement**  21:18 30:3 39:5
56:13 57:4,18 60:1 63:11,15,22
68:21 69:19 78:11 79:2 87:19
88:4,13,20 89:6,10,14,22 90:11,
21 91:24 93:13,14 107:7 117:19

**enforcement/security**  9:5

**ensuing**  96:6

**entered**  81:10

**enterprise**  88:4

**entire**  18:24 21:10 25:25 32:21
41:10,17,22 42:4 47:3 57:6,18
99:8

**entirety**  47:7

**entitled**  55:16

**environment**  89:15

**equivalent**  56:16,22

**escape**  55:1,2,12,16

**essence**  107:18

**established**  79:2 90:21 94:2

**et al**  4:24 10:13

**etcetera**  39:1 41:6 93:12

**evading**  54:25 55:13

**event**  41:10,23 42:4 44:8 47:7

**events**  42:14 47:24

**evidence**  41:21 84:25

**EVOT**  116:10

**exacerbated**  66:6

**exacerbates**  92:4

**exam**  16:23

**examination**  1:18 2:15 3:5 17:11
118:19 119:12 122:15 123:15

**EXAMINATIONS**  2:14

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: examiners..fleeing

**examiners** 88:12

**examples** 56:11 69:3 119:23 120:4

**exceptional** 70:20 81:23 82:22

**excessive** 49:10 50:6,19 52:4,21 53:1 54:5 67:12 70:21 101:19 107:19,21 108:7,12

**excited** 5:5 20:5,7 21:19 22:18, 21 23:9,11,18 24:1,7,14 25:11,13 37:15,22,25 38:1 39:3,8 40:7,15 52:21 66:6 67:20,22,23,24 68:9, 11,16,19 69:1,13 70:10,13,18,19 75:2,3,7,12,17,19,21 77:25 78:2, 7,12 79:3,13 80:13,15,22 81:4,7, 10,25 82:18,23 83:10,12,21 86:23 87:10,19 88:8,10,16,17,21 89:8 90:3,6,13 95:11 99:24 111:14,23, 25 112:2,8,9,22 113:15,23 114:8, 9,12,14 115:1,5 117:2,7,13,20,24 118:10

**excitement** 70:20

**exciting** 112:12

**excluded** 107:10 108:3,11,13,18, 25

**exclusive** 120:1

**exculpatory** 85:2,3,11

**excuse** 17:15 24:11

**exercise** 116:19

**exhibit** 6:6,11,15,16 7:5 9:20 21:5 25:19 33:1 118:25 119:3 122:25 124:10,14,16,22

**exhibited** 114:6

**exhibiting** 39:7 40:7,15 68:15 79:3 80:10 84:5 89:1,8 111:24 112:8,23 113:1 118:10

**exhibits** 2:14,18 3:19

**exited** 80:11

**expect** 3:19 68:23 69:1 73:1

**expecting** 105:21

**expedited** 125:12

**expenses** 106:2

**experience** 8:16 24:13 31:22 56:13 57:24 64:10

**expert** 4:14,16,18 5:3,8 6:19

16:24 17:9,21 30:18 32:16 72:16, 17 107:7 108:8 112:4,14,16

**expertise** 4:18,25 5:2

**experts** 1:23 12:1 29:2 32:9 68:25 88:11,14,18

**explain** 91:1 108:7,16

**explained** 48:14

**express** 107:15

**expressed** 20:9

**expressing** 107:19

**expression** 59:22

**extent** 37:3 82:9

**extra** 22:3

**extreme** 70:19 113:16,19,21,24

**extremely** 78:2

**eye** 120:6,12

**eyes** 70:22

———————————

**F**

———————————

**face** 120:9

**face-** 91:11

**fact** 13:9 14:3,6,8 39:15 43:4,22 47:6 51:7,22 53:18 54:16 61:2 62:17 65:14 67:20 69:4 77:2,5 78:1,6 96:7 99:7 101:11 104:14 106:9 108:6,22 111:16 112:7 123:7,8

**factor** 54:24 122:5

**factor's** 51:6

**factors** 54:2 89:24

**facts** 29:9 32:13,18 33:20,22 34:6,9,13,23 35:3,6 50:13 63:2 64:8 67:14 69:19 94:4 114:11

**failed** 79:4 100:23 102:4

**failing** 104:5

**falling** 47:14,20 123:21

**familiar** 51:14 79:11

**fast** 38:18

**fatigue** 70:24

**FBI** 13:14 57:7

**fearful** 86:15

**federal** 3:12 12:25 13:1,3,6,7 14:6 86:5 89:15

**fee** 105:24 106:1,4

**feel** 123:4

**feet** 63:9 94:13

**fellow** 100:24

**felony** 55:17 63:22

**felt** 42:16

**field** 14:11 107:8

**figure** 74:15 110:17

**figuring** 48:21

**file** 21:10 22:8 25:23,25 26:21 27:3,7,12,17 28:7 48:22 106:22

**filed** 17:16 48:17 107:22

**final** 20:10,11 71:13

**finalize** 18:18 110:1

**finalizing** 17:19 18:1 48:23 122:25

**Finally** 67:7

**find** 21:13 78:3 94:10 104:16 109:2 117:4,20,25

**fine** 8:12 25:4 77:16 78:20 125:10

**finish** 47:3

**finished** 52:11

**fire** 1:9 25:10 111:7

**firearms** 30:2 31:2

**firm** 10:13,15,25 11:24 12:17,20 13:6 26:22 44:18

**fist** 57:8 63:9

**fit** 94:24

**fixated** 83:17

**fixation** 83:16 84:1,6

**flat** 106:3

**flat-fee** 105:19 106:10

**fled** 51:5

**flee** 82:2

**fleeing** 54:21

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                     Index: flight..Hardyal

**flight** 54:25

**flip** 122:8

**floor** 25:24 91:14

**FLORDIA** 1:1

**Florida** 1:8 2:4,8,11 8:8,10 51:8, 9,12,14 55:7,9,12,15,17 56:5 57:14,17 63:15,21 90:4,6 102:19 105:4,6 106:22

**Florida's** 53:20

**follow** 87:17 89:5,9 90:13 109:1

**follow-up** 123:12

**footnote** 21:15 22:16,23 26:20 78:17 89:13

**footnoted** 21:12,14,15,17,23 22:22 23:21 26:14

**footnotes** 24:1

**force** 4:21 5:3,4,12,18 13:5 15:22 18:16,18,20 19:7,9,12,16 21:15 25:12 29:14,21 31:8,20,25 36:21 48:5 49:11 50:5,7,17,19 51:17,21, 24,25 52:4,5,6,7,8,9,16,21 53:5,8 54:4,10 55:25 56:3,6,7,22 57:1,2, 9,21,22 58:3,7,16 59:14,25 61:6, 7,14,17,23,25 62:1,4,19 63:1 64:18,24 65:4,5 67:13 71:4 83:7 91:6,8 92:16 93:1 101:4,11,15,19, 20,24 102:19,24 103:25 104:25 105:1,3,11 107:16,17,19,21 108:7,9,10,12 117:23 119:5,13, 17,23 120:2,5,13,16 121:12

**Fordland** 4:2

**forearm** 60:14

**forget** 76:16

**forgive** 3:17

**forgot** 87:14

**form** 6:10 19:25 45:6 47:16 55:18 60:13 63:16,23 66:11 76:5 77:10 80:17 82:13 83:4 85:19 86:9 88:2 104:2 109:20 112:15 115:22 121:14

**formal** 111:19 112:17

**format** 25:7

**formulating** 16:13

**formulation** 89:19

**Fort** 2:4

**fortunately** 28:4

**forward** 28:8

**found** 28:14,16 74:2

**frame** 14:22

**frankly** 48:25 59:23

**friend** 113:13

**front** 2:19 3:18 6:20 45:25 124:18

**full** 3:21 98:24 106:22 125:9

**Fuller** 1:21

**future** 105:22

---

**G**

**gain** 95:15

**gather** 39:23

**gauge** 103:13

**gauges** 98:7

**gee** 20:6

**Gees** 41:18

**general** 31:12

**generally** 4:20

**Gileweski** 16:23 37:24 38:6,14 42:12

**Giuffreda** 2:3

**give** 3:18 32:24 43:20 44:4 65:3,7 103:5

**glass** 83:16,17 84:2,6 85:11 112:25

**Glenwood** 1:23

**Gonzalez** 16:19

**good** 3:7,8 7:11 23:5 30:23 46:14

**gosh** 61:23

**grabbing** 47:20

**graduating** 8:9

**Graham** 50:18,20 54:2 69:5,22 70:2 86:7,11

**grandchildren** 91:14,20

**Gray** 2:7

**great** 51:16 114:19 124:25 125:15

**greater** 50:7 64:24 107:17

**ground** 47:14,21 65:15 94:11,19 95:8 96:2,17,24 123:22 124:3

**Grove** 10:20 11:8 12:8,15,22 118:20

**guardian** 1:4

**guess** 17:10 50:4 51:5 63:6 78:5 80:7,16 85:11 91:1 110:17 124:7

**guide** 88:19

**guy** 59:24 73:4 96:17 99:18,20 121:4

**guy's** 72:3

---

**H**

**half** 13:22,23 51:12 99:19

**hallucinations** 112:23

**hand** 61:12 63:9 86:15,18

**handcuff** 100:16

**handcuffed** 31:14 40:21 64:8, 11,13,23 65:10,16 67:13 77:3 81:15 82:2 93:5 94:16 95:6 96:12 122:20

**Handcuffing** 53:8

**handcuffs** 95:8

**handed** 41:3

**handle** 79:2

**Handling** 117:24

**hands** 31:11,14 48:7 52:19 53:11 64:11 65:17 71:25 92:22 96:13 97:9 98:2,15 100:5

**hanging** 82:9

**happen** 28:9

**happened** 14:18 41:24 42:10 48:3,4 59:23 72:21 89:11 106:20 107:24 109:5

**happening** 38:24

**happy** 11:25

**hard** 25:7,9 26:8,10 30:18

**Hardyal** 16:20

**harm** 51:16 57:10,22 60:5 64:7, 14 122:19 123:5

**hat** 82:9

**head** 18:15,20 19:5,8 31:13 35:5 37:9 49:10 51:18 52:2,3,10,14,15 53:4 55:22,25 56:3,9,18,19,21 57:4,8,20 58:5,6,21,25 59:1,3,4, 19 60:3 61:13,17,18 64:22 96:2 98:17,18 101:3,11,23,24 102:3,8, 12,15,17,18,22,24 103:25 104:13, 20,23,24 105:2,15 114:23 121:4 123:18 124:3

**heading** 29:8 32:6 33:20

**heads** 81:21 85:7 113:5,6

**health** 43:10 54:19 74:7 75:21 83:2

**healthy** 99:21

**hear** 60:19

**heard** 43:19 60:8 73:7 90:8 92:14

**hearing** 66:18 68:8

**heated** 84:9

**heavy** 103:16

**Hecht** 11:10,14

**heck** 46:15

**held** 98:17

**hematomas** 57:11

**herewith** 27:13,16

**Hickory** 13:21 15:3,4,6

**hide** 68:6

**high-risk** 5:18

**high-speed** 5:14 116:11

**history** 75:25 76:2 115:12

**hit** 94:11,19 104:22

**hitting** 37:9,11 103:25

**hold** 4:18 5:8 11:14 23:16 63:6 93:19,21 94:10 95:14 96:17 97:5, 8 98:1

**holding** 22:6 46:24,25 48:6 52:18,24 95:21 96:5,8,18 100:15 104:9

**home** 106:5

**Homeland** 29:19

**homicide** 14:5

**hospital** 72:18 83:25

**hostility** 70:22

**hot** 75:14

**hour** 106:15 107:2,4

**hours** 106:7,12,13

**huge** 25:22

**hunting** 85:7

**hyperactivity** 70:21

**hyperthermia** 81:19 82:21

————————————

**I**

**I"m** 116:25

**IACP** 25:11 87:19 117:1,19

**ice** 43:20 76:9,16,18

**idea** 74:14,20 99:9 106:13 123:20

**identification** 118:4

**identified** 71:5 81:18 83:6,9,10, 11 85:8 93:10 102:18

**identify** 88:7

**ignorant** 79:10

**ill** 40:6,14 43:15

**immediately** 71:15,22 72:18 76:25 78:3

**impact** 89:22 99:12 103:16,17

**impose** 74:7

**in-custody** 114:21 115:3

**in-my-opinions** 64:3

**incentive** 29:25

**incident** 36:7 63:6,8,18 67:3,21 79:4,5 90:12 112:3 114:16,18 115:4,16 121:21

**include** 25:2 31:21 50:22 51:17 119:18 124:13

**included** 11:19 13:9 65:14

**includes** 4:21 6:6 56:9,10 89:13 119:22

**including** 5:5 17:1 41:5 48:19

102:1

**inclusive** 56:11 120:3

**income** 109:8

**incomprehensible** 96:19

**incriminating** 85:1,2,10

**independent** 1:10 35:23 96:3

**INDEX** 2:14

**indicating** 121:23

**indication** 43:9

**indicators** 39:1

**individual** 14:19 40:4 65:7 72:25 97:14 99:22 114:18

**individual's** 120:12

**individually** 1:6,7,9

**individuals** 45:25

**Industrial** 5:23

**industry** 93:23

**information** 39:24 48:2,19 49:1 63:4 74:16 85:1,2,3 100:8

**ingested** 99:24

**initial** 3:24 77:8

**initially** 42:25 77:2,6

**injuries** 5:7 100:2

**injury** 62:25 103:18

**innumerable** 65:3

**input** 10:5

**inquiry** 40:22

**inside** 38:7 39:19 74:15,17 85:17,21

**insignificant** 53:25

**instruct** 67:22

**instruction** 93:1

**instructors** 88:13

**insulin** 69:7

**interact** 72:10

**interaction** 39:22 41:17 47:3

**interest** 28:19 43:23

**interestingly** 69:5

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: internal..lifted

**internal** 49:5,6

**International** 21:17 81:16 88:5 117:9

**interpretation** 35:24

**interrupt** 20:15 52:11 55:9

**intervene** 100:24 101:18 104:5,6

**intervened** 102:7

**interview** 85:16

**interviews** 45:15

**intoxicated** 40:6,13 69:4

**intoxication** 50:25 53:21 54:11

**investigation** 22:14 38:18 39:2 49:6,7

**investigator** 45:5,10

**invoked** 83:21

**invoking** 74:11

**involve** 84:21

**involved** 11:4 26:25 41:5 57:4 63:19 83:13 87:25 88:15,16 98:8 107:13

**involving** 5:5,15 60:9

**Iphone** 46:8

**Irritable** 113:20

**Israel** 5:24

**Israeli** 5:24

**issue** 49:4 50:23,24 52:16 53:4,6 54:3 69:10,11,12 75:21 81:14 84:23 95:2 96:7 107:13

**issues** 21:19 52:20,21 53:12 76:7,10 78:4,11 88:15

**items** 6:7,8 18:3 21:7,12,23 25:19 26:2,11,14

---
**J**
---

**Jack** 11:7

**jail** 92:24

**Janice** 1:3 3:13

**January** 78:10 87:20

**jaw** 51:18 52:3 56:8 58:13 59:4,8, 15 102:18,21

**job** 79:17

**jogging** 75:14 83:2

**joint** 88:4

**Jolly** 2:3

**Jose** 1:8 95:22 111:8

**judge** 108:6,15

**judge's** 14:6

**judgment** 10:22 33:10

**judicial** 89:16

**Julie** 2:6 23:23 77:13 111:7

**julie.tyk@wilsonelser.com** 2:9

**July** 1:13,24

**jumped** 61:24

**jury** 108:22

**Justice** 9:13 51:10,13 88:5 93:16

**justified** 18:21 48:5 52:5,7 62:1 63:1 101:4,20

**justifies** 61:8,10

**justify** 54:1 61:7,13,23 62:19

---
**K**
---

**K-a-n-h-a-i** 66:17

**Kanhai** 37:8 66:17

**KEN** 1:8

**kicked** 42:23

**kill** 66:18,22 68:2

**killed** 61:24

**kind** 37:1 39:6,22 40:17 57:8,12 62:23 65:11 66:7 68:8,24,25 73:19 76:9,17 81:22 83:15 99:11 103:13 114:7,10 121:15

**kinds** 82:20 93:23

**knew** 68:11 85:21 101:3,23 113:6

**knowingly** 79:1,7,10,23 80:5,7, 15,25 86:4 87:6 90:20 92:12 94:6

**knowledge** 11:4 75:24 107:6

---
**L**
---

**lab** 115:15

**labored** 91:12

**lack** 47:10 91:22

**laid** 71:24

**Lakes** 2:11

**language** 89:14

**large** 10:22 15:11

**latest** 114:20

**Lauderdale** 2:4

**law** 9:5 10:13,15 11:23 12:17,19 21:18 26:22 30:3 39:5 44:18 54:23 55:7 56:13 57:4,18 60:1 63:11,15,21 68:20 69:19 74:5 78:11 79:2 87:19 88:3,13,19 89:6, 10,14,21 90:4,5,10,21 91:24 93:13,14 107:7 117:19

**laws** 89:15

**lawsuit** 3:12

**lawyer** 11:11 55:10,15,19 63:13

**lawyers** 88:13

**lay** 92:23 107:18

**laying** 91:14 98:24 121:4

**Leah** 37:17

**learn** 35:3

**learned** 38:24 108:6

**learning** 109:6

**leave** 124:21

**left** 16:4 42:8,9

**leg** 95:14

**legal** 1:4,22 55:10 89:9 107:13,23 108:8,11,13

**legs** 94:21 95:15 96:25 98:16 104:10

**level** 50:7 64:24 107:16,17 114:3 115:18

**Lewinski** 70:24 71:4

**liability** 116:21

**lifted** 96:24

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: lifting..minute

**lifting** 95:10

**light** 103:16

**liken** 84:23

**limine** 107:12,22 109:3

**limited** 31:9

**lines** 94:22

**list** 11:19,21,25 12:8 16:11,17
33:3,17 34:14 56:11 120:1,6

**listed** 6:8 9:4 16:16 17:24 26:1,
13,20 115:10

**literally** 98:24 108:15

**litigation** 9:4 28:22 106:21

**live** 95:13

**lived** 99:18

**living** 29:17

**load** 28:11

**lobster** 75:5

**local** 89:16,20

**location** 106:6

**long** 24:23 32:10 46:3,4,5,9
74:14,20 99:9 100:1,16

**longer** 28:19

**looked** 45:19

**lost** 29:1

**lot** 28:6 31:21 33:8 42:10,14
45:22 46:14 47:15 69:15 73:22
74:13 75:4,17 88:9 95:12 118:2
120:25

**Lucie** 1:8,9 3:10,11 17:2 20:13
49:3,9,14 67:19 68:6 80:21 87:11
89:4,9 90:2 109:25 110:5 111:7
113:7 115:16

**lumping** 80:3

**Lynn** 1:20

───────────

**M**

───────────

**M-e-l-v-i-n** 3:23

**M-e-r-i-n-e** 66:17

**M26** 30:7

**made** 14:15 21:16,20,22 36:18

39:12,22 40:22,24 54:17 59:18
78:15 87:1

**Maine** 116:16

**maintain** 30:14

**maintained** 26:3

**majority** 5:16

**make** 8:4 22:11 25:1 29:11 34:5,
15 36:9 39:13 46:15 49:20 68:23
85:4 86:18 97:25 110:1 124:16

**makes** 68:12

**making** 39:24 54:3 66:17 71:8
72:3 96:4

**male** 69:6

**man** 37:11 67:13 96:12

**man's** 37:8

**Management** 8:7

**manager** 41:5 42:6,16

**Mangrum** 1:7 16:22 18:13,19,23
19:3,13,21 20:6,20,22,23 31:21
38:20 50:5 51:22 52:16,25 61:3,
22 67:10,12 79:1,23 81:9 86:24
90:20 94:12,20 96:14,16 98:11
100:23 102:1,2,4,7,13 103:20
104:4,14,19 105:2,5,9,13 120:17
121:18,23

**Mangrum's** 19:2 35:4

**manner** 86:21 98:23

**marijuana** 99:21

**mark** 6:5,13,15 16:5,20 27:1

**marked** 6:11,16 7:4 9:20 26:13
44:17,20,22 118:25 122:25

**Mary** 1:20

**MASCARA** 1:8

**Massachusetts** 99:16 106:24

**material** 106:23

**materials** 6:9 17:1 25:2,5,15,16,
25 27:13,15 34:5,15 44:2 49:1

**math** 27:25

**matter** 4:19,23 11:17 22:20 36:1
39:6 42:20 88:11,18 94:1 99:11,
19,23 103:2,3,23 111:9 113:10
115:9,13

**matters** 4:21 5:5 12:19

**may've** 11:23

**Mcdonald's** 43:20

**meaningly** 79:14

**means** 86:13

**meant** 48:15 101:1 113:1

**Media** 1:22

**medial** 88:23

**medical** 16:23 17:11,20 20:5
39:5,10 43:10,16 52:21 54:19
67:10,11,17,24 68:10,11,17,25
69:11,16 71:15,17,22 72:16,18,23
73:16 75:25 76:2,7,10 77:1 79:5,
21 80:9 83:22,23 85:13 87:4
88:11,12 89:2 90:3,7,23 111:17,
19 112:10,11 115:8,12,16 116:14,
18

**meet** 55:11

**meets** 59:13

**Melvin** 1:16 3:2,23

**memorized** 10:14

**memory** 45:17 122:3

**mental** 43:10 54:18 70:19 74:7
75:20 83:1

**mentally** 40:6,14 43:15

**mention** 29:11 44:7 50:3

**mentioned** 5:10 6:12 10:11 11:9
19:20 21:5 27:3 35:2 37:14 40:24
43:2 44:4 53:2,5,15 66:15 70:3,14
75:1 83:14 84:1 86:3 123:17

**mentions** 70:16

**Merine** 66:16

**metal** 56:16

**Michael** 16:24 17:9

**middle** 3:23

**might've** 39:21 102:21

**military** 8:16

**mind** 20:4,6,7 23:14 81:10

**minor** 53:22,25

**minute** 11:14 23:16 44:4 46:3,9
47:6 63:6 66:12 74:21 94:10
99:19,23 119:7

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                    Index: minutes..opinion

