VIDEO TELECONFERENCE DEPOSITION
JOHN A. STERBA, MD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother and
legal guardian,

                    Plaintiff,

         - vs -      Case No.
                     2:16cv14413

CHRISTOPHER NEWMAN, individually;
CLAYTON MAGRUM, individually;
CALVIN ROBINSON, individually;
WADE COURTEMANCHE, individually;
KEN J. MASCARA, as Sheriff of
 St. Lucie County, Florida;
JOSE ROSARIO, individually; and the
ST. LUCIE COUNTY FIRE DISTRICT,
  an independent special district,

                    Defendants.
----------------------------------------
          Video teleconference deposition of JOHN

**A. STERBA, MD, present at JACK W. HUNT &**

**ASSOCIATES, INC., 1120 Liberty Building, Buffalo,**

**New York, taken pursuant to Federal Rules of Civil**

**Procedure connected with PURDY, JOLLY, GIUFFREDA &**

**BARRANCO, PA, 2455 East Sunrise Boulevard, Suite**

**1216, Fort Lauderdale, Florida, on July 19, 2017,**

**commencing at 10:07 a.m., before NANCY C. BROICH,**

**Notary Public.**


          **JACK W. HUNT & ASSOCIATES, INC.**

2

```
 1   APPEARANCES:        SEARCY, DENNEY, SCAROLA,
                         BARNHART & SHIPLEY, PA,
 2                       By ADAM S. HECHT, ESQ.,
                         2139 Palm Lakes Boulevard,
 3                       West Palm Beach, Florida 33409,
                         (561) 686-6300,
 4                       ash@searcylaw.com,
                         Appearing for the Plaintiff,
 5                       (in Buffalo).

 6                       PURDY, JOLLY,
                         GIUFFREDA & BARRANCO, PA,
 7                       By SUMMER M. BARRANCO, ESQ.,
                         2455 East Sunrise Boulevard,
 8                       Suite 1216,
                         Fort Lauderdale, Florida,
 9                       (954) 462-3200,
                         summer@purdlaw.com,
10                       Appearing for the Defendants,
                         Christopher Newman, Clayton Magrum,
11                       Calvin Robinson, Wade Courtemanche,
                         Ken Mascara,
12                       (in Fort Lauderdale).

13                       WILSON ELSER MOSKOWITZ
                         EDELMAN & DICKER LLP,
14                       By JULIE A. TYK, ESQ.,
                         111 North Orange Avenue, Suite 1200,
15                       Orlando, Florida  32801,
                         (407) 203-7592,
16                       julie.tyk@wilsonelser.com,
                         Appearing for the Defendants,
17                       St. Lucie County Fire District,
                         an independent special district,
18                       Jose Rosario,
                         (in Buffalo).
19

20

21

22

23
```

3

```
 1              (STIPULATIONS:  Waive filing of the

 2              transcript, waive Oath of the Referee,

 3              reserve all objections until trial, with

 4              exception of objections as to form.)

 5

 6         MR. HECHT:  Is this being videotaped at all?

 7         MS. BARRANCO:  Not that I'm aware of.  I

 8    didn't set this up.

 9         MR. HECHT:  We are not videoing it on our

10    end.  I just wanted to make you weren't on your

11    end.  It's a little warm in here so he is going to

12    take off his jacket and tie.  I just wanted to make

13    sure it's not being filmed.

14         MS. BARRANCO:  No problem.

15

16    J O H N  A.  S T E R B A, MD, Saved By Grace

17    Ministry, Incorporated, 226 Center Road, East

18    Aurora, New York  14052-2233, after being duly

19    called and sworn, testified as follows:

20

21              EXAMINATION BY MS. TYKE:

22

23         Q.   Hi, Dr. Sterba.  My name is Julie Tyke
```

Sterba, MD - Tyke - 7/19/17

4

1    and I represent St. Lucie County Fire District and

2    Jose Rosario in this matter.  Have you had your

3    deposition taken before?

4         **A.   Yes, ma'am.**

5         Q.   I will skip all the ground rules since

6    you already know the process and go right into

7    questioning, if that is okay with you?

8         **A.   Yes, ma'am.**

9         Q.   Dr. Sterba, you listed your business

10   address as Saved by Grace Ministry.  I saw on your

11   CV that was attached to your report that you also

12   list house physician, house calls?

13        **A.   And that CV is 2012.  I brought you an**

14   **updated CV according to Schedule A.**

15        Q.   I was going to ask you if you had an

16   updated one.

17        **A.   This is everything that you required**

18   **for Schedule A, that is your copy, and I have the**

19   **same.**

20        Q.   Just give me a minute.  And you were

21   kind enough to bring with you an updated CV that is

22   dated June 21st, 2017, is this the most up-to-date

23   CV that you have?

Sterba, MD - Tyke - 7/19/17

5

1          A.     Yes, ma'am.

2          Q.    I will attach that as an Exhibit to

3    this deposition.  First, what I will do is attach a

4    copy of the notice for taking deposition -- hold

5    on.  I will attach a copy of that as Exhibit 2 and

6    then his current curriculum vitae as Exhibit 1.

7          The following were marked for Identification:

8          EXH. 1       Curriculum Vitae

9          EXH. 2       Notice of Taking Deposition

10   BY MS. TYKE:

11         Q.    And going back to my question, it lists

12   on your CV and website physicianhousecalls.org, is

13   that a separate business entity?

14         A.    No.  That is just the website.

15         Q.    That's what I was trying to figure out.

16   The entity that you are employed with is that Saved

17   by Grace Ministries, Inc.?

18         A.    Yes.

19         Q.    And the website for Saved by Grace

20   Ministries, Inc. is physicianhousecalls?

21         A.    .org.

22         Q.    Okay.  I did see a .com one for

23   physicianhousecalls there is actually a .com?

Sterba, MD - Tyke - 7/19/17

6

1          A.    That is not us.

2          Q.    And how long have you worked with Saved

3    by Grace Ministries, Inc.?

4          A.    December 11th, 1998.

5          Q.    What is it that Saved by Grace

6    Ministries, Inc. does?  What kind of corporation is

7    it?

8          A.    It is a health -- I should say medical

9    and research corporation.  And it is Saved by Grace

10   Ministry, singular, which is ministry.  It is a

11   nonprofit public charity.  And you will find our

12   corporation purposes somewhere on our website or I

13   have a copy somewhere.  We conduct medical research

14   and I also practice emergency medicine.

15         Q.    What type of research does the business

16   conduct?

17         A.    The original research was sports

18   therapy.  The physiological benefit of various

19   adaptive sports to benefit children that are

20   disabled.  And that is based on my second NIH

21   postdoctoral fellowship in medical rehabilitation.

22   The research right now focuses on emergency

23   physician house calls, and as a trademark using the

Sterba, MD - Tyke - 7/19/17

7

1    community based federally registered and trademark

2    portable Er, with a little r in a circle, and that

3    is our current research.  And you will find that

4    research summarized on our website under the tab

5    research and publications.

6         Q.   Is Saved by Grace Ministry associated

7    with any religious organization?

8         A.   No.  It's a nonprofit public charity,

9    humanitarian medical and research corporation.

10        Q.   Can you describe for me the emergency

11   medicine portion of the business?

12        A.   Yes.  I'm a board certified physician

13   for children and adults in emergency medicine,

14   American Board of Emergency Medicine.  And also,

15   likewise for children and adults through the

16   American Board of Urgent Care Medicine.  So I

17   provide emergency physician house calls using the

18   using the community based portable ER Monday

19   through Friday, 9:00 a.m. to 8:00 p.m. in the

20   greater East Aurora area, which would include

21   Orchard Park, your hometown, all the way out to

22   Strykersville, North Java, Elma, Marilla and down

23   to Holland and the Village of East Aurora and the

Sterba, MD - Tyke - 7/19/17

8

1    **Town of Aurora, that is 313 square miles of service**

2    **area, that is the practice of emergency medicine**

3    **that is credentialed by National Government**

4    **Services, that is the administrator for Medicare**

5    **Part B, Medicaid and all insurances for the**

6    **practice of emergency medicine.**

7            Q.   Do you employ any other physicians

8    besides yourself?

9            A.   No.

10           Q.   Do you employ any physician extenders?

11           A.   No.

12           Q.   Do you take all types of emergency

13   calls?

14           **A.   Yes.  Being that every single call that**

15   **comes through -- like the one I just received a**

16   **little bit ago on my cell phone, every single**

17   **request for an emergency physician house call is**

18   **triaged only by me.**

19           Q.   Is there a certain level of triage that

20   you will accept and other ones would have to be

21   deferred to a hospital?

22           **A.   Yes.  Unreasonable requests would go to**

23   **the hospital.**

Sterba, MD - Tyke - 7/19/17

9

1          Q.    What would be considered unreasonable

2     request?

3          A.    Plastic surgery of the droopy eyelids

4     was about a week ago.  People are unaware that I am

5     a physician that does house calls, even though it's

6     greatly accelerating across the United States.  So

7     many calls that come through are for general

8     information.  All emergencies are treated by me

9     except for obvious life threatening surgical or

10    medical emergencies.

11         Q.    Can you explain to us what categories

12    of life threatening medical emergencies would fall

13    into that category?

14         A.    A family calling requesting for me to

15    come to the house for someone who would be having

16    crushing chest pain, nausea, sweating, diaphoresis,

17    they would be instructed to immediately call 911.

18    And whatever information I would receive quickly

19    via triage would be called directly in through my

20    private lines that I have to all ERs in the area,

21    and I would give full report for whatever I

22    learned.  That doesn't happen that often.

23         Q.    Are you able to do any type of labs or

Sterba, MD - Tyke - 7/19/17

10

1    diagnostic studies?

2        A.    Yes.  We've received considerable

3    funding for a portable blood chemistry lab, and

4    that is also included in our research, which shows

5    that the time from ordering a lab until the time

6    that the printed lab result is explained is always

7    under 14 minutes on average.  And that was done in

8    two studies, the wound care study and then the

9    study on sick patients that require point of care

10   labs using a portable blood chemistry laboratory.

11   I'm also New York State Department of Health

12   clinical laboratory director?

13       Q.    Are you able to do diagnostic studies

14   such as MRI or CT scan?

15       A.    Portable MRI, no, there is no such

16   thing.  Well, there is one but that goes from

17   hospital to hospital.  Portable CAT scan, no.  They

18   are referred to a facility that would do a CAT

19   scan.  I have done that directly skipping the ER

20   working directly with say a neurosurgeon.  Because

21   I'm an emergency physician with actually an ER, so

22   my evaluation nine out of ten times the patient

23   never has to go to the ER for either surgical wound

Sterba, MD - Tyke - 7/19/17

11

1    care or being sick requiring labs.  We are keeping

2    90 percent at home.

3         Q.   Are there any type of labs that you are

4    unable to do in your portable lab?

5         A.   The portable lab is only blood

6    chemistries.  There are a few others that are done

7    as well.  However, I have a full array of all

8    vacutainers and I do phlebotomy.  And then I just

9    personally deliver whatever labs would be necessary

10   stat labs to 24-hour services right here.  And

11   those lab results are called by my cell phone or

12   directly to my office.

13        Q.   Going back earlier in some of the

14   patients that you would not be able to treat, you

15   were describing somebody who might be suffering

16   from a cardiac arrest or an MI, is that accurate?

17        A.   Yes.

18        Q.   Would you be able to treat somebody who

19   had a stroke?

20        A.   Yes.

21        Q.   You would be able to handle?

22        A.   If it wasn't clear I would see them

23   right away.  Our response time is quite quick.  We

Sterba, MD - Tyke - 7/19/17

12

1   are in a semi-rural area.  If it was an obvious

2   stroke they would be referred to the closest most

3   appropriate hospital.  I wouldn't delay any time

4   for an obvious stroke.  If there was some concern

5   of just general weakness and it turned out to be a

6   stroke in evolution, then I would expedite by

7   ambulance to the appropriate stroke facility.

8          Q.   Do you have credentials at any of the

9   local hospitals?

10         A.   To do what?

11         Q.   To go in once you've triaged somebody,

12  if you know that they need to go to the hospital

13  are you able to then go to the hospital and follow

14  that patient?

15         A.   Emergency physicians do not admit and

16  they also do not treat patients on the floor.  We

17  are not hospitalists.  As an emergency physician I

18  would not have any credentials at hospitals to act

19  as the patient's primary care physician.  My role

20  is as a medical and surgical acute care specialist

21  of emergency medicine only.

22         Q.   Do you have any credentials at any

23  local hospitals?  Do you practice at any local

Sterba, MD - Tyke - 7/19/17

13

1  hospitals?

2      A.    You mean in other ERs?

3      Q.    Yes.

4      A.    No.  Being that I have my own ER it is

5  not medically necessary for me to work in somebody

6  else's emergency room.

7      Q.    When was the last time that you

8  actually worked at a hospital emergency room?

9      A.    2008 Dominican Republic, a total of

10  4,300 patients were treated by me over a period of

11  years overseas in emergency rooms.

12      Q.    And when was the last time that you

13  worked in an emergency room at a hospital in the

14  United States?

15      A.    2002.  And the last time I worked with

16  an ER was this past week.

17      Q.    And can you describe that for me?

18      A.    At the patient's home using the

19  portable ER it does constitute using an ER, it is

20  portable.  And this is better explained on our

21  website.  I'm happy to send the first article,

22  doctor reinvents house calls, advanced wound care

23  at home.

Sterba, MD - Tyke - 7/19/17

14

1            The portable ER was invented by me back in

2    1989 out of necessity, national security.  I

3    deployed to the North Pole region through Thule Air

4    Base.  And was up there for two months as the sole

5    emergency physician.  I had to develop rather

6    quickly in a two-week period of time the portable

7    ER.  This is the military portable ER.  The

8    practice of emergency medicine, including the US

9    standards of care were done using that military

10   portable ER, which was then retooled as a medical

11   missionary portable ER used during and recovering

12   from diasters in Sierra Leone, which would have

13   been their civil war.  Honduras after the

14   hurricane, and I don't remember what hurricane it

15   was.  And then the Dominican Republic with the

16   Haitian refugee crisis.  So the portable ER is used

17   to practice emergency medicine including for me now

18   full-time.

19        Q.   And you talked earlier about triage,

20   are there different levels of triage?

21        A.   No.  I triage everything.

22        Q.   I mean, like is there a number of signs

23   and different levels of triage?

Sterba, MD - Tyke - 7/19/17

15

1          A.    No.   I just triage everything.   I don't

2     use a numbering system.   I professionally do it as

3     an emergency physician.   No nurse, no EMS triage

4     system.

5          Q.    Can you give me the benefit of your

6     educational background starting with undergraduate

7     studies?

8          A.    Sure.   In your packet you have a blue

9     sheet of paper.   We should start with the most

10    interesting one for this case.

11         Q.    This packet that you just handed to me.

12         A.    See that blue one.   I forgot your name.

13    MR. HECHT:   Summer.

14    THE WITNESS:   Summer is your first name?

15    MS. BARRANCO:   Yes.

16    THE WITNESS:   Thanks.   Indian River

17    Community College 1973 EMT course that was done in

18    1973, and I became certified, completing the EMT

19    training course registry 5025 under Philip Wayne

20    Bobbit, and that expired three years later in

21    August of 1976, so that was after my first year of

22    college.   I became then nationally registered as an

23    EMT working in the states of Wisconsin, Illinois,

Sterba, MD - Tyke - 7/19/17

16

1   Florida to begin with.  And I actually did

2   part-time volunteer work just during the summer of

3   1973 with Indian River Volunteer Ambulance Squad.

4   And I did look at the video that said I worked

5   there eight years, that was a mistake on their part

6   that I couldn't correct, that was just part of the

7   EMT training.

8        The first case that I had was an overdose of

9   Benzodiazepine and alcohol, which I vividly

10  remember.  My professional work for eight years was

11  in Wisconsin, Illinois and New York State to get me

12  through college and graduate school working

13  full-time.

14       So I completed my bachelor's, a bachelor's

15  of arts in 1976 at Lawrence University and I went

16  directly into Ph.D. in physiology with an expressed

17  interest in asphyxiation and cold water near

18  drowning, which is also known as environmental

19  physiology or cardiovascular pulmonary physiology

20  or diving physiology, and that was awarded with

21  distinction in 1981.

22       Thereafter I began -- concurrent with

23  medical school at Loyola in Chicago, my first --

Sterba, MD - Tyke - 7/19/17

17

1    National Institutes of Health post-doctoral

2    fellowship in cardiology and cardiovascular

3    physiology research on the neuro regulation of the

4    heart beat, if you will -- it is a little more

5    detailed than that, in the department of physiology

6    at Loyola Stritch School of Medicine, and that was

7    1981 to 1982.  My MD was completed in 1985 along

8    with specialty training as a missionary physician

9    with overseas training and experience in emergency

10   medicine and primary care, and that would have been

11   June 8th of 1985.

12         Thereafter I began PGY-1, and that was

13   internship, and this was a US Navy scholarship

14   commitment.  So my internship was in family

15   practice, also we were co-trained as emergency

16   physicians working the ER every third night from

17   1985 to 1986.  I was also involved in helicopter

18   medical evacuation and establishment of standards.

19         1986 for six months undersea medical officer

20   training and I worked as an emergency physician at

21   Naval Undersea Medical Undersea Institute subbase

22   New London in Groton, Connecticut, and also down in

23   Florida.  And that training as an undersea medical

Sterba, MD - Tyke - 7/19/17

18

1    officer involves areas of emergency medicine

2    related to diving.  It's called diving medicine and

3    submarines, so submarine medicine, and then

4    radiation health medicine, nuclear biological

5    chemical warfare, and people exposed to radiation

6    occupationally.

7            And thereafter you have to stop your

8    residency training and go active duty, which I did

9    for four years, paying back my scholarship

10   commitment.  And that active duty time was the Navy

11   experimental diving unit Panama City, Florida where

12   I was healthcare medical officer but I was also an

13   emergency physician locally during that time.

14           Research medical officer, and my main area

15   of interest as a cardiopulmonary physiologist with

16   research in asphyxiation and suffocation and cold

17   water near drowning was on the physiology of deep

18   diving, including diving to extreme depths.  I was

19   responsible as the research medical officer

20   physiologically monitoring divers that were

21   partially asphyxiated because they were at extreme

22   depth trying to conduct work with diving helmets

23   that we were evaluating.  I monitored them very

Sterba, MD - Tyke - 7/19/17

19

1   similar to how patients are monitored in the

2   operating room or now in the emergency department.

3         I was released from active duty and from

4   1990 to 1993 I completed my emergency medicine

5   residency training Dayton, Ohio.  And I also had a

6   license to practice medicine from Florida, which I

7   got an Ohio license, and without letting the

8   residency know I moonlighted extensively during all

9   three years of my residency with the experience

10  that I had.

11        That takes me to '93 and my Ph.D. post-doc

12  number 2 was right around '98.  I would have to

13  look at my CV.  That was on the physiological

14  response on gross motor function of various sports

15  used as therapy, which is a high interest area here

16  in Western New York.  Horseback riding, the

17  swimming, aquatic therapy that is, and even

18  downhill skiing.  So I got a second post-doc to

19  study all that concurrent with working in the ER.

20        **BY MS. TYKE:**

21        Q.   Thank you.  You mentioned and pulled

22  out your certificate from Indian River Community

23  College as an emergency medical technician, an EMT?

Sterba, MD - Tyke - 7/19/17

20

1      A.    Yes.

2      Q.    Were you also trained as a paramedic?

3      A.    No.   In the areas that I worked I was

4  always the EMT assigned to a paramedic.   So it was

5  a basic with a level 3 or level 4 EMT or paramedic.

6      Q.    You mentioned that you practiced being

7  an EMT in Florida, Wisconsin, Illinois and

8  Washington State?

9      A.    New York State.

10      Q.    New York State?

11      A.    Not Washington State.   Washington State

12  I worked 91 hours a week on my internship.   I

13  trained EMTs and paramedics during that time.   I

14  had no time to breathe, so I didn't work on any

15  ambulance while I interned.

16      Q.    Were any of your EMT licenses in any of

17  those states still active?

18      A.    No.   That was ions ago.

19      Q.    And when was the last time that you

20  actually practiced in the field as an EMT?

21      A.    Probably right up until the point of

22  graduating from my Ph.D., which would have been

23  '81.   However, I have extensively been in the

Sterba, MD - Tyke - 7/19/17

21

1   field, including lately, working alongside

2   paramedics that are even being called to the house

3   where I was conducting an emergency physician house

4   call acting as medical director or occasionally

5   stopping for an accident or ski patrol work years

6   ago.   That is working as a physician alongside

7   basic EMT level 1, 2 and paramedic level 3, 4.

8           Q.    What I was trying to find out was just

9   as an EMT, the last time that you would have

10  practiced in the field, sounds like 1981, is that

11  accurate?

12          A.    Correct.

13          Q.    And you mentioned sometimes stopping

14  for somebody who was involved in a motor vehicle

15  accident, are you able to -- in your portable

16  emergency medical to treat somebody who was

17  involved and sustained traumatic injuries in a car

18  accident?

19          A.    Yes.

20          Q.    Would you -- depending on the level of

21  injuries, need to refer that person over to a local

22  hospital?

23          A.    Either by air or ground ambulance, yes.

Sterba, MD - Tyke - 7/19/17

22

1   I don't transport.  The portable ER means portable,

2   hand carried.

3          Q.   I understand.

4          A.    But there is confusion.  Mobile ER

5   means you are going to treat somebody in a vehicle.

6   Nobody is ever treated in a Suburban or Malibu or

7   Grand Caravan, these are just personally owned

8   cars.

9          Q.   Do you hold a board certification in

10  cardiology?

11         A.    No.  My postdoctoral fellowship is in

12  cardiovascular physiology and also cardiology

13  research, but I'm not a cardiologist.  I'm an

14  advanced cardiac life support instructor and

15  medical director but I'm not a cardiologist.  I'm a

16  cardiovascular physiologist, Ph.D.

17         Q.   Did you work as an EMT in Florida at

18  any time?

19         A.    This was only volunteer work with the

20  Indian River volunteer ambulance squad that is

21  still there, as I understand, transporting

22  non-emergency patients.  These were actual runs

23  back then with basic EMTs and it was unpaid

Sterba, MD - Tyke - 7/19/17

23

1    volunteer work as part of my training.

2          Q.    And how long did you do that?

3          A.    The summer of '73, that's when I went

4    back to college in Wisconsin.

5          Q.    During the time that you were an EMT,

6    so before you obtained your medical degree, did you

7    ever use chemical restraint on any individual that

8    you were treating in the field?

9          A.    No.

10         Q.    The same question, during the time that

11   you practiced as an EMT only, so prior to obtaining

12   your medical degree did you use physical restraint

13   on any individual that you were treating in the

14   field?

15         A.    Frequently.  The paramedic would use

16   chemical restraint.  And I would be right there

17   monitoring the patient's vital signs, blood

18   pressure, et cetera, before and after a patient

19   would receive whatever.

20         Q.    And do you know what medication was

21   administered when the paramedic gave chemical

22   restraint?

23         A.    I'm not sure what was used back then.

Sterba, MD - Tyke - 7/19/17

24

1      Q.    And the reason why you couldn't

2   administer the chemical restraint was because you

3   were not a paramedic; is that accurate?

4          **A.    No.   I only assisted the paramedic.**

5      Q.    Can you describe the difference between

6   an EMT and a paramedic?

7          **A.    More training, more clinical**

8   **experience.**

9      Q.    Is there aspects of the job that a

10   paramedic can do versus what an EMT can do?

11          **A.    Yes.   Intubation, ACLS skills, putting**

12   **it simply.**

13      Q.    Any medications that a paramedic can

14   administer versus an EMT?

15          **A.    EMTs now are trained to give epi, but**

16   **back then no.   We didn't have the autoinjector back**

17   **then I don't think.   The medications are delivered**

18   **by the paramedic with the assistance of another**

19   **paramedic or just one paramedic and an EMT, the way**

20   **we ran in those states, as a team effort.**

21      Q.    Is there a difference between the level

22   of care that a paramedic or EMT is able to provide

23   a patient in the field versus what can be done at

Sterba, MD - Tyke - 7/19/17

25

1    the emergency department?

2          A.    By a physician?

3          Q.    Yes.

4          A.    I'm licensed in medicine and surgery

5    and they are not.  So the level of care is much

6    different.

7          Q.    Are there also things in an emergency

8    department that you are able to do that somebody in

9    the field, like an EMT and paramedic, is unable to

10   do, such as obtain labs on a patient or to get

11   diagnostic studies done such as CTs and MRIs?

12         A.    Sure.  Paramedics back then and now can

13   draw labs and then bring them in to expedite the

14   labs.

15         Q.    But they are not able to do them in the

16   ambulance?

17         A.    No.  There is no portable lab, other

18   than glucometers, finger stick blood sugars that

19   diabetics have.  We would frequently use those.  No

20   blood chemistry labs, CBC.

21         Q.    Those are not things that EMTs and

22   paramedics can do?

23         A.    No.  They draw the labs and then we

Sterba, MD - Tyke - 7/19/17

26

1    **expedite running them off to the lab in the ER.**

2         Q.   Are you a member of the National

3    Association of Emergency Medical Technicians?

4         **A.   No.**

5         Q.   Are you a member of the National

6    Association of State EMS Officials?

7         **A.   No.**

8         Q.   Are you a member of the National

9    Association of EMS Physicians?

10        **A.   No.**

11        Q.   Have you authored any articles, peer

12   review journal articles, books, textbooks regarding

13   emergency medical services?

14        **A.   I have to check my CV.**

15        Q.   Here's your current one.

16        **A.   Nothing that is related to the case,**

17   **but the list of publications that I'm referring to**

18   **right now goes from page 23 to 30.**

19        Q.   And I didn't see anything, I didn't

20   know if anything popped into your head that you

21   believe was related?

22        **A.   The articles and textbook chapters are**

23   **EMS related, being that --**

Sterba, MD - Tyke - 7/19/17

27

1          Q.    Related to this particular matter?

2          **A.    No.  It was related to the care that is**

3    **offered not only in the field like in hyperthermia,**

4    **field treatment of hyperthermia, which I authored,**

5    **and conducted human research both at Panama City**

6    **and at the North Pole region.**

7          Q.    There is not an issue of hyperthermia

8    in this case, is that accurate?

9          **A.    Hyperthermia and resuscitation from**

10   **hyperthermia.**

11         Q.    Is that an issue in this case?

12         **A.    No.  But as many of the articles are**

13   **emergency medical services as well as emergency**

14   **medicine related.**

15         Q.    But are they related to any issue that

16   is in this particular case?

17         **A.    No.  However, I did establish the safe**

18   **exposure limit for hypercapnia in divers that are**

19   **in a simulated asphyxiation situation with diving**

20   **helmets at extreme depths, but none of that could**

21   **be measured in this case.  I can clinically assess**

22   **right here on the DVD asphyxiation and suffocation**

23   **with impaired ventilation would have brought on**

Sterba, MD - Tyke - 7/19/17

28

1    hypoxia as well as hypercapnia, and that is very

2    evident just watching the video, but no levels were

3    measured.

4         Q.   How do you measure those levels?

5         A.   You measure them by end tidal CO2,

6    which we did by mask spectometry, that is now

7    infrared, we did it by infrared as well as mask

8    spec, which is done now in the OR, in the ER and in

9    the ICU.  And on some ambulances it is measured

10   right now on certain defibrillators.

11        Q.   Do you know if that was the case in

12   this matter?

13        A.   It was not measured in this case.

14        Q.   Do you know if they had the ability to

15   measure that?

16        A.   I thought I read that they did not have

17   the ability to measure end tidal CO2, so it doesn't

18   pertain to this case.  My background as a

19   physiologist is to explain what was happening, the

20   function of the human body under the stresses of

21   asphyxiation both physically and chemically.

22   Asphyxiation meaning impaired ventilation.  You

23   can't move air in and out, CO2 builds up and oxygen

Sterba, MD - Tyke - 7/19/17

29

1    **falls by either physical means or chemical means.**

2              Q.    So just going back specifically to my

3    question, do you have any specific articles that

4    relate to any issue in this matter?

5              A.    **No.**

6              Q.    Have you conducted any research in

7    emergency medical services that specifically relate

8    to any issue in this case?

9              A.    **Yes.**

10             Q.    And what is that?

11             A.    **I called the bookstore of my old ala**

12   **mater, Indian River State College as it is called**

13   **right now, and I asked what textbook are you using,**

14   **are you still using Emergency Care and they said**

15   **yes.  What I did is I pulled the textbooks.**

16             Q.    Is this research that you are currently

17   conducting yourself?

18             A.    **Not human medical research, no.**

19             Q.    That was not my question.

20             A.    **Not literature review?**

21             Q.    No.

22             A.    **Beg your pardon.**

23             Q.    That's okay.  Any research that you

Sterba, MD - Tyke - 7/19/17

30

1    personally have been involved in?

2           A.    Relating to the effects of --

3           Q.    That deals with emergency medical

4    services that deal with any issue in this case?

5           A.    No.

6           Q.    Have you taught any emergency medical

7    services class --

8           A.    Yes.

9           Q.    Can I finish my question.

10          A.    Okay.

11          Q.    Thank you.  Have you taught any

12   emergency medical services class that relate to any

13   issue in this case?

14          A.    I may have.  I used to teach EMTs back

15   in residency about all topics, as far as restraint,

16   violent patients and such.  I covered all the

17   topics.

18          Q.    And when did you begin that teaching?

19          A.    Residency '90 to '93.  Everything would

20   be covered.  I don't have any details.  That's part

21   of your residency training is to oversee paramedic

22   ambulance services, that is on my CV.  And now

23   occasionally we will have a paramedic in my ACLS

Sterba, MD - Tyke - 7/19/17

31

1   classes.  We talk about the drugs, including

2   sedating drugs and contraindications.  I teach

3   paramedics on the hazards of using Ativan, for

4   instance.

5          Q.   And when was the last time that you

6   gave any type of teaching or seminar or lecture to

7   paramedics regarding the use of Ativan?

8          A.   We talk about all of the drugs.  And

9   the last time a paramedic was in my class was

10  probably last year.

11         Q.   And do you still have that course

12  material or lecture material?

13         A.   It's the ACLS manual.  It's their

14  student workbook as well as the small handbook.

15         Q.   Did you prepare any type of PowerPoint

16  or slides or handouts for that class?

17         A.   It's at the bedside with a mannequin.

18  No, nothing is prepared like that.  We cover all

19  the drugs and they can look it up.

20         Q.   When was the last emergency medical

21  service conference that you attended?

22         A.   EMS conference not as an emergency

23  physician, I don't remember.  Refreshers back to

Sterba, MD - Tyke - 7/19/17

32

1    recertify my EMT between '73 and '81 at Erie County

2    Community College North Campus probably 80 or so,

3    1980.

4            Q.   I guess it is safe to assume that you

5    didn't recently attend the Clinicon 2017 Emergency

6    Medicine Learning and Resource Center conference

7    that just occurred?

8            A.   No.   However, as a fellow of the

9    American College of Emergency Physician and an avid

10   reader of anals of emergency medicine, I do review

11   the current literature on a regular basis including

12   EMS.  I'm so involved with the EMS now at the

13   bedside with my patients every time an ambulance is

14   called.  I review the literature continuously.  I

15   don't have to attend an EMT conference for that.

16           Q.   So as to what they were teaching as far

17   as chemical restraint, you were unaware at the

18   Clinicon conference?

19           A.   I'm not aware of the Clinicon

20   conference for EMTs and paramedics.  I'm aware of

21   the United States standard of care for paramedics

22   in the use of chemical restraints.

23           Q.   Have you worked with any EMS agency,

Sterba, MD - Tyke - 7/19/17

33

1    emergency medical services agency in writing or

2    developing their policies, procedures and

3    protocols?

4           A.   I may have.  I forgot that I was

5    medical advisor, not director, but advisor with

6    CareFlight, which was the air ambulance service out

7    of Miami Valley level 1 trauma center, Miami Valley

8    Hospital.

9           Q.   Where is that?

10          A.   It's in Dayton, Ohio, even though it

11   says Miami.  I was an advisor under the medical

12   director, and I remember writing up some policies

13   and I don't remember what policies they were.

14          Q.   What year was that?

15          A.   During my residency of '90 to '93.  And

16   they would have been signed off by the director.

17          Q.   Do you know if any of those policies

18   dealt with chemical sedation?

19          A.   I don't remember.

20          Q.   Do you know if those policies are still

21   in effect?

22          A.   No, I don't.  In addition I established

23   the corpsman training program.  Corpsman is like a

Sterba, MD - Tyke - 7/19/17

34

1   paramedic but it is a military person in the Navy.

2   I established the corpsman training program from

3   '87 to '90 down in Panama City, Florida as a health

4   care medical officer and emergency physician.  And

5   we talked about all drugs.  And as far as policies,

6   I don't recall anything specifically.  And as far

7   as them being in effect now, I don't know.

8          Q.   Do you know if they dealt with chemical

9   sedation?

10         A.   Yes.

11         Q.   Do you remember what that encompassed?

12         A.   No.  Whatever drugs were currently used

13   back at that time.

14         Q.   Do you know what that was?

15         A.   No.

16         Q.   Has it changed over the years?

17         A.   These are independent duty technicians

18   or IDTs that would be working with special warfare

19   or seal teams or on special deployment with diving

20   operations.  So they had to do everything.  In

21   addition, I was also BENS watch medical officer and

22   I talked directly via satellite with independent

23   duty technicians in the field, including combat and

Sterba, MD - Tyke - 7/19/17

35

1   orders were given confidentially for the use of

2   just about all drugs you can imagine.

3        Q.   Again, I just want to focus on the

4   questions that I'm asking.

5        A.   '87 to '90.

6        Q.   Sure.  And I just want to focus on the

7   question, I think we can go off on a lot of things.

8   I'm just asking about policies and procedures that

9   you would have developed specifically for emergency

10  medical providers?

11       A.   That would have included my work in the

12  Navy with corpsman, corpsman in the field and

13  corpsman on subs.  And also during my residency

14  from '90 to '93 local paramedics and EMTs, and

15  that's about it.

16       Q.   So it looks like early '90s was about

17  the last time that you would be involved in any

18  type of policies and procedures?

19       A.   Written policies and procedures,

20  correct.  Now I teach the current standard of

21  practice at the bedside.  And that would be the

22  American Heart Association standards of care for

23  paramedics.

Sterba, MD - Tyke - 7/19/17

36

1          Q.    Where do you teach that at?

2          **A.    Here in Buffalo, ACLS.**

3          Q.    Any particular organization that you

4    provide that through?

5          **A.    Kaleida Health.**

6          Q.    Do you have your course materials?

7          **A.    No.   It's a standard ACLS.   Course**

8    **materials are provided, and we use the handbook and**

9    **go over all the drugs.**

10         Q.    And what do you teach your EMTs and

11   paramedics regarding the use of Ativan?

12         **A.    I don't teach EMTs the use of Ativan.**

13   **It would be inappropriate.   Whatever paramedics**

14   **attend the ACLS class, the proper use of Ativan and**

15   **its precautions and contraindications.**

16         Q.    What are those?

17         **A.    What?**

18         Q.    The proper use and contraindications?

19         **A.    It's listed in all of the handouts that**

20   **have been disseminated to me, hypotension,**

21   **respiratory depression, shock, coingestion of drugs**

22   **and things like that that are mentioned in the**

23   **enclosures that people sent me.**

Sterba, MD - Tyke - 7/19/17

37

1       Q.   But what I'm asking is what you teach?

2  You said you teach a class of ACLS.

3       **A.   We talk about the cardiopulmonary**

4  **complications of using Benzodiazepines.**

5       Q.   And what do you teach the paramedics

6  that are contraindications in your class?

7       **A.   I just mentioned it to physicians,**

8  **nurses and occasionally a paramedic that**

9  **cardiovascular and pulmonary risks of using**

10 **Benzodiazepine, hypotension, respiratory --**

11      Q.   I understand the risks.  What I'm

12 saying is what are the contraindications?

13      **A.   Those that are listed in the papers.**

14 **We can go over those right now.**

15      Q.   I'm just asking you about your class

16 specifically, not what is in your report or your

17 papers.  Pretend that I'm in your class.  And so

18 what do you instruct the people who take your ACLS

19 class as to the contraindications to using Ativan?

20      **A.   Hypotension, respiratory depression,**

21 **head trauma, metabolic disturbances including**

22 **hypoxia, which can lead to lactic acidosis making**

23 **the heart very unstable, shock would be the key**

Sterba, MD - Tyke - 7/19/17

38

1    ones to watch out for if you are using a

2    Benzodiazepine like Ativan or Lorazepine.

3        Q.   When we are talking about

4    contraindications and the lists that you just gave,

5    are these absolute contraindications?

6        A.   They are list only as

7    contraindications, not absolute relative.  We just

8    talked about contraindications not whether someone

9    is allergic or something.  Hypersensitivity means

10   don't take it, you might be allergic to it.  That

11   is for every drug listed.  We're talking about the

12   serious cardiovascular pulmonary effects of the

13   cardiac and respiratory depression, cardiac arrest.

14       Q.   And are these side effects of Ativan

15   that you are talking about?

16       A.   And death.  Yes.  These are side

17   effects so that if somebody does have a problem

18   with head trauma or metabolic acidosis you don't

19   give the drug.  It's a contraindication.

20       Q.   An absolute contraindication?

21       A.   A contraindication, that's how it is

22   listed.

23       Q.   Do you consider it an absolute

Sterba, MD - Tyke - 7/19/17

39

1    contraindication?

2        **A.    I don't think I would break it down to**

3    **absolute and relative like we do with a tissue**

4    **plasminogen activator like in stroke, but we talk**

5    **about in general terms contraindications, meaning**

6    **do not give it.**

7        Q.    Would that be an absolute then?

8        **MR. HECHT:**  Form.

9        **THE WITNESS:**  It can be.  But again, you

10   have asked that three times now.  We speak to

11   paramedics and nurses primarily as

12   contraindications for these drugs.  Do not give it,

13   it carries a risk of dying.

14       **MS. TYKE:**  And what do you base that

15   instruction as to those specific being

16   contraindications, do not give?

17       **MR. HECHT:**  Form.

18       **THE WITNESS:**  The United States standard of

19   care.

20       **BY MS. TYKE:**

21       Q.    And where is that?

22       **A.    I'm just about ready to answer your**

23   **question.**

Sterba, MD - Tyke - 7/19/17

40

1      Q.    Sure.

2      **A.    The United States standard of care**

3   **based on my education, continuous reading of the**

4   **current literature, my medical practice and the**

5   **American Heart Association's recommendations that**

6   **are published.**

7      Q.    And can you give me a citation for the

8   American Heart Association?

9      **A.    Yes.  Go to the**

10  **americanheartassociation.org or whatever and get**

11  **yourself a student manual and the handbook, and you**

12  **will be able to read up on it.  I didn't bring**

13  **those today.**

14     Q.    Did you rely on that in forming your

15  opinion in this matter?

16     **A.    No.  I just teach it regularly.  So are**

17  **you going to ask me if it's authoritative?  It is**

18  **not.**

19     Q.    Okay.  What literature are you

20  discussing, you said broadly literature?

21     **A.    Literature that I read.  I read**

22  **extensively as a MD/pH.D.  I'm online almost all**

23  **the time.  And journals, a lot of journals.**

Sterba, MD - Tyke - 7/19/17

41

1      Q.   Have you read the actual insert for

2  Ativan?

3      **A.   Yes.   Years ago.   I used to carry**

4  **Ativan.   It's refrigerated.   I had to have a**

5  **special small refrigerator for it.**

6      Q.   Have you recently read the insert for

7  Ativan?

8      **A.   Not recently.**

9      Q.   Do you know what it lists as

10  contraindications?

11     **A.   No, I would have to review it.**

12     Q.   And what specific articles, journals,

13  peer review, whatever that you are reading that

14  says that head trauma and metabolic acidosis is a

15  contraindication, do not use Ativan with?

16     **MR. HECHT:**  Form.

17     **THE WITNESS:**  Well, they are included in

18  Jeffrey Lindsey, he is a Ph.D., Dr.  Jeffrey

19  Lindsey's report.  I looked at the enclosures and I

20  actually got copies of those enclosures to take a

21  look at.  The contraindications that were missing,

22  at one point it only listed if you are allergic

23  don't take it, but also other ones that go into

Sterba, MD - Tyke - 7/19/17

42

1    head trauma, metabolic disturbance, respiratory

2    depression and things like that.  Collectively it

3    fits my background, education, experience and

4    continued review of the literature and ongoing

5    medical teaching, which occasionally includes a

6    paramedic, of what to watch out for and when not to

7    give it.  And both conditions of head trauma and

8    metabolic acidosis existed for Mr. Docher.

9          **BY MS. TYKE:**

10         Q.   And again, I know that you talked about

11   the American Heart Association and their discussion

12   of head trauma and metabolic acidosis being --

13         **A.   No.  I didn't say that the American**

14   **Heart Association discusses head trauma.  It was**

15   **collectively that it is often mentioned that head**

16   **traumatic and metabolic acidosis are two**

17   **contraindications to give the drug.**

18         Q.   And really what I'm trying to narrow

19   this down as you keep just broadly mentioning that

20   you've seen this in literature and things that

21   you've read and how you keep up with the standards.

22   What I'm asking is specifically where have you seen

23   that?

Sterba, MD - Tyke - 7/19/17

43

1          A.    Are you familiar with Lindsey's report?

2          Q.    Besides Lindsey --

3          A.    Well, I'm going to refer to Lindsey's

4    report right now rather than skip over it.  This is

5    what your question was and I'm going to take a

6    moment right now to actually bring out where it

7    states that.  Just one second and I will answer

8    your question.  And other references that he

9    mentioned I actually looked them all up.  In

10   chapter 12, drugs and chemical classes, that is

11   page 24 in your document.  This is Lindsey's

12   report.  Contraindications, hypersensitivity, that

13   is if you are allergic to the drug, substance

14   abuse, which Docher probably had.

15         Q.    Are you assuming that?

16         A.    No, that is what the cops said -- that

17   is what the Sheriff's office said that he may be on

18   some unknown drugs, and it is also stated in the

19   medical record by Rosario, besides the alcohol he

20   may be on some other drugs due to his behavior.  So

21   substance abuse, coma.  Coma has a GCS, Glasgow

22   coma scale of 3, which he had prior to EMS

23   arriving.  He was asphyxiated into unconsciousness,

Sterba, MD - Tyke - 7/19/17

44

1  he was unresponsive and put into the recovery

2  position by Mangrum, who is a former EMT with Life

3  Line Ambulance years before.  He had shock, he was

4  unconscious with abnormal respiratory.  The former

5  EMT Mangrum basically said his respirations were

6  shallow after he was asphyxiated or suffocated by

7  the two maneuvers that were done.  Severe

8  hypotension, no blood pressure was ever taken

9  before the 4 milligram IM injection of Ativan was

10 given.  So was his blood pressure low, we won't

11 know.  Could it have been low, more likely than not

12 it was low.  He was unconscious.

13        CNS depression.  Could he have had CNS

14 depression, he was unconscious after being

15 physically restrained with a 330 to 335 pound

16 Officer Mangrum stepping own his chest between the

17 shoulder blades, which is in the police report by

18 -- I can't pronounce the officer's name that did

19 the investigation, but I can get you right to the

20 page.  And pulling up on the arms, very similar to

21 strappado or corda, which is a form of torture.  To

22 make it clear, I do not think that Mangrum tortured

23 Docher.  I think it was very painful in this

Sterba, MD - Tyke - 7/19/17

45

1   unapproved improvised method of pulling the arms up

2   to 90 degrees and handcuffed behind his back, and

3   that is also called reverse hanging, that I was

4   familiar with prior to this case.  And with him

5   being 330 to 335 pounds placing his left foot after

6   he yells the F bomb.  And I have it right here.  He

7   puts his foot there and you don't see him leaning

8   on his right foot and just gently putting his foot

9   down to prevent the chest from coming off the

10  ground.  He had pressure.  To what degree, I don't

11  know.  It is hard to say, probably half his weight.

12  All right.  So we've got those.

13         What else is there.  COPD, sleep apnea and

14  acute close angle glaucoma.  So what do we have

15  here substance abuse, coma, shock, likely severe

16  hypotension and CNS depression.  Contraindications,

17  what can happen if you give it --

18         Q.   Doctor, just so we are clear about the

19  question that I had asked.  It specifically had to

20  do with head trauma and metabolic acidosis.

21         A.   I would find that as well.

22         Q.   I appreciate you going through

23  everything single one of the contraindications on

Sterba, MD - Tyke - 7/19/17

46

1    that particular page.

2         A.    That is correct.  You wanted to find

3    out where it is listed as head trauma and I will

4    find that for you.  If you have your report go to

5    page 18, agitated or violent patient behavioral

6    emergencies.  And let me find page 17, I'm a little

7    out of order right now.  One second.  And let's

8    see, looking at the bottom it says -- page 43 but I

9    list it as page 18 because that was the enclosure

10   for Lindsey's report, exclusion criteria, patient

11   exhibiting agitated or violent behavior due to

12   medical conditions including but not limited to

13   head trauma, metabolic disorders, examples,

14   hypoglycemia or hypoxia.  Head trauma and hypoxia

15   both existed and those are contraindications for

16   the use of Ativan.

17        Q.    We will come back to that.  Besides

18   that specific reference are there any references

19   outside of Dr. Lindsey's report that you recall?

20        A.    And so that exclusion criteria on page

21   43 which I listed as page 18 refers also to

22   chemical restraints, which is my page 19 of his

23   report, and chemical restraints, paragraph 3,

Sterba, MD - Tyke - 7/19/17

47

1    **Benzodiazepines, it talks about Lorazepam. Your**

2    **question again.**

3        Q.   I said besides the material that is

4    attached to Dr. Lindsey's report are there any

5    other articles, research, medication inserts that

6    you've read during your career that indicate that

7    head trauma and metabolic acidosis is a

8    contraindication to the use of Ativan?

9        **MR. HECHT:**  Form.

10       **THE WITNESS:**  Yes.  Because with head trauma

11   and lactic acidosis --

12       **BY MS. TYKE:**

13       Q.   It was just a yes or no.  And then my

14   next question is can you tell me what those

15   articles are?

16       **A.   No.  It is based on my experience,**

17   **education and training and board certification that**

18   **in head trauma patients the use of a Benzodiazepine**

19   **in head trauma can bring on immediate respiratory**

20   **depression and respiratory arrest and cardiac**

21   **arrest as can be with lactic acidosis from**

22   **hypoxemia, from asphyxiation, suffocation or airway**

23   **obstruction with no protected airway in place.**

Sterba, MD - Tyke - 7/19/17

48

1          Q.   Can you tell the materials that you

2     have reviewed in this matter?

3          A.   Sure.  The information that I reviewed

4     in this matter besides my confidential report,

5     which lists everything, exhibits and references on

6     my page 15, you can take a look at all of that.  I

7     can go over in detail what was presented to me.

8     Pictures of Tavares Docher, some handwritten notes.

9     I don't know who wrote them.  CAD records request

10    form, Miranda information from St. Lucie County,

11    intro to law enforcement operations, core schedule

12    it looks like, training roster and St. Lucie County

13    Sheriff's office CBS employee statement forms by

14    witnesses, use of force incident report, incident

15    investigation report, including by Investigator

16    Blatchford, David T., that is the name I couldn't

17    pronounce.  We are on his page 5 he talks about

18    Mangrum's foot between the shoulder blades.  St.

19    Lucie Medical Center emergency provider report,

20    emergency probe, EMS run sheet, that is the

21    paramedic report, news article, man remains in coma

22    a month after arrest.  Some handwritten notes,

23    photographic wound documentation, transition

Sterba, MD - Tyke - 7/19/17

49

1    discharge plan, Social Security information.  And I

2    ran out of dividers.  Copy of St. Lucie County Fire

3    District emergency medical guidelines for Ativan

4    use.  And it's in that that the contraindications

5    are less than complete listing only allergic

6    reaction, that is a history of hypersensitivity.

7    It left off all of the key contraindications.

8    Another article about Florida deputy seizing the

9    phone.

10           Depositions would be paramedic Jose Rosario.

11   And if I'm referring to people just by their last

12   name it is just to move things along and it is not

13   out of any disrespect.  Sheriff deputy officer Clay

14   Mangrum, former EMT, and I will just respectfully

15   refer to him as Mangrum, officer or deputy Wade

16   Courtemanche, Deputy Christopher Eric Newman,

17   deputy trainee Calvin Robinson, Captain Ryan

18   Gonzalez.  Exhibit 4, which is when I believe

19   Gonzalez was deposed, and that's the one that

20   includes his emergency guidelines medication test

21   back in '07, January something of '07, where he

22   actually correctly wrote down a contraindication of

23   the use of Lorazepam as hypotension, which the

Sterba, MD - Tyke - 7/19/17

50

1    reason that is important is he never measured the

2    blood pressure before he gave the Ativan.  The

3    deposition of Samantha Galuski, CVS employee

4    Hardile Bagdas, Mark Wayne Brown.

5         Q.   And those look like medical records?

6         A.   Yes.  It looks like rehab information,

7    emergency medical guidelines, and I have two copies

8    of that.  EMS run sheets from Miami, which

9    demonstrate that he did have an underlying

10   psychiatric condition of depression, anxiety and

11   some unspecified psychiatric disorder with

12   delusions, so it was a preexisting medical

13   condition.

14        Q.   And we will talk about your report

15   and --

16        A.   And that covers it.  These were not

17   provided to me but I had them.  And those are the

18   EMT textbooks.

19        Q.   And I think we were provided with what

20   you referenced in those textbooks.  Were you also

21   provided -- you list in your report the St. Lucie

22   Medical Center emergency provider report?

23        A.   Yes.  That is the ER chart.  I

Sterba, MD - Tyke - 7/19/17

51

1    mentioned that.

2         Q.   Were you provided the entire chart from

3    St. Lucie Medical Center?  It doesn't look like you

4    did.

5         A.   I will tell you what I got.  I have

6    pages 1 through 14 of 14, that's it.

7         Q.   So the entire chart probably is close

8    to 1,000 pages you have not seen?

9         MR. HECHT:  Form.

10        THE WITNESS:  No.  So labs might be

11   excluded, but that's all I had.

12        BY MS. TYKE:

13        Q.   You handed me this morning a report

14   that you prepared in this matter; is that correct?

15        A.   Yes.

16        Q.   Does this report contain all of your

17   opinions in this matter?

18        A.   Probably not.

19        Q.   Have you let counsel know that you have

20   additional opinions?

21        A.   No.  I put in it in the report that if

22   any additional forensic information is presented to

23   me because at the time of the report I couldn't

Sterba, MD - Tyke - 7/19/17

52

1    verify if the handcuffs were behind his back.

2    Since other information showed up, depositions, it

3    now is confirmed that not only were his handcuffs

4    behind his back.  When he ran, anywhere between 5

5    and 20 feet, it can be 5 to 8, 6 to 8, 10 and even

6    15 to 20 feet, he ran a certain distance of say

7    roughly 10 feet.  He was taken to the ground by

8    three deputies totaling about 700 pounds, including

9    Newman, who is 205 pounds, directly on his back

10   with his hands behind his back sustaining head

11   trauma.  When you break your nose in multiple

12   pieces on both sides and you have bruises all about

13   the face that is considered head traumatic.  And

14   I'm a former advanced cardiac life support

15   instructor through the American College of

16   Surgeons, it is not correct to say it is not head

17   trauma, it is just to his face.  The face is part

18   of the head and you have blunt force head trauma to

19   this patient with an unprotected fall.  He can't

20   break his fall that is, and 205 pounds are on his

21   back, so that is a very significant force applied

22   to his head.

23        Q.   So what additional opinions are not

Sterba, MD - Tyke - 7/19/17

53

1  contained in this report?

2       A.    That his hands were cuffed behind him

3  the whole duration.

4       Q.    Isn't that really just your

5  understanding of the facts versus an opinion?

6       A.    No.   If it's my opinion that since he

7  couldn't protect his fall, all the force was

8  applied to his head on the fall with a significant

9  blunt force head traumatic.   It is confirmed now.

10 It's not just facial traumatic as Lindsey tried to

11 point out.   This is significant head trauma.   This

12 is a contraindication to the use of Ativan.

13      Q.    Any other opinion not contained in this

14 report?

15      A.    Unless more information becomes

16 available the report stands as it is and I don't

17 have any new opinions.

18      Q.    Okay.   And will you be providing an

19 amendment to your report to include that?

20      A.    No.   I will just mention that we now

21 have it confirmed that the hands were cuffed behind

22 the back.

23      Q.    What I'm going to do is attach this

Sterba, MD - Tyke - 7/19/17

54

1    report as Exhibit 3 and you are aware that?

2         The following was marked for Identification:

3         EXH. 3        Report of Dr. Sterba

4    **BY MS. TYKE:**

5         Q.   And you are aware that this case is in

6    Federal Court?

7         **A.   I don't know what that means.**

8         Q.   That expert reports are required under

9    the rules, so will you be providing an amendment to

10   your report that contains your new opinion and the

11   basis for that opinion?

12       **MR. HECHT:**  Form.

13       **THE WITNESS:**  No.  It is not necessary.

14   Everybody knows that he was cuffed behind his back.

15   It is not necessary.

16       **MS. TYKE:**  Adam, do you know if you are

17   going to be providing us with an additional report?

18       **MR. HECHT:**  If we do we will let you know.

19       **THE WITNESS:**  I don't need to.

20       **MR. HECHT:**  The fact that the officers had

21   Mr. Docher handcuffed behind his back is something

22   that he is telling you right now and you can

23   certainly ask him about it.  And if we do file an

Sterba, MD - Tyke - 7/19/17

55

1    amended report, we will provide that to you.

2         **BY MS. TYKE:**

3         Q.   Are there other materials that you are

4    requesting or that you have asked for before you

5    can finalize your opinions?

6         **A.   I did ask for other information that**

7    **was not provided.**

8         Q.   And what information did you ask for

9    that has not been provided?

10        **A.   Complete drug list of what was onboard**

11   **the ambulance, whether or not there was a**

12   **refrigerator to refrigerate the Ativan.  There were**

13   **a few more things that I asked for that didn't show**

14   **up.  They will probably show up eventually and if I**

15   **have additional opinions I will put an addendum to**

16   **my report of 5/22/17.**

17        Q.   Do you remember any other information

18   that you've requested?

19        **A.   No.  Drug list, whether or not Ativan**

20   **was refrigerated.  It's minor.**

21        Q.   Okay.  Did anyone assist you in

22   preparing your report?

23        **A.   No.**

Sterba, MD - Tyke - 7/19/17

56

1        Q.   Are you being compensated for your

2    expert opinions in this case?

3        A.   I don't request any money.  Benjamin --

4    what was the last name?

5        Q.   Newman?

6        A.   Newman.  I received a check for $2,000,

7    but I asked for it to be donated directly to the

8    public charity Saved by Grace Ministry.  I'm not

9    getting paid.  I use all money that comes in,

10   whether it is insurance money or co-pay as a tax

11   deductible donation.  Today a thank you note of the

12   tax deductible donation from his law firm is on its

13   way to him.  So I'm not compensated.

14       Q.   Has any other fees been paid in this

15   matter for your work?

16       A.   No.  It has all been donated to Saved

17   by Grace Ministry.

18       Q.   That's what I'm asking.  How much do

19   you charge for your time?

20       A.   It's in the report because you

21   requested that.  I think it's on the last page.

22   It's $350 an hour not including any clerical work

23   and I use a stopwatch.  You have a worksheet.

Sterba, MD - Tyke - 7/19/17

57

1          Q.    I saw that.

2          **A.    And that's 70 some hours over the past**

3   **three years.  I think I tallied it up for you last**

4   **night.  It's over three years.**

5          Q.    Is this the worksheet?

6          **A.    Yes.  Go to the last page, please.  Is**

7   **it 75.4 or something.**

8          Q.    The last page of mine --

9          **A.    72.5 hours Saved by Grace Ministry.**

10  **And this stuff hasn't been paid yet but it is in**

11  **process.  So the bulk of it has not been paid but**

12  **it will be paid to Saved by Grace Ministry.**

13         Q.    And we will attach this as Exhibit 4,

14  this is a worksheet of the time that you spent on

15  this matter.

16         The following was marked for Identification:

17         EXH. 4      Worksheet

18         **BY MS. TYKE:**

19         Q.    While I'm here we will look through.

20  You handed me -- and I'm sorry, I guess you kind of

21  explained it to me.  This Wikipedia page for --

22  what is it?

23         **A.    Prior to this case based on my training**

Sterba, MD - Tyke - 7/19/17

58

1  and experience as a civilian and military emergency

2  physician including special operations various

3  forms of torture were well known to me and their

4  physiological effects.  Some of which I'm not

5  allowed to discuss because I have been debriefed by

6  the Department of the Navy.  What I can discuss --

7  and I mentioned it to the attorneys, I can bring

8  out pictures of arms behind the back called reverse

9  hanging, and that's what I have here.  And it is a

10  form of torture, torture being defined as sadistic

11  pain induction while trying to retrieve

12  information, both of which were not in place in

13  this case.  This first one dated back to 1633 in

14  France.  If the person had been cuffed, if you

15  will, and then suspended by a rope with the arms

16  behind the back called reverse hanging or strappado

17  or corda as I mentioned here.  They often died

18  within an hour due to asphyxiation.  You can't

19  breathe.  In a way it's like a reverse crucifixion.

20  That technique is in play today overseas and has

21  been on the news.  I will not discuss how and why I

22  know this.

23          The other one is a reverse hanging post that

Sterba, MD - Tyke - 7/19/17

59

1    is either at Dachau or Auschwitz.  And that was

2    done for torture.  And if you take a look at the

3    next page at Dachau you see an actual picture of

4    two people alive and one person dead on the ground.

5    You don't die from the shoulders dislocating and

6    the pain.  You die from asphyxiation.

7         The next picture shows a demonstration of

8    how it is done including today.  And the next

9    picture is a recreation of how it has been most

10   recently done in China.  This is a demonstration of

11   asphyxiation or suffocation, which is an impairment

12   of ventilation mechanically preventing the exchange

13   of $CO_2$ and oxygen.  In other words, the chest can

14   not rise and fall, you cannot breathe.  And that is

15   part of what was happening to Docher on the ground

16   with his arms being pulled up but also with the 330

17   to 335 pound Deputy Newman stepping between the

18   shoulder blades pushing the chest into the ground.

19   And right now --

20        MR. HECHT:  I think you said 135 pounds.

21        THE WITNESS:  I meant 330 to 335 pound

22   Deputy Mangrum stepping in between the shoulder

23   blades as the sheriff's office investigator

Sterba, MD - Tyke - 7/19/17

60

1   documented on that page 5.

2        **MS. TYKE:**  I will attach this as Exhibit 5

3   to your deposition.

4        The following was marked for Identification:

5        EXH. 5        Wikipedia Pages

6        **BY MS. TYKE:**

7        Q.   Looking in these photographs it looks

8   like the majority -- all of the photographs show

9   individuals who are in an upright position with

10  their arms outstretched behind their back and are

11  lifted above the ground, is that an accurate

12  description?

13       **A.   That is half of what was done to**

14  **Docher.**

15       Q.   I'm just asking about the photos.

16       **A.   This is true.  They are being lifted**

17  **off the ground.  And so was Docher, but there was**

18  **also a foot pressing his chest back into the ground**

19  **with pressure applied.  This describes half of what**

20  **was happening to Docher, that's why Docher lost**

21  **consciousness from asphyxiation and suffocation so**

22  **quickly.  But it gives a good illustration as to**

23  **how forms of torture have been done and are**

Sterba, MD - Tyke - 7/19/17

61

1    **currently being done worldwide.**

2         Q.   Did you rely on this in any way in

3    forming any of your opinions?

4         **A.   Not the pictures.  My knowledge**

5    **preceded this case on forms of torture.  And I'm**

6    **not at liberty to discuss who had it done to them.**

7         Q.   I wasn't going to ask.

8         **A.   Okay.**

9         **MR. HECHT:**  Let's take a recess.

10        (A recess was then taken.)

11        **BY MS. TYKE:**

12        Q.   Doctor, before break we were talking

13   about the fees that you charge in this matter.  You

14   stated that on your report on page 18 you list that

15   your fees are $350 an hour for review, a flat fee

16   of $2,000 for deposition.  It lists here that your

17   fees for trial are 2,000 per day, plus $1,000 per

18   day for travel outside of trial days, is that

19   accurate?

20        **A.   Yes, ma'am.**

21        Q.   Do you also charge for your travel

22   expenses?

23        **A.   I would submit a trip report like I**

Sterba, MD - Tyke - 7/19/17

62

1    **would for a scientific trip for the military for**

2    **full reimbursement, modest lodging, coach.**

3         Q.   You mentioned as you were going through

4    your notebook that you have notes, did you provide

5    me with a copy of your notes?

6         **A.   I don't have any notes.**

7         Q.   One of the tabs you stated was various

8    notes?

9         **A.   What is that now?**

10        Q.   When you were going through your

11   notebook.

12        **A.   These are keywords.  I don't use --**

13   **like on a deposition where you have keywords at the**

14   **end, I find that hard to use.  What I do is I put**

15   **down like restraint protocol, I will write that off**

16   **on the side so I know how to get to it quickly.**

17        Q.   And I guess I got confused because I

18   thought one of the tabs you said were some

19   handwritten notes?

20        **A.   I don't have any interpretive notes or**

21   **opinions or anything on these things.  These are**

22   **just to help me quickly get to sections.**

23        Q.   No.  I know about those documents.  I'm

Sterba, MD - Tyke - 7/19/17

63

1   talking about under the tabs.

2          A.    Yes.   I see what you mean.   I don't

3   know whose notes they are.   They are pretty hard to

4   read.   I can go to those if you want.

5          Q.    But none of those are your personal

6   handwritten notes in this matters?

7          A.    No.   And I don't think I read them that

8   carefully.

9          Q.    That's what I'm trying to figure out,

10  if you have any personal hand notes or timelines in

11  this matter?

12         A.    No.

13         Q.    When did you start doing expert legal

14  reviews?

15         A.    I did 41 military cases active duty on

16  determining the causes of death of the

17  physiological factors while on active duty, '86 to

18  '90.   And, of course, that is no charge, that is

19  just part of my job.   I was selected as the subject

20  matter expert on diving medicine.   I was involved

21  in a lot of accident investigations, that's when I

22  started.

23         Q.    So about '86?

Sterba, MD - Tyke - 7/19/17

64

1          A.    '86.  And from 1977 through 1981 I did

2    not forensically look at cases, but I did

3    investigate all cold water drowning cases as part

4    of my Ph.D. thesis on cold water near drowning and

5    the diving response.

6          Q.    When did you begin to do expert legal

7    reviews for private law firms?

8          A.    Being that I was the Navy experts on

9    diving medicine, in 1994 I was contacted by Mr.

10   William Norton, and he asked for me to forensically

11   evaluate why a student scuba diver died off of West

12   Palm Beach.  I determined the cause of death was

13   drowning being that his tank was never turned on.

14   And he asked me how much I charge.  And I said

15   there is no charge.  And he insisted, so I charged

16   him.  Since that point on I did charge but I can't

17   tell you the number of years that have gone by

18   where I didn't personally charge.  I just ask for

19   donations to the public charity.  100 percent of

20   that money is spent caring for those of greater

21   need.

22         Q.    So we can just go back to the question

23   that I asked.  Is it accurate that you started

Sterba, MD - Tyke - 7/19/17

65

1    reviewing cases for private firms or attorneys

2    around 1994?

3         A.   Yes.  That includes DOJ and JAG.  They

4    were military and there were also criminal cases

5    involved.  And I am involved in those now.  Nothing

6    active, but trying to determine how and why people

7    die from torture, from asphyxiation and things

8    related to my research.

9         Q.   Currently how many active cases are you

10   reviewing as an expert?

11        A.   Maybe three.  This one and two others

12   in South Carolina.

13        Q.   I know this one is on behalf of the

14   plaintiff.  The two that are in South Carolina are

15   they for the plaintiff or the defense?

16        A.   The plaintiff.  The contact I have with

17   defense attorneys I do the forensic evaluation and

18   almost always find fault with a provider or a

19   problem or that the patient was going to naturally

20   die anyway.  And I render those opinions over the

21   phone or in written reports.  And I've only

22   testified once on behalf of another physician on

23   his defense.  My work is one-third defense,

Sterba, MD - Tyke - 7/19/17

66

1    two-thirds plaintiff and occasional criminal.

2         Q.   Now, when you say your work, are you

3    including cases in which you are not giving

4    testimony?

5         A.   Yes.  That would be a lot of the

6    defense work, they want me to carefully go over

7    everything and explain what happened and why.

8         Q.   Now, if we broke that down into

9    testimony in the last four years, what percentage

10   do you testify for plaintiffs versus defense?

11        A.   100 percent plaintiff.  I have not been

12   asked to testify against the defendants by the

13   defense.

14        Q.   You mean on behalf of the defendant?

15        A.   Yes.  I don't know the terms, but the

16   defense attorneys asked me to evaluate the cases

17   where I found that there was fault and I explained

18   everything.  Of course, I was not asked to testify

19   to hurt their client.

20        Q.   Do you review cases for the defense for

21   anybody in Florida?

22        A.   Yes.

23        Q.   Anybody that you regularly have contact

Sterba, MD - Tyke - 7/19/17

67

1    with?

2         A.    No.   Long firm names, Italian names on

3    the west coast, but I don't remember their names.

4    I'm sorry.   I don't keep a list of anything.   It is

5    not that frequent.

6         Q.    To your knowledge has any of your

7    opinions ever been disqualified or limited by any

8    court?

9         A.    None.   No fees have ever been rejected

10   by any judge either.

11        Q.    Have you ever worked with the law firm

12   of Searcy, Denney before?

13        A.    Yes.

14        Q.    Do you know how many times?

15        A.    No.

16        Q.    Do you have an estimate as to how many

17   cases you have reviewed for them?

18        A.    I don't.

19        Q.    Do you remember working with them in

20   the matter of Wax versus Tenant Health Systems?

21        A.    I remember the name Wax but I don't

22   remember the case.

23        Q.    Do you remember a case called Olszewski

Sterba, MD - Tyke - 7/19/17

68

1   versus Orlando Regional Health Care?

2        A.   Yes, but I don't remember the details.

3        Q.   Any other matters besides those and

4   this Docher matter that you recall working with

5   Searcy, Denney on?

6        A.   Yes, but I don't remember the names or

7   whatever the conditions were.  They don't have any

8   bearings on this case.  This is very unique.

9        Q.   That was going to be my next question,

10  have you been an expert in any case with similar

11  factual situation as this one?

12       A.   No.

13       Q.   I want to go through your report.  If

14  you turn to the page 1, the very top says the

15  complete statement of all opinions the witness will

16  express and the basis and the reasons for them and

17  the facts and the data considered by the witness in

18  forming them.  We learned today this report does

19  not contain all of your opinions, is that accurate?

20       A.   It does.  It contains all of my

21  opinions as of the date of this report.  If further

22  information becomes available as I put that in the

23  report then I reserve the right to make further

Sterba, MD - Tyke - 7/19/17

69

1   **opinions.**

2        Q.   My question was I thought today you've

3   given me an additional opinion that is not

4   contained in this report?

5        **A.   Have I?**

6        **MR. HECHT:**  I can't answer.

7        **THE WITNESS:**  All I said was that I thought

8   the hands were cuffed behind the back.  And in the

9   depositions they confirmed the hands were cuffed

10  behind the back.  I put it in the report as of the

11  date of this report I can't confirm if the hands

12  were cuffed behind the back.  If the information

13  becomes available, but it doesn't change anything.

14       **BY MS. TYKE:**

15       Q.   Okay.  We will go through the report.

16       **A.   Okay.**

17       Q.   It starts off it looks like a forensic

18  summary and your opinions?

19       **A.   Right.**

20       Q.   And there is a few questions that I

21  have as we go through this report.  The very first

22  paragraph you state Sheriff's office, SO officers

23  and eyewitness observed Mr. Docher to be agitated

Sterba, MD - Tyke - 7/19/17

70

1    and delusional.  When you state agitated and

2    delusional, can you specifically tell me what they

3    stated was his actions that led you to that

4    conclusion?

5         **A.    References 1 and 2, and St. Lucie**

6    **statement forms.**

7         Q.    I know what you are referencing.  What

8    I'm asking you is can you tell me specifically what

9    you read in those that led you to the conclusion

10   that he was agitated and delusional?

11        **A.    They concluded that.**

12        Q.    Have you concluded that?

13        **A.    Yes.**

14        Q.    What in their statements led you to

15   that conclusion?

16        **A.    He was confused, he was nervous,**

17   **agitated and he believed something that wasn't**

18   **true.  But at CVS he had no evidence of what is**

19   **called excited delirium or super human strength or**

20   **anything to indicate drug overdose of any**

21   **sympathomimetic drug or cocaine or methamphetamine**

22   **type drug.  He was very polite, he was worried, he**

23   **wanted 911 called, he was scared.  I think his**

Sterba, MD - Tyke - 7/19/17

71

1    number one emotion was that he was very fearful and

2    his delusion was bizarre, but he did not really

3    pose any serious threat to anybody at that point.

4    He asked for 911 to be called.  And he politely

5    said when the police show up I will be outside

6    smoking.  And that is before all of this started.

7    He was scared and he believed something that wasn't

8    true.

9            Q.   But we are also talking about the

10   Sheriff's officers, you reference them?

11           A.   Yes.  Their reports.

12           Q.   And that would have been with the

13   interaction with the Sheriff's officers, is that

14   accurate?

15           A.   And also interviewing the eyewitnesses.

16           Q.   You just talked about inside the CVS.

17   Now going outside the CVS you mentioned excited

18   delirium, do you believe at any time Mr. Docher was

19   suffering from excited delirium?

20           A.   Excited delirium is not a medical

21   diagnosis.  It is a term that is used by police and

22   EMS.  It's not found in the American Medical

23   Association international classification of disease

Sterba, MD - Tyke - 7/19/17

72

1  addition 9 called ICD-9 back in 2014 or even now,

2  ICD-10.  As an emergency physician I have to find

3  out why somebody would be confused or delirious and

4  why they would be agitated.  So your question, do I

5  think he had excited delirium, no.  He did not have

6  any evidence of what is called excited delirium

7  prior to the police showing up.

8        Q.   Once the police showed up did he have

9  any signs or symptoms of excited delirium?

10       A.   From reading the testimony of the

11 deputies that were there who interviewed him, he

12 was compliant.  He put the screwdriver down, which

13 was for his own personal protection.  He was

14 cooperative.  His arms were rather animated and he

15 was rather verbose, which was his personality

16 according to his mother's deposition or testimony

17 or videotape I should say.  During that period of

18 time there was no evidence of what is called

19 excited delirium.  Was he delirious, exceptionally

20 confused, agitated and violent, no.  There was

21 nothing like that there.

22       Q.   Once he was placed in the vehicle and

23 he fled was there any signs or symptoms of excited

Sterba, MD - Tyke - 7/19/17

73

1    delirium?

2          **MR. HECHT:**  Form.

3          **THE WITNESS:**  I think at that point he was

4    scared that he was going to die.  He was fearful of

5    spec 14 6, that's special warfare SEAL team 6,

6    which he thought, and he saw a visual hallucination

7    that they were overhead in a black ops helicopter

8    attached to a local Sheriff's office and hiding

9    behind the brushes.  He was fearful of his life and

10   fearful that the Arabs were going to kill him and a

11   family member.  His primary emotion or mood at that

12   point or affect at that point was that he was

13   fearful.

14         Q.   Do you believe at that point he was

15   showing signs or symptoms of excited delirium?

16         **A.   No, he was not.  He actually**

17   **voluntarily put his hands behind his back.  He was**

18   **cuffed.  He was put into the squad car with 700**

19   **pounds of deputies.  The three of them right there.**

20   **And he shot out, much to their embarrassment most**

21   **likely, and almost made it to the busy street.  I**

22   **can't remember the street name.  And it took**

23   **between 5 and 20 feet before they tackled him.**

Sterba, MD - Tyke - 7/19/17

74

1    Q. Do you remember in any of the witness

2 statements that they described prior to him fleeing

3 from the vehicle that he attempted to bite the

4 officers?

5    **A. I thought the biting was done after he**

6 **was put into the squad car.**

7    Q. That's what I just said.

8    **A. Yes.  That all came about with his**

9 **paranoia accelerating.  I can't tell you what was**

10 **in Tavares Docher's mind at that point, whether he**

11 **confused the police officers with Arabs or SEAL**

12 **team 6 or whatever.  He was crying out.  And I have**

13 **it right here on the DVD, please don't let them**

14 **kill me.  I don't know if he was calling out to the**

15 **people witnessing this or to the deputies that were**

16 **restraining him.  Nobody will know that.**

17    Q. During the time that he was interacting

18 with the officers after he fled and he was on the

19 ground, do you believe that he was experiencing or

20 exhibiting any signs or symptoms of excited

21 delirium?

22    **A. Yes.**

23    Q. At that time you believe that he was?

Sterba, MD - Tyke - 7/19/17

75

1        A.   He was resisting arrest, he was

2   fearful, he thought he was being killed.  And was

3   he excited, yes.  Was he delirious, yes.  Was he

4   delusional, yes.  I don't use the term excited

5   delirium, that is a police officer/EMS term.

6   Either way he was doing everything he could to get

7   away.

8        Q.   Can you define for me what excited

9   delirium is?

10       A.   Not really being that it is not a

11  medical diagnosis.  What I can define for you is

12  that he was delusional, he was not agitated at the

13  beginning.  And prior to actually being cuffed --

14  even though he was a Backer act at that time

15  according to the testimony, he was cuffed and being

16  put into the squad car.  He did not show any

17  aggression, any agitation, he didn't fight, he was

18  agreeable.  He laid down his screwdriver.  He laid

19  it down actually and picked it up again at CVS.  He

20  was exhibiting the same cooperative behavior of a

21  very scared individual.  But excited delirium at

22  that point, no.

23       Q.   When do you believe that he started to

Sterba, MD - Tyke - 7/19/17

76

1  show signs of aggression?

2      A.   When he was fighting to get away from

3  the police -- I should say the Sheriff's office,

4  but if I say the police the same thing.

5      Q.   Would that include the time that he was

6  in the vehicle and attempted to bite some of the

7  officers before exiting the vehicle?

8      A.   I don't know when the bites occurred.

9      Q.   Do you recall there being witness

10  statements that he attempted to bite officers while

11  he was still in the vehicle?

12      A.   I don't remember.  I would have to look

13  that over again before the trial as to when he

14  started biting and spitting and kicking.  He did

15  try to knee one of the officers on the way out of

16  the vehicle, but his hands were behind his back,

17  that would be a hard one to do.  He is a wiry 150

18  skinny man, if you will.  Spitting and trying to

19  bite that was all happening.  He did make his way

20  into the vehicle without any trouble, but running

21  out of the vehicle is when it all began, it seems

22  to me.

23      Q.   The next line in your report you

Sterba, MD - Tyke - 7/19/17

77

1    discussed the smell of alcohol and that he had

2    reported drinking a Natty Ice, which is Natural Ice

3    beer.  You describe it as having a high alcohol

4    content.  Can you describe for me high alcohol

5    content?

6         A.    American watered down beer was 3 and a

7    half percent.  Ales can get up to 7 and 8 percent.

8    I had to look up Natty beer because I never had

9    one.  5.9 percent alcohol to me is a high alcohol

10   content beer.

11        Q.   Are you comparing it to other alcohol

12   based drinks such as wine or hard liquors?

13        A.    No.  Beer at our local store would have

14   right around 4 to 5 percent alcohol.  5.9 is

15   higher.

16        Q.   I just wanted to clarify when you said

17   high alcohol content if you were comparing it to

18   other alcoholic type of beverages?

19        A.    No.  I'm comparing it to other beers.

20   It is hard to go above that without turning into an

21   ale.

22        Q.   Do you know how many Natty Ice Docher

23   consumed?

Sterba, MD - Tyke - 7/19/17

78

1       A.   He said he consumed more than one in

2    his testimony -- not testimony, but what was

3    mentioned that he had -- actually his comments made

4    to the deputies stated that he had -- I don't know

5    if it was a couple or a few.  So I don't know how

6    many he had.  His blood alcohol level was only .038

7    roughly .04.  I don't know how many he had.

8       Q.   And can you quantify the .038 into how

9    many beers it would take to get to that level?

10       A.   No.  And it is the timing, too.

11       Q.   Do you know when he consumed these

12   Natty Ice?

13       A.   No.  He said he had more than one, but

14   they smelled the alcohol on his breath.  Can you

15   smell alcohol on the breath of somebody who is

16   blowing a .04, yes.  It doesn't mean he is legally

17   intoxicated to drive but he might be impaired.  I

18   don't know.

19       Q.   Was there anything to indicate that he

20   was impaired?

21       A.   He had an altered mental status being

22   delusional and I don't know if that contributed to

23   it.

Sterba, MD - Tyke - 7/19/17

79

1      Q.   There was a place in your report that
2  mentioned that you thought that he had consumed
3  hard liquor?

4      **A.   That was mentioned, yeah, by one**
5  **report.**

6      Q.   Do you remember what type of hard
7  liquor that would be?

8      **A.   The word hard liquor was only used.**

9      Q.   Do you know when he would have consumed
10  that?

11      **A.   No.  It was a comment made.**

12      Q.   You have no idea as to how much he
13  would have consumed?

14      **A.   I didn't see anything in the record.**

15      Q.   You mentioned his blood alcohol level
16  of .038 percent that was drawn over at the St.
17  Lucie County Medical Center, is that accurate?

18      **A.   Yes.**

19      Q.   And you would agree with me that is
20  below the Florida State legal limit of .08 percent?

21      **A.   For what?**

22      Q.   For blood alcohol level for drunk
23  driving?

Sterba, MD - Tyke - 7/19/17

80

1          A.   Yes.  But you can still be impaired.

2     Family members that don't drink at .04 might be

3     somewhat impaired.  It looks like he might have

4     been drinking on a regular basis.  He had alcohol

5     on board in the past, so I really make any comments

6     other than two people documented, and it was passed

7     on to Rosario, that is Jose Rosario, paramedic.  I

8     will just refer to him respectfully as Rosario.  As

9     the smell of alcohol was on his breath by two of

10    the deputies.

11         Q.   And that goes to another question I was

12    going to ask, are you aware of Mr. Docher's history

13    with alcohol use?

14         A.   Yes.  It was mentioned in some of the

15    EMS run sheets from Miami.

16         Q.   Have you seen any of the medical

17    records from Broward Imperial Hospital where he was

18    treated for alcohol intoxication?

19         A.   No.

20         Q.   And do you know as to what his

21    impairment level given his history with drinking a

22    .03 would have on him?

23         A.   No.

Sterba, MD - Tyke - 7/19/17

81

1        Q.   It was also mentioned in your report

2   about suspected drug abuse?

3        **A.   That was brought up by the deputies**

4   **mentioned to Rosario documented in Rosario's EMS**

5   **run sheet that alcohol and unknown drugs would be**

6   **involved being that he was so strong and**

7   **delusional.**

8        Q.   Have you seen the lab reports from St.

9   Lucie County Medical Center that has the toxicology

10  screen for various drugs?

11       **A.   Yes.  And the only thing that I found**

12  **in the records that I received was THC, marijuana.**

13       Q.   A trace?

14       **A.   A trace, but I don't know if there were**

15  **any other drugs that were mentioned.  Again, my**

16  **records are limited.**

17       Q.    I have here the labs.  And, Doctor,

18  what I have handed to you is a copy of the drug

19  screen report for Tavares Docher from St. Lucie

20  County Medical Center which previously has not been

21  disclosed to you.  Do you see the various drugs

22  that he was screened for?

23       **A.   Coke, amphetamines, barbs, benzos, none**

Sterba, MD - Tyke - 7/19/17

82

1    detected.  That is a qualitative measurement.  He

2    had Ativan given, that's strange.  Unless it's

3    looking at a metabolite and there was not enough

4    time to measure the byproduct of Ativan breakdown,

5    if you will.  Opiates, PCP and ecstasy, that is all

6    they checked.  And I thought I had something from

7    the ER.  The only thing I do remember is THC.

8        Q.   And you have not seen this before?

9        A.   No.

10       Q.   And so he would have been screened

11   negative for those various drugs that you just read

12   out?

13       A.   Yes.  It is not a comprehensive screen,

14   but that is what they tested for a few years back.

15       Q.   Do you have any other information, any

16   facts that would support that he was on any type of

17   illegal drugs?

18       A.   No.  When you look at his behavior at

19   CVS, it seemed he was afraid, mildly delusional and

20   seeking help and worried.  I don't see any

21   toxidromes, that is a constellation of signs and

22   symptoms that would point to any particular drug

23   that would overwhelm his ability to reason or act.

Sterba, MD - Tyke - 7/19/17

83

1    He was just scared and confused and delusional.

2         Q.   Do you have any opinion as to whether

3    he was on any illicit drugs at the time of the

4    incident on May 11, 2014?

5         A.   No, I don't.  I don't see any evidence

6    in the chart or his behavior I should say prior to

7    the incident with the deputies that he was on

8    anything.  That would have been quite significant.

9    And I do have something on page 7 of 14 that is

10   very similar to your printout here of urine tox

11   screen, urine drug screen.  So what you have is

12   similar to what was in the ER chart.  Eight drugs.

13   And all it is is a qualitative presume positive.

14   What you have is a quantitative whatever it was.

15        Q.   Presumptive positive.

16        A.   Okay.  It's the same thing.

17        Q.   And that is for the THC?

18        A.   Yes.

19        Q.   Which is marijuana?

20        A.   Right.  Even though I raised the

21   question of being on any other dangerous alcohol

22   like methanol or antifreeze, there was no osmolar

23   gap to indicate another alcohol in his system that

Sterba, MD - Tyke - 7/19/17

84

1    **was affecting the measurement of the number of**

2    **particles in his blood stream osmolarity or**

3    **osmolality.  He didn't have any of that and no**

4    **crystals were seen on his urine testing.  All we**

5    **have is alcohol and a little bit of THC.**

6         Q.   And as far as when he either consumed

7    or inhaled or however he did the THC, we don't

8    know?

9         **A.   No, we don't.**

10        Q.   As you were writing out your summary of

11   the facts in this case, this is your understanding

12   of all of the facts that you've learned through the

13   materials that you've read?

14        **A.   Yes.**

15        Q.   And the last paragraph on paragraph 1

16   you talk about when he's handcuffed by the

17   officers, when he escapes, when he thrust his knee

18   into one of the officers, when they are hanging

19   onto him 8 to 10 feet before forcibly being taken

20   to the ground with the handcuffs behind his back,

21   unable to protect his head from subsequent blunt

22   force trauma.  It sounds to me when you discussed

23   earlier you reviewed the officers' deposition, what

Sterba, MD - Tyke - 7/19/17

85

1   you were talking about that it confirmed what was

2   in your report, is that accurate?

3        **A.   Yes.**

4        Q.   So it is just an additional source of

5   information for that part of your report, is that

6   accurate?

7        **A.   Sure.**

8        Q.   And when you talk about subsequent

9   blunt force trauma, what are you talking about?

10       **A.   Where are you at?**

11       Q.   Page 1 of your report, the last

12  paragraph, unable to protect his head from

13  subsequent blunt force trauma.

14       **A.   With being cuffed behind his back and**

15  **tackled with a 205 pound Deputy Newman on his back,**

16  **he had blunt force trauma to his head when he got**

17  **taken down to the asphalt.**

18       Q.   Can you describe for me the specific

19  trauma that he sustained to his head?

20       **A.   Bilateral nasal fractures and**

21  **contusions about the face that are listed on the**

22  **next page documented by the emergency physician,**

23  **head laceration to the right side of his head, head**

Sterba, MD - Tyke - 7/19/17

86

1    bilateral depressed fractures of the facial nasal

2    bone, extensive soft tissue swelling over the face.

3         Q.    Is it your opinion that --

4         A.    That came from the medical record.

5         Q.    Sure -- - the bilateral nasal fractures

6    occurred when he was taken to the ground?

7         A.    I can't tell you when it happened.  I

8    can't tell you when it happened.  But it happened,

9    I believe, as a result of falling, having somebody

10   on him.  And he did have strikes to the head, but

11   there is nothing in the chart to show that he had

12   strikes to his nose.  More likely than not with

13   medical certainty it was the result of a face plant

14   with his hands handcuffed behind his back being

15   tackled to the asphalt with a deputy on his back.

16        Q.    Is there a description of the

17   laceration to the right side of his head?

18        A.    Yes, in the ER chart.

19        Q.    And what is that description in the ER

20   chart?

21        A.    However long it was it was sutured.  I

22   can look it up.  It's there.

23        Q.    Was there any evidence of internal head

Sterba, MD - Tyke - 7/19/17

87

1    trauma?

2         A.    **This is blunt force head traumatic, but**

3    **the CT was negative for any intracranial**

4    **hemorrhage.**

5         Q.    And just in layman's terms that means

6    there was no evidence on CT of any internal bleed

7    in the brain?

8         A.    **No brain bleed.**

9         Q.    Was there any evidence on the CT scan

10   of any skull fracture?

11        A.    **None.  Facial fractures, yes, but not**

12   **skull.**

13        Q.    According to your review of the

14   materials in this case was Tavares Docher acting

15   agitated prior to the fall that occurred when him

16   and the officers kind of all came down together

17   after he escaped from the vehicle?

18        A.    **Did you ask was he agitated before the**

19   **fall?**

20        Q.    Yes.

21        A.    **He was fearful, somewhat agitated, yes,**

22   **he was waiving his arms about with rather pressured**

23   **speech talking a lot about the visual**

Sterba, MD - Tyke - 7/19/17

1    **hallucinations that he was seeing, so there was**

2    **agitation.**

3         Q.   Was there also aggression exhibited by

4    Mr. Docher --

5         **A.   No.**

6         **MR. HECHT:**  Let her finish.

7         **BY MS. TYKE:**

8         Q.   Can I finish my question.

9         **A.   I'm sorry, yeah.**

10        Q.   Let me back up.  Sorry.  Was there any

11   aggression exhibited by Tavares Docher prior to the

12   fall with the law enforcement officers after he

13   escaped from the vehicle?

14        **A.   Yes.  He tried to knee one and maybe**

15   **bite or something when he ran through the three**

16   **deputies.**

17        Q.   How would you describe the laceration

18   that he sustained on the right side of his head?

19        **A.   Page 3 of 14 laceration management of**

20   **wound, I would basically just read what the**

21   **emergency physician described it as, a right**

22   **temporal 3.0 centimeter laceration without foreign**

23   **body.  It required 5-0 Prolene sutures, a simple**

Sterba, MD - Tyke - 7/19/17

89

1    **suture, simple repair, that's all I can say.**

2         Q.   You have no other information other

3    than what is contained in the emergency physician's

4    report?

5         **A.   No.**

6         Q.   As your report goes on it talks about

7    Mr. Docher resisting arrest, spitting, kicking and

8    trying to bite the officers?

9         **A.   Yes.**

10        Q.   So if you turn to page 2, your first

11   full paragraph discusses further physical restraint

12   upon Mr. Docher by the SO officers including

13   strikes to his face, head, chest and major muscles

14   of his right and left gluteal or buttocks and lower

15   back muscles, and that is based upon your review of

16   the materials, did the review of the deposition of

17   the officers add any additional information?

18        **A.   Let's see.  References 2 through 4,**

19   **handwritten notes.  Not depos but the handwritten**

20   **notes, and the use of force incident report, and**

21   **the incident investigation report.  That is why I**

22   **mentioned it as such.**

23        Q.   And it looks like here you list 1

Sterba, MD - Tyke - 7/19/17

90

1   through 8, which is the documentation from the

2   emergency department of the various injuries that

3   he came in with, is that accurate?

4        **A.   Yes.**

5        Q.   And as to when he sustained all of

6   these various injuries during his interaction with

7   law enforcement up until the time that he was taken

8   to the emergency room, do you have any opinion as

9   to the timing of these?

10       **A.   No.**

11       Q.   The last one, number 8, can you explain

12   for me what that is?

13       **A.   Yes.   The skeletal muscles have a very**

14   **sticky protein and when there is damage to the**

15   **skeletal muscles you can release this protein into**

16   **the blood stream, and that is what that means.**

17       Q.   And when we are talking about skeletal

18   muscles, can you me what those are?

19       **A.   Buttocks, lower back, the bruising over**

20   **major muscles groups and the video actually showed**

21   **that, the strikes.**

22       Q.   When this muscle protein is released

23   into the circulation, does that cause anything or

Sterba, MD - Tyke - 7/19/17

91

 1    affect anything with Mr. Docher?

 2         A.    Yes.  It can cause kidney damage.

 3         Q.    Was there any evidence of kidney

 4    damage?

 5         A.    Indirectly, that's why he was put on

 6    special IV fluids and it showed up in his urine.

 7         Q.    If we turn to page 3 of your report we

 8    already talked about the blood alcohol level.  You

 9    talked about -- in your second paragraph, because

10    of the cardiopulmonary arrest that the emergency --

11    does ED mean emergency doctor?

12         A.    No.  Emergency department.

13         Q.    Emergency department was unable to

14    determine a complete medical history?

15         A.    Right.

16         Q.    In your review of the materials in this

17    case do you have any evidence that Mr. Docher was

18    taking or was prescribed antipsychotic medication

19    prior to May 11th, 2014?

20         A.    I do not.

21         Q.    Do you have any evidence that in this

22    case or facts that support that he was taking

23    prescription medications?

Sterba, MD - Tyke - 7/19/17

92

1          **A.    No.   Unknown.**

2          Q.    And the same question for illicit

3    medications?

4          **A.    The same.   Unknown.**

5          Q.    And you also talk about do you believe

6    that Mr. Docher was an alcoholic?

7          **A.    I don't know.**

8          Q.    Do you believe that he had a history of

9    alcohol dependence?

10         **A.    I don't know.**

11         Q.    Have you seen anything that would

12   support that he was suffering from alcohol

13   withdrawal?

14         **A.    No.**

15         Q.    Or that he was suffering from delirium

16   tremors or DTs?

17         **A.    No.  Or Wernicke's encephalopathy or**

18   **malnutrition, those are all consideration for an**

19   **emergency room physician for an unconscious**

20   **patient.**

21         Q.    Did this affect in any way the ability

22   of the emergency room physician to be able to

23   provide care and treatment to Mr. Docher?

Sterba, MD - Tyke - 7/19/17

93

1    **A.    No.   I don't have any negative comments**

2    **about the care rendered in the ER.   If I say ER, I**

3    **just mean ED.**

4         Q.    I was trying to determine if the lack

5    of being able to obtain this information affected

6    the emergency department ability to treat or if you

7    have any comments about their treatment?

8         **A.    I don't.**

9         Q.    On page 4 you talk about the various --

10   your understanding of the facts prior to the

11   arrival of the emergency medical services EMS for

12   St. Lucie County Fire District from arriving.   And

13   then you say shortly before EMS arrived at an

14   unknown time, and were you able to later through

15   the run report determine what time they actually

16   arrived on scene?

17        **A.    Yes.**

18        Q.    Mr. Docher suddenly lost consciousness

19   as witnessed by the SO officers?

20        **A.    Yes.  Specifically the former EMT**

21   **Deputy Mangrum who placed him unconsciously in the**

22   **recovery position and checked his pulse.  Although**

23   **nothing was ever mentioned as to what his pulse**

Sterba, MD - Tyke - 7/19/17

94

1    was, rapid or weak or bounding.  And respirations,

2    other than it was shallow, which is very abnormal

3    for someone who was nearly asphyxiated to death.

4            Q.    When you say shallow breathing, can you

5    describe that for me?

6            A.    Abnormally inadequate exchange of air.

7            Q.    Would that mean that somebody -- well,

8    let's go.  What is the normal respiratory rate for

9    an adult male?

10           A.    It varies, but it can be like maybe 16

11   to 18 or so, but you have to also look as to not

12   just the rate but the depth.  And normal breathing

13   in and out versus heavy breathing versus

14   hyperventilation versus inadequate ventilation

15   breathing or inadequate shallow breathing.

16           Q.    How would that be observed?

17           A.    For having not been able to speak but

18   one to two word sentences, gasping saying I can't

19   brrr, and he didn't have enough air in his lungs to

20   say the word breath.  It is right here and I can

21   actually pull that up.

22           Q.    We will get to that in a minute.  I'm

23   asking generally how would one be able to observe

Sterba, MD - Tyke - 7/19/17

95

1    that?

2         A.    I observed it before he lost

3    consciousness with --

4         Q.    I'm just talking generally, not about

5    Mr. Docher, just generally how would one observe

6    somebody who is exhibiting shallow breathing?

7         A.    Where it looks like he is not breathing

8    very well.

9         Q.    Would that be gasping?

10        A.    Gasping would be struggling to breathe,

11   having a shortness of breath or dyspnea.  Shallow

12   breathing would be inadequate ventilation.

13        Q.    Would someone with inadequate

14   ventilation have a higher or lower respiratory

15   rate?

16        A.    Both.  You can have shallow slow

17   respirations or shallow fast respirations.  We

18   don't know the rate.

19        Q.    Would shallow breathing affect

20   somebody's 02 level?

21        A.    It could.

22        Q.    How would that be affected?

23        A.    If the breathing was inadequate -- and

Sterba, MD - Tyke - 7/19/17

96

1    it was inadequate for him because he couldn't

2    breathe with a deputy stepping on his chest and

3    pulling his arms up in reverse hanging, you can see

4    that on the video that he was panting with very

5    shallow respirations only able to say okay, all

6    right.  I can't brrr.  And he actually ran out of

7    air before he said the word breathe at 37 to

8    38 seconds into that video.

9         Q.   Do you know the time that the video was

10   taken?

11        A.   The time of day?

12        Q.   Yes.

13        A.   No.

14        Q.   Do you know when in the course of the

15   interaction with the law enforcement officers that

16   the video was taken?

17        A.   Roughly, but not accurately.

18        Q.   When do you understand it to be?

19        A.   EMS was dispatched, we can look up at

20   the timeline, but I don't have the exact minutes as

21   to when these things happened.

22        Q.   How do you know that EMS was already

23   dispatched when that video was taken?

Sterba, MD - Tyke - 7/19/17

97

1          A.    I don't.  We're trying to get you

2    medical help, I'm assuming that EMS had been

3    dispatched.  I would have to go back over the

4    timeline for the trial to find out when.  I don't

5    have any timeline of the cell phone video to match

6    it accurately.

7          Q.    You don't know one way or the other if

8    EMS had been dispatched at that point?

9          A.    At the minute 37 to 38 second mark I

10   don't know.

11         Q.    And do you know when in relation to

12   when EMS actually did arrive that that video was

13   taken?

14         A.    No.

15         Q.    And you mentioned in your report how

16   long he lost consciousness, you don't know the

17   duration of time?

18         A.    I don't.  One other thing I did

19   request, it comes to mind, as far as setting up a

20   timeline, was there any CVS video taken of the

21   parking lot.

22         Q.    And you have not seen that?

23         A.    Is there one of the parking lot?

Sterba, MD - Tyke - 7/19/17

98

1        Q.    Yes.

2        **A.    There is.  How come I have not seen it**

3  **as the forensic examiner?**

4        Q.    I don't know.

5        **A.    Oh, okay.  So I reserve the right to**

6  **amend my report and come up with more opinions once**

7  **that video with the timeline on it is presented to**

8  **me so I can put together how long he was**

9  **unconscious and how much time elapsed before EMS**

10  **showed up.**

11        Q.    Did you review -- you did receive as

12  part of your review the incident investigation

13  report, did you not read the paragraph that goes

14  into detail as to the contents of the CVS parking

15  lot video?

16        **A.    Yes, but I haven't seen the video.**

17        Q.    Did you see the timeline where it goes

18  minute by minute as to what the video actually

19  shows?

20        **A.    No.**

21        Q.    It is in the report and materials that

22  you have been provided?

23        **A.    I would like to see that again.  Let me**

Sterba, MD - Tyke - 7/19/17

99

1    make sure.  Do you have it there so I can find it

2    in mine?

3         Q.    You list it as number 2 of your

4    exhibits.

5         A.    The timeline for the video from CVS.

6         Q.    So the video itself is something that

7    you have asked for and you have not been provided

8    in this case?

9         MR. HECHT:  Form.

10        BY MS. TYKE:

11        Q.    Doctor.

12        A.    I'm thinking.  You mentioned this as

13   one of my references on page 15, what number?

14        Q.    Number 2.

15        A.    St. Lucie County Sheriff's office

16   incident investigation report.  Okay.  I know where

17   that is.  It says I then reviewed the CVS in store

18   video Docher seen entering at 17:57.  I don't have

19   that other than the case supplemental report by

20   Blatchford.

21        Q.    So you don't actually have the video?

22        A.    No.  At 18:20 Docher in handcuffs,

23   18:22 the deputies appear back in camera, Docher

Sterba, MD - Tyke - 7/19/17

100

1    appears on the ground, struggling to control

2    Docher.  18:21, a minute earlier, Sean Mahoney and

3    Docher are on camera at the register purchasing

4    drinks.  This is a different view.  This is

5    outside, inside.  I read all of this.

6          Q.    So you have read this?

7          A.    Yes.

8          Q.    But you have actually not seen the

9    video?

10          A.    I would like to.  I asked for it but I

11    haven't seen it.

12          Q.    You talk about -- again, going to page

13    4 of your report, the various interactions that he

14    has with law enforcement prior to EMS arriving, and

15    we talked about the loss of consciousness.  You

16    state then that Docher's condition in the field at

17    this point was critical and unstable?

18          A.    Absolutely.

19          Q.    Can you describe for me what you mean

20    by critical and unstable?

21          A.    He's in shock, he's unresponsive, his

22    Glasgow coma scale would be 3, that is as low as

23    you can go.  He has just sustained a loss of

Sterba, MD - Tyke - 7/19/17

101

1    consciousness as a result of physical restraint by

2    improvised non-approved torturous method, even

3    though it was not torture, it was very painful,

4    with a foot stepping on his back and his arms

5    pulled to 90 degrees restricting his ventilation,

6    which by definition when you restrict the exchange

7    of CO2 and oxygen is asphyxiation, and a synonym

8    for that is suffocation, resulting in a loss of

9    consciousness.

10          He actually -- right at the video that you

11   don't want me to play, but at seconds 37 and 38

12   after Deputy Mangrum says the F bomb word and he

13   says okay.  Docher says okay or something, I can't

14   brrr.  And he is not able to actually say the word

15   breathe because he has no air left to actually

16   speak at that point.  So that is suffocation or

17   asphyxiation followed by a loss of consciousness,

18   which would be shock.  We don't know the blood

19   pressure.  You don't have to have a measurement of

20   blood pressure to say someone is in shock if

21   they're unconscious having been asphyxiation.  You

22   don't have to be dead from asphyxiation to say that

23   somebody was being asphyxiated either.

Sterba, MD - Tyke - 7/19/17

102

1          Q.    Can you tell me what, if any, injury he

2     sustained because of the asphyxiation?

3          A.    Hypercapnia, hypoxia, not traumatic,

4     but in this case restricted ventilation with rise

5     in CO2 probably into the narcotic range and you do

6     not lose consciousness as a result of elevated

7     carbon monoxide.  It just makes you very, very

8     sick.  The narcotic effect makes you very dizzy,

9     confused, agitated.  All of that I have observed in

10    my own human experimentation.  And hypoxia as a

11    result of not being able to get enough oxygen into

12    his blood stream, that results in a build-up of

13    lactic acid, metabolic or in this case respiratory

14    acidosis from restricted ventilation.  So what

15    injury, asphyxiation is an injury.  It's induced.

16         Q.    And what is respiratory acidosis?

17         A.    When you can't exchange CO2 and oxygen

18    due to at impairment of ventilation exchange of CO2

19    and oxygen, your CO2 will rise and your oxygen will

20    drop.

21         Q.    What is the treatment for somebody who

22    has respiratory acidosis?

23         A.    Breathe.

Sterba, MD - Tyke - 7/19/17

103

1        Q.    And you describe in your report as

2    metabolic acidosis, is it the same thing?

3        **A.    No.   The metabolic acidosis is a result**

4    **of a 16 minute period of time from injection until**

5    **they got him back into normal sinus rhythm, that is**

6    **NSR.   There is a 16 minute period of time after the**

7    **injection until normal sinus rhythm and a good**

8    **blood pressure was found by the paramedics after**

9    **the successful resuscitation of getting back a**

10   **pulse and a blood pressure.   That resulted in a**

11   **rapid build-up in acid, and that is determined by**

12   **lab testing in the emergency department.**

13       Q.    And what is the treatment for metabolic

14   acidosis?

15       **A.    If the patient is ventilated bicarb**

16   **fluids but also having appropriate ventilator**

17   **settings to eliminate any excess CO2.**

18       Q.    And just so I --

19       **A.    And fluids.**

20       Q.    Please correct me if I'm

21   misunderstanding your opinion, do you believe that

22   he was -- that he had metabolic acidosis prior to

23   the injection or that he had metabolic acidosis as

Sterba, MD - Tyke - 7/19/17

104

1   a result of the time between the injection and when

2   he was returned to sinus rhythm?

3       A.   The cause of his acidosis metabolically

4   was restricted ventilation.  We don't have any

5   evidence of a blood gas in the field naturally.

6       Q.   Right.

7       A.   As far as a metabolic disturbance it

8   would be classified as respiratory acidosis as the

9   metabolic disturbance that you see as a

10  contraindication in the use of Ativan.  When they

11  talk about a metabolic disturbance they refer to

12  hypoglycemia or low blood sugar or hypoxia, which

13  is a low oxygen level in your inhaled breath or in

14  your blood stream.  Actually in the blood stream

15  it's hypoxemia.  And so he had that, that was his

16  metabolic disturbance, but the medical term for it

17  would be respiratory acidosis as the metabolic

18  disturbance.  I am not splitting hairs.  This is

19  what I teach.

20      Q.   No.  I appreciate the clarification.

21      A.   And then in the ER with such a long

22  period of time without a pulse your body continues

23  to pour out much more lactic acid and other acids.

Sterba, MD - Tyke - 7/19/17

105

1    **Therefore, you have a metabolic acidosis on top of**

2    **the preceding respiratory acidosis.  That is why**

3    **his pH was so low.**

4         Q.   Would that also be something that you

5    would see in somebody who had suffered a cardiac

6    arrest?

7         **A.   Yes.**

8         Q.   Going back to describing that Docher's

9    condition was critical and unstable, would you

10   consider his condition when emergency medical

11   services arrived as a medical emergency?

12        **A.   Yes.**

13        Q.   And then you go over the five ongoing

14   problems that he was suffering from, number one,

15   was alcohol ingestion of hard liquor and then

16   Natural Ice, amounts and timing unknown?

17        **A.   Right.**

18        Q.   When you talk about that he was -- has

19   a problem with alcohol ingestion, can you describe

20   for me what, if any, affects he was having from the

21   alcohol?

22        **A.   No.**

23        Q.   Why do you describe that as a problem?

Sterba, MD - Tyke - 7/19/17

106

1      A.    As mentioned before the combination of

2   alcohol and a Benzodiazepine can bring on

3   respiratory depression and respiratory arrest.   So

4   the use of Ativan with alcohol ingestion is risky

5   although we do use Ativan with acute alcohol

6   intoxication.   We have to be very weary that the

7   person can have further respiratory depression.

8   And that is actually found in the EMT books, so

9   that is part of Rosario's training.   Ativan has

10   been used with alcohol intoxication.   It's risky.

11   And in the emergency department setting and

12   sometime in the EMS setting it can be used.   But

13   when you combine it with shock, coma.   Not

14   respiratory depression, respiratory arrest almost

15   with maybe some degree of recovery with him having

16   shallow respiratory, you have a number of

17   contraindications and risks when you combine it.

18   Being that there is some degree of alcohol onboard

19   that is considered a risk.

20      Q.   But it is not an absolute

21   contraindication to using Ativan?

22      A.    No.   It is a risk.

23      Q.   You talk about suspected drug abuse of

Sterba, MD - Tyke - 7/19/17

107

1    unknown drugs, but you would agree with me that

2    there is no facts that support that he was on any

3    type of illicit drug at the time?

4           A.    **The testing was only eight drugs in the**

5    **urine tox screen, which is not very comprehensive.**

6    **He may have had other drugs bring on psychotic**

7    **behavior or he might have been psychotic from**

8    **schizophrenia that's not treated.**

9           Q.   You have no facts or basis to say that

10   he was on any illicit drugs?

11          A.    **That's why I said suspected drug abuse**

12   **of an unknown drug or drugs which was mentioned by**

13   **the police which may have resulted in his**

14   **delusional state and worsening the agitation and**

15   **fighting.   It's a factor for anybody that comes**

16   **into the ER.**

17          Q.   So it's a factor to consider but it's

18   not one that we have any facts to support that he

19   was on any illicit drugs, right?

20          A.    **Right.**

21          Q.   And are these five ongoing problems,

22   are these considerations or are they actual

23   problems that he was suffering from?

Sterba, MD - Tyke - 7/19/17

108

1      **A.    It would be on the differential, the**

2      **possibilities, some of which cannot be proven.**

3          Q.    Because there is nothing to support the

4      illicit drugs?

5          **A.    That doesn't mean that it wasn't there.**

6          Q.    You have nothing in the facts to

7      support that he was on illicit drugs?

8          **A.    The drug testing was incomplete.**

9          Q.    That's not my question.  Do you have

10     any facts that you can show me in this matter that

11     he was on any illicit drugs?

12         **A.    No.  Just the suspected co-ingestion**

13     **which is also brought up in the EMT training that**

14     **you have to consider other drugs as well as alcohol**

15     **intoxication.**

16         Q.    Delusions and paranoia and fear of

17     being killed is another ongoing problem that you

18     describe?

19         **A.    Yes.**

20         Q.    Blunt force head trauma with bleeding

21     and sudden loss of consciousness?

22         **A.    Yes.**

23         Q.    Any other problems that he had when EMS

Sterba, MD - Tyke - 7/19/17

109

```
1   arrived?

2        A.   I didn't bring it out, but his altered

3   mental status is still present.  He was suddenly

4   combative and not following directions.  If you

5   can't get an accurate Glasgow coma scale, I feel it

6   was reduced, even though it wasn't accurately

7   measured as far as the response to the eyes, the

8   verbal response and the motor response was very

9   impaired.

10       Q.   Let's talk about when Jose Rosario

11  arrives at the scene.  What is your understanding

12  as to the information that he was actually provided

13  by law enforcement as to what had been going on

14  with Mr. Docher?

15       A.   Alcohol, drugs were a consideration,

16  resisting arrest and that he had fallen.

17       Q.   In regards to the resisting arrest,

18  what is your understanding as to what law

19  enforcement told him as to the various tactics that

20  were used with Mr. Docher?

21       A.   I'm not sure what you asked.

22       Q.   Sure.  What I'm trying to find out is

23  do you believe that Jose Rosario -- on page 4 you
```

Sterba, MD - Tyke - 7/19/17

1    go over the different types of trauma that he

2    sustained due to blunt force, such as to his head,

3    to his chest, to his collarbone, shoulders,

4    buttocks, to his face, do you have any information

5    that law enforcement informed either Mr. Sinclair

6    or Mr. Rosario as to what areas of the body that

7    they used force on Mr. Docher?

8         **A.    No, nothing there.  They never split**

9    **out what was caused by his fall versus what they**

10   **caused themselves.**

11        Q.   Do you have any information that they

12   disclosed to Mr. Rosario -- other than what he

13   observed with the facial injuries, any other

14   injuries that he might have sustained in other

15   parts of his body?

16        **A.    I'm not sure what you are asking**

17   **because in the chart it does talk about head injury**

18   **not just facial.  The word head is mentioned, so we**

19   **have head trauma, fall.**

20        Q.   What I'm trying to find out is did you

21   see anywhere in any of the depositions, the notes

22   that there was information provided to Mr. Rosario

23   that he could have had a fractured collarbone,

Sterba, MD - Tyke - 7/19/17

111

1    shoulder contusion, abrasions to other extremities,

2    severe skeletal muscle damage to his lower back or

3    buttocks or anything like that?

4         **A.    No.**

5         Q.    Was there any information provided to

6    Mr. Rosario that Mr. Docher's arms, as you

7    described them, were being held behind his back at

8    a 90 degree angle while they were handcuffed while

9    a law enforcement officer stepped on his back?

10        **A.    There is no information that that was**

11   **presented to Rosario.**

12        Q.    Any information that it was presented

13   to Mr. Sinclair?

14        **A.    Not that I saw.  He didn't know about**

15   **this unapproved improvised tactic by Mangrum.  And**

16   **it wasn't the officers, it was Mangrum.**

17        Q.    He is an officer?

18        **A.    It wasn't the other officers.  You said**

19   **officers that did this.  No, it was just Mangrum.**

20        Q.    I see what you're saying.  And was

21   there any discussion with Mr. Rosario regarding the

22   loss of consciousness observed by Mangrum?

23        **A.    Let me just quickly look at the EMS**

Sterba, MD - Tyke - 7/19/17

112

1   documentation that I have here.

2        Q.   Sure?

3        A.   Whether or not Rosario knew that he was

4   -- well, when he got there he was not responding,

5   so.

6        Q.   Is your understanding that as soon as

7   Mr. Rosario arrived on scene that he immediately

8   made contact with the patient?

9        A.   Yes.  No.  The answer to your question

10  as far as the preceding loss of consciousness it is

11  not mentioned in the EMS record.

12       Q.   Do you remember in the various

13  statements and in Rosario's deposition that he

14  describes when they first arrived upon the scene

15  they witnessed Mr. Docher struggling with law

16  enforcement officers?

17       A.   Yes.  And that is also in the EMS

18  record.  The SO officers were subduing him and

19  seemingly controlling him.  He was controlled --

20       Q.   Seemingly?

21       A.   Yeah.  It wasn't an out of control

22  situation with the 150 pound person getting away

23  with it with three officers.  He was controlled.

Sterba, MD - Tyke - 7/19/17

113

1        Q.   And in the EMS report, is it correct

2   that Mr. Rosario did observe a laceration to the

3   head but described that it was not bleeding at the

4   time?

5        A.   Um-hmm, with minimal to no bleeding.

6   MR. HECHT:  Was that a yes?

7   THE WITNESS:  Yes.

8   BY MS. TYKE:

9        Q.   So as far as the information that Jose

10  Rosario knew at the time, and what is your

11  understanding as to his understanding of Mr.

12  Docher's condition other than the suspected drug

13  use and smell of alcohol and observed laceration to

14  his head?

15       A.   That he was on the ground, officers

16  subduing and controlling him, that he was very

17  combative and would not stay on the LSB long spine

18  board with CID, cervical immobilization device.

19  But we also see from the testimony that when he

20  came around and he could not be subdued or reasoned

21  with or whatever that he kicked Rosario in the leg.

22  At one place I read that Rosario actually fell down

23  on his butt, and in another place said that he

Sterba, MD - Tyke - 7/19/17

114

1    almost fell down.  It looks like he got taken by

2    surprise, which has happened to me over eight years

3    of ambulance work.  So that is my assessment.

4         Q.   And then your report goes into the

5    initial assessment done by Mr. Rosario, it talks

6    about that the patient's airway was patent, which

7    means open?

8         A.   Patent, the airway is open.

9         Q.   And open means what?

10        A.   Not obstructed.

11        Q.   And it says respirations were rapid,

12   abnormal?

13        A.   Yes.

14        Q.   Radio pulse at rest was rapid,

15   abnormal?

16        A.   Yes.

17        Q.   Skin was moist, which is abnormal?

18        A.   Right.

19        Q.   And breathing quality was fast, 20 to

20   30 breaths per minute?

21        A.   Right.

22        Q.   Is there a difference between where you

23   say respirations were rapid and breathing quality

Sterba, MD - Tyke - 7/19/17

115

1    was fast?  And I'm looking at page 5 of your

2    report.

3          A.    I'm there now.  Breathing quality was

4    fast.

5          Q.    Right.  And what I'm trying to decipher

6    is the difference between where you say the

7    respirations were rapid abnormal and you say

8    breathing quality was fast 20 to 30 breaths per

9    minute?

10         A.    The rate was rapid, which is abnormal,

11   and the breathing quality was fast, the

12   respirations were rapid abnormal meaning that there

13   is no number to it, but then the breathing quality

14   was fast at 20 to 30 beats per minute.

15         Q.    Breaths.

16         A.    Breaths.  How about a little break.

17         (A recess was then taken.)

18         BY MS. TYKE:

19         Q.    I guess my question is, just from a lay

20   person, what is the difference between when we

21   describe respirations and breathing quality?

22         A.    Respirations can be described both

23   ways.  The quality of breathing, shallow,

Sterba, MD - Tyke - 7/19/17

116

1    **inadequate, gasping, as you mentioned before.  And**

2    **we don't have a lot of that in the chart.  We have**

3    **the respiratory rate of 20 to 30, that is**

4    **abnormally fast.  That's all I can say.**

5         Q.   And we talked about the difference that

6    respirations, the pulse, the skin moisture all

7    being abnormal, what is the normal range for

8    respirations, I think you said between 18 --

9         **A.   Maybe 12 to 18.**

10        Q.   For pulse what is the normal?

11        **A.   Anything above 100 is called**

12   **tachycardia.**

13        Q.   Skin moisture, does that mean sweat?

14        **A.   Yes.**

15        Q.   The fact that he has rapid respirations

16   and his pulse is elevated and then he has sweat or

17   moisture on his skin, would that be something that

18   would be an unusual finding for somebody who has

19   been in a struggle?

20        **A.   Yes.**

21        Q.   So the fact that he had -- so if you

22   are in a struggle you normally don't have elevated

23   respiration?

Sterba, MD - Tyke - 7/19/17

117

1      A.    Prior to the struggle he probably

2  didn't have any of these, even though we don't have

3  documentation.  After the struggle he is breathing

4  too fast, his heart rate is too fast, his skin is

5  moist and it should be dry.  We still don't know

6  the number one contraindication for the use of

7  Ativan, which is hypotension.

8      Q.    Wait, wait.

9      A.    We don't have a blood pressure and we

10  don't have a pulse ox, so the vitals are incomplete

11  at this point.

12      Q.    Just going back so that I understand.

13  You would find it to be unusual that somebody who

14  has just been through a struggle and is currently

15  struggling with law enforcement, for their

16  respirations to be elevated?

17      A.    If they're physiologically abnormal but

18  expected if somebody is struggling against

19  resistance.

20      Q.    And the fact that he has an elevated

21  pulse and that he has been in a struggle and is

22  currently in a struggle, is that something that you

23  would find to be unusual?

Sterba, MD - Tyke - 7/19/17

118

1       **A.   No.**

2       Q.   The same with the fact that he has skin

3  moisture, sweating, the fact that he was involved

4  in a struggle and currently in a struggle, is that

5  an unusual finding?

6       **A.   No, it is not.**

7       Q.   Now, you talked about the fact that we

8  don't have a pulse ox and that we don't have a

9  blood pressure, how do you, as an emergency

10  physician, go about obtaining those in a patient

11  who is currently in the midst of a struggle?

12      **A.   You can assess the pulse to find out if**

13  **it's weak and thready, in other words, the blood**

14  **pressure might be very, very low or if you can't**

15  **even feel it at the wrist, which would mean it's**

16  **far too low.  If you can't get a blood pressure**

17  **cuff on somebody -- it is never described here.  It**

18  **is just the heart rate of 110.  And let me back up**

19  **to the EMS run sheet here.**

20       Q.   Sure.

21      **A.   He really didn't assess any of this at**

22  **18:36 on page 1 of 6 for the emergency probe,**

23  **carotid pulse, radial pulse, brachial pulse,**

Sterba, MD - Tyke - 7/19/17

119

1     femoral pulse not assessed times four.

2          Q.    And, Dr. Sterba, do you recall reading

3     in his deposition where he stated upon initially

4     arriving at the 18:36 that he was not able to get

5     to Mr. Docher at the time because law enforcement

6     was still in the midst of their struggle with him

7     and he was not able to get to the patient?

8          A.    He did say that.

9          Q.    So that would make it difficult if you

10    are not able to get to a patient to be able to take

11    their vitals?

12         A.    It can make it difficult.  That's why

13    we teach EMTs and paramedics try to get a radial

14    pulse, if they have a pulse, if something is

15    abnormal there.  He did get 110 somehow.  But it's

16    required to determine whether or not somebody is

17    stable before you make a determination to give

18    Ativan.  He did not have stability at all.  He was

19    unstable and in critical condition.

20         Q.    Are you talking about hemodynamic

21    stability?

22         A.    Hemodynamic stability looking at blood

23    pressure, looking at the quality of the pulse and

Sterba, MD - Tyke - 7/19/17

120

1    the capillary refill, which is prolonged because we

2    do have a capillary refill greater than 2 seconds

3    about four minutes later.  So things are all

4    abnormal but incomplete.

5         Q.   Do you have any opinion as to if his

6    blood pressure was taken at 18:38 what that blood

7    pressure would be?

8         A.   No.  I can't say with medical certainty

9    that it was normal or abnormal.  It was just

10   missed.  And for Rosario to know that low blood

11   pressure is a contraindication, and that is what he

12   put on his test, and that is what you see

13   throughout all of these protocols.  He needed to

14   measure the blood pressure.

15        Q.   We talked about your time as an EMT

16   with chemical sedation, your time as an emergency

17   room physician have you ever had to administer

18   chemical sedation?

19        A.   Yes.

20        Q.   And is chemical sedation something that

21   is recognized for patients who are combative?

22        A.   Yes.

23        Q.   Is Ativan one of the drugs -- and we

Sterba, MD - Tyke - 7/19/17

121

1    are just talking generally right now, just

2    generally is Ativan one of the drugs that is

3    recognized as an appropriate medication given the

4    situation to use for chemical sedation in a patient

5    who is combative?

6         A.   It can be.  It is not used as much as

7    other drugs, 5-HT2 serotonin receptor blockers,

8    like Ziprasidone known as Geodon or Haldol which

9    acts in a slightly different way.  These

10   anti-psychotic tranquilizing type of drugs are

11   probably often used than a drug that has serious

12   side effects for somebody who is on alcohol with

13   head trauma, had a metabolic disturbance of

14   respiratory acidosis from hypoxia.  We do not use

15   Ativan in a situation like this.  And, in fact, his

16   protocol mandates that he talks to someone like me

17   as medical control.  And being 8 minutes and

18   25 seconds out I would have said to him do you have

19   the patient on oxygen with four points?  No.  Do

20   that, expedite transport and do not give Ativan.

21        Q.   When you said his protocol required him

22   to call medical control, can you show me that?

23        A.   I can.  It will take some time.  It

Sterba, MD - Tyke - 7/19/17

1    states when you have a situation like this it is

2    advised to contact medical control.  Do you want me

3    to look that up for you?

4           Q.   I do.

5           A.   In the Lindsey report, my page 15, his

6    page 1 of 3 of the patient restraint and emergency

7    medical services approved by the NAEMSP board of

8    directors.  And we are talking about page 2 of 3

9    and my page 16, direct medical oversight of EMS

10   provider, interventions may be necessary for

11   combative patients who refuse treatment or orders

12   to restrain a patient before, immediately after

13   restraint or for orders for chemical restraint

14   before or after medication is administered, and

15   that should have been done.

16          Q.   Where are you specifically looking?

17          A.   It's this one.

18          Q.   And what page?

19          A.   It is page 2.

20          Q.   Direct medical oversight?

21          A.   Yeah.

22          Q.   And it says may, it does not say shall,

23   is that correct?

Sterba, MD - Tyke - 7/19/17

123

1    A.    No.   May.   And in this case I feel it

2  was medically necessary.   And had he called and

3  spoken to someone like me Ativan, which was clearly

4  contraindicated for both reasons and for other

5  reason that we have talked about would have been

6  denied.

7    Q.    But you do agree with me that this

8  protocol is not conclusive that he must or shall

9  call medical --

10    A.    We talked about it.   It is a strong

11  recommendation.

12    Q.    And then this is a general guideline

13  that is put out by NAEMSP board of directors, is

14  that accurate?

15    A.    Yes.

16    Q.    It is dated December 20, 2016, which is

17  after the incident in this matter?

18    A.    It is true.   I noticed that, too.   But

19  having been medical director for EMS in the past --

20    Q.    And when was that?

21    A.    1992 or 1993.   When you have combative

22  patients with contraindications to a Benzodiazepine

23  with alcohol onboard and possibly another drug.

Sterba, MD - Tyke - 7/19/17

124

1   And in this case a coma situation, even though it

2   is more a layman's term, a loss of consciousness,

3   hypoxemia most likely from restricted ventilation,

4   shock, head trauma, all of these things with being

5   8 minutes and 25 seconds away, I would have asked

6   so are the cops failing to restrain this patient.

7   No.  He is seemingly under control.  Have physical

8   restraints been applied by you?  No.  He just has

9   the police metal handcuffs behind his back.  Put

10  him in soft restraints and keep him cuffed if you

11  want, bring a cop, put him on high flow oxygen and

12  expedite transport to the ER.  And do not give

13  Ativan, is that clear.  And I have done that

14  before, I have given those types of orders.  That

15  would have prevented all of this.

16        Q.   And you would agree that these are not

17  protocols or policies and procedures that are

18  disseminated by St. Lucie County Fire District,

19  correct?

20        A.   No.  They were just included by the

21  technical college adult instructor, Jeff Lindsey.

22        Q.   Because you said Rosario violated his

23  protocols, meaning St. Lucie County Fire District?

Sterba, MD - Tyke - 7/19/17

125

1        **A.    He violated the US standard of care for**
2   **EMS in this case.   And I determined that.**

3        Q.    You determined that?

4        **A.    I just did.**

5        Q.    You mentioned just a moment ago that he
6   had restricted ventilation, what are you talking
7   about, what time period?

8        **A.    37 seconds to 38 seconds into the DVD,**
9   **and we don't have an accurate timeline, maybe a few**
10  **minutes prior to EMS arriving, he is not able to**
11  **breathe adequately.**

12       Q.    Do you know if Jose Rosario was aware
13  or had reviewed this video at the time of the
14  incident?

15       **A.    Most likely he did not review it.**

16       Q.    As far as him being aware that at some
17  point in time prior to his arrival Tavares Docher
18  suffered from restricted ventilation, you have no
19  facts to support that, that Jose Rosario knew that?

20       **A.    No.**

21       Q.    You talk about in your report -- again,
22  on page 6 that no EMS emergency treatment had been
23  started such as administration of high flow oxygen

Sterba, MD - Tyke - 7/19/17

126

1    by non-rebreather facemask or by any other method

2    for this trauma patient with a head injury.  As he

3    is being combative and is kicking Mr. Rosario to

4    him falling, how is it that you would expect Mr.

5    Rosario to administer high flow oxygen to the

6    patient?

7            A.    If he refuses the mask and he refuses

8    nasal cannula -- you have to understand even in

9    their protocols they state you must evaluate

10   whether or not somebody is agitated and combative

11   because of hypoxemia or low oxygen in the blood.

12   You still have to give the oxygen.  How is that

13   done, by blow-by.  At least you pass it as close as

14   you can to have as high of a concentration as

15   possible to try to treat the hypoxia that would be

16   going on -- that may be going on.

17           Q.    That may be going on?

18           A.    Right.

19           Q.    And you just try to administer that

20   even though the patient is struggling and fighting?

21           A.    Yes.  Either by having it close to the

22   face and blow it past the face or nasal cannula.

23   Let's try this and maybe you like this better.  And

Sterba, MD - Tyke - 7/19/17

127

1   you try to talk a patient down.  In this case is it

2   possible, it is really hard to say.

3        Q.   And again, you talk about the second

4   measured respiratory rate, 28 breaths per minute,

5   abnormally high and no oxygen was applied?

6        A.   Yes.  And you can take the facemask and

7   have it right below the chin.

8        Q.   And you described that Mr. Docher was

9   very combative at that time?

10        A.   Yes.  It's hard.  I did it for eight

11   years.

12        Q.   And it's your understanding that he was

13   required under policies and procedures by St. Lucie

14   County Fire District to provide the high flow

15   oxygen by non-rebreather facemask prior to doing

16   anything else?

17        A.   For patients that are trauma patients

18   with bleeding and the issues that he had an attempt

19   should be made to deliver oxygen, and an attempt

20   should be made to measure the oxygen level.  None

21   of that was done.  That falls below the US standard

22   of practice for EMS.

23        Q.   In a situation where you were unable to

Sterba, MD - Tyke - 7/19/17

128

1    do that assessment but you still have a combative

2    patient, and you need to get that combative patient

3    to the hospital, is it your testimony that you are

4    not then to go forward with any type of physical or

5    chemical restraint of that patient to get them to

6    the hospital?

7            A.    Absolutely not.  He never went ahead

8    with any EMS approved -- I'm not done.  He never

9    went ahead with any EMS approved physical

10   restraint.  He is on his back on the ground with

11   handcuffs behind his back, which may have been

12   somewhat painful.  He comes around and he kicks the

13   paramedic.  At that point high flow oxygen, getting

14   soft restraints applied to the legs so that nobody

15   else gets kicked.  You have three deputies there

16   that could have pressed above his knees, getting

17   the four points started on both ankles, keeping him

18   cuffed, moving the arms over to one side to put

19   soft restraints on one wrist and either leaving him

20   like that or preferably unlocking the handcuffs and

21   bringing the other hand around and reapplying

22   either the handcuffs with all four point restraints

23   applied with the police officer present.  That is

Sterba, MD - Tyke - 7/19/17

129

1    what was needed.  And that was completely skipped

2    over.  And once those restraints are applied and he

3    is not moving around on the gurney that much, you

4    can try to apply oxygen and maybe even get a pulse

5    ox on the finger.  I've done it.  And it needed to

6    be done.  It's against the US standard of practice

7    to launch straight into the wrong drug and the

8    wrong dose and cause this problem.

9         Q.   And we're located in Florida, you keep

10   saying the United States standard of practice.

11        A.   Right.  And I was a Florida licensed

12   physician responsible for EMS providers.

13        Q.   And when was that?

14        A.   As I mentioned I worked in the ER in

15   Florida, and that was '86 to '90 working in the ER

16   but also setup the corpsman training program.  And

17   also, over satellite communication ordered a lot of

18   this to independent duty technicians.  Those are

19   specialized corpsman that work with the teams.

20        Q.   And you believe that had Rosario

21   applied physical restraints he would have been able

22   to apply those to Mr. Docher despite his

23   combativeness?

Sterba, MD - Tyke - 7/19/17

130

1       A.   Yes.  The protocol -- as I pointed out,

2   is you use law enforcement agents to help you apply

3   the four point restraints.  It should have been

4   done and it was skipped over.  He just went and

5   gave a contraindicated drug at too high of a level.

6   Rosario caused the cardiopulmonary arrest and the

7   brain damage, and that is with medical certainty.

8       Q.   Where is it specifically that it says

9   you must do physical restraints prior to using

10  chemical restraints?

11      A.   You talk the patient down, physical

12  restraint and then chemical restraints in that

13  order is mentioned in a few places.  And I can

14  point them out to you.  If you take a look at

15  patient restraint in EMS page 1 of 3, my page 15.

16  Restraint protocols must address the restraint

17  techniques that will be used.  Verbal deescalation,

18  physical or chemical.  When each will be used, who

19  can apply them and when direct medical oversight

20  must be involved.  These are recommendations.

21      Q.   There is no indication --

22      A.   You're asking when physical restraint

23  must be used before?

Sterba, MD - Tyke - 7/19/17

131

1        Q.   Yes.

2        A.   I did read it.  I will find that in a

3   second.  It is on page 2 of 3 of that document

4   where it says at the bottom law enforcement

5   officers should be involved in all cases when a

6   patient poses a threat to EMS personnel and others.

7        Q.   You agree with me that law enforcement

8   officers were there during the time that Jose

9   Rosario was with Mr. Docher, correct?

10       A.   Yes, but they were never incorporated

11   into getting EMS approved soft restraints placed.

12       Q.   And in your review of the deposition of

13   the law enforcement officers were you aware that it

14   was protocol and procedure for them to keep the

15   hard handcuffs on him at the time since he was

16   under arrest?

17       A.   That is fine, but that doesn't exclude

18   the use of soft EMS approved restraints.

19       Q.   And you would agree with me that the

20   hard handcuffs that were placed on Mr. Docher were

21   placed by the law enforcement officers and not by

22   Mr. Rosario?

23       A.   That's correct.  But you can't use

Sterba, MD - Tyke - 7/19/17

132

1    **their handcuffs as your restraint, it is strictly**

2    **prohibited according to protocol.**

3         Q.   Have you seen in various documents that

4    are even approved by NAEMSP and their board of

5    directors in which if the law enforcement agency

6    requires for a person to be in handcuffs that is

7    something that is acceptable?

8         **MR. HECHT:**  Form.

9         **THE WITNESS:**  Yes.  If the police officer

10   accompanies.  And sometimes soft restraints are

11   still needed, but somebody can be under arrest and

12   not needing four point soft restraints that are EMS

13   approved, and that happens.  Not in this case.  It

14   doesn't apply to this case.  In this case EMS

15   approved soft restraints, four point restraints

16   were clinically indicated and is the US standard of

17   practice for EMS.  They were skipped.  And going

18   directly to chemical restraints is against the US

19   standard of care.

20        **BY MS. TYKE:**

21        Q.   And if you could find that for me?

22        **A.    It is against the US standard of care.**

23        Q.   Again, if you can find that for me?

Sterba, MD - Tyke - 7/19/17

133

1      A.   No.  It is against the US standard of

2   care.  I just mentioned that.

3      Q.   I do need what documentation or support

4   or training that you are relying on in that?

5      A.   Sure.  My EMT training at Indian River

6   Community College, eight years field experience

7   working full time, EMS medical director, emergency

8   medical residency training and EMS director under

9   supervision during the residency and afterwards

10  that four point restraints are always applied

11  before going straight to chemical restraint.

12     Q.   Would you be surprised at national

13  conferences currently being held regarding

14  emergency medical services that that is not what is

15  being trained and taught?

16     MR. HECHT:  Form.

17     THE WITNESS:  I can't answer that because I

18  was not at that conference.

19     MS. TYKE:  Would you be surprised if that is

20  what is being trained and taught through NAEMSP?

21     MR. HECHT:  Form.

22     THE WITNESS:  Again, your question.

23     MS. TYKE:  That there is no set physical

Sterba, MD - Tyke - 7/19/17

134

1    restraint prior to chemical restraint?

2              **MR. HECHT:**  Form.

3              **THE WITNESS:**  Requirement?

4              **BY MS. TYKE:**

5         Q.   Right.

6         **A.    It is what is taught and what is the**

7    **national standard or policy for EMS not to go**

8    **directly to chemical restraint you should try**

9    **physical restraint first.**

10        Q.   I'm just asking you where that is?

11        **A.    From my education and training and**

12   **reading.**

13        Q.   And what books, training books, you

14   have a bunch over there?

15        **A.    I can't cite any of the references that**

16   **we have here.  It is from my experience and also**

17   **training.**

18        Q.   From your experience?

19        **A.    Yes.**

20        Q.   You can't point to any actual training

21   books or educational books or policies or

22   procedures?

23        **A.    I'm referring to Emergency Medical**

Sterba, MD - Tyke - 7/19/17

135

1    Guidelines 4th education, Plaintiff's Exhibit 1,

2    Jose Rosario, page E-28.  It talks about the

3    standards when restraints are necessary.  And they

4    were necessary.  They were skipped, so that is a

5    breach of the standard of care.  Practitioners must

6    determine the most appropriate and least

7    restrictive device, not drug, device, to allow the

8    patient to maintain as much dignity as possible.

9         Q.   What page is that?

10        A.   This is E-28.

11        Q.   What is the title of that?

12        A.   The previous page E-27 under restraints

13   and this is the Emergency Medical Guidelines,

14   participating agencies, everybody in Florida, the

15   St. Lucie County Fire District, who you represent,

16   they signed off on it.

17        Q.   Dr. Sterba, you are aware based on the

18   deposition of the EMS providers in this case and on

19   the corporate representative that that policy and

20   procedure manual was not in place at the time of

21   this incident, correct?

22        A.   It is dated '06.

23        Q.   Correct.  But you realize that there

Sterba, MD - Tyke - 7/19/17

136

1  were updated versions and that that actual policy

2  and procedure manual was not the one in place at

3  the time of this incident?

4       **A.    I was unaware of that.**

5       Q.    Were you provided with the deposition

6  transcript of the corporate representative for St.

7  Lucie County, Brian Gonzalez?

8       **A.    Yes.**

9       Q.    So you were aware in his testimony that

10  he testified that that policy and procedure manual

11  that you were citing in 2006 no longer applied to

12  the situation in this case, correct?

13       **A.    He said so.  I'm saying as an EMS**

14  **expert witness on this case it does apply because**

15  **it talks about the national standard that I'm aware**

16  **of and that is --**

17       Q.    And do national standards change over

18  time?

19       **A.    They can.  There is absolutely no**

20  **national standard that states if you can't talk**

21  **somebody down give them an contraindicated**

22  **Benzodiazepine with many contraindications.  You**

23  **must try restraints, soft EMS approved restraints.**

Sterba, MD - Tyke - 7/19/17

137

1   **And you cannot use hard handcuffs by the police as**

2   **a substitute, it is strictly prohibited.  It is**

3   **expressly prohibited as mentioned in the documents**

4   **that were in the Jeff Lindsey report.**

5              Q.    Dr. Sterba, going back to the patient

6   restraint emergency medical services approved by

7   the NAEMSP board of directors December 20th, 2016

8   which you relied on numerous times in your

9   deposition and your report, you would agree with me

10  that the last paragraph talks about if a law

11  enforcement restraint intervention must be

12  continued during patient care and transport, but is

13  otherwise not sanction for use by an EMS provider,

14  a law enforcement should either accompany the

15  patient and EMS provider during transport to

16  definitive care or the law enforcement based

17  restraint intervention should when appropriate be

18  discontinued in favor or appropriate sanctions EMS.

19  It is an either/or, they are allowed to continue it

20  if it is required by law enforcement.  In this

21  situation a law enforcement official, Deputy

22  Robinson, did go with them in transport to St.

23  Lucie County Medical Center; is that correct?

Sterba, MD - Tyke - 7/19/17

138

1      A.   It is correct.  I found the paragraph

2   on the question that you asked for before.  It's

3   page E-28.  It is again a policy that was in effect

4   prior to this case and it is the bottom left-hand

5   paragraph.  Although physical restraints generally

6   are the first method employed when restraints are

7   necessary.  And in this case it was medically

8   necessary and clinically indicated.  And I will

9   continue, pharmacological restraints may be used as

10  an alternative or adjunct to physical restraints.

11  It does not state that you can skip physical

12  restraints.  It is mandatory.  It was skipped.  It

13  is below the US standard of practice.  It is

14  inexcusable.  And going directly to chemical

15  restraints at the wrong dose for the wrong drug

16  that was contraindicated caused cardiopulmonary

17  arrest and brain damage.

18      Q.   And the handcuffs being placed on him

19  with his hands behind the back, you would agree

20  that was also done by law enforcement officers?

21      A.    Yes.  Left in place without soft

22  restraints is against the US standard of practice?

23      Q.   Even though we just read one of the

Sterba, MD - Tyke - 7/19/17

139

1   policies and procedures that you rely on that says

2   that you can leave them on?

3       A.    That is a different situation.  If

4   somebody --

5       Q.    Sir, I'm just asking generally if that

6   was something that we just read.

7       A.    We just read it.  But understand this,

8   if somebody is arrested and there is no need for

9   other physical restraint, that is fine.  It was

10  medically necessary for four point EMS approved

11  restraints to be placed.  The cuff taken off, the

12  hand moved around and recuffed would be fine if a

13  policeman accompanied the patient to the hospital.

14  But skipping over four point restraints, which

15  would have solved the situation, and not needing

16  any Ativan, especially at this dose, would have

17  been sufficient for this patient.  It was

18  completely avoidable.  It was with reckless

19  disregard that approved four point soft restraints

20  were not applied.  It was with reckless disregard

21  that Rosario went ahead and gave him with no

22  adequate monitoring before or after the Ativan of 4

23  milligrams 4 times the dose injection that resulted

Sterba, MD - Tyke - 7/19/17

140

1    in an onset of action in one minute as documented

2    in the records right now, that this calmed the

3    patient down a minute later.  Approximately two

4    minutes later he went into arrest because of what

5    Rosario did.

6          Q.    How do you define reckless disregard?

7          A.    He knew or should have known what he

8    did could cause harm or kill a patient.

9          Q.    Isn't that true of all medical

10   treatment?

11         A.    No.

12         Q.    Most medical treatment?

13         A.    I can't say most medical treatment.

14   But if you know that doing something could cause

15   harm or kill a patient, you should have known or

16   you knew it would be reckless disregard for the

17   life and wellbeing of the patient to go ahead and

18   do that.

19         Q.    Can the administration of anesthetic

20   potentially cause harm or kill a patient during

21   surgery?

22         A.    Anesthetic, do you mean general

23   anesthesia?

Sterba, MD - Tyke - 7/19/17

141

1          Q.    Yes.

2          **A.    Yes.**

3          Q.    So would it be reckless disregard for

4    any anesthesiologist to apply general anesthetic to

5    a patient because of the potential?

6          **A.    No.   Unless the anesthesiologist knew**

7    **or should have known that the patient was deathly**

8    **allergic by a hypersensitivity reaction or that**

9    **medication -- like in this case, was**

10   **contraindicated for one or many reasons -- and I've**

11   **listed five reasons that this medication was**

12   **contraindicated, then the anesthesiologist would**

13   **have been acting with reckless disregard to risk**

14   **the life and wellbeing of his patient on the**

15   **operating table.   We have to come back to the**

16   **totality of this case.   Rosario knew -- he tested**

17   **on it and got a 99 percent on his exam, he knew**

18   **that hypotension was a contraindication.   He never**

19   **measured the blood pressure or attempted to even**

20   **get close to it with checking the pulses,**

21   **peripheral or central pulses, before skipping over**

22   **the required step of physical restraints and going**

23   **straight to the wrong drug at the wrong dose which**

Sterba, MD - Tyke - 7/19/17

142

1    **caused the brain damage.**

2          Q.   Do you know if blood pressures would

3    have shown that Mr. Docher was hypotensive at the

4    time?

5          **A.   No, I don't.  It should have been**

6    **checked.**

7          Q.   Why is it that Mr. Rosario should have

8    known that he was hypotensive?

9          **A.   Why should he have known what?**

10         Q.   You said there were contraindications

11   that Rosario knew?

12         **A.   In his test --**

13         Q.   Wait, wait.

14         **A.   -- that hypotension is a**

15   **contraindication to Ativan.**

16         Q.   Dr. Sterba, I'm really trying to

17   shortcut this, so if we can answer my questions.

18   What five things were the contraindications that

19   you believe Rosario knew at the time that underlie

20   your opinion that he administered the Ativan with

21   reckless disregard?

22         **MR. HECHT:**  Form.

23         **THE WITNESS:**  Either knew or should have

Sterba, MD - Tyke - 7/19/17

143

1     known comes from the expert, the enclosure, chapter

2     12, drugs and chemical classes, my page 24 at the

3     bottom, and we are talking about table 24-24,

4     Lorazepam contraindications, substance abuse was

5     suspected.  He knew that because the police said he

6     may be on drugs.  Coma, there was a loss of

7     consciousness prior to.  We don't have it in the

8     record that he didn't know or he knew, but it

9     should have been passed on.  Shock, he had lost

10    consciousness and he had an abnormal respiratory

11    rate.  Severe hypotension, could that have

12    happened.  We can't say for certainty because he

13    never even attempted to measure pulses or even a

14    blood pressure or even put a blood pressure cuff on

15    the arm, pump it up and let the pressure drop until

16    he could feel the pulse called BP systolic by

17    palpation.  CNS depression, of course he had CNS

18    depression.  So we have possible substance abuse,

19    coma, shock.  We don't know for sure about severe

20    hypotension, but most likely he did have that when

21    he was unconscious with asphyxiation.  CNS

22    depression.  We have enough of those that he knew

23    or should have known and that the police knew or

Sterba, MD - Tyke - 7/19/17

144

1    should have known.

2         Q.   Just going over that last.  The coma,

3    do you have any evidence that shows that Rosario

4    knew that he had a coma?

5         **A.   That he was unconscious, unresponsive?**

6         Q.   Right.

7         **A.   No.**

8         Q.   Do you have any facts to support that

9    Rosario knew that he had lost consciousness?

10        **A.   No, but the police knew that.**

11        Q.   CNS depression --

12        **A.   Reckless disregard talks about --**

13   **you're asking for evidence where no evidence**

14   **exists.  You have to hear what I have to say about**

15   **reckless disregard.  Knew or should have known.  He**

16   **had the responsibility to say what happened to this**

17   **guy when you were arresting him, was there any**

18   **problem.  Did he lose consciousness?  Yeah, he lost**

19   **consciousness.  Well, what were you doing?  I had**

20   **my foot on his chest and I pulled his arms up and**

21   **he passed out.  Oh, my God, how were the**

22   **respirations after that.  Well, they were very**

23   **shallow.  He should have known and he should have**

Sterba, MD - Tyke - 7/19/17

1    asked what happened during all of this arrest.

2    Because the police officers knew, Mangrum knew.

3    And it is the responsibility of EMS always to get

4    as much history as possible especially from law

5    enforcement officers.  It doesn't matter that there

6    is nothing in the record, if there is no evidence.

7    You always have to work very, very closely with law

8    enforcement officers, not only in the application

9    of EMS approved restraints but whatever happened to

10   the patient, especially if the patient was

11   asphyxiated into unconsciousness.  So should he

12   have known, yes.  Is it his fault for not asking,

13   yes.

14        Q.   Do you know the substance of all the

15   questions that he asked law enforcement?

16        A.   No.  There is very little in the

17   record, but having done this line of work and

18   supervised and taught paramedics in the past, you

19   have to get as much information as possible.  What

20   happened in the minutes, was this guy out.  Yeah,

21   he was out.  You have to find out.

22        Q.   You don't know the substance of any of

23   those conversations?

Sterba, MD - Tyke - 7/19/17

146

1    A.    No.

2          Q.    Or what was asked or not asked?

3          A.    No.    The EMS record would discuss that

4    if he had asked the question.    It is a pertinent

5    positive.    Did Docher lose consciousness while you

6    were restraining him?    Oh, yes, he did.    For how

7    long?    Oh, blank minutes.    And what happened?    I

8    put him in recovery position.    When did he start

9    coming around, being combative again?    Just now

10   when you pulled up.    He failed to act, he failed to

11   ask.    He should have known.    It was with reckless

12   disregard that his care was not only incomplete, it

13   was dangerous, reckless.    He caused the

14   cardiopulmonary arrest that was compounded by what

15   the law enforcement officers did and it led to

16   brain damage.    Both are at fault and both caused

17   the brain damage.

18         Q.    Both what?

19         A.    The law enforcement officers and

20   Rosario, both are responsible, and acted with

21   reckless disregard and caused the cardiopulmonary

22   arrest and the subsequent brain damage.

23         Q.    And, Dr. Sterba, earlier you said

Sterba, MD - Tyke - 7/19/17

147

1    unequivocally that the only cause was Jose Rosario,

2    are you now changing your opinion that law

3    enforcement and Jose Rosario combined are the cause

4    of the cardiac arrest?

5         MR. HECHT:  Form.

6         THE WITNESS:  Rosario did cause it, but I

7    never excluded the police officers or the deputies.

8    It's a contributing factor.  If somebody is

9    asphyxiated or suffocated and there is a loss of

10   consciousness with shock, is that a cause of

11   subsequent cardiac arrest, of course, it is.

12        BY MS. TYKE:

13        Q.   You say on page 9 that -- in the first

14   full paragraph, he was an combative agitated

15   patient with toxication from alcohol, a CNS

16   depressant.  Again, what evidence do you have that

17   he was intoxicated by alcohol?

18        A.   Two noses by two law enforcement

19   officers mentioned to the paramedic who documented

20   it that the smell of alcohol was noted.  And it is

21   mentioned in their deposition as well.

22        Q.   I don't think we are talking about

23   whether he consumed alcohol.  You specifically say

Sterba, MD - Tyke - 7/19/17

148

1    that he was intoxicated?

2         A.   That's what they thought.  That's what

3    they arrested him for disorderly conduct -- no,

4    disorderly intoxication.

5         Q.   I'm asking you, as a medical provider

6    looking at the records, what factual basis do you

7    have?  I understand that people might have personal

8    opinions.

9         A.   Smelling is not an opinion.  It is a

10   sense.  Two officers smelled the alcohol --

11        Q.   Doctor, can I finish my question.

12        A.   Yeah.

13        Q.   Okay.  What evidence do you have that

14   Docher was actually intoxicated by alcohol?  And I

15   understand smelling alcohol can indicate that

16   somebody consumed it, but if I have one sip of wine

17   and someone talks to me and they smell alcohol,

18   that does not mean I'm intoxicated?

19        MR. HECHT:  Form.

20        THE WITNESS:  In this case we have altered

21   mental status with the smell of alcohol.  It was

22   their impression that he was intoxicated and

23   disorderly as a result of alcohol, plus other

Sterba, MD - Tyke - 7/19/17

149

1    drugs.  It's a judgment call based on the sensation

2    of smelling alcohol.  What factual evidence, they

3    can smell -- and not everyone can smell it, Rosario

4    didn't smell it.  It doesn't matter because the

5    level was only .04.

6         Q.    That is what I was trying to figure out

7    in your report what you were basing that on?

8         **A.    Behavior and the smell of alcohol.**

9         Q.    So the objective interpretation of the

10   factual witnesses and law enforcement officers?

11        **A.    The objective sensation of the smell of**

12   **alcohol with the direct observation of erratic**

13   **delusional behavior, agitation as well.**

14        Q.    Is it your opinion that his actions,

15   his delusions, hallucinations and agitation were

16   caused by alcohol?

17        **A.    Partially, yes.**

18        Q.    And what else?

19        **A.    Schizophrenia, other drugs, we are not**

20   **sure at that point.  We are dealing at this point**

21   **in time with delusional state and acute psychotic**

22   **reaction.  Are there other drugs causing this, is**

23   **it just alcohol, how much alcohol was onboard, hard**

Sterba, MD - Tyke - 7/19/17

150

1    liquor, multiple Nattys, we don't know at this

2    point.

3          Q.    I am now talking about retrospectively?

4          A.    Looking at the whole case?

5          Q.    Yes.

6          A.    A .04 alcohol is not enough to explain

7    away all his behavior.  Underlying psychiatric

8    condition that we see in this who box of this EMS

9    medical records from Miami, which everyone is

10   saying he is a psychiatrically impaired patient,

11   depression, anxiety and some other underlying

12   psychiatric problems.  Is he an untreated

13   schizophrenic, are there possibly other drugs that

14   are causing a psychotic reaction, we will never

15   know.  Those are contributing factors.  And it is

16   on the list, these issues are on the list of a

17   differential diagnosis as to why he was behaving

18   when his life was about to be lost.

19         Q.    Can you render any within a reasonable

20   degree of medical probability as to what was the

21   specific cause of his actions on the day of May

22   11th, 2014?

23         A.    No.  I don't think anybody will.  And

Sterba, MD - Tyke - 7/19/17

151

1    in the short eight comments things we would have

2    tested back in 2014 of opioids, PCP and all of that

3    is a very short list.  I do not believe that he had

4    any of the other common drugs that people think

5    about with extreme violence or extreme energy or

6    extreme strength.

7          Q.   Are you talking about flakka or bath

8    salts?

9          A.   There are many, many synthetic -- I

10   will call it just synthetic methamphetamines, if

11   you will.  There is a certain drug class for that.

12   No, he didn't exhibit any of the signs and symptoms

13   of either a bath salt or flakka or there are many

14   other street names for these things at CVS.  He

15   didn't exhibit anything when he came out and

16   surrendered the screwdriver.  He was just very

17   scared and he was delusional.

18         Q.   You mentioned in your report about Mr.

19   Docher yelling that he was being killed, is it your

20   understanding that he was continuing to yell that

21   when Mr. Rosario showed up?

22         A.   I don't know.  I just know it from the

23   tape, that is prior to Rosario showing up.

Sterba, MD - Tyke - 7/19/17

152

1          Q.    On page 9 of your report in the first

2    full paragraph, the last sentence, it says more

3    likely than not Mr. Docher at this point in time --

4    talking about when EMS arrived, was suffering from

5    a metabolic disturbance of acidosis due to a

6    buildup of lactic acid in his body, medically all

7    lactic acidosis, prior to EMS arrival and prior to

8    his eventual cardiopulmonary arrest?

9          **A.    Yes.**

10         Q.    Going back earlier in your deposition

11   testimony, I thought that you had testified that he

12   was suffering from respiratory acidosis?

13         **A.    Correct.**

14         Q.    That the metabolic acidosis was not

15   until after the injection?

16         **A.    That's true.  Are these metabolic**

17   **disturbances both lung and cardiac arrest, yes.  A**

18   **metabolic disturbance does not mean metabolic**

19   **acidosis alone.  A metabolic disturbance, if we**

20   **wrap duct tape around your chest right now and you**

21   **found it very, very difficult to breathe, and you**

22   **became panicky with an elevated $CO_2$ level and your**

23   **oxygen level would drop.  What do you have?  You**

Sterba, MD - Tyke - 7/19/17

153

1    have a metabolic disturbance of lactic acidosis.

2    What is the cause?  You just can't breathe.  You

3    are asphyxiated and now your heart stops, and

4    lactic acid really starts to build up in your body

5    because your heart is not even pumping, maybe for

6    even as long as a 16 minute period of time, that is

7    a metabolic problem.  He is being ventilated.  You

8    try to get rid of the respiratory acidosis by

9    blowing off more carbon dioxide, yes.  But when he

10   shows up at the hospital, his CO2 level is very,

11   very low, but the pH is extremely low, which means

12   he has an abundance of acid in his body and they're

13   breathing for him adequately.  What does he have at

14   the hospital, he has metabolic acidosis.  What did

15   he have with Mangrum's foot on his back pulling up

16   on the arms, asphyxiation, suffocation causing

17   hypoxia with a metabolic disturbance of respiratory

18   acidosis.  In other words, the cause is

19   respiratory.  He is not in a coma from diabetes.

20   He can't breathe.  He is asphyxiated, so that's

21   respiratory.  What happens later, he goes into

22   cardiac arrest.

23         Q.   When you talk about lactic acidosis

Sterba, MD - Tyke - 7/19/17

154

1    though, are you saying lactic acidosis is the same

2    thing as respiratory acidosis?

3         **A.   Lactic acidosis can develop when you**

4    **can't breathe.**

5         Q.   So you in your report say he was more

6    likely than not specifically suffering from lactic

7    acidosis, there is no mention of respiratory

8    acidosis?

9         **A.   No.   That is a medical term.   The cause**

10   **of the metabolic disturbance of a buildup of lactic**

11   **acidosis from asphyxiation is called respiratory**

12   **acidosis, the cause is breathing, respiratory.**

13   **Now, metabolic acidosis, the heart stopped.**

14        Q.   In this case we don't have any blood

15   test or arterial blood gas that was done prior to

16   the cardiac arrest?

17        **A.   No.**

18        Q.   And what is your basis that he was

19   suffering from metabolic acidosis, lactic acidosis

20   or respiratory acidosis prior to, just the video?

21        **MR. HECHT:**  Form.

22        **THE WITNESS:**  No.  You can see that his

23   respirations are so fast and so shallow that he

Sterba, MD - Tyke - 7/19/17

155

1  can't even talk, and he tells you that I can't

2  brrr.  He has no air in his lungs to say a

3  three-word sentence.  Okay, all right, I can't

4  brrr.

5          **BY MS. TYKE:**

6          Q.   So is everybody who is unable to

7  breathe suffering from respiratory acidosis?

8          **A.   No.  But if you stepped on somebody's**

9  **chest and you pulled their arms up behind them.**

10 **And you can take a look at that picture from France**

11 **from 1633, that is how he died.**

12         Q.   So other than the video what other

13 basis do you have that he was suffering from lactic

14 acidosis, respiratory acidosis or any type of

15 metabolic acidosis prior to his cardiac arrest?

16         **A.   Observing his breathing pattern on the**

17 **ground.**

18         Q.   Is that how you, as a medical doctor,

19 would determine whether somebody who came into the

20 emergency room or you came to their house if they

21 were suffering from acidosis?

22         **A.   It would be an actual blood test that I**

23 **could do at somebody's house.  If I'm observing**

Sterba, MD - Tyke - 7/19/17

156

1    that they are breathing very fast, too shallow,

2    inadequate ventilation, and I put a pulse ox on the

3    finger and show that their oxygen level was very

4    low, you can assume that the $CO_2$ level would be

5    very high.

6            Q.   Was there a pulse ox that was done in

7    this case --

8            A.   No.

9            Q.   -- that shows on the EMS report?

10           A.   Later on, yes, after they did their

11   resuscitation, but not on the initial evaluation

12   before they gave the 4 milligrams of Ativan.

13           Q.   Do you have an opinion as to what that

14   pulse ox would show at the time within a reasonable

15   degree of medical probability what that pulse ox

16   would be?

17           A.   No, I don't.  Do you mean upon arrival?

18           Q.   Right.

19           A.   No, I don't.  I don't have any

20   information on it other than what the investigators

21   wrote down.  And the deputy stated that he was

22   breathing shallow.  After being asphyxiated,

23   breathing shallow would the pulse ox be low at that

Sterba, MD - Tyke - 7/19/17

157

1    point with medical certainty, absolutely.  He would

2    have been hypoxic, unconscious with abnormal

3    shallow breathing.  At that point, yes.

4         Q.    At what point?

5         A.    After he was asphyxiated on the ground,

6    put in recovery position by the former EMT, Deputy

7    Mangrum, with his respirations being very shallow

8    -- which is the only thing we have from his

9    deposition, with the pulse ox at that point -- and

10   some police officers actually have like a pulse ox,

11   not very many, but had the paramedic tossed on a

12   pulse ox with him unconscious laying on his side,

13   would it have been low, absolutely with medical

14   certainty.

15        Q.    But that was before Rosario?

16        A.    Before EMS showed up.  Had it been

17   measured, would it have shown hypoxia, absolutely.

18   And the metabolic disturbance would have been

19   there.

20        Q.    And when you say that absolutely, you

21   are talking about the time period of when Deputy

22   Mangrum describes Docher as losing consciousness

23   and him having to put him in recovery stage, is

Sterba, MD - Tyke - 7/19/17

158

1    that accurate?

2         A.    Yes.   With an EMT assessment that

3    checked his pulse.   But no one came around and said

4    what was the pulse check, former EMS Mangrum?   Was

5    it rapid, was it very thready and weak, and in

6    other words, almost shocky like.   And you said

7    respirations were shallow.   Do you mean shallow and

8    slow or shallow and fast, what was the degree of

9    his ventilation at that point.   You can ask him all

10   of those questions, he will give you the answer.

11        Q.    Generally when you have a patient who

12   has shallow low breathing --

13        A.    Not shallow --

14        Q.    Wait, wait.

15        A.    Go ahead.   Sorry.

16        Q.    You were talking earlier about Deputy

17   Mangrum's description of Docher having shallow and

18   slow breathing?

19        A.    No.   Shallow only.

20        Q.    Shallow only.   Okay.   Do you pay --

21   generally I'm not talking about Docher.   I'm

22   generally talking now.   Patients who have shallow

23   breathing, do they always have respiratory

Sterba, MD - Tyke - 7/19/17

159

1    acidosis?

2         A.    No.   When you talk about shallow

3    breathing, it sounds like inadequate breathing,

4    which can be fast and inadequate or slow and

5    inadequate.   Now, would you expect somebody who was

6    just asphyxiated who is lying on his side breathing

7    to have inadequate shallow breathing, absolutely

8    not.   This guy is in shock.   This is dangerous.

9    And I put him in unstable critical condition caused

10   by Mangrum prior to EMS arrival.

11        Q.    In page 9, again, going to the last

12   paragraph, according to training, EMS policies and

13   procedures Rosario in this risk situation was

14   required to first contact medical control before

15   using CNS depressant, sedatives, hypnotics,

16   Lorazepam, Ativan.   And you cite 8 and 9 in your

17   support for that, can you show me where in your

18   reference number 8 it states that?

19        A.    Well, the only reason 8 is mentioned is

20   that -- and it is mentioned in the book, you don't

21   have to contact medical control.   It is an EMT

22   book.   That the combination of alcohol and

23   Benzodiazepine is very dangerous to bring on

Sterba, MD - Tyke - 7/19/17

160

1   respiratory depression, that's why it is mentioned.

2        Q.   And then --

3        A.   And in a dangerous situation you always

4   contact medical control.

5        Q.   And again, where are you getting that

6   from?

7        A.   You have a copy of it.  I made a

8   photocopy of it for you.  It talks about alcohol

9   and Benzodiazepine causing --

10        Q.   No, no.  Where in a dangerous situation

11   does it say you always contact medical control?

12        A.   In reference 8 it does not state that.

13        Q.   In reference 9 does it state that?

14        A.   Yes.  We already talked about that.  It

15   says may contact.  It doesn't say you have to

16   contact, but I'm saying that they should have.

17        Q.   Do you agree that what you cite does

18   not say shall, it says may, do you agree with that?

19        A.   It says -- does it say may?

20        Q.   I'm asking you.

21        A.   I think it said may.  Let's see.  I

22   can't put my hands on it.  I do agree it says

23   advised that you may contact.  It doesn't say must.

Sterba, MD - Tyke - 7/19/17

161

1    So if you don't, you better explain yourself.

2         Q.    Policies and procedures or protocols or

3    however you want to call them that give a range in

4    which paramedics or EMTs can administer treatments,

5    would you agree with me that those are also known

6    as standing orders?

7         A.    Yes.

8         Q.    And with standing orders, as an

9    emergency room physician and in your time as a

10   physician in your career, do you expect whether it

11   is a nurse or a paramedic or a physician extender

12   to call you every time that they are going to

13   administer some type of treatment within parameters

14   of your standing order?

15        A.    No.  The section that I was trying to

16   find is actually page 2 of 3 on the patient

17   restraint on EMS.  It wasn't in the other one.  And

18   it says, toward the bottom -- third from the

19   bottom, direct medical oversight of EMS provider

20   interventions may be necessary.  You wouldn't say

21   must be necessary.  If it's necessary that means

22   that you should.  May be necessary for combative

23   patients who refuse treatment, for orders to

Sterba, MD - Tyke - 7/19/17

162

1    restrain a patient before or immediately after

2    restraint, for orders for chemical restraint before

3    or after medication.  Was it necessary, yes.

4         Q.    And what --

5         A.    Not maybe done at the discretion.  It

6    may be necessary.  Was it necessary, it was

7    necessary.  It was medically necessary and

8    clinically indicated for Rosario to contact medical

9    control.

10        Q.    And specifically can you identify what

11   made it medically necessary for him to contact

12   medical control?

13        A.    The risks and the contraindications and

14   also violating protocol by skipping over physical

15   restraints, and not using four point restraints,

16   not apply oxygen.  Basically not doing anything

17   according to his training that we've already talked

18   about.  We are beating this to death.  He didn't

19   use oxygen, he didn't check the blood pressure, he

20   didn't check the pulses.  He went right ahead to a

21   dangerous level of chemical restraint without using

22   four points.  Four points by themselves would have

23   been adequate.

Sterba, MD - Tyke - 7/19/17

163

1          Q.   Dr. Sterba, I understand what you are

2     saying as far as what he didn't do.  What I'm

3     asking is in this situation what would have

4     triggered in the mind of a paramedic for them to

5     say, hey, I have a situation where I should call

6     medical control?

7          **MR. HECHT:**  Form.

8          **THE WITNESS:**  I don't think that trigger

9     happened.  You are asking me what is in Rosario's

10    mind.

11         **BY MS. TYKE:**

12         Q.   No, no, no.

13         **A.   I'm going to finish my thought here.**

14         Q.   I'm saying generally.

15         **A.   I'm thinking in general nothing was in**

16    **Rosario's mind to actually contact medical control**

17    **and say I have a dangerous situation here, a loss**

18    **of consciousness.  He is not acting normal.  We**

19    **might have alcohol and drugs.  They restrained him**

20    **to the point of a loss of consciousness.  Can I go**

21    **ahead with 4 milligrams of Ativan with no**

22    **restraints and no oxygen, and I don't know what the**

23    **blood pressure is, and I don't even know what the**

Sterba, MD - Tyke - 7/19/17

164

1    pulse ox is.  What do you think an emergency

2    physician would say, no.  Transport with oxygen and

3    monitor closely.

4         Q.   And, Dr. Sterba, just going back to my

5    question.  I was not asking about Rosario

6    specifically.  I said generally what in that

7    situation, in the mind of a general paramedic,

8    somebody -- not Rosario, I'm just talking about if

9    we are just talking about the situation where you

10   believe what would have triggered in their mind to

11   contact medical control in that situation?

12        A.   That it was necessary.

13        Q.   And I'm asking you what specifically

14   made it necessary?

15        A.   That the patient had previously lost

16   consciousness, therefore, coma and shock.  That the

17   patient had restricted ventilation, which if they

18   would have talked it over they would have realized

19   this is a situation, this is what we did.  The

20   paramedic had an obligation to ask the police what

21   did you guys do to him for him to lose

22   consciousness.  Well, I stepped on his chest and

23   pulled his arms up.  Oh, boy, is there anything

Sterba, MD - Tyke - 7/19/17

165

1    onboard.  Yeah, we think drugs and alcohol are

2    onboard.  Would it be necessary for a general

3    paramedic, absolutely.  Is Rosario a general

4    paramedic, no.  He acted with reckless disregard

5    and caused the problem along with Mangrum.

6         Q.   Do you think your responsibility as an

7    expert is to determine whether Rosario acted with

8    reckless disregard?

9         MR. HECHT:  Form.

10        THE WITNESS:  Absolutely.

11        BY MS. TYKE:

12        Q.   In going to page 10 of your report you

13   talk about in the second full paragraph starting

14   with established EMS training, 8, and EMS protocols

15   9 through 11, repeatedly warned basic EMT there

16   should be great caution when evaluating a patient

17   that is intoxicated with alcohol with the sedative

18   medication such as Lorazepam or Ativan?

19        A.   Right.

20        Q.   Can we agree just to continually call

21   it Ativan at this point?

22        A.   Sure.

23        Q.   Do any of those citations 8, 9 or 11

Sterba, MD - Tyke - 7/19/17

166

1    specifically talk about or state that because a

2    patient consumed alcohol that it is a

3    contraindication to the use of Ativan?

4         A.    They do not.  We have to look at this

5    case in the totality of what was going on.  We have

6    not only alcohol in an unknown amount.  We have

7    other drugs likely involved according to the

8    deputies and EMS, excited delirium, therefore,

9    metabolic disturbance of lactic acidosis.  My

10   observation on the video of asphyxiation or

11   suffocation with hypoxia being more likely than

12   not.  The alcohol alone, not in this case.  You

13   have to look at the whole picture.  Ativan is

14   dangerous and caused a problem.

15        Q.    And let's talk a little bit about

16   Ativan.  What pharmacokinetic basis do you have to

17   suggest the conditions that Tavares Docher was

18   suffering from in combination with the Ativan led

19   to the cardiorespiratory arrest?

20        A.    When you give a very potent

21   Benzodiazepine, which is a known respiratory

22   depressant, but it's also known as a medication

23   that can drop your blood pressure, it can cause

Sterba, MD - Tyke - 7/19/17

167

1    hypotension.  If you combine that medication with

2    what we know existed at the time in totality, coma,

3    shock, likely hypotension, likely hypoxemia before

4    EMS arrived, you have a very dangerous situation

5    for the Ativan being given to act quickly and

6    powerfully to stop breathing, and actually drop the

7    blood pressure so bad and so fast.  And if you say,

8    well, the onset of action is very long.  No, the

9    onset of action is what it was.  It was observed

10   that within one minute the patient was calm and

11   able to be loaded onto the gurney.  The onset of

12   action for Docher was one minute.  And in the

13   medical literature or the enclosures that

14   accompanied these reports, as I mentioned right

15   here, the onset of action of Ativan can be as

16   quickly as one minute.

17        Q.   I did read those.  And going through

18   what you cited, and do you agree with me that the

19   faster times had to do with when they were

20   interjected intravenously?

21        A.   No.  It can be IM.  You can have a 1 to

22   5 minute IM.

23        Q.   Can you show me where that is?

Sterba, MD - Tyke - 7/19/17

168

1          A.    Yeah.  And it actually says IM IV.  And

2     I've read the onset of action --

3          Q.    Again, if you can show me.  I did read

4     those over last night and did not find it.

5          A.    Section 3, pharmacology, it is page

6     564, and let's see what document that is.  It's

7     going to be another enclosure to Lindsey's report,

8     my page 28, section 3, pharmacology, page 564.

9     This is where they are talking about giving it a 2

10    milligrams per minute, which was another violation.

11    It is with reckless disregard that he gave 4

12    milligrams instantly rather than over 2 minutes.

13    Does that increase the onset of action, yes.  For

14    him being in an unstable critical condition does

15    that increase the onset of action, yes.  What is

16    the duration of action onset 1 to 5 minutes, there

17    it is.  Now, is that IV or IM, it doesn't say.  But

18    the onset of action has a lot to do with the

19    totality of the patient, are they on the brink, is

20    there a lot of acidosis going on right now, have

21    they just sustained a loss of consciousness maybe

22    with asphyxiation.  If you give Ativan -- that's

23    why they say don't give it.  If you give Ativan in

Sterba, MD - Tyke - 7/19/17

169

1    a situation like that could it kick in hard and

2    fast and cause cardiac arrest, yeah, that's why

3    we're telling you not to give it.

4         Q.   What is the difference between onset of

5    action and peak effect?

6         A.   The onset of action is when it first

7    starts to take hold.  We know from the record that

8    after 1 minute he became calm, calm enough to be

9    transferred onto the gurney.  When was the

10   injection given, 18:40, so roughly 18:41.

11        Q.   And really my question -- I'm trying to

12   get --

13        A.   Onset of action --

14        Q.   Doctor --

15        A.   I'm not done answering your question.

16   Onset of action is when it first begins to work.

17   Peak effect is the maximum effect.  We are talking

18   about onset of action which can kill a patient in

19   this situation.

20        Q.   And you talked about earlier coma,

21   shock, hypotension, and what was the 4th thing that

22   you said was in combination with the Ativan that

23   led to the cardiopulmonary arrest, you said four

Sterba, MD - Tyke - 7/19/17

170

1    things?

2         A.    Substance abuse.

3         Q.    No, no.  You only mentioned four

4    earlier.

5         A.    Substance abuse, coma, shock, severe

6    hypotension and CNS depression.  There are five

7    suspected at the time that Ativan was given.  You

8    have to go with what he likely had.  You have five.

9         Q.    Wait, wait.

10        A.    So substance abuse includes alcohol.

11   We have got drugs and alcohol as one, substance

12   abuse, coma, he's out --

13        Q.    Let's back up again.  And we have gone

14   over this, suspected drug use, coma, shock,

15   hypotension and CNS depression --

16        A.    You've got this?

17        Q.    Yeah.  I'm just asking you your list.

18   So that's though the pharmacokinetics --

19        A.    Pharmacokinetics just talks about how

20   quickly it kicks in and how long it lasts.

21   Kinetics is movement.

22        Q.    What is the biological basis that all

23   of those things in combination with the Ativan led

Sterba, MD - Tyke - 7/19/17

171

1    to the cardiopulmonary arrest?

2          A.    You become hypersensitive to

3    respiratory depression and cardiovascular collapse

4    in those situations.  Medically and physiologically

5    speaking you give Ativan without a protected airway

6    in a situation like that, could you like your

7    breathing might slow down.  No, your breathing can

8    stop.  Can your blood pressure drop so severe and

9    so fast that your heart stops, yes.  What happened,

10   we don't have a good timeline.  All of a sudden

11   he's dead.  He just died, that is the testimony

12   that we heard.  In 3 minutes time, do I really

13   think in three minutes time the breathing stopped

14   and the heart stopped at the same time, absolutely

15   not.  I'm an expert on breath holding and

16   asphyxiation.  I think the Ativan kicked in right

17   away.  Onset of action 1 minute in this patient.

18   His breathing went way down, his blood pressure

19   fell and all of a sudden we see that he is

20   flatlined.  He should had a lot of cardiac

21   irregularities prior to going asystolic.  And all

22   of that was missed because he was never monitored.

23   He was never pre-screened.  We didn't have vitals

Sterba, MD - Tyke - 7/19/17

172

1   **before or after the Ativan was given.  He just got**

2   **put on a gurney and put in the ambulance, and, oh,**

3   **by the way, he just died.**

4        Q.   Have you seen any published reports,

5   studies, anything that would indicate that the use

6   of Ativan in this type of patient, like Tavares

7   Docher, would lead one to cardiopulmonary arrest?

8        A.   No.  **Just the precautions are quite**

9   **similar to my training.**

10       Q.   That is your answer.

11       A.   **I don't have an article in mind for you**

12  **guys to pin down.  There is no authoritative**

13  **treatise or textbook or article.**

14       Q.   So no article or study or research or

15  peer review?

16       A.   **What we would say in emergency medicine**

17  **and EMS is a no brainer.  That is why it is in the**

18  **EMT textbook that Rosario used at Indian River**

19  **State College, that the combination of alcohol and**

20  **Benzodiazepine can be fatal.**

21       Q.   But was the alcohol in Tavares Docher

22  system in combination with the Ativan the reason

23  that he went into cardiopulmonary arrest?

Sterba, MD - Tyke - 7/19/17

173

1      **A.   One reason.   The other reasons were**

2   **that he had just been asphyxiated.**

3      Q.   Have you seen the studies where it

4   shows the use of Ativan is recognized and approved

5   for patients who have consumed alcohol?

6      **A.   I've done in, yes, in the ER.   It is**

7   **safe under those highly monitored conditions, but**

8   **not with all of the other risk factors that are**

9   **there.   Not for a patient that has just been**

10  **asphyxiated.**

11     Q.   So that the alcohol standing alone was

12  not the reason why --

13     **A.   I see what you mean.   Did the level of**

14  **.04 cause his arrest, no.   It contributed to it**

15  **because he has a toxin in his blood stream.   Could**

16  **he have other drugs that have contributed, yes.**

17  **Were they tested, no.   You have just eight simple**

18  **drugs.**

19     Q.   You would be assuming that he was on

20  another drug?

21     **A.   I didn't assume that.   The two police**

22  **officers did.**

23     Q.   Doctor, for what you just stated you

Sterba, MD - Tyke - 7/19/17

174

1   would have to assume that he was on another drug?

2        **A.    Yes.   Either that or he has limited**

3   **psychoses from untreated schizophrenia.**

4        Q.    We have no evidence in this case, no

5   facts to support that he was on any other illicit

6   drug --

7        **A.    THC.**

8        Q.    -- other than the presumption of facts,

9   witnesses?

10        **A.    And THC.**

11        Q.    Did the THC play any part in his

12   cardiopulmonary arrest?

13        **A.    No.   Unless it was laced with something**

14   **that they didn't test for, which would be common.**

15        Q.    Would that be an assumption on your

16   part?

17        **A.    It always is.   I'm trained in**

18   **toxicology, so yes.**

19        Q.    Do you have any facts that it was

20   laced?

21        **A.    No.   Assumption is based on a**

22   **differential of what I think this guy might have.**

23        Q.    But we are dealing with facts and we

Sterba, MD - Tyke - 7/19/17

175

1    are looking retrospectively, and I want to know

2    factually what we can say --

3         **A.    You're dealing with facts.  I'm the**

4    **physician that --**

5         Q.    Dr. Sterba, can you let me finish my

6    question and this would go a lot faster.

7         **A.    It's not going very fast.**

8         Q.    I know.  Because you keep interrupting

9    me.

10        **A.    No.  I've answered the same thing three**

11   **times.  You can go ahead.**

12        Q.    I have asked you do you have any

13   factual support in this case to point to that the

14   marijuana that he either smoked or consumed in some

15   form or fashion was laced with any illicit drugs?

16        **A.    No.  Just my clinical experience that**

17   **it sometimes is and it has to be considered.  All**

18   **drugs used were not tested in this case so we will**

19   **never know.**

20        Q.    You cite quite a few times to these

21   emergency care in transport of the sick and injured

22   from, I think, 2006 and 2002, is that accurate?

23        **A.    Yes.**

Sterba, MD - Tyke - 7/19/17

176

1          Q.   Did you read, I guess -- what would

2     this be called, this second part of the page where

3     you copied.

4          **MR. HECHT:**  The copyright page.

5          **BY MS. TYKE:**

6          Q.   Yes.  The copyright page.

7          **A.     Right.**

8          Q.   Did you read where it says this

9     textbook is intended solely as a guide to the

10    appropriate procedures to be employed when

11    rendering emergency care to the sick and injured is

12    not intended as a statement of the standard of

13    care?

14         **A.    That's true.  The disclaimer is always**

15    **there.  I'm here to tell you what the standard of**

16    **care is.**

17         Q.   I just wanted to know if you had read

18    that in that book.

19         **A.    I did.  And that is not an**

20    **authoritative text, but it is what he studied for**

21    **his EMT at the time.**

22         Q.   Do you consider any textbook

23    authoritative in the realm of emergency medical

Sterba, MD - Tyke - 7/19/17

177

1   services?

2        A.   No.

3        Q.   You mentioned in your report or

4   suggested that the injection given by Jose Rosario

5   might have been given intravenously?

6        A.   It is possible because it happened so

7   quickly.

8        Q.   Can you say within a reasonable degree

9   of medical probability that it was given

10  intravenously?

11       A.   No, I cannot.  It was suggested by one

12  of the other experts.

13       Q.   You also talk about in your report with

14  how Mr. Rosario gave the injection.  You read over

15  Mr. Rosario's deposition, correct?

16       A.   Yes.

17       Q.   Did you see anywhere where he was asked

18  specific questions regarding where specifically on

19  the body the injection was given, how specifically

20  he gave the injection, whether he did aspirate

21  before the injection or not, did you see those

22  questions in the deposition?

23       MR. HECHT:  Form.

Sterba, MD - Tyke - 7/19/17

178

1          **THE WITNESS:**  I didn't remember seeing

2     someone asked him whether he aspirated.  Was it

3     asked?

4          **BY MS. TYKE:**

5          Q.   No.

6          **A.   I didn't think so.  That kind of thing**

7     **should be brought up.  Now, if he said, oh,**

8     **certainly that is my standard, I aspirated.  Well,**

9     **how can he get such a rapid onset of action.  By**

10    **being that critically unstable it can happen within**

11    **a minute.  Especially when you give way over what**

12    **you are supposed to.**

13         Q.   I think we talked about to be done

14    slowly 2 milligrams per minute, do you base that on

15    the attachment to Mr. Lindsey's report, is that

16    accurate?

17         **A.   No.**

18         Q.   That's you are citing.

19         **A.   That is what I cited.  I'm not going to**

20    **be citing everything.  I do know that Ativan has to**

21    **be given slowly to avoid these complications.  And**

22    **in this case 4 milligrams should have been**

23    **delivered over a 2 minute period of time -- no, let**

Sterba, MD - Tyke - 7/19/17

179

1   me backup.  It should never have been given in the

2   first place.  So I'm not going to get trapped into

3   saying, oh, if you give it over 2 minutes

4   everything would have been fine.  It should never

5   have been given.  When you are giving Ativan IV or

6   IM, it has to be given slowly, no faster than 2

7   milligrams per minute.  And I have used the drug

8   recently, I give it slowly and I'm monitoring the

9   patient very carefully.

10        Q.   If you could turn to what you have

11   marked as page 27, Mr. Lindsey's report.

12        A.   Dr. Lindsey.

13        Q.   Yes, Dr. Lindsey.  Sorry.

14        A.   Yes.

15        Q.   And we talked about dosage and

16   administration?

17        A.   Yes.

18        Q.   And it says adult 2 to 4 milligrams

19   slow?

20        A.   Yes.  At 2 milligrams per minute.

21        Q.   Can you explain to me how it is that

22   you can give between 2 to 4 milligrams slow IM at 2

23   milligrams per minute to be repeated in 15 to

Sterba, MD - Tyke - 7/19/17

180

1    20 minutes, does that mean that the 4 milligrams

2    would be given over a 4 minute time period?

3         **MR. HECHT:**  Form.

4         **THE WITNESS:**  No.  4 milligrams would have

5    been given over 2 minutes.  2 to 4 milligrams slow

6    IV IM at 2 milligrams per minute.  So how many

7    minutes is for 4 milligrams.

8         Q.   I said for 2 minutes.

9         **A.   How do you do that slowly IM?**

10        Q.   Yes?

11        **A.   It's very hard.**

12        Q.   That is what I was going to ask you.

13   In a combative patient how would you administer

14   that?

15        **A.   In this patient --**

16        Q.   No, in general.

17        **A.   A patient in the emergency department I**

18   **would have given it IV slowly, recheck slowly,**

19   **recheck or IO.  I do both, intraosseous as well as**

20   **IV.  As far as a slow IM push it's impracticable.**

21   **It can be done.  Maybe a small amount, recheck the**

22   **patient, a small amount recheck the patient.**

23        Q.   Is it your opinion in this case that

Sterba, MD - Tyke - 7/19/17

181

1   any amount of Ativan, 1 milligram of Ativan would

2   have led to Tavares Docher into cardiopulmonary

3   arrest?

4        A.    I don't know.  I can say with medical

5   certainty that 4 milligrams put him over the edge.

6   I can't say with medical certainty what 1 milligram

7   would have done.  It's very dangerous and

8   contraindicated and I would not have recommended

9   it.  I can tell you with medical certainty what

10  would happened.  When you have a contraindicated

11  drug for five reasons in this case, you don't have

12  to guess, I wonder what would have happened.  You

13  just don't give it.

14       Q.    The asystolic that you talked about

15  when they put monitors on Taveras Docher, can you

16  explain to me what that is?

17       A.    Flatline.  When you stop breathing --

18  this is all part of my research and my teaching and

19  such, your heart slows down almost like you're

20  holding your breath.  You stop breathing.  And then

21  you have irregularities in the beats and maybe

22  extra beats.  And it finally decompensates down to

23  more dangerous rhythms.  And finally, no electrical

Sterba, MD - Tyke - 7/19/17

182

1   **activity in the heart at all, flatline.  That is a**

2   **very dangerous situation.  And if you do get the**

3   **heart rate back -- I should say the heartbeat with**

4   **a blood pressure by using epinephrine, it is often**

5   **at the expense of the brain.**

6           Q.   In your practice as an emergency room

7   physician have you seen patients who presented in

8   an asystolic rhythm?

9           **A.   Yes.**

10          Q.   Have all of those patients been given

11  Ativan before they presented?

12          **A.   I don't remember.**

13          Q.   If all of them had been?

14          **A.   You want me to tell you?**

15          Q.   When you see somebody who has an

16  asystolic or flatline, is it always preceded by

17  them being injected with Ativan?

18          **A.   No.**

19          Q.   Cardiac arrest is one of the largest

20  causes of death in the United States, correct?

21          **A.   Yes.**

22          Q.   And sudden cardiac death is also one of

23  the largest causes of death in the United States?

Sterba, MD - Tyke - 7/19/17

183

1      A.    Right.

2      Q.    And you have seen through your career

3   patients who have presented in cardiac arrest?

4      A.    Yes.  Docher does not fit this picture.

5   He is a 29 year old healthy guy that was

6   asphyxiated and overdosed by the paramedic.

7      Q.    Dr. Sterba, I wasn't asking

8   specifically about Mr. Docher, just general

9   statements about cardiac arrest.

10     A.    But not in this age group.

11     Q.    Have you ever seen an individual in

12  Tavares Docher's age group who have suffered from

13  cardiac arrest?

14     A.    Rarely, yes.

15     Q.    And do you know what the underlying

16  cause of their cardiac arrest was?

17     A.    Yes.

18     Q.    What was that?

19     A.    I don't remember.

20     Q.    Was it always associated with Ativan?

21     A.    I don't remember.

22     Q.    Do you remember any situation in which

23  somebody was 29 years old and came in with cardiac

Sterba, MD - Tyke - 7/19/17

184

1    arrest after receiving Ativan in any of your

2    career?

3           A.    With everything being normal, Ativan

4    asystole, no.

5           Q.    Any time in your career that you have

6    ever seen somebody come in cardiac arrest or

7    asystole after being given Ativan with any number

8    of issues that they could have had?

9           A.    I don't remember.

10          Q.    You say on the last page that Jose

11   Rosario caused chemical asphyxiation and

12   cardiopulmonary arrest and subsequent instability?

13          A.    Yes.

14          Q.    And the chemical asphyxiation is from

15   the Ativan?

16          A.    Yes.

17          Q.    Which caused him to go into

18   cardiopulmonary arrest?

19          A.    Yes.

20          Q.    Do you think he was suffering from any

21   type of cardiac issue prior to him injecting him

22   with Ativan?

23          A.    Yes.

Sterba, MD - Tyke - 7/19/17

185

1      Q.    What do you think he was suffering

2   from?

3        **A.    Hypotension as a result from**

4   **asphyxiation by Mangrum.**

5      Q.    Do you think he was suffering from any

6   type of cardiac arrest prior to the Ativan

7   injection?

8        **A.    No.  He had just passed out.**

9      Q.    If an EKG monitor was hooked up to Mr.

10   Docher prior to the Ativan injection, can you tell

11   me with any degree of medical certainty as to what

12   that would have shown?

13       **A.    No.**

14      Q.    We talked about the policies and

15   procedures that are in effect for St. Lucie County

16   Fire District, what specifically do you find fault

17   with those policies and procedures?

18       **A.    It was mentioned by one of the EMS**

19   **people that the only contraindication is**

20   **hypersensitivity.  That is not true at all.  All**

21   **drugs carry a risk of an allergic reaction, that is**

22   **not the severe contraindication or severe risk.  As**

23   **we have gone over many times he had five severe**

Sterba, MD - Tyke - 7/19/17

186

1    **risks and not hypersensitivity.  He wasn't allergic**

2    **to it.  So to say that is the only reason that you**

3    **can't give Ativan is hypersensitivity is ignorant**

4    **and dangerous.**

5         Q.   Have you ever been involved in

6    developing any of the medical inserts that come

7    with medications?

8         **A.   No.**

9         Q.   Do you know if those need to be FDA

10   approved?

11        **A.   I don't know.  Good question.**

12        Q.   Do you know if those need to list out

13   all the contraindications for that specific

14   medication?

15        **A.   They often do.**

16        Q.   You have not reviewed the current

17   medical insert for Ativan?

18        **A.   No.  I will before trial.**

19        Q.   Other than hypersensitivity do you know

20   if it lists any other contraindications?

21        **A.   For the package insert for Lorazepam I**

22   **didn't review it.**

23        Q.   Would it surprise you if that is the

Sterba, MD - Tyke - 7/19/17

187

1    only contraindication that it lists?

2         A.   Yes.   I think that contraindications

3    and risks, there might be risks mentioned, which to

4    me I might interpret as contraindications.

5         Q.   Are there differences between risks and

6    contraindications?

7         A.   In my case in the emergency department

8    if there are risks, I would determine this drug is

9    contraindicated.  The risk is too high.  As far as

10   FDA approved contraindications, I really don't have

11   any comment on the FDA approved package insert.

12        Q.   What is your definition of an

13   contraindication?

14        A.   If you give it, they could die or have

15   a severe reaction, do not give it.

16        Q.   And what is your definition of a risk?

17        A.   Side effects can be either mild, severe

18   or could lead to death.

19        Q.   Are there any types of medications that

20   you use in your career as an emergency physician

21   that carry the risk of death, but given the

22   situation that the benefit would outweigh that risk

23   such that you would give that medication?

Sterba, MD - Tyke - 7/19/17

188

1      A.    Yes.   The risk benefit ratio for Docher

2   for Ativan was an enormous risk.   And the benefit,

3   there was no need to give the drug if four point

4   restraints had been used and blow-by oxygen, 8

5   minutes from the hospital -- actually 8 minutes and

6   25 seconds.

7      Q.    What is the causes or recognized causes

8   of asystolic?

9      A.    Asystole?

10      Q.    Yes.

11      A.    Hypotension, hypovolemia, hypokalemia,

12   other electrolyte disturbances.   Hypothermia,

13   tension pneumothorax, cardiac tamponade, tablets

14   and toxins.   There are quite a few things to

15   consider when someone is in asystole that are

16   correctible.

17      Q.    And what is the treatment for somebody

18   who would be found in asystole?

19      A.    Try to find the cause and go ahead and

20   give Epinephrine, effective CPR, advance airway, no

21   shock.   You don't shock asystole.

22      Q.    Was Docher given Epinephrine?

23      A.    Yes.   There is nothing wrong with their

Sterba, MD - Tyke - 7/19/17

189

1    resuscitation.

2         Q.   Dr. Sterba, when you were reviewing

3    this matter did you consider anything else as the

4    cause of Tavares Docher's cardiopulmonary arrest?

5         **A.   Yes.  I considered were there any**

6    **possible drugs that would have brought this on.**

7    **And my answer was no, being that his behavior was**

8    **mildly delusional, afraid, cooperative to the point**

9    **of resisting arrest, and then everything fell apart**

10   **after that.  He does not fit any pattern or**

11   **toxidrome to indicate that he was suffering from an**

12   **overdose of any illegal or prescription medication.**

13        Q.   Anything else that you considered?

14        **A.   No.**

15        Q.   Have we now covered all of your

16   opinions as they relate to Jose Rosario?

17        **A.   Yes.**

18        Q.   As far as the policy and procedure with

19   St. Lucie County Fire District how did it cause or

20   contribute to Tavares Docher's injuries in this

21   matter?

22        **MR. HECHT:**  Form.

23        **THE WITNESS:**  Reading the contraindications

Sterba, MD - Tyke - 7/19/17

190

1    listing only hypersensitivity it completely left

2    off all of the risky factors of this drug, the

3    contraindications that we talked about already, the

4    five.  And for the instructors not to know any

5    better would tell me that the paramedics don't know

6    any better.  And from what I learned, that Rosario

7    has given Ativan 50 to 200 times, and over half of

8    those times 25 to 100 he went straight to the 4

9    milligrams and not the 1 milligram with

10   reassessment increments.  I'm not sure he

11   understands what increments mean.  He might not

12   have fully understood that.  So looking through the

13   enclosures and policies and procedures for this

14   risky medication I don't think the policies were

15   written clearly.  I don't think they were taught

16   adequately.  And I think the paramedics were not

17   only misinformed, they were undereducated and

18   ignorant to the dangerous life threatening effects

19   of Ativan used when it should never be used.  In

20   addition, it is not emphasized enough that if there

21   are any of these problems you must contact medical

22   control so that somebody like myself who has

23   experience can weigh out what should be done or

Sterba, MD - Tyke - 7/19/17

191

1    what should not be done.

2          **BY MS. TYKE:**

3          Q.   And just so we talked a lot about the

4    risks that were mentioned and we referred a lot to

5    that one document that was attached to Dr.

6    Lindsey's report and talked about coma, CNS

7    depression and talked about illicit drug use, was

8    there anywhere where it mentioned alcohol?

9          **A.   Substance abuse is part of that.  When**

10   **it mentions it in the books, too, and in EMT and**

11   **paramedic training, substance abuse also includes**

12   **alcohol.  One other factor that we talked about**

13   **much earlier that shows up in these documents that**

14   **we talked about is head traumatic.  Head trauma**

15   **poses a severe risk for the use of Ativan because**

16   **it sensitizes the patient to respiratory depression**

17   **and cardiovascular collapse.  So we have six things**

18   **going right now.**

19         Q.   So you believe that the policy and

20   procedure should have indicated that those six

21   things were contraindications to using Ativan?

22         **A.   Contraindications or risks.  And it all**

23   **has to be brought out and explained much better so**

Sterba, MD - Tyke - 7/19/17

192

1   that this problem doesn't happen again.  And if

2   Rosario has given 4 milligrams straight up 25 to

3   100 times, then all of his EMS run sheets should be

4   reviewed by a competent emergency physician to find

5   out if he indeed caused any problems for anybody

6   else.

7        Q.   As an emergency physician have you ever

8   during your career administered 4 milligrams of

9   Ativan to a patient?

10       A.   2 milligrams, repeat, 2 milligrams.  4

11   milligrams all at once, never.

12       Q.   Is 4 milligrams in and of itself a

13   dangerous dose?

14       A.   No.  If it is given at the right time

15   according to how the patient presents.  Like if

16   somebody, for instance, status epilepticus, meaning

17   epileptic seizures that just won't quit, I may have

18   to give even over 4 milligrams with the airway

19   protected.

20       Q.   So just to be clear, we are not talking

21   about this case at all, just generally, 4

22   milligrams of Ativan in the right situation would

23   not be an excessive dose of that particular

Sterba, MD - Tyke - 7/19/17

193

1    medication?

2         A.    You would have to qualify that.   4

3    milligrams all at once IV push is dangerous,

4    always.

5         Q.    Always?

6         A.    You push 4 milligrams on just about

7    anybody and you can have a very dangerous

8    situation.   It has to be given slow.

9         Q.    4 milligrams intramuscular.   Is that

10   always dangerous?

11        A.    No.   But you are asking a loaded

12   question.   Is 4 milligrams dangerous, if it is

13   given improperly it can be.   If it is given slowly

14   with careful physiological monitoring before and

15   after say 1 or 2 milligrams at a time at a rate no

16   faster than 2 milligrams per minute.   It is safe to

17   give up to 4 milligrams and even over that under

18   medical direction.

19        Q.    Do you know what the package insert

20   says regarding dosage?

21        A.    No.   I haven't read it.

22        Q.    Have you asked for the package insert?

23        A.    No.

Sterba, MD - Tyke - 7/19/17

194

```
1        Q.   Have you tried to obtain the package

2   insert so that you could read up on Ativan?

3        A.   No.

4        Q.   Is there any reason?

5        A.   I'm experienced on using it.  I didn't

6   have to read it.

7        MR. HECHT:  Time out.

8        (A recess was then taken.)

9        BY MS. TYKE:

10        Q.   Dr. Sterba, we have gone over now the

11   policies and procedures for St. Lucie County Fire

12   District, have we covered all of your opinions as

13   it relates to the policy and procedure for St.

14   Lucie County Fire District in this matter?

15        A.   Yes.

16        MS. TYKE:  That's all the questions I have

17   right now.

18        MR. HECHT:  Off the record.

19        (Discussion off the record.)

20        MR. HECHT:  Back on the record.  Per

21   agreement with all counsel since I need to catch a

22   flight back to Florida we are going to agree to

23   suspend the deposition at this point.  And Ms.
```

Sterba, MD - Tyke - 7/19/17

195

1  Barranco obviously has not asked her line of

2  questioning yet, and then certainly there may be

3  some followup with Ms. Tyke and myself.  So what we

4  will do is all counsel will agree to a mutually

5  convenient time, of course, with the Doctor, and we

6  will continue the deposition either over the

7  telephone or over video conference prior to

8  discovery cutoffs in this case.  Does everyone

9  agree with that?

10        **MS. TYKE:**  Yes.

11        **MS. BARRANCO:**  Yes.

12        **COURT REPORTER:**  Who is ordering

13  transcripts?

14        **MS. TYKE:**  I can order.

15        **MS. BARRANCO:**  I am ordering.

16        **MR. HECHT:**  I'm ordering and he will read.

17        (Deposition adjourned at 2:50 p.m.)

18                    *    *    *

19

20

21

22

23

196

1        I hereby CERTIFY that I have read the

2    foregoing 195 pages, and that they are a true and

3    accurate transcript of the testimony given by me in

4    the above entitled action on July 19, 2017.

5

6

7                              ------------------------

8                              JOHN A. STERBA, MD

9    Sworn to before me this

10

11   -------- day of  ---------, 2017.

12

13   ------------------------

14   NOTARY PUBLIC.

15

16

17

18

19

20

21

22

23

197

1    STATE OF NEW YORK )

2                          ss:

3    COUNTY OF ERIE    )

4

5        I DO HEREBY CERTIFY as a Notary Public in and

6    for the State of New York, that I did attend and

7    report the foregoing deposition, which was taken

8    down by me in a verbatim manner by means of machine

9    shorthand.  Further, that the deposition was then

10   reduced to writing in my presence and under my

11   direction.  That the deposition was taken to be

12   used in the foregoing entitled action.  That the

13   said deponent, before examination, was duly sworn

14   to testify to the truth, the whole truth and

15   nothing but the truth, relative to said action.

16

17

18                         NANCY C. BROICH,
                           Notary Public.
19

20

21

22

23

```
                                                          198
 1                      INDEX TO EXHIBITS

 2   Exhibit              Description              Page

 3     EXH. 1       Curriculum Vitae                 5

 4     EXH. 2       Notice of Taking Deposition      5

 5     EXH. 3       Report of Dr. Sterba            54

 6     EXH. 4       Worksheet                       57

 7     EXH. 5       Wikipedia Pages                 60

 8

 9

10    * Exhibits returned to Ms. Tyk.

11

12

13

14

15

16

17

18

19

20

21

22

23
```

199

1                          INDEX TO WITNESSES

2    Witness                  Examination              Page

3
     JOHN A. STERBA, MD    BY MS. TYKE:                  3
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Pg. 1 & 6

**CASE NAME:** Tavares Docher (Janice Docher-Neeley) vs. Christopher Newman, et. al., and St. Lucie County Fire District

**DEPONENT:** John A. Sterba, M.D., Ph.D., FACEP, FACFEI   **DATE TAKEN** July 19, 2017

STATE OF )
                      ) ss.
COUNTY OF )

I wish to make the following changes, for the following reasons:

| PAGE | LINE(S) | | |
|------|---------|---|---|
| 3 | 16 | CHANGE: | John A. Sterba, M.D., Ph.D., FACEP, FACFEI |
| | | REASON: | Transcription error |
| 6 | 23 | CHANGE: | Emergency Physician House Calls (TM), and has a ... |
| | | REASON: | Transcription error |
| 27 | 3+4 | CHANGE: | in hypothermia, field treatment of hypothermia ... |
| | | REASON: | Transcription error |
| 27 | 9+10 | CHANGE: | Hypothermia and resuscitation from hypothermia |
| | | REASON: | Transcription error. |
| 28 | 6 | CHANGE: | mass spectrometry, that is ... |
| | | REASON: | Transcription error |
| 28 | 7+8 | CHANGE: | "... infrared as well as by MASS spec, ..." |
| | | REASON: | Transcription error |
| 34 | 21 | CHANGE: | "I was also BENDS Watch Medical Officer ..." |
| | | REASON: | Transcription error |

**Signature:** John A. Sterba, MD, PhD, FACEP, FACFEI / JS

**Subscribed and sworn to before me this**

2 day of August , 2004 2005 2017 / JS

_____
**Notary Public**

SHIELA D BARANOWSKI
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01BA6349373
COMM. EXP. 10/17/20

*jack w. hunt and associates, inc.*
*1420 Liberty Building, Buffalo, New York 14202*

Pg 2 § 6

CASE NAME: _TAVARES Docker (JANICE Docker - neeley) vs. Christopher Newman, et.al., and St. Lucie County Fire District_

DEPONENT: _JOHN A. STERBA, M.D., Ph.D., FACEP, ~~FACFEI~~_ DATE TAKEN _July 19, 2017_

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

I wish to make the following changes, for the following reasons:

| PAGE | LINE | | |
|------|------|--------|----------------------------------------|
| 38 | 7 | CHANGE: | "contraindications, not absolute or relative..." |
| | | REASON: | Transcription error |
| 38 | 11 | CHANGE: | "That is true for every drug...." |
| | | REASON: | Transcription error. |
| 44 | 4 | CHANGE: | "... abnormal respiratory effort." |
| | | REASON: | Transcription error. |
| 45 | 6 | CHANGE: | "And I have it right here (DVD)." ... |
| | | REASON: | Omission |
| 48 | 13 | CHANGE: | "Sheriff's office. CVS employee ..." |
| | | REASON: | Transcription error |
| 52 | 13 | CHANGE: | "... that is considered head trauma." |
| | | REASON: | Transcription error. |
| 52 | 14 | CHANGE: | "I'm a former Advanced TRAUMA Life Support." |
| | | REASON: | Transcription error. |

Signature: _John A. Sterba, MD, PhD, FACEP, FACFE I_

Subscribed and sworn to before me this

_2_ day of _August_, ~~2004~~ ~~2005~~ 2017 /s/

/s/ _____
Notary Public

SHIELA D BARANOWSKI
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01BA6349373
COMM. EXP. 10/17(2)

# jack w. hunt and associates, inc.

### 1420 Liberty Building, Buffalo, New York 14202

Pg 3 § 6

CASE NAME: _Tavares Docher (Janice Docher-Neeley) vs. Christopher Newman, et. al., and St. Lucie County Fire District_

DEPONENT: _John A. Sterba, M.D., Ph.D., FACEP, FACFEI_  DATE TAKEN _July 19, 2017_

STATE OF )

                 SS.

COUNTY OF )

I wish to make the following changes, for the following reasons:

| PAGE | LINE | | |
|------|------|--------|-----|
| 53 | 9 | CHANGE: | "... blunt force head trauma." |
| | | REASON: | Transcription error. |
| 53 | 10 | CHANGE: | "It's not just facial trauma as Lindsay..." |
| | | REASON: | Transcription error |
| 58 | 11 | CHANGE: | "... pain induction and while trying to ..." |
| | | REASON: | Transcription error. |
| 62 | 1 | CHANGE: | "...for a scientific trip on for the military" |
| | | REASON: | Transcription error |
| 73 | 5 | CHANGE: | "Spec War Team 6, that's Special Warfare SEAL" |
| | | REASON: | Transcription error |
| 75 | 14 | CHANGE: | "... he was Baker Acted at that time ..." |
| | | REASON: | Transcription error |
| 80 | 5 | CHANGE: | "so I really can't make any comments ..." |
| | | REASON: | Transcription error. |

Signature: _John A. Sterba, MD, PhD, FACEP, FACFEI_

Subscribed and sworn to before me this

_2_ day of _August_ , ~~2004~~ ~~2005~~ 2017 /___

_____
Notary Public

SHIELA D BARANOWSKI
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01BA6349373
COMM. EXP. 10/17/20

# jack w. hunt and associates, inc.

Pg 4 _8_ 6

CASE NAME: _Tavares Docher (Janice Docher-Neeley) vs. Christopher Newman, et. al., and St. Lucie County Fire District_

DEPONENT: _John A. Sterba, M.D., Ph.D., FACEP, FACFEI_ DATE TAKEN _July 19, 2017_

STATE OF )
                                    ss.
COUNTY OF )

I wish to make the following changes, for the following reasons:

| PAGE | LINE | | |
|------|------|--------|------|
| 87 | 2 | CHANGE: | "... blunt force head trauma but ..." |
| | | REASON: | Transcription error |
| 96 | 13 | CHANGE: | "No." "Actually, yes. See Timeline, Addendum" |
| | | REASON: | Correction; see Addendum of July 25, 2017. |
| 97 | 6,10,14,18 | CHANGE: | " But I do now; See Addendum Timeline" |
| | | REASON: | Correction; see Addendum of July 25, 2017 |
| 102 | 7 | CHANGE: | "... elevated carbon dioxide ..." |
| | | REASON: | Transcription error |
| 150 | 8 | CHANGE: | "... in this white box & these EMS ..." |
| | | REASON: | Transcription error. |
| 151 | 1 | CHANGE: | "... the short eight common things we ..." |
| | | REASON: | Transcription error. |
| 158 | 4 | CHANGE: | "... former EMT Mangrum?" |
| | | REASON: | Transcription error. |

Signature: _John A. Sterba, MD, PhD, FACEP, FACFEI_ /JAS

Subscribed and sworn to before me this

_2_ day of _August_, ~~2004 2005~~ 2017 /JAS

_Shiela D Baranowski_
Notary Public

SHIELA D BARANOWSKI
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01BA6348373
COMM. EXP. 10/17/20

## jack w. hunt and associates, inc.

*1420 Liberty Building, Buffalo, New York 14202*

Pg 5 8 6

CASE NAME: _TAVARES Docher (JANICE Docher- Neeley) vs. Christopher Newman, et. al., and St. Lucie County Fire District_

DEPONENT: _JOHN A. STERBA, M.D., Ph.D., FACEP, FACFEI_ DATE TAKEN _July 19, 2017_

STATE OF )
)  ss.
COUNTY OF )

I wish to make the following changes, for the following reasons:

| PAGE | LINE | | |
|------|------|--|--|
| 167 | 16 | CHANGE: | "can be as quick as one minute." |
| | | REASON: | Transcription error. |
| 174 | 2 | CHANGE: | "...or he has exhibited psychoses..." |
| | | REASON: | Transcription error. |
| 181 | 12 | CHANGE: | "...to guess, I wouldn't wonder what would..." |
| | | REASON: | Transcription error. |
| 181 | 21 | CHANGE: | "...have irregularities in the rate and maybe..." |
| | | REASON: | Transcription error. |
| 189 | 17 | CHANGE: | "yes unless more information becomes Available then I reserve the right to Amend my Report." |
| | | REASON: | Correction, as per pp. 96 & 97 → See Addendum → Timeline of 7/25/17 |
| 190 | 10 | CHANGE: | "...reassessment passed increments, then I'm not..." |
| | | REASON: | Transcription error |
| 190 | 19 | CHANGE: | "...& Ativan being used when it should never..." |
| | | REASON: | Transcription error. |

Signature: _John A. Sterba, MD, PhD, FACEP, FACFEI_ /SS/

Subscribed and sworn to before me this

_2_ day of _August_, ~~2004~~ ~~2005~~ 2017 /SB/

_Shiela D Baranowski_
Notary Public

SHIELA D BARANOWSKI
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01BA6349373
COMM. EXP. 10/17/20

*jack w. hunt and associates, inc.*
*1420 Liberty Building, Buffalo, New York 14202*

Pg 6 8 6

CASE NAME: _Tavares Docker (Janice Docker-Neeley) vs. Christopher Newman,_
_et. al., and St. Lucie County Fire District_

DEPONENT: _John A. Sterba, M.D., Ph.D., FACEP, FACFEI_ DATE TAKEN _July 19, 2017_

STATE OF                     )
                             ) ss·
COUNTY OF                    )

I wish to make the following changes, for the following reasons:

| PAGE | LINE | | |
|------|------|--------|---|
| 191 | 14 | CHANGE: | "... we talked about is head trauma, _Head trauma_" |
| | | REASON: | Transcription error |
| 194 | 15 | CHANGE: | "Yes Unless more information becomes Available then I reserve the right to Amend my Report." |
| | | REASON: | Correction, as per page 96, 97 + 189. |
| 196 | 7 | CHANGE: | John A. Sterba, M.D., Ph.D, FACEP, FACFEI |
| | | REASON: | Transcription error |
| 199 | 3 | CHANGE: | John A. Sterba, M.D., Ph.D, FACEP, FACFEI |
| | | REASON: | Transcription error |
| | | CHANGE: | |
| | | REASON: | |
| | | CHANGE: | |
| | | REASON: | |
| | | CHANGE: | |
| | | REASON: | |

Signature: _John A. Sterba, MD, PhD, FACEP, FACFEI_ /JS

Subscribed and sworn to before me this

_2_ day of _August_ , 2004 2005 2017/ JS

_Shiela Baranowski_
Notary Public

SHIELA D BARANOWSKI
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01BA6349373
COMM. EXP. 10/17/__

# jack w. hunt and associates, inc.

_1420 Liberty Building, Buffalo, New York 14202_

# CURRICULUM VITAE

Updated: June 21, 2017

**NAME:**  John A. Sterba, M.D., Ph.D., FACEP
Commander, Medical Corps, U.S. Navy Reserves
(Honorably Discharged, 05/15/1997)

**ADDRESS**:  226 Center Street
East Aurora, NY 14052-2233

**MARITAL STATUS**: Married
**DATE of BIRTH**: March 3, 1954
**PLACE OF BIRTH:** Evanston, IL

**PHONE NUMBERS and EMAIL ADDRESS:**
(716) 655-6854 (Office/Fax); E-mail: PhysicianHouseCalls@roadrunner.com
(716) 655-7633 (Home); (716) 998-7474 (private cell phone)
**WEBSITE:**  www.PhysicianHouseCalls.org

**BOARD CERTIFICATION:**
<u>Diplomate</u> of the American Board of Emergency Medicine (ABEM), June 2,
1994, Recertified ABEM December 29, 2003 through December 31, 2013;
Recertified ABEM December 29, 2013 through December 31, 2023;
ABEM Emergency Medicine Continuous Certification (EMCC) through
yearly Life Long Self-Assessment (LLSA) Examinations: 2004-2015.
<u>Diplomate</u> of the American Board of Urgent Care Medicine
(ABUCM), December 12, 2008 through December 12, 2016;
Recertified December 5, 2016 through December 5, 2024
<u>Diplomate</u> and Board Certified Forensic Examiner, American Board of
Forensic Examiners (ABFE), May 31, 1996; Member, American Board of
Forensic Examiners, October 24, 1994.
<u>Board Certification</u> (Equivalency) in Undersea Medicine, United States Navy:
Hyperbaric, Diving, Submarine and Radiation Health Medicine, 1/4/1988

**FELLOW AND MEMBER STATUS:**
<u>Fellow</u>, American College of Emergency Physicians (FACEP),
September 10, 1996
<u>Fellow</u>, American College of Forensic Examiners Institute (FACFEI),
November 7, 1997
<u>Fellow</u>, American Academy for Cerebral Palsy and Developmental Medicine,
(FAACPDM), December 7, 2000
<u>Member,</u> American College of Emergency Physicians (ACEP), October, 1990
<u>Member,</u> American College of Forensic Examiners (ACFE), November, 1997
<u>Member,</u> American Academy of Family Physicians (AAFP), June 1, 2007

**ACADEMIC APPOINTMENTS:**
<u>Research (Adjunct) Assistant Professor of Pediatrics,</u> July 1, 2000 to present
Department of Pediatrics
Women and Children's Hospital of Buffalo/Kaleida Health
Division of Developmental Pediatrics and Rehabilitation
Robert Warner Rehabilitation Center (renamed February 26, 2007 to
Robert Warner, M.D. Center for Children with Special Needs)
219 Bryant Street, Buffalo, NY 14222



<u>Senior Teaching Fellow in Emergency Medicine and Paediatrics</u>
(Equivalent to Clinical Assistant Professor in the USA), June 29, 2004 to present
College of Medicine & Allied Health Sciences, University of Sierra Leone,
Freetown, Sierra Leone, West Africa

**MEDICAL LICENSE:** New York State, 193741-1 (09/24/1993), expiration 02/29/2016

**EDUCATION AND TRAINING:**

09/72 - 06/76  **B.A. in Biology & Chemistry** (June 13, 1976)
Lawrence University, 115 South Drew Street
Appleton, WI  54911

06/73 - 08/73  **Emergency Medical Technician-Ambulance (EMT-A)**
State of Florida, Department of Health and Rehabilitative Services,
Division of Health; Emergency Medical Technician Training
Course, Registry No. 5025, August, 1973
Indian River Community College
Ft. Pierce, FL

08/76 - 08/81  **Ph.D. in Human Physiology** (September 1, 1981)
Department of Physiology
State University of New York at Buffalo
3435 Main Street
Buffalo, NY 14214

08/81 – 12/82  **Postdoctoral Fellowship, National Institutes of Health (NIH)
Cardiovascular Physiology/Cardiology**
Department of Physiology
Loyola University Medical Center
Stritch School of Medicine
2160 South First Avenue
Maywood, IL 60153

08/81 – 06/85  **M.D.** (June 8, 1985)
Loyola University of Chicago
2160 South First Avenue
Stritch School of Medicine
Maywood, IL 60153

07/85 – 06/86  **Internship, Family Practice** (June 30, 1986)
Department of Family Practice
Naval Hospital Bremerton
HPO 1, Boone Rd.
Bremerton, WA  98312

| | |
|---|---|
| 10/85 | **Combat Casualty and Critical Care (C-4) and Advanced Trauma Life Support (ATLS) Provider Courses** U.S. Army, Fort Sam Houston, San Antonio, TX |
| 07/85 | **Advanced Cardiac Life Support (ACLS) Provider Course** Naval Hospital Bremerton Bremerton, WA |
| 07/86 – 12/86 | **Undersea Medical Officer Training, Course #86002** (12/19/86) Naval Undersea Medical Institute P.O. Box 159 Naval Submarine Base, New London Groton, CT 06349-5159 |
| 1988 | **Current Concepts in Organ and Tissue Donation and Transplant Course** School of Medicine, Medical College of Georgia Augusta, GA |
| 07/90 – 06/93 | **Residency, Emergency Medicine** (June 30, 1993) Wright State University, School of Medicine Department of Emergency Medicine, Cox Heart Institute Kettering Medical Center 3525 Southern Blvd., Kettering, OH 45429 |
| 1990 – 1991 | **ACLS Provider and ACLS Instructor Courses** Wright State University, School of Medicine Dayton, OH |
| 1991 | **Diagnostic Ultrasonography for Emergency Medicine** Skills Lab, American College of Emergency Physicians Cincinnati, OH |
| 1991 | **Advanced Trauma Life Support (ATLS) Provider Course** Humana Hospital, University of Louisville, KY Louisville, KY |
| 1992 | **Pediatric Advanced Life Support (PALS) and Pediatric Emergency Care Courses** University of Utah School of Medicine and Primary Children's Medical Center Salt Lake City, Utah |
| 1992 | **Emergency Department Administration Training The Management Academy** American College of Emergency Physicians Chicago, IL |

| | |
|---|---|
| 1993 | **ATLS Instructor Course**<br>Miami Valley Hospital<br>Dayton, OH |
| 1994-2002 | **PALS Provider Course**<br>Children's Hospital of Buffalo, NY |
| 1995 | **ACLS Provider and ACLS Instructor Courses**<br>Genesee Memorial Hospital<br>Batavia, NY |
| 1997 | **ATLS Provider Course**<br>State University of New York<br>Health Science Center<br>Syracuse, NY |
| 1999-2014 | **ACLS Provider and ACLS Instructor Courses**<br>**ACLS-Experienced Provider Course; Healthcare Provider**<br>Kaleida Healthcare Systems<br>Buffalo General Hospital/Kaleida Health<br>Buffalo, NY |
| 1999, 2006,<br>2009, 2011,<br>2017 | **ACLS Instructor Updates**<br>American Heart Association Guidelines, On-line and<br>Kaleida Healthcare Systems<br>Buffalo General Hospital, Millard Fillmore Hospital at Gates<br>Circle, Gates Vascular Institute<br>Buffalo, NY |
| 1999 | **PALS Provider Course**<br>University at Buffalo School of Medicine & Biomedical Sciences<br>Buffalo, NY |
| 07/98 – 06/00 | **Post-Doctoral Fellowship, National Institutes of Health (NIH), National Center for Medical Rehabilitation Research (NCMRR)** in Medical Rehabilitation Research.<br>Children's Hospital of Buffalo and State University of New<br>York at Buffalo<br>219 Bryant St.<br>Buffalo, NY 14222 |
| 2001 | **ATLS Provider Recertification**<br>Cooper Hospital/University Medical Center<br>Camden, NJ |
| 2009 | **ATLS Provider Course**<br>University of Rochester, Strong Memorial Hospital<br>Rochester, NY |

4

**WORK EXPERIENCE:**

07/73 – 09/73 **Scientific Underwater Assistant in Marine Biology and Oceanography**
Harbor Branch Foundation Laboratory and Smithsonian Institute
Link Port Marine Science Center
Fort Pierce, FL

12/73 – 01/74, **Emergency Medical Technician – Ambulance**
12/74 – 01/75 (Christmas vacations from College)
Superior Paramedic Air-Ground Ambulance Company
Elmhurst, IL

09/73 – 06/76 **Premedical Preceptorship in Emergency Medicine**
Dr. Delano Zimmerman
Emergency Department
St. Elizabeth Hospital
Appleton, WI

06/74 – 09/74 **State Park Naturalist**
Director of Interpretive Center
Wisconsin Department of Natural Resources
Peninsula State Park, Door County, WI
Fish Creek, WI

06/74 – 09/74 **Deputy Sheriff, Emergency Medical Technician – Ambulance and First Aid/CPR Instructor**
Door County Sheriff's Department
Door County, WI

09/73 – 06/76 **Emergency Medical Technician - Ambulance**
Gold Cross Paramedic Ambulance Company
Appleton, WI

06/75 – 09/75 **SCUBA Diving Instructor (YMCA) and Lodge Manager**
Door County, WI
Gills Rock, WI

Developed and tested a new air/sea search and rescue (SAR) protocol coordinated with U.S. Coast Guard (Cleveland, OH, Traverse City, MI and Plum Island, WI) for the helicopter medical evacuation of diving accident victims from the waters of Green Bay - Northern Lake Michigan to Dr. Eric Kindwall, Department of Hyperbaric Medicine, St. Luke's Hospital, Milwaukee, WI. Protocol tested with actual victim successfully recovered at sea by USCG helicopter and flown to Gills Rock, WI to rendezvous with ground paramedic ambulance transport to the hospital, August, 1975.

08/76 – 06/77 **Physiological Investigator, Cellular Physiology**
Department of Physiology
State University of New York Buffalo, NY
Buffalo, NY

While a Ph.D. graduate student, conducted research on the influence of hydrostatic pressure on cellular function ($Na+$ -$K+$, ATPase activity) in human erythrocytes as it relates to the physiological condition of deep diving.

08/76 – 06/80 **Graduate and Teaching Assistance, Medical Physiology**
Cardiovascular & Pulmonary Laboratories
Medical and Nursing Schools
State University of New York at Buffalo, NY
Buffalo, NY

07/77 – 08/81 **Emergency Medical Technician - Ambulance**
LaSalle Paramedic Ambulance Company
Buffalo, NY

07/77 – 08/81 **Physiological Investigator**
Hyperbaric Research Laboratory
Department of Physiology
State University of New York
Buffalo, NY

Principal investigator conducting human diving physiology and Emergency Medicine research simulating cold-water near-drowning, asphyxiation, hypoxemia, hypercarbia and underwater blackout. Medical, Physiological and Clinical Laboratory training, measurement experience in human test subjects, and clinical teaching (cardiac-output, electrocardiograms, peripheral perfusion, pulmonary function tests, mass spectrometry end-tidal gas analysis, blood gases, blood chemistries and hematology, and microscopy).

08/81 – 12/82 **Postdoctoral Fellowship and Research Associate in Cardiovascular Physiology and Cardiology**
Department of Physiology
Loyola University of Chicago, Stritch School of Medicine
2160 South First Avenue
Maywood, IL 60153

Principal Investigator (PI) in cardiovascular physiology/cardiology research: stabilization and neural regulation of atrial subsidiary pacemakers in a surgical canine model as it relates to sinoatrial node dysfunction and sick sinus syndrome. Lecturer and Instructor in cardiovascular and pulmonary physiology, Loyola University of Chicago, Stritch School of Medicine and Department of Physiology. Medical, Physiological and Clinical Laboratory training, measurement experience in the canine model, and clinical teaching (cardiac-output, electrocardiograms, blood gases, blood chemistries and hematology)

6

04/85 – 06/85 **Emergency Physician, Christian Medical Missionary**
**Externship through Loyola Medical School of Maywood, IL**
Emergency Department
St. Jude's Hospital
Vieux Fort, St. Lucia, Windward Islands
West Indies

Family Practice Clinic, Emergency Department and Physician House Calls in community. Medical and Clinical Laboratory training and measurement experience in patients (electrocardiograms, bed-side and clinical laboratory rapid diagnostic tests, blood gases, blood chemistries, hematology, urinalysis and microscopy)

07/85 – 06/86 **Intern and Emergency Physician**
Department of Family Practice and Emergency Department
Naval Hospital Bremerton, Affiliate Hospital to
University of Washington's Family Practice Residency
Bremerton, WA

Intern in Family Practice with Emergency Department duty every third night. Lecturer to staff, residents and Independent Duty Corpsman. E.M.T. Instructor. Community lecturer to Kitsap County Search and Rescue on field management of cold-water near-drowning and hypothermia. Member of Ad-Hoc Committee, improving helicopter and ground ambulance transfer of critically ill patients from Naval Hospital Bremerton to tertiary care hospitals in Seattle, WA. Medical and Clinical Laboratory training and measurement experience in patients (electrocardiograms, bed-side and clinical laboratory rapid diagnostic tests, blood gases, blood chemistries, hematology, urinalysis and microscopy).

07/90 – 06/93 **Resident, Department of Emergency Medicine**
Wright State University School of Medicine
Dayton, OH

Lecturer in residency program and in community. Published Emergency Department protocol on the treatment of accidental hypothermia and near-drowning. Conducted Independent Studies (IS) on: 1) Quality Assurance (QA) and Quality Improvement (QI) for patient care and laboratory testing in the Emergency Department, 2) Medical Advisor and Physiology Instructor of hospital-based helicopter EMS systems, 3) COBRA, 4) Risk Management (RM), and 5) Emergency Department strategies in billing and reimbursement. Outside of residency, I was an Emergency Physician (Independent Contractor) at Level I Trauma Center and Community Hospitals, from 1991 to 1993, in Greenfield and Dayton, OH. Medical and Clinical Laboratory training and measurement experience in patients (electrocardiograms, ultrasound [chest, abdomen, transvaginal and vascular access], bed-side and clinical laboratory rapid

7

diagnostic tests, blood gases, pulse oximetry/co-oximetry, blood chemistries, hematology, urinalysis and microscopy).

01/91 – 06/93   **Emergency Physician**
National Emergency Services (NES)
Emergency Department
Greenfield Area Medical Center
Greenfield, OH

01/91 – 06/93   **Emergency Physician**
Coastal Emergency Services (CES)
Emergency Department
Southview Hospital
Dayton, OH

01/91 – 0693   **Emergency Physician**
Emergency Department
Miami Valley Trauma Center (Level I), Dayton, OH

07/93 – 09/93   **Emergency Physician, Medical Director**
Emergency Department and Emergency Medical Services
Gifford Medical Center
Randolph, VT

10/93 – 06/94   **Emergency Physician**
National Emergency Services (NES)
Emergency Department, Bertrand Chaffee Hospital
224 East Main Street
Springville, NY 14141

01/94 – 06/94   **Emergency Physician**
Coastal Emergency Services (CES)
Millard Fillmore Hospitals
Buffalo, NY

07/94 – 06/98   **Emergency Physician and ACLS Instructor**
Emergency Department, Genesee Memorial Hospital
(renamed to Genesee Mercy Healthcare, then named to United
Memorial Medical Center due to multiple hospital mergers)
127 North Street
Batavia, NY 14020

07/98 – 06/99   **Emergency Physician**
Emergency Department, Sister's of Charity Hospital
2157 Main Street
Buffalo, NY

8

07/98 – 06/00 **Physician and Research Physiologist, Post-Doctoral Fellowship**
National Institutes of Health (NIH)
National Center for Medical Rehabilitation Research (NCMRR) in Medical Rehabilitation Research.
Children's Hospital of Buffalo, the University at Buffalo, School of Health Related Professions
Buffalo, NY

07/98 – 03/02 **Emergency Physician and ACLS Instructor/ACLS Course Medical Director**
Keystone Healthcare of New York
Emergency Department, Bertrand Chaffee Hospital
224 East Main Street
Springville, NY 14141

03/02 – 04/04 **Physician and Research Physiologist, Principal Investigator**
Awarded 2002 Children's Guild Annual Clinical Research Grant in Pediatric Medical Rehabilitation: Sports Therapy medical rehabilitation clinical studies in children with cerebral palsy.
Center for Sports Therapy Research, Inc.
226 Center Road
East Aurora, NY 14052-2233

12/98-Present **Emergency Physician and Research Physiologist President & CEO; Medical & Scientific Director**
Saved by Grace Ministry, Inc.
(Formerly named Center for Sports Therapy Research, Inc.)
226 Center Road
East Aurora, NY 14052-2233

11/99-Present **Emergency Physician and ACLS Instructor/ACLS Course Medical Director**
Department of Clinical Education
Buffalo General Hospital and Kaleida Health
Buffalo, NY 14203

07/00-Present **Research Assistant Professor, Adjunct**
Department of Pediatrics
Division of Developmental Pediatrics and Rehabilitation
Robert Warner Rehabilitation Center (renamed to Robert Warner, M.D. Center for Children with Special Needs)
219 Bryant Street
Women and Children's Hospital of Buffalo, NY 14222
Buffalo, NY 14222

09/01 -03/02   **Emergency Physician, Principal Investigator**
Invited Participant: Civilian Disaster Preparedness "Brain Trust" of the Department of Health, Erie County, Buffalo.

Originator: Southern Tier Emergency Medicine (STEM) Disaster Plan, War on Terrorism, Bertrand Chaffee Hospital, Springville, NY coordinating response of eight surrounding hospitals and communities of Western New York and Northwestern Pennsylvania.

Principal Investigator, "Rural Medical Response System (RMRS) for Nuclear, Biological and Chemical (NBC) Terrorism" Grant, U.S. Department of Health and Human Services (DHHS), Office of Homeland Security (OHS) and the Executive Office of the President (EOP)-The White House.

2001- Present   **Emergency Physician**
Saved by Grace Ministry, Inc.
226 Center Rd.
East Aurora, NY 14052-2233 USA

Emergency Medicine practice providing emergency medical care and field support for medical missionaries serving in Afghanistan, Ukraine, Sierra Leone, Honduras, and the Dominican Republic. The practice of Emergency Medicine alongside Non-Governmental Organization (NGO's) and Corporations of Samaritan's Purse, Wesleyan Church, World Hope-Sierra Leone, Mercy Ships and Medical Ministries International. Medical and Clinical Laboratory training, measurement experience in patients, and clinical teaching (electrocardiograms, bed-side and clinical laboratory rapid diagnostic tests, blood gases, pulse oximetry, blood chemistries, hematology, urinalysis and microscopy).

03/02- present **Emergency Physician and Research Physiologist; President & CEO; Medical & Scientific Director; NYS DOH Clinical Laboratory Director**
Saved by Grace Ministry, Inc.
226 Center Rd.
East Aurora, NY 14052-2233 USA

Emergency Medicine and Urgent Care Medicine private medical practice providing **Emergency Physician House Calls**™ for infants, children and adults using the first **PORTABLE ER**®, worldwide and locally in Western New York State.

The **PORTABLE ER**® was originally invented, developed, Tested & Evaluated (T&E) and published from extended expeditionary military deployment in the North Pole Region upon the High Arctic Icepack by LCDR John A. Sterba, Medical Corps, U.S. Navy-Reserves (Diving and Submarine Medical Officer and Emergency Physician) during Ice Exercise 1989 (ICE-EX 89). For published

details, see www.PhysicianHouseCalls.org , under heading "History of The **PORTABLE ER**®".

The nation's first **PORTABLE ER**® was Federally Registered on April 9, 2013 (United States of America, United States Patent and Trademark Office (USPTO) Reg. No. 4,319,189) for International Classification 44, "For: CHARITABLE SERVICES, NAMELY, PROVIDING MEDICAL EQUIPMENT AND SERVICES TO UNDERSERVED COMMUNITIES, IN CLASS 44" (U.S. CLS. 100 AND 101), with Service Mark First Use Date, 2-16-2009; In Commerce Date, 2-16-2009.

International Healthcare providing Emergency Medicine and Urgent Care Medicine was done internationally during and recovering from man-made and natural disasters using the re-developed, Tested & Evaluated and published Missionary **PORTABLE ER**® caring for those in greater need (03/02 – 02/09).

Beginning February 16, 2009, Emergency Medicine, Urgent Care Medicine using the Community-Based **PORTABLE ER**® personally caring for those in greater need has been successfully done in the Greater East Aurora, NY Area.  The expanding services and growing private practice of Emergency Medicine and Urgent Care Medicine by **Emergency Physician House Calls**™ is fully reimbursed by National Government Services-Medicare B, Medicaid, TRICARE and third-party insurances (e.g. BlueCross/BlueShield, Independent Health, Univera, UnitedHealthcare, Aetna, others).  Saved by Grace Ministry gained approval from National Government Services-Medicare B and insurances for all doctors in the U.S. to be paid for over 300 new procedures codes (CPT Codes) during **Emergency Physician House Calls**™ when done in patient's private homes & temporary residences (visitors, Inns/Hotels, shelters).   Insurance money, medications & supplies, and tax-deductible co-pays & donations are used 100% to care for those in greater need, anywhere.  Medical and Clinical Laboratory training and measurement experience in pediatric and adult patients (Abbott i-STAT Blood Chemistry Laboratory (Basic Metabolic Profile-BMP), Abaxis Piccolo xpress™ Blood Chemistry Laboratory (BMP and Comprehensive Metabolic Profile-CMP), bed-side and clinical laboratory rapid diagnostic tests, urinalysis, hematology, transcutaneous pulse oximetry, and Transcutaneous Hemoglobin, Carboxy-Hemoglobin, Met-Hemoglobin, and Perfusion Index). Quality Assurance/Quality Improvement (QA/QI) for clinical laboratory measurements.

The Community-Based **PORTABLE ER**® was published in Sterba, JA and JE Sterba.  Chapter 10, "The Community-Based Portable ER", pp. 138-239, In: *Textbook of Equipping for Disasters, Sheltering at Home*.  Revised & Expanded, Third Edition.  Saved by Grace Ministry, Inc., East Aurora, NY, March 30, 2012; 249 pages.

The history and current use of the Community-Based **PORTABLE ER**® and **Emergency Physician House Calls**™ are detailed in the peer-reviewed article:

Sterba, JA. Wound Care on the Go. 'Portable ER' Allows Physician to Reinvent House Calls. *Today's Wound Clinic*. 2012, September: 18-21.

As Medical & Scientific Director, I serve as Principal Investigator conducting and publishing Institutional Review Board (IRB)-approved, funded clinical studies. Current research studies through Saved by Grace Ministry, Inc. with Women & Children's Hospital of Buffalo include Emergency Medicine and Urgent Care Medicine by **Emergency Physician House Calls**™ using The **PORTABLE ER**® and previously Pediatric Medical Rehabilitation using Sports as Therapy (e.g. Horseback Riding Therapy, Adaptive Downhill Skiing Therapy, and Aquatic Therapy).

04/04-Present **Emergency Physician, Senior Teaching Fellow (Clinical Assistant Professor)  Emergency Medicine and Paediatrics**
Saved by Grace Ministry, Inc.
226 Center Rd.
East Aurora, NY 14052-2233 USA

International Emergency Medicine Clinical Practice and support at Kamakwie Wesleyan Hospital, Kamakwie, Sierra Leone, West Africa and through the College of Medicine & Allied Health Sciences, University of Sierra Leone, Freetown, Sierra Leone, West Africa. Medical and Clinical Laboratory training, measurement experience in patients, and clinical teaching (electrocardiograms, bed-side and clinical laboratory rapid diagnostic tests, blood gases, pulse oximetry, blood chemistries, hematology, urinalysis and microscopy).

05/04 – 07/08 **Emergency Physician**
Saved by Grace Ministry, Inc.
226 Center Rd.
East Aurora, NY 14052-2233 USA

International Emergency Medicine Clinical Practices with The Hospital Ship, *M/V Caribbean Mercy*, of Mercy Ships, Inc., Garden Valley, TX, Trujillo and Puerto Castilla, Honduras, Central America. (*M/V Caribbean Mercy* Honorably Retired, April 2006). Land-based International Emergency Medicine clinical practice, without *M/V Caribbean Mercy*, with Mercy Ships, Inc., Garden Valley, TX and Barahona Province, Dominican Republic. Land-based International Emergency Medicine clinical practice with Medical Ministry International (MMI), Allen, TX and Barahona Province and Cachón, Dominican Republic and Jehová Jireh Ministry and Health Care, Emergency Room (Salon de Emergencia), Cachón, Dominican Republic. Emergency Medicine Advisor and Emergency Medical Services, Jehová Jireh Ministry and Health Care, Emergency Room (Salon de Emergencia), Cachón, Dominican Republic. Medical and Clinical Laboratory training, measurement experience in patients, and clinical teaching (electrocardiograms, bed-side and clinical laboratory rapid diagnostic tests, blood gases, pulse oximetry, blood chemistries, hematology, urinalysis and microscopy).

07/07 - 04/09   **Emergency Physician**
                Emergency Medicine Instructor, Physician Assistant Program
                D'Youville College, Buffalo, NY

07/07-2012      **Emergency Physician**
                Emergency Medicine Instructor, Physician Assistant Program
                Daemen College, Buffalo, NY

10/12-present   **New York State Department of Health Clinical Laboratory**
                **Director**

New York State, Department of Health awarded John A. Sterba, M.D., Ph.D.,
FACEP the Certificate of Qualification (CQ Code: STERJ2) to act a Clinical
Laboratory Director in the Categories of General Chemistry and Hematology in
accordance with Article 5, title V, Section 573 of the Public Health Law, effective
October 22, 2012 through October 22, 2018. Laboratory training and
measurement experience in pediatric and adult patients (Abbott i-STAT Blood
Chemistry Laboratory (Basic Metabolic Profile-BMP), Abaxis Piccolo xpress™
Blood Chemistry Laboratory (BMP and Comprehensive Metabolic Profile-CMP),
bed-side and clinical laboratory rapid diagnostic tests, urinalysis, hematology,
transcutaneous pulse oximetry, and Transcutaneous Hemoglobin, Carboxy-
Hemoglobin, Met-Hemoglobin, and Perfusion Index). Quality Assurance/Quality
Improvement (QA/QI) for clinical laboratory measurements.


**MILITARY DUTY:**

07/85 – 05/97   **Highest Rank, Commander, Medical Corps U.S. Navy Reserve**

Completed U.S. Navy active duty obligation for Medical School Health
Professions Scholarship Program (HPSP). Honorably Discharged May 15, 1997

10/85           **Emergency Physician and Medical Officer Training:**
                Brooks Army Medical Center and Fort Sam Houston
                San Antonio, Texas

Nuclear, Biological, Chemical (NBC) warfare training. Escape and Evasion
(E and E) Course. Combat Casualty and Critical Care (C-4) Course. Advanced
Trauma Life Support (ATLS) Course with Ballistics Laboratory.

07/86-12/86     **Emergency Physician and Medical Officer Training:**
                Naval Undersea Medical Institute
                Naval Submarine Base, New London
                Groton, CT and
                Naval Coastal Systems Center
                Panama City, FL

Six months training course as a Submarine Medical Officer, Diving Medical
Officer, Radiation Health Medical Officer and U.S. Navy Diver. Stood weekend

duty as an Emergency Physician-Assistant Medical Officer of the Day (MOD) in the Emergency Department, Naval Hospital, Subase New London, Groton, CT. Medical and Clinical Laboratory training and measurement experience in patients (electrocardiograms, bed-side and clinical laboratory rapid diagnostic tests, blood gases, blood chemistries, hematology, urinalysis and microscopy).

01/87 – 06/90  **U.S. Naval Medical Officer (Navy Doctor)**
               Navy Experimental Diving Unit (NEDU)
               Naval Coastal Systems Center (NCSC)
               Panama City, FL 32407-5001

Clinical and research duties included Emergency Physician, Health Care Medical Officer, Assistant Senior Medical Officer, Research Medical Officer, Division Officer, Saturation and Experimental Diving Medical Officer.  Clinically treated 66 cases of decompression sickness and arterial gas embolism, civilian and military.  Remotely deployed on expedition in the High Arctic and Greenland with U.S. Navy, Canadian and NATO Forces, March – April 1989, working as an emergency physician, research physiologist, Diving Medical Officer (DMO) and U.S. Navy Diver with diving operations and research beneath the Arctic icecap.

Medical, Physiological and Clinical Laboratory training, measurement experience in human test subjects and patients, and clinical teaching (electrocardiograms, pulmonary function tests, mass spectrometry end-tidal gas analysis, blood gases, blood chemistries and hematology, and microscopy).

At NEDU, clinical duties included emergency on-call duty as Diving Medical Officer for worldwide "Bends-Watch" providing emergency medical consultation, management and medical evacuation of diving accident victims, civilian and military (U.S. and foreign).  Health Care Medical Officer in charge of Sick Bay operations for emergency and primary medical care; Quality Assurance (QA) of care provided by medical officers (physicians) and Corpsmen.  Founder and director of the USN/USCG Corpsman training program for EMT and Advanced Life Support (ALS) training at NEDU.

Conducted human diving physiology research on the cardiovascular, pulmonary, thermal, auditory and underwater explosion stresses during diving.  Designed medical-research facility for exercise and thermal underwater physiology research simulating underwater and surface Arctic conditions.  Assisted in the design of a new research building including physiology wet lab and data acquisition facility.

Designed and taught a course, "Fundamentals of Human Medical Research" to physicians and engineers at Naval Coastal Systems Center (NCSC).  Assisted organizing medical journal club.  Conducted ACLS, ATLS and general medical training for Corpsmen and physicians.  Developed heat-stress policies and wrote military instructions on treating medical/trauma emergencies, onshore/offshore.

Lecturer on topics in Diving Medicine including dangerous marine animals, hypothermia and near-drowning at U.S. Navy Diving and Salvage Training

Center (NDSTC).  Taught in the community and at two international symposia on accident and hypothermia management at Duke University, Raleigh-Durham, NC and the Defense and Civil Institute of Environmental Medicine (DCIEM), Downsview, Ontario.  Lecturer for U.S. Navy Search and Rescue (SAR), Naval Air Station, Pensacola, FL on the emergency medical management and evacuation of trauma and diving accident victims.  Qualified as Diving Medical Officer and Submarine Medical Officer, January 1988, and Saturation Diving Medical Officer, March 1988.

01/87 – 12/89 **Emergency Physician**
Emergency Department
Tyndall Air Force Base Hospital
Tyndall AFB, FL

**Ph.D. TRAINING RESEARCH SUPPORT:**
BRSG (Grant #5 S07 RR07066-12)
USPHS NIH (Grant #HL 14414)
U.S. Navy (Grant #N00014-76-C-0472)
U.S. Navy (Grant #N00014-78-C-0205)
NOAA (Grant #150-S025E), Sea Grant for Ph.D. Thesis Research, 1979-1981

**CARDIOVASCULAR PHYSIOLOGY/CARDIOLOGY POST-DOCTORAL FELLOWSHIP RESEARCH SUPPORT:**
Loyola University Medical Center. National Institute of Health, HL 28205, HL 27595, HL 27664, The Bane Charitable Trust of Chicago and the James DePauw Fund of Chicago.

**MEDICAL REHABILITATION POST-DOCTORAL FELLOWSHIP RESEARCH SUPPORT**:
National Institutes of Health, National Center for Medical Rehabilitation Research, T-32 Grant, University at Buffalo. National Institute of Health, T32 HD07423-08, T32, HD07423-09.

**PRINCIPAL INVESTIGATOR RESEARCH SUPPORT:**
Research and Development funds (totaling $400,000), Naval Sea Systems Command, Washington, DC, U.S. Navy sponsored medical research.
Grant from Health Care Quality Solution, Inc. ($42,000): testing new respiratory therapy (Vapotherm™) during human endurance exercise.
Grant from the Vapotherm™ Company, Inc. ($24,000), evaluating new respiratory therapy (Vapotherm™) for treating Cystic Fibrosis.
Grant from the Children's Guild, Inc. ($38,000, May, 1998) The 1998 Annual Pediatric Medical Rehabilitation Grant: "Sports Therapy medical rehabilitation clinical research in children with cerebral palsy."
Grant from the Children's Guild, Inc. ($100,000, March, 2002) The 2002 Annual Pediatric Medical Rehabilitation Grant: "Sports Therapy medical rehabilitation clinical research in children with cerebral palsy."
Grant from Abbott Point of Care, Inc., Princeton, NJ (Point of Care Portable Laboratory loaned, supplies and technical support, March 21, 2011),

Clinical Study: "Effect of Using a Point of Care (POC) Laboratory on Patient Convenience"

Grant from Margaret L. Wendt Foundation, Buffalo, NY ($27,945.72, August 10, 2011): Antibiotics and Point of Care-POC Blood Testing and Other Tests.

Grant from Masimo Corporation, Irvine, CA (RAD-57 Non-Invasive Point of Care Device and supplies donated with technical support, February 2, 2013), Transcutaneous Oxygen, Carbon Monoxide, Hemoglobin, Methemoglobin, and Perfusion Index for Clinical Study: "Effect of Using a Point of Care (POC) Laboratory on Patient Convenience"

Grant from Margaret L. Wendt Foundation of Buffalo, NY ($122,060.00, February 27, 2015) to purchase and research Specialty Emergency Vehicle for Emergency Physician House Calls™ using PORTABLE ER®.

**EMERGENCY MEDICINE AND URGENT CARE MEDICINE CLINICAL RESEARCH SUPPORT DESCRIPTION:**

Grant from Abbott Point of Care, Inc., Princeton, NJ (Point of Care Portable Laboratory loaned, supplies and technical support, March 21, 2011), Clinical Study: "Effect of Using a Point of Care (POC) Laboratory on Patient Convenience"

Grant from Margaret L. Wendt Foundation of Buffalo, NY ($27,945.72 on August 10, 2011) for Physician House Calls using the Community-Based Portable ER. Grant for Saved by Grace Ministry, Inc. to purchase needed prescription medications, advanced diagnostics laboratory equipment and medical supplies to care for others in greater need in the Greater East Aurora, NY Area.

Grant from Margaret L. Wendt Foundation of Buffalo, NY ($122,060.00, February 27, 2015) for purchasing (The Armored Group, LLC, www.ArmoredCars.com) and conducting research by Test & Evaluation of a new prototype Specialty Emergency Vehicle for Emergency Physician House Calls™ transporting America's first community-based and Federally-Registered PORTABLE ER® caring for others in greater need in the Greater East Aurora, NY Area.

**MEDICAL SOCIETIES:**

Undersea Medical Society (Member, February 10, 1982), renamed to Undersea & Hyperbaric & Medical Society (Member, June 18, 1987).

Christian Medical Society (Member, April 9, 1982), renamed to Christian Medical & Dental Associations (Member, March, 2007)

American Academy of Family Physicians (1985; renewed Active Membership, May 5, 2007)

American College of Emergency Physicians (ACEP) ACEP (Member, October, 1990); ACEP, New York Chapter

American College of Forensic Examiners (Member, November, 1997)

American Academy for Cerebral Palsy and Developmental Medicine (Member, December 7, 2000).

American College of Sports Medicine (Member, June 8, 2000)

Medical Society of the State of New York, County of Erie (Member, July, 2001, and Granted "Life Member" Status, January 23, 2013)

**COMMITTEES AND SPECIAL DUTIES:**

Founder/Director, Angel Plane, Chicago Chapter. Private Pilot/coordinator of air transport of transplant surgery organs, blood products and surgical teams, 1984-85

Physician member of Ad-Hoc Committee on ambulance and medical evacuation (MEDEVAC) policies at Naval Hospital, Bremerton, WA, 1985-1986.

Judge at Three Rivers Science Fair, Naval Coastal Systems Center, Panama City, FL, 1987-1988.

Member Quality Assurance and Credentials Committees, Medical Department, U.S. Navy Experimental Diving Unit, Panama City, FL, 1987-1990.
Appointed February 24, 1988, member of the National Academy of Sciences (NAS), Institute of Medicine (IOM) Committee to Advise the American National Red Cross (ANRC) on issues of Emergency Medicine: Diving Medicine, near-drowning, hypothermia, and helicopter medical evacuation of trauma patients.

Nominated June 2, 1989 as a candidate for the U.S. Navy Technical Advisor/Subject Matter Expert (TA/SME) for Diving Medicine by Naval Medical Command and Health Science Education Training Command, Washington, DC.

Medical Advisor to National Marine Health Systems and Marcus Foundation on treating offshore medical emergencies in international waters, 1989-1990.

Medical Advisor, CareFlight: hospital-based air EMS helicopter service, Miami Valley Trauma Center, Dayton, OH. Dr. S. Rymer, Medical Director, 1990- 93.

Medical Advisor, Box-21, EMS/SCUBA Dive-Team Unit, Dayton, OH, 1990-93.

Medical Consultant, Diver's Alert Network (DAN), Duke University, Durham, NC. 1993-Present.

Medical Advisor on Nuclear, Biological and Chemical (NBC) warfare/civilian terrorism, disaster preparedness "Brain Trust", Erie County Department of Health, Buffalo, NY, July 2001 - 2002.

Community Lecturer: "Emergency Preparedness and Home Care Ministry for the Elderly". September 2003 - present.

Emergency Medicine Advisor, Emergency Medical Services (EMS), Jehova Jireh Ministry and Health Care, Primary Care Clinic and Emergency Room, Cachon de Barahona, Dominican Republic, November 29, 2006.

Community Lecturer: "The Community-Based Portable ER and Physician House Calls. Emergency Medicine and Urgent Care Medicine for All Ages". September 2010 – present.

Community Lecturer: "Advanced Wound Care by **Emergency Physician House Calls**™ using the Community-Based **PORTABLE ER**™".  Caregivers Support Group, March 21, 2013.

Community Lecturer: "**Emergency Physician House Calls**™ using the **PORTABLE ER**®; Equipping for Disasters", Rotary Club Presentations, Roycroft Inn, East Aurora, NY, February 16 and March 1, 2016.

Medical Student Instructor: "Practicing Medicine by Physician House Calls", Lecture to the Medical Students of Jacobs School of Medicine and Biomedical Sciences, Butler Auditorium, Farber Hall, State University of New York at Buffalo, March 15, 2016.

Clinical Nursing Teaching: "Practicing Medicine by Physician House Calls", Lecture to the Nursing Administration of Independent Nursing Care (INC), LLP, West Falls, NY, August 8, 2016.

**CLINICAL INTERESTS:**

**Emergency Medicine**: Emergency Medicine and Urgent Care Medicine clinical private medical practice.  Acute care, non-invasive and invasive physiological and monitoring in the Emergency Department, CCU/ICU and on board helicopter and fixed-wing air-ambulances.  Emergency Medicine training in the Emergency Department for Nurses, Physician Assistants, Nurse Practitioners, Paramedics and Emergency Medical Technicians.  Emergency Medical Services (EMS) Medical Direction.  Medical Direction of Air EMS (helicopter and fixed-wing) for military (USN and USAF) and civilian air ambulance operations.  Long-distance direct management of trauma and medical emergencies.  Emergency Department Quality Assurance, Quality Improvement and COBRA/EMTALA policies. Civilian emergency preparedness and emergency medical care during natural disasters (blizzards, ice storms and power-outage disasters) in Western New York. International Emergency Medicine private medical practice (Sierra Leone, Honduras and the Dominican Republic), children and adults.

Private medical practice of Emergency Medicine and Urgent Care Medicine caring for children and adults in greater need by **Emergency Physician House Calls**™ using the Medical Missionary Portable ER and the U.S. Community-Based **PORTABLE ER**® in the Greater East Aurora, NY Area of Western New York State.

Laboratory training and measurement experience by **Emergency Physician House Calls**™ using the **PORTABLE ER**® for pediatric and adult patients (Abbott i-STAT Blood Chemistry Laboratory (Basic Metabolic Profile-BMP), Abaxis Piccolo xpress™ Blood Chemistry Laboratory (BMP and Comprehensive Metabolic Profile-CMP), bed-side and clinical laboratory rapid diagnostic tests, urinalysis, hematology, transcutaneous pulse oximetry, and Transcutaneous Hemoglobin, Carboxy-Hemoglobin, Met-Hemoglobin, and Perfusion Index).

Quality Assurance/Quality Improvement (QA/QI) for clinical laboratory measurements.

Advanced Wound Care using the Community-Based **PORTABLE ER**® (Trademarked February 22, 2013; Registered April 9, 2013) during **Emergency Physician House Calls**™ (Trademarked March 21, 2013).  Advanced Wound Care including surgical and medical management of acute and chronic ulcers (pressure, arterial and venous insufficiency, lymphedema, diabetic, neuropathic), burns (thermal, chemical) and lacerations (simple, complex and complicated).

Advanced Wound Care Continuing Medical Education (CME) Conferences attended:
1. "Improving Wound Care 2012.  A Discussion about the Latest Advancements in Wound Care", March 10, 2012 Hyatt Regency, Downtown Buffalo, NY.
2. "Innovations in Wound Healing 2012", May 11, 2012, Holiday Valley Resort, Ellicottville, NY.
3. "Improving Wound Care 2013.  Discussing the Latest Advancements in Wound Care", March 9, 2013 Hyatt Regency, Downtown Buffalo, NY.
4. "Improving Wound Care 2015.  Discussing the Latest Advancements in Wound Care", March 21, 2015 Hyatt Regency, Downtown Buffalo, NY.

Advanced Wound Care Wounds International Global Webcasts:

1. "TIME to revisit wound bed preparation", 13 December, 2012.  Professor Keith Harding, CBE, Director TIME Institute, School of Medicine, Cardiff University, UK
2. "Improving patient wellbeing through dressing choice", Wednesday 8 May 2013.  Professor Keith Harding, CBE, Director TIME Institute, School of Medicine, Cardiff University, UK
3. "Stop Pressure Ulcers Webinar 2014: Proof Into Practice – Pressure Ulcer Prevention Pathway.  Prevention and Treatment of Pressure Ulcers: Clinical Practice Guideline", Tuesday, 29 October, 2014.  Chaired, Dr Joyce Black, RN, PhD, University of Nebraska USA; Prof. Amit Gefen, B.Sc., M.Sc.,Ph.D. Tel Aviv University, Tel Aviv, Israel; and Prof. Nick Santamaria, RN, RPN, B.App.Sc, Grad Dip Health ED, M.ED. St, PhD. University of Melbourne & Royal Melbourne Hospital, Australia.

**Wilderness Emergency Medicine**.  Long-distance aero-medical emergency medical care and transport of critically injured or ill patients in the High Arctic, on the Arctic Sea, Northern Greenland, remote offshore military dive-sites, Central America, Caribbean Basin, and in the United States.

**Nuclear, Biological and Chemical (NBC) Warfare and Terrorism.**  Civilian preparedness in the U.S. rural settings (Rural Medical Response System-RMRS) coordinated with nearby cities (Metropolitan Medical Response System-MMRS).

**RESEARCH INTERESTS:**

**Rehabilitation Medicine Research**: Measuring the physiological healthcare benefits of various sports used as therapy, called Sports Therapy: e.g. Horseback Riding Therapy, Aquatic Therapy, Adaptive Downhill Skiing Therapy and Sailing Therapy in children with neurological disorders (e.g. Cerebral Palsy and Autism), using the outcome measures of Gross Motor Function Measure, Happiness Measure, Children's Functional Independence, Pediatric Evaluation of Disability Inventory and cognitive/communication assessment tools for autism.

**Cardio-Pulmonary Physiology Research**: Medical research in cardiovascular and pulmonary diseases.  Emergency Medicine research in cardiovascular, pulmonary and thermal stresses related to hypothermia, SCUBA and breath-hold diving, near-drowning, drowning and asphyxiation.  Undersea medical research in acoustic and auditory stresses from underwater impulse noise (underwater explosions).

**Emergency Medicine Research:** Clinical Studies:
1. "Effect of Using Point of Care (POC) Laboratories on Patient Convenience, Clinical Outcomes and Medical Insurance Patient-Care Costs using the Community-Based **PORTABLE ER**® during **Emergency Physician House Calls™**"
2. "Advanced Wound Care using the Community-Based **PORTABLE ER**® during **Emergency Physician House Calls™**"

**FORENSIC INTERESTS:**

My Forensic interests and background includes being a Board-Certified Forensic Examiner and expert witness determining and teaching the medical and physiological causes of injuries, illnesses, disabilities and death in civil, criminal, military and product-liability cases.  Medical-legal cases investigated since 1987 have involved the U.S. Military, Foreign Militaries and Governments, U.S. Department of Justice, Judge Advocate General Office, U.S. District Attorneys' Offices and civilian civil cases (Plaintiff and Defense).  My Forensic Examination of all cases combines my training and work experience as an M.D. plus Ph.D. in Human Physiology with my two National Institutes of Health (NIH) Post-Doctoral Fellowships.  My clinical work experience includes practicing in the medical specialties of Emergency Medicine, Urgent Care Medicine, Forensics, International Emergency Medicine, Undersea Medicine (Submarine and Diving Medicine, Hyperbaric Medicine and Radiation Health Medicine) and Operational Military Medicine (Undersea Warfare, Arctic Warfare) with Human Medical Research, Research & Development, and the Test & Evaluation and Safety of commercial products, hardware, biomedical equipment, life support systems, various vehicles and emergency procedures of Emergency Medicine and Emergency Medical Systems.  My Florida Medical Doctor Expert Witness Certificate is MEEW2122, Expiration 07/14/2016.

**AWARDS:**

Galen Edney Fellowship in Oceanography and Marine Biology, Harbor Branch Foundation and Smithsonian Institute, June, 1973

Phi Sigma Honorary Society for Biological Research, Lawrence University, June, 1976

Ph.D. in Physiology awarded with Distinction.  S.U.N.Y. at Buffalo, July, 1981

Decorated, U.S. Navy Arctic Service Ribbon, 1989

Nominated June 2, 1989 as a candidate for the U.S. Navy Technical Advisor/Subject Matter Expert (TA/SME) for Diving Medicine by Naval Medical Command and Health Science Education Training Command, Washington, DC.

Decorated, U.S. Navy Commendation Medal for Emergency Medical Research, 17 January, 1990 (C.A.H. Trost, Admiral, USN, Chief of Naval Operations)

Decorated, U.S. Navy Achievement Medal for Emergency Medical Service, 21 August, 1990 (P.M. Hekman, Jr., VADM, USN, Commander, Naval Sea Systems Command)

Appointed, Commander, Medical Corps, U.S. Navy, August 1, 1993 by the President of the United States

Awarded Certificate of Appreciation, U.S. General Services Administration (GSA) for "Outstanding emergency medical service and dedication to civilian and military disaster victims", Blizzard Disaster of November 20-21, 2000, Buffalo, NY.  Award presented on December 28, 2000.

Selected for "2009 Guide to America's Top Emergency Medicine Physicians", Consumers' Research Council of America, Washington, D.C.

**EXTRACURRICULAR INTERESTS:**

My wife, Janice, is the Vice President & Secretary/Treasurer of Saved by Grace Ministry, Inc., former name, Center for Sports Therapy Research, Inc.  We enjoy working together training local Physical and Occupational Therapists to physiologically assess gross motor function and functional independence in children having disabilities.  I clinically investigate the physiological healthcare benefits of Sports Therapy to rehabilitate children through our local community sports programs of Horseback Riding Therapy, Adaptive Downhill Skiing Therapy and Aquatic Therapy.  We present scientific papers at international medical meetings, publish our findings in peer-reviewed medical journals, and publish reference books for healthcare providers, therapists and parents.

My wife and I founded "Home Care Ministry".  We have trained volunteers to automatically respond less than two hours to our common emergencies, especially storm-related power failures, to care for local widows, widowers, single elderly people and disabled people of all ages in the Greater East Aurora Area and surrounding rural areas of Western New York State.  We successfully conducted Test & Evaluation (T&E) of our Home Care Ministry Disaster Plan, which includes safely assessing and transporting at-risk people to pre-determined Safe Haven Homes, defined as homes having food, safe-to-drink water, safe heat in the winter, security and all provisions to meet all medical and personal needs.  Home Care Ministry is in our *Textbook of Equipping for Disasters, Sheltering at Home*.

In the U.S. Navy (1985-1990) and on medical missions worldwide (2004-present), I developed and completed final Test & Evaluation of the Community-Based Portable ER, published elsewhere [1]. Our Community-Based Portable ER has select Basic Life Support (BLS) supplies and Advanced Life Support (ALS) airway equipment, always in my car. I professionally serve the community as a Board-Certified Emergency Medicine physician, operationally trained and experienced in catastrophic disaster care as a Naval Operational Medical Officer ("Navy Doctor") with overseas Active Duty serving in the U.S. Navy and attached to NATO Forces.

As a civilian emergency physician, I volunteer at field emergencies including being first on scene for car accidents in remote, rural areas of Western New York State. I volunteer during civilian disasters, including the blizzard disaster in Buffalo, November 20-21, 2000, working in leadership and providing hands-on care alongside with local authorities, police, fire, rescue and EMS. Hands-on Emergency Medicine care and EMS supervision to EMTs and paramedics is voluntarily done as a Good Samaritan. Certified as a U.S. National Ski Patroller, I occasionally provide or supervise volunteer BLS/ALS emergency care and extrication on ski hills at two local ski resorts of Holiday Valley and HoliMont in Ellicottville, NY and at Emory Park Ski Hill in the Town of East Aurora, NY.

Beginning in 2002 and expanding in 2009, our private medical practice of Emergency Medicine and Urgent Care Medicine by **Emergency Physician House Calls**™ using the Community-Based **PORTABLE ER**® is routinely conducted at patient's homes, Inns/Hotels, other people's homes and elsewhere worldwide. We are assisting neighbors and businesses locally on disaster preparations using our Third Edition, *"Textbook of Equipping for Disasters, Sheltering at Home"*-2012. [1] We remain at Full Operational Readiness able to serve those in greater need, 24/7, in the field, at shelters or Safe Haven Homes during and recovering from any cataclysmic disaster. Not needing immediate re-supply, we have a fully-stocked Dispensary and emergency systems to provide drinking water, electricity, ice & refrigeration. Our facility is fully disaster-proofed.

[1] Sterba, JA and JE Sterba. Chapter 10, The Community-Based Portable Emergency Room. "The Portable ER", pp. 138-239. In: *Textbook of Equipping for Disasters, Sheltering at Home*. Revised & Expanded, Third Edition. Saved by Grace Ministry, Inc., East Aurora, NY, March 30, 2012; 249 pages. Also published electronically by Amazon.com for Kindle Books (eBooks) on June 30, 2012 as Sterba, JA and JE Sterba. *Textbook of Equipping for Disasters, Sheltering at Home.* [Kindle Edition] Revised & Expanded, Third Edition. Saved by Grace Ministry, Inc., 226 Center Rd., East Aurora, NY 14052, June 30, 2012; 376 pages.
See http://www.amazon.com/Textbook-Equipping-Disasters-Sheltering-ebook/dp/B008EL8MFM/ref=sr_1_1?s=books&ie=UTF8&qid=1341936149&sr=1-1&keywords=First+Aid.

**PUBLICATIONS:**

**ABSTRACTS PUBLISHED: Papers Presented at Annual Scientific or Medical Meetings**

Goldinger JM, Hong SK, Paganelli CV, Choo YE, Sterba JA.  Effect of hydrostatic pressure on sodium transport in human erythrocytes.  *The Physiologist* 1978;21:45.

Sterba JA, Lundgren CEG.  Influence of water temperature on breath-holding time in man.  *Undersea Biomedical Research* 1979;6(suppl):29-30.

Lundgren CEG, Sterba JA.  Influence of the diving response and submersion on the breath-holding time in man.  *Undersea Biomedical Research* 1981;8(suppl):46.

Sterba JA, Rinkema LE, Randall WC, Jones SB, Brynjolfsson G.  Overdrive suppression of atrial pacemaker tissue following cardiac denervation before and after sinoatrial node excision.  *The Physiologist* 1982;25:198.

Sterba JA.  Evaluation of underwater impulse noise (Explosions) on hearing in divers.  *Undersea Biomedical Research* 1988;15(suppl):80.

Braun JR, Sterba JA.  Diver monitoring systems, on-line and portable for thermal and metabolic measurements.  *Undersea Biomedical Research* 1989;16(suppl):49.

Braun JR, Sterba JA.  Cold water swimming flume: Design and operation.  *Undersea Biomedical Research* 1989;16(suppl):49-50.

Sterba JA. A method to determine accuracy in breath-to-breath end-tidal gas analysis.  *Undersea Biomedical Research* 1989;16(suppl):54-55.

Sterba JA.  Cold water thermal protection:  A comparative study.  *Undersea Biomedical Research* 1989;16(suppl):58.

Sterba JA, Guillaume LS.  Carbon dioxide retention, helmet pressure and dyspnea using Superlite-17 during heavy underwater exercise at 190 FSW.  *Undersea Biomedical Research* 1989;16(suppl):94-95.

Sterba JA.  Efficacy and safety of inhalation and peripheral rewarming techniques for the field treatment of mild hypothermia.  *Undersea Biomedical Research* 1990;17(suppl).

Sterba JA.  Oxygen consumption during free-swimming in 2°C water wearing dry suits and using MK-15 underwater breathing apparatus.  *Undersea Biomedical Research* 1990;17(suppl).

Sterba JA.  Physiological comparison of two actively heated tube suits for cold water diving.  *Undersea Biomedical Research* 1990;17 (suppl).

Sterba, JA, CP Michlin, BC Smith, FJ Cerny. Pre-exercise breathing of vapor-phase, warm, humidified air (Vapotherm™) increases running time in well-conditioned track athletes. *Medicine and Science in Sports and Exercise*. Vol 32, No. 5(suppl), May, 2000, 668.

Sterba, JA, BT Rogers, AP France, DA Vokes. Effect of horseback riding on Gross Motor Function Measure (GMFM) in children with cerebral palsy. *Developmental Medicine & Child Neurology* 2000: 83(suppl) Vol. 42, page 47.

Sterba, JA. Effect of adaptive downhill skiing on Gross Motor Function Measure scores in children with cerebral palsy. *Developmental Medicine & Child Neurology* 2004: No. 99 (suppl), Vol. 46, page 46.

Sterba, JA. Effect of horseback riding therapy on Gross Motor Function Measure for each level of disability in children with cerebral palsy. *Developmental Medicine & Child Neurology* 2004: No. 99 (suppl), Vol. 46, page 47.

Sterba, JA, D Safar-Riessen, M DeForest. Effect of aquatic therapy on Gross Motor Function Measure in children with cerebral palsy. *Developmental Medicine & Child Neurology* 2004: No. 99 (suppl), Vol. 46, page 47-48.


**ARTICLES and TEXTBOOK CHAPTERS**

Sterba JA, Rinkema LE, Randall WC, Jones SB, Brynjolfsson G.  The influence of cardiac denervation on subsidiary atrial pacemaker stabilization following sinoatrial node excision.  *American Journal of Physiology* 1984;247 (Heart Circ. Physiol 16):H523-530.

Sterba JA, Lundgren CEG.  Diving bradycardia and breath-holding time in man. *Undersea Biomedical Research* 1985;12:139-150.

Sterba JA.  Medical tips for mountain skiing.  *Trident Tides* 1986;10:7.

Sterba JA.  Diving Medicine, Hypothermia (Chapter Eight) and Dangerous Marine Animals (Appendix I)  *U.S. Navy Diving Manual*, Volume One, 1988.

Sterba JA, Lundgren CEG.  Breath-hold duration in man and the diving response induced by face immersion.  *Undersea Biomedical Research* 1988;15, No. 5, pp 361-75, 1988.

Sterba JA (Contributing Editor).  American Red Cross.  *First Aid, Responding to Emergencies*.  Mosby Year Book, St. Louis, MO, 1991.

Sterba JA.  Efficacy and safety of pre-hospital rewarming techniques to treat accidental hypothermia.  *Annals of Emergency Medicine* 1991; 20:896-901.

Sterba JA.  Emergency Department resuscitation protocol for accidental hypothermia.  *Wright State University School of Medicine, Department of Emergency Medicine*, 1991.

Sterba JA.  Chapter 12: Thermal problems, prevention and treatment.  In: Bennett PB, Elliott DA (Eds.).  *The Physiology and Medicine of Diving*, Fourth Edition. W.B. Saunders Co., Ltd., London, 1993.

Sterba, JA.  Arctic cold weather medicine and accidental hypothermia.  In: Underwater Construction Team (UCT) *Arctic Operations Manual*, NAVFAC P-992.  Naval Facilities Engineering Command, 200 Stovall St., Alexandria VA, June, 1994.

Sterba, JA, BT Rogers, AP France, DA Vokes. Horseback riding in children with cerebral palsy: effects on gross motor function. *Developmental Medicine & Child Neurology* 2002, 44: 301-308.

Sterba, JA.  Adaptive downhill skiing therapy in children with cerebral palsy: effect on gross motor function.  *Pediatric Physical Therapy*. 2006 Winter; 18(4):289-96.

Sterba, JA.  A Review: Does Horseback Riding Therapy or Therapist-Directed Hippotherapy Rehabilitate Children with Cerebral Palsy? *Developmental Medicine & Child Neurology* 2007, 49: 68-73.

Sterba, JA. Wound Care on the Go. 'Portable ER' Allows Physician to Reinvent House Calls.  *Today's Wound Clinic*. 2012, September: 18-21.

**REFERENCE BOOKS AND TEXTBOOKS**

Sterba, JA and JE Sterba. *The Complete Handbook for Parents with Disabled Children.* American Christian Writers (ACW Press), Phoenix, Arizona, 2002.

Sterba, JA and JE Sterba. *Sports Therapy and Recreational Programs for Children with Disabilities.* The Center for Sports Therapy Research, Inc., East Aurora, NY, 2004.

Sterba, JA and JE Sterba.  *Equipping for Disasters, Sheltering at Home. Handbook of Preparation & Encouragement.*  Saved by Grace Ministry, Inc., East Aurora, NY, 2007; 134 pages.

Sterba, JA and JE Sterba.  *Textbook of Equipping for Disasters, Sheltering at Home.*  Revised & Expanded, Second Edition.  Saved by Grace Ministry, Inc., East Aurora, NY, March 23, 2010; 249 pages.

Sterba, JA and JE Sterba.  *Textbook of Equipping for Disasters, Sheltering at Home.*  Revised & Expanded, Third Edition.  Saved by Grace Ministry, Inc., 226 Center Rd., East Aurora, NY 14052, March 30, 2012; 249 pages.

Sterba, JA and JE Sterba.  *Textbook of Equipping for Disasters, Sheltering at Home.*  [Kindle Edition] Revised & Expanded, Third Edition.  Saved by Grace Ministry, Inc., 226 Center Rd., East Aurora, NY 14052, 376 pages.  Published electronically by Amazon.com for Kindle Books (eBooks) on June 30, 2012.  See http://www.amazon.com/Textbook-Equipping-Disasters-Sheltering-ebook/dp/B008EL8MFM/ref=sr_1_1?s=books&ie=UTF8&qid=1341936149&sr=1-1&keywords=First+Aid.

Sterba, JA and JE Sterba.  *Textbook of Equipping for Disasters, Sheltering at Home.*  Revised & Expanded, Fourth Edition.  Saved by Grace Ministry, Inc., 226 Center Rd., East Aurora, NY 14052, November 5, 2016; 249 pages.

**INSTRUCTIONAL BOOKLETS**

Sterba, JA and JE Sterba. *Home Preparation Guide for Disasters and National Emergencies.*  The Center for Sports Therapy Research, Inc., East Aurora, NY, 2004.

Sterba, JA and JE Sterba. *Home Preparation Mini-Guide for Disasters and National Emergencies.*  The Center for Sports Therapy Research, Inc., East Aurora, NY, 2004.

Sterba, JA. *Home Care Instructions for Common Illnesses and Injuries.* The Center for Sports Therapy Research, Inc., East Aurora, NY, 2004.

Sterba, JA.  *Mission Guide: Cachón and Barahona Province, Dominican Republic.*  Saved by Grace Ministry, Inc., East Aurora, NY, 2006.

Sterba, JA.  *Mission Guide: Caribbean and Central America.*  Saved by Grace Ministry, Inc., East Aurora, NY, 2009.

**MEDICAL REPORTS**

Sterba, JA.  *Kamakwie Wesleyan Hospital.  Assessment of Needs Report, April 24, 2004.*  The Center for Sports Therapy Research, Inc., East Aurora, NY, 2004.

Sterba, JA.  *Healthcare Services in Honduras.*  The Center for Sports Therapy Research, Inc., East Aurora, NY, 2004.

Sterba, JA.  *Jehová Jireh Ministry and Healthcare, Faith, Hope & Love Christian Medical Center: Project Summary.*  Saved by Grace Ministry, Inc., East Aurora, NY 2006.

Sterba, JA. *Project Summary. Faith, Hope and Love Christian Medical Center, Cachón de Barahona, Dominican Republic.* Saved by Grace Ministry, Inc., East Aurora, NY 2006.

Sterba, JA. *Mission Summary for Donations.* The LORD's Hospital, Centro Medico Cristiano, Fe, Esparanza y Amor (Faith, Hope and Love Christian Medical Center) Cachón de Barahona, Dominican Republic. Saved by Grace Ministry, Inc., East Aurora, NY 2006.

Sterba, JA. *Jehová Jireh Ministry and Healthcare, Faith, Hope & Love Christian Medical Center: Plan of Action & Milestones (POA&M).* Saved by Grace Ministry, Inc., East Aurora, NY 2006.

Sterba, JA. *Jehová Jireh Ministry and Healthcare, Faith, Hope & Love Christian Medical Center: Medical and Surgical General Supplies Inventory.* Saved by Grace Ministry, Inc., East Aurora, NY 2006.


**SCIENTIFIC SYMPOSIA**

Sterba JA. Field management of accidental hypothermia during diving. In: Bennett PB, Moon RE (eds.) *Diving Accident Management.* Undersea and Hyperbaric Medical Society, Workshop 41, UHMS Publication Number 78 (DIVACC) 12/1/90, December 1990, Bethesda, MD.

Romet T, Sterba JA, Nishi R (eds.). *Diver Thermal Protection.* Defense and Civil Institute of Environmental Medicine (DCIEM), 1991, Downsview, Ontario, CANADA.


**MILITARY TECHNICAL REPORTS: Not Classified**

Sterba JA. Evaluation of an impulse noise producing underwater tool on hearing in divers. *Navy Experimental Diving Unit* (Panama City, FL) Report 5-87. June, 1987.

Sterba JA. Evaluation of an impulse noise producing underwater explosive device on hearing in divers. *Navy Experimental Diving Unit* (Panama City, FL) Report 10-87. July, 1987.

Brewster DF, Sterba JA. Market survey of commercially available dry suits. *Navy Experimental Diving Unit* (Panama City, FL) Report 3-88. February, 1988.

Sterba JA. Evaluation of the integrated pneumatic system (IPS) suit for concept and experimental protocol. *Navy Experimental Diving Unit* (Panama City, FL) Technical Memorandum 88-04. July, 1988.

Ashton G, Sterba JA. Audible recall device. *Navy Experimental Diving Unit* (Panama City, FL) Report 2-89. March, 1989.

Sterba JA, Hanson RS, Stiglich JF. Diver thermal protection insulation, compressibility and absorbency. *Navy Experimental Diving Unit* (Panama City, FL) Report 10-89. August, 1989.

Sterba JA. Field management of accidental hypothermia during diving. *Navy Experimental Diving Unit* (Panama City, FL) Report 1-90. February, 1990.

Sterba JA. Arctic cold weather medicine and accidental hypothermia. *Navy Experimental Diving Unit* (Panama City, FL) Report 2-90. March, 1990.

Sterba JA. Physiological evaluation of two diver active *thermal systems (ATS): S-TRON and ILC-Dover. Navy* Experimental Diving Unit (Panama City, FL) Report 3-90. March, 1990.

Wallick MT, Sterba JA. Human factors evaluation and hand dexterity measures for two diver active thermal systems (ATS): S-TRON and ILC-Dover. *Navy Experimental Diving Unit* (Panama City, FL) Report 5-90. April, 1990.

Sterba JA. Efficacy and safety of inhalation and peripheral rewarming techniques for the field treatment of mild hypothermia. *Navy Experimental Diving Unit* (Panama City, FL) Report 9-90. May, 1990.

Braun JR, Sterba JA. Diver monitoring systems, on-line and portable for thermal and metabolic measurements. *Navy Experimental Diving Unit* (Panama City, FL) Report 10-90. May, 1990.

Sterba JA. Oxygen consumption during underwater fin swimming wearing dry suits. *Navy Experimental Diving Unit* (Panama City, FL) Report 11-90. May, 1990.

Sterba JA. Hypercapnia during deep air and mixed gas diving. *Navy Experimental Diving Unit* (Panama City, FL) Report 12-90. May, 1990.

Sterba JA. A method to determine accuracy in end-tidal carbon dioxide monitoring. *Navy Experimental Diving Unit* (Panama City, FL) Report 13-90. May, 1990.

Sterba JA. Field repair guide for Viking and Diving Unlimited International dry suits. *Navy Experimental Diving Unit* (Panama City, FL) Report 14-90. June, 1990.

**NEWS PAPER & WEB-BASED ARTICLES, PRESS RELEASES, TELEVISION AND RADIO**

"Focus: Health. Sterba Provides In-Home Emergency Medical Care", *East Aurora Advertiser*, Thursday, June 18, 2009.

"Replenishing our Portable ER Supplies", *The Medical Society Bulletin*, Counties of Erie and Chautauqua, Summer, 2010, page 14.

"Testimonial: Dr. John Sterba Says PennySaver Ad Works", *PennySaver*, December 12, 2010.

"EA's Sterba Makes Old-Fashioned House Calls", *East Aurora Bee*, Thursday, April 28, 2011.

"Physician House Calls Provides Free Labs, at Home & at Work" *PennySaver*, May 1, 2011.

"Focus: Health.  Free Point of Care Labs Offered in East Aurora.  Sterba can do Blood Tests Onsite", *East Aurora Advertiser*, Thursday, May 19, 2011.

"Dr. Sterba to Talk About Service.  Physician House Calls", *The Orchard Park Press,* Friday, February 17, 2012.

"Dr. Sterba to Speak at St. John's Church.  Emergency Care and Immediate Urgent Care by Physician House Calls", *PennySaver East Aurora - Elma* Sunday, February 19, 2012.

Dr. Sterba to Speak at St. John's Church.  Emergency Care and Immediate Urgent Care by Physician House Calls", *PennySaver West Seneca,* Sunday, February 19, 2012.

"Dr. Sterba to Speak at St. John's Church.  Emergency Care and Immediate Urgent Care by Physician House Calls", *PennySaver Orchard Park,* Sunday, February 19, 2012.

"Healthcare Delivery Models Are Changing – A New Model as Practiced by "Dr. John" ", April 9, 2012, Linda Brodsky, M.D., http://thebrodskyblog.com/?p=2623.

"Focus: Health.  House Call Services is Growing.  Sterba Offers Care at Home for Local Residents", *East Aurora Advertiser*, Page 14, Thursday, May 17, 2012.

"Focus: Health.  Physician House Calls.  Faster, Better and Cheaper Than Your Doctor (PA, NP) or Urgent Care or the Over-crowded E.R.", *East Aurora Advertiser*, Page 14, Thursday, August 16, 2012.

"Physician House Calls and the Portable ER; Equipping for Disasters" Christian TV, TCT (WNYB, Buffalo, NY) "*The Public Report*", Host, Mr. Larry Wiggins. Aired Saturday (12/1/12) at 2:30 PM.

"Free Flu Shots Are Available" *East Aurora Advertiser*, Page 10, Thursday, January 31, 2013.

"Caregivers Support Group provides comfort, resources" *East Aurora Bee*, Page 19, Thursday, March 7, 2013.

"In-home Seminar, Equipping for Disasters. Sheltering at Home" *PennySaver East Aurora-Elma, Orchard Park and West Seneca,* Sunday, October 12, 2014.

"'Portable ER' Allows for Modern Day House Calls" *East Aurora Advertiser*, Page 11, Thursday, May 21, 2015.

"**Emergency Physician House Calls**™ using the **PORTABLE ER**®; Equipping for Disasters" Christian TV, TCT's (WNYB, Buffalo, NY) "*Celebrate*" TV Show aired Friday, January 29, 2016 at 5:30 P.M.

"**Emergency Physician House Calls**™ using the **PORTABLE ER**®" WWKB, ESPN Radio, 1520 AM, Buffalo, NY. "*Planting Seeds*" Radio Show. Host: Jill O'Hara, RN, aired August 27, Saturday, 2016, 9:30 -10:00 AM.  See the link: **http://media.espn1520.com/hosting/media/wwkb/1642872/116522444/planting-seeds-8-27-16-116522444.mp3**

**Saved by Grace Ministry, Inc.**
226 Center Road
East Aurora, NY 14052-2233   USA

## CONFIDENTIAL

**Report:**
**Emergency Medicine, Cardio-Pulmonary Physiology and**
**Forensic Summary of Injuries with Causation Sustained by**
**Tavares L. Docher on May 11, 2014**

**Author:**
**John A. Sterba, M.D., Ph.D., FACEP, FACFEI**
**President & CEO, Medical & Scientific Director,**
**NYS DOH Clinical Laboratory Director**

**Date: May 22, 2017**



EXHIBIT
PENGAD 800-631-6989
#2
7/19/17 DC3

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

# Saved by Grace Ministry, Inc.
## 226 Center Road
## East Aurora, NY 14052-2233   USA

**Table of Contents**                                                                    **Pages**

1.  "Complete statement of all opinions the witness will express and          1 - 14
        the basis and reasons for them with facts or data considered
        by the witness in forming them"

2.  "Exhibits (and References) that will be used to summarize or                 15
        support them"

3.  "Witness's qualifications, including a list of all publications authored     16
        in the previous 10 years"

4.  "List of all other cases in which, during the previous 4 years, the          17
        witness testified as an expert at trial or by deposition"

5.  "Statement of the compensation to be paid for the study and testimony        18
        in the case"

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page One

**"Complete statement of all opinions the witness will express and the basis**

**and reasons for them with facts or data considered by the witness in forming them"**

**Forensic Summary and Opinions**

On May 11, 2014 (Sunday), Mr. Tavares L. Docher, a 29 year old African-American male at the time, asked CVS Pharmacy staff to call 911 in fear that his mother and he would be murdered by the Arabs.[1,2] Sheriff's Office (SO) Officers and eye witnesses observed Mr. Docher to be agitated and delusional.[1,2] An SO Officer smelled that Mr. Docher had been drinking alcohol, mentioned in his report to be "Natty",[2] which is Natural Ice beer (Anheuser-Busch, Missouri) having a high-alcohol content of 5.9% alcohol.

Mr. Docher was arrested for alcohol intoxication with disorderly conduct, i.e. the charge of "Disorderly Intoxication". In addition, Mr. Docher was determined by SO Officers to be a Police 10-Code "10-96", a "Mental Patient".[2]

Mr. Docher was hand-cuffed behind his back using hard metal hand-cuffs by SO Officers, and then he was placed into the SO Police cruiser.[2] Mr. Docher then escaped, tried to thrust his knee into an SO Officer. He ran with three SO Officers hanging onto him 8-10 feet before forcibly being taken to the ground still wearing SO Officer's hand-cuffs behind his back, unable to protect his head from his subsequent blunt-force trauma.[2] Thereafter, Mr. Docher resisted being arrested; he spit, kicked and tried to bite

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*,
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Two

SO Officers, who then charged Mr. Docher with additional counts of "Battery/Assault on

a Law Enforcement Officer (LEO), Escape, and Resisting Arrest with Violence".[2.]


After being taken to the ground forcibly by the SO Officers with further physical

restraint placed upon Mr. Docher by SO Officers including resisting strikes to his face,

head, chest and major muscles of his right and left gluteal (buttocks & lower back)

muscles,[2.-4.] Mr. Docher was later documented to have eight (8) multiple blunt-force

trauma injuries to his head, chest, back/buttocks and extremities by the emergency

physician (EP) at St. Lucie County Medical Center emergency department (ED)[5.],

specifically:

1.  Head laceration to the right side of his head in the temporal region;

2.  Several abrasions on the extremities bilaterally;

3.  Larger abrasions on left shoulder, left ear, left cheek;

4.  Fractured right clavicle (collarbone);

5.  Head bilateral, depressed fractures of the facial nasal bone;

6.  Extensive soft tissue swellings of the gluteal region (buttocks/lower back)
    right worse than left;

7.  Extensive soft tissue swelling over the face; and

8.  Destruction of skeletal muscles releasing muscle proteins into Mr.
    Docher's circulation (rhabdomyolysis).

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Three

Regarding Mr. Docher's admitted ingestion of alcohol and the smell of alcohol on his breath[2], laboratory testing at St. Lucie County Medical Center ED ordered by the EP confirmed Mr. Docher had been drinking alcohol with a measured Blood Alcohol Level (BAL) of 38mg/dl (0.038%), which is below the Florida State legal limit of 0.08%.[5] At this BAL, the smell of alcohol on Mr. Docher's breath is very possible, more likely than not, which was indeed observed and documented by the SO Officer (Deputy Newman)[2], plus mentioned to and likewise documented in the EMS record by José Rosario, EMT-P (paramedic).[6], despite José Rosario, EMT-P [6] not smelling the alcohol himself.[2]


Later in the hospital ED, due to the nature of this cardio-pulmonary arrest, the EP was not able to determine or document the complete medical history of the timing or amount of Mr. Docher's last drink of alcohol (ethanol), or how many Natural Ice beers he had, or whether or not Mr. Docher acutely abused ethanol that day, or possibly ingested any other toxic alcohols (e.g. methanol, moon-shine, ethylene glycol, etc.), or if he was an alcoholic, or if he had any history of alcohol dependence, alcohol-abuse or other drug-abuse, or any history of either alcohol-withdrawal or drug-withdrawal, or any history of alcohol detoxification, or if Mr. Docher had suffered today or in the past from Delirium Tremens (DT's), Wernicke's Encephalopathy or malnutrition.  There no mention of Mr. Docher being prescribed or otherwise taking any anti-psychotic prescriptions, or taking any other prescriptions, anyone else's prescriptions, or taking illicit medications.[5]  Mr. Docher's initial fear of his mother or he being chased to be murdered by Arabs was never forensically confirmed to be true; it was a true psychiatric delusion.[5]

*Saved by Grace Ministry, Inc., A Faith Based Organization Telling, Caring and Helping*
**(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com**
**Website: www.PhysicianHouseCalls.org**

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Four

In the field, prior to Emergency Medical Services (EMS) arriving[1,-7], Mr. Docher had resisted arrest, escaped, and was forcibly taken to the ground with multiple blows by the SO Officers.[1,-4] Mr. Docher was documented to have sustained multiple blunt-force trauma to his head (lacerated right temporal area, bilateral fractures of facial nasal bone, contusions of the face), his chest (fractured collar bone, contused shoulder), his extremities (abrasions), and his lower back/buttocks with severe skeletal muscle damage.[5] On the ground, still hand-cuffed by SO Officers with his hands behind him,[1,-2] Mr. Docher was observed to be lying with a pool of blood above his head, plus there was blood from his head, nose and mouth while he was prone (face-down).[1]

Shortly before EMS arrived at an unknown time, Mr. Docher suddenly lost consciousness (unknown duration) as witnessed by the SO Officers.[2] He was placed on his side in the recovery position awaiting EMS.[2]

Prior to EMS arriving, Mr. Docher's condition in the field at this point was critical and unstable   This is based on five on-going problems, summarized below:

1. Alcohol ingestion of hard liquor then Natural Ice beer[2], amounts and

   timing unknown;

2. Suspected drug-abuse of an unknown drug(s) resulting in Mr. Docher's

   delusional state with agitation and fighting with extreme exertion resisting

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

## Saved by Grace Ministry, Inc.
### 226 Center Road
### East Aurora, NY 14052-2233   USA

Page Five

arrest, which required three SO Officers to take him down and keep him down in the prone position.  There were minor injuries sustained by SO Officers;[1.-4.]

3.      Delusion and paranoia in fear of being killed with a likely psychiatric (mental) medical condition ("10-96, "Mental Patient");[2.]

4.      Blunt-force head trauma with bleeding;[1.-4.] and

5.      Sudden loss of loss of consciousness[2.] with Mr. Docher going into some form of shock, more likely than not, with these SO Officers waiting for EMS.

Upon arrival of EMS, Mr. Docher was initially assessed by José Rosario, EMT-P at 18:36 (6:36 PM) with Mr. Docher still on the ground, restrained.  José Rosario, EMT-P observed and documented head trauma with a bleeding laceration on the right side of his head.[6.]  There was a pool of blood above Mr. Docher's head and there was blood in the patient's nose and mouth.[6.]

Initial assessment by José Rosario, EMT-P was the patient was resisting the SO Officers who were subduing him.  The patient's airway was patent (opened), respirations were rapid (abnormal), radial pulse (at the wrist) was rapid (abnormal), and the skin was moist (abnormal).  The Breathing Quality was fast 20-30 (breaths/minute).

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Six

Two minutes past José Rosario, EMT-P initial assessment, now at 18:38 (6:38 PM), José Rosario, EMT-P documented an abnormally fast respiratory rate (28 breaths/minute) with an abnormally fast heart rate (110 beats/minute), which is tachycardia of unknown cause; there was no four-lead ECG monitoring yet or documented.  The level of Mr. Docher's responsiveness was abnormally low; his Central Nervous System (CNS) was very depressed with him being responsive to *only* a painful stimuli documented by José Rosario, EMT-P.  At 18:38 (6:38 PM), there was no measurement or any attempt to measure the blood pressure or pulse oximetry with Mr. Docher still on the ground restrained by SO Officers.[6]

At this same point in time, 18:38 (6:38 PM), Mr. Docher was not stable; he was unstable and in critical condition.  He's still on the ground, lying on a long spine board (LSB), not yet on the gurney.  No EMS emergency treatments had been started such as any administration of high-flow oxygen by non-rebreather facemask or any other method for this trauma patient with a head injury, bleeding from the head and face, and a most-recent loss of consciousness with ongoing altered mental status, responsive only to pain.[6]

The second measured respiratory rate at 18:38 (6:38 PM) of 28 breaths/minute continued to be abnormally high, yet José Rosario, EMT-P incorrectly documents "Respiratory Effort: Normal" and there was no oxygen applied, or documented as such.[6]

It is now 18:39 (6:39 PM), three minutes past José Rosario, EMT-P initial assessment at 18:36 (6:36 PM).  Mr. Docher becomes "very combative" while lying

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

Page Seven

supine (face-up) on the hard long spine board (LSB) still on the ground.  Unknown by me on the date of this Report (May 22, 2017), was whether or not Mr. Docher may *still* have been hand-cuffed by SO Officers, behind his back, while lying on his hands on the EMS hard long spine board.  If so, this would have been very painful to Mr. Docher and may have agitated him further, plus this would have restricted his ability to breathe.

If José Rosario, EMT-P was using *only* these SO Officer's hard restraints (hand-cuffs) as his EMS restraining method, he violated strict EMS training and protocols in the approved use of EMS physical restraints.[8,9,12]  Hard, Police metal hand-cuffs, or even a Police zip-tie hand-cuffs, behind the back are expressly prohibited to be exclusively used by EMS for combative patients.  Police hard restraints (hand-cuffs) by themselves do *not* constitute EMS-approved physical restraints.[10,12]  Hand-cuffing behind the back of a patient is also expressly prohibited, whether the patient is prone (face-down), [10,12] or even supine (face-up). Even if the SO Officer's Police hand-cuffs *had* been removed, which was not documented, and hand-cuffs were *not* on Mr. Docher at this point in time (18:39, 6:39 PM), José Rosario, EMT-P recklessly disregarded the well-being and safety of Mr. Docher with his direct violation of his EMS training[8] and EMS Policies and Procedures.[9,10]  José Rosario, EMT-P failed to meet the EMS Standard-of-Care by *not* using available multiple SO Officers to keep Mr. Docher safely restrained on the EMS long spine board to allow José Rosario, EMT-P to then quickly and safely apply his available, EMS-approved, four-point soft restraints (both ankles then both arms) along

**Saved by Grace Ministry, Inc., A Faith Based Organization** *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Eight

with applying his EMS-approved Rayon across-the-chest straps (like seat-belts) onto the long spine board before moving Mr. Docher onto the gurney.[9,-10,12]

Even if SO Officers insisted that Mr. Docher remained hand-cuffed as he was under arrest, this could have been safely done in a coordinated team effort following EMS training and EMS Standard-of-Care.[8,-10, 12] For example, and there are other methods, Mr. Docher's right and left ankles and legs could have been restrained onto the long spine board by SO Officers so EMS soft-restraints could have been placed by José Rosario, EMT-P to prevent Mr. Docher from kicking anyone. Also at this time, EMS-approved Rayon across-the-chest straps could have been applied by José Rosario, EMT-P. The metal hand-cuffs could have been safely un-locked and removed by the SO Officers while they maintained control of both wrists and arms to prevent Mr. Docher from hurting himself or others. Next, one wrist should have been restrained using an EMS-approved soft restraint, allowing both wrists to be hard hand-cuffed together by SO Officers in front of Mr. Docher on one side. An SO Officer with a hand-cuff key could have then accompanied Mr. Docher to the hospital ED following EMS Standard-of-Care.[12]

In short, EMS-approved physical restraints *were never done* before José Rosario, EMT-P skipped this required step, recklessly going straight to chemically-restraining Mr. Docher with the highest 4 mg dose of lorazepam (Ativan®). Mr. Docher at this point in time was still unmonitored (no ECG), with no blood pressure taken or attempted (not documented in the EMS record), no pulse oximetry taken or attempted (not documented

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
226 Center Road
East Aurora, NY 14052-2233   USA

Page Nine

in the EMS record) with Mr. Docher still on the long spine board, on the ground, not on the gurney, and not yet in the ambulance.[6.,13.]

At this point in time, before lorazepam (Ativan®) was given by José Rosario, EMT-P, Mr. Docher was in a critical, unstable condition due to the following.  He was a combative, agitated patient with intoxication from alcohol (a CNS depressant[8.]), plus Mr. Docher was, more likely than not, on another drug suspected and testified by witnesses.[1.] and suspected by SO Officers[2] who warned José Rosario, EMT-P.[6.]  Mr. Docher had blunt-head trauma with temporal and facial bleeding with a preceding loss of consciousness.  Mr. Docher was identified by SO Officers as a "Mental Patient", being delusional at the time of being arrested.  Mr. Docher continued to be delusional, yelling that he was being killed.[1.,2.]  Mr. Docher had extreme physical exertion with his violent resistance while under arrest until he suddenly lost consciousness before EMS arrived.[2.]  More likely than not, Mr. Docher at this point in time was suffering from a metabolic disturbance of acidosis due to a buildup of lactic acid in his body, medically called "lactic acidosis", all prior to EMS arrival and prior to his eventual cardio-pulmonary arrest.

According to training and EMS Policies and Procedures, José Rosario, EMT-P in this high-risk situation was required to first contact Medical Control before using a strong CNS depressant, sedative-hypnotic, lorazepam (Ativan®).[8.,9.]  Had José Rosario, EMT-P spoken by radio directly to Medical Control, the emergency physician in the ED would *not have given any verbal order for lorazepam (Ativan®)* due to both contra-indications and the many high-risks for Mr. Docher explained below.  The EP would have directed

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Ten

José Rosario, EMT-P  to first safely apply four-point restraints and chest straps with all SO Officers assisting him, to begin high-flow oxygen by non-rebreather facemask (if tolerated, or blow-by oxygen) and to expedite transport to the ED with close cardio-pulmonary monitoring including ECG, pulse oximetry with frequent vital signs.  The documented short transport time from CVS (the scene) to St. Lucie Medical Center was only 8 minutes, 25 seconds.[6.].

Established EMS protocols list two contra-indications for using lorazepam (Ativan®), *both* of which existed for Mr. Docher.  He had **head trauma** and, more likely than not, the **metabolic disturbance of acidosis** from extreme physical exertion being chased, taken down and violently resisting and fighting after being arrested.

Established EMS training[8.] and EMS protocols[9.-11.] repeatedly warn basic EMT's (EMT-B) and EMT-P's there should be great caution when evaluating a patient that is intoxicated with alcohol because there are many other sedative hypnotic medications, including lorazepam, which can also cause respiratory depression and hypotension. EMT-P's must exercise great caution, or contact Medical Control, if considering whether or not to administer lorazepam (Ativan®), a potent CNS depressant sedative-hypnotic, to an agitated or combative patient that may already on other potent CNS depressant sedative-hypnotic(s), especially alcohol, or a drug-of-abuse, or a prescribed medication. Combining these sedative-hypnotics, in this case alcohol plus lorazepam (Ativan®)  can cause CNS depression, respiratory depression, a severe drop in blood pressure

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
226 Center Road
East Aurora, NY 14052-2233   USA

Page Eleven

(hypotension), cardiovascular collapse and death, all of which occurred and were caused by José Rosario, EMT-P.

The St. Lucie County Fire District's Emergency Medical Guidelines for Lorazepam (Ativan®) use[11.] are at fault for not being clearly and properly written, leading to improper training, practices and treatment in the field by EMT-P's.  José Rosario, EMT-P not only mis-understood his training, he disregarded his training and EMS Policies and Procedures.  He recklessly administered lorazepam (Ativan®) incorrectly by going straight to the maximum dose of 4 mg intra-muscularly (IM), *not* the required 1 mg in step-by-step (incremental) dosing of 1 mg each time, *if* the patient was indeed determined to be stable with close medical monitoring for any respiratory depression and hypotension.[8.-11.]  Furthermore, the EMS use of the maximum dose of 4mg lorazepam (Ativan®) either IM or intravenously (IV) is to be done *slowly*, 2 mg per minute,[12.] which was not done by José Rosario, EMT-P.  This 4 mg dose was administered by a *push*, all-at-once, not slowly over two minutes.  Following José Rosario, EMT-P administration of lorazepam (Ativan®) pushed at the maximum dose of 4 mg IM, while the patient was still on the ground on the long spine board, not on the gurney, and not in the ambulance with no monitoring and no oxygen, José Rosario, EMT-P failed to monitor the patient before and during these next three minutes when he thereafter suddenly noticed the Mr. Docher had gone into cardio-pulmonary arrest with no respirations and no pulse.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Twelve

Lorazepam has reported *wide ranges of times* for the onset of action for an IM injection, including (1-5 minutes), (2-5 minutes), (5-10 minutes), and up to (15-30 minutes).[9,-11,,12]   A patient such as Mr. Docher, more likely than not, went into respiratory and cardiac arrest caused by José Rosario, EMT-P rapidly administering such a high-dose (4 mg), of lorazepam (Ativan®), all-at-once, with Mr. Docher having both contra-indications for its use, plus being in a critical unstable condition from his existing medical and physiological problems discussed below.

Mr. Docher was unstable, in critical condition with other CNS depressants in his system (e.g. alcohol, possibly other drug(s)), with head trauma, a loss of consciousness, and more likely than not, he had the metabolic disturbance of metabolic acidosis with lactic acid potentiating the CNS and cardio-pulmonary effects of lorazepam (Ativan®) to rapidly cause this cardio-pulmonary arrest.  More likely than not, had 4 mg, IM of lorazepam (Ativan®) *not* been given, Mr. Docher would not have gone into cardio-pulmonary arrest.

In addition, there was no documentation that José Rosario, EMT-P *ever* aspirated after inserting the needle into the buttocks muscle by first pulling back on the syringe plunger to confirm he had not inadvertently inserted the needle into *a vein, or artery.* This was not only his training, it was critically medically necessary plus it is the EMS Standard-of-Care.  With such a rapid deterioration of Mr. Docher's unstable critical condition into cardio-pulmonary arrest three minutes after injection of the high 4 mg dose of lorazepam (Ativan®), more likely than not, this attempted IM injection was actually an

**Saved by Grace Ministry, Inc., A Faith Based Organization** *Telling, Caring and Helping*
**(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com**
**Website: www.PhysicianHouseCalls.org**

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Thirteen

IV injection in the buttocks, which would have produced a fast onset of action.  However, even if José Rosario, EMT-P did aspirate finding no venous or arterial blood, his IM injection of such a high-dose (4 mg) under these conditions would still have caused cardio-pulmonary arrest.

It is without medical and physiological truth or any basis to speculate that Mr. Docher would have gone into a cardio-pulmonary arrest in the next three minutes *anyway*, even without any rapid push of 4 mg lorazepam (Ativan®) IM, or inadvertently IV.

In the José Rosario, EMT-P Deposition, he admitted under oath to using lorazepam (Ativan®) 50-200 times, and more than half those times (i.e. > 25-100, times) he testified he always used this same single dose (4 mg, IM) of lorazepam (Ativan®).[13.]

Therefore, in this case of Mr. Taveras L. Docher when the maximum dose of lorazepam (Ativan®), 4 mg, was *not* properly administered by José Rosario, EMT-P *slowly* in 1 mg increments with careful monitoring after each 1 mg for respiratory depression and hypotension[9.-13.], *nor* did José Rosario, EMT-P properly administer this maximum 4 mg dose of lorazepam (Ativan®) *slowly* over two minutes (2 mg/minute) with close monitoring for respiratory depression and hypotension[9.-13.], then there may be other incidents including, but not limited to, respiratory depression, hypotension, cardio-pulmonary arrest, disability and even death caused by José Rosario, EMT-P administering 4 mg lorazepam (Ativan®).

**Saved by Grace Ministry, Inc., A Faith Based Organization** *Telling, Caring and Helping*
**(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com**
**Website: www.PhysicianHouseCalls.org**

**Saved by Grace Ministry, Inc.**
226 Center Road
East Aurora, NY 14052-2233   USA

Page Fourteen

In summary, lorazepam (Ativan®) administered to Mr. Docher by José Rosario, EMT-P was dangerous and against his EMS training, Policy and Procedures.  The St. Lucie County Fire District's Emergency Medical Guidelines for Lorazepam (Ativan®) use[11.] are at fault for not being clearly and properly written, leading to improper training, wrongful and dangerous practices and treatment in the field by EMT-P's.

Therefore, In Mr. Docher's case, José Rosario, EMT-P knowingly acted with reckless disregard.   José Rosario, EMT-P caused chemical asphyxiation, cardio-pulmonary arrest, and subsequent disability in Mr. Docher.

Respectfully submitted,

John A. Sterba, M.D., Ph.D., FACEP, FACFEI
President & CEO; Medical & Scientific Director; NYS DOH Clinical Laboratory Director,
        Saved by Grace Ministry, Inc.  **Emergency Physician House Calls**™ using the
        **PORTABLE ER**®
Commander, Medical Corps, U.S. Navy-Reserves (Hon Disch), Undersea & Arctic Warfare,
        Operational Medicine
May 22, 2017
East Aurora, NY

**Saved by Grace Ministry, Inc., A Faith Based Organization** *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Fifteen

**"Exhibits (and References) that will be used to summarize or support them"**

1. St. Lucie County Sheriff's Office Statement Forms and DVD Cell Phone Videos of Mr. Docher's arrest
2. St. Lucie County Sheriff's Office, Incident/Investigation Report
3. Use of Force Incident Report Number: 14-05401
4. Hand-written notes by SO Officers
5. St. Lucie Medical Center, Emergency Provider Report
6. EmergencyPRO, Saint Lucie County Fire District
7. E-911 Audio/CAD Records, Communications, Event Report
8. "*Emergency Care and Transportation of the Sick & Injured*" EMS Textbooks, Eight Edition (© 2002) and Ninth Edition (© 2005)
9. Emergency Medical Guidelines, Fourth Edition, Plaintiff's Exhibit 1
10. Patient Restraint in Emergency Medical Services.  Approved by the NAEMSP® Board of Directors: 20 December 2016. Pages 1-3
11. St. Lucie County Fire District's Emergency Medical Guidelines for Ativan Use, Rev. 12/18/2012, with letter from Brian Blizzard, Deputy Chief to Janite Docher-Neeley, dated June 17, 2014
12. Report, Jeffrey T. Lindsey, Ph.D., PM ("EMT-P") with enclosures, dated May 1, 2017
13. Deposition, José Rosario, EMT-P, on April 13, 2017

**Saved by Grace Ministry, Inc., A Faith Based Organization** *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

### Saved by Grace Ministry, Inc.
#### 226 Center Road
#### East Aurora, NY 14052-2233   USA

Page Sixteen

**"Witness's qualifications, including a list of all publications authored in the previous 10 years"**.

**Summary.**  (Please refer to Curriculum Vitae, attached)

**EMS Work Experience.**  EMT training Indian River Community College (1973). Registered EMT-Ambulance in Florida, Illinois, Wisconsin and New York States. Worked full-time in college and graduate School 1973-1981 as EMT-A on Paramedic Ambulances Services.

**EMS/Emergency Medicine (EM) Research:**  Principal Investigator of cardiovascular and pulmonary effects of asphyxiation. Ph.D. awarded with Distinction in Physiology, 1985, SUNY at Buffalo.

 *1981*

**National Institutes of Health (NIH) Post-doctoral Fellowship, Cardiology and Cardiovascular Physiology Research.** Focus on neuro and endocrine regulation of cardiovascular function and pacemakers with stable and unstable physiological conditions.  Department of Physiology, Loyola Stritch School of Medicine, 1981-1982.

**Medical School with focus on EM.**  1981-1985, Loyola Stritch School of Medicine.

**Medical Missionary Training in EM and Worldwide Health in Developing Countries:**  St. Lucia, West Indies, 1985 with Loyola Stritch School of Medicine.

**Emergency Medicine Training and Work Experience.**

Trained in Emergency Medicine (Internship), United States Navy, Naval Hospital Bremerton, WA, 1985-1986.

Trained in Undersea Medicine (Emergency Medicine during diving and submarine operations) and EM duty in the emergency department (ED), U.S. Navy, 1985-1986

Emergency Physician, U.S. Navy.  Principal Investigator with human medical and physiological research including asphyxiation.  EM duty in the ED. EMT/Corpsman Clinical Instructor, U.S. Navy, 1986-1990.

EM Residency and Emergency Physician, EMS Advisor, 1990-1993, Dayton, OH; EMS Medical Director, 1993.

Emergency Physician and Clinical Instructor of physicians, nurse practitioners, physician assistants and paramedics, 1990-present.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**

Page Seventeen

**"List of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition"**

Cases Currently Providing Expert Testimony
1. Alain Perez v. Palmetto General Hospital, May 3, 2016, Mr. Robert C. Tilghman, Esq.

Depositions Past Five Years
1. Kenneth M. Beamon vs. Marc Coan, M.D., et al., February 29, 2012, Michael Terrell, Esq., Michael Terrell, Esq., Terrell Law Firm, P.C., 3405 Dallas Highway, Suite 827, Marietta, GA 30064
2. Lucia Moreno v. Kendal Regional Medical Center, Cherryl LeBlanc, M.D., et al., July 21, 2014, Robert C. Tilghman, Esq.
3. Coterel v. Dorel Juvenile Group, October 10, 2014, J. Brad Wilmoth, Esq.
4. Denise A. Pierre v. Holy Cross Medical Center, November 4, 2014, Robert C. Tilghman, Esq.
5. Alain Perez v. Palmetto General Hospital, May 3, 2016, Mr. Robert C. Tilghman, Esq.

Trials past Five years
1. Kenneth M. Beamon vs. Marc Coan, M.D., April 10, 2012, Michael Terrell, Esq. Terrell Law Firm, P.C., 3405 Dallas Highway, Suite 827, Marietta, GA 30064
2. Coterel v. Dorel Juvenile Group, March 2-5, 2014, J. Brad Wilmoth, Esq.

**Saved by Grace Ministry, Inc., A Faith Based Organization** *Telling, Caring and Helping*
**(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com**
**Website: www.PhysicianHouseCalls.org**

## Saved by Grace Ministry, Inc.
### 226 Center Road
### East Aurora, NY 14052-2233   USA

Page Eighteen

**"Statement of the compensation to be paid for the study and testimony in the case"**

$350.00/hour for medical, physiological and forensic review, excluding clerical work.
$2,000.00 flat fee for Depositions
$2,000.00 per day for Trial plus $1,000.00 per day for travel day(s) outside of trial days

All payments are to please be made payable to the Public Charity, "Saved by Grace Ministry, Inc.", sent to the address, above. Thank you.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**
**WORKSHEET**
CASE: Tavares Docher Medical-legal Case
Attorneys, Darryl L. Lewis, Esq. and John Scarola, Esq,
Medical-legal Consultation by: John A. Sterba, M.D., Ph.D., FACEP

EXHIBIT
#3
7/19/17 ots

| DATE | WORK and CONTACTS | DISCUSSION/TASKS | TIME(HR) |
|------|-------------------|------------------|----------|
| 12/2/14 | PC, D. Lewis, Esq. | Requested Forensic Examination | 0.3 |
| 12/12/14 | PC, Anne Marie, Sec. | Sent W-9, CV, Florida Medical Expert Certificate | 0.1 |
| 12/15/14 | PC, Anne Marie, Sec. | Disc'd records being sent, FedEx | 0.1 |
| 12/19/14 | (Rec'd records, retainer) | Rec'd records and 3.0 hr. retainer | (-3.0) |
| 12/22/14 | RR, --- | Rev'd Photos-Tavares Docher, Hand-written 2-pg. notes (Newman-#280, Robinson-#314, Mangrum-#213), DVD-Docher 911Audio recordings with e-911 Audio/CAD Records, Consent To Search/Search Warrant Waiver (cell-phone), Intro LE Ops, Statement Forms-3 CVS Employees and 1 Outside Witness, Use of Force Incident, Incident/Investigation Rpt, St. Lucie Hosp. ED, Emergency/PRO (EMS), Bystander cellphone videos, WPBF News article, | 2.9 |
| 12/23/14 | RR, --- | Rev'd Hand-written notes, Transition/ Discharge Plan (New Horizons), SSI, St. Lucie Fire Dist. EMS Guidelines-Ativan, PINAC article | 0.7 |
| 12/23/14 | RR, --- | Rev'd some records | 1.7 |
| 12/24/14 | RR, --- | Rev'd rest of records, sent to date | 2.4 |
| 12/24/14 | PC, D. Lewis, Esq. | Left message on case, requesting Missing medical records | 0.1 |
| 1/5/15 | PC, D. Lewis, Ann Marie | Req'd missing medical records, Disc'd Case | 0.3 |
| 1/6/15 | RR, --- | Rev'd some records | 0.6 |
| 1/6/15 | PC, D. Lewis, Esq. | Disc'd case.  Req'd CVS video, Full medical records, & eye witness information/testimony before EMS | 0.5 |

Hours submitted on 1/6/15                    Total hours = 9.7 hrs.–3.0 hrs. retainer = 6.7 hrs.


**WORK KEY**: PC: (phone conversation), LS/R: (literature search/review), MR: Medical
Records; FR: Forensic Records; RR: (records review), D: (deposition), LTR: letter, FEDEX:
Federal Express mailing.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

## Saved by Grace Ministry, Inc.
### 226 Center Road
### East Aurora, NY 14052-2233   USA
### WORKSHEET

CASE: Tavares Docher Medical-legal Case

Attorneys, Darryl L. Lewis, Esq., Adam S. Hecht, Esq., Michael H. Kugler, Esq.

Medical-legal Consultation by: John A. Sterba, M.D., Ph.D., FACEP

| DATE | WORK and CONTACTS | DISCUSSION/TASKS | TIME(HR) |
|------|-------------------|------------------|----------|
| 4/12/17 | PC, A. Hecht, Esq. | Rev'd case briefly | 0.5 |
| 4/19/17 | RR, --- | Rev'd EMS/LE records | 0.5 |
| 4/19/17 | RR, --- | Rev'd partial Depo, J. Rosario | 1.4 |
| 4/19/17 | RR, --- | Rev'd partial Depo, J. Rosario | 1.0 |
| 4/20/17 | RR, --- | Rev'd Depo, J. Rosario | 0.5 |
| 4/20/17 | LS/R, --- | EMT-P LS/R | 0.3 |
| 4/20/17 | PC's, A. Hecht, Esq., Sec. | Re: Depo (J. Rosario), Req'd phone call from Mr. Hecht; Set-up Conf. Call, D. Lewis, Esq., A. Hecht, Esq., and M. Kugler, Esq., 4/21/17 | 0.1 |
| 4/20/17 | PC, A. Hecht, Esq. | Rev'd case & Depo (J. Rosario) | 0.4 |
| 4/21/17 | PC, D. Lewis, Esq., A. Hecht, Esq., M. Kugler, Esq., and H. Koerner, Esq. | Disc'd case & Depo (J. Rosario) | 0.7 |

Hours submitted on April 21, 2017                                Total hours = 5.4 hrs.

| | | | |
|------|-------------------|------------------|----------|
| 4/28/17 | RR, --- | Rev'd Plaintiff's Exhibits #1 (P#1): Emerg. Med. Guidelines; P#2: St. Lucie Co Fire Dist.; P#3: EmergencyPRO & P#4: Combative Pts. | 1.2 |
| 4/28/17 | PC, A. Hecht, Esq. | Rev'd case & P#1-4 | 0.4 |
| 5/2/17 | LR, --- | Rev'd *"Emergency Care and Transportation of the Sick & Injured"* | 0.5 |
| 5/2/17 | PC's, A. Hecht, Esq., Sec. | Set-up Conf. Call, J. Rosario Depo & *"Emergency Care and Transportation of the Sick & Injured"* | 0.1 |
| 5/5/17 | PC's, A. Hecht, Esq. | Disc'd, J. Rosario Depo & *"Emergency Care and Transportation of the Sick & Injured"* | 0.4 |
| 5/5/17 | LTR, FAX, A. Hecht, Esq. | Prepared summary of my anticipated Testimony; Deposition Invoice for the Defense Attorneys w/ W-9; & list of my Depositions and Trials. | 1.2 |

**WORK KEY**: PC: (phone conversation), LS/R: (literature search/review), MR: Medical Records; FR: Forensic Records; RR: (records review), D: (deposition), LTR: letter, FEDEX: Federal Express mailing.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

## Saved by Grace Ministry, Inc.
### 226 Center Road
### East Aurora, NY 14052-2233   USA
### WORKSHEET

CASE: Tavares Docher Medical-legal Case
Attorneys, Darryl L. Lewis, Esq., Adam S. Hecht, Esq.
Medical-legal Consultation by: John A. Sterba, M.D., Ph.D., FACEP

| DATE | WORK and CONTACTS | DISCUSSION/TASKS | TIME(HR) |
|------|-------------------|------------------|----------|
| 05/11/17 | PC's, A. Hecht, Esq. Sec. | Set-up Video Conference | 0.5 |
| 05/11/17 | DP, PC, A. Hecht, Esq. Sec. | Amended Expert Disclosure | 0.2 |
| 05/11/17 | PC, Mike Downey, Visual Evidence | Set-Up Video- Conference, 5/12/17 | 0.1 |
| 05/12/17 | RR, PC, Video Testimony, PC, Mike Downey, Visual Evidence & A. Hecht, Esq. | Rev'd Depo José Rosario, EMT-P, Records, Policies/Procedures, Video Testimony (J.W. Hunt), Travel to/from J.W. Hunt | 4.1 |

Hours submitted on May 12, 2017                                          Total hours = 8.7 hrs

| DATE | WORK and CONTACTS | DISCUSSION/TASKS | TIME(HR) |
|------|-------------------|------------------|----------|
| 05/17/17 | RR, --- | Rev'd 8th and 9th Editions, "*Emergency Care and Transportation of the Sick & Injured*" Textbooks used at Indian River State College | 0.4 |
| 05/17/17 | RR, --- | Rev'd Report, J. Lindsey with his Attachments, then original National Model EMS Clinical Guidelines (August, 2016); Rosario & SLCFD's Initial Expert Disclosure; J. Lindsey's R26 Expert Report (done); Anderson R26 Expert Report; Durham R26 Expert Report. | 3.1 |
| 05/17/17 | PC's, A. Hecht, Esq. | Left message & requested conf. call | 0.1 |
| 05/19/17 | DP, --- | Report Draft, Dated May 19, 2017 | 8.1 |
| 05/19/17 | PC, A. Hecht, Esq. | Disc'd case | 0.2 |
| 05/20/17 | PC, A. Hecht, Esq. | Disc'd case | 1.0 |
| 05/21/17 | PC, A. Hecht, Esq. | Disc'd case | 0.1 |
| 05/22/14 | DP, --- | Report Draft, updated May 19, 2017 | 1.4 |
| 05/22/17 | PC's, A. Hecht, Esq. | Disc'd case, my 1st, report, other EMS Training, Policies & Procedures | 0.4 |
| 05/22/17 | DP, --- | Revised Report Draft May 22, 2017 To Final Report Draft May 22, 2017 | 7.4 |

Hours submitted on May 22, 2017                                          Total hours = 22.2  hrs.


**WORK KEY**: PC: (phone conversation), LS/R: (literature search/review), MR: Medical Records; FR: Forensic Records; RR: (records review), D: (deposition), LTR: letter, FEDEX: Federal Express mailing.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**
WORKSHEET
CASE: Tavares Docher Medical-legal Case
Attorneys, Darryl L. Lewis, Esq., Adam S. Hecht, Esq.
Medical-legal Consultation by: John A. Sterba, M.D., Ph.D., FACEP

| DATE | WORK and CONTACTS | DISCUSSION/TASKS | TIME(HR) |
|------|-------------------|------------------|----------|
| 05/24/17 | PC, A. Hecht, Esq. | Disc'd case | 0.1 |
| 05/30/17 | RR, PC, Ann Marie | Video CME, Dr Shahnasarian, DVD not opening x4 devices | --- |
| 06/01/17 | PC, Ann Marie (D. Lewis, Esq.) | Req'd a Cover letter and to Email 3 .pdf files, (Ref. 8, both 8th and 9th Edition EMS textbooks, and Reference 10) from my 5/22/17 Report, and the summary of Physical Restraint Section sent, ASAP | 2.6 |
| 06/02/17 | RR, PC's, A. Hecht, Esq. | My Report (5/22/17); DVD of CME of Tavaraes Docher with Michael Shahnasarian, Ph.D. (not M.D.); Depo of Trainee Deputy Calvin Robinson, his training of 'excited delirium', *not* a recognized Diagnosis by AMA, DSM-5, ICD-9 or ICD-10); Depo CAPT Brian Gonzalez; Disc'd case | 5.7 |
| 06/03/17 | RR, PC's, A. Hecht, Esq. | Depo Christopher Newman; Rev'd traumatic Head Injuries; Disc'd case | 2.9 |
| 06/03/17 | RR, PC's, A. Hecht, Esq. | Depo Clay Mangrum; Rev'd traumatic head injuries, Video of arrest, cuffing and asphyxiation; DVD 911/Dispatcher; Depo Wade Courtemanche; Jackson Health System medical records; Letter From Raul Roa, M.D., Greystone Health Network dated 5/9/17; Exhibits, Disc'd case | 4.4 |
| 06/05/17 | PC, A. Hecht, Esq. | Disc'd case | 0.3 |
| 06/07/17 | RR, PC, A. Hecht, Esq. | Rev'd Video (Visual Evidence), Disc'd Video with minor correction And Disc'd case | 0.5 |

Hours submitted on June 7, 2017                              Total hours = 16.5 hrs.

**WORK KEY**: PC: (phone conversation), LS/R: (literature search/review), MR: Medical Records; FR: Forensic Records; RR: (records review), D: (deposition), LTR: letter, FEDEX: Federal Express mailing.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

**Saved by Grace Ministry, Inc.**
**226 Center Road**
**East Aurora, NY 14052-2233   USA**
WORKSHEET
CASE: Tavares Docher Medical-legal Case
Attorneys, Darryl L. Lewis, Esq., Adam S. Hecht, Esq.
Medical-legal Consultation by: John A. Sterba, M.D., Ph.D., FACEP

| DATE | WORK and CONTACTS | DISCUSSION/TASKS | TIME(HR) |
|------|-------------------|------------------|----------|
| 06/15/17 | RR, PC, A. Hecht, Esq. | Rev'd Depo's H. Bhagudas, S. Gilewski and M. Brown; Disc'd Case with Mr. Hecht & Req'd EMS lorazepam (Ativan) info. | 2.1 |
| 06/21/17 | RR, PC, A. Hecht, Esq. | Rev'd cell phone videos and disc'd Case | 0.7 |
| 06/23/17 | LTR, D. Lewis, Esq., Sec. | Req'd Depo Invoice Letter with Justification and W-9 sent | 0.9 |
| 06/23/17 | RR, --- | Rev'd paper Depo's with !-points from: S. Gilewski; H. Bhagudas; M. Brown; W. Coutemanche; C. Mangrum; and C. Newman | 1.2 |
| 06/23/17 | RR, PC's, D. Lewis, Esq., Sec. and A. Hecht, Esq. | Rev'd cell phone videos. Disc'd Case. Req'd Conf. Call with Mr. Lewis, Esq. and Mr. Hecht, Esq. | 1.1 |
| 06/26/17 | RR, PC's A. Hecht, Esq. | Rev'd cell phone videos; Circumstances causing injuries | 1.6 |
| 06/26/17 | RR, --- | MR's St. Lucie Medical Center (SLMC) & Palm West MR's | 1.7 |
| 06/26/17 | RR, --- | of EMS Pompano Beach Fire Ambulance runs, x 17 | 1.8 |
| 06/26/17 | RR, --- | RR: Cell phone videos and Docher Settlement Documentary | 1.4 |
| 06/26/17 | PC's A. Hecht, Esq. and D. Lewis, Esq | Disc'd cell phone videos, the Settlement Documentary, and all circumstances with physiological and medical reasons for injuries; Req'd audio enhancement of cell Phone videos | 0.5 |

Hours submitted on June 26, 2017                    Total hours = 13.0 hrs

*[handwritten note]*

| | | | |
|------|-------------------|------------------|----------|
| 06/27/17 | DP, PC, A. Hecht, Esq. and D. Lewis, Esq | Disc'd photos of behind-the-back restraints and methods to be shown at my Depo and the Trial | 1.9 |

**WORK KEY**: PC: (phone conversation), LS/R: (literature search/review), MR: Medical Records; FR: Forensic Records; RR: (records review), D: (deposition), LTR: letter, FEDEX: Federal Express mailing.

Saved by Grace Ministry, Inc., A Faith Based Organization *Telling, Caring and Helping*
(716) 655-6854 (o, Fax), Email: PhysicianHouseCalls@roadrunner.com
Website: www.PhysicianHouseCalls.org

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother and
legal guardian,

        CASE NO.: 2:16-cv-14413

       Plaintiff(s),

vs.

CHRISTOPHER NEWMAN, individually,
CLAYLAN MANGRUM, individually,
CALVIN ROBINSON, individually, WADE
COURTEMANCHE, individually, KEN J.
MASCARA, as Sheriff of St. Lucie County,
Florida, JOSE ROSARIO, individually, and
the ST. LUCIE COUNTY FIRE DISTRICT,
an independent special district,

       Defendant(s).

_____/



EXHIBIT
#4
7/19/17 AP

## NOTICE OF TAKING DEPOSITION DUCES TECUM

PLEASE TAKE NOTICE that the undersigned attorney for Defendants, JOSE

ROSARIO, individually, and the ST. LUCIE COUNTY FIRE DISTRICT, an independent

special district, will take the deposition of the below-named person on the date, time and at the

location indicated upon oral examination before Florida Court Reporting Company, Notary

Public, in and for the State of Florida at Large, or some other officer duly authorized by law to

take depositions:

| NAME | DATE & TIME | LOCATION |
|---|---|---|
| John Sterba, M.D., Ph.D. | July 19, 2017 at 10:00 a.m. | J.W. Hunt & Associates, Inc. 424 Main Street, Suite 1420 Liberty Building Buffalo, NY 14202 (716) 853-5600 |

Please see Attachment "A" for any and all records requested to be present at your

deposition. The deposition will continue from day to day until completed.  The deposition is

being taken for the purpose of discovery, for use at trial, or both of the foregoing, and for such

other purposes as are permitted under the Florida Rules of Civil Procedure and other applicable

law.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of June, 2017, the undersigned counsel

emailed the foregoing to **Adam Hecht, Esq.,** *(Counsel for Plaintiff)* ash@searcylaw.com,

axs@searcylaw.com, mal@searcylaw.com, jcx@searcylaw.com, lewisteam@searcylaw.com,

Searcy Denney Scarola Barnhart & Shipley, P.A., 2139 Palm Beach Lakes Boulevard, West Palm

Beach, FL 33409; **Summer M. Barranco, Esq.,** *(Counsel for Christopher Newman, Claylan*

*Mangrum, Calvin Robinson, Wade Courtemanche, and Ken J. Mascara, as Sheriff of St. Lucie*

*County, Florida)* summer@purdylaw.com; Melissa@purdylaw.com; Law Offices of Purdy, Jolly,

Giuffreda & Barranco, P.A., 2455 East Sunrise Boulevard, Suite 1216, Fort Lauderdale, FL

33304.

*/s/BENJAMIN W. NEWMAN*
BENJAMIN W. NEWMAN, ESQUIRE
Florida Bar No.: 0011223
JULIE A. TYK, ESQUIRE
Florida Bar No.: 84493
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 N. Orange Ave., Suite 1200
Orlando, FL 32801
Phone: (407) 203-7599
Fax:    (407) 648-1376
Ben.Newman@wilsonelser.com
Julie.Tyk@wilsonelser.com

*Counsel for Defendants, Jose Rosario, individually, and St.*
*Lucie County Fire District*

## SCHEDULE A

✓ 1.  Any and all materials you <u>reviewed</u> in this matter, including but not limited to, depositions, correspondence, photographs, reports, books, articles, literature, films, tests, experiments, statements, results of inspections of vehicles, drawings, blueprints, or other reference material that you reviewed in relation to this case, regardless of whether you used or relied on them.

✓ *Report § 5/23/17* 2.  Any and all reports you prepared or furnished in this case.

*S. Lindsey* ✓ 3.  Any and all reports which were furnished to you by other experts in this case.

*CV, 6/21/17* ✓ 4.  Your curriculum vitae.

ø 5.  Anything provided to you or your agents by the Plaintiff or anyone on their behalf, including their attorneys. This should include, but not limited to, summaries, notes, answers to written questions, pleadings or other data.

ø 6.  Any and all results of tests and/or experiments you conducted in this case.

✓ *pictures copied (attached)* ø 7.  Any and all photographs which were <u>taken</u> by you, your agents, servants or employees. *(not taken but copied)*

ø 8.  Any and all films taken by you, your servants, agents or employees.

ø 9.  Any and all video tapes taken by you, your servants, agents or employees.

ø 10.  Any and all results of tests you, your agents, servants or employees conducted in this case.

✓ 11.  Your complete billing file in this case, including, but not limited to, the charges you have <u>rendered</u>, the state<u>ments</u> that you have rendered, the time spent on this case, and other relevant materials concerning the <u>time and</u> billings on this case.

ø 12.  Any and all notes, writings, memoranda, etc., which you have prepared in this case.

ø 13.  Any and all notes taken or prepared by you or your agents, servants or employees which were prepared for this case.

*attached* ✓ 14.  Any and all publications or source materials which you have consulted and/or relied upon in this case.

15.   Any and all doctor's office notes, charts, doctor's reports, x-rays or other memoranda of whatever kind or description, used by you or your office in reaching your conclusions in this case, including any and all psychiatric or psychological evaluations regarding Tavares Docher.





The Strappado, used as public punishment, detail of plate 10 of Les Grandes Misères de la guerre by Jacques Callot, 1633

The **strappado**, also known as **corda**,[1] is a form of torture wherein the victim's hands are tied behind his or her back and suspended by a rope attached to the wrists, typically resulting in dislocated shoulders.[2][3] Weights may be added to the body to intensify the effect and increase the pain.[4] This kind of torture would generally not last more than an hour, without rest,[5] as it would likely result in death.

https://en.wikipedia.org/wiki/Strappado Strappado, Reverse Hanging, From Wikipedia, the free encyclopedia

**2) Backwards Hanging**

Outside of Block 11 stands a three-meter post, with a hook near the top. Victims of this unspeakable torture had their arms tied behind their back, were lifted up, and hung onto the hook by their bonds, their arms breaking at the joints. Some died of shock and pain there on the post; others did not. The problem with the latter case was that you were no longer fit to work and therefore of no use to your captors, and were either sent to the hospital where the experimenting doctors could find you (see #5), sent to the gas chamber (see #4), or simply executed via a shot of acid, injected directly into your heart.



*Our guide demonstrates in front of the hanging posts.*

http://www.paulspond.com/index.php?entry=119, The 7 Worst Ways To Die At Auschwitz (an actually serious post) - 7/7/09

There were also claims by the Dachau Museum that the "tree hanging" punishment was used at Dachau.



This photo was hanging in the Dachau Museum in 2001

https://furtherglory.wordpress.com/2012/11/07/was-the-tree-hanging-den-baum-hangen-punishment-used-at-auschwitz/ Was the "tree hanging" (den Baum hängen) punishment used at Auschwitz?



**Lifting of arms twisted behind the back**

The arms of the victim are twisted behind the back and bound with a thin rope. The arms of the victim are then pulled upwards, thus becoming overstretched and often dislocated. The rope cuts into the victim's flesh. The pain is so severe that the victim sometimes loses control over their bladder. According to reports, there have been cases of death when victims have been abused repeatedly in this way.

http://www.ishr.org/?id=1047  International Society for Human Rights (ISHR), Common methods of torture and abuse in the People's Republic of China.

*Hands Cuffed Behind the Back and Suspended in the Air by a Chain, at*
http://en.minghui.org/html/articles/2014/12/20/147374.html



**JOHN A. STERBA, MD**
**VOLUME 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
---------------------------------------
TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother and
legal guardian,

                    Plaintiff,

        - vs -      Case No.
                    2:16cv14413

CHRISTOPHER NEWMAN, individually;
CLAYTON MAGRUM, individually;
CALVIN ROBINSON, individually;
WADE COURTEMANCHE, individually;
KEN J. MASCARA, as Sheriff of
 St. Lucie County, Florida;
JOSE ROSARIO, individually; and the
ST. LUCIE COUNTY FIRE DISTRICT,
  an independent special district,

                    Defendants.
---------------------------------------

          Continued examination before trial of

**JOHN A. STERBA, MD**, taken pursuant to Federal Rules

of Civil Procedure at the office of John A. Sterba,

MD, 226 Center Street, East Aurora, New York, on

August 8, 2017, commencing at 1:12 p.m., before

NANCY C. BROICH, Notary Public.

*JACK W. HUNT & ASSOCIATES, INC.*