UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16cv14413

TAVARES DOCHER, by and through
JANICE DOCHER-NEELEY, his mother
and legal guardian,

Plaintiff,

vs.

CHRISTOPHER NEWMAN,
individually; CLAYTON MANGRUM,
individually; CALVIN ROBINSON,
individually; WADE COURTEMANCHE,
individually; KEN J. MASCARA, as
SHERIFF of ST. LUCIE COUNTY,
Florida; JOSE ROSARIO,
individually; and the ST. LUCIE
COUNTY FIRE DISTRICT, an
independent special district,

Defendants.
_____/


DEPOSITION OF

WADE COURTEMANCHE


VOLUME 1
Pages 1 through 34


Wednesday, May 31, 2017
2:00 p.m. - 2:35 p.m.


Phipps Reporting
1680 Southwest Bayshore Boulevard
Port St. Lucie, Florida  34984

Stenographically Reported By:
Patricia A. Lanosa, RPR, FPR, CSR

Page 2

1  APPEARANCES:
2
   On behalf of Plaintiff:
3
       SEARCY, DENNEY, SCAROLA
4      BARNHART & SHIPLEY, PA
       2139 Palm Beach Lakes Boulevard
5      West Palm Beach, Florida 33402-3626
       (561)686-6300
6      BY: ADAM S. HECHT, ESQUIRE
       ash@searcylaw.com
7
8
   On behalf of Defendant:
9
       PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
10     2455 East Sunrise Boulevard, Suite 1216
       Fort Lauderdale, Florida 33304
11     (954)462-3200
       BY: SUMMER M. BARRANCO, ESQUIRE
12     summer@purdylaw.com
13
   On behalf of St. Lucie County Fire District:
14
       WILSON, ELSER, MOSKOWITZ,
15     EDELMAN & DICKER, LLP (Appearing via Phone)
       111 North Orange Avenue, Suite 1200
16     Orlando, Florida 32801
       (407)203-7592
17     BY: JULIE TYK, ESQUIRE
       julie.tyk@wilsonelser.com
18
19
20
21
22
23
24
25

Page 3

1
2              I N D E X
3
4
   Examination                    Page
5
6        VOLUME 1 (Pages 1 - 34)
7  Direct     By Mr. Hecht              4
8  Certificate of Oath              31
   Certificate of Reporter          32
9  Read and Sign Letter to Witness      33
   Errata Sheet (forwarded upon execution)   34
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       The following proceedings began at 2:00 p.m.:
2          THE COURT REPORTER:  Would you raise your
3  right hand, please?
4          Do you solemnly swear that the testimony
5  you shall give today will be the truth, the
6  whole truth, and nothing but the truth?
7       THE WITNESS:  I do.
8          WADE COURTEMANCHE,
9  having been first duly sworn or affirmed, was
10 examined and testified as follows:
11       DIRECT EXAMINATION
12 BY MR. HECHT:
13     Q.  Can you please state your name?
14     A.  Wade Courtemanche.
15        MR. HECHT:  And we can go off the record
16 for this.
17        (Discussion off the record.)
18 BY MR. HECHT:
19     Q.  Where are you currently employed?
20     A.  St. Lucie County Sheriff's Office.
21     Q.  What is your position there?
22     A.  I'm a detective -- a canine detective in
23 the special investigations unit.
24     Q.  How long have you held that position for?
25     A.  Canine for the last three years.  And for

Page 5

1  the last six years, the detective.
2       Q.  How long have you been employed by
3  the St. Lucie County Sheriff's Office?
4       A.  Since 2009.
5       Q.  What other law enforcement agencies have
6  you worked for besides the St. Lucie County
7  Sheriff's Office?
8       A.  The City of Pittsfield, New Hampshire, and
9  the New Hampshire Department of Corrections, the
10 state prison.
11      Q.  What were the years that you worked for
12 the Pittsfield, New Hampshire, Police Department?
13      A.  I think it was 2000 to 2007.  And then
14 like '99 to 2000 at the prison.
15      Q.  You worked at the Pittsfield Police
16 Department; is that correct?
17      A.  Yes.
18      Q.  And it was from 2000 to 2007?
19      A.  Yes.
20      Q.  You were a police officer?
21      A.  Yes.
22      Q.  And then for the Department of
23 Corrections, what did you do?
24      A.  Corrections officer at the state prison.
25      Q.  What did you do from 2000 to 2009?

Page 6

1     A.  From 2000 to 2007 I worked for the
2  Pittsfield Police Department.  2007 and 2009 we
3  moved from New Hampshire to here.
4     Q.  I'm sorry.
5     A.  It's all right.
6     Q.  It's kind of a long day.  I apologize.
7     A.  I knew where you were going.
8     Q.  Why was it that you relocated from New
9  Hampshire to Florida?
10     A.  Weather.
11     Q.  Did you grow up in New Hampshire?
12     A.  Most of it.  I moved to New Hampshire -- I
13  think it was my eighth-grade year.  Before that I
14  was a military brat.  My dad was in the Army.  Born
15  in Texas, moved to Germany, Kansas.
16     Q.  After high school, what did you do?
17     A.  I worked for the restaurant business
18  mostly, and then started my college for criminal
19  justice.
20     Q.  Where did you go to college?
21     A.  Hesser College.
22     Q.  Where was that?
23     A.  Hesser College, that was in Manchester.  I
24  think it's -- I think they were bought out by
25  Southern New Hampshire University now.

Page 7

1     Q.  Is that a two-year or four-year college?
2     A.  I started it, but I am finishing now
3  through Columbia Southern.  I'm finishing my degree.
4  I'm in my last class as of today.
5     Q.  So you graduated high school.  You worked
6  in the restaurant industry.  And then you went to
7  college but you did not graduate.  Did you join the
8  military at that time?
9     A.  I did not.
10     Q.  What did you do after Hesser College?
11     A.  Restaurant business.  And then I went to
12  work for the New Hampshire State Prison and then
13  Pittsfield.
14     Q.  I apologize, did you tell me that you
15  joined the military?
16     A.  I did not.  My father.  I was a military
17  brat.  I moved around when I was young.
18     Q.  Okay.  Tell me what your involvement was
19  on May 11, 2014 regarding the Tavares Docher case.
20     A.  I was currently assigned, still in special
21  investigations.  I was actually on my way home.  I
22  was south on US 1 when I heard the radio
23  transmission that they needed assistance at the CVS
24  at Prima Vista and Floresta.
25     Q.  And when you got to the CVS, tell me what

Page 8

1  you saw.
2     A.  I observed -- who was it -- Newman,
3  Mangrum and Calvin.  I think Calvin was still FTO.
4  They were actively fighting with an individual that
5  was handcuffed.  The individual was on the ground
6  kicking, flailing his head.
7     I had my window down as I pulled in, and I
8  could hear Mangrum specifically telling him to
9  relax, stop resisting.  As I pulled in, everything
10  kind of stopped.  Everything came to a stop.  He had
11  stopped resisting on the ground.
12     I pulled up and Mangrum asked me to ask
13  the individual that kept creeping up with a cell
14  phone, asked him to get back.  So I did so.  I told
15  him to get back towards the entranceway of the CVS.
16     So I stood in that area, which was
17  probably 20, 25 feet away from them.  At that point
18  after I had told the individual to go back towards
19  the entrance and to back up, I saw Newman trying to
20  render some type of first aid to the individual on
21  the ground, his head.
22     Every once in a little while the
23  individual would flare back up and start kicking a
24  little bit, but he would calm down.  And then
25  shortly after that rescue arrived.

