# In the Matter of:

## Docher v. Newman

## Dr. Brian G. McAlary

August 4, 2017



Court Reporting
Videography
Videoconferencing

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

        TAVARES DOCHER, by and through
        JANICE DOCHER-NEELEY, his mother
        and legal guardian,

                    Plaintiff(s),

        v.                              Case No.:2:16-cv-14413

        CHRISTOPHER NEWMAN, individually,
        CLAYLAN MANGRUM, individually,
        CALVIN ROBINSON, individually,
        WADE COURTEMANCHE, individually,
        KEN J. MASCARA, as Sheriff of
        St. Lucie County, Florida,
        JOSE ROSARIO, individually, and
        the ST. LUCIE COUNTY FIRE DISTRICT,
        an independent special district,

                    Defendant(s).
        - - - - - - - - - - - - - - - - - -

                                        Culpeper, Virginia
                                        Friday, August 4, 2017

        Video conference deposition of

                    DR. BRIAN G. MCALARY

        the expert witness, called by counsel on behalf

        of the defendants, pursuant to notice, taken in

        the home office of Dr. Brian G. McAlary, located

        at 10771 Alum Springs Road, Culpeper, Virginia,

        commencing at approximately 9:05 o'clock, a.m.,

        before Sharon D. Akers, a Notary Public in and

        for the Commonwealth of Virginia, when there were

        present on behalf of the respective parties:
```

APPEARANCES:


On Behalf of the Plaintiff:


Adam S. Hecht, Esquire
Searcy Denney Scarola Barnhart
 & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida  33409
ASH@SearcyLaw.com


On Behalf of the Defendants:


Benjamin W. Newman, Esquire
Wilson Elser Moskowitz Edelman
 & Dicker, L.L.P.
11 N. Orange Avenue, Suite 1200
Orlando, Florida  32801
BenNewman@wilsonelser.com


Bruce W. Jolly, Esquire
Purdy, Jolly, Giuffreda & Barranco, P.A.
2455 East Sunrise Boulevard
Suite 1216
Fort Lauderdale, Florida  33304
Bruce@purdylaw.com


                    * * * * *

                 C O N T E N T S


WITNESS:                                    PAGE:


Dr. Brian G. McAlary
     Examination by Mr. Newman           3, 85
     Examination by Mr. Jolly               53
     Examination by Mr. Hecht               81


                    * * * * *

```
 1              P R O C E E D I N G S

 2   Whereupon,

 3              DR. BRIAN G. MCALARY

 4   the expert witness, was called by counsel on

 5   behalf of the defendants, and having been duly

 6   sworn by the Notary Public, was examined and

 7   testified as follows:

 8       EXAMINATION ON BEHALF OF THE DEFENDANTS

 9          BY MR. NEWMAN:

10       Q    Good morning, sir.  Can you tell me your

11   name and address please.

12       A    Yes.  It's Brian Gerard McAlary and I'm

13   talking to you from my home office at 10771 Alum

14   Springs Road, in Culpeper, Virginia.

15       Q    Dr. McAlary, my name is Ben Newman and

16   I'm an attorney representing the St. Lucie County

17   Fire District.  I understand that you have been

18   retained in this case involving Tavares Docher as

19   an expert for the plaintiff.  Is that your

20   understanding?

21       A    That is my understanding.

22       Q    All right.  And as part of the
```

```
 1    requirements in federal court, you have prepared

 2    a report which we've been provided.  The date of

 3    it is May 21st, 2017, the one that I have.  Since

 4    that time, have you prepared any additional

 5    reports?

 6         A    No, nor have I been asked to.

 7         Q    As part of the report, it has a list of

 8    deposition and trial testimony since 2013,

 9    through 2016.  It doesn't have 2017.  Have you

10    had depositions or trial testimony in 2017?

11         A    Yes.

12         Q    Do you know approximately how many

13    depositions you've had in 2017?

14         A    I'd say approximately four or five.

15         Q    Have you testified at trial in 2017?

16         A    Not to my recollection.

17         Q    How long have you held yourself out as

18    an expert for medical legal cases?

19         A    I have served as an expert analyst in

20    adverse outcomes for a little over 40 years; and

21    during that time, I have been accepted by the

22    courts in several states as a qualified medical
```

1    expert; and I'm also certified in the state of

2    Florida for whatever relevance that my have.

3         Q     Certified in what way?

4         A     I have a certificate as an expert

5    witness from the state of Florida.

6         Q     Is that the, as far as you know, is that

7    the certificate that allows you to testify about

8    the standard of care?

9         A     As far as I know.  It doesn't have any

10   restrictions that I'm aware of.  I just, about

11   every two to three years, have to renew it.  In

12   fact, I just recently renewed it and I'm

13   expecting the new certificate to arrive.

14        Q     In that approximate 40-year time frame,

15   how many depositions have you given?

16        A     Approximately 450.

17        Q     And of the cases that you have reviewed

18   where you've given depositions, what percentage

19   have been on behalf of the plaintiff as opposed

20   to the defendant?

21        A     In the first let's say 15 years, it was

22   probably only 15 percent for defendant.  In that

 1   last 20 or so years, it's been about 90 percent

 2   of the time at the request of a plaintiff's

 3   attorney.

 4        Q    In preparing the list of deposition and

 5   trial testimony that you have in this report,

 6   what did you do to compile that list, what did

 7   you look at?

 8        A    It wasn't so much what I looked at.  I

 9   had some folders of what I thought to be active

10   cases, so I looked at that.  I also looked at

11   correspondence to see if there was any reference.

12   I called some attorneys that I knew I had worked

13   with, asked if they could provide pieces.  So it

14   was a hodge-podge of pulling together random

15   sources since I do not keep a database of that.

16        Q    Is this a complete and accurate list?

17        A    I doubt it.  I suspect there could be

18   matters there that either containing correction

19   or contain lack of correction, not intended

20   obviously, or a few omissions because as

21   indicated, I do not keep such a database.

22        Q    All right.  How many cases do you

```
 1   believe are not included on the list where you've

 2   given deposition or trial testimony?

 3        A    I'd say maybe two.

 4        Q    Dr. McAlary, I took your deposition on

 5   June 30th, 2016 in a case called Aulbach,

 6   A-u-l-b-a-c-h, where you were retained by the

 7   plaintiff.  It's not on this list.  Do you recall

 8   that you gave a deposition in that particular

 9   case?

10        A    I don't but the name sounds very

11   familiar and I will accept your representation,

12   in which case, feel free to add it to that list.

13        Q    Do you still have records from your

14   involvement from that case?

15        A    Not if the matter is settled I wouldn't.

16        Q    Okay.  Other than that case, as we talk

17   about it, are there any other cases that come to

18   mind that you may have given or that -- not you

19   may but you did give deposition testimony or

20   trial testimony and they aren't on this list?

21        A    No.

22        Q    Just very briefly, Doctor, obviously
```

```
 1  you've had depositions before.  We're doing this

 2  by video conference.  You're doing a great job so

 3  far allowing me to finish my question before you

 4  answer me.  I'm going to do my best to make sure

 5  you're done with your answer before I ask you

 6  another question.

 7          I don't know how long this will be.

 8  Ordinarily, it's not a lengthy process.  But at

 9  anytime you want to take a break, please feel

10  free to do so; okay?

11      A    Thank you.

12      Q    Dr. McAlary, currently, are you actively

13  practicing as a physician?

14      A    No.  I anticipate that I will be

15  returning to the clinical practice of medicine in

16  approximately a month.

17      Q    Where will that be?

18      A    At an unidentified location in North

19  Carolina.

20      Q    All right.  When you say unidentified,

21  are you saying that you don't know yet or you're

22  not at liberty to say where it will be?
```

1      A     A combination of both, mostly the

2    former.

3      Q     Okay.  And in what capacity will you be

4    practicing?

5      A     As an anesthesiologist.

6      Q     Will you be brought on as a locum tenens

7    situation or will you be considered a full-time

8    staff member?

9      A     My role will be as an independent

10    contractor associated with an organization that

11    provides anesthesia services.  My role will be

12    more of supervision, direction, and depending on

13    the facility, perhaps starting it from the ground

14    up.

15      Q     You said you're not currently in

16    clinical practice as an anesthesiologist.  As a

17    doctor, has anesthesiology been your area of

18    clinical practice?

19      A     In clinical practice, it's been

20    anesthesiology and its respective sub-

21    specialties.

22      Q     When is the most recent time that you've

Dr. Brian G. McAlary                                    8/4/2017

```
 1   practiced clinically?

 2        A    I retired the end of 2013.

 3        Q    Where did you retire from?

 4        A    I finished up 12 years of practice at

 5   Rush University Medical Center, in Chicago.

 6        Q    Do you currently hold any academic

 7   positions?

 8        A    I currently hold two academic positions.

 9        Q    Where are they?

10        A    One is at Rush University and the other

11   is at Virginia Commonwealth University.

12        Q    What are the positions?

13        A    I'm an assistant professor at Rush and

14   I'm an associate professor at Virginia

15   Commonwealth.

16        Q    In the assistant professorship role, do

17   you actively teach medical students or interns or

18   residents?

19        A    I do not.  My teaching responsibility

20   there is for the program of nurse anesthesia.

21        Q    And what are your responsibilities as an

22   associate professor at Virginia Commonwealth?
```

```
 1       A     That appointment gives them the

 2   prerogative of contacting me from time to time

 3   where they use me, as they had for the prior 12

 4   years I was at Rush, as a consultant in terms of

 5   both issues within their department, as well as

 6   national issues.

 7             I also go in there to Chicago about four

 8   times a year where I conduct seminar-type of

 9   training for the students.

10       Q     Since retiring in 2013 from the clinical

11   practice, what percentage of your overall income

12   has been derived from working as a medical legal

13   expert?

14       A     I would say the percentage of my

15   professional income has increased from about 15

16   percent when I was clinically active, to closer

17   to 40 percent now.

18       Q     Have you ever served as a medical

19   director for any emergency medical services

20   organization, including any fire departments or

21   fire districts?

22       A     No, I have not served as a medical
```

 1   director; but I have served as a faculty member

 2   during the approximately seven years I served at

 3   the Baltimore Shock Trauma Center.  I was one of

 4   the faculty instructors for the pre-hospital

 5   community.

 6        Q    I'm sorry.  I missed that part.  You

 7   said you were a faculty member for the Shock

 8   Trauma Center.  Was there an actual title?

 9        A    I don't know if there was a title or

10   not.  I held a faculty position through the

11   University of Maryland, but I was one of the

12   instructors for the pre-hospital community that

13   served the local area in Baltimore, as well as

14   with the EMT paramedics and state police who

15   served a five-state wide EMS system.

16        Q    Other than this case, have you ever been

17   retained in a case to render opinions about the

18   conduct of emergency medical personnel?

19        A    It is certainly possible.  I suspect in

20   no more than two or three times over 40 years has

21   that aspect of the care been of relevance to my

22   analysis and opinions.

Dr. Brian G. McAlary

1      Q     If you look at the list of cases that

2   you provided from 2013 through 2016, do you know

3   if any of those concern opinions related to the

4   implementation or provision of emergency medical

5   services?

6      A     Not to my knowledge.

7      Q     In this particular case, you were

8   retained and hired by the Searcy Denney Law Firm.

9   Do you know on how many occasions other than this

10  case you have been hired by that law firm as an

11  expert?

12     A     I'd say approximately three others.

13     Q     Are any of them currently active?

14     A     I couldn't tell you.

15     Q     Do you know if you've given deposition

16  testimony in any of those cases?

17     A     Yes, I'm virtually certain I have

18  because I recall being involved in a trial of one

19  of those cases and therefore it's probable that I

20  was deposed.

21     Q     That was going to be my next question,

22  about trial testimony.  So you believe you've

 1    given trial testimony in at least one case on

 2    behalf of the Searcy Denney Law Firm?

 3        A    I believe that's correct.

 4        Q    In your report of May 21, 2017, you list

 5    out the information that was provided to you.  It

 6    starts on -- there's a cover letter, May 21st,

 7    and then there's a report that starts with page

 8    numbers and on page one and going over to page

 9    two, there's a list of things that were provided

10    to you.

11            Since that time, have you been provided

12    anything else by Mr. Hecht or his office for this

13    case?

14        A    Yes.

15        Q    What else have you been provided?

16        A    Well, let's see.  I'm fairly sure that

17    I've received additional deposition material.

18    The only way I could confirm that is, I can give

19    you -- I have organized in front of me materials

20    that I received over the years, and I have a

21    stack of depositions.

22            I'll be happy to read you those and

```
 1   obviously any that are in that stack that aren't

 2   in this letter would be able to be presumed to be

 3   those that I received subsequent to this letter

 4   report.

 5       Q    Great.  Yeah, why don't you tell me the

 6   names of the depositions that you have received.

 7       A    All right.  Yes, this is definitely one

 8   of the new, this is Dr. Sterba, S-t-e-r-b-a; I've

 9   also received the audio file transcription of the

10   statement made by EMTP Thomas Sinclair; Sheriff

11   Deputy Courtemanche, C-o-u-r-t-e-m-a-n-c-h-e,

12   Sheriff Deputy Eric Newman; a plaintiff expert by

13   the name of Melvin Tucker; EMTP Jose Rosario,

14   R-o-s-a-r-i-o; Sheriff Deputy, who at the time

15   was in training, Calvin Robinson; a station chief

16   at the time of this event, Captain Brian

17   Gonzales; a grouping of CVS employees and

18   witnesses including a Ms. Gilewski,

19   G-i-l-e-w-s-k-i; the shift manager at CVS at the

20   time Mr. Marc, M-a-r-c, Marc Brown; the store

21   manager Mr. Hardyal Bhagudas, H-a-r-d-y-a-l, last

22   name B-h-a-g-u-d-a-s; the deposition of EMTP
```

```
 1    Thomas Sinclair; the deposition of Deputy

 2    Mangrum, M-a-n-g-r-u-m; and the deposition of a

 3    family medicine doctor who cared for Tavares at

 4    Kindred by the name of Dr. Nasar, N-a-s-a-r.

 5            Those appear to be all the depositions

 6    that I have.

 7        Q    And have you read all of those

 8    depositions?

 9        A    I have.

10            MR. NEWMAN:  Let's go off the record for

11    a second.  I'm having technical issues, so I need

12    to step out of the room for probably two or three

13    minutes.

14            (A brief recess was taken.)

15            BY MR. NEWMAN:

16        Q    Right before the brief break, Dr.

17    McAlary, we discussed the deposition transcripts

18    and you told me you reviewed all of them.

19        A    All of the ones I mentioned.  I don't

20    know how many others may have been taken.

21        Q    Right.  In the list of information or

22    materials that you have, you have disclosed the
```

 1    Emergency Medical Guidelines, Fourth Edition,

 2    regarding combative patients.

 3         A    Yes.

 4         Q    All right.  Is that something that you

 5    have available there with you today?

 6         A    I do.

 7         Q    And what is that, sir, is that a chapter

 8    in a book, is it a brochure, what is it?

 9         A    Let's see.  I should be able to retrieve

10    that from this stack, which is a separate

11    grouping.  Okay.  What I have is what I would

12    call a section on the agitated or violent patient

13    behavioral emergency portion of the national

14    model for EMS clinical guidelines.

15              Subsequently, I have received the entire

16    publication.

17         Q    Do you have just the section there with

18    you today?

19         A    I have both the entire publication, as

20    well as a couple of sections.  I believe the

21    sections were sent initially.

22         Q    Were they provided by Mr. Hecht's office

1    to you or is it something that you got on your

2    own?

3        A    No.  They were referenced in a

4    deposition, and I was provided the portions and

5    then recently requested the entire publication

6    and received it.

7        Q    Do you have the publication there?  You

8    said you do; right?

9        A    I do.

10       Q    Is it a textbook, is it simply a paper,

11   what's the format?

12       A    Let me show it to you.

13       Q    Okay.

14       A    You can see the depth of it of 8 1/2 by

15   11 papers and you can see the title.

16       Q    Right.

17       A    And it is a publication of the National

18   Association of State EMS Officials, with the

19   intended use to guide EMS professionals.

20       Q    Before we get into your opinions in this

21   case, what in that publication did you rely upon

22   that supports your opinions that you have?

1      A      I think there were several things within

2   this publication that were supportive of the

3   opinions that I had shared with Mr. Hecht, most

4   of which, but perhaps not all of which, are in

5   the May 21st previously mentioned report.  I'm

6   going to go to the index of this publication, or

7   perhaps more accurately the table of contents.

8           The areas that I looked at that I found

9   relevant begin on page 43, and that's the one

10  that I have the individual section that was

11  previously sent to me captioned agitated or

12  violent patient/behavioral emergency.

13          The next was under the category of

14  general trauma management and it began on page

15  146 and head injury that began on page 164.

16  Those were the areas that I found relevant to the

17  areas of concern and opinions that I intend to

18  express.

19          If you don't have that publication, I

20  think it's easily accessible online.

21      Q      Okay.  Based on the materials that you

22  have reviewed, that appears to be the only

```
 1   outside reference source not specifically related

 2   to this case.

 3           Have you reviewed any other literature,

 4   research --

 5       A    Yes.

 6       Q    -- medical publications?

 7       A    Prompted by a question that was asked in

 8   earlier deposition, I obtained the package insert

 9   associated with lorazepam/ativan.  And I don't

10   think there's anything else, as I'm looking

11   quickly through reference materials, that is

12   otherwise new since that report.

13       Q    In regard to that package insert, Dr.

14   McAlary, are there contraindications that are

15   listed --

16       A    There are.

17       Q    -- for ativan?

18       A    Yes.

19       Q    Okay.  What, if any, contraindications

20   listed in the package insert do you believe, if

21   any, were present in this situation with Mr.

22   Docher?
```

1       A    I don't believe there were any of their

2    listed contraindications.

3       Q    Okay.  And --

4       A    With the possible exception, although

5    it's not cause, there was the absence of

6    indications.  For example, on page 4 of the 28-

7    page document, it states that ativan is not

8    recommended for use in patients with a primary

9    depressive disorder or psychosis; and it is my

10   opinion that, as documented by the EMS, that the

11   primary condition was a psychiatric condition

12   that included psychosis, both a delusional and

13   hallucinatory.

14      Q    In reviewing the package insert, did you

15   review the section that's titled adverse

16   reactions?

17      A    Yes.

18      Q    In Mr. Docher's case, do you believe

19   that any of these adverse reactions listed

20   occurred?

21      A    Yes.  He sustained, following injection,

22   apnea and further hypotension leading to cardiac

Dr. Brian G. McAlary

```
 1   arrest.

 2        Q    What is apnea?

 3        A    Apnea literally means the absence of any

 4   breathing.

 5        Q    Can it also be characterized as

 6   respiratory arrest?

 7        A    Yes, although that's a less precise

 8   term.

 9        Q    All right.  Under the adverse reactions

10   in the package insert of ativan, is apnea or

11   respiratory arrest listed as an adverse reaction?

12        A    I recall respiratory depression.  Let me

13   see if this package insert uses either of those

14   terms or at least that I noted, if you'll give me

15   just a moment.  In order to save time, I'm going

16   to look at the highlighted portions.

17             It refers to sleep apnea as a cautionary

18   concern.  Yes, it does.  On page 10 of 28, which

19   is the first page of the adverse reactions, it

20   listed respiratory depression and apnea.

21        Q    Where is the term apnea?  I'm not seeing

22   it.
```

```
 1        A     Okay.  Do you have page 10 of 28 in

 2    front of you?

 3        Q    I have the package insert.  I'm not sure

 4    if you and I have the exact same format.

 5        A     Okay.  If you look under adverse

 6    reactions, the term apnea would be half way

 7    through the third paragraph on the version that I

 8    have.

 9        Q    Okay.  Is cardiac arrest listed as an

10    adverse reaction?

11        A    I don't believe so.  And it should not

12    be as a primary manifestation of the drug.  It

13    would be secondary to respiratory arrest.

14        Q    In regard to the scope of your opinions

15    in this case, do you believe that you're offering

16    opinions regarding the standard of care for the

17    emergency medical services?

18        A    In a very limited scope, yes.

19        Q    Why don't we go ahead and just go into

20    your opinions, sir, if you could share with me

21    what your opinions are with regard to the

22    standard of care and if you're rendering
```

1    causation opinions, as well, please.

2        A    Yes.  Let me attempt to do that by

3    giving you an overview and then inviting you to

4    explore any component that you wish.

5            The overview was that, upon arrival on

6    the scene, the emergency medical services people

7    had a duty to adequately evaluate Mr. Docher as a

8    prerequisite to deciding on treatment, including

9    the administration of any pharmacologic

10   restraint.

11           In fact, it is my understanding from

12   multiple sources that what occurred is, there was

13   gross visual inspection by line of sight and by

14   limited communication with the sheriff deputies

15   that were on scene and restraining Mr. Docher,

16   but there was not, for example, assessment

17   including level of consciousness, verbal

18   responsiveness, there were no vital signs

19   obtained, there was no pulse oximetry

20   measurements made.

21           And yet despite the absence of this

22   assessment, which is clearly indicated, as well

```
 1   as outlined in the national EMS clinical

 2   guidelines, a dose of ativan was administered

 3   intramuscularly.  So I guess the first category

 4   of criticism would be described, for lack of

 5   better terminology, as the failure to provide an

 6   adequate pre-medication assessment.

 7            The second in sequence was the

 8   administration of ativan in an entire 4 milligram

 9   dose given as a single intended intramuscular

10   bolus rather than incremental administration and

11   without any documentation or testimony that

12   proper administration for an intended

13   intramuscular drug was used, namely that

14   aspiration was used prior to administration.  So

15   the two components of it would be improper

16   administration and excessive dose bolusing.

