UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 2:16cv14413

TAVARES DOCHER,
by and through
JANICE DOCHER-NEELEY,
his mother and
legal guardian,

Plaintiffs,

VIDEO DEPOSITION OF

vs.

DR. CHARLES WETLI

CHRISTOPHER NEWMAN, individually,
CLAYLAN MANGRUM, individually,
CALVIN ROBINSON, individually,
WADE COURTEMANCHE, individually,
KEN J. MASCARA, as SHERIFF of
ST. LUCIE COUNTY, Florida,
JOSE ROSARIO, individually,
and the ST. LUCIE COUNTY
FIRE DISTRICT, an independent
special district.

Defendants.

------------------------------

DATE: September 21, 2017

TIME: 10:13 a.m.

BEFORE: NAYRA PEREZ, a Certified Court Reporter of the State of New Jersey, and State of New York Notary Public

LOCATION: Fort Lee, New Jersey

EX A

A P P E A R A N C E S:

On Behalf of Plaintiff Tavares Docher:
SEARCY DENNEY SCAROLA BARNHART & SHIPLEY
2139 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33409
BY: JORDAN A. DULCIE, ESQUIRE

On Behalf of Defendants Newman, Mangrum, Robinson, Courtemanche and Sheriff:
PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
BY: SUMMER BARRANCO, ESQUIRE

On behalf of Defendant Newman:
ELSER MOSKOWITZ EDELMAN & DICKER
111 North Orange Avenue, Suite 1200
Orlando, Florida 32801
BY: JULIE TYK, ESQUIRE

INDEX

| WITNESS | PAGE |
|---|---|
| DR. CHARLES WETLI | |
| Examination by Mr. Dulcie | 4 |

EXHIBITS

| EXHIBIT NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Plaintiff-1 | Dr. Wetli's CV | Previously marked |
| Plaintiff-3 | Fee schedule | Previously marked |
| Plaintiff-4 | Report | Previously marked |
| P-5 | Notes | 84 |
| P-6 | Correspondence | 85 |
| P-7 | Billing records | 85 |

(Exhibits retained by Court Reporter)

THE COURT REPORTER: Please state your name and address for the record.
THE WITNESS: I'm Dr. Charles Wetli; 2 Berkery Place; Alpine, New Jersey.
DR. CHARLES WETLI
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. DULCIE:
Q. Good morning, Doctor. My name is Jordan Dulcie. I represent the Plaintiff, Tavares Docher in this matter.
Have you ever had your deposition taken before?
A. Yes.
Q. Okay. When was the last time you had your deposition taken?
A. Probably last week or the week before.
Q. Okay. I'll be brief on the ground rules. If you need to take a break for any reason, let me know. If I ask you a question and you don't understand it, let me know and I'll rephrase it.
If I ask you a question and you answer it, I'm going to assume that you understood the question and answer that you gave is an honest

and truthful answer.
Is that fair?
A. Sounds good.
Q. Okay. You previously marked your CV as exhibit -- Plaintiff's Exhibit 1. I'm looking at it. It's dated April 27, 2017.
Is that the most updated CV that you have?
A. Yes.
Q. Okay. Is there anything that you need to add to it as we sit here today?
A. No.
Q. Okay. If you can for me, can you tell me what your current employment status is?
A. I'm doing consulting work in the area of forensic pathology.
Q. Okay. Are you currently doing any clinical work?
A. No. I'm not a clinician.
Q. Okay. Are you doing any kind of pathology work outside of litigation?
A. Well, as I said, I'm doing consulting work. Litigation is a relatively small part of what I do. It's mostly consulting work.
Q. Okay. Explain to me what type of

Page 6

consulting work that you do outside of litigation?
A. Well, a lot of times lawyers will ask me to -- give me -- for me to give an opinion about a particular case. It could be cause of death, pain and suffering, or whatever; and they may or they may not want a written report on it, and so forth. So I will examine the materials, and I will give them a verbal or a written report, as they request.
On occasion, they require that I give a deposition or go to trial, go to court. Most of the time I'm not going to court. Most of the cases I deal with do not wind up in litigation. I mean, they do not wind up in my giving a deposition or court testimony.
Q. Okay. What, I guess, I mean by litigation is: Is there any consulting work that is done outside of a lawsuit?
A. No. Not really.
Q. Okay. When was the last time you did any consulting or pathology work outside of the context of a lawsuit?
A. Probably maybe three or four times in the last ten years or so when I have done private autopsies. That's about it.
Q. Okay. Do you know when the most recent

Page 7

last time would have been, approximate date?
A. Four or five years ago.
Q. Okay. And would that have been up in New Jersey?
A. Connecticut.
Q. Okay. Where do you currently live?
A. New Jersey.
Q. Okay. And do you have a professional address?
A. Basically, I work out of my home.
Q. Okay. Is that what's indicated on your CV, that address?
A. Correct.
Q. Okay. All right. I'm looking now at your testimony list that you provided, and I can see it's very detailed and goes back quite a bit.
Can you tell me how often -- we'll just keep it to the past, say, five years -- that you testified on behalf of plaintiffs versus defendants?
A. It's listed there. I couldn't tell you offhand. I know that about -- my case -- my civil cases in general, are about 60 percent defense, 40 percent plaintiff, approximately.
Q. Okay. And how much of your income in a

Page 8

given year is from -- strike that.
Assuming that as we sit here today you only do expert consulting work in the context of lawsuits. Is it fair to say that your percentage of income is 100 percent from expert work?
A. Yes. The only additional income I have is from retirement, Social Security, that type of thing.
Q. Okay. In this particular case, do you know how much you've been paid to date for your services?
A. Yes.
Q. How much?
A. 3,500.
Q. Do you expect any future payments?
A. Yes.
Q. How much of future payments?
A. Probably about 8,500.
Q. Okay. And what will that be for?
A. The various work I've done on the case, minus the 3,500 which was the retainer fee.
Q. Okay. So 35 was the retainer fee, and you expect 8500 for work you've done up until this point; is that correct?
A. Correct. That's correct.

Page 9

Q. Okay. And for any future work you may do from this point forward, that's a bill that you have not produced or have not generated yet?
A. Correct.
Q. Can you tell me who hired you in this case?
A. The -- well, the law firm of Purdy, Jolly, Giuffreda & Barranco.
Q. And do you know who they represent?
A. They represent the -- well, the Defendants. They represent, I guess, Sheriff Mascara and others in the lawsuit. I'm not exactly sure what parties they represent.
Q. Did you know at the time you were hired that they were representing the sheriff officers in this case?
A. Yes.
Q. Okay. Have you ever been hired by this firm before in the past?
A. No.
Q. Have you ever been hired by St. Lucie Sheriff's Office before in the past?
A. Not that I know of, no.
Q. Do you know how many times, let's say in the past five years, you've been hired by the

Page 10

defense in cases involve allegations of police brutality?
A. No. It's not something I keep track of.
Q. Okay. Do you know how many times in the past five years you have been hired by law enforcement officers in allegations of police brutality?
A. Again, it's not something that -- well, first of all, I wouldn't be hired by the police officers. I would be hired by a law firm representing the police officers. But how many times, again, it's not something I keep track of.
Q. Okay. And the testifying list you provided through July 25th, 2017, is there additional cases that you've been a part of that aren't listed on that list?
A. Well, yes. I've testified at least in two trials since then, and I probably have given one or two depositions since then.
Q. Okay. In cases not listed on here?
A. Correct.
Q. Okay. Have you ever been hired by the attorneys representing law enforcement officers in cases in the past?
A. Yes.

Page 11

Q. Okay. Do you know how many of those cases were wrongful death cases?
A. Probably the majority of them.
Q. Okay. If you know, do you know how many times in cases where you're hired by the attorneys representing law enforcement officers -- strike that.
In those cases involving law enforcement officers, how often are you hired by the plaintiff?
A. Not often. Probably once or twice -- one or two a year, perhaps.
Q. Okay. In those cases where police officers or law enforcement officers are involved and you're hired by the defendant and the plaintiff has died, so it's a wrongful death action, how many times have you determined that the cause of death was something other than the actions of the police officers?
MS. BARRANCO: Object to the form. Go ahead.
THE WITNESS: When I've been hired by the defense?
BY MR. DULCIE:
Q. Correct.

Page 12

A. If I understand your question correctly, usually when I'm hired by the defense, it's not the action of the police officers that did anything to the person. Or if they did, I'm not sure how to answer your question.
Q. Let me rephrase it.
A. Yes, thank you.
Q. I'll rephrase it for you. It is probably a bad question.
In those cases where you're hired by the attorneys who represent law enforcement officers in which the plaintiff has died, so it would be a wrongful death action, how many times have you determined that the cause of death was caused by the actions of the law enforcement officers?
A. Oh. Again, it's hard to answer because it's not something I keep track of; but, for example, I'm sometimes hired by defense attorneys in a fatal police shooting, for example. And obviously the police officer did, in fact, kill the plaintiff in that case.
Q. Okay. Let me turn to your fee schedule real quick. Looking at the fee schedule, which is previously marked as Plaintiff's Exhibit 3. If you can take a look at it and tell me if that is

Page 13

accurate and up-to-date?
A. Can you hand me the fee schedule, please?
Yes, this is correct and up-to-date.
Q. Okay. Looking at that fee schedule, I see you charged day out of the office. Is that a flat rate of $3,750?
A. Correct.
Q. Okay. In a case like today where you're out of the office and you're doing a deposition, do you charge a combination of the three -- do you charge 3,750 plus $500 an hour? Can you explain how you would do that?
A. Sure. I met with Ms. Barranco earlier before the deposition, so I'll bill her for the time we did the deposition preparation; and I will bill you at $500 an hour for the deposition, and that's it.
Q. Okay. So you don't bill $3,750?
A. That's correct. That 3,750 would be if I'm tied up doing something all day long. Say I go to Westchester County Medical Examiner's Office and spend most of the day there, that type of thing, or fly to California, whatever.
Q. Okay. And then how is your hourly rate? When is that used?

Page 14

A. Predominantly for reviewing various materials that I'm given.
Q. Okay.
A. Telephone conferences, things like that.
Q. Okay. And with your air travel, do you still require first class air travel for flights of two hours or more?
A. Yes.
Q. Okay. Can you tell me when the last time was that you performed an autopsy as part of your services on behalf of an attorney?
A. About four or five years ago, the one I told you about in Connecticut.
Q. Okay. Can you tell me when the last time was that you reviewed a case where the plaintiff was still living?
A. That is not unusual, but I couldn't tell you the last time I did that. In other words, like, some of my consulting work doesn't necessarily involve wrongful death. It occurs with people who get injured one way or the other but are still alive. But the last time I don't remember; I just don't recall. It's not unusual.
Q. Okay. Was it in the past two years?
A. Oh, yeah. It occurs every year.

Page 15

Q. Okay. How often each year, if you know?
A. I really don't know. Probably -- probably several times a year.
Q. Okay. In cases where you're hired by the attorney on behalf of law enforcement officers to determine the cause of death of the plaintiff, in those cases how often do you cite the cause of death as excited delirium?
A. If that's the cause of death, that's where I cite it; but how many times I do, I have no idea. Again, I don't keep records of these things.
Q. Okay. Jumping back briefly to your CV, I see you authored -- or was a coauthor -- in several publications over your career.
Do you know when the last time you were an author or a coauthor in a publication involving excited delirium?
A. Yes. It was the last paper I actually coauthored with Dr. Mark Kroll, K-R-O-L-L. That would be No. 125 on my bibliography list. The title of the article is "Fatal Traumatic Brain Injury with Electrical Weapon Falls." A number of those cases had excited delirium.
Q. Okay. So in that publication was excited delirium discussed within the context of that

Page 16

overall topic?
A. It wasn't so much discussed in that particular topic, but some of them actually did have excited delirium and was referred to as such. And a taser was applied, and they did a sustained head injury. It's just in that context, but --
Q. Go ahead. Sorry.
A. The main focus on the article was not excited delirium. The main focus of the article was head trauma due to the application of the taser.
Q. When was the last time you authored or coauthored a publication where the main topic of discussion was excited delirium?
A. That would be Publication No. 123:
"Brain Biomarkers for Identifying Excited Delirium as a Cause of Sudden Death."
Q. Okay. In your career testifying as a consultant in lawsuits, has any of your opinions ever been excluded from trial?
A. No.
Q. Okay.
A. Not that I know of, anyway.
Q. Okay.
A. Excuse me. With the caveat on that: Sometimes I'm told ahead of time that a judge, say,

Page 17

you're not allowed to refer to prior history of drug abuse, for example, something like that. Nothing --
Q. Okay.
A. -- personal, but just basically that's what the trial judge decided, that nobody can talk about that particular issue.
Q. All right. But you never recall, at least to your knowledge, that you've ever been excluded completely from testifying at trial; is that correct?
A. No. The only time that ever happened once was a judge that I was retained by an attorney and the judge said -- and it was a person who hadn't died -- and the judge said wait a minute, he's a medical examiner, a forensic pathologist only deals with dead people; therefore, I won't let him testify. That was the extent of that.
Q. Do you remember when that was?
A. Well, a number of years, 10 years ago.
Q. Do you know if it was a Federal Court?
A. Well, it was State Court, I believe.
Q. Okay. Do you remember the name of the case?
A. Not at all.
Q. Any of the parties?

Page 18

A. Not at all.
Q. Okay. Can you tell me a little bit about what forensic pathology is?
A. Forensic pathology mainly is about the medical-legal investigation of death, which loosely translated means investigation of anybody who dies suddenly and unexpectedly while they are apparently in good health. Anytime there is a suspicion of an unnatural death, anytime there is a suspicion of a threat to public health, such as smallpox or Anthrax, for example, or therapeutic or diagnostic complications.
Those are the cases that's forensic pathologists generally get involved with.
Q. As a forensic pathologist in determining the cause of death of someone, do you examine the tissues and organs, as well as any toxicology screens that may be done to determine what the cause of death was?
A. Oh, sure. You do whatever is necessary to determine the cause of death. You take into account the terminal events, the medical social history of the individual, the autopsy findings. You examine tissues under the microscope. Submit specimens for toxicology. And do any other testing that is

Page 19

required. For example, chemical testing, you might use DNA, you might use all kinds of things that would be germane to a particular case.
Q. In this case, did you evaluate Tavares Docher?
A. Well, I evaluated all the records that I had, yes. I'm not sure I understand --
Q. Did you ever evaluate -- did you ever evaluate him personally?
A. You mean like actually examine him? No.
Q. Okay. And you didn't perform an autopsy on him, did you?
A. No. He's not dead yet.
Q. Okay. Do you have formal training, education -- strike that.
Do you have any formal education, training or experience as a toxicologist?
A. No, not as a toxicologist.
Q. Do you have any formal training, education or experience as a cardiologist?
A. No.
Q. Do you have any formal education training or experience as a pulmonologist?
A. No.
Q. Do you have any formal education, training

Page 20

or experience as a neurologist?
A. No.
Q. And I think you said this earlier: You're not a clinical physician; correct?
A. Correct.
Q. And that means that you don't examine patients in a clinical setting?
A. Correct. I don't know if you'd call this an exception to it or not. Every once in a while I will examine somebody to look at an injury, for example. But that's about it.
Q. Okay. Have you ever examined individuals personally who are still alive?
A. Well, that's what I just said. Sometimes I will examine somebody who's still alive. As a medical examiner, for example, the police may want to know which is the entry versus the exit wound of a person, and they're still alive. Sometimes it's a matter of interpreting the injury pattern, possible cause of an injury, either by examining a photograph or by examining the person themselves. That happens everyone now and then.
Q. Okay. I have in front of me a publication I believe you authored called, An Atlas of Forensic Pathology. Is that an article or publication that

Page 21

you recall --
A. It's a book.
Q. -- being a coauthor on?
A. It's a book.
Q. It's a book?
A. Yes.
Q. And were you a coauthor of that book?
A. Yes.
Q. Okay. I'm going to ask you a few questions out of the Introduction, and let me know if you agree or disagree with some of the statements made.
Do you agree that a photograph and diagram or photographs and diagrams are of paramount importance in documenting both external and internal abnormalities?
A. Yes.
MS. BARRANCO: Object to form.
MS. TYK: Join.
MR. DULCIE: What's the objection for?
MS. BARRANCO: The objection? Well, it's leading and it is speculative, and it is assuming facts not in evidence.
MR. DULCIE: Okay.

BY MR. DULCIE:
Q. You did author this book; right?
A. Correct.
Q. Okay. Would you say it's authoritative on someone's role as a forensic pathologist?
A. In doing autopsies, yes.
Q. Okay. Would you -- the statement that I just said, "photographs and diagrams are of paramount importance in documenting both external and internal abnormalities," does that also apply to cases like this where the victim is still living?
A. It should, yes.
Q. Okay. In performing a forensic autopsy, is it important to look at the toxicological findings?
A. Of course.
Q. And does that apply in this case as well of someone who's living?
A. Of course.
Q. Do you agree that forensic pathology -- a purpose of forensic pathology is to determine the cause of sudden natural and unnatural death, characterize and interpret the role of injurious physical agents on the body, and establish the relationship been natural disease and physical

injury?
A. Sure.
Q. And, again, in the context of this case, does that all apply to figure out what the current condition of someone who is still living?
A. It should be applied to that, yes. But for the person who is still living, then medical examiners generally cannot get involved.
Q. Okay. Would you agree that truth is a summation of all available facts?
A. Yes.
Q. An expert witness must only testify only in their field of expertise?
A. Correct.
Q. And it's the responsibility of an expert to thoroughly review all pertinent material on a case and to render an honest opinion?
A. Correct.
Q. And it's important -- strike that.
Would you agree that as an expert whose task with determining what the cause of death is or how someone got to their current condition, that you must looking at all available facts and not just take certain facts that you believe are pertinent but look at the entire -- not the entire

clinical picture but the entire picture and all the facts available to you, to determine what is relevant and pertinent in order to determine what the cause of someone's s condition is?
A. Right. The more facts you have, the better opinion you can give.
Q. Okay. And if you don't have all the facts and you render an opinion without all the facts, it's possible that your opinion could be unreliable?
Is that fair?
A. Of course.
MS. BARRANCO: Object to the form.
THE WITNESS: Of course. If you don't have all the facts, then your opinion is going to be limited by the facts that you don't have.
BY MR. DULCIE:
Q. Can you tell me a little bit about what excited delirium is and the history of excited delirium?
A. Well, the history of excited delirium goes back to 1849 when a Dr. Luther Bell presented a series of cases to a medical meeting, and he described individuals who were previously mentally healthy who had a psychotic break and developed certain signs of symptoms such as violence,

increased strength and stamina, hyperthermia, and so forth. Required use of restraints and then died suddenly. Those are the first reports in 1849.
It was reported in the psychiatric and medical literature numerous times over the next 150 years autopsies in general were completely negative. Very thorough autopsies were completely negative.
The syndrome pretty much disappeared in the 1950s when the psychotropic medicines became available, such as Thorazine, for example. And then reappeared in the late 1970s, early 1980s, and became associated predominantly with the use of stimulant and hallucinogenic drugs, such as cocaine, Benzoylecgonine, and so forth.
It's basically a transient psychotic delusional state where the person does not have complete perception of their environment. They're very violent individuals. They have increased strength and stamina. They very frequently have increased body temperatures, and they may lose vital signs suddenly and unexpectedly, particularly after they are restrained.
The autopsies in general are negative. The predominant causes today are

Page 26

stimulant and hallucinogenic drugs, certain psychiatric conditions such as schizophrenia and bipolar disorder, and on rarer occasions, injections.

