UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 2:16cv14413

TAVARES DOCHER, by and through JANICE DOCHER-NEELEY, his mother and legal guardian,

Plaintiff,

-vs-

CHRISTOPHER NEWMAN, individually, CLAYTON MANGRUM, individually, CALVIN ROBINSON,individually, WADE COURTEMANCHE, individually, KEN J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, JOSE ROSARIO, individually, and the ST. LUCIE COUNTY FIRE DISTRICT, an independent special district

Defendants.
__________________________________/

DEPOSITION OF CAPTAIN BRIAN GONZALEZ

May 22, 2017
9:58 a.m. - 12:24 p.m.

5160 N.W. Milner Drive,
Port St. Lucie, Florida, 34980

Stenographically Reported By:
Barbara J. Shandell, RPR, FPR
Notary Public, State of Florida

APPEARANCES:

On behalf of the Plaintiffs:

SEARCY, DENNEY, SCAROLA, BARNHART & SHIPLEY, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
(561) 686-6300
ash@searcylaw.com
BY: ADAM HECHT, ESQ.

On behalf of the Defendant Port St. Lucie Fire Rescue:

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
111 North Orange Avenue
Suite 1200
Orlando, Florida 32801
(407) 648-1376
ben.newman@wilsonelser.com
BY: BENJAMIN W. NEWMAN, ESQ.

On behalf of the Defendant Ken Mascara:

PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
2455 East Sunrise Boulevard
Suite 1216
Fort Lauderdale, Florida 33304
(954) 462-3861
greg@purdylaw.com
BY: GREGORY J. JOLLY, ESQ.

ALSO PRESENT: KIM SABOL, ESQ.

\- - -

INDEX OF PROCEEDINGS


| WITNESS: | PAGE |
|---|---|
| CAPTAIN BRIAN GONZALEZ | |
| Direct Examination By Mr. Hecht | 4 |
| Cross Examination By Mr. Newman | 88 |
| Certificate of Oath | 91 |
| Certificate of Reporter | 92 |
| Read & Sign Letter to Witness | 93 |
| Errata Sheet | 94 |


PLAINTIFF'S EXHIBITS


| NUMBER | | PAGE |
|---|---|---|
| No. 1 | Notice of taking deposition duces tecum | 35 |
| No. 2 | Guidelines regarding the administration of Ativan | 38 |
| No. 3 | Emergency medical guidelines | 42 |
| No. 4 | Entire file brought by Captain Brian Gonzalez | 89 |
| | | 90 |

The following proceedings began at 9:58 a.m.:

THE COURT REPORTER: Would you raise your right hand please.

Do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

Thereupon,

CAPTAIN BRIAN GONZALEZ,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HECHT:

**Q. Good morning, sir.**

A. Good morning.

**Q. My name is Adam Hecht. I represent Tavares Docher. Today we're here to take your deposition in this matter.**

**Could you please state your full name.**

A. Brian Gonzalez.

**Q. What's your date of birth?**

A.

**Q. Where are you currently employed?**

A. St. Lucie County Fire District.

**Q. How long have you been an employee there?**

A. Since 18 years now.

**Q. Currently what is your position?**

A. Captain of the training and safety division.

**Q. How long have you held that position for?**

A. As a captain, since October 25th.

**Q. Of what year?**

A. 2016.

**Q. Explain for me what are your responsibilities and your role as the captain of training and safety division.**

A. I am in charge of all training and safety issues when it comes to the St. Lucie County Fire District.

**Q. When you say the St. Lucie County Fire District, does that include paramedics, EMS, firefighters?**

A. Yes.

**Q. Is there anyone else that you oversee the training and safety issues for besides EMS, paramedics and firefighters?**

A. On nonuniformed employees, I do deal with some of their training also.

**Q. What's your involvement with the**

**nonuniformed employees?**

A. If I have to assign like back training or that type of stuff, like non-EMS type training, we also include the non-uniformed personnel.

**Q. Since October 25, 2016, have you implemented any policies, procedures, rules or regulations as it pertains to the training and safety issues of paramedics that work at the St. Lucie County Fire District?**

A. We have updated the guidelines, EMS guidelines.

**Q. When you say that you updated EMS guidelines, what does that mean?**

A. We have an EMS Guideline Committee. The EMS guidelines are a live document. As they need updated, we make the recommendation up the chain of command.

**Q. Who is made up of the EMS Guideline Committee?**

A. It's a group of personnel throughout the district.

**Q. How many people make up that committee?**

A. I am not sure.

**Q. Can you name the people that make up that committee?**

A. I don't have their names on me.

**Q. Can you name any of the people that make up that committee?**

A. I can tell you who the chair of the committee is, which is Flight Paramedic Matt Nielson.

**Q. Anyone else you can name beside Mr. Nielson?**

A. Mr. Nielson is in charge of the group of personnel on that committee, so unless I can get into a list, I would be guessing.

**Q. Are you on that committee?**

A. I oversee the committee.

**Q. When you say you oversee the committee, what does that mean?**

A. I sit on it and make sure they are making recommendations that are within the scope of practice.

**Q. Does the committee vote on what needs to be updated in the EMS guidelines for the St. Lucie County Fire District?**

A. They review the guidelines, make recommendations within the committee for those updates and they get recommendations from a person in the field to look into and then they make those recommendations and they go up the chain of command.

**Q. When you say once they make those**

**recommendations and they go up the chain of command -- strike that.**

**When you say they review the guidelines and make recommendations and they go up the chain of command, who makes up that chain of command?**

A. Those guidelines will go to me as part of the training safety. We send it up to the training chief. If everybody agrees, it gets sent to the medical director to make the final decision on whether it gets implemented.

**Q. Who's the training chief?**

A. At this time it is Chief Jennifer Chambers.

**Q. Who's the medical director?**

A. Chi Chiou Liu.

**Q. Are you able to tell me as you sit here today, since you've come on as the captain of Training and Safety Division on October 25, 2016, what in the EMS guidelines have been updated?**

A. Not off memory.

**Q. But have there been updates in the St. Lucie County Fire District EMS Guidelines since you took office on October 25, 2016?**

A. Yes.

**Q. Are you able to tell me any updates as you**

**sit here today or is that simply not possible for you to do?**

A. Not off memory.

**Q. Have there been any updates since you've taken the position of the captain of Training and Safety Division on October 25, 2016, involving the administration of sedatives to patients by paramedics?**

A. I would have to look at our training files to give you a definite answer.

**Q. Are your training files located in this building?**

A. Yes.

**Q. Do you have them with you today?**

A. No, sir.

**Q. Are you able to get them today?**

A. If you gave me time, I would be able to get that information.

**Q. Maybe when we take a break, I'd like to have you get the updates that have been instituted by the committee and you since you've taken office regarding the administration of Ativan; is that something you could easily do today?**

A. Do you want a specific protocol?

**Q. I would like any updates that have been added, amended, instituted, changed, to the medical**

**guidelines since you've taken office regarding the administration of Ativan?**

A. I can get you a summary of changes. If you want each specific guideline that has to do with Ativan, it's going to require a little bit of research, a little bit more time.

**Q. So maybe that's something that I can request from your attorney if that's going to take too much time today.**

**As you sit here today, are you able to tell me how many changes have been made since you've taken office regarding the administration of Ativan?**

A. No, sir. Not without doing the research.

**Q. As you sit here right now, are you able to tell me -- strike that.**

**Backing up a little bit, what was your position on May 11, 2014, at the St. Lucie County Fire District?**

A. Was that the date of the incident?

**Q. Yes.**

A. I was a station officer, lieutenant station officer, station three.

**Q. Tell me what a station officer at station three, when you were a lieutenant, did as part of the St. Lucie County Fire District?**

A. I oversaw all the daily operations for that station.

**Q. Were you involved at that time in instituting, modifying, altering, creating, any policies and procedures as it relates to the administration of Ativan for paramedics that work at the Port St. Lucie Fire District?**

A. I was part of the EMS Guideline Committee.

**Q. So on May 11, 2014, you were part of the EMS Guideline Committee and currently as you sit here today, you oversee the committee, correct?**

A. That's correct.

**Q. So is it actually considered a more involved role now that you have the committee versus back in May of 2014?**

A. It's a different job.

**Q. How does being just a part of the EMS Guideline Committee differ than being, as you said, the person who oversees the committee?**

A. Being part of the EMS Guideline Committees you are involved in making recommendations and doing research on what's new and upcoming. Overseeing the committee, I take those recommendations, give my opinion, and move it up the chain of command.

**Q. Currently if you disagree with the**

**committee, can you strike down any recommendation that the committee makes prior to you taking it up the chain of command?**

A. I go back to the committee and we have a discussion and as a group we either alter the recommendation or we keep it as is, depending on who -- on the discussion.

**Q. In May of 2014, who was it that oversaw the committee?**

A. I am not sure.

**Q. Was there someone that oversaw the committee in May of 2014?**

A. I am not sure.

**Q. You were part of the committee in May of 2014, correct?**

A. Yes.

**Q. So explain to me the makeup of the committee?**

A. You had members of the committee and then there was a chair. As far as the chain of command above that, I'm not sure who the chair reported to.

**Q. Who was the chair?**

A. Mark Cristaldi.

**Q. Was Mark Cristaldi a paramedic/firefighter?**

A. I know he was an officer, but what rank at that time, I'm not sure.

**Q. Does Mark Cristaldi still work at the St. Lucie County Fire District?**

A. Yes.

**Q. What is his position today?**

A. He's a station officer.

**Q. Was Mark Cristaldi the chair prior to you becoming the chair?**

A. We co-chaired it for awhile.

**Q. What were the dates that you co-chaired the committee?**

A. I'm not 100 percent sure. I couldn't tell you.

**Q. Why is it that Mark Cristaldi no longer continued to co-chair the committee with you?**

A. It is a volunteer position that you volunteer. It is not an assignment and he did it for awhile and I cannot answer that question for him.

**Q. Currently where is your office located?**

A. Here in the administrative building.

**Q. What's the address? Where are we?**

A. I have to look. 5160 Northwest Milner Drive, Port St. Lucie, Florida, 34983.

**Q. Is this where you come to work every day?**

A. Yes, sir.

**Q. Tell me what a typical day is like for you.**

A. There is no typical day. It's what hits -- whatever we get hit with whenever we come in.

**Q. Well, you are the captain of training in the safety division, correct?**

A. Correct.

**Q. Do you actually respond to any calls?**

A. I do not get dispatched to any calls.

**Q. Does your day involve staying in this building?**

A. Sometimes.

**Q. And then when you're not in this building, where are you?**

A. At the stations.

**Q. And at the station, is that where you perform training?**

A. Sometimes.

**Q. And where else would you perform training?**

A. In this building.

**Q. So if you're not in the station and you're not in this building, where else would you perform training?**

A. At the college.

**Q. Do you teach?**

A. Are you asking do I teach aside from being with St. Lucie County Fire District?

**Q. Yes.**

A. Yes, I do.

**Q. Where you do teach?**

A. Indian River State College.

**Q. What do you do teach there?**

A. At this moment I teach EMT lab.

**Q. What is EMT lab?**

A. Emergency medical technician. I teach their lab, their hands-on skills.

**Q. My understanding from speaking to Paramedic Rosario, that there's a difference between EMTs and paramedics, correct?**

A. Correct.

**Q. EMTs do not administer any medication, correct?**

A. EMTs administer very few medications.

**Q. What medication --**

A. They can assist -- I'm sorry, they can assist with very few medications.

**Q. But paramedics have the discretion to administer medications to patients out in the field, correct?**

A. Yes.

**Q. Do you currently have any involvement in training paramedics?**

A. Yes.

**Q. What does that consist of?**

A. I ensure that all paramedics meet the required CEUs to maintain their State of Florida certificate, and I also run the apprenticeship program.

**Q. What's the apprenticeship program?**

A. Paramedic apprenticeship program. Before any paramedic gets released into the field as a primary paramedic, they have to go through an apprenticeship program and pass the apprenticeship program.

**Q. How long does the apprenticeship program last for?**

A. It could be anywhere from three months to a year.

**Q. Is that field work or classroom work?**

A. Both.

**Q. You said you run it, so what does that mean? Do you actually teach anything?**

A. No. I maintain their paperwork and ensure they pass all their tests and keep track of their

progress prior to allowing them to have a release interview with myself and Dr. Chi Chiou Liu.

**Q. In your role as the captain of training in the safety division, explain to me the difference between what it is that you do on the training side versus the safety side.**

A. They're all one.

**Q. So just tell me, what does it mean when you say you're the captain of training in the safety division?**

A. Safety division is part of safety. At the end of the day, we have to make sure we keep ourselves safe and there is -- whether it's back training, scene safety training to ensure that we are kept safe, and it's training. It's all one.

**Q. And in addition to keeping the paramedics and the EMTs safe, is it also part of your responsibility to ensure that the employees, the paramedics and the EMTs keep the patient safe?**

A. Are you asking me have we done any training on that?

**Q. I'm asking you as part of your responsibilities as the captain of training and safety division, is it part of your responsibility to train the paramedics and EMTs how to keep patients in the**

**field safe?**

A. We don't have any training modules, but it is -- what's discussed during their training here with -- during apprenticeship program and during their training to receive their license.

**Q. Are you involved in the training of EMTs or paramedics?**

A. Yes.

**Q. Tell me how it is that paramedics specifically are trained at the St. Lucie County Fire District?**

A. We try to hit every possible aspect of training. There's a hands-on component that we make sure they have hands-on training, whether it's in the field or here at admin.

There is educational, which we do through a program that we have that's called target solutions, that we send out training modules that they have to do on their own, and so that way we can hit both hands-on and educational.

**Q. And you spoke about this target solution training manual, what is that?**

A. It's a training module, it's a software. That's the software that we use to get training out to personnel at once.

**Q. And as part of that training module, is there any training contained within that module relating to the administration of Ativan?**

A. I would have to look back at the training. That reverts back to your prior question that you asked me, has there been any changes. If there are changes, then there was training.

MR. NEWMAN: I just want to make sure I'm clear on the question, you mean specifically with regard to the target solutions?

MR. HECHT: Yes.

MR. NEWMAN: Did you understand that's what he asked?

THE WITNESS: Yes.

BY MR. HECHT:

**Q. Let me just make sure that I'm clear, as part of the training that paramedics undergo, you said that there's hands-on training and there's educational training, correct?**

A. Correct.

**Q. And this hands-on educational training, does this last for a period of one year?**

A. They are not in their apprenticeship program. This is anything new or any updates that we

have to do, we ensure that 100 percent of our personnel get the training before we make any type of implementation.

**Q. So am I correct that as part of your role as the chair of the EMS Guideline Committee, if there's any changes or updates to the medical guidelines, then the paramedics have to go through hands-on as well as educational training, correct?**

A. The EMS Guideline Committee, their sole job is to make recommendations. They do not implement anything, they make recommendations. It goes up the chain of command, whether those recommendations get implemented or not.

**Q. And once the committee goes up the chain of command, it's up to the doctor and the training chief whether those recommendations are implemented, correct?**

A. At the end of the day, Dr. Liu makes the final decision.

**Q. And if Dr. Liu approves the recommendation, is it correct that all of the paramedics will go through both hands-on and educational training as it was relates to those updates?**

A. Depending on the type of training. Some

training modules require hands-on only, some require only educational. Some require both.

**Q. So my question for you is, have there been, since the time that you have been the chair of the EMS Guideline Committee, any updates regarding the administration of Ativan that paramedics have had to learn in the target solution training module?**

A. It goes back to the way I answered your past question, I would have to look and see what training we have implemented since I've been in training. I can give you that summary of changes, but not at this time.

**Q. Now my understanding is that when someone wants to become a paramedic, they have to first be trained as an EMT, correct?**

A. That's correct.

**Q. Once someone is an EMT, how long is the process by which they have to go through in order to become a paramedic?**

A. According to the State of Florida, you can enter the paramedic program once you have an EMT certificate.

**Q. Does the St. Lucie County Fire District have any sort of training program that EMTs have to go through in order to become a paramedic at the**

**St. Lucie Fire District?**

A. It is called the apprenticeship program. If you are -- Let me back up. Depends if you get hired on as a paramedic or hired on as an EMT.

**Q. If you get hired on as a paramedic, do you go through the apprenticeship program?**

A. If you get hired on as a paramedic, you still -- even though you're a state certified paramedic, you still have to go through St. Lucie County Fire District Paramedic Apprenticeship Program.

**Q. How long does that apprenticeship program last for?**

A. As I said earlier, three months to a year.

**Q. In May of 2014, what role did you have in the apprenticeship program?**

A. I did not.

**Q. So you did not in any way have any sort of involvement with teaching, training, educating individuals going through the apprenticeship program in May of 2014?**

A. I was a station officer. So my answer is no.

**Q. Where did you go to high school?**

A. Vero Beach High School.

**Q. And after high school did you go on to any**

**further education?**

A. Went to IRSC.

**Q. That stands for what?**

A. Indian River -- at the time it was Indian River Community College. At the time it was IRCC, Indian River Community College.

**Q. Is that a two-year or four-year program?**

A. Well, two-year program. That's also where I went to paramedic school, EMT school and fire school.

**Q. So it's a two-year program, and what did you graduate with?**

A. My Associate's in Science at that time, from IRSC.

**Q. And then after graduating with an Associate's in Science, what did you do?**

A. During that time, that was part of my paramedic/EMT/fire.

**Q. During the two-year program that you were at Indian River Community College --**

A. Yes.

**Q. -- you received your EMT license?**

A. Yes.

**Q. You received your paramedic license?**

A. Yes.

**Q. What was the third thing you said?**

A. My fire standards.

**Q. So after obtaining those licenses, what did you do?**

A. You're mixing everything together. Things didn't happen one after the other. I went to IRSC, got my EMT fire, hired on with several departments, ended up getting hired on here, and then I went to paramedic school.