**minutes** 45:21,22 74:20 77:15 93:21 99:18,20,22 106:11

**misdemeanor** 53:21

**missed** 17:10

**missing** 35:20,21

**mistake** 23:1 36:13,20

**mistaken** 53:23

**model** 87:20,22 88:19

**moment** 53:16 55:23 76:24 82:5

**momentarily** 19:18 48:12

**money** 29:25

**month** 14:12 26:9

**months** 14:17

**morning** 3:7,8

**Morristown** 13:23 14:4,25

**mother** 1:3 3:13 113:9

**motion** 107:22

**motions** 107:12 109:2

**motoring** 116:20

**move** 90:16 100:20

**moved** 29:18 30:9

**moving** 32:2 61:12

**MPA** 8:12

**multiple** 81:3

**murder** 14:6 37:23

**must've** 121:11

---

**N**

**naked** 84:10,15

**named** 3:12

**names** 10:14 122:2

**narrative** 95:19,20

**National** 21:18 78:11 87:19 88:3 93:14 117:19

**natural** 76:18 77:14 91:22

**navy** 8:17

**necessarily** 87:23 97:6

**needed** 41:3,7 67:11

**Neeley** 1:3 3:14

**nervous** 37:23

**Newman** 1:6 4:24 16:22 19:6,9 20:24 31:20 38:20,21 39:13 50:5 51:20 52:15 58:23 60:22 61:3,22 64:17 67:9,12,18 68:4,7 79:1,11 86:25 90:19 94:12,19 96:16 98:17 101:2,11,22 102:4,5,13 103:20 104:15,20 120:17 121:11,25

**Newman's** 19:17 59:18 94:11 105:14 121:8 124:1

**News** 21:16 117:23

**Newsletter** 25:12,13

**night** 53:9

**NOD** 2:18

**non-medically** 68:20

**normal** 37:19 71:9 72:5 113:7

**North** 1:12,22,23 4:2,4,6 8:14 13:21 15:4,16 29:18 30:9

**nose** 51:18 52:3 56:8,19 58:13

**Notary** 1:21

**noted** 116:1

**notice** 6:5,7 21:6 25:20 29:7 37:2

**noticed** 81:8 82:1 89:12

**number** 12:4 14:13 21:15 44:7 49:25 50:4 65:3 67:6 78:25 83:19 85:25 90:16 100:21,22 111:13

**numerous** 24:14 65:2 69:3 74:4

---

**O**

**Object** 19:25 121:14

**objection** 26:17 35:11 38:10 45:6 47:16 55:18 60:13,16 63:16, 23 66:11 73:10 76:5 77:10 80:17 82:13 83:4 85:19 86:9 88:2 104:2 109:20 112:15 115:22

**objective** 86:10,11,19,22 87:5 88:24

**objectively** 107:21 108:9

**objectivity** 32:6,8,12

**observe** 40:4 42:14

**observed** 83:20 95:23,25 101:22

**obtain** 109:9

**obvious** 67:7,15 98:19

**OC** 30:7 31:4 53:9

**occur** 94:3

**occurred** 14:17 19:23

**occurring** 101:17

**Ocher** 36:15

**October** 28:20

**office** 11:4 49:15 109:25 110:5

**Office-involved** 22:14

**officer** 13:10,11,13 14:2,7,16 38:17 46:7 62:8 63:11,15,22 64:5, 12,14 65:24 66:3 67:8,16 68:8,14, 21 69:19 71:14 86:14 92:13 95:20 122:17

**officer's** 14:11 30:3 36:6 37:6,10 47:18 86:17 122:23

**officers** 14:10,15 15:6,19 16:1,3, 6 18:25 29:24 37:13,25 39:12 40:17 41:23 43:24 46:12,24 48:20 50:8 51:4 55:13 56:4 60:1 63:1 64:8,25 65:6 68:23 69:3,7,9 71:11 73:25 74:6 86:20,24 87:3,10 88:25 91:5,6,8,24 92:6 94:15 95:20 97:22 100:3 101:12 104:1 107:17 122:20 123:3

**Offices** 101:15

**older** 33:16 91:20

**oleoresin** 30:6

**operate** 116:18

**operates** 89:14

**operation** 14:14

**operations** 5:18,19 23:3 116:7, 10,17

**opine** 49:13

**opinion** 37:15 49:25 50:4,14 53:17 56:2,4 61:4,16 62:6 64:4,9, 21 66:8 67:6 68:18 71:23 76:23 77:6 78:25 80:6 85:15,25 90:16 96:22 100:21,22 101:9,10 107:20, 23 108:11 111:13 112:6 122:6,12, 15,17 123:24

**opinions** 6:10 16:13 17:4 18:11, 24 19:23 20:2,9 27:5,8 29:8 33:23 34:2,9 36:4 37:5,6 46:11 48:10, 14,15,16,23 53:7 66:15 107:11,15 108:2,18,25 109:18,23 112:2

**opportunity** 17:18,25

**opposed** 54:18 73:22 74:3 80:16

**opposite** 19:6 97:7

**order** 30:14 61:16 125:6

**ordinances** 89:16

**organization** 116:16

**original** 11:13 93:10

**originally** 41:6 42:25

**Orlando** 2:8

**outcome** 109:2

**outline** 29:22

**outweighs** 85:3

**overheating** 70:21 75:10,13

**overpower** 72:12

---

**P**

**P.A.** 2:3,10

**p.m.** 78:22 125:16

**pacing** 37:23

**pages** 24:10,17,19 25:23 34:19

**paid** 29:25 105:23

**Palm** 2:11 10:20

**paper** 21:19 26:24 78:4,11 117:20

**papers** 23:11 118:8

**paragraph** 36:15 81:13 122:11

**paragraphs** 29:12

**paramedic** 95:22,25 116:24 121:2 124:2

**paramedics** 96:4

**paramedics'** 98:9

**paranoia** 70:23

**paranoial** 37:18 38:25

**paranoid** 81:19,22 82:21

**parking** 42:10,14 45:21 47:15 73:22 74:13

**part** 6:6 17:10,22 19:3 28:19 36:13 46:17 48:9 50:15 56:15 59:18 65:21,23,25 87:6 92:1 93:15 94:12 101:9 105:15,16 112:1 124:13

**participated** 102:4

**parties** 26:25

**parts** 16:9

**passed** 29:2

**past** 31:23 32:19,25 107:24

**patrol** 54:22 77:4,5 97:20

**pending** 110:11

**people** 40:22 41:5 43:19 77:1 83:12,16 85:7,9 88:11 89:7 93:4 98:19,21 100:6,14 124:15

**pepper** 30:6,12

**peppered** 30:15

**perceived** 64:6 86:20 87:3 122:18

**percentage** 36:5 109:8 114:19

**period** 12:1 13:13 32:21 35:22 36:11,14 93:9 95:18 99:9

**periods** 13:25

**permanent** 100:2

**permit** 30:4

**person** 31:14 39:7 40:6,13,14 43:22,25 48:6 52:18 56:21 57:10 62:7 64:11,13 66:1,4 68:1,15 78:1 79:3 84:9 85:5 91:11 92:1,8 94:15 97:21 100:4,15 102:24 107:18 113:24 114:13

**person's** 58:5 91:17 92:6 107:19 120:9

**personal** 11:4 64:10

**personnel** 4:21 39:5

**persons** 72:1 89:1

**perspective** 28:5

**perspectives** 89:20

**Phillips** 28:6

**philosophies** 89:22

**phone** 41:4 45:24 46:21 120:20 125:5

**photocopy** 22:1 124:12

**photos** 44:10,18

**physical** 81:22 82:22

**physician** 112:11

**physiological** 70:20

**physiology** 5:6 48:8 65:23,25 90:22 91:3,9,10 92:5 93:18 94:7, 25 99:14 122:6

**pick** 96:17

**pictures** 99:17

**pile** 103:3

**Pine** 2:7

**place** 83:15

**places** 94:23 120:4

**placing** 40:20

**plaintiff** 4:14 32:20 33:8 108:12 110:4

**plaintiff's** 10:12,22 33:6

**plaintiffs** 1:4 2:2 32:17

**plan** 39:24

**play** 37:4 91:13

**pleasure** 125:9

**plenty** 25:14 40:21

**point** 13:9,15 30:2 35:7 38:3 52:23 67:3,21 69:6 71:16 72:7 77:14 83:18 95:21 96:15 97:10,11 100:3 102:1 109:10,16 123:6

**pointed** 57:15 81:24

**pointing** 36:20 62:22

**points** 119:22

**police** 4:16,20,22 5:16,18 10:20 13:10,11,13,16,18,19,21,22 14:1, 2,4,7,9,11,14,16,24 15:3,6,16,19, 25 16:7 21:18 30:5 32:11,14,23 36:2 38:17 44:8 71:18 81:16 83:13 88:6,7 92:24 98:10 99:4 107:7,18 108:16 117:8,9

**policies** 14:15 49:14 89:19

**policing** 14:13 31:25 116:23

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: policy..quickly

**policy** 21:18 25:11 78:11 87:19, 20,22,23 88:4,19 89:3 110:4 117:1,19

**political** 89:20

**pone** 97:8

**pool** 96:2 121:4 123:17,25 124:3

**population** 115:4

**portion** 25:20 37:15 60:9 68:22

**posed** 51:3 123:4

**posing** 51:1

**position** 31:15 39:19 48:7 52:19, 24 53:11 66:1 91:12 93:5,20 97:4, 6,8,16 98:1,15 100:5 104:6,11

**positional** 24:12 66:9 92:18,19 93:6,11,17 97:12

**positions** 92:20

**possession** 42:18

**possibility** 70:4 75:15 93:16

**posterior** 77:4

**potential** 116:21

**potentially** 58:15

**pounds** 52:25 96:14 98:12,13 103:14 121:18,20,24,25 122:1,4

**practice** 49:8,19,21 89:7 90:10 109:22

**practices** 107:8

**preliminary** 17:4 36:4 38:18 39:2 48:14,15,17,21 49:24 50:4 67:6 78:25 85:25 90:16 100:21,22 109:23 111:13

**preparation** 27:14 45:18

**prepare** 9:20

**preparing** 9:24,25

**prerogatives** 89:21

**presence** 115:24

**present** 3:25 9:5 11:11 12:18 38:11,13 65:7 86:24 96:12 101:16 104:9

**presented** 67:9

**pressure** 92:4 93:4 98:5,7 100:15 103:14,19

**pretty** 95:5

**Prevention** 22:14

**primarily** 26:8 45:22

**primary** 88:24 113:8

**prints** 103:11

**prior** 80:22 90:11

**prisoners** 92:22

**private** 45:5,10

**privileged** 26:23

**probable** 84:23 85:4 107:14

**problem** 25:4 42:24 43:10 48:4,8 69:7 82:2

**problematic** 31:16

**problems** 40:19 83:1,2 88:7

**procedures** 4:16,20

**proceeding** 10:16 110:10

**process** 109:7

**produced** 25:7

**product** 123:21

**profession** 89:6,11 90:11 93:13, 14

**professional** 68:20 117:8

**profuse** 81:19 82:21

**program** 58:18 79:19 105:5

**programs** 57:21 91:7 93:1 101:16

**prohibit** 90:1

**prohibited** 90:4

**projects** 93:23,25

**prominence** 58:11

**prone** 31:15 48:6 52:19,24 53:11 66:1 92:23 93:5,20 98:1,15 100:4

**pronounced** 16:21

**prop** 75:6

**proper** 90:13

**proprietor** 9:11

**proprietorship** 9:12

**protect** 88:25

**protocol** 39:6 72:8,9,14,19 73:15,19 74:11 83:21 89:5,10,13 94:2

**protocols** 36:2 38:2 74:7

**Provide** 29:8

**provided** 16:25 27:11 34:17 44:17 45:9 49:1 80:21,24 87:15 115:1

**provider** 88:24

**proximity** 5:7

**public** 1:21 8:12 13:22 14:24 50:25 69:10 116:20

**publicly** 69:8

**published** 117:8 118:1

**Publishing** 21:24

**pull** 57:16

**punctuation** 35:18

**Purdy** 2:3

**purposes** 34:4

**pursuant** 1:19

**pursuit** 5:14 116:11

**push** 66:2 95:9

**push-up** 65:17

**put** 10:6,8 26:24 35:23 36:5,15 42:22 88:19 90:11 92:20 93:20 97:4 98:10,13 100:4 108:15 113:21

**putting** 36:14 93:4

## Q

**qualifications** 29:8,23

**qualified** 5:3,11 30:4 79:13 107:7

**question** 4:17 8:11 11:8 12:12 17:23 23:5 27:10 29:16 33:12 41:12 43:17 51:6 59:17 60:2 67:14 69:11 77:19,21 78:5 79:6 80:19 81:4 86:20 102:25 123:12

**questions** 40:4,16 96:21 110:9, 20,22 111:2,3,8 118:12,15 120:15 122:14 123:9 124:5,6

**quickly** 72:12

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

**quote** 35:17,22 36:12,14

**quotes** 35:18,22

_____

**R**

**R-h-e-y** 93:10

**race** 5:14

**raised** 81:14 86:14,18

**Raleigh** 1:12,23 4:2,12 106:6

**ramifications** 90:23

**ran** 40:21

**Randolph** 35:17

**ranged** 5:13

**ranges** 24:22

**ranging** 33:15

**ransom** 37:23

**rapid** 88:22

**rate** 114:18 115:4

**reaction** 60:24 91:22

**read** 35:3 42:1 56:11 59:23 68:22 73:13 90:24 93:9 100:23 101:5 119:20 122:20,24 124:7

**reading** 18:12 20:1 42:5 44:13 48:21 70:25 71:2,3 80:20

**ready** 39:3 81:11

**real** 39:25

**reason** 34:24 56:15,17 83:16 98:19 106:9 107:11 108:3 125:12

**reasonable** 64:5,12 65:6,11 67:7,16 68:13 73:24 74:12 86:24 87:2 108:10 122:17

**reasons** 30:10

**recall** 11:5 13:2 15:21 38:16 41:18 42:15,19 45:20,22 46:16, 21,22 47:1,8,12,13,17,18 52:23 54:17 74:22 79:19,23 81:8 84:7 118:20 120:15,19,23 121:8,23 122:14,23 123:3,8

**receive** 18:2,4 105:19 115:8

**received** 8:7,12 16:18,23 26:7,8 33:9 34:5 48:25 51:25 52:1 56:5 67:19 79:21 87:10

**receives** 92:16

**receiving** 48:18

**recent** 93:3

**recently** 11:21 32:22 79:18 84:3 87:13

**recipe** 97:11

**recognize** 37:25 38:1 39:11 69:1,9 91:16,25 118:8

**recognized** 36:2 57:19 60:1 74:1 87:3 89:6,10 90:10 92:21 102:23 105:1

**recognizing** 20:4 69:15 88:17

**recollection** 11:22 12:21 47:24

**recommend** 97:17

**record** 3:9,22 6:2,3,4 22:12 78:21,22 90:19 100:22

**records** 112:10 115:8

**recovery** 97:4

**recruit** 51:9 56:5 57:16 79:19 105:4

**Redirect** 2:17 123:15

**reduced** 28:11

**refer** 7:16 24:8 70:13 98:21

**reference** 7:5 22:17 35:16 37:2, 17 45:13 58:2 66:15,17 78:16 123:17

**referenced** 6:9 19:21 21:7 46:6 18:19

**referred** 19:15 55:24

**referring** 19:13 20:17 21:2 32:1 57:25 58:10 66:19,21,23 78:9 82:17 87:7,8 91:2 98:4 118:22

**reform** 13:20

**refresh** 11:21

**regard** 4:23 24:8 53:6 60:8 80:12 94:5,9 116:19 123:24

**region** 77:4

**regular** 14:7,11 106:1

**regularly** 113:25

**regulations** 89:16

**reinforced** 18:12 20:2,9

**related** 66:8 95:3

**relation** 49:15

**relevant** 20:11 23:4 33:23 34:9 35:1,25 109:18 110:10

**reliable** 117:5,13,21,25

**relied** 21:7,8,12 24:13

**religious** 5:14

**rely** 27:4 48:1 50:13

**relying** 41:23 47:23 65:12 94:4

**remain** 17:4

**remember** 12:22,25 45:23 46:3, 17 76:6,10,12,20 104:21

**remembrance** 42:5

**render** 55:10 112:6

**renew** 30:10

**repeat** 69:24

**rephrase** 41:13

**report** 2:19 5:2 6:8,9,12,14,19,22 7:6,12 9:20,24,25 10:1,6,9 11:19 16:11 17:16,19 18:1,10,18,24 19:16 20:10,12 21:8,13,14 22:16, 25 23:2 26:14,15,20 27:14 28:8 29:7 32:2 33:19,24 34:12 36:20 44:5 48:13,17,22,23 49:25 53:2 54:7 55:23 58:2 62:17 63:6,8,18, 25 66:14 70:13 78:14,16,17,24 81:12 82:17 90:17 91:2 95:5,19 99:4 100:21 102:2 103:11 106:15 111:9,16,22 112:14,21 117:1,19 118:24 119:8 122:8,25

**reported** 38:8

**reporter** 1:21 3:20 6:4,13 59:10 60:15 69:24 99:16 117:11,15 124:9,12,15,23 125:4,8,11,15

**reporting** 95:20

**reports** 18:25 19:1 36:7 37:13 39:14 44:8 46:13 96:5 98:11 112:10,19 115:15

**represent** 3:10 111:7

**representative** 17:2 20:13 49:3, 23 109:25

**request** 107:1

**required** 11:25 74:6 89:5

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: requirement..sheriff's

**requirement** 89:9 116:17

**research** 93:23,25

**reserve** 8:25

**reserves** 8:19,20

**resistance** 91:25

**resisting** 51:4,5 65:24 66:3 92:2, 3

**resource** 89:23

**respect** 57:5 103:5

**respond** 38:17

**responded** 43:24 76:15 86:21

**responding** 68:5

**response** 25:19 61:8 116:11

**responsibility** 72:14 100:24

**restrain** 91:11

**restrained** 62:7 82:6,12

**restraint** 39:8 53:9 66:5 81:24 82:10 92:7

**result** 57:12 89:3 101:24 103:17

**results** 115:20

**retained** 4:14 10:12,15 11:6,12, 23 12:17,19 28:21 29:19

**retainer** 27:16 105:19 106:19,24 107:2

**retention** 36:15,21

**retire** 27:22 28:25 29:5

**retired** 14:17,21 16:1 30:3 32:23

**retirement** 109:11,12

**retract** 93:19

**retracted** 93:12,22

**revealing** 93:6

**reverse** 32:14

**reversed** 122:2

**review** 8:2 17:25 18:6,9 27:13 34:4 45:18 46:16 48:19 113:9

**reviewed** 7:23 16:13,14,18,19 17:3 25:16 34:16 44:2 45:16 46:10

**reviewing** 19:23 112:21

**revision** 19:22

**rewards** 37:24

**Rhey** 93:9

**ride** 95:14

**riding** 38:21

**rights** 86:5

**risk** 90:22 100:7

**road** 110:12

**robbery** 14:17

**Robert** 28:6

**Robinson** 1:7 2:7 16:22 20:24 31:21 38:21 50:5 67:10,12 79:1, 16,17 80:12,13,22 81:5,20 86:25 87:11 90:20 94:13,17,20,21 95:13 96:16 98:17 100:23 101:21,22 104:4,9