Page 9

1     Q.  Did you give a statement to anyone in this
2  case?
3     A.  I wrote a report.
4     Q.  The individual that you asked to step
5  back, was his name Sean Mahoney?
6     A.  I believe so.
7     Q.  And according to your report, you asked
8  him to stop taping, correct?
9     A.  Yes.
10     Q.  Why is it you asked him to stop taping?
11     A.  Just to stop taping and to get back.
12     Q.  But specifically why did he need to stop
13  taping?
14     MS. BARRANCO:  Object to the form.  Go
15  ahead.
16     A.  I'm sorry.
17     MS. BARRANCO:  I'm just objecting to the
18  form of the question.  You can go ahead and
19  answer.
20     A.  For no really specific reason, just to
21  stop taping and get back out of the area so the
22  officers could do what they needed to do and not
23  fear him creeping up on them.
24  BY MR. HECHT:
25     Q.  Was he standing too close to where the

3 (Pages 6 to 9)

Page 10

```
 1   struggle was going on?
 2        A.  He was moving closer and closer.  And then
 3   when I got there, Mangrum had said -- asked, said,
 4   "Hey, get that guy back."  I guess talking to
 5   Mangrum later, he had asked him several times, and
 6   he was a lot closer during stages of the struggle.
 7        Q.  Is it a crime for an individual to use
 8   their cell phone to tape a police encounter with an
 9   individual?
10        A.  No.
11        MS. BARRANCO:  Object to the form.  Go
12   ahead.
13        A.  No.
14   BY MR. HECHT:
15        Q.  So it wasn't that he was taping the
16   officers and Tavares Docher.  The reason you asked
17   him to step away was for his safety and the
18   officers' safety?
19        A.  More so, yes, sir.
20        Q.  Did you ever attempt to take his phone
21   away from him?
22        A.  After everything was completed, yes.
23        Q.  When you say, "after everything was
24   completed," what does that mean?
25        A.  Mr. Docher was transported in the
```

Page 11

```
 1   ambulance by then and the scene was stale, I guess.
 2        Q.  And why is it that you took his cell
 3   phone?
 4        A.  At that point other supervisors had shown
 5   up, and at that point it was deemed there might
 6   actually be some evidentiary value to the video.
 7        Q.  What sort of evidentiary value?
 8        A.  As far as Mr. Docher, I know at some point
 9   they stated that he may have passed; he might not
10   have passed.  So at that point I was asked to
11   collect the cell phone.
12        Q.  And did Sean Mahoney hand over his cell
13   phone?
14        A.  He did.  Actually, I think he handed it to
15   his girlfriend.  His girlfriend handed it over.
16        Q.  Did you threaten Shaun Mahoney or his
17   girlfriend in any way when you attempted to
18   confiscate his cell phone?
19        MS. BARRANCO:  Object to the form.  Go
20   ahead.
21        A.  The very first time I was asked to get the
22   phone, Mr. Mahoney refused but did hand over the
23   phone.  The phone was then returned to Mr. Mahoney,
24   and it was asked of me to retrieve the phone a
25   second time.  So at which time I did, Mr. Mahoney
```

Page 12

```
 1   refused.  At that time I placed him into handcuffs,
 2   and he told me that his girlfriend had the phone.  I
 3   asked her for the phone, and then she handed over
 4   the phone.
 5   BY MR. HECHT:
 6        Q.  Okay.  So I want to make sure I understand
 7   this correctly.  After the scene was cleared and
 8   while Shaun Mahoney was still at the CVS, did you
 9   ask him to hand over the cell phone?
10        A.  Yes.
11        Q.  And did he comply?
12        A.  The first time he did comply, from what I
13   remember.  And then I was asked to return the phone
14   back to Mr. Mahoney, so I did.  And then I was asked
15   to retrieve it a third time -- or a second time to
16   retrieve it.
17        Q.  Let's focus on the first time.  You asked
18   Shaun Mahoney for his cell phone, and he handed it
19   over to you, correct?
20        A.  Not initially.  We went round and round
21   about him turning it over.
22        Q.  And tell me about that conversation when
23   you say that you went round and round.
24        A.  Me asking for the phone.  Him telling me
25   he doesn't have to turn it over, that kind of
```

Page 13

```
 1   conversation back and forth.
 2        Q.  I want to know specifically.
 3        A.  I don't remember specifically.
 4        Q.  So I would imagine you would have said to
 5   him, I'm taking your cell phone, or can I have your
 6   cell phone?
 7        A.  I believe it was more along the line:  The
 8   phone is needed for evidence.
 9        Q.  And what did he say?
10        A.  I could not tell you.
11        Q.  But he didn't readily hand it over,
12   correct?
13        A.  No, not right away.
14        Q.  And then what would you have said in
15   response?
16        A.  I don't remember.
17        Q.  How did you ultimately get the cell phone?
18   It sounds like he didn't give it to you.
19        A.  He did give it to me the first time.  We
20   went back and forth.  And I don't remember exactly what
21   was said.  But I was able to get the phone the first
22   time, and then was asked to give it back, so I gave
23   it back.
24        Q.  I understand.  I still want to talk about
25   this first incident, and then we'll talk about the
```

www.phippsreporting.com
888-811-3408

Page 14

1  second time you tried to retrieve the phone.
2       You asked him for it, and he didn't hand
3  it over, correct?
4       A.  No, I don't believe so.  Like I said, we
5  argued over the phone.
6       Q.  And did you tell him what would happen to
7  him if he did not hand it over?
8       A.  Possibly.  Like I said, I don't remember
9  the exact conversation.
10       Q.  Did you tell him that he would be arrested
11  if he did not hand over the phone?
12       A.  I could have.
13       Q.  And is that legal?
14       MS. BARRANCO:  Object to the form.
15       A.  I would say, yes.
16  BY MR. HECHT:
17       Q.  You can arrest someone for them not
18  handing over a cell phone when they videotaped
19  footage between officers and an individual during a
20  struggle?
21       MS. BARRANCO:  Object to the form.  Go
22  ahead.
23       A.  At that point there might actually be some
24  evidence on that phone.  So, yes.
25

Page 15

1  BY MR. HECHT:
2       Q.  And did you, in fact, tell Mr. Mahoney if
3  he did not hand over the phone, he would have been
4  arrested?
5       A.  I could have.
6       Q.  After you said that to him, is that when
7  he handed over the phone?
8       A.  Probably.  Like I said, I don't remember
9  the exact conversation.
10       Q.  Okay.  So then you took the cell phone.
11  What did you do with it?
12       A.  I handed it over to I believe one of the
13  detectives that was handling the case.
14       Q.  And do you know what they did with it?
15       A.  I have no idea.
16       Q.  Did they watch anything on it?
17       A.  I have no idea.
18       Q.  Did they download anything?
19       A.  I have no idea.
20       Q.  And how long after you gave the cell phone
21  to one of the other detectives did they then give it
22  back to you to bring back to Shaun Mahoney?
23       A.  I couldn't tell you.  It wasn't -- I
24  couldn't tell you the exact amount of time.
25       Q.  But you were still at the CVS, correct?