17            The third category would be based upon

18   the understanding that following the

19   administration of the drug, there was no

20   monitoring the patient because none of the

21   monitoring devices were at the patient's bedside,

22   they were all within the rescue vehicle, and that
```

Dr. Brian G. McAlary                                    8/4/2017

```
 1   the injected drug with its needle was returned to

 2   the sharps bin of the rescue vehicle and then

 3   there was the return to the patient's side in the

 4   parking lot where it was observed that the

 5   patient was in complete cardiopulmonary arrest as

 6   manifest by no pulse, no breathing, and upon

 7   return to the vehicle which was done in an

 8   accelerated manner, hooked to an ECG which showed

 9   a straight line, following which ACLS measures

10   were undertaken.

11            Based on that understanding, it would be

12   my opinion that the third category of failure was

13   the failure to properly observe after the

14   administration of the medication resulting in a

15   delay that resulted in complete arrest prior to

16   intervention.

17            I think that in essence is the capsule

18   version.

19       Q    And do you have further opinions about

20   whether the use of the ativan caused or

21   contributed to the cardiopulmonary arrest?

22       A    I do.  Using my choice --
```

Dr. Brian G. McAlary                                          8/4/2017

```
 1        Q     What is it?

 2        A     -- of words, I would say that the

 3   improper administration of ativan as previously

 4   mentioned was a significant cause of his

 5   preventable cardiopulmonary arrest.

 6        Q     What is the basis of that opinion?

 7        A     The basis of that opinion was several

 8   fold.  One, Mr. Docher, as evidenced by his

 9   subsequent care and evaluation after getting to

10   the receiving hospital, had no significant mental

11   conditions that predisposed him to having

12   cardiopulmonary arrest.

13              Secondly, we know from both testimony of

14   the sheriff's deputies, as well as from limited

15   video footage, that Mr. Docher was in a position

16   for an undocumented period of time that was

17   characterized by prone, that was characterized by

18   one or more deputies putting weight with varying

19   parts of their body upon him, with his arms

20   handcuffed behind his back, and with his arms

21   raised into the air while his body was prone on

22   the asphalt of the parking area.
```

Dr. Brian G. McAlary                                    8/4/2017

```
 1              In addition to that, we know that Deputy

 2      Mangrum had at least one foot on the patient's

 3      upper back, neck.  The combination of this

 4      position and these restraint maneuvers would very

 5      likely invite asphyxia.

 6              In addition to that, we know that Mr.

 7      Docher had partial airway obstruction as

 8      evidenced by bleeding in the nose and oral

 9      pharynx and that that was another contribution to

10      his inability to properly breathe.

11              It is likely that during that antecedent

12      period prior to the administration of the ativan,

13      that had he been assessed -- and by the way, the

14      assessment should have included auscultation of

15      the chest, I meant to include that earlier, I

16      apologize -- that during this interval of time of

17      restraint, it is likely that he became

18      hypercapnic, hypoxic, and acidotic with

19      associated medical derangement, making him very

20      vulnerable, along with his antecedent alcohol

21      ingestion, to the respiratory deppressant effects

22      of the ativan, making it all the more necessary
```

```
 1   that the guidelines for administering ativan

 2   should have been followed.

 3         So that's my understanding of the

 4   multifaceted element to his preventable

 5   respiratory and subsequent cardiac arrest.

 6   Q     The alcohol ingestion, as you referred

 7   to it, did you ever see the laboratory results at

 8   the hospital --

 9   A     I did.

10   Q     -- regarding blood alcohol level?

11   A     He had a blood alcohol of about .4,

12   approximately half of the state of Florida's

13   threshold for intoxication for purposes of DUI.

14   Q     How long a period of time was it between

15   the administration of the ativan and when there

16   was an observation that he was in cardiopulmonary

17   arrest?

18   A     Approximately three minutes.

19   Q     Is that temporal relationship or the

20   time relationship between the administration of

21   the ativan and the observation of cardiopulmonary

22   arrest the basis for why you believe that the
```

1   ativan caused or contributed to that condition?

2      A    Not so much the temporal relationship as

3   the sequential relationship.  The temporal

4   relationship contributes to my opinion that he

5   was in a severely compromised status prior to its

6   administration and raises the very valid

7   question, given the failure to document proper

8   administration technique, that some or all of the

9   drug went intravenously, because, as has been

10  stated by others, in an otherwise healthy

11  individual, an intramuscular dose, even given as

12  a bolus, would not likely produce respiratory

13  depression this quickly, an observation with

14  which I would be in agreement, but in the

15  specific facts of this case, in the context of a

16  highly compromised individual without proper

17  administration, certainly three minutes, assuming

18  that to be correct -- and obviously we have a

19  time line issue here of precision being difficult

20  to state -- but three minutes seems to be the

21  approximate time, it could have been as long as

22  five.

Dr. Brian G. McAlary                                      8/4/2017

```
 1      Q    All right.  So I think I heard you say

 2   in the soliloquy that you believe that there was

 3   improper administration of the medication.  Is it

 4   your opinion that the medication was actually

 5   given in whole or in part intravenously?

 6      A    Yes.  I think that would be likely.

 7   What part of it went intravenously, I couldn't

 8   say.  But it would be, certainly when improper

 9   technique is used, you invite that.

10           There is a reason why proper

11   intramuscular injection technique is taught and

12   advocated and required by the standard of care,

13   and that is to dramatically reduce, if not

14   eliminate, the need -- not the need, but the

15   occurrence of intravenous injection.

16      Q    Putting the time line aside for a

17   moment, meaning the time from administration, to

18   the time of symptoms, what evidence in this case

19   have you seen that the injection was given

20   improperly?

21      A    The fact that in neither the

22   documentation or the subsequent testimony was
```

Dr. Brian G. McAlary

```
 1    there any reference to aspiration once the needle

 2    was placed in the buttocks to the injection by a

 3    depression of the plunger.

 4         Q    Okay.  Is there any evidence in this

 5    case that you have seen that there was not

 6    aspiration of the syringe prior to injection?

 7         A    No.  As indicated earlier, the indicated

 8    documentation is absent.

 9         Q    And what difference would aspiration

10    make prior to injection, whether it's done or not

11    done?

12         A    It would dramatically lessen the risk

13    and occurrence of intravascular injection.

14         Q    So in the case you would agree with me

15    that there is no evidence in the form of

16    testimony or documentation or otherwise that

17    paramedic Rosario did not aspirate prior to

18    injection?

19         A    That is correct.  There is no evidence

20    that he did not.  There is no evidence that he

21    did.

22         Q    And in this case, you are making the
```

1   choice to believe that he did not; is that fair?

2           MR. HECHT:  Objection, form.

3           THE WITNESS:  No.  I'm trying to look at

4   the facts as best we know them, given some

5   imprecision in time line et cetera, and attempt

6   to explain the very thing that you asked me

7   about, how can a patient who is apparently alive,

8   although not verbalizing and markedly tachypnic -

9   - because we know that some four minutes prior to

10  the injection, he is seen with respiratory rates

11  of 20 to 30.  So he's obviously in some degree of

12  respiratory distress at that point, even though

13  being described as in the recovery position of

14  left lateral decubitus.  So he obviously was in a

15  compromised status at the time of the injection.

16          And then looking at the duration, or the

17  interval more accurately, between injection and

18  discovery of apnea, I think it makes it more

19  likely than not that some, most, all of the

20  ativan was intravascularly injected.

21          BY MR. NEWMAN:

22      Q    I believe that you said as a cause of

1    the apnea, you have essentially ruled out a

2    primary cardiac process; is that fair?

3         A    Yes.

4         Q    Okay.  What else have you ruled out as

5    possible or probable reasons why Mr. Docher went

6    into cardiopulmonary arrest?

7         A    Considering the very thorough evaluation

8    in the emergency room and subsequently at St.

9    Lucie and subsequently even years later,

10   including at Jackson Health, were tests including

11   echocardiography, et cetera, performed, I think

12   it is highly probable that what can be ruled out

13   includes intracerebral hemorrhage, a massive CVA

14   if you will, I think we can rule out with high

15   confidence that he had a primary myocardial

16   infarction, I think we can rule out with high

17   probability that he had a primary dysrhythmia, we

18   can rule out with high probability that he had

19   pulmonary embolism.

20            So disorders that are known to be

21   capable of causing acute cessation of life were

22   looked for.  None of them were found.

Dr. Brian G. McAlary                      8/4/2017

```
 1      Q    Okay.  Do you know what synthetic

 2   cathinones are?  And it's c-a-t-h-i-n-o-n-e-s.

 3      A    Yeah.  I think as I recall, they're a

 4   class of drugs having methamphetamine-like

 5   properties that are clearly illegal and have no

 6   recognized medical therapeutic benefit.  They are

 7   a street or illegal drug category.

 8      Q    Do you know whether or not Mr. Docher

 9   had any type of testing when he was brought into

10   the hospital initially for synthetic cathinones,

11   sometimes known as bath salts?

12      A    Yes, and improperly so because they are

13   not bath salts, in case you were curious.  But

14   the fact is, the toxicology screen as described

15   did not include specific analysis for that group

16   of drugs.

17      Q    All right.  What's the difference

18   between bath salts and synthetic cathinones?

19      A    Bath salts is a street name that I think

20   derived from law enforcement, if I recall

21   correctly hearing a presentation about it, in

22   which in order to smuggle the drugs, including
```

Dr. Brian G. McAlary                              8/4/2017

1   into this country, they were put into a

2   crystalline form, which makes them more stable,

3   and put into packages of what was originally bath

4   salts.  The package was emptied and re-packaged

5   with this category of drug.

6          When they finally stumbled onto it, the

7   term bath salts became attached to it and has, at

8   least in some people's usage, stuck with it.

9      Q   What's the accurate term for the drugs

10  that are commonly referred to as bath salts?

11     A    I would call them synthetic congeners of

12  the catecholamine family that produce elevation

13  of heart rate, blood pressure, and their reason

14  for consumption is marked psycho tropic effects,

15  including aggressive and violent behavior.

16     Q   Was Mr. Docher tested for the presence

17  of bath salts when he was brought into the

18  hospital initially?

19     A   He was not.  And in all due respect to

20  the people caring for him, I would not have

21  expected them to test for it given what they had

22  hopefully obtained from a history in the field.

Dr. Brian G. McAlary                               8/4/2017

```
 1      Q    In determining the causes of the

 2  cardiopulmonary arrest, did you rule out -- did

 3  you consider and rule out the involvement

 4  potentially of synthetic cathinones or bath salts

 5  in Mr. Docher?

 6      A    I did.  Yes to both.

 7      Q    Tell me about that.  How did you

 8  consider them and rule them out?

 9      A    From a combination of sources.  The

10  testimony of civilian bystanders --

11           MR. HECHT:  Object.

12           THE WITNESS:  -- the behavior of Mr.

13  Docher up until the point at which he fled the

14  squad car, as well as looking at the surveillance

15  tapes, particularly those obtained from the

16  camera behind the cash registers and the one that

17  was aimed at the front door of CVS which showed

18  at least glimpses of Mr. Docher, also in

19  listening to the 911 dispatcher tapes, putting

20  that together, all of those pieces together,

21  there was no evidence of aggressive or violent

22  behavior that would be indicative of toxic effect
```

Dr. Brian G. McAlary                     8/4/2017

```
 1   of this group of drugs.

 2          BY MR. NEWMAN:

 3      Q    You said that you read the testimony,

 4   deposition testimony of the paramedics Rosario

 5   and Sinclair.  Do you agree that the manner in

 6   which, at least paramedic Sinclair describes Mr.

 7   Docher's conduct with having almost superhuman

 8   strength, do you agree that that is a sign or at

 9   least is consistent with someone using bath

10   salts?

11      A    That alone would be.  I do have some

12   difficulty with the description of superhuman

13   strength based upon the video of him being

14   restrained in the parking lot.

15          The description of him able to slide one

16   arm under his body and do, in essence, a partial

17   one-arm pushup would also be very consistent with

18   someone who can't breathe and is using extreme

19   energy and effort to be able to get himself in a

20   position where he could breathe.

21          The implication that this, quote,

22   superhuman," which I think is incorrect, I think
```

```
 1   it's clearly within the spectrum of recognized

 2   human strength, being drug related when up to the

 3   point of his physical restraint there was no

 4   evidence of drug intoxication causing aggressive

 5   or violent behavior.

 6       Q    Do you agree that the video, the limited

 7   video that you have seen, does not show Mr.

 8   Docher and how he was interacting with the

 9   emergency personnel at the time that they

10   arrived?

11       A    Correct.  The only one that shows any

12   insight to that alone is the distance view from

13   the surveillance camera that was viewing the

14   outside of the CVS area and the parking area but

15   the size of the figures and the resolution of

16   that camera do not permit a detailed insight as

17   to the physical restraint maneuvers, and we are,

18   in terms of that specifics or that resolution,

19   are restricted to the very brief cell phone video

20   recording that we have.

21       Q    Which again does not show the

22   interaction between Mr. Docher and the emergency
```

```
 1   medical personnel?

 2       A    It very much does.  I'm sorry.  The

 3   emergency medical personnel, I believe that is a

 4   correct statement.

 5       Q    All right.  Let's talk about the policy

 6   that you cited earlier about the use of ativan.

 7   Do you have that handy and the same with the

 8   county fire district?

 9       A    I believe so.  One moment.

10       Q    And if you don't --

11       A    I have in front of me, just to make sure

12   we're talking about the same thing, Ben, I have

13   in front of me a cover letter of June 17, 2014,

14   signed by deputy chief, then Deputy Chief Brian

15   Blizzard, and then attached to it or enclosed, as

16   it says, is the guidelines by St. Lucie County

17   Fire District emergency medical guidelines for

18   ativan.  Is that what you're referring to?

19       Q    Yes, sir.  There's a page from the

20   policies and procedures that has on the top

21   lorazepam and then in parentheses ativan, with a

22   revised date of January 20th, 2013.
```

Dr. Brian G. McAlary                                    8/4/2017

```
 1        A    Yes, I have that.  It would naturally be

 2    the last page.

 3        Q    What does it say in these policies and

 4    procedures about the dosage of ativan in adults?

 5    If you could read word for word.

 6        A    Yes.  The dosage section reads:  Adults

 7    1 milligram increments to a max of 4 milligrams.

 8        Q    All right.

 9        A    That same reference is found elsewhere

10    in that grouping of documents.

11        Q    In your report that you have provided

12    regarding your criticism about the use of ativan,

13    I think you said that there was a failure to

14    follow policy by not titrating in 1 milligram

15    increments.  Does this policy include the word

16    titrate?

17        A    It does at the E29, the specific word

18    titrated is used.

19        Q    Can you read that for me.

20        A    Yes.  You should have it in that same

21    grouping that Deputy Chief Blizzard provided to

22    the family.  It's under the upper right-hand
```

1   corner of E29.  It says education guidelines, and

2   then on the left-hand column, there is a bold

3   print of the word agents and the first agent

4   mentioned is lorazepam, ativan.

5          It reads:  Adult dose is 1 to 4

6   milligrams i-v-i-o-i-m or intranasal titrated to

7   effect.

8      Q    Okay.  And is there a time frame that is

9   either what you just referenced or the other

10  policy that we were talking about that is

11  referenced as an interval between milligrams of

12  ativan?

13     A    There is in the section.  Not all of the

14  dose references contain intervals but in the

15  cocaine overdose page with the same revision

16  date, it reads:  Ativan 1 milligram, cue three to

17  five minutes until relief of chest pain, maximum

18  4 milligrams.

19          I'm looking at the other pages to see if

20  there is reference to intervals in the

21  incremental process of administration.  I do not

22  see any other reference at the moment.

Dr. Brian G. McAlary                                      8/4/2017

```
 1      Q    And Mr. Docher was not known or

 2   suspected to be a patient with cocaine overdose;

 3   do you agree with that?

 4      A    No, I don't agree with that.  There was

 5   a question raised of drugs other than alcohol by

 6   one or more the deputies.  That concern was

 7   communicated verbally to the EMS personnel.  I

 8   don't think we can accept the choice of words in

 9   your question as suspected cocaine.

10      Q    But, in fact, he did not have, based on

11   the laboratory results, there was no cocaine in

12   his system; do you agree with that?

13      A    Exactly.

14      Q    In the run report, do you have it there

15   --

16      A    I do.

17      Q    -- Dr. McAlary?

18      A    Yes, Ben, I do.

19      Q    Thank you.  What time was the ativan

20   administered pursuant to the run report?

21      A    Approximately 18:40.

22      Q    And do you agree that there was an
```

1    assessment done prior, at 18:38, that had a pulse

2    rate of 110?

3         A     That's what's documented.   My problem

4    with that is in no other portions of the

5    documentation or recalled was there any physical

6    contact made up until the intramuscular

7    injection.

8              Attempts to approach the patient were

9    associated with the patient either striking out

10   at them or lashing or moving or in some way

11   making it virtually a significant challenge

12   without further restraint by the police, or the

13   sheriff's deputies perhaps better stated, that

14   anybody measured any vital sign.

15             So I found that documentation to be

16   inconsistent with other sources.

17        Q     What other sources?

18        A     Both of the EMTP.   Part of the

19   justification for pharmacologic restraint was

20   that they were unable to get into contact with

21   this patient, and yet we have a documentation of

22   a pulse and a respiration, which it would have

```
 1   required several seconds if not a minute of

 2   cooperation by the patient to make possible.

 3       Q    So the fact that there is a pulse rate

 4   of 110 and a respiratory rate of 28 and an

 5   observation of respiratory effort as normal, you

 6   essentially are choosing to disbelieve that

 7   portion of the documentation; is that accurate?

 8       A    I'm simply characterizing it as

 9   inconsistent.  For example, you mentioned the

10   respiratory effort being described as normal, yet

11   also with the same time reference of 18:36, it

12   identifies breathing quality adult as fast, 20 to

13   30.  20 to 30 is certainly not normal.  So within

14   their own document, there is another

15   inconsistency.

16       Q    It says respiratory effort, correct,

17   normal?  It doesn't say respiratory rate.

18       A    You would not describe someone breathing

19   at 20 to 30 as having a normal effort.

20       Q    You wouldn't, correct, you're talking

21   about that Dr. McAlary wouldn't?

22       A    That would be an improper use of the
```

```
 1   descriptive term.  In the narrative that proceeds

 2   that description of vital signs, there is no

 3   indication of their making any contact with the

 4   patient other than visual observation.

 5              Also, it describes --

 6        Q    If you take --

 7        A    -- airway patent and respirations were

 8   rapid, radio pulse rapid, skin moist and that is

 9   not consistent with normal respiratory effort.

10        Q    If you take that description and the way

11   that these vitals are documented at 18:38, would

12   you agree that there is no evidence of

13   respiratory depression prior to the

14   administration of ativan?

15        A    Not as respiratory depression is usually

16   used, meaning either bradypnea or reduced tidal

17   volume.  We don't know what the tidal volume was

18   however.  This could have -- we know its

19   tachypnea but we have no idea of how shallow

20   those breaths were.

21        Q    And I'm not asking for what we don't

22   have.  I'm asking based on what we have, you
```

```
 1    would agree with me that there is no documented

 2    evidence of respiratory depression prior to the

 3    administration ativan?

 4         A    There is insufficient documentation to

 5    say.

 6         Q    With all due respect, Doctor, that's not

 7    an answer to my question.  I'm not asking about

 8    the adequacy or inadequacy.  I'm asking you

 9    about, what we do have, do you agree with me that

10    there is no evidence of respiratory depression?

11              MR. HECHT:  Form.

12              THE WITNESS:  Given the inadequacy of

13    what is documented, we do not have any indication

14    of tidal volume or how shallow the breathing

15    might have been.

16              BY MR. NEWMAN:

17         Q    All right.  I'm going to ask the

18    question again because I don't think I have heard

19    an answer yet.  My question is, based on the

20    evidence that we do have, meaning what is

21    recorded as I mentioned to you here, do you agree

22    that there is no documented evidence of signs or
```

```
 1    symptoms of respiratory depression?

 2         A     Yes.

 3               MR. HECHT:   Form.

 4               BY MR. NEWMAN:

 5         Q     Okay.  All right.  Getting back to the

 6    policy about the administration of ativan.   Is

 7    there an explicit prohibition documented in the

 8    use of 4 milligrams as a single administration?

 9         A     Not as you have phrased it, according to

10    my reading.

11         Q     You have read the deposition testimony

12    of Captain Gonzales and Paramedic Rosario and

13    Paramedic Sinclair; correct?

14         A     Correct.

15         Q     In those depositions, do any of those

16    employees of the St. Lucie County Fire District

17    say that the administration of ativan as a single

18    4 milligram dose was a violation of the fire

19    district's policy?

20         A     They do not.

21         Q     Other than other experts in this case,

22    have you read any testimony from any witness who
```

1    has said that the administration of 4 milligrams

2    of ativan at once was a violation of the policy

3    of St. Lucie County Fire District?

4        A    Other than other experts, no.

5        Q    We've been going for a little bit,

6    Doctor.  This would probably be a good time for a

7    brief restroom break if it's okay with you.

8        A    Fine.

9            MR. JOLLY:  How long we going for?

10            MR. NEWMAN:  Five minutes.  Is that

11    adequate?

12            MR. HECHT:  That's fine.

13            MR. JOLLY:  That's all I need.

14            (A brief recess was taken.)

15            BY MR. NEWMAN:

16        Q    Dr. McAlary, we took a brief break.  I

17    have just a couple of questions to finish up

18    with, and then I'm going to of course allow the

19    other attorneys time to ask you questions.

20            You had testified earlier about Mr.

21    Docher being in a prone position and that -- I'm

22    just trying to find my note -- and with the

Dr. Brian G. McAlary                    8/4/2017

```
 1   deputies applying pressure, it caused asphyxia.