Q. In the context of a lawsuit, have you ever ruled that someone who was still alive has arrived at their condition due to excited delirium?

A. Yes.

Q. How often, if you can remember?

A. First of all, not all cases of excited delirium are fatal, to begin with. As -- in my field, I usually become aware of that when I look at medical records. The person is deceased, but then the medical records indicate they've had prior experiences with excited delirium and went to a hospital and then survived that particular episode or more than one episode.

I also have on rare occasions seen individuals go into persistent vegetative states as a result of excited delirium. In one case, I remember particularly in California the person did, in fact, die after about four or five years. But when I was involved on the case, they were in persistent vegetative state.

Q. Okay. Besides the case you mentioned, how

Page 27

many other cases arrived -- how many other cases has the victim been in a persistent vegetative state?

A. That's the only one I actually remember. There may have been others, but that is the only one I actually remember. It's pretty rare.

Q. Okay. With excited delirium how long do episodes last, generally?

A. That's a hard question to answer. Basically, I would estimate that from the time the police are called, which the usual scenario is the person is acting in a bizarre fashion and the police get called to the scene. And from the time the police get called to the scene to the time they have their loss of vital signs is generally within 15 minutes to a half hour, approximately. It could be a little less. It could -- be sometimes it could be more but generally that ballpark.

Q. Okay. And can you have multiple bouts of excited delirium in a certain span of time?

A. Well, people can go in and out of it, yes. For example, I've seen cases where, let's say, family members have called the police because they are afraid of the violent behavior, bizarre behavior of a family member. When the police get there, the person is now rational and maybe hostile but very

Page 28

rational and not hallucinating or anything else. And then suddenly they become extremely violent again, acting in a bizarre fashion. So they can go in and out of it over a period of time, yes.

Q. Do you know what causes an individual to go in and out of it?

A. No.

Q. Okay. Are episodes of excited delirium unique to the person's individual circumstance?

A. I'm not sure I understand your question.

Q. Okay. That's fair. What I'm saying is: Is every situation -- can you -- strike that.

Can you describe a set of people that always have consistent, similar -- strike that. I'll come back to that.

Excited delirium, let's say in the past 20 years, how often is that term used outside of the context of people being in custody of law enforcement officers?

A. I can't answer that question for you because I'm seeing a fairly narrow sample of individuals like that. However, the American College of Emergency Physicians a few years ago published what's called a white paper on the topic, and that's because they felt that they had to

Page 29

recognize it and treat it.

I would say the majority of people with excited delirium do come to police attention, so whether they, you know -- they will come to police attention.

Q. Would you agree with me, Doctor, that in the U.S. excited delirium is most frequently associated with cocaine, amphetamine, or other stimulant type drugs?

A. Or to hallucinogenic drugs, yes.

Q. Do you believe that excited delirium is a controversial syndrome disorder, syndromal disorder because mechanism of lethality is unknown?

A. No.

Q. Okay. Is it true that excited delirium is often used as a postmortem explanation offered by medical examiners in deaths of individuals who are in the process of being restrained by law enforcement officers and are being taken into custody by law enforcement officers?

A. That's when the people of excited delirium usually lose signs, yes.

Q. In the custody of law enforcement officers?

A. Yes, usually during the arrest phase.

www.phippsreporting.com
888-811-3408

Q. Are you aware of any situations where people suffer excited delirium and end up dying outside the context of law enforcement custody?
A. Oh, yes.
Q. Can you explain the situations?
A. Sure. Usually they don't get listed as excited delirium. They get listed as being hit by automobiles, jumping off buildings, drowning, things like that.
Q. Just to take a hypothetical example, if someone is experiencing excited delirium and an officer shoots them, would the cause of death be excited delirium or the officer shooting them?
MS. BARRANCO: Object to the form. Go ahead.
THE WITNESS: Gunshot wound, the officer shooting them.
BY MR. DULCIE:
Q. Okay.
A. Depending upon the medical examiner, they may or may not list excited delirium due to whatever -- say, cocaine intoxication as a contributory factor. But most medical examiners would probably just simply list that as a gunshot wound to the person.

Q. Okay. In this case with Tavares Docher, did you see anywhere in the medical records, the EMS records, any of the documents produced to you, that excited delirium was the cause of his persistent vegetative state?
A. No.
Q. Okay. Is it true that the prevalence of excited delirium has focused on deceased victims rather than on victims who are still living?
A. I can't say that because the only ones I generally see are the ones that are deceased.
Q. Okay.
A. Emergency room physicians tend to see cases that survive, and so forth. So how often that occurs, I don't know; but I know it occurs enough so that the American College of Emergency Physicians did put out a white paper on it.
Q. And is that a condition that emergency room physicians would write on their medical records?
MS. BARRANCO: Object to the form. Go ahead.
THE WITNESS: I don't really know. I've seen it done. I've seen it on medical records but not all the time.

BY MR. DULCIE:
Q. Okay. Is there a reason why someone would put it in one case and not in another case?
A. I have no idea.
Q. If you know?
A. I don't know.
Q. Okay. It's true, Doctor, that excited delirium is not recognized by a Diagnostic and Statistical Manual of Mental Disorder of the American Psychiatric Association, also referred to as the DSM?
A. It's not true at all. If you read the chapter on -- or the section on delirium, it is nicely described. They do not use the term excited delirium, but it is described in the DSM. The term excited delirium was coined by psychiatrists even though it's not in the DSM.
Q. But is the term excited delirium in the most recent DSM-5?
A. The term itself is not used. It is described, but the term itself is not used.
Q. They describe delirium; correct?
A. They describe a stuporous delirium, and they describe an agitated delirium, although they don't call it agitated delirium, but they do

describe delirium in an agitated state, yes.
Q. Okay. You're not a psychologist, are you?
A. Not at all.
Q. Okay. Do you have any training experience as a psychologist?
A. Psychologist, no.
Q. Okay. Is excited delirium classified or recognized in the International Classification of Disease -- Diseases -- by the World Health Organization?
A. I have no idea. It probably wouldn't be because it's not -- it's always secondary to something, so it probably would not be.
Q. What do you mean by it's always secondary to something else?
A. Excited delirium does not occur spontaneously. It occurs in the context of drugs, mental abnormalities that are untreated or undertreated, or in the case of infections. The causes of the excited delirium would certainly be listed but not necessarily excited delirium itself.
Q. Okay. So excited delirium is -- I'm briefly looking at your report -- is usually in the presence or secondary to something else, and that -- that's why it's not always listed as a disease -- is

that what you're saying? -- and some of these classifications by, for example, World Health Organization?
A. Correct. It's not a disease.
Q. Okay. Is it recognized -- is excited delirium recognized by the American Medical Association --
A. I'm not a member.
Q. -- as a disease?
A. Probably not, for the same reason. It's not a disease.
Q. Because it's secondary to something else?
A. Correct.
Q. Okay. Do you agree that cardiovascular disease is recognized as a disease; correct?
A. Well, it depends upon the cardiovascular disease you're talking about.
Q. Well, cardiovascular disease is a disease; right?
A. That's too broad a category. If you want to say cardiovascular disease, it could encompass many things. If you want to talk about arteriosclerotic heart disease, hypertensive cardiac disease, cardiomyopathies, these are all recognized diseases.

Cardiac arrest, to some people, might be called a disease, but it's not.
Q. Correct. And those diseases that you mentioned, aren't they secondary to something else?
A. Only in a sense, for example, hypertensive cardiovascular disease is going to be secondary to hypertension. Arthrosclerosis is going to be secondary to diet, smoking, things like that. So in a sense those things are.
Your cardiomyopathies are very frequently idiopathic. Meaning, there is no identifiable cause. Sometimes things are genetic.
Q. Okay.
THE WITNESS: I was going to say yell at me if I'm going too fast.
BY MR. DULCIE:
Q. Do you know an individual by the name of Vincent Di Maio?
A. Yes. He and his wife, both.
Q. Okay. Would you consider him someone who's authoritative on the topic of excited delirium?
A. I'm not sure what you mean by authoritative. He has written a book on the topic, along with his wife. There are some things in that

book I don't agree with, but in general he's done quite a bit of work on researching excited delirium, yes.
Q. That's fair. I'm going to read you something that you wrote. You tell me if you agree with this statement:
"Excited delirium is only determined after an autopsy fails to reveal evidence of sufficient trauma or natural disease to explain the death."
A. Only assuming the person is dead, yes.
Q. Okay. Does that theory apply to somebody who is also living, so excited delirium is only determined after -- strike that.
If you're looking at somebody who is still living and he fails to reveal evidence of sufficient trauma or natural disease to explain the condition that he's in, then excited delirium could be considered as a cause of that condition?
MS. BARRANCO: Object to the form. Go ahead.
THE WITNESS: Yes, but you have to keep in mind --
MS. TYK: Join.
THE WITNESS: -- you have to keep in mind

that excited delirium is based upon the behavior of the individual. And if you -- they die, then it would be required that to ascribe excited delirium as a cause of death, you need a negative autopsy.
If a person is not deceased, they may or may not have some kind of physical condition that may have caused the excited delirium, but basically they had excited delirium. Again, it's based upon the behavior of the individual.
BY MR. DULCIE:
Q. Okay. Can you describe to me, Doctor, how excited delirium, the path of physiology leading to a cardiopulmonary arrest?
A. As best we can tell, it's because of the prolonged struggle that takes place and the intensity of the struggle that takes place, because they are impervious to pain and, therefore, they are also impervious to exhaustion. So they keep on going.
And as this process is continuing, as the strenuous physical activity progresses, they go into something called anaerobic metabolism, which means that they start building up a lot of lactic acid in their blood. That drops the blood pH. So

Page 38

enzyme systems are going to be pretty inefficient at a low blood pH.

Then when the person is finally restrained and there's a sudden cessation of the strenuous physical activity, then very frequently you get a surge of a hormone called norepinephrine or noradrenaline, and this does a number of things, but one of the things it does do is it can stop the heart. And that is the predominant consensus as to why people die with excited delirium.

There's also possible contributions from either very high or very low potassium levels that may accompany the excited delirium. If they survive for a short period of time, very frequently they break down skeletal muscle, and this can cause kidney failure and eventually multi-organ failure that generally results in death within three to five days.

Q. Have you ever seen cases of excited delirium resulting in death or persistent vegetative state when someone was not in an intense struggle?

A. No.

Q. Okay.

A. I'm sorry. I take that back. They could be in an excited delirium state and not in an

Page 39

intense struggle, but then they die, generally, from traumatic injuries for other reasons. They jump off buildings, they get hit by cars, drown. I saw one person die in a closet from carbon monoxide inhalation.

Q. Okay. You mentioned briefly norepinephrine as something that occurs naturally in the body that can lead to cardiac arrest. Can you explain that a little more, in a little more detail if you can, how norepinephrine can lead to cardiac arrest with someone experiencing excited delirium?

A. Yes. Basically, nor -- well, I can explain it to you somewhat.

Norepinephrine is a hormone, which is generally secreted upon cessation of strenuous physical activity. The reason it is beneficial is because it constricts blood vessels and skin and muscle and shunts that blood back to the central core of the body once the strenuous physical activity is over with. Unfortunately, it also has the ability to stop the heart.

This is why, for example, a cardiologist will tell you, or any physician will tell you, if you're on a treadmill say doing 5 or 6 miles an hour and you've come to the end of it,

Page 40

your exercise program, you just don't stop. You cool down to prevent that surge of norepinephrine.

The exact mechanism as to how it stops the heart is something I can't tell you. I'm sure it's probably in a pharmacology textbook or something like that, but I couldn't tell you offhand.

Q. Someone who's experiencing excited delirium -- strike that.

Does excited delirium cause someone to have seizures?

A. Not usually. It could happen if you get sufficient brain damage, what we call anoxic encephalopathy, meaning that you don't get sufficient amount of blood to the brain and parts of your brain continue to die. That can trigger seizure activity, but seizure activity, per se, is not considered part of the excited delirium syndrome.

Q. Okay. Would you agree that delusional is different than delirium?

A. Yes, I would think so.

Q. Okay. You were able to see looking at St. Lucie medical records a toxicology screening that was performed; correct?

Page 41

A. Correct.

Q. Okay. And in that report isn't it true, Doctor, that he tested negative for cocaine?

A. Yes.

Q. He was also negative for barbiturates; correct?

A. Correct.

Q. And he was negative for MDMA and ecstasy, if you will?

A. Yes, amphetamines.

Q. Okay. And he was also negative for opiates?

A. Correct.

Q. Okay. And there was a presence of THC; is that correct?

A. Correct.

Q. And when a toxicology screening shows the presence --

MS. BARRANCO: Hold on, Jordan. We're getting a message on the screen. You've been on the call for 80 minutes. Do you want to disconnect?

I think we got to address that before we get cut off here. Hold on.

MR. DULCIE: Certainly. Off the record.

www.phippsreporting.com
888-811-3408

Page 42

(Whereupon, a recess was taken from 11:25 a.m. to 11:49 p.m.)

BY MR. DULCIE:

Q. Doctor, as a forensic pathologist, when you see the presence of THC is it possible to discern exactly when the individual would have ingested THC or if they were high at the time of their death?

A. Just if you have the presence of THC, no, you can't tell anything. If you break it down so you have THC and then you also have the metabolites, then you might get an idea, but it would also have to be quantified.

Q. Okay. Do you have any opinions about whether THC was a causal factor in his excited delirium?

A. I'm sure it was not.

Q. Okay. Did the toxicology report find a presence of any drug that would make someone agitated?

A. No. This toxicology report, no.

Q. Okay. I'm going to be looking at your report right now previously marked as Plaintiff Exhibit 4, and I'm going to asking you some questions about the report and the terms you

Page 43

reviewed.

A. Okay.

Q. Can you tell me on the record: Is there anything that is not listed in your August 17, 2017 report that you used, reviewed, or relied upon in forming your opinions in that report?

A. No.

Q. Were there any facts or assumptions that you relied upon that were presented to you that you relied upon?

A. No. Everything that is listed here in the report is what I relied upon. There is no other extraneous information.

Q. Okay. Can you tell me how long or how much time before this deposition you spent with the attorney?

A. We actually met about 8:30, and then you got -- then you got on the video about 10:00.

Q. Okay. Were there any facts or information that were presented to you at that meeting that you relied upon or expect to rely upon in your testimony today?

A. No, nothing else.

Q. Okay. Looking at your report, you make a note that additional items such as audio statements

Page 44

and video recordings were provided but not listed since they were not particularly helpful. Can you tell me which audio statements you were presented with?

A. I don't recall offhand. I've looked at some audio statements and some video recordings, kind of glanced at them, and they weren't really very helpful with anything. So from what I can gather, I didn't waste a lot of time on it.

Q. The audio statements, if you remember, you just listed those; correct?

A. Correct.

Q. Okay. Were they, if you know, statements of witnesses or statements of police officers?

A. I don't recall offhand.

Q. Okay. But you did not rely on any of that information that was in the audio statements?

A. Correct.

Q. In the video recordings that were provided to you, do you know what they were?

A. I don't recall offhand. Again, they didn't seem to provide any useful information; so I just pretty much ignored it. So I didn't listen to them.

Q. Did any of the video recordings, if you

Page 45

recall, show Tavares Docher in custody?

A. I don't recall.

Q. Okay. Is it fair to say that you -- strike that.

Did you ever see any videos via cellphone or via surveillance camera depicting the police or law enforcement interaction with Tavares Docher?

A. I don't recall.

Q. Looking at your first -- strike that.

Did you consult with any other experts or healthcare providers before generating this report?

A. No.

Q. Do you anticipate that you will be proffering an updated report at any point in time?

A. Not that I'm aware of.

Q. Is there any information or materials that you would need or would need in the future that would be pertinent to your opinions in this case?

A. There's information I'd like to have, but we could not get it now.

Q. What type of information?

A. A decent toxicology analysis.

Q. Okay. What would that toxicology analysis

entail?
A. Something much more detailed than the screening test that was done at the hospital. For example, checking for designer drugs, synthetic cannabinoids, bath salts, other drugs that do not usually show up on normal hospital drug screens. For example, they couldn't even screen for barbiturates. I haven't seen barbiturates used in years.
Q. What's a common name of a barbiturate?
A. Phenobarbital.
Q. Looking at your first paragraph, it looks like a factual summary of what occurred at CVS pharmacy, along with the measures taken by EMS at CVS, the toxicology screening at the hospital, a reference to .038 percent blood alcohol concentration, and referencing that Tavares admitted to consuming alcoholic beverages and denying ingesting any drugs. That information, where did you find that information?
A. Basically, it's just a summary of the information that I have listed on the first page there, so it came from police reports, it came from hospital records, the EMS reports, et cetera.
Q. Okay. The Intake Psychological Screening

Report, dated March 1st, 2012, by the Florida Department of Corrections, was there any information in there that was pertinent to you?
A. No, just that they never came up with a diagnosis or anything on him indicating that there was any real significant mental problem.
Q. Okay. And what about the Prehospital Care Report Summary, Pompano Beach, dated February 15th, 2014?
A. I'd have to look at it again. I don't recall. There wasn't anything significant about it as far as I can recall.
Q. Okay. Are you aware that there are other prehospital care reports out there?
A. I presume there are, but I haven't seen them.
Q. Okay. Did you ever request these documents, or were these provided to you without any requests?
A. I believe I probably requested any prior medical records or psychiatric records that may have existed on this individual, including police reports, and so forth. I wanted to have the information about him, about Mr. Docher -- is it Docher or Docher --

Q. Mr. Docher.
A. -- Docher, okay -- about Mr. Docher prior to the incident at CVS, whatever information that would be available.
Q. Okay. Did you initially request any of the reports of McAlary, Tucker, and Sterba?
A. No.
Q. Did you request those at a later time, or are those provided to you without a request?
A. I believe they're just provided to me without a request.
Q. Is that the same for the depositions that were provided to you?
A. Correct.
Q. You mention on the first page that Mr. Tavares became combative and exhibited surprising strength and endurance. Do you know what acts or actions that Mr. Tavares had that indicated that he had surprising strength?
A. No. It was just the statement of the police.
Q. Okay. Is that the same for endurance as well?
A. Correct.
Q. Okay. That information was just pulled

from the police reports of the deposition testimony?
A. Correct.
Q. Okay. Does that go for the rest of the paragraph, that information was just pulled from the records and it doesn't reflect anything of your opinions?
A. Correct.
Q. Okay. Do you know what effect .038 percent blood alcohol concentration would have on an individual?
A. Well, a lot depends upon how much tolerance they have to alcohol. But regardless of their tolerance to alcohol, this would be a level where they could still be competent to drive an automobile even if they were naïve to alcohol. It's the equivalent basically of two beers, standard beers.
Q. And do you know what the legal limit is in Florida --
A. I believe --
Q. -- for alcohol --
A. -- I believe it's .008 percent.
Q. Okay. That would be obviously less than the legal limit; correct?
A. The point --

Page 50

Q. Under the legal limit, rather?
A. .038 is, yes.
Q. Is the legal limit the same in New Jersey?
A. Yes.
Q. And it's true that in reading the reports that you have that Mr. Tavares denied ingesting any drugs; correct?
A. Correct.
Q. Okay. And were you hired in this case to determine the cause of Tavares's loss of vital signs?
A. Right. Essentially.
Q. Okay. Was there anything else or any other reason why you were hired in this case?
A. No.
Q. Okay. Paragraph 2, is that the beginning of your opinions as to what Mr. Docher was exhibiting in relation to what you term as excited delirium?
A. Correct.
Q. Okay. You mention that sudden loss of vital signs may occur, generally, after the individual is restrained. Is there something with being restrained which causes the sudden loss of vital signs?