**Q. Let's just go in order. At Indian River Community College, it was a two-year program, graduated with your Associate's in Science, correct?**

A. No. I started attending IRCC.

**Q. You attended IRCC?**

A. Yes.

**Q. While attending, what did you study?**

A. Went to core classes, EMT and fire.

**Q. And you got your license in EMT and fire?**

A. Yes.

**Q. After that?**

A. I got hired on.

**Q. By who?**

A. City of Winter Haven.

**Q. What did you do for the City of Winter Haven?**

A. Firefighter/EMT.

**Q. How long did you work there for?**

A. Approximately a year.

**Q. Where did you go after that?**

A. Brevard County Fire Rescue.

**Q. How long did you work there for?**

A. Approximately a year.

**Q. What did you do for Brevard County?**

A. Firefighter/EMT.

**Q. After Brevard?**

A. Got hired on with St. Lucie County Fire District.

**Q. What year did you start working at the St. Lucie County Fire District?**

A. July 7, 2000.

**Q. What was your position at that time?**

A. Firefighter/EMT.

**Q. When did you get your paramedic license?**

A. Shortly after.

**Q. What year?**

A. I would have to look at my records.

**Q. Shortly after 2000, though?**

A. Yes.

**Q. Were you a part of the apprenticeship program?**

A. Once I became a state certified paramedic, at that time I went through the apprenticeship program.

**Q. Tell me what the apprenticeship program consisted of when you went through it.**

A. It's a list of tests. You had to take tests. You had to review your guidelines, you have to sit in front of a panel, hands-on skills, and also so many -- certain amount of interventions in the field while being supervised.

**Q. How long did your apprenticeship program last for?**

A. I would have to go back in my records to find out how long I was in the program.

**Q. You don't know if it was three months or a year?**

A. It was somewhere between three months and a year.

**Q. And has the apprenticeship program changed at all from the time you went through it --**

A. Yes.

**Q. -- to the present day?**

A. Yes.

**Q. How has it changed?**

A. It has just been cleaned up.

**Q. When you say cleaned up, what does that mean?**

A. We practice medicine, everything changes every day. So we have to make sure that the apprenticeship program goes hand in hand with our guidelines. Any time the guidelines changes, the apprenticeship program has to change.

**Q. When you went through the apprenticeship program in 2000, were you trained how to properly administer Ativan to patients in the field?**

A. When I came in in 2000, Ativan was not on the rescue trucks.

**Q. When did Ativan become part of the rescue trucks?**

A. I would have to look at our general orders to find out exactly when it came on.

**Q. Currently as part of the apprenticeship program, those that go through the program, are they trained how to properly administer Ativan to patients in the field?**

A. Yes.

**Q. And are you involved in that training?**

A. Yes.

**Q. In 2014, were you involved in that training?**

A. No.

**Q. So in 2014, who was it that was in charge of the apprenticeship program?**

A. I'm not sure.

**Q. In 2013, who was it that was in charge of the apprenticeship program?**

A. I'm not sure.

**Q. In 2006, who was in charge of the apprenticeship program?**

A. I'm not sure.

**Q. Juno Paramedic Jose Rosario --**

A. Yes.

**Q. -- have you spoken to him prior to the deposition today?**

MR. NEWMAN: You mean about this?

BY MR. HECHT:

**Q. Yes. Let me rephrase the question.**

**Prior to your deposition today, have you spoken to Jose Rosario regarding the deposition he gave in this case?**

A. No.

**Q. Do you oversee Jose Rosario currently?**

A. Currently direct supervision, no.

**Q. When you say direct supervision, do you have any supervision over him whatsoever?**

A. As a training officer, we ensure all training is done, so I keep in contact with all paramedics through their station officer.

**Q. Are you involved currently in sanctioning or disciplining paramedics as it relates to their performance out in the field?**

A. I do not issue discipline, only recommendations.

**Q. Again, do you issue those recommendations at the chain of command?**

A. Yes.

**Q. Who is it that you issue disciplinary recommendations to when we talk about the chain of command?**

A. It would be Chief Jennifer Chambers.

**Q. In 2014, were you involved in recommending disciplinary actions against any paramedics?**

A. No.

**Q. In 2006, were you involved in recommending any disciplinary actions against any paramedics?**

A. I am not sure.

**Q. You've been employed at the St. Lucie County Fire District for 17 years, correct?**

A. Yes.

**Q. Tell me all of the positions that you've**

**held?**

A. Firefighter/EMT, firefighter/paramedic, lieutenant field training officer, lieutenant station officer, lieutenant training and safety division, captain training and safety division.

**Q. Can you tell me the years you were firefighter/EMT?**

A. When I got hired on in 2000, I would have to go through human resources to find out the rest of my timeline.

**Q. So you can't tell me the years that you were a firefighter/EMT, correct?**

A. No.

**Q. And you can't tell me the years that you were a paramedic in the field?**

A. No.

**Q. And you can't tell me the years you were a lieutenant field training officer?**

A. No.

**Q. You can't me tell me the years you were a lieutenant station officer?**

A. No.

**Q. You can't tell me the years that you were a lieutenant of training in the safety division?**

A. No. October 25th.

**Q. Let's go back. What were the years that you were the lieutenant of the training and safety division?**

A. I can tell you when I started being the captain in the training and safety division, it was October 25th of 2016.

**Q. And currently who do you report to? You said it's the Chief, Jennifer --**

A. Chief Jennifer Chambers.

**Q. In May of 2014, who did you report to?**

A. We're going through some chiefs retiring, so I believe at that time -- you know what, I would have to find out. I would have to go through human resources because we had some retirement and there was a couple of different chiefs at that time.

**Q. We've been talking a lot about the medical guidelines, did you bring a copy of those guidelines with you today?**

A. What year?

**Q. 2014.**

A. Yes, sir.

**Q. Could I see them.**

**Before we launch into that, could we take a brief restroom break?**

MR. HECHT: Yes.

(A brief recess was taken.)

BY MR. HECHT:

**Q. Captain, before we took the break, I was asking you if you brought the medical guidelines with you today.**

A. I did not bring the entire medical guidelines, but I do have the areas where Ativan is mentioned.

**Q. Can I see those.**

**We'll go ahead and discuss that.**

A. Discuss these?

**Q. Yes, we'll discuss what you brought with you.**

A. Okay.

**Q. But before we do that, I'm going to ask you, because I see you have a file in front of you of the things you brought, so tell me what it is that you brought with you today to this deposition.**

A. I have the guidelines that Ativan is mentioned in. I have -- these are also the guidelines back here.

**Q. Can I see those?**

A. There's a repeat of what I just gave you.

**Q. What you just handed me, is this exactly a copy of what you just gave to me?**

A. Yes, I believe so.
**Q. I'll give that back to you.**
A. This is the run report.
**Q. Is it six pages?**
A. Yes.
**Q. What else?**
A. This was given to me, I haven't looked at it. This was an events report.
**Q. Can I see that?**
A. I don't know what that is. I haven't had a chance to look at it.
**Q. I'll hand that back to you.**
**What else do you have with you?**
A. This is the signature form that was part of the one report that we are required to have signed by either the patient or the ER, saying we basically have taken that patient to the ER.
**Q. Okay.**
A. EKG strips.
**Q. These EKG strips, were these taken out in the field when the paramedics were treating Mr. Docher?**
A. These are part of the EMS run report, so these were attachments of the EMS run report.
**Q. Does that mean that the paramedics when**

**they were treating Mr. Docher, hooked him up to an EKG?**

A. Yes. These are statements from both -- from the personnel that there at the scene.

**Q. Can I see those statements?**

A. Yes.

**Q. Thank you.**

**So the statements that you just handed me, these are all St. Lucie County Fire District personnel statements, correct?**

A. That's correct.

**Q. What else do you have with you?**

A. Run report. This is another copy of the event report. This is a public records request that was made for the guideline and the guidelines are in there.

**Q. Okay.**

A. This is that event log again. Okay. It's a medication test that was taken by Rosario back in '07, when he was in the apprenticeship program.

**Q. Anything else?**

A. No. I mean, there's more in there, but it's just guidelines again, same thing, copies of the guidelines.

**Q. You've already shown me those?**

A. Yes. It's the same copies of the same thing I just gave you.

**Q. Now, Captain Gonzalez, you have been identified as the person or persons with the most knowledge from the St. Lucie County Fire District set forth in the attached Exhibit A, which is contained in this notice of taking deposition duces tecum, which we'll mark as Exhibit 1.**

**(Plaintiff's Exhibit No. 1 was marked for Identification by the reporter.)**

**Q. Have you seen this duces tecum before?**

A. Yes. Yes, I did see this.

**Q. Again, it's listed you as the person or persons with the most knowledge from the St. Lucie County Fire District set forth in the attached Exhibit A, so I'd like to go to Exhibit A, which is contained within Plaintiff's 1, and take a look at one through 10 for me.**

**Have you seen one through 10 before?**

A. Yes.

**Q. And is it correct that you are the person with the most knowledge regarding numbers one through 10?**

A. I am the person with the most involvement in these areas.

**Q. Is there someone else that I should be speaking to besides you regarding areas one through 10?**

A. That would be a decision for you to make. I can tell you what I'm involved in.

**Q. Well, I requested to speak with the person with the most knowledge regarding numbers one through 10, contained in Exhibit A of Plaintiff's 1, so I want to make sure I'm speaking to the right person with the most knowledge regarding those areas that are listed one through 10.**

**Are you the person with the most knowledge regarding areas one through 10 contained in Exhibit A?**

A. I am the person with the most involvement. I cannot account for other people's knowledge. I can tell you that I am the one with the most involvement in these areas.

**Q. All right.**

**And then going to Exhibit B in Plaintiff's 1, it asks for you to bring these things with you today. Have you brought Exhibit B and all the items contained in Exhibit B with you today?**

A. We have done the best to get everything that we need from these areas.

**Q. Let's go through them under Exhibit B.**

**Number one, the official policies and customs and practice of the St. Lucie County Fire District regarding the administration of sedatives, such as Ativan by its employees, including Jose Rosario.**

**Did you bring that document with you?**

A. We don't have policies, we have guidelines.

**Q. Did you bring the guidelines with you today?**

A. Yes. That is part of the EMS Guidelines, the ones I just showed you.

**Q. Could you take those out for me please.**

A. Can I rephrase that question.

**Q. You mean answer?**

A. Answer.

**Q. Sure.**

A. When it comes to patient care, we have guidelines.

**Q. So under Exhibit B, number one, I asked for the official policies and customs and practices of the St. Lucie County Fire District regarding the administration of sedatives, such as Ativan by its employees, including Jose Rosario, and is it correct that the St. Lucie County Fire District does not have written policies customs and practices regarding the**

**administration of sedatives?**

A. We have EMS medical guidelines.

**Q. And you brought those guidelines with you?**

A. They're right here, yes.

(Plaintiff's Exhibit No. 2 was marked for Identification by the reporter.)

MR. HECHT: What I'd like to do is mark the guidelines as Plaintiff's 2.

MR. NEWMAN: What was one?

MR. HECHT: It was the duces tecum.

BY MR. HECHT:

**Q. When we talk about Plaintiff's Exhibit 2, which is the guidelines regarding the administration of Ativan, what year were those guidelines in existence from?**

A. These guidelines were revised May 5, 2013 -- May of 2015 -- Sorry, May of 2013. Not all of them.

Do we need to go through each one when they were revised?

**Q. Explain to me what you mean.**

A. The EMS Guideline is a living document, meaning you can revise a small portion of the guideline without revising the entire guideline. So we put dates on the bottom of each individual

guideline that was revised, that way we know when that specific guideline was revised.

**Q. Okay. Can I see that.**

**Looking at the heading sedation --**

A. Yes.

**Q. -- tell me when the sedation guidelines were revised.**

A. May 5, 2013.

**Q. And are those the guidelines related to sedation in May of 2014?**

A. Yes.

**Q. So that sedation guideline would have been in existence and active when Jose Rosario treated Tavares Docher on May 11, 2014?**

A. Yes.

**Q. Has the sedation guidelines been revised since May 5, 2013?**

A. I would have to look.

**Q. And did you bring with you any documents in regards to Number 2, that states the official policies and customs and practices of the St. Lucie County Fire District regarding whether sedatives such as Ativan are to be administered incrementally?**

A. That is the guideline that we were looking at.

**Q. And that guideline was in effect on May 11, 2014?**

A. Correct.

**Q. Did you bring with you number three under Exhibit B, the official policies and customs and practices of the St. Lucie County Fire District regarding the administration of sedatives such as Ativan in patients with a medical history of alcohol use, mental illness or both?**

A. This is the guideline that we go by. We do have a pharmacology section that's also part of the guideline.

**Q. Anywhere in Exhibit 2 that you've brought with you today, is there any mention of the administration of Ativan in patients with the medical history of alcohol use, mental illness or both?**

A. I would have to look through the document.

**Q. Take your time.**

A. In regards to sedation?

**Q. Yes, sir.**

A. In regards to sedation, there is no mention.

**Q. Are you aware if there has ever been a mention contained within the St. Lucie County Fire District guidelines, any mention of the administration**

**of Ativan in a patient with a history of alcohol or mental illness?**

A. I am not sure.

**Q. So is it correct that in May of 2014, there was no policy, procedure, custom or guideline that directed paramedics who chose to administer a sedative to a patient with a medical history of alcohol use or mental illness?**

A. From the information that I have gathered in sitting here in front of you, no.

**Q. Did you bring with you number four, the customs, policies and practices of the St. Lucie County Fire District regarding the review of run reports to determine if care and treatment is consistent with existing policies in the best interests of the patient?**

A. Yes.

**Q. Could you show me that please.**

**Number five, did you bring with you the official written policies of the St. Lucie County Fire District?**

A. Policies for what?

**Q. Is there a general written set of policies that is given to paramedics that are employed at the St. Lucie County Fire District?**

A. We have an area in our target solution software that has all of the EMS policies.

**Q. Did you bring that with you?**

A. No, I did not.

**Q. Why not?**

A. It had nothing to do with sedation. I brought everything that had to do with sedation and with this call, but it wouldn't be a problem if you wanted me to print them all up.

**Q. Okay. Exhibit 2 that you brought with you is how many pages?**

A. This one?

**Q. Yes.**

A. Eight pages.

(Plaintiff's Exhibit No. 3 was marked for Identification by the reporter.)

BY MR. HECHT:

**Q. I'm going to show you what we'll mark as Exhibit 3. This is 600 pages, Exhibit 3.**

**Have you seen the emergency medical guidelines contained in Exhibit 3 before?**

A. Yes.

**Q. What is this?**

A. This is our guidelines that we were -- we used to work under.

**Q. And do you continue to work under the guidelines that are contained in Exhibit 3?**

A. No.

**Q. Why not?**

A. What exhibit is this?

**Q. Exhibit 3.**

A. The guidelines that you showed me, Exhibit 3, was a regional guideline. Many participating agencies were part of this guideline. When it was time for its update, all agencies decided to go on their own.

**Q. What was the year that the medical guidelines that I just handed you, which we marked as Exhibit 3, was no longer in use by the St. Lucie County Fire Department?**

A. I'm not sure.

**Q. Do you know if on May 11, 2014, those emergency medical guidelines were in use and active by the St. Lucie County Fire District?**

A. They were not.

**Q. So is it your testimony that the emergency medical guidelines that I just handed you contained in Exhibit 3, were no longer used by the St. Lucie County Fire District on May 11, 2014?**

A. That's correct.

**Q. But you don't know when it is that the St. Lucie County Fire District stopped utilizing those emergency medical guidelines?**

A. No, I do not.

**Q. Could you find that out for me?**

A. Yes, I can.

(Plaintiff's Exhibit No. 3 was marked for Identification by the reporter.)

BY MR. HECHT:

**Q. Exhibit 2 that you brought with you, and specifically the heading sedation, looks to me to be identical to the sedation section that's contained within Plaintiff's Exhibit 3.**

**So I'm going to have you look at Plaintiff's Exhibit 3 and show me if there's been any changes between what you've brought with you which you've told me is in effect today?**

A. I did not say that.

**Q. You did not say that?**

A. No, sir.

**Q. Well, then let's go back.**

**Exhibit 2 that you brought with you today, which is the guidelines, is that currently in use today by the St. Lucie County Fire District?**

A. I'm not sure if it has been updated or

not. That's when I had told you I would look into what has and has not been updated. This guideline is what was in use the day that you had mentioned.

**Q. So Exhibit 2, and the heading sedation and the information contained within the sedation page, was in use by the St. Lucie County Fire District on May 11, 2014; is that correct?**

A. That's correct.

**Q. I'm going to show you Exhibit 2, sedation, and then Exhibit 3, sedation?**

A. Okay.

**Q. These documents look different, correct?**

A. At a glance, yes.

**Q. And are you able to tell me if the sedation section from Exhibit 3 was in use in May of 2014?**

MR. NEWMAN: Asked and answered. I'm objecting for the record.

THE WITNESS: I have to take a look at it if you give me a moment.

BY MR. HECHT:

**Q. Okay.**

A. Okay. Your question again?

**Q. My question was, the sedation page that's contained in Plaintiff's Exhibit 3, was that in use on**

**May 11, 2014, by the St. Lucie County Fire District?**

A. No.

**Q. And how do you know that?**

A. Because this was 2009, this is 2013.

**Q. So you looked at the bottom of the sedation page from Plaintiff's Exhibit 3, and because the bottom says October 7, 2009, that leads you to believe that this was not in use on May 11, 2014, correct?**

A. If you're asking me do we refer to this page on 2014, the answer is no. We refer to the 2013, because that's what was in effect in 2014.