**role** 37:4

**Rosario** 1:9 95:22 99:1,4 111:8

**roughly** 122:1

**royalties** 21:24

**rules** 12:1 26:23

**rulings** 89:15

**run** 74:10 100:7

**runs** 95:6

**Ryan** 16:19

## S

**safety** 13:22 14:24 42:20 51:3

**Samantha** 16:22 37:24 42:12

**Scarola** 2:10 11:7 44:18,22

**scenario** 69:23 72:22 73:17,20 84:17

**scene** 39:6 45:16 69:20 72:9,11 73:25 74:3,8 77:2 95:16,23 101:16 121:3

**schedule** 14:12

**scheduled** 12:9

**Science** 21:15 25:12 71:4 83:7 117:23

**scoops** 43:20

**screw** 42:18

**screwdriver** 42:22 73:23

**Searcy** 2:10 10:13 11:5,23 12:17, 19 26:22 44:18,22 45:9

**seat** 54:22 77:5 92:24

**seated** 4:3 97:15,22

**second-degree** 53:21 55:17

**seconds** 46:9 47:7

**security** 5:20,23,24,25 6:1 9:13 29:19 109:13

**sedation** 118:9

**sedative** 72:15,16 83:24

**seek** 71:15,17

**seeking** 43:25

**seized** 41:20 46:7

**self-explanatory** 58:17

**semantics** 58:9

**send** 29:21

**sends** 28:7 124:24

**sense** 14:22 34:15 68:12 70:19 71:8 72:4

**sentence** 29:12 62:17 64:20

**separate** 38:22 101:2

**September** 29:13

**served** 51:12

**services** 116:5,6

**set** 64:14 97:5

**settled** 10:21 12:9 33:9

**severe** 91:18

**severity** 50:23 54:3

**sex** 5:13

**Shahnasarian** 16:24 17:9

**shake** 102:6

**Shannon** 35:17

**share** 76:3

**sheet** 26:24

**sheriff** 1:8 3:10

**sheriff's** 3:11 17:2 20:14 29:20

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: Shipley..stop

45:3 49:4,9,14,23 67:19 87:12
90:2 109:25 110:5

**Shipley** 2:10

**shit** 35:25

**shock** 103:9,12

**shocked** 30:12,15

**short** 34:19 45:24

**shortly** 29:1 65:14

**shot** 61:24 86:15 97:2

**should've** 23:2,7 35:22 36:11
39:16,20 40:8,24 52:1 61:23
68:16 71:22,25 72:1 77:8 81:6
82:7 85:16 96:24 101:3,21

**show** 32:12

**showed** 46:16,23 114:22

**showing** 20:4 47:13

**shown** 39:8

**shows** 32:24 51:11

**sic** 113:19

**side** 10:12 19:11 33:6 51:17 52:2
56:8 58:25 59:1,2,3,4,5,7,15
85:12 96:18 97:5 102:15,17
108:10,12

**signals** 116:19

**significant** 43:4 48:1

**significantly** 31:13

**signs** 67:22 70:11 80:21 84:5
89:8 113:8

**similar** 50:9 64:5,25 122:18

**simple** 39:25 40:3 62:20 63:4,9
85:14

**simply** 29:17 62:22 73:21 90:9
91:6,11

**Sinclair** 95:25 99:1,6 124:2

**sir** 3:7 16:15 21:9 22:23 100:20
118:17,21 122:10 123:10

**sister** 14:6

**sit** 97:5,24

**site** 106:2

**sitting** 25:23

**situation** 66:7 69:18 70:2,9
76:25 79:6 85:14 87:2,4 90:14
92:4 97:14,18

**situations** 70:6 88:10 116:22

**skills** 14:13

**skull** 57:12

**slam** 103:23

**slid** 95:8

**slip** 65:16

**smoked** 99:20

**Smoking** 74:25

**snapping** 99:17

**so-called** 41:21 48:8 86:11

**social** 109:13

**Society** 5:22

**socket** 120:7,12

**soft** 60:10

**sole** 9:11,12

**somebody's** 43:14,15 99:13

**sort** 27:2 36:7 73:16 87:22
116:20

**sought** 71:22

**sounds** 7:8 47:22 103:22

**source** 82:18

**South** 8:8,10 28:6

**SOUTHERN** 1:1

**speaking** 4:9 23:23 98:23

**speaks** 79:24

**special** 1:10

**specialist** 5:23

**specialized** 88:14

**specific** 13:3 29:8 51:15 58:12
89:19 94:4

**specifically** 6:9 19:3 46:4 54:9
58:2,22 76:21 81:2,24 102:12,19
105:4,14 111:13

**spell** 3:22 5:2 72:14

**spelled** 72:19 91:4 92:10

**spent** 106:8,18

**spot** 29:11

**spots** 58:5

**spotted** 14:18

**spray** 30:6 31:4

**sprayed** 30:13,15

**St** 1:8,9 3:10,11 17:2 20:13 49:3,
9,14 67:19 68:6 80:20 87:11 89:4,
9 90:2 109:25 110:5 111:7 113:7
115:15

**stabbing** 73:22 74:10

**stabilized** 58:5,14 61:19

**stains** 124:1

**stand** 96:17 97:7

**standard** 50:16 86:6,7,12,23

**standards** 51:13 67:14 100:25

**standby** 72:23

**standing** 73:22,23 74:12 97:16

**standpoint** 79:14

**stands** 17:12

**start** 40:17 47:3 74:11 107:2

**started** 20:16 28:3 32:22 53:18
94:14 107:4

**startling** 59:23

**state** 1:22 3:21 4:4,6 8:13 12:25
13:3,4 29:23 50:3 55:17 83:12
89:15 97:13 118:7

**statement** 47:19

**statements** 36:7 37:7,10 42:2
44:9,10,11,19 45:9 47:25 94:23
96:4 98:10

**states** 1:1 57:15 115:5

**Statute** 55:16

**stay** 97:15

**steady** 96:18

**Stephens** 10:19,22 11:3 12:6,13

**sticks** 53:10

**stomach** 66:1 91:15 94:16 97:9
98:14

**stood** 39:20 96:25

**stop** 28:17 92:2 100:24 101:18

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: stopped..Tavares

102:4

**stopped** 27:22 28:2,9

**store** 38:7,23 40:3,23 41:5 42:6, 9,16 47:11 85:9,16,22

**straight** 27:1

**strategies** 89:22

**Street** 2:7

**strength** 70:22 81:23 82:22 95:11,12

**stricken** 107:23

**strictly** 45:17

**strike** 18:15,20 19:7,9,21 35:5 51:12,22 56:14,16,21 57:1,8 58:6, 14 59:20,21 60:2,19 61:16 62:4 64:22 65:11 101:23 102:3,8 103:3,14 104:15,20,22,23 105:2, 9,14 119:5,18,23 120:2,11,16

**strikes** 19:16 31:13 37:7 49:10 51:15 52:2,9,14,15 53:4,10 55:22, 25 56:3,6,7,17 57:2,20 58:3,24 60:8,23 61:13 64:17 101:2,10 102:23 103:15,16,21 104:13 105:2 119:13 121:13 123:22

**striking** 64:21

**striping** 84:15

**strips** 84:10

**stroke** 29:2

**strong** 103:2,20

**struck** 19:4 102:13 105:15,16

**struggle** 5:6 39:7 45:21 46:17,24 48:8 65:24,25 83:13 90:22 91:3, 10 92:1,6 93:18 94:7,14,25 95:12 96:6 99:15 122:6

**struggling** 92:7 95:24

**studies** 93:4,5,8 114:20,22,24 115:2

**subdural** 57:11

**subject** 4:19 22:20 71:14,19 88:11,18,23 89:2 90:23 95:23 96:1 106:8 124:2

**subjective** 86:7,17 87:1

**submitted** 82:1

**subpoena** 21:11

**subsection** 56:25

**substantially** 46:11 99:12

**sudden** 89:3 93:17 94:3

**sued** 109:15

**suffer** 100:1

**suffering** 69:6 78:1,7 99:24 112:12 114:14 115:5

**sufficient** 83:18 84:25

**sugar** 69:7,10

**suggesting** 61:21

**Suite** 1:23 2:3,7

**summarized** 33:23

**summary** 33:9,20 34:6,11,14,22, 24 35:12,23

**summary's** 34:13

**summed** 77:1

**Summer** 2:2 3:9 77:11 125:5

**summer@purdylaw.com** 2:5

**summoned** 71:25 77:9

**Sunrise** 2:3

**super** 95:11

**superhuman** 70:22

**supplement** 48:22

**supplemental** 48:22 96:5 98:11

**support** 20:2 37:6

**supports** 37:12

**suppose** 25:1

**Supreme** 50:18

**surpassed** 106:17

**surveillance** 47:10

**suspected** 89:2

**sweating** 38:25 75:13 81:19 82:21 112:23

**sweaty** 37:19 68:3 72:6 85:6 113:4

**sworn** 1:20 3:3

**symp** 88:17

**symptom** 75:3,4,12 81:25

**symptomatic** 89:1

**symptomology** 82:18

**symptoms** 20:4 37:22,24 39:4,7 40:7,15 52:20 67:23 68:9,11,16, 19 69:1,16 70:11,16,17 71:5,14 72:8 74:2 75:2,17 79:3,13 80:9, 11,12,22 81:3,5,18 82:20 83:6,8, 10,19 84:2,8,22 85:8,12,13 86:23 87:12 88:17 90:3 111:24 112:9,22 113:3,15 118:4,10

**syndrome** 78:7

**system** 106:10 115:24

---

**T**

**T-u-c-k-e-r** 3:24

**table** 87:9

**tabs** 106:11

**tactics** 30:6 31:9 51:11 56:25 88:13

**takes** 87:8 100:1 106:13 108:8

**taking** 28:2 34:12 40:17 53:6 84:14 96:7 100:14

**talk** 31:17 33:1 38:19 40:1 48:12 66:12 77:25

**talked** 20:3 38:23 39:16 71:6,10 72:1 74:1 83:8 108:6

**talking** 6:18 7:8 11:15 14:14,23 30:8 31:24 37:1,23 46:20 52:14 56:14,20 60:12 66:24 67:1 68:1,2, 5 70:10 71:10 73:15 78:9 81:13, 20 85:6 86:6 104:4 110:12

**Tallahassee** 13:17,18 14:9,16 15:25 16:7 109:13,14

**tap** 103:3,23

**target** 51:16 58:12 119:17,23 120:1

**targeted** 61:18

**taser** 10:21 103:6,8

**tasers** 30:7,24 53:10

**taught** 51:12 57:20 91:6,8,24 92:14 94:15,18 98:19 101:13,15 104:3

**Tavares** 1:3 3:13 17:8 36:21 79:4 101:3 111:23 112:11 115:9

Case 2:16-cv-14413-RLR   Document 136-1   Entered on FLSD Docket 10/27/2017   Page 148 of 210

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                    Index: Taylor..Tucker

**Taylor** 37:11

**teach** 79:13 91:8

**teaching** 29:22

**tearing** 70:22

**Techniques** 56:25

**Technology** 93:15

**tecum** 6:6 21:6,11 25:20

**teleconference** 3:17

**telling** 7:20 49:20 55:22 82:5 89:24

**temperature** 103:8

**temple** 19:11 51:17 52:2 56:7,18 58:12 59:3,14 102:17,21 105:3,11

**tend** 28:22 92:6

**Tennessee** 13:23 14:4,25 29:18, 20,23

**term** 73:11 114:1

**term's** 19:16

**terms** 8:6 9:3 10:5 12:16 19:2 31:19,25 39:18 43:17 69:18 77:3 80:6 83:11 85:22 95:1 99:11 100:10,15 106:18 108:16 110:10 123:21 124:10

**test** 50:18

**testified** 3:4 12:5 33:10 60:23 112:4 120:3 123:7

**testify** 12:7 19:3

**testifying** 96:4

**testimonies** 37:4

**testimony** 12:18 18:22 19:2,22 20:11,12 21:3 27:7 32:17,20,25 36:6 46:12 47:19,23 48:19 49:2, 12,22 52:6 56:24 59:16 62:15 65:13,14 74:22 79:12 84:20 102:16 109:24 122:23,24 123:8

**testing** 115:21

**That'll** 124:25

**theoretically** 108:8

**theory** 92:17

**thereof** 75:22,23

**thing** 6:19 7:8 16:12 23:5 27:2 36:8 37:11 42:11,12 57:17 69:12

71:13 92:17,20 94:1 116:20 123:25

**things** 28:17 31:22 34:14 38:16, 25 39:15 40:10 49:9 68:3,7,8 72:6 75:3,4,18 92:2 94:3 96:9,10 98:22 99:20 103:7 107:25 108:14 109:5 113:4

**thinking** 69:4

**Thomas** 95:25

**thought** 19:7 42:19 54:16 76:24

**thousands** 25:23

**threat** 51:2 64:6,13 86:17,21 122:19 123:5

**threatening** 61:6

**three-quarters** 34:20

**throat** 51:18 52:4 56:9,19 58:13

**Ticker** 81:4

**till** 109:10

**time** 7:23 13:9,14,25 14:22 15:8 16:1 25:3 30:5 32:19,21 35:7 38:11,13 40:22 45:19 52:22 53:1 57:6 64:7 66:4 67:16 69:14 74:21 83:6 93:9 99:9 106:18 110:19 112:2 118:1 121:21 122:20

**time-sequenced** 99:17

**times** 5:3,11 10:18 12:16 46:14 64:22 107:6,9 108:2,4,25

**tip** 58:4,11 59:21 60:3,4,9,10,20, 21 61:20

**Tips** 117:24

**titled** 7:12 17:7 48:16

**today** 3:14,20 4:9 6:12,15 21:9 23:12 25:6,18 26:1,12 43:17 48:24 105:24 106:6,11 107:25 109:19

**today's** 6:5

**told** 12:13 15:24 16:11,25 18:3,6 33:2 48:17 55:23 63:13 65:12 82:15 87:9 102:11 105:12 107:5 108:24 109:22

**tools** 31:25

**toothpick** 86:14,18

**top** 9:14 32:5 58:20 64:4 95:23 96:1,6,8 98:9,22,25 99:8 114:23

121:3

**topic** 32:5 92:25 109:17

**Toronto** 28:20

**totality** 50:21 67:8 68:14

**totally** 45:11 46:12

**touch** 73:4

**touching** 59:2

**track** 115:2

**traffic** 14:7

**train** 29:19 69:9

**trained** 5:24 37:25 57:6 68:7,20 100:3,10

**trainer** 9:5

**training** 24:13 30:11 51:9,14,25 56:5 57:16,21 58:1,10,16,18 60:8 67:14,19 69:15 70:11 79:2,8,9,10, 11,19,21 80:8,21,25 86:4 87:7,10, 15 90:21 91:5,7 92:15 93:1 94:6 100:9,25 101:15 102:19 105:5,6 111:19 116:5,6,10,15 117:24

**transcript** 125:6,12

**transfer** 88:23

**transpired** 41:10

**transport** 72:18 83:24

**transporting** 92:22

**travel** 106:2

**traveling** 4:25 26:8 62:3

**treat** 69:11 79:4 85:13

**treated** 68:17 79:5

**treating** 69:16 80:8

**treatment** 54:19 74:7

**trending** 33:7

**trial** 12:6,7 28:20 32:20 33:11,17 105:25 106:1,2 109:5

**trier** 108:22

**trouble** 94:16

**true** 33:4 34:3 57:1 69:12 70:6 102:20 103:21 112:5

**Tucker** 1:16 3:2,24 4:1 6:14 24:6 25:6 27:19 30:24 32:3 38:5 39:17 45:8,14 50:1 54:7,20 56:2 57:24

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017

Index: turn..work

60:7,22 63:25 68:18 69:17 71:23
75:16 78:24 86:1 90:15 93:3 94:5
96:22 98:21 100:9 101:6 102:10
103:4 105:17 109:17 110:3,25
111:6 118:16 123:13 124:11
125:1

**turn** 29:6 48:13 118:24

**turning** 63:25 88:10

**Tyk** 2:6,16 23:11,14,18,20,25
24:4 77:11,13,18,22 110:25
111:3,6,7,12 117:13,16,17
118:12,14 124:6

**type** 5:20 10:2 31:19 116:14

**typical** 72:19 106:14

**typically** 5:6 12:2 38:18,22 40:16
48:1 49:16,17 57:11 109:1,6
116:22

## U

**U.S.** 50:18 88:5 93:15 117:8

**ultimately** 27:8 103:22

**Um-hmm** 24:4 114:16 117:16
124:9

**unarmed** 64:11,13 67:13

**unaware** 115:12

**understand** 4:13 5:20 6:13,18
7:20 10:11 13:15 31:19 38:5
39:17 41:12 43:24 45:13 52:13
53:3 56:23 58:10 62:2,4 71:23
76:23 80:18 86:5 95:1 110:18
122:24

**understanding** 4:15 38:12
40:10 41:8 45:24 47:22 49:12
61:15

**understood** 43:5,6 72:20

**uniform** 14:11

**unique** 89:15

**United** 1:1 115:5

**University** 8:8,9,13

**unreasonable** 50:7 107:21

**unrelated** 75:18

**unusual** 70:17 71:14 81:23 82:10

**update** 19:22

**updated** 16:17 30:1,5 124:22

**upper** 94:12,19,20

**upset** 113:20,21

**Upwards** 107:9

**usage** 30:24 31:2,8

**utilize** 58:4

**utilized** 31:20

**utilizing** 58:11

## V

**varied** 89:23

**ve** 43:11

**vegetative** 83:12 97:12

**vehicle** 5:19 23:3 116:7,10,16

**version** 7:23 35:19 37:12

**versus** 4:24 86:7 103:3 113:24

**veteran** 96:15

**vice-chairman** 51:13

**video** 3:16 16:23 17:6,7,8,19
41:20 44:19 45:25 46:5,13,19,21
47:10,13,17,25 120:20,24

**video/phone** 44:9,19

**videos** 45:13,14,15,16,20 46:16

**videotape** 47:3

**viewed** 120:20

**violated** 79:1,8,10,23 80:7,25
87:15 90:20 92:12 94:6

**violating** 86:4 87:6

**violation** 54:23 55:15 67:13
100:25 101:17,18

**violent** 78:3

**visual** 116:19

**vitae** 7:13,16,24 16:10 116:3

**Vitale** 2:10,16 19:25 26:17 35:11
38:10 45:6 47:16 55:18 60:13,17
63:16,23 66:11 73:10 76:5 77:10
80:17 82:13 83:4 85:19 86:9 88:2
104:2 109:20 111:1,5 112:15
115:22 118:15,18 123:9 125:3,4,
7,10,14

**Volume** 51:10

**voluntary** 30:16

## W

**Wade** 16:20

**wait** 39:23 49:21 111:4 119:7

**waited** 39:20

**wanted** 16:12 25:18 31:19 36:9
45:12,13 80:11 124:17

**wanting** 23:17

**warning** 93:16

**warp** 75:6

**watch** 17:18

**water** 77:17

**Wayne** 27:1 42:11

**weapon** 62:23

**weapons** 61:24 63:9,19

**Wednesday** 1:24

**weeks** 79:17

**weigh** 91:20 122:4

**weighed** 98:12 121:20 122:3

**weight** 85:12 91:17 92:3,7 93:20
95:3 97:10 98:2,4,25 100:10
121:17 122:5

**weights** 99:8

**well-established** 38:2

**West** 2:11 10:20

**witness's** 35:24

**witnessed** 38:15 41:10,16,22

**witnesses** 35:23 37:3,4 39:15,18
41:15 42:2,3 96:3 108:21 120:20

**wondering** 25:17 35:19

**wooden** 56:16

**word** 20:16 30:23 47:10 75:1,11

**worded** 21:8

**words** 73:7,11

**wore** 14:11

**work** 9:16 13:4 17:22 32:23 83:23
88:18 106:14 109:9

TAVARES DOCHER vs. CHRISTOPHER NEWMAN
TUCKER, MELVIN on 07/12/2017                                    Index: worked..Zackary

**worked**  14:5 28:6 106:11,12

**working**  14:15 16:7 27:19 38:7
 39:18 109:11

**worry**  107:25

**would've**  8:1 10:2 30:15 38:24
 45:2,19 50:8,25 53:20 64:25 67:7,
 15 68:9,15 71:6,10 74:14 80:13
 87:3,25 99:9 107:15,17,20,22

**wow**  72:7

**wrapped**  75:6

**write**  106:14

**written**  111:9 112:17

**wrong**  102:7,8

**wrote**  102:2

———————————————
                    **X**
———————————————

**X26**  30:7

———————————————
                    **Y**
———————————————

**year**  12:1 14:20 28:3,10 96:15

**years**  5:17 6:1 8:18,19 12:3
 13:16,19,20,22,24 15:9 24:14
 28:18,21 32:19,25 33:3,13 49:17
 51:13 57:6,18 69:2,9 72:20 90:12
 91:6 92:21 93:2 100:4 103:1
 106:13,20,25 108:25

**yesterday**  16:17 48:25

———————————————
                    **Z**
———————————————

**Zackary**  37:11

# ERRATA SHEET

F.R.C.P. RULE 1.310 PROVIDES, IN PART:

(e)"... Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

| PAGE/LINE | CHANGE/CORRECTION | REASON |
|---|---|---|



I, MELVIN TUCKER, do hereby certify that I have read the foregoing transcript of my deposition, given on 7/12/2017, and that together with any additions or corrections made herein, it is true and correct.

MELVIN TUCKER - Deponent

Docher, Tavares vs. St. Lucie County Sheriff's Office, 562016CA001430(OC)

# EXHIBIT

# A



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TAVARES DOCHER, by and through                            CASE NO.: 2:16cv14413
JANICE DOCHER-NEELEY, his mother
and legal guardian,

        Plaintiffs,

vs.

CHRISTOPHER NEWMAN, individually,
CLAYLAN MANGRUM, individually,
CALVIN ROBINSON, individually, WADE
COURTEMANCHE, individually, KEN J.
MASCARA, as SHERIFF of ST. LUCIE
COUNTY, Florida, JOSE ROSARIO,
individually, and the ST. LUCIE COUNTY
FIRE DISTRICT, an independent special
district,

        Defendants.

_____/

## NOTICE OF TAKING DEPOSITION DUCES TECUM
## VIA VIDEO CONFERENCE

    YOU are hereby notified that on **Wednesday, July 12, 2017 at 10:00 a.m.,** at Legal Media

Experts, 4801 Glenwood Avenue, Suite 200, Raleigh, NC 27612, attorney for Defendants will take

the deposition of:

### MEL TUCKER

    You, or your representatives, must also bring with you to the deposition the following
documents, electronically stored information, or objects, and must permit inspection, copying,
testing, or sampling of the material: SEE EXHIBIT A ATTACHED.

    Said depositions will be taken before a Notary Public or any officer authorized to administer
oaths by the laws of the State of Florida, and a person who is neither a relative or employee of any
such attorney or counsel, and who is not financially interested in the action.

    Said depositions to be taken pursuant to the Federal Rules of Civil Procedure in such cases
provided. The oral examination will continue from hour to hour and from day to day until completed.

-1-

**I HEREBY CERTIFY** that a copy of the foregoing was emailed to: **ADAM S. HECHT, ESQUIRE,** Searcy Denney Scarola Barnhart & Shipley, P.A., 2139 Palm Beach Lakes Boulevard, West Palm Beach, Florida 33409, ash@searcylaw.com, axs@searcylaw.com; mal@searcylaw.com; jcx@searcylaw.com; **HUGH L. KOERNER, ESQUIRE,** Hugh L. Koerner, P.A., Sheridan Executive Centre, 3475 Sheridan Street, Suite 208, Hollywood, FL 33021, hlklaw@hughkoerner.com and **BENJAMIN W. NEWMAN, ESQUIRE**, GRAY ROBINSON, 301 East Pine Street, Suite 1400, Orlando, Florida 32801, Ben.Newman@wilsonelser.com; Leah.Rover@wilsonelser.com, this **6th** day of July, 2017.

> PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
> Attorneys for Defendants Newman, Mangrum, Robinson, Courtemanche and Sheriff
> 2455 East Sunrise Boulevard, Suite 1216
> Fort Lauderdale, Florida 33304
> Telephone (954) 462-3200
> Telecopier (954) 462-3861
> Email: summer@purdylaw.com
>      melissa@purdylaw.com
>
> BY:    */s/ Summer M. Barranco*
>      Summer M. Barranco
>      Fla. Bar No. 984663

Tavares Docher, by and through Janice Docher-Neeley, his mother and legal guardian
vs. Ken J. Mascara, as Sheriff of St. Lucie, et al.
United States District Court, Southern District of Florida
Case No.: 2:16cv14413

## NOTICE OF TAKING DEPOSITION OF MEL TUCKER
## EXHIBIT A

Please bring with you to the deposition scheduled for Wednesday, July 12, 2017:

**All Materials, Documents, etc. listed in your Report and all materials, documents, etc., not specifically referenced in your report that you used to form the basis of your opinions in this action**.