Page 16

1       A.  Yes.  Yes.
2       Q.  So at some point you bring the phone back
3  to Mr. Mahoney, correct?
4       A.  Yes.
5       Q.  How much time went by when you approached
6  him a second time and told you needed the phone
7  again?
8       A.  I couldn't tell you an amount.  Again, we
9  were still there.
10       Q.  And what happened when you asked
11  Mr. Mahoney for the telephone back?
12       A.  This time he again said no, and that he
13  didn't have the phone anymore.
14       Q.  Did he tell you where the phone was?
15       A.  Not initially.
16       Q.  And at some point did you find out where
17  the phone was?
18       A.  Yes.
19       Q.  And how did you find out where the phone
20  was?
21       A.  Mr. Mahoney told me.
22       Q.  And did he tell you, after you told him
23  that if he didn't tell you where it was, he was
24  going to be arrested?
25       A.  Could have.  Like I said, I don't remember

Page 17

1  the exact conversation.
2       Q.  All right.  And at some point did you
3  approach his girlfriend?
4       A.  Yes.
5       Q.  And did she have his phone?
6       A.  She did.  I believe she had it in her
7  purse, if I remember correctly.
8       Q.  Did you ask her for the phone?
9       A.  Yes.
10       Q.  What did she say?
11       A.  Initially, no.
12       Q.  How did you ultimately get her to hand
13  over the phone?
14       A.  She eventually gave it to me.
15       Q.  Is that after you told had her if she
16  didn't hand it over, she would be arrested?
17       A.  I don't remember what our conversation was
18  either.
19       Q.  But it was clear to you that she did not
20  want to hand it over, correct?
21       A.  Initially, no.
22       Q.  And then what did you do with the phone
23  after she gave it to you?
24       A.  Handed it off to the detective.
25       Q.  Do you know what happened with the phone

5 (Pages 14 to 17)

Page 18

1  after that?
2      A.  I do not.
3      Q.  Did you ever bring them back the phone?
4      A.  No.
5      Q.  Did you ever watch anything on the phone?
6      A.  I did not.
7      Q.  Were you involved in any of the
8  downloading of the phone?
9      A.  No.  Right after that, I completed my
10  supplement and cleared the scene.
11      Q.  When you arrived on scene, did you see
12  Deputy Newman, Robinson, and Mangrum on top of
13  Tavares Docher?
14          MS. BARRANCO:  Object to the form.  Go
15      ahead.
16      A.  Yes.  They were actively -- he was
17  actively -- Mr. Docher was actively resisting, so
18  they were using strikes, and things like that, to
19  get him to comply.
20  BY MR. HECHT:
21      Q.  Who did you see striking Tavares Docher?
22      A.  I don't remember specifically which deputy
23  it was.
24      Q.  Do you recall more than one deputy
25  striking Tavares Docher?

Page 19

1      A.  No.
2      Q.  Do you remember where they were striking
3  him?
4      A.  I remember -- I think -- I can't remember
5  exactly which one was towards the legs, maybe -- I
6  believe it was Robinson delivered a strike to his
7  leg.
8      Q.  Did it appear to you that Shaun Mahoney
9  was concerned with the way that -- strike that.
10          Did it appear to you that Shaun Mahoney
11  was concerned with the way in which Deputy Newman,
12  Robinson, and Mangrum were treating Tavares Docher?
13          MS. BARRANCO:  Object to the form.
14      A.  I have no idea what he was thinking.
15  BY MR. HECHT:
16      Q.  Did he convey to you in any way that they
17  were utilizing force that was excessive,
18  unnecessary, and inappropriate?
19          MS. BARRANCO:  Object to the form.  Go
20      ahead.
21      A.  I don't recall.
22  BY MR. HECHT:
23      Q.  When you arrived, did you hear Tavares
24  Docher screaming, "Help me, help me, they're going
25  to kill me"?

Page 20

1          MS. BARRANCO:  Object to the form.  Go
2      ahead.
3      A.  I don't remember him saying anything.
4  BY MR. HECHT:
5      Q.  Do you know what a thumb strike is?
6      A.  A thumb strike?
7      Q.  Yes, sir.
8      A.  No.
9      Q.  Have you ever been trained on how to use a
10  thumb strike?
11      A.  I don't know what it is.  So, no.
12      Q.  Is it considered deadly force to elbow
13  strike an individual in the temple?
14          MS. BARRANCO:  Object to the form.  Go
15      ahead.
16      A.  I would -- it depends on the situation.
17  BY MR. HECHT:
18      Q.  Is it considered deadly force to elbow
19  strike an individual on the side of the jaw?
20          MS. BARRANCO:  Object to the form.
21      A.  Again, it depends on the situation.
22  BY MR. HECHT:
23      Q.  Is it considered deadly force to elbow
24  strike an individual on the bridge of their nose?
25      A.  Same answer.

Page 21

1          MS. BARRANCO:  Object to form.
2  BY MR. HECHT:
3      Q.  Is it considered deadly force to strike an
4  individual on the back of the head?
5          MS. BARRANCO:  Object to the form.
6      A.  Same.
7  BY MR. HECHT:
8      Q.  Is it deadly force to elbow strike an
9  individual in their throat?
10          MS. BARRANCO:  Object to the form.
11      A.  Same.
12  BY MR. HECHT:
13      Q.  If you were to elbow strike an individual
14  on their temple, would that be likely to cause great
15  bodily harm to that individual?
16          MS. BARRANCO:  Object to the form.
17      A.  It could.
18  BY MR. HECHT:
19      Q.  If you were to utilize an elbow strike to
20  the side of the jaw to an individual, would that be
21  likely to cause great bodily harm?
22          MS. BARRANCO:  Object to the form.
23      A.  It could.
24  BY MR. HECHT:
25      Q.  If you were to utilize an elbow strike to

www.phippsreporting.com
888-811-3408

Page 22

1    the bridge of an individual's nose, would that be
2    likely to cause great bodily harm?
3         MS. BARRANCO: Object to the form.
4         A. It could.
5    BY MR. HECHT:
6         Q. If you were to utilize an elbow strike to
7    the back of an individual's head, would that be
8    likely to cause great bodily harm?
9         MS. BARRANCO: Object to the form.
10        A. It could.
11   BY MR. HECHT:
12        Q. If you were to utilize an elbow strike to
13   the throat of an individual, would that be likely to
14   cause great bodily harm?
15        MS. BARRANCO: Object to the form.
16        A. It could.
17   BY MR. HECHT:
18        Q. If you were to utilize an elbow strike to
19   the side of one's head, would that be likely to
20   cause great bodily harm?
21        MS. BARRANCO: Object to the form.
22        A. It could.
23   BY MR. HECHT:
24        Q. Were you acting in any sort of supervisory
25   capacity on May 11, 2014 in regards to this

Page 23

1    incident?
2         A. Absolutely not.
3         Q. Did you have any conversations with
4    Tavares Docher?
5         A. No.
6         Q. Did you have any conversations with any of
7    the paramedics on scene?
8         A. No.
9         Q. Did it appear to you when you arrived that
10   Tavares Docher was having a difficult time
11   breathing?
12        A. No.
13        Q. Did it appear he was breathing fine to
14   you?
15        MS. BARRANCO: Object to the form. Go
16   ahead.
17        A. He was moving and actively resisting.
18   BY MR. HECHT:
19        Q. I understand that.
20        Did it appear to you that he was breathing
21   normally?
22        A. I was far enough away that I couldn't see
23   him breathing normally or abnormally.
24        Q. So you have no opinion.
25        A. Yeah, he appeared fine to me.