 2   Let's talk about that.  What do you mean by that?

 3       A    That the position he was in, coupled

 4   with the weight of the deputies and with at least

 5   during the brief portion as seen on the bystander

 6   cell phone video where there was compression of

 7   the upper chest, neck with a foot, would all

 8   contribute to the inability to be able to

 9   normally breathe.

10       Q    What is asphyxia?

11       A    Asphyxia basically is the inability to

12   get in sufficient amount of oxygen and secrete

13   sufficient amounts of carbon dioxide.

14       Q    And do you agree that you do not -- you

15   have not seen any video to show the state of Mr.

16   Docher at the time the paramedics were on scene

17   and getting ready to administer ativan to him?

18       A    Correct, the distance was too great and

19   the resolution was too small, other than to show

20   the approach and arrival of the rescue vehicle

21   and additional personnel with what appeared to be

22   dark blue uniforms.
```

```
 1            But beyond that, what they did, it would

 2   be impossible for me at least to interpret that.

 3   Whether that video can be somehow enhanced to

 4   provide both clarity and size is beyond my

 5   knowledge.

 6       Q    What are the signs and symptoms of

 7   asphyxia?

 8       A    Initially, there is a great deal of

 9   struggling as is a reflex response to the

10   inability to obtain adequate breathe, and then as

11   the asphyxia process continues, the person starts

12   to lose consciousness and reduces the amount of

13   struggling.

14       Q    Is there anything that you have read,

15   either in deposition testimony or the record from

16   the emergency medical services, that Mr. Docher

17   was losing consciousness immediately prior to the

18   administration of ativan?

19       A    The closest that I could get for

20   information or insight was that Mr. Docher became

21   nonverbal after having been very animated, very

22   verbal throughout the pre-handcuffed phase and
```

1    then, while being restrained, screaming, to be

2    audible by bystanders, he then, in various

3    descriptive phrases or views, he then seemed to

4    quiet down, et cetera.

5            We know that one of the three

6    restraining deputies left the patient's side and

7    we know from the EMS report that there was no

8    verbal exchange between them and Mr. Docher or

9    between Mr. Docher and anyone else that they

10   witnessed.

11           So he became from combative and shouting

12   to non-combative, being able to be rolled on his

13   side by only one person and not verbalizing.

14      Q    And do you agree that there is no

15   documentation of loss of consciousness?

16      A    That is correct.

17      Q    Dr. McAlary, thank you for your time.

18   Those are all the questions I have for you right

19   now.  I may have some follow-up after the other

20   attorneys are finished.

21      A    You're most welcome.

22      MR. JOLLY:  I think that means I'm next.

```
 1          EXAMINATION ON BEHALF OF THE DEFENDANTS

 2             BY MR. JOLLY:

 3      Q    Dr. McAlary, am I pronouncing your name

 4   correctly?

 5      A    You are, Mr. Jolly.

 6      Q    I'm Bruce Jolly.  I'm here today

 7   representing the defendant sheriff and the

 8   deputies that are also defendants in this

 9   lawsuit.

10             Referring to your report, page 2, first

11   paragraph under summary of opinion, you recite

12   that Mr. Docher was in generally good physical

13   health.

14             Now, as a part of your workup in this

15   case, what documentation, if any, did you review,

16   provided to you, regarding prior physical injury

17   predating the date of this incident?

18      A    I missed one word.  Prior physical and

19   then the next word I missed.

20      Q    Injury.

21      A    Injury, is that the word?

22      Q    It is.
```

Dr. Brian G. McAlary                          8/4/2017

```
 1       A     Okay.  I do not remember seeing any

 2   descriptions, including those of the emergency

 3   department, et cetera, where there was

 4   documentation of prior physical injury.  That is

 5   not to say it wasn't there.  I just, sitting here

 6   at this point, do not recall it.

 7       Q     I'll rephrase the question.  I'm not

 8   concerned about what was documented as he was

 9   taken to the ER.  My question is, as a part of

10   your work-up, had you reviewed any documentation

11   which predates the date of this incident

12   documenting the prior physical injury to Mr.

13   Docher?

14       A     Now I better understand your question,

15   at least I think I do.  Now that I do, no.  If

16   you look at the list of materials I reviewed, I

17   do not believe it includes any medical records

18   describing his health one way or another prior to

19   this.  My only insight from that comes from the

20   statements made by the family.

21       Q     Going away from documentation, my next

22   question is, what information is it that you had
```

Dr. Brian G. McAlary                              8/4/2017

1   upon which you rely in characterizing Mr.

2   Docher's physical health as being generally good

3   since you didn't have any documents?  What

4   information did you --

5       A    Well, I technically do have some

6   documentation.  In about 4 to 5 feet from my left

7   arm is a group of such records.  Let me grab

8   them.  Just a moment.

9            What I'm looking at now is a series of

10  what appears to be a -- I'm giving you an

11  approximate number here -- 20 plus grouping of

12  Pompano Beach Fire and related trips run sheets

13  that go from May of 2009, and hopefully they're

14  sequential, let me look at the last one, which

15  would be February of 2014, approximately three

16  months prior to the incident in question.

17           Here we see a pattern of Mr. Docher

18  calling for help.  Throughout those visits, there

19  is no description of violent behavior, toxic drug

20  manifestation, or any confrontation with

21  healthcare providers or rescue personnel and he

22  needed no medications to restrain him.  So that

1    provided me useful insight.

2            In addition, the chief complaints were

3    very commonly related to anxiety, psychiatric

4    emergency, depression, and similar such

5    terminology.  With rare exception, there was

6    minor trauma from what was felt to be probably a

7    physical altercation that sort of -- one case

8    where he stated that he had been assaulted with a

9    firearm.

10           So it was a mixed bag of complaints and

11   the relevance to me was that I found no major

12   physical related trauma or disorder other than

13   what is described.

14       Q    And, Doctor, when were those materials

15   received by you, that which you've just

16   described?

17       A    Let me take a look at the May 21st.  I

18   believe they were in the early group of materials

19   received.  Upon my review, I do not see them

20   listed in the May 21st, but I certainly don't

21   recall them as recently received.

22       Q    Well, my question is, do you have a

Dr. Brian G. McAlary

1    recollection of when those documents that you've

2    alluded to generally, they were not mentioned by

3    you earlier, do you have a recollection of when

4    you reviewed them?

5        A    I do not.  I would say that it was

6    probably before the time of the May 21st report,

7    but I don't recall with certainty.

8        Q    And I think at some point we have

9    received similar records in our office and if I

10   understand your testimony correctly, nothing in

11   that documentation tended to make you think that

12   the reference that he was generally in good

13   physical health was inaccurate?

14       A    That's correct, other than the obvious,

15   which is psychiatric status, because obviously,

16   you can't be in good health and have this degree

17   of psychiatric disturbance.

18       Q    And other than the documents that you've

19   just generally alluded to --

20       A    Oh, let me mention another thing.

21       Q    -- do you have any other documentation

22   regarding prior medical treatment?

```
 1      A      My apologies.  I was trying to re-answer

 2   the earlier question and I wasn't giving due

 3   attention to your question but let me insert if I

 4   may, and I don't know if this is responsive to

 5   your question, but I looked at variables such as

 6   vital sign documentation, pulse rates, pulse

 7   oximetry and found nothing of concern there.  I

 8   saw ECGs that were obtained.  The only other

 9   element --

10      Q      This is from before?

11      A      I'm sorry.

12      Q      This is from before, what you're now

13   referring to?

14      A      Yes.  I thought that was the category we

15   were talking about, which is --

16      Q      Well, I'm having some trouble

17   understanding much of what you're saying, so I

18   just wanted to clarify but please continue.

19      A      Are you having trouble for technical

20   reasons or is what I'm saying --

21      Q      No.

22      A      -- not making sense?
```

Dr. Brian G. McAlary                                    8/4/2017

```
 1      Q     Unless it's that my brain is short

 2   circuiting, but no, I am hearing you.

 3      A     Okay.  There is another element that

 4   appears to appear on more than one occasion and

 5   that is consistent with consumption of alcohol.

 6   Other than those elements of overall monitored

 7   healthcare parameter, there was never the need,

 8   for example, to admit him or to get consultation

 9   or to followup on the negative tests that were

10   performed.

11      Q     Doctor, are you able to list generally

12   the documents that you are now referring to that

13   you previously indicated were six feet away from

14   you?

15      A     Yes.  They're now in front of me.  As I

16   indicated, there are about 20 groupings of a few

17   pages from the emergency department records that

18   are stapled together.  If you want, I can read

19   those into the record.

20      Q     I just need to know what they are so

21   that we can be reasonably confident that I have

22   an idea of what you're talking about.
```

Dr. Brian G. McAlary                          8/4/2017

```
 1        A    Okay.  These are run reports, and I'm

 2    going through, the dominant amounts seem to be

 3    from Pompano Beach Fire during the dates I

 4    referenced, which was early May of 2009, through

 5    February of 2014.

 6             I'm looking now to see if any of them

 7    originated other than by Pompano Beach Fire.  No.

 8    This grouping that I have referenced with the

 9    earliest and latest date inclusive are all

10    authored by members of the Pompano Beach Fire and

11    Rescue.

12        Q    All right.  That's all that you're

13    talking about, the 20 groupings?

14        A    Yes.

15        Q    They're all run reports from Pompano?

16        A    Correct.

17        Q    And do you have any kind of record of

18    receipt reflecting when those documents were

19    received by you?

20        A    I do not.  I thought that was the same

21    question that you asked earlier.  I don't know

22    when I received them.  I don't know when I
```

Dr. Brian G. McAlary                                        8/4/2017

```
 1   reviewed them.  But memory would suggest that it

 2   wasn't recent.

 3        Q    So none of those documents, if I've

 4   understood you correctly, reflect or relate to

 5   hospitalization?

 6        A    That is correct.

 7        Q    What documentation do you have that Mr.

 8   Docher was ever hospitalized prior to the day of

 9   this incident?

10        A    Let me look at these reports and see if

11   there is such a reference.  Usually there is not

12   in run reports, but I'll take a quick look and

13   see if something catches --

14        Q    It might be --

15        A    -- my eye.

16        Q    -- that you have something else.

17        A    I do not.

18        Q    Okay.  So as you reviewed the material

19   that you did review, ultimately opining that Mr.

20   Docher was in generally good physical health, you

21   have no idea of whether, when, or why Mr. Docher

22   was previously hospitalized?
```

```
 1      A      That is correct.  I do not recall, for

 2   example, in the emergency records, the history

 3   and physical of his admission, any reference to

 4   any significant antecedent health problems or

 5   significant admissions.

 6      Q      And what information, if any, do you

 7   have that Mr. Docher never, prior to May 11,

 8   2014, was treated for mental health issues?

 9      A      Other than the diagnosis of mental

10   health issues, I do not see or recall any

11   reference to that.  Now if you'd like, I can turn

12   to the records from his admission and see if

13   there is anything in there --

14      Q      Did you --

15      A      -- that is responsive to your question.

16      Q      The May 11 admission?

17      A      Yes.

18      Q      I don't need to go there.  I want to

19   know, as you're reviewing these materials, what

20   materials, what information did you have that Mr.

21   Docher had received mental health treatment prior

22   to May 11th?
```

```
 1        A    I don't recall any specific statements

 2   or references to that.  If they are present, then

 3   the only way I would be able to answer your

 4   question is to take a look at those records and

 5   see if there is such reference.

 6        Q    All right.  As we speak here today, as

 7   you are responding to these questions, you cannot

 8   tell me from memory?

 9        A    From memory alone, that is correct.

10        Q    Fair enough.  What information, what

11   documentation, if any, do you have regarding Mr.

12   Docher having previously been arrested?

13        A    Been arrested?

14        Q    Yes.

15        A    I do not have any such documentation.

16        Q    What information other than -- from

17   other than documents do you have, if any, that

18   Mr. Docher was previously arrested?

19        A    I cannot say with confidence whether he

20   was or was not.

21        Q    Same question with regard to, first,

22   documentation of whether he had been previously
```

```
 1   incarcerated?

 2        A    I do not have any recollection one way

 3   or the other.

 4        Q    And same question with respect to

 5   information, other than from documents, maybe

 6   somebody told you, other than one of the lawyers,

 7   that he had ever been incarcerated?

 8        A    Not to my knowledge.  I was not given

 9   any verbal --

10        Q    What documentation --

11        A    -- information regarding that, according

12   to my recollection.

13        Q    What documentation, if any, do you have

14   as to Mr. Docher's living arrangement at the time

15   of this incident?

16        A    My vaguest of understandings is that he

17   was living with family.

18        Q    What family?

19        A    I believe he had a mother.  There was

20   some reference to the fact that he had been

21   driven to the location by a family member and

22   that there were other family members in the
```

Dr. Brian G. McAlary                    8/4/2017

```
 1   vicinity of this location.

 2            But understand that I am not certain of

 3   that, number one; and number two, nor do I

 4   consider any of that information relevant to the

 5   opinions I'm providing.

 6        Q    So other than what you've just told me,

 7   you have no information of how or where or for

 8   how long Mr. Docher had been living prior to his

 9   arrest?

10        A    That's correct.

11        Q    What information, if any, do you have as

12   to Mr. Docher's lifestyle, how he lived, prior to

13   this incident?

14        A    Very limited insight other than the fact

15   that gross visual inspection was not consistent

16   with homelessness and the gross visual inspection

17   was that he was a person who was having adequate

18   nutrition.

19        Q    And from the gross observation that you

20   reference, how did you conclude that he was not

21   homeless?

22        A    I didn't say --
```

```
 1        Q    Or that he --

 2        A    -- he was not.  I did not conclude that

 3   he was not homeless, Mr. Jolly.  I indicated --

 4        Q    Then how --

 5        A    -- that his appearance --

 6        Q    -- did --

 7        A    You must try to show me the courtesy of

 8   not interrupting if you wish for me to answer

 9   your questions.

10        Q    I think that's a fair request.

11        A    Now please restate your question.

12        Q    I will.  You indicated that his

13   appearance was inconsistent with homelessness.

14   In what respect?

15        A    I won't quarrel with the choice of

16   words.  I won't say inconsistent with.  It was

17   not classically consistent with.

18             In years of treating homeless

19   individuals requiring care, including trauma,

20   there was a pattern that one would see of being

21   very unkempt, typically very unshaven, typically

22   having a discernable body odor, typically having
```

Dr. Brian G. McAlary                          8/4/2017

```
 1    torn or stained clothing.  Those were not

 2    apparent to me on the video.

 3         Q    What information, if any, do you have,

 4    what documentation, if any, was provided to you

 5    regarding Mr. Docher's work history, what he did

 6    for a living?

 7         A    Virtually no insight whatsoever.

 8         Q    Is there anything you can do in going

 9    through the materials which have been provided to

10    you to determine when the records that you

11    reference today regarding Pompano Beach were

12    received?

13         A    I will take a look at my correspondence

14    to see if there is such a reference.  There is

15    nothing in my correspondence which helps to

16    refresh my memory as to the receipt of those.

17         Q    Now, as you have reviewed them today to

18    the extent that you have, is there anything in

19    there that would conflict with -- no -- that

20    would make you want to recite that he was not,

21    Mr. Docher was not generally in good physical

22    health?
```

```
 1        A     No, other than the psychiatric component

 2    which we've discussed.

 3        Q     Have you ever worked for a law

 4    enforcement agency?

 5        A     I have not.

 6        Q     Have you ever been an advisor for any

 7    law enforcement agency?

 8        A     I don't believe so.

 9        Q     Have you ever taught at a law

10    enforcement academy?

11        A     No.

12        Q     Have you ever received any training as a

13    law enforcement officer?

14        A     No.

15        Q     In any of the litigation which you've

16    listed, in the listing of deposition and trail

17    testimony, do you have any recollection that

18    those cases involved claims of excessive force by

19    law enforcement agents?

20        A     I don't believe so.

21        Q     Have you ever worked as a first

22    responder?
```

1        A    Yes.  As a first responder?

2        Q    Yes.

3        A    No.

4        Q    Yes, sir.

5        A    No.

6        Q    Do you have training as a first

7   responder?

8        A    No.

9        Q    Doctor, please bear with me.  These are

10  coming from today's notes.  You generally talked

11  about bath salts.  Do you know, what is your

12  understanding of the effect of the ingestion of

13  bath salts?

14       A    They are taken for what would be illegal

15  and recreational purposes by individuals who are

16  seeking the psychotropic effect.

17       Q    What is the time between ingestion and

18  effect?

19       A    It in part depends on the dose that's

20  taken and the purity, but generally within less

21  than an hour.

22       Q    Have you reviewed any St. Lucie County

Dr. Brian G. McAlary                                           8/4/2017

```
 1   sheriffs' colloquies regarding -- as a part of

 2   your review?

 3        A    Yes.  We've already made reference to

 4   the fire --

 5        Q    No, the --

 6        A    -- district --

 7        Q    -- sheriff's office.

 8        A    Oh, the sheriff's office.  One moment,

 9   let me look.

10        Q    Yes, sir.  The answer is you have not?

11        A    I don't believe so.  Let me just finish

12   looking.  No, that's not correct.  I have

13   received also a group of records that include law

14   enforcement operations.

15             I'm looking at some of the other titles.

16   These appear to be news clippings.  I have a

17   training roster of St. Lucie County Sheriff's

18   Office members.  I have a document from the Board

19   of County Commissioners.  I have a summary of

20   case information, statement forms, incident

21   investigation report.

22             That's all that I have that would have
```

Dr. Brian G. McAlary

```
 1   any relevance directly to the law enforcement.

 2        Q    What relevance, what importance -- no.

 3   What significance, if any, did you place on the

 4   receipt of newspaper clippings?

 5        A    I don't know.  From my perspective, the

 6   only relevance was to see if there was any

 7   additional insight into the medical aspects of

 8   the case that would assist me in forming the

 9   opinions that I've expressed today.

10        Q    Did the newspaper clippings help you in

11   that regard?

12        A    They did not.

13        Q    Is there anything that you have

14   requested as a part of your review that has not

15   been provided to you?

16        A    Not to date.

17        Q    Do you anticipate requesting additional

18   information?

19        A    Nothing that I can identify.  But if I

20   receive word that there was pertinent other

21   additional information, for example, I understand

22   that there will be additional expert deposition
```

Dr. Brian G. McAlary                                    8/4/2017

```
 1   testimony, and that would be potentially of

 2   relevance if it pertained to my opinions.

 3       Q    The documents that you indicated were

 4   provided to you, I think you said you received

 5   some policies, sheriff policies.

 6       A    Let me look and see if that's the case.

 7   As I just looked through it briefly, I did not

 8   see anything that I saw captioned policy but I'll

 9   go back through it.

10       Q    That's what I wrote.

11       A    No, I see nothing captioned policies.

12       Q    Do you have any opinions other than as

13   contained in your report of 5/21 or other than as

14   recited today regarding the involvement of

15   sheriff staff in this matter?

16       A    I do not, nor was that my focus, other

17   than whatever their activity was that caused or

18   contributed to the medical compromise and

19   ultimate code.

20       Q    And you have already described that?

21       A    My apologies but I didn't understand.

22       Q    In other words, whatever those opinions
```

Dr. Brian G. McAlary                          8/4/2017

1   are, you've already related them today?

2        A    That is correct.

3        Q    All right.  Doctor, please bear with me.

4   I need three minutes.

5        A    Certainly.

6        Q    I think you indicated you read the

7   deposition of first responder Sinclair, did you

8   not?

9        A    I did.

10        Q    Do you recall his description, Mr.

11   Sinclair's description of Docher's actions as

12   they were interacting with him?

13        A    Yes.

14        Q    Tell me about that.  What's your memory?

15        A    I've already shared some of those but

16   basically, it was apparently a biphasic

17   interaction.  In other words, there was an

18   interaction prior to the attempt to place him on

19   a long spine board with cervical collar

20   immobilization and then the post-activities which

21   included the resuscitation.

22            In the pre-efforts to interact with him,

1    he was described as nonverbal.  He was described

2    as lying in the left lateral decubitus position

3    with immobilization by the sheriff's deputies.

4              He described him as having a laceration

5    that was apparent to the right side of his head,

6    that his head was surrounded by a puddle of

7    blood.  Those were some of the observations that

8    I recall him making that he remembered and told

9    us about.

10             Then there was the effort to --

11        Q    What observations do you remember him

12   reciting regarding Docher's behavior?

13        A    Up until the time they tried to put him

14   on the long board, there was no description by

15   him of overt struggling or combativeness, as I

16   recall.  I'll be more than happy to make

17   reference --

18        Q    Did there ever come a time --

19        A    I will more than happy to make reference

20   to that deposition testimony if you like.

21        Q    That's all right.  Do you recall

22   Sinclair ever referencing that Docher was

1    combative, resisting?

2         A    Yes.

3         Q    Struggling?

4         A    Yes.

5         Q    And when was it that Sinclair indicated

6    that occurred?

7         A    In the effort to move him from the

8    ground to the long spinal board and cervical

9    collar application, he then became, once again,

10   combative.

11            There was reference to him spitting

12   blood.  There was reference to him lashing out

13   with his, I believe, lower extremities.  I recall

14   no reference to attempts to punch or grab with

15   his upper extremities.

16            That's what I remember as to the point

17   when he became reactive and that his colleague

18   EMTP Rosario, with his acquisition or

19   acquiescence rather or agreement, became a

20   candidate for pharmacologic restraint.

21        Q    Apparently you noted, at least your

22   report indicates that there were injuries, that

Dr. Brian G. McAlary                              8/4/2017

```
 1   Mr. Docher suffered physical injury.  What is

 2   your understanding of what those injuries were

 3   and what is your understanding of how those

 4   injuries were caused?

 5        A    The cause can be multiple but I will

 6   tell you the list of possibilities.  The injuries

 7   that I think that are not in any way in dispute

 8   include the physical restraint of ventilatory

 9   capacity, the laceration to the right side of the

10   head, bilateral depressed nasal fractures, a

11   collar bone fracture that I recall that

12   understandably was not detectable until x-ray

13   screening when he got to the facility.