Page 51

A. It probably results in the surge of norepinephrine, like I talked about earlier.
Q. Okay. And you also mention that it can also result in terminal heart rhythm known as asystole; correct?
A. Correct.
Q. And asystole is the absence of both mechanical and electrical activity of the heart?
A. Correct.
Q. And it's known as pulseless electrical activity; correct?
A. Correct. Well, pulseless electrical activity means that you have some residual electrical stimulation or signals taking place in the heart but the heart muscle is not responding.
Q. Okay. You mention on rare occasions as with Tavares a persistent vegetative state may occur from what you call excited delirium; is that correct?
A. Correct.
Q. I think you mentioned this earlier. You've only seen it in one other case; is that correct?
A. Only one that I recall. I may have seen it in others, but I only recall one.

Page 52

Q. Have you seen it in any other cases that you weren't hired as a consultant on, so just generally?
A. I don't recall any.
Q. And you mention in paragraph 2 that the causes of excited delirium today are generally the ingestion of stimulant or hallucinogenic drugs. Is that correct?
A. Correct. Most commonly.
Q. Okay. And you would agree with me that in this case there is no evidence of stimulants or hallucinogenic drugs?
A. Well, the toxicology test does not reveal the presence of any -- the toxicologist testing that was done did not reveal the presence of any such drugs. That's true.
Q. Okay. Have you seen any evidence of any designer drugs, such as other synthetic drugs in this case?
A. Well, no, because it wasn't tested for.
Q. Okay. Is there any evidence in this case that -- strike that.
You mentioned that the ingestion of stimulant or hallucinogenic drug has not been excluded as the cause of excited delirium in

Page 53

Mr. Docher.
Is there any reason or any evidence that would lead to -- lead you to believe that he had designer drugs or stimulants in his system?
A. Yes.
Q. And what actions are those?
A. Well, first of all --
Q. What evidence, rather?
A. There is no evidence.
Q. Sorry.
A. There is no evidence for infection, number one. Number two, we don't have any good evidence that he had schizophrenia or bipolar disorder. He does have excited delirium, so you're left with the ingestion or a stimulant or hallucinogenic drug. The toxicological testing that was done, it was simply a screening test in a hospital, but this will not pick up a great many of these drugs.
Q. Do you know if Tavares has a history of using synthetic drugs?
A. I don't know.
Q. Did you see that Tavares Docher in any of the records had a history of excited delirium?
A. To my knowledge, he did not.
Q. Do you know the exact time at which

Tavares Docher went into respiratory distress?
A. I don't know it offhand. I guess I could look it up, I suppose. It should be on the EMS records.
Q. Do you recall any testimony that indicated he was in respiratory distress before EMS arrived?
A. To my knowledge that -- I don't recall reading anything about that, no.
Q. Okay. If his respiratory system was compromised before the administration of Ativan, would that change your opinions in this case?
MS. BARRANCO: Objection to form. Go ahead.
THE WITNESS: Not at all.
MS. TYK: Join.
THE WITNESS: Not at all.
BY MR. DULCIE:
Q. You mention in a report that the dose of 4 milligrams of Ativan is high but in a dosage range of intramuscular injection.
Can you tell me what you mean by that?
A. The usual dosage for intramuscular injection of Lorazepam is 1 to 4 milligrams, so it's within the range. It's at the high end of the

range, but it's within the range. I've seen it given numerous times to people in cases that I reviewed.
Q. Okay. Are you aware of which or that suggests that Ativan should be given in incremental dosages of 1 milligram?
MS. TYK: Object to form.
MS. BARRANCO: Object to form.
THE WITNESS: I've never heard of that; but again, I'm not a clinician, I don't administer drugs.
BY MR. DULCIE:
Q. Okay. And you're not a toxicologist; correct?
A. Correct.
Q. Do you have any education, training or experience as a pharmacologist?
A. Just what I had in medical school.
Q. You mention in paragraph 3, "The effect of an overdose of Lorazepam would be one of respiratory depression."
Is that a comment that applies to someone who's for all intents and purposes normal?
A. It applies to anybody. That's how Benzodiazepine drugs work, if they're going to give

you an overdose. If you're going to have an overdoes of any of these Benzodiazepine drugs, they're going to affect the respiratory centers of the brain.
Q. Is that risk of respiratory depression increase with someone who's engaged in physical activity or in an intense struggle?
A. Probably decreased.
Q. Okay. Why would it decrease?
A. Because they're obviously not obtundent in any sense. They're hyperstimulated.
Q. Okay.
A. The reason the Lorazepam is given is to calm them down.
Q. And if an individual is already suffering by some type of respirator depression, would the administration of Lorazepam increase the risk of going into cardiopulmonary arrest?
MS. BARRANCO: Object to the form.
MS. TYK: Join.
THE WITNESS: It's not cardiopulmonary arrest, no.
BY MR. DULCIE:
Q. What would it increase the risk of?
A. To my knowledge, nothing.

Q. Okay. So if someone is barely breathing, has a low respiratory inventory rate, the administration of 4 milligrams of Ativan will have no effect on his respiratory status?
MS. BARRANCO: Object to form.
MS. TYK: Object to form.
THE WITNESS: In my opinion no; but again, I'm not a clinician, I don't administer drugs.
BY MR. DULCIE:
Q. Okay. You mention that a sudden cessation of respiration along with cardiac arrest would not be expected with the administration of Lorazepam. Do you know if he was ever monitored, his pulse or respiratory status, by EMS prior to the administration of Ativan?
A. As far as I know, they couldn't do that. That's why they gave them Lorazepam.
Q. Okay. If someone -- strike that.
Before administering Ativan to an individual, do you believe it's important to know their respiratory status?
MS. TYK: Object to form.
THE WITNESS: I would say probably not; but again, I'm not a clinician.

www.phippsreporting.com
888-811-3408

Page 58

BY MR. DULCIE:
Q. Is it important before administering 4 milligrams of Ativan to an individual to know what their pulse is?
A. I wouldn't think so.
MS. TYK: Object to form.
THE WITNESS: Apparently not. I've never seen it done.
BY MR. DULCIE:
Q. Do you agree with me, Doctor, that hypoxia can be a cause of zero electrical activity?
A. Zero electrical activity of what?
Q. Of the heart?
A. Hypoxia by itself, if it's severe enough or prolonged enough, sure, it can stop a heart.
Q. And what about hypovolemia?
A. Of course. You can bleed to death.
Q. And can trauma lead to a pulseless cardiac arrest?
A. Sure.
Q. What about ventricular tachycardia?
A. I'm sorry. I don't understand your question. What about ventricular tachycardia?
Q. Can that lead to a pulseless cardiac arrest?

Page 59

A. Not that I know of.
Q. Okay.
A. If anything, it would lead to ventricular fibrillation.
Q. And what is that?
A. That's where each individual muscle fiber of the heart beats independently of every other muscle fiber. It literally looks like a bag of worms and the heart is no longer pumping blood.
Q. Do you see any evidence of that in this case?
A. No.
Q. Is it true that excited delirium can exist with other clinical disease processes and behavior?
A. I don't see why not.
Q. You say that you don't recall seeing any of the videos of Tavares being in custody or interacting with law enforcement officers in this case. Would seeing him in any of those videos being beaten change your opinions in this case?
MS. BARRANCO: Object to the form.
MS. TYK: Join.
THE WITNESS: No.
BY MR. DULCIE:
Q. Why not?

Page 60

A. Why would it? There's no reason. I mean, he did not sustain any lethal injuries or anything that comes close to be a lethal injury.
Q. How do you know that?
A. Looking at the medical records.
Q. Where in the medical records supports that?
A. All of them. There's nothing that shows he has a subdural hematoma or anything along those lines. I think the worst he has, I think, is the fracture of some nasal bones. That's it.
Q. I assume you're referring to the radiology reports in there?
A. Yes, and the clinical evaluation.
Q. Are you a radiologist, Doctor?
A. Of course not. That's why I rely on the reports.
Q. Does excited delirium cause blunt force trauma to the head?
A. Does it cause blunt force trauma to the head? No.
Q. Okay. Does it cause scalp lacerations?
A. No. Not in and of itself, no.
Q. Okay. Does it cause nasal bone fractures?
A. No.

Page 61

Q. Does it cause clavicle fractures?
A. No. The only way it would cause any of these things would be because of the interactions with others or with the environment.
Q. Does blunt force trauma in the head increase the risk of someone who's suffering from excited delirium to go into a cardiopulmonary arrest?
MS. BARRANCO: Object to the form. Go ahead.
THE WITNESS: No.
BY MR. DULCIE:
Q. Okay. Why not?
A. There's no reason for it to unless they have a severe head injury such as a large subdural hematoma or a basilar skull fracture or something like that. But, again, it would be secondary to interaction with others and/or the environment.
Q. Would trauma to the kidneys increase the risk of someone going into cardiopulmonary arrest who suffers from excited delirium?
MS. BARRANCO: Object to the form.
THE WITNESS: I never heard of such of thing. I couldn't see how it would.

BY MR. DULCIE:
Q. The last paragraph of your report, you mention what appears be your ultimate opinions in this case that it's your opinion that "to a degree of reasonable medical certainty that Tavares Docher had excited delirium, which resulted in sudden loss of vital sign. And because of medical treatment, he entered into a persistent vegetative state." Is that correct?
A. Correct.
Q. Has your opinion changed on that?
A. Not at all.
Q. What do you mean by "because of medical treatment, he entered into a persistent vegetative state"?
A. Because EMS was there at the time. They immediately saw that he had gone into a state where he lost vital signs, and they immediately began to try and resuscitate him. They got him as far as going into a persistent vegetative state. If they had done nothing or waited another minute, then he probably would have died if not then, then a couple of days later.
Q. Is it your understanding that before EMS arrived he was still breathing?

A. Yes.
Q. You answered, "The cause of excited delirium is unknown but probably secondary to drug ingestion."
What drug ingestion are you referring to?
A. I couldn't tell you. All I could say is that it would be a stimulant or hallucinogenic drug.
Q. Okay. And, again, there's no evidence that he was on any hallucinogens or synthetic drug; correct?
MS. BARRANCO: Object to the form.
THE WITNESS: Except for the fact there was no history of mental illness or infection and, therefore, that leaves you with stimulant and hallucinogenic drugs as the only likely candidate to cause the excited delirium.
BY MR. DULCIE:
Q. In forming your opinion that he was not suffering from any mental illnesses, are you relying solely on the medical records and the psychological screening report that was provided to you?
A. Just on the information that was provided to me. Obviously, if there's information that wasn't provided to me, then that's an entirely

different story. There might be medical or psychiatric records available but I have not been provided them.
Q. If he was suffering by some mental illness that was perhaps undiagnosed, how would that effect your opinions in this case?
MS. BARRANCO: Object to the form. Go ahead.
THE WITNESS: Then I would attribute it to that. I've seen cases where the mental illness had not been diagnosed, but the person was obviously schizophrenic or bipolar based upon their actions, and so forth, but they had not actually received an official psychiatric or medical diagnosis and they did go into excited delirium. I've seen that happen. Whether that applies to Mr. Docher or not, I don't know.
BY MR. DULCIE:
Q. You're aware that Tavares was cooperative with the police and was willing to be put into handcuffs by the police officers?
A. Yes.
Q. At that time was he exhibiting any behavior -- erratic behavior, agitation or aggressiveness at that time?

A. Not at that time, no.
Q. Okay. Your opinion is that there's no support for a contribution to loss of vital signs by administration of Lorazepam. Is that your opinion as we sit here today?
A. That's absolutely; correct.
Q. And why is it that the administration of 4 milligrams of Lorazepam was not a contributing factor in the los of vital signs of Tavares Docher?
A. As I said before, Lorazepam, if it was given as -- if he received an overdose of Lorazepam, then I would expect to see respiratory depression but not a cardiac arrest.
He had both at the same time. That is typical for excited delirium. It is not typical for a Benzodiazepine overdose, which, in fact, is very rare because it is a pretty benign drug.
The only other way you could kill that rapidly would be by an anaphylactic reaction, and there's no evidence for that either.
Q. How do you know that the ceasing of respiration and the zero pulse happened at the same time?
A. Because the EMS noted it. They saw that he wasn't breathing; and as soon as he got an EKG

Page 66

monitor on him, he was in asystole. That's pretty typical.
Q. He was also provided with epinephrine afterwards; correct?
A. Yes.
Q. Do you think that has any contributing cause to him ultimately succumbing to become in a persistent vegetative state?
A. Sure.
MS. TYK: Object to form.
THE WITNESS: Yes. They got his heart going again after he already had some damage to the brain from lack of oxygen.
BY MR. DULCIE:
Q. Is it your opinion that by the time they got his heart going again, he already suffered hypoxic injury to his brain?
A. Yes.
Q. Do you know how they're measuring his pulse at 6:47 p.m.? And you can refer to the EMS report, if you need to.
A. I don't know how they're measuring his pulse.
Q. You mention that there's no evidence that the actions of the police caused or contributed to

Page 67

the sudden loss of vital signs. Is that your opinion as we sit here today?
A. Yes.
Q. How did you arrive at that opinion if you do not see any of the video of Tavares's interaction with the police officers?
A. Because he had a sudden loss of vital signs, he was given the Lorazepam because of his combative state. So there was -- I cannot envision anything that the police could have done to result in his death at that time particular time, in that particular fashion. It's not like they had him in a forearm bar hold or anything along those lines.
Q. But you didn't see any of the video; correct?
A. I did. I just didn't -- I just looked at it. It wasn't very contributory, so I just ignored it.
Q. Okay. And do you think the sudden -- strike that.
Did you come to the conclusion that his sudden loss of vital signs given the fact that there is a total absence of monitoring in the pre-injection and post-injection until he's found to be apneic, how do you arrive with that conclusion

Page 68

that there was all of a sudden a sudden loss when there's not monitoring of his pulse?
MS. BARRANCO: Object to form.
THE WITNESS: Because I saw --
MS. TYK: Join.
THE WITNESS: When they saw that he was apneic, they immediately began to check him for vital signs. They found there was no pulse, and the AED or whatever they used showed that he was in asystole. That's typical.
BY MR. DULCIE:
Q. But we don't know what his pulse was prior to or if he was in respiratory stress prior to them putting on those monitors, do we?
MS. BARRANCO: Object to form.
MS. TYK: Object to form.
THE WITNESS: Of course we do. He was being violent. That's why he was given the Lorazepam. He obviously had a pulse and he obviously was breathing.
BY MR. DULCIE:
Q. You read testimony that prior to EMS arriving, he was put in a, I think, recovery position?
A. A what position?

Page 69

Q. It was referred to as a recovery position?
A. I have no idea what that is.
Q. Do you remember ever reading that?
A. No.
Q. With regard to the sudden loss of vital signs, there's testimony in this case that after they injected him he remained on the ground for several minutes before he was actually placed on a stretcher and assessed to be determined to be not breathing and have no pulse.
So how do you know, again, that there was a sudden loss when there's no monitoring and several minutes have passed before they actually assessed him to determine he had no breathing and no pulse?
MS. BARRANCO: Object to the form.
MS. TYK: Object to form.
THE WITNESS: My understanding was that they injected him with Lorazepam, they put him on the stretcher, and then they noticed that he did not have any vital signs. I don't know anything about several minutes having passed.
BY MR. DULCIE:
Q. If several minutes would have passed, would that have changed your opinions in this case?

www.phippsreporting.com
888-811-3408

A. Not at all.
Q. Why is that?
A. Because there's nothing significant. He's -- after being restrained, losing vital signs is very typical for excited delirium.
Q. We discussed earlier that there's other events that can cause someone to have a sudden loss of vital signs; correct?
A. Of course. There are lots of reasons. As far as we know, he did not have any.
Q. Can you tell me the process you use to exclude those other reasons?
A. All the medical attention he got did not disclose any other reason for him to have a loss of vital signs.
Q. Okay. Are you familiar with the term positional asphyxia?
A. Very.
Q. Can you tell me what that is?
A. When a person is usually under the influence of a hypnotic or sedative type drug and they get themselves into a position of partial obstruction of the upper airway to the point where they limit their ability to breathe adequately, and generally after a period of a few hours they are

found dead.
Q. Okay. Can positional asphyxia also occur with law enforcement officers placing someone into custody?
MS. BARRANCO: Object to the form.
THE WITNESS: Never. Never. It is a debunked theory.
BY MR. DULCIE:
Q. Okay. How has it been debunked?
A. By numerous studies showing that being put into a prone position has absolutely done nothing to impede respiration. It does not impede the diaphragm, and the prone position actually facilitates breathing.
Q. What do you consider a prone position?
A. By definition, you're lying on your stomach.
Q. Okay. So you think someone lying on their stomach with a foot in their back, which is compressing their chest cavity, is not in a positional asphyxia position?
MS. BARRANCO: Object to the form. Go ahead.
THE WITNESS: No. That is not a positional --

MS. TYK: Join.
THE WITNESS: That is not a positional asphyxia. If the way you describe it actually compressing the chest cavity, that would be a compressional asphyxia but not the positional asphyxia.
BY MR. DULCIE:
Q. And in the video that you saw, if you recall, did you see any actions taken by law enforcement officers that created positional asphyxia?
A. Of course not. As I said before, positional asphyxia occurs with hypnotic and sedative type drugs. It does not occur because a person is lying prone.
Q. Okay. Does positional asphyxia also result from a combination of increased oxygen demand with failure to maintain a patent airway and/or inhibition of chest wall and diaphragmatic movement?
A. Object to form.
MS. TYK: Join.
THE WITNESS: That was the original theory, which has been thoroughly debunked.