**Q. So no paramedic would have been utilizing any of the information that's contained on the sedation page in Plaintiff's Exhibit 3, correct?**

A. This is Exhibit 3?

**Q. Yes, sir.**

A. No paramedic would have referenced this guideline in 2014.

**Q. Understood.**

**So the document that was in existence and active and that would have been used by a paramedic for reference in May of 2014, is what you brought with you today, Plaintiff's Exhibit 2, heading sedation, correct?**

A. Correct.

**Q. This is a medical guideline; is that correct?**

A. Correct.

**Q. Is it a policy and procedure that paramedics are supposed to follow when administering Ativan?**

MR. NEWMAN: Object to the form; asked and answered.

A. It is a guideline. It is not a policy or procedure.

BY MR. HECHT:

**Q. And when you say guideline, that leads me to believe that they can essentially stray from the guideline; is that true?**

MR. NEWMAN: Object to the form.

You can answer.

A. They can come call for orders if they needed to deviate from these guidelines.

BY MR. HECHT:

**Q. Who would they call?**

A. The ER.

**Q. Would they speak to a physician?**

A. Yes.

**Q. Could they also call Dr. Chi?**

A. Chi Chiou Liu.

**Q. I apologize, Chi Chiou Liu.**

A. If they had a way of getting ahold of him, yes, he could have made that call.

**Q. In 2014, did the paramedics have Dr. Chi Chiou Liu's cell phone number?**

A. We don't give his information out.

**Q. So it's correct that the paramedics in 2014, did not have Dr. Chi Chiou Liu's cell phone number?**

A. Correct.

**Q. Did they have his office number?**

A. I couldn't answer that, if he had his office number or not.

**Q. How would the paramedics have gotten in touch with Dr. Chi Chiou Liu in an emergency if they needed to contact him when they were in the field?**

A. These guidelines are Dr. Liu's offline medical direction. That's his extension. If they needed to get ahold of a -- to get online medical direction, they would call the ER.

**Q. Well, again, back to my question, if a paramedic was out in the field and needed to talk to Dr. Chi Chiou Liu regarding the sedation guidelines, would they have been able to contact him?**

A. There would be no reason to contact Dr. Liu, these are offline medical directions. If they needed assistance, they would call the ER for online medical direction.

**Q. The answer is, if a paramedic in May of 2014 wanted to call Dr. Chi Chiou Liu, they would have no way of getting ahold of him in an emergency, correct?**

MR. NEWMAN: Object to the form.

You can answer.

**Q. No, they don't need to get ahold of Dr. Chi Chiou Liu.**

BY MR. HECHT:

**Q. I understand you're telling me they wouldn't need to get ahold of him because they have this guideline?**

A. Right.

**Q. I'm with you, I understand what you're saying.**

**My question is, if they wanted to contact him, they would not be able to because they did not have his phone number, correct?**

A. Whether they had his phone number or not, I do not know.

**Q. You just told me it was not given out,**

**correct?**

A. It doesn't get given out, but if they have it -- I don't know if they have it or not.

**Q. But it wasn't a policy in May of 2014 for the paramedics to have Dr. Chi Chiou Liu's number on them, correct?**

A. Correct.

**Q. Let's go through the sedation guideline.**

A. Okay.

**Q. Under sedation, it says indications, cardioversion, external pacing, combative patient, anywhere under the heading sedation in Exhibit 2 that you brought with you today, does it list any contraindications for Ativan?**

A. No.

**Q. Why not?**

A. As the guideline says, it doesn't have it. When this guideline was put together, there was no need to put contraindication under it.

**Q. Why not?**

A. I don't know.

**Q. Is it dangerous for the St. Lucie County Sheriff's Office not to have what the contraindications for Ativan administration is under the heading sedation?**

MR. NEWMAN: Object to the form, and also you asked the St. Lucie County Sheriff's Office.

BY MR. HECHT:

**Q. Let me rephrase the question.**

**Is it dangerous for the St. Lucie County Fire Department not to have the contraindications for Ativan contained within the sedation page contained in the Exhibit 2?**

MR. NEWMAN: Object to the form.

A. Are you asking me for my opinion?

BY MR. HECHT:

**Q. Well, you are a captain at the Port St. Lucie Sheriff's Office and in charge of the training in the safety division, so I'm asking based on that, is it dangerous not to have listed the contraindications for the administration of Ativan under the sedation heading?**

A. No.

MR. NEWMAN: Object to the form. Also, your question referred to him as a captain in the St. Lucie County Sheriff's Office.

MR. HECHT: I apologize. I understand you don't work for the

Sheriff's Office.

BY MR. HECHT:

**Q. I'll ask it again, as captain at the St. Lucie County Fire Department in charge of the training and safety division, is it dangerous not to have listed the contraindications for Ativan contained within the sedation heading on Exhibit 2?**

MR. NEWMAN: Object to the form.

A. No.

BY MR. HECHT:

**Q. Why not?**

A. There is no contraindications in the emergency setting for Ativan.

**Q. Explain that to me, sir.**

A. There's a difference between the emergency setting and the nonemergency setting. Ativan can be given for many different reasons. Depending on the situation, there may not be a contraindication. There are cautions, but no contraindications.

**Q. Is that how you train your paramedics at the Port St. Lucie Fire Department, that there's no contraindication for Ativan in an emergency setting?**

A. We make them aware of the cautions that they need to be aware of when administering Ativan.

**Q. And I understand that you're telling me**

**about the cautions, but my question is more specific, is it a part of the training and culture at the Port St. Lucie Fire Department that the paramedics are not trained in the contraindications for Ativan use in an emergency setting?**

A. Can I refer to the guideline real quick?

**Q. Sure.**

MR. NEWMAN: I object to the form of the question. Just so we're clear for the record, the organization is the St. Lucie County Fire District, it's not the Port St. Lucie, and it's also not fire department. So the St. Lucie County Fire District.

BY MR. HECHT:

**Q. Do you understand so far that all the questions I've asked you are involving your role and position and experience working at the St. Lucie County Fire District?**

A. Yes.

**Q. Sir, you've had a chance to look at --**

A. Yes.

**Q. Exhibit 2.**

**Would you like me to ask the question again?**

A. Yes.

**Q. Is it correct that as part of the training and culture at the St. Lucie County Fire District, that paramedics are not trained on the contraindications for Ativan use or administration in an emergency setting?**

A. They are trained not to give Ativan if the patient is hypersensitive to it.

**Q. How would a paramedic know if a patient is hypersensitive to Ativan administration?**

A. If that information is given to them on scene.

**Q. Who would give the paramedic that information?**

A. Either family members or the patient.

**Q. What if the patient is not able to speak?**

A. If the patients are not able to speak, we look for medical alert tags to see if they are hypersensitive or have any allergies to medication.

**Q. What if there's no medical alert tag?**

A. If there's no medical alert tag, we weigh out the risk versus gain.

**Q. Is that discretionary to the paramedic?**

A. Yes.

**Q. As part of the training that paramedics go**

**through in the apprenticeship program, are they trained on the contraindications of Ativan administration?**

A. The contraindications as per our protocols.

**Q. And is the only contraindication for Ativan administration hypersensitivity?**

A. As per our protocols.

**Q. Are you aware of any other contraindications for Ativan administration administered intramuscularly to a patient?**

A. No.

**Q. Are you aware if head trauma is a contraindication to Ativan administration intramuscularly?**

MR. NEWMAN: Object to the form.

MR. JOLLY: Join.

MR. NEWMAN: You can answer.

A. No.

BY MR. HECHT:

**Q. Are you aware if alcohol use is a contraindication to the administration of Ativan injected intramuscularly?**

A. No.

**Q. Are you aware if excited delirium is a**

**contraindication to the administration of Ativan injected intramuscularly?**

MR. NEWMAN: Object to the form.

A. I would have to look at our excited delivery and protocol.

BY MR. HECHT:

**Q. Sitting here right now, are you able to answer that?**

A. No.

**Q. Do you have protocols in front of you related to excited delirium that you could look through to answer that question?**

A. I would have to pull the guidelines from 2013 and actually look at our protocol at that time.

**Q. Are you aware that metabolic acidosis is a contraindication for the administration of Ativan injected intramuscularly?**

MR. NEWMAN: Form.

A. No.

BY MR. HECHT:

**Q. Are you aware if the use of narcotics is a contraindication for the use of Ativan injected intramuscularly?**

MR. NEWMAN: Form.

A. No.

BY MR. HECHT:

**Q. Are you aware if someone is suffering from respiratory depression -- strike that.**

**Is respiratory depression a contraindication for Ativan use injected intramuscularly?**

MR. NEWMAN: Object to the form.

A. No.

BY MR. HECHT:

**Q. You do not know?**

A. All the nos I'm answering, they are not contraindications per our protocol. The only contraindication is hypersensitivity.

**Q. And everything that I've asked you so far, do you have any personal knowledge whether anything I just mentioned is a contraindication for the use of Ativan injection -- excuse me, strike that.**

**Let me just phrase it this way, are you aware if head trauma, alcohol use, narcotic use, metabolic acidosis, respiratory depression, are contraindicated for Ativan to be injected intramuscularly based on any personal knowledge that you have?**

MR. NEWMAN: Form objection.

MR. JOLLY: Join.

A. As per our protocol, no. Above and beyond that, I don't know.

BY MR. HECHT:

**Q. Let's talk about the sedation protocol that you have in front of you.**

**It says benzodiazepines may cause respiratory depression or compromise, correct?**

A. Correct.

**Q. Is that something that the paramedics would have been trained on in 2014?**

A. Yes.

**Q. When administering, observe for signs of hypotension or respiratory depression, they would have been aware of that in 2014?**

A. Yes.

**Q. ALS stands for advanced life support; is that correct?**

A. Correct.

**Q. Under the second bullet point, says Ativan one milligram increments to a max of four?**

A. Correct.

**Q. What were the paramedics trained to do regarding that bullet point in 2014?**

A. Regarding the Ativan, one milligram increments to a max of four milligrams?

**Q. Yes, sir.**

A. The paramedic can give one milligram up to four milligrams of Ativan.

**Q. Is that discretionary?**

A. They cannot go over four milligrams without a physician consult.

**Q. Is it the custom policy and practice of the St. Lucie County Fire District to have its paramedics in 2014 decide whether to inject a patient with between one to four bolus milligrams to a patient in the field?**

MR. NEWMAN: Form.

A. It was depending on the situation, every situation is different, they have the ability to make that decision.

BY MR. HECHT:

**Q. Was it the custom, policy, practice of the St. Lucie County Fire District in May of 2014, to give its paramedics the discretion to administer one single four-milligram dose of Ativan intramuscularly to a patient in the field?**

MR. NEWMAN: Form.

A. The paramedic has that discretion.

BY MR. HECHT:

**Q. Was it the custom, policy and practice of**

**paramedics employed by the St. Lucie County Fire District in May of 2014, to administer intramuscularly one single four-milligram dose to patients in the field?**

MR. NEWMAN: Form.

A. They have that discretion.

BY MR. HECHT:

**Q. In 2014, are you aware of how many times a paramedic injected a four-milligram dose of Ativan to patients during that year?**

A. Without doing some research and some digging, I would not be able to give you that off the top of my head.

**Q. Do you have the capability of finding out that information?**

A. I have the ability to look and see if I can find that information. Whether I can retrieve that information is a different story.

**Q. The word increment, what does that mean to you?**

A. One right after the other, or increments.

**Q. Like one, then two, then three --**

A. Correct.

**Q. -- then four.**

A. (Witness nods head.)

**Q. Is it incorrect that a paramedic in May of 2014, did not have to first inject a patient with one milligram, wait, monitor the patient and then if they decide to administer a second milligram, for a total of two milligrams, that's not what this policy says, correct?**

MR. NEWMAN: Let me just object to the form of the question.

Go ahead.

A. If the policy were to state three to five minutes in between or if it gave a time frame in between increments, then yes. In this case, it does not give a time frame of in between increments. It allows the paramedic to give up to four milligrams without monitoring in between.

BY MR. HECHT:

**Q. How do you get to four milligrams if you don't begin with one milligram and work your way up incrementally?**

MR. NEWMAN: Object to the form.

BY MR. HECHT:

**Q. You do?**

A. You give one milligram, right after that you give two, three, four. It was written like that on purpose for the safety of our paramedics, for the

safety of police officers, the safety of the patient.

If the paramedic, in this case sedation, had -- was mild, mildly combative, anxiety, those type of signs and symptoms, they would give one milligram, see how it works, that patient is not a detriment to themselves or us. If Rosario felt that there was a detriment, the patient was -- could cause harm to themselves, to him as a paramedic, or the people around him, he had the right to go straight to four milligrams. One milligram increments, one after the other, those numbers, if you look on other guidelines, it gives you specifics, three to five minutes in between, two to three minutes in between. This guideline does not. For that reason, for the safety of the patient, for the safety of the paramedic and for the safety of others around him.

**Q. So Paramedic Jose Rosario, do you agree with me, did not begin with one milligram of Ativan, wait a period of time and then give a second one milligram, wait a period of time, then give a third one milligram and then wait a period of time and then give a fourth one milligram?**

A. I was not there, I could not tell you what Rosario did, but I can tell you what the guideline gives them the ability to do.

**Q. So just so that I'm clear, that if Paramedic Jose Rosario administered one single dose of four milligrams of Ativan, that is consistent with the St. Lucie County Fire District's guidelines for the injection of Ativan, correct?**

A. That's correct. It actually states it in the guidelines.

**Q. Is this guideline that allows paramedics to inject a single four-milligram dose of Ativan to a patient the way that all paramedics employed by the St. Lucie County Fire District have been trained since at least 2012?**

A. Paramedics have been trained, if one milligram of Ativan can -- is sufficient to fix the problem, they will give one milligram. If they need to go to four milligrams because they feel the patient is in danger to themselves, to us as paramedics or to anybody else around, they have the option to go to four milligrams.

**Q. And my question was, has the custom, policy and practice that allows paramedics to inject one single four-milligram dose to a patient, been in existence since at least December 18, 2012?**

A. I can't say if it was in existence in 2012.

**Q. According to Exhibit 2, under sedation, it looks like you have -- what says revised May 5, 2013?**

A. Correct.

**Q. So let me rephrase my question: Is it correct that the custom, policy and practice of the paramedics employed by the St. Lucie County Fire District since May 5, 2013, have had the discretion to inject a single four-milligram dose of Ativan to patients out in the field?**

A. Yes.

**Q. If we go to page M-8 of Exhibit 2, the heading says pharmaceutical assisted intubation?**

A. That's correct.

**Q. Is it also correct that the custom, policy and practice of the St. Lucie County Fire District has given discretion since May 5, 2013, that allows Ativan to be administered in one single four-milligram dose post-intubation for the purposes of intubation?**

A. Post-intubation?

**Q. Yes, sir.**

A. Ask that -- rephrase that or ask that question again.

**Q. Sure.**

**Is it correct that on page M-8 of Exhibit 2, under the heading pharmaceutical assisted**

**intubation, that the custom, policy and practice at the St. Lucie County Fire District gave the paramedics discretion to inject one single four-milligram dose post-intubation to a patient for the purposes of sedation?**

A. This is a guideline. Are you asking, do they have the discretion to give one to four milligrams of Ativan, and the answer is yes?

**Q. My specific question was --**

A. You're putting post-sedation -- you're putting post-intubation and sedation in the same guideline, and you are looking at two completely different guidelines.

**Q. Let's look at M-8. What I want to know is where it says, under sedation, it says Ativan one-milligram increments to a max of four milligrams?**

A. Correct.

**Q. What is that referring to?**

A. That is referring to post-intubation.

**Q. So --**

A. If you're sedating a patient due to post-intubation versus the guideline that we were previously at, which is we are sedating somebody due to a combative and violent patient, two completely different guidelines.

**Q. Let me be clear on page M-8, was it the custom, policy or practice of the St. Lucie County Fire District from May 5, 2013 going forward, to allow paramedics to administer one single four-milligram dose of Ativan post-intubation?**

A. They have that discretion according to the guideline.

**Q. If Jose Rosario in his deposition stated that he had injected approximately 50 to 100 people during the course of his career with one single four-milligram dose of Ativan, do you see anything wrong with that?**

MR. NEWMAN: Object to the form.

A. Every call is different. I cannot answer that question. I would have to look at each individual call to be able to say whether he was correct in administering those.

BY MR. HECHT:

**Q. Based on the customs, policies, practices, guidelines of the St. Lucie Fire District, would you agree with me that under those customs, policies and practices, that Medic Jose Rosario was allowed and it was appropriate for him to administer one single four-milligram dose of Ativan to a patient if he felt that the situation required such?**

MR. NEWMAN: Object to the form.

A. Correct.

BY MR. HECHT:

**Q. During the apprenticeship program or any training that paramedics would have gone through in 2014, were they ever trained regarding the administration of Ativan and how that may affect a patient that's under the influence of alcohol?**

A. I wasn't part of the training division at that time.

**Q. Is that something that at the present time paramedics are trained on?**

A. As guidelines are updated, they are trained.

**Q. As you sit here today, is it correct that you're not able to tell me whether currently paramedics are trained on how the administration of Ativan may affect someone that's under the influence of alcohol?**

A. I am telling you, like I said earlier, we have updated our guidelines and there has been training on certain -- they're called the guidelines that were updated. Whether or not sedation was one of them, I'm not sure.

MR. NEWMAN: We've been going an

additional hour, so why don't we take a short break.