# EXHIBIT
# B



DEPOSITION
EXHIBIT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

                     Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF OF ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent specialized district,

                     Defendants.

**Expert Report
of
Melvin L. Tucker**

_____/

### Retention

My name is Melvin L. Tucker.  I was retained by counsel for the plaintiff to review the use of force against Tavares Docher by St. Lucie County, Florida Deputies Christopher Newman, Clayton Mangrum, and Calvin Robinson which occurred on May 11, 2014.

I was asked to render my opinions as to whether the deputies violated applicable standards of care for dealing with a person exhibiting the signs that medical attention might be needed; whether the officers use of force was in keeping with established training; and whether the level of force used against Tavares Ocher was greater than other reasonable officers would have used in the same or similar circumstances in 2014.

### General Qualifications

I am the former Chief of Police for the City of Tallahassee, Florida, having retired in 1994.

During a twenty-five year law enforcement career, I served as a Chief of Police in four cities, in three states and as an Agent with the Federal Bureau of Investigation.

1

I served as an FBI Agent from 1969 to 1971 and during the time period from 1971 to 1994, I served as the Chief of Police for Morristown, Tennessee; Hickory, North Carolina; Asheville, North Carolina and Tallahassee, Florida.

I have taught criminal justice courses at colleges and universities across the United States. I served as an adjunct faculty member in criminal justice at Western Carolina University located in Cullowhee, NC; Florida State University, Florida A&M University and Tallahassee Community College located in Tallahassee, FL; Walters State Community College located in Morristown, TN; and the University of Maine located in Augusta, ME.

I held several law enforcement certificates, including the Advanced Certificate from the State of North Carolina and Basic Certificates from Tennessee and Florida.

I received a bachelor's degree from the University of South Florida, Tampa, Florida and a master's degree with honors from Appalachian State University, Boone, North Carolina.

I have authored forty-two articles on policing and criminal justice issues that have been published in legal, public administration, police trade magazines, and criminal justice professional journals.

I served as a member and Chairman of the North Carolina Criminal Justice Education and Training Council for three years and as a member and Vice-Chairman of the Florida Criminal Justice Standards and Training Commission for three years. In both capacities, I was part of a commission that was responsible for establishing uniform minimum standards for the employment and training of all full-time, part-time and auxiliary law enforcement officers and correctional officers in the respective states.

### Specific Qualifications to Provide Opinions on the Facts of this Case

I co-authored a book titled *Prevention and Investigation of Officer Involved Deaths*, which included chapters on policing with respect to emotionally disturbed persons, use of force and the phenomenon known as 'excited delirium."

I am familiar with the training protocols, standards, and model policies published by professional associations on use of force, dealing with emotionally disturbed persons, and dealing with people exhibiting the symptoms of "excited delirium."

I have trained thousands of law enforcement on the legal and professional standards regulating the use of force and was certified until September 2009 on most use of force disciplines.

I have qualified as an expert in law enforcement practices and procedures, including police use of force, ninety-seven times.

My current and complete curriculum vita is attached as Appendix A to this Report.

## Objectivity

Over the past twenty years my trial and deposition testimony has been approximately 70% plaintiff and 30% defendants.  A current list of my trial and deposition testimony for the past four years is attached as Appendix B to this Report.

## Fees

My fee for analysis in this case was $6,000.00.  The fee was based upon a $150.00 hourly rate and an estimate that it would require approximately forty hours of work to review the materials provided and to prepare an Expert Report.

## Items Reviewed and Relied Upon in Development of Preliminary Opinions

Before developing my preliminary opinions in this case, I reviewed the materials listed in Appendix C attached to this report. The materials reviewed are of the type typically relied upon by consultants and experts when conducting an analysis of law enforcement issues and provided me with enough relevant data to develop my preliminary opinions to a reasonable degree of professional certainty.

## Methodology Utilized in Developing Preliminary Opinions

The methodology I employed is consistent with my review of the U.S. Supreme Court decisions *Daubert v. Merrill Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and in *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 147 119 S. Ct. 1167 (1999).

I understand that a non-scientific expert must be qualified to offer expert testimony by knowledge, skill, experience, training, or education. I have provided in this report both my general and specific qualifications as a basis for my expert testimony in this case.

I also understand that an expert's testimony must be relevant to the facts of the case and of assistance to the jury in understanding the evidence in the case.

To insure my methodology was reliable, and my conclusions were based upon reliable methodology, I did not assign credibility to any witness; reviewed sufficient data to reach conclusions to a reasonable degree of professional certainty; developed a set of material and relevant facts only after a review of all materials provided; and assumed those facts to be true solely for purposes of analysis.  I then analyzed those facts against a backdrop of the professional standards, practices, principles and protocols recognized, relied upon, and employed in law enforcement on the date of this incident.

The methodology I have used in this case is the same that I have utilized for several years.  The methodology has been accepted over ninety times by presiding judges in previous cases in which I have testified at trial.  The methodology is consistent with the methodology utilized by other experts in the field of law enforcement.

3

I possess knowledge regarding the protocols that were recognized in the law enforcement profession prior to 2014 on dealing with emotionally unstable persons and with people exhibiting the symptoms of "excited delirium."

I also am familiar about what officers were taught prior to 2014 in training programs about what force is considered reasonable force in a particular set of circumstances.

These subjects are all matters beyond the knowledge of a typical juror and sufficiently tied to the facts of this case to be relevant and of assistance to the jury in understanding the evidence and resolving factual disputes.

### Summary of Assumed Facts

The facts in this case that are relevant to my opinions are summarized in Appendix D attached to this report.

### Preliminary Opinions

I have classified my opinions as preliminary opinions at this point because I have been advised that I will be provided with additional materials to review in this matter, including deputy depositions and the internal affairs investigation. I therefore reserve the right to supplement my opinions after my review of the additional materials.

The basis and reasons for my preliminary opinions are premised upon my experience as a law enforcement officer; my education and training in law enforcement; my knowledge of law enforcement standards; my knowledge of law enforcement training and protocols for dealing with emotionally disturbed persons and people exhibiting the symptoms of "excited delirium" my knowledge of a phenomenon known in law enforcement as the "physiology of a struggle"; and my knowledge of law enforcement training and protocols on use of force; through consulting professional literature, and the facts of this case as determined by a comprehensive review of the materials listed in Appendix C.

My preliminary opinions are based upon a synthesis of the above. I hold the following preliminary opinions to a reasonable degree of professional certainty.

### Preliminary Opinion #1

The force used against Tavares Docher on May 11, 2014 by SLCSO Deputies Christopher Newman, Clayton Mangrum and Calvin Robinson was excessive and unreasonable and was a greater level of force than other officers would have used in 2014 if confronted with the same, or similar, circumstances.

4

### Training on Use of Force

Since 1989, all law enforcement officers have been instructed in basic law enforcement training programs, in the legal training block, that the United States Supreme Court decided in *Graham v. Connor*, 490 U.S. 386, that the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application and the determination of reasonableness requires careful evaluation of the facts and circumstances of each case including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or another, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

The Court, in *Graham v. Connor*, demonstrated a high level of consideration for law enforcement officers and the difficulty involved in decision making in the field when it declared "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and the calculus of reasonableness must allow for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain and rapidly evolving, about the amount of force that is necessary in a particular situation."

All law enforcement officers in Florida were instructed in Basic Law Enforcement Training (BLET) prior to 2014 that using the elbow to strike a person in the temple, side of jaw, bridge of nose throat or back of head is likely to cause great bodily harm and is classified as deadly force (Page 291, FL BRT Curriculum, Volume 2, titled *Criminal Justice Defensive Tactics* attached as Appendix E).

### Analysis

Here, before the deputies used force, the only crime Docher had committed was Disorderly Intoxication. In Florida, Disorderly Intoxication (when an intoxicated person causes a public disturbance in a public place) is a second degree misdemeanor. Thus, the severity of the crime Docher committed was minor. In this case, according to Deputy Newman, Docher did not have issues with being placed under arrest for Disorderly Intoxication and he initially complied with Newman's orders, and was handcuffed. However, when the deputies started to put Docher in a patrol car, Docher looked at all three deputies and took off.  In response, all three deputies grabbed Docher and took him to the ground.  While on the ground Deputy Mangrum delivered palm heel strikes to Docher's large muscle groups and Deputy Newman delivered elbow strikes to the right side of Docher's head (Page 6, SLCSO Case Supplemental Report #14-05401).

In this case, the use of elbow strikes delivered to Docher's head by Deputy Newman was contrary to use of force training all Florida law enforcement officers received prior to 2014 because it was an act of deadly force not justified under the circumstances.  In fact, Docher was not criminally charged with Aggravated Assault (necessary to justify the use of deadly force) and instead was charged with simple assault/battery.

In my opinion, a reasonable officer, under similar circumstances, would not have perceived Docher as an immediate threat of serious bodily harm or death at any time after the officers handcuffed him.

In my opinion, striking Docher in the head with an elbow strike two times when he was handcuffed and while there were at least three deputies available to control Docher was a greater level of force than other officers would have used under the same, or similar, circumstances.

In addition, citizen witness Merine Kanhai, stated she saw 3-4 deputies restraining an African American male and saw a deputy elbow the male in the face. The male was saying "Don't let them kill me" and the deputies were saying "stop resisting arrest." In her opinion the deputies were using excessive force (Page 21, SLCSO Case Supplemental Report #14-05401).

Ariana Kanhai, another citizen witness, stated she saw deputies holding a man on the ground. He wasn't moving much. The deputies kept hitting the man after he was handcuffed. The deputy by the man's head kept hitting him with his elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Zackery Taylor, the deputies were hitting the man with their elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

Finally, it would have been obvious to any reasonable officer on May 11, 2014, when considering the totality of the circumstances presented to Deputies Newman, Mangrum and Robinson, that Docher was having a medical emergency and needed immediate medical attention. Instead, Newman, Mangrum and Robinson used excessive force on an unarmed and handcuffed man in violation of training and standards.

## Preliminary Opinion # 2

Deputies Newman, Mangrum and Robinson knowingly violated clearly established law enforcement training on how to handle a person exhibiting the symptoms of "excited delirium" when they failed to treat the incident with Tavares Docher as a medical emergency and instead treated the incident as a control and arrest situation.

## Excited Delirium

Excited delirium is a controversial term used to explain sudden deaths, or serious medical ramifications, after restraint of individuals involved in a struggle with the police.

There has been no formal recognition of the phenomenon by the medical community and it is not recognized in the Diagnostic and Statistical Manual of Mental Disorders.

Even though the American Medical Association does not recognize this diagnosis as a medical or psychiatric condition, both the medical and law enforcement communities agree that excited delirium is a medical emergency no matter what the cause.

6

All law enforcement officers in Florida were instructed in Basic Law Enforcement Training (BLET) prior to 2014 about the symptoms of excited delirium (agitation, aggression, hyperactivity, super strength, sweaty) and that when confronting a subject with these symptoms they should immediately seek medical attention because the subject could die suddenly (FRL BRT Curriculum: Volume 2, Criminal Justice Defensive Tactics, Pages 210 and 211 attached as Appendix F).

The International Association of Chiefs of Police (IACP), National Law Enforcement Policy Center, published a Model Policy titled *Excited Delirium* in January 2014 which was designed to provide guidance and direction to officers in the handling of individuals who are exhibiting the signs of excited delirium.

The IACP identified the symptoms as agitation, hyperthermia, profuse sweating, paranoid behavior, constant physical activity, exceptional strength, and unusual calmness after restraint.

According to the IACP officers confronting a subject exhibiting symptoms of excited delirium should have medical personnel on scene before initiating subject control and when subject is restrained they should avoid putting pressure on the subjects chest, neck, or head and should not attempt control by pinning the subject to the ground by using their body weight (IACP Model Policy titled *Excited Delirium* attached as Appendix G).

## Analysis

Just as law enforcement officers had to be trained in years past to distinguish between a combative drunk and a person in a diabetic crises, to make the decision as to which needs to go to jail and which needs to go to the hospital, the law enforcement community has long believed that the key to avoiding deaths, or serious medical ramifications, from excited delirium is to train law enforcement officers on the recognition of the symptoms of excited delirium so that early action can be taken.

Although law enforcement officers are not expected to be medical experts, they have been told in recent years to be alert for the symptoms of excited delirium syndrome such as hallucinations, extreme agitation, screaming, property damage, profuse sweating, cocaine use, glass breakage and bizarre behavior.[1]

The Force Science Research Center (FSRC) published training tips for handling excited delirium incidents in 2005 that identified the same symptoms and concluded that police officers needed to treat excited delirium as a medical emergency.[2]

According to the International Association of Chiefs of Police (IACP), incidents of excited delirium should be treated as a medical emergency rather than a criminal incident notwithstanding any criminal violations that may be involved. [3]

According to Deputy Newman, Docher told him he had a few drinks, and Arabs were trying to kill his mother and him because they knew where the Arabs dropped the headless body in St. Lucie County.

In this incident, according to witness Leaha Boles, Docher was "delusional and paranoial" and "very sweaty" and not acting normal (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Samantha Gilewski, Docher "was pacing, nervous and delirious." "He was talking murders, ransom and rewards." (Page 21, SLCSO Case Supplemental Report #14-05401).

All of these are symptoms should have been characterized by Deputies Newman, Robinson and Mangrum as excited delirium and should have alerted them that they were dealing with a medical emergency.

### Preliminary Opinion # 3

Deputies Newman, Mangrum and Robinson knowingly violated clearly established law enforcement training on avoiding the basic physiology of a struggle because of the risk to a subject of death or serious medical ramifications.

### Basic Physiology of a Struggle

The U.S. Department of Justice, National Law Enforcement Technology Center, a National Institute of Justice Program, published a bulletin in June 1995 which described for law enforcement officers what is called the *Basic Physiology of a Struggle.*

Simply stated, a person lying on their stomach has trouble breathing when pressure is applied to the back. As their breathing becomes labored, they try to get up. Officers, not understanding and aware of the physiology of a struggle, interpret the subjects actions as resistance to their control and apply more weight and restraint which results in the subject having increased difficulty in breathing which is a natural reaction to oxygen deficiency – and the subject struggles more violently. The officers then apply more compression and restraint to subdue the subject until death or serious medical ramifications for the subject occurs (U.S. DOJ Bulletin attached as Appendix H).

### Analysis

In this incident, when Docher ran from the deputies he was already handcuffed. According to the SLCSO Reporting Officer Narrative, all three deputies (Newman, Mangrum and Robinson) were on Docher's back and he was taken to the ground. Docher was able to slide the handcuff on his right arm up to his elbow and was attempting to push himself off the ground lifting all three deputies. Robinson then applied a "leg ride" to gain control and Deputy Alonge arrived on the scene and assisted the other three deputies in keeping Docher on the ground (page 6 of SLCSO Reporting Officer Narrative in Case # 14-05401).

According to Paramedic Jose Rosario, when he arrived on the scene he observed several deputies on top of a subject who was still struggling with them (page 13, SLCSO Case Supplemental Report in case # 14-05401).

According to Paramedic Thomas Sinclair, when he arrived on the scene he observed several deputies on top of a subject who was on the ground with a pool of blood around his head (page 14, SLCSO Case Supplemental Report, Case # 14-05401).

### Preliminary Opinion # 4

Deputies Robinson and Mangrum failed in their responsibility to intervene to stop a fellow deputy from committing a clear violation of training and standards when the saw Deputy Newman deliver two separate elbow strikes to the head of Tavares Docher when they knew, or should have known, that deadly force was not justified under the circumstances they were confronted with.

### Analyses

All law enforcement officers in Florida were instructed in Basic Law Enforcement Training (BLET) prior to 2014 that using the elbow to strike a person in the temple, side of jaw, bridge of nose throat or back of head is likely to cause great bodily harm and is classified as deadly force (Page 291, FL BRT Curriculum, Volume 2, titled *Criminal Justice Defensive Tactics* attached as Appendix E).

The use of elbow strikes delivered to Docher's head by Deputy Newman was contrary to use of force training all Florida law enforcement officers received prior to 2014 because it was an act of deadly force not justified under the circumstances. In fact, Docher was not criminally charged with Aggravated Assault (necessary to justify the use of deadly force) and instead was charged with simple assault/battery.

Deputies Robinson and Mangrum should have known that striking Docher in the head with an elbow strike while he was handcuffed and while there were at least three deputies available to control Docher was excessive force and they should have intervened to stop Newman before he was able to deliver a second elbow strike to Docher's head.

Respectfully Submitted,

*Mel L. Tucker*

Melvin L. Tucker
May 16, 2017

---

[1] Wecht, Lee, Van Blaricom & Tucker, *Investigation and Prevention of Officer – Involved Deaths*, Chapter 4, CRC Press, 2011
[2] Force Science News #29 titled *Training Tips for Handling Excited Delirium*, 10-7-05
[3] IACP National Law Enforcement Policy Center, Concepts and Issues Paper, *Excited Delirium*, April 2014

Appendix A

**MELVIN L. TUCKER**
**Criminal Justice and Security Consultant/Trainer**
**5929 Fordland Drive**
**Raleigh, North Carolina 27606**

mtucker50@nc.rr.com
919 249-6592

# CURRICULUM VITAE

## EMPLOYMENT

- Litigation Consultant and Law Enforcement/Security Trainer 1994 – Present

## ELECTED OFFICE EXPERIENCE

- Councilmember, City of Morristown, Tennessee 2005 - 2008

## CRIMINAL JUSTICE EXPERIENCE

- Project Manager, Maine Community Policing Institute, Augusta, ME, 2000-2004
- Chief of Police, Tallahassee, FL, 1979 - 1994
- Chief of Police, Asheville, NC, 1977 - 1979
- Chief of Police, Hickory, NC, 1974 - 1977
- Chief of Police and Public Safety Director, Morristown, TN, 1971 - 1974
- Special Agent, Federal Bureau of Investigation, 1969 – 1971

## MILITARY EXPERIENCE

- United States Navy Reserve, Active Duty 1965-1969, Ensign to Lieutenant
- United States Navy Reserve, Reserve Duty 1969-1988. Lieutenant to Commander

## EDUCATION

- MPA - Public Administration, Appalachian State University; Boone, NC, 1977
- BA - Business Management, University of South Florida; Tampa, FL, 1965

## ACADEMIC APPOINTMENTS

- The University of Maine at Augusta; Augusta, ME; Adjunct, Criminal Justice, 2000-2004
- Florida A&M University; Tallahassee, FL; Adjunct, Criminal Justice, 1981-1994
- Florida State University; Tallahassee; FL; Adjunct, Criminal Justice, 1984

1

- Tallahassee Community College; Tallahassee, FL; Adjunct, Criminal Justice, 1983-1984
- Western Carolina University; Cullowhee, NC; Adjunct, Criminal Justice, 1978-1979
- Walters State Community College; Morristown, TN; Adjunct, Criminal Justice, 1972-1974

## PUBLICATIONS

Books
- Wecht, Cyril; Lee, Henry; Van Blaricom, D.P.; and Tucker, Melvin; *Investigation and Prevention of Officer-Involved Deaths*, CRC Press, 2011

Articles
- Taylor, Roy & Tucker, Melvin, *Action Always Beats Reaction-Or Does It?* The ILEETA Journal, Winter Edition, Volume 5, Edition 3, 2015
- Tucker, Melvin L., *Defense Against Edged Weapons Training and "Unreasonable Fear,"* The ILEETA Journal, Fall Edition, Volume 4, Edition 3, 2014
- Merritt, J., Adams, R., Tucker, M., & McGuinness, J., *Law Enforcement Officer Association Political Candidate Endorsements*, The National Trooper Magazine, October 2012 Issue
- McGuinness, M., & Tucker, M., *Staying out of Trouble and Defending Yourself*, The Blue Review, Issue 5, 2010
- Tucker, M., *The Value of an Expert Witness in Police Litigation*, The Blue Review, Issue 4, 2009
- Tucker, M. & Wisecarver C., *Legal Authority for Preemptive Action*, The Tactical Edge, Spring 2008 Issue
- Overholt, Roger, Tucker, Melvin & Wisecarver, Chris, *Procedural Due Process and the Determination of Just Cause*, The Police Chief, Vol. LXXV, Number 1, January 2008
- Wisecarver, Chris & Tucker, Melvin, *The Force Science Reactionary Gap,* Law and Order, Vol. 55, No.8, September 2007.
- McGuinness, M & Tucker, M., *Police Use of Force: Federal and Colorado Standards*, The Colorado Lawyer, Vol. 36, No. 5, May 2007.
- Tucker, M., *Officer Involved Shootings–Where and When it Happened Matters*, The Tactical Edge, Winter 2007 Issue.
- Tucker, M., *On Liars, Mistletoe and Lack of Respect for Colleagues*, Guest Editorial, The Police Marksman, November/December 2006 Issue.
- Tucker, M., *Poor Training: The Real Story Behind The Headlines*, The Law Enforcement Trainer, Oct/Nov/Dec 2005 Issue.
- Tucker, M., *The Selection Process and the Role of Leadership,* Integrity Talk, International Association of Ethics Instructors, Vol. 5, Issue 2, Summer 2003
- Tucker, M. & Mears, R, *High Risk Police Operations Manual,* Augusta, ME, 10-01
- Tucker, M. & Mears, R, *The Investigation of Police Officers And The Fifth Amendment,* Maine Law Officer's Bulletin No. 21, Augusta, ME, 9-01