Page 24

1         Q. Based on what you saw, did Deputy Newman,
2    Robinson, and Mangrum comply with the customs,
3    policies and practices of the St. Lucie County
4    Sheriff's Office during their interaction with
5    Tavares Docher?
6         MS. BARRANCO: Object to the form. Go
7    ahead.
8         A. Yes.
9    BY MR. HECHT:
10        Q. When you arrived on scene, Tavares Docher
11   was handcuffed behind his back, correct?
12        A. Yeah, I believe he was.
13        Q. And were his arms at a 90-degree angle in
14   the air?
15        A. I don't remember seeing that.
16        Q. But when you arrived, there was an active
17   struggle going on?
18        A. There was.
19        Q. And how long after you arrived did that
20   struggle last for?
21        A. Seconds.
22        Q. And then Tavares Docher calmed down?
23        A. Yes. And that's when, like I said,
24   Detective Newman was rendering first aid to -- I
25   think it was his head.

Page 25

1         Q. Did you see the paramedic inject Tavares
2    Docher with any medication?
3         A. I don't -- I don't believe I did. I mean,
4    they were working on him. So I don't know.
5         Q. When you saw the paramedics working on
6    Tavares Docher, describe Tavares' demeanor.
7         A. Initially he was calm, and then he kind of
8    started flailing around again.
9         Q. Were you reprimanded or disciplined or
10   sanctioned in any way as a result of your
11   involvement in this case?
12        A. No.
13        Q. Have you ever been trained by any law
14   enforcement agency that you've worked for to apply
15   pressure with your thumb to the nerve mass in
16   someone's neck to gain control over them?
17        MS. BARRANCO: Object to the form. Go
18   ahead.
19        A. Yeah, there's -- I can't actually think of
20   one of the -- there is actually a thumb to the side
21   here (indicating) -- I don't remember the exact
22   nerve -- to get somebody who is resisting to comply.
23   BY MR. HECHT:
24        Q. And you've been trained on that?
25        A. Yes.

7 (Pages 22 to 25)

Page 26

```
1        Q.  Have you utilized that technique before?
2        A.  I have not.
3        Q.  Why not?
4        A.  I just haven't had that situation.
5        Q.  Is that technique when you would use your
6   thumb to apply pressure to the nerve mass in one's
7   neck likely to cause great bodily injury?
8            MS. BARRANCO:  Object to the form.  Go
9   ahead.
10        A.  It's more -- the one I'm referring to is
11  up underneath the ear (indicating).  So if that's
12  what you're calling the neck area, then, yes.  Is
13  that likely to cause?  No.
14  BY MR. HECHT:
15        Q.  The entire time that you observed Tavares
16  Docher, was he in handcuffs behind his back?
17        A.  I believe so.  I couldn't tell you
18  exactly.  I don't remember if they got moved to the
19  front or not.
20        Q.  Did you ever see Tavares Docher be placed
21  in the ambulance?
22        A.  I don't remember.  I remember -- I know he
23  got in the ambulance.  I don't remember if I
24  witnessed it or I was talking to somebody else that
25  was there or not.
```

Page 27

```
1        Q.  When you arrived on scene and Tavares
2   Docher was handcuffed behind his back, were you in
3   fear for the safety of Deputy Newman, Robinson, and
4   Mangrum?
5            MS. BARRANCO:  Object to the form.  Go
6   ahead.
7        A.  They would have to answer as far as what
8   their fear was.  But he was in active resistance at
9   that point.
10  BY MR. HECHT:
11        Q.  When you arrived on scene, did you ever
12  feel that Deputy Newman, Robinson, and Mangrum's
13  life were in danger?
14            MS. BARRANCO:  Object to the form.
15        A.  Like I said, I was like 20-something feet
16  away.  If I felt at any point that they were in need
17  of any more help or whatnot, I would have helped.
18  BY MR. HECHT:
19        Q.  So is it correct you did not feel like
20  their lives were in danger when you arrived on
21  scene?
22            MS. BARRANCO:  Object to form.  Go ahead.
23        A.  They would have to tell you better what
24  they were feeling.  As far as me, I didn't feel like
25  their lives were in danger at the time.
```

Page 28

```
1   BY MR. HECHT:
2        Q.  Why is it you did not go to their aid and
3   assist in the struggle with Tavares Docher?
4            MS. BARRANCO:  Object to the form.  Go
5   ahead.
6        A.  At the time, like I said, when I first got
7   there he was kicking around trying to bite and do
8   things.  So he calmed down at that point.  Mangrum
9   had asked me to keep the people back.  There were
10  several other people besides the one individual you
11  mentioned with the phone that were up underneath the
12  CVS front door.  Plus it's an open business with
13  cars coming in and stuff like that.  I stood back
14  there to make sure nobody approached them.
15        Q.  Were there other people besides Shaun
16  Mahoney that were filming this struggle?
17        A.  I don't recall if there were.  I don't
18  remember seeing any.
19  BY MR. HECHT:
20        Q.  Is the only person that you told to stop
21  filming Shaun Mahoney?
22            MS. BARRANCO:  Object to the form.
23        A.  I believe so, yes.
24  BY MR. HECHT:
25        Q.  Why didn't you simply tell Shaun Mahoney
```

Page 29

```
1   to step back?  Why is it that you also told him to
2   stop filming?
3            MS. BARRANCO:  Object to the form.
4        A.  I told him to do both.
5   BY MR. HECHT:
6        Q.  Why is that?
7        A.  Just to stop filming.  I felt like if he
8   would stop filming, he would just go about his
9   business and leave.  I felt like the only reason he
10  was still there is because he was filming.  Stop
11  filming and move back.
12        Q.  Did he move back?
13        A.  He did move back.
14        Q.  Did he continue to film?
15        A.  He stopped for a little while.  And then
16  at some point I observed him filming behind a post.
17        Q.  Did you approach him again?
18        A.  No.  I think I just told him, "Finish your
19  business.  If you're shopping, shop.  If you're not,
20  go."
21        Q.  So you did approach him and tell him to
22  either continue shopping or leave, correct?
23        A.  I don't believe I approached him.  I just
24  told him.  We weren't that far away.  It was more
25  just a loud, "Hey, I told you once:  If you're done
```

Page 30

1 with your business here at CVS, then leave."
2    Q.  And then when you told this to him, was he
3 hiding?
4    A.  Yeah, at that time he was hiding behind a
5 pillar there.
6    Q.  He was hiding from you?
7    A.  I don't know if he was hiding from me or
8 who he was hiding from.
9    MR. HECHT:  All right.  I don't have any
10 other questions.
11    MS. BARRANCO:  Julie, do you have any
12 questions?
13    MS. TYK:  No questions.
14    MS. BARRANCO:  Okay.  I have no questions.
15 He will read the deposition if it's ordered.
16    MR. HECHT:  I'll order it.
17    MS. BARRANCO:  I'll take a copy.
18    MS. TYK:  I'll take a copy.
19    (The proceedings concluded at 2:35 p.m.)
20
21
22
23
24
25

Page 31

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF PALM BEACH

   I, the undersigned authority, certify
that WADE COURTEMANCHE personally appeared before
me and was duly sworn on the 31st day of May,
2017.
   Signed this 1st day of June, 2017.