14            In terms of mechanism, I think the most

15   likely cause of the collar bone fracture was his

16   being thrown to the ground while his hands were

17   held behind him with handcuffs, making it

18   impossible for him to break his fall by extending

19   his arms.

20            The laceration to the forehead is also

21   probably more likely than other possible

22   explanations related to the fall.  The depressed
```

Dr. Brian G. McAlary                        8/4/2017

```
 1    bilateral nasal fractures are not likely related

 2    to the fall but are more likely related to the

 3    use of elbows to his head area.

 4        Q    And what indication in your review of

 5    the records is there that there was an elbow

 6    strike to the nasal -- to the nose?

 7        A    In the sense that we know that there

 8    were at least two officers that performed elbow

 9    strikes and they were indicated as being to the

10    head area and in addition to that, it is unlikely

11    that that occurred at the same time he struck the

12    pavement because it would be very difficult to

13    imagine a mechanism of fall that would cause the

14    bilateral nasal compression, as well as a

15    laceration to the right side of his head.

16        Q    From your review of the records, what

17    indication did you see that Mr. Docher had ever

18    previously suffered a nasal bone fracture?

19        A    I believe there was some reference in

20    his evaluation that there might have been a prior

21    nasal bone fracture and we also know that he had

22    been in previous altercations.
```

Dr. Brian G. McAlary                              8/4/2017

```
1        Q    How do you know, where did you learn,

2   where is it documented that he had prior

3   altercations?

4        A    In the previously mentioned trip

5   reports.

6        Q    Okay.  As you sit here today, you have

7   no specific awareness of whether elbow strikes

8   were ever administered to the nose?

9        A    Not to the nose in particular.  That is

10  not documented and it was not recalled.

11       Q    I'm thinking.  What is your opinion as

12  to whether the use of force is linked to the

13  respiratory arrest?

14       A    That question has already been answered,

15  as you may recall and I can attempt --

16       Q    I apologize.  Apparently I'm not doing a

17  good job of note taking.

18       A    If you would like, I will attempt to re-

19  answer that question or you can refer to --

20       Q    I would like --

21       A    -- the record as you see fit.

22       Q    That will work.  You can answer again.
```

Dr. Brian G. McAlary                               8/4/2017

```
 1   Oh, no, I need the answer.

 2        A    Okay.

 3        Q    I didn't get it from before, so I need

 4   it again.

 5        A    Perhaps when I repeat my answer, it will

 6   sound familiar to you.  If you recall --

 7        Q    Don't count on it.

 8        A    If you recall, I indicated that prior to

 9   the administration of ativan, restraint measures

10   were utilized which included at least three

11   officers with some or most of their body weight

12   applied throughout the area of upper body to

13   legs, including one officer sitting on his lower

14   extremities, and then at some point after that,

15   he, while still in a prone position, had his arms

16   raised in a near vertical position relative to

17   his back and a foot, while the arms were in that

18   position, was placed on his upper back, neck area

19   with weight obviously being applied.

20             The combination of those moves --

21        Q    You're right.

22        A    -- would almost certainly compromise
```

Dr. Brian G. McAlary                          8/4/2017

```
 1  ventilation.

 2      Q    You're right.  I did have that answer.

 3  I apparently asked the wrong question.  I'm

 4  sorry.  I'm talking about the (a) the use of

 5  force taking Mr. Docher to the ground or (b) the

 6  elbow strike.  That's what I meant when I asked

 7  the question, how that relates to the respiratory

 8  or cardiac failure.

 9      A    Yes.  Both of those would produce

10  concussive-like forces to the brain and, by so

11  doing, reduce the capacity for normal

12  ventilation.

13      Q    What indication is there from the record

14  that Mr. Docher suffered a concussion?

15      A    We don't have anything other than the

16  obvious, that if a person is tackled and has

17  nothing to break their fall and they strike a

18  hard surface, such as a parking lot surface,

19  sufficient to tear their scalp, that the

20  probability of concussion is very high.

21      Q    Okay.  You indicated except for the

22  obvious.  What indication, other than the
```

```
 1    obvious, exists either from testing or other

 2    sources that he actually suffered a concussion?

 3        A    We don't know because he went

 4    unconscious and arrested prior to any

 5    neurological screening exam being done.

 6        Q    All right, Dr. McAlary, you've been

 7    patient.  I appreciate it.  I'm done.

 8        A    You're most welcome.

 9            MR. HECHT:  Dr. McAlary, this is Adam

10    Hecht.  I'm going to ask you some questions.

11            Can everyone hear me?

12            MR. NEWMAN:  Yes.

13            MR. JOLLY:  Yes.

14        EXAMINATION ON BEHALF OF THE PLAINTIFF

15            BY MR. HECHT:

16        Q    Dr. McAlary, you were asked questions

17    about synthetic cathinones, also known as bath

18    salts, and I'd like to ask you some questions

19    about that topic.

20            Is it correct that the most significant

21    signs and symptoms of someone using synthetic

22    cathinones would be violent and aggressive
```

1    behavior?

2        A    Yes.

3        Q    Have you seen any medical records or any

4    labs that were taken of Tavares Docher in this

5    case that would indicate that on May 11, 2014,

6    that he was taking synthetic cathinones?

7        A    No.

8        Q    Is there any evidence in this case that

9    you can point to, in any of the literature or

10   medical records that would indicate that Tavares

11   Docher, on May 11, 2014, was taking synthetic

12   cathinones?

13       A    No.

14       Q    And would you agree with me that just as

15   there is no medical evidence in this case that

16   Tavares Docher was taking synthetic cathinones on

17   May 11, 2014, that there is also no evidence in

18   this case that the sheriff's deputies or the fire

19   rescue personnel were using bath salts on May 11,

20   2014?

21       A    Correct.

22       Q    So is it correct that, based on

1    everything that you've seen in this case, that

2    there's nothing to indicate that Tavares Docher,

3    the deputies, or the paramedics in this case were

4    using bath salts?

5         A    Correct.

6         Q    Now, you've reviewed surveillance

7    footage of inside the CVS; correct?

8         A    Correct.

9         Q    And you've also read the depositions of

10   the CVS employees; correct?

11        A    Correct.

12        Q    Based on the review of the surveillance

13   and the depositions of the CVS employees, have

14   you seen any evidence that while Tavares Docher

15   was inside the CVS, that he was exhibiting

16   violent and aggressive behavior?

17        A    No, there was no evidence of that from

18   the footage, nor was there any description of

19   that.

20        Q    Would you agree with me that it was not

21   until Tavares Docher was placed in handcuffs that

22   according to the police officers that that is

1   when he started to exhibit any sort of aggressive

2   behavior?

3       A    It was not until after he was partially

4   in the patrol car and then bolted from that

5   position across the parking lot that there was

6   any indication of any aggressive behavior.

7       Q    And in fact, would you agree with me

8   that Tavares Docher did not begin to physically

9   struggle until it was when he was lying on the

10  ground on his belly with his hands in cuffs

11  behind his back being struck by the officers?

12          MR. JOLLY:  Let me object to form on

13  that one.

14          THE WITNESS:  I saw no evidence or

15  recall testimony of his engaging in any struggle

16  until the attempts to restrain him while he was

17  on the ground.

18          BY MR. HECHT:

19      Q    Dr. McAlary, did the actions of the

20  sheriff's deputies, combined with the actions of

21  the paramedics in this case substantially

22  contribute to Tavares Docher's injuries?

Dr. Brian G. McAlary                         8/4/2017

```
 1      A    Yes.

 2      Q    Thank you very much, Dr. McAlary.  I

 3   don't have any further questions.

 4      FURTHER EXAMINATION ON BEHALF OF THE DEFENDANTS

 5           BY MR. NEWMAN:

 6      Q    Dr. McAlary, this is Ben Newman.  I have

 7   a few brief follow-up questions.  Do you need to

 8   take a break?

 9      A    No, I'm fine.  Thank you.

10      Q    Okay.  Following Mr. Hecht's questions,

11   at the time that you understand that Mr. Docher

12   became combative and the conduct that he engaged

13   in at that point in time, do you agree that that

14   combative conduct is consistent with someone who

15   may be under the influence of bath salts?

16      A    In and off itself, yes.  But one has to

17   look at it in the context, as well as the

18   antecedent behavior, to be able to determine that

19   it was unlikely the primary, if any, factor.

20      Q    And Mr. Hecht asked you if there was any

21   testing, laboratory testing done at the hospital

22   to confirm the presence of bath salts.  The
```

Dr. Brian G. McAlary

```
 1   reality is, there wasn't testing one way or the

 2   other; correct?

 3       A    Correct.

 4       Q    So we don't know, do we, based on the

 5   laboratory data whether, in fact, Mr. Docher had

 6   bath salts in his system?

 7       A    We don't from any laboratory testing.

 8       Q    And then, to broaden that, we don't

 9   know, there's no evidence one way or the other

10   about the presence of bath salts, not just

11   laboratory testing, but any other; right?

12       A    That's not technically true.  There is

13   indirect evidence as seen in his EKG, which shows

14   no evidence of myocardial ischemia known to exist

15   with toxic doses of this drug.  There is no

16   dysrhythmia since the time of his defibrillation.

17   There's no evidence of any irregularity in vital

18   signs that would be consistent with that.

19            So we do not have any indirect evidence,

20   even absent the direct evidence of a toxicology

21   screen.

22       Q    Even though we have behavior prior to
```

```
 1    the administration of ativan which you've already

 2    testified is consistent with someone who is under

 3    the influence of bath salts?

 4              MR. HECHT:  Form.

 5              THE WITNESS:  The only portion that

 6    would be consistent was after he fell, struck his

 7    head, and was being restrained.  There was no

 8    evidence in his behavior prior to that that is

 9    consistent with toxicity from these agents.

10              BY MR. NEWMAN:

11        Q    I'm going to shift gears and just ask

12    you a couple questions about the ativan

13    administration.  I just want to make sure I'm

14    clear on your testimony.

15              You agree or do you agree that there is

16    no policy, written policy from the St. Lucie

17    County Fire District that a paramedic is not

18    authorized to give 4 milligrams of ativan at

19    once?

20        A    Not that I have received.

21        Q    And do you agree with me that there is

22    no evidence in the form of testimony from anyone
```

Dr. Brian G. McAlary

```
 1   who operates under the policies and procedures of

 2   the St. Lucie County Fire District that it is

 3   against the fire district policy to give 4

 4   milligrams to a patient all at once?

 5        A    That is correct.

 6        Q    And I guess I'm not real clear on this.

 7   Is it your opinion that giving 4 milligrams

 8   generally at once is a violation of a standard of

 9   care or is it your opinion that giving 4

10   milligrams at once under these circumstances is a

11   violation of the standard of care?

12        A    The latter.

13        Q    Okay.  So you agree that there are

14   situations and circumstances where it is

15   appropriate to give a patient 4 milligrams of

16   ativan in a bolus fashion or at once?

17        A    Yes, there are circumstances where that

18   could be both justified and within the standard

19   of care.

20        Q    Okay.  I meant to say in a bolus form or

21   all at once, in my last question; and your answer

22   is the same I assume.
```

```
 1        A     Yes.

 2        Q     Thank you, sir.  I don't have any other

 3   questions for you.  I don't know if anybody has

 4   any followup.

 5              MR. JOLLY:  This is Bruce Jolly.  I do

 6   not have followup.

 7              MR. HECHT:  No.

 8              MR. NEWMAN:  Dr. McAlary, as you know,

 9   you have the right to read the transcript of this

10   deposition to check it for its accuracy or you

11   can waive that right.  It's up to you, sir, you

12   just need to let us know.

13              THE WITNESS:  In all due respect to the

14   court reporter, I would prefer to read.

15              MR. NEWMAN:  Thank you very much for

16   your time.

17              THE WITNESS:  You're most welcome.  Have

18   a good day, gentlemen.

19              MR. HECHT:  Madam Court Reporter?

20              THE COURT REPORTER:  Yes.

21              MR. HECHT:  Wait.  Wait.  Wait.  This is

22   Adam Hecht.
```

```
 1              THE COURT REPORTER:  Okay.

 2              MR. HECHT:  I would like to expedite

 3    this deposition please.

 4              THE COURT REPORTER:  Okay.  When would

 5    you like it?

 6              MR. HECHT:  Tomorrow.

 7              THE COURT REPORTER:  Saturday?

 8              MR. HECHT:  Yes.

 9              THE COURT REPORTER:  I don't know if

10    that's going to be possible.

11              MR. HECHT:  Okay.  Sunday.

12              THE COURT REPORTER:  Could I have a

13    number to reach you?  I have to talk to the

14    office manager and have either Cori or Jodi get

15    in touch with you.

16              MR. HECHT:  Okay.  561-686-6300.

17              MR. JOLLY:  Reporter, my name is Bruce

18    Jolly.  However quickly you are able to get it to

19    plaintiff, on behalf of the defendant sheriff, we

20    too need it.