BY MR. DULCIE:
Q. But no one can ever be put in a positional asphyxia position?
MS. BARRANCO: Object to the form.
MS. TYK: Join.
THE WITNESS: You'd have to be more specific as to what you mean by positional asphyxia position.
BY MR. DULCIE:
Q. Certainly. When someone is -- let's just say in Tavares's case, if someone is in a prone position on their belly and they are being pushed on their chest cavity, I would consider that a position, and I would also consider that a position in which someone can be asphyxiated because they can't move their chest wall. And every time they try to move, the pressure of whatever is pushing down on them collapses their chest wall and diaphragm, and that decreases the amount of oxygen they can bring in when they have a demand for increased oxygen.
Are you telling me that can't ever occur?
MS. BARRANCO: Object to the form.
MS. TYK: Join.

THE WITNESS: First of all, the short answer is yes, you're correct, that cannot occur. It does occur because of compressional asphyxia, which is what you're describing. That is not a positional asphyxia.

If there was a compressional asphyxia, as you described it just then, it would have to take place over a period of several minutes. I would expect to see other changes, such as ruptured capillaries in the eyes, which you can see very readily, which would not be missed by EMS or by the clinicians at the hospital. That obviously did not happen.

Furthermore, I would expect to see damage to the chest wall, and there is apparently no damage to the chest wall, such as rib fractures or bruises.

BY MR. DULCIE:

Q. And did you see any photos of Tavares's body?

A. No.

Q. Okay. So how do you know there were no bruises?

MS. BARRANCO: Object to the form. Go ahead.

THE WITNESS: Just the medical records. They described the injuries to the face, and so forth; but I don't recall any bruises of the chest or anything like that, no petechiae, P-E-T-E-C-H-I-A-E.

BY MR. DULCIE:

Q. If there are photos of his body that showed bruising, would that be something that would change your opinion as to whether or not he was put in such a position or hit in such a way that would cause him to be in a compressional asphyxiation?

MS. BARRANCO: Object to the form. Go ahead.

MS. TYK: Join.

THE WITNESS: Just from the bruises alone, absolutely not. Would not change my impression about anything. It just could mean you got punched or kicked, or whatever.

BY MR. DULCIE:

Q. Did you see or recall any video of Mr. Tavares being struck in the head by an elbow?

A. I believe I read something about that happening. I don't recall about in the video.

Q. Do you agree that the blunt force trauma -- assuming there is blunt force trauma to

Tavares's head and face -- that it was a substantial contributing factor to his cardiopulmonary arrest and ultimate brain injury?

MS. BARRANCO: Objection to form.

MS. TYK: Join.

THE WITNESS: Not at all. His brain injury is due to anoxic encephalopathy, lack of oxygen to the brain.

BY MR. DULCIE:

Q. And do you think that lack of oxygen to the brain was due to directly by excited delirium?

A. Well, through the cardiac arrest, which is secondary to the excited delirium, yes.

Q. Okay. And if he were to have blunt force trauma to the head, trauma to his kidneys, placed in a position that created compressional asphyxia as well as administered 4 milligrams of Ativan, none of that would be a contributing factor to his cardiac arrest and ultimate brain injury?

MS. BARRANCO: Object to form.

MS. TYK: Join.

THE WITNESS: That is correct. There is absolutely no evidence that any of those things actually happened to any significant degree.

BY MR. DULCIE:

Q. But he was given 4 milligrams of Ativan; correct?

A. Correct.

Q. To the degree that Ativan or Lorazepam depresses the central nervous system --

A. To some degree.

Q. -- does Lorazepam with other depressants compound the effect -- compound an effect on the central nervous system?

A. It could have contributed.

MS. TYK: Object to form.

THE WITNESS: Yes, it could contribute. Usually, when you have deaths from Benzodiazepine, it's usually not from the drug by itself; it's usually in combination with an overdoes of other drugs.

BY MR. DULCIE:

Q. Okay. Are you aware that Tavares was spitting blood while he was on the ground in custody of the law enforcement officers?

A. I believe I read something about that, yes.

Q. Can blood in someone's mouth and throat cause someone to not be able to breathe?

Page 78

MS. BARRANCO: Object to the form.
THE WITNESS: I don't think I've ever seen that.
MS. TYK: Join.
THE WITNESS: I don't think I have ever seen that happen, but I suppose it could if you're pouring out blood like crazy, yeah.
BY MR. DULCIE:
Q. Do you recall reading the police report that Deputy Mangrum utilized palm heel strikes to the shoulders, chest, and back?
A. I believe I read something about that.
Q. Okay. Can strike to that area cause bruising?
A. Of course.
Q. And do you recall reading in the police report that Deputy Newman gave an elbow strike to the right side of Docher's head?
A. I believe somebody did, yes.
Q. Are you aware that in the Department of Corrections intake screening that was done on March 1, 2012, that Tavares was identified as being an individual who has a low intellectual functioning?
A. I believe that's correct, yes.

Page 79

Q. Does the low intellectual functioning have any bearing on someone going into a state of excited delirium?
A. Not that I know of.
Q. Did you see any evidence of airway obstruction in the records and materials that you reviewed?
A. No.
Q. If there was evidence of airway obstruction, would that change your opinions in this case?
A. Possibly.
Q. How would they change your opinions?
A. It would just be a contributory cause of the death. He still had excited delirium. You have to be more specific by what you mean by airway obstruction.
Q. Okay. First of all, I know you said death; but I'm assuming when you mean death, you meant the state that he's in now?
A. I'm sorry. My mistake. I'm sorry.
Q. That's all right. What's your definition of airway obstruction?
A. It could be anything that's inhibiting your ability to breathe.

Page 80

Q. If someone has fluids or liquids in their throat, can that be an airway obstruction?
A. It could be.
Q. If someone is putting pressure on your throat, can that be an airway obstruction?
A. Of course.
Q. Would you agree that if someone is suffering from a compromised respiratory function, that a higher dose of Lorazepam might suppress the central nervous system?
MS. BARRANCO: Object to form.
MS. TYK: Object to form.
THE WITNESS: As I said, I'm not a clinician. I don't administer drugs. I wouldn't think it would be significant, but it might, you know, suppress to some degree.
BY MR. DULCIE:
Q. Do you agree that excited delirium is a medical emergency no matter what the cause?
A. Correct.
Q. Are EMS personnel trained to identify excited delirium?
MS. TYK: Object to form.
THE WITNESS: You'd have to ask the EMS personnel that question. I know in Miami they

Page 81

are, but I don't know about elsewhere.
BY MR. DULCIE:
Q. Do you think that's important for EMS to be trained to identify such a condition such as excited delirium?
MS. TYK: Object to form.
THE WITNESS: I'm not so sure if that's important for them or not. Usually, what I recommend to police agencies is that if you have to use maximal restraints on somebody, take them to a hospital before you take them to jail and let the medical personnel evaluate them.
BY MR. DULCIE:
Q. Can you prevent someone from going into a cardiopulmonary arrest if they're suffering from excited delirium?
A. I don't know.
Q. And have you ever seen a case where someone suffered from excited delirium in police custody and did not end up in a persistent vegetative state or dead?
A. I personally haven't seen it, but I'm not a clinician. I could tell you that emergency room personnel told me that they have seen cases where

www.phippsreporting.com
888-811-3408

police have brought somebody in with excited delirium, and then the person walked out of the hospital the following day, or so. I know that does happen. Personally I have not seen it because I usually get involved after they're dead.

Q. Do you know where they administer the shot of Ativan?

A. In the buttocks.

Q. Okay. It was administered in the right hip. Would that change any of your opinions?

A. No.

Q. Testimony by Clay Mangrum stated that "He was not breathing heavily anymore. He's not exacerbated. This is before EMS arrives. And that's when I pulled him on his side, which is considered the recovery position, to check his breathing and pulse. He said he could feel his pulse and still hear him breathing lightly and see his stomach moving, and he was calm at that point."

Do you consider those facts to be consistent with a compromised respiratory system?

A. No.

MS. BARRANCO: Object to form.

MS. TYK: Join.

THE WITNESS: I wouldn't.

BY MR. DULCIE:

Q. Why not?

A. He's breathing.

Q. Would someone typically go from a very excited agitated state to lightly breathing and stomach moving and almost a point of complete calmness with no responsive verbal communication?

A. Sure. I've seen that happen with excited delirium.

MS. TYK: Object to form.

MS. BARRANCO: Form.

THE WITNESS: Yes, I've seen that happen with excited delirium. Then they become violent again.

BY MR. DULCIE:

Q. Okay. And what causes them to switch back and forth?

A. I have no idea.

Q. Do you know who would know?

A. No.

Q. You said that you have notes there of your opinions; is that correct?

A. No. I have a opinion letter, and I have some typewritten notes which I generate generally after I finish reviewing the initial documents on a

particular case.

Q. Okay. Are those notes reflected in your report?

A. No.

MR. DULCIE: Okay. I want to mark those notes as Exhibit 5.

(Whereupon, Exhibit No. P-5 was so marked for identification, being notes)

BY MR. DULCIE:

Q. Doctor, you also said you had correspondence from counsel; is that correct?

A. Correct.

MR. DULCIE: I want to mark those -- I don't know if there's information that's work product or information that he didn't rely upon, but I would like to mark those unless there's an objection.

MS. BARRANCO: Counsel, just for the record, I would be objecting to providing any communications that fall outside the purview of Rule 26b4C as far as what's allowable. Otherwise, I think what he has with him today, there's no objection to those items.

MR. DULCIE: All right. We'll mark those

correspondence as 6.

(Whereupon, Exhibit No. P-6 was so marked for identification, being correspondence)

BY MR. DULCIE:

Q. Doctor, you mentioned you have billing records; correct?

A. Correct.

Q. Okay.

MR. DULCIE: We're going to mark those billing records as Plaintiff's Exhibit 7.

(Whereupon, Exhibit No. P-7 was so marked for identification, being billing records)

BY MR. DULCIE:

Q. Doctor, I have with me that white paper you referenced by the American College of Emergency Physicians, and I read from you a paragraph from that publication, and just let me know if you agree or disagree with the statement in this publication.

The statement is, "At present, physicians and other medical and nonmedical personnel involved in personal interaction with these patients, patients with excited delirium, do not have a definitive diagnostic test for excited

delirium."
Do you agree with that statement?
A. Yes, unless you're dead.
Q. Okay. Fair. And would you agree that excited delirium must be identified by its clinical features?
A. Yes.
Q. Would you agree because of that, that it makes it very difficult to ascertain the true incidence of excited delirium?
A. No. I think there are other factors that are involved in why you cannot find the incident, the true incidence of excited delirium. But just because of the fact that it's always based on a clinical diagnosis or a clinical constellation of signs and symptoms does not necessarily mean that is the limiting factor.
Q. Do you believe that Tavares ever endured physical compression to his chest?
A. He may have but not significant to impair breathing or anything else.
Q. How do you know that?
A. Because he was breathing just fine up to the point where he got the Lorazepam, and so forth. There are no petechiae or anything else to indicate

that he had respiratory difficulty.
Q. Do you see any evidence of labored breathing by Tavares?
A. I don't recall any.
Q. If he was suffering from labored breathing before the administration of Ativan, would that change any of your opinions in this case?
A. No.
Q. Doctor, did we discuss today all of your opinions that you plan to present at trial in this case?
A. Yes.
Q. Okay. Do you anticipate that you will be presenting your testimony live at trial?
A. Yes.
Q. Do you anticipate that your opinions will change prior to trial?
A. I can't see that happening unless I'm provided with additional significant information.
Q. Okay. What information if it were provided to you that would make you change your opinions?
A. Oh, say, psychiatric records, for example.
Q. And how would they change your opinions?
A. It would give me a cause for the excited

delirium. It still wouldn't exclude drugs, but at least it would have something to explain the excited delirium.
Q. If there is no evidence of drugs and no evidence of a conclusive mental disorder, can someone still suffer from excited delirium?
MS. BARRANCO: Object to the form.
MS. TYK: Form.
THE WITNESS: I've never seen excited delirium on its own. It's always been secondary to something else.
BY MR. DULCIE:
Q. Do people who -- that you've evaluated postmortem and suffer or their cause of death was related to excited delirium, did those individuals have a history of excited delirium?
A. Usually -- some have. Usually not.
Q. Is typically the first time they're considered to be suffering from excited delirium after an autopsy is performed?
A. I'm not sure I understand your question. Sometimes they have a history of excited delirium when you look back at the medical records. Or sometimes family members will -- or other people will say, make a comment about it, and so forth,

that you can identify that the person did, in fact, have a nonfatal episode of excited delirium in the past.
Did that answer your question?
Q. Yeah, that's fine. My last question is going to be very blunt, but do you find it's odd that excited delirium is almost exclusively determined as a cause of death in cases where someone is in police custody?
A. Not at all. It's usually expected.
Q. Why is that?
A. Because the police get called -- because of the system we have in the United States, the police are generally fairly readily available regardless of where you are in the United States. When people are acting in bizarre and violent fashion, the usual response is to call 911 and say I need the police here. The police respond, and they are the ones who are encountering the individual.
The other cases of excited delirium where police are not involved are rarely where the citizens, local citizenry is restraining the individual and the same exact thing happens, or they die because of their excited delirium because of their interaction with the environment. As I said

Page 90

before, getting hit by cars, drowning, and jumping off buildings are the usual causes.
Q. Is there a reason why in those absent the ones of them jumping in front of a car or doing something that causes their death, but, for example, the struggle between citizens that arrive to someone either getting a persistent vegetative state or ultimately dying, is there a reason why the medical examiners in those cases or the emergency room personnel don't consider excited delirium?
MS. BARRANCO: Object to the form.
THE WITNESS: I can't talk about medical personnel, but medical examiners generally consider excited delirium as the cause of death, yes.
BY MR. DULCIE:
Q. Okay. And do you know what the rate is of people who outside of police custody who get in altercations, the cause of death is cited as excited delirium?
A. I'm sorry. Could you repeat that?
Q. Sure. Do you know the frequency of times when a medical examiner is involved to rule on a cause of death in situations where someone is in a struggle and altercation similar to this but without

Page 91

police involved, why the medical examiner -- strike that. I'm confusing myself.
Do you know the incident rate of people who suffer death or significant injury in altercations as civilians, not with police custody, and suffer from excited delirium?
A. No. As I said before, they tend to be pretty unusual. Usually, the citizens get involved, and then the police show up shortly afterwards and then take over. I've seen it on occasion, very few occasions, where the person actually died while having interaction with ordinary citizens. That does happen but it's rare.
Q. Okay. Do you believe any of the medical treatment provided caused Tavares to have a loss of his vital signs?
A. Not at all.
MR. DULCIE: All right, Doctor. That's all the questions I have. Thank you.
MS. BARRANCO: Julie, do you have any questions for Dr. Wetli?
MS. TYK: No questions.
MS. BARRANCO: Doctor, if I may just ask you: In the event that you are unavailable for trial testimony, would you be so kind to just

Page 92

tell us for the benefit of the jury what your background is?
THE WITNESS: Sure. I have a Bachelor of Science degree from the University of Notre Dame, and I received my Doctor of Medicine from the St. Louis University School of Medicine, in St. Louis, Missouri. I then did an internship and residency in anatomical and clinical pathology at the University of Miami School of Medicine, in Miami, Florida. And subsequently, I did a fellowship in forensic pathology at the Dade County Florida Medical Examiner's Office, which is the Greater Miami area.
Upon completion of my residency in anatomical and clinical pathology, I worked for a brief period of time at the Dade County Medical Examiner's Office, and then served in the United States Army as a pathologist in an overseas command for three years.
After that I did one year of private practice in pathology at a hospital in Miami, Florida, and then joined the Dade County Medical Examiner's Office full-time in September of 1977. I became the Deputy Cheif Medical Examiner there and remained in that

Page 93

position until February of 1995, when I became the Chief Medical Examiner and Director Of Forensic Sciences for Suffolk County, New York, which is eastern Long Island.
While in Miami, I was also a Clinical Associate Professor of Pathology at the University Miami School of Medicine. And while in New York, I was also a Clinical Professor of Pathology at the State University of New York, at Stony Brook. I resigned from my position -- retired from my position, I should say -- in New York in August 2006, and I've been doing consulting work in forensic pathology ever since.
MS. BARRANCO: Okay. And you are a medical doctor?
THE WITNESS: Yes. I'm a Doctor of Medicine. I'm Board Certified by the American Board of Pathology in anatomical, clinical, and forensic pathology.
MS. BARRANCO: All right. Thank you so much doctor.
THE WITNESS: Thank you.
(Whereupon, the deposition concluded at 1:04 p.m.)

CERTIFICATE

I, NAYRA PEREZ, Certified Court Reporter of the State of New Jersey certify that prior to the commencement of the examination, DR. CHARLES V. WETLI was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in the action.