(A brief recess was taken.)

BY MR. HECHT:

**Q. Captain Gonzalez, are you aware of the training provided to Jose Rosario regarding the administration of Ativan when he was going through his paramedic training?**

A. No.

**Q. Number five, under Exhibit A, states that you would be the person with the most knowledge regarding the training provided to Jose Rosario regarding the administration of sedatives such as Ativan?**

A. Correct.

**Q. You had no knowledge of that?**

A. I don't know -- I could find his records, but I couldn't tell you off the top of my head what his training is, but however, I do have a medication test that he had to take, which he scored a 99 on, that I have with me, but as far as anything else in the apprenticeship program, I would have to do research on.

**Q. That test he scored a 99 percent on, that doesn't discuss whether or not the administration of**

**Ativan is contraindicated if someone is suffering from a mental illness or head trauma, or alcohol use or metabolic acidosis, does it?**

A. That test is a direct reflection of our guidelines. So that test -- those questions come directly from our guidelines, so if there's nothing in the guidelines, there's nothing on that test.

**Q. And, therefore, would you agree with me that Paramedic Rosario, when he was going through his training and his apprenticeship, did not learn anything about the contraindications for Ativan besides hypersensitivity, correct?**

A. According to our guidelines, hypersensitivity is the only contraindications for administering Ativan, so if the district were to supply him with any training, it would have been according to our guidelines.

**Q. Again, the person that wrote the guidelines was who?**

A. The person who wrote them?

**Q. Yes. How were the guidelines formulated?**

A. The guidelines are put together from the guideline committee, which they make recommendations, they get interviewed by the training division, they get approved by the training chief, and then they go

to the medical director to give his final approval.

**Q. And that's Dr. --**

A. Chi Chiou Liu.

**Q. He's the person that gives final approval, correct?**

A. (Witness nods head.)

**Q. And the committee and going up the chain of command are all people that are employed by the St. Lucie County Fire District, correct?**

A. Correct.

**Q. In May of 2014, was there a guideline that discussed combative patients?**

A. I would have to look at the entire guideline.

**Q. Let me show you what's been contained within Plaintiff's Exhibit 3, and the heading is combative patients, and I'll show that to you, page E-14 and page E-15.**

MR. NEWMAN: These are the guidelines he testified that were not in effect.

THE WITNESS: I was going to say these guidelines are from 2006, which Rosario was not held to, just to let you know.

BY MR. HECHT:

**Q. When Medic Rosario went through his training, wasn't that in 2006?**

A. It was in 2006, but like I told you earlier, things change, so things that we did in 2006, we no longer do, it's called practicing medicine.

**Q. Right.**

A. So I can't -- only because we did it in 2006, doesn't mean it's correct now.

**Q. Understood.**

**So my question, though, is on May 11, 2014, the document, the two-page document that I handed you which is contained in Plaintiff's Exhibit 3, entitled combative -- is it combative patients?**

A. Combative patients.

**Q. Combative patients.**

**Do you know if in May of 2014, that was in existence?**

A. I would have to go back and look at what was in effect in 2014 as far as the guidelines. I would have to look at the entire guideline book to see if that was -- I'm not sure if this was in the guidelines in 2014.

**Q. I want to assume, because I'm going to ask**

**you questions about this, I want to assume that these were for my questions, okay. I understand you're saying you don't know if they are, but I'm going to ask you questions about it. I want you to know that's why I'm asking you.**

**All right. Could I see that?**

A. I need them back if you want me to look at it.

**Q. No, I have my own copy.**

A. Can I let you know what we're looking at?

**Q. Yes. I'll put it on the record. We're looking at the emergency medical guidelines titled combative patients from what date?**

A. 2006?

**Q. Yes.**

A. What was the beginning page of this entire section? No, of the section.

**Q. I'll give the whole thing to you if you want to look at it.**

A. What I'm telling you is, you're looking at the very beginning where it says medical emergency guidelines. It's broken up -- that guideline, that old guideline was broken up in sections. This is a section of that guideline.

What does the section say?

**Q. General medical.**

A. These are educational guidelines, not treatment guidelines, so let's make sure that you separate the two.

**Q. Okay.**

A. We are discussing the educational section of the guidelines, not the treatment section of the guidelines, which are two completely different areas of the guideline, so the medical guidelines at that time.

**Q. And what's the difference between the educational and --**

A. The difference is the treatment section is how we're going to treat our patient. The educational guideline is an overview of combative patients. It educates you in that area. We may or may not use those areas in our treatment guideline.

Our treatment is what Dr. Liu signs off on. Our guidelines are something that you can look in a reference book and say these -- I'm educating you in combative patients. We can write a novel on combative patients. We are held to the standard of our treatment section, which is what we talked about earlier. So just letting you know.

**Q. Is it your position that in 2006, that the**

**combative patient educational guideline was not a custom, policy or practice that was to be followed by the paramedics employed by the St. Lucie County Fire District?**

A. What I'm telling you is the combative patient section in the educational section was to educate personnel a little bit further outside of what Dr. Liu signed off on in the treatment section, just to better educate yourself because, again, the treatment section is a guideline, very specific guideline. This is just generalized, just like it says, general guidelines educational section.

**Q. Would you classify this combative patient portion of the emergency medical guidelines to be a policy and procedure in 2006?**

MR. NEWMAN: Object to the form.

A. Like I said, this is a place where people would go to educate themselves. If you were to look at the combative patient, educational section, it also talks about Haldol. We do not carry Haldol, we never carried Haldol. It's just educating patients in the area of combative patients.

BY MR. HECHT:

**Q. And my specific question was, the combative patient portion of the 2006 emergency**

**medical guidelines, would you consider the combative patient portion to be a policy and procedure that paramedics were to follow in 2006 at the St. Lucie County Fire District?**

MR. NEWMAN: Form.

A. The paramedics will follow the treatment guideline. They will go here to educate themselves further. They will not -- they would follow what it says in the treatment guideline.

BY MR. HECHT:

**Q. So is it your testimony that the paramedics in 2006 did not have to follow this combative patient information contained in the emergency medical guidelines?**

A. This is a guideline for them to look at the -- this is a guideline for them to take a look at to educate themselves, to educate -- the treatment section is where they would go to treat the patient.

**Q. Were all paramedics in 2006 that were working at the St. Lucie County Fire District supplied with this combative patient information contained within the emergency medical guidelines?**

A. Yes.

**Q. Was it expected that those paramedics in 2006 would follow the information contained within**

**this combative patient portion of the emergency medical guidelines?**

A. All paramedics were expected to follow the treatment guideline. If they wanted to educate themselves further, they would go into the educational section.

**Q. Looking on page E-15, which is the second page, number five, should a patient become combative the following steps should be taken: Look for potential etiologies and correct hypoxia, shock, excessive environmental stimulation.**

**B, the following physical restraints are authorized for use if, A, above does not work or apply, and then parentheses, it says apply before transport if it at all possible.**

**One, rayon webbing strapped across chest and legs. Number two, hard extremity restraints. And then, in parentheses, all four limbs.**

**Was that the policy of the St. Lucie County Fire District in 2006?**

A. This is an overall educational guideline. It is not a policy, it is a guideline. Did St. Lucie County fire have a policy to restrain patients on all four limbs? Policy, no. Guideline, yes.

**Q. In 2006, did the St. Lucie Fire District**

**have any policies?**

A. Yes.

**Q. And did those policies involve the administration of Ativan?**

A. I am not sure.

**Q. In 2006, were there any policies regarding the physical restraining of a patient?**

A. I'm not sure.

**Q. Going to C, pharmacologic restraints may be used if physical restraints are not sufficient, or if continued combativeness may interfere with deliverance of proper medical care or may cause further harm to the patient?**

A. Correct.

**Q. What does that mean to you?**

A. Pharmaceutical restraints may be used if physical restraints are not sufficient or if continued combative -- if they cannot be physically restrained, you can sedate them medically.

**Q. So in 2006, was it a guideline of the St. Lucie County Fire District that paramedics should first try and use physical restraints to restrain a patient and then go to pharmacologic restraints?**

A. According to this guideline, it says pharmaceutical restraints may be used if physical

restraints are not sufficient, or if continued combativeness may interfere with deliverance of proper medical care or may cause further harm.

**Q. Yes, sir.**

A. Right?

**Q. Right.**

**So my question is, was it a guideline of the St. Lucie County Fire District in 2006, that pharmacologic restraints should be secondary to physical restraints if physical restraints were not sufficient?**

MR. NEWMAN: Object to the form, asked and answered.

A. It's at the discretion of the medic. Are you talking about me restraining him, PD restraining him? Their family member restraining them? That's a decision for the medic to make when they come on scene. At no point will they put themselves in harm's way, the patients or anybody else that's around.

BY MR. HECHT:

**Q. So is it your testimony that based upon C, on page E-15, that it was discretionary for the paramedic to decide whether or not to administer a pharmacologic restraint prior to attempting to use a physical restraint?**

A. You're asking me a question out of a generalized educational portion of the guideline. It is in my experience and through the training division, that patients can be medically restrained if the medic feels the need. If they feel there's a threat to the patient themselves, to the people around them or to themselves, they can take that route. It is not secondary.

**Q. Simply put, if a paramedic in 2006 presented to the scene where there were officers around an individual that, let's say, is causing a disturbance, it's discretionary as to whether or not the paramedic administers a sedative or attempts to use some sort of physical restraint?**

MR. NEWMAN: Let me object to the form of the question. Go ahead.

A. You're asking me to draw a line in the sand and every situation is different, so medics have the ability to make that decision on scene, depending on each and every situation. Every situation is approached differently.

BY MR. HECHT:

**Q. What did you review prior to coming to this deposition today?**

A. Well, I reviewed -- I looked -- I glanced

at the guidelines, glanced at the run report, and that's pretty much it, just glanced at everything.

**Q. Did you review the St. Lucie County Sheriff's Office incident report?**

A. I believe it was in there, but I didn't look at it.

**Q. Do you know if when Medic Rosario arrived on scene, if Tavares Docher was acting intoxicated?**

A. I was not there on scene, so I could not tell you whether he was or wasn't. And we are not trained to make that decision.

**Q. I'm asking you based on your review -- well, strike that.**

**Did you read the St. Lucie County Sheriff's incident report?**

A. No.

**Q. Do you know if in this case, prior to the administration of Ativan if Tavares Docher was suffering from metabolic acidosis?**

A. There would be no way of knowing.

**Q. Do you know prior to the administration of Ativan if Tavares Docher was suffering from respiratory depression?**

A. There would be no way of knowing.

**Q. Do you know prior to the administration of**

**Ativan, if Tavares Docher told any of the officers that he was drinking alcohol?**

A. I wasn't there. I cannot say whether he told them that or not.

**Q. If Tavares Docher told the officers that he had been drinking alcohol and Medic Rosario learned of that information, would it have been appropriate for Medic Rosario to inject four milligrams intramuscularly of Ativan to Tavares Docher?**

MR. NEWMAN: Object to the form.

A. Alcohol consumption is not a contraindication to give Ativan.

BY MR. HECHT:

**Q. How do you know that?**

A. According to our guidelines, the only contraindication is hypersensitivity to Ativan.

**Q. So, because the only contraindication is hypersensitivity, that means to all the paramedics that there is no other contraindications for Ativan, correct?**

A. There's cautions.

**Q. What are those cautions?**

A. You want me to read them right from the guidelines?

**Q. Sure.**

A. Caution, benzodiazepine may cause respiratory depression or compromise. When administering, observe for signs of hypotension and respiratory depression. Those are our cautions.

**Q. Did you review Medic Rosario's actions in this case?**

A. When you say I reviewed them?

**Q. Do you know what his involvement was in this case?**

A. I was his station officer. So, did we have a discussion of the call back in 2014? When he came back, I'm sure we did sit down and discuss the -- critique the call, so to speak.

**Q. Was he reprimanded in any way?**

A. I am not sure. Not that I know of.

**Q. Was he disciplined in any way?**

A. Not that I know of.

**Q. Did he have to go through any further education or training as a result of his care to Tavares Docher?**

A. Not that I know of.

**Q. Is it your position here today that Jose Rosario complied with the customs, policies, and practices of the St. Lucie County Fire District in his treatment of Tavares Docher?**

A. Jose Rosario followed the St. Lucie County Fire District guidelines as were stated back in 2014.

**Q. Putting it another way, did Medic Rosario in his treatment and care of Tavares Docher on May 11, 2014, violate any of the customs, policies, practices or guidelines of the St. Lucie County Fire District?**

A. As far as my knowledge, he followed the St. Lucie County Fire District guidelines.

**Q. Have you ever injected four milligrams of Ativan to a patient intramuscularly or intravenously?**

A. I would have to go back and look at all my reports.

**Q. You're not able to tell me that sitting here today?**

A. No.

**Q. Benzodiazepines are central nervous system depressants, correct?**

A. Yes.

**Q. And is alcohol also a central nervous system depressant?**

A. I would have to do some research.

**Q. Does the St. Lucie County Fire District not train paramedics on the interaction of alcohol with the human body?**

A. St. Lucie County Fire District trains the

paramedics as per the protocols and as per Dr. Liu's recommendations.

**Q. Prior to administering Ativan to a patient, are paramedics trained to ask the patient whether or not they've ingested any alcohol or drugs?**

A. No.

**Q. When Tavares Docher was injected intramuscularly with the Ativan, do you know if he was handcuffed?**

A. I wasn't there. I don't know.

**Q. Does the St. Lucie County Fire District have a policy as to whether or not a paramedic could inject someone if they're handcuffed with their hands cuffed behind their back?**

A. I would have to look at the policy. I can tell you I do know that if they are handcuffed, a police officer must be there with them.

**Q. That's in the ambulance, correct?**

A. Yes.

**Q. So my question is, as you sit here today, are you aware if there is a policy in existence currently as to whether a paramedic is allowed to inject someone intramuscularly, with their hands cuffed, with police handcuffs behind their back?**

A. There's no policy that I know of.

**Q. What about on May 11, 2014, was there a policy at the St. Lucie County Fire District that discussed whether it was appropriate to inject Ativan to a patient while they are cuffed with their hands behind their back?**

A. There was not a policy that I know of.

**Q. So would it have been appropriate and within the standard of care of paramedics working at the St. Lucie County First District in 2014, to inject someone with four milligrams of Ativan with their hands cuffed behind their back?**

A. If the paramedic feels that their patient is in danger to themselves, to the paramedic or to anyone around them, yes, they have the ability to make that call.

**Q. You reviewed the run report, correct?**

A. Briefly.

**Q. When I say the run report, is that the same thing as paramedics emergency six-page report?**

A. Correct.

**Q. It was Medic Rosario's intent to inject four milligrams of Ativan intramuscularly to Tavares Docher's buttocks, correct?**

A. I have to look at the run report. I was not there. I can only go by what the run report says.

According to Rosario's run report, he gave Ativan, four milligrams IM.

**Q. In 2014, was Medic Rosario trained to aspirate the needle prior to injecting the Ativan?**

A. If he was a release paramedic, which he was, all paramedics are trained on how to administer medications.

**Q. Based on your review of the run report in this case and any other documents that you may have seen, do you have an opinion as to whether Medic Rosario hit a vessel?**

A. I would not know.

**Q. After being injected intramuscularly with a four-milligram dose of Ativan, how quickly does it take for the dosage to sedate someone?**

MR. NEWMAN: Object to the form.

A. Depending if it's intramuscular, IV. Intramuscular takes a little bit longer. Again, educational guidelines, depending on what you read, where you read it, everybody has their opinion. From what I understand, it could be 10, 15 minutes before you start seeing the effects of Ativan.

BY MR. HECHT:

**Q. And that's intramuscularly?**

A. It's intramuscularly.

**Q. What about if it was intravenously?**

A. It would be a little faster.

**Q. How much faster?**

A. Five to 10 minutes, I believe. Again, that would be depending on what literature you read.

**Q. In 2014, did paramedics have EMS approved restraints on their vehicles?**

A. What do you mean?

**Q. What sort of EMS approved restraints are typically on a paramedic's vehicle?**

A. We have padded restraints.

**Q. Would that have existed on Medic Rosario's vehicle in May of 2014?**

A. I'm not sure if they were on there or not.

**Q. Was there a policy in 2014 that stated that EMS approved restraints had to be on all the paramedics' vehicles?**

A. I would have to look at the policies and procedures.

**Q. You can't tell me that as you sit here today?**

A. Not right now.

**Q. So is it your testimony that there's times that paramedics are out in the field without EMS approved restraints on their vehicles?**

MR. NEWMAN: Object to the form.

A. If the policy was out at that time, then they should have been on there.

MR. HECHT: I don't have any other questions. Thank you.

MR. JOLLY: I have no questions.

MR. NEWMAN: Very brief follow-up, Captain Gonzalez.

CROSS EXAMINATION

BY MR. NEWMAN:

**Q. With regard to guidelines for the use of Ativan, are there guidelines that do specify time intervals in between administration of milligrams?**

A. Yes.

**Q. Under what circumstances is Ativan administered or can Ativan be administered pursuant to your guidelines where there is a specified time interval between administrations?**

A. That would be under the chest pain, cocaine overdose section. It actually specifies that there is a time frame in between your increments.

**Q. What is that time frame? Do you know?**

A. It's right here.

**Q. What is that, sir?**

A. According to our cocaine overdose

guideline, Ativan, one milligram every three to five minutes until relief of chest pain, to a maximum of four milligrams.

MR. NEWMAN: Thank you, sir. I have no further questions.

We are going to read the transcript if it's ordered.

MR. HECHT: I'm going to order it.

THE REPORTER: Do you want a copy?

MR. JOLLY: Yes, please.