- Tucker, M., *Warning: Use of Force Standards Have Changed,* The Florida Police Journal, Tallahassee, FL, 1-99
- Tucker, M, *Constitutional Rights of Public Employees in a Para-Military Organization*, Quality Cities, 1-94
- Tucker, M., *Crime Prevention Through Environmental Design (CPTED): The Tallahassee Model*, The Police Chief, Alexandria, VA, 10-93
- Tucker, M., *That Looming Reporter: Coping With a Cantankerous Press*, The Florida Police Chief, Tallahassee, FL, 11-91
- Tucker, M., *Military Joins the Drug Fight*, The Florida Police Chief, Tallahassee, FL, 8-90
- Willingham, Mark & Tucker, M., *Ethics and Values Training: A Multifaceted Approach*, The Police Chief, Alexandria, VA, 11-88
- Tucker, M., *Crack Squad Not Enough*, The Police Chief, Alexandria, VA, 6-88
- Kleman, Daniel A. & Tucker, M., *How to Build an Effective Working Relationship: The Manager/Police Chief Relationship*, Public Management, Tallahassee, FL, 6-88
- Tucker, M., *The Consequences of Liberalizing Gun Laws*, The Police Chief, Alexandria, VA, 3-88
- Tucker, Kimberly J. & Tucker, M., *How to Avoid Becoming a Defendant in a Civil Suit* (Part 2), The Florida Police Chief, Tallahassee, FL, 5-85
- Tucker, Kimberly J. & Tucker, M., *How to Avoid Becoming a Defendant in a Civil Suit* (Part 1), The Florida Police Chief, Tallahassee, FL, 4-85
- Tucker, M., *Law Enforcement Accreditation: It's about Time*, The Florida Police Chief, Tallahassee, FL, 3-85
- Hyder, Alan K. & Tucker, M., *Efficiency in Police Services: Traffic*, Law And Order, Wilmette, IL, 6-79
- Tucker, M & Bumgarner, B.L., *Attaining Public Confidence – The Police Department's Role*, The Administrator, Vol. IV, No. 1, 4-79
- Bumgarner, B.L. & Tucker, M., *Attaining Public Credibility Through Open Access*, The Administrator, North Carolina City and County Management Association, 1-79
- Tucker, M., *The Police Administrator and Affirmative Action*, Southern City, Tallahassee, FL, 1-79
- Tucker, M. & Hyder, Alan K., *Some Practical Considerations in Law Enforcement Education*, North Carolina Police Officer (Reprinted), 5-79
- Tucker, M., *The Problem Solving Task Force: Use of Participatory Management Methodology*, The North Carolina Justice Academy Reporter, 8-79
- Tucker, M. & Hyder, Alan, *Some Practical Considerations in Law Enforcement Education*, The Police Chief, Alexandria, VA, 8-78
- Tucker, M., *Zeroing in on Police Productivity,* North Carolina Police Officer, 7-77
- Tucker, M. & Hyder, Alan, *The Compact Police Car*, Southern City, 10-76
- Tucker, M., *The New Breed Police Chief* (Reprinted), Carolina Law And Order, 9-76
- Tucker, M., *The New Breed Police Chief*, The North Carolina Justice Academy Reporter, 8-76, Alexandria, VA
- Hyder, Alan K. & Tucker, M., *Economic Realities Force Effective Manpower Utilization*, The Police Chief, Alexandria, VA, 4-76

- Tucker, M., *Fostering Inefficiency Through LEAA Grants*, <u>Western Piedmont Government News,</u> 12-75
- Tucker, M., *The New Breed of Police Officer,* <u>The North Carolina Justice Academy Reporter,</u> 12-75

## PROFESSIONAL AFFILIATIONS

- International Law Enforcement Educators and Trainers Association (ILEETA)
- National Tactical Officers Association (NTOA)
- American Society of Law Enforcement Trainers (ASLET)
- American Society for Industrial Security (ASIS)
- Police Executive Research Forum (PERF)
- International Association of Chiefs of Police (IACP)
- Maine Chiefs of Police Association (MCPA)
- Florida Department of Business Regulation, Hotels and Restaurants Security Task Force
- Florida Juvenile Justice Center; Commissioner
- Florida Police Chiefs' Association Ethics Committee
- State of Florida Technical Committee for Public Service Education
- Florida District 2, State Emergency Response Commission
- Advisory Board, Florida Criminal Justice Information System (CJIS)
- Advisory Board, Florida Interagency Narcotics Information Network (FININ)
- Florida Criminal Justice Standards and Training Commission; Vice-Chairman
- Florida Governor's Task Force on Law Enforcement
- Florida Police Chiefs Association (FPCA)
- North Carolina Governor's Crime Prevention Commission
- North Carolina Association of Chiefs of Police; Vice-President
- North Carolina Criminal Justice Education and Training Council; Chairman
- North Carolina Association of Chiefs of Police; Secretary-Treasurer
- North Carolina Governor's Law and Order Commission
- Technical Advisory Committee, University of North Carolina, Charlotte

## CERTIFICATIONS

- S&W 9MM Semi-Automatic
- Monadnock PR-24 Baton Basic
- Monadnock Expandable Baton Advanced
- Advanced M-26 and X-26 Taser
- Oleoresin Capsicum (OC)
- Police Defensive Tactics
- Law Enforcement Trainer (CLET), American Society for Law Enforcement Trainers (ASLET)
- Law Enforcement Ethics Instructor, National Institute of Ethics (NIE)

- Certified Protection Professional (CPP), American Society for Industrial Security 1998-2001
- Law Enforcement Certificate, State of Florida 1979-1994
- Advanced Law Enforcement Certificate, State of North Carolina 1974-1979
- Jail Operations Certificate, State of North Carolina 1974-1977
- Law Enforcement Certificate, State of Tennessee 1971-1974

## AWARDS AND RECOGNITIONS

- *First Place Award; Use of Force Academic Test*, 14th Annual Seminar, American Society for Law Enforcement Training (ASLET); Orlando, FL, 2-01
- *Outstanding Public Administrator*, North Florida Chapter of the American Society Of Public Administration (ASPA), 4-93
- *Writing Excellence Award* for article, That Looming Reporter: Coping With a Cantankerous Press, Charles G. Wellborn Foundation, 10-92
- *Service Award*, Glenn Terrell Foundation, Tallahassee, FL, 5-90
- *President's Service Award*, United Way, Tallahassee, FL, 5-83
- *Freedom Award*, NAACP, Tallahassee, FL, 5-81
- *Service Award*, North Carolina Attorney General's Office, 12-79
- *Appreciation Award*, U.S. Secret Service, Tallahassee, FL, 9-79
- *Tennessee Law Enforcement Officer of the Year*, TN 1972

## LAW ENFORCEMENT AND SECURITY TRAINING AND CONSULTING

Since 1994, Chief Tucker has been training law enforcement officers in personnel issues, high-risk operations, conducting security surveys for businesses and government agencies, conducting agency evaluations, providing criminal justice and security consulting services and providing litigation support as an expert in police and security matters for both defense and plaintiffs.

## LITIGATION SUPPORT SERVICES

Chief Tucker has been retained in approximately 530 law enforcement and security cases. He has testified as an expert approximately 97 times in the following areas:

- Negligent hiring, retention, assignment, training, and supervision
- Use of less than lethal and lethal force
- Emergency vehicle operations
- Premises liability/Security Guard negligence
- Reasonable accommodation
- Free speech
- Probable cause/ reasonable suspicion
- Police personnel practices, officer conduct
- Race and sex discrimination
- Proper police procedures, criminal investigations

5

He has provided litigation services in:

| | | | |
|---|---|---|---|
| Alabama | Alaska | Arizona | Arkansas |
| California | Canada | Colorado | Connecticut |
| District of Columbia | Florida | Georgia | Illinois |
| Kentucky | Louisiana | Maine | Maryland |
| Massachusetts | Michigan | Mississippi | Missouri |
| Montana | Nebraska | New Hampshire | New Jersey |
| New Mexico | New York | Nevada | North Carolina |
| Oklahoma | Ohio | Pennsylvania | Puerto Rico |
| South Carolina | Tennessee | Texas | Virginia |
| Washington | West Virginia | | |

## CRIMINAL JUSTICE TRAINING SERVICES

Chief Tucker conducts training seminars for officers, supervisors and managers of federal, state, county and municipal law enforcement agencies in the following areas:

- High-speed pursuit and emergency response
- Use of force
- Personnel practices
- Writing reports to reduce civil liability risk
- Legal and professional standards regulating police high-risk operations
- Auditing operations to reduce civil liability risk
- Civil liability awareness
- Standards for discipline

He has provided criminal justice training for the following organizations:

- The Henry C. Lee Institute of Forensic Science, University of New Haven, *The Crises Between the Police and People of Color*;
- American Bar Association (ABA) Conference in Tampa, FL on *Resolving The Crises*
- Duke Law Center on Law, Race and Politics, *Police Use of Force*
- North Carolina Conference of District Attorneys, *Conducting Investigations and Evaluations of Law Enforcement Officers Use of Deadly Force*, Raleigh, NC
- North Carolina Chapter of the Southern Police Institute Alumni Association, *Career Survival*, Conover, NC
- North Carolina Criminal Defense Lawyers Association, Continuing Legal Education Seminar, Cary, NC, *The Use of Law Enforcement Expert Testimony in Criminal Cases*
- Performance Institute, Arlington, Virginia, National Summit on Use of Force in Law Enforcement, *The Legal Standards of Use of Force*

- Jefferson County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Hancock County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Hamblen County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Utah/Nevada FBI National Academy Graduates Association, *Use of Force, Standards & Threat Assessment*
- Morristown, TN Police Department, *Use of Force: Legal and Professional Standards*
- DOJ/COPS, Lewiston, Maine, *Use of Force and Investigation of Citizen Complaints*
- Houlton, Maine Police Department, *Use of Force: Legal, Professional and Ethical Standards*
- Police Executive Leadership Seminar, Lewiston, Maine, *The Police Departments Role in Homeland Security*
- Director's Conference, Regional Community Policing Institutes, Washington, D.C., *Surviving Federal Audits of Grants*
- The 13th Annual NASRO Conference, Orlando, FL, *Avoiding Liability While Serving As A School Resource Officer*
- The 2nd Annual Community Policing Conference, Washington, D.C., *Ethics and Integrity: The Selection Process*
- Augusta Police Department, Augusta, ME, *Emergency Vehicle Operations*
- Mid-Coast Police Chiefs Association, Brunswick, ME, *Ethics in Law Enforcement*
- National Troopers Coalition, Portland, ME, *Free Speech, Due Process, and Use of Force Investigations*
- Maine Department of Corrections, Charleston, ME, *Ethics and Integrity in a Corrections Setting*
- Tallahassee Police Department, Tallahassee, FL, *Writing Reports, Auditing, Training, and Understanding Concepts to Avoid Administrative and Civil Culpability*
- Pat Thomas Law Enforcement Academy, Quincy, FL; *Legal and Professional Standards Regulating Police Use of Force, Pursuit and Emergency Response*
- Bangor Theological Seminary, Bangor, ME; *Counseling Victims in Police Use of Force Cases*
- Maine Criminal Justice Academy, Vassalboro, ME; *Domestic Violence and Crimes Against the Elderly*
- Maine Mid-Coast Chief's Association, Wiscasset, ME; *High Risk Police Operations*
- Maine Mid-Coast Chief's Association, Rockland, ME; *High Risk Police Operations*
- Maine Criminal Justice Academy, Waterville, ME; *Civil Liability Awareness*
- Labor Relations Information System Seminar, Kissimmee, FL; *Standards For Discipline*
- National Expert Witness and Litigation Seminar, Hyannis, MA; *Police Use of Force*
- Labor Relations Information System, Orlando, FL; *Procedural Due Process and Just Cause*
- Maine EMS, Islesboro, ME; *Emergency Vehicle Operations*
- Public Employment Labor Relations Forum, Tampa, FL; *Constitutional Rights of Public Employees*

7

- Florida Department of Law Enforcement, Tallahassee, FL; *Investigating Use of Force*
- Center for Advanced Law Enforcement Studies, Tampa, FL; *Excessive and Deadly Force: Law, Policy and Investigation*
- Florida Criminal Justice Executive Institute, Ft. Lauderdale, FL; *Personnel Issues*
- MCPI Leadership 2000 Seminar, Northport, ME; *Auditing Operations to Reduce Civil Liability Risk*
- Gulf Coast Community College, Panama City, FL; *Personnel Issues in Managing a Florida Law Enforcement Agency*
- Florida Police Chiefs and Florida Criminal Justice Executive Institute Annual Seminar, Tallahassee, FL; *Civil Liability*, *Manpower Allocation* and *other Personnel Considerations*
- Florida Criminal Justice Executive Institute: Fort Pierce, FL; *Police Personnel Use, Discipline Process, and Public Official Liability*
- New River Criminal Justice Academy, Radford, VA; *Policy Issues Relating to Substance Abuse Within Criminal Justice Agencies*
- Florida Criminal Justice Executive Institute, Tallahassee, FL; *Police Personnel Management*
- Lively Criminal Justice Training Academy, Advanced Instructor Training Series: Quincy, FL; *Police Vehicle Operations*, *Use of Force,* and *Vicarious Liability* Concerns for Instructors
- Annual Florida Police Chiefs' Seminar: Tallahassee, FL; *Police Patrol*, *Use of Force*, *Police Vehicle Operations*, and *Police Tactical Operations*
- Iceland Police Department; Reykjavik, Iceland, *Drug investigations, interdiction, and prevention strategies*
- Florida Criminal Justice Executive Institute, St. Petersburg Junior College, St. Petersburg, FL; Personnel *Issues and High Risk Management*
- Maine Police Chiefs' Association, Houlton, ME; *Police High Risk Operations* and *Vicarious Liability*
- Portland Police Department, Portland, ME; *Police High Risk Operations*
- Florida Marine Patrol, Tallahassee, FL; *Police High Risk Operations*
- Bay County Community College, Panama City, FL; *Police Raids, Stakeouts, Use of Force, Vehicle Operations*
- Escambia County Sheriff's Department, Pensacola, FL; *Police High Risk Operations*
- Broward Community College, Melbourne, FL; *Police Raids*, *Stakeouts*, *Use of Force*, *Vehicle Operations*, *Hostage Situations*
- O'Connell Corporation, Washington, D.C.; *Criminal Interrogation Techniques*
- Office of the State Attorney, 6th Judicial Circuit, Key West Florida, *Consultant on Police Code of Silence*
- Hillsborough County Sheriff's Department; Tampa, FL; *Police Civil Liability Awareness/High Risk Operations*

## CRIMINAL JUSTICE CONSULTING

Chief Tucker has provided criminal justice consultant services for the following organizations:

8

- CNN Kate and John appearance on *Walter Scott Shooting*, North Charleston, SC
- CNN Wolf Blitzer appearance on *Walter Scott Shooting*, North Charleston, SC
- The Associated Press, *Deadly Force Issues since Michael Brown* incident Ferguson, MO
- CBS (Sixty-Minutes) *Police Shootings of unarmed African American males*
- The Associated Press, News Consultant, *Deadly Force Incidents Memphis Police*
- The Sarasota Herald-Tribune, News Consultant, *Off-Duty Officer Involved Shooting*
- The Palm Beach Post, News Consultant, *Policy Guidance, Training, Use of Less Than Lethal Weapons: Tasers*
- The Boston Globe, The Associated Press, The New York Times, The Washington Post, News Consultant, *Death of College Student by Pepper Ball Weapon following Red Sox Game*
- Camden and Rockport, Maine; *Efficiency/Manpower Utilization Studies of Police Departments*
- Louisville Courier-Journal; News Consultant, *Evaluation of Six Officer-Involved Shootings*
- The Florida Department of Lottery; *Review of Firearms Training and Deadly Force Policy*
- Jackson, MS; *Police Chief Selection Consultant*
- CBS program Eye to Eye With Connie Chung; News consultant, *Violence in America*
- CNN program Across America With Larry Woods; News consultant, *Drug Abuse Resistance Education*
- Cape Coral, FL; *Police Chief Selection Consultant*
- Cairo, GA; *Police Chief Selection Consultant*
- Cocoa Beach, FL Police Department; *Management Evaluation*
- Fort Walton Beach, FL; *Police Chief Selection Consultant*
- Orange City Police Department; Orange City, FL; *Management Evaluation*
- Edgewater, FL Police Department; *Management Evaluation*
- Bowling Green, KY; *Police Chief Selection Consultant*
- Hendersonville, NC; *Police Chief Selection Consultant*
- Texas League of Municipalities, Houston, TX; *Police Officer Bill Of Rights Consultant*
- U.S. Department of Justice, Nashua, NH *Race Relations and Racial Profiling*
- The Eighth Annual National Expert Witness and Litigation Seminar, Hyannis, MA *Police Use of Force: Myths and Realities*
- Labor Relations Information Personnel Issues Seminar, Orlando, FL; *Procedural Due Process and the Right to Be Heard*
- Labor Relations Information Systems Personnel Issues Seminar, Orlando, FL; *The Investigation of Police Officers and the Fifth Amendment*
- Labor Relations Information Systems Personnel Issues Seminar, Orlando, FL; *Procedural Due Process and the Determination of Just Cause*
- The American Criminal Justice Association, Pittsburgh, PA; *Police Discipline: An Innovative Process for Intra-Agency Corrective Response*

## SECURITY TRAINING AND CONSULTING

During his law enforcement career Chief Tucker supervised crime prevention units in four police departments that provided security surveys of homes, businesses, and government buildings. He routinely reviewed construction plans for new businesses for compliance with the principles of crime prevention through environmental design (see *Crime Prevention Through Environmental: Design (CPTED): The Tallahassee Model,* The Police Chief, 10-93). He trained hotel, motel, and restaurant/lounge managers and apartment complex managers on crime prevention techniques, conducting security surveys, and calculating the risk of crime on their property. He served on the Florida Hotel, Motel, and Restaurants Security Task Force providing crime prevention techniques for the Task Force bulletin. He taught crime prevention strategies, concepts, and techniques at the university level as an adjunct faculty member. He also served on the North Carolina Governor's Crime Prevention Commission. In December 2002 he received training in Tel-Aviv, Israel from the Israeli Security Agency (ISA) on airport/airline security, threat assessment, doctrine development, and training requirements. A member of the American Society for Industrial Security (ASIS) and a former Certified Protection Professional (CPP), he has provided security consulting services and security training for the following organizations:

- Walters State Community College, Morristown, TN, *Campus Security Awareness*
- Consortium of Security Professionals, Chicago O'Hare Airport, *Security in a Mass-Transportation Environment/Role of State and Local Police in Homeland Security*
- Maine Post-Secondary Educational Institutions Security Directors Conference, Augusta, ME, *Campus Security*
- University of Maine Center Directors Conference, Augusta, ME, *Premises Liability Concepts, Risks Identification, Security Protocols*
- State of Maine Campus Security Summit, Colby College, Waterville, ME, *Campus Security Risks Assessments, Programs and Audits*
- Gardiner, ME Boys and Girls Club, *Security Evaluation*
- Seeds of Peace Center, Otisfield, ME, *Security Evaluation in preparation for Israeli/Palestinian youth conference*
- Florida Department of Management Services, Division of Facilities Management, Tallahassee, FL, *Security, Safety & Premises Liability*
- Latitude 44/Longitude 69 Restaurant, Islesboro, Maine, *Security Survey of Facility*
- The Florida Department of Revenue; Tallahassee, FL, *Security Survey of Facilities,* Miami, Tampa, and Clearwater offices
- Academy of Florida Trial Lawyers, Premises Liability Seminar, Tampa, FL; *The Role of Law Enforcement in Crime Prevention on Private Property*
- National Crime Prevention Institute, Reykjavik, Iceland; *Crime Prevention in the Future*
- Brett and DeHaven, Tallahassee, FL; *Security Survey of The Highpoint Center Office Complex*
- Florida Hotel & Motel Association, Tallahassee, FL; *Avoiding Liability in Premises Security*

10

Appendix B

Melvin L. Tucker
Deposition/Trial Testimony

1. <u>Chastity Davidson v. City of Statesville et al</u>
   United States District Court for Western District of North Carolina
   Statesville Division
   C.A. No. 5:10-CV-182
   Deposition/Plaintiff

2. <u>Dalton Haley v. Washington, Green and Fulton County</u>
   United States District Court
   Northern District of Georgia
   Atlanta Division
   C.A. No. 1:11-CV-1883-TCB
   Deposition/Plaintiff

3. <u>Jack Sayegh v. William Paterson University, et al</u>
   Superior Court of New Jersey
   Law Division – Passaic County
   Docket No. PAS-L-1304-10
   Deposition/Plaintiff

4. <u>Joseph McAdam v. Officer Warmuskerken, Deputy Wilson, Deputy Davila, City</u>
   <u>of Ludington and County of Mason</u>
   United States District Court
   Western District of Michigan
   Southern Division
   Case No. 1:11 – cv – 00170
   Deposition/Plaintiff

5. <u>Joanne Lose vs. Renters Paradise Realty, Inc, NJZ Enterprises, Inc</u>
   In the Circuit Court of the 11th Judicial Circuit
   Miami-Dade County, Florida
   Case No: 10-21450 CA 06
   Deposition/Plaintiff

6. <u>Martin Robinson v. Lt. Jerome Barrow, et al</u>
   United States District Court
   Northern District of Ohio
   Eastern Division
   Case No: 1:11-CV-1609
   Deposition/Plaintiff

7.     <u>Dwayne Allen Dail v. City of Goldsboro, et al.</u>
United States District Court
Eastern District of North Carolina
Western Division
Case No.; 5:10 CV 451-BHO
Deposition/Plaintiff

8.     <u>Estate of Jeffrey Scot Heinze v. City of Mesa, et al.</u>
United States District Court
District of Arizona
Case No. CVV 10-02385-PHX-SRB
Deposition/Plaintiff

9.     <u>Christopher Zamora v. City of Houston</u>
United States District Court
Southern District of Texas
Houston Division
Civil Action No. 4:07-4510
Trial/Plaintiff

10.    <u>Matthew Olson v. Kenneth Dier, Elizabeth Morgan, Scott Goss, Robert Atkins, Scott Barnes and Craig Buth</u>
Middle District of Florida
Orlando Division
Case No.; 6:10-CV-01771-JA-DAB
Deposition/Plaintiff

11.    <u>Gerald Allmond v. North Carolina State Highway Patrol</u>
North Carolina Industrial Commission
Raleigh, NC
I.C. Docket No. TA-22537
Deposition/Plaintiff