PATRICIA A. LANOSA, RPR, FPR, CSR
Notary Public, State of Florida
My Commission No. FF 169350
Expires: 10/19/2018

Page 32

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF PALM BEACH

   I, PATRICIA A. LANOSA, Registered
Professional Reporter, do hereby certify that I
was authorized to and did stenographically report
the foregoing deposition of WADE COURTEMANCHE;
Pages 1 through 34; that a review of the
transcript was requested; and that the transcript
is a true record of my stenographic notes.
   I FURTHER CERTIFY that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorneys or counsel
connected with the action, nor am I financially
interested in the action.
   Dated this 1st day of June, 2017.

PATRICIA A. LANOSA, RPR, FPR, CSR

Page 33

June 1, 2017
PURDY, JOLLY, GIUFFREDA & BARRANCO, PA
c/o Wade Courtemanche
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
(954)462-3200
ATTN: SUMMER BARRANCO, ESQUIRE

Re:  Docher v. Newman et al.
Case No.:  2:16cv14413
Please take notice that on the 31st day of May,
2017, you gave your deposition in the above cause.
At that time, you did not waive your signature.
The above-addressed attorney has ordered a copy of
this transcript and will make arrangements with you
to read their copy.  Please execute the Errata
Sheet, which can be found at the back of the
transcript, and have it returned to us for
distribution to all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.
If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.
Very truly yours,

PATRICIA A. LANOSA, RPR, FPR, CSR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401
I do hereby waive my signature.

_____
WADE COURTEMANCHE

Page 34

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re:  DOCHER V. NEWMAN ET AL.

Case No.:  2:16cv14413

WADE COURTEMANCHE

May 31, 2017

PAGE  LINE    CHANGE          REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

_____    _____
Date                 WADE COURTEMANCHE

**A**

able 13:21
abnormally 23:23
above-address... 33:9
Absolutely 23:2
acting 22:24
action 32:17,18
active 24:16 27:8
actively 8:4 18:16,17,17 23:17
ADAM 2:6
address 33:16
affirmed 4:9
agencies 5:5
agency 25:14
ahead 9:15,18 10:12 11:20 14:22 18:15 19:20 20:2,15 23:16 24:7 25:18 26:9 27:6,22 28:5
aid 8:20 24:24 28:2
air 24:14
al 33:5 34:3
ambulance 11:1 26:21,23
amount 15:24 16:8
angle 24:13
answer 9:19 20:25 27:7
anymore 16:13
apologize 6:6 7:14
appear 19:8,10 23:9,13,20
APPEARAN... 2:1
appeared 23:25 31:9

**Appearing** 2:15
apply 25:14 26:6
approach 17:3 29:17,21
approached 16:5 28:14 29:23
area 8:16 9:21 26:12
argued 14:5
arms 24:13
Army 6:14
arrangements 33:9
arrest 14:17
arrested 14:10 15:4 16:24 17:16
arrived 8:25 18:11 19:23 23:9 24:10,16 24:19 27:1,11 27:20
ash@searcyla... 2:7
asked 8:12,14 9:4,7,10 10:3,5 10:16 11:10,21 11:24 12:13,13 12:14,17 13:22 14:2 16:10 28:9
asking 12:24
assigned 7:20
assist 28:3
assistance 7:23
attempt 10:20
attempted 11:17
ATTN 33:4
attorney 32:14 33:9,13
attorneys 32:16
authority 31:8
authorized 32:8
Avenue 2:15

**B**

back 8:14,15,18 8:19,23 9:5,11 9:21 10:4 12:14 13:1,20 13:22,23 15:22 15:22 16:2,11 18:3 21:4 22:7 24:11 26:16 27:2 28:9,13 29:1,11,12,13 33:10
BARNHART 2:4
BARRANCO 2:9,11 9:14,17 10:11 11:19 14:14,21 18:14 19:13,19 20:1 20:14,20 21:1 21:5,10,16,22 22:3,9,15,21 23:15 24:6 25:17 26:8 27:5,14,22 28:4,22 29:3 30:11,14,17 33:2,4
Based 24:1
Bayshore 1:23
Beach 2:4,5 31:5 32:4 33:20
began 4:1
behalf 2:2,8,13
believe 9:6 13:7 14:4 15:12 17:6 19:6 24:12 25:3 26:17 28:23 29:23
better 27:23
bit 8:24
bite 28:7
blank 33:15
bodily 21:15,21 22:2,8,14,20 26:7
Born 6:14

**bottom** 33:15
bought 6:24
Boulevard 1:23 2:4,10 33:3
brat 6:14 7:17
breathing 23:11 23:13,20,23
bridge 20:24 22:1
bring 15:22 16:2 18:3
business 6:17 7:11 28:12 29:9,19 30:1

**C**

c/o 33:2
calling 26:12
calm 8:24 25:7
calmed 24:22 28:8
Calvin 1:9 8:3,3
canine 4:22,25
capacity 22:25
cars 28:13
case 1:2 7:19 9:2 15:13 25:11 33:6 34:3
cause 21:14,21 22:2,8,14,20 26:7,13 33:7
cell 8:13 10:8 11:2,11,12,18 12:9,18 13:5,6 13:17 14:18 15:10,20
Certificate 3:8,8 31:1 32:1
certify 31:8 32:7 32:13
CHANGE 34:6
CHANGES 34:2
CHRISTOPH... 1:8
City 5:8
class 7:4
CLAYTON 1:8

**clear** 17:19
cleared 12:7 18:10
Clerk 33:14
close 9:25
closer 10:2,2,6
collect 11:11
college 6:18,20 6:21,23 7:1,7 7:10
Columbia 7:3
coming 28:13
Commission 31:16
completed 10:22 10:24 18:9
comply 12:11,12 18:19 24:2 25:22
concerned 19:9 19:11
concluded 30:19
confiscate 11:18
connected 32:17
considered 20:12,18,23 21:3
continue 29:14 29:22
control 25:16
conversation 12:22 13:1 14:9 15:9 17:1 17:17
conversations 23:3,6
convey 19:16
copy 30:17,18 33:9,10
correct 5:16 9:8 12:19 13:12 14:3 15:25 16:3 17:20 24:11 27:19 29:22
Corrections 5:9 5:23,24

correctly 12:7
17:7
counsel 32:14,16
County 1:10,12
2:13 4:20 5:3,6
24:3 31:5 32:4
Court 1:1 4:2
33:14
Courtemanche
1:9,17 4:8,14
31:9 32:9 33:2
33:22 34:4,24
creeping 8:13
9:23
crime 10:7
criminal 6:18
CSR 1:25 31:15
32:21 33:18
currently 4:19
7:20
customs 24:2
CVS 7:23,25
8:15 12:8
15:25 28:12
30:1