21              THE COURT REPORTER:  Mr. Newman, I

22    assume you --
```

1            MR. NEWMAN:  Yes.  Yes.  Since I noticed

2   the deposition, yes, of course, I do want it

3   assuming plaintiff's counsel is shouldering the

4   burden of the expedited fee, but I would like a

5   full-size copy, a mini, and electronic version.

6                    *  *  *  *  *

7       (Whereupon, at approximately 11:30 o'clock,

8   a.m., the taking of the deposition in the above-

9   entitled matter was concluded.)

ERRATA SHEET

RE: Tavares Docher, by and through Janice
    Docher-Neeley, his mother and legal
    guardian

DATE:  August 4, 2017

DEPONENT:  Dr. Brian G. McAlary

TO THE REPORTER:


I hereby certify that I have read the

entire transcript of my deposition taken on

the 4th day of August 2017, or the same has

been read to me.  I request that the

following changes be entered upon the record

for the reasons indicated.  I have signed my

name to the signature line below and

authorize you to attach the same to the

original transcript.

Page:    Line:    Correction:




Page:    Line:    Correction:

**Dr. Brian G. McAlary**

Page:      Line:      Correction:

Page:      Line:      Correction:

Page:      Line:      Correction:

Page:      Line:      Correction:

Page:      Line:      Correction:

Page:      Line:      Correction:

Page:      Line:      Correction:

Page:      Line:      Correction:

Page:       Line:       Correction:


Page:       Line:       Correction:


Page:       Line:       Correction:


Page:       Line:       Correction:


Page:       Line:       Correction:


Page:       Line:       Correction:


Page:       Line:       Correction:


Page:       Line:       Correction:

**Dr. Brian G. McAlary**                                  8/4/2017

Page:        Line:        Correction:




Page:        Line:        Correction:




Page:        Line:        Correction:




Page:        Line:        Correction:




Page:        Line:        Correction:




Page:        Line:        Correction:




Page:        Line:        Correction:




Page:        Line:        Correction:

96

**Dr. Brian G. McAlary**                                   8/4/2017

Page:     Line:     Correction:




Page:     Line:     Correction:




Page:     Line:     Correction:




Page:     Line:     Correction:




Signature:_____


Date:_____

CERTIFICATE OF REPORTER

I, Sharon D. Akers, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and that I thereafter reduced it to typewriting; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise i

outcome of the action.                 *Sharon D. Akers*

_____
Sharon D. Akers

My commission expires May 31, 2020
Registration No. 268253

## WORD INDEX

**< 1 >**
**1** 18:*14* 41:*7, 14* 42:*5, 16*
**10** 22:*18* 23:*1*
**10771** 1:*1* 3:*13*
**11** 2:*1* 18:*15* 62:*7, 16* 82:*5, 11, 17, 19*
**11:30** 91:*7*
**110** 44:*2* 45:*4*
**11th** 62:*22*
**12** 10:*4* 11:*3*
**1200** 2:*1*
**1216** 2:*1*
**146** 19:*15*
**15** 5:*21, 22* 11:*15*
**164** 19:*15*
**17** 40:*13*
**18:36** 45:*11*
**18:38** 44:*1* 46:*11*
**18:40** 43:*21*

**< 2 >**
**2** 18:*14* 53:*10*
**20** 6:*1* 33:*11* 45:*12, 13, 19* 55:*11* 59:*16* 60:*13*
**2009** 55:*13* 60:*4*
**2013** 4:*8* 10:*2* 11:*10* 13:*2* 40:*22*
**2014** 40:*13* 55:*15* 60:*5* 62:*8* 82:*5, 11, 17, 20*
**2016** 4:*9* 7:*5* 13:*2*
**2017** 1:*1* 4:*3, 9, 10, 13, 15* 14:*4* 92:*1, 1*
**2020** 97:*1*
**20th** 40:*22*
**21** 14:*4* 72:*13*
**2139** 2:*1*

**21st** 4:*3* 14:*6* 19:*5* 56:*17, 20* 57:*6*
**2455** 2:*1*
**268253** 97:*1*
**28** 21:*6* 22:*18* 23:*1* 45:*4*

**< 3 >**
**3** 2:*1*
**30** 33:*11* 45:*13, 13, 19*
**30th** 7:*5*
**31** 97:*1*
**32801** 2:*1*
**33304** 2:*1*
**33409** 2:*1*

**< 4 >**
**4** 1:*1* 21:*6* 25:*8* 29:*11* 41:*7* 42:*5, 18* 48:*8, 18* 49:*1* 55:*6* 87:*18* 88:*3, 7, 9, 15* 92:*1*
**40** 4:*20* 11:*17* 12:*20*
**40-year** 5:*14*
**43** 19:*9*
**450** 5:*16*
**4th** 92:*1*

**< 5 >**
**5** 55:*6* 72:*13*
**53** 2:*1*
**561-686-6300** 90:*16*

**< 8 >**
**8** 18:*14*
**81** 2:*1*
**85** 2:*1*

**< 9 >**
**9:05** 1:*1*

**90** 6:*1*
**911** 37:*19*

**< A >**
**a.m** 1:*1* 91:*8*
**able** 15:*2* 17:*9* 38:*15, 19* 50:*8* 52:*12* 59:*11* 63:*3* 85:*18* 90:*18*
**absence** 21:*5* 22:*3* 24:*21*
**absent** 32:*8* 86:*20*
**academic** 10:*6, 8*
**academy** 68:*10*
**accelerated** 26:*8*
**accept** 7:*11* 43:*8*
**accepted** 4:*21*
**accessible** 19:*20*
**accuracy** 89:*10*
**accurate** 6:*16* 36:*9* 45:*7*
**accurately** 19:*7* 33:*17*
**acidotic** 28:*18*
**ACLS** 26:*9*
**acquiescence** 75:*19*
**acquisition** 75:*18*
**action** 97:*1, 1*
**actions** 73:*11* 84:*19, 20*
**active** 6:*9* 11:*16* 13:*13*
**actively** 8:*12* 10:*17*
**activity** 72:*17*
**actual** 12:*8*
**acute** 34:*21*
**Adam** 2:*1* 81:*9* 89:*22*
**add** 7:*12*
**addition** 28:*1, 6* 56:*2* 77:*10*
**additional** 4:*4* 14:*17* 50:*21* 71:*7,*

17, 21, 22
**address** 3:*11*
**adequacy** 47:*8*
**adequate** 25:*6* 49:*11* 51:*10* 65:*17*
**adequately** 24:*7*
**administer** 50:*17*
**administered** 25:*2* 43:*20* 78:*8*
**administering** 29:*1*
**administration** 24:*9* 25:*8, 10, 12, 14, 16, 19* 26:*14* 27:*3* 28:*12* 29:*15, 20* 30:*6, 8, 17* 31:*3, 17* 42:*21* 46:*14* 47:*3* 48:*6, 8, 17* 49:*1* 51:*18* 79:*9* 87:*1, 13*
**admission** 62:*3, 12, 16*
**admissions** 62:*5*
**admit** 59:*8*
**Adult** 42:*5* 45:*12*
**adults** 41:*4, 6*
**adverse** 4:*20* 21:*15, 19* 22:*9, 11, 19* 23:*5, 10*
**advisor** 68:*6*
**advocated** 31:*12*
**agency** 68:*4, 7*
**agent** 42:*3*
**agents** 42:*3* 68:*19* 87:*9*
**aggressive** 36:*15* 37:*21* 39:*4* 81:*22* 83:*16* 84:*1, 6*
**agitated** 17:*12* 19:*11*
**agree** 32:*14* 38:*5, 8* 39:*6* 43:*3, 4, 12, 22* 46:*12* 47:*1, 9, 21* 50:*14* 52:*14* 82:*14* 83:*20* 84:*7*

85:*13*  87:*15, 15, 21*  88:*13*
**agreement**  30:*14* 75:*19*
**ahead**  23:*19*
**aimed**  37:*17*
**air**  27:*21*
**airway**  28:7  46:7
**Akers**  1:*1*  97:*1, 1*
**alcohol**  28:*20* 29:*6, 10, 11*  43:*5* 59:*5*
**alive**  33:7
**allow**  49:*18*
**allowing**  8:*3*
**allows**  5:7
**alluded**  57:*2, 19*
**altercation**  56:7
**altercations**  77:*22* 78:*3*
**Alum**  1:*1*  3:*13*
**amount**  50:*12* 51:*12*
**amounts**  50:*13* 60:2
**analysis**  12:22 35:*15*
**analyst**  4:*19*
**anesthesia**  9:*11* 10:*20*
**anesthesiologist** 9:*5, 16*
**anesthesiology** 9:*17, 20*
**animated**  51:*21*
**answer**  8:*4, 5* 47:*7, 19*  63:*3* 66:*8*  70:*10*  78:*19, 22*  79:*1, 5*  80:2 88:*21*
**answered**  78:*14*
**antecedent**  28:*11, 20*  62:*4*  85:*18*
**anticipate**  8:*14*

71:*17*
**anxiety**  56:*3*
**anybody**  44:*14* 89:*3*
**anytime**  8:9
**apnea**  21:22  22:2, *3, 10, 17, 20, 21* 23:6  33:*18*  34:*1*
**apologies**  58:*1* 72:*21*
**apologize**  28:*16* 78:*16*
**apparent**  67:2 74:5
**apparently**  33:7 73:*16*  75:*21* 78:*16*  80:*3*
**appear**  16:5  59:*4* 70:*16*
**appearance**  66:*5, 13*
**APPEARANCES** 2:*1*
**appeared**  50:*21*
**appears**  19:22 55:*10*  59:*4*  97:*1*
**application**  75:9
**applied**  79:*12, 19*
**applying**  50:*1*
**appointment**  11:*1*
**appreciate**  81:*7*
**approach**  44:8 50:*20*
**appropriate**  88:*15*
**approximate**  5:*14* 30:*21*  55:*11*
**approximately**  1:*1* 4:*12, 14*  5:*16* 8:*16*  12:2  13:*12* 29:*12, 18*  43:*21* 55:*15*  91:*7*
**area**  9:*17*  12:*13* 27:*22*  39:*14, 14* 77:*3, 10*  79:*12, 18*

**areas**  19:*8, 16, 17*
**aren't**  7:*20*  15:*1*
**arm**  38:*16*  55:7
**arms**  27:*19, 20* 76:*19*  79:*15, 17*
**arrangement**  64:*14*
**arrest**  22:*1, 6, 11* 23:*9, 13*  26:5, *15, 21*  27:5, *12*  29:5, *17, 22*  34:6  37:2 65:*9*  78:*13*
**arrested**  63:*12, 13, 18*  81:*4*
**arrival**  24:5  50:*20*
**arrive**  5:*13*
**arrived**  39:*10*
**ASH@SearcyLaw.c om**  2:*1*
**aside**  31:*16*
**asked**  4:6  6:*13* 20:7  33:6  60:*21* 80:*3, 6*  81:*16* 85:*20*
**asking**  46:*21, 22* 47:*7, 8*
**aspect**  12:*21*
**aspects**  71:*7*
**asphalt**  27:*22*
**asphyxia**  28:*5* 50:*1, 10, 11*  51:*7, 11*
**aspirate**  32:*17*
**aspiration**  25:*14* 32:*1, 6, 9*
**assaulted**  56:*8*
**assessed**  28:*13*
**assessment**  24:*16, 22*  25:6  28:*14* 44:*1*
**assist**  71:*8*
**assistant**  10:*13, 16*
**associate**  10:*14, 22*
**associated**  9:*10* 20:9  28:*19*  44:*9*
**Association**  18:*18*

**assume**  88:*22* 90:*22*
**assuming**  30:*17* 91:*3*
**ativan**  20:*9, 17* 21:*7*  22:*10*  25:*2, 8*  26:*20*  27:*3* 28:*12, 22*  29:*1, 15, 21*  30:*1*  33:*20* 40:*6, 18, 21*  41:*4, 12*  42:*4, 12, 16* 43:*19*  46:*14*  47:*3* 48:*6, 17*  49:*2* 50:*17*  51:*18*  79:*9* 87:*1, 12, 18*  88:*16*
**attach**  92:*1*
**attached**  36:7 40:*15*
**attempt**  24:2 33:*5*  73:*18*  78:*15, 18*
**Attempts**  44:*8* 75:*14*  84:*16*
**attention**  58:*3*
**attorney**  3:*16*  6:*3* 97:*1*
**attorneys**  6:*12* 49:*19*  52:*20*
**audible**  52:2
**audio**  15:9
**August**  1:*1*  92:*1, 1*
**Aulbach**  7:*5*
**A-u-l-b-a-c-h**  7:*6*
**auscultation**  28:*14*
**authored**  60:*10*
**authorize**  92:*1*
**authorized**  87:*18*
**available**  17:*5*
**Avenue**  2:*1*
**aware**  5:*10*
**awareness**  78:*7*

< B >

**back** 27:*20* 28:*3* 48:*5* 72:*9* 79:*17*, *18* 84:*11*
**bag** 56:*10*
**Baltimore** 12:*3*, *13*
**Barnhart** 2:*1*
**Barranco** 2:*1*
**Based** 19:*21* 25:*17* 26:*11* 38:*13* 43:*10* 46:*22* 47:*19* 82:*22* 83:*12* 86:*4*
**basically** 50:*11* 73:*16*
**basis** 27:*6, 7* 29:*22*
**bath** 35:*11, 13, 18, 19* 36:*3, 7, 10, 17* 37:*4* 38:*9* 69:*11, 13* 81:*17* 82:*19* 83:*4* 85:*15, 22* 86:*6, 10* 87:*3*
**Beach** 2:*1, 1* 55:*12* 60:*3, 7, 10* 67:*11*
**bear** 69:*9* 73:*3*
**bedside** 25:*21*
**began** 19:*14, 15*
**behalf** 1:*1, 1* 2:*1, 1* 3:*5, 8* 5:*19* 14:*2* 53:*1* 81:*14* 85:*4* 90:*19*
**behavior** 36:*15* 37:*12, 22* 39:*5* 55:*19* 74:*12* 82:*1* 83:*16* 84:*2, 6* 85:*18* 86:*22* 87:*8*
**behavioral** 17:*13* 19:*12*
**believe** 7:*1* 13:*22* 14:*3* 17:*20* 20:*20* 21:*1, 18* 23:*11, 15* 29:*22* 31:*2* 33:*1, 22* 40:*3, 9* 54:*17* 56:*18* 64:*19* 68:*8,*

*20* 70:*11* 75:*13* 77:*19*
**belly** 84:*10*
**Ben** 3:*15* 40:*12* 43:*18* 85:*6*
**benefit** 35:*6*
**Benjamin** 2:*1*
**BenNewman@wilso nelser.com** 2:*1*
**best** 8:*4* 33:*4*
**better** 25:*5* 44:*13* 54:*14*
**beyond** 51:*1, 4*
**Bhagudas** 15:*21*
**B-h-a-g-u-d-a-s** 15:*22*
**bilateral** 76:*10* 77:*1, 14*
**bin** 26:*2*
**biphasic** 73:*16*
**bit** 49:*5*
**bleeding** 28:*8*
**Blizzard** 40:*15* 41:*21*
**blood** 29:*10, 11* 36:*13* 74:*7* 75:*12*
**blue** 50:*22*
**Board** 70:*18* 73:*19* 74:*14* 75:*8*
**body** 27:*19, 21* 38:*16* 66:*22* 79:*11, 12*
**bold** 42:*2*
**bolted** 84:*4*
**bolus** 25:*10* 30:*12* 88:*16, 20*
**bolusing** 25:*16*
**bone** 76:*11, 15* 77:*18, 21*
**book** 17:*8*
**Boulevard** 2:*1, 1*
**bradypnea** 46:*16*
**brain** 59:*1* 80:*10*

**break** 8:*9* 16:*16* 49:*7, 16* 76:*18* 80:*17* 85:*8*
**breathe** 28:*10* 38:*18, 20* 50:*9* 51:*10*
**breathing** 22:*4* 26:*6* 45:*12, 18* 47:*14*
**breaths** 46:*20*
**Brian** 1:*1, 1* 2:*1* 3:*3, 12* 15:*16* 40:*14* 92:*1*
**brief** 16:*14, 16* 39:*19* 49:*7, 14, 16* 50:*5* 85:*7*
**briefly** 7:*22* 72:*7*
**broaden** 86:*8*
**brochure** 17:*8*
**brought** 9:*6* 35:*9* 36:*17*
**Brown** 15:*20*
**Bruce** 2:*1* 53:*6* 89:*5* 90:*17*
**Bruce@purdylaw.c om** 2:*1*
**burden** 91:*4*
**buttocks** 32:*2*
**bystander** 50:*5*
**bystanders** 37:*10* 52:*2*

**< C >**
**call** 17:*12* 36:*11*
**called** 1:*1* 3:*4* 6:*12* 7:*5*
**calling** 55:*18*
**CALVIN** 1:*1* 15:*15*
**camera** 37:*16* 39:*13, 16*
**can't** 38:*18* 57:*16*
**candidate** 75:*20*
**capable** 34:*21*

**capacity** 9:*3* 76:*9* 80:*11*
**capsule** 26:*17*
**Captain** 15:*16* 48:*12*
**captioned** 19:*11* 72:*8, 11*
**car** 37:*14* 84:*4*
**carbon** 50:*13*
**cardiac** 21:22 23:*9* 29:*5* 34:*2* 80:*8*
**cardiopulmonary** 26:*5, 21* 27:*5, 12* 29:*16, 21* 34:*6* 37:*2*
**care** 5:*8* 12:*21* 23:*16, 22* 27:*9* 31:*12* 66:*19* 88:*9, 11, 19*
**cared** 16:*3*
**caring** 36:*20*
**Carolina** 8:*19*
**Case** 1:*1* 3:*18* 7:*5, 9, 12, 14, 16* 12:*16, 17* 13:*7, 10* 14:*1, 13* 18:*21* 20:*2* 21:*18* 23:*15* 30:*15* 31:*18* 32:*5, 14, 22* 35:*13* 48:*21* 53:*15* 56:*7* 70:*20* 71:*8* 72:*6* 82:*5, 8, 15, 18* 83:*1, 3* 84:*21*
**cases** 4:*18* 5:*17* 6:*10, 22* 7:*17* 13:*1, 16, 19* 68:*18*
**cash** 37:*16*
**catches** 61:*13*
**catecholamine** 36:*12*
**category** 19:*13* 25:*3, 17* 26:*12* 35:*7* 36:*5* 58:*14*

cathinones 35:2, 10, 18 37:4 81:17, 22 82:6, 12, 16
c-a-t-h-i-n-o-n-e-s 35:2
causation 24:1
cause 21:5 27:4 33:22 76:5, 15 77:13
caused 26:20 30:1 50:1 72:17 76:4
causes 37:1
causing 34:21 39:4
cautionary 22:17
cell 39:19 50:6
Center 10:5 12:3, 8
certain 13:17 65:2
certainly 12:19 30:17 31:8 45:13 56:20 73:5 79:22
certainty 57:7
certificate 5:4, 7, 13 97:1
certified 5:1, 3
certify 92:1 97:1
cervical 73:19 75:8
cessation 34:21
cetera 33:5 34:11 52:4 54:3
challenge 44:11
changes 92:1
chapter 17:7
characterized 22:5 27:17, 17
characterizing 45:8 55:1
check 89:10
chest 28:15 42:17 50:7
Chicago 10:5 11:7

chief 15:15 40:14, 14 41:21 56:2
choice 26:22 33:1 43:8 66:15
choosing 45:6
CHRISTOPHER 1:1
circuiting 59:2
circumstances 88:10, 14, 17
cited 40:6
civilian 37:10
claims 68:18
clarify 58:18
clarity 51:4
class 35:4
classically 66:17
CLAYLAN 1:1
clear 87:14 88:6
clearly 24:22 35:5 39:1
clinical 8:15 9:16, 18, 19 11:10 17:14 25:1
clinically 10:1 11:16
clippings 70:16 71:4, 10
closer 11:16
closest 51:19
clothing 67:1
cocaine 42:15 43:2, 9, 11
code 72:19
collar 73:19 75:9 76:11, 15
colleague 75:17
colloquies 70:1
column 42:2
combative 17:2 52:11 75:1, 10 85:12, 14
combativeness 74:15

combination 9:1 28:3 37:9 79:20
combined 84:20
come 7:17 74:18
comes 54:19
coming 69:10
commencing 1:1
commission 97:1
Commissioners 70:19
commonly 36:10 56:3
Commonwealth 1:1 10:11, 15, 22
communicated 43:7
communication 24:14
community 12:5, 12
compile 6:6
complaints 56:2, 10
complete 6:16 26:5, 15
component 24:4 68:1
components 25:15
compression 50:6 77:14
compromise 72:18 79:22
compromised 30:5, 16 33:15
concern 13:3 19:17 22:18 43:6 58:7
concerned 54:8
conclude 65:20 66:2
concluded 91:9
concussion 80:14, 20 81:2
concussive-like 80:10

condition 21:11, 11 30:1
conditions 27:11
conduct 11:8 12:18 38:7 85:12, 14
conference 1:1 8:2
confidence 34:15 63:19
confident 59:21
confirm 14:18 85:22
conflict 67:19
confrontation 55:20
congeners 36:11
consciousness 24:17 51:12, 17 52:15
consider 37:3, 8 65:4
considered 9:7
Considering 34:7
consistent 38:9, 17 46:9 59:5 65:15 66:17 85:14 86:18 87:2, 6, 9
consultant 11:4
consultation 59:8
consumption 36:14 59:5
contact 44:6, 20 46:3
contacting 11:2
contain 6:19 42:14
contained 72:13
containing 6:18
contents 19:7
context 30:15 85:17
continue 58:18
continues 51:11
contractor 9:10

**contraindications**
20:*14*, *19*  21:2
**contribute**  50:*8*
84:*22*
**contributed**  26:*21*
30:*1*  72:*18*
**contributes**  30:*4*
**contribution**  28:9
**cooperation**  45:2
**copy**  91:*5*
**Cori**  90:*14*
**corner**  42:*1*
**correct**  14:*3*
30:*18*  32:*19*
39:*11*  40:*4*  45:*16*,
*20*  48:*13*, *14*
50:*18*  52:*16*
57:*14*  60:*16*  61:*6*
62:*1*  63:*9*  65:*10*
70:*12*  73:2  81:*20*
82:*21*, *22*  83:*5*, *7*,
*8*, *10*, *11*  86:*2*, *3*
88:*5*
**correction**  6:*18*,
*19*  92:*1*, *1*  93:*1*, *1*,
*1*, *1*, *1*, *1*, *1*  94:*1*,
*1*, *1*, *1*, *1*, *1*, *1*
95:*1*, *1*, *1*, *1*, *1*, *1*,
*1*  96:*1*, *1*, *1*, *1*
**correctly**  35:*21*
53:*4*  57:*10*  61:*4*
**correspondence**
6:*11*  67:*13*, *15*
**couldn't**  13:*14*
31:*7*