____________________________

NAYRA PEREZ
Certificate No. 30X100238000

**A**
**a.m** 1:18 42:2
**ability** 39:21 70:24 79:25 94:11
**able** 40:23 77:25
**abnormalities** 21:16 22:10 33:18
**absence** 51:7 67:23
**absent** 90:3
**absolutely** 65:6 71:11 75:16 76:23
**abuse** 17:2
**accompany** 38:13
**account** 18:21
**accurate** 13:1 94:8
**acid** 37:25
**acting** 27:11 28:3 89:16
**action** 11:16 12:3,13 94:14 94:17
**actions** 11:18 12:15 48:18 53:6 64:13 66:25 72:9
**activity** 37:22 38:5 39:16,20 40:17,17 51:8 51:11,13 56:7 58:11,12
**acts** 48:18
**add** 5:11
**additional** 8:6 10:15 43:25 87:19
**address** 4:2 7:9 7:12 41:23
**adequately** 70:24
**administer** 55:11 57:8 80:14 82:6
**administered** 76:17 82:9
**administering** 57:19 58:2
**administration** 54:10 56:17 57:3,12,15 65:4,7 87:6
**admitted** 46:17
**AED** 68:9
**affect** 56:3
**afraid** 27:23
**agencies** 81:9
**agents** 22:24
**aggressiveness** 64:25
**agitated** 32:24 32:25 33:1 42:20 83:5
**agitation** 64:24
**ago** 7:2 14:12 17:19 28:23
**agree** 21:11,13 22:20 23:9,20 29:6 34:14 36:1,5 40:20 52:10 58:10 75:24 80:7,18 85:19 86:2,4,8
**ahead** 11:21 16:7,25 30:15 31:22 36:21 54:13 61:10 64:8 71:23 74:25 75:13
**air** 14:5,6
**airway** 70:23 72:18 79:5,9 79:16,23 80:2 80:5
**alcohol** 46:16 49:9,12,13,15 49:21
**alcoholic** 46:18
**alive** 14:22
**allegations** 10:1 10:6
**allowable** 84:22
**allowed** 17:1
**Alpine** 4:4
**altercation** 90:25
**altercations** 90:19 91:5
**American** 28:22 31:16 32:10 34:6 85:17 93:18
**amount** 40:15 73:19
**amphetamine** 29:8
**amphetamines** 41:10
**anaerobic** 37:23
**analysis** 45:24 45:25
**anaphylactic** 65:19
**anatomical** 92:8 92:15 93:19
**and/or** 61:18 72:18
**anoxic** 40:13 76:7
**answer** 4:24,25 5:1 12:5,16 27:8 28:20 74:2 89:4
**answered** 63:2
**Anthrax** 18:11
**anticipate** 45:15 87:13,16
**anybody** 18:6 55:24
**anymore** 82:13
**anytime** 18:8,9
**anyway** 16:22
**apneic** 67:25 68:7
**apparently** 18:7 58:7 74:15
**appears** 62:3
**application** 16:10
**applied** 16:5 23:6
**applies** 55:22,24 64:17
**apply** 22:10,17 23:4 36:12
**approximate** 7:1
**approximately** 7:24 27:15
**April** 5:6
**area** 5:15 78:13 92:13
**Army** 92:18
**arrest** 29:25 35:1 37:14 39:8,11 56:18 56:22 57:11 58:19,25 61:8 61:20 65:13 76:2,12,19 81:16
**arrive** 67:4,25 90:6
**arrived** 26:6 27:1 54:6 62:25
**arrives** 82:14
**arriving** 68:23
**arteriosclerotic** 34:23
**Arthrosclerosis** 35:7
**article** 15:21 16:8,9 20:25
**ascertain** 86:9
**ascribe** 37:3
**asking** 42:24
**asphyxia** 70:17 71:2,21 72:3,5 72:6,11,13,16 73:3,8 74:4,5,6 76:16
**asphyxiated** 73:15
**asphyxiation** 75:11
**assessed** 69:9,14
**Associate** 93:6
**associated** 25:13 29:8
**Association** 32:10 34:7
**assume** 4:24 60:12
**assuming** 8:2 21:23 36:11 75:25 79:19
**assumptions** 43:8
**asystole** 51:5,7 66:1 68:10
**Ativan** 54:10,19 55:5 57:3,15 57:19 58:3 76:17 77:2,5 82:7 87:6
**Atlas** 20:24
**attention** 29:3,5 70:13
**attorney** 14:11 15:5 17:12 43:16 94:13,15
**attorneys** 10:23 11:5 12:11,18
**attribute** 64:9
**audio** 43:25 44:3 44:6,10,17
**August** 43:4 93:12
**author** 15:16 22:2
**authored** 15:13 16:11 20:24
**authoritative** 22:4 35:21,24
**automobile** 49:15
**automobiles** 30:8

**autopsies** 6:24
22:6 25:6,7,24
**autopsy** 14:10
18:23 19:11
22:13 36:8
37:5 88:20
**available** 23:10
23:23 24:2
25:11 48:4
64:2 89:14
**Avenue** 2:11
**aware** 26:12
30:1 45:17
47:13 55:4
64:19 77:19
78:20

**B**
**Bachelor** 92:3
**back** 7:16 15:12
24:21 28:15
38:24 39:18
71:19 78:11
83:16 88:23
**background**
92:2
**bad** 12:9
**bag** 59:8
**ballpark** 27:17
**bar** 67:13
**barbiturate**
46:10
**barbiturates**
41:5 46:8,8
**barely** 57:1
**BARNHART**
2:3
**Barranco** 2:7,9
9:8 11:20
13:13 21:18,21
24:12 30:14
31:21 36:20
41:19 54:12
55:8 56:19
57:5 59:21
61:9,22 63:12
64:7 68:3,15

69:16 71:5,22
73:4,24 74:24
75:12 76:4,20
78:1 80:11
82:23 83:11
84:19 88:7
90:11 91:20,23
93:15,21
**based** 37:1,10
64:12 86:14
**basically** 7:10
17:4 25:16
27:9 37:9
39:12 46:21
49:16
**basilar** 61:16
**bath** 46:5
**Beach** 2:4,4 47:8
**bearing** 79:2
**beaten** 59:20
**beats** 59:7
**beers** 49:16,17
**began** 62:18
68:7
**beginning** 50:16
**behalf** 2:3,6,10
7:19 14:11
15:5
**behavior** 27:23
27:23 37:2,10
59:14 64:24,24
**believe** 17:21
20:24 23:24
29:11 47:20
48:10 49:20,22
53:3 57:20
75:22 77:22
78:12,19,25
86:18 91:14
**Bell** 24:21
**belly** 73:12
**beneficial** 39:16
**benefit** 92:1
**benign** 65:17
**Benzodiazepine**
55:25 56:2
65:16 77:15

**Benzoylecgoni...**
25:15
**Berkery** 4:4
**best** 37:15 94:11
**better** 24:6
**beverages** 46:18
**bibliography**
15:20
**bill** 9:2 13:14,15
13:18
**billing** 3:14 85:6
85:11,14
**Biomarkers**
16:15
**bipolar** 26:3
53:13 64:12
**bit** 7:16 18:2
24:17 36:2
**bizarre** 27:11,23
28:3 89:16
**bleed** 58:17
**blood** 37:25,25
38:2 39:17,18
40:15 46:16
49:9 59:9
77:20,24 78:7
**blunt** 60:18,20
61:5 75:24,25
76:14 89:6
**Blvd** 2:4
**Board** 93:18,19
**body** 22:24
25:21 39:8,19
74:20 75:7
**bone** 60:24
**bones** 60:11
**book** 21:2,4,5,7
22:2 35:24
36:1
**Boulevard** 2:8
**bouts** 27:18
**brain** 15:21
16:15 40:13,15
40:16 56:4
66:13,17 76:3
76:6,8,11,19
**break** 4:20

24:24 38:15
42:10
**breathe** 70:24
77:25 79:25
**breathing** 57:1
62:25 65:25
68:20 69:10,14
71:14 82:13,17
82:18 83:3,5
86:21,23 87:3
87:5
**brief** 4:19 92:16
**briefly** 15:12
33:23 39:6
**bring** 73:20
**broad** 34:20
**Brook** 93:10
**brought** 82:1
**bruises** 74:17,23
75:3,15
**bruising** 75:8
78:14
**brutality** 10:2,7
**building** 37:24
**buildings** 30:8
39:3 90:2
**buttocks** 82:8

**C**
**C** 2:1
**California** 13:23
26:21
**call** 20:8 32:25
40:13 41:21
51:18 89:17
**called** 4:6 20:24
27:10,12,13,22
28:24 35:2
37:23 38:6
89:12
**calm** 56:14
82:19
**calmness** 83:7
**CALVIN** 1:10
**camera** 45:6
**can't** 42:10
73:22

**candidate** 63:17
**cannabinoids**
46:5
**capillaries** 74:10
**car** 90:4
**carbon** 39:4
**cardiac** 34:23
35:1 39:8,10
57:11 58:18,24
65:13 76:12,18
**cardiologist**
19:20 39:23
**cardiomyopat...**
34:24 35:10
**cardiopulmon...**
37:14 56:18,21
61:7,20 76:2
81:16
**cardiovascular**
34:14,16,18,21
35:6
**care** 47:7,14
**career** 15:14
16:17
**cars** 39:3 90:1
**case** 1:2 6:4 7:22
8:9,20 9:6,16
12:21 13:8
14:15 17:23
19:3,4 22:17
23:3,17 26:20
26:23,25 31:1
32:3,3 33:19
45:20 50:9,14
51:22 52:11,19
52:21 54:11
59:11,19,20
62:4 64:6 69:6
69:25 73:11
79:11 81:19
84:1 87:7,11
**cases** 6:11 7:23
10:1,15,20,24
11:1,2,5,8,13
12:10 15:4,7
15:22 18:13
22:11 24:22

26:10 27:1,1
27:21 31:14
38:19 52:1
55:2 64:10
81:25 89:8,20
90:9
**category** 34:20
**causal** 42:15
**cause** 6:4 11:17
12:14 15:6,7,9
16:16 18:16,18
18:21 20:20
22:22 23:21
24:4 30:12
31:4 35:12
36:19 37:4
38:15 40:10
50:10 52:25
58:11 60:18,20
60:22,24 61:1
61:2 63:2,17
66:7 70:7
75:11 77:25
78:13 79:14
80:19 87:25
88:14 89:8
90:14,19,24
**caused** 12:14
37:8 66:25
91:15
**causes** 25:25
28:5 33:20
50:24 52:6
83:16 90:2,5
**caveat** 16:24
**cavity** 71:20
72:4 73:13
**ceasing** 65:21
**cellphone** 45:6
**centers** 56:3
**central** 39:18
77:6,10 80:10
**certain** 23:24
24:25 26:1
27:19
**certainly** 33:20
41:25 73:10

**certainty** 62:5
**Certificate** 94:1
94:22
**Certified** 1:19
93:18 94:2
**certify** 94:3,7,12
**cessation** 38:4
39:15 57:10
**cetera** 46:24
**change** 54:11
59:20 75:9,16
79:10,13 82:10
87:7,17,21,24
**changed** 62:11
69:25
**changes** 74:9
**chapter** 32:13
**characterize**
22:23
**charge** 13:10,11
**charged** 13:5
**Charles** 1:8 3:3
4:3,5 94:4
**check** 68:7 82:16
**checking** 46:4
**Cheif** 92:24
**chemical** 19:1
**chest** 71:20 72:4
72:19 73:13,16
73:18 74:15,16
75:4 78:11
86:19
**Chief** 93:2
**CHRISTOPH...**
1:9
**circumstance**
28:9
**cite** 15:7,10
**cited** 90:19
**citizenry** 89:22
**citizens** 89:22
90:6 91:8,12
**civil** 7:22
**civilians** 91:5
**class** 14:6
**Classification**
33:8

**classifications**
34:2
**classified** 33:7
**clavicle** 61:1
**Clay** 82:12
**CLAYLAN** 1:10
**clinical** 5:18
20:4,7 24:1
59:14 60:14
86:5,15,15
92:8,15 93:5,8
93:19
**clinician** 5:19
55:10 57:8,24
80:14 81:24
**clinicians** 74:12
**close** 60:3
**closet** 39:4
**coauthor** 15:13
15:16 21:3,7
**coauthored**
15:19 16:12
**cocaine** 25:14
29:8 30:22
41:3
**coined** 32:16
**collapses** 73:18
**College** 28:23
31:16 85:17
**combative** 48:16
67:9
**combination**
13:10 72:17
77:16
**come** 28:15 29:3
29:4 39:25
67:21
**comes** 60:3
**command** 92:19
**commencement**
94:4
**comment** 55:22
88:25
**common** 46:10
**commonly** 52:9
**communication**
83:7

**communicatio...**
84:21
**competent** 49:14
**complete** 25:18
83:6
**completely** 17:9
25:6,7
**completion**
92:14
**complications**
18:12
**compound** 77:9
77:9
**compressing**
71:20 72:4
**compression**
86:19
**compressional**
72:5 74:3,6
75:11 76:16
**compromised**
54:10 80:8
82:21
**concentration**
46:17 49:9
**concluded** 93:24
**conclusion**
67:21,25
**conclusive** 88:5
**condition** 23:5
23:22 24:4
26:7 31:18
36:18,19 37:7
81:4
**conditions** 26:2
**conferences** 14:4
**confusing** 91:2
**Connecticut** 7:5
14:13
**consensus** 38:9
**consider** 35:20
71:15 73:13,14
82:20 90:10,14
**considered**
36:19 40:18
82:16 88:19
**consistent** 28:14

82:21
**constellation**
86:15
**constricts** 39:17
**consult** 45:11
**consultant** 16:18
52:2
**consulting** 5:15
5:22,24 6:1,16
6:20 8:3 14:19
93:13
**consuming**
46:18
**context** 6:20 8:3
15:25 16:6
23:3 26:5
28:18 30:3
33:17
**continue** 40:16
**continuing**
37:21
**contribute** 77:13
**contributed**
66:25 77:11
**contributing**
65:8 66:6 76:2
76:18
**contribution**
65:3
**contributions**
38:11
**contributory**
30:23 67:17
79:14
**controversial**
29:12
**cool** 40:2
**cooperative**
64:19
**core** 39:19
**correct** 7:13
8:24,25,25 9:4
10:21 11:25
13:3,7,19
17:10 20:4,5,8
22:3 23:14,18
32:22 34:4,13

34:15 35:3
40:25 41:1,6,7
41:13,15,16
44:11,12,18
48:14,24 49:2
49:7,24 50:7,8
50:20 51:5,6,9
51:11,12,19,20
51:23 52:8,9
55:14,15 62:9
62:10 63:11
65:6 66:4
67:15 70:8
74:2 76:22
77:3,4 78:25
80:20 83:22
84:12,13 85:7
85:8
**Corrections**
47:2 78:21
**correctly** 12:1
**correspondence**
3:13 84:12
85:1,4
**couldn't** 7:21
14:17 63:7
**counsel** 84:12,19
94:13,16
**County** 1:12,13
13:21 92:12,16
92:22 93:3
**couple** 62:22
**course** 22:16,19
24:11,13 58:17
60:16 68:17
70:9 72:12
78:15 80:6
**court** 1:1,19
3:15 4:1 6:10
6:11,14 17:20
17:21 94:2
**Courtemanche**
1:11 2:7
**crazy** 78:7
**created** 72:10
76:16
**current** 5:14

23:4,22
**currently** 5:17
7:6
**custody** 28:18
29:20,23 30:3
45:1 59:17
71:4 77:20
81:21 89:9
90:18 91:5
**cut** 41:24
**CV** 3:9 5:4,7
7:12 15:12
**CVS** 46:13,15
48:3

**D**
**Dade** 92:12,16
92:22
**damage** 40:13
66:12 74:14,16
**Dame** 92:5
**date** 1:17 7:1
8:10 94:10
**dated** 5:6 47:1,8
**day** 13:5,20,22
82:3
**days** 38:18
62:23
**dead** 17:16
19:13 36:11
71:1 81:22
82:5 86:3
**deal** 6:12
**deals** 17:15
**death** 6:4 11:2
11:16,17 12:13
12:14 14:20
15:6,7,9 16:16
18:5,9,16,19
18:21 22:22
23:21 30:12
36:10 37:4
38:17,20 42:8
58:17 67:11
79:15,19,19
88:14 89:8
90:5,15,19,24

91:4
**deaths** 29:17
77:14
**debunked** 71:7
71:9 72:23
**deceased** 26:13
31:8,11 37:6
**decent** 45:24
**decided** 17:5
**decrease** 56:9
**decreased** 56:8
**decreases** 73:19
**defendant** 2:10
11:15
**defendants** 1:15
2:6 7:20 9:11
**defense** 7:23
10:1 11:23
12:2,18
**definition** 71:16
79:22
**definitive** 85:25
**degree** 62:4
76:24 77:5,7
80:16 92:4
**delirium** 15:8,17
15:23,25 16:4
16:9,13,16
24:18,19,20
26:7,11,15,20
27:6,19 28:8
28:16 29:3,7
29:11,15,21
30:2,7,11,13
30:21 31:4,8
32:8,13,15,16
32:18,22,23,24
32:25 33:1,7
33:16,20,21,22
34:6 35:22
36:2,7,13,18
37:1,4,8,9,13
38:10,13,20,25
39:11 40:9,10
40:18,21 42:16
50:19 51:18
52:6,25 53:14

53:23 59:13
60:18 61:7,21
62:6 63:3,17
64:16 65:15
70:5 76:11,13
79:3,15 80:18
80:22 81:5,17
81:20 82:2
83:9,13 85:24
86:1,5,10,13
88:1,3,6,10,15
88:16,19,22
89:2,7,20,24
90:10,14,20
91:6
**delusional** 25:17
40:20
**demand** 72:17
73:20
**denied** 50:6
**DENNEY** 2:3
**denying** 46:18
**Department**
47:2 78:20
**Depending**
30:20
**depends** 34:16
49:11
**depicting** 45:6
**deposition** 1:7
4:13,17 6:10
6:13 13:9,14
13:15,16 43:15
49:1 93:24
**depositions**
10:19 48:12
**depressants** 77:8
**depresses** 77:6
**depression**
55:21 56:5,16
65:12
**Deputy** 78:10,17
92:24
**describe** 28:13
32:22,23,24
33:1 37:12
72:3

**described** 24:23
32:14,15,21
74:7 75:2
**describing** 74:4
**DESCRIPTION**
3:8
**designer** 46:4
52:18 53:4
**detail** 39:9
**detailed** 7:16
46:2
**determine** 15:6
18:18,21 22:21
24:2,3 50:10
69:14
**determined**
11:17 12:14
36:7,14 69:9
89:8
**determining**
18:15 23:21
**developed** 24:24
**Di** 35:18
**diagnosed** 64:11
**diagnosis** 47:5
64:15 86:15
**diagnostic** 18:11
32:8 85:25
**diagram** 21:14
**diagrams** 21:14
22:8
**diaphragm**
71:13 73:19
**diaphragmatic**
72:19
**DICKER** 2:11
**die** 26:22 37:3
38:10 39:1,4
40:16 89:24
**died** 11:16 12:12
17:14 25:2
62:22 91:11
**dies** 18:6
**diet** 35:8
**different** 40:21
64:1
**difficult** 86:9

**difficulty** 87:1
**directly** 76:11
**Director** 93:2
**disagree** 21:11
  85:20
**disappeared**
  25:9
**discern** 42:6
**disclose** 70:14
**disconnect**
  41:22
**discuss** 87:9
**discussed** 15:25
  16:2 70:6
**discussion** 16:13
**disease** 22:25
  33:9,25 34:4,9
  34:11,15,15,17
  34:18,18,21,23
  34:24 35:2,6
  36:9,17 59:14
**diseases** 33:9
  34:25 35:3
**disorder** 26:3
  29:12,12 32:9
  53:13 88:5
**distress** 54:1,6
**district** 1:1,1,13
  1:14
**DNA** 19:2
**Docher** 1:4 2:3
  4:11 19:5 31:1
  45:1,8 47:24
  47:25,25 48:1
  48:2,2 50:17
  53:1,22 54:1
  62:5 64:17
  65:9
**Docher's** 78:18
**DOCHER-NE...**
  1:5
**doctor** 4:10 29:6
  32:7 37:12
  41:3 42:4
  58:10 60:15
  84:11 85:6,16
  87:9 91:18,23