MR. NEWMAN: Copy. I want the errata sheet.

MR. HECHT: Captain, I'm going to mark your entire file that you brought with today. Thank you.

(Plaintiff's Exhibit No. 4 was marked for Identification by the reporter.)

(A discussion was held off the record.)

BY MR. HECHT:

**Q. I know there were some documents that you say you didn't bring with you that may exist or you have to go somewhere, I know some of the attorneys have scheduling matters, so I'm not going to ask you to do it now, but I may send a request and ask for certain things that you don't have with you today.**

A. If the attorney --

MR. HECHT: I'll send it to your attorney and he may --

A. Whatever they request, I'll be more than happy to do my best to get what you need.

MR. HECHT: Thank you. Appreciate it.

MR. NEWMAN: Okay.

MR. HECHT: I'll mark the whole file as Exhibit 4.

(Plaintiff's Exhibit No. 4 was marked for Identification by the reporter.)

(Thereupon, the proceedings concluded at 12:24 p.m.)

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF ST. LUCIE )

I, the undersigned authority, certify that CAPTAIN BRIAN GONZALEZ personally appeared before me and was duly sworn on the 22nd day of May, 2017.

Signed this 27th day of May, 2017.



Barbara J. Shandell, RPR, FPR

Notary Public - State of Florida

My Commission No. FF 945479

My Commission Expires: January 27, 2020

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )
COUNTY OF ST. LUCIE )

I, Barbara J. Shandell, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of CAPTAIN BRIAN GONZALEZ, pages 1 through 94; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 27th day of May, 2017.

______________________________

Barbara J. Shandell, RPR, FPR

May 27, 2017

CAPTAIN BRIAN GONZALEZ
c/o Benjamin Newman, Esquire
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
111 North Orange Avenue
Suite 1200
Orlando, Florida 32801

IN RE: DOCHER VS. NEWMAN, et al.
CASE NO.: 2:16CV14413

Please take notice that on the 22nd day of May, 2017, you gave your deposition in the above cause. At that time you did not waive your signature.

The above-addressed attorney has ordered a copy of this transcript and will make arrangements with you to read their copy. Please execute the Errata Sheet, which can be found at the back of the transcript, and have it returned to us for distribution to all parties.

If you do not read and sign the deposition within a reasonable amount of time, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.

If you wish to waive your signature now, please sign your name in the blank at the bottom of this letter and return it to the address listed below.

Very truly yours,

Barbara J. Shandell, RPR, FPR
Phipps Reporting
1551 Forum Place, Suite 200E
West Palm Beach, Florida 33401

I do hereby waive my signature.

______________________________
CAPTAIN BRIAN GONZALEZ

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

IN RE: DOCHER VS. NEWMAN, et al.

CASE NO. 2:16CV14413

WITNESS: CAPTAIN BRIAN GONZALEZ TAKEN: 05/22/2017

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_______________ ______________________________

Date CAPTAIN BRIAN GONZALEZ

**A**

**a.m** 1:17 4:1
**ability** 59:14 60:16 62:25 79:19 85:14
**able** 8:16,25 9:15,16 10:10 10:14 45:14 48:25 49:21 54:16,17 56:7 60:12 66:16 67:16 83:13
**above-address...** 93:10
**account** 36:15
**acidosis** 56:15 57:20 69:3 80:19
**acting** 80:8
**action** 92:17,17
**actions** 29:17,20 82:5
**active** 39:13 43:18 46:22
**Adam** 2:6 4:17
**added** 9:25
**addition** 17:16
**additional** 68:1
**address** 13:22 93:17
**admin** 18:15
**administer** 15:17,19,24 27:10,19 41:6 59:19 60:2 61:4 66:4,23 78:23 86:6
**administered** 39:23 55:11 63:2 64:17 88:16,16
**administering** 47:6 52:24 58:12 66:17 69:15 82:3 84:3
**administers** 79:13
**administration** 3:12 9:7,21 10:2,12 11:6 19:3 21:6 37:3 37:22 38:1,14 40:7,15,25 50:24 51:17 54:5,10 55:3,7 55:10,14,22 56:1,16 67:7 67:17 68:7,13 68:25 77:4 80:18,21,25 88:13
**administrations** 88:18
**administrative** 13:21
**advanced** 58:16
**affect** 67:7,18
**affirmed** 4:11
**agencies** 43:9,10
**agree** 62:17 66:21 69:8
**agrees** 8:8
**ahead** 32:10 61:9 79:16
**ahold** 48:3,20 49:7,11,15
**al** 93:6 94:2
**alcohol** 40:8,16 41:1,8 55:21 57:19 67:8,19 69:2 81:2,6,11 83:19,23 84:5
**alert** 54:18,20 54:21
**allergies** 54:19
**allow** 66:3
**allowed** 66:22 84:22
**allowing** 17:1
**allows** 61:14 63:8,21 64:16
**ALS** 58:16
**alter** 12:5
**altering** 11:4
**ambulance** 84:18
**amended** 9:25
**amount** 26:9 93:14
**answer** 9:9 13:19 22:21 37:14,15 46:11 47:17 48:13 49:5,10 55:18 56:8,12 65:8 66:14
**answered** 21:8 45:17 47:9 78:13
**answering** 57:11
**anxiety** 62:3
**anybody** 63:18 78:19
**apologize** 48:2 51:24
**APPEARAN...** 2:1
**appeared** 91:8
**apply** 76:14,14
**Appreciate** 90:6
**apprenticeship** 16:8,10,11,14 16:14,16 18:4 19:24 22:2,6 22:10,11,15,19 25:24 26:2,4 26:11,19 27:5 27:7,8,17 28:3 28:6,9 34:20 55:1 67:4 68:22 69:10
**approached** 79:21
**appropriate** 66:23 81:7 85:3,7
**approval** 70:1,4
**approved** 69:25 87:6,9,16,25
**approves** 20:20
**approximately** 25:3,7 66:9
**area** 42:1 73:16 74:22
**areas** 32:7 35:25 36:2,10,13,17 36:24 73:8,17
**arrangements** 93:10
**arrived** 80:7
**ash@searcyla...** 2:5
**aside** 15:2
**asked** 19:6,14 37:19 45:17 47:9 51:2 53:17 57:14 78:13
**asking** 15:2 17:20,22 32:4 46:10 51:11,15 65:6 72:5 79:1 79:17 80:12
**asks** 36:20
**aspect** 18:12
**aspirate** 86:4
**assign** 6:2
**assignment** 13:18
**assist** 15:21,22
**assistance** 49:3
**assisted** 64:12 64:25
**Associate's** 23:13,16 24:12
**assume** 71:25 72:1
**Ativan** 3:12 9:21 10:2,5,12 11:6 19:3 21:6 27:10,11,13,19 32:7,19 37:4 37:22 38:14 39:23 40:8,15 41:1 47:7 50:14,24 51:8 51:17 52:6,13 52:16,22,24 53:4 54:5,7,10 55:2,7,10,14 55:22 56:1,16 56:22 57:5,17 57:21 58:19,24 59:3,20 60:9 62:18 63:3,5,9 63:14 64:8,16 65:8,15 66:5 66:11,24 67:7 67:18 68:7,14 69:1,11,15 77:4 80:18,22 81:1,9,12,16 81:19 83:10 84:3,8 85:3,10 85:22 86:2,4 86:14,22 88:12 88:15,16 89:1
**attached** 35:6,15
**attachments** 33:24
**attempting** 78:24
**attempts** 79:13
**attended** 24:14
**attending** 24:13 24:16
**attorney** 10:8 90:1,3 92:14 92:16 93:10,14
**attorneys** 89:22
**authority** 91:7
**authorized** 76:13 92:7
**Avenue** 2:9 93:3
**aware** 40:23 52:23,24 55:9 55:13,21,25 56:15,21 57:2 57:19 58:14 60:8 68:5 84:21
**awhile** 13:10,19

**B**

**B** 36:19,21,22,25 37:19 40:5 76:12
**back** 6:2 11:15 12:4 17:13 19:4,5 21:8 22:3 26:13 31:1 32:21 33:2,12 34:19 44:21 48:22 71:20 72:7 82:11,12 83:2 83:11 84:14,24 85:5,11 93:11
**Backing** 10:16
**Barbara** 1:23 91:22 92:6,25 93:19
**BARNHART** 2:3
**BARRANCO** 2:14
**based** 51:15 57:22 66:19 78:21 80:12 86:8
**basically** 33:16
**Beach** 2:4,4 22:24 93:20
**becoming** 13:9
**began** 4:1
**beginning** 72:16 72:21
**behalf** 2:2,7,13
**believe** 31:12 33:1 46:8 47:14 80:5 87:4
**ben.newman...** 2:11
**Benjamin** 2:12 93:2
**benzodiazepine** 82:1
**benzodiazepines** 58:6 83:16
**best** 36:23 41:15 90:5
**better** 74:9
**beyond** 58:1
**birth** 4:22
**bit** 10:5,6,16 74:7 86:18
**blank** 93:16
**body** 83:24
**bolus** 59:10
**book** 71:22 73:20
**bottom** 38:25 46:5,7 93:16
**Boulevard** 2:4 2:14
**break** 9:18 31:24 32:3 68:2
**Brevard** 25:5,8 25:10
**Brian** 1:14 3:3 3:14 4:10,21 91:8 92:9 93:2 93:25 94:3,25
**brief** 31:24 32:1 68:3 88:7
**Briefly** 85:17
**bring** 31:17 32:6 36:20 37:5,8 39:19 40:4 41:11,19 42:3 89:21
**broken** 72:22,23
**brought** 3:13 32:4,12,17,18 36:21 38:3 40:13 42:7,10 44:10,16,22 46:23 50:13 89:14
**building** 9:11 13:21 14:12,14 14:21,23
**bullet** 58:19,23
**buttocks** 85:23

**C**

**C** 77:9 78:21
**c/o** 93:2
**call** 42:8 47:18 47:21,25 48:4 48:21 49:3,6 66:14,16 82:11 82:13 85:15
**called** 18:17 22:2 67:22 71:6
**calls** 14:9,10
**CALVIN** 1:8
**capability** 60:14
**captain** 1:14 3:3 3:14 4:10 5:4,7 5:11 8:17 9:5 14:6 17:3,9,23 30:5 31:5 32:3 35:3 51:13,22 52:3 68:5 88:8 89:13 91:8 92:9 93:2,25 94:3,25
**cardioversion** 50:11
**care** 37:17 41:14 77:12 78:3 82:19 83:4 85:8
**career** 66:10
**carried** 74:21
**carry** 74:20
**case** 1:2 28:20 61:12 62:2 80:17 82:6,9 86:9 93:6 94:2
**cause** 58:6 62:7 77:12 78:3 82:1 93:8
**causing** 79:11
**Caution** 82:1
**cautions** 52:19 52:23 53:1 81:21,22 82:4
**cell** 48:6,9
**central** 83:16,19
**certain** 26:9 67:22 89:25
**certificate** 3:5,6 16:8 21:22 91:1 92:1
**certified** 22:8 26:1
**certify** 91:7 92:7 92:13
**CEUs** 16:7
**chain** 6:16 7:24 8:1,4,5 11:24 12:3,20 20:12 20:14 29:10,13 70:7
**chair** 7:4 12:20 12:21,22 13:8 13:9 20:5 21:4
**Chambers** 8:13 29:15 31:9
**chance** 33:11 53:21
**change** 27:7 71:5 94:4,4
**changed** 9:25 26:19,24
**changes** 10:3,11 19:6,7 20:6 21:11 27:3,6 44:16 94:1
**charge** 5:13 7:8 28:2,5,8 51:14 52:4
**chest** 76:16 88:19 89:2
**Chi** 8:15 17:2 47:25 48:1,2,6 48:9,16,24 49:6,12 50:5 70:3
**chief** 8:8,11,12 20:16 29:15 31:8,9 69:25
**chiefs** 31:11,15
**Chiou** 8:15 17:2 48:1,2,6,9,16 48:24 49:6,12 50:5 70:3
**chose** 41:6
**CHRISTOPH...** 1:7
**circumstances** 88:15
**City** 24:23,24
**classes** 24:17
**classify** 74:13
**classroom** 16:20
**CLAYTON** 1:7
**cleaned** 26:25 27:1
**clear** 19:9,17 53:9 63:1 66:1
**Clerk** 93:15
**co-chair** 13:16
**co-chaired** 13:10,11
**cocaine** 88:20,25
**college** 14:25 15:7 23:5,6,20 24:11
**combative** 50:11 62:3 65:24 70:12,17 71:14 71:14,16,17 72:13 73:15,21 73:21 74:1,5 74:13,19,22,25 75:1,13,21 76:1,8 77:18
**combativeness** 77:11 78:2
**come** 8:17 13:25 14:5 47:18 69:5 78:17
**comes** 5:14 37:17
**coming** 79:23
**command** 6:17 7:24 8:1,5,5 11:24 12:3,20 20:12,15 29:10 29:14 70:8
**Commission**

91:24,25
**committee** 6:14 6:19,22,25 7:3 7:5,9,11,12,13 7:17,21 9:20 11:8,10,11,14 11:18,19,23 12:1,2,4,9,12 12:14,18,19 13:12,16 20:5 20:9,14 21:5 69:23 70:7
**Committees** 11:20
**Community** 23:5,6,20 24:11
**complete** 92:11
**completely** 65:12,24 73:8
**complied** 82:23
**component** 18:13
**compromise** 58:7 82:2
**concluded** 90:14
**connected** 92:16
**consider** 75:1
**considered** 11:13
**consist** 16:5
**consisted** 26:5
**consistent** 41:15 63:3
**consult** 59:6
**consumption** 81:11
**contact** 29:2 48:17,25 49:1 49:20
**contained** 19:2 35:6,17 36:8 36:13,22 40:24 42:21 43:2,22 44:12 45:5,25 46:14 51:8,8 52:6 70:15 71:13 75:13,21 75:25
**continue** 43:1
**continued** 13:16 77:11,17 78:1
**contraindicated** 57:21 69:1
**contraindicati...** 50:19 52:18,22 55:6,14,22 56:1,16,22 57:5,13,16 81:12,16,17
**contraindicati...** 50:14,24 51:7 51:17 52:6,12 52:19 53:4 54:5 55:2,4,10 57:12 69:11,14 81:19
**copies** 34:23 35:1
**copy** 31:17 32:25 34:13 72:9 89:9,11 93:10,11
**core** 24:17
**correct** 11:11,12 12:15 14:7,8 15:15,16,18,25 19:20,21 20:4 20:8,17,21 21:15,16 24:12 29:23 30:12 34:10,11 35:21 37:23 40:3 41:4 43:25 45:7,8,12 46:9 46:15,25 47:1 47:3,4 48:8,11 49:8,22 50:1,6 50:7 54:2 58:7 58:8,17,18,21 60:23 61:6 63:5,6 64:3,5 64:13,14,24 65:17 66:17 67:2,15 68:15 69:12 70:5,9 70:10 71:9 76:10 77:14 81:20 83:17 84:18 85:16,20 85:23
**counsel** 92:14,16
**County** 1:9,10 4:25 5:14,16 6:8 7:19 8:22 10:17,25 13:4 15:3 18:10 21:23 22:10 25:5,8,11,14 29:23 34:9 35:5,15 37:2 37:21,24 39:22 40:6,24 41:13 41:20,25 43:15 43:19,23 44:2 44:24 45:6 46:1 50:22 51:2,6,22 52:4 53:11,13,19 54:3 59:8,18 60:1 63:4,11 64:6,15 65:2 66:2 70:9 74:3 75:4,20 76:20 76:23 77:21 78:8 80:3,14 82:24 83:1,6,8 83:22,25 84:11 85:2,9 91:3 92:4
**couple** 31:15
**course** 66:10
**Court** 1:1 4:2 93:15
**COURTEMA...** 1:8
**creating** 11:4
**Cristaldi** 12:23 12:24 13:3,8 13:15
**critique** 82:13
**Cross** 3:5 88:9
**cuffed** 84:14,24 85:4,11
**culture** 53:2 54:3
**currently** 4:24 5:3 11:10,25 13:20 16:2 27:17 28:22,23 29:4 31:7 44:23 67:16 84:22
**custom** 41:5 59:7,17,25 63:20 64:5,14 65:1 66:2 74:2
**customs** 37:1,20 37:25 39:21 40:5 41:12 66:19,21 82:23 83:5

**D**

**daily** 11:1
**danger** 63:17 85:13
**dangerous** 50:22 51:6,16 52:5
**date** 4:22 10:19 72:13 94:25
**DATED** 92:19
**dates** 13:11 38:25
**day** 13:25 14:2,4 14:11 17:12 20:18 26:22 27:4 45:3 91:9 91:13 92:19 93:8
**deal** 5:23
**December** 63:23
**decide** 59:9 61:4 78:23
**decided** 43:10
**decision** 8:9 20:19 36:4 59:15 78:17 79:19 80:11
**declare** 94:22
**Defendant** 2:7 2:13
**Defendants** 1:11
**definite** 9:9
**delirium** 55:25 56:11
**deliverance** 77:12 78:2
**delivery** 56:5
**DENNEY** 2:3
**department** 43:15 51:7 52:4,21 53:3 53:13
**departments** 24:7
**depending** 12:6 20:25 52:17 59:13 79:19 86:17,19 87:5
**Depends** 22:3
**deposition** 1:14 3:10 4:19 28:14,18,19 32:18 35:7 66:8 79:24 92:8 93:8,13
**depressant** 83:20
**depressants** 83:17
**depression** 57:3 57:4,20 58:7 58:13 80:23 82:2,4
**determine** 41:14
**detriment** 62:5,7
**deviate** 47:19
**DICKER** 2:9 93:3
**differ** 11:18
**difference** 15:14 17:4 52:15 73:11,13
**different** 11:16