12.    <u>Robert Putnam, Debra Putnam v. Sam's Club Puerto Rico</u>
USDC
District of Puerto Rico
C.A. No: 11-1325 (SEC)
Deposition/Defense

13.    <u>Winston Gaillard v. City of Mobile, et al</u>
USDC
Southern District of Alabama
Civil Action No. CV-112-228-WS-N
Deposition/Plaintiff

14.   Anelle Wharton (Ellis) v. Officer Brett Lampris-Tremba, et al.
      Second Judicial District Court
      County of Bernalillo
      State of New Mexico
      Civil Action No: CV-2010-06590
      Deposition/Trial/Plaintiff

15.   Jesus Ornelas vs. C. R. Lovewell
      USDC
      District of Kansas
      Civil Action No. 11-2261-JAR-KMH
      Deposition/Plaintiff

16.   Donald Spadaro  vs. City of Miramar and Broward County Sheriff's Office
      United States District Court
      Southern District of Florida
      CA 11-61607-CIV-COHN/Seltzer
      Deposition/Plaintiff

17.   Veronica Lewis, Lance Lewis v. Bradenton Beach Police Department et al
      United States District Court
      Middle District of Florida
      Tampa Division
      CA No. 8:11-CV-18-T-39AEP
      Trial/Defense

18.   Breedlove vs Demings Orange County So et al
      United States District Court
      Middle District of Florida
      Orlando Division
      CA No. 6:11 CV 2027 – ORL – 31 KRS
      Deposition/Plaintiff

19.   Streater v. City of Charlotte, et al.
      United States District Court
      Western District of North Carolina
      Charlotte Division
      C.A. No. 3:11 CV 548
      Trial Plaintiff

20.   Rolen v. City of Cleveland, et al
      United States District Court
      Northern District of Ohio
      Eastern Division
      CA No. 1:12 CV 1914
      Deposition/Plaintiff

21.    Anthony Caravella v. City of Miramar, et al
United States District Court
Southern District of Florida
Case No. 11-61607-CIV-COHN/Seltzer
Trial/Plaintiff

22.    Leonora Macharia v City of Revere, et al.
United States District Court
District of Massachusetts
Case No. 1:09-CV-10391
Trial/Plaintiff

23.    Alan Loehle v. Georgia DPS and City of Atlanta
State Court of Fulton County
State of Georgia
Civil Action No. 10EV011568E
Deposition/Plaintiff

24.    Hollis v. City of Key West, FL
United States District Court
Southern District Of Florida
Key West Division
Civil Action 12-10013-CIV
Trial/Plaintiff

25.    Beatriz Torres v. City of Greenville, et al
United States District Court
District of South Carolina
CA No. 6:12-1767-JMC
Deposition/Plaintiff

26.    Peter Paske v. Joel Fitzgerald, et al
United States District Court
Southern District of Texas
Houston Division
CA No: H-12-2915
Deposition/Plaintiff

27.    Adam Wade Carter v. Wake County Sheriff, et al
United States District Court
Eastern District of North Carolina
Western Division
CA 5:12-cv-00701-H
Deposition/ Plaintiff

28.   Tenisha Felio v. Christopher Hyatt, Karl Hydrick and City of Lawrenceville, GA
      United States District Court
      Northern District of Georgia
      Atlanta Division
      CA 1:12-cv-04186-ODE
      Deposition/Plaintiff

29.   Suzanne Wick v. Phillip Redmond and Ben Jenkins
      United States District Court
      Western District of North Carolina
      Statesville Division
      CA No: 5:12-cv-00052-RLV-DSC
      Deposition/Plaintiff

30.   Darwin Johnson v City of Fayetteville
      United States District Court
      Eastern District of North Carolina
      Western Division
      CA No: 5:12-cv-00456-F
      Deposition/Plaintiff

31.   Gladys Freeman v John Turner and Scotland Neck PD
      United States District Court
      Eastern District of North Carolina
      Western Division
      CA No: 4:13-cv-129-F
      Deposition/Plaintiff

32.   Charles Shelley v. Oddie Tribble
      United States District Court
      District of South Carolina
      Columbia Division
      CA No. 3:11-3477-CMC
      Trial/Plaintiff

33.   Ronald Armstrong v. Village of Pinehurst, et al.
      United States District Court
      Middle District of North Carolina
      CA No: 13 CVS 00455
      Deposition/Plaintiff

34.  Anthony Boschele v. David Rainwater and Chesterfield County SO
     United Sates District Court
     District of South Carolina
     Florence Division
     CA No: 2013-CP-13-000185
     Deposition/Plaintiff

35.  Heather Minick, et al v. Metro Government of Nashville Davidson County ,et al
     United States District Court
     Middle District of Tennessee
     Nashville Division
     CA No: 3:12-cv-00524
     Deposition/Plaintiff

36.  Abel Martinez vs. City of Pembroke Pines, et al
     United States District Court
     Southern District of Florida
     CA No: 0:14 cv-61303
     Deposition/ Defense

37.  Rodney Mitchell v Sarasota County Sheriff's Office et al
     United States District Court
     Middle District of Florida
     Tampa Division
     CA No: 8:14-cv-01376
     Deposition/Plaintiff

38.  Tanner Gates vs Officers Leonbruno and Gerardi, Willoughby Hills PD
     Court of Common Pleas
     Cuyahoga County, Ohio
     CV 14 824344
     Deposition/Plaintiff

39.  Madel Rivero v Sheriff Steve Loftis, Greenville County SO
     Court of Common Pleas
     County of Greenville
     State of South Carolina
     Case # 2013-CP-23-06522
     Deposition/Plaintiff/Trial

40. Monte Stanford v Union County Sheriff's Department
Court of Common Pleas
County of Union
State of South Carolina
Case No.:2013-CP-44-00227
Deposition/Plaintiff

41. Shauna Smith v. Pt. Roger Jones
United Sates District Court
Northern District of Ohio
Case No. 1:13-CV-744
Trial/Plaintiff

42. Vicki McKenney v. Nicholas Mangino, Cumberland County SO
United States District Court
District of Maine
CA No.: 2:15-cv-00073-JDL
Deposition/Plaintiff

43. Arlean Brown vs. Brian Elliott, Jim Matthews, & Kershaw County SO
United States District Court
District of South Carolina
Columbia Division
CA.: 3:14-cv-01188-JFA-PJG
Deposition/Plaintiff

44. Williston Drayton vs. County of Charleston, et al.
United States District Court
District of South Carolina
Charleston Division
CA No.: 2:14-CV-3488-RMG-BM
Deposition/Plaintiff

45. June Morris v. City of East Orange, et al
Superior Court of New Jersey
Essex County
Docket # ESX-L-3896-13
Deposition/Plaintiff

46. Dontrell Stephens v. Ric Bradshaw and PBCSO
United States District Court
Southern District of Florida
CA No.: 9:14-cv-80425
Trial/Plaintiff

47. William Sadulsky v. Town of Winslow, et al
    United States District Court
    District of Maine
    CA No: 1:14-CV-01-GZS
    Trial/Plaintiff

48. Corey Khansari v. City of Houston, et al
    United States District Court
    Southern District of Texas
    Houston Division
    CA N0: 4:13-CV-02722
    Trial/Plaintiff

49. Kenneth Hunter, Rick Donathan, Jerry Medlin v. Town of Mocksville
    United States District Court
    Middle District of North Carolina
    CA NO: 1:12-cv-333
    Deposition/Trial/Plaintiff

50. Willie Grimes vs. City of Hickory, et al
    United States District Court
    Western District of North Carolina
    Statesville Division
    CA No 5:14-CV-160
    Deposition/Plaintiff

51. Spencer Mims Jr. vs City of Charlotte et al.
    General Court of Justice
    Superior Court Division State of North Carolina
    County of Mecklenburg
    2014 –CVS-23815
    Deposition/Plaintiff

52. Veronica Dorato vs. Officer Martin Smith, et al.
    United States District Court
    District of New Mexico
    No: 1:14-CV-00365 JB-GBW
    Deposition/Plaintiff

53. Jordan Jefferson v Thaddeus Reddish, City of New Haven et al
    United States District Court
    District of Connecticut
    CA 3:12-cv-01543-VLB
    Deposition/Plaintiff

54.    <u>Reginald Newberne v. NC Department of Public Safety</u>
       General Court of Justice
       Superior Court Division
       Wake County, NC
       Trial/Plaintiff

55.    <u>Lissette Hernandez v. Bob Hansell et al</u>
       USDC
       Middle District of Florida
       Orlando Division
       CA NO: 6:14-cv-1351-ACC-DAB
       Trial/Plaintiff

56.    <u>Jeffrey Martin, et al v. Mississippi Dept of Public Safety</u>
       Circuit Court of Lee County, Mississippi
       CA No: CV 2013-021
       Trial/Plaintiff

57.    <u>Sara Knowlton vs. Richland County, Ohio, et al</u>
       USDC
       Northern District of Ohio
       Eastern Division
       CA N0: 1:15-CV-00210
       Deposition/Plaintiff

Appendix C

Materials Reviewed

1. Amended Complaint;
2. Answer and Affirmative Defenses of St. Lucie County Fire District;
3. Answer and Affirmative Defenses – Sheriff Mascara;
4. Answer and Affirmative Defenses – Deputy Courtemanche;
5. Answer and Affirmative Defenses – Deputy Robinson;
6. Answer and Affirmative Defenses – Deputy Newman;
7. Answer and Affirmative Defenses – Deputy Mangrum;
8. Scheduling Order and Order Referring Case to Mediation;
9. Emergency Medical Guidelines (Plaintiff's Exhibit #1 Rosario Deposition);
10. St. Lucie County Fire District's Emergency Medical Guidelines for Ativan use (Plaintiff's Exhibit #2 Rosario Deposition);
11. Deposition of Janice Docher-Neeley taken 2-2-16;
12. Deposition of Jose Rosario taken 4-13-17 (volume 1);
13. Five (5) discs containing police reports, articles, event reports, witness statements, CVS video/phone audio, 911 audio, audio/video witness statements and photos and witness statements;
14. News article from WPBF 8-13-14;
15. Statement of Mark Brown dated January 26, 2015;
16. Statement of Leah Boles dated January 27, 2015;
17. St. Lucie County Sheriff's Office Statement Form statement of Leah Boles dated 5-11-14;
18. Statement of Samantha Gileweski dated January 14, 2015;
19. Statement of Hardyal Bhagudas dated January 16, 2015;
20. Statement of Shawn P. Mahoney dated 12-18-14;
21. St. Lucie County Sheriff's Office Statement Form statement of Shaun Mahoney dated 5-11-14;
22. St. Lucie County Sheriff's Office, Ft. Pierce, Florida Miranda Warning for Shaun Mahoney dated 5-11-14;
23. Statement of Shannon Randolph dated 12-18-14;
24. Numerous photographs of scene, Docher and deputies involved;
25. St Lucie County Fire District Incident Report;
26. Incident Report SLCSO dated 1-14-16;
27. IA Files Responding Deputy Carmichael;
28. IA Files Responding Deputy Mangrum;
29. IA Files Responding Deputy Alonge;
30. IA Files Responding Deputy Robinson;
31. IA Files Responding Deputy Newman;
32. Personnel Actions-Deputy Claylan Mangrum;
33. Personnel Actions-Deputy Christopher Newman;
34. Personnel File of Responding Deputy Alonge;
35. Personnel File of Responding Deputy Mangrum;
36. Personnel File of Responding Deputy Newman;

37.  Personnel File of Responding Deputy Courtemanche; and
38.  Personnel File of Responding Deputy Robinson;

Appendix D

Facts Assumed

At approximately 6:00 pm on Sunday, May 11, 2014, Mark Wayne Brown, an employee of the CVS Drug Store located at 301 NE Prima Vista Boulevard, Port St. Lucie, Florida, noticed a black male, later identified as Tavares Docher, in the CVS store.

According to Brown, Docher was talking loudly, not making any sense, saying that somebody was at his house threatening him, and he had change missing from his laundry room.  Because of his concern about Docher's behavior, Brown called 911 and was advised deputies from the St. Lucie County Sheriff's Office (SLCSO) would be sent to him. Docher then walked out of the store. According to Brown, Docher was "higher than a kite" (Page 13, SLCSO Case Supplemental Report #14-05401).

At approximately 6:03 pm, SLCSO Deputies Christopher Newman, Clayton Mangrum and Calvin Robinson were dispatched to the CVS Store and made contact with Docher.

According to the deputies, Docher was acting intoxicated, was unsteady on his feet, speaking loudly and swinging his hands and arms. Docher was holding a screwdriver in his right hand which he dropped when commanded to do so by Deputy Mangrum (Page 6, SLCSO Case Supplemental Report #14-05401).

According to Deputy Newman, Docher told him he had a few drinks, and Arabs were trying to kill his mother and him because they knew where the Arabs dropped the headless body in St. Lucie County.

According to Deputy Newman, because Docher was able to tell them who and where he was, they decided to arrest Docher for disorderly intoxication instead of taking him into protective custody under the Baker Act (Page 6, SLCSO Case Supplemental Report #14-05401).

According to Newman, he told Docher to put his hands behind his back because he was arresting him for Disorderly Intoxication.  According to Newman, Docher did not have issues with that, complied with Newman's orders, and was handcuffed. However, when the deputies started to put Docher in a patrol car, Docher looked at all three deputies and took off.  In response, all three deputies grabbed Docher and took him to the ground. While on the ground Deputy Mangrum delivered palm heel strike to Docher's large muscle groups and Deputy Newman delivered an elbow strike to the right side of Docher's head (Page 6, SLCSO Case Supplemental Report #14-05401).

According to Deputy Newman, Docher tried to bite him so he delivered a second elbow strike to Docher's head (Page 25, SLCSO Case Supplemental Report #14-05401). Deputy Mangrum then called for Rescue to respond to treat Docher's injuries.  Deputy Alonge then arrived on the scene and assisted in keeping Docher on the ground.

1

According to Deputy Mangrum, before medical personnel arrived on the scene, he noticed Docher go limp so he checked for a heartbeat and breathing and placed Docher in the recovery position (Page 25, SLCSO Case Supplemental Report #14-05401).

After Medical arrived on the scene  and started treating Docher, Docher came to and started fighting again and Rescue gave him a shot and one minute later Docher was calm enough to be placed on a gurney and put in an ambulance (Pages 25 and 26, SLCSO Case Supplemental Report #14-05401).

According to citizen witness Merine Kanhai, she saw 3-4 deputies restraining an African American male and saw a deputy elbow the male in the face. The male was saying "Don't let them kill me" and the deputies were saying "stop resisting arrest." In her opinion the deputies were using excessive force (Page 21, SLCSO Case Supplemental Report #14-05401).

Ariana Kanhai, another citizen witness, stated she saw deputies holding a man on the ground.  He wasn't moving much.  The deputies kept hitting the man after he was handcuffed. The deputy by the man's head kept hitting him with his elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Zackery Taylor, the deputies were hitting the man with their elbows (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Leaha Boles, Doucher was "delusional and paranoial" and "very sweaty" and not acting normal (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Samantha Gilewski, Doucher "was pacing, nervous and delirious." "He was talking murders, ransom and rewards." (Page 21, SLCSO Case Supplemental Report #14-05401).

According to witness Shannon Randolf, when she saw the incident Docher was on the ground with his hands behind his back and the cops "were beating the shit out of him



# Defensive Tactics Techniques: Deadly Force Techniques

Appendix E

Deadly force is usually associated with the use of a firearm. However, certain empty-hand techniques and unconventional weapons can be used effectively in a deadly force encounter. Empty-hand techniques become deadly force when they have the capability of causing great bodily harm or even death. A good example is a ground fight that turns into a deadly threat when a subject attempts to choke or bite you, gouge your eyes, or grab your gun. If you cannot access a weapon, then an empty-hand technique may help stop or disable your attacker, giving you the chance to recover to a different position.

Some empty-hand techniques can become deadly force if applied to a specific target area of the body that is likely to result in great bodily harm or death. Some examples of deadly force techniques include the thumb strike, elbow strike, and eye gouge. *(DT501.3.T.)*

**OBJECTIVES**

DT501.3.T. Demonstrate the simulation of deadly force techniques.

## Deadly Force Thumb Strike

Form a fist with your strong hand.

Extend your thumb past the middle knuckle of your index finger.

Squeeze your hand tightly so that the pad of the thumb pushes firmly against the index finger.

Allow it to curl upward to form a slight bend that will lock the middle knuckle of the thumb.

Using good control, deliver a strike to various areas of the subject. Some examples of striking areas include the throat and eyes. (See Figure 4-106)

The throat and eyes are two examples of effective target areas for a deadly force thumb strike.

## Deadly Force Elbow Strike

The deadly force elbow strike uses the tip of the elbow to target a specific area where great bodily harm may result. To be a deadly force strike, certain target areas must be stabilized.

Some target areas for a deadly force elbow strike include the following:

- temple
- side of jaw
- bridge of nose
- back of the head
- throat (See Figure 4-107)



Deadly force thumb strike     *Figure 4-106*

# Defensive Tactics Techniques:
# Threat Assessment—Assessment and Response

**OBJECTIVES**

**DT501.3.A.1.** Identify the necessity of conducting a threat assessment.

**DT501.1.C.** Identify verbal and nonverbal cues in assessing threats.

**DT501.3.A.** Demonstrate officer presence.

**DT501.3.A.4.** Demonstrate the interview stance.

**DT501.3.A.5.** Demonstrate the offensive ready stance.

**DT501.3.A.3.b.** Identify relative positioning.

**DT501.3.A.3.** Demonstrate the slide step approach.

**DT501.3.A.2.** Demonstrate how to maintain a minimum reactionary gap.

**DT501.3.A.3.a.** Identify the danger zone.

**DT501.3.B.1.** Demonstrate hand clearing techniques.

**DT501.3.A.1.a.** Define *reaction time principle.*

**DT501.3.I.1.** Demonstrate evasion techniques.

**DT501.3.I.2.** Demonstrate redirection techniques.

Though it may be difficult to determine factors that constitute a specific threat, there are certain facts, circumstances, and conditions that, when taken together, may be perceived by an officer as threatening.

An officer's assessment of a perceived threat is critical for safety and influences his or her actions when dealing with a situation. The more information an officer has, the better prepared he or she will be to assess the situation. All factors, whether obvious or not, should be considered when assessing threats. *(DT501.3.A.1.)*

Officers must recognize that threats may be fluid and constantly changing. Circumstances must be continually analyzed for their threat potential.

## Subject Behavior

There are certain verbal and nonverbal cues that indicate the possibility of subject aggression or posturing. *(DT501.1.C.)*

Verbal cues may include abnormal stuttering, serious and specific swearing, and specific verbal threats.

Nonverbal cues may include the following:

- increased breathing and pulse rates
- cessation of all movement
- clenched fists and quivering hands
- refusal to show palms of hands
- reddened or flushed face
- expanding veins showing prominently on face and forearms
- shifting of shoulders or change of stance
- target glance
- ignoring the officer
- rapid, angry movements

### Excited Delirium

Officers should be aware of unusual symptoms exhibited by a subject upon initial contact or that may develop or intensify during the course of the confrontation. These symptoms may be indicators of serious issues, such as physical illness, mental illness, drug reaction or overdose, or post-traumatic stress disorder.



CMS Criminal Justice Defensive Tactics 2-11

he unusual symptoms or behavior is usually attributed to a condition known as excited delirium. "*Excited delirium* is a state of extreme mental and physiological excitement characterized by exceptional agitation and hyperactivity, overheating, excessive tearing of the eyes, hostility, superhuman strength, aggression, acute paranoia, and endurance without apparent fatigue" (Lewinski, 2006).

A subject in a state of excited delirium could die suddenly and without explanation, a death sometimes referred to as Sudden Death Syndrome. Unfortunately, the death may be wrongly attributed to the actions of an officer or his or her use of certain levels of force.

When confronting a subject with unusual symptoms, an officer should immediately seek medical attention. Be careful of the position in which the subject is restrained. Take care to maintain an open airway, and ensure continuous breathing and proper circulation until medical help arrives.

## Environmental Factors

Some potential environmental factors that should also be considered in threat assessment may include weather, traffic conditions, terrain, presence of animals, presence of bystanders, and potential weapons.

## Presence

*Officer presence* is your ability to convey to subjects and onlookers that you are able and ready to take control. Subjects' and onlookers' reaction toward you depends on their perceptions of how you present yourself.

You should be aware of and interpret nonverbal communication. Some movements and gestures are clues to escalating aggression, for example, clenched fists, shifting feet, or hidden hands. Subjects also observe your actions to determine your attitudes and intentions. Officer presence is your first response to any situation. By simply arriving on the scene, an officer affects a subject or situation. *(DT501.3.A.)*

*Command presence* is the way you carry yourself. Your presence can determine whether a subject's resistance escalates or de-escalates. A good command presence projects an image of confidence in your skills and abilities to perform the task at hand. Important aspects of command presence include personal appearance (uniform and personal grooming), erect posture, and alertness and attention to surroundings.

## Stances
### Interview Stance *(DT501.3.A.4.)*

Stand with head, hips, and feet aligned.

Place your feet shoulder-width apart with the knees slightly bent.

Angle your body to the subject with the strong side away.

Place your hands above waist level. (See Figure 4-4)



Interview stance                    *Figure 4-4*

---

**Appendix G**

# IACP National Law Enforcement Policy Center
# EXCITED DELIRIUM
### Model Policy
### January 2014

---

## I. PURPOSE

The purpose of this policy is to provide guidance and direction in the handling of individuals who may appear to law enforcement officers and others to be in a state of excited delirium (ExDS). This policy is part of a cooperative response protocol shared by this department, the emergency call center, Emergency Medical Services (EMS), and hospital emergency department staff. The coordinated activities and responsibilities identified herein are designed to enhance the response to incidents involving excited delirium.

## II. POLICY

Rapid control of the subject and transfer to the care of emergency medical providers should be the primary objectives of law enforcement officers unless other action is necessary in order to protect officers or others. The underlying causes of ExDS are not fully understood, although its common symptoms have been documented and witnessed by police officers. Persons exhibiting symptomatic behavior should be suspected of being the subject of a medical emergency that could result in sudden death.