**D**

D 3:2
dad 6:14
danger 27:13,20
27:25
Date 34:24
Dated 32:19
day 6:6 31:10,12
32:19 33:7
days 33:13
deadly 20:12,18
20:23 21:3,8
declare 34:21
deemed 11:5
Defendant 2:8
Defendants 1:13
degree 7:3
delivered 19:6
demeanor 25:6
DENNEY 2:3
Department 5:9

5:12,16,22 6:2
depends 20:16
20:21
deposition 1:16
30:15 32:9
33:7,12
deputy 18:12,22
18:24 19:11
24:1 27:3,12
describe 25:6
detective 4:22
4:22 5:1 17:24
24:24
detectives 15:13
15:21
DICKER 2:15
difficult 23:10
Direct 3:7 4:11
disciplined 25:9
Discussion 4:17
distribution
33:11
district 1:1,1,12
1:12 2:13
Docher 1:4 7:19
10:16,25 11:8
18:13,17,21,25
19:12,24 23:4
23:10 24:5,10
24:22 25:2,6
26:16,20 27:2
28:3 33:5 34:3
DOCHER-NE...
1:4
document 34:21
door 28:12
download 15:18
downloading
18:8
Drawer 2:5
duly 4:9 31:10

**E**

E 3:2
ear 26:11
East 2:10 33:3
EDELMAN

2:15
eighth-grade
6:13
either 17:18
29:22
elbow 20:12,18
20:23 21:8,13
21:19,25 22:6
22:12,18
ELSER 2:14
employed 4:19
5:2
employee 32:14
32:15
encounter 10:8
enforcement 5:5
25:14
ENTER 34:2
entire 26:15
entrance 8:19
entranceway
8:15
Errata 3:9 33:10
34:1
ESQUIRE 2:6
2:11,17 33:4
et 33:5 34:3
eventually 17:14
evidence 13:8
14:24
evidentiary 11:6
11:7
exact 14:9 15:9
15:24 17:1
25:21
exactly 13:20
19:5 26:18
Examination
3:4 4:11
examined 4:10
excessive 19:17
execute 33:10
execution 3:9
Expires 31:17

**F**

fact 15:2

facts 34:21
far 11:8 23:22
27:7,24 29:24
father 7:16
fear 9:23 27:3,8
feel 27:12,19,24
feeling 27:24
feet 8:17 27:15
felt 27:16 29:7,9
FF 31:16
fighting 8:4
filed 33:14
film 29:14
filming 28:16,21
29:2,7,8,10,11
29:16
financially 32:17
find 16:16,19
fine 23:13,25
Finish 29:18
finishing 7:2,3
Fire 1:12 2:13
first 4:9 8:20
11:21 12:12,17
13:19,21,25
24:24 28:6
flailing 8:6 25:8
flare 8:23
Floresta 7:24
Florida 1:1,11
1:23 2:5,10,16
6:9 31:4,16
32:3 33:3,20
focus 12:17
following 4:1
follows 4:10
footage 14:19
force 19:17
20:12,18,23
21:3,8
foregoing 32:9
34:21
form 9:14,18
10:11 11:19
14:14,21 18:14
19:13,19 20:1
20:14,20 21:1

21:5,10,16,22
22:3,9,15,21
23:15 24:6
25:17 26:8
27:5,14,22
28:4,22 29:3
Fort 2:10 33:3
forth 13:1,20
Forum 33:19
forwarded 3:9
33:13
found 33:10
four-year 7:1
FPR 1:25 31:15
32:21 33:18
front 26:19
28:12
FTO 8:3
FURTHER
32:13

**G**

gain 25:16
Germany 6:15
girlfriend 11:15
11:15,17 12:2
17:3
GIUFFREDA
2:9 33:2
give 4:5 9:1
13:18,19,22
15:21
go 4:15 6:20
8:18 9:14,18
10:11 11:19
14:21 18:14
19:19 20:1,14
23:15 24:6
25:17 26:8
27:5,22 28:2,4
29:8,20
going 6:7 10:1
16:24 19:24
24:17
graduate 7:7
graduated 7:5
great 21:14,21

22:2,8,14,20
26:7
**ground** 8:5,11
8:21
**grow** 6:11
**guardian** 1:5
**guess** 10:4 11:1
**guy** 10:4

**H**
**Hampshire** 5:8
5:9,12 6:3,9,11
6:12,25 7:12
**hand** 4:3 11:12
11:22 12:9
13:11 14:2,7
14:11 15:3
17:12,16,20
**handcuffed** 8:5
24:11 27:2
**handcuffs** 12:1
26:16
**handed** 11:14,15
12:3,18 15:7
15:12 17:24
**handing** 14:18
**handling** 15:13
**happen** 14:6
**happened** 16:10
17:25
**harm** 21:15,21
22:2,8,14,20
**head** 8:6,21 21:4
22:7,19 24:25
**hear** 8:8 19:23
**heard** 7:22
**Hecht** 2:6 3:7
4:12,15,18
9:24 10:14
12:5 14:16
15:1 18:20
19:15,22 20:4
20:17,22 21:2
21:7,12,18,24
22:5,11,17,23
23:18 24:9
25:23 26:14

27:10,18 28:1
28:19,24 29:5
30:9,16
**held** 4:24
**help** 19:24,24
27:17
**helped** 27:17
**Hesser** 6:21,23
7:10
**Hey** 10:4 29:25
**hiding** 30:3,4,6
30:7,8
**high** 6:16 7:5
**home** 7:21

**I**
**idea** 15:15,17,19
19:14
**imagine** 13:4
**inappropriate**
19:18
**incident** 13:25
23:1
**independent**
1:12
**indicating** 25:21
26:11
**individual** 8:4,5
8:13,18,20,23
9:4 10:7,9
14:19 20:13,19
20:24 21:4,9
21:13,15,20
22:13 28:10
**individual's**
22:1,7
**individually** 1:8
1:9,9,10,11
**industry** 7:6
**initially** 12:20
16:15 17:11,21
25:7
**inject** 25:1
**injury** 26:7
**interaction** 24:4
**interested** 32:18
**investigations**

4:23 7:21
**involved** 18:7
**involvement**
7:18 25:11

**J**
**J** 1:10
**JANICE** 1:4
**jaw** 20:19 21:20
**join** 7:7
**joined** 7:15
**JOLLY** 2:9 33:2
**JOSE** 1:11
**Julie** 2:17 30:11
**julie.tyk@wils...**
2:17
**June** 31:12
32:19 33:1
**justice** 6:19