**counsel**  1:*1*  3:*4*
91:*3*  97:*1*, *1*
**count**  79:*7*
**country**  36:*1*
**County**  1:*1*, *1*
3:*16*  40:*8*, *16*
48:*16*  49:*3*  69:*22*
70:*17*, *19*  87:*17*
88:*2*

**couple**  17:*20*
49:*17*  87:*12*
**coupled**  50:*3*
**course**  49:*18*  91:*2*
**COURT**  1:*1*  4:*1*
89:*14*, *19*, *20*  90:*1*,
*4*, *7*, *9*, *12*, *21*
**COURTEMANCH**
**E**  1:*1*  15:*11*
**C-o-u-r-t-e-m-a-n-c**
**-h-e**  15:*11*
**courtesy**  66:*7*
**courts**  4:*22*
**cover**  14:*6*  40:*13*
**criticism**  25:*4*
41:*12*
**crystalline**  36:2
**cue**  42:*16*
**cuffs**  84:*10*
**Culpeper**  1:*1*, *1*
3:*14*
**curious**  35:*13*
**currently**  8:*12*
9:*15*  10:*6*, *8*
13:*13*
**CVA**  34:*13*
**CVS**  15:*17*, *19*
37:*17*  39:*14*  83:*7*,
*10*, *13*, *15*

**< D >**
**dark**  50:*22*
**data**  86:*5*
**database**  6:*15*, *21*
**date**  4:*2*  40:*22*
42:*16*  53:*17*
54:*11*  60:*9*  71:*16*
92:*1*
**Date:**  96:*1*
**dates**  60:*3*
**day**  61:*8*  89:*18*
92:*1*
**deal**  51:*8*
**deciding**  24:*8*

**decubitus**  33:*14*
74:2
**Defendant**  1:*1*
5:*20*, *22*  53:*7*
90:*19*
**defendants**  1:*1*
2:*1*  3:*5*, *8*  53:*1*, *8*
85:*4*
**defibrillation**
86:*16*
**definitely**  15:*7*
**degree**  33:*11*
57:*16*
**delay**  26:*15*
**delusional**  21:*12*
**Denney**  2:*1*  13:*8*
14:2
**department**  11:*5*
54:*3*  59:*17*
**departments**  11:*20*
**depending**  9:*12*
**depends**  69:*19*
**DEPONENT**  92:*1*
**deposed**  13:*20*
**deposition**  1:*1*
4:*8*  6:*4*  7:2, *4*, *8*,
*19*  13:*15*  14:*17*
15:*22*  16:*1*, 2, *17*
18:*4*  20:*8*  38:*4*
48:*11*  51:*15*
68:*16*  71:*22*  73:*7*
74:*20*  89:*10*  90:*3*
91:*2*, *8*  92:*1*  97:*1*,
*1*, *1*
**depositions**  4:*10*,
*13*  5:*15*, *18*  8:*1*
14:*21*  15:*6*  16:*5*,
*8*  48:*15*  83:*9*, *13*
**deppressant**  28:*21*
**depressed**  76:*10*,
*22*
**depression**  22:*12*,
*20*  30:*13*  32:*3*
46:*13*, *15*  47:2, *10*

**48:*1*  56:*4**
**depressive**  21:*9*
**depth**  18:*14*
**deputies**  24:*14*
27:*14*, *18*  43:*6*
44:*13*  50:*1*, *4*
52:*6*  53:*8*  74:*3*
82:*18*  83:*3*  84:*20*
**Deputy**  15:*11*, *12*,
*14*  16:*1*  28:*1*
40:*14*, *14*  41:*21*
**derangement**
28:*19*
**derived**  11:*12*
35:*20*
**describe**  45:*18*
**described**  25:*4*
33:*13*  35:*14*
45:*10*  56:*13*, *16*
72:*20*  74:*1*, *1*, *4*
83:*18*
**describes**  38:*6*
46:*5*
**describing**  54:*18*
**description**  38:*12*,
*15*  46:*2*, *10*  55:*19*
73:*10*, *11*  74:*14*
83:*18*
**descriptions**  54:*2*
**descriptive**  46:*1*
52:*3*
**despite**  24:*21*
**detailed**  39:*16*
**detectable**  76:*12*
**determine**  67:*10*
85:*18*
**determining**  37:*1*
**devices**  25:*21*
**diagnosis**  62:9
**Dicker**  2:*1*
**didn't**  55:*3*  65:*22*
72:*21*  79:*3*
**difference**  32:9
35:*17*
**difficult**  30:*19*

77:12
difficulty  38:12
dioxide  50:13
direct  86:20
direction  9:12
directly  71:1
director  11:19
  12:1
disbelieve  45:6
discernable  66:22
disclosed  16:22
discovery  33:18
discussed  16:17
  68:2
disorder  21:9
  56:12
disorders  34:20
dispatcher  37:19
dispute  76:7
distance  39:12
  50:18
distress  33:12
DISTRICT  1:1, 1,
  1, 1  3:17  40:8, 17
  48:16  49:3  70:6
  87:17  88:2, 3
district's  48:19
districts  11:21
disturbance  57:17
DOCHER  1:1
  3:18  20:22  24:7,
  15  27:8, 15  28:7
  34:5  35:8  36:16
  37:5, 13, 18  39:8,
  22  43:1  49:21
  50:16  51:16, 20
  52:8, 9  53:12
  54:13  55:17  61:8,
  20, 21  62:7, 21
  63:12, 18  65:8
  67:21  74:22  76:1
  77:17  80:5, 14
  82:4, 11, 16  83:2,
  14, 21  84:8  85:11
  86:5  92:1

Docher's  21:18
  38:7  55:2  64:14
  65:12  67:5  73:11
  74:12  84:22
DOCHER-NEELE
Y  1:1  92:1
Doctor  7:22  9:17
  16:3  47:6  49:6
  56:14  59:11  69:9
  73:3
document  21:7
  30:7  45:14  70:18
documentation
  25:11  31:22  32:8,
  16  44:5, 15, 21
  45:7  47:4  52:15
  53:15  54:4, 10, 21
  55:6  57:11, 21
  58:6  61:7  63:11,
  15, 22  64:10, 13
  67:4
documented  21:10
  44:3  46:11  47:1,
  13, 22  48:7  54:8
  78:2, 10
documenting
  54:12
documents  41:10
  55:3  57:1, 18
  59:12  60:18  61:3
  63:17  64:5  72:3
doesn't  4:9  5:9
  45:17
doing  8:1, 2
  78:16  80:11
dominant  60:2
don't  7:10  8:7,
  21  12:9  15:5
  16:19  19:19  20:9
  21:1  23:11, 19
  40:10  43:4, 8
  46:17, 21  47:18
  56:20  57:7  58:4
  60:21, 22  62:18
  63:1  68:8, 20

70:11  71:5  79:7
  80:15  81:3  85:3
  86:4, 7, 8  89:2, 3
  90:9
door  37:17
dosage  41:4, 6
dose  25:2, 9, 16
  30:11  42:5, 14
  48:18  69:19
doses  86:15
doubt  6:17
Dr  1:1, 1  2:1  3:3,
  15  7:4  8:12  15:8
  16:4, 16  20:13
  43:17  45:21
  49:16  52:17  53:3
  81:6, 9, 16  84:19
  85:2, 6  89:8  92:1
dramatically
  31:13  32:12
driven  64:21
drug  23:12  25:13,
  19  26:1  30:9
  35:7  36:5  39:2, 4
  55:19  86:15
drugs  35:4, 16, 22
  36:9  38:1  43:5
due  36:19  47:6
  58:2  89:13
DUI  29:13
duly  3:5  97:1
duration  33:16
duty  24:7
dysrhythmia
  34:17  86:16

< E >
E29  41:17  42:1
earlier  20:8
  28:15  32:7  40:6
  49:20  57:3  58:2
  60:21
earliest  60:9
early  56:18  60:4

easily  19:20
East  2:1
ECG  26:8
ECGs  58:8
echocardiography
  34:11
Edelman  2:1
Edition  17:1
education  42:1
effect  37:22  42:7
  69:12, 16, 18
effects  28:21
  36:14
effort  38:19  45:5,
  10, 16, 19  46:9
  74:10  75:7
either  6:18  22:13
  42:9  44:9  46:16
  51:15  81:1  90:14
EKG  86:13
elbow  77:5, 8
  78:7  80:6
elbows  77:3
electronic  91:5
element  29:4
  58:9  59:3
elements  59:6
elevation  36:12
eliminate  31:14
Elser  2:1
embolism  34:19
emergency  11:19
  12:18  13:4  17:1,
  13  19:12  23:17
  24:6  34:8  39:9,
  22  40:3, 17  51:16
  54:2  56:4  59:17
  62:2
employed  97:1, 1
employee  97:1
employees  15:17
  48:16  83:10, 13
emptied  36:4

**EMS** 12:*15* 17:*14* 18:*18*, *19* 21:*10* 25:*1* 43:7 52:7
**EMT** 12:*14*
**EMTP** 15:*10*, *13*, *22* 44:*18* 75:*18*
**enclosed** 40:*15*
**energy** 38:*19*
**enforcement** 35:*20* 68:*4*, *7*, *10*, *13*, *19* 70:*14* 71:*1*
**engaged** 85:*12*
**engaging** 84:*15*
**enhanced** 51:*3*
**entered** 92:*1*
**entire** 17:*15*, *19* 18:*5* 25:*8* 92:*1*
**entitled** 91:*9*
**ER** 54:*9*
**Eric** 15:*12*
**ERRATA** 92:*1*
**Esquire** 2:*1*, *1*, *1*
**essence** 26:*17* 38:*16*
**essentially** 34:*1* 45:*6*
**et** 33:*5* 34:*11* 52:*4* 54:*3*
**evaluate** 24:*7*
**evaluation** 27:*9* 34:*7* 77:*20*
**event** 15:*16*
**evidence** 31:*18* 32:*4*, *15*, *19*, *20* 37:*21* 39:*4* 46:*12* 47:*2*, *10*, *20*, *22* 82:*8*, *15*, *17* 83:*14*, *17* 84:*14* 86:*9*, *13*, *14*, *17*, *19*, *20* 87:*8*, *22*
**evidenced** 27:*8* 28:*8*
**exact** 23:*4*
**Exactly** 43:*13*
**exam** 81:*5*

**Examination** 2:*1*, *1*, *1* 3:*8* 53:*1* 81:*14* 85:*4*
**examined** 3:*6*
**example** 21:*6* 24:*16* 45:*9* 59:*8* 62:*2* 71:*21*
**exception** 21:*4* 56:*5*
**excessive** 25:*16* 68:*18*
**exchange** 52:*8*
**exhibit** 84:*1*
**exhibiting** 83:*15*
**exist** 86:*14*
**exists** 81:*1*
**expected** 36:*21*
**expecting** 5:*13*
**expedite** 90:*2*
**expedited** 91:*4*
**expert** 1:*1* 3:*4*, *19* 4:*18*, *19* 5:*1*, *4* 11:*13* 13:*11* 15:*12* 71:*22*
**experts** 48:*21* 49:*4*
**expires** 97:*1*
**explain** 33:*6*
**explanations** 76:*22*
**explicit** 48:*7*
**explore** 24:*4*
**express** 19:*18*
**expressed** 71:*9*
**extending** 76:*18*
**extent** 67:*18*
**extreme** 38:*18*
**extremities** 75:*13*, *15* 79:*14*
**eye** 61:*15*

**< F >**
**facility** 9:*13* 76:*13*
**fact** 5:*12* 24:*11* 31:*21* 35:*14*

43:*10* 45:*3* 64:*20* 65:*14* 84:*7* 86:*5*
**factor** 85:*19*
**facts** 30:*15* 33:*4*
**faculty** 12:*1*, *4*, *7*, *10*
**failure** 25:*5* 26:*12*, *13* 30:*7* 41:*13* 80:*8*
**fair** 33:*1* 34:*2* 63:*10* 66:*10*
**fairly** 14:*16*
**fall** 76:*18*, *22* 77:*2*, *13* 80:*17*
**familiar** 7:*11* 79:*6*
**family** 16:*3* 36:*12* 41:*22* 54:*20* 64:*17*, *18*, *21*, *22*
**far** 5:*6*, *9* 8:*3*
**fashion** 88:*16*
**fast** 45:*12*
**February** 55:*15* 60:*5*
**federal** 4:*1*
**fee** 91:*4*
**feel** 7:*12* 8:*9*
**feet** 55:*6* 59:*13*
**fell** 87:*6*
**felt** 56:*6*
**field** 36:*22*
**figures** 39:*15*
**file** 15:*9*
**finally** 36:*6*
**financially** 97:*1*
**find** 49:*22*
**Fine** 49:*8*, *12* 85:*9*
**finish** 8:*3* 49:*17* 70:*11*
**finished** 10:*4* 52:*20*
**FIRE** 1:*1* 3:*17* 11:*20*, *21* 40:*8*, *17* 48:*16*, *18* 49:*3* 55:*12* 60:*3*, *7*, *10*

70:*4* 82:*18* 87:*17* 88:*2*, *3*
**firearm** 56:*9*
**Firm** 13:*8*, *10* 14:*2*
**first** 5:*21* 22:*19* 25:*3* 42:*3* 53:*10* 63:*21* 68:*21* 69:*1*, *6* 73:*7*
**fit** 78:*21*
**five** 4:*14* 30:*22* 42:*17* 49:*10*
**five-state** 12:*15*
**fled** 37:*13*
**Florida** 1:*1*, *1* 2:*1*, *1*, *1* 5:*2*, *5*
**Florida's** 29:*12*
**focus** 72:*16*
**fold** 27:*8*
**folders** 6:*9*
**follow** 41:*14*
**followed** 29:*2*
**following** 21:*21* 25:*18* 26:*9* 85:*10* 92:*1*
**follows** 3:*7*
**followup** 59:*9* 89:*4*, *6*
**follow-up** 52:*19* 85:*7*
**foot** 28:*2* 50:*7* 79:*17*
**footage** 27:*15* 83:*7*, *18*
**force** 68:*18* 78:*12* 80:*5*
**forces** 80:*10*
**foregoing** 97:*1*, *1*
**forehead** 76:*20*
**form** 32:*15* 33:*2* 36:*2* 47:*11* 48:*3* 84:*12* 87:*4*, *22* 88:*20*
**format** 18:*11* 23:*4*

former 9:2
forming 71:8
forms 70:20
Fort 2:1
found 19:8, 16
34:22 41:9 44:15
56:11 58:7
four 4:14 11:7
33:9
Fourth 17:1
fracture 76:11, 15
77:18, 21
fractures 76:10
77:1
frame 5:14 42:8
free 7:12 8:10
Friday 1:1
front 14:19 23:2
37:17 40:11, 13
59:15
full-size 91:5
full-time 9:7
further 21:22
26:19 44:12 85:3,
4 97:1

< G >
gears 87:11
general 19:14
generally 53:12
55:2 57:2, 12, 19
59:11 61:20
67:21 69:10, 20
88:8
gentlemen 89:18
Gerard 3:12
getting 27:9 48:5
50:17
Gilewski 15:18
G-i-l-e-w-s-k-i
15:19
Giuffreda 2:1
give 7:19 14:18
22:14 87:18 88:3,
15

given 5:15, 18
7:2, 18 13:15
14:1 25:9 30:7,
11 31:5, 19 33:4
36:21 47:12 64:8
97:1
gives 11:1
giving 24:3 55:10
58:2 88:7, 9
glimpses 37:18
go 11:7 16:10
19:6 23:19, 19
55:13 62:18 72:9
going 8:4 13:21
14:8 19:6 22:15
47:17 49:5, 9, 18
54:21 60:2 67:8
81:10 87:11
90:10
Gonzales 15:17
48:12
Good 3:10 49:6
53:12 55:2 57:12,
16 61:20 67:21
78:17 89:18
grab 55:7 75:14
great 8:2 15:5
50:18 51:8
gross 24:13 65:15,
16, 19
ground 9:13 75:8
76:16 80:5 84:10,
17
group 35:15 38:1
55:7 56:18 70:13
grouping 15:17
17:11 41:10, 21
55:11 60:8
groupings 59:16
60:13
guardian 1:1 92:1
guess 25:3 88:6
guide 18:19

Guidelines 17:1,
14 25:2 29:1
40:16, 17 42:1

< H >
half 23:6 29:12
hallucinatory
21:13
handcuffed 27:20
handcuffs 76:17
83:21
hands 76:16
84:10
handy 40:7
happy 14:22
74:16, 19
hard 80:18
Hardyal 15:21
H-a-r-d-y-a-l 15:21
he's 33:11
head 19:15 74:5,
6 76:10 77:3, 10,
15 87:7
Health 34:10
53:13 54:18 55:2
57:13, 16 61:20
62:4, 8, 10, 21
67:22
healthcare 55:21
59:7
healthy 30:10
hear 81:11
heard 31:1 47:18
hearing 35:21
59:2
heart 36:13
Hecht 2:1, 1
14:12 19:3 33:2
37:11 47:11 48:3
49:12 81:9, 10, 15
84:18 85:20 87:4
89:7, 19, 21, 22
90:2, 6, 8, 11, 16
Hecht's 17:22
85:10

held 4:17 12:10
76:17
help 55:18 71:10
helps 67:15
hemorrhage 34:13
high 34:14, 16, 18
80:20
highlighted 22:16
highly 30:16
34:12
hired 13:8, 10
history 36:22
62:2 67:5
hodge-podge 6:14
hold 10:6, 8
home 1:1 3:13
homeless 65:21
66:3, 18
homelessness
65:16 66:13
hooked 26:8
hopefully 36:22
55:13
hospital 27:10
29:8 35:10 36:18
85:21
hospitalization
61:5
hospitalized 61:8,
22
hour 69:21
human 39:2
hypercapnic 28:18
hypotension 21:22
hypoxic 28:18

< I >
I'd 4:14 7:3
13:12 81:18
I'll 14:22 54:7
61:12 72:8 74:16
I'm 3:12, 16 5:1,
10, 12 8:4 10:13,
14 12:6 13:17
14:16 16:11 19:5

20:*10*  22:*15, 21*
23:*3*  33:*3*  40:*2*
42:*19*  45:*8*  46:*21,
22*  47:*7, 8, 17*
49:*18, 21*  52:22
53:*6, 6*  54:*7*  55:*9,
10*  58:*11, 16, 20*
60:*1, 6*  65:*5*
70:*15*  78:*11, 16*
80:*3, 4*  81:*7, 10*
85:*9*  87:*11, 13*
88:6
**I've**  14:*17*  15:8
61:*3*  71:*9*  73:*15*
**idea**  46:*19*  59:22
61:*21*
**identifies**  45:*12*
**identify**  71:*19*
**illegal**  35:*5, 7*
69:*14*
**imagine**  77:*13*
**immediately**  51:*17*
**immobilization**
73:*20*  74:*3*
**implementation**
13:*4*
**implication**  38:*21*
**importance**  71:2
**impossible**  51:2
76:*18*
**imprecision**  33:*5*
**improper**  25:*15*
27:*3*  31:*3, 8*
45:22
**improperly**  31:*20*
35:*12*
**inability**  28:*10*
50:*8, 11*  51:*10*
**inaccurate**  57:*13*
**inadequacy**  47:*8,
12*
**incarcerated**  64:*1,
7*
**incident**  53:*17*
54:*11*  55:*16*  61:9

64:*15*  65:*13*
70:20
**include**  28:*15*
35:*15*  41:*15*
70:*13*  76:8
**included**  7:*1*
21:*12*  28:*14*
73:*21*  79:*10*
**includes**  34:*13*
54:*17*
**including**  11:*20*
15:*18*  24:*8, 17*
34:*10, 10*  35:22
36:*15*  54:2  66:*19*
79:*13*
**inclusive**  60:*9*
**income**  11:*11, 15*
29:6  69:*12, 17*
**inconsistency**
45:*15*
**inconsistent**  44:*16*
45:9  66:*13, 16*
**incorrect**  38:22
**increased**  11:*15*
**incremental**  25:*10*
42:*21*
**increments**  41:*7,
15*
**independent**  1:*1*
9:*9*
**index**  19:*6*
**indicate**  82:*5, 10*
83:2
**indicated**  6:*21*
24:22  32:*7, 7*
59:*13, 16*  66:*3, 12*
72:*3*  73:*6*  75:*5*
77:*9*  79:*8*  80:*21*
92:*1*
**indicates**  75:22
**indication**  46:*3*
47:*13*  77:*4, 17*
80:*13, 22*  84:6
**indications**  21:*6*
**indicative**  37:22
**indirect**  86:*13, 19*

**individual**  19:*10*
30:*11, 16*
**individually**  1:*1, 1,
1, 1, 1*
**individuals**  66:*19*
69:*15*
**infarction**  34:*16*
**influence**  85:*15*
87:3
**information**  14:*5*
16:*21*  51:*20*
54:22  55:*4*  62:*6,
20*  63:*10, 16*  64:*5,
11*  65:*4, 7, 11*
67:*3*  70:*20*  71:*18,
21*
**ingestion**  28:*21*
29:6  69:*12, 17*
**initially**  17:*21*
35:*10*  36:*18*  51:8
**injected**  26:*1*
33:20
**injection**  21:*21*
31:*11, 15, 19*  32:2,
6, 10, 13, 18  33:*10,
15, 17*  44:7
**injuries**  75:22
76:2, 4, 6  84:22
**injury**  19:*15*
53:*16, 20, 21*  54:*4,
12*  76:*1*
**insert**  20:8, *13, 20*
21:*14*  22:*10, 13*
23:*3*  58:*3*
**inside**  83:*7, 15*
**insight**  39:*12, 16*
51:20  54:*19*  56:*1*
65:*14*  67:*7*  71:7
**inspection**  24:*13*
65:*15, 16*
**instructors**  12:*4,
12*
**insufficient**  47:*4*
**intend**  19:*17*

**intended**  6:*19*
18:*19*  25:*9, 12*
**interact**  73:22
**interacting**  39:*8*
73:*12*
**interaction**  39:22
73:*17, 18*
**interested**  97:*1*
**interns**  10:*17*
**interpret**  51:2
**interrupting**  66:8
**interval**  28:*16*
33:*17*  42:*11*
**intervals**  42:*14, 20*
**intervention**  26:*16*
**intoxication**  29:*13*
39:4
**intracerebral**
34:*13*
**intramuscular**
25:9, *13*  30:*11*
31:*11*  44:6
**intramuscularly**
25:3
**intranasal**  42:6
**intravascular**
32:*13*
**intravascularly**
33:20
**intravenous**  31:*15*
**intravenously**
30:9  31:*5, 7*
**investigation**  70:*21*
**invite**  28:5  31:9
**inviting**  24:*3*
**involved**  13:*18*
68:*18*
**involvement**  7:*14*
37:3  72:*14*
**involving**  3:*18*
**irregularity**  86:*17*
**ischemia**  86:*14*
**issue**  30:*19*
**issues**  11:*5, 6*
16:*11*  62:8, *10*

Dr. Brian G. McAlary