92:5 93:16,17
  93:22
**documenting**
  21:15 22:9
**documents** 31:3
  47:18 83:25
**doing** 5:15,17,20
  5:22 13:9,20
  22:6 39:24
  90:4 93:12
**don't** 14:22 44:5
  58:22
**dosage** 54:19,23
**dosages** 55:6
**dose** 54:18 80:9
**Dr** 1:8 3:3,9 4:3
  4:5 15:19
  24:21 91:21
  94:4
**drive** 49:14
**drops** 37:25
**drown** 39:3
**drowning** 30:8
  90:1
**drug** 17:1 42:19
  46:6 52:24
  53:15 63:3,5,8
  63:10 65:17
  70:21 77:15
**drugs** 25:14 26:1
  29:9,10 33:17
  46:4,5,19 50:7
  52:7,12,16,18
  52:18 53:4,18
  53:20 55:11,25
  56:2 57:8
  63:16 72:14
  77:17 80:14
  88:1,4
**DSM** 32:11,15
  32:17
**DSM-5** 32:19
**due** 16:10 26:7
  30:21 76:7,11
**Dulcie** 2:5 3:4
  4:9,11 11:24
  21:20,24 22:1

24:16 30:18
  32:1 35:16
  37:11 41:25
  42:3 54:17
  55:12 56:23
  57:9 58:1,9
  59:24 61:12
  62:1 63:18
  64:18 66:14
  68:11,21 69:23
  71:8 72:7 73:1
  73:9 74:18
  75:6,19 76:9
  77:1,18 78:8
  80:17 81:2,14
  83:1,15 84:5
  84:10,14,25
  85:5,10,15
  88:12 90:16
  91:18
**duly** 4:6 94:5
**dying** 30:2 90:8

**E**

**E** 2:1,1
**earlier** 13:13
  20:3 51:2,21
  70:6
**early** 25:12
**East** 2:8
**eastern** 93:4
**ecstasy** 41:8
**EDELMAN**
  2:11
**education** 19:15
  19:16,19,22,25
  55:16
**effect** 49:8 55:19
  57:4 64:5 77:9
  77:9
**either** 20:20
  38:12 65:20
  90:7
**EKG** 65:25
**elbow** 75:21
  78:17
**electrical** 15:22

51:8,10,12,14
  58:11,12
**ELSER** 2:11
**emergency**
  28:23 31:13,16
  31:18 80:19
  81:24 85:17
  90:9
**employee** 94:13
  94:15
**employment**
  5:14
**EMS** 31:2 46:14
  46:24 54:3,6
  57:14 62:16,24
  65:24 66:20
  68:22 74:12
  80:21,24 81:3
  82:14
**encephalopathy**
  40:14 76:7
**encompass**
  34:21
**encountering**
  89:19
**endurance**
  48:17,22
**endured** 86:18
**enforcement**
  10:6,23 11:6,9
  11:14 12:11,15
  15:5 28:19
  29:19,20,23
  30:3 45:7
  59:18 71:3
  72:10 77:21
**engaged** 56:6
**entail** 46:1
**entered** 62:8,14
**entire** 23:25,25
  24:1
**entirely** 63:25
**entry** 20:17
**environment**
  25:18 61:4,18
  89:25
**envision** 67:9

**enzyme** 38:1
**epinephrine**
  66:3
**episode** 26:16,17
  89:2
**episodes** 27:7
  28:8
**equivalent** 49:16
**erratic** 64:24
**ESQUIRE** 2:5,9
  2:12
**Essentially**
  50:12
**establish** 22:24
**estimate** 27:9
**et** 46:24
**evaluate** 19:4,8
  19:9 81:12
**evaluated** 19:6
  88:13
**evaluation** 60:14
**event** 91:24
**events** 18:22
  70:7
**eventually** 38:16
**evidence** 21:23
  36:8,16 52:11
  52:17,21 53:2
  53:8,9,11,12
  59:10 63:9
  65:20 66:24
  76:23 79:5,9
  87:2 88:4,5
**exacerbated**
  82:14
**exact** 40:3 53:25
  89:23
**exactly** 9:12
  42:6
**examination** 3:4
  4:8 94:4
**examine** 6:7
  18:16,23 19:10
  20:6,10,15
**examined** 4:7
  20:12
**examiner** 17:15

20:16 30:20 90:23 91:1 92:25 93:2
**Examiner's** 13:21 92:12,17 92:23
**examiners** 23:8 29:17 30:23 90:9,13
**examining** 20:20 20:21
**example** 12:18 12:19 17:2 18:11 19:1 20:11,16 25:11 27:21 30:10 34:2 35:5 39:22 46:4,7 87:23 90:5
**exception** 20:9
**excited** 15:8,17 15:23,24 16:4 16:9,13,15 24:18,18,20 26:7,10,15,20 27:6,19 28:8 28:16 29:3,7 29:11,15,21 30:2,7,11,13 30:21 31:4,8 32:7,14,16,18 33:7,16,20,21 33:22 34:5 35:21 36:2,7 36:13,18 37:1 37:4,8,9,13 38:10,13,19,25 39:11 40:8,10 40:18 42:15 50:18 51:18 52:6,25 53:14 53:23 59:13 60:18 61:7,21 62:6 63:2,17 64:15 65:15 70:5 76:11,13 79:2,15 80:18 80:22 81:5,17 81:20 82:1 83:5,8,13 85:24,25 86:5 86:10,13 87:25 88:2,6,9,15,16 88:19,22 89:2 89:7,20,24 90:10,14,19 91:6
**exclude** 70:12 88:1
**excluded** 16:19 17:8 52:25
**exclusively** 89:7
**Excuse** 16:24
**exercise** 40:1
**exhaustion** 37:19
**exhibit** 3:8 5:5,5 12:24 42:24 84:6,7 85:2,11 85:12
**exhibited** 48:16
**exhibiting** 50:18 64:23
**Exhibits** 3:7,15
**exist** 59:13
**existed** 47:22
**exit** 20:17
**expect** 8:15,23 43:21 65:12 74:9,14
**expected** 57:12 89:10
**experience** 19:17,20,23 20:1 33:4 55:17
**experiences** 26:15
**experiencing** 30:11 39:11 40:8
**expert** 8:3,5 23:12,15,20
**expertise** 23:13
**experts** 45:12
**explain** 5:25 13:11 30:5 36:9,17 39:9 39:13 88:2
**explanation** 29:16
**extent** 17:17
**external** 21:15 22:9
**extraneous** 43:13
**extremely** 28:2
**eyes** 74:10

**F**

**face** 75:2 76:1
**facilitates** 71:14
**fact** 12:20 26:22 63:13 65:16 67:22 86:14 89:1
**factor** 30:23 42:15 65:9 76:2,18 86:17
**factors** 86:11
**facts** 21:23 23:10,23,24 24:2,5,7,8,14 24:15 43:8,19 82:20
**factual** 46:13
**fails** 36:8,16
**failure** 38:16,16 72:18
**fair** 5:2 8:4 24:10 28:11 36:4 45:3 86:4
**fairly** 28:21 89:14
**fall** 84:21
**Falls** 15:22
**familiar** 70:16
**family** 27:22,24 88:24
**far** 47:12 57:16 62:19 70:10 84:22
**fashion** 27:11 28:3 67:12 89:17
**fast** 35:15
**fatal** 12:19 15:21 26:11
**features** 86:6
**February** 47:8 93:1
**Federal** 17:20
**fee** 3:10 8:21,22 12:22,23 13:2 13:4
**feel** 82:17
**fellowship** 92:11
**felt** 28:25
**fiber** 59:6,8
**fibrillation** 59:4
**field** 23:13 26:12
**figure** 23:4
**finally** 38:3
**financially** 94:16
**find** 42:18 46:20 86:12 89:6
**findings** 18:23 22:15
**fine** 86:23 89:5
**finish** 83:25
**FIRE** 1:13
**firm** 9:7,19 10:10
**first** 4:6 10:9 14:6 25:3 26:10 45:10 46:12,22 48:15 53:7 74:1 79:18 88:18
**five** 7:2,18 9:25 10:5 14:12 26:22 38:17
**flat** 13:5
**flights** 14:6
**Florida** 1:1,12 2:4,8,12 47:1 49:19 92:10,12 92:22
**fluids** 80:1
**fly** 13:23
**focus** 16:8,9
**focused** 31:8
**following** 82:3
**follows** 4:7
**foot** 71:19
**force** 60:18,20 61:5 75:24,25 76:14
**forearm** 67:13
**foregoing** 94:7
**forensic** 5:16 17:15 18:3,4 18:13,15 20:24 22:5,13,20,21 42:4 92:11 93:3,13,20
**form** 11:20 21:18 24:12 30:14 31:21 36:20 54:12 55:7,8 56:19 57:5,6,22 58:6 59:21 61:9,22 63:12 64:7 66:10 68:3,15 68:16 69:16,17 71:5,22 72:20 73:4,24 74:24 75:12 76:4,20 77:12 78:1 80:11,12,23 81:6 82:23 83:10,11 88:7 88:8 90:11
**formal** 19:14,16 19:19,22,25
**forming** 43:6 63:19
**Fort** 1:21 2:8
**forth** 6:6 25:2,15 31:14 47:23 64:13 75:3 83:17 86:24 88:25 94:10
**forward** 9:2

**found** 67:24
68:8 71:1
**four** 6:22 7:2
14:12 26:22
**fracture** 60:11
61:16
**fractures** 60:24
61:1 74:16
**frequency** 90:22
**frequently** 25:20
29:7 35:11
38:5,14
**front** 20:23 90:4
**full-time** 92:23
**function** 80:8
**functioning**
78:24 79:1
**FURTHER** 94:7
94:12
**Furthermore**
74:14
**future** 8:15,17
9:1 45:19

**G**
**gather** 44:9
**general** 7:23
25:6,24 36:1
**generally** 18:14
23:8 27:7,14
27:17 31:11
38:17 39:1,15
50:22 52:3,6
70:25 83:24
89:14 90:13
**generate** 83:24
**generated** 9:3
**generating**
45:12
**genetic** 35:12
**germane** 19:3
**getting** 41:20
90:1,7
**Giuffreda** 2:7
9:8
**give** 6:3,3,7,9
24:6 55:25

87:25
**given** 8:1 10:18
14:2 55:2,5
56:13 65:11
67:8,22 68:18
77:2
**giving** 6:13
**glanced** 44:7
**go** 6:10,10 11:20
13:20 16:7
26:19 27:20
28:3,6 30:14
31:21 36:20
37:22 49:3
54:12 61:7,9
64:7,15 71:23
74:24 75:12
83:4
**goes** 7:16 24:20
**going** 4:24 6:11
21:9 24:14
35:6,7,14,15
36:4 37:20
38:1 42:22,24
55:25 56:1,3
56:18 61:20
62:20 66:12,16
79:2 81:15
85:10 89:6
**good** 4:10 5:3
18:8 53:12
**great** 53:18
**Greater** 92:13
**ground** 4:19
69:7 77:20
**guardian** 1:6
**guess** 6:15 9:11
54:2
**gunshot** 30:16
30:24

**H**
**half** 27:15
**hallucinating**
28:1
**hallucinogenic**
25:14 26:1

29:10 52:7,12
52:24 53:15
63:8,16
**hallucinogens**
63:10
**hand** 13:2
**handcuffs** 64:21
**happen** 40:12
64:16 74:13
78:6 82:4 83:8
83:12 91:13
**happened** 17:11
65:22 76:24
**happening**
75:23 87:18
**happens** 20:21
89:23
**hard** 12:16 27:8
**haven't** 47:15
**head** 16:5,10
60:19,21 61:5
61:15 75:21
76:1,15 78:18
**health** 18:8,10
33:9 34:2
**healthcare** 45:12
**healthy** 24:24
**hear** 82:18
**heard** 55:9
61:23
**heart** 34:23 38:9
39:21 40:4
51:4,8,15,15
58:13,15 59:7
59:9 66:11,16
**heavily** 82:13
**heel** 78:10
**helpful** 44:2,8
**hematoma** 60:9
61:16
**hereinbefore**
94:10
**high** 38:12 42:7
54:19,25
**higher** 80:9
**hip** 82:10
**hired** 9:5,14,18

9:21,25 10:5,9
10:10,22 11:5
11:9,15,22
12:2,10,18
15:4 50:9,14
52:2
**history** 17:1
18:22 24:18,20
53:19,23 63:14
88:16,22
**hit** 30:7 39:3
75:10 90:1
**hold** 41:19,24
67:13
**home** 7:10
**honest** 4:25
23:17
**hormone** 38:6
39:14
**hospital** 26:16
46:3,6,15,24
53:17 74:12
81:11 82:3
92:21
**hostile** 27:25
**hour** 13:11,16
27:15 39:25
**hourly** 13:24
**hours** 14:7 70:25
**hyperstimulat...**
56:11
**hypertension**
35:7
**hypertensive**
34:23 35:5
**hyperthermia**
25:1
**hypnotic** 70:21
72:13
**hypothetical**
30:10
**hypovolemia**
58:16
**hypoxia** 58:10
58:14
**hypoxic** 66:17

**I**
**idea** 15:10 32:4
33:11 42:12
69:2 83:18
**identifiable**
35:12
**identification**
84:8 85:3,13
**identified** 3:8
78:22 86:5
**identify** 80:21
81:4 89:1
**Identifying**
16:15
**idiopathic** 35:11
**ignored** 44:23
67:17
**illness** 63:14
64:4,10
**illnesses** 63:20
**immediately**
62:17,18 68:7
**impair** 86:20
**impede** 71:12,12
**impervious**
37:18,19
**importance**
21:15 22:9
**important** 22:14
23:19 57:20
58:2 81:3,8
**impression**
75:16
**incidence** 86:10
86:13
**incident** 48:3
86:12 91:3
**including** 47:22
**income** 7:25 8:5
8:6
**increase** 56:6,17
56:24 61:6,19
**increased** 25:1
25:19,21 72:17
73:21
**incremental**

55:5
**independent** 1:13
**independently** 59:7
**INDEX** 3:1
**indicate** 26:14 86:25
**indicated** 7:11 48:18 54:5
**indicating** 47:5
**individual** 18:23 28:5,9 35:17 37:2,10 42:6 47:22 49:10 50:23 56:15 57:20 58:3 59:6 78:23 89:19,23
**individually** 1:9 1:10,10,11,12
**individuals** 20:12 24:23 25:19 26:19 28:22 29:17 88:15
**inefficient** 38:1
**infection** 53:11 63:14
**infections** 33:19
**influence** 70:21
**information** 43:13,19 44:17 44:22 45:18,21 45:23 46:19,20 46:22 47:2,24 48:3,25 49:4 63:23,24 84:15 84:16 87:19,20
**ingested** 42:7
**ingesting** 46:19 50:6
**ingestion** 52:7 52:23 53:15 63:4,5
**inhalation** 39:5
**inhibiting** 79:24
**inhibition** 72:19
**initial** 83:25
**initially** 48:5
**injected** 69:7,19
**injection** 54:20 54:24
**injections** 26:4
**injured** 14:21
**injuries** 39:2 60:2 75:2
**injurious** 22:23
**injury** 15:21 16:6 20:10,19 20:20 23:1 60:3 61:15 66:17 76:3,7 76:19 91:4
**intake** 46:25 78:21
**intellectual** 78:23 79:1
**intense** 38:21 39:1 56:7
**intensity** 37:17
**intents** 55:23
**interacting** 59:18
**interaction** 45:7 61:18 67:5 85:23 89:25 91:12
**interactions** 61:3
**interested** 94:16
**internal** 21:15 22:10
**International** 33:8
**internship** 92:7
**interpret** 22:23
**interpreting** 20:19
**intoxication** 30:22
**intramuscular** 54:20,23
**Introduction** 21:10
**inventory** 57:2
**investigation** 18:5,6
**involve** 10:1 14:20
**involved** 11:14 18:14 23:8 26:23 82:5 85:23 86:12 89:21 90:23 91:1,8
**involving** 11:8 15:17
**Island** 93:4
**issue** 17:6
**items** 43:25 84:24

**J**

**J** 1:11
**jail** 81:12
**JANICE** 1:5
**Jersey** 1:19,21 4:4 7:4,7 50:3 94:3
**Join** 21:19 36:24 54:15 56:20 59:22 68:5 72:1,21 73:5 73:25 75:14 76:5,21 78:4 82:24
**joined** 92:22
**Jolly** 2:7 9:7
**Jordan** 2:5 4:10 41:19
**JOSE** 1:12
**judge** 16:25 17:5 17:12,13,14
**Julie** 2:12 91:20
**July** 10:14
**jump** 39:2
**jumping** 15:12 30:8 90:1,4
**jury** 92:1

**K**

**K-R-O-L-L** 15:19
**keep** 7:18 10:3 10:12 12:17 15:11 36:22,25 37:19
**KEN** 1:11
**kicked** 75:18
**kidney** 38:16
**kidneys** 61:19 76:15
**kill** 12:20 65:18
**kind** 5:20 37:7 44:7 91:25
**kinds** 19:2
**know** 4:21,22 6:25 7:22 8:10 9:9,14,23,24 10:4 11:1,4,4 15:1,2,15 16:22 17:20 20:8,17 21:10 28:5 29:4 31:15,15,23 32:5,6 35:17 44:13,20 48:17 49:8,18 53:19 53:21,25 54:2 57:13,16,20 58:3 59:1 60:4 64:17 65:21 66:19,22 68:12 69:11,21 70:10 74:22 79:4,18 80:16,25 81:1 81:18 82:3,6 83:19,19 84:15 85:19 86:22 90:17,22 91:3
**knowledge** 17:8 53:24 54:7 56:25
**known** 51:4,10
**Kroll** 15:19

**L**

**labored** 87:2,5
**lacerations** 60:22
**lack** 66:13 76:7 76:10
**lactic** 37:24
**Lakes** 2:4
**large** 61:15
**late** 25:12
**Lauderdale** 2:8
**law** 9:7 10:5,10 10:23 11:6,8 11:14 12:11,15 15:5 28:18 29:18,20,23 30:3 45:7 59:18 71:3 72:9 77:21
**lawsuit** 6:17,21 9:12 26:5
**lawsuits** 8:4 16:18
**lawyers** 6:2
**lead** 39:8,10 53:3,3 58:18 58:24 59:3
**leading** 21:22 37:13
**leaves** 63:15
**Lee** 1:21
**left** 53:14
**legal** 1:6 49:18 49:24 50:1,3
**let's** 9:24 27:21 28:16 73:10
**lethal** 60:2,3
**lethality** 29:13
**letter** 83:23
**level** 49:13
**levels** 38:12
**lightly** 82:18 83:5
**limit** 49:18,24 50:1,3 70:24
**limited** 24:15
**limiting** 86:17
**lines** 60:10 67:13