52:17 59:14 60:18 65:13,25 66:14 73:8 79:18
**differently** 79:21
**digging** 60:12
**direct** 3:4 4:13 28:23,24 69:4
**directed** 41:6
**direction** 48:19 48:21 49:4
**directions** 49:2
**directly** 69:6
**director** 8:9,14 70:1
**disagree** 11:25
**disciplinary** 29:12,17,20
**discipline** 29:7
**disciplined** 82:16
**disciplining** 29:5
**discretion** 15:23 59:19,23 60:6 64:7,16 65:3,7 66:6 78:14
**discretionary** 54:23 59:4 78:22 79:12
**discuss** 32:10,11 32:12 68:25 82:12
**discussed** 18:3 70:12 85:3
**discussing** 73:6
**discussion** 12:5 12:7 82:11 89:18
**dispatched** 14:10
**distribution** 93:12
**district** 1:1,1,10 1:10 4:25 5:15 5:17 6:9,21 7:19 8:22 10:18,25 11:7 13:4 15:3 18:11 21:23 22:1,10 25:12 25:14 29:23 34:9 35:5,15 37:2,21,24 39:22 40:6,25 41:13,21,25 43:19,24 44:2 44:24 45:6 46:1 53:11,14 53:19 54:3 59:8,18 60:2 63:11 64:7,15 65:2 66:3,20 69:15 70:9 74:4 75:4,20 76:20,25 77:21 78:8 82:24 83:2,6,8,22,25 84:11 85:2,9
**District's** 63:4
**disturbance** 79:12
**division** 5:5,12 8:18 9:6 14:7 17:4,10,11,24 30:4,5,24 31:3 31:5 51:15 52:5 67:9 69:24 79:3
**Docher** 1:3 4:18 33:22 34:1 39:14 80:8,18 80:22 81:1,5,9 82:20,25 83:4 84:7 93:6 94:2
**Docher's** 85:23
**DOCHER-NE...** 1:3
**doctor** 20:15
**document** 6:15 37:5 38:22 40:17 46:21 71:12,12 94:22
**documents** 39:19 45:12 86:9 89:20
**doing** 10:13 11:21 60:11
**dosage** 86:15
**dose** 59:20 60:3 60:9 63:2,9,22 64:8,17 65:3 66:5,11,24 86:14
**Dr** 17:2 20:18,20 47:25 48:6,9 48:16,18,24 49:2,6,12 50:5 70:2 73:18 74:8 84:1
**draw** 79:17
**drinking** 81:2,6
**Drive** 1:18 13:24
**drugs** 84:5
**duces** 3:11 35:7 35:11 38:10
**due** 65:21,23
**duly** 4:11 91:9

**E**

**E-14** 70:18
**E-15** 70:18 76:7 78:22
**earlier** 22:13 67:20 71:5 73:24
**easily** 9:22
**East** 2:14
**EDELMAN** 2:9 93:3
**educate** 74:7,9 74:18 75:7,17 75:17 76:4
**educates** 73:16
**educating** 22:18 73:20 74:21
**education** 23:1 82:19
**educational** 18:16,20 19:19 19:22 20:8,23 21:2 73:2,6,12 73:14 74:1,6 74:12,19 76:5 76:21 79:2 86:19
**effect** 40:1 44:17 46:12 70:21 71:21
**effects** 86:22
**Eight** 42:14
**either** 12:5 33:16 54:15
**EKG** 33:19,20 34:2
**ELSER** 2:9 93:3
**emergency** 3:12 15:11 42:20 43:18,21 44:3 48:16 49:7 52:13,15,22 53:5 54:6 72:12,21 74:14 74:25 75:14,22 76:1 85:19
**employed** 4:24 29:22 41:24 60:1 63:10 64:6 70:8 74:3
**employee** 5:1 92:14,15
**employees** 5:23 6:1 17:18 37:4 37:23
**EMS** 5:17,21 6:10,12,14,15 6:18 7:18 8:19 8:22 11:8,10 11:17,20 20:5 20:9 21:5 33:23,24 37:10 38:2,22 42:2 87:6,9,16,24
**EMT** 15:9,10 21:15,17,21 22:4 23:9,22 24:7,17,18
**EMTs** 15:15,17 15:19 17:17,19 17:25 18:6 21:24
**ended** 24:8
**ensure** 16:6,24 17:14,18 20:1 29:1
**enter** 21:21 94:1
**entire** 3:13 32:6 38:24 70:13 71:22 72:16 89:14
**entitled** 71:14
**environmental** 76:11
**ER** 33:16,17 47:22 48:21 49:3
**errata** 3:7 89:12 93:11 94:1
**ESQ** 2:6,12,17 2:18
**Esquire** 93:2
**essentially** 47:14
**et** 93:6 94:2
**etiologies** 76:10
**event** 34:14,18
**events** 33:8
**everybody** 8:8 86:20
**exactly** 27:16 32:24
**Examination** 3:4,5 4:13 88:9
**examined** 4:11
**excessive** 76:11
**excited** 55:25 56:4,11
**excuse** 57:17
**execute** 93:11
**exhibit** 35:6,8,9 35:16,16 36:8 36:13,19,21,22 36:25 37:19 38:5,13 40:5 40:13 42:10,15 42:19,19,21 43:2,5,6,8,14

43:23 44:7,10 44:13,15,22 45:4,9,10,15 45:25 46:6,15 46:16,24 50:12 51:9 52:7 53:23 64:1,11 64:25 68:10 70:16 71:14 89:16 90:10,11
**EXHIBITS** 3:8
**exist** 89:21
**existed** 87:12
**existence** 38:15 39:13 46:21 63:23,24 71:19 84:21
**existing** 41:15
**expected** 75:24 76:3
**experience** 53:18 79:3
**Expires** 91:25
**explain** 5:10 12:17 17:4 38:21 52:14
**extension** 48:19
**external** 50:11
**extremity** 76:17

**F**

**facts** 94:22
**family** 54:15 78:16
**far** 12:20 53:16 57:14 68:21 71:21 83:7
**faster** 87:2,3
**feel** 63:16 79:5
**feels** 79:5 85:12
**felt** 62:6 66:24
**FF** 91:24
**field** 7:23 15:24 16:12,20 18:1 18:15 26:9 27:10,20 29:6 30:3,15,18 33:21 48:17,23 59:11,21 60:4 64:9 87:24
**file** 3:13 32:16 89:14 90:10
**filed** 93:15
**files** 9:8,10
**final** 8:9 20:19 70:1,4
**financially** 92:17
**find** 26:14 27:16 30:9 31:13 44:5 60:17 68:17
**finding** 60:14
**fire** 1:10 2:8 4:25 5:14,16 6:9 7:19 8:22 10:17,25 11:7 13:4 15:3 18:10 21:23 22:1,10 23:9 24:2,7,17,18 25:5,11,14 29:23 34:9 35:5,15 37:2 37:21,24 39:22 40:6,24 41:13 41:20,25 43:15 43:19,24 44:2 44:24 45:6 46:1 51:7 52:4 52:21 53:3,11 53:12,13,19 54:3 59:8,18 60:1 63:4,11 64:6,15 65:2 66:3,20 70:9 74:3 75:4,20 76:20,23,25 77:21 78:8 82:24 83:2,6,8 83:22,25 84:11 85:2
**Firefighter/E...** 25:1,9,17 30:2 30:7,12
**firefighter/par...** 30:2
**firefighters** 5:18 5:22
**first** 4:11 21:14 61:2 77:22 85:9
**five** 41:19 61:11 62:12 68:10 76:8 87:4 89:2
**fix** 63:14
**Flight** 7:5
**Florida** 1:1,9,19 1:23 2:4,10,15 13:24 16:7 21:20 91:2,23 92:3 93:4,20
**follow** 47:6 75:3 75:6,8,12,25 76:3
**follow-up** 88:7
**followed** 74:2 83:1,7
**following** 4:1 76:9,12
**follows** 4:12
**foregoing** 94:22
**form** 33:14 47:8 47:16 49:9 51:1,10,20 52:8 53:8 55:16 56:3,18 56:24 57:7,24 59:12,22 60:5 61:8,20 66:13 67:1 74:16 75:5 78:12 79:16 81:10 86:16 88:1
**formulated** 69:21
**Fort** 2:15
**forth** 35:6,15
**Forum** 93:20
**forward** 66:3
**forwarded** 93:14
**found** 93:11
**four** 41:11 58:20 58:25 59:3,5 59:10 60:24 61:14,17,24 62:9 63:3,16 63:19 65:8,16 76:18,24 81:8 83:9 85:10,22 86:2 89:3
**four-milligram** 59:20 60:3,9 63:9,22 64:8 64:17 65:3 66:4,11,24 86:14
**four-year** 23:7
**fourth** 62:22
**FPR** 1:23 91:22 92:25 93:19
**frame** 61:11,13 88:21,22
**front** 26:8 32:16 41:10 56:10 58:5
**full** 4:20
**further** 23:1 74:7 75:8 76:5 77:13 78:3 82:18 89:5 92:13

**G**

**gain** 54:22
**gathered** 41:9
**general** 27:15 41:23 73:1 74:12
**generalized** 74:11 79:2
**getting** 24:8 48:3 49:7
**GIUFFREDA** 2:14
**give** 4:5 9:9 11:23 21:11 33:2 45:20 48:7 54:7,13 59:2,18 60:12 61:13,14,23,24 62:4,19,20,22 63:15 65:7 70:1 72:18 81:12
**given** 33:7 41:24 49:25 50:2 52:17 54:11 64:16
**gives** 62:12,25 70:4
**glance** 45:13
**glanced** 79:25 80:1,2
**go** 7:24 8:1,4,6 12:4 16:13 20:7,22 21:18 21:24 22:6,9 22:23,25 24:10 25:4 26:13 27:18 30:9 31:1,13 32:10 35:16 36:25 38:19 40:10 43:11 44:21 50:8 54:25 59:5 61:9 62:9 63:16,18 64:11 69:25 71:20 74:18 75:7,18 76:5 77:23 79:16 82:18 83:11 85:25 89:22
**goes** 20:11,14 21:8 27:5
**going** 10:5,8 22:19 31:11 32:15 36:19 42:18 44:14 45:9 66:3 67:25 68:7 69:9 70:7,22 71:25 72:3 73:14 77:9 89:6,8,13,23

**Gonzalez** 1:14 3:3,14 4:10,21 35:3 68:5 88:8 91:8 92:9 93:2 93:25 94:3,25
**Good** 4:15,16
**gotten** 48:15
**graduate** 23:12
**graduated** 24:12
**graduating** 23:15
**greg@purdyl...** 2:16
**GREGORY** 2:17
**group** 6:20 7:8 12:5
**guardian** 1:4
**guessing** 7:10
**guideline** 6:14 6:18 10:4 11:8 11:10,18,20 20:5,9 21:5 34:15 38:22,24 38:24 39:1,2 39:12,24 40:1 40:10,12 41:5 43:8,9 45:2 46:19 47:2,10 47:13,15 49:16 50:8,17,18 53:6 62:14,24 63:8 65:6,12 65:22 66:7 69:23 70:11,14 71:22 72:22,23 72:24 73:9,15 73:17 74:1,10 74:11 75:7,9 75:15,16 76:4 76:21,22,24 77:20,24 78:7 79:2 89:1
**guidelines** 3:11 3:12 6:10,11 6:13,15 7:18 7:20 8:3,6,19 8:22 10:1 20:7 26:7 27:6,6 31:17,17 32:4 32:7,19,20 34:15,23,24 37:7,8,10,18 38:2,3,8,13,15 38:16 39:6,9 39:16 40:25 42:21,24 43:2 43:7,13,18,22 44:3,23 47:19 48:18,24 56:13 62:11 63:4,7 65:13,25 66:20 67:13,21,22 69:5,6,7,13,17 69:19,21,22 70:20,23 71:21 71:24 72:12,22 73:2,3,7,8,9,19 74:12,14 75:1 75:14,22 76:2 80:1 81:15,24 83:2,6,8 86:19 88:11,12,17

**H**

**Haldol** 74:20,20 74:21
**hand** 4:3 27:5,5 33:12
**handcuffed** 84:9 84:13,16
**handcuffs** 84:24
**handed** 32:24 34:8 43:13,22 71:13
**hands** 84:13,23 85:4,11
**hands-on** 15:12 18:13,14,19 19:19,22 20:8 20:22 21:1 26:8
**happen** 24:6
**happy** 90:5
**hard** 76:17
**harm** 62:7 77:13 78:3
**harm's** 78:18
**Haven** 24:23,25
**head** 55:13 57:19 60:13,25 68:18 69:2 70:6
**heading** 39:4 44:11 45:4 46:24 50:12,25 51:18 52:7 64:12,25 70:16
**Hecht** 2:6 3:4 4:14,17 19:12 19:16 28:16 31:25 32:2 38:7,10,11 42:17 44:9 45:21 47:12,20 49:13 51:4,12 51:24 52:2,10 53:15 55:20 56:6,20 57:1,9 58:3 59:16,24 60:7 61:16,21 66:18 67:3 68:4 71:1 74:23 75:10 78:20 79:22 81:13 86:23 88:4 89:8,13 89:19 90:2,6,9
**held** 5:6 30:1 70:24 73:22 89:18
**high** 22:23,24,25
**hired** 22:4,4,5,7 24:7,8,21 25:11 30:8
**history** 40:8,16 41:1,7
**hit** 14:5 18:12 18:19 86:11
**hits** 14:5
**hooked** 34:1
**hour** 68:1
**human** 30:9 31:13 83:24
**hypersensitive** 54:8,10,19
**hypersensitivity** 55:7 57:13 69:12,14 81:16 81:18
**hypotension** 58:13 82:3
**hypoxia** 76:10

**I**

**identical** 44:12
**Identification** 35:10 38:6 42:16 44:8 89:17 90:12
**identified** 35:4
**illness** 40:9,16 41:2,8 69:2
**IM** 86:2
**implement** 20:10
**implementation** 20:3
**implemented** 6:6 8:10 20:13 20:16 21:10
**incident** 10:19 80:4,15
**include** 5:17 6:4
**including** 37:4 37:23
**incorrect** 61:1
**increment** 60:19
**incrementally** 39:23 61:19
**increments** 58:20,25 60:21 61:12,13 62:10 65:16 88:21
**independent** 1:10
**INDEX** 3:1
**Indian** 15:7 23:4 23:4,6,20 24:10
**indications** 50:10
**individual** 38:25 66:16 79:11
**individually** 1:7 1:7,8,9
**individuals** 22:19
**influence** 67:8 67:18
**information** 9:17 41:9 45:5 46:14 48:7 54:11,14 60:15 60:17,18 75:13 75:21,25 81:7
**ingested** 84:5
**inject** 59:9 61:2 63:9,21 64:8 65:3 81:8 84:13,23 85:3 85:9,21
**injected** 55:23 56:2,17,22 57:5,21 60:9 66:9 83:9 84:7 86:13
**injecting** 86:4
**injection** 57:17 63:5
**instituted** 9:19 9:25
**instituting** 11:4
**intent** 85:21
**interaction** 83:23
**interested** 92:17
**interests** 41:16
**interfere** 77:11 78:2
**interval** 88:18
**intervals** 88:13
**interventions** 26:9
**interview** 17:2

**interviewed** 69:24
**intoxicated** 80:8
**intramuscular** 86:17,18
**intramuscularly** 55:11,15,23 56:2,17,23 57:6,22 59:20 60:2 81:9 83:10 84:8,23 85:22 86:13,24 86:25
**intravenously** 83:10 87:1
**intubation** 64:12,18 65:1
**involve** 14:11 77:3
**involved** 11:3,14 11:21 18:6 27:22,24 29:4 29:16,19 36:5
**involvement** 5:25 16:2 22:18 35:24 36:14,16 82:8
**involving** 9:6 53:17
**IRCC** 23:5 24:13,14
**IRSC** 23:2,14 24:6
**issue** 29:7,9,12
**issues** 5:14,21 6:8
**items** 36:22
**IV** 86:17

**J**

**J** 1:8,23 2:17 91:22 92:6,25 93:19
**JANICE** 1:3
**January** 91:25
**Jennifer** 8:12 29:15 31:8,9
**job** 11:16 20:10
**Join** 55:17 57:25
**JOLLY** 2:14,17 55:17 57:25 88:6 89:10
**Jose** 1:9 28:11 28:19,22 37:4 37:23 39:13 62:17 63:2 66:8,22 68:6 68:12 82:22 83:1
**July** 25:15
**Juno** 28:11

**K**

**keep** 12:6 16:25 17:12,19,25 29:2
**keeping** 17:16
**Ken** 1:8 2:13
**kept** 17:14
**KIM** 2:18
**know** 13:1 26:15 31:12 33:10 39:1 43:17 44:1 46:3 49:24 50:3,21 54:9 57:10 58:2 65:14 68:17 70:25 71:18 72:3,4 72:10 73:24 80:7,17,21,25 81:14 82:8,15 82:17,21 84:8 84:10,16,25 85:6 86:12 88:22 89:20,22
**knowing** 80:20 80:24
**knowledge** 35:5 35:14,22 36:7 36:10,12,15 57:15,22 68:11 68:16 83:7