## III. DEFINITIONS

*Excited Delirium Syndrome (ExDS):* A medical disorder generally characterized by observable behaviors including extreme mental and physiological excitement, intense agitation, hyperthermia often resulting in nudity, hostility, exceptional strength, endurance without apparent fatigue, and unusual calmness after restraint accompanied by a risk of sudden death.[1]

*Medical Syndrome:* A collection of behavioral and physiological signs and symptoms of a medical disorder known to frequently appear together but without a full understanding of their underlying cause or causes.

## IV. PROCEDURES

A. Initial Call
   1. Calls associated with ExDS often include descriptions by complainants of wild, uncontrollable physical action, and hostility that comes on rapidly.
   2. Where there is suspicion from the complainant that ExDS might be involved, call takers shall request the following types of information:
      a. Specific behaviors of the subject

   b. Whether the subject has been or is using PCP, methamphetamine, cocaine, alcohol, or other mind-altering substances separately or in combination.

   c. Whether the subject has a history of mental or physical illness or substance use.

 3. When information suggests ExDS, a sufficient number of officers to physically control the subject should be dispatched together with Advanced Life Support EMS personnel, all of whom shall be alerted to the possibility that the call may involve ExDS.

 4. A supervisory officer should be dispatched to all such calls for service, when reasonably possible.

 5. The caller should be kept on the line, unless it is unsafe or impractical so he or she can provide updated information about the subject that can be relayed to responding officers and emergency medical providers.

B. Assessment

 While officers cannot diagnose ExDS, they should be cognizant of specific signs and characteristic symptoms. These may include one or more of the following.

 1. Constant or near constant physical activity

 2. Irresponsiveness to police presence

 3. Nakedness/inadequate clothing that may indicate "self-cooling" attempts

 4. Elevated body temperature/Hot to touch

 5. Rapid breathing

 6. Profuse sweating

 7. Extreme aggression or violence

 8. Making unintelligible, animal-like noises

 9. Insensitivity to/extreme tolerance of pain

 10. Excessive strength (out of proportion)

 11. Lack of fatigue despite heavy exertion

 12. Screaming and incoherent talk

 13. Paranoid or panicked demeanor

 14. Attraction to bright lights/loud sounds/glass or shiny objects

C. Control

 Physical control must be affected quickly to minimize the intensity and duration of resistance and struggle, which often are direct contributors to sudden death.

 1. When responding to a call involving possible ExDS, officers shall do the following:

   a. Eliminate unnecessary emergency lights and sirens.

   b. Ensure that an adequate number of backup officers have been dispatched to affect rapid control of the suspect.

   c. Ensure that EMS is on the scene or en route. Where possible, EMS should be on site when subject control is initiated.

 2. When the individual is responsive to verbal commands, one officer should approach the subject and employ verbal techniques to help reduce his or her agitation before resorting to the use of force.  The officer should

      a. not rush toward, become confrontational, verbally challenge, or attempt to intimidate the subject, as he or she may not comprehend or respond positively to these actions and may become even more agitated or combative; and

      b. ask the subject to sit down, which may have a calming effect, and be prepared to repeat instructions or questions.[2]

3. Pepper spray, impact weapons, and electronic control weapons (ECWs) used in drive stun contact mode are normally ineffective due to the subject's elevated threshold of pain.

4. If an ECW is used in probe mode, the officer shall energize the suspect no longer than necessary to overcome resistance. The subject should be restrained as soon as practical while affected by ECW power.

5. Alternately, a physical takedown using a swarming technique is an effective means of obtaining compliance as long as an adequate number of officers are available. Lateral vascular neck restraint, if authorized, is another effective means of obtaining control. A coordinated restraint plan should be devised quickly before implementing these approaches.

6. Officers should use only those restraints that appear necessary to control the situation and only for the period of time required.

7. When restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck, or head.

8. Reasonable steps should be taken to avoid injury, such as moving the subject from asphalt to a grassy area to reduce abrasions and contusions.

9. Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.

10. Officers should check the subject's pulse and respiration on a continuous basis until transferred to EMS personnel. Officers shall ensure the airway is unrestricted and be prepared to administer CPR or an automated external defibrillator (AED) if the subject becomes unconscious.

11. If the subject becomes calm and breathing is not labored shortly during or after the application of restraints while officers are still gasping for air, it may be an indication that the subject is in jeopardy and requires immediate medical attention to avoid cardiac arrest.

12. Individual officers who encounter persons exhibiting symptoms of ExDS should adhere to the following guidelines.

      a. When there is no apparent threat of immediate injury to the subject or others, the officer should not attempt to take physical control of the subject. This would likely precipitate a struggle and exacerbate the subject's physical and emotional distress. The officer should wait for backup and EMS assistance before attempting to control the subject.

      b. If the subject poses a threat of death or serious bodily injury to the officer, others, or to him or herself, apart from the dangers inherent

in ExDS alone, intervention should be taken using that level of force reasonably necessary to control the individual.

   c. If it can be determined that the subject has been under duress for an extended period of time, the symptoms of ExDS appear acute, and EMS is not readily available, the officer should consider affecting control and transporting the subject to the nearest emergency medical facility. This decision should be based largely on whether police backup and/or EMS assistance is forthcoming, and the officer's judgment as to his or her ability to gain control through the use of ECWs or similar means without undue personal risk of bodily harm.

D. Emergency Medical Response

   1. As soon as control is obtained, pre-staged EMS personnel should examine the subject and provide emergency medical aid as necessary, to include sedation and cooling as indicated.

   2. If sedation is authorized, officers shall work with EMS to control the subject for purposes of drug administration.

   3. Whenever possible, an officer should accompany the subject to the hospital for security purposes and to provide assistance as necessary.

E. Documentation

   1. Documentation of ExDS incidents is critical for purposes of post-incident personnel review and debriefing, training, creation of a historical record to respond effectively to any civil litigation that may arise, and to respond effectively to inquiries concerning the incident from the community and the media. Documentation should include, at a minimum,

     a. Conditions at the incident scene

     b. Description of the subject's behavior and its duration

     c. Description of what the subject said during the event

     d. Type of and duration of resistance

     e. Identity of officers at the scene

     f. Actions taken to control the subject

     g. Restraints used on the subject and the length of time applied

     h. Location of the restraints on the subject

     i. Response time and actions taken by EMS, including a list of drugs given to the patient

     j. Means of transport and total elapsed time of transport

     k. Behavior of the subject during transport

     l. Means of resuscitation, if appropriate

     m. Vital signs; especially body temperature

     n. Ambient temperature at the time of the incident (warm temperatures are associated with increased frequency of ExDS)

     o. Results of tests and medical assessments taken by EMS personnel and emergency medical staff

     p. Results of autopsy, if appropriate

     q. Information from relatives and friends of the subject that can provide insight to the potential causation of the incident

r.   Measures taken by EOC during initial receipt of the call for service, dispatch, and follow up

s.   Analysis of incident and arrest reports and any other information from involved police personnel concerning the department's response to ExDS

t.   Where in-car video cameras and related video recordings are available, they should be used to document the actions of the subject and officers during the incident

F.  Training

1.  This department's training authority shall ensure that officers are properly prepared for such incidents, including early detection of ExDS, instruction in defensive tactics recommended for use when dealing with ExDS subjects, tactics and techniques that should be avoided, and protocols for interfacing with emergency medical responders.

2.  Emergency call center staff shall be trained to recognize symptoms that may indicate that an incident involves someone experiencing ExDS.

**Acknowledgment**

This document was prepared by the IACP National Law Enforcement Policy Center, in conjunction with the IACP Police Physicians Section and the IACP Police Psychological Services Section.

**Endnotes**

[1] A broad based panel of experts, commissioned by the National Institute of Justice, US Department of Justice, concluded that "the consensus view of the panel's medical experts is that this syndrome is indeed real." Special Panel Review of Excited Delirium, Weapons and Protective Systems Technology Center, December 2011. This is not necessarily the view of the NIJ or USDOJ. However, the report illustrates the continuing debate on underlying causation rather than whether the syndrome, by any other name, exists.

  The term "excited delirium" has been accepted by the National Association of Medical Examiners (NAME), the American College of Emergency Physicians (ACEP), and other medical experts but not by the American Medical Association or the American Psychiatric Association.

[2] While verbal de-escalation techniques should be employed before the use of force, due to the extreme fear, confusion, agitation, and panic characteristic of ExDS, these actions will not normally be adequate in efforts to gain compliance sufficient to apply restraints.

© Copyright 2014. Departments are encouraged to use this policy to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

Every effort has been made by the IACP National Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors.

This project was supported by Grant No. 2010-DJ-BX-K002 awarded by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the SMART Office, and the Office for Victims of Crime. Points

of view or opinions in this document are those of the author and do not represent the official position or policies of the United States Department of Justice or the IACP.

IACP National Law Enforcement Policy Center Staff: Philip Lynn, Manager; Sara Dziejma, Project Specialist; Gregory Joy, Policy Advisor - Law Enforcement, Bureau of Justice Assistance, U.S. Department of Justice; and Bart R. Johnson, Executive Director, International Association of Chiefs of Police.

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*





# *National Law Enforcement Technology Center*

**June 1995**                                          **A National Institute of Justice Program**

# Positional Asphyxia—Sudden Death

*Major portions of this bulletin are drawn from a report prepared by the International Association of Chiefs of Police for the National Institute of Justice (NIJ), based on research conducted by Dr. Charles S. Petty, Professor of Forensic Pathology, University of Texas, and Dr. Edward T. McDonough, Deputy Chief Medical Examiner, State of Connecticut, and reviewed by the Less-Than-Lethal Liability Task Group.*

Police, sheriffs, and correctional officers have a limited and largely inadequate set of tools to use to safely subdue violent and aggressive subjects. Through NIJ's National Law Enforcement Technology Center (NLETC), the Federal Government is working to identify and support the development of a range of less-than-lethal technologies—from those suitable for one-on-one encounters to those that might be used for stopping fleeing vehicles. In a recent analysis of in-custody deaths, we discovered evidence that unexplained in-custody deaths are caused more often than is generally known by a little-known phenomenon called positional asphyxia.

This NLETC bulletin presents information relevant to positional asphyxia—i.e., death as a result of body position that interferes with one's ability to breathe—as it occurs within a confrontational situation involving law enforcement officers. We offer this information to help officers recognize factors contributing to this phenomenon and, therefore, enable them to respond in a way that will ensure the subject's safety and minimize risk of death.

The bulletin identifies factors found to precipitate positional asphyxia, and provides recommendations for ensuring a subject's safety and advisory guidelines for care of subjects. Information regarding the collection of potential evidence in cases involving positional asphyxia is also included. Through officer awareness and resultant action, it is anticipated that deaths attributable to this cause will be reduced.

Sudden in-custody death is not a new phenomenon—it can occur at any time, for a variety of reasons. Any law enforcement agency may experience a sudden in-custody death, and while rare, such deaths appear to be associated most often with the following variables:

■ **Cocaine-induced bizarre or frenzied behavior.** When occurring while confined by restraints, cocaine-induced excited delirium (an acute mental disorder characterized by impaired thinking, disorientation, visual hallucinations, and illusions) may increase a subject's susceptibility to sudden death by effecting an increase of the heart rate to a critical level.

■ **Drugs and/or alcohol intoxication.** Drug and acute alcohol intoxication is a major risk factor because respiratory drive is reduced, and *subjects may not realize they are suffocating.*

■ **Violent struggle extreme enough to require the officers to employ some type of restraint technique.** Subjects who have engaged in extreme violent activities may be more vulnerable to subsequent respiratory muscle failure.

■ **Unresponsiveness of subject during or immediately after a struggle.** Such unresponsive behavior may indicate cardiopulmonary arrest and the need for immediate medical attention.

It is important to understand how preexisting risk factors, combined with the subject's body position when subdued or in transit, can compound the risk of sudden death. Information contained in this bulletin may help to alert officers to those factors found frequently in deaths involving positional asphyxia.

## Basic Physiology of a Struggle

A person lying on his stomach has trouble breathing when pressure is applied to his back. The remedy seems relatively simple: get the pressure off his back. However, during a violent struggle between an officer or officers and a suspect, the solution is not as simple as it may sound. Often, the situation is compounded by a vicious cycle of suspect resistance and officer restraint:

■ A suspect is restrained in a face-down position, and breathing may become labored.

■ Weight is applied to the person's back—the more weight, the more severe the degree of compression.

- The individual experiences increased difficulty breathing.

- The natural reaction to oxygen deficiency occurs—the person struggles more violently.

- The officer applies more compression to subdue the individual.

## Predisposing Factors to Positional Asphyxia

Certain factors may render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position:

- Obesity.

- Alcohol and high drug use.

- An enlarged heart (renders an individual more susceptible to a cardiac arrhythmia under conditions of low blood oxygen and stress).

The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position.

## Advisory Guidelines for Care of Subdued Subjects

To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors contributing to positional asphyxia. Where possible, avoid the use of maximally prone restraint techniques (e.g., hogtying). To help minimize the potential for in-custody injury or death, officers should:

- Follow existing training and policy guidelines for situations involving physical restraint of subjects.



**Officer Subduing a Violent Suspect and How It Can Interfere With Breathing**

Subject's chest fully extended.

Breathing becomes labored due to pressure being exerted on subject's back.

Officer subdues violent suspect.

- As soon as the suspect is handcuffed, get him off his stomach.

- Ask the subject if he has used drugs recently or suffers from any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema.

- Monitor subject carefully and obtain medical treatment if needed.

- Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the individual to the emergency room, or call for an emergency medical team (EMT) unit if such signs are observed.

- Obtain medical care upon subject's request.

- If the subject is turned over to a detention facility, inform the facility's custodians of any preexisting medical conditions (cardiac, respiratory) or that the subject requested or needed medical treatment because of respiratory difficulty or because he became unconscious.

## Collection of Potential Evidence

Officers involved in confrontational situations should collect information that may later be of value in a civil or perhaps criminal action.

A use-of-force report should include details of how the individual was

2

restrained. The following information should be included:

- What was the nature of the postarrest restraint procedure? Identify whatever type of restraint (including chemical incapacitants) was used.

- How long was the subject face down and/or restrained?

- How was the subject transported, and in what position was the subject during transport?

- How long did the transport phase last, and what observations were made of the subject's condition?

To reasonably establish the cause of death or serious injury, a broad range of factors must be examined:

- Nature of the confrontation.

- Weapon(s), if any, employed by officers.[*]

- Duration of the physical combat.

- System or type of postarrest restraint employed.

- Transportation of the subject: destination, duration, mode of transport, and position of subject during transport.

- Emergency room observations and actions, names of attending medical personnel.

- Postmortem examination (autopsy) of subject: nature of injuries, diseases present, drugs present, and other physical factors.

---

[*]If any incapacitant was used (e.g., pepper spray), the delivery system should immediately be secured for possible analysis.

## Conclusion

To help minimize the risk of positional asphyxia, diligent observation and monitoring of subjects displaying any one or a combination of the described indicators are procedurally warranted. Furthermore, the use of maximal, prone restraint techniques should be avoided. If prone positioning is required, subjects should be closely and continuously monitored. By implementing such procedural protocols, the potential for in-custody deaths may be lessened.

---

### NLETC Bulletin

The *NLETC Bulletin* is designed as a forum for disseminating to the law enforcement and criminal justice communities the most current information on technologies relevant to your needs. We welcome your comments or recommendations for future *Bulletins*.

---

The National Law Enforcement Technology Center is designing data bases to help respond to agencies that want to know who manufactures a specific product and what other agencies may be using that product. Your contributions to the Center's information network are important. What technologies or techniques are you using that you would like to share with colleagues? Please call or write to the National Law Enforcement Technology Center, P.O. Box 1160, Rockville, MD 20849, 800–248–2742.

---

NYPD's Guidelines to Preventing Deaths in Custody

- As soon as the subject is handcuffed, *get him off his stomach*. Turn him on his side or place him in a seated position.

- If he continues to struggle, *do not sit on his back*. Hold his legs down or wrap his legs with a strap.

- Never tie the handcuffs to a leg or ankle restraint.

- If required, get the suspect immediate medical attention.

- Do not lay the person on his stomach during transport to a station house or hospital. Instead, place him in a seated position.

- An officer should sit in the rear seat beside the suspect for observation and control.

The New York City Police Department (NYPD) has developed a training tape on positional asphyxia. The Department has agreed to make the tape available to interested law enforcement agencies. To request a complimentary copy, please send your written request on departmental letterhead, and a blank VHS tape, to the Deputy Commissioner of Training, NYPD, 235 East 20th Street, New York, New York 10003.

---

The National Law Enforcement Technology Center is supported by Cooperative Agreement #95–IJ–CX–K002 awarded by the U.S. Department of Justice, National Institute of Justice.

The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, Bureau of Justice Statistics, Office of Juvenile Justice and Delinquency Prevention, and Office for Victims of Crime.

**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*

*Washington, DC 20531*

Official Business
Penalty for Private Use $300

BULK RATE
POSTAGE & FEES PAID
DOJ/NIJ
Permit No. G–91

# Investigation and Prevention of Officer-Involved Deaths





**Cyril H. Wecht, JD, MD**
Forensic Pathologist

**Henry C. Lee, PhD**
Professor, University of New Haven

**D.P. Van Blaricom**
MPA, Chief of Police (Ret)

**Mel Tucker**
MPA, Chief of Police (Ret)



**CRC** CRC Press
Taylor & Francis Group


DEPOSITION
EXHIBIT
C
Tucker
PENGAD 800-631-6989

# Excited Delirium

# 5

*Excited delirium* is a term that is being used to explain the deaths of individuals who have been involved in a struggle with the police. It is controversial term because there has been no formal recognition of the phenomenon by the medical community, and it is not recognized in the *Diagnostic and Statistical Manual of Mental Disorders*. Even though the American Medical Association does not recognize this diagnosis as a medical or psychiatric condition, the National Association of Medical Examiners has recognized it for more than a decade. It is used by medical examiners in most major cities. Thus, there is a great deal of controversy regarding the use of this syndrome to explain sudden death while restrained. However, the one thing that the medical community does agree upon is that excited delirium is a "medical emergency" no matter what the cause? The law enforcement community believes that excited delirium is a physical condition that sometimes leads to death after a physical struggle and also believes that the key to avoiding these deaths is to train law enforcement officers on the recognition of the symptoms of excited delirium.

The *Canadian Medical Association Journal* has dismissed excited delirium as a "pop culture phenomenon." The Royal Canadian Mounted Police (RCMP) hired Compliance Strategy Group to author an independent study of excited delirium. In their report, the authors stated that the concept of excited delirium should be removed from RCMP training manual, policies, and procedures.

TASER® International has funded numerous studies to prove that excited delirium is a valid cause of death in cases where the excessive use of force and the use of TASERs were shown to have been involved.

Proponents of excited delirium as a legitimate diagnosis say that it usually strikes people who use large amounts of stimulants, especially cocaine or methamphetamines, and the mentally ill. In 1849, Luther V. Bell, M.D., the superintendent of Massachusetts McLean Asylum for the Insane, published a description of what appears to be the first case of excited delirium. Since that time, what today is called excited delirium has been variously known as Bell's Mania, agitated delirium, excited delirium, and acute exhaustive mania. Most of the early papers describing the condition speak of a prolonged period of increasingly bizarre behavior, usually over several days or weeks. This bizarre period seems to be much shorter when the victim is abusing stimulants such as cocaine or methamphetamines. Officers tend to see the bizarre



and alarming behavior of a subject experiencing excited delirium as strictly a control-and-arrest situation rather than a serious medical emergency that can turn fatal. Proponents of excited delirium as a legitimate medical condition say that just as it became important for police officers to distinguish between a combative drunk and a person having a diabetic crisis, there needs to be training so that officers can recognize and distinguish between people choosing to act in a violent and criminal way, and those who are doing so because of an underlying medical condition that is affecting them both mentally and physically.

Opponents of excited delirium theory say they have never seen any proof that someone can be excited to death. The American Civil Liberties Union (ACLU) and the National Association for the Advancement of Colored People (NAACP) fear that the condition is being exploited and used as a medical scapegoat for police abuse. They believe most of these people do not die from drugs or some mysterious syndrome but from confrontation, abuse, and inappropriate use of force and restraint during a violent encounter that should have been avoided. They theorize that the cause is due to the psychological stress of being confronted with aggression that results in further physiological reactions (e.g., adrenaline release, increased heart rate, temperature, and strength), leading to death. The fact that many of these deaths happen during or soon after restraint clearly implies police abuse. The ACLU believes that most in-custody deaths are the result of excessive force and improper restraint techniques such as hog-tying and the use of pepper spray.

Excited delirium has become recognized as a police-related cause of death that can be experienced in any size community, where it may be suddenly confronted by a patrol officer who is ill prepared to either recognize this medical emergency or know how to best respond. Although the phenomenon has been known to exist for many years, it was rarely encountered until more recently, and the greater occurrence is due to certain societal developments:

• Public policy has discouraged institutionalization of the mentally ill, while approximately 5% of the U.S. population, many of whom are homeless, suffer from a serious mental illness.

• Street abuse of cocaine and methamphetamine (meth) is increasing.

Not surprisingly, the primary candidates for being potential victims of excited delirium include:

• The mentally ill (primarily bipolar or paranoid schizophrenic), who

• Those who are suffering from both a combination of mental illness and street drug abuse.

Although the actual physiology of excited delirium is not yet fully understood, medical examiners are more frequently listing it as being at least a contributory cause of death.

Because unscientific and speculative media reporting of such death has caused widespread public criticism of in-custody deaths, police trainers have started to educate themselves about excited delirium and have started to develop training programs that are designed to prepare officers and minimize potential excited delirium deaths.

## What Would You Have Done?

This incident takes place in the suburb of a metropolitan area that is served by a medium-sized police department of 150 officers and acts totally independent of the larger city's staff and training or communications facilities.

Sean Richards was 26 years of age and had been diagnosed as a paranoid schizophrenic since high school. He had been generally responsive to therapy and successfully medicated for several years, but unfortunately, and as is often the case, his medications had always produced unwanted side effects. His new girlfriend, Jennifer, had recently introduced him to crystal meth, and Sean soon found that he could "feel good" without the unwanted side effects of his psychotropic medications. Within a few weeks, he had completely quit taking his prescribed medications and was heavily into crystal meth, which he and Jennifer were able to manufacture in one room of the small home that they rented in a high-crime neighborhood of the central city.