**K**
**Kansas** 6:15
**keep** 28:9
**KEN** 1:10
**kept** 8:13
**kicking** 8:6,23
28:7
**kill** 19:25
**kind** 6:6 8:10
12:25 25:7
**knew** 6:7
**know** 11:8 13:2
15:14 17:25
20:5,11 25:4
26:22 30:7

**L**
**Lakes** 2:4
**Lanosa** 1:25
31:15 32:6,21
33:18
**Lauderdale** 2:10
33:3
**law** 5:5 25:13
**leave** 29:9,22
30:1
**leg** 19:7

**legal** 1:5 14:13
**legs** 19:5
**Let's** 12:17
**letter** 3:9 33:15
**life** 27:13
**line** 13:7 34:6
**listed** 33:16
**little** 8:22,24
29:15
**lives** 27:20,25
**LLP** 2:15
**long** 4:24 5:2 6:6
15:20 24:19
**lot** 10:6
**loud** 29:25
**Lucie** 1:10,11,23
2:13 4:20 5:3,6
24:3

**M**
**M** 2:11
**Mahoney** 9:5
11:12,16,22,23
11:25 12:8,14
12:18 15:2,22
16:3,11,21
19:8,10 28:16
28:21,25
**Manchester**
6:23
**Mangrum** 1:8
8:3,8,12 10:3,5
18:12 19:12
24:2 27:4 28:8
**Mangrum's**
27:12
**MASCARA**
1:10
**mass** 25:15 26:6
**mean** 10:24 25:3
**medication** 25:2
**mentioned**
28:11
**military** 6:14 7:8
7:15,16
**MOSKOWITZ**
2:14

**mother** 1:4
**move** 29:11,12
29:13
**moved** 6:3,12,15
7:17 26:18
**moving** 10:2
23:17

**N**
**N** 3:2
**name** 4:13 9:5
33:15
**neck** 25:16 26:7
26:12
**need** 9:12 27:16
**needed** 7:23
9:22 13:8 16:6
**nerve** 25:15,22
26:6
**New** 5:8,9,12 6:3
6:8,11,12,25
7:12
**Newman** 1:8 8:2
8:19 18:12
19:11 24:1,24
27:3,12 33:5
34:3
**normally** 23:21
23:23
**North** 2:15
**nose** 20:24 22:1
**Notary** 31:16
**notes** 32:12
**notice** 33:7

**O**
**Oath** 3:8 31:1
**Object** 9:14
10:11 11:19
14:14,21 18:14
19:13,19 20:1
20:14,20 21:1
21:5,10,16,22
22:3,9,15,21
23:15 24:6
25:17 26:8
27:5,14,22

28:4,22 29:3
**objecting** 9:17
**observed** 8:2
    26:15 29:16
**Office** 4:20 5:3,7
    24:4
**officer** 5:20,24
**officers** 9:22
    10:16 14:19
**officers'** 10:18
**Okay** 7:18 12:6
    15:10 30:14
**once** 8:22 29:25
**one's** 22:19 26:6
**open** 28:12
**opinion** 23:24
**Orange** 2:15
**order** 30:16
**ordered** 30:15
    33:9
**ordering** 33:13
**original** 33:13
**Orlando** 2:16

**P**

**p.m** 1:21,21 4:1
    30:19
**P.O** 2:5
**PA** 2:4,9 33:2
**Page** 3:4 34:6
**Pages** 1:19 3:6
    32:10
**Palm** 2:4,5 31:5
    32:4 33:20
**paramedic** 25:1
**paramedics** 23:7
    25:5
**parties** 32:15
    33:11
**parties'** 32:16
**passed** 11:9,10
**Patricia** 1:25
    31:15 32:6,21
    33:18
**penalties** 34:21
**people** 28:9,10
    28:15

**perjury** 34:21
**person** 28:20
**personally** 31:9
**Phipps** 1:22
    33:19
**phone** 2:15 8:14
    10:8,20 11:3
    11:11,13,18,22
    11:23,23,24
    12:2,3,4,9,13
    12:18,24 13:5
    13:6,8,17,21
    14:1,5,11,18
    14:24 15:3,7
    15:10,20 16:2
    16:6,13,14,17
    16:19 17:5,8
    17:13,22,25
    18:3,5,8 28:11
**pillar** 30:5
**Pittsfield** 5:8,12
    5:15 6:2 7:13
**Place** 33:19
**placed** 12:1
    26:20
**Plaintiff** 1:6 2:2
**please** 4:3,13
    33:7,10,15
**Plus** 28:12
**point** 8:17 11:4
    11:5,8,10
    14:23 16:2,16
    17:2 27:9,16
    28:8 29:16
**police** 5:12,15
    5:20 6:2 10:8
**policies** 24:3
**Port** 1:23
**position** 4:21,24
**Possibly** 14:8
**post** 29:16
**practices** 24:3
**pressure** 25:15
    26:6
**Prima** 7:24
**prison** 5:10,14
    5:24 7:12

**probably** 8:17
    15:8
**proceedings** 4:1
    30:19
**Professional**
    32:7
**Public** 31:16
**pulled** 8:7,9,12
**PURDY** 2:9
    33:2
**purse** 17:7

**Q**

**question** 9:18
**questions** 30:10
    30:12,13,14

**R**

**radio** 7:22
**raise** 4:2
**read** 3:9 30:15
    33:10,12 34:21
**readily** 13:11
**really** 9:20
**reason** 9:20
    10:16 29:9
    34:6
**recall** 18:24
    19:21 28:17
**record** 4:15,17
    32:12
**referring** 26:10
**refused** 11:22
    12:1
**regarding** 7:19
**regards** 22:25
**Registered** 32:6
**relative** 32:14,15
**relax** 8:9
**relocated** 6:8
**remember** 12:13
    13:3,16,20
    14:8 15:8
    16:25 17:7,17
    18:22 19:2,4,4
    20:3 24:15
    25:21 26:18,22

26:22,23 28:18
**render** 8:20
**rendering** 24:24
**report** 9:3,7
    32:8
**Reported** 1:24
**Reporter** 3:8 4:2
    32:1,7
**Reporting** 1:22
    33:19
**reprimanded**
    25:9
**requested** 32:11
**rescue** 8:25
**resistance** 27:8
**resisting** 8:9,11
    18:17 23:17
    25:22
**response** 13:15
**restaurant** 6:17
    7:6,11
**result** 25:10
**retrieve** 11:24
    12:15,16 14:1
**return** 12:13
    33:16
**returned** 11:23
    33:11
**review** 32:10
**right** 4:3 6:5
    13:13 17:2
    18:9 30:9
**Robinson** 1:9
    18:12 19:6,12
    24:2 27:3,12
**ROSARIO** 1:11
**round** 12:20,20
    12:23,23
**RPR** 1:25 31:15
    32:21 33:18