**It's** 3:*12* 6:*1* 7:*7* 8:*8* 9:*19* 13:*19* 19:*20* 21:*5* 32:*10* 35:*2* 39:*1* 41:*22* 49:*7* 59:*1* 89:*11*
**its** 9:*20* 26:*1* 30:*5* 46:*18* 89:*10*
**i-v-i-o-i-m** 42:*6*

**< J >**
**Jackson** 34:*10*
**JANICE** 1:*1* 92:*1*
**January** 40:*22*
**job** 8:*2* 78:*17*
**Jodi** 90:*14*
**Jolly** 2:*1*, *1*, *1* 49:*9*, *13* 52:*22* 53:*2*, *5*, *6* 66:*3* 81:*13* 84:*12* 89:*5*, *5* 90:*17*, *18*
**JOSE** 1:*1* 15:*13*
**June** 7:*5* 40:*13*
**justification** 44:*19*
**justified** 88:*18*

**< K >**
**keep** 6:*15*, *21*
**KEN** 1:*1*
**kind** 60:*17*
**Kindred** 16:*4*
**knew** 6:*12*
**know** 4:*12* 5:*6*, *9* 8:*7*, *21* 12:*9* 13:*2*, *9*, *15* 16:*20* 27:*13* 28:*1*, *6* 33:*4*, *9* 35:*1*, *8* 46:*17*, *18* 52:*5*, *7* 58:*4* 59:*20* 60:*21*, *22* 62:*19* 69:*11* 71:*5* 77:*7*, *21* 78:*1* 81:*3* 86:*4*, *9* 89:*3*, *8*, *12* 90:*9*
**knowledge** 13:*6* 51:*5* 64:*8*

**known** 34:*20* 35:*11* 43:*1* 81:*17* 86:*14*

**< L >**
**L.L.P** 2:*1*
**laboratory** 29:*7* 43:*11* 85:*21* 86:*5*, *7*, *11*
**labs** 82:*4*
**laceration** 74:*4* 76:*9*, *20* 77:*15*
**lack** 6:*19* 25:*4*
**Lakes** 2:*1*
**lashing** 44:*10* 75:*12*
**lateral** 33:*14* 74:*2*
**latest** 60:*9*
**Lauderdale** 2:*1*
**Law** 13:*8*, *10* 14:*2* 35:*20* 68:*3*, *7*, *9*, *13*, *19* 70:*13* 71:*1*
**lawsuit** 53:*9*
**lawyers** 64:*6*
**leading** 21:*22*
**learn** 78:*1*
**left** 33:*14* 52:*6* 55:*6* 74:*2*
**left-hand** 42:*2*
**legal** 1:*1* 4:*18* 11:*12* 92:*1*
**legs** 79:*13*
**lengthy** 8:*8*
**lessen** 32:*12*
**let's** 5:*21* 14:*16* 16:*10* 17:*9* 40:*5* 50:*2*
**letter** 14:*6* 15:*2*, *3* 40:*13*
**level** 24:*17* 29:*10*
**liberty** 8:*22*
**life** 34:*21*
**lifestyle** 65:*12*

**limited** 23:*18* 24:*14* 27:*14* 39:*6* 65:*14*
**line** 24:*13* 26:*9* 30:*19* 31:*16* 33:*5* 92:*1*, *1*, *1* 93:*1*, *1*, *1*, *1*, *1*, *1*, *1* 94:*1*, *1*, *1*, *1*, *1*, *1*, *1* 95:*1*, *1*, *1*, *1*, *1*, *1*, *1* 96:*1*, *1*, *1*, *1*
**linked** 78:*12*
**list** 4:*7* 6:*4*, *6*, *16* 7:*1*, *7*, *12*, *20* 13:*1* 14:*4*, *9* 16:*21* 54:*16* 59:*11* 76:*6*
**listed** 20:*15*, *20* 21:*2*, *19* 22:*11*, *20* 23:*9* 56:*20* 68:*16*
**listening** 37:*19*
**listing** 68:*16*
**literally** 22:*3*
**literature** 20:*3* 82:*9*
**litigation** 68:*15*
**little** 4:*20* 49:*5*
**lived** 65:*12*
**living** 64:*14*, *17* 65:*8* 67:*6*
**local** 12:*13*
**located** 1:*1*
**location** 8:*18* 64:*21* 65:*1*
**locum** 9:*6*
**long** 4:*17* 8:*7* 29:*14* 30:*21* 49:*9* 65:*8* 73:*19* 74:*14* 75:*8*
**look** 6:*7* 13:*1* 22:*16* 23:*5* 33:*3* 54:*16* 55:*14* 56:*17* 61:*10*, *12* 63:*4* 67:*13* 70:*9* 72:*6* 85:*17*

**looked** 6:*8*, *10*, *10* 19:*8* 34:*22* 58:*5* 72:*7*
**looking** 20:*10* 33:*16* 37:*14* 42:*19* 55:*9* 60:*6* 70:*12*, *15*
**lorazepam** 20:*9* 40:*21* 42:*4*
**lose** 51:*12*
**losing** 51:*17*
**loss** 52:*15*
**lot** 26:*4* 38:*14* 80:*18* 84:*5*
**lower** 75:*13* 79:*13*
**LUCIE** 1:*1*, *1* 3:*16* 34:*9* 40:*16* 48:*16* 49:*3* 69:*22* 70:*17* 87:*16* 88:*2*
**lying** 74:*2* 84:*9*

**< M >**
**Madam** 89:*19*
**major** 56:*11*
**making** 28:*19*, *22* 32:*22* 44:*11* 46:*3* 58:*22* 74:*8* 76:*17*
**management** 19:*14*
**manager** 15:*19*, *21* 90:*14*
**maneuvers** 28:*4* 39:*17*
**MANGRUM** 1:*1* 16:*2* 28:*2*
**M-a-n-g-r-u-m** 16:*2*
**manifest** 26:*6*
**manifestation** 23:*12* 55:*20*
**manner** 26:*8* 38:*5*
**Marc** 15:*20*, *20*
**M-a-r-c** 15:*20*
**marked** 36:*14*
**markedly** 33:*8*

**Maryland** 12:*11*
**MASCARA** 1:*1*
**massive** 34:*13*
**material** 14:*17*
61:*18*
**materials** 14:*19*
16:22 19:*21*
20:*11* 54:*16*
56:*14, 18* 62:*19,*
*20* 67:*9*
**matter** 7:*15*
72:*15* 91:*9*
**matters** 6:*18*
**max** 41:*7*
**maximum** 42:*17*
**McAlary** 1:*1, 1*
2:*1* 3:*3, 12, 15*
7:*4* 8:*12* 16:*17*
20:*14* 43:*17*
45:*21* 49:*16*
52:*17* 53:*3* 81:*6,*
*9, 16* 84:*19* 85:*2,*
*6* 89:*8* 92:*1*
**mean** 50:*2*
**meaning** 31:*17*
46:*16* 47:*20*
**means** 22:*3* 52:*22*
**meant** 28:*15* 80:*6*
88:*20*
**measured** 44:*14*
**measurements**
24:*20*
**measures** 26:*9*
79:*9*
**mechanism** 76:*14*
77:*13*
**medical** 4:*18, 22*
10:*5, 17* 11:*12, 18,*
*19, 22* 12:*18* 13:*4*
17:*1* 20:*6* 23:*17*
24:*6* 28:*19* 35:*6*
40:*1, 3, 17* 51:*16*
54:*17* 57:*22* 71:*7*
72:*18* 82:*3, 10, 15*

**medication** 26:*14*
31:*3, 4*
**medications** 55:*22*
**medicine** 8:*15*
16:*3*
**Melvin** 15:*13*
**member** 9:*8* 12:*1,*
*7* 64:*21*
**members** 60:*10*
64:22 70:*18*
**memory** 61:*1*
63:8, 9 67:*16*
73:*14*
**mental** 27:*10*
62:8, 9, *21*
**mention** 57:*20*
**mentioned** 16:*19*
19:*5* 27:*4* 42:*4*
45:*9* 47:*21* 57:*2*
78:*4*
**methamphetamine-**
**like** 35:*4*
**milligram** 25:*8*
41:7, *14* 42:*16*
48:*18*
**milligrams** 41:*7*
42:6, *11, 18* 48:*8*
49:*1* 87:*18* 88:*4,*
*7, 10, 15*
**mind** 7:*18*
**mini** 91:*5*
**minor** 56:*6*
**minute** 45:*1*
**minutes** 16:*13*
29:*18* 30:*17, 20*
33:*9* 42:*17* 49:*10*
73:*4*
**missed** 12:*6*
53:*18, 19*
**mixed** 56:*10*
**model** 17:*14*
**moist** 46:*8*
**moment** 22:*15*
31:*17* 40:*9* 42:22

55:*8* 70:*8*
**monitored** 59:*6*
**monitoring** 25:*20,*
*21*
**month** 8:*16*
**months** 55:*16*
**morning** 3:*10*
**Moskowitz** 2:*1*
**mother** 1:*1* 64:*19*
92:*1*
**move** 75:*7*
**moves** 79:*20*
**moving** 44:*10*
**multifaceted** 29:*4*
**multiple** 24:*12*
76:*5*
**myocardial** 34:*15*
86:*14*

**< N >**
**name** 3:*11, 15*
7:*10* 15:*13, 22*
16:*4* 35:*19* 53:*3*
90:*17* 92:*1*
**names** 15:*6*
**narrative** 46:*1*
**nasal** 76:*10* 77:*1,*
*6, 14, 18, 21*
**Nasar** 16:*4*
**N-a-s-a-r** 16:*4*
**national** 11:*6*
17:*13* 18:*17* 25:*1*
**naturally** 41:*1*
**near** 79:*16*
**necessary** 28:22
**neck** 28:*3* 50:*7*
79:*18*
**need** 16:*11* 31:*14,*
*14* 49:*13* 59:*7, 20*
62:*18* 73:*4* 79:*1,*
*3* 85:*7* 89:*12*
90:*20*
**needed** 55:22
**needle** 26:*1* 32:*1*
**negative** 59:*9*

**neither** 31:*21*
97:*1*
**neurological** 81:*5*
**never** 59:7 62:*7*
**new** 5:*13* 15:*8*
20:*12*
**NEWMAN** 1:*1*
2:*1, 1* 3:*9, 15*
15:*12* 16:*10, 15*
33:*21* 38:2 47:*16*
48:*4* 49:*10, 15*
81:*12* 85:5, *6*
87:*10* 89:*8, 15*
90:*21* 91:*1*
**news** 70:*16*
**newspaper** 71:*4,*
*10*
**No.:2:16-cv-14413**
1:*1*
**non-combative**
52:*12*
**nonverbal** 51:*21*
74:*1*
**normal** 45:*5, 10,*
*13, 17, 19* 46:*9*
80:*11*
**normally** 50:*9*
**North** 8:*18*
**nose** 28:*8* 77:*6*
78:8, *9*
**Notary** 1:*1* 3:*6*
**note** 49:22 78:*17*
**noted** 22:*14* 75:*21*
**notes** 69:*10*
**notice** 1:*1*
**noticed** 91:*1*
**number** 55:*11*
65:*3, 3* 90:*13*
**numbers** 14:*8*
**nurse** 10:*20*
**nutrition** 65:*18*

**< O >**
**o'clock** 91:*7*

**Object** 37:*11* 84:*12*
**Objection** 33:2
**observation** 29:*16, 21* 30:*13* 45:5 46:*4* 65:*19*
**observations** 74:7, *11*
**observe** 26:*13*
**observed** 26:*4*
**obstruction** 28:7
**obtain** 51:*10*
**obtained** 20:*8* 24:*19* 36:22 37:*15* 58:*8*
**obvious** 57:*14* 80:*16, 22* 81:*1*
**obviously** 6:*20* 7:22 15:*1* 30:*18* 33:*11, 14* 57:*15* 79:*19*
**occasion** 59:*4*
**occasions** 13:9
**occurred** 21:*20* 24:*12* 75:6 77:*11*
**occurrence** 31:*15* 32:*13*
**o'clock** 1:*1*
**odor** 66:22
**offering** 23:*15*
**office** 1:*1* 3:*13* 14:*12* 17:22 57:9 70:7, *8, 18* 90:*14*
**officer** 68:*13* 79:*13* 97:*1*
**officers** 77:*8* 79:*11* 83:22 84:*11*
**Officials** 18:*18*
**Oh** 57:*20* 70:*8* 79:*1*
**Okay** 7:*16* 8:*10* 9:*3* 17:*11* 18:*13* 19:*21* 20:*19* 21:*3* 23:*1, 5, 9* 32:*4*

34:4 35:*1* 42:8 48:5 49:7 54:*1* 59:*3* 60:*1* 61:*18* 78:6 79:2 80:*21* 85:*10* 88:*13, 20* 90:*1, 4, 11, 16*
**omissions** 6:*20*
**once** 32:*1* 49:2 75:9 87:*19* 88:*4, 8, 10, 16, 21*
**one-arm** 38:*17*
**ones** 16:*19*
**online** 19:*20*
**operates** 88:*1*
**operations** 70:*14*
**opining** 61:*19*
**opinion** 21:*10* 26:*12* 27:6, 7 30:*4* 31:*4* 53:*11* 78:*11* 88:7, *9*
**opinions** 12:*17, 22* 13:*3* 18:*20, 22* 19:*3, 17* 23:*14, 16, 20, 21* 24:*1* 26:*19* 65:5 71:9 72:2, *12, 22*
**opposed** 5:*19*
**oral** 28:8
**Orange** 2:*1*
**order** 22:*15* 35:22
**Ordinarily** 8:8
**organization** 9:*10* 11:*20*
**organized** 14:*19*
**original** 92:*1*
**originally** 36:*3*
**originated** 60:7
**Orlando** 2:*1*
**outcome** 97:*1*
**outcomes** 4:*20*
**outlined** 25:*1*
**outside** 20:*1* 39:*14*
**overall** 11:*11* 59:6

**overdose** 42:*15* 43:2
**overt** 74:*15*
**overview** 24:*3, 5*
**oximetry** 24:*19* 58:7
**oxygen** 50:*12*

**< P >**
**P.A** 2:*1, 1*
**package** 20:*8, 13, 20* 21:*14* 22:*10, 13* 23:*3* 36:*4*
**packages** 36:*3*
**PAGE** 2:*1* 14:7, *8, 8* 19:*9, 14, 15* 21:6, 7 22:*18, 19* 23:*1* 40:*19* 41:2 42:*15* 53:*10* 92:*1, 1* 93:*1, 1, 1, 1, 1, 1, 1* 94:*1, 1, 1, 1, 1, 1, 1* 95:*1, 1, 1, 1, 1, 1, 1* 96:*1, 1, 1, 1*
**pages** 42:*19* 59:*17*
**pain** 42:*17*
**Palm** 2:*1, 1*
**paper** 18:*10*
**papers** 18:*15*
**paragraph** 23:7 53:*11*
**paramedic** 32:*17* 38:6 48:*12, 13* 87:*17*
**paramedics** 12:*14* 38:*4* 50:*16* 83:3 84:*21*
**parameter** 59:7
**parentheses** 40:*21*
**parking** 26:*4* 27:22 38:*14* 39:*14* 80:*18* 84:5
**part** 3:22 4:7 12:6 31:*5, 7*

44:*18* 53:*14* 54:9 69:*19* 70:*1* 71:*14*
**partial** 28:7 38:*16*
**partially** 84:*3*
**particular** 7:8 13:7 78:9
**particularly** 37:*15*
**parties** 1:*1* 97:*1, 1*
**parts** 27:*19*
**patent** 46:7
**patient** 17:*12* 19:*12* 25:*20* 26:5 33:7 43:2 44:*8, 9, 21* 45:2 46:*4* 81:7 88:*4, 15*
**patient's** 25:*21* 26:*3* 28:2 52:6
**patients** 17:2 21:8
**patrol** 84:*4*
**pattern** 55:*17* 66:*20*
**pavement** 77:*12*
**people** 24:6 36:*20*
**people's** 36:8
**percent** 5:22 6:*1* 11:*16, 17*
**percentage** 5:*18* 11:*11, 14*
**performed** 34:*11* 59:*10* 77:8
**period** 27:*16* 28:*12* 29:*14*
**permit** 39:*16*
**person** 51:*11* 52:*13* 65:*17* 80:*16*
**personnel** 12:*18* 39:9 40:*1, 3* 43:7 50:*21* 55:*21* 82:*19*
**perspective** 71:*5*
**pertained** 72:2
**pertinent** 71:*20*
**pharmacologic**

24:9  44:*19*  75:20
**pharynx**  28:*9*
**phase**  51:*22*
**phone**  39:*19*  50:6
**phrased**  48:*9*
**phrases**  52:*3*
**physical**  39:*3*, *17*
44:5  53:*12*, *16*, *18*
54:*4*, *12*  55:2
56:7, *12*  57:*13*
61:*20*  62:*3*  67:*21*
76:*1*, *8*
**physically**  84:*8*
**physician**  8:*13*
**pieces**  6:*13*  37:20
**place**  71:*3*  73:*18*
**placed**  32:2
79:*18*  83:*21*
**Plaintiff**  1:*1*  2:*1*
3:*19*  5:*19*  7:7
15:*12*  81:*14*
90:*19*
**plaintiff's**  6:2
91:*3*
**please**  3:*11*  8:9
24:*1*  58:*18*  66:*11*
69:9  73:*3*  90:*3*
**plunger**  32:*3*
**plus**  55:*11*
**point**  33:*12*  37:*13*
39:*3*  54:6  57:8
75:*16*  79:*14*  82:9
85:*13*
**police**  12:*14*
44:*12*  83:*22*
**policies**  40:*20*
41:*3*  72:5, *5*, *11*
88:*1*
**policy**  40:*5*  41:*14*,
*15*  42:*10*  48:6, *19*
49:2  72:8  87:*16*,
*16*  88:*3*
**Pompano**  55:*12*
60:*3*, *7*, *10*, *15*
67:*11*

**portion**  17:*13*
45:7  50:5  87:5
**portions**  18:*4*
22:*16*  44:*4*
**position**  12:*10*
27:*15*  28:4  33:*13*
38:*20*  49:*21*  50:*3*
74:2  79:*15*, *16*, *18*
84:5
**positions**  10:7, *8*,
*12*
**possibilities**  76:6
**possible**  12:*19*
21:*4*  34:5  45:2
76:*21*  90:*10*
**post-activities**
73:*20*
**potentially**  37:*4*
72:*1*
**practice**  8:*15*
9:*16*, *18*, *19*  10:*4*
11:*11*
**practiced**  10:*1*
**practicing**  8:*13*
9:*4*
**precise**  22:7
**precision**  30:*19*
**predates**  54:*11*
**predating**  53:*17*
**predisposed**  27:*11*
**pre-efforts**  73:*22*
**prefer**  89:*14*
**pre-handcuffed**
51:*22*
**pre-hospital**  12:*4*,
*12*
**pre-medication**
25:*6*
**prepared**  4:*1*, *4*
**preparing**  6:*4*
**prerequisite**  24:*8*
**prerogative**  11:*2*
**presence**  36:*16*
85:*22*  86:*10*

**present**  1:*1*  20:*21*
63:*2*
**presentation**  35:*21*
**pressure**  36:*13*
50:*1*
**presumed**  15:*2*
**preventable**  27:5
29:*4*
**previous**  77:*22*
**previously**  19:5,
*11*  27:*3*  59:*13*
61:*22*  63:*12*, *18*,
*22*  77:*18*  78:*4*
**primary**  21:*8*, *11*
23:*12*  34:2, *15*, *17*
85:*19*
**print**  42:*3*
**prior**  11:*3*  25:*14*
26:*15*  28:*12*  30:5
32:6, *10*, *17*  33:9
44:*1*  46:*13*  47:2
51:*17*  53:*16*, *18*
54:*4*, *12*, *18*  55:*16*
57:*22*  61:8  62:7,
*21*  65:8, *12*  73:*18*
77:*20*  78:2  79:8
81:*4*  86:*22*  87:8
**probability**  34:*17*,
*18*  80:*20*
**probable**  13:*19*
34:5, *12*
**probably**  5:*22*
16:*12*  49:6  56:6
57:6  76:*21*
**problem**  44:*3*
**problems**  62:*4*
**procedures**  40:*20*
41:*4*  88:*1*
**proceeds**  46:*1*
**process**  8:*8*  34:2
42:*21*  51:*11*
**produce**  30:*12*
36:*12*  80:*9*
**professional**  11:*15*

**professionals**
18:*19*
**professor**  10:*13*,
*14*, *22*
**professorship**
10:*16*
**program**  10:*20*
**prohibition**  48:7
**Prompted**  20:7
**prone**  27:*17*, *21*
49:*21*  79:*15*
**pronouncing**  53:*3*
**proper**  25:*12*
30:7, *16*  31:*10*
**properly**  26:*13*
28:*10*
**properties**  35:5
**provide**  6:*13*
25:5  51:*4*
**provided**  4:2
13:2  14:5, *9*, *11*,
*15*  17:22  18:*4*
41:*11*, *21*  53:*16*
56:*1*  67:*4*, *9*
71:*15*  72:*4*
**providers**  55:*21*
**provides**  9:*11*
**providing**  65:5
**provision**  13:*4*
**psychiatric**  21:*11*
56:*3*  57:*15*, *17*
68:*1*
**psycho**  36:*14*
**psychosis**  21:*9*, *12*
**psychotropic**  69:*16*
**Public**  1:*1*  3:6
**publication**  17:*16*,
*19*  18:5, *7*, *17*, *21*
19:2, *6*, *19*
**publications**  20:6
**puddle**  74:6
**pulling**  6:*14*
**pulmonary**  34:*19*

**pulse** 24:*19* 26:*6* 44:*1, 22* 45:*3* 46:*8* 58:*6, 6*
**punch** 75:*14*
**Purdy** 2:*1*
**purity** 69:*20*
**purposes** 29:*13* 69:*15*
**pursuant** 1:*1* 43:*20*
**pushup** 38:*17*
**put** 36:*1, 3* 74:*13*
**putting** 27:*18* 31:*16* 37:*19*

**< Q >**
**qualified** 4:*22*
**quality** 45:*12*
**quarrel** 66:*15*
**question** 8:*3, 6* 13:*21* 20:*7* 30:*7* 43:*5, 9* 47:*7, 18, 19* 54:*7, 9, 14, 22* 55:*16* 56:*22* 58:*2, 3, 5* 60:*21* 62:*15* 63:*4, 21* 64:*4* 66:*11* 78:*14, 19* 80:*3, 7* 88:*21*
**questions** 49:*17, 19* 52:*18* 63:*7* 66:*9* 81:*10, 16, 18* 85:*3, 7, 10* 87:*12* 89:*3*
**quick** 61:*12*
**quickly** 20:*11* 30:*13* 90:*18*
**quiet** 52:*4*
**quote** 38:*21*

**< R >**
**radio** 46:*8*
**raised** 27:*21* 43:*5* 79:*16*
**raises** 30:*6*

**random** 6:*14*
**rapid** 46:*8, 8*
**rare** 56:*5*
**rate** 36:*13* 44:*2* 45:*3, 4, 17*
**rates** 33:*10* 58:*6*
**reach** 90:*13*
**reaction** 22:*11* 23:*10*
**reactions** 21:*16, 19* 22:*9, 19* 23:*6*
**reactive** 75:*17*
**read** 14:*22* 16:*7* 38:*3* 41:*5, 19* 48:*11, 22* 51:*14* 59:*18* 73:*6* 83:*9* 89:*9, 14* 92:*1, 1*
**reading** 48:*10*
**reads** 41:*6* 42:*5, 16*
**ready** 50:*17*
**real** 88:*6*
**reality** 86:*1*
**re-answer** 58:*1*
**reason** 31:*10* 36:*13*
**reasonably** 59:*21*
**reasons** 34:*5* 58:*20* 92:*1*
**recall** 7:*7* 13:*18* 22:*12* 35:*3, 20* 54:*6* 56:*21* 57:*7* 62:*1, 10* 63:*1* 73:*10* 74:*8, 16, 21* 75:*13* 76:*11* 78:*15* 79:*6, 8* 84:*15*
**recalled** 44:*5* 78:*10*
**receipt** 60:*18* 67:*16* 71:*4*
**receive** 71:*20*
**received** 14:*17, 20* 15:*3, 6, 9* 17:*15* 18:*6* 56:*15, 19, 21*

57:*9* 60:*19, 22* 62:*21* 67:*12* 68:*12* 70:*13* 72:*4* 87:*20*
**receiving** 27:*10*
**recess** 16:*14* 49:*14*
**recite** 53:*11* 67:*20*
**recited** 72:*14*
**reciting** 74:*12*
**recognized** 35:*6* 39:*1*
**recollection** 4:*16* 57:*1, 3* 64:*2, 12* 68:*17*
**recommended** 21:*8*
**record** 16:*10* 51:*15* 59:*19* 60:*17* 78:*21* 80:*13* 92:*1* 97:*1*
**recorded** 47:*21*
**recording** 39:*20*
**records** 7:*13* 54:*17* 55:*7* 57:*9* 59:*17* 62:*2, 12* 63:*4* 67:*10* 70:*13* 77:*5, 16* 82:*3, 10*
**recovery** 33:*13*
**recreational** 69:*15*
**reduce** 31:*13* 80:*11*
**reduced** 46:*16* 97:*1*
**reduces** 51:*12*
**refer** 78:*19*
**reference** 6:*11* 20:*1, 11* 32:*1* 41:*9* 42:*20, 22* 45:*11* 57:*12* 61:*11* 62:*3, 11* 63:*5* 64:*20* 65:*20* 67:*11, 14* 70:*3* 74:*17, 19* 75:*11, 12, 14* 77:*19*

**referenced** 18:*3* 42:*9, 11* 60:*4, 8*
**references** 42:*14* 63:*2*
**referencing** 74:*22*
**referred** 29:*6* 36:*10*
**referring** 40:*18* 53:*10* 58:*13* 59:*12*
**refers** 22:*17*
**reflect** 61:*4*
**reflecting** 60:*18*
**reflex** 51:*9*
**refresh** 67:*16*
**regard** 20:*13* 23:*14, 21* 63:*21* 71:*11*
**regarding** 17:*2* 23:*16* 29:*10* 41:*12* 53:*16* 57:*22* 63:*11* 64:*11* 67:*5, 11* 70:*1* 72:*14* 74:*12*
**registers** 37:*16*
**Registration** 97:*1*
**relate** 61:*4*
**related** 13:*3* 20:*1* 39:*2* 55:*12* 56:*3, 12* 73:*1* 76:*22* 77:*1, 2* 97:*1*
**relates** 80:*7*
**relationship** 29:*19, 20* 30:*2, 3, 4*
**relative** 79:*16* 97:*1*
**relevance** 5:*2* 12:*21* 56:*11* 71:*1, 2, 6* 72:*2*
**relevant** 19:*9, 16* 65:*4*
**relief** 42:*17*
**rely** 18:*21* 55:*1*
**remember** 54:*1*

74:11  75:16