**list** 7:15 10:13 10:16 15:20 30:21,24
**listed** 7:21 10:16 10:20 30:6,7 33:21,25 43:4 43:11 44:1,11 46:22
**listen** 44:23
**literally** 59:8
**literature** 25:5
**litigation** 5:21 5:23 6:1,12,15
**little** 18:2 24:17 27:16 39:9,9
**live** 7:6 87:14
**living** 14:16 22:11,18 23:5 23:7 31:9 36:13,16
**local** 89:22
**LOCATION** 1:21
**long** 13:20 27:6 43:14 93:4
**longer** 59:9
**look** 12:25 20:10 22:14 23:25 26:12 47:10 54:3 88:23
**looked** 44:5 67:16
**looking** 5:5 7:14 12:23 13:4 23:23 33:23 36:15 40:23 42:22 43:24 45:10 46:12 60:5
**looks** 46:12 59:8
**loosely** 18:5
**Lorazepam** 54:24 55:20 56:13,17 57:12 57:17 65:4,8 65:10,11 67:8 68:19 69:19 77:5,8 80:9 86:24
**los** 65:9
**lose** 25:21 29:22
**losing** 70:4
**loss** 27:14 50:10 50:21,24 62:6 65:3 67:1,7,22 68:1 69:5,12 70:7,14 91:15
**lost** 62:18
**lot** 6:2 37:24 44:9 49:11
**lots** 70:9
**Louis** 92:6,7
**low** 38:2,12 57:2 78:23 79:1
**Lucie** 1:12,13 9:21 40:24
**Luther** 24:21
**lying** 71:16,18 72:15

**M**

**main** 16:8,9,12
**maintain** 72:18
**Maio** 35:18
**majority** 11:3 29:2
**Mangrum** 1:10 2:6 78:10 82:12
**Manual** 32:9
**March** 47:1 78:22
**mark** 15:19 84:5 84:14,17,25 85:10
**marked** 3:9,10 3:11 5:4 12:24 42:23 84:8 85:3,13
**Mascara** 1:11 9:12
**material** 23:16
**materials** 6:7 14:2 45:18 79:6
**matter** 4:12 20:19 80:19
**maximal** 81:10
**McAlary** 48:6
**MDMA** 41:8
**mean** 6:12,15 19:10 33:14 35:23 54:21 60:1 62:13 73:7 75:17 79:16,19 86:16
**meaning** 35:11 40:14
**means** 18:6 20:6 37:24 51:13
**meant** 79:20
**measures** 46:14
**measuring** 66:19 66:22
**mechanical** 51:8
**mechanism** 29:13 40:3
**medical** 13:21 17:15 18:22 20:16 23:7 24:22 25:5 26:13,14 29:17 30:20,23 31:2 31:19,24 34:6 40:24 47:21 55:18 60:5,6 62:5,7,13 63:21 64:1,15 70:13 75:1 80:19 81:12 85:22 88:23 90:8,12,13,23 91:1,14 92:12 92:17,23,25 93:2,16
**medical-legal** 18:5
**Medicine** 92:5,6 92:10 93:7,18
**medicines** 25:10
**meeting** 24:22 43:20
**member** 27:24 34:8
**members** 27:22 88:24
**mental** 32:9 33:18 47:6 63:14,20 64:4 64:10 88:5
**mentally** 24:23
**mention** 48:15 50:21 51:3,16 52:5 54:18 55:19 57:10 62:3 66:24
**mentioned** 26:25 35:4 39:6 51:21 52:23 85:6
**message** 41:20
**met** 13:13 43:17
**metabolism** 37:23
**metabolites** 42:11
**Miami** 80:25 92:9,10,13,21 93:5,7
**microscope** 18:24
**miles** 39:25
**milligram** 55:6
**milligrams** 54:19,24 57:3 58:3 65:8 76:17 77:2
**mind** 36:23,25
**minus** 8:21
**minute** 17:14 62:21
**minutes** 27:15 41:21 69:8,13 69:22,24 74:8
**missed** 74:11
**Missouri** 92:7
**mistake** 79:21
**monitor** 66:1
**monitored** 57:13
**monitoring** 67:23 68:2 69:12
**monitors** 68:14
**monoxide** 39:4
**morning** 4:10
**MOSKOWITZ** 2:11
**mother** 1:5
**mouth** 77:24
**move** 73:16,17
**movement** 72:19
**moving** 82:19 83:6
**multi-organ** 38:16
**multiple** 27:18
**muscle** 38:15 39:18 51:15 59:6,8

**N**

**N** 2:1
**naïve** 49:15
**name** 4:2,10 17:22 35:17 46:10
**narrow** 28:21
**nasal** 60:11,24
**natural** 22:22,25 36:9,17
**naturally** 39:7
**NAYRA** 1:19 94:2,22
**necessarily** 14:19 33:21 86:16
**necessary** 18:20
**need** 4:20 5:10 37:4 45:19,19 66:21 89:18
**negative** 25:7,8 25:25 37:5 41:3,5,8,11
**neither** 94:12,15
**nervous** 77:6,10

80:10
**neurologist** 20:1
**never** 17:7 47:4 55:9 58:7 61:23 71:6,6 88:9
**New** 1:19,19,21 4:4 7:3,7 50:3 93:3,8,9,12 94:3
**Newman** 1:9 2:6 2:10 78:17
**nicely** 32:14
**nonfatal** 89:2
**nonmedical** 85:22
**noradrenaline** 38:7
**norepinephrine** 38:6 39:7,10 39:14 40:2 51:2
**normal** 46:6 55:23
**North** 2:11
**Notary** 1:20
**note** 43:25
**noted** 65:24
**notes** 3:12 83:21 83:24 84:2,6,9
**noticed** 69:20
**Notre** 92:4
**number** 15:22 17:19 38:7 53:11,12
**numerous** 25:5 55:2 71:10

**O**

**Object** 11:20 21:18 24:12 30:14 31:21 36:20 55:7,8 56:19 57:5,6 57:22 58:6 59:21 61:9,22 63:12 64:7 66:10 68:3,15 68:16 69:16,17 71:5,22 72:20 73:4,24 74:24 75:12 76:20 77:12 78:1 80:11,12,23 81:6 82:23 83:10 88:7 90:11
**objecting** 84:20
**objection** 21:20 21:21 54:12 76:4 84:18,24
**obstruction** 70:23 79:6,10 79:17,23 80:2 80:5
**obtundent** 56:10
**obviously** 12:19 49:23 56:10 63:24 64:12 68:19,20 74:13
**occasion** 6:9 91:10
**occasions** 26:3 26:18 51:16 91:11
**occur** 33:16 50:22 51:17 71:2 72:14 73:23 74:3,3
**occurred** 46:13
**occurs** 14:20,25 31:15,15 33:17 39:7 72:13
**odd** 89:6
**offered** 29:16
**offhand** 7:22 40:7 44:5,15 44:21 54:2
**office** 9:22 13:5 13:9,21 92:13 92:17,23
**officer** 12:20 30:12,13,16
**officers** 9:15
**official** 64:14
**Oh** 12:16 14:25 18:20 30:4 87:23
**okay** 4:16,19 5:4 5:10,13,17,20 5:25 6:15,19 6:25 7:3,6,8,11 7:14,25 8:9,19 8:22 9:1,18 10:4,13,20,22 11:1,4,13 12:22 13:4,8 13:18,24 14:3 14:5,9,14,24 15:1,4,12,24 16:17,21,23 17:3,22 18:2 19:11,14 20:12 20:23 21:9,24 22:4,7,13 23:9 24:7 26:25 27:6,18 28:8 28:11 29:15 30:19 31:1,7 31:12 32:2,7 33:2,4,7,22 34:5,14 35:13 35:20 36:12 37:12 38:23 39:6 40:20,23 41:2,11,14 42:14,18,22 43:2,14,19,24 44:13,16 45:3 45:25 46:25 47:7,13,17 48:2,5,22,25 49:3,8,23 50:9 50:13,16,21 51:3,16 52:10 52:17,21 54:9 55:4,13 56:9 56:12 57:1,10 57:18 59:2 60:22,24 61:13 63:9 65:2 67:19 70:16 71:2,9,18 72:16 74:22 76:14 77:19 78:13 79:18 82:9 83:16 84:2,5 85:9 86:4 87:13,20 90:17 91:14 93:15
**once** 11:11 17:11 20:9 39:19
**ones** 31:10,11 89:19 90:4
**opiates** 41:12
**opinion** 6:3 23:17 24:6,8,9 24:14 57:7 62:4,11 63:19 65:2,4 66:15 67:2,4 75:9 83:23
**opinions** 16:18 42:14 43:6 45:20 49:6 50:17 54:11 59:20 62:3 64:6 69:25 79:10,13 82:10 83:22 87:7,10 87:16,22,24
**Orange** 2:11
**order** 24:3
**ordinary** 91:12
**Organization** 33:10 34:3
**organs** 18:17
**original** 72:22
**Orlando** 2:12
**outside** 5:21 6:1 6:17,20 28:17 30:3 84:21 90:18
**overall** 16:1
**overdoes** 56:2 77:17
**overdose** 55:20 56:1 65:11,16
**overseas** 92:19
**oxygen** 66:13 72:17 73:19,21 76:8,10

**P**

**P** 2:1,1
**P-5** 3:12 84:7
**P-6** 3:13 85:2
**P-7** 3:14 85:12
**P-E-T-E-C-H-...** 75:5
**P.A** 2:7
**p.m** 42:2 66:20 93:25
**page** 3:2 46:22 48:15
**paid** 8:10
**pain** 6:4 37:18
**palm** 2:4,4 78:10
**paper** 15:18 28:24 31:17 85:16
**paragraph** 46:12 49:4 50:16 52:5 55:19 62:2 85:18
**paramount** 21:14 22:9
**part** 5:23 10:15 14:10 40:18
**partial** 70:22
**particular** 6:4 8:9 16:3 17:6 19:3 26:16

67:11,12 84:1
**particularly**
    25:22 26:21
    44:2
**parties** 9:13
    17:25 94:14
**parts** 40:15
**passed** 69:13,22
    69:24
**patent** 72:18
**path** 37:13
**pathologist**
    17:15 18:15
    22:5 42:4
    92:18
**pathologists**
    18:14
**pathology** 5:16
    5:20 6:20 18:3
    18:4 20:25
    22:20,21 92:9
    92:11,15,21
    93:6,9,13,19
    93:20
**patients** 20:7
    85:24,24
**pattern** 20:19
**payments** 8:15
    8:17
**people** 14:20
    17:16 27:20
    28:13,18 29:2
    29:21 30:2
    35:1 38:10
    55:2 88:13,24
    89:16 90:18
    91:4
**percent** 7:23,24
    8:5 46:16 49:9
    49:22
**percentage** 8:4
**perception**
    25:18
**PEREZ** 1:19
    94:2,22
**perform** 19:11
**performed**

14:10 40:25
    88:20
**performing**
    22:13
**period** 28:4
    38:14 70:25
    74:8 92:16
**persistent** 26:19
    26:24 27:2
    31:4 38:20
    51:17 62:8,14
    62:20 66:8
    81:21 90:7
**person** 12:4
    17:13 20:18,21
    23:7 25:17
    26:13,21 27:11
    27:25 30:25
    36:11 37:6
    38:3 39:4
    64:11 70:20
    72:15 82:2
    89:1 91:11
**person's** 28:9
**personal** 17:4
    85:23
**personally** 19:9
    20:13 81:23
    82:4
**personnel** 80:21
    80:25 81:12,25
    85:23 90:10,13
**pertinent** 23:16
    23:25 24:3
    45:20 47:3
**petechiae** 75:4
    86:25
**pH** 37:25 38:2
**pharmacologist**
    55:17
**pharmacology**
    40:5
**pharmacy** 46:14
**phase** 29:25
**Phenobarbital**
    46:11
**photograph**

20:20 21:13
**photographs**
    21:14 22:8
**photos** 74:19
    75:7
**physical** 22:24
    22:25 37:7,22
    38:5 39:16,19
    56:6 86:19
**physician** 20:4
    39:23
**physicians** 28:23
    31:13,16,19
    85:18,22
**physiology**
    37:13
**pick** 53:18
**picture** 24:1,1
**place** 4:4 37:16
    37:17 51:14
    74:8 94:10
**placed** 69:8
    76:15
**placing** 71:3
**plaintiff** 2:3 4:11
    7:24 11:10,15
    12:12,20 14:15
    15:6 42:23
**Plaintiff's** 12:24
**Plaintiff-1** 3:9
**Plaintiff-3** 3:10
**Plaintiff-4** 3:11
**Plaintiff's** 5:5
    85:11
**plaintiffs** 1:7
    7:19
**plan** 87:10
**please** 4:1 13:2
**plus** 13:11
**point** 8:24 9:2
    45:16 49:25
    70:23 82:19
    83:6 86:24
**police** 10:1,6,9
    10:11 11:13,18
    12:3,19,20
    20:16 27:10,11

27:13,22,24
    29:3,5 44:14
    45:7 46:23
    47:22 48:21
    49:1 64:20,21
    66:25 67:6,10
    78:9,16 81:9
    81:20 82:1
    89:9,12,14,18
    89:18,21 90:18
    91:1,5,9
**Pompano** 47:8
**position** 68:24
    68:25 69:1
    70:22 71:11,13
    71:15,21 73:3
    73:8,12,14,14
    75:10 76:16
    82:16 93:1,10
    93:11
**positional** 70:17
    71:2,21,25
    72:2,5,10,13
    72:16 73:2,7
    74:5
**possible** 20:19
    24:9 38:11
    42:5
**Possibly** 79:12
**post-injection**
    67:24
**postmortem**
    29:16 88:14
**potassium** 38:12
**pouring** 78:7
**practice** 92:21
**pre-injection**
    67:24
**predominant**
    25:25 38:9
**predominantly**
    14:1 25:13
**prehospital** 47:7
    47:14
**preparation**
    13:15
**presence** 33:24

41:14,18 42:5
    42:9,19 52:14
    52:15
**present** 85:21
    87:10
**presented** 24:21
    43:9,20 44:3
**presenting**
    87:14
**pressure** 73:17
    80:4
**presume** 47:15
**pretty** 25:9 27:5
    38:1 44:23
    65:17 66:1
    91:8
**prevalence** 31:7
**prevent** 40:2
    81:15
**previously** 3:9
    3:10,11 5:4
    12:24 24:23
    42:23
**prior** 17:1 26:14
    47:20 48:2
    57:14 68:12,13
    68:22 87:17
    94:3
**private** 6:23
    92:20
**probably** 4:18
    6:22 8:18
    10:18 11:3,11
    12:8 15:2,2
    30:24 33:11,13
    34:10 40:5
    47:20 51:1
    56:8 57:23
    62:22 63:3
**problem** 47:6
**process** 29:18
    37:21 70:11
**processes** 59:14
**produced** 9:3
    31:3
**product** 84:16
**professional** 7:8

**Professor** 93:6,8
**proffering** 45:16
**program** 40:1
**progresses** 37:22
**prolonged** 37:16 58:15
**prone** 71:11,13 71:15 72:15 73:11
**provide** 44:22
**provided** 7:15 10:14 44:1,19 47:18 48:9,10 48:13 63:22,23 63:25 64:3 66:3 87:19,21 91:15
**providers** 45:12
**providing** 84:20
**psychiatric** 25:4 26:2 32:10 47:21 64:2,14 87:23
**psychiatrists** 32:16
**psychological** 46:25 63:21
**psychologist** 33:2,5,6
**psychotic** 24:24 25:16
**psychotropic** 25:10
**public** 1:20 18:10
**publication** 15:16,24 16:12 16:14 20:23,25 85:19,20
**publications** 15:14
**published** 28:24
**pulled** 48:25 49:4 82:15
**pulmonologist** 19:23
**pulse** 57:13 58:4 65:22 66:20,23 68:2,8,12,19 69:10,15 82:17 82:18
**pulseless** 51:10 51:12 58:18,24
**pumping** 59:9
**punched** 75:18
**Purdy** 2:7 9:7
**purpose** 22:21
**purposes** 55:23
**purview** 84:21
**pushed** 73:12
**pushing** 73:17
**put** 31:17 32:3 64:20 68:23 69:19 71:10 73:2 75:9
**putting** 68:14 80:4

**Q**

**quantified** 42:13
**question** 4:21,23 4:25 12:1,5,9 27:8 28:10,20 58:23 80:25 88:21 89:4,5
**questions** 21:10 42:25 91:19,21 91:22
**quick** 12:23
**quite** 7:16 36:2

**R**

**R** 2:1
**radiologist** 60:15
**radiology** 60:12
**range** 54:19,25 55:1,1
**rapidly** 65:19
**rare** 26:18 27:5 51:16 65:17 91:13
**rarely** 89:21
**rarer** 26:3
**rate** 13:6,24 57:2 90:17 91:3
**rational** 27:25 28:1
**reaction** 65:19
**read** 32:12 36:4 68:22 75:22 77:22 78:12 85:18
**readily** 74:11 89:14
**reading** 50:5 54:8 69:3 78:9 78:16
**real** 12:23 47:6
**really** 6:18 15:2 31:23 44:7
**reappeared** 25:12
**reason** 4:20 32:2 34:10 39:16 50:14 53:2 56:13 60:1 61:14 70:14 90:3,8
**reasonable** 62:5
**reasons** 39:2 70:9,12
**recall** 14:23 17:7 21:1 44:5,15 44:21 45:1,2,9 47:11,12 51:24 51:25 52:4 54:5,7 59:16 72:9 75:3,20 75:23 78:9,16 87:4
**received** 64:14 65:11 92:5
**recess** 42:1
**recognize** 29:1
**recognized** 32:8 33:8 34:5,6,15 34:24
**recommend** 81:9
**record** 4:2 41:25 43:3 84:20
**recordings** 44:1 44:6,19,25
**records** 3:14 15:11 19:6 26:13,14 31:2 31:3,20,24 40:24 46:24 47:21,21 49:5 53:23 54:4 60:5,6 63:21 64:2 75:1 79:6 85:7,11,14 87:23 88:23
**recovery** 68:23 69:1 82:16
**refer** 17:1 66:20
**reference** 46:16
**referenced** 85:17
**referencing** 46:17
**referred** 16:4 32:10 69:1
**referring** 60:12 63:5
**reflect** 49:5
**reflected** 84:2
**regard** 69:5
**regardless** 49:12 89:15
**related** 88:15
**relation** 50:18
**relationship** 22:25
**relative** 94:13,15
**relatively** 5:23
**relevant** 24:3
**relied** 43:5,9,10 43:12,21
**rely** 43:21 44:16 60:16 84:16
**relying** 63:20
**remained** 69:7 92:25
**remember** 14:22 17:18,22 26:9 26:21 27:3,5 44:10 69:3
**render** 23:17 24:8
**repeat** 90:21
**rephrase** 4:22 12:6,8
**report** 3:11 6:6 6:8 33:23 41:2 42:18,21,23,25 43:5,6,12,24 45:13,16 47:1 47:8 54:18 62:2 63:22 66:21 78:9,17 84:3
**reported** 25:4
**Reporter** 1:19 3:15 4:1 94:2
**reports** 25:3 46:23,24 47:14 47:23 48:6 49:1 50:5 60:13,17
**represent** 4:11 9:9,10,11,13 12:11
**representing** 9:15 10:11,23 11:6
**request** 6:8 47:17 48:5,8,9 48:11
**requested** 47:20
**requests** 47:19
**require** 6:9 14:6
**required** 19:1 25:2 37:3
**researching** 36:2
**residency** 92:8 92:14
**residual** 51:13
**resigned** 93:10
**respiration** 57:11 65:22 71:12

**respirator** 56:16
**respiratory** 54:1 54:6,9 55:20 56:3,5 57:2,4 57:14,21 65:12 68:13 80:8 82:21 87:1
**respond** 89:18
**responding** 51:15
**response** 89:17
**responsibility** 23:15
**responsive** 83:7
**rest** 49:3
**restrained** 25:23 29:18 38:4 50:23,24 70:4
**restraining** 89:22
**restraints** 25:2 81:10
**result** 26:20 51:4 67:10 72:17
**resulted** 62:6
**resulting** 38:20
**results** 38:17 51:1
**resuscitate** 62:19
**retained** 3:15 17:12
**retainer** 8:21,22
**retired** 93:11
**retirement** 8:7
**reveal** 36:8,16 52:13,15
**review** 23:16
**reviewed** 14:15 43:1,5 55:3 79:7
**reviewing** 14:1 83:25
**rhythm** 51:4
**rib** 74:16
**right** 7:14 17:7 22:2 24:5 34:19 42:23 50:12 78:18 79:22 82:9 84:25 91:18 93:21
**risk** 56:5,17,24 61:6,20
**Robinson** 1:10 2:7
**role** 22:5,23
**room** 31:13,19 81:24 90:9
**ROSARIO** 1:12
**rule** 84:22 90:23
**ruled** 26:6
**rules** 4:19
**ruptured** 74:10

**S**

**s** 2:1 24:4
**salts** 46:5
**sample** 28:21
**saw** 39:3 62:17 65:24 68:4,6 72:8
**saying** 28:11 34:1
**scalp** 60:22
**SCAROLA** 2:3
**scenario** 27:10
**scene** 27:12,13
**schedule** 3:10 12:22,23 13:2 13:4
**schizophrenia** 26:2 53:13
**schizophrenic** 64:12
**school** 55:18 92:6,9 93:7
**Science** 92:4
**Sciences** 93:3
**screen** 41:20 46:7
**screening** 40:24 41:17 46:3,15 46:25 53:17 63:22 78:21
**screens** 18:18 46:6
**se** 40:17
**SEARCY** 2:3
**secondary** 33:12 33:14,24 34:12 35:4,6,8 61:17 63:3 76:13 88:11
**secreted** 39:15
**section** 32:13
**Security** 8:7
**sedative** 70:21 72:14
**see** 7:15 13:4 15:13 31:2,11 31:13 40:23 42:5 45:5 53:22 59:10,15 61:24 65:12 67:5,14 72:9 74:9,11,14,19 75:20 79:5 82:18 87:2,18
**seeing** 28:21 59:16,19
**seen** 26:18 27:21 31:24,24 38:19 46:8 47:15 51:22,24 52:1 52:17 55:1 58:8 64:10,16 78:2,6 81:19 81:23,25 82:4 83:8,12 88:9 91:10
**seizure** 40:17,17
**seizures** 40:11
**sense** 35:5,9 56:11
**September** 1:17 92:24
**series** 24:22
**served** 92:17
**services** 8:11 14:11
**set** 28:13 94:10
**setting** 20:7
**severe** 58:14 61:15
**sheriff** 1:11 2:7 9:11,15
**Sheriff's** 9:22
**SHIPLEY** 2:3
**shooting** 12:19 30:13,17
**shoots** 30:12
**short** 38:14 74:1
**shortly** 91:9
**shot** 82:6
**shoulders** 78:11
**show** 45:1 46:6 91:9
**showed** 68:9 75:8
**showing** 71:10
**shows** 41:17 60:8
**shunts** 39:18
**side** 78:18 82:15
**sign** 62:7
**signals** 51:14
**significant** 47:6 47:11 70:3 76:24 80:15 86:20 87:19 91:4
**signs** 24:25 25:22 27:14 29:22 50:11,22 50:25 62:18 65:3,9 67:1,8 67:22 68:8 69:6,21 70:4,8 70:15 86:16 91:16
**similar** 28:14 90:25
**simply** 30:24 53:17
**sit** 5:11 8:2 65:5 67:2
**situation** 28:12
**situations** 30:1,5 90:24
**skeletal** 38:15
**skin** 39:17
**skull** 61:16
**small** 5:23
**smallpox** 18:10
**smoking** 35:8
**social** 8:7 18:22
**solely** 63:21
**somebody** 20:10 20:15 36:12,15 78:19 81:10 82:1
**someone's** 22:5 24:4 77:24
**somewhat** 39:13
**soon** 65:25
**sorry** 16:7 38:24 53:10 58:22 79:21,21 90:21
**Sounds** 5:3
**SOUTHERN** 1:1
**span** 27:19
**special** 1:14
**specific** 73:7 79:16
**specimens** 18:24
**speculative** 21:22
**spend** 13:22
**spent** 43:15
**spitting** 77:20
**spontaneously** 33:17
**St** 1:12,13 9:21 40:24 92:6,7
**stamina** 25:1,20
**standard** 49:16
**start** 37:24
**state** 1:19,19 4:1 17:21 25:17 26:24 27:2 31:5 33:1 38:21,25 51:17 62:8,15,17,20

66:8 67:9 79:2 79:20 81:22 83:5 90:7 93:9 94:3
**stated** 82:12
**statement** 22:7 36:6 48:20 85:20,21 86:2
**statements** 21:11 43:25 44:3,6,10,13 44:14,17
**states** 1:1 26:19 89:13,15 92:18
**Statistical** 32:9
**status** 5:14 57:4 57:14,21
**stenographica...** 94:9
**Sterba** 48:6
**stimulant** 25:14 26:1 29:9 52:7 52:24 53:15 63:8,15
**stimulants** 52:11 53:4
**stimulation** 51:14
**stomach** 71:17 71:19 82:19 83:6
**Stony** 93:10
**stop** 38:8 39:21 40:1 58:15
**stops** 40:4
**story** 64:1
**strength** 25:1,20 48:17,19
**strenuous** 37:22 38:5 39:15,19
**stress** 68:13
**stretcher** 69:9 69:20
**strike** 8:1 11:6 19:15 23:19 28:12,14 36:14 40:9 45:4,10 52:22 57:18 67:20 78:13,17 91:1
**strikes** 78:10
**struck** 75:21
**struggle** 37:16 37:17 38:21 39:1 56:7 90:6 90:25
**studies** 71:10
**stuporous** 32:23
**subdural** 60:9 61:15
**Submit** 18:24
**subsequently** 92:10
**substantial** 76:1
**succumbing** 66:7
**sudden** 16:16 22:22 38:4 50:21,24 57:10 62:6 67:1,7,19 67:22 68:1,1 69:5,12 70:7
**suddenly** 18:7 25:3,22 28:2
**suffer** 30:2 88:6 88:14 91:4,6
**suffered** 66:16 81:20
**suffering** 6:5 56:15 61:6 63:20 64:4 80:8 81:16 87:5 88:19
**suffers** 61:21
**sufficient** 36:9 36:17 40:13,15
**Suffolk** 93:3
**suggests** 55:5
**Suite** 2:8,11
**summary** 46:13 46:21 47:8
**summation** 23:10
**SUMMER** 2:9
**Sunrise** 2:8
**support** 65:3
**supports** 60:6
**suppose** 54:3 78:6
**suppress** 80:9,16
**sure** 9:13 12:4 13:13 18:20 19:7 23:2 28:10 30:6 35:23 40:5 42:17 58:15,20 66:9 81:7 83:8 88:21 90:22 92:3
**surge** 38:6 40:2 51:1
**surprising** 48:17 48:19
**surveillance** 45:6
**survive** 31:14 38:14
**survived** 26:16
**suspicion** 18:8,9
**sustain** 60:2
**sustained** 16:5
**switch** 83:16
**sworn** 4:7 94:5
**symptoms** 24:25 86:16
**syndromal** 29:12
**syndrome** 25:9 29:12 40:19
**synthetic** 46:4 52:18 53:20 63:10
**system** 53:4 54:9 77:6,10 80:10 82:21 89:13
**systems** 38:1

**T**

**tachycardia** 58:21,23
**take** 4:20 12:25 18:21 23:24 30:10 38:24 74:8 81:11,11 91:10
**taken** 4:14,17 29:19 42:1 46:14 72:9 94:9
**takes** 37:16,17
**talk** 17:5 34:22 90:12
**talked** 51:2
**talking** 34:17
**taser** 16:5,10
**task** 23:21
**Tavares** 1:4 2:3 4:11 19:4 31:1 45:1,7 46:17 48:16,18 50:6 51:17 53:19,22 54:1 59:17 62:5 64:19 65:9 75:21 77:19 78:22 86:18 87:3 91:15
**Tavares's** 50:10 67:5 73:11 74:19 76:1
**Telephone** 14:4
**tell** 5:13 7:17,21 9:5 12:25 14:9 14:14,17 18:2 24:17 36:5 37:15 39:23,24 40:4,6 42:10 43:3,14 44:3 54:21 63:7 70:11,19 81:24 92:1
**telling** 73:22
**temperatures** 25:21
**ten** 6:23
**tend** 31:13 91:7
**term** 28:17 32:14,15,18,20 32:21 50:18 70:16
**terminal** 18:22 51:4
**terms** 42:25
**test** 46:3 52:13 53:17 85:25
**tested** 41:3 52:20
**testified** 4:7 7:19 10:17
**testify** 17:17 23:12 94:5
**testifying** 10:13 16:17 17:9
**testimony** 6:14 7:15 43:21 49:1 54:5 68:22 69:6 82:12 87:14 91:25 94:8
**testing** 18:25 19:1 52:14 53:16
**textbook** 40:5
**thank** 12:7 91:19 93:21,23
**That's** 8:25 13:19
**THC** 41:14 42:5 42:7,9,11,15
**theory** 36:12 71:7 72:23
**therapeutic** 18:11
**thing** 8:8 13:22 61:24 89:23
**things** 14:4 15:11 19:2 30:8 34:22 35:8,9,12,25 38:7,8 61:3 76:23
**think** 20:3 40:22 41:23 51:21 58:5 60:10,10 66:6 67:19

68:23 71:18 76:10 78:2,5 80:15 81:3 84:23 86:11
**Thorazine** 25:11
**thorough** 25:7
**thoroughly** 23:16 72:23
**threat** 18:10
**three** 6:22 13:10 38:17 92:19
**throat** 77:24 80:2,5
**tied** 13:20
**time** 1:18 4:16 6:11,19 7:1 9:14 13:14 14:9,14,18,22 15:15 16:11,25 17:11 27:9,12 27:13,19 28:4 31:25 38:14 42:7 43:15 44:9 45:16 48:8 53:25 62:16 64:23,25 65:1,14,23 66:15 67:11,11 73:16 88:18 92:16 94:9
**times** 6:2,22 9:24 10:4,12 11:5,17 12:13 15:3,10 25:5 55:2 90:22
**tissues** 18:17,24
**title** 15:20
**today** 5:11 8:2 13:8 25:25 43:22 52:6 65:5 67:2 84:23 87:9
**told** 14:13 16:25 81:25
**tolerance** 49:12 49:13
**topic** 16:1,3,12 28:24 35:21,24
**total** 67:23
**toxicological** 22:14 53:16
**toxicologist** 19:17,18 52:14 55:13
**toxicology** 18:17 18:25 40:24 41:17 42:18,21 45:24,25 46:15 52:13
**track** 10:3,12 12:17
**trained** 80:21 81:4
**training** 19:14 19:17,19,22,25 33:4 55:16
**transcript** 94:8
**transient** 25:16
**translated** 18:6
**trauma** 16:10 36:9,17 58:18 60:19,20 61:5 61:19 75:25,25 76:15,15
**traumatic** 15:21 39:2
**travel** 14:5,6
**treadmill** 39:24
**treat** 29:1
**treatment** 62:7 62:14 91:15
**trial** 6:10 16:19 17:5,9 87:10 87:14,17 91:25
**trials** 10:18
**trigger** 40:16
**true** 29:15 31:7 32:7,12 41:2 50:5 52:16 59:13 86:9,13 94:8
**truth** 23:9 94:5 94:6,6
**truthful** 5:1
**try** 62:19 73:17
**Tucker** 48:6
**turn** 12:22
**twice** 11:11
**two** 10:17,19 11:12 14:7,24 49:16 53:12
**TYK** 2:12 21:19 36:24 54:15 55:7 56:20 57:6,22 58:6 59:22 66:10 68:5,16 69:17 72:1,21 73:5 73:25 75:14 76:5,21 77:12 78:4 80:12,23 81:6 82:24 83:10 88:8 91:22
**type** 5:25 8:7 13:22 29:9 45:23 56:16 70:21 72:14
**typewritten** 83:24
**typical** 65:15,15 66:2 68:10 70:5
**typically** 83:4 88:18

**U**

**U.S** 29:7
**ultimate** 62:3 76:3,19
**ultimately** 66:7 90:8
**unavailable** 91:24
**understand** 4:22 12:1 19:7 28:10 58:22 88:21
**understanding** 62:24 69:18
**understood** 4:24
**undertreated** 33:19
**undiagnosed** 64:5
**unexpectedly** 18:7 25:22
**Unfortunately** 39:20
**unique** 28:9
**United** 1:1 89:13 89:15 92:18
**University** 92:4 92:6,9 93:7,9
**unknown** 29:13 63:3
**unnatural** 18:9 22:22
**unreliable** 24:9
**untreated** 33:18
**unusual** 14:17 14:23 91:8
**up-to-date** 13:1 13:3
**updated** 5:7 45:16
**upper** 70:23
**use** 19:2,2 25:2 25:13 32:14 70:11 81:10
**useful** 44:22
**usual** 27:10 54:23 89:17 90:2
**usually** 12:2 26:12 29:22,25 30:6 33:23 40:12 46:6 70:20 77:14,15 77:16 81:8 82:5 88:17,17 89:10 91:8
**utilized** 78:10

**V**

**V** 94:4
**various** 8:20 14:1
**vegetative** 26:19 26:24 27:2 31:5 38:20 51:17 62:8,14 62:20 66:8 81:22 90:7
**ventricular** 58:21,23 59:3
**verbal** 6:8 83:7
**versus** 7:19 20:17
**vessels** 39:17
**victim** 22:11 27:2
**victims** 31:8,9
**video** 1:7 43:18 44:1,6,19,25 67:5,14 72:8 75:20,23
**videos** 45:5 59:17,19
**Vincent** 35:18
**violence** 24:25
**violent** 25:19 27:23 28:2 68:18 83:14 89:16
**vital** 25:21 27:14 50:10,22,25 62:7,18 65:3,9 67:1,7,22 68:8 69:5,21 70:4,8 70:15 91:16
**vs** 1:8

**W**

**WADE** 1:11
**wait** 17:14
**waited** 62:21
**walked** 82:2
**wall** 72:19 73:16 73:18 74:15,16
**want** 6:6 20:16 34:20,22 41:21 84:5,14
**wanted** 47:23
**wasn't** 16:2

47:11 52:20 63:25 65:25 67:17
**waste** 44:9
**way** 14:21 61:2 65:18 72:3 75:10
**we'll** 7:17 84:25
**We're** 41:19 85:10
**Weapon** 15:22
**week** 4:18,18
**went** 26:15 54:1
**weren't** 44:7 52:2
**West** 2:4
**Westchester** 13:21
**Wetli** 1:8 3:3 4:3 4:5 91:21 94:5
**Wetli's** 3:9
**white** 28:24 31:17 85:16
**wife** 35:19,25
**willing** 64:20
**wind** 6:12,13
**witness** 3:2 4:3,6 11:22 23:12 24:13 30:16 31:23 35:14 36:22,25 54:14 54:16 55:9 56:21 57:7,23 58:7 59:23 61:11,23 63:13 64:9 66:11 68:4,6,17 69:18 71:6,24 72:2,22 73:6 74:1 75:1,15 76:6,22 77:13 78:2,5 80:13 80:24 81:7 82:25 83:12 88:9 90:12 92:3 93:17,23
**witnesses** 44:14
**words** 14:18
**work** 5:15,18,21 5:23,24 6:1,16 6:20 7:10 8:3,5 8:20,23 9:1 14:19 36:2 55:25 84:15 93:13
**worked** 92:15
**World** 33:9 34:2
**worms** 59:9
**worst** 60:10
**wouldn't** 10:9 33:11 58:5 80:15 82:25 88:1
**wound** 20:17 30:16,25
**write** 31:19
**written** 6:6,8 35:24
**wrongful** 11:2 11:16 12:13 14:20
**wrote** 36:5

**X**

**Y**

**yeah** 14:25 78:7 89:5
**year** 8:1 11:12 14:25 15:1,3 92:20
**years** 6:23 7:2 7:18 9:25 10:5 14:12,24 17:19 17:19 25:6 26:22 28:17,23 46:9 92:19
**yell** 35:14
**York** 1:19 93:3 93:8,9,12

**Z**

**zero** 58:11,12 65:22

**0**

**008** 49:22
**038** 46:16 49:9 50:2

**1**

**1** 5:5 54:24 55:6 78:22
**1:04** 93:25
**10** 17:19
**10:00** 43:18
**10:13** 1:18
**100** 8:5
**11:25** 42:1
**11:49** 42:2
**111** 2:11
**1200** 2:11
**1216** 2:8
**123** 16:14
**125** 15:20
**15** 27:14
**150** 25:6
**15th** 47:8
**17** 43:4
**1849** 24:21 25:3
**1950s** 25:10
**1970s** 25:12
**1977** 92:24
**1980s** 25:12
**1995** 93:1
**1st** 47:1

**2**

**2** 4:3 50:16 52:5
**2:16cv14413** 1:2
**20** 28:17
**2006** 93:12
**2012** 47:1 78:22
**2014** 47:9
**2017** 1:17 5:6 10:14 43:4
**21** 1:17
**2139** 2:4
**2455** 2:8
**25th** 10:14
**26b4C** 84:22
**27** 5:6

**3**

**3** 12:24 55:19
**3,500** 8:14,21
**3,750** 13:6,11,18 13:19
**30X100238000** 94:22
**32801** 2:12
**33304** 2:8
**33409** 2:4
**35** 8:22

**4**

**4** 3:4 42:24 54:19,24 57:3 58:3 65:8 76:17 77:2
**40** 7:24

**5**

**5** 39:24 84:6
**500** 13:11,16

**6**

**6** 39:25 85:1
**6:47** 66:20
**60** 7:23

**7**

**7** 85:11

**8**

**8,500** 8:18
**8:30** 43:17
**80** 41:21
**84** 3:12
**85** 3:13,14
**8500** 8:23

**9**

**911** 89:17