**L**

**lab** 15:9,10,12
**Lakes** 2:4
**Lauderdale** 2:15
**launch** 31:23
**leads** 46:7 47:13
**learn** 21:7 69:10
**learned** 81:6
**legal** 1:4
**legs** 76:17
**let's** 24:10 31:1 36:25 44:21 50:8 58:4 65:14 73:3 79:11
**letter** 3:6 93:16
**letting** 73:24
**license** 18:5 23:22,24 24:18 25:18
**licenses** 24:3
**lieutenant** 10:21 10:24 30:3,3,4 30:18,21,24 31:2
**life** 58:16
**limbs** 76:18,24
**line** 79:17 94:4
**list** 7:10 26:6 50:13
**listed** 35:13 36:10 51:16 52:6 93:17
**literature** 87:5
**little** 10:5,6,16 74:7 86:18 87:2
**Liu** 8:15 17:2 20:18,20 48:1 48:2,16,24 49:2,6,12 70:3 73:18 74:8
**Liu's** 48:6,9,18 50:5 84:1
**live** 6:15
**living** 38:22
**LLP** 2:9 93:3
**located** 9:10 13:20
**log** 34:18
**long** 5:1,6 16:16 21:17 22:11 25:2,6 26:11 26:14
**longer** 13:15 43:14,23 71:6 86:18
**look** 7:23 9:8 13:23 19:4 21:9 25:21 27:15 33:11 35:17 39:18 40:17 44:14 45:1,12,19 53:21 54:18 56:4,11,14 60:16 62:11 65:14 66:15 70:13 71:20,22 72:7,19 73:19 74:18 75:15,16 76:9 80:6 83:11 84:15 85:24 87:18
**looked** 33:7 46:5 79:25
**looking** 39:4,24 65:12 72:10,12 72:20 76:7
**looks** 44:11 64:2
**lot** 31:16
**Lucie** 1:9,10,19 2:7 4:25 5:14 5:16 6:8 7:18 8:22 10:17,25 11:7 13:4,24 15:3 18:10 21:23 22:1,9 25:11,14 29:22 34:9 35:5,14 37:2,21,24 39:21 40:6,24 41:12,20,25 43:14,19,23 44:2,24 45:6 46:1 50:22 51:2,6,14,22 52:4,21 53:3 53:11,12,13,18 54:3 59:8,18 60:1 63:4,11 64:6,15 65:2 66:2,20 70:9 74:3 75:3,20 76:19,22,25 77:21 78:8 80:3,14 82:24 83:1,6,8,22,25 84:11 85:2,9 91:3 92:4

**M**

**M-8** 64:11,24 65:14 66:1
**maintain** 16:7 16:24
**makeup** 12:17
**making** 7:15 11:21
**MANGRUM** 1:7
**manual** 18:22
**mark** 12:23,24 13:3,8,15 35:8 38:8 42:18 89:14 90:9
**marked** 35:9 38:5 42:15 43:13 44:7 89:16 90:11
**Mascara** 1:9 2:13
**Matt** 7:5
**matter** 4:19
**matters** 89:23
**max** 58:20,25 65:16
**maximum** 89:2
**mean** 6:13 7:14 16:23 17:8

19:9 27:2 28:15 33:25 34:22 37:14 38:21 60:19 71:9 77:15 87:8
**meaning** 38:23
**means** 81:18
**medic** 66:22 71:2 78:14,17 79:4 80:7 81:6 81:8 82:5 83:3 85:21 86:3,10 87:12
**medical** 3:12 8:9 8:14 9:25 15:11 20:6 31:16 32:4,6 38:2 40:8,15 41:7 42:20 43:12,18,22 44:3 47:2 48:19,20 49:2 49:4 54:18,20 54:21 70:1 72:12,21 73:1 73:9 74:14 75:1,14,22 76:2 77:12 78:3
**medically** 77:19 79:4
**medication** 15:17,20 34:19 54:19 68:19
**medications** 15:19,22,24 86:7
**medicine** 27:3 71:6
**medics** 79:18
**meet** 16:6
**member** 78:16
**members** 12:19 54:15
**memory** 8:20 9:3
**mental** 40:9,16 41:2,8 69:2
**mention** 40:14 40:22,24,25
**mentioned** 32:8 32:20 45:3 57:16
**metabolic** 56:15 57:20 69:3 80:19
**mild** 62:3
**mildly** 62:3
**milligram** 58:20 58:24 59:2 61:3,4,18,23 62:4,10,18,20 62:21,22 63:14 63:15 89:1
**milligrams** 58:25 59:3,5 59:10 61:5,14 61:17 62:10 63:3,16,19 65:8,16 81:8 83:9 85:10,22 86:2 88:13 89:3
**Milner** 1:18 13:23
**minutes** 61:11 62:12,13 86:21 87:4 89:2
**mixing** 24:5
**modifying** 11:4
**module** 18:23 19:1,2 21:7
**modules** 18:2,18 21:1
**moment** 15:9 45:20
**monitor** 61:3
**monitoring** 61:15
**months** 16:18 22:13 26:15,17
**morning** 4:15,16
**MOSKOWITZ** 2:9 93:3
**mother** 1:3
**move** 11:24

**N**

**N.W** 1:18
**name** 4:17,20 6:24 7:2,6 93:16
**names** 7:1
**narcotic** 57:19
**narcotics** 56:21
**need** 6:15 36:24 38:19 49:11,15 50:19 52:24 63:15 72:7 79:5 90:5
**needed** 47:19 48:17,20,23 49:3
**needle** 86:4
**needs** 7:17
**nervous** 83:16 83:19
**never** 74:20
**new** 11:22 19:25
**Newman** 1:7 2:12 3:5 19:8 19:13 28:15 38:9 45:17 47:8,16 49:9 51:1,10,20 52:8 53:8 55:16,18 56:3 56:18,24 57:7 57:24 59:12,22 60:5 61:7,20 66:13 67:1,25 70:19 74:16 75:5 78:12 79:15 81:10 86:16 88:1,7 88:10 89:4,11 90:8 93:2,6 94:2
**Nielson** 7:5,7,8
**nods** 60:25 70:6
**non-EMS** 6:3
**non-uniformed** 6:4
**nonemergency** 52:16
**nonuniformed** 5:23 6:1
**North** 2:9 93:3
**Northwest** 13:23
**nos** 57:11
**Notary** 1:23 91:23
**notes** 92:12
**notice** 3:10 35:7 93:8
**novel** 73:21
**number** 3:10 37:1,19 39:20 40:4 41:11,19 48:6,10,12,14 49:22,23 50:5 68:10 76:8,17
**numbers** 35:22 36:7 62:11

**O**

**Oath** 3:5 91:1
**object** 47:8,16 49:9 51:1,10 51:20 52:8 53:8 55:16 56:3 57:7 61:7 61:20 66:13 67:1 74:16 78:12 79:15 81:10 86:16 88:1
**objecting** 45:18
**objection** 57:24
**observe** 58:12 82:3
**obtaining** 24:3
**October** 5:7 6:5 8:18,23 9:6 30:25 31:6 46:7
**office** 8:23 9:20 10:1,12 13:20 48:12,14 50:23 51:3,14,23 52:1 80:4
**officer** 10:21,22 10:23 13:1,7 22:21 29:1,3 30:3,4,18,21 82:10 84:17
**officers** 62:1 79:10 81:1,5
**official** 37:1,20 39:20 40:5 41:20
**offline** 48:18 49:2
**okay** 32:14 33:18 34:17,18 39:3 42:10 45:11,22,23 50:9 72:2 73:5 90:8
**old** 72:23
**once** 7:25 18:25 20:14 21:17,21 26:1
**one-milligram** 65:16
**ones** 37:11
**online** 48:20 49:4
**operations** 11:1
**opinion** 11:24 51:11 86:10,20
**option** 63:18
**Orange** 2:9 93:3
**order** 21:18,25 24:10 89:8
**ordered** 89:7 93:10
**ordering** 93:14
**orders** 27:15 47:18
**organization** 53:10
**original** 93:14
**Orlando** 2:10

93:4
**outside** 74:7
**overall** 76:21
**overdose** 88:20 88:25
**oversaw** 11:1 12:8,11
**oversee** 5:20 7:12,13 11:11 28:22
**Overseeing** 11:22
**oversees** 11:19
**overview** 73:15

**P**

**P.A** 2:3,14
**p.m** 1:17 90:14
**pacing** 50:11
**padded** 87:11
**page** 3:2,10 45:5 45:24 46:6,11 46:15 51:8 64:11,24 66:1 70:17,18 72:16 76:7,8 78:22 94:4
**pages** 33:4 42:11 42:14,19 92:9
**pain** 88:19 89:2
**Palm** 2:4,4 93:20
**panel** 26:8
**paperwork** 16:24
**paramedic** 7:5 15:14 16:11,12 16:13 21:14,19 21:21,25 22:4 22:5,7,9,10 23:9,24 24:9 25:18 26:1 28:11 30:15 46:13,18,22 48:23 49:5 54:9,13,23 59:2,23 60:9 61:1,14 62:2,8 62:15,17 63:2 68:8 69:9 78:23 79:9,13 84:12,22 85:12 85:13 86:5
**paramedic's** 87:10
**paramedic/E...** 23:18
**paramedic/fir...** 12:25
**paramedics** 5:17 5:21 6:8 9:7 11:6 15:15,23 16:3,6 17:16 17:19,25 18:7 18:9 19:18 20:7,22 21:6 29:3,5,17,20 33:21,25 41:6 41:24 47:6 48:5,8,15 50:5 52:20 53:3 54:4,25 58:9 58:22 59:9,19 60:1 61:25 63:8,10,13,17 63:21 64:6 65:2 66:4 67:5 67:12,17 74:3 75:3,6,12,19 75:24 76:3 77:21 81:18 83:23 84:1,4 85:8,19 86:6 87:6,24
**paramedics'** 87:17
**parentheses** 76:14,18
**part** 8:6 10:24 11:8,9,17,20 12:14 17:11,17 17:22,24 19:1 19:18 20:4 23:17 25:24 27:13,17 33:14 33:23 37:10 40:11 43:9 53:2 54:2,25 67:9
**participating** 43:9
**parties** 92:15 93:12
**parties'** 92:16
**pass** 16:14,25
**patient** 17:19 33:16,17 37:17 41:1,7,16 50:11 54:8,9 54:15,16 55:11 59:9,10,21 61:2,3 62:1,5,7 62:15 63:10,16 63:22 65:4,21 65:24 66:24 67:8 73:14 74:1,6,13,19 74:25 75:2,13 75:18,21 76:1 76:8 77:7,13 77:23 79:6 83:10 84:4,4 85:4,12
**patients** 9:7 15:24 17:25 27:10,19 40:8 40:15 54:17 60:3,10 64:9 70:12,17 71:15 71:16,17 72:13 73:15,21,22 74:21,22 76:23 78:19 79:4
**PD** 78:15
**penalties** 94:22
**people** 6:22,24 7:2 62:8 66:9 70:8 74:17 79:6
**people's** 36:15
**percent** 13:13 20:1 68:24
**perform** 14:18 14:20,23
**performance** 29:6
**period** 19:23 62:19,20,21
**perjury** 94:22
**person** 7:22 11:19 35:4,13 35:21,24 36:6 36:9,12,14 68:11 69:18,20 70:4
**personal** 57:15 57:22
**personally** 91:8
**personnel** 6:4,20 7:9 18:25 20:2 34:4,9 74:7
**persons** 35:4,14
**pertains** 6:7
**pharmaceutical** 64:12,25 77:16 77:25
**pharmacologic** 77:9,23 78:9 78:24
**pharmacology** 40:11
**Phipps** 93:19
**phone** 48:6,9 49:22,23
**phrase** 57:18
**physical** 76:12 77:7,10,17,22 77:25 78:10,10 78:25 79:14
**physically** 77:18
**physician** 47:23 59:6
**place** 74:17 93:20
**Plaintiff** 1:5
**Plaintiff's** 3:8 35:9,17 36:8 36:20 38:5,8 38:12 42:15 44:7,13,15 45:25 46:6,15 46:24 70:16 71:13 89:16 90:11
**Plaintiffs** 2:2
**please** 4:3,20 37:12 41:18 89:10 93:8,11 93:16
**point** 58:19,23 78:18
**police** 62:1 84:17,24
**policies** 6:6 11:5 37:1,6,20,25 39:21 40:5 41:12,15,20,22 41:23 42:2 66:19,21 77:1 77:3,6 82:23 83:5 87:18
**policy** 41:5 47:5 47:10 50:4 59:7,17,25 61:5,10 63:21 64:5,14 65:1 66:2 74:2,15 75:2 76:19,22 76:23,24 84:12 84:15,21,25 85:2,6 87:15 88:2
**Port** 1:19 2:7 11:7 13:24 51:13 52:21 53:2,12
**portion** 38:23 74:14,25 75:2 76:1 79:2
**position** 5:3,6 9:5 10:17 13:6 13:17 25:16 53:18 73:25 82:22
**positions** 29:25

**possible** 9:1 18:12 76:15
**post-intubation** 64:18,19 65:4 65:11,19,22 66:5
**post-sedation** 65:10
**potential** 76:10
**practice** 7:16 27:3 37:2 59:7 59:17,25 63:21 64:5,15 65:1 66:2 74:2
**practices** 37:20 37:25 39:21 40:6 41:12 66:19,22 82:24 83:5
**practicing** 71:6
**present** 2:18 26:22 67:11
**presented** 79:10
**pretty** 80:2
**previously** 65:23
**primary** 16:13
**print** 42:9
**prior** 12:2 13:8 17:1 19:5 28:13,18 78:24 79:23 80:17,21 80:25 84:3 86:4
**problem** 42:8 63:15
**procedure** 41:5 47:5,11 74:15 75:2
**procedures** 6:6 11:5 87:19
**proceedings** 3:1 4:1 90:13
**process** 21:18
**Professional** 92:7
**program** 16:9 16:10,11,14,15 16:16 18:4,17 19:25 21:21,24 22:2,6,10,11 22:15,19 23:7 23:8,11,19 24:11 25:25 26:3,4,11,14 26:19 27:5,7,9 27:18,18 28:3 28:6,9 34:20 55:1 67:4 68:22
**progress** 17:1
**proper** 77:12 78:2
**properly** 27:9,19
**protocol** 9:23 56:5,14 57:12 58:1,4
**protocols** 55:5,8 56:10 84:1
**provided** 68:6 68:12
**public** 1:23 34:14 91:23
**pull** 56:13
**PURDY** 2:14
**purpose** 61:25
**purposes** 64:18 65:4
**pursuant** 88:16
**put** 38:25 50:18 50:19 69:22 72:11 78:18 79:9
**putting** 65:10,11 83:3

**Q**

**question** 13:19 19:5,9 21:3,9 28:17 37:13 45:23,24 48:22 49:20 51:5,21 53:1,9,24 56:12 61:8 63:20 64:4,22 65:9 66:15 71:11 74:24 78:7 79:1,16 84:20
**questions** 53:17 69:5 72:1,2,4 88:5,6 89:5
**quick** 53:6
**quickly** 86:14

**R**

**raise** 4:2
**rank** 13:1
**rayon** 76:16
**read** 3:6 80:14 81:23 86:19,20 87:5 89:6 93:11,13 94:22
**real** 53:6
**reason** 49:1 62:14 94:4
**reasonable** 93:14
**reasons** 52:17
**receive** 18:5
**received** 23:22 23:24
**recess** 32:1 68:3
**recommendati...** 6:16 12:1,6 20:21
**recommendati...** 7:16,21,22,24 8:1,4 11:21,23 20:10,11,12,16 29:8,9,13 69:23 84:2
**recommending** 29:16,19
**record** 45:18 53:10 72:11 89:18 92:11
**records** 25:21 26:13 34:14 68:17
**refer** 46:10,11 53:6
**reference** 46:23 73:20
**referenced** 46:18
**referred** 51:21
**referring** 65:18 65:19
**reflection** 69:4
**regard** 19:10 88:11
**regarding** 3:11 9:21 10:1,12 21:5 28:19 35:22 36:2,7 36:10,13 37:3 37:21,25 38:13 39:22 40:7 41:13 48:24 58:23,24 67:6 68:6,12,13 77:6
**regards** 39:20 40:19,21
**regional** 43:8
**Registered** 92:6
**regulations** 6:7
**related** 39:9 56:11
**relates** 11:5 20:23 29:5
**relating** 19:3
**relative** 92:14,15
**release** 17:1 86:5
**released** 16:12
**relief** 89:2
**repeat** 32:23
**rephrase** 28:17 37:13 51:5 64:4,21
**report** 31:7,10 33:3,8,15,23 33:24 34:13,14 80:1,4,15 85:16,18,19,24 85:25 86:1,8 92:8
**reported** 1:22 12:21
**reporter** 3:6 4:2 35:10 38:6 42:16 44:8 89:9,17 90:12 92:1,7
**Reporting** 93:19
**reports** 41:14 83:12
**represent** 4:17
**reprimanded** 82:14
**request** 10:8 34:14 89:24 90:4
**requested** 36:6 92:10
**require** 10:5 21:1,1,2
**required** 16:7 33:15 66:25
**rescue** 2:8 25:5 27:12,13
**research** 10:6,13 11:22 60:11 68:23 83:21
**resources** 30:9 31:14
**respiratory** 57:3 57:4,20 58:7 58:13 80:23 82:2,4
**respond** 14:9
**responsibilities** 5:11 17:23
**responsibility** 17:18,24
**rest** 30:9
**restrain** 76:23 77:22
**restrained** 77:18 79:4
**restraining** 77:7 78:15,15,16
**restraint** 78:24 78:25 79:14
**restraints** 76:12

76:17 77:9,10 77:16,17,22,23 77:25 78:1,9 78:10,10 87:7 87:9,11,16,25
**restroom** 31:24
**result** 82:19
**retirement** 31:14
**retiring** 31:11
**retrieve** 60:17
**return** 93:17
**returned** 93:12
**reverts** 19:5
**review** 7:20 8:3 26:7 41:13 79:23 80:3,12 82:5 86:8 92:10
**reviewed** 79:25 82:7 85:16
**revise** 38:23
**revised** 38:16,20 39:1,2,7,16 64:2
**revising** 38:24
**right** 4:3 10:14 36:9,18 38:4 49:17 56:7 60:21 61:23 62:9 71:7 72:6 78:5,6 81:23 87:22 88:23
**risk** 54:22
**River** 15:7 23:4 23:5,6,20 24:10
**ROBINSON,i...** 1:8
**role** 5:11 11:14 17:3 20:4 22:14 53:17
**Rosario** 1:9 15:14 28:11,19 28:22 34:19 37:4,23 39:13 62:6,17,24 63:2 66:8,22 68:6,12 69:9 70:24 71:2 80:7 81:6,8 82:23 83:1,3 86:3,11
**Rosario's** 82:5 85:21 86:1 87:12
**route** 79:7
**RPR** 1:23 91:22 92:25 93:19
**rules** 6:6
**run** 16:8,22 33:3 33:23,24 34:13 41:13 80:1 85:16,18,24,25 86:1,8

**S**

**SABOL** 2:18
**safe** 17:13,14,17 17:19 18:1
**safety** 5:4,12,13 5:21 6:7 8:7,18 9:6 14:7 17:4,6 17:9,11,11,14 17:23 30:4,5 30:24 31:2,5 51:15 52:5 61:25 62:1,1 62:14,15,16
**sanctioning** 29:4
**sand** 79:18
**saying** 33:16 49:19 72:3
**says** 46:7 50:10 50:17 58:6,19 61:6 64:2,12 65:15,15 72:21 74:12 75:9 76:14 77:24 85:25
**SCAROLA** 2:3
**scene** 17:13 34:4 54:12 78:18 79:10,19 80:8 80:9
**scheduling** 89:23
**school** 22:23,24 22:25 23:9,9 23:10 24:9
**Science** 23:13,16 24:12
**scope** 7:16
**scored** 68:20,24
**SEARCY** 2:3
**second** 58:19 61:4 62:19 76:7
**secondary** 78:9 79:8
**section** 40:11 44:12 45:15 72:17,17,24,25 73:6,7,13,23 74:6,6,8,10,12 74:19 75:18 76:6 88:20
**sections** 72:23
**sedate** 77:19 86:15
**sedating** 65:21 65:23
**sedation** 39:4,6 39:10,12,16 40:19,21 42:6 42:7 44:11,12 45:4,5,9,10,15 45:24 46:6,15 46:24 48:24 50:8,10,12,25 51:8,18 52:7 58:4 62:2 64:1 65:5,11,15 67:23
**sedative** 41:7 79:13
**sedatives** 9:7 37:3,22 38:1 39:22 40:7 68:13
**see** 21:9 31:22 32:9,16,22 33:9 34:5 35:12 39:3 54:18 60:16 62:5 66:11 71:22 72:6
**seeing** 86:22
**seen** 35:11,19 42:20 86:10
**send** 8:7 18:18 89:24 90:2
**sent** 8:8
**separate** 73:4
**set** 35:5,15 41:23
**setting** 52:13,16 52:16,22 53:5 54:6
**Shandell** 1:23 91:22 92:6,25 93:19
**sheet** 3:7 89:12 93:11 94:1
**SHERIFF** 1:9
**Sheriff's** 50:23 51:3,14,22 52:1 80:4,15
**SHIPLEY** 2:3
**shock** 76:10
**short** 68:2
**Shortly** 25:19,22
**show** 41:18 42:18 44:15 45:9 70:15,17
**showed** 37:11 43:7
**shown** 34:25
**side** 17:5,6
**sign** 3:6 93:13 93:16
**signature** 33:14 93:9,16,23
**signed** 33:15 74:8 91:13
**signs** 58:12 62:4 73:18 82:3
**simply** 9:1 79:9
**single** 59:19 60:3 63:2,9,22 64:8 64:17 65:3 66:4,10,23
**sir** 4:15 9:14 10:13 14:1 31:21 40:20 44:20 46:17 52:14 53:21 59:1 64:20 78:4 88:24 89:4
**sit** 7:15 8:16 9:1 10:10,14 11:10 26:8 67:15 82:12 84:20 87:20
**sitting** 41:10 56:7 83:13
**situation** 52:18 59:13,14 66:25 79:18,20,20
**six** 33:4
**six-page** 85:19
**skills** 15:12 26:8
**small** 38:23
**software** 18:23 18:24 42:2
**sole** 20:9
**solemnly** 4:4
**solution** 18:21 21:7 42:1
**solutions** 18:17 19:11
**somebody** 65:23
**sorry** 15:21 38:17
**sort** 21:24 22:17 79:14 87:9
**SOUTHERN** 1:1
**speak** 36:6 47:23 54:16,17 82:13
**speaking** 15:13 36:2,9
**special** 1:10
**specific** 9:23 10:4 39:2 53:1

65:9 74:10,24
**specifically** 18:10 19:10 44:11
**specifics** 62:12
**specified** 88:17
**specifies** 88:20
**specify** 88:12
**spoke** 18:21
**spoken** 28:13,19
**St** 1:9,10,19 2:7 4:25 5:14,16 6:8 7:18 8:22 10:17,25 11:7 13:4,24 15:3 18:10 21:23 22:1,9 25:11 25:14 29:22 34:9 35:5,14 37:2,21,24 39:21 40:6,24 41:12,20,25 43:14,19,23 44:2,24 45:6 46:1 50:22 51:2,6,13,22 52:4,21 53:3 53:11,12,13,18 54:3 59:8,18 60:1 63:4,11 64:6,15 65:2 66:2,20 70:9 74:3 75:3,20 76:19,22,25 77:21 78:8 80:3,14 82:24 83:1,6,8,22,25 84:11 85:2,9 91:3 92:4
**standard** 73:22 85:8
**standards** 24:2
**stands** 23:3 58:16
**start** 25:13 86:22
**started** 24:13 31:4
**state** 1:23 4:20 15:7 16:7 21:20 22:8 26:1 61:10 91:2,23 92:3
**stated** 66:8 83:2 87:15 94:23
**statements** 34:3 34:5,8,10
**states** 1:1 39:20 63:6 68:10
**station** 10:21,22 10:22,23,23 11:2 13:7 14:17,22 22:21 29:3 30:3,21 82:10
**stations** 14:16
**staying** 14:11
**stenographic** 92:12
**stenographica...** 1:22 92:8
**steps** 76:9
**stimulation** 76:11
**stopped** 44:2
**story** 60:18
**straight** 62:9
**strapped** 76:16
**stray** 47:14
**strike** 8:2 10:15 12:1 57:3,17 80:13
**strips** 33:19,20
**study** 24:16
**stuff** 6:3
**suffering** 57:2 69:1 80:19,22
**sufficient** 63:14 77:10,17 78:1 78:11
**Suite** 2:10,15 93:4,20
**summary** 10:3 21:11
**Sunrise** 2:14
**supervised** 26:10
**supervision** 28:23,24,25
**supplied** 75:20
**supply** 69:16
**support** 58:16
**supposed** 47:6
**sure** 6:23 7:15 12:10,13,21 13:2,13 17:12 18:14 19:9,17 27:4 28:4,7,10 29:21 36:9 37:16 41:3 43:16 44:25 53:7 64:23 67:24 71:23 73:3 77:5,8 81:25 82:12,15 87:14
**swear** 4:4
**sworn** 4:11 91:9
**symptoms** 62:4
**system** 83:16,20

**T**

**tag** 54:20,21
**tags** 54:18
**take** 4:18 9:18 10:8 11:23 26:6 31:23 35:17 37:12 40:18 45:19 68:1,20 75:16 79:7 86:15 93:8
**taken** 9:5,20 10:1,12 32:1 33:17,20 34:19 68:3 76:9 94:3
**takes** 86:18
**talk** 29:13 38:12 48:23 58:4
**talked** 73:23
**talking** 31:16 78:15
**talks** 74:20
**target** 18:17,21 19:10 21:7 42:1
**Tavares** 1:3 4:18 39:14 80:8,18 80:22 81:1,5,9 82:20,25 83:4 84:7 85:22
**teach** 15:1,2,6,8 15:9,11 16:23
**teaching** 22:18
**technician** 15:11
**tecum** 3:11 35:7 35:11 38:10
**tell** 7:4 8:16,25 10:11,15,23 13:13 14:2 17:8 18:9 26:4 29:25 30:6,11 30:14,17,20,23 31:4 32:17 36:5,16 39:6 45:14 62:23,24 67:16 68:18 80:10 83:13 84:16 87:20
**telling** 49:14 52:25 67:20 72:20 74:5
**test** 34:19 68:20 68:24 69:4,5,7
**testified** 4:12 70:20
**testimony** 4:5 43:21 75:11 78:21 87:23
**tests** 16:25 26:6 26:7
**Thank** 34:7 88:5 89:4,15 90:6
**thing** 24:1 34:23 35:2 72:18 85:19
**things** 24:5 32:17 36:20 71:5,5 89:25
**third** 24:1 62:20
**threat** 79:5
**three** 10:22,24 16:18 22:13 26:15,17 40:4 60:22 61:10,24 62:12,13 89:1
**time** 8:12 9:16 10:6,9 11:3 13:2 21:4,12 23:4,5,13,17 25:16 26:2,20 27:6 31:12,15 40:18 43:10 56:14 61:11,13 62:19,20,21 67:10,11 73:10 88:2,12,17,21 88:22 93:9,14
**timeline** 30:10
**times** 60:8 87:23
**titled** 72:12
**today** 4:18 8:17 9:1,13,15,22 10:9,10 11:11 13:6 28:14,18 31:18 32:5,18 36:21,22 37:9 40:14 44:17,22 44:24 46:24 50:13 67:15 79:24 82:22 83:14 84:20 87:21 89:15,25
**told** 44:17 45:1 49:25 71:4 81:1,4,5
**top** 60:13 68:18
**total** 61:5
**touch** 48:16
**track** 16:25
**train** 17:24 52:20 83:23
**trained** 18:10 21:15 27:9,19 53:4 54:4,7

55:2 58:10,22 63:11,13 67:6 67:12,14,17 80:11 84:4 86:3,6
**training** 5:4,12 5:13,21,24 6:2 6:3,7 8:7,7,11 8:17 9:5,8,10 14:6,18,20,24 16:3 17:3,5,9 17:13,14,15,21 17:23 18:2,3,5 18:6,13,14,18 18:22,23,24 19:1,2,4,7,18 19:19,20,22 20:2,8,15,23 20:25 21:1,7 21:10,11,24 22:18 27:22,25 29:1,2 30:3,4,5 30:18,24 31:2 31:5 51:14 52:5 53:2 54:2 54:25 67:5,9 67:22 68:6,8 68:12,19 69:10 69:16,24,25 71:3 79:3 82:19
**trains** 83:25
**transcript** 89:6 92:10,11 93:10 93:11 94:1
**transport** 76:15
**trauma** 55:13 57:19 69:2
**treat** 73:14 75:18
**treated** 39:13
**treating** 33:21 34:1
**treatment** 41:14 73:3,7,13,17 73:18,23 74:8 74:10 75:6,9 75:17 76:4 82:25 83:4
**trucks** 27:12,14
**true** 47:15 92:11 94:23
**truly** 93:18
**truth** 4:6,6,7
**try** 18:12 77:22
**two** 60:22 61:5 61:24 62:13 65:12,24 73:4 73:8 76:17
**two-page** 71:12
**two-year** 23:7,8 23:11,19 24:11
**type** 6:3,3 20:2 20:25 62:3
**typical** 14:2,4
**typically** 87:10

**U**

**undergo** 19:18
**undersigned** 91:7
**understand** 19:13 49:14,18 51:25 52:25 53:16 72:2 86:21
**understanding** 15:13 21:13
**Understood** 46:20 71:10
**UNITED** 1:1
**upcoming** 11:22
**update** 43:10
**updated** 6:10,12 6:16 7:18 8:19 44:25 45:2 67:13,21,23
**updates** 7:21 8:21,25 9:4,19 9:24 19:25 20:6,24 21:5
**use** 18:24 40:9 40:16 41:8 43:14,18 44:23 45:3,6,15,25 46:8 53:4 54:5 55:21 56:21,22 57:5,16,19,19 69:2 73:16 76:13 77:22 78:24 79:14 88:11
**utilizing** 44:2 46:13

**V**

**vehicle** 87:10,13
**vehicles** 87:7,17 87:25
**Vero** 22:24
**versus** 11:14 17:6 54:22 65:22
**vessel** 86:11
**violate** 83:5
**violent** 65:24
**volunteer** 13:17 13:18
**vote** 7:17
**VS** 93:6 94:2
**vs-** 1:6

**W**

**W** 2:12
**WADE** 1:8
**wait** 61:3 62:19 62:20,21
**waive** 93:9,16,23
**want** 9:23 10:4 19:8 36:8 65:14 71:25 72:1,4,7,19 81:23 89:9,11
**wanted** 42:9 49:6,20 76:4
**wants** 21:14
**wasn't** 50:4 67:9 71:3 80:10 81:3 84:10
**way** 18:19 21:8 22:17 39:1 48:3 49:7 57:18 61:18 63:10 78:19 80:20,24 82:14 82:16 83:3
**we'll** 32:10,12 35:8 42:18
**we're** 4:18 31:11 53:9 72:10,11 73:14
**We've** 31:16 67:25
**webbing** 76:16
**weigh** 54:21
**went** 23:2,9 24:6 24:8,17 26:2,5 26:20 27:8 71:2
**West** 2:4 93:20
**whatsoever** 28:25
**WILSON** 2:9 93:3
**Winter** 24:23,24
**wish** 93:16
**Witness** 3:2,6 4:8 19:15 45:19 60:25 70:6,22 94:3
**word** 60:19
**work** 6:8 11:6 13:3,25 16:20 16:20 25:2,6 42:25 43:1 51:25 61:18 76:13
**working** 25:13 53:18 75:20 85:8
**works** 62:5
**wouldn't** 42:8 49:15
**write** 73:21 94:1
**written** 37:25 41:20,23 61:24
**wrong** 66:12
**wrote** 69:18,20

**X**

**Y**

**year** 5:8 16:19 19:23 22:13 25:3,7,13,20 26:16,18 31:19 38:14 43:12 60:10
**years** 5:2 29:23 30:6,11,14,17 30:20,23 31:1

**Z**

**0**

**05/22/2017** 94:3
**07** 34:20

**1**

**1** 3:10 35:8,9,17 36:8,20 92:9
**10** 35:18,19,23 36:3,8,11,13 86:21 87:4
**100** 13:13 20:1 66:9
**11** 10:17 11:9 39:14 40:2 43:17,24 45:7 46:1,8 71:11 83:4 85:1
**111** 2:9 93:3
**12:24** 1:17 90:14
**1200** 2:10 93:4
**1216** 2:15
**15** 86:21
**1551** 93:20
**17** 29:23
**18** 5:2 63:23

**2**

**2** 3:11 38:5,8,13 39:20 40:13 42:10 44:10,22 45:4,9 46:24 50:12 51:9

52:7 53:23
64:1,11,25
**2:16cv14413** 1:2
93:6 94:2
**2000** 25:15,22
27:9,11 30:8
**2006** 28:8 29:19
70:23 71:3,4,5
71:9 72:14
73:25 74:15,25
75:3,12,19,25
76:20,25 77:6
77:20 78:8
79:9
**2009** 46:4,7
**200E** 93:20
**2012** 63:12,23
63:25
**2013** 28:5 38:17
38:17 39:8,17
46:4,11 56:14
64:2,7,16 66:3
**2014** 10:17 11:9
11:15 12:8,12
12:15 22:14,20
27:24 28:2
29:16 31:10,20
39:10,14 40:2
41:4 43:17,24
45:7,16 46:1,8
46:11,12,19,23
48:5,9 49:6
50:4 58:10,14
58:23 59:9,18
60:2,8 61:2
67:6 70:11
71:12,18,21,24
82:11 83:2,5
85:1,9 86:3
87:6,13,15
**2015** 38:17
**2016** 5:9 6:5
8:18,23 9:6
31:6
**2017** 1:16 91:9
91:13 92:19
93:1,8
**2020** 91:25
**2139** 2:4
**22** 1:16
**22nd** 91:9 93:8
**2455** 2:14
**25** 6:5 8:18,23
9:6
**25th** 5:7 30:25
31:6
**27** 91:25 93:1
**27th** 91:13 92:19

**3**

**3** 3:12 42:15,19
42:19,21 43:2
43:6,8,14,23
44:7,13,15
45:10,15,25
46:6,15,16
70:16 71:14
**32801** 2:10 93:4
**33304** 2:15
**33401** 93:20
**33409** 2:4
**34980** 1:19
**34983** 13:24
**35** 3:10
**38** 3:11

**4**

**4** 3:4,13 89:16
90:10,11
**407** 2:11
**42** 3:12
**462-3861** 2:16

**5**

**5** 38:16 39:8,17
64:2,7,16 66:3
**50** 66:9
**5160** 1:18 13:23
**561** 2:5

**6**

**600** 42:19
**648-1376** 2:11
**686-6300** 2:5

**7**

**7** 25:15 46:7

**8**

**88** 3:5
**89** 3:13

**9**

**9/9/73** 4:23
**9:58** 1:17 4:1
**90** 3:14
**91** 3:5
**92** 3:6
**93** 3:6
**94** 3:7 92:9
**945479** 91:24
**954** 2:16
**99** 68:20,24