One particularly hot summer afternoon, Sean and Jennifer were high and decided to supplement their income by a shoplifting foray into the neighboring suburb's shopping mall. While riding the bus to their destination, Jennifer noticed that Sean was becoming agitated, but he reassured her that he was okay and just worried about being caught by mall security. After leaving the bus and while walking to the mall entrance, Sean began sweating profusely and started mumbling to himself. Without warning, he suddenly began shouting, "The devil is trying to kill me," and started tearing off his clothes until he was completely naked. The entrance to the mall displayed a large water fountain that cascaded onto plate glass panels, and Sean leaped into the water, where he began bashing his head against the glass until he was bleeding profusely. Although his speech was mostly incoherent, he could sometimes be understood to yell, "I'm God, you can't kill God!"

naked guy is in the mall fountain shouting that he's God." The dispatcher obtained the caller's identifying information and dispatched the nearest unit to the scene.

A solo officer soon arrived, parked with his emergency lights still activated, and ran up to the fountain. This officer was a large young man who lifted weights, was physically fit, and had a reputation for being able to handle himself in any physical confrontation. To the contrary, Sean was short, skinny, and obviously drunk or high. This should be no problem, the officer thought, and immediately asserted his command and control presence. Although Jennifer had been tempted to run, she knew that something was seriously wrong with Sean, whom she loved in her way, and she tried to talk with the officer. She wanted to at least tell him that Sean was a diagnosed paranoid schizophrenic, was "off his meds," and maybe even admit that he was high on crystal meth, too. She never had a chance before the officer told her, "Get back and stay out of this." The officer next shouted at Sean, "Get out of there, you're under arrest," and that is when Sean's attention turned to the officer. Growling like an animal, he waded toward the officer, climbed out of the fountain, and charged forward screaming, "You can't kill God!"

The officer was totally unprepared for the attack and suddenly found himself unexpectedly struggling with a person who displayed superhuman strength and felt no pain. After managing to radio, "Officer needs help," in a clearly exhausted voice, he was able to access his oleoresin capsicum (OC) and covered Sean's face with spray but to no effect. The officer dropped his empty OC canister and extended his Asp baton, but repeated strikes also had no effect. Likewise, repeated drive stuns from his TASER had no effect. He was in a fight with Superman and had just concluded that he would have no alternative but to shoot in self-defense, when the first backup unit arrived, and a second officer joined the fight. Sean, however, threw both officers around with seeming ease, and they could not even begin to restrain him. The third and fourth units arrived next, and they, too, joined the fight, each trying to control an arm or leg, as they finally managed to place Sean face down on the ground. A sergeant was the fifth to arrive, and by the mutual efforts of all five officers, they managed to attach a handcuff to each wrist and join them together behind his back. Even with that amount of restraint, Sean managed to continue his struggle and was kicking wildly, as he repeatedly arched his body off of the ground. A sixth officer arrived with a hobble, which was still struggled with maximum physical exertion. Accordingly, the two latest arriving officers held him down with the weight of pressure on his back and buttocks, while the others caught their breath.

It seemed like the more they tried to hold him down, the more he

waiting for medics to arrive, one of the officers noticed that their prisoner did not seem to be breathing, and a quick check of his carotid pulse found none. The restraints were removed, he was rolled over onto his back, and cardiopulmonary resuscitation (CPR) was being started as the medics arrived to take charge of the patient. Although the medics managed to start his heart and breathing again en route to the hospital, he never regained consciousness.

The nightly news reported that a mentally ill man was severely beaten by the police, hog-tied, and died in police custody. The story was repeated in the local press, and an editorial demanded that the officers be held criminally responsible.

## Best Practices Based upon What We Know

- There are estimated to be between 50 and 125 in-custody deaths each year in the United States that correlate with excited delirium symptoms.
- There is no medical or psychiatric diagnosis of excited delirium.
- The International Association of Chiefs of Police (IACP) does not acknowledge the syndrome.
- Each year more medical examiners blame excited delirium for in-custody deaths.
- Excited delirium symptoms include:
  - Imperviousness to pain
  - Great strength
  - Hyperthermia
  - Sweating
  - Bizarre and violent behavior
  - Aggression
  - Hyperactivity
  - Hallucinations
  - Confusion and disorientation
  - Foaming at the mouth
  - Drooling
  - Dilated pupils
- It is accepted in the law enforcement profession that excited delirium is a medical emergency that requires acute medical care.
- It is accepted in the law enforcement profession that officers must be trained on recognition of excited delirium.
- It is accepted in the law enforcement profession that law enforcement

Investigation and Prevention of Officer-Involved Deaths

- If a TASER is used, it is recommended that one firing in probe mode is all that should be used, as multiple activations increase the risk of death.
- Officers should be trained so they are aware that a high risk of sudden death is associated with people in excited delirium.

Simply stated, officers confronted with a situation in which the suspect is believed to be in a state of excited delirium should immediately call for backup officers, should immediately call for emergency medical personnel to be ready to treat the suspect as soon as he or she is under physical control, and should use a TASER in electromuscular disruption mode one time and attempt restraint while the suspect is incapacitated by the TASER. If the TASER is ineffective, the officers will have little choice but to go hands-on with the suspect to gain physical control and restraint.

## Investigation of the Scene

these types of situations, officers should communicate with headquarters immediately to report the incident and request an ambulance and additional backup personnel be dispatched right away. The shift supervisors or commanding officer should respond to the scene immediately. The following tasks should be implemented:

- Assist and remove any injured individuals from the scene as soon as possible.
- Secure the crime scene.
- Begin crime scene protection measures.
- Use barrier tape, official vehicles, or necessary measures as needed.
- Set up a command post in accordance with departmental operations policy.
- Notify the appropriate personnel in the departmental chain of command to take charge of the situation.
- Employ crowd control procedures to protect the integrity of the scene.
- Detain witnesses—witnesses have valuable information about the incident.
- Try to separate all witnesses to prevent discussions about the incident.
- To avoid a potential confrontation between the officer or officers and the victim's family, remove the officer or officers involved from the scene.
- Initiate crime scene investigation procedures.
- Notify the appropriate agencies, including the forensic laboratory, medical examiner, and other law enforcement agencies when required.

Excited Delirium

## General Crime Scene Procedure

The general crime scene procedure should be followed. Major crime investigators, crime scene technicians, and forensic specialists should be called to the scene. Scientists and investigators should work together methodically and swiftly to process the scene. The purpose of crime scene investigation is to document and memorialize the scene, to collect and preserve forensic evidence, and to reconstruct the incident event.

The basic elements of a crime scene investigation include the following:

1. Crime Scene Survey
   The lead investigator and case officer should conduct a quick scene survey and determine the crime scene parameter. Avoid any unnecessary delay.

2. Documentation of the Crime Scene
   The crime scene should be documented according to standard procedures, and a four-corner crossover photographing method should be used for document the area.

3. Crime Scene Search
   There are seven commonly used methods for a crime scene search. Figure 5.1 illustrates these methods. Line search, strip method, and grid method are used for outdoor scenes. Spiral and wheel methods and zone search are used for indoor scenes. Link searches are used for special situations.

   Crime scene search patterns are varied and outwardly different in style and application. However, they all share a common goal of



Crime Scene Search Methods

- Line search
- Strip method
- Grid method
- Spiral method
- Wheel method
- Zone search
- Link search

providing structure and organization to ensure that no physical or pattern evidence is overlooked. There is no single correct method for a specific type of crime scene.

## Line or Strip Methods

This approach involves the demarcation of the crime scene into a series of lines or strips. Then, members of the search team are arranged at regular intervals, usually at arm's length, and then proceed to search along straight lines. The investigator identifies any evidence in his or her path. This method is also referred to as the strip method. The crime scene coordinator regulates the pace of the search. This method is well suited for searching large areas, such as parks, fields, yards, parking lots, or highways. In addition, it can be conducted by as few as one or two investigators or as many as hundreds.

Crime scenes that involve multiple gunshots must be searched for all related firearms evidence, shell casings, and projectiles. An inventory of the weapons and bullet magazines potentially involved in the incident will identify the maximum amount of cartridges and bullets that may be found at the scene. The information can be supplemented with a preliminary examination of the firearms evidence, then an organized line method search should be conducted. In an investigation concerning a police officer–related shooting when the initial scene search was unable to locate one of the expended shell casings, the scene search should include the use of metal detectors. Locating the shell casing is important, as it is information needed to assist in the reconstruction process conducted months later.

## Grid Method

The grid method is a modified double-line search. In this approach, a line pattern is constructed, and then a second line pattern is established in the same area, running perpendicular to the first line pattern. Searchers follow the first line pattern and search in the same manner as with the line method. Upon completing the first line pattern, the searchers realign on the other line pattern. Thus, the same area is searched twice by a grid pattern format. An additional advantage is that two different searchers search the same area. Although this method is more time consuming, it has the advantage of being more thorough and methodical.

## Wheel Method

along many straight lines, or rays, from this point. This search pattern becomes increasingly difficult when searching larger areas and, therefore, is usually used only for special scene situations and with limited applications.

## Spiral Method

Similar to the wheel/ray method, the spiral method considers the crime scene as circular in design. There are two techniques commonly used for spiral methods: one method is generally referred to as an inward spiral and the other is an outward spiral. With the inward spiral method, investigators start at the outer boundary and circle the crime scene toward the critical point. With the completion of each circuit, the diameter of the circle is progressively decreased until a central point is reached. Meanwhile, the outward method involves starting at the critical point and circling outward. These approaches rely on the ability to trace a regular pattern of fixed diameter. Thus, physical barriers at the scene may pose problems during the search. The spiral method is generally used for special conditions of the crime scene search. However, there is a danger that physical evidence could be destroyed while walking to the central point to initiate the search. A very limited number of situations require the application of these search methods.

## Zone Search

Crime scenes that include readily definable zones can be effectively searched by focusing on the zones in a systematic manner. Indoor crime scenes are examples of such a scene. Depending on the size of the scene, each zone may be subdivided as needed until it is of manageable size. There are a variety of techniques for conducting a zone pattern search. If the search is to be conducted by a small group of trained crime scene investigators, the entire team can work together in a particular zone. For example, if the scene involved a private residence, the investigators could enter one room at a time, document, search, and collect all relevant evidence as a unified team. For the primary areas of the scene, this methodology is recommended. However, if there are numerous zones in ancillary areas, then the team can be divided, and each member can conduct a search of a particular zone. If this method is chosen, it is good practice to have a particular zone searched twice by two different investigators. The scope of the search and the type of evidence being sought will help determine the appropriate method to search in a zone format. Zone searching is also advantageous in that the individual zone can be prioritized.

## Link Search

The link method is often the most productive and common approach for crime scene searches. This method is based on the four-way linkage theory, seeking to find associations between the scene, victim, suspect, and physical evidence. With this method, the investigators evaluate the scene and then proceed through the area in a systematic and logical fashion to gather physical evidence that can be linked or associated to a particular crime or activity.

## Collection, Preservation, and Packaging of Physical Evidence

In this particular scenario, the following types of physical evidence should be collected:

1. From the Police Officer Involved in the Shooting
   a. Weapon, if firearm was discharged
   b. Ammunition, if firearm was discharged
   c. Clothing, shoes, tear and damage patterns
   d. Gunshot residue (GSR) kit of hands, if firearm was discharged
   e. Injury pattern
   f. Bloodstain
   g. OC can
   h. Soil, grass, stains
   i. Other relevant evidence
2. From Decedent
   a. Clothing and shoes
   b. Bullet or bullets and fragments, if firearm was discharged
   c. Bullet trajectory, if firearm was discharged
   d. GSR kit and pattern on clothing if firearm was discharged
   e. Trace evidence
   f. Weapon (knife) if possessed by suspect
   g. OC residues on clothing and body
   h. Drug, containers, documents on body
   i. Complete toxicology results
3. Evidence at Scene
   a. Spent casings and their locations if firearm was discharged
   b. Spent bullets and their locations if firearm was discharged
   c. Weapon and its location
   d. Bloodstains and their patterns
   e. Body location

   h. Trace and transfer evidence
   i. Bullet trajectory if firearm was discharged
   j. Location and condition of TASER
   k. Location and condition of OC can
   l. Location and condition of baton
   m. Any vomited material or other body fluids

## Preliminary Reconstruction

Preliminary crime scene reconstruction should be conducted to determine the sequence of events and the location of each subscene within the overall crime scene.

## Releasing the Scene

Once the scene processing is complete, the scene should be released quickly. All the debris, bloodstains, markings, and crime scene tape should be removed from the area.

## TASER and Excited Delirium

Some persons involved in an altercation with law enforcement agents die as a result of an altercation when TASERs are involved. Some studies suggest the reason for many of these deaths is based on the fact that the person fighting with a law enforcement officer is suffering from a controversial condition known as *excited delirium*. Excited delirium is said to occur when a person has a state of mind "begetting irrational and often violent behavior." It has been noted that persons suffering from excited delirium often had been using cocaine at the time of the altercation. Cocaine is a drug that causes heart arrhythmias when ingested by a person. The victim's drug use may be unknown to the police officers at the time of the altercation. As already stated, there is much debate surrounding excited delirium as a legitimate medical condition, and as the stated cause of death in altercations involving the use of a TASER on an out-of-control and noncompliant victim.

Law enforcement agents depend on nondeadly weapon alternatives such as TASERs to safely subdue suspects and defuse potentially dangerous situations. Recently, serious injuries and deaths have been linked to TASER use

Many police suspects have been injured or killed after being shocked with TASERs. Officers have been injured during training. Critics believe the TASER should be used only as an alternative to lethal force, and that law enforcement agents currently use the device too freely. These critics cite a rash of recent injuries caused by the device on cadets of law enforcement agencies, suspects not imposing an imminent danger to themselves or others, and even on uncooperative children, the elderly, and pregnant women.

From 2001 to 2007, there were over 250 deaths associated with police use of TASERs throughout the United States and Canada. The number of TASER-related deaths has increased by the year as more law enforcement agencies have included TASERs as standard-issue weapons to their officers. One noted organization reports the death toll by TASER use in the United States and Canada as follows: 1 in 1999, 1 in 2000, 4 in 2001, 13 in 2002, 19 in 2003, 56 in 2004, 67 in 2005, and 69 in 2006. This statistic alone demonstrates that as the number of TASERs in the hands of law enforcement agencies grows, so does the number of deaths of TASER victims.

A 2005 British Columbia study examined current information regarding law enforcement agents' use of TASERS and the impact of the electrical shocks on subjects. The study found that persons shocked by TASERs might suffer serious bodily harm or even death after being shocked by the supposedly nonlethal device. TASER International officially recognizes only a few health risks associated with its weapons: direct injuries from the laser aim, TASERs include abrasions, scarring, and eye damage from the laser aim. Strong muscle contractions may also cause injuries that may include the following: hernias; ruptures; internal injuries to soft tissues, organs, muscles, tendons, ligaments, nerves, and joints; and bone fractures including fractures to vertebrae. TASER International also cautions about secondary injuries caused by the inevitable loss of control and fall of the stunned victim. Those who are physically infirm, pregnant, or located on unstable or elevated platforms may be at a higher risk of secondary injury after receiving a TASER shot.

Other sources indicate a number of significant health risks associated with TASER use that are not recognized by TASER International. For example, a shock from a TASER can occur during the vulnerable period of a heartbeat cycle. This vulnerable period is the stage in a heartbeat cycle during which an electroshock is highly likely to cause ventricular fibrillation. Ventricular fibrillation is a state in which the heart muscles spasm uncontrollably, disrupting the heart's pumping function and causing death. Certain segments of the population may be more susceptible to ventricular fibrillation, such as children, due to their small size and, in direct relation, the small size of their

psychiatric medication or other drugs due to the effect of such drugs of raising blood pressure in the body. Multiple applications of TASER shocks can also naturally increase the chance that the electrical charge will hit the heart during the vulnerable period.

## Other Cases Involving Excited Delirium

On February 13, 2006, Darvel Smith struggled with police after leaving a New Orleans bar. Smith was tased by Louisiana State Police during the struggle. After being tased, Smith was placed in handcuffs. Shortly after the TASER blast to his back, Darvel Smith died of cardiac arrest. A pathologist for the Orleans Parish Coroner's Office stated, "Darvel Smith died as a result of excited delirium and the presence of cocaine in his system." The coroner went on to state that the TASER stun did not contribute to Smith's death. Smith's family sued for wrongful death, but the case was dismissed because the force used by the officers was reasonable under the *Graham* test.

Police responded to a disturbance on the evening of April 16, 2006. Billy Ray Cook had been seen running through the streets screaming "Please don't shoot me." Cook was incoherent, delusional, and under the influence of impairing substances. Three officers attempted to handcuff Cook, but Cook resisted and was tased numerous times until the officers were able to handcuff and shackle him. Between the three officers, Cook was tased a total of 38 times. The chief medical examiner determined the main cause of death in the case to be excited delirium due to cocaine intoxication. The medical examiner did state that Cook's altercation with the officers "may have been a contributing proximate cause of his death." Cook's estate sued the county and the officers for wrongful death, but summary judgment was granted for the defendants due to the fact that the officer's use of force was reasonable under the *Graham* test.

Sergio Galvan died of a heart attack after a struggle with police officers on March 23, 2007. Galvan was in a residential neighborhood, not far from his home, and was screaming incoherently. Galvan was approached by two police officers and began fighting with them. Galvan was tased during the struggle and died shortly thereafter. The medical examiner's report indicated four sets of lesions, which were interpreted as being marks left by the TASER. The coroner listed Galvan's cause of death as a result of "Excited Delirium Syndrome due to acute intoxication with cocaine." A wrongful death suit filed by Galvan's estate ended in summary judgment for the defendants, the City of San Antonio, and the officers involved in the struggle that resulted in Galvan's death. The court found the force applied to Galvan to be reasonable under the *Graham* test set forth by the U.S.

Phillip Wayne LeBlanc died April 1, 2004, after being briefly detained by the Los Angeles Police Department. Police officers came upon LeBlanc that evening and instantly believed that he was under the influence or mentally ill. LeBlanc was handcuffed to a fence, and at that time "his speech became unintelligible growling." LeBlanc was sweating profusely even though it was a cool night, and he seemed impervious to pain. The police rejected using pepper spray or a beanbag gun to control LeBlanc, and instead agreed the best course of action would be to tase him. LeBlanc was tased twice and restrained by the officers. LeBlanc stopped breathing while he was restrained and soon after died. The coroner determined the cause of death to be excited delirium caused by cocaine intoxication. The coroner went on to claim that the TASER discharge did not contribute to LeBlanc's death.

LeBlanc's estate sued the city for wrongful death and had four expert witnesses testify to dispute the excited delirium diagnosis. Dr. Gary Ordog testified that the amount of alcohol and cocaine in LeBlanc's system at the time of his death was nonlethal, and that the cause of death was cardiac arrest resulting from the TASER discharge. Dr. Dennis Hooper testified that the cocaine found in LeBlanc's blood was nonlethal, and that the TASER charges deployed by the officers were "the major contributing cause of death." Dr. Michael Morse testified that the use of a TASER by the police in the circumstances surrounding the case should be deemed a use of deadly force. Finally, Gary Clark, a 27-year veteran of the Los Angeles County Sheriff's Department, testified that the officers involved did not allow sufficient time for the situation to deescalate, and that the use of a TASER in that circumstance was tactically improper. Even with the plaintiff's expert testimony calling the coroner's diagnosis directly into question, the court granted summary judgment for the defendants.

## Model Legislation for the Safe Use of TASERS

Recognizing the abundance of TASER-related deaths and health risks, states should recognize the need for regulating the use of TASERS by law enforcement agencies. Only New Jersey outright forbids TASER use, which is too drastic of a measure because TASER use is beneficial in many situations that require nonlethal force. Successful TASER legislation should include standard reporting and training requirements for all law enforcement officers.

Massachusetts has a well-developed TASER statute in regards to reporting requirements that should be in place in model TASER safety legislation. The reporting requirements under the Massachusetts statute require the assaulting officer to report the number of times the weapon has been fired as

well as to identify the characteristics of the individual at whom it was fired. This information is likely already found in police reports, so the reporting requirements would not be burdensome extra paperwork for officers.

TASER International's X26 TASER model is capable of recording the time, date, and duration of each discharge. There is a data port on the X26 model that connects through a USB cable to any computer for ease of recording the data. The X26 model also has an optional TASER Cam, which records both audio and video of the TASER discharge. The TASER X26 would be an ideal choice for law enforcement agencies attempting to comply with the reporting requirements, because most, if not all, of the needed data is saved on the TASER.

The raw data collected by the law enforcement agencies should then be transmitted to an independent clinic, such as in a university, for annual analysis. The results would then be forwarded to government officials and agencies to review and to determine if any remedy is necessary. This practice is similar to that required in Massachusetts.

The model legislation for regulating TASERS should also mirror the Massachusetts statutes in regard to training requirements. Massachusetts requires TASER training programs to be developed using guidelines set forth by a government agency and requires that the programs be approved by that agency before implementation. Specific issues regarding health risks should be covered extensively in the training programs. Other issues such as minimum shock duration, recognition of intoxicated or excited persons, medical protocol, and location on use-of-force continuum should all be covered in the mandatory training program.

Finally, the model TASER statute should include strict use requirements similar to those found in Florida's statute. The language of the Florida statute states that situations when police may deploy TASERS "must involve an arrest or a custodial situation during which the person who is the subject of the arrest or custody escalates resistance to the officer from passive physical restraint to active physical resistance," and the suspect must be "preparing or attempting to flee or escape." Requirements such as these would prevent the use of TASERS against those suspects who pose no risk to the officer or to themselves.

## Endnotes

1. Mary Paquette, Excited Delirium: Does It Exist? *Perspectives in Psychiatric Care*, September 2009.

2. C.W. Lawrence and J.T. Cairns, Sudden Custody Death: The Ontario Perspective, *RCMP Gazette*, 2001.