**S**

**S** 2:6
**safety** 10:17,18
    27:3
**sanctioned**
    25:10

**saw** 8:1,19 24:1
    25:5
**saying** 20:3
**SCAROLA** 2:3
**scene** 11:1 12:7
    18:10,11 23:7
    24:10 27:1,11
    27:21
**school** 6:16 7:5
**screaming** 19:24
**Sean** 9:5 11:12
**SEARCY** 2:3
**second** 11:25
    12:15 14:1
    16:6
**Seconds** 24:21
**see** 18:11,21
    23:22 25:1
    26:20
**seeing** 24:15
    28:18
**Shaun** 11:16
    12:8,18 15:22
    19:8,10 28:15
    28:21,25
**Sheet** 3:9 33:10
    34:1
**SHERIFF** 1:10
**Sheriff's** 4:20
    5:3,7 24:4
**SHIPLEY** 2:4
**shop** 29:19
**shopping** 29:19
    29:22
**shortly** 8:25
**shown** 11:4
**side** 20:19 21:20
    22:19 25:20
**sign** 3:9 33:12
    33:15
**signature** 33:8
    33:15,21
**Signed** 31:12
**simply** 28:25
**sir** 10:19 20:7
**situation** 20:16
    20:21 26:4

six 5:1
solemnly 4:4
somebody 25:22
  26:24
someone's 25:16
sorry 6:4 9:16
sort 11:7 22:24
sounds 13:18
south 7:22
Southern 1:1
  6:25 7:3
Southwest 1:23
special 1:12 4:23
  7:20
specific 9:20
specifically 8:8
  9:12 13:2,3
  18:22
St 1:10,11,23
  2:13 4:20 5:3,6
  24:3
stages 10:6
stale 11:1
standing 9:25
start 8:23
started 6:18 7:2
  25:8
state 4:13 5:10
  5:24 7:12 31:4
  31:16 32:3
stated 11:9
  34:22
statement 9:1
STATES 1:1
stenographic
  32:12
stenographica...
  1:24 32:8
step 9:4 10:17
  29:1
stood 8:16 28:13
stop 8:9,10 9:8
  9:10,11,12,21
  28:20 29:2,7,8
  29:10
stopped 8:10,11
  29:15

strike 19:6,9
  20:5,6,10,13
  20:19,24 21:3
  21:8,13,19,25
  22:6,12,18
strikes 18:18
striking 18:21
  18:25 19:2
struggle 10:1,6
  14:20 24:17,20
  28:3,16
stuff 28:13
Suite 2:10,15
  33:3,19
SUMMER 2:11
  33:4
summer@pur...
  2:12
Sunrise 2:10
  33:3
supervisors 11:4
supervisory
  22:24
supplement
  18:10
sure 12:6 28:14
swear 4:4
sworn 4:9 31:10

_____ T _____

take 10:20 30:17
  30:18 33:7
talk 13:24,25
talking 10:4
  26:24
tape 10:8
taping 9:8,10,11
  9:13,21 10:15
Tavares 1:4 7:19
  10:16 18:13,21
  18:25 19:12,23
  23:4,10 24:5
  24:10,22 25:1
  25:6 26:15,20
  27:1 28:3
Tavares' 25:6
technique 26:1,5

telephone 16:11
tell 7:14,18,25
  12:22 13:10
  14:6,10 15:2
  15:23,24 16:8
  16:14,22,23
  26:17 27:23
  28:25 29:21
telling 8:8 12:24
temple 20:13
  21:14
testified 4:10
testimony 4:4
Texas 6:15
things 18:18
  28:8
think 5:13 6:13
  6:24,24 8:3
  11:14 19:4
  24:25 25:19
  29:18
thinking 19:14
third 12:15
thirty 33:13
threaten 11:16
three 4:25
throat 21:9
  22:13
thumb 20:5,6,10
  25:15,20 26:6
time 7:8 11:21
  11:25,25 12:1
  12:12,15,15,17
  13:19,22 14:1
  15:24 16:5,6
  16:12 23:10
  26:15 27:25
  28:6 30:4 33:8
times 10:5
today 4:5 7:4
told 8:14,18 12:2
  16:6,21,22
  17:15 28:20
  29:1,4,18,24
  29:25 30:2
top 18:12
trained 20:9

25:13,24
transcript 32:11
  32:11 33:9,11
  34:2
transmission
  7:23
transported
  10:25
treating 19:12
tried 14:1
true 32:12 34:22
truly 33:17
truth 4:5,6,6
trying 8:19 28:7
turn 12:25
turning 12:21
two-year 7:1
TYK 2:17 30:13
  30:18
type 8:20

_____ U _____

ultimately 13:17
  17:12
underneath
  26:11 28:11
undersigned
  31:8
understand 12:6
  13:24 23:19
unit 4:23
UNITED 1:1
University 6:25
unnecessary
  19:18
use 10:7 20:9
  26:5
utilize 21:19,25
  22:6,12,18
utilized 26:1
utilizing 19:17

_____ V _____

v 33:5 34:3
value 11:6,7
video 11:6
videotaped

14:18
Vista 7:24
VOLUME 1:18
  3:6
vs 1:7

_____ W _____

Wade 1:9,17 4:8
  4:14 31:9 32:9
  33:2,22 34:4
  34:24
waive 33:8,15,21
want 12:6 13:2
  13:24 17:20
wasn't 10:15
  15:23
watch 15:16
  18:5
way 7:21 11:17
  19:9,11,16
  25:10
we'll 13:25
Weather 6:10
Wednesday 1:20
went 7:6,11
  12:20,23 13:20
  16:5
weren't 29:24
West 2:5 33:20
whatnot 27:17
WILSON 2:14
window 8:7
wish 33:15
Witness 3:9 4:7
witnessed 26:24
work 7:12
worked 5:6,11
  5:15 6:1,17 7:5
  25:14
working 25:4,5
WRITE 34:2
wrote 9:3

_____ X _____

X 3:2

_____ Y _____

**Yeah** 23:25
24:12 25:19
30:4
**year** 6:13
**years** 4:25 5:1
5:11
**young** 7:17

**Z**

**0**

**1**
**1** 1:18,19 3:6,6
7:22 32:10
33:1
**10/19/2018**
31:17
**11** 7:19 22:25
**111** 2:15
**1200** 2:15
**1216** 2:10 33:3
**1551** 33:19
**1680** 1:23
**169350** 31:16
**1st** 31:12 32:19

**2**
**2:00** 1:21 4:1
**2:16cv14413** 1:2
33:6 34:3
**2:35** 1:21 30:19
**20** 8:17
**20-something**
27:15
**200-E** 33:19
**2000** 5:13,14,18
5:25 6:1
**2007** 5:13,18 6:1
6:2
**2009** 5:4,25 6:2
**2014** 7:19 22:25
**2017** 1:20 31:11
31:12 32:19
33:1,7 34:4
**2139** 2:4
**2455** 2:10 33:3

**25** 8:17

**3**
**30** 33:13
**31** 1:20 3:8 34:4
**31st** 31:10 33:7
**32** 3:8
**32801** 2:16
**33** 3:9
**33304** 2:10 33:3
**33401** 33:20
**33402-3626** 2:5
**34** 1:19 3:6,9
32:10
**34984** 1:23
**3626** 2:5

**4**
**4** 3:7
**407)203-7592**
2:16

**5**
**561)686-6300**
2:6

**6**

**7**

**8**

**9**
**90-degree** 24:13
**954)462-3200**
2:11 33:4
**99** 5:14