**remembered**  74:8
**render**  12:17
**rendering**  23:22
**renew**  5:11
**renewed**  5:12
**re-packaged**  36:4
**repeat**  79:5
**rephrase**  54:7
**report**  4:2, 7  6:5
14:4, 7  15:4  19:5
20:12  41:11
43:14, 20  52:7
53:10  57:6  70:21
72:13  75:22
**reporter**  89:14, 19,
20  90:1, 4, 7, 9, 12,
17, 21  92:1  97:1
**reports**  4:5  60:1,
15  61:10, 12  78:5
**representation**
7:11
**representing**  3:16
53:7
**request**  6:2  66:10
92:1
**requested**  18:5
71:14
**requesting**  71:17
**required**  31:12
45:1
**requirements**  4:1
**requiring**  66:19
**rescue**  25:22  26:2
50:20  55:21
60:11  82:19
**research**  20:4
**residents**  10:18
**resisting**  75:1
**resolution**  39:15,
18  50:19
**respect**  36:19
47:6  64:4  66:14
89:13

**respective**  1:1
9:20
**respiration**  44:22
**respirations**  46:7
**respiratory**  22:6,
11, 12, 20  23:13
28:21  29:5  30:12
33:10, 12  45:4, 5,
10, 16, 17  46:9, 13,
15  47:2, 10  48:1
78:13  80:7
**responder**  68:22
69:1, 7  73:7
**responding**  63:7
**response**  51:9
**responsibilities**
10:21
**responsibility**
10:19
**responsive**  58:4
62:15
**responsiveness**
24:18
**restate**  66:11
**restrain**  55:22
84:16
**restrained**  38:14
52:1  87:7
**restraining**  24:15
52:6
**restraint**  24:10
28:4, 17  39:3, 17
44:12, 19  75:20
76:8  79:9
**restricted**  39:19
**restrictions**  5:10
**restroom**  49:7
**resulted**  26:15
**resulting**  26:14
**results**  29:7  43:11
**resuscitation**  73:21
**retained**  3:18  7:6
12:17  13:8
**retire**  10:3

**retired**  10:2
**retiring**  11:10
**retrieve**  17:9
**return**  26:3, 7
**returned**  26:1
**returning**  8:15
**review**  21:15
53:15  56:19
61:19  70:2  71:14
77:4, 16  83:12
**reviewed**  5:17
16:18  19:22  20:3
54:10, 16  57:4
61:1, 18  67:17
69:22  83:6
**reviewing**  21:14
62:19
**revised**  40:22
**revision**  42:15
**right**  3:22  6:22
8:20  15:7  16:16,
21  17:4  18:8, 16
22:9  31:1  35:17
40:5  41:8  47:17
48:5  52:18  60:12
63:6  73:3  74:5,
21  76:9  77:15
79:21  80:2  81:6
86:11  89:9, 11
**right-hand**  41:22
**risk**  32:12
**Road**  1:1  3:14
**ROBINSON**  1:1
15:15
**role**  9:9, 11  10:16
**rolled**  52:12
**room**  16:12  34:8
**ROSARIO**  1:1
15:13  32:17  38:4
48:12  75:18
**R-o-s-a-r-i-o**  15:14
**roster**  70:17
**rule**  34:14, 16, 18
37:2, 3, 8
**ruled**  34:1, 4, 12

**run**  43:14, 20
55:12  60:1, 15
61:12
**Rush**  10:5, 10, 13
11:4

**< S >**
**salts**  35:11, 13, 18,
19  36:4, 7, 10, 17
37:4  38:10  69:11,
13  81:18  82:19
83:4  85:15, 22
86:6, 10  87:3
**Saturday**  90:7
**save**  22:15
**saw**  58:8  72:8
84:14
**saying**  8:21  58:17,
20
**says**  40:16  42:1
45:16
**scalp**  80:19
**Scarola**  2:1
**scene**  24:6, 15
50:16
**scope**  23:14, 18
**screaming**  52:1
**screen**  35:14
86:21
**screening**  76:13
81:5
**Searcy**  2:1  13:8
14:2
**second**  16:11  25:7
**secondary**  23:13
**Secondly**  27:13
**seconds**  45:1
**secrete**  50:12
**section**  17:12, 17
19:10  21:15  41:6
42:13
**sections**  17:20, 21
**see**  6:11  14:16
17:9  18:14, 15
22:13  29:7  42:19,

Dr. Brian G. McAlary

*22* 55:*17* 56:*19*
60:6 61:*10, 13*
62:*10, 12* 63:5
66:*20* 67:*14* 71:6
72:6, *8, 11* 77:*17*
78:*21*
**seeing** 22:*21* 54:*1*
**seeking** 69:*16*
**seen** 31:*19* 32:5
33:*10* 39:7 50:5,
*15* 82:3 83:*1, 14*
86:*13*
**seminar-type** 11:*8*
**sense** 58:22 77:7
**sent** 17:*21* 19:*11*
**separate** 17:*10*
**sequence** 25:7
**sequential** 30:*3*
55:*14*
**series** 55:9
**served** 4:*19* 11:*18,*
*22* 12:*1, 2, 13, 15*
**services** 9:*11*
11:*19* 13:5 23:*17*
24:6 51:*16*
**settled** 7:*15*
**seven** 12:2
**severely** 30:5
**shallow** 46:*19*
47:*14*
**share** 23:*20*
**shared** 19:*3* 73:*15*
**Sharon** 1:*1* 97:*1,*
*1*
**sharps** 26:2
**SHEET** 92:*1*
**sheets** 55:*12*
**Sheriff** 1:*1* 15:*10,*
*12, 14* 24:*14* 53:7
72:5, *15* 90:*19*
**sheriff's** 27:*14*
44:*13* 70:7, *8, 17*
74:3 82:*18* 84:*20*
**sheriffs'** 70:*1*

**shift** 15:*19* 87:*11*
**Shipley** 2:*1*
**Shock** 12:*3, 7*
**short** 59:*1*
**shouldering** 91:*3*
**shouting** 52:*11*
**show** 18:*12* 39:7,
*21* 50:*15, 19* 66:7
**showed** 26:8
37:*17*
**shows** 39:*11*
86:*13*
**side** 26:*3* 52:6, *13*
74:5 76:9 77:*15*
**sight** 24:*13*
**sign** 38:8 44:*14*
58:6
**signature** 92:*1*
**Signature:** 96:*1*
**signed** 40:*14* 92:*1*
**significance** 71:*3*
**significant** 27:*4,*
*10* 44:*11* 62:4, *5*
81:*20*
**signs** 24:*18* 46:2
47:*22* 51:6 81:*21*
86:*18*
**similar** 56:*4* 57:9
**simply** 18:*10* 45:*8*
**Sinclair** 15:*10*
16:*1* 38:5, *6*
48:*13* 73:7 74:22
75:5
**Sinclair's** 73:*11*
**single** 25:9 48:*8,*
*17*
**sir** 3:*10* 17:7
23:*20* 40:*19* 69:*4*
70:*10* 89:2, *11*
**sit** 78:6
**sitting** 54:5 79:*13*
**situation** 9:7
20:*21*
**situations** 88:*14*

**six** 59:*13*
**size** 39:*15* 51:*4*
**skin** 46:8
**sleep** 22:*17*
**slide** 38:*15*
**small** 50:*19*
**smuggle** 35:22
**soliloquy** 31:2
**somebody** 64:6
**sorry** 12:6 40:2
58:*11* 80:4
**sort** 56:7 84:*1*
**sound** 79:6
**sounds** 7:*10*
**source** 20:*1*
**sources** 6:*15*
24:*12* 37:9 44:*16,*
*17* 81:2
**SOUTHERN** 1:*1*
**speak** 63:6
**special** 1:*1*
**specialities** 9:*21*
**specific** 30:*15*
35:*15* 41:*17* 63:*1*
78:*7*
**specifically** 20:*1*
**specifics** 39:*18*
**spectrum** 39:*1*
**spinal** 75:8
**spine** 73:*19*
**spitting** 75:*11*
**Springs** 1:*1* 3:*14*
**squad** 37:*14*
**St** 1:*1, 1* 3:*16*
34:*8* 40:*16* 48:*16*
49:*3* 69:22 70:*17*
87:*16* 88:2
**stable** 36:2
**stack** 14:*21* 15:*1*
17:*10*
**staff** 9:8 72:*15*
**stained** 67:*1*
**standard** 5:*8*
23:*16, 22* 31:*12*

88:*8, 11, 18*
**stapled** 59:*18*
**started** 84:*1*
**starting** 9:*13*
**starts** 14:6, *7*
51:*11*
**state** 5:*1, 5* 12:*14*
18:*18* 29:*12*
30:*20* 50:*15*
**stated** 30:*10*
44:*13* 56:8
**statement** 15:*10*
40:4 70:*20*
**statements** 54:*20*
63:*1*
**STATES** 1:*1*
4:*22* 21:7
**station** 15:*15*
**status** 30:5 33:*15*
57:*15*
**stenographically**
97:*1*
**step** 16:*12*
**Sterba** 15:8
**S-t-e-r-b-a** 15:*8*
**store** 15:*20*
**straight** 26:9
**street** 35:7, *19*
**strength** 38:8, *13*
39:2
**strike** 77:6 80:6,
*17*
**strikes** 77:9 78:7
**striking** 44:9
**struck** 77:*11*
84:*11* 87:6
**struggle** 84:*9, 15*
**struggling** 51:9,
*13* 74:*15* 75:*3*
**stuck** 36:8
**students** 10:*17*
11:*9*
**stumbled** 36:6
**sub** 9:*20*

Dr. Brian G. McAlary
8/4/2017

**subsequent** 15:*3* 27:*9* 29:*5* 31:22
**Subsequently** 17:*15* 34:8, *9*
**substantially** 84:*21*
**suffered** 76:*1* 77:*18* 80:*14* 81:2
**sufficient** 50:*12, 13* 80:*19*
**suggest** 61:*1*
**Suite** 2:*1, 1*
**summary** 53:*11* 70:*19*
**Sunday** 90:*11*
**Sunrise** 2:*1*
**superhuman** 38:7, *12*
**superhuman,"** 38:22
**supervision** 9:*12*
**supportive** 19:2
**supports** 18:22
**sure** 8:*4* 14:*16* 23:*3* 40:*11* 87:*13*
**surface** 80:*18, 18*
**surrounded** 74:*6*
**surveillance** 37:*14* 39:*13* 83:6, *12*
**suspect** 6:*17* 12:*19*
**suspected** 43:2, *9*
**sustained** 21:*21*
**sworn** 3:*6* 97:*1*
**symptoms** 31:*18* 48:*1* 51:*6* 81:*21*
**synthetic** 35:*1, 10, 18* 36:11 37:*4* 81:*17, 21* 82:6, *11, 16*
**syringe** 32:*6*
**system** 12:*15* 43:*12* 86:*6*

< T >

**table** 19:*7*
**tachypnea** 46:*19*
**tachypnic** 33:*8*
**tackled** 80:*16*
**take** 8:*9* 46:6, *10* 56:*17* 61:*12* 63:*4* 67:*13* 85:*8*
**taken** 1:*1* 16:*14, 20* 49:*14* 54:*9* 69:*14, 20* 82:*4* 92:*1* 97:*1, 1, 1*
**talk** 7:*16* 40:*5* 50:*2* 90:*13*
**talked** 69:*10*
**talking** 3:*13* 40:*12* 42:*10* 45:*20* 58:*15* 59:*22* 60:*13* 80:*4*
**tapes** 37:*15, 19*
**taught** 31:*11* 68:*9*
**TAVARES** 1:*1* 3:*18* 16:*3* 82:*4, 10, 16* 83:*2, 14, 21* 84:*8, 22* 92:*1*
**teach** 10:*17*
**teaching** 10:*19*
**tear** 80:*19*
**technical** 16:*11* 58:*19*
**technically** 55:*5* 86:*12*
**technique** 30:*8* 31:*9, 11*
**tell** 3:*10* 13:*14* 15:*5* 37:*7* 63:*8* 73:*14* 76:*6*
**temporal** 29:*19* 30:*2, 3*
**tended** 57:*11*
**tenens** 9:*6*
**term** 22:*8, 21* 23:*6* 36:*7, 9* 46:*1*
**terminology** 25:*5* 56:*5*

**terms** 11:*4* 22:*14* 39:*18* 76:*14*
**test** 36:*21*
**tested** 36:*16*
**testified** 3:*7* 4:*15* 49:*20* 87:*2*
**testify** 5:*7*
**testimony** 4:*8, 10* 6:*5* 7:*2, 19, 20* 13:*16, 22* 14:*1* 25:*11* 27:*13* 31:*22* 32:*16* 37:*10* 38:*3, 4* 48:*11, 22* 51:*15* 57:*10* 68:*17* 72:*1* 74:*20* 84:*15* 87:*14, 22* 97:*1, 1, 1*
**testing** 35:*9* 81:*1* 85:*21, 21* 86:*1, 7, 11*
**tests** 34:*10* 59:*9*
**textbook** 18:*10*
**Thank** 8:*11* 43:*19* 52:*17* 85:*2, 9* 89:*2, 15*
**that's** 14:*3* 19:*9* 21:*15* 22:*7* 29:*3* 44:*3* 47:*6* 49:*12, 13* 57:*14* 60:*12* 65:*10* 66:*10* 69:*19* 70:*12, 22* 72:*6, 10* 74:*21* 75:*16* 80:*6* 86:*12* 90:*10*
**therapeutic** 35:*6*
**there's** 14:*6, 7, 9* 20:*10* 40:*19* 83:*2* 86:*9, 17*
**thereto** 97:*1*
**they're** 35:*3* 55:*13* 59:*15* 60:*15*
**thing** 33:*6* 40:*12* 57:*20*
**things** 14:*9* 19:*1*

**think** 19:*1, 20* 20:*10* 26:*17* 31:*1, 6* 33:*18* 34:*11, 14, 16* 35:*3, 19* 38:22, *22* 41:*13* 43:8 47:*18* 52:22 54:*15* 57:8, *11* 66:*10* 72:*4* 73:6 76:7, *14*
**thinking** 78:*11*
**third** 23:7 25:17 26:*12*
**Thomas** 15:*10* 16:*1*
**thorough** 34:7
**thought** 6:9 58:*14* 60:20
**three** 5:*11* 12:20 13:*12* 16:*12* 29:*18* 30:*17, 20* 42:*16* 52:5 55:15 73:4 79:*10*
**threshold** 29:*13*
**thrown** 76:*16*
**tidal** 46:*16, 17* 47:*14*
**time** 4:*4, 21* 5:*14* 6:*2* 9:22 11:2, *2* 14:*11* 15:*14, 16, 20* 22:*15* 27:*16* 28:*16* 29:*14, 20* 30:*19, 21* 31:*16, 17, 18* 33:*5, 15* 39:*9* 42:*8* 43:*19* 45:*11* 49:6, *19* 50:*16* 52:*17* 57:6 64:*14* 69:*17* 74:*13, 18* 77:*11* 85:*11, 13* 86:*16* 89:*16*
**times** 11:*8* 12:20
**title** 12:8, *9* 18:*15*
**titled** 21:*15*
**titles** 70:*15*
**titrate** 41:*16*

**titrated** 41:*18*
*42*:6
**titrating** 41:*14*
**today** 17:*5, 18*
*53*:6 63:6 67:*11,
17* 71:9 72:*14*
*73:1* 78:6
**today's** 69:*10*
**told** 16:*18* 64:6
65:6 74:8
**Tomorrow** 90:6
**top** 40:*20*
**topic** 81:*19*
**torn** 67:*1*
**touch** 90:*15*
**toxic** 37:22 55:*19*
86:15
**toxicity** 87:9
**toxicology** 35:*14*
86:*20*
**trail** 68:*16*
**training** 11:9
15:*15* 68:*12* 69:6
70:*17*
**transcript** 89:9
92:*1, 1*
**transcription** 15:9
**transcripts** 16:*17*
**Trauma** 12:*3, 8*
19:*14* 56:6, *12*
66:*19*
**treated** 62:8
**treating** 66:*18*
**treatment** 24:8
57:22 62:*21*
**trial** 4:*8, 10, 15*
6:*5* 7:*2, 20* 13:*18,
22* 14:*1*
**tried** 74:*13*
**trip** 78:*4*
**trips** 55:*12*
**tropic** 36:*14*
**trouble** 58:*16, 19*
**true** 86:*12* 97:*1*
**try** 66:7

**trying** 33:*3* 49:22
58:*1*
**Tucker** 15:*13*
**turn** 62:*11*
**two** 5:*11* 7:*3*
10:8 12:*20* 14:9
16:*12* 25:*15* 65:*3*
77:8
**type** 35:9
**typewriting** 97:*1*
**typically** 66:*21, 21,
22*

**< U >**
**ultimate** 72:*19*
**ultimately** 61:*19*
**unable** 44:*20*
**unconscious** 81:*4*
**understand** 3:*17*
54:*14* 57:*10* 65:2
71:*21* 72:*21*
85:*11*
**understandably**
76:*12*
**understanding**
3:*20, 21* 24:*11*
25:*18* 26:*11* 29:*3*
58:*17* 69:*12* 76:*2,
3*
**understandings**
64:*16*
**understood** 61:*4*
**undertaken** 26:*10*
**undocumented**
27:*16*
**unidentified** 8:*18,
20*
**uniforms** 50:*22*
**UNITED** 1:*1*
**University** 10:*5,
10, 11* 12:*11*
**unkempt** 66:*21*
**unshaven** 66:*21*

**upper** 28:*3* 41:22
50:*7* 75:*15* 79:*12,
18*
**usage** 36:8
**use** 11:*3* 18:*19*
21:8 26:*20* 40:6
41:*12* 45:22 48:8
77:*3* 78:*12* 80:*4*
**useful** 56:*1*
**uses** 22:*13*
**usually** 46:*15*
61:*11*
**utilized** 79:*10*

**< V >**
**vaguest** 64:*16*
**valid** 30:6
**variables** 58:*5*
**various** 52:2
**varying** 27:*18*
**vehicle** 25:22
26:*2, 7* 50:*20*
**ventilation** 80:*1,
12*
**ventilatory** 76:8
**verbal** 24:*17*
51:22 52:8 64:9
**verbalizing** 33:8
52:*13*
**verbally** 43:7
**version** 23:7
26:*18* 91:5
**vertical** 79:*16*
**vicinity** 65:*1*
**Video** 1:*1* 8:2
27:*15* 38:*13* 39:*6,
7, 19* 50:6, *15*
51:*3* 67:2
**view** 39:*12*
**viewing** 39:*13*
**views** 52:*3*
**violation** 48:*18*
49:*2* 88:*8, 11*
**violent** 17:*12*
19:*12* 36:*15*

37:*21* 39:5 55:*19*
81:22 83:*16*
**Virginia** 1:*1, 1, 1*
3:*14* 10:*11, 14, 22*
**virtually** 13:*17*
44:*11* 67:7
**visits** 55:*18*
**visual** 24:*13* 46:4
65:*15, 16*
**vital** 24:*18* 44:*14*
46:2 58:6 86:*17*
**vitals** 46:*11*
**volume** 46:*17, 17*
47:*14*
**vulnerable** 28:*20*

**< W >**
**WADE** 1:*1*
**Wait** 89:*21, 21, 21*
**waive** 89:*11*
**want** 8:9 59:*18*
62:*18* 67:*20*
87:*13* 91:2
**wanted** 58:*18*
**wasn't** 6:8 54:*5*
58:2 61:2 86:*1*
**way** 5:*3* 14:*18*
23:6 28:*13* 44:*10*
46:*10* 54:*18* 63:*3*
64:2 76:7 86:*1, 9*
**We're** 8:*1* 40:*12*
**we've** 4:2 49:*5*
68:2 70:*3*
**weight** 27:*18*
50:*4* 79:*11, 19*
**welcome** 52:*21*
81:8 89:*17*
**well** 11:5 12:*13*
14:*16* 17:*20* 24:*1,
22* 27:*14* 37:*14*
55:5 56:22 58:*16*
77:*14* 85:*17*
**went** 30:9 31:7
34:5 81:*3*
**West** 2:*1*

Dr. Brian G. McAlary

**what's**  18:*11*
35:*17*  36:9  44:*3*
73:*14*
**whatsoever**  67:*7*
**wide**  12:*15*
**Wilson**  2:*1*
**wish**  24:*4*  66:*8*
**witness**  1:*1*  2:*1*
3:*4*  5:*5*  33:*3*
37:*12*  47:*12*
48:22  84:*14*  87:*5*
89:*13, 17*  97:*1, 1, 1*
**witnessed**  52:*10*
**witnesses**  15:*18*
**won't**  66:*15, 16*
**word**  41:*5, 5, 15,*
*17*  42:*3*  53:*18, 19,*
*21*  71:*20*
**words**  27:2  43:*8*
66:*16*  72:22
73:*17*
**work**  67:*5*  78:22
**worked**  6:*12*  68:*3,*
*21*
**working**  11:*12*
**workup**  53:*14*
**work-up**  54:*10*
**wouldn't**  7:*15*
45:*20, 21*
**written**  87:*16*
**wrong**  80:*3*
**wrote**  72:*10*

**< X >**
**x-ray**  76:*12*

**< Y >**
**Yeah**  15:*5*  35:*3*
**year**  11:*8*
**years**  4:*20*  5:*11,*
*21*  6:*1*  10:*4*  11:*4*
12:2, *20*  14:*20*
34:*9*  66:*18*
**you'd**  62:*11*
**you'll**  22:*14*

**You're**  8:2, *5, 21*
9:*15*  23:*15, 22*
40:*18*  45:*20*
52:*21*  58:*12, 17*
59:22  60:*12*
62:*19*  79:*21*  80:2
81:8  89:*17*
**you've**  4:*13*  5:*18*
7:*1*  8:*1*  9:22
13:*15, 22*  56:*15*
57:*1, 18*  65:*6*
68:*15*  73:*1*  81:6
83:*1, 6, 9*  87:*1*

ERRATA SHEET

RE: Tavares Docher, by and through Janice
    Docher-Neeley, his mother and legal
    guardian

DATE:  August 4, 2017

DEPONENT:  Dr. Brian G. McAlary

TO THE REPORTER:

    I hereby certify that I have read the

entire transcript of my deposition taken on

the 4th day of August 2017, or the same has

been read to me.  I request that the

following changes be entered upon the record

for the reasons indicated.  I have signed my

name to the signature line below and

authorize you to attach the same to the

original transcript.

Page:      Line:      Correction:

27         10         Change "mental"
                      to "health"

Page:      Line:      Correction:

Dr. Brian G. McAlary

Page:        Line:        Correction:

28           19           Change "medial" to
                          "metatolic"

Page:        Line:        Correction:

42           6            delete " 1-V-1-0-1-n"

Page:        Line:        Correction:

42           16           change "quia" to "q"

Page:        Line:        Correction:

Page:        Line:        Correction:

Page:        Line:        Correction:

Brian G. McAlary

Aug 11, 2017

Page:        Line:        